UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :      <u>SUPERSEDING INDICTMENT</u>

       -v.-                       :      S5 11 Cr. 62 (PAC)

DONNA LEVY,                            :
DAVID LEVY, and
THOMAS PREZIOSO,                       :

          Defendants.      :

- - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUN 2 8 2012

<u>**COUNT ONE**</u>

(Conspiracy to Commit Securities Fraud and Wire Fraud)

      The Grand Jury charges:

<u>The Scheme to Defraud Start-Up Companies and Investors</u>

      1.    From at least in or about 2007 to at least
2010, DONNA LEVY and DAVID LEVY, the defendants, together with
others known and unknown, executed a scheme to defraud
founders and executives of, and investors in, multiple start-
up companies.  The scheme worked, in substance and in part, as
follows:

      a.   DAVID LEVY obtained, directly or
indirectly through associates and co-conspirators, large
numbers of publicly-tradeable shares of start-up companies
that he and DONNA LEVY, among others, targeted (collectively,
the "Target Companies") through deceptive means.  Where shares
of the Target Companies were not already publicly-tradeable,
DAVID LEVY orchestrated so-called "reverse mergers" between

the Target Companies and shell companies with publicly-tradeable shares that he controlled so that shares of the Target Companies could, as a result of the mergers with the shell companies, become publicly traded.  The mergers occurred in connection with agreements between DAVID LEVY and founders and executives of the Target Companies to provide needed start-up financing for these companies.  Alternatively or in conjunction with the mergers, DAVID LEVY provided financing to Target Companies by obtaining convertible notes granting him shares of Target Companies if certain conditions were met. DAVID LEVY placed publicly-tradeable shares that he obtained in this manner in numerous entities that he and/or DONNA LEVY controlled.  DAVID LEVY and/or DONNA LEVY also transferred proceeds of market manipulation activities through various entities that they controlled, including but not limited to entities called EZ English, Date Palm Capital, Fitzwilliam Investments, DML Marketing, Fleetwood Media, and Miracle Marketing (collectively, the "Levy-Controlled Entities").

b.   DAVID LEVY did not seek a formal managerial or supervisory role with the Target Companies, in part to make it difficult for prospective purchasers of stock in the Target Companies to discover his role in the Target Companies, and in part to enable him to argue that he was able to sell shares of the Target Companies without restrictions

-2-

imposed by Securities and Exchange Commission rules concerning
sales of stock by company insiders.  Despite lacking a formal
managerial or supervisory role with the Target Companies,
DAVID LEVY continued to exercise influence and control over
Target Companies, in part because they were dependent on DAVID
LEVY for continued financial support, and in part because he
owned or controlled, directly or indirectly, a large
percentage of voting shares of the Target Companies through
the arrangements described above and could influence the
Target Companies' management and operations through his voting
power.

       c.   Once the principals of the Target
Companies entered into a financial relationship with DAVID
LEVY, DAVID LEVY persuaded the Target Companies to use his
wife, DONNA LEVY, to coordinate investor relations and
marketing activities for the companies.  Company founders
agreed to do so, in part, because of their continued financial
dependence on DAVID LEVY and his power and influence as a
holder of a large block of shares with the Target Companies.
In this role, DONNA LEVY was given authority to oversee the
drafting, timing, and distribution of press releases and other
marketing materials for the Target Companies.

       d.   DONNA LEVY and DAVID LEVY drafted and
distributed, or caused to be distributed, press releases and

-3-

other marketing materials for the Target Companies that at
times contained exaggerated, misleading, and/or false
information.  Executives of the Target Companies did not have
full knowledge of or control over material disseminated to the
public in the name of the Target Companies by or at the
direction of DAVID LEVY and DONNA LEVY.

