UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

　　　　　*Plaintiff*,

v.　　　　　　　　　　　　　　　CASE NO.: S3 11 Cr. 62 (PAC)

DONNA LEVY, et al.,　　　　　　　**(Filed Under Seal)**

　　　　　*Defendants*.

_____/

# DEFENDANT DONNA LEVY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE OBTAINED FROM TITLE III WIRETAP

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     The government's brief pre-application investigation . . . . . . . . . . . . . . . . . . . 3

II.    CW-3 informs the government of a potential stock scheme at the Port . . . . . . . . 3

III.   The government obtains a wiretap on ▮▮▮▮ phone . . . . . . . . . . . . . . . . . . . . . 5

IV.    The government obtains extensions of its wiretap on ▮▮▮▮ phone . . . . . . . . . . . 6

V.     The government arrests ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . . . . . . . . . . . . . . . . . 7

LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.     Title III strictly requires the government to be complete and accurate in
       a wiretap application and justify its need for a wiretap with specificity . . . . . . . 8

       A.     The government's obligation to be accurate and forthright . . . . . . . . . . . 8

       B.     The government's obligation to be specific . . . . . . . . . . . . . . . . . . . . . 11

II.    Title III's requirements of candor and specificity apply equally when the
       government seeks an extension of a wiretap . . . . . . . . . . . . . . . . . . . . . . . . 11

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.     Communications between ▮▮▮▮ and Ms. Levy recorded during the first
       period of interception must be suppressed . . . . . . . . . . . . . . . . . . . . . . . . . 12

       A.     The government misled the issuing court as to the necessity
              for a wiretap by misrepresenting that its narcotics and stock fraud
              investigations were related . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Page**

      1.    The government misrepresented that the subjects of the stock fraud investigation are armed, dangerous, and reticent international narcotics traffickers . . . . . . . . . . . . . . . . . . . 12

      2.    The government's misrepresentation that the stock fraud and narcotics investigations were related was, at a minimum, reckless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      3.    The government's misrepresentations were necessary to the issuing court's decision to authorize a wiretap on ▮ phone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B.    The first wiretap application fails to specify how less intrusive investigatory techniques failed, would fail, or were too dangerous . . . . . 16

      1.    Physical Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      2.    Telephone Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      3.    Undercover Officers & Confidential Informants . . . . . . . . . . . . 18

      4.    Grand Jury Subpoenas, Search Warrants & Arrests . . . . . . . . . . . 20

II.    Communications between ▮ and Ms. Levy recorded during the second wiretap should be suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.    The government misled the issuing court regarding the necessity for an extension of the wiretap in the Second Affidavit . . . . . . . . . . . . . . 21

      1.    Like the First Affidavit, the Second Affidavit misled the issuing court into believing that the narcotics and stock fraud investigations were related . . . . . . . . . . . . . . . . . . . . . . . . . 21

      2.    By not fully accounting for facts learned from the first period of interception, the government misled the issuing court in the Second Affidavit as to the need for an extension . . . . 22

**Page**

        a.     Misleading statements and material omissions in the Second Affidavit regarding the futility of using undercover officers and confidential informants  . . . . . . . . 22

        b.     Misleading statements and material omissions in the Second Affidavit regarding the futility of physical surveillance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        c.     Other material omissions in the Second Affidavit regarding necessity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    3.    These misleading statements and material omissions were recklessly included in the Second Affidavit, and were necessary to the issuing court's decision to grant an extension of the wiretap  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  B.    The second wiretap application failed to establish necessity because it regurgitated the same boilerplate statements from the First Affidavit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.  All evidence derived from the recorded calls between ███ and Ms. Levy must be suppressed as fruits of the poisonous tree . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## PRELIMINARY STATEMENT

This case presents yet another example of the government's expanded use of Title III wiretaps beyond their original purpose.   The government obtained a wiretap as an investigative tool of first resort in a garden-variety "pump and dump" stock fraud investigation that was less than three months old.  As a result, the government was able to capture the voice of defendant Donna Levy on a wiretap placed on the phone of ████████ an alleged "Target Subject" of the government's investigation.

On its face, however, the government's wiretap affidavit failed to demonstrate with specificity why less intrusive, traditional investigative measures – which have historically been successful in stock fraud cases – were futile.  To the extent the government was able to establish any arguable necessity to wiretap the phone of "Target Subject" ████████ it was only because the government lumped the stock fraud allegations against him in the same wiretap affidavit with allegations about an unrelated two-year cocaine trafficking investigation at the Port of New York and New Jersey (the "Port").   In truth, the only connection between the two investigations was that a cooperating narcotics trafficker at the Port had recently informed the DEA of the unrelated stock fraud scheme involving ████ also a Port employee, but one who was never involved in narcotics activity. (Statement of Alex Arteaga-Gomez, Esq., June 12, 2012 ("Arteaga-Gomez St.") ¶¶6-7 (**Ex. 1**)).

Because the Affirmation of Anthony Maddalone (the "3/23/10 Maddalone Aff." or "First Affidavit") (**Ex. 2**) defined "Target Subjects" to include the subjects of ***both***

investigations, it falsely portrayed the subjects of the stock fraud investigation as members of the dangerous narcotics organization operating at the Port, and thereafter claimed necessity based on that false portrayal:



To be sure, the initial wiretap affidavit (and subsequent extension affidavits) misled the authorizing judge to believe that the same factors that justified the wiretap in the two-year

narcotics investigation applied with equal force to the incipient stock fraud investigation. Accordingly, all evidence of the communications involving Ms. Levy should be suppressed.

