```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                        11 Cr. 62 (PAC)

 5   DONNA LEVY,
     DAVID LEVY,
 6                                        Jury Trial
                    Defendants.
 7
     ------------------------------x
 8
                                         New York, N.Y.
 9                                       March 4, 2013
                                         10:55 a.m.
10
     Before:
11
              HON. PAUL A. CROTTY
12
                                         District Judge
13

14            APPEARANCES

15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   CARRIE H. COHEN
     HOWARD S. MASTER
18        Assistant United States Attorneys

19   HOWARD M. SREBNICK
     NOAH FOX
20   ALEX ARTEAGA-GOMEZ
          Attorneys for Defendant Donna Levy
21

22   GERALD L. SHARGEL
     ROSS M. KRAMER
23   JENNIFER HAYS
          Attorneys for Defendant David Levy
24

25
```

1              (Case called; jury panel not present)

2              THE COURT:  Mr. Shargel.

3              MR. SHARGEL:  Yes, your Honor.  A housekeeping matter.

4     Mr. Levy is a diabetic.

5              THE COURT:  Type 1 or type 2?

6              MR. SHARGEL:  Type 2.  He has been given bread by the

7     marshals, which is obviously not suitable.  The point is that I

8     want the permission of the Court to give him a peanut butter

9     bar, unopened, commercial piece of candy or energy bar.

10              THE COURT:  Fine.

11              MR. SHARGEL:  Thank you.

12              THE COURT:  The jury is on its way up?

13              THE CLERK:  Yes, your Honor.

14              THE COURT:  Tell us how many are there.

15              THE CLERK:  We have 120 prospective jurors coming up

16     this morning.

17              THE COURT:  We are going to have them fill out the

18     hardship questionnaire.  That will take about a half an hour.

19     I will discharge them then until 1:00 or 1:30, depending on

20     when they finish, and then we'll start.  I assume we needed an

21     array of about 80 to get the number of jurors.  Have we talked

22     about peremptory challenges?

23              MR. MASTER:  We have not, your Honor.

24              THE COURT:  I propose that we have 12 for the

25     defendants and 6 for the government.  You will be exercising 1

1   for the government and 2 for the defendants, do it in 6 rounds.

2   Do you want to be heard on the number of alternates?

3              MR. SHARGEL:  I had a very brief conversation with one

4   of the prosecutors, and we talked about 4 alternates.  I don't

5   know if that was because it was your Honor's wishes.

6              THE COURT:  I had 4 in the last case.  We used 3 of

7   the 4, and it was a 4-week trial.

8              MR. SHARGEL:  Perhaps 6 might be better if you got so

9   close to the end of the alternates.  Obviously, I leave it to

10  your discretion, your Honor.

11             THE COURT:  I think 4 will probably be enough.

12             MR. MASTER:  4 is fine with the government.

13             THE COURT:  Then you would have 2 peremptory

14  challenges, Mr. Shargel.

15             MR. SHARGEL:  Yes, 1 for each 2.

16             THE COURT:  And the government would have 1.  So we'll

17  put 7 up there and you will exercise your challenges.  The

18  remaining 4 will be the alternates.

19             MR. SHARGEL:  Very well.

20             THE COURT:  Who is sitting in the spectator seats?

21             MR. SHARGEL:  This is Mr. Levy's father and a friend

22  of the family.

23             THE COURT:  Space is going to be kind of tight.  Why

24  don't they come in and sit in front of the bar.  With 120

25  people, we are going to be packed.

1           MR. SHARGEL:  I understand that.  That will work.

2           MR. SREBNICK:  Good morning, your Honor.  Would it be

3    acceptable to the Court that throughout the trial an objection

4    by one defendant be treated as an objection by both unless the

5    other opts out?

6           THE COURT:  Generally, I don't mind that.  Does the

7    government want to be heard?

8           MR. MASTER:  That's fine with the government.

9           THE COURT:  Generally, I don't mind, so that's all

10   right.

11          MR. SREBNICK:  While we are on housekeeping, I have

12   confirmed with Mr. Shargel, and he and I will jointly request

13   that the Court consider breaking roughly every hour and 15

14   minutes or so for washroom breaks.  That would be our joint

15   request.

