D36LLEV1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

       v.                    11 Cr. 62 (PAC)

DONNA LEVY,
DAVID LEVY,
                          Jury Trial
          Defendants.

------------------------------x

                         New York, N.Y.
                         March 6, 2013
                         12:07 p.m.

Before:

       HON. PAUL A. CROTTY

                         District Judge

       APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
CARRIE H. COHEN
HOWARD S. MASTER
     Assistant United States Attorneys

HOWARD M. SREBNICK
NOAH FOX
ALEX ARTEAGA-GOMEZ
     Attorneys for Defendant Donna Levy

GERALD L. SHARGEL
ROSS M. KRAMER
JENNIFER HAYS
     Attorneys for Defendant David Levy

1          (A jury of 12 and 4 alternates was impanelled and

2     sworn)

3          THE DEPUTY CLERK:  They have been sworn, your Honor.

4          THE COURT:  Please sit down.

5          What I'm going to do now is give you some preliminary

6     instructions which I hope will be helpful to you in following

7     this case.  After that we're going to take our luncheon break.

8     It's a little bit early today.  Normally we sit until 12:45,

9     but we're going to break a little bit early today.  And then

10    when we come back, I think we can resume at 1:30, 1:45, and

11    we'll have openings by the government.  And if the defendants

12    choose to make an opening, we're going to have an opening by

13    them as well.

14         But while taking our break, Mr. Ovalles will get you

15    our contact information and try to get contact information for

16    you so that we can stay in touch in case there's any problems

17    with weather or someone is having an individual problem, you

18    can let us know.

19         But I want to take a few minutes now to give you some

20    initial instructions about this case and about your duties as

21    jurors.  At the end of the trial, I'll give you final

22    instructions.  I may also give you instructions during the

23    trial.  Unless I specifically tell you otherwise, all such

24    instructions, both those I give you now and those I give you

25    later, are equally binding on you and you must follow my

1    instructions.

2         Your duty is to find from the evidence what the facts

3    are.  You and you alone are the judges of the facts and then

4    you apply the law as I give it to you to the facts as you find

5    them and to reach your verdict.  You have to follow the law

6    whether or not you agree with it.

7         Now, please remember that nothing I may say or do

8    during the course of the trial is intended to indicate to you

9    or should be taken by you to be indicating what your verdict

10   should be.  What your verdict should be is strictly up to you.

11        I've already told you briefly about the charges in

12   this case.  The defendants are charged with the commission of

13   federal crimes under an indictment filed by a grand jury

14   sitting in this district.  The indictment charges Donna Levy

15   and David Levy with four separate crimes, which are known as

16   counts.  Donna Levy is also charged with one additional crime,

17   and David Levy is charged with two additional crimes.

18        I will now elaborate on the relevant facts as alleged

19   in the indictment.

20        The government alleges that from 2007 to 2010, Donna

21   Levy and David Levy participated in a scheme to defraud

22   founders of and investors in and to manipulate the stock price

23   of two companies:  Cardiac Networks Inc. and Banneker Inc.  The

24   defendants are alleged to have made or caused to be made

25   fraudulent misrepresentations to gain the trust of officers and

employees of these two companies and to induce outside

investors to purchase shares of these two companies in order to

enrich themselves and others who held shares of Cardiac

Networks and Banneker stock.

The defendants are charged with a conspiracy to commit

securities fraud and wire fraud and with committing securities

fraud.  A conspiracy or agreement among more than one person to

commit a crime is a separate offense from the commission of the

underlying crime itself.  Accordingly, as here, the defendants

may be charged both with a crime and with conspiring with

others to commit that crime.

The government additionally alleges that from 2009

through 2011, David Levy participated in a similar scheme to

defraud founders of and investors in a third company, Greenway

Design Group Inc.  The government also alleges that from 2009

through 2010, David Levy participated in a money laundering

conspiracy by transferring the proceeds of these schemes to

Panama in an attempt to disguise the source of this money.

Finally, the government alleges that from 2007 through

2010, Donna Levy defrauded investors in and manipulated the

stock price of additional companies, including Emerging World

Pharma Inc.

Defendants deny those allegations.

The evidence from which you're going to find the facts

will consist of the testimony of witnesses from this chair

here -- they'll be sworn as witnesses and they'll have to tell you the truth. You have to judge their credibility -- documents and other things that will be received in evidence, and occasionally there will be facts that the parties may agree to. Those are called stipulations. So the evidence consists of the testimony, the documents, and any stipulations.

Certain things are not evidence and you should not consider them. I'm going to list them for you.

First of all, the attorneys' statements, arguments, and questions are not evidence. They're not sworn as witnesses. It's not the question that the lawyer asks; what is important is the witness's answer to the question.

Secondly, attorneys' objections to questions are not evidence either. It is the duty of the attorney for each side in the case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. You should not be influenced by the objection or by my ruling on it. If the objection is sustained, you will hear me say sustained. Then you should ignore the question. If I overrule the objection, then you should treat the answer just like any other answer.

My job is to rule on what evidence comes in at trial, but I have no view on what your verdict should be because your verdict is strictly up to you, as the jury decides those questions.

1    If I instruct you that some items of evidence are

2  being received for a limited purpose only, you must follow that

3  instruction as you have to follow all my instructions.  You

4  don't have to worry about this right now.  There may not be a

5  limiting instruction in this case.  But if there is, I will

6  explain it to you at the time and I will give you instructions

7  as clear as I possibly can and what the limitations are.

8    In addition, I may tell you that I'm excluding

9  evidence or tell you to disregard testimony.  When I do that,

10  it means you should follow my instructions and ignore the

11  testimony because it is not in evidence.

12    In addition, anything you may have seen or heard

13  outside the courtroom is not evidence and should be

14  disregarded.  You are to decide this case solely on the

15  admissible evidence that is presented here in the courtroom.

16    Now, there are two kinds of evidence that I want to

17  review with you:  direct evidence and circumstantial evidence.

18  Direct evidence is, as the name suggests, direct proof of a

19  fact.  An example would be the testimony of an eyewitness,

20  somebody who actually saw the event as it occurred.

21  Circumstantial evidence is proof of a fact or facts from which

22  you may infer or conclude that some other fact or facts exist.

23  Obviously, I'll give you further instructions on this in more

24  detail, these and other matters, at the end of the case.  But

25  just keep in mind that you can consider both kinds of evidence,

1    both direct evidence and circumstantial evidence.

2         A very important task for every jury is to determine

3    the credibility of witnesses.  It's going to be up to you to

4    decide which witnesses to believe, which witnesses not to

5    believe, and how much of any witness's testimony to accept or

6    to reject.  Again, in my instructions to you at the end of the

7    trial, I'll give you some guidelines which I hope will be

8    helpful to you in determining witness credibility.  But witness

9    credibility is something that's uniquely for the jury.  You

10   have to make up your mind who to believe or how much to believe

11   or not believe of any witness's testimony.

12        Now, this is a criminal case, as we've told you

13   before, and you must remember that there are three basic rules

14   about criminal cases that you have to keep in mind at all

15   times:  First, the defendants are presumed innocent; second,

16   the government has the burden of proof; and, third, the

17   government must prove its case beyond a reasonable doubt.

18        Let me go through each of those three elements now.

19        First, as I mentioned earlier, the defendants are

20   presumed innocent until proven guilty.  The indictment against

21   the defendants brought by the government is only an accusation

22   and nothing more.  It is not proof of guilt or anything else.

23   The defendants, therefore, start out with an absolutely clean

24   slate.  They are presumed innocent.

25        Second, the burden of proof is on the government.  The

1   defendants have no burden to prove their innocence or to

2   present any evidence or to testify at all.  Since they have the

3   right to remain silent, the law prohibits you from arriving at

4   your verdict by considering that the defendants may not have

5   testified.

6            And, third, the government must prove the defendants'

7   guilt beyond a reasonable doubt.  Again, I will give you

8   further detailed instructions on this point later on, but bear

9   in mind in this respect a criminal case is different from a

10  civil case.  The criminal standard of proof is proof beyond a

11  reasonable doubt.

12           Now, just a few words about your own conduct as

13  jurors.

14           First of all, do not discuss the case with anyone or

15  permit anyone to discuss it with you.  This includes discussing

16  the case in person, in writing, by phone, electronic means,

17  text messages, email, Facebook, Twitter, or blogging.  This

18  also includes discussing the case with your fellow jurors.  You

19  cannot deliberate on your verdict until after you are charged

20  by me and that takes place at the end of the trial.  Until

21  then, you simply cannot talk about this case.  So you can talk

22  to each other about almost anything you'd like, but don't talk

23  about the case.

24           I know that seems strange to you but here's the

25  reason.  Obviously, the evidence can be presented only one

witness at a time and one exhibit at a time.  We don't want to

start talking to each other and reaching conclusions before

you've had the opportunity to see and hear all the witness in

the case and hear my instructions on the law.  So that is why

we direct you to begin your deliberations at the end and until

that time not to have any discussions about this case.  Think

of it like a painting where you cannot tell from one stroke or

one color what the painting will look like.  You have to wait

until it's finished to make a judgment.  That's what we ask you

to do.

If at any time during the course of this trial any

person attempts to talk to you or communicate with you about

the case, either inside or outside the courtroom -- and I hope

that doesn't happen -- you should immediately report such an

attempt to me.  Don't bring it to the attention of another

juror; just send me a note directly.

Also, the lawyers and other participants at counsel

table for both the government and the defendants, they have

been instructed not have any communication with you as jurors.

That's the rule.  You must not say hello or even wave.  That

goes for you, the lawyers, and the witnesses.  In this court

you're bound to see people standing in line or being in the

elevators.  So if you run into one another, please don't

acknowledge them or expect them to acknowledge you.  They are

under instructions not to have any communication and they're

D36LLEV1

1    going to observe that rule and we ask you to observe the rule

2    as well.

3            Don't read or listen to anything touching upon this

4    case in any way.  Don't try to do any research on your own or

5    conduct your own investigation.  This means, for example, that

6    you should not consult a dictionary, search the internet,

7    website, blogs, or any electronic tools to obtain information

8    about this case.  If you see something on the case, about this

9    case in the newspaper, please don't read the article.  Don't

10   watch television discussions about this case or issues involved

11   in this case.  Your sworn duty is to decide this case solely

12   and wholly on the evidence presented in the courtroom.

13           Now, if you wish, you can take notes while the

14   evidence is being presented to you.  This is permitted because

15   some people find taking notes helps them focus on the testimony

16   being given.  You should not try to summarize the testimony,

17   however.  We have an excellent court reporter here -- Ms. Jones

18   and Mr. Murray -- who take down everything that's said

19   throughout the trial.  Your job is to listen to the testimony

20   and assess the credibility of the witnesses.  If you do take

21   notes, don't let it distract you from your task.

22           Moreover, your notes are for your private use only, as

23   a way to help you recall the testimony when you begin your

24   deliberations.  Your notes are not entitled to any greater

25   weight than the recollections of a juror who did not take

1   notes.  Finally, you cannot take your notes out of the
2   courthouse.  Leave them in the jury room at the end of each
3   day.

4        As I mentioned to you, we hope to get this case done
5   in the month of March.  Let me tell you again how important
6   your service is and how much we appreciate it.  During a trial,
7   all of us have to be here before any work can be done.  You saw
8   that this morning when we were a little bit slow in calling the
9   court reporter.  That means everybody -- the attorneys, the
10  witnesses, the court reporter, me, the judge, and you, the
11  jury -- we have to be here and all of us have to be here at one
12  time.  If one person is missing, everything stops.  So we ask
13  you to cooperate and try to make sure that you get here on time
14  so that we can begin our deliberations.

15       I start my trial day at 10 a.m., but we're going to
16  open up the jury room at 9 o'clock and provide you with a light
17  continental breakfast.  We'll have coffee and tea, fruit, and
18  rolls.  That's an inducement for you to get here on time.  You
19  don't have to start the day worrying about your lunch.  We'll
20  provide you with an afternoon snack as well -- again, tea and
21  coffee and cookies.  But we can't provide you with lunch until
22  you begin your jury deliberations.

23       Now, here's how we're going to proceed.  The
24  government is going to make an opening statement, which is an
25  outline of what they hope to prove and to help you understand

D36LLEV1

1    the evidence as it comes in.  Next, the defendants may make an

2    opening statement but they don't have to.  And please remember

3    as you listen to the opening statements that they are not

4    evidence.

5           Then the government will start presenting its

6    witnesses and the defense may cross-examine those witnesses.

7    Following the government's case, the defendants may, if they

8    choose and if they wish to do so, present witnesses.  They have

9    no obligation to do so.

10          After all the evidence is in, each side will have an

11   opportunity to get up again and present their closing arguments

12   to you.  In these arguments, they're going to summarize and

13   interpret the evidence for you.

14          And then, of course, I'll instruct you on the law.

15   And after all that is completed, you can retire to begin your

16   deliberations.

17          Now for some housekeeping matters.  You probably

18   already met my courtroom deputy, Mr. Ovalles, and Mr. Ovalles

19   will tend to whatever your needs are during the course of this

20   jury trial.  And Mr. Ovalles, as I said, when we break now,

21   we'll be interested in getting some contact information from

22   you and we'll give you our contact information so we can stay

23   in touch with one another.  My court clerk who's working with

24   me on this case is Mr. Kelly, who's in the back.  And our court

25   reporters are Tara Jones, who's sitting here, and Mr. Murray,

1    who was here this morning.

2              So those are my preliminary instructions.  It's now

3    12:20.  We're going to break.  Mr. Ovalles will escort you to

4    the jury room and you can hang up your clothes there and your

5    coats and then we'll take our break.  We'll resume -- if we can

6    resume at 1:45, we'll have openings by the government and any

7    openings the defendants wish to make, and then we'll start with

8    our witnesses this afternoon.  Thank you very much.

9              (Jury not present)

10             THE COURT:  All right.  Anything you want to take up?

11             MR. SHARGEL:  Two very short housekeeping matters.

12             THE COURT:  Yes, sir.

13             MR. SHARGEL:  One is that with respect to the

14   openings, and I suppose it applies to the closing arguments as

15   well, would the two defense counsel be permitted to decide

16   between themselves as to who goes first and who goes second?

17             THE COURT:  Yes.

18             MR. SHARGEL:  And with respect to cross-examination of

19   witnesses, can we do the same thing?

20             THE COURT:  Yes.

21             MR. SHARGEL:  Thank you, sir.

22             THE COURT:  Only one lawyer per --

23             MR. SHARGEL:  Of course.  The point is that I was

24   going to open first and Mr. Srebnick was going to open after

25   me.  And then when, for example, Zev Helfer, one of the

D36LLEV1

 1    witnesses we expect this afternoon, who will testify this

 2    afternoon, I'm going to do the first cross-examination.

 3              THE COURT:  That's fine with me.

 4              MR. SHARGEL:  Very well.

 5              THE COURT:  My observation is I wouldn't want you to

 6    start, get halfway through a witness, and have someone pick up

 7    the same witness on your team.

 8              MR. SHARGEL:  Oh, no, no.  We won't do that.  I

 9    promise you we won't do that.

10              THE COURT:  Mr. Master, who are the first set of

11    witnesses going to be?

12              MR. MASTER:  The first two witnesses are Peter Melley

13    of FINRA, and Zev Helfer, the founder, one of the founders of

14    Cardiac Networks.

15              THE COURT:  Who's coming first?

16              MR. MASTER:  Peter Melley.

17              THE COURT:  We'll get through him today?

18              MR. MASTER:  Certainly our direct is not very long.

19              THE COURT:  Yes.

20              MR. SHARGEL:  Your Honor, I was just told that the MCC

21    will not honor your order as to the clothes that Mr. Levy needs

22    for the next day.  You might see he's been in the same suit.

23    He did get a shave this morning, but this is very difficult

24    circumstances.  He's still in SHU.

25              THE COURT:  But his other needs have been

1  accommodated?

2         MR. SHARGEL:  No pencil and paper in SHU and it's very

3  difficult circumstances.  I know the government is working on

4  this and I've been in.  They're keeping me updated every step

5  of the way, but, nevertheless, we still have this situation.

6         THE COURT:  What's the nature of the noncompliance?

7         MR. SHARGEL:  I have an order that your Honor signed I

8  guess this morning and --

9         THE COURT:  I had one problem with the order.  One was

10  it said MCC and it was MDC.  It was addressed to one facility

11  and he's in the other facility.

12         MR. SHARGEL:  Now they won't take it because there are

13  cross-outs here by hand and it's not typed in.

14         THE COURT:  Whose cross-outs are they?

15         MR. SHARGEL:  In other words, it was crossed out from

16  MDC to MCC.

17         THE COURT:  So you want us to white it out and type it

18  out?

19         MR. SHARGEL:  I think they want a fresh order.  If we

20  can have this by this afternoon, I'll have someone go over.

21         THE COURT:  Listen, I signed the order.  I thought the

22  order on its face was misdirected because you gave it to the

23  warden over in Brooklyn and Mr. Levy is in Manhattan.