       e.   DAVID LEVY and DONNA LEVY paid third
parties through the Levy-Controlled Entities and/or through
co-conspirators not named herein, at times secretly, to draft
and disseminate to the public "touts" recommending that
prospective investors buy shares of stock in the Target
Companies at the same time that DAVID LEVY and DONNA LEVY were
causing large numbers of press releases and marketing material
to be disseminated to the public in the names of the Target
Companies.  DAVID LEVY and DONNA LEVY knew that aspects of
several of the touts that they paid to have disseminated were
exaggerated, misleading, and/or deceptive, in part because as
insiders of the Target Companies, they possessed information
concerning the Target Companies' shortage of capital,
operational issues, and dependence on DAVID LEVY and others
for future financing that was not available to the public.
Moreover, many of the touts that were privately funded by
DAVID LEVY and DONNA LEVY contained inadequate disclosures
concerning the roles that DAVID LEVY and DONNA LEVY played in

paying for and influencing the content of the touts, in controlling and influencing the affairs of the Target Companies, and in owning or controlling a large percentage of the stock in the Target Companies.

f.    In part through the volume and misleading nature of the promotional activity that DAVID LEVY and DONNA LEVY caused to be distributed in the names of the Target Companies and by third parties, DAVID LEVY and DONNA LEVY "pumped up," i.e., artificially manipulated, the price of the stock in the Target Companies.

g.    DAVID LEVY and DONNA LEVY took advantage of the artificial increase in the price of stock in the Target Companies, and increased public interest in the Target Companies, that they had orchestrated by "dumping," i.e., selling, into the market shares in the Target Companies that had been acquired through the transactions described above, or by causing co-conspirators to sell their shares in the Target Companies.  DAVID LEVY and DONNA LEVY continued their misleading marketing campaign, and their simultaneous sale of shares, directly or through co-conspirators, until they had realized hundreds of thousands of dollars or more in profits from the sale of shares that were being dumped into the market in this manner.  When their manipulation campaign was no longer propelling outside money to purchase shares that they

owned, controlled, or had a financial interest in, DAVID LEVY
and DONNA LEVY ceased causing the Target Companies to issue
press releases on an accelerated schedule and ceased funding
misleading third-party touts of the Target Companies.
Following the conclusion of this misleading promotional
campaign, the price of and investor interest in shares of the
Target Companies collapsed, thereby harming: (i) investors in
the Target Companies who had been induced to invest, in part,
in reliance on the misleading promotional campaign
orchestrated by DAVID LEVY and DONNA LEVY, (ii) founders and
executives of the Target Companies, who held large numbers of
restricted shares that were devalued by DAVID LEVY's and DONNA
LEVY's manipulative activities, and (iii) the Target Companies
themselves, by devaluing stock that could have otherwise been
used by the Target Companies to seek alternative sources of
financing and/or fund the Target Companies' growth.

          h.   After months or, in some cases, more than
a year had passed, DAVID LEVY and DONNA LEVY again started to
"pump and dump" Target Companies in which they continued to
hold large blocks of shares.  They did so by again
orchestrating misleading promotional activities concerning the
Target Companies and selling their shares to unsuspecting
investors who purchased shares in part in reliance on the new
misleading promotional campaign.  This activity continued

until it was no longer profitable for DAVID LEVY and DONNA LEVY to fund these promotional campaigns, in the process decimating the value of the stock of the Target Companies and the value of shares held by founders, executives, and public purchasers of shares in the Target Companies.  DAVID LEVY, DONNA LEVY, and a co-conspirator not named herein ("CC-1") made over $6.5 million from the sale of shares of two Target Companies alone that they manipulated during the period 2007 to 2010 — Cardiac Networks, Inc., which traded publicly under symbol "CNWI" ("Cardiac Networks" or "CNWI"), and Banneker, Inc., which traded publicly under symbol "BANI" ("Banneker" or "BANI").

   i. DAVID LEVY and DONNA LEVY used proceeds from the fraudulent scheme to finance a lavish lifestyle, including several luxury cars, large credit card expenses, and mortgage payments on a waterfront home in Fort Lauderdale, Florida, and to provide financing to Target Companies and new companies in exchange for stock that could later be manipulated.