## STATEMENT OF FACTS

### I.    The government's brief pre-application investigation

The government first learned about ████████████ (the person whose phone it tapped for three months) during the course of an unrelated, long-running investigation of cocaine trafficking at the Port.  (3/23/10 Maddalone Aff. ¶¶17, 40).  As early as March 2008, the DEA was investigating information of suspected narcotics trafficking at the Port.  (*Id.* ¶17). Over time, DEA agents learned that cocaine was being regularly smuggled into the Port via containers from Panama.  (*Id.*).  During that investigation, DEA agents and Panamanian authorities were able to obtain judicially-authorized wiretaps in the U.S. and Panama.  (*Id.*).

As a result of the narcotics investigation, DEA agents seized over 300 kg of cocaine, investigated, and arrested multiple individuals, including CW-3.  (*Id.* ¶¶22-25).  In or about January 6, 2010, CW-3 was caught with narcotics proceeds, and agreed to cooperate.  (*Id.*). CW-3 informed the DEA about two suspected narcotics traffickers at the Port, Shonn Norville and Henry Machado, which led the DEA to investigate those individuals.  (*Id.* ¶¶25.a, 27, 30, 32-39).  By March 23, 2010, the DEA had information that Norville, Machado and eight others were involved in drug trafficking at the Port.  (*Id.* ¶3).

### II.   CW-3 informs the government of a potential stock scheme at the Port

During the course of the narcotics investigation, CW-3 informed the DEA abou ████

a Port employee who CW-3 had known for over 15 years. (*Id.* ¶40). CW-3 told the agents

that ▮▮▮ previously solicited CW-3 and other Port employees to invest in certain stocks. (*Id.*

¶¶40-41). The government then commenced the stock fraud investigation. (*Id.* ¶¶22, 40-42).

The stock fraud investigation was spear-headed by SA Maddalone, a local police sergeant

with apparently no prior experience investigating securities fraud, who was assigned to a

DEA task force. (*Id.* ¶¶1, 2). Based on CW-3's information, the government contacted TD

Ameritrade, where ▮▮▮ CW-3, and other Port employees held brokerage accounts. (*Id.*

¶42). They spoke to a TD Ameritrade investigator, who told the government that ▮▮▮

accounts were shut down because his activity was indicative of a pump-and-dump scheme.

(*Id.* ¶44).

In February 2010, CW-3 learned that ▮▮▮ was again soliciting Port employees for

money to invest in stocks. (*Id.* ¶45). This led to three consensually-recorded calls between

CW-3 and ▮▮▮ n February 2010, and an in-person meeting so that CW-3 could give ▮▮▮

$5,000 to invest. (*Id.* ¶¶45-47). On February 18, 2010, CW-3 met ▮▮▮ in broad daylight

in a store parking lot while wearing a body wire and while agents conducted visual

surveillance. (*Id.* ¶48). ▮▮▮ shared several details of the investment with CW-3 without any

coaxing. (*Id.* ¶¶48-49). CW-3 handed $5000 in cash over to ▮▮▮ and they departed

separately. (*Id.* ¶48).

Thereafter, the government conducted a toll analysis of ▮▮▮'s phone, which revealed

that he recently had extensive contact with others TD Ameritrade identified as having

participated in ▮▮▮▮'s prior scheme, including Bradley Susser and Michael Steinberg, both of whom were eventually indicted in this case. (*Id.* ¶57-60). Believing Steinberg to be a broker assisting ▮▮▮▮ with the current scheme, the DEA identified Steinberg as a Target Subject along with ▮▮▮▮ in its first wiretap application. (*Id.* ¶¶3, 60).

## III.   The government obtains a wiretap on ▮▮▮▮ phone

On March 23, 2010, within three months of first getting a tip of a potential stock fraud scheme from CW-3, the government applied for an order authorizing a wiretap. The same application sought wiretaps on telephones assigned to three individuals: Shonn Norville (alleged drug trafficker), Henry Machado (alleged drug trafficker), and ▮▮▮▮ (alleged stock fraudster). (3/23/10 Maddalone Aff. ¶7). The government essentially bulked together the two investigations into one application. But there is no evidence that either Target Subject implicated in the stock fraud scheme at the time (▮▮▮▮ and Steinberg) was ever involved in narcotics trafficking at the Port. (Arteaga-Gomez St. ¶¶6, 7). On March 23, 2010, United States District Judge Faith Hochberg authorized a wiretap on all three phones for a maximum period of thirty days, and on the next day, March 24, 2010, entered an amended sealed order. (3/23/10 Sealed Order, pp.2, 5, 12; 3/24/10 Amended Sealed Order, pp. 2, 5, 12 (**Ex. 3**)).

During the first period of interception, the government recorded numerous conversations over ▮▮▮▮'s phone that produced significant leads for the stock fraud investigation. The government's transcripts and synopses of those calls are at **Exhibit 4**.

However, the government apparently did not pursue any of these leads by way of undercover officers, confidential informants, physical surveillance, or otherwise, before proceeding to apply for its first extension of the wiretap. It certainly did not disclose how it pursued any of these leads. The first period of interception concluded on April 22, 2010. (Affirmation of Anthony Maddalone in Support of Application, April 26, 2010 (the "4/26/10 Maddalone Aff." or "Second Affidavit"), ¶14.c (**Ex. 5**)).