16          THE COURT:  We break once in the morning and once in

17   the afternoon.

18          MR. SREBNICK:  It is a question of becoming

19   uncomfortable after about that period of time.

20          THE COURT:  Just so it is clear, I break for 15

21   minutes in the morning and 15 minutes in the afternoon.  We are

22   starting at 10:00, we will go until 12:45, resume at 2:00 and

23   go to 5:00.  We will have a break for 15 minutes somewhere

24   halfway in the morning and in the afternoon.

25          Mr. Shargel, with respect to your request which I have

1    already granted, and hopefully Mr. Levy has had nourishment, I

2    meant to ask the marshal if the marshal had any objection to

3    Mr. Levy having a snack.

4               THE MARSHAL:  No.

5               THE COURT:  Thank you.  So we don't have to go through

6    this every time, if Mr. Levy is feeling low, you ought to keep

7    a bunch of snacks so he doesn't go low.

8               MR. SHARGEL:  Very well.

9               DEFENDANT D. LEVY:  Thank you.

10              (Recess)

11              THE COURT:  The jury has arrived.

12              (Jury selection)

13              (In the robing room)

14              THE COURT:  We'll start tomorrow at 10 o'clock and

15   we'll do the voir dire.  You have seen the voir dire?

16              MS. COHEN:  No, I don't believe we have, your Honor.

17              THE COURT:  We'll send that around tonight.  It

18   represents a blend of the government's requests and your

19   requests.

20              MR. SHARGEL:  There was a defense request for attorney

21   voir dire.

22              THE COURT:  It's not going to be granted.  It's going

23   to be denied.  I will follow the traditional practice.

24              The other questions I think we tried to incorporate

25   those questions that made sense.  If you have others that we

1  have left out that you feel strongly about, let us know.

2         MR. SHARGEL:  Very well.

3         THE COURT:  Let us know by 9 o'clock tomorrow.  That

4  will give us enough time to work it into the questionnaire.

5         MR. SHARGEL:  Judge, can I raise one thing?  There is

6  one issue that may place a burden on the Court.  Several days

7  ago we asked that the Court order that the redacted portions of

8  the 3500 material be provided to your Honor.

9         THE COURT:  You gave me one example, 3511-14.

10         MR. SHARGEL:  There are many.

11         THE COURT:  I only have one.

12         MR. KRAMER:  In our letter we put that in as an

13  example.

14         THE COURT:  I know.  I thought Mr. Shargel was saying

15  they submitted a lot more.  I only got the one that you

16  submitted.

17         MR. SHARGEL:  Here is why.  We suggested to the

18  government that all that had been redacted be provided to the

19  Court, have ready for the Court, rather than simply identifying

20  it.  We both know what has been redacted because it is clearly

21  redacted.  I could supply you with a copy where there is a

22  Post-it by every redaction.

23         MS. COHEN:  I believe you are talking about two

24  different 3500 documents that are multipage.

25         MR. SHARGEL:  There is more than that.  I'm not

1   objecting to redactions that have to do with identifying

2   characteristics, Social Security numbers, telephones.  I'm not

3   suggesting you look at that.  But there are in many of the

4   reports blocks, paragraphs, whole paragraphs taken out.

5              THE COURT:  You submitted one to me, right?

6              MR. KRAMER:  I did in our letter.

7              THE COURT:  3511-14.  I took it as an example, a 5- or

8   6-page document.

9              MR. KRAMER:  Yes.

10             THE COURT:  The total printing on it that you could

11  see was 2 pages.  There were 4 pages or more of blanks.

12             MR. SHARGEL:  Correct.

13             THE COURT:  You asked me under 3500 to take a look.

14             MR. SHARGEL:  Yes.

15             THE COURT:  And asked the government to produce an

16  unredacted version so I could check the redactions.

17             MR. SHARGEL:  Yes, sir.

18             MS. COHEN:  We can talk and you can tell me exactly

19  which documents.  I just want to make sure.