24         MR. SHARGEL:  It was prepared when he was in Brooklyn.

25  You know he was in Brooklyn.

D36LLEV1

| | |
|---|---|
| 1 | THE COURT:  He's moved, so, you know, they're kind of |
| 2 | persnickety at the Bureau of Prisons. |
| 3 | MR. SHARGEL:  I'm persnickety? |
| 4 | THE COURT:  No, Bureau of Prisons. |
| 5 | MR. SHARGEL:  Oh. |
| 6 | THE COURT:  If you correct it, if that's the |
| 7 | objection, why don't you correct it and I'll sign the order |
| 8 | again. |
| 9 | MR. SHARGEL:  Very well.  I don't have a printer here |
| 10 | but perhaps we can -- |
| 11 | THE COURT:  Do you want us to? |
| 12 | THE LAW CLERK:  I'll just type it. |
| 13 | THE COURT:  Who's getting the order, give it to the |
| 14 | government, give it to you? |
| 15 | MR. SHARGEL:  If you give it to us, we'll be here. |
| 16 | Ms. Hays will be up here.  We're going to have a fast lunch and |
| 17 | come back to the courtroom. |
| 18 | THE COURT:  That's what we'll do then. |
| 19 | MR. SHARGEL:  Thank you. |
| 20 | (Luncheon recess) |
| 21 | (Continued on next page) |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Hd36rlev2

|     |                                                                    |
|-----|--------------------------------------------------------------------|
|  1  | AFTERNOON SESSION                                                  |
|  2  | 1:45 p.m.                                                          |
|  3  | (Jury not present)                                                |
|  4  | (At the side bar)                                                 |
|  5  | THE COURT:  I have a note from Ms. Genevieve Shuler.              |
|  6  | I think she is Juror No. 2.  At any rate, she sends this note     |
|  7  | which I want to call to everyone's attention.  I think it is      |
|  8  | just extraordinary caution on her part.  I don't see any          |
|  9  | problem.  Does anybody see a problem?                             |
| 10  | MR. SHARGEL:  I don't see a problem.                             |
| 11  | MR. SREBNICK:  No.                                               |
| 12  | THE COURT:  I'll mark it as a court exhibit and make             |
| 13  | it part of the file.  The jury is all here.  Are we all ready     |
| 14  | to go?  You found the podium?                                     |
| 15  | MR. SHARGEL:  I did.                                             |
| 16  | THE COURT:  It was missing before.                              |
| 17  | (In open court; jury present)                                   |
| 18  | THE COURT:  Mr. Master.                                          |
| 19  | MR. MASTER:  Thank you, your Honor.                             |
| 20  | Ladies and gentlemen, I wanted to start out by                   |
| 21  | thanking you for you patience during jury selection and for       |
| 22  | your service as jurors and for your patience during the course    |
| 23  | of the trial.  I'm Howard Master.  I'm an Assistant U.S.          |
| 24  | Attorney here with the Southern District of New York.  I'm        |
| 25  | going to give an opening statement that lays out some of the      |

1    evidence that I expect you will hear over the course of the

2    case.

3           These two defendants, David Levy and Donna Levy, they

4    made millions upon millions of dollars from deception, lies,

5    and greed.  They preyed on small business people trying to

6    realize their dreams.  They pretended to be good-faith

7    investors.  They pretended to care about these businesses'

8    long-term success.

9           They used cash from other frauds and other people to

10   get cheap stock in these businesses, and then they teamed up

11   and they worked with a network of other stock fraudsters to

12   pump up, or increase, the price of these stocks in those

13   companies so they could dump, or sell, their own shares into

14   the market at a huge profit.

15          This kind of scheme, ladies and gentlemen, is called a

16   pump and dump stock fraud.  The defendants used that scheme to

17   defraud business after business, investor after investor.

18   Along the way they told lie after lie to the businesses,

19   owners, and managers, the founders of those companies, and they

20   deceived the investing public again and again.

21          By the time the defendants were done, they had

22   pocketed millions while small business owners and the investing

23   public were left with huge losses.  To ensure that nobody would

24   get their hands on some of the profits from that stock fraud,

25   David Levy laundered some of the proceeds of that scheme using

1  shell company bank accounts in Panama.

2          Ladies and gentlemen, at this trial the defendants'

3  deception, their lies, and their greed will be exposed by their

4  own voices on tape, by victims of their crimes, by other

5  witnesses, and by trading records and other evidence, all

6  leading to one conclusion:  That these two defendants are

7  guilty as charged.  That's why we are here.  That's what this

8  trial is about.

9          Before I continue, I've already introduced myself.

10 I'm an Assistant U.S. Attorney here in the Southern District of

11 New York.  With me at counsel table is Assistant U.S. Attorney

12 Carrie Cohen, IRS criminal investigations Special Agent Richard

13 Reinhardt, paralegal specialist Michael Dinet with our office,

14 and task force officer Anthony Maddalone.  We are the trial

15 team.  Together it is our privilege and our responsibility to

16 present the government's case and to prove the defendant's

17 guilt beyond a reasonable doubt.

18          The opening is just our opportunity to give an

19 overview of what the government expects the evidence to prove

20 so that as the evidence comes in, you will begin to see how it

21 all fits together.  Don't worry if you don't remember every

22 detail of what I say today, because it will all make sense at

23 the end of trial.

24          Let me give you an overview of what I expect the

25 evidence will show about the defendants' crimes.  Then I'll

1  explain how we intend to prove it.  We are going to focus over

2  the course of this trial on four companies whose shares one or

3  both of these two defendants helped to pump and dump:  Cardiac

4  Networks, which is a heart monitoring company; Banneker

5  Incorporated, which is a designer watch company; Greenway

6  Design Group, which makes energy saving devices; and an alleged

7  company called Emerging World Pharma.

8         You are going to meet the business people who founded

9  and worked so hard to build Cardiac Networks, Banneker, and

10  Greenway design.  You are going to learn that at the time they

11  met the Levys, they had big dreams.  What they needed to make

12  those dreams a reality was seed money, seed money to invest in

13  real products and real services, to hire staff, to tell the

14  public about the real things that they made and did and why

15  people should buy them.

16         You will also learn that in each case David Levy

17  approached these small business people with a similar

18  proposition.  He would take the company to the next level, he'd

19  provide funding, he would take these companies public.  All he

20  asked for in return was some of the business's stock and the

21  right to buy more.  He said he was in it for the long haul.

22         Donna Levy, on the other hand, she told these small

23  business people who founded Cardiac Networks and Banneker that

24  she knew how to handle publicity and investor relations, and

25  she offered to do it for these two businesses.

1    You will learn that the founders of these two

2  companies were not experts on the stock market, they weren't

3  experts in public relations or in running a publicly traded

4  business, and the Levys were offering the money and the

5  expertise that they needed to make their dreams a reality.  So,

6  after meeting with the Levys and hearing what they offered, in

7  each case they took the deal.

8    But you will learn that in each case, once these

9  unsuspecting small business people accepted the Levys' money,

10  they took care of the rest, the Levys.  They took each of the

11  companies public using shell companies, a term called a reverse

12  merger that you will hear about, and he awarded himself

13  millions of shares in each of those companies in the process.

14  He arranged for the stocks to trade on what is known as the

15  pink sheets market with other penny stocks, that is, other

16  stocks with low share prices and low visibility.

17    Once the Levys got their hands on that stock and

18  arranged for it to be publicly traded, they carried out the

19  same pump and dump scheme again and again with each of those

20  companies.  They did it multiple times with each company.  On

21  at least three occasions with Cardiac Networks, that stock,

22  2007, 2009, and 2010, and on at least two occasions with

23  Banneker stock, in 2008 and 2009.  David Levy artificially

24  inflated the price of Greenway design on two separate occasions

25  in 2011.

1      The Levys made millions upon millions of dollars off

2  of these manipulation schemes.

3      How did they manipulate the stock price and make those

4  millions?  You will hear that they worked with a network of

5  other stock fraudsters to artificially inflate the price of the

6  stock they had gotten from these small businesses.  They used

7  that network to send out thousands upon thousands of email

8  blasts containing false statements and half-truths to the

9  investing public.  They arranged for people to post positive

10  information on investor websites and Internet message boards

11  concerning these companies.

12      In coordination with the Levys, members of their

13  network, they would buy shares in the companies to make it look

14  like the demand was going up, and other members of the network

15  would sometimes sell stock to make money that they would split

16  with the Levys.

17      They timed it all to coincide with the press releases

18  that the companies were issuing, in many cases press releases

19  that were drafted and issued by Donna Levy herself, so that

20  investors would think that there were legitimate developments

21  in these companies, legitimate reasons why the company was

22  doing well and the stock price was soaring.

23      You will learn that the defendants spent lots of money

24  on these coordinated campaigns to pump up the stock price.  You

25  will learn that it was far more money than they spent on these

1  businesses that they supposedly cared about to promote real

2  products and real services.

3       Ladies and gentlemen, guess what happened when the

4  defendants stopped spending all that money to pump up the plies

5  of those stocks?  The price of those stocks collapsed again and

6  again each time.  And they knew that it would, because they did

7  it again and again.

8       But, ladies and gentlemen, the price collapse happened

9  after the Levys had already cashed in.  Meanwhile, the

10  investors who had believed the defendants' hype machine and the

11  small businessmen who founded these companies and who worked so

12  hard to build them and who had what is known as restricted

13  stock in these companies, stock they couldn't sell during these

14  campaigns at all because they were company insiders, they were

15  left holding worthless stock.  And when these business people

16  asked what happened, the Levys lied.  They denied they were

17  selling and they blamed others because they didn't want the

18  truth to come out.

19       Ladies and gentlemen, what happened with all of the

20  money that the Levys made from this scheme?  They gave some of

21  it to the businesses they supposedly believed in, but not

22  nearly enough to keep the businesses from going in the red and

23  eventually running out of cash.  And while they were telling

24  these businesses that they didn't have enough cash to continue

25  funding them, they spent millions on themselves:  On a huge

1  waterfront home in Florida, on luxury vehicles, on hundreds of

2  thousands of dollars in credit card bills, on money-losing

3  movie and TV projects.

4        You will hear that the defendants' scheme was exposed

5  after Donna Levy got caught on a court-authorized wiretap

6  manipulating the price of the fourth company that I mentioned

7  earlier, Emerging World Pharma.  She was captured on tape

8  talking about pumping up the price of that stock.  She also

9  talked on that wiretap about future deals in a way that leaves

10  no doubt about her role.

11        You will see that the price of Emerging World Pharma

12  more than tripled in a matter of days, generating at least a

13  quarter million dollars in fees for Donna Levy while investors

14  who bought on the basis of that promotional campaign that she

15  orchestrated were left with huge losses.

16        In the fall of 2010 Donna Levy was arrested and the

17  Levys' Florida home was searched, turning up evidence of the

18  scheme.  You will learn that after Donna Levy was arrested,

19  David Levy carried out that same scheme again, that scheme with

20  Greenway design that I mentioned earlier.  You will learn that

21  David Levy made more than $5 million manipulating the price of

22  Greenway design in the space of a few months in 2011, after his

23  wife was arrested.

24        Ladies and gentlemen, what the defendants did was

25  wrong, but it was also criminal.  You see, it's a crime to

1    deceive small business people so that you can get rich while

2    they take huge losses.  It's a crime to trick the investing

3    public into buying shares of stock from you at prices that you

4    know are inflated because you're the one who inflated them in

5    the first place.

6            When you lie to and deceive people in connection with

7    the purchase and sale of stock, like these two defendants did,

8    that's securities fraud.  And when you carry out a scheme to

9    defraud using the Internet, wire transfers, wire

10   communications, a scheme like the one the defendants carried

11   out again and again and again, that's called wire fraud.

12           You will learn that David Levy tried to hide over

13   $2 million of his profits from stock fraud in Panamanian shell

14   companies that were set up by a money launderer.  You will hear

15   that agents obtained records tying David Levy to the accounts,

16   and they got that money launderer to make secret recordings

17   with David Levy in which David Levy admitted that the money was

18   his, that it was obtained from stock promotion activities, and

19   that he couldn't let the bank know the true source of that

20   money.  You will hear these tapes at the trial.

21           That, ladies and gentlemen, is money laundering.  It's

22   a separate crime.  And that's why we are here.

23           Now that you have heard what the case is about, let me

24   take a few minutes to explain to you how the government is

25   going to prove this to you.  First, you're going to hear from

1  representatives of those first three small businesses that I

2  mentioned:  Cardiac Networks, Banneker, and Greenway Design.

3  The government expects that their stories will be remarkably

4  consistent even though they are in different industries, in

5  different parts of the country, and they have no real knowledge

6  of each other and how each was defrauded by the same people,

7  these two defendants.

8        They are going to tell you how David Levy and, in the

9  case of Cardiac Networks and Banneker, Donna Levy came to them

10  with all the outward signs of success, with up-front money and

11  a promise of more to come.  You will learn that that up-front

12  money and the defendants' nice house, nice cars, signs of

13  success, they were essential reasons why these small business

14  people trusted the Levys, why they believed that the Levys had

15  the resource to come through and were in it for the long haul.

16        You will hear how the founders and the managers of

17  those companies who had worked so hard to build those

18  businesses, how they knew nothing about the misleading

19  promotional campaigns that the Levys orchestrated to

20  artificially inflate the price of their stock for the Levys own

21  financial gain.

22        You will hear how the Levys lied when the stock

23  dropped by denying that they were selling.  You will hear how

24  David Levy forged document after document in the name of his

25  sister Yael Levy Tal in the name of this scheme.  You will hear

1  how these small business people were left holding essentially

2  worthless stock in these companies that they had built while

3  the Levys made millions.

4         You will also hear from outside investors who were

5  tricked by the defendants' promotional schemes and who lost

6  big.  You will get to see press releases that Donna Levy issued

7  herself or helped issue for Cardiac Networks and Banneker.  You

8  will see examples from the misleading promotional campaigns

9  that the Levys timed to coincide with those press releases and

10  with their stock sales so that they could stack the deck in

11  their favor.  You will see similar timing with Emerging World

12  Pharma and Greenway Design as well.

13         You will also hear from people who heard the Levys and

14  members of their network talk about how they carried out their

15  scheme.  Some of these people are what is known as cooperating

16  witnesses for the government.  They are people who have

17  committed crimes.  They are testifying in hopes of getting a

18  lesser sentence at the end of the day.  Some of these people

19  have committed fraud, some with the Levys, and some have even

20  lied to the government before.

21         For these reasons, you should scrutinize those

22  people's testimony carefully.  And when you do, you will find

23  that what they tell you is backed up, corroborated, by all of

24  the other evidence in this case, by the Levys' own words caught

25  on tape, by trading records and charts showing how those stocks

1    got pumped and dumped again and again and again, and how the

2    Levys profited again and again and again in response to those

3    misleading promotional schemes, by their orchestrated fraud.

4         You will hear from victims, both small business people

5    and outside investors, who got scammed by the Levys.

6         Ladies and gentlemen, these two defendants, David Levy

7    and Donna Levy, they cheated small business people out of their

8    dreams.  They cheated investors in these businesses.  They

9    cheated others out of their money.  They cheated the public

10   markets by manipulating the stocks in these businesses again

11   and again and again.  They made millions of dollars doing it,

12   some of which David Levy tried to hide by laundering it in

13   Panama.

14        During this trial you will hear recordings of the

15   defendants, you will see a lot of documents, you will hear from

16   many witnesses.  You will see and hear the evidence of the

17   defendants' deception, their lies, their greed.  As this trial

18   unfolds, I ask you to do three things.  First, please pay

19   careful attention to the evidence.  Second, listen carefully to

20   the judge and follow all of his instructions on the law.

21        And third, please use your common sense, the same

22   common sense you use in your everyday lives.  It serves you

23   equally well here.  When you do that and you do the other two

24   things that I mentioned, it is going to lead you to the only

25   conclusion that is consistent with the facts and the law, and

1    it's that these two defendants are guilty as charged.

2          Thank you.

3          THE COURT:  Thank you, Mr. Master.

4          Mr. Shargel.

5          MR. SHARGEL:  Yes.  May it please the Court.

6          THE COURT:  Yes, sir.

7          MR. SHARGEL:  Counsel, ladies and gentlemen of the

8    jury, I want to say it as emphatically as I can say it:  David

9    Levy is an investor.  He's not a fraudster.  He's not a day

10   trader.  He's not a stock manipulator.  He's not a liar.  He's

11   not a pump and dump person.  He did not BS anyone.

12         You know, there was one thing that Mr. Master said,

13   but he said it quite low.  Even with the benefit affect

14   microphone, he said it quite low.  He said some of the people

15   who will be called before you as witnesses lied.  He said it so

16   softly.

17         You're going to hear again and again and again that

18   these people, people who weren't named by Mr. Master, people

19   who, according to Mr. Master, were working hard to create a

20   business, working hard to create a business, David Levy

21   targeted them and David Levy fooled them and David Levy

22   deceived them.  I say to you, ladies and gentlemen, that that

23   will never be proven, let alone proven beyond a reasonable

24   doubt.

25         I say to you, ladies and gentlemen, that in the days

1    ahead and with the proof that you see and the documents that

2    you see, it will be crystal clear that David Levy never set out

3    to deceive anyone, and again and again he was deceived by

4    hucksters and fraudsters themselves, people who the government

5    lawyer just said to you were the hard-working people creating

6    businesses.

7           Let's talk about this.  I'm going to be a little more

8    specific.  I'm not going to talk in vague generalities.  I'm

9    not going to paint on a canvas of generalities about how

10   wealthy they are and how are we to react to that, and how much

11   money they spent and how are we to react to that, and how much

12   they gained from this work, how are we to react to that.  I

13   want to talk about specifics.

14          David Levy, as I said a moment ago, is an investor.

15   These are situations that you are well familiar with,

16   situations that you are well familiar with.  He invested, as

17   you will see from the evidence in this case, in the

18   entertainment world.

19          He invested not only, what did Mr. Master say, in

20   businesses that failed.  Yes, he has invested in businesses

21   that failed, like all investors.  But he has invested and has

22   achieved by hard work and diligence and perseverance and

23   industry of his own an enormous success.

24          There is no reason in 21st century America to

25   apologize for that.  He has achieved again and again and again.

1   He has produced feature films.  He has promoted rock concerts.

2   He had a reality TV show on a major cable network.  He has

3   again and again showed diverse and interesting leadership and

4   involvement in significant companies.

5        He also invested in what are called startup companies.

6   Each and every one of you are familiar with startup companies.

7   There is nothing unusual about that.  A new business.  Yes,

8   this is the land of hope and dreams.  Yes, a new business that

9   was striving to get off the ground.

10        But it wasn't always operated, as you will see and as

11   I will go into more detail, it wasn't always operated by people

12   of good will and good intention.  You will find that from the

13   evidence in this case.

14        These startup companies would come to David Levy.  And

15   let me make that clear.  The charges are, as I think that Mr.

16   Master referred to it, that David Levy and Donna Levy would

17   target companies and take advantage as if they were some sort

18   of predator and approached startup companies.  That's not what

19   happened.  The opposite was true.  People would come to David

20   Levy because he was known as an investor, I'll give you more

21   specifics as I go along, because he was known as an investor,

22   and they would propose a deal.

23        They would propose a deal and they would propose a

24   business and they would talk about financing that was needed.

25   They asked him for money.  They asked him for investment.  And

1  they were willing to give him the only thing ultimately that

2  they had to trade for the money, and that was stock, the only

3  way that they could secure the investment, the only way.

4         There was no collateral.  They couldn't go to a bank.

5  That's the very point.  They had no collateral to take out a

6  loan for the new business.  They had to find willing investors

7  who were willing to take the risk because some 75 percent, as

8  you will hear, 75 percent of startup companies fail in America.