   2. DAVID LEVY and DONNA LEVY made numerous material omissions and misrepresentations to founders and executives of the Target Companies in connection with the scheme described above, including but not limited to, the following:

a.   DAVID LEVY and DONNA LEVY made material omissions concerning their past history.  In particular, they failed to inform founders and executives of the Target Companies that they had previously been found to have engaged in fraudulent and deceptive marketing practices by the United States District Court for the Northern District of Georgia in an action brought by the Federal Trade Commission ("FTC"), and that in connection with this finding, they had been (a) permanently restrained from engaging in deceptive marketing practices; (b) permanently barred from engaging in telemarketing or assisting others engaged in telemarketing without posting a $6 million performance bond; and (c) ordered to pay more than $6 million to the FTC for distribution to victims of the scheme (the "FTC Judgment").  Had DAVID LEVY and DONNA LEVY informed founders and executives of the Target Companies of this detrimental information, it would have affected founders and executives' decisions to, among other things, (a) enter into business relationships with DAVID LEVY and/or DONNA LEVY, (b) trust DAVID LEVY's and/or DONNA LEVY's representations concerning the purpose and meaning of agreements they were being asked to sign, (c) rely on DAVID LEVY as a source of funding for the Target Companies, and (d) entrust DAVID LEVY and/or DONNA LEVY with controlling,

-8-

influencing, or participating in the Target Companies'
marketing activities.

        b.    DAVID LEVY and DONNA LEVY, among others,
misrepresented to founders and executives of the Target
Companies their purpose in providing financing to the Target
Companies in exchange for shares in the Target Companies.
Among other things, they misrepresented that they were
providing financing because they wanted to help the Target
Companies achieve their long-term goals, when in fact, their
true intention was to manipulate the stock of the Target
Companies in order to make quick profits from the sale of
shares that they had obtained in part based on these
misrepresentations, even though they knew that their
manipulative activities would in fact be detrimental to the
Target Companies that they were purporting to support.

        c.    DAVID LEVY, among others, misrepresented
the extent of his financial commitment to the Target
Companies, leading founders and executives of the Target
Companies to believe that he would be providing sufficient
financing to the Target Companies for them to achieve their
goals, when in fact he only intended to provide sufficient
financing to induce founders and executives of the Target
Companies to give him shares that he and DONNA LEVY could
manipulate.

d.   DAVID LEVY and DONNA LEVY failed to inform founders and executives of the Target Companies of their involvement in (a) funding and distributing misleading third-party touts concerning the Target Companies, (b) in manipulating the stock of the Target Companies, and (c) in selling shares of the Target Companies based on the promotional campaigns that they had orchestrated.  DAVID LEVY and DONNA LEVY misrepresented to founders and executives of the Target Companies the reasons for the upward and downward movements of the stock price and the dramatic increase in trading volume, and the role that they were playing in pumping up the stock price and dumping shares that they and CC-1, among others, owned or controlled.

e.   DAVID LEVY, among others, misrepresented to certain executives and founders of Target Company CNWI the meaning of agreements that his representatives drafted and presented to them.  Among other things, DAVID LEVY misrepresented to these individuals that his shares and those of CC-1, who also invested in CNWI, were restricted and could not have been the source of the shares sold during periods in which he and DONNA LEVY were manipulating the market in shares of CNWI, when in fact DAVID LEVY's and CC-1's shares were unrestricted and were the primary source of shares being sold into the market.

-10-

3.    In engaging in this fraudulent conduct, DAVID LEVY, DONNA LEVY, and CC-1, among others, (a) used brokerage accounts located in the Southern District of New York to hold and sell shares of the Target Companies that they were manipulating, (b) sent and/or received proceeds of the scheme that were routed through the Southern District of New York, (c) caused fraudulent marketing materials and third-party touts to be sent by email and posted on websites that were visible in the Southern District of New York, (d) induced members of the public who used brokerage accounts located in the Southern District of New York to purchase shares in reliance on the fraudulent scheme described above, and (e) manipulated the prices of Target Stocks reflected on the "pink sheets" stock quotation service based in the Southern District of New York.