## IV.   The government obtains extensions of its wiretap on ███ 's phone

On April 26, 2010, the government submitted the Second Affidavit to apply for an extension of the wiretap on ███ 's, Norville's, and Machado's phones, as well as an initial wiretap on two additional phones owned by other people newly-implicated in the narcotics investigation. (4/26/10 Maddalone Aff. ¶7, p.62). Like the First Affidavit, the Second Affidavit lumped together the two unrelated investigations. (*Id.* ¶¶2, 3). The Second Affidavit identified ███ and Michael Oiring as new "Target Subjects" because agents overheard them discussing stocks with ███ on the phone. (*Id.* ¶¶3, 16). As is the case with ███ and Steinberg, there is no evidence that either ███ or Oiring was involved in narcotics trafficking at the Port. (Arteaga-Gomez St. ¶6). On April 26, 2010, Judge Hochberg authorized the first extension for an additional thirty days. (4/26/10 Sealed Order, pp. 6, 13 (**Ex. 6**)). Surveillance continued through May 25, 2010. (Affirmation of Anthony Maddalone in Support of Application, June 7, 2010 (the "6/7/10 Maddalone Aff.") ¶14, p.13).

6

On June 6, 2010, the government applied for a second extension of its wiretap on the phone █████ had been using, as well as an initial wiretap on a new phone that █████ had recently acquired, which was granted for an additional thirty days.  (6/7/10 Maddalone Aff. ¶7, p. 64; 6/7/10 Sealed Order, pp. 6, 13).

A total of ten conversations and fourteen voice messages between █████ and Ms. Levy were intercepted pursuant to the wiretap on █████'s phones during the first and second periods of interception.  Ms. Levy's voice apparently was not intercepted during the third period.[1]

## V.   The government arrests █████

In or about August or September 2010, ████████████████████ ████████████████████.  On October 4, 2010, the government applied for a warrant to search Ms. Levy's home.  (Affidavit of ICE Special Agent, Joseph Cerar (the "10/4/10 Cerar Aff."), Warrant & Return ¶¶12, 17 (**Ex. 8**)).  U.S. Magistrate Judge Robin Rosenbaum authorized a search warrant for Ms. Levy's home, which agents executed on October 5, 2010, the same day they arrested Ms. Levy.  (*Id.*).

---

[1] Attached hereto as **Exhibit 7** is a statement from Ms. Levy confirming that it is her voice on all of those communications. *See United States v. Labate*, No. S100CR.632(WHP), 2001 WL 533714, at *12 (S.D.N.Y. May 18, 2001) (requiring one who is not named as a target of surveillance or interceptee to establish standing by sworn evidence).  Accordingly, Ms. Levy is an "aggrieved person" with standing to challenge the interception. 18 U.S.C. §2518(10)(a)(i).

## LEGAL STANDARDS

I.  **Title III strictly requires the government to be complete and accurate in a wiretap application and justify its need for a wiretap with specificity.**

The major check in Title III against needless government intrusion on individual privacy is the so-called "necessity" requirement. *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985). Every application for a wiretap must include "*a full and complete statement* that other investigative techniques have been tried and failed, or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(c) (emphasis added); *United States v. Lilla*, 699 F.2d 99, 103 (2d Cir. 1983) (stating that "an affidavit offered in support of a wiretap warrant must provide some basis for concluding that less intrusive investigative procedures are not feasible"). Because a judge must make a finding of necessity, *see* 18 U.S.C. §§2518(3)(c), the government must be both *accurate* to the issuing court in its reasons for why a wiretap is necessary, *and specific* about why less-intrusive techniques will not suffice.

In this case, the wiretap affidavits failed to establish "necessity" on their face. Moreover, any *arguable* necessity was manufactured by lumping the "Target Subjects" of the nascent stock fraud investigation in the same applications as the long-running cocaine investigation at the Port, and failing to inform the authorizing judge that the stock fraud suspects were *not* members of the dangerous narcotics organization.

### A.  The government's obligation to be accurate and forthright

In requiring that an application include "a full and complete statement," 18 U.S.C.

8

§2518(1)(c), justifying the necessity for a wiretap, Title III necessarily implies that the application's necessity showing must be truthful and forthright. To be sure, courts have applied *Franks v. Delaware, supra,* to determine whether evidence derived from a wiretap should be suppressed on the basis that the application contains false or misleading statements in support of the necessity requirement. *See Ippolito,* 774 F.2d at 1485; *United States v. Rajaratnam,* No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *18 (S.D.N.Y. Nov. 24, 2010).

*Franks's* rule, as applied to the necessity context, provides that evidence obtained pursuant to a wiretap may be suppressed where (1) a false or misleading statement knowingly and intentionally, or with reckless disregard for the truth, or a material omission, was included by the affiant in the wiretap application, and (2) the allegedly false or misleading statement or material omission was necessary to the issuing court's finding of necessity. *See Franks,* 438 U.S. at 155-56; *Ippolito,* 774 F.2d at 1485-86; *United States v. Rajaratnam,* No. 09 Cr. 1184, 2010 WL 3219333, at *2 (S.D.N.Y. Aug. 12, 2010).

With respect to the first prong of the *Franks* analysis, a false or misleading statement in an affidavit is made "recklessly" when the affiant subjectively "entertained serious doubts as to the truth of the subject statements." *Rajaratnam,* 2010 WL 4867402, at *8. *See, e.g., also United States v. Vilar,* No. S305CR621KMK, 2007 WL 1075041, at *26 (S.D.N.Y. April 4, 2007). However, "[b]ecause states of mind must be proved circumstantially, a fact finder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Rajaratnam,* 2010 WL 4867402, at *9 (*quoting United*

9

*States v. Perez*, 247 F. Supp. 2d 459, 473 (S.D.N.Y. 2003)).