20             MR. SHARGEL:  I will do that as soon as we go back to

21  the office.

22             THE COURT:  I think I have the document.

23             MS. COHEN:  Yes.  I believe he is saying other

24  documents.  I had thought it was limited to that document and

25  one like it.

1          MR. SHARGEL:  No.  I was asking that all redactions be

2     reviewed.  It's just that a paragraph was missing in the

3     middle.

4          THE LAW CLERK:  The parties submitted a large set

5     of --

6          THE COURT:  That's 3501.  I meant the trial notebook

7     that she gave me.  I think I have in my notebook the document

8     that you submitted.

9          MR. SHARGEL:  Yes.  Again, that was simply an example.

10         THE COURT:  No, I left it upstairs.  At any rate,

11    we'll talk.  You want me to check the redactions to make sure

12    that there is a basis for them?

13         MR. SHARGEL:  Yes.

14         THE COURT:  OK.

15         MR. SHARGEL:  If the government wants to take the

16    burden, or we can do it, it doesn't matter.

17         MS. COHEN:  If you could tell us which documents you

18    are requesting.

19         THE COURT:  I thought it was very much like the

20    question of somebody down in Georgia didn't want to turn over

21    the affidavits, so you couldn't use the tapes.  I understood

22    the request to say if the Eastern District of New York wanted

23    to redact all these things, then the witness couldn't testify.

24         MR. KRAMER:  Yes.

25         MS. COHEN:  That's different from the other

1   redactions.  You're just talking about that one witness?

2           MR. SHARGEL:  No.

3           MS. COHEN:  You're not.

4           MR. SHARGEL:  Here is how we can separate it out.  If

5   we are talking about one issue with another district, there is

6   the Eastern District document that was turned over in another

7   case pursuant to section 3500 with regard to a witness named

8   Phil.

9           MS. COHEN:  Orlando.

10          MR. SHARGEL:  Mr. Orlando cooperated enthusiastically

11  in the Eastern District.  Apparently, his attorney prepared 85

12  different -- I'm guessing now, I don't have it in front of

13  me -- a large number of different schemes that Mr. Orlando had

14  knowledge of.  I think that this goes to motive, bias,

15  hostility, and it's fair game for cross-examination.  Parts of

16  it have been revealed, but only those parts where Mr. or Mrs.

17  Levy are mentioned.

18          We want an unredacted part to show the level.

19  Obviously, if this person knows so much about fraudulent stock

20  matters, he could be cross-examined about his involvement and

21  his efforts to curry favor with the government.  I don't think

22  anyone is quarreling with the proposition that he could be

23  cross-examined about that.

24          That's a stand-alone, I think, because that is the

25  only issue about another district.  But within this district

1   and work that is done by these prosecutors or predecessor

2   prosecutors, there are redactions of paragraphs.  Again, I'm

3   not interested in identifying a permission, but substantive

4   redactions.

5        What I'll do this evening is, with the help of Ms.

6   Hays, take the 3500 materials, it's not all that voluminous,

7   and we'll put a yellow Post-it on the redaction and give you

8   either a list or a set of the 3500 material with the Post-its.

9        I think this is a mandatory process under 3500(b), if

10  I'm not mistaken.  There is a (c)?  (c), one letter off.  Under

11  3500(c).  I assure the Court this is not some empty exercise to

12  make work.  I'm not doing that.  I think there may be fertile

13  ground for cross-examination there.

14       MS. COHEN:  We will look at whatever other documents

15  you claim were redacted, not just phone numbers and Social

16  Security numbers, etc.  I'm aware of the issue with the Eastern

17  District document.  It is redacted to protect potentially

18  ongoing investigations where that defendant is a cooperator of

19  the Eastern District of New York.  He supplied information over

20  a long period of time.

21       I do not know the status of all the different people

22  that he identified as engaging in criminal activities.  They

23  obviously have nothing to do with this case.  If the government

24  decides to call him, and we haven't made a final decision on

25  that, but if he gets on the stand, he will talk about all of

his criminal conduct and all the people he knows. I don't know that it is necessary to identify each person, and I'd be worried about jeopardizing the investigations that I don't even know about.