9  75 percent.

10        This was a risk not only for the people involved in

11 the startup companies, this was a risk not only for the

12 employees who decided to take low salaries and stock, this was

13 a risk for David Levy in each and every one of those instances.

14 And it was David Levy who wanted these companies to work.  If

15 the companies worked.  Everyone thought about the next Facebook

16 or the next Instagram.  If the companies worked, there was the

17 potential for huge success.

18        This was a risk.  It was a risk for many reasons.  A

19 startup company could be facing tough competition in the

20 market.  A startup company could suffer from mismanagement.  A

21 startup company could have difficulty developing a product.

22 But the main problem, the main problem is shortage of money,

23 shortage of capital.  Unless you had a rich family or unless

24 you had independent wealth, the only way you could deal with

25 this is to go to an investor.

1          The government says that David Levy targeted companies

2     and he led companies along and the companies were naive.

3     That's what he said.  He said the companies weren't familiar

4     with the ways of the stock market, they weren't sophisticated

5     investors themselves, they weren't sophisticated business

6     people.  Nothing could be further from the truth.  As you will

7     see from the evidence in the case, as you will see by the

8     documents that are put before you, nothing could be further

9     from the truth.

10          This is an opening statement, and I'm going to tell

11     you flat-out at this moment that David and Donna Levy committed

12     no crime.  They committed no crime in their business dealings

13     with Cardiac Network and Banneker.  They committed no crime.

14     That's a bold statement to make.

15          You just heard the government lawyer up here before

16     you saying that the evidence is going to show this and it's

17     going to be crystal clear and the evidence will show that and

18     they will be able to prove their case beyond a reasonable

19     doubt.  I say no, they won't, because the evidence in this case

20     will show a completely different picture of what occurred.

21          The evidence in this case will show that they weren't

22     out to fool anyone, to pull the wool over anyone's eyes.  David

23     Levy provided capital and furnished valuable advice based on

24     years of business experience, and he wasn't dealing with some

25     naive people trying to put a business together, hard-working

1    people.

2            Yes, he received shares, and yes, he was interested in

3    making a profit.  That is because of the risk that he took.

4    But, again, I don't want to paint with generalities.  Now I

5    want to be specific.  Now I want to talk about two of the

6    companies, Cardiac Networks and Banneker, to show you exactly

7    what happened.

8            There is only one thing that I will agree on.  There

9    was a similarity or a commonality of events or developments

10   with respect to both of those companies.  I'm going to tell you

11   specifically what the evidence in this case will show.  Cardiac

12   Network.  I'm going to talk to you about the story behind

13   Cardiac Network and Mr. Levy's involvement and Mrs. Levy's

14   involvement.  Cardiac Network speaks volumes about these

15   unwarranted, undeserved, and unearned charges that have been

16   brought against them.

17           I want to tell you a little more than Mr. Master did

18   about the products that Cardiac Network had.  I will introduce

19   into evidence and I'll show you a film, short, five minutes,

20   I'll show you a film or video, a promotional video, and we will

21   talk about that promotional video some more, a promotional

22   video about this product.

23           It was a fabulous product.  A heart patient, believing

24   that he or she was having a heart attack, could take this

25   monitor and put thumbs on the electrodes, both thumbs on the

1    electrodes, and then by telephone, by telephone, a doctor could

2    read essentially the equivalent of an EKG and determine whether

3    the patient was having a heart attack.  There was enough

4    information that was being conveyed via telephone.  You didn't

5    need to wait for the ambulance.  You didn't need to decide

6    whether to call 911.  This would enable someone to via phone

7    get that information to the cardiologist.

8            Cardiac needed money.  There is no question about the

9    fact that this was an important and significant device that had

10   a very promising future.  You will see what the owners of

11   Cardiac said about the future of that company.

12           The business, Cardiac Network, had almost no revenue.

13   It had almost no assets.  The company needed to sign up doctors

14   and patients, buy monitors, and advertise their product.  As

15   you know, you can't sell a product without advertising.

16           It's charged that Cardiac Network was supposedly a

17   target of David Levy and Donna Levy.  Let me talk to you about

18   these companies.  Let me tell you that Cardiac Network targeted

19   David Levy.  David Levy did not target Cardiac Network, it was

20   the opposite.

21           There were some early investors before David Levy got

22   involved with Cardiac.  There were early investors who put up

23   some money.  One person put up 300 or $350,000, a partner in

24   the company.

25           Then there was a man by the name of John Fisher.  This

1    is a name that you are going to hear again from the evidence in

2    this case.  There was a man by the name of John Fisher who put

3    up a loan of $20,000, never got it back.  He loaned it to the

4    principal of Cardiac, a man by the name of Zev Helfer.  You may

5    see him on the stand this afternoon.  If not this afternoon,

6    then certainly tomorrow.  Zev Helfer was one of the key

7    partners in Cardiac Networks.

8        John Fisher, the man who loaned $20,000, was

9    significant for a reason beyond the loan.  John Fisher lived

10   down the block from David and Donna Levy in Fort Lauderdale,

11   Florida.  He was a neighbor.  He was a friend.  He called David

12   Levy on the telephone and said, I'm involved with this company

13   Cardiac, they need money and they are looking for an investor,

14   and we would like to come over and make a presentation.  David

15   Levy said come on over and make the presentation.

16       For those of you who have watched Shark Tank, I think

17   the show is called, a presentation is made, an idea is hatched,

18   and a case is made as to why the investor should lend the

19   money.  That's what would happen again and again in David

20   Levy's life.  He was an investor, and people came to him and

21   made proposals and gave him the details of the business,

22   discussed the financials, discussed the projections, and

23   discussed the product.

24       So, Zev Helfer is introduced to David Levy through

25   John Fisher.  Zev Helfer comes over to the house, and he brings

1    the monitor with him.  He brings some facts and figures with

2    him, and he makes a presentation.  David Levy has heard

3    presentations his whole adult life, presentations, requests for

4    capital.  He either says at the end, I'm in or I'm out, I like

5    the deal or I don't like the deal.

6         When Zev Helfer walked in with John Fisher to Mr.

7    Levy's house and Mr. Levy sat down with him, it sounded like a

8    fabulous idea, as I said before.  Even more than sounding like

9    a fabulous idea, Zev Helfer said that there was a doctor, a Los

10   Angeles-based doctor named Eli Gang, Dr. Gang, G-A-N-G.  Dr.

11   Gang was a world-known cardiologist, a cardiologist with an

12   impeccable reputation, known literally throughout the world,

13   respected and recognized as a top cardiologist throughout the

14   world.

15        Zev Helfer said to David Levy, you know, Dr. Gang is

16   going to be, is already -- it's just a startup at that point --

17   is already our medical adviser, he believes in this company, he

18   has confidence in what it is that we are doing; this product,

19   the monitor, was manufactured in Israel from a technology

20   company in Israel; Dr. Gang said that is a fabulous product and

21   it has an enormous future.

22        David Levy weighed the prospect.  He did his due

23   diligence.  He looked into the efficacy of what had been

24   promised or suggested or predicted as to what could happen, and

25   he said, I'm interested, count me in, count me in.

1      The next thing that happens is that David Levy goes

2   out to Los Angeles.  He goes out to Los Angeles and has

3   lunch -- I don't remember if it was lunch or dinner; you will

4   hear from the testimony -- lunch or dinner with Dr. Gang in

5   Beverly Hills, at a restaurant in Beverly Hills.  Dr. Gang

6   again tries to persuade David Levy that this is a great

7   investment, that he himself has affiliated himself with the

8   company and that this is a great investment.

9      It's clear that they are doing everything they can to

10  persuade, to persuade David Levy that this is worth his while.

11     You know what David Levy says?  And I'll tell you

12  something.  When Zev Helfer is cross-examined, I suggest to you

13  most respectfully and I ask you most respectfully -- there is a

14  direct examination and then there is the cross-examination --

15  do you know what David Levy says?  The person whom you heard a

16  few minutes ago was so greedy, the person who just wanted to

17  get a quick profit, he didn't care who he threw under the bus,

18  he just wanted his quick profit, do you know what Zev Helfer,

19  the principal of Cardiac Networks says to David Levy?

20     First, Mr. Levy says, how much money do you think

21  you'll need?  How much money do you want me to invest?  Helfer

22  says, I think $400,000 will do it.  David Levy said, no, what

23  you need to establish this network, $400,000 won't do it, I

24  will get you a million 2.  You need three times that.  This is

25  the person who is greedy and taking money from people and only

1  cares about himself.  He says, in response to we need 400,000,

2  Mr. Levy, in words or substance, I'm an experienced

3  businessman, that is not enough, you need $1.2 million.

4        Now, there was something about Helfer that didn't seem

5  exactly right.  It's true that he had gone, as Mr. Levy

6  learned, through a horrible divorce.  But he apparently was so

7  broke that he didn't even have a car to get around down in

8  Florida or wherever he was living at the time.  He didn't even

9  have a car.  He had no money.  Other people kicked money into

10  Cardiac to get it started before David Levy was approached.

11  They put in their own money, and Zev Helfer put in nothing.  He

12  didn't even have a car.

13        Now, I'm going to get ahead of myself, but I just want

14  to put one small fact before you, particularly since Mr. Master

15  was talking about this unbridled greed and these poor people

16  who were putting startups together.  What did he say, working

17  very hard, worked hard to create, worked hard to create, and

18  they were lied to.

19        This man who didn't have a car, after David Levy

20  invested his money -- and I'll come back to it because there is

21  more to this story -- after David Levy invested his money, this

22  man who didn't have a car is now driving around in a Porsche,

23  which he got by spending David Levy's money contributed to the

24  business for the promotion of the business and the success of

25  the business.  This man who is creating this business goes out

1    and leases a Porsche for $1700 a month.  Now that's how he's

2    getting around.  That was Mr. Levy's money, because Helfer

3    didn't have a dime before Mr. Levy furnished that $1.2 million.

4           David Levy says, as I said a moment ago, count me in.

5    This trial will spend a lot of time focusing on what happened

6    next.  On what happened next.

7           There were handshakes.  Then the handshakes became

8    term papers and contracts that put the parties' understanding

9    in writing.  Let me tell you this.  In 2007 -- because this

10   meeting is at the beginning of 2007 -- 2008, 2009 Mr. Levy was

11   not in the business for 15 minutes.  The witnesses that you

12   will see testify here, like Mr. Helfer, will have very

13   different recollections of what occurred.  They will have very

14   different recollections of promises that were made and

15   commitments that they say were broken and representations that

16   they say were false.

17          Let me tell you this.  We live in an electronic age.

18   We all live in an electronic age.  Each and every one of us in

19   this courtroom has entered into contracts at one time or

20   another.  It may be the lease of a car, it may be the lease of

21   an apartment, it may be something to sell or something to buy,

22   but each one of us has had contracts at some time in our lives.

23   If there were ever any question about what the agreement was,

24   if there were ever any question about what the parties

25   understood, it was always go back to the contract and see what

1  was said at the time of the contract.

2        I say to you that in this electronic age of ours, the

3  contract is always available, stored in a computer somewhere.

4  The emails, the text messages, the bank statements, the loan

5  agreements, the stock certificates, that's all available.  Will

6  the government be putting documents in evidence?  Absolutely,

7  yes, they will.  But we'll be putting documents in evidence

8  also.

9        We will be putting documents in evidence also to show

10  again and again with incandescent clarity, with incandescent

11  clarity we will show again and again that the documents speak

12  for themselves, the signed and executed documents speak for

13  themselves.  The email traffic speaks for itself to show that

14  there was no fraud of deception of any kind that David and

15  Donna Levy committed.

16        Mr. Master mentioned that Mr. Levy knew about the

17  stock market and these were naive people.  They weren't naive

18  people.  The documents will show that.  The emails will show

19  that.

20        You heard one thing that I think Mr. Master mentioned,

21  I don't want to run past it, the reverse merger, the reverse

22  merger and the idea of going public in penny stocks.  Let me

23  say this.  None of that was illegal.  Reverse mergers are not

24  illegal.  It made perfect sense for a startup company.  You

25  will hear testimony about that.  It made perfect sense as a

1  vehicle for people to invest in a startup company.

2        If it is just a private business, a business that was

3  not public, it's very difficult to get investors.  You will

4  hear people testify that this was an ideal solution for a

5  startup company, to have stock purchased by the public,

6  purchased by individuals who also believed in this company.

7        The deal went through at Cardiac Network.  The

8  contracts were signed.  The agreements and terms were made

9  clear.  Mr. Levy had free-trading stock, there is no question

10  about it, and he had a lot of money committed to Cardiac

11  Network.

12        He expected one thing in return.  He expected what any

13  of you would expect if you made an investment like that, of

14  well over a million dollars into a company.  He expected

15  loyalty and honest services from the people who owned the

16  company, including Zev Helfer.  That's all he was asking for.

17  He thought the future was there.  The monitors were well

18  endorsed.  The only issue was would he get honest services from

19  the people who actually owned that company and who originated

20  that company, and he did not.  He did not.

21        Not only was the company mismanaged -- you will see

22  that Zev Helfer had a business plan that was one page long.

23  Not only was the company mismanaged, but the bank statements

24  that I will offer into evidence, the bank statements that I

25  will put before you and put up on that screen and put on those

1    monitors will show that again and again, as fast as Mr. Levy

2    was putting money into Cardiac, as fast as he could get money

3    to that business, again and again and again it was being taken

4    right out.

5         It was being taken right out with large checks, large

6    checks, not only for a Porsche car for $1700 a month, but the

7    original partners in Cardiac were taking Mr. Levy's money and

8    robbing him blind, diverting money that was intended to jump-

9    start this company, to allow the company to grow and to

10   distribute those heart monitors.  That money was just being

11   diverted, diverted.

12        The bank records show it.  The bank records will show

13   the money that went in and the money that came out, and who was

14   getting that money completely, completely unrelated to the

15   project at hand, the success of this heart monitor business.

16        Even Dr. Gang, if I may say, even Dr. Gang, who will

17   be a witness here, was taking money out of the business.  That

18   wasn't what Mr. Levy struck a bargain for.  That wasn't what

19   Mr. Levy intended to have happen.  He wanted to see the success

20   of this company.  His interest in earning money was directly

21   base on the success of the company.

22        Again and again money was taken out of this company.

23   But, you know, it didn't even stop there.  Zev Helfer will

24   testify -- it might be this afternoon -- Zev Helfer will

25   testify that he was kicked out of the company.  He was kicked

1    out of the company.  You're going to see that he wasn't kicked
2    out of the company.  He was voted out of the company.

3          I keep wanting to go back to the words.  This man who
4    worked hard to create a company and was lied to by Mr. Levy and
5    lied to by Donna Levy, this man had perpetrated an enormous
6    fraud, an enormous fraud that essentially was killing the
7    company.  It was killing the company because it was diluting
8    the shares and creating false financial information for other
9    investors and purchasers of stock.

10         You might say, well, these are just lawyer's words.  I
11   say to you, ladies and gentlemen, hold me to it.  Hold me to
12   it.  Focus on that one issue for a moment.  And there will be
13   so many of these issues throughout the case.  Just focus on
14   that one issue for a moment, that Zev Helfer, unbeknownst until
15   he was discovered -- he wasn't discovered by Mr. Levy.  He
16   fooled Mr. Levy.

17         There was a new CEO that came into the company, a new
18   CEO named Michael Swartzburg, a well credentialed CEO who
19   discovered that there was an enormous fraud, an enormous fraud,
20   not by Mr. Levy, not by David Levy or Donna Levy, but an
21   enormous fraud created, engineered, and executed by Zev Helfer.
22   Hold me to it.

23         Another thing about the claim that Mr. Levy was only
24   in it to pump it and dump it and he didn't care what happened
25   to the company.  You're going to see again and again

Opening – Mr. Shargel

1   circumstantial evidence, direct evidence -- the judge explained

2   the difference between the two -- you're going to see exquisite

3   evidence eloquently showing that again and again that David

4   Levy was interested in the success, not the failure.  He wasn't

5   dumping on the company.  Not the failure of the company.

6          What is the evidence of that?  Let me give you a few

7   examples.  While Zev Helfer was figuring out what was going to

8   happen with his Porsche and the cash he was putting in his

9   pocket, withdrawing from the bank, do you know what David Levy

10  was doing?  He wasn't pumping and he wasn't dumping.

11         David Levy was working.  He himself was working to get

12  this company going, thinking that everyone was well-

13  intentioned.  He said, we need a promotional video, a

14  promotional video, David Levy says, that will get the company,

15  that will get the name out there, that will get the idea before

16  the public.

17         He goes to people from the industry in which he

18  worked, the film and music industry.  He went to people in that

19  industry and he said, can you help me with a promotional film,

20  a video?  And they said yes.  After he got the estimate, after

21  he got the estimate, there were two ways to go.  One was that

22  the film would cost $4,000 -- I think this speaks volumes --

23  one that the film would cost $4,000 and another that would cost

24  a little over $6,000.

25         David Levy, who is only interested in himself, said to

1  Zev Helfer at that time when he thought that Zev Helfer was an

2  honest man, he said to him, I'll pay for the video, I'll pay

3  for the video, but let's do the $6,000 one because I think it

4  is a better video.  I think these people who are very

5  experienced out in California, we'll get a better product if we

6  do the $6,000 video, and I'll pay for it.

7          Then they wanted to have a logo for the business,

8  Cardiac Network, to get some attractive logo.  Zev Helfer,

9  while he is riding around in his Porsche, it's David Levy who

10 meets and says, I want to have a logo designed, that that was

11 going to cost a fair amount of money.  But he said to Zev

12 Helfer, don't worry, I will pay for it and the company can pay

13 me back after it's successful.  Again and again, again and

14 again David Levy showed without equivocation that he was a

15 person who was interested in this business.

16         Well, after it was discovered by Michael Swartzburg

17 that a fraud was committed -- by the way, it wasn't Zev

18 Helfer's only fraud.  More frauds come out when the government

19 starts talking to him and more frauds come out as these papers

20 are analyzed and what Zev Helfer was doing that was killing

21 this business.