<u>Statutory Allegations</u>

4.    From at least in or about 2007, up to and including at least 2010, in the Southern District of New York and elsewhere, DONNA LEVY and DAVID LEVY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit: (a) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal

-11-

Regulations, Sections 240.10b-5 and 240.10b5-2; and (b) wire
fraud, in violation of Title 18, United States Code, Section
1343.

     5.    It was a part and object of the conspiracy that
DONNA LEVY and DAVID LEVY, the defendants, and others known
and unknown, willfully and knowingly, directly and indirectly,
by the use of means and instrumentalities of interstate
commerce, and of the mails, and of facilities of national
securities exchanges, would and did use and employ, in
connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances in
contravention of Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2, by: (a) employing devices,
schemes and artifices to defraud; (b) making untrue statements
of material fact and omitting to state material facts
necessary in order to make the statements made, in the light
of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices and courses of
business which operated and would operate as a fraud and
deceit upon purchasers and sellers of securities, all in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, and Title 17, Code of Federal Regulations, Sections
240.10b-5 and 240.10b5-2.

6.   It was a further part and an object of the conspiracy that DONNA LEVY and DAVID LEVY, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>Overt Acts</u>

7.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about September 6, 2007, CC-1 wire transferred $911,148, representing proceeds from the sale of CNWI stock, via a bank located in the Southern District of New York to another bank account controlled by CC-1.

b.   On or about September 10, 2007, CC-1 transferred $959,548, representing proceeds from the sale of CNWI stock, from a bank account that CC-1 controlled to a bank account controlled by DAVID LEVY, the defendant.

-13-

c.    On or about September 9, 2008, DAVID LEVY and DONNA LEVY, the defendants, received a wire transfer of $130,000, representing proceeds of sale of BANI stock, from a brokerage account located in the Southern District of New York into an account held in the name of EZ English.

d.    On or about September 18, 2009, DAVID LEVY and DONNA LEVY received a wire transfer of $150,000, representing proceeds from the sale of CNWI stock, via a bank located in the Southern District of New York into an account held in the name of Date Palm Capital.

(Title 18, United States Code, Section 371.)

### COUNTS TWO AND THREE

(Securities Fraud)

The Grand Jury further charges:

8.    The allegations contained in paragraphs 1-3 of this Indictment are repeated and realleged as if fully set forth herein.

9.    On or about the dates set forth below, in the Southern District of New York and elsewhere, DONNA LEVY and DAVID LEVY, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ, and cause to be used and

-14-

employed, and did aid and abet the use and employment of, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, DONNA LEVY and DAVID LEVY, the defendants, participated in pump and dump schemes involving the following securities in or about the time periods set forth below:

| COUNT | DEFENDANTS | SECURITY | TIME PERIOD |
|-------|------------|----------|-------------|
| TWO | DONNA LEVY and DAVID LEVY | CNWI | 2007 to 2010 |
| THREE | DONNA LEVY and DAVID LEVY | BANI | 2008 to 2009 |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2).

## COUNT FOUR

(Securities Fraud)

The Grand Jury further charges:

10.   The allegations contained in paragraphs 1-3 of this Indictment are repeated and realleged as if fully set forth herein.