Accordingly, as to any false or misleading statements in the wiretap application, the defendant must show that the affiant: (1) made a false or misleading statement with knowledge that the statement was false or misleading; (2) subjectively had a serious doubt as to the truth of the statement when it was made; or (3) had obvious reasons to doubt the veracity of the statement. *See Rajaratnam*, 2010 WL 4867402, at *9.

"Intentional or reckless omissions of material information, like false statements, may [also] serve as the basis for a *Franks* challenge." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). However, "the guideposts for determining recklessness are different" with respect to omissions (as opposed to false statements) in a wiretap affidavit. *Rajaratnam*, 2010 WL 4867402, at *9. The question "is whether the omitted information was clearly critical to assessing the legality of the search." *Id. (quoting United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996)).

To analyze the second prong of *Franks'* rule, the court must "delete false or misleading statements and insert the omitted truths revealed at the suppression hearing." *Ippolito*, 774 F.2d at 1487 n.1; *see also Rajaratnam*, 2010 WL 4867402, at *19. If the affidavit, corrected for falsehoods and material omissions, does not establish the necessity for the wiretap, then the affidavit's false statements and material omissions were necessary to the issuing court's decision to authorize the wiretap. *See id.* at *18 (*citing United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985)).

The threshold question is whether to hold an evidentiary hearing. All that is required for a hearing is a substantial preliminary showing with respect to *Franks'* two elements. *See Rajaratnam*, 2010 WL 3219333, at *1, n.1.

### B.    The government's obligation to be specific

Courts uniformly "reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." *Lilla*, 699 F.2d at 104 (citing cases from the First, Third, Ninth, and D.C. Circuits); *see also People v. Fonville*, 247 A.D. 2d 115, 121 (N.Y. App. Div. 1998) ("The practice of using template allegations of necessity is to be condemned.").[2] Thus, the wiretap affidavit "must show with specificity why in *this particular investigation* ordinary means of investigation will fail." *United States v. Simpson*, 813 F.2d 1462, 1472 (9th Cir. 1987) (quotations omitted; emphasis in original). A specific showing of necessity "prevent[s] the government from making general allegations about classes of cases and thereby sidestepping the requirement that there be necessity in the particular investigation in which a wiretap is sought." *Ippolito*, 774 F.2d at 1486. *See also Lilla*, 699 F.2d at 105 (wiretap affidavit insufficient where it did "not enlighten us as to why this narcotics case presented problems different from any other small-time narcotics case").

## II.    Title III's requirements of candor and specificity apply equally when the government seeks an extension of a wiretap.

Title III requires the government to make a renewed showing of necessity when it

---

[2] New York state court decisions regarding "necessity" are instructive because "[f]or practical purposes the federal and New York statutory requirements are the same." *Lilla*, 699 F.2d at 102.

applies for an extension of a wiretap.  18 U.S.C. §2518(1)(f).  "*Each* wiretap application, standing alone, must satisfy the necessity requirement."  *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988) (emphasis in original).  The government "is not free to transfer a statutory showing of necessity from one application to another – even within the same investigation."  *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1115 (9th Cir. 2005); *see also United States v. Giordano*, 416 U.S. 505, 513 (1974); *United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995).

## DISCUSSION

**I.**    **Communications between ▆▆▆ and Ms. Levy recorded during the first period of interception must be suppressed.**

The first wiretap application violated Title III's necessity requirement because it misled the issuing court as to the necessity for a wiretap over ▆▆▆'s phone, and failed to specify the particular facts about the stock fraud investigation that warranted a wiretap.

**A.**    **The government misled the issuing court as to the necessity for a wiretap by misrepresenting that its narcotics and stock fraud investigations were related.**

**1.**    **The government misrepresented that the subjects of the stock fraud investigation are armed, dangerous, and reticent international narcotics traffickers.**

The First Affidavit broadly defines the "Target Offenses" to include all of the offenses which were a part of *both* investigations, and all of the "Target Subjects" as all of the subjects of *both* investigations.  (3/23/10 Maddalone Aff. ¶¶2, 3).  In addition, its statement of "Objectives" draws no distinctions between the stock fraud and narcotics trafficking

12

investigations, and thus represents them as a single conspiracy between the same individuals suspected of committing the same crimes. (*Id.* ¶13). Read together, these portions of the First Affidavit state in plain terms that all of the "Target Subjects" – i.e., including ▆▆ and Steinberg – are under investigation ***both*** for trafficking narcotics ***and*** running a stock fraud scheme. However, the record does not demonstrate any basis for believing this to be true.

These introductory provisions set the stage for the misleading statements the government makes in support of its necessity for a wiretap on ▆▆'s phone. Such averments include:



However, these allegations are simply untrue with respect to ▓▓ and Steinberg, the subjects of the stock fraud investigation at the time. There is no record evidence that either ▓▓ or Steinberg was involved in any narcotics trafficking activity at the Port. (Arteaga-Gomez St. ¶¶6, 7). Yet, the First Affidavit paints ▓▓ and Steinberg as armed, dangerous, reticent international narcotics traffickers. As a result, the First Affidavit contains misleading statements as to the potential of traditional techniques for investigating the stock fraud scheme.

### 2.   The government's misrepresentation that the stock fraud and narcotics investigations were related was, at a minimum, reckless.