THE COURT: If you put him on the stand, are you going to produce all the 3500 material.

MS. COHEN: We will produce it and redact it.

THE COURT: Are you going to unredact it if he takes the stand?

MS. COHEN: No, because I don't know if these people are being investigated by this district or other district.

MR. SHARGEL: If I may, Judge, that is a very, very thin suggestion that there are continuing investigations. This document was turned over to defense counsel in the Eastern District cases in what year?

MS. COHEN: It was turned over only about a year ago. The document itself was created in 2008, but it was turned over redacted and --

MR. SHARGEL: My point is it was turned over in 2008 even redacted. I can't imagine that five years later there is still a sensitive investigation on it.

MR. KRAMER: I don't think this is actually a ground under 3500(d) anyway. I think that is still fair game.

THE COURT: I guess what the mode is now, you're going to identify the documents.

1              MR. SHARGEL:  Yes.

2              THE COURT:  And you're going to justify it.

3              MS. COHEN:  We will produce them and your Honor will

4    decide.  Also, with regard to that one document we informed

5    defense counsel of, the document related to Phil Orlando, that

6    very clearly says "attorney-client privilege" on top.  As I

7    understand it from Phil Orlando, he prepared that document at

8    the direction of his counsel to tell his then defense counsel

9    prior to cooperating with the Eastern District of all the

10   things he could potentially tell the Eastern District about.

11             Inadvertently, he gave that document along with other

12   documents to the FBI agent who was handling him, so that there

13   was an inadvertent disclosure.  The Eastern District prosecutor

14   did not know that fact and turned it over in 3500.  But since

15   we are now aware of that, I would also argue that that document

16   is an attorney-client privilege and that it was inadvertently

17   disclosed by Phil Orlando.

18             MR. SHARGEL:  Then I would ask for a hearing on that

19   issue because I don't believe that to be the case.  I think

20   they were trying to make a deal for Phil Orlando.  There were

21   other documents turned over as well.  He had very experienced

22   counsel.  Actually, I believe Leslie Crocker Snyder was his

23   counsel.  She was doing all that she could to win a favorable

24   resolution for her client.  I don't believe that it was turned

25   over accidentally, because it would do nothing but help Mr.

1    Orlando to have that turned over to the government.

2            Obviously, I don't understand why they are claiming

3    privilege.  Obviously, he was debriefed on these very issues.

4    Obviously, he discussed these issues with the prosecutors and

5    the FBI agents.  I don't know whether he ever got to testify.

6    I think he didn't.

7            MS. COHEN:  He didn't.

8            THE COURT:  We will consider these issues when they

9    come up.  I guess they are going to come up shortly?

10           MR. SHARGEL:  Yes.

11           THE COURT:  I appreciate the advance argument.

12           MS. COHEN:  It's a preview.

13           MR. MASTER:  Preargument.

14           MR. SHARGEL:  I'd like to alert you to one more thing.

15   I know you have a pile of things on your desk.

16           THE COURT:  I'm on high alert now.  Go ahead.

17           MR. SHARGEL:  Here on high alert is that I think the

18   government's intended first witness -- remind me of his name.

19           MS. COHEN:  Peter Melley.

20           MR. SHARGEL:  Peter Melley from FINRA.  I think we

21   have an argument.  I don't know if your Honor has had a chance

22   to look at it.

23           THE COURT:  I haven't looked at your papers.

24           MR. SHARGEL:  I think clearly under Second Circuit law

25   this is, as the courts say, an expert witness in lay witness's

1    clothing.  If he's going to get on the stand and he has

2    specialized knowledge, then he has to testify within the

3    confines of 702.  More importantly, despite several requests on

4    our part, we asked again and again and again do you have an

5    expert witness, and the government said no.  And we have no

6    expert witness report.

7            As I sit here now probably a day and a half or two

8    days from when he is going to testify and I am going to cross-

9    examine him, I have no really idea of what he is going to

10   define.  The government says he is going to define terms.  The

11   Second Circuit has made crystal clear, and it is in the brief,

12   that if he is going to define terms or impart specialized

13   knowledge, he is an expert witness.