22         There was no pump and dump here.  Michael Swartzburg

23 comes on as the new CEO.  I'll make this brief.  Everyone has

24 such high hopes, high hopes, now that Zev Helfer was out of the

25 company.  Swartzburg, a seasoned, experienced, well-

1    credentialed CEO comes in and everyone expected that the

2    company would be turned around, everyone including David Levy.

3          When Swartzburg comes in, you will hear him tell you

4    this himself, he will be a witness in the case, he will tell

5    you that after he came on board, David Levy, confident that

6    Helfer was out, wrote a check for $100,000.  Another hundred

7    thousand dollars goes into the business, another hundred

8    thousand dollars.  You know what?  Mr. Levy still owns Cardiac

9    Network  stock.  He wasn't looking to dump or ruin or steal or

10   fool or deceive the company.

11         Let's go to one more example.  I'll even make it

12   shorter.  Mr. Master said, well, there was a commonality of

13   interest, yes, a commonality of events between and among the

14   companies.  Well, yes, there was.  In that respect let me talk

15   about Banneker.  Again, David Levy targeted companies?  I say

16   no, he did not, the companies targeted David Levy and came to

17   him to make presentations as an investor.

18         (Continued on next page)

19

20

21

22

23

24

25

1      MR. SHARGEL: Let me bring you back to April of 2007.

2  David and Donna go to Smokey Robinson -- they remember the

3  concert they went to -- Smokey Robinson concert down in Florida

4  and they met a woman named Bree Foster. They met the woman and

5  it was an afterparty at the concert and they met this woman

6  Bree Foster. And it's like any other party that you go to --

7  what do you do, what do you do? And David Levy says to her,

8  I'm an investor. And they go on and they talk and they

9  exchange phone numbers and everyone is getting along.

10     And about a month after the party, the Smokey Robinson

11 concert, Bree Foster calls David Levy and said I'm involved in

12 this company called Banneker and would you be interested? And

13 he said come talk to me. Tell me about it. Come over to my

14 house again. He said come over to the house.

15     There were two meetings at the house. The first

16 meeting took place with Tim Hardaway, the basketball player.

17 Tim Hardaway was one of the founding partners in Banneker. And

18 Tim Hardaway comes over with Bree, Bree Foster, and they talk

19 about Banneker and its business and they brought a laptop

20 computer and they're going over the product.

21     After that first meeting, there was another meeting.

22 Tim Hardaway came again to David Levy's house with Bree, and

23 they brought also a man named Derrick Holmes. Mr. Holmes will

24 be a witness here. Mr. Holmes was one of the founding, along

25 with Tim Hardaway, was one of the founding partners in the

1   company.  Holmes said he designed the jewelry for the Banneker

2   brand, and he said they also had a contract with Jostens.  I

3   don't know if you've heard of that company.  The class rings is

4   what they specialize in.  Everybody has a class ring probably

5   from that company.  And Holmes said that the idea that Banneker

6   had is they were designing class rings specifically targeted at

7   urban youth.  And speaking of targeted, again, David Levy was

8   targeted.

9         David Levy did his due diligence, as he did in every

10  one of the cases.  He was told by Holmes that Beyonce was

11  involved in this company and was interested in this project.

12  David knew Beyonce's father, Matthew Knowles, and David called

13  Matthew Knowles and asked him whether his daughter was involved

14  in the company.  And Matthew Knowles said that he wasn't, but

15  his daughter is involved in the company and it seemed like a

16  darn good idea.

17        And you know what -- particularly for a startup

18  company -- you know what, it was a darn good idea.  If you

19  think about it, to have Beyonce's name anywhere near the

20  project, to have what seemed like a fabulous business venture,

21  what could be wrong with that?  What could possibly be wrong

22  with that?

23        Well, there was something wrong with that.  The

24  something wrong with that is that Derrick Holmes -- and we'll

25  show this again and again -- that Derrick Holmes essentially

 1  destroyed the company.  He destroyed the company.  And David

 2  Levy was saying to him, after providing a large sum of money --

 3  and by the way, David Levy, Mr. Master said, well, you know,

 4  David Levy would promise money and then not deliver on the

 5  money that he promised.  Well, I don't think you'll find that

 6  not delivering money to someone who's stealing the money from

 7  you is any kind of criminal violation, I respectfully submit.

 8       But David Levy had money that was left with a lawyer

 9  that was earmarked to give that company additional money, but

10  Derrick Holmes was taking money out of that company faster than

11  David Levy could get it to the company.  And this is what,

12  again, worked hard, all these people, the companies that I'm

13  talking about now.  Look, these are Mr. Master's words and you

14  can hold him to it -- worked hard to create a company and they

15  were lied to and deceived and fooled by David Levy.  No, they

16  weren't.  Personal expenses were essentially sucked out of

17  Banneker.

18       And what, David Levy is a bad person because he didn't

19  continue supplying the money when he found out and saw what

20  Holmes was doing; that he had these side deals that were

21  diluting the shares of the company; that he had private

22  placements under a certain section of the SEC, the securities

23  law, this unsophisticated person?  And David Levy was supposed

24  to say okay, sir, here's more money, here's more money.

25       Look, I think the picture is clear.  I don't have to

1   labor it.  We should get on to the evidence in this case.  What

2   the lawyers are saying is not evidence.  It's just a prediction

3   of what we believe the evidence will show.  And I think that as

4   I said before, you can hold me to it, because everything I said

5   to you is something that will be proven before you.  And the

6   idea that they can prove this case against the Levys beyond a

7   reasonable doubt is utter nonsense, I respectfully submit.

8           But I want to say one more thing before I sit down.

9   That jury selection process, well, we all went through it

10  together.  But I want to share something with you.  When we

11  were up there at the side and going in the back door and

12  exercising our challenges, we weren't looking for black jurors

13  or white jurors, we weren't looking for Jewish jurors or

14  Gentile jurors, we weren't looking for Protestant jurors or

15  Catholic jurors, we weren't looking for tall jurors or short

16  jurors.  We were looking for fair jurors -- that's the only

17  thing we were looking for -- fair jurors.

18          And you are that jury.  You are the people who said

19  emphatically again and again -- you didn't make any excuses to

20  get off -- you said again and again you could be fair and I

21  have confidence in that representation and David and Donna Levy

22  have confidence in that representation.

23          And I suggest to you most respectfully at the end of

24  this case, no matter how long or how short it takes, the

25  verdict that you'll find from the evidence and the lack of

1    evidence and the inconsistency of the evidence and, no, I'm not

2    going to drop my voice and say witnesses lie.  Witnesses lie?

3    Witnesses lie to the government again and again and they lied

4    to David Levy as well.  Thank you.

5            THE COURT:  Mr. Srebnick.

6            MR. SREBNICK:  May it please the Court, your Honor.

7            THE COURT:  Yes, please.

8            MR. SREBNICK:  Good afternoon, ladies and gentlemen.

9    Mr. Shargel, as you can tell, is a hard act to follow.  But I

10   must follow him because I represent Donna Levy and it is my

11   privilege to do so.

12           Donna Levy has been the loyal wife to David Levy for

13   30 plus years.  And despite her young looks, she's a

14   grandmother.  She has a daughter who's in her thirties who

15   David, although is not the father, David raised their daughter

16   Victoria.  She's 39 years old.  Donna's granddaughter Millie.

17   And she has a stepsister, half-sister I should say, Natalie,

18   who's 30, who Donna basically raised since she was so much

19   older.

20           For the last 15 years after her daughter was grown,

21   Donna Levy joined her husband David in his capacity as an

22   investor, as you've heard from Mr. Shargel, and she started her

23   own enterprise promoting, advertising, a company she called DML

24   Marketing, her initials, Donna Michelle Levy Marketing.  And

25   she developed a business, a marketing business.  Eventually

1     developing a website.  Her business is the business of

2     marketing and advertising young companies that go public, young

3     companies that go public who the big Wall Street firms do not

4     follow, the big Wall Street firms do not analyze.

5              But make no mistake, she's in the advertising

6     business.  She is not a journalist.  She's not an analyst.  She

7     doesn't hold herself out ever to be an investment adviser.

8     She's not an accountant.  She's not an auditor.  She's not a

9     lawyer.  She's an advertiser.  And, you know, in the

10    advertising business, they say there's no such thing as bad

11    press.  And it was her job to create investor awareness, public

12    awareness of startup companies.

13             Why do young companies want that?  Because a young

14    company where there's no investor awareness, where the public

15    doesn't know about them, will have no chance of having their

16    stocks ever traded if no one knows about them.  And so it's

17    Donna Levy's job through her company, DML Marketing, and

18    eventually through a website called Wallstreetpremiere.com, to

19    alert the public to young companies, some of which her husband

20    may be investing in, and you'll hear and you heard about

21    Cardiac and Banneker; and some companies in which her company

22    does not have an investment, a company called Emerging World

23    Pharma, EWPI, would be an example of a company which you'll

24    hear about in this case.

25             So what a marketing company like Donna's does, it

1   chronics the history of a young company.  We all hear about

2   companies, as Mr. Shargel talked about Facebook, Microsoft,

3   Apple.  Well, I assume that when Microsoft started in the

4   garage of Mr. Gates and when Apple started in the garage of

5   Mr. Jobs, nobody heard much about them.  Of course, now the

6   Wall Street Journal follows them every day.  But young

7   companies don't get that kind of media attention.  And it's the

8   job of marketing companies, when hired to do so, to create that

9   investor awareness for a fee.

10          Let me take a little side track.  You've heard a

11  little bit, you're going to hear about two more weeks of it

12  about Cardiac and Banneker and these companies, but perhaps we

13  should define some of the terminology that will be important to

14  this case which the witnesses hopefully will educate us about

15  and I expect you'll hear about.

16          Most of us have heard of the New York Stock Exchange,

17  the American Stock Exchange, and then we've heard perhaps of

18  something called the pink sheets.  Stock, which is nothing more

19  than ownership of a company in a particular percentage, those

20  stock if publicly traded may be available on the New York Stock

21  Exchange or may be available on a bigger exchange.  But in

22  small young companies that don't qualify to be traded on the

23  New York Stock Exchange, they'll be traded in a market known as

24  the pink sheets because in the old days before -- as

25  Mr. Shargel who will remember because of his age -- before the

1   electronic age, it was traded on paper and the color of the

2   paper happened to be pink so it developed the name pink sheets.

3          And so you hear the term penny stock, and a penny

4   stock is nothing more than a stock that simply doesn't qualify

5   for trading on one of the big exchanges because either the

6   price of the share is too low or the market capitalization is

7   too low.  But there is no market in the same way for these

8   penny stocks as you hear about for the New York Stock Exchange.

9   And the market for these young companies, the stock you'll hear

10  about, although publicly traded, there's no unified exchange.

11  And so different companies become market makers and you'll hear

12  more about that.

13         But the bottom line is, unless there's someone

14  advertising the company to the media, there will be no investor

15  awareness.  You will never have heard about the company.  You

16  would never have heard about Cardiac Networks or Banneker or

17  EWPI except for them hiring or someone hiring a marketing

18  company to do that.

19         Now, what's important as we go along through the trial

20  is to remember that anyone who decides to invest in a penny

21  stock, any of us who decide to invest in a penny stock, first,

22  of course, we can go on the internet and do as much research as

23  we'd like.  We live in the electronic age.

24         No. 2, we can learn from the SEC, the Securities and

25  Exchange Commission, their website, they tell you penny stocks

1   are a different breed.  Why?  They don't have any disclosure

2   requirements regarding their financials; they don't post a

3   balance sheet; they don't necessarily post an income statement.

4   They don't have to register with the Securities and Exchange

5   Commission.  And so we all know from our own personal

6   experience that penny stocks present a much higher risk, the

7   kind of risk Mr. Shargel told you about when an investor like

8   David Levy or Donna Levy buy into a young company, the risk

9   that the stock will simply not be available to be sold because

10  no one will have heard about it, no one will have access to

11  information about the company.

12          And there's another term you'll hear about and it's a

13  term that's known as liquidity and it simply means the

14  availability, the volume, how much stock is traded.  And you'll

15  hear about that, I'm sure, from the government's own witnesses.

16  There should be no debate about it.  And one of the goals a

17  young company has is to create liquidity in its stock.  Why?

18  If a shareholder ever wants to sell his shares, there needs to

19  be liquidity, meaning enough buyers in the market, so that he

20  can sell his shares.

21          After all, when we buy stock, we don't intend to hold

22  the stock forever, do we?  At some point in time we intend to

23  sell.  If you could never sell your stock, you'd never buy it

24  for it would have no value if it couldn't be sold.  These are

25  basic principles.

1        And so Donna Levy is in the business of creating

2   investor awareness.  How does she do that?  How does she

3   chronicle the history of a company?

4        What a company does is it generates press releases.  A

5   press release, whether it be in the stock industry or whether

6   it be the White House that issues a press release when the

7   President wants to send a statement about some new policy, is

8   drafted, it's edited, it's prepared, it's studied by whoever is

9   going to issue the release.  President Obama, for example, when

10  he issues a press release, he probably has a speech writer who

11  drafts it up and with the President's authority it's released

12  to the news media.

13       It's not much different in the business of advertising

14  stock.  Donna Levy would assist a company.  In the case of

15  Cardiac, she would contact the management, Zev Helfer, who you

16  heard about, discuss with him, tell me what is the news that is

17  worthy of reporting to the public.  For example, Cardiac has

18  just been listed, has a new product, signed a new deal.  A

19  press release is issued.  Donna Levy doesn't create the

20  information that goes into a press release.  She drafts it with

21  the supervision and approval of the management of a company.

22       And in this electronic age you will see that the

23  simplest way to create a press release -- and it's the way

24  Donna Levy did it -- is through email.  Email the company, have

25  them review the draft press release, get the approval, and then

1    the press release is issued.  It's exactly how she did it.  And

2    we will present to you a load of email traffic establishing

3    that when Donna Levy worked on a press release, she worked

4    closely with management, publicizing that information that

5    management had approved.

6            The press release is disseminated.  Now, who's going

7    to care that a press release is disseminated without some sort

8    of advertising campaign?  So, Donna Levy's next job is to

9    create an advertising campaign with the press release as the

10   source of information.  Similar to when the President issues a

11   press release, the Wall Street Journal picks it up and all the

12   commentary starts.  You turn to the back of the Wall Street

13   Journal, the New York Times, the New York Post, or, in my case,

14   the Miami Herald, and I read what people have to say about that

15   press release.

16           So what Donna Levy does through her company, DML

17   Marketing, is to make sure that people are reading the press

18   releases.  It's a promotion campaign.  It's an advertisement.

19   Government Exhibit 101-10, I'm sure you'll see it in evidence.

20   It's a promotion campaign.

21           Soon millions of American seniors will carry the

22   telephonic part one wherever they go and Cardiac Network,

23   symbol, CNWI, will be making millions for investors who buy

24   their dollar stock now.  With Cardiac Network's unique patient

25   monitors which send lifesaving heart data over the telephone,

1    in only seconds the doctor or a trained heart specialist can

2    receive phone transmitted digital data that tells if the

3    patient is having a heart attack.  And this technology is

4    available now.

5           It is encouraging people to research Cardiac Network

6    and to consider on their own whether Cardiac Network suits them

7    as a potential investment perhaps.  But make no mistake, these

8    promotional campaigns are very clear, Donna Levy is not a

9    investment adviser.  Donna Levy is not soliciting anything from

10   anybody.  And in order to comply with the law, not to break the

11   law but to comply with the law, the promotions contain

12   language, legal notices, what some people call disclaimers,

13   that let the public know exactly who is Donna Levy and why is

14   she promoting this stock.

15          And the disclaimer will read in part -- you'll see it

16   during the trial -- this publicly distributed email report is a

17   sponsored advertisement, does not purport to provide an

18   analysis of any company's financial position, and is not in any

19   way to be construed as an offer or solicitation to buy or sell

20   any security.

21          She is a paid advertiser.  The distribution costs of

22   this report were funded by DML Marketing in an effort to create

23   investor awareness of Cardiac Network Inc.  She tells the

24   reader, I am paid to create investor awareness.  DML is not a

25   licensed broker, not a broker dealer, not a market maker, not

1    an investment banker, not an investment adviser -- and here's

2    the key language -- but could be deemed an affiliate of the

3    featured company insofar as friends, family members, and

4    affiliates own approximately 20 percent of the company.

5         She tells the reader, she tells the public, family own

6    20 percent of the stock.  She doesn't hide it.  She doesn't

7    conceal it.  She fully discloses that she's a paid advertiser

8    because her family has 20 percent of the stock.  So the reader

9    knows she's not disinterested, she has a conflict of interest,

10   but it's disclosed.  A conflict of interest meaning she's

11   promoting the stock that she owns and, therefore, people who

12   buy it know that her family could benefit.

13        And she goes further:  Affiliates do own shares and

14   may buy and sell additional shares of the company for less than

15   the expected price given in this material.  And so not to break

16   the law but to comply with the law, Donna Levy tells the public

17   my family may own stock, 20 percent, may sell the stock, may

18   sell it at less than what some projections may be for this

19   stock, meaning, may not hold it forever, may not wait for the

20   stock to go higher.

21        And then Donna Levy through her disclosures tells the

22   potential reader:  Each investor must make the decision based

23   on his or her own judgment of the market.

24        And it goes further:  This report is for informational

25   and advertising purposes only, should not be construed as

1    investment advice.  Furthermore, the information used to

2    prepare this report is believed to be from reliable sources,

3    but no representation is made as to the accuracy or

4    completeness of such information.  Investment in securities

5    carries a high degree of risk.  It involves risks and

6    uncertainties which may result in an investor losing all of

7    their invested capital.

8            The disclosure could not be clearer at just how risky

9    an investment in a young company can be.

10           And then citing the Security and Exchange Act of 1933

11   and the Security and Exchange Act of 1934, laws that have been

12   on the books for 80 years or plus, the information contained

13   herein contains forward looking statements within the meaning

14   of Section 27A of the Securities Act of 1933 and Section 21E of

15   the Securities and Exchange Act of 1934.  Forward looking

16   statements are based upon expectations, estimates, and

17   projections at the time the statements are made and involve

18   risks and uncertainties that could cause actual events to

19   differ materially from those anticipated.  Readers should

20   consult their own professional investment, tax, and portfolio

21   advisers before making any investment decision and should

22   independently verify all information herein.