11.   DAVID LEVY, the defendant, also used several of the means and methods described above to perpetrate and facilitate a pump and dump stock fraud scheme involving a company by the name of Greenway Design Group, Inc., which traded publicly under symbol "GDGI" ("Greenway Design" or "GDGI"), including but not limited to the following:

a.   Beginning in 2009, and continuing through 2011, in exchange for providing financing to GDGI, DAVID LEVY obtained convertible notes granting him shares of GDGI if certain conditions were met.

b.   DAVID LEVY used certain of the Levy-Controlled Entities to hold and trade shares of GDGI, and/or to receive proceeds of the trades of GDGI.

c.   DAVID LEVY used certain of the touters and promotional websites that were used to facilitate the conspiracy charged above in Count One of the Indictment, and the securities fraud schemes charged in Counts Two and Three

-16-

of the Indictment, to help tout and increase the share price
of GDGI.

        d.    DAVID LEVY caused shares of GDGI that he
had acquired through conversion of convertible notes to be
sold at the same time that he was facilitating the
manipulation of the share price of GDGI by, among other
things, spending several hundred thousand dollars privately
funding a promotional campaign touting GDGI at the same time
that GDGI was issuing numerous press releases promoting the
company.  After DAVID LEVY had dumped millions of shares of
GDGI into the market during the promotional campaign, he
ceased funding the promotional campaign, causing the price of
GDGI to collapse.

        12.  DAVID LEVY, the defendant, grossed over $5.6
million in proceeds from the sale of GDGI stock pursuant to
this fraudulent scheme.

Statutory Allegation

        13.  From at least in or about 2009, up to and
including at least 2011, in the Southern District of New York
and elsewhere, DAVID LEVY, the defendant, willfully and
knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce, the mails and the
facilities of national securities exchanges, in connection
with the purchase and sale of securities, did use and employ,

and cause to be used and employed, and did aid and abet the
use and employment of, manipulative and deceptive devices and
contrivances, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices,
schemes and artifices to defraud; (b) making untrue statements
of material facts and omitting to state material facts
necessary in order to make the statements made, in the light
of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices and courses of
business which operated and would operate as a fraud and
deceit upon persons, to wit, DAVID LEVY, the defendant,
participated in a pump and dump scheme involving the
securities of GDGI during the time period, and using the means
and methods, set forth above.

   (Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
  240.10b5-2, and Title 18, United States Code, Section 2).

### COUNT FIVE

     The Grand Jury further charges:

     14.   The allegations contained in paragraphs 1-3 and
10-11 of this Indictment are repeated and realleged as if
fully set forth herein.

     15.   In addition to facilitating market manipulation
efforts concerning the above-listed stocks listed in Counts
Two through Four above, as well as others targeted by the

conspiracy set forth in Count One above, DAVID LEVY, the defendant, also helped launder proceeds of the schemes by employing the services of an individual who has since become a cooperating witness ("CW") to launder proceeds through bank accounts and entities maintained by the CW in Panama.  Among other things, DAVID LEVY caused $150,000 in proceeds of the CNWI pump and dump stock fraud scheme to be wire transferred to a Panamanian shell corporation through a bank in the Southern District of New York, and he caused over $2.1 million in cashier's checks, representing proceeds of the CNWI and other pump and dump stock fraud schemes, to be carried from the United States to Panama and deposited into a bank account maintained in Panama by the CW to facilitate money laundering activities, among other things.  DAVID LEVY obtained cashier's checks from accounts he controlled and from co-conspirators, and he physically carried the cashier's checks to Panama and deposited them in a Panamanian bank account, in an effort to avoid generating a paper trail identifying the location of the funds; linking the funds to the fraudulent schemes that resulted in generation of the funds; and identifying him as the individual who owned and controlled the funds.  DAVID LEVY and co-conspirators used and intended to use funds transported or transferred to Panama in this manner to pay individuals, including individuals located in the United States, to

-19-

facilitate pump and dump stock fraud schemes in which DAVID
LEVY was involved.

<u>Statutory Allegation</u>

16.   From at least in or about 2009, up to and
including at least 2010, in the Southern District of New York
and elsewhere, DAVID LEVY, the defendant, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other, to
violate Title 18, United States Code, Sections
1956(a)(1)(B)(i) and 1956(a)(2)(B)(i).