The government acted recklessly in bunching the two investigations together in one wiretap application. Wiretaps are typically authorized to investigate large-scale narcotics trafficking organizations because such organizations are typically composed of secretive, clandestine, armed and dangerous people. *See* S. Rep. No. 90-1097 at 40, 43-55 (1968); *United States v. Biasucci*, 786 F.2d 504, 511-12 (2d Cir. 1986) (a "major purpose of title III is to combat organized crime") (quotations omitted). Stock fraud conspiracies do not carry the same cache. Moreover, the First Affidavit sets out in detail the numerous traditional investigative techniques the DEA had employed during its long-running narcotics investigation, and disclosed that a target had been threatened with violence and used counter-surveillance techniques. (3/23/10 Maddalone Aff. ¶¶16, 21-27, 30, 32, 35-39, 50-52, 54-56, 61-63, 69). The government's 2½-month pre-application investigation of the stock fraud

14

scheme does not remotely compare to the magnitude of its 2-year investigation of this international drug trafficking ring, and did not involve any comparable risks of danger.

At a minimum, the First Affidavit was drafted with a reckless disregard for the obvious possibility that the issuing court would fail to appreciate that the two investigations were totally separate. District judges are faced with "pressing and diverse demands on their clearly limited resources," so there is "a real premium on quality and honesty in drafting." *United States v. Ailemen*, 986 F. Supp. 1228, 1246 (N.D. Cal. 1997). It is therefore "wholly unrealistic to expect most district judges to spend hours and hours of assertive analytical effort dissecting and probing affidavits like this." *Id.* (suppressing evidence derived from wiretap where affidavit contained false and misleading misrepresentations regarding necessity). Accordingly, the First Affidavit fell short of the candor and forthrightness required by Title III. *See, e.g., United States v. Blackmom*, 273 F.3d 1204, 1208 (9th Cir. 2001) (wiretap affidavit held to be insufficient where it "contain[ed] statements perhaps applicable to Miller, but not to Blackmom," and thus misled the issuing court).

### 3.    The government's misrepresentations were necessary to the issuing court's decision to authorize a wiretap on ▮▮▮▮ phone.

If this Court sets aside the detailed recitation of the government's extensive two-year investigation of this large-scale international narcotics trafficking organization, all that remain are generalized, boilerplate allegations in support of necessity. These do no more than describe the inherent limitations of certain investigative techniques, and are thus insufficient as a matter of law. Accordingly, the inclusion of misleading facts relating to the

narcotics investigation necessarily influenced the issuing court's decision to authorize the first wiretap on ▮▮▮ phone.

**B.   The first wiretap application fails to specify how less intrusive investigatory techniques failed, would fail, or were too dangerous.**

It is evident that the government used a wiretap as the "initial step in [its] criminal investigation," in violation of Title III. *Giordano*, 416 U.S. at 515. The government practically admits as much when it states that the stock fraud investigation had "just begun." (3/23/2010 Maddalone Aff. ¶65). Indeed it had just begun. Agents had not even reviewed all the documents provided to them by the TD Ameritrade investigator before applying for a wiretap. (*Id.* ¶82). The First Affidavit simply "does nothing to allay our fears that the [government] in this case relied on wiretapping as a substitute for standard investigative procedure." *Lilla*, 699 F.2d at 105. *See, e.g., also People v. Candella*, 171 A.D. 2d 329, 332 (N.Y. App. Div. 1991) (wiretap affidavit insufficient where "the investigation was only about two months old and the effort expended by the police was minimal").

The First Affidavit does not provide a single unique fact about this particular investigation suggesting that traditional investigative techniques had failed, would fail, or would be too dangerous to try.

**1.   Physical Surveillance**

The government alleged that physical surveillance would fail because ▮▮▮ and other subjects are expected to conspire online and over the phone instead of in person. (3/23/10 Maddalone Aff. ¶70). But this is true in any case involving a computer or phone. The

16

government cites no facts suggesting that physical surveillance would be dangerous, nor any instances of targets of the stock fraud investigation using counter-surveillance techniques to avoid detection by law enforcement.

In fact, the government's single act of physical surveillance prior to the first application suggested that this method likely would succeed. When ███ met with CW-3 on February 18, 2010, he expressed no apprehension, used no evasive techniques, and never put law enforcement in danger. (3/23/10 Maddalone Aff. ¶¶48-49). *See, e.g., Lilla*, 699 F.2d at 104-05 (wiretap affidavit held insufficient where subject "operated more openly than most and with less care in terms of evading detection"); *Candella*, 171 A.D.2d at 332 (wiretap affidavit held insufficient where "[t]his was not a situation where the defendant was acting in an evasive manner and refused to deal with the informant," or "where the informant had tried to get defendant to identify his sources and had been rebuffed").

## 2. Telephone Records

The government alleges that telephone toll records are insufficient because subjects may use false names or addresses, (3/23/10 Maddalone Aff. ¶73), but the government did not cite any evidence that ███, or any other target of the stock fraud investigation, employed this tactic. The government is right that phone records "do not provide real time evidence of the content of communications," (*Id.*), but this is "nothing more than a description of the inherent limitation of these devices." *Blackmom*, 273 F.3d at 1210 (wiretap affidavit held insufficient where its claim that pen registers "only provide evidence that the telephone was used,

17

without showing the identity of the callers or the nature or purpose of the communications" did not "specify why, in the particular case at hand, these inherent limitations will be insufficient").