14           THE COURT:  What is he going to say?

15           MR. MASTER:  Your Honor, we submitted responsive

16   briefing.  I think it is absolutely clear that Mr. Melley, who

17   has testified on numerous occasions as a nonexpert witness in

18   this district, and others at FINRA who work with him preparing

19   summary charts describing stock trades, proceeds of stock

20   sales, integrating numerous sources of financial data and data

21   gathered by FINRA into summary charts are summary witnesses,

22   they are not expert witnesses.

23           I believe your Honor had a FINRA witness testify in

24   the Tomasetta trial that was before this Court on several

25   occasions.  Mr. Melley reports that he has never had to be

1    qualified as an expert to do what he does and has done for more

2    than ten years.

3              THE COURT:  The objection is not to the summary

4    charts, is it?

5              MR. SHARGEL:  No.  Well, actually, there may be an

6    objection to the summary charts.  Rule 1006 clearly says where

7    you have a huge, voluminous documents.  I don't see that the

8    underlying documents to the chart that were put in evidence

9    were voluminous.

10             MR. KRAMER:  These charts aren't just summary charts

11   in this case.  What they are are charts that do exactly what

12   the expert would do, draw the inference that there was a causal

13   connection between certain Internet promotions and spikes in

14   volume and price of stocks.

15             What he does on the charts is he does a stock price

16   and then puts a sticker on days when there is Internet

17   promotions, giving the inference to the jury, like an expert

18   would, that there is a correlation between the two things.

19   That's exactly what an expert would testify to.

20             MR. SHARGEL:  In other words, he's gathering the

21   information under 702.

22             THE COURT:  He could put on a summary chart that on a

23   certain day the stock of the company was X and the trading

24   volume was Y.  He could put it on the chart that says these are

25   the press releases that were issued.

1          MR. KRAMER:  He titles these "Analysis," and actually

2     there is a correlation between what would be two separate

3     charts.  By overlaying them on top of one another, this is an

4     expert opinion that there is a one-to-one correlation.  There

5     was a tout on this day and there was a stock price here.  So

6     it's really an ultimate issue in the case, whether the tout

7     created a upward tick in the stock price and volume.

8          THE COURT:  Is he going to testify what a tout is?

9          MR. KRAMER:  I think so.

10          THE COURT:  Does he have to be an expert to do that?

11          MR. SHARGEL:  He is defining it.  Yes, because he is

12     defining it based on specialized knowledge.  That's the point.

13     He's going to either talk about reverse mergers.  You can

14     correct me if I'm wrong, but reverse mergers, stock splits,

15     penny stock, pink sheets, he's going to give these definitions.

16          I've been in stock fraud cases in this district where

17     witnesses doing this very same thing are qualified as experts.

18     There is no big deal, except I don't know if this is skirting

19     the provisions of Rule 16 that require something more than the

20     résumé that we got with this individual.  They require a

21     statement as to what he is going to testify to.

22          THE COURT:  You filed this motion in limine when?

23          MR. KRAMER:  I believe it was last Friday, when we

24     first got the 3500 for him.  It was just his CV and a set of

25     charts.

1          MS. COHEN:  We filed an opposition.

2          THE COURT:  You filed the opposition yesterday?

3          MS. COHEN:  Correct.

4          MR. SHARGEL:  We ask you to take a look at the brief.

5          THE COURT:  I will.

6          MR. SHARGEL:  Thank you.

7          MS. COHEN:  You have another motion in limine pending

8    that may go to openings?

9          MR. SHARGEL:  Yes.  You may remember this case, a 1980

10   case of United States v. Stanley Stahl, the real estate tycoon.

11         THE COURT:  Yes.

12         MR. SHARGEL:  The Second Circuit reversed the

13   conviction.

14         THE COURT:  Who is the guy that wanted to kill Stanley

15   Stahl?  He ran for governor.

16         MR. SHARGEL:  Hirschfeld.

17         THE COURT:  Yes, I remember Stanley Stahl.  What does

18   the Second Circuit say?