23           And for further information, it directs the reader to

24   the website of the company.  In this case, it was Cardiac.  And

25   so despite all of the advertising, all of the optimism in an

1    advertising, it is very clear to the reader that she is

2    promoting a stock that her family owned and might well sell at

3    any time.

4            The same can be said about the advertising campaign of

5    Banneker, in the Banneker case where the Levys have stock in

6    that company.  When Donna worked on one of the promotions, it

7    had much of the same language you heard me read regarding

8    Cardiac about paid advertiser, etc.  And then it went on to say

9    that an affiliate has 1 million Rule 144 restricted shares of

10   Banneker.  Licensors, affiliates, officers, directors, and

11   employees may own shares and may buy and sell additional shares

12   of the company mentioned for less than the expected price.

13           And so these advertising campaigns are much like

14   perhaps an infomercial that we see on television, perhaps it's

15   like an advertisement in the classified section when someone is

16   selling their car.  These are advertisements and they encourage

17   you -- don't have to get into all the language -- before you

18   make an investment decision, you got to do more research.

19           One of the campaign, advertising campaign specifically

20   says do your research.  Why?  Because none of the fundamentals

21   of the company are published.  No balance sheets, no income

22   statements.  It's a high risk for one to invest in a company

23   like this.

24           It's an advertising campaign like you see on

25   television for prescription medication, whether it be Lipitor,

1   Crestor, Viagra, whatever it is.  It says here's the great news

2   about this product, and then they go on for two minutes about

3   how you can -- it can cause cancer, you could have a heart

4   attack, you could end up not being able to sleep at night,

5   diarrhea, nausea.  And then it says consult your doctor before

6   making a decision.  Of course, with prescription medication,

7   you need to see a doctor first because you can't go to the

8   drugstore and buy it.  So you ask yourself, why are the

9   prescription drug companies even advertising at all to us since

10  we can't go out and buy Lipitor?  Investor awareness, product

11  awareness.  But check with your doctor first.  Check with your

12  investment adviser first, and that's exactly what Donna did,

13  not to break the law, but to comply with the law.

14          And so she built a business for herself, a business

15  which relied on the law to protect her from people like the Zev

16  Helfers who after the fact, when they are revealed for who they

17  are, unfortunately, she has the protection of the law, we hope,

18  because she complied with the law.

19          And of course there are going to be people who are

20  disappointed in a stock investment.  Of course for every winner

21  in a stock there's a loser in many people's mind.  It's called

22  a zero sum gain in some economist's mind.  When I sell, someone

23  buys.  I assume the person who buys thinks the stock is going

24  to be worth more.  The person who sells may think it won't be

25  or maybe needs the money.  There are many different reasons why

1   people buy and why people sell.

2          But it was simply Donna's job and she did it well and

3   she commanded handsome fees for doing that.  In some instances,

4   she could earn over a hundred thousand dollars for doing a

5   successful marketing campaign of a stock.  And that's

6   inexpensive compared to what it would cost a company to hire an

7   entire investor relations department and try to do it on their

8   own.  And so what Donna did was like most of us do, she did her

9   job.

10          Now, Donna wasn't involved in day-to-day investment

11  decisions.  David Levy for the family, he had the savvy, he had

12  the background, he had the experience.  And, of course, she's a

13  loyal wife and she relied on him because she understood he knew

14  the business.  But she developed her own little enterprise and

15  she did her enterprise well.  She may not have the same

16  background as Wall Street people, she may not have gotten an

17  MBA, she may not have gotten a degree in advertising; but she

18  did a really good job of developing a database and developing a

19  website to create the investor awareness.

20          And so I submit to you that Donna Levy, rather than

21  breaking the law, she endeavored to comply with the law.  And

22  the evidence will show in every instance she communicated with

23  the people she was working with, she communicated with

24  management, she communicated with the folks at Cardiac to learn

25  more to draft up these releases.  She hired other people to

1    work with her, draftsmen who could help draft these promotions.

2    She collected the photographs of Beyonce with Mr. Holmes, of

3    Hardaway with Mr. Holmes.  Donna is not involved in the

4    day-to-day.  But in the electronic age, she was able to

5    exchange the information to do her job and to do it well.

6         And so I submit to you that what the evidence will

7    show is that Donna did her job and that's all she did.  She did

8    it well.  It paid well.  And, as Mr. Shargel said, there's no

9    shame in being successful and she was successful at that.  And

10   so I ask you to pay close attention, and I know it's going to

11   be laborious and you're probably at this point the details,

12   well, they may be boring, but they're really important to

13   Donna.  These details are really important to Donna because she

14   is being charged criminally.

15        This is a criminal courtroom, we all understand.

16   We're not talking about a civil dispute here between the

17   Cardiac people and Donna, between the Banneker people and

18   Donna.  This is a criminal courtroom and there are criminal

19   consequences and she's being accused of committing a crime.

20   And I may be boring because the details may be boring, but the

21   law is in the details.  The law is in the details.

22        So I'm going to ask you, as difficult as it will be,

23   let's try to pay attention to those details because those

24   details will show you that Donna Levy complied with the law.

25   She didn't break the law.

1          Okay?  Thank you.  Thank you, ladies and gentlemen.

2          THE COURT:  Ladies and gentlemen, we'll take our

3    afternoon break.  As soon as we come back, we'll start.  We'll

4    swear in a witness and start hearing the testimony and the

5    evidence which will control your decision.

6          THE DEPUTY CLERK:  Ten-minute break, your Honor?

7          THE COURT:  Ten-minute break.

8          Marlon, would you advise the jurors they can leave

9    their coats in the jury room.

10          THE DEPUTY CLERK:  Yes, your Honor.

11          THE COURT:  See you in ten minutes.

12          (Recess)

13          (Jury not present)

14          THE COURT:  Call in the jury, please.

15          THE DEPUTY CLERK:  We're waiting for the deputy

16    marshal to come upstairs.

17          MS. COHEN:  Your Honor, we have a question.  Can we

18    raise it now?

19          THE COURT:  What is it?

20          MS. COHEN:  Your Honor, we have different stipulations

21    in this case and we've spoken with defense counsel.  I don't

22    know if your Honor requires us to read the entire stipulation

23    into evidence or we should just admit the stipulation and then

24    it will be in evidence for people to read.

25          THE COURT:  You can do it either way you want.  I

D36LLEV3

1  think it's more effective if the jury hears it, but that's up

2  to you.

3          MR. MASTER:  Thank you, your Honor.

4          MS. COHEN:  Thank you, your Honor.

5          THE COURT:  In my experience, I've never seen anybody

6  not read the stipulation.  But if you don't want to read it and

7  have it admitted into evidence, okay.  I don't know what the

8  jury makes of it.  But maybe you can read it to them later.

9          MS. COHEN:  Okay.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  You can sit down.

3          The government will call its first witness.

4          MR. MASTER:  Yes, your Honor.  At this time the

5    government calls Peter Melley.

6     PETER J. MELLEY,

7        called as a witness by the Government,

8        having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10         MR. MASTER:  Thank you.

11   BY MR. MASTER:

12   Q.  Mr. Melley, where do you work?

13   A.  I'm the director of FINRA's criminal prosecution assistance

14   group in Washington, D.C.

15   Q.  And what does FINRA stand for?

16   A.  FINRA is a financial industry regulatory authority.  It is

17   a private self-regulatory organization of the securities

18   industry.  It's charged with regulating trading on various

19   securities markets, as well as governing the behavior of its

20   members who are brokerage firms and registered individuals who

21   work at those firms.

22   Q.  And for how long you have been with FINRA?

23   A.  Approximately 17 years.

24   Q.  And what are your duties and responsibilities as the

25   director of FINRA's criminal prosecution assistance group?

D36LLEV3                    Melley - direct

1    A.   I oversee a small staff of four attorneys that work on --

2    only work on providing assistance in criminal investigations

3    and prosecutions involving securities fraud.  It is a unit that

4    is separate from the regulatory operations of FINRA.

5    Q.   Now, what if any entity supervises FINRA?

6    A.   FINRA falls under the jurisdiction of the U.S. Securities

7    and Exchange Commission.

8    Q.   And what's the U.S. Securities and Exchange Commission?

9    A.   It is the federal agency that has civil jurisdiction over

10   the securities industry.  It's charged with enforcing the

11   federal securities laws and regulating activities on the

12   various markets.

13   Q.   And in which stock markets does FINRA exercise its

14   regulatory authority?

15   A.   FINRA regulates trading on a variety of markets including

16   what's commonly called NYSE, the New York Stock Exchange, also

17   the NASDAQ stock market, as well as over-the-counter securities

18   markets.

19   Q.   And are there different types of over-the-counter

20   securities markets?

21   A.   Yes, there are.

22   Q.   What are they?

23   A.   The two primary markets that fall within that larger area

24   are what's called the over-the-counter bulletin board, which is

25   a trading service, trading platform, which involves companies

D36LLEV3                    Melley - direct

1   that are smaller than what you would find on the NASDAQ or the

2   NYSE.  They're companies that trade for smaller dollars per

3   share and are not as visible to the general public.  Those

4   companies do have certain requirements to file their financial

5   information with the SEC.

6           And below that rung on the ladder would be what's

7   commonly called the Pink Sheet trading arena, which is where

8   you have companies that trade for even lower share prices for a

9   number of them.  They do not attract the same number of buyers

10  and sellers of stock that you're going to find on those listed

11  exchanges like NASDAQ or the NYSE.  And companies that trade in

12  that Pink Sheet arena also do not have any requirements to file

13  financial information with the SEC.

14  Q.  And where are each of those markets that FINRA regulates

15  located?

16  A.  Right here in Manhattan.

17  Q.  And in which of those stock markets that you just described

18  does FINRA actually monitor trading activities?

19  A.  All of those ones that I just listed.

20  Q.  And what if anything does FINRA do to actually monitor

21  trading activities on those markets?

22  A.  FINRA monitors the daily trading, looking at both price and

23  volume in the securities, as well as publicly disseminated

24  information related to those companies.

25  Q.  And what types of publicly disseminated information

1    concerning those companies are you referring to?

2    A.  It could include press releases that are issued by the

3    companies themselves, as well as various promotional materials

4    that may be put out whether it was through newsletters or

5    emails or message boards, various internet type promotions.

6    Q.  And in connection with the government's investigation of

7    this case, did there come a time when you were asked to prepare

8    certain summary charts concerning the companies Cardiac

9    Networks, Banneker, Greenway Design Group, and Emerging World

10   Pharma?

11   A.  Yes.

12   Q.  What sources of information were you asked to summarize and

13   incorporate into those summary charts?

14   A.  I reviewed information that derived from three main

15   sources.  One comes from Bloomberg Finance.  Bloomberg is a

16   financial software, news, and data service.  It's considered

17   the industry standard for getting information related to the

18   trading in public companies in various markets.

19         I also gathered information, I reviewed information

20   that came from FINRA itself.  Those would be press releases and

21   other promotional materials.

22         And, finally, I also reviewed and analyzed actual

23   trading information that was listed on various brokerage firm

24   account statements and trading spreadsheets.

25   Q.  Let's take each of those sources of information that you

1   summarized in turn.

2           First, focusing on the trading data concerning those

3   four companies, in which markets did each of these company's

4   stocks trade during the time period that you looked at?

5   A.   Those four stocks traded on the Pink Sheet, in the Pink

6   Sheet arena during those times.  So they were four securities

7   that traded in the over-the-counter securities market.

8   Q.   And, sir, what is a penny stock?

9   A.   Penny stock is a term used to refer to over-the-counter

10  securities that trade for less than $5 a share that also do not

11  have as many investors or buyers or sellers in the securities

12  as you may find on something on a listed exchange like Apple or

13  IBM or something of that nature.

14  Q.   And did all four companies that you were looking at trade

15  below $5 a share during this relevant time period?

16  A.   Yes, they did.

17  Q.   Now, concerning the trading data that you gathered, how is

18  the data itself that you summarized generated?

19  A.   It's generated by -- I have access to a Bloomberg terminal,

20  which is basically just a computer, part of a service that

21  Bloomberg provides where you could just input the name of the

22  company you're looking for, a time period, and you can generate

23  what's called the closing price and daily share volume

24  information for that period of time.

25  Q.   And what is the source of the information that Bloomberg

1    maintains concerning the trading data that you gathered?

2    A.  It is the actual transactions that brokerage firms are

3    required to report to FINRA, per FINRA rules.

4    Q.  And what does FINRA do with that information about actual

5    trades?

6    A.  FINRA is able to sell that information, that trading data,

7    to various financial services, Bloomberg being one of them.

8    Q.  And what's the reason that you downloaded this from

9    Bloomberg as opposed to from FINRA's own data?

10   A.  Bloomberg is considered the industry standard because of

11   the wide range of services that they provide in gathering

12   various types of information on publicly traded companies.

13   Q.  Now, what types of data, again, did you actually download

14   from this Bloomberg service concerning the trades in these four

15   companies' stock?

16   A.  The two types for each stock for a select period of time

17   would be the closing price, which is considered the last sale

18   of the regular trading day, which ends at 4 p.m. on the trading

19   day.

20        And the second piece of data would be what's

21   considered the daily market volume or market share volume,

22   which the volume basically is just the shares that are

23   exchanged among buyers and sellers over the course of the

24   trading day.

25   Q.  And what do you mean by when you refer to the term shares?

1    A.   Shares are a unit of ownership in a corporation whether

2    it's a private corporation or, in these four instances,

3    publicly traded companies.

4               MR. MASTER:  Your Honor, at this time the government

5    would like to read a stipulation admitting numerous categories

6    of financial records in this case --

7               THE COURT:  Go ahead.

8               MR. MASTER:  -- including Bloomberg records.

9               And it's a stipulation between the parties.  It's

10   marked as Government Exhibit S-2.  And with permission of the

11   Court, it states:

12              It's hereby stipulated and agreed by and between the

13   United States of America by Preet Bharara, United States

14   Attorney, Carrie Cohen -- and Carrie Cohen, United States

15   attorneys, of counsel, and Donna Levy and David Levy, the

16   defendants, by their counsel, Howard Srebnick, Scott Srebnick,

17   and Alex Arteaga-Gomez, Esquires, for Donna Levy, and Gerald L.

18   Shargel and Ross Kramer, Esquires, for David Levy, that:

19              1.   If called as a witness, a records custodian from

20   Bank of America would testify as follows:  Government

21   Exhibits 1206 through 1212 are retrieved from the computer

22   archive system of Bank of America.  The records reflected on

23   Government Exhibits 1206 through 1212 were created by a person

24   with knowledge of, or created from information transmitted by a

25   person with knowledge of, the information shown; were created

1    at or near the time the information became available to Bank of

2    America; and were created and maintained by Bank of America as

3    part of its regularly conducted business activity.

4              2.  If called as a witness, a records custodian from

5    JP Morgan Chase would testify as follows:  Government

6    Exhibit 1201 was retrieved from the computer archive system of

7    JP Morgan Chase.  The records reflected on Government Exhibit

8    1201 were created by a person with knowledge of, or created

9    from information transmitted by a person with knowledge, of

10   information shown; were created at or near the time the

11   information became available to JP Morgan Chase; and were

12   created and maintained by JP Morgan Chase as part of its

13   regularly conducted business activity.

14             3.  If called as a witness, a records custodian from

15   BNY Mellon would testify as follows:  Government Exhibit 1202

16   was retrieved from the computer archive system of BNY Mellon.

17   The records reflected on Government Exhibit 1202 were created

18   by a person with knowledge of, or created from information

19   transmitted by a person with knowledge of, the information

20   shown; they were created at or near the time the information

21   became available to BNY Mellon; and they were created and

22   maintained as part of its regularly conducted business

23   activity.

24             If called as a witness -- No. 4, fourth category -- a

25   records custodian for BankUnited would testify as follows:

1   Government Exhibits 1218 through 1220 were retrieved from the

2   computer archive system of BankUnited.  The records reflected

3   on Government Exhibits 1218 through 1220 were created by a

4   person with knowledge of, or created from information

5   transmitted by a person with knowledge of, the information

6   shown; created at or another the time the information became

7   available to BankUnited; and were created and maintained by

8   BankUnited as part of its regularly conducted business

9   activity.

10        If called as a witness, a records custodian from Wells

11  Fargo would testify as follows -- this is the fifth category of

12  information -- Government Exhibit 1221 through 1223, 1229,

13  1230, and 1239 through 1247 were retrieved from the computer

14  archive systems of Wells Fargo.  The records reflected on

15  Government Exhibits 1221 through 1223, 1229, 1230, and 1239

16  through 1247 were created by a person with knowledge of, or

17  created from information transmitted by a person with knowledge

18  of, the information shown; they were created at or near the

19  time the information became known by Wells Fargo; and they were

20  created and maintained by Wells Fargo as part of its regularly

21  conducted business activity.

22        Sixth category.  If called as a witness, a records

23  custodian from Colonial Bank would testify that Government

24  Exhibits 1248 through 1251 were retrieved from the computer

25  archive system of Colonial Bank.  The records reflected on

1   Government Exhibits 1248 through 1251 were created by person

2   with knowledge of, or from information transmitted by a person

3   with knowledge of, the information shown; created at or near

4   the time that information became available to the Colonial

5   Bank; and were created and maintained by Colonial Bank as part

6   of its regularly conducted business activity.

7           If called as a witness, a records custodian from

8   Standard Bank would testify as follows:  Government

9   Exhibit 1228 was retrieved from the computer archive system of

10  Standard Bank.  The records reflected on Government

11  Exhibit 1228 were created by a person with knowledge of, or

12  created from information transmitted by a person with knowledge

13  of, the information shown; they were created at or near the

14  time the information became available to Standard Bank; and

15  they were created and maintained by Standard Bank as part of

16  its regularly conducted business activity.

17          Eighth category.  If called as a witness, a records

18  custodian from Citibank would testify that Government

19  Exhibits 1233 through 1238 were retrieved from the computer

20  archive system of Citibank.  The records reflected on

21  Government Exhibits 1233 through 1238 were created by a person

22  with knowledge of, or created from information transmitted by a

23  person with knowledge of, the information shown; created at or

24  near the time the information became available to Citibank; and

25  created and maintained by Citibank as part of its regularly

1   conducted business activity.