17.   It was a part and an object of the conspiracy
that DAVID LEVY, the defendant, and others known and unknown,
in an offense involving and affecting interstate and foreign
commerce, knowing that the property involved in certain
financial transactions represented the proceeds of some form
of unlawful activity, willfully and knowingly would and did
conduct and attempt to conduct such financial transactions
which in fact involved the proceeds of specified unlawful
activity, to wit, the proceeds of the wire fraud and
securities fraud conspiracy charged in Count One of this
Indictment, and the proceeds of the securities frauds charged
in Counts Two through Four of this Indictment, knowing that
the transactions were designed in whole and in part to conceal
and disguise the nature, the location, the source, the

ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

18. It was further a part and an object of the conspiracy that DAVID LEVY, the defendant, and others known and unknown, willfully and knowingly would and did transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from a place in the United States to or through a place outside the United States, and to a place in the United States from or through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit, the proceeds of the wire fraud and securities fraud conspiracy charged in Count One of this Indictment, and the proceeds of the securities frauds charged in Counts Two through Four of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

OVERT ACT

-21-

19.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a.   On or about September 21, 2010, DAVID LEVY, the defendant, caused $150,000 to be wire transferred to a Panamanian bank account via a bank located in the Southern District of New York.

(Title 18, United States Code, Section 1956(h).)

## COUNT SIX

(Conspiracy to Commit Securities Fraud and Wire Fraud)

The Manipulation for Hire Scheme

The Grand Jury further charges:

20.   The allegations contained in paragraphs 1-3 of this Indictment are repeated and realleged as if fully set forth herein.

21.   From at least in or about 2007 to at least September 2010, in addition to facilitating manipulation of stocks in which she and/or her husband, DAVID LEVY, the defendant, held or controlled large blocks of stock, DONNA LEVY, the defendant, also served as a promoter for hire, responsible for coordinating market manipulation campaigns on behalf of owners of shares in other publicly-traded stocks of companies with low share prices, also known as "penny stocks." In order to accomplish the goals of these campaigns, DONNA

-22-

LEVY utilized, among other individuals, a network of promoters and other facilitators that included THOMAS PREZIOSO, the defendant.  PREZIOSO engaged in or facilitated misleading promotional activities, and engaged in other manipulative conduct, including trades and wire transfers that facilitated the manipulation scheme, to artificially affect the price of shares in stocks that DONNA LEVY was hired to help manipulate. PREZIOSO also worked with other co-conspirators not named herein to help manipulate the prices of other stocks that promoters other than DONNA LEVY hired him and others to help manipulate.

22.  During the course of the conspiracy, DONNA LEVY and THOMAS PREZIOSO, the defendants, worked, in conjunction with others known and unknown, to manipulate the share prices of penny stocks that they were hired to help manipulate (collectively, the "Manipulation-for-Hire Companies") in exchange for payment in stock of the Manipulation-for-Hire Companies; in cash; or in other forms of consideration, including inside information about the timing of manipulation schemes concerning the Manipulation-for-Hire Companies, including their projected peak and end times, so that participants in the scheme could trade profitably on the basis of the information.  Penny stocks targeted in furtherance of the conspiracy described herein traded in brokerage accounts

located in the Southern District of New York; misleading
emails, and postings on the Internet and social networking
sites used by members of the conspiracy, were viewable in the
Southern District of New York; meetings in furtherance of the
scheme occurred in the Southern District of New York; and
funds used in furtherance of the scheme, or representing
proceeds of the scheme, were routed through bank accounts
located in the Southern District of New York.

<u>Statutory Allegations</u>

23.  From at least in or about 2007, up to and
including at least September 2010, in the Southern District of
New York and elsewhere, DONNA LEVY and THOMAS PREZIOSO, the
defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree
together and with each other to commit offenses against the
United States, to wit: (a) securities fraud, in violation of
Title 15, United States Code, Sections 78j(b) & 78ff, and
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2; and (b) wire fraud, in violation of Title 18,
United States Code, Section 1343.