Moreover, the government's brief use of phone records prior to the first application suggested phone records would further the investigation. ███ and Michael Steinberg (the two subjects of the stock investigation at the time) registered their phones under their own names. (3/23/10 Maddalone Aff. ¶¶7, 59, 60). So did Bradley Susser, who was indicted in this case. (*Id.* ¶59; S1 Indictment (DE:88) p.1). The government could have followed up with pen registers, subpoenas to phone companies, and physical surveillance with respect to Susser and Steinberg. *See, e.g., Ailemen*, 986 F. Supp. at 1241 (wiretap affidavit held to be insufficient where "the investigators could have installed pen registers on the phones of at least some of these suspects, put covers on their mail, surveilled them or explored their financial transactions," and "before the government took these conventional steps, there was no need for a wiretap to identify [the subject's] co-conspirators"). But it apparently did not pursue any of these avenues to investigate Susser and Steinberg before tapping ███'s phone.

### 3.   Undercover Officers & Confidential Informants

The government alleges that both undercover officers and confidential informants would fail because any CI or UC would pose as an investor, and ███ would be unlikely to share the details of his scheme with a low-level investor. (3/23/10 Maddalone Aff. ¶¶76, 80). However, the government cites no specific conduct or statements by ███ or any other target

18

to suggest that these broad generalizations are true in this case. *See, e.g., United States v. Landeros-Lopez*, 718 F. Supp. 2d 1058, 1067 (D. Ariz. 2010) (wiretap affidavit held to be insufficient where allegation that "even highly placed confidential informants . . . could likely not gain knowledge of the full scope of [an] organization's narcotics and currency stash houses, personnel, and day-to-day trafficking activities" is "true of most or all drug conspiracy investigations") (quotations omitted).

The government's brief use of a CI  prior to the first application suggests that ████ was willing to share details of his scheme with his investors, and thus, a CI or UC would further the investigation.  When ████ met with CW-3 in broad daylight on February 18, 2010, he shared various details of his scheme without any coaxing by CW-3.  (3/23/10 Maddalone Aff. ¶¶48-49).  Thus, if the government's brief use of a CI proved anything, it is that ████ was not secretive of his scheme, and thus, the use of a CI could bear some fruit.

Moreover, the government mistakenly assumes that a UC could only have infiltrated ████'s scheme by posing as an investor.  (*Id.* ¶76).  An agent could also have approached ████ as a potential co-conspirator, which was feasible with CW-3's assistance given his long-standing, 15-year "close relationship" with ████ (*Id.* ¶¶40-41).  Undercover sting operations "are an effective law enforcement tool to uncover securities fraud" because they are a method of infiltrating such schemes in real time. *United States v. Sneed*, 34 F.3d 1570, 1574-76 (10th Cir. 1994) (agent posed as the president of a fictional investment firm); *see also United States v. Manas*, 272 F.3d 159, 162-63 (2d Cir. 2001) (agent posed as a corrupt stock broker);

19

*United States v. Hochevar*, 5 Fed. Appx. 84, 85 (2d Cir. 2001) (agent posed as a corrupt stock broker). The government apparently did not even consider this method of investigation before resorting to a wiretap.

### 4.     Grand Jury Subpoenas, Search Warrants & Arrests

Far from demonstrating that grand jury subpoenas would fail, the government recognizes that this method would work because documents "***may reveal*** a clear pattern of fraudulent activities typical of a pump and dump scheme[.]" (3/23/10 Maddalone Aff. ¶82 (emphasis added)). "Before using a wiretap, the agents must, at the very least, use traditional investigative techniques that easily suggest themselves and are potentially productive and not unduly dangerous." *Carneiro*, 861 F.2d at 1181 (quotations omitted). A grand jury subpoena to the bank where ▮▮▮▮ deposited his paychecks is precisely the type of technique the government could have pursued before applying for a wiretap.

The government complains that fraudsters could "use [ ] aliases, shell companies, and fake identities," (3/23/10 Maddalone Aff. ¶82), to hide bank accounts, but cites no example of ▮▮▮▮ or any other target of the stock fraud scheme employing such tactics. True, a grand jury subpoena will not expose the entire scheme alone (*Id.* ¶82), but the "government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances." *Blackmom*, 273 F.3d at 1211.

Similarly, the government's claim that subpoenas for witness testimony would fail because such witnesses "would face prosecution themselves," and thus be unlikely to "testify

voluntarily," (3/23/10 Maddalone Aff. ¶81), is true in every criminal investigation. *See, e.g.,*

*Blackmom*, 273 F.3d at 1210 (fact that "interviews of witnesses would not be successful in

developing sufficient evidence to prosecute this entire organization" is true "of most if not

all narcotics investigations"). The government similarly offers no facts specific to the stock

fraud investigation explaining why either search warrants or arrests would fail or be too

dangerous to pursue. (3/23/10 Maddalone Aff. ¶¶83, 85).

**II. Communications between ▮▮▮▮ and Ms. Levy recorded during the second wiretap should be suppressed.**

The government's Second Affidavit makes an even weaker case of necessity than the

first, primarily because it failed to account for the fact that the government learned

information from the first period of interception directly undermining the need for more

wiretapping.

### A. The government misled the issuing court regarding the necessity for an extension of the wiretap in the Second Affidavit.

#### 1. Like the First Affidavit, the Second Affidavit misled the issuing court into believing that the narcotics and stock fraud investigations were related.

The Second Affidavit repeats the same misleading statements in the First Affidavit

that misrepresent the subjects of the stock fraud investigation to be armed and dangerous

international narcotics traffickers. (4/26/10 Maddalone Aff. ¶¶2, 3, 51, 52, 57, 61, 62, 64).