19         MR. SHARGEL:  The Second Circuit said, reversing the

20   conviction, that the prosecutor leaned too heavily on class

21   distinction.  One of the things they said was in summation the

22   prosecutor said he sits in his fancy offices on Park Avenue.

23   The government has argued in its response, well, the

24   acquisitions that the Levies made demonstrate their greed.  But

25   in Stanley Stahl's case, as in every financial case, to every

1   alleged offense for financial gain there is a question of

2   greed.

3           What the Stahl court did was say you can't splash it

4   in front of the jury.  They are going to introduce on their

5   exhibit list pictures of cars and boats and acquisitions.  They

6   are doing precisely I think what was done in the Stahl case.

7           In the Stahl case you might remember the facts are

8   that Stanley Stahl was convicted of bribing an IRS agent to

9   save a huge amount of money because his deceased father's

10  estate was being audited by the IRS.  The claim was that Mr.

11  Stahl bribed the agent.  Obviously, Mr. Stahl wanted to save

12  huge amounts of money, huge amounts under 1979 or 1980 money.

13  That doesn't mean that they could get up and rail against his

14  wealth and how wealthy he is.  That's what they were doing,

15  precisely that.

16          What the prosecutors were doing with Stanley Stahl, I

17  respectfully ask you to take a look at the case, is precisely

18  what they want to do here.

19          MR. MASTER:  Your Honor, they filed this motion

20  yesterday.  They have known that this has been an issue for

21  quite some time.  We responded the same day.  I think it is a

22  whole meritless argument.  This is direct evidence of the

23  fraud, evidence of how they spent their money.  We addressed

24  this in the brief that we filed last night shortly after

25  receiving the motion in limine.

1        First of all, the defendants said to numerous

2   corporate victims, numerous small businessmen, that they were

3   cutting them off, they were stopping funding for these

4   companies.  They said times were tight, we just don't have the

5   money to continue to follow up.  That was a lie, and we can

6   show that because they spent money on themselves instead of

7   sending it back to the companies.

8        Second, they told these companies, I'm sorry, these

9   small businessmen would come, try to figure out if these were

10  legitimate people.

11            THE COURT:  All this is in your papers, right?

12            MR. MASTER:  Yes.

13            THE COURT:  I will reread the papers.  The due date is

14  when?

15            MS. COHEN:  Openings, your Honor, tomorrow.

16            MR. MASTER:  We need to know tomorrow.

17            THE COURT:  Thanks for giving me all this advance

18  notice.

19            MR. SHARGEL:  That's what I want to address.  We filed

20  on the very day that we got the government's exhibit list.  We

21  saw that on the exhibit list you had not only what Mr. Master

22  just said but that they are going to have pictures up on the

23  screen.

24            MR. KRAMER:  Multiple pictures of the Bentley.

25            MS. COHEN:  The defendant's lavish lifestyle was in

1    the indictment.

2            MR. MASTER:  There is no surprise.  If they want two

3    photos of the Bentley instead of three, we'll compromise.

4            MS. COHEN:  We briefed it as soon as we got it.

5            THE COURT:  I'll read it to be better informed and get

6    to it promptly.

7            I think it will take us most of the day to get through

8    the jury selection, so I think we are on schedule for opening

9    statements on Wednesday, the 6th.

10           MR. SHARGEL:  Yes.

11           THE COURT:  Mr. Srebnick?

12           MR. SREBNICK:  May I elect to defer my opening until

13   the defense case if I so choose?  Is that an option?

14           THE COURT:  Not with me.  It's not an option.  You

15   open when we do the openings.  What you propose is not an

16   option.  If you want to do an opening, do an opening.  If you

17   don't want to do an opening, that's fine, too.  If you want to

18   do an opening, you have to do it after the government.

19           I suppose you will be opening.

20           MR. SHARGEL:  Yes.

21           THE COURT:  And after Mr. Shargel.  Anything else?

22           MR. SHARGEL:  No, sir.

23           MR. MASTER:  No, your Honor.

24           THE COURT:  See you tomorrow at 10 o'clock.

25           (Adjourned to 10:00 a.m., March 5, 2013)