2          Ninth category.  If called as a witness, a records

3   custodian from American Express would testify as follows:

4   Government Exhibits 1203 through 1205 were retrieved from

5   computer archive systems of American Express.  The records

6   reflected on Government Exhibits 1203 through 1205 were created

7   by a person with knowledge of, or created from information

8   transmitted by a person with knowledge of, the information

9   shown; created at or another the time the information became

10  available to American Express; and created and maintained by

11  American Express as part of its regularly conducted business

12  activity.

13         Tenth category.  If called as a witness, a records

14  custodian from Legend Securities would testify as follows:

15  Government Exhibit 1200-1 through 1200-32, 1200-36 through

16  1200-40, and 1200-42 through 1200-44, were retrieved from the

17  computer archive system of Legend Securities.  The records

18  reflected on Government Exhibits 1200-1 through 1200-32,

19  1200-36 through 1200-40, and 1200-42 through 1200-44, were

20  created by a person with knowledge of, or created from

21  information transmitted by a person with knowledge of, the

22  information shown; were created at or near the time the

23  information became available to Legend Securities; and were

24  created and maintained by Legend Securities as part of its

25  regularly conducted business activity.

1      Eleventh category.  If called as a witness, a records

2   custodian from Penson Financial Services would testify as

3   follows:  Government Exhibits 1252 through 1258 were retrieved

4   from the computer archive system of Penson Financial Services.

5   The records reflected on Government Exhibits 1252 through 1258

6   were created by a person with knowledge of, or from information

7   transmitted by a person with knowledge of, the information

8   shown; created at or near the time the information became

9   available to Penson; and were created and maintained by Penson

10   as part of its regularly conducted business activity.

11      Twelfth category.  If called as a witness, a records

12   custodian from BMA Securities would testify as follows:

13   Government Exhibits 1213 through 1216 were retrieved from the

14   computer archive system of BMA Securities.  The records

15   reflected on Government Exhibits 1213 through 1216 were created

16   by a person with knowledge of, or created from information

17   transmitted by a person with knowledge of, the information

18   shown; were created at or near the time the information became

19   available to BMA Securities; and were created and maintained by

20   BMA Securities as part of its regularly conducted business

21   activity.

22      Thirteenth category.  If called as a witness, a

23   records custodian from E*Trade would testify as follows:

24   Government Exhibits 1224 through 1227 were retrieved from the

25   computer archive system of E*Trade.  The records reflected on

1    Government Exhibits 1224 through 1227 were created by a person

2    with knowledge of, or created from information transmitted by a

3    person with knowledge of, the information shown; were created

4    at or near the time the information became available to

5    E*Trade; and were created and maintained by E*Trade as part of

6    its regularly conducted business activity.

7            Fourteenth category.  If called as a witness, a

8    records custodian from Fagenson would testify as follows:

9    Government Exhibit 1231 and 1232 were retrieved from the

10   computer archive system of Fagenson.  The records reflected on

11   Government Exhibits 1231 and 1232 were created by a person with

12   knowledge of, or created from information transmitted by a

13   person with knowledge of, the information shown; were created

14   at or near the time the information became available to

15   Fagenson; and were created and maintained by Fagenson as part

16   of its regularly conducted business activity.

17           Fifteen category.  If called as a witness, a records

18   custodian from Goldman Sachs would testify as follows:

19   Government Exhibit 1217 was retrieved from the computer archive

20   system of Goldman Sachs.  The records reflected on Government

21   Exhibit 1217 were created by a person with knowledge of, or

22   created from information transmitted by a person with knowledge

23   of, the information shown; created at or near the time the

24   information became available to Goldman Sachs; and created and

25   maintained by Goldman Sachs as part of its regularly conducted

1    business activity.

2          Next to last, 16.  If called as a witness, a records

3    custodian from Capital Bank would testify as follows:

4    Government Exhibits 502-1 through 502-3 were retrieved from the

5    computer archive system of Capital Bank.  The records reflected

6    on Government Exhibits 502-1 through 502-3 were created by a

7    person with knowledge of, or created from information

8    transmitted by a person with knowledge of, the information

9    shown; created at or near the time the information became

10   available to Capital Bank; and were created and maintained by

11   Capital Bank as part of its regularly conducted business

12   activity.

13         Seventeenth and final category.  If called as a

14   witness, a records custodian from Bloomberg LP would testify as

15   follows:  Government Exhibits 101-29, 103-45, 104-28, and

16   105-52 were retrieved from the computer archive system of

17   Bloomberg LP.  The records reflected on Government

18   Exhibits 101-29, 103-45, 104-28, and 105-52 were created by a

19   person with knowledge of, or created from information

20   transmitted by a person with knowledge of, the information

21   shown; created at or near the time the information became

22   available to Bloomberg LP; and were created and maintained by

23   Bloomberg LP as part of its regularly conducted business

24   activity.

25         And, finally, it's further stipulated and agreed

1    between the parties that the following Government Exhibits

2    101-29, 103-45, 104-28, and 105-52, 502-1 through 502-3, 1200-1

3    through 1200-32, 1200-36 through 1200-40, 1200-42 through

4    1200-44, and 1201 through 1258 may be received in evidence at

5    trial and that this stipulation may be received in evidence at

6    trial.

7              Just one moment.

8              It's now signed by the parties.  And so, therefore,

9    the government offers the exhibits that are listed in this

10   stipulation.

11             THE COURT:  S-2 and the exhibits referred to from the

12   17 institutions listed are received in evidence.

13             (Government's Exhibits S-2, 101-29, 103-45, 104-28,

14   and 105-52, 502-1 through 502-3, 1200-1 through 1200-32,

15   1200-36 through 1200-40, 1200-42 through 1200-44, and 1201

16   through 1258 received in evidence)

17             MR. MASTER:  Thank you, your Honor.  Thank you for

18   your patience.

19   BY MR. MASTER:

20   Q.  We're now going to turn to the 17th category of evidence

21   that was listed in the stipulation, those Bloomberg records.

22             I'd like you to look at Government Exhibit 101-29,

23   103-45, 104-28, and 105-52.  Do you see those items before you?

24   A.  I do.

25   Q.  And so they're already in evidence.  If you wouldn't mind

1    just taking a look at Government Exhibit 101-29, do you see

2    that in front of you?

3    A.  Yes.

4          MR. MASTER:  Your Honor, may I have permission to

5    publish the first page?

6          THE COURT:  Yes, publish it.

7    Q.  So this is the first page of Government Exhibit 101-29.  If

8    you could just explain for the jury what the source is of this

9    information and how you obtained it and what's depicted on that

10   document?

11   A.  This is information that I generated from Bloomberg, and

12   the information was just exported from Bloomberg into a Excel

13   spreadsheet, which is what I created here.  All the information

14   that I asked for was for a date range of January 1, 2007

15   through December 31, 2010, all closing price and trading volume

16   in Cardiac Networks, which also had the ticker symbol CNWI.

17   Each publicly traded company has a three or four character

18   ticker symbol that relates to the actual full name of the

19   company.

20          And as you can see here, the way the data is generated

21   it provides for each trading day.  What's listed in the price

22   column is really the closing price.  Again, it's that last sale

23   of the regular trading day.  And for that corresponding date,

24   what the total volume was over the course of the day, the share

25   volume, again, the number of shares that are exchanged among

1  all the buyers and sellers, in this case, Cardiac Network on

2  each day.

3          MR. MASTER:  You can take that off the screen.

4  Q.  Let's turn to the second category of information that you

5  used in preparing your summary charts.  That's the FINRA

6  gathered data.

7          What specific FINRA data or FINRA gathered information

8  were you asked to look at when you were preparing your summary

9  charts?

10 A.  Press releases as well as other promotional materials.

11 Q.  And is that information that FINRA gathers over the course

12 of its regularly conducted business activities?

13 A.  It is.

14 Q.  And I'd like you to take a look at a number of documents

15 that are behind you, and if you could just quickly flip through

16 them.  They're marked as Government Exhibits 101-1 through

17 101-28, 102-1 through 102-31, 103-1 through 103-44, 104-1

18 through 104-27, and 105-1 through 105-51.

19         (Pause)

20 A.  Okay.

21         (Continued on next page)

22

23

24

25

1  Q.  Do you recognize the documents that are in those big

2  folders?

3  A.  Yes.  These are the FINRA materials, the press releases and

4  various other types of promotional materials related to the

5  four companies.

6  Q.  How do you recognize them?

7  A.  They are materials that I had previously reviewed.

8  Q.  Are these records of press releases and promotional

9  materials that are gathered by FINRA created at or near the

10  time the information became available to FINRA?

11  A.  Yes.

12  Q.  Were they created by a person at FINRA with knowledge of or

13  created from information transmitted by a person with knowledge

14  of that information shown on those records that you examined?

15  A.  Yes, they were.

16          MR. MASTER:  Your Honor, at this time the government

17  offers Government Exhibits 101-1 to 101-28, 102-1 to 102-31,

18  103-1 to 103-44, 104-1 to 104-27, and 105-1 to 105-51.

19          THE COURT:  Any objection?

20          MR. SHARGEL:  No objection.

21          THE COURT:  The documents are received in evidence.

22          (Government's Exhibits 101-1 to 101-28, 102-1 to

23  102-31, 103-1 to 103-44, 104-1 to 104-27, and 105-1 to 105-51

24  received in evidence)

25  Q.  What information were you actually asked to summarize from

1   those prereleases and promotional materials?

2   A.  I was asked only to look at the dates of the promotional

3   materials as well as the press releases, the dates they were

4   issued and collected by FINRA.

5   Q.  What would you do with the material that was gathered by

6   FINRA and didn't have a date associated with it?

7   A.  I would not include it on a subsequent chart that I

8   created.

9   Q.  What, if any, independent research did you do to look to

10  locate press releases or promotional materials other than those

11  already gathered by FINRA over the course of its regularly

12  conducted business activities?

13  A.  Beyond what was provided to me in the FINRA materials, I

14  did not do any additional research.

15  Q.  Now let's turn to that third and final category of

16  information you were asked to summarize, those brokerage

17  accounts.  For which entities were you asked to summarize

18  trading data or stock purchases and sales concerning those four

19  companies?

20  A.  I was asked to review trading accounts pertaining to a

21  number of different entities:  Bedrock Ventures, Petrobond,

22  Date Palm Capital, EZ English, as well as EMC Holdings.  For a

23  couple of those names, there were also multiple accounts.

24  Q.  How about accounts in the name of an entity called DML

25  Marketing?

1   A.  Yes, DML Marketing as well.  I'm sorry.

2   Q.  What did you do with that information?

3   A.  I reviewed the trading activity in those accounts, focusing

4   on trades pertaining to Cardiac Network, Banneker, Emerging

5   World Pharma, and Greenway Design and looked to incorporate

6   some of that data into my summary charts.

7   Q.  Speaking of summary charts, I would like you to take a look

8   at what is in front of you and marked Government Exhibits 110-1

9   to 110-7, 111-1 to 111-10, 112-1 to 112-4, and 113-1 to 113-7.

10  Please take a moment.

11  A.  OK.

12  Q.  Do you see those items?

13  A.  Yes.

14  Q.  Do you recognize them?

15  A.  I do.

16  Q.  What are they?

17  A.  They contain both charts that I created and other, for

18  instance, account statements that I had reviewed.

19  Q.  With respect to those that are marked as those government

20  exhibits that I mentioned, what are those?  110-1 to 110-7,

21  111-1 to 111-10, 112-1 to 112-4, and 113-1 to 113-7.

22  A.  They relate to charts that I created.

23          MR. MASTER:  Your Honor, at this time the government

24  offers those exhibits 110-1 to 110-7, 111-1 to 111-10, 112-1 to

25  112-4, and 113-1 to 113-7.

D36rlev4                    Melley - direct

1              MR. SHARGEL:  No objection.

2              MR. SREBNICK:  May we have a moment?

3              No objection, Judge.

4              THE COURT:  They are received in evidence.

5              (Government's Exhibits 110-1 to 110-7, 111-1 to

6     111-10, 112-1 to 112-4, and 113-1 to 113-7 received in

7     evidence)

8              MR. MASTER:  If you would publish Government Exhibit

9     111-1.  We are going to go a little bit out of order.

10             THE COURT:  111-1?

11             MR. MASTER:  111-1.

12             THE COURT:  OK.

13    BY MR. MASTER:

14    Q.  Sir, what is the source of the information that's on this

15    summary chart that you created?

16    A.  This concerns Cardiac Network pricing volume information

17    that was gathered from Bloomberg, Government Exhibit 101-29.

18    Q.  When you created these summary charts, what did you do to

19    indicate the sources of the data that are in the summary

20    charts?

21    A.  It's indicated in a footer at the bottom of the chart.

22    Q.  What did you do to create this chart?

23    A.  I took from Government Exhibit 101-29 the closing price and

24    daily market share volume and incorporated it into this chart

25    showing the closing prices over the course of January '07 to

1    December 2010 which are indicated by the red line.  That

2    corresponds to the scale, the axis on the right-hand side, from

3    0 to $3.25.  And the trading volume is represented by the blue

4    columns over the course of the chart, which correspond to the

5    scale on the left-hand side.

6    Q.  For example, in what is reflected in the chart as occurring

7    with respect to February 16, 2010?

8    A.  On that date, as you can see, there is a very tall column,

9    blue column, to indicate that the trading volume on that day

10   was more than 4.25 million shares, while the closing price on

11   that day was approximately 50 cents.

12   Q.  There is a text box on that chart indicating something

13   called a stock split.  What is the source of that information?

14   A.  That also came from Bloomberg as well, because Bloomberg

15   also maintains information regarding corporate events.  A stock

16   split is simply a corporate event where the number of shares as

17   well as the stock price changes, however the value of the

18   investment does not change.

19          A forward stock split would be one share may be broken

20   up into numerous shares, so there are more shares but each

21   share is worth less than before.  Whereas, in a reverse stock

22   split, which is what occurred on this date here, you have a

23   number of shares that are combined into less shares, however

24   the stock price for each share is worth more.  However, again,

25   the value of the investment does not change at all, it's the

1   same before and after a stock split.

2   Q.  Did there come a time when you were asked to focus on

3   specific time periods reflected in this 3-year chart?

4   A.  Yes, there was.

5   Q.  What were you asked to do with respect to those specific

6   time periods?

7   A.  I was asked to provide more selected time frame charts

8   again showing the closing price as well as the analysis of the

9   volume and also then looking at the other two sources of

10  information that we have discussed, the FINRA materials and

11  also looking at what was happening in certain selected trading

12  accounts during those selected periods.

13  Q.  What is the first period that you were asked to look at?

14  A.  The first period concerned August through September 2007

15  trading in Cardiac Network.

16  Q.  I'd like you to turn to Government Exhibit 111-5, if we

17  could publish that.  What is the specific period that you were

18  asked to look at?

19  A.  August 6th through September 4, 2007.  This covers only a

20  closing price analysis of the share price of CNWI.

21  Q.  What other information did you add to that chart?

22  A.  In addition to the closing price information, there is also

23  a number of text boxes that indicate the dates of either a

24  press release or a promotional material or some combination of

25  the two.  Again, those were materials that were collected by

1  FINRA.

2  Q.  If you saw a press release in FINRA materials, how would

3  you denote that?

4  A.  That would represented by "PR."

5  Q.  How about if you saw promotional material in the FINRA

6  materials that you summarized?

7  A.  I would simply list that as the word "promo."

8  Q.  What would happen if you saw a press release and

9  promotional material issued on the same day?

10 A.  I would only have both materials listed in one text box to

11 that day.

12 Q.  How would you indicate that?

13 A.  It would be indicated as "PR" and "promo."

14         MR. MASTER:  Turning to Government Exhibit 111-6,

15 could we publish that.

16 Q.  Does that relate to the same approximately 5-week period?

17 A.  Correct.

18 Q.  If you could explain to the jury what is reflected in this

19 chart and what the sources of information were for this chart.

20 A.  Again, the source includes the Bloomberg data, in this case

21 only the volume information, in addition to the third category

22 we discussed, the actual brokerage account statements that came

23 from certain firms for certain selected accounts.  Each bar

24 over the course of this time period, the length of the bar

25 indicates the total market share volume for each day.

1    Then, within each day there are two colors

2 represented.  The red, with the corresponding percentage, would

3 indicate how much of the overall volume for that day is

4 accounted for, in this case Bedrock Ventures, the account I was

5 focused on at the time, while the blue bar would represent all

6 non-Bedrock Ventures trading shares on that particular day.

7 Again, for each day there is a percentage listed again showing

8 the percentage of the overall activity that can be attributed

9 to Bedrock Ventures.

10 Q.  Which government exhibits contain the Bedrock Ventures

11 brokerage account information that you used?

12 A.  Exhibits 1217 and 1257, as indicated in the bottom left-

13 hand corner.

14 Q.  Did there come a time in the course of your examination of

15 those records that you determined the name of the individual

16 who controlled the Bedrock Ventures account?

17 A.  Yes.  Fotis Georgiadis.

18    MR. MASTER:  If you would publish the first page of

19 Government Exhibit 1257.

20 Q.  Did there come a time when you were asked to try to

21 incorporate all three sources of information into a single

22 chart?

23 A.  Yes, there was.

24 Q.  I'd like you to turn to Government Exhibit 111-3.  Is that

25 the chart that you just described where you integrated all

1    three sources of information?

2    A.   Correct.

3    Q.   What other information did you include in this chart?

4    A.   The additions to this chart include the light orange boxes

5    that show for this period that there was a 292 percent increase

6    in the price of CNWI shares between August 6th and the high

7    point during that period on September 5th.  Then there was a

8    subsequent decline in the price of 40 percent between the 5th

9    of September and the final day of the period, September 14th.

10   In addition, there is a yellow box to indicate that Bedrock

11   Ventures generated $2,632,238.80 in net proceeds from sales of

12   CNWI between August 10th and September 11, 2007.

13   Q.   How did you calculate that $2,632,000 number?

14   A.   By reviewing the trading account statements for Bedrock

15   Ventures and adding up the purchases and sales over the course

16   of the period and coming up with a net dollar figure.

17   Q.   Explain to the jury, what does the green bar represent and

18   what do those columns represent?

19   A.   The green bar represents the closing price over the course

20   of time in the selected period, while each daily bar represents

21   the total volume, as well as within that bar colors

22   representing Bedrock Ventures' percentage of that total volume.