24.  It was a part and object of the conspiracy that
DONNA LEVY and THOMAS PREZIOSO, the defendants, and others
known and unknown, willfully and knowingly, directly and
indirectly, by the use of means and instrumentalities of

-24-

interstate commerce, and of the mails, and of facilities of
national securities exchanges, would and did use and employ,
in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances in
contravention of Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2, by: (a) employing devices,
schemes and artifices to defraud; (b) making untrue statements
of material fact and omitting to state material facts
necessary in order to make the statements made, in the light
of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices and courses of
business which operated and would operate as a fraud and
deceit upon purchasers and sellers of securities, all in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, and Title 17, Code of Federal Regulations, Sections
240.10b-5 and 240.10b5-2.

     25.  It was a further part and an object of the
conspiracy that DONNA LEVY and THOMAS PREZIOSO, the
defendants, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations and
promises, would and did transmit and cause to be transmitted
by means of wire communication in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds for
the purpose of executing such scheme and artifice, in
violation of Title 18, United States Code, Section 1343.

<u>Overt Acts</u>

26.  In furtherance of the conspiracy and to effect
the illegal objects thereof, the following overt acts, among
others, were committed in the Southern District of New York
and elsewhere:

a.  On or about March 12, 2009, a co-
conspirator not named herein ("CC-2") received 40 million
shares of stock in Paradigm Medical Industries, Inc. ("PDMI"),
which was the target of a pump and dump scheme, into a
brokerage account he/she controlled in the Southern District
of New York.

b.  In or about March 2009, THOMAS PREZIOSO,
the defendant, received approximately 13.5 million shares of
PDMI stock into a brokerage account that he controlled.

c.  On or about April 5, 2010, DONNA LEVY, the
defendant, had a telephone conversation with a co-conspirator
not named herein ("CC-3") concerning Emerging World Pharma,
Inc. ("EWPI"), another target of a pump and dump scheme
involving the conspiracy.

(Title 18, United States Code, Section 371.)

**<u>COUNTS SEVEN THROUGH ELEVEN</u>**

-26-

(Securities Fraud)

The Grand Jury further charges:

27.  The allegations contained in paragraphs 1-3 and 21-22 of this Indictment are repeated and realleged as if fully set forth herein.

28.  On or about the dates set forth below, in the Southern District of New York and elsewhere, DONNA LEVY and THOMAS PREZIOSO, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ, and cause to be used and employed, and did aid and abet the employment of, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants set forth below

participated in pump and dump schemes involving the following securities in or about the time periods set forth below:

| COUNT | DEFENDANTS | SECURITY | TIME PERIOD |
|-------|-----------|----------|-------------|
| SEVEN | THOMAS PREZIOSO | PDMI | January to June 2009 |
| EIGHT | THOMAS PREZIOSO | Metatron, Inc. ("MRNJ") | July 2009 to March 2010 |
| NINE | DONNA LEVY and THOMAS PREZIOSO | EWPI | March to June 2010 |
| TEN | THOMAS PREZIOSO | Talent Alliance, Inc. ("TLAN") | March to June 2010 |
| ELEVEN | THOMAS PREZIOSO | GreenGro Technologies, Inc. ("GRNH") | March to June 2010 |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2).

## COUNT TWELVE

The Grand Jury further charges:

29.   The allegations contained in paragraphs 1-3 and 21-22 of this Indictment are repeated and realleged as if fully set forth herein.