In fact, the Second Affidavit goes a step further to obscure the relationship between

the two investigations by eliminating references to the stock fraud investigation in certain

21

introductory paragraphs. It states that "the TARGET SUBJECTS are believed to be using the TARGET CELLPHONES to arrange for the importation and distribution of narcotics," and that there "is probable cause to believe that the interception of wire communications . . . will help to reveal: (i) the nature, extent and methods of operation of the TARGET SUBJECTS' narcotics trafficking operations[.]" (*Id.* ¶¶8, 13).

The parallel provisions in the First Affidavit at least referred to "the stock fraud scheme" in addition to the narcotics trafficking operation. (3/23/10 Maddalone Aff. ¶¶8, 13). Eliminating those references to the suspected "stock fraud scheme" in the Second Affidavit could only have strengthened the charade that the Target Subjects of the stock fraud investigation – i.e. ▮▮▮▮ Steinberg, and new "Target Subjects" Michael Oiring and ▮▮▮▮ ▮▮▮▮ (4/26/10 Maddalone Aff. ¶¶3, 16) – were dangerous narcotics traffickers.

**2.  By not fully accounting for facts learned from the first period of interception, the government misled the issuing court in the Second Affidavit as to the need for an extension.**

The government's Second Affidavit failed to account for what it learned during the first period of interception (March 23, 2010 through April 22, 2010). This was at least reckless, and must have been necessary to the issuing court's decision to grant an extension of the wiretap.

**a.  Misleading statements and material omissions in the Second Affidavit regarding the futility of using undercover officers and confidential informants**

The Second Affidavit contains the following two boilerplate statements regarding the

22

futility of using undercover officers and confidential informants:



These are carried over from the first application, as practically identical averments appear in the First Affidavit. (3/23/10 Maddalone Aff. ¶¶76, 77).

However, the government learned information during the first period of interception that significantly undermined the veracity of these statements. Several calls recorded during the first period of interception demonstrate that in March and April 2010, ▮ wanted to make more money by working directly with a company in driving up its stock price, even if it meant working with someone he did not know. Thus, ▮ was likely to ***not*** "be suspicious of any unknown individual who asks to participate in ▮'s scheme," and ▮'s scheme ***was*** "open to outsiders." (4/26/10 Maddalone Aff. ¶59).   There are at least three recorded calls during the first period of interception to this effect:





The truth is that ▮▮ was aching to work with anyone, including any outsider, willing to pay ▮▮ to help take a private company public.

Numerous other recorded calls demonstrate the inaccuracy of the government's allegation that ▮▮ did not share the "the inner workings of the fraud or identify other co-conspirators," when speaking with investors, and that a CI lacked the ability to "obtain evidence against" ▮▮ and his co-conspirators. (4/26/10 Maddalone Aff. ¶¶59, 60 ). Investors did not just blindly hand their money over to ▮▮ Several Port employees set up their own brokerage accounts that they used to trade on penny stock tips from ▮▮ who regularly shared with them the location of his brokerage accounts, the identities and locations of co-conspirators, ticker symbols, information about his e-mail blasts touting certain stocks, and trading strategies. There are at least seven calls recorded during the first period of interception to this effect:





All of these calls recorded during the first period of interception demonstrate that ▮▮▮ regularly kept investors abreast of the "inner workings" of his scheme, and that CW-3 had the ability to learn the identities of ▮▮▮'s co-conspirators and "obtain evidence" against them and ▮▮▮ (4/26/10 Maddalone Aff. ¶¶59, 60).   The government's broad generalizations to the contrary are inaccurate.

**b.      Misleading statements and material omissions in the Second Affidavit regarding the futility of physical surveillance**

The Second Affidavit makes the following averment regarding the futility of physical surveillance:

> . . ▮▮▮ and other TARGET SUBJECTS, including STEINBERG, OIRING, and ▮▮▮ are planning, discussing, and conduct transactions online and over the phone, *instead of in person*.

(4/26/10 Maddalone Aff. ¶53 (emphasis added)).    This is carried over from a practically identical averment in the First Affidavit. (3/23/10 Maddalone Aff. ¶70).  However, several calls recorded during the first period of interception prove this statement inaccurate because they demonstrate that subjects of the stock fraud investigation regularly planned to meet in person.  There are at least three recorded calls to this effect during the first period of interception:



These recorded calls demonstrate that, contrary to the government's boilerplate averment in the Second Affidavit, physical surveillance could prove fruitful because ▮ was very willing to plan, discuss, and conduct business with others "in person." (4/26/10 Maddalone Aff. ¶53).

### c.    Other material omissions in the Second Affidavit regarding necessity

The government also collected extensive amounts of information during the first period of interception that would have advanced its investigation, such as the names of potential targets, banks where targets held brokerage accounts, stocks they were trading, and

web sites and social media sites they were using.  The following are just a few of the calls to this effect:



There are numerous other calls included in **Exhibit 4** that disclosed similar leads.  (*See* Sessions 295, 392, 1142, 2121, 2414, 2622, 3412, 4290, 4756, 4774, 6578, and 6748 (Ex. 4)). The Second Affidavit, however, omits any discussion of these numerous leads generated during the first period of interception.

The government could have pursued all of this information using traditional investigative techniques.  To the extent that it did pursue any of these leads, the government should have disclosed such efforts in the Second Affidavit.  *See* 18 U.S.C. §2518(1)(f). However, the government omits altogether from its Second Affidavit any discussion of these leads generated during the first period of interception, or any efforts it took to follow up on such leads through the use of traditional investigative techniques.