23            THE COURT:  Bedrock is the red?

24            THE WITNESS:  Correct, Bedrock is the red.  And the

25   blue represents --

D36rlev4                    Melley - direct

1          THE COURT:  Everybody else?

2          THE WITNESS:  Exactly, all non-Bedrock activity.

3    Q.  In addition to the red, there are numbers on those columns.

4    What does the number represent?

5    A.  It represents the percentage of shares of the overall day

6    that can be attributed to Bedrock Ventures activity.

7    Q.  What is the second period of time that you were asked to

8    look at?

9    A.  August 31st through October 9th of 2009.

10   Q.  Were you asked to create summary charts concerning those

11   periods, that period?

12   A.  Right.

13   Q.  If you wouldn't mind turning to Government Exhibit 111-7.

14   What is depicted in Government Exhibit 111-7?

15   A.  This summary chart shows the closing prices over the course

16   of the period as well as the dates of any press releases or

17   promotional materials that were issued concerning CNWI.

18   Q.  Turning to the next chart, what is depicted in Government

19   Exhibit 111-8?

20   A.  For the same period of time, the focus here is only on the

21   daily trading volume in CNWI.  Again, the red portion of the

22   bar indicating the percentage of activity of the overall

23   volume.  Unlike the previous charts concerning Bedrock, the

24   focus during this period was an account called Date Palm

25   Capital.

1   Q.  Did you see any trading activity in the Bedrock Ventures

2   accounts that you were looking at during this period?

3   A.  No.

4   Q.  With respect to Date Palm Capital, what is the government

5   exhibit that you used as the source of the trading data?

6   A.  The account statements, brokerage firm account statements.

7   Q.  Yes.

8   A.  Exhibit number 1213.

9   Q.  That is listed on the footer?

10  A.  Yes.

11  Q.  Did there come a time when you examined the statements for

12  Date Palm Capital in this Government Exhibit 1213 in the course

13  of preparing your summary charts?

14  A.  Yes.

15  Q.  Who is listed as the individual who controls the Date Palm

16  Capital account?

17  A.  David Levy.

18  Q.  For some further detail concerning how you calculated these

19  percentages and red bars, if you wouldn't mind using as an

20  example September 2, 2009.  Do you see a bar there that relates

21  to September 2, 2009?

22  A.  Yes.

23  Q.  What number is on that bar?

24  A.  That bar reflects that Date Palm Capital was responsible

25  for 67 percent of the volume on that date.

1   Q.  If you could explain to the jury how you calculated that 67

2   percent number.

3   A.  I divided the number of shares that were traded in the Date

4   Palm account which I believe was 179,600 shares.  That came

5   from the account statement.  I divided that number into the

6   total volume for the day, which was, I believe, approximately

7   268,000 shares.

8           MR. MASTER:  If you wouldn't mind pulling up, Mr.

9   Dinet, the first two pages of Government Exhibit 1213.

10  Q.  What is the account?

11  A.  Date Palm Capital.

12  Q.  Which company?

13  A.  BMA Securities.

14  Q.  Where is the trade on September 2, 2009 reflected?

15  A.  I think you have to go to the next page.  If you look under

16  realized gain/loss detail, the bottom portion, the first line

17  which has a trade date of 9/2/2009, you see the heading is date

18  sold or closed.  Then there is a quantity amount, 179,600

19  shares.  It's that first line.

20  Q.  Below that, what else is reflected?

21  A.  Other transactions in the Date Palm Capital account for

22  that period of time.

23  Q.  For which?

24  A.  This is a monthly statement for September 2009 for the

25  account of BMA Securities.

1            MR. SHARGEL:  Can we know what exhibit this is?

2            THE WITNESS:  1213 I think.

3            THE COURT:  1213 is the answer, Mr. Shargel.

4    Q.  How did you then calculate the percentage?  What did you do

5    with that information, for example, for September 2, 2009?

6    A.  I divided that number into the total share volume number,

7    which was called in this case Government Exhibit 101-29, the

8    Bloomberg data, which has the total volume on each day.  I

9    divided 179,600 into that total number, which I think for that

10   date was --

11   Q.  Take a look at Government Exhibit 101-29.

12   A.  For that date on September 2, 2009, the total volume was

13   268,700 shares.

14           MR. MASTER:  Mr. Dinet, if you wouldn't mind pulling

15   up Government Exhibit 111-4.

16   Q.  What is depicted in Government Exhibit 111-4?

17   A.  This is a chart that summarizes information from those

18   three main sources:  The closing price, the daily volume

19   information, as well as the selected account activity of Date

20   Palm Capital, the press releases and promotional material

21   dates.

22           In addition, I note that between August 31st and

23   September 11th there was a 457 percent increase in the CNWI

24   share price, and then there was a subsequent 212 percent

25   decline in that price over the remaining days of the period

1   from that high point on 9/11.

2           Finally, in the yellow box I indicated for my

3   calculation of the net proceeds for the Date Palm account that

4   Date Palm generated $666,710.65 in net proceeds from sales of

5   CNWI between September 2nd and the 18th of September.

6   Q.  Was there a third period that you were asked to focus on

7   concerning Cardiac Network?

8   A.  Yes, February 2010.

9           MR. MASTER:  If you would, Mr. Dinet, pull up

10  Government Exhibit 111-9.

11  Q.  What is depicted in Government Exhibit 111-9?

12  A.  It shows over the course of that month the closing price

13  indicated by the red line as well as whether there were dates

14  of press releases or promotional materials that had been

15  gathered by FINRA.

16  Q.  Did you do, again with respect to this one-month period, a

17  second kind of chart that you have been walking through?

18  A.  Yes.

19          MR. MASTER:  If you wouldn't mind, Mr. Dinet, pulling

20  up Government Exhibit 111-10.

21  Q.  Again, what did you do to create this chart?

22  A.  This comes from the brokerage account statement information

23  1213 as well as the Bloomberg data 101-29, showing the daily

24  volume and the percentage of Date Palm's activity over the

25  course of that month.

1    Q.  Again, were you asked to provide or create that third

2    category of chart that tried to integrate everything into one

3    chart?

4    A.  Yes.

5          MR. MASTER:  Please pull up Government Exhibit 111-2.

6    Q.  What is depicted in Government Exhibit 111-2?

7    A.  In addition to the information seen on the previous two

8    charts, this also shows that there was a 79 percent increase in

9    the Cardiac Network share price between February 3rd and

10   February 10th as well as a subsequent 182 percent decline in

11   the price from that high point on the 10th through the 26th of

12   February.  Finally, I also was able to calculate that Date Palm

13   Capital generated $535,441.54 in net proceeds from sales of

14   CNWI during the period.

15   Q.  Now let's turn to Banneker, if you wouldn't mind taking a

16   look at Government Exhibit 110-1.  What is depicted in

17   Government Exhibit 110-1?

18   A.  This shows the closing price and daily market share volume

19   in Banneker between January 2008 and December 2009.

20   Q.  What is the source of that information?

21   A.  The Bloomberg data 103-45.  It also indicates that on the

22   9th of February 2009 there was a stock split.  In this instance

23   for every share of Banneker after that date, it became 12

24   shares.

25   Q.  On that date what was the trading volume or the market

1   share volume of Banneker reflected by the chart?

2   A.   A little under 8 million shares.

3   Q.   Were you asked again, as with Cardiac, to focus on specific

4   subsets of that time period that is depicted in Government

5   Exhibit 110-1?

6   A.   Yes, I was.

7   Q.   What is the first subset or the first period within that

8   multiyear period that you were asked to look at?

9   A.   July 15th through September 15, 2008.

10          MR. MASTER:  If you wouldn't mind pulling up

11  Government Exhibit 110-4, Mr. Dinet.

12  Q.   What is depicted in this chart?

13  A.   This shows over the course of that two-month period the

14  closing price as well as any relevant promotional materials or

15  press releases concerning Banneker.

16  Q.   Were you asked to prepare that second category of chart,

17  the one that looked at trading volume in specific brokerage

18  accounts?

19  A.   Yes.

20          MR. MASTER:  If you wouldn't mind pulling up

21  Government Exhibit 110-5.

22  Q.   What is depicted in that exhibit?

23  A.   This shows on a daily basis the total volume as well as the

24  percentage of volume attributed to certain accounts.  In this

25  case those accounts were in the names of EMC Holdings and

1    EZ English.

2    Q.  What are the names of the individuals based on your review

3    of these trading records who are listed as the individuals

4    controlling those two accounts?

5    A.  For EMC Holdings the name I saw was Christian Burnett, and

6    for EZ English the name listed was Yael Tal.

7    Q.  Did you create the third category of information or the

8    third category of chart for the specific time period?

9    A.  Yes.

10   Q.  If you wouldn't mind turning to Government Exhibit 110-3.

11   What is depicted in this chart?

12   A.  This shows both the closing price and volume analysis as

13   previously seen, in addition showing that there was a 234

14   percent increase in the BANI, Banneker, stock price from July

15   15th to the high point on August 4th and the subsequent 178

16   percent decline in the price over the remaining days of the

17   period.  In addition, my analysis of the EZ English and EMC

18   Holdings accounts showed that they combined to generate

19   $268,714.10 in net proceeds from sales of BANI during the

20   period.

21   Q.  Were you also asked to take a look at a second subperiod

22   during the two-year period covered by the Bloomberg data?

23   A.  Yes.

24   Q.  Are those dates around the time of the forward stock split

25   that you just described?

D36rlev4                    Melley - direct

1    A.   Correct.

2    Q.   What specific time period did you look at?

3    A.   January 26th through February 25th of 2009.

4         MR. MASTER:  If you wouldn't mind pulling up

5    Government Exhibit 110-6.

6    Q.   What is depicted in this chart?

7    A.   The closing price analysis over the course of the time,

8    month, as well as any relevant Banneker-related press releases

9    or promotional materials and those dates.

10   Q.   Were you asked to also analyze this collection of trading

11   accounts for trading data concerning Banneker during this time

12   period?

13   A.   I was.

14        MR. MASTER:  If you wouldn't mind pulling up

15   Government Exhibit 110-7.

16   Q.   Which accounts did you use to prepare your trading volume

17   analysis or trading volume summary chart that is depicted here

18   in Government Exhibit 110-7?

19   A.   The accounts focused on here included DML Marketing as well

20   as EZ English.

21   Q.   What is the name of the individual who is listed as the

22   person controlling DML Marketing?

23   A.   Donna Levy.

24   Q.   Did there come a time when you were asked to prepare that

25   third category of chart that integrated all three sources of

1   data?

2   A.  Yes.

3   Q.  I'd like you to now turn to Government Exhibit 110-2.  Is

4   that that third category of chart?

5   A.  Correct.

6   Q.  Did you also provide the price increase and decrease data?

7   A.  Yes.

8   Q.  What did your calculations determine?

9   A.  That between January 26th and February 6th there was a 775

10  percent increase in the price.  Then there was a subsequent

11  decline in the price of 5,150 percent from the date February

12  6th through the 25th of February, which also includes the stock

13  split listed on February 9th.  In addition, I calculated the

14  net proceeds to show that DML Marketing and EZ English combined

15  to generate $694,895.06 from sales of BANI over the course of

16  the period.

17  Q.  Now let's turn to the third company that you were asked to

18  analyze and prepare summary charts concerning, and that is

19  Greenway Design Group.

20          MR. MASTER:  If you wouldn't mind pulling up

21  Government Exhibit 113-1.

22  Q.  What is depicted in Government Exhibit 113-1?

23  A.  This covers both closing price and daily market share

24  volume between January and December 2011 in Greenway Design

25  Group.  Again, this comes from the Bloomberg data, Government

D36rlev4                    Melley - direct

1    Exhibit 104-28.

2    Q.  As with the prior two stocks, did there come a time when

3    you were asked to combine two or more categories of data for

4    specific subsets of time?

5    A.  Yes.

6    Q.  Turning to the first subset of time, what was that?

7    A.  January 25th through April 29, 2011.

8    Q.  For that roughly 3-month period, what did you do?

9    A.  As I did earlier, I analyzed the closing price data as well

10   as the volume data and then looked at the FINRA materials and

11   also the brokerage account statements and summarized all that

12   data.

13              MR. MASTER:  If you wouldn't mind pulling up 113-4,

14   Mr. Dinet.

15   Q.  What is depicted in Government Exhibit 113-4?

16   A.  This contains any day there was a press release or

17   promotional material put out -- again, this comes from the

18   FINRA materials -- as well as the closing prices over the

19   3-month period.

20   Q.  Were you asked to analyze certain accounts and calculate

21   what percentage of the total trading volume those accounts

22   represented?

23   A.  Yes.

24   Q.  If you wouldn't mind turning to Government Exhibit 113-5.

25   What is depicted in Government Exhibit 113-5?

1  A.  This shows that volume analysis with the focus being on an

2  account in the name of EZ English and EZ English's percentage

3  on a daily basis when it traded in GDGI.

4  Q.  In whose name is this EZ English account listed?

5  A.  Yael Tal.

6        MR. MASTER:  Your Honor, at this time I'd like to read

7  a stipulation.  It is marked as Government Exhibit S3.

8        THE COURT:  All right.

9        MR. MASTER:  "It is hereby stipulated and agreed by

10  and between the United States of America, by Preet Bharara,

11  United States Attorney, Howard S. Master and Carrie H. Cohen,

12  Assistant United States Attorneys, of counsel, and Donna Levy

13  and David Levy, the defendants, by their counsel, Howard

14  Srebnick, Scott Srebnick, and Alex Arteaga-Gomez, Esqs., for

15  Donna Levy, and Gerald L. Shargel and Ross M. Kramer, Esqs. for

16  David Levy, that if called to testify, Paul Bunnell would

17  testify as follows:

18        "Paul Bunnell is the accountant for David Levy and

19  Donna Levy.  David Levy provided documents to Paul Bunnell

20  related to the following entities and Paul Bunnell prepared tax

21  returns for tax year 2011 for the entities as indicated below."

22        Mr. Dinet, if you wouldn't mind publishing the second

23  page of that.  I'm going to read the chart.

24        There is a chart on the second page.  I'm going to

25  publish that for the jury.  The columns are "State of

1    Incorporation," "Name of Entity," and "Tax Return Filed." It

2    indicates three Delaware corporations: Allegro West Marketing,

3    Inc.; Miracle Marketing, Inc.; and Date Palm Capital LLC.

4         It lists several Florida corporations: Allegro

5    Marketing & Media Corp.; Allegro Media Enterprises, Inc.; Date

6    Palm Capital Corp.; DML Marketing Corp.; DML Marketing & Media

7    Corp.; EZ English, Inc.; Fitzwilliams Investment, Inc.;

8    Fitzwilliam Investment, Inc.; Florida Media Corporation;

9    Miracle Marketing, Inc.; Miracle Marketing & Media Corp.;

10   Miracle Marketing Specialties Corp.; Should've Been Romeo, Inc.

11   It lists a Nevada corporation Fitzwilliams. Then it lists

12   three Wyoming corporations in the names of DML Marketing,

13   Fleetwood Media Corp. and Melody Holdings.

14        Then it indicates whether a tax return was filed in

15   the name of those entities for 2011, and it indicates, among

16   other things, that the tax return was filed in the name of

17   EZ English by Paul Bunnell for tax year 2011 based on provision

18   of documents by David Levy.

19        Then it states in paragraph 3, "Government Exhibit

20   705-2 is a true and accurate copy of a report of foreign and

21   financial accounts maintained by David Levy that was signed by

22   David Levy on or about September 12, 2012, and maintained by

23   Paul Bunnell in the course of his regularly conducted business

24   activity. Government Exhibit 100-20 is true and accurate copy

25   of an email that David Levy sent to Paul Bunnell on or about

1   April 15, 2011."

2             Finally, your Honor, "It is further stipulated and

3   agreed that Government Exhibit 705-2 and 1500-20 may be

4   received in evidence at trial and that the stipulation may be

5   received in evidence at trial."  Signed by the parties.

6             THE COURT:  The stipulation and documents referred to

7   are received in evidence.

8             MR. MASTER:  Thank you, your Honor.

9             (**Government's Exhibits** 705-2 and 1500-20 received in

10  evidence)

11  BY MR. MASTER:

12  Q.  Getting back to the EZ English account volume referred to

13  during this time period, Government Exhibit 113-5, could we put

14  that up.  I want to ask you a couple of questions about the

15  first portion of the chart.  There is an indication that with

16  respect to certain dates the number 100 percent appears.  Could

17  you explain to the jury what the chart means when it says 100

18  percent.

19  A.  That on those dates 100 percent of the volume can be

20  attributed to trading by EZ English.

21  Q.  For example, on January 27, 2011?

22  A.  There were 500 shares that were traded, and that's what was

23  represented in Government Exhibit 104-28, the Bloomberg

24  activity for GDGI.  And an analysis of the EZ English account,

25  Government Exhibit 1258, shows that on that date EZ English

1    sold 500 shares.

2    Q.   Therefore?

3    A.   I divided 500 into 500 to get 100 percent of the activity

4    can be attributed to EZ English.

5    Q.   Did there come a time when you were asked to provide that

6    third category of chart with respect to this time period?

7    A.   Yes.

8            MR. MASTER:  If you wouldn't mind pulling up

9    Government Exhibit 113-2.

10   Q.   What is depicted in this exhibit?

11   A.   This summarizes the closing price and volume activity as

12   well as showing the 60 percent price increase in GDGI between

13   the 18th and 28th of March and the subsequent 405 percent

14   decline in the price over the remaining days of the period and

15   the fact that EZ English generated $4,989,274.35 in net

16   proceeds of sales of GDGI during the period.

17   Q.   Sir, was there a second subset time that you were asked to

18   look at concerning Greenway Design Group?

19   A.   Yes.

20   Q.   What period of time was that?

21   A.   That concerned primarily August 22nd through September 23,

22   2011.

23           MR. MASTER:  If you wouldn't mind pulling up

24   Government Exhibit 113-6, Mr. Dinet.

25   Q.   What is reflected in this chart?

1   A.  The closing prices over the course of that time frame.

2   Q.  Is there a reason why there is no indication of press

3   releases or promotional material on this chart?

4   A.  I was not provided with any materials that FINRA had

5   collected during this time period.

6   Q.  If you wouldn't mind turning to Government Exhibit 113-7.

7   What is depicted in that exhibit?

8   A.  This is the trading volume analysis over that same period

9   of August 22 through September 23rd, again showing any activity

10  and percentages of the overall activity that would be

11  attributed to EZ English.