30.   In addition to facilitating market manipulation efforts concerning the above-listed stocks listed in Counts Seven through Eleven above, as well as others targeted by the conspiracy set forth in Count Six above, THOMAS PREZIOSO, the defendant, also helped launder proceeds of the schemes by

-28-

engaging in financial transactions through bank accounts and
entities that he and other co-conspirators controlled that
they knew were designed in whole and in part to conceal and
disguise the nature, the location, the source, the ownership
and the control of these criminal schemes.  THOMAS PREZIOSO,
for example, managed trading and bank accounts in the names of
entities that he controlled, and also accounts held in the
name of entities controlled by another individual not named
herein ("Individual-1"), that he used to, among other things,
generate and receive proceeds of the schemes, and transfer
those proceeds to other participants in the schemes, in a
manner that was intended, in whole or in part, to make it
difficult for law enforcement to determine the connection
between the transfers and the manipulative activity that
participants in the schemes collectively were engaged in.  In
connection with this laundering activity, PREZIOSO maintained
and wrote checks actually or purportedly signed by Individual-
1 to other participants in the schemes, and traded in accounts
purportedly held or controlled by Individual-1 to generate
proceeds of the schemes that could be distributed to others.

<u>Statutory Allegation</u>

31.  From at least in or about 2007, up to and
including at least September 2010, in the Southern District of
New York and elsewhere, THOMAS PREZIOSO, the defendant, and

-29-

others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to violate Title 18, United States Code, Section 1956(a)(1)(B)(i).

32.   It was a part and an object of the conspiracy that THOMAS PREZIOSO, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of the wire fraud and securities fraud conspiracy charged in Count Six of this Indictment, and the proceeds of the securities frauds charged in Counts Seven through Eleven of this Indictment, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

<u>OVERT ACT</u>

33.   In furtherance of said conspiracy and to effect the illegal object thereof, the following overt act, among

others, was committed in the Southern District of New York and elsewhere:

a.   On or about April 30, 2010, THOMAS PREZIOSO, the defendant, received a wire transfer of $30,000 from a co-conspirator not named herein ("CC-4") in a bank account that PREZIOSO controlled in the Southern District of New York and then routed $14,250 of those funds that same day from the bank account to a bank account controlled by CC-3.

(Title 18, United States Code, Section 1956(h).)

### FORFEITURE ALLEGATION: COUNTS 1-4 and 6-11

34.   As a result of committing one or more of the offenses alleged in Counts One through Four and Six through Eleven of the Indictment (i.e., conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371; and securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2), DONNA LEVY, DAVID LEVY, and THOMAS PREZIOSO, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of one or more of the offenses alleged in Counts One through Four

and Six through Eleven of this Indictment, including but not limited to the following:

        a.  At least $14 million in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained as a result of the offenses alleged in Counts One through Four and Six through Eleven of the Indictment;

        b.  The real property and appurtenances, with all improvements and attachments thereon, located at 3109 N.E. 29th Court, Fort Lauderdale, Florida  33305.

<u>Substitute Asset Provision</u>

        35.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (1) cannot be located upon the exercise of due diligence;

        (2) has been transferred or sold to, or deposited with, a third person;

        (3) has been placed beyond the jurisdiction of the Court;

        (4) has been substantially diminished in value; or

        (5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981, and
Title 28, United States Code, Section 2461.)

<u>FORFEITURE ALLEGATION: COUNTS 5 AND 12</u>

36.   As the result of committing one or more of the money laundering offenses alleged in Counts Five and Twelve of this Indictment, DAVID LEVY and THOMAS PREZIOSO, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a.   At least $14 million in United States currency, in that such sum in aggregate is property involved in the money laundering offenses alleged in Counts Five and Twelve of the Indictment;

b.   The real property and appurtenances, with all improvements and attachments thereon, located at 3109 N.E. 29th Court, Fort Lauderdale, Florida  33305.

-33-

## Substitute Asset Provision

37.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants, up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 982 and 1956.)


_____                    _____
FOREPERSON                                 PREET BHARARA
                                           United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

DONNA LEVY,
DAVID LEVY, and
THOMAS PREZIOSO,

Defendants.

## INDICTMENT

S5 11 Cr. 62 (PAC)

(18 U.S.C. §§ 371, 1956;
15 U.S.C. §§ 78j(b) & 78ff &
18 U.S.C. § 2.)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

Foreperson.

6/28/12 - Filed Superseding Indictment.

Judge Francis
U.S.M.J.