27

3.    **These misleading statements and material omissions were recklessly included in the Second Affidavit, and were necessary to the issuing court's decision to grant an extension of the wiretap.**

All of the above-quoted recorded calls should have given the government "obvious reasons to doubt the veracity," *Rajaratnam*, 2010 WL 4867402, at *9, of various boilerplate statements in the Second Affidavit. In addition, the omission of the above-quoted calls from the Second Affidavit was material, as they were "clearly critical to assessing the legality," of the first wiretap extension. *Id.* It was therefore "reckless for the government to portray" its investigative efforts "as a failure and to conceal the leads it chose not to pursue." *Ailemen*, 986 F. Supp. at 1237-38 (wiretap affidavit held to be insufficient, where government failed to disclose that it had learned the identities of co-conspirators and that there was a prime opportunity for a meeting between UC and defendant's narcotics suppliers). *See, e.g., also Carneiro*, 273 F.3d at 1183 (wiretap extension application held to be insufficient where statement "taken verbatim from the previous wiretap application" that visual surveillance was impractical failed "to tell the issuing court that, after the original wiretap order was issued, DEA agents were able" to conduct visual surveillance).

Once this Court deletes these misleading allegations and inserts the omitted information gleaned from the calls recorded during the first period of interception into the Second Affidavit, *see Ippolito*, 774 F.2d at 1487, n.1, it is apparent that the Second Affidavit does not establish the necessity for an extension. At a minimum, there has been a substantial preliminary showing to hold a *Franks* hearing.

**B.      The second wiretap application failed to establish necessity because it regurgitated the same boilerplate statements from the First Affidavit.**

Like the First Affidavit, the Second Affidavit failed to establish the necessity for a wiretap. The government unquestionably moved "swiftly from wiretap to wiretap, without pausing," *Fonville*, 247 A.D. 2d at 124, since it applied for an extension within four days of the conclusion of the first period of interception. (4/26/10 Maddalone Aff. ¶14.c, p.62). As a result, the First and Second Affidavits' necessity sections regarding the stock fraud investigation are nearly identical. (3/23/10 Maddalone Aff. ¶¶64-85; 4/26/10 Maddalone Aff. ¶¶47-66). Such "carbon-copying" fails to meet Title III's requirement that an extension independently establish necessity. *See, e.g., Carneiro*, 861 F.2d at 1182-83 (wiretap extension application held to be insufficient where it "repeat[ed] the same statements of necessity set forth" in the original application). Thus, like the First Affidavit, the Second Affidavit also failed to establish the necessity for a wiretap.

**III.   All evidence derived from the recorded calls between ▮▮▮▮ and Ms. Levy must be suppressed as fruits of the poisonous tree.**

When communications are unlawfully intercepted in violation of Title III's necessity requirement, a Court must suppress both the communications and all evidence derived therefrom. *See* 18 U.S.C. §2518(10)(a)(I); *see also Giordano*, 416 U.S. at 530-32. An adversarial evidentiary hearing is required to determine the full scope of the taint of the recorded calls. *See United States v. Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974).

At a minimum, the derivative evidence to be suppressed must include everything

seized pursuant to the search warrant executed at Ms. Levy's home on October 5, 2010, because the affidavit supporting the warrant relied on recorded conversations between Ms. Levy and ▮▮▮ (10/4/10 Cerar Aff. ¶¶4, 7, 12, 14, 17). *See United States v. Spagnuolo*, 549 F.2d 705, 712 (9th Cir. 1977) (evidence seized pursuant to warrants should have been suppressed where "[s]ummaries of conversations [illegally] intercepted under Wiretap A form the essence of the probable cause allegations in" warrant affidavits).

The taint likely goes beyond just the evidence obtained during the search of Ms. Levy's home because it appears that the government first began to investigate Ms. Levy by listening to her speak on the telephone with ▮▮▮ *See, e.g., Magaddino*, 496 F.2d at 460 (search warrant was tainted by prior illegal eavesdropping where "Agent Griffin conceded at the suppression hearing that he first learned of Benjamin Nicoletti, Sr., from listening to and translating the tapes of the illegal electronic surveillance"). A hearing is necessary to determine the full scope of the taint.

## CONCLUSION

For the foregoing reasons, the Court should suppress all communications between ▮▮▮ and Defendant Donna Levy and all evidence derived therefrom and conduct a hearing to determine the full scope of all evidence derived from the illegal wiretap. In the alternative, there Court should conduct a *Franks* evidentiary hearing.

Respectfully Submitted,

Scott A. Srebnick, Esq.
(FL Bar No. 872910)
Alex Arteaga-Gomez, Esq.
(FL Bar No. 18122)
Scott A. Srebnick, P.A.
201 South Biscayne Boulevard, Suite 1380
Miami, Florida 33131
scott@srebnicklaw.com
(305) 285-9019

Howard M. Srebnick
Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Hsrebnick@royblack.com
(305) 371-6421
Fax: (305) 358-2006

Bradford M. Cohen
Bradford Cohen Law
1132 SE 3rd Avenue
Ft Lauderdale, Florida 33316
lawronin@aol.com
(954) 523-7774

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this 13th day of June, 2012, a true and correct copy of the

foregoing was served under seal upon counsel for David Levy, Thomas Prezioso, and the

United States via U.S. Mail, and sent via Federal Express to the Court's Chambers to be filed

under seal.

SCOTT A. SREBNICK

31