12  Q.  Is that the same account that was trading in that first

13  time period?

14  A.  Yes.

15  Q.  Again, were you asked to provide that third category of

16  chart for this time period?

17  A.  Correct.

18          MR. MASTER:  Please pull up Government Exhibit 113-3.

19  Q.  What additional information did you provide in this chart

20  beyond integrating those three categories of information?

21  A.  That there was a 73 percent increase in the GDGI share

22  price between the 22nd of August and September 12th, and then a

23  subsequent 96 percent decline in the price over the remaining

24  days of the period, as well as the fact that the EZ English

25  account generated $741,474.67 in net proceeds from GDGI sales

1   over the course of the period.

2   Q.  Now turning to the fourth company that you were asked to

3   analyze and provide summary charts for, Emerging World Pharma?

4          MR. MASTER:  If you wouldn't mind pulling up

5   Government Exhibit 112-1.

6   Q.  What is depicted in that exhibit?

7   A.  This covers closing price and volume activity in EWPI, the

8   ticker symbol for Emerging World Pharma, between January and

9   December 2010.

10  Q.  What is the source for that information?

11  A.  The Bloomberg data by GX-105-52.

12  Q.  Were you also asked to look at one specific subset of time

13  and provide more detailed chart concerning that subset?

14  A.  Yes, March 1st through May 22nd -- I'm sorry -- may 21,

15  2010.

16         MR. MASTER:  If you wouldn't mind turning to

17  Government Exhibit 112-3.

18  Q.  What is depicted in this 7-week time period?

19  A.  The closing prices and any relevant EWPI press releases or

20  promotional materials that FINRA had gathered and the dates of

21  those materials.

22  Q.  Turning to Government Exhibit 112-4, what is depicted in

23  that chart?

24  A.  On a daily basis the overall market share volume as well as

25  the percentage of that daily volume that could be attributed to

D36rlev4                    Melley - direct

1    an account in the name of Petrobond.

2    Q.   What is the name of the individual who was on Petrobond

3    trading accounts that you looked at as receiving those

4    accounts?

5    A.   Clarke Coleman.

6    Q.   Were you asked to provide another chart that integrated all

7    of those categories of information?

8    A.   Yes.

9    Q.   If you wouldn't mind turning to Government Exhibit 112-2.

10   Is that the chart where you integrated all the sources of

11   information?

12   A.   Correct.  This, in addition to the other information

13   previously discussed, the price and volume, also shows that

14   there was a 175 percent increase in EWPI share price between

15   March 1st and April 6th, and then there was a corresponding 175

16   percent decline in the price over the remaining days of the

17   period, and that Petrobond generated $686,495.52 in net

18   proceeds from sales of EWPI.

19   Q.   What was the top, the peak price of that period that you

20   were asked to look at?

21   A.   The peak price, which occurred on April 6th, was I believe

22   approximately 71 cents.

23            MR. MASTER:  Just a moment, your Honor.

24            Nothing further, your Honor.

25            THE COURT:  Mr. Shargel?

1           MR. SHARGEL:  Mr. Srebnick will handle it.

2           THE COURT:  Mr. Srebnick.  I'm sorry.

3    CROSS-EXAMINATION

4    BY MR. SREBNICK:

5    Q.  Good afternoon.

6    A.  Good afternoon.

7    Q.  My name is Howard Srebnick.  We have never spoken before

8    you and I, have we?

9    A.  No.

10   Q.  Good afternoon to you.

11   A.  Same to you.

12   Q.  We only have a few minutes before 5 o'clock.  I'd like to

13   take that time to define a few of the terms that you have used

14   today so that we all have an agreed understanding of what we

15   are talking about.  You have been showing us some charts

16   regarding the volume of shares of stock that presumably were

17   bought or sold, so I'd like to first understand together what

18   we mean by stock.  Are we talking now about a share of

19   ownership in a company that is publicly traded?

20   A.  Correct.

21   Q.  Is that to be distinguished from stock perhaps in a company

22   that is privately held, like a mom-and-pop shop that doesn't

23   trade its shares publicly?

24   A.  Correct.

25   Q.  There is a significant difference between stock that is

D36rlev4                    Melley - cross

1   available on the public market versus stock that is privately

2   held in a private company, big difference, right?

3   A.  I'm not sure in terms of what difference you're talking

4   about.

5   Q.  Fair point.  A privately held company, small mom-and-pop

6   shop, which has stock, the owner of the stock, if he or she

7   wants to sell the company, needs to somehow find a potential

8   buyer.  There is no active market for that stock, correct?

9   A.  True.

10  Q.  If I build up my company, I own a hundred percent of the

11  shares in my company, and I want to retire and sell the shares

12  in my company, I have to find somebody who is interested in

13  buying my stock and perhaps even running my business, right?

14  A.  As holding shares of a private company, yes, you need to

15  find a buyer in order if you're looking to sell those shares,

16  which may be more difficult than on the public marketplace.

17          THE COURT:  FINRA has nothing to do with such

18  companies, right?

19          THE WITNESS:  FINRA has no jurisdiction over publicly

20  traded companies or private companies.  It just regulates the

21  trading and sale.

22  Q.  I want to get to the word "trading" in a moment, but I want

23  to make sure we understand what it is that is being traded.

24  Those of us that are familiar with a mom-and-pop shop and stock

25  in a private company where there is no trading or market in

1    that stock, really the only way to sell it is to find a buyer

2    for it, right?

3    A.   Find a buyer for it or have that company become a publicly

4    traded company.

5    Q.   OK.   You're ahead of me, but that's where we are going with

6    all of this.   A private company that ultimately wants to be

7    able to, as an owner of company, sell his or her stock over

8    time either, one, needs to find a private buyer of that stock

9    or take the company public so that the stock can be traded in

10   some sort of market, perhaps?

11   A.   Correct.

12   Q.   Good.   A stock that is not publicly traded would not be

13   liquid, is that a fair statement?

14   A.   In terms of having to find a buyer of those share, yes.

15   Liquid or liquidity refers to the ease at which you're able to

16   purchase and sell shares.

17   Q.   Typically, is it a fair statement to say that publicly

18   traded stock is more liquid than privately held stock?

19   A.   I would say generally yes, that is the case.

20   Q.   I want to talk to you and ask you some questions about the

21   value of the stock, the price of the stock.   OK?   When we talk

22   about a stock of a private company where it is not publicly

23   traded, how does one determine the price of a stock?   You have

24   talked to us about the prices of stock.   What is the price of a

25   stock that's not publicly traded, that's privately held?

D36rlev4                    Melley - cross

1    A.  The price would have to be determined by whatever the

2    seller believes they could sell it at or what they are

3    interested in selling it at and whether there is any attraction

4    of someone buying it at that price.  They may look at a number

5    of different factors, but that's generally where it would come

6    out.

7    Q.  Would it typically include, when you say factors to

8    determine a price, what is known as the fundamentals of the

9    company?

10   A.  That would be one factor, the financial aspects of it, what

11   the future potential is regarding the product.  There could be

12   a number of different things.

13   Q.  So the owner of the stock, in trying to sell his or her

14   stock, would have to show the buyer, perhaps, why that stock

15   has value, right?

16              MR. MASTER:  Objection, your Honor.

17              THE COURT:  Sustained.

18   Q.  I'd like to now ask you some questions about the price of

19   stock in the publicly traded market as you have been describing

20   to us today.  The price of stock on the publicly traded market,

21   like everything else, is determined by supply and demand, is

22   that a fair statement?

23              MR. MASTER:  Objection.

24              THE COURT:  Sustained.

25   Q.  You were describing for the jury, through your charts,

1    trades.  Are those on the pink sheet markets or through the

2    pink sheets?

3    A.  For these four stocks they were traded on the over-the-

4    counter what is considered the pink sheet market, yes.

5    Q.  If you could again describe for us what is the pink sheet

6    so we all understand that term.

7    A.  Pink sheet refers to over-the-counter securities that are

8    traded for less than $5where there often are not the same

9    number of investors to purchase and sell the stock that you may

10   find on something like the NASDAQ Stock Market or the NYSE.

11   Q.  Is there for these pink sheet stocks an actual market?  Is

12   there a trading market for them?

13   A.  Yes.  The pink sheet market, today it's called OTC Markets

14   Group, but commonly it's always been referred to as the pink

15   sheet market.  It's a quotation service, meaning it's a

16   platform where brokerage firms can come and look to buy and

17   sell shares of the stock.

18           Unlike the NASDAQ Stock Market, where it is the

19   company itself that is responsible for exposure in order to be

20   traded, the pink sheet arena is an arena solely where the

21   brokerage firms offer to buy and sell shares of various

22   publicly traded companies that are at this level, the pink-

23   sheet level.

24   Q.  If a member of the public wants to find out the price of a

25   particular stock that's a pink sheet stock, where does a member

 1   of the public go to find that price?

 2   A.  They could go to a number of different avenues, one being

 3   the Internet.  They could go to the OTC Markets Group site.

 4   You could also find it on Bloomberg, Yahoo! Finance.  There are

 5   a number of different available platforms to see price and

 6   volume information.

 7   Q.  Does one need to have some sort of subscription to gain

 8   access to that type of information?

 9   A.  In order to gain access to?

10   Q.  Pricing information.

11   A.  It depends on how real-time you need to see that

12   information.  If you're looking at what the last sale is as

13   well as the competing quotes, which are bids and asks or prices

14   at which firms are interested in buying or selling the stock,

15   then you may need a subscription.  But in order to see general

16   information on a daily basis, you can go to the Internet, a

17   number of sites, and see what it's currently traded at.

18   Q.  Now I'd like to ask you some questions about the volume of

19   stock that you were discussing with the jury vis-a-vis some of

20   these companies.  I believe you started with Cardiac Network.

21   I'd like to turn our attention, if I could, to Government

22   Exhibit 111-3.

23            THE COURT:  Can you put that up on the board, please.

24            MR. SREBNICK:  Thank you so much.

25   Q.  It appears that what this chart does is correlate volume,

D36rlev4                    Melley - cross

1   price, and promotions that were published as you have put them

2   all together on one chart.  Is that fair?

3   A.  This shows on a daily basis what actually happened to both

4   the closing price and trading volume in the stock, as well as

5   overlaying any relevant promotional or press release materials.

6   Q.  There appear to have been, according to your chart, a

7   series of promotions starting with -- I think the date down in

8   the bottom left would be August 9th of 2007, is that right?

9   A.  Correct, there is a press release on that date.

10  Q.  Then there is another event, a promotion, which occurs

11  according to the chart on August 10th?  I don't have a pointer.

12  A.  Yes, correct.

13  Q.  Oh, we have one here, great.  I'm in this vicinity here.

14  A.  OK.

15  Q.  It appears that on the day that there was a promotion,

16  there appears to be a higher level of trading activity than

17  before the promotion on that same week, correct?

18  A.  Yes.

19  Q.  Did you perform an event study to determine whether it was

20  the promotion that caused that increase in trading activity

21  that day?

22  A.  No.

23          THE COURT:  Mr. Srebnick, would this be a convenient

24  place to break?  It's 5 o'clock.

25          MR. SREBNICK:  Of course.

1            THE COURT:  Ladies and gentlemen, this is the end of

2      the day.  We will resume tomorrow morning at 10 o'clock.  I

3      know somebody asked questions about the weather.  We have a

4      weather monitoring service.  We have had no reports on that.

5      Let me give you a call-in number in case it changes.

6      212-805-0515.  Mr. Ovalles has this if he didn't give it to

7      you.  212-805-0515.

8            Please remember my instructions.  Don't discuss the

9      case.  Don't do any research.  Keep open minds.  And have a

10     nice ride home tonight.  We'll see you tomorrow morning.  Try

11     to give yourself a little bit more time.  We will be serving

12     the continental breakfast starting at 9 o'clock, and we will

13     resume at 10:00.  Thanks.  Good night.

14            (Jury not present)

15            THE COURT:  You can step down, Mr. Melley.  You are on

16     cross-examination now, so please don't talk to the government

17     about your testimony.  All right?

18            THE WITNESS:  Yes, your Honor.

19            THE COURT:  Thank you very much.

20            (Witness not present)

21            THE COURT:  Anything to take up?

22            MR. SREBNICK:  I have one matter, Judge, if I may.

23            THE COURT:  Yes, Mr. Srebnick.

24            MR. SREBNICK:  Thank you, Judge.

25            THE COURT:  Please be seated.

1          MR. SREBNICK:  Judge, I'm not from this district, so I

2   was not familiar with the procedure of jury selection.  I asked

3   my brother to help me with some research.  I wanted to let the

4   Court know what I found.

5          There appears to be Second Circuit case law that is

6   divided on the issue about the peremptory challenge.  I would

7   like to cite to the Court United States v. Blouin, 666 F.2d 796

8   (2d Cir. 1981), which appears to approve the system that your

9   Honor has adopted, although that appears to conflict with an

10  earlier Second Circuit case, Carr v. Watts, 597 F.2d 830 (2d

11  Cir. 1979).  Then I was suggested to read United States v.

12  Rick's, which I read quickly, a Fourth Circuit case, 776 F.2d

13  455, (7th Cir. 1985).

14         Given what I view as an ambiguity or potential

15  conflict in the Second Circuit law, I would like to preserve

16  that issue for appellate review.

17         THE COURT:  It's kind of late for that.  We picked the

18  jury.  The opportunity to correct any deficiencies, which I

19  disclosed in advance how we were going to select the jury, the

20  time has passed.  You have your record.  I don't know if you

21  made the objection, I don't know if you did, in time for me to

22  cure whatever deficiencies might have existed.  Your remarks

23  are duly noted.  Ms. Cohen?

24         MS. COHEN:  I was going to note that your Honor

25  informed the parties how you were going to conduct jury

D36rlev4                    Melley - cross

1    selection and that the defense had no objection.

2            THE COURT:  That is my recollection.  What is the

3    Fourth Circuit say?

4            MR. SREBNICK:  It's not exactly the same scenario.

5    That's why I'm not marrying myself to it.  I didn't get to read

6    it carefully.  It's an interesting question.

7            THE COURT:  There is quite a variation.  I tried a

8    case not too long ago with two lawyers from the West Coast.

9    They had all kinds of things they do on the West Coast, but we

10   don't do 'em here.

11           MR. SREBNICK:  Respectfully, your Honor, thank you for

12   letting me address the Court.

13           THE COURT:  Thank you, Mr. Srebnick.

14           Anything else to take up?

15           MS. COHEN:  Your Honor, depending on the weather, we

16   have several witnesses flying in from out of town.  We are

17   hoping to get everyone here on time, but it may be the fact

18   that on Thursday afternoon or Friday afternoon we have gone a

19   little short on witnesses.  I just wanted to alert the Court to

20   that.

21           THE COURT:  Two inches of snow is going to do all

22   this?

23           MS. COHEN:  It may or may not, because people's

24   flights may or may not get canceled.  I just wanted to inform

25   the Court.  We are hoping to fill the days.

1          THE COURT:  Who are the witnesses who may testify that

2     I'm looking at the 3500 material on?

3          MS. COHEN:  Your Honor, that would be Alan Weiner.

4     Right now he was scheduled to testify tomorrow, but I don't

5     know if he is going to make it in or not.

6          THE COURT:  Where is he flying from?

7          MS. COHEN:  He is flying from Los Angeles on a red-

8     eye, your Honor.  They are already canceling a lot of flights,

9     it's been reported to me.  I'm not sure he will get on the

10    flight or not.  He also has a prior commitment Friday afternoon

11    in Atlanta.  I'm just not sure even, if he gets here, if he

12    will get on and off the stand on time.  We may have to put him

13    on on Monday.

14         MR. SHARGEL:  Judge, I'm not quarreling, but this is

15    the first I'm hearing of this Mr. Weiner being a witness this

16    week.  I have the list.  There is no need to have a dispute

17    about it.  All I'm asking for is an accurate list as to who is

18    coming next during the course of this week.  I don't think that

19    is asking for too much.

20         THE COURT:  I don't think it is, either.

21         MS. COHEN:  It's not.

22         THE COURT:  I know it's not.

23         MS. COHEN:  My memory, your Honor, is that I told

24    defense counsel several times he might come this week.

25         THE COURT:  Ms. Cohen, do you have an alternative plan

1    if the witnesses can't fly in so we don't waste time with the

2    jury?  It's pretty clear that to the extent we slip into the

3    final week of March, we are going to have problems with

4    religious observance.

5            MS. COHEN:  Your Honor, we are doing everything we can

6    to fill the gaps with individuals that are already here or

7    within the tri-state area.  A lot of our witnesses are,

8    unfortunately, in California and Florida.  We have flown in

9    those that we can early to testify this week, but we couldn't

10   account for the snowstorm.  I don't know that that will happen

11   at all, your Honor.  I just want to alert the Court in case we

12   run an hour or two short on Thursday or Friday, which is all I

13   think it will be.

14           THE COURT:  You are making alternative plans to get

15   other witnesses in who are not subject to travel conditions?

16           MS. COHEN:  We are, your Honor, but there are not a

17   lot of those.

18           THE COURT:  We will have a short form order for you on

19   the 3500 material.  We are just about completed with our

20   review, the ex parte review that we have to conduct under

21   3500(b).  We will have that for you by the close of -- well,

22   you will have it before you go home tonight.  We'll give you an

23   email.

24           Anything else to take up?  See you at 10 o'clock.

25           (Adjourned to 10:00 a.m., March 7, 2013)

1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3   PETER J. MELLEY

4   Direct Mr. Master  . . . . . . . . . . . . 103

5   Cross By Mr. Srebnick  . . . . . . . . . . 147

6                   GOVERNMENT EXHIBITS

7   Exhibit No.                          Received

8    S-2, 101-29, 103-45, 104-28, and  . . . . . 117

9            105-52, 502-1 through 502-3,

10           1200-1 through 1200-32,

11           1200-36 through 1200-40,

12           1200-42 through 1200-44, and

13           1201 through 1258

14   101-1 to 101-28, 102-1 to 102-31, 103-1 . . . 120

15           to 103-44, 104-1 to 104-27,

16           and 105-1 to 105-51

17   110-1 to 110-7, 111-1 to 111-10, 112-1  . . . 123

18           to 112-4, and 113-1 to 113-7

19   705-2 and 1500-20   . . . . . . . . . . . . 142

20

21

22

23

24

25