D37LLEV1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4           v.               11 Cr. 62 (PAC)

5   DONNA LEVY,
    DAVID LEVY,
6                              Jury Trial
             Defendants.
7   ------------------------------x

8
                          New York, N.Y.
9                          March 7, 2013
                          10:17 a.m.
10
    Before:
11
           HON. PAUL A. CROTTY
12
                          District Judge
13

14        APPEARANCES

15

    PREET BHARARA
16       United States Attorney for the
        Southern District of New York
17   CARRIE H. COHEN
    HOWARD S. MASTER
18       Assistant United States Attorneys

19

    HOWARD M. SREBNICK
20   NOAH FOX
    ALEX ARTEAGA-GOMEZ
21       Attorneys for Defendant Donna Levy

22

    GERALD L. SHARGEL
23   ROSS M. KRAMER
    JENNIFER HAYS
24       Attorneys for Defendant David Levy

25

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  The jurors are all here, so we'll call in

4     the jury.

5          MR. SREBNICK:  Good morning, your Honor.  May I

6     request permission -- apparently the other paralegal who has

7     the computer access is not available, so I would need to work

8     with the Elmo.  May I stand here to examine while I work with

9     the Elmo or where would you prefer that I stand?

10          THE COURT:  You can stand there if you want.

11          MR. SREBNICK:  Thank you, Judge.

12          THE COURT:  Will the government assist you in

13     putting --

14          MR. SREBNICK:  They've offered to assist.  But since

15     we don't have the technology, I may need to physically do it

16     myself.

17          THE COURT:  Okay.  It's up to you.

18          MR. SREBNICK:  Thanks.

19          THE COURT:  The government will cooperate, but it's up

20     to you, Mr. Srebnick.

21          MR. SREBNICK:  Thank you very much, Judge.  I'm good.

22          (Continued on next page)

23

24

25

D37LLEV1

1          (Jury present)

2          THE COURT:  Good morning.  Glad you made it through

3     the snowstorm.  Please be seated.

4          Mr. Melley, I want to remind you you're still under

5     oath.

6          Mr. Srebnick, any time you're ready.

7          MR. SREBNICK:  May it please the Court, good morning,

8     everybody.

9      PETER J. MELLEY, resumed.

10    CROSS-EXAMINATION (cont'd)

11    BY MR. SREBNICK:

12    Q.  Mr. Melley, good morning.

13    A.  Good morning.

14    Q.  When we left off yesterday, I was going to illustrate with

15    your chart.  Today I'm going to need to go over to the Elmo.

16    Technology is different today.  And you'll forgive if I'm a

17    little clumsy, but I'll do the best I can.

18          And I'm publishing what is in evidence as Government

19    Exhibit 111-3.  Is that in focus?  Because I don't have 20/20.

20          THE COURT:  Do you see it on your screen, Mr. Melley?

21          THE WITNESS:  Yes.

22    Q.  Okay.  Now, 111-3 appears to be a combination of other

23    charts that you had already prepared and then compiled into

24    this one exhibit, correct?

25    A.  Correct.

D37LLEV1                    Melley - cross

1    Q.  There's one chart that we saw that deals with volume of

2    shares traded and that's reflected in the blue and red bars?

3    A.  Correct.

4    Q.  And if we look along the left axis with this green light

5    that I've been given, it shows the number of shares that are

6    being traded on a particular day?

7    A.  Correct.

8    Q.  The green line which I'm tracking here with the green dot

9    would illustrate the price on given days, correct?

10   A.  Right, the closing price as of the end of each day.

11   Q.  And the right axis of the chart has the price points

12   starting at zero and the axis goes to $3.50; do you see that?

13   A.  Yes.

14   Q.  And along the horizontal axis we have the various dates for

15   this chart?

16   A.  Right.

17   Q.  Okay.  So you've also tracked for us the promotions and

18   press releases that may have coincided with the volume and/or

19   price points that you mapped along this chart, correct?

20   A.  Right.  Those were for those particular dates, right.

21   Q.  I'd like to ask you a few questions about the volume that's

22   depicted in the chart.

23   A.  Okay.

24   Q.  And on some days we can see that the red is as high as

25   let's say 50 some odd percent -- I can't see that exact number

D37LLEV1                    Melley - cross

1    right here.

2    A.  Yeah, 54.

3    Q.  And on some days the red -- is that a zero?  I can't tell.

4    A.  Some days, yeah.  That one you're pointing to there's zero,

5    meaning, there are no Bedrock shares traded on that day.

6    Q.  So, for example, on 9/13/07 when the stock price was

7    somewhere above $2.25, there were shares traded roughly in an

8    amount of 300,000 shares, correct?

9    A.  Correct.

10   Q.  And did you identify who those individuals were who had

11   somehow transacted 300,000 shares of the Cardiac stock?

12   A.  No, I did not.

13   Q.  You did track the trading activity of Bedrock Ventures on

14   this chart, correct?

15   A.  Correct.

16   Q.  Now, on the day that Bedrock Ventures comprised roughly 50

17   some odd percent of all of the trades of that day, there was

18   still another 300,000 shares traded by other individuals?

19   A.  Yes.

20   Q.  And when we use the word traded, does that include short

21   selling of the stock?

22   A.  The volume here would include any trades.  So short sale --

23   I don't know if I need to define.

24   Q.  I think we do.  Could you please explain to the jury what

25   is a short sale of stock?

1   A.   Sure.  Short sale is when an entity or firm or an account

2   sells shares that it does not yet own, does not yet have in its

3   possession.  So it's obligated to, if it first sells those

4   shares, it's obligated to quickly identify where it can buy

5   those shares to, in essence, cover the shares that it's already

6   sold.

7   Q.   And when you say quickly identify, I'd like to ask you a

8   few questions about that.

9   A.   Sure.

10  Q.   Because this is a Pink Sheet stock, the trading activity is

11  through market makers; is that a fair statement?

12  A.   Correct.  Yeah, the market makers are responsible to make

13  sure that if there -- somebody wants to sell the stock and

14  there isn't a buyer, a market maker's obligation is to step in

15  and purchase those shares.  And, obviously, the flip side, if

16  there's somebody that wants to buy and there's no seller,

17  market maker's job is to step in and sell shares.

18  Q.   How is that different from what we know about the New York

19  Stock Exchange or American Stock Exchange, what is the

20  difference?

21  A.   Traditionally, the New York Stock Exchange or the AMEX,

22  what you had were called specialists who were individuals or

23  entities who would sit ready to buy and sell shares of stock

24  to, in essence, keep the markets moving and help create

25  liquidity and price movement.  In the electronic marks like the

1  NASDAQ, as well as the over-the-counter securities like the

2  Pink Sheets, market makers fulfill that role.  So a firm is

3  obligated to help make sure that there's always someone on the

4  other side of a trade to make sure that, you know, there's

5  liquidity in the market, so to speak.

6  Q.  But there is a difference between the trading in the Pink

7  Sheets versus the trading in the New York Stock Exchange; isn't

8  it fair to say the Pink Sheets really are just a quotation

9  service?

10  A.  Correct.  The market makers, their job is to post quotes,

11  which is the price they're willing to buy and sell the stock.

12  But they are the ones that then, by setting those quotes,

13  they're the ones that, as I said, keep that liquidity moving in

14  the markets.  The main difference between the NYC and AMEX

15  versus the Pink Sheet arena is the liquidity or lack of

16  liquidity in the Pink Sheet arena.  There are less investors in

17  the Pink Sheet arena than you would find for the listed

18  markets.

19  Q.  When the market maker in a Pink Sheet stock quotes a stock

20  price, it doesn't necessarily mean there's someone out there

21  either ready to buy it or ready to sell it; is that a fair

22  statement?

23  A.  Correct.  And those prices that they quote can change at

24  any time over the course of the day.

25  Q.  Those prices are in fact hypothetical prices in many

1   instances, right?

2   A.  They're prices that are determined by research or diligence

3   that the firms may do, as well as what they're seeing in terms

4   of interest in the stock.

5   Q.  But it's not like the New York Stock Exchange where there's

6   a ready buyer and a ready seller that are being put together

7   through the exchange, correct?

8   A.  It depends on the security and, again, how much interest

9   there is at any given time.

10  Q.  So now I'd like to have you explain that the short sales

11  means that somebody, one of these market makers, is selling

12  stock that it doesn't even own yet; isn't that a fair

13  statement?

14  A.  With regards to Cardiac during this period of time?

15  Q.  What is a short sale?  Isn't it in the case of a Pink Sheet

16  stock, it's a market maker selling stock that it does not even

17  own, right?

18  A.  Right, at one given time.  And as I said earlier, they're

19  obligated to then cover, go out into the market, identify

20  shares that they can then buy to replace the shares that

21  they're already selling.

22  Q.  And if a market maker sells the stock short as we

23  described, meaning selling stock it does not own, the market

24  maker at some point in the future needs to buy that stock in

25  order to fill the sale; is that how it works?

D37LLEV1                    Melley - cross

A.  Correct.  And just to clarify, I mean, selling short sales

is not only found on the Pink Sheet arena.  That can be found

in any market.

Q.  Of course.  But when somebody like a market maker sells the

stock short, the market maker is betting against the stock, so

to speak, because it needs to go out and find those shares

hopefully at a lower price than the market maker sold the

shares at; fair statement?

A.  Yes.

Q.  So a short sale is a bet against the stock, right?

A.  It can be, yes.

Q.  And do we know how active the short sales were from your

charts, from this trading activity, how much of this reflects

short sales?

A.  I did not examine the activity to determine the level of

any short selling, if there was any short selling at all.

Q.  Okay.  Now I'd like to ask you then a few questions about

the promotions that are depicted here.

        What the chart illustrates is that some of the

promotions coincide with an increase in volume, meaning more

activity in the stock at the same time of the promotion,

correct?

A.  Meaning they occurred on the same date.

Q.  Right.  Are you saying that it was the promotion that

stimulated the trading activity, is that what this chart is

1   proposing to say to the jury?

2   A.  This chart just shows that on these individual dates, this

3   was the volume, and on that same date, there was also either a

4   promotion or a press release issued on that date.

5   Q.  So you're not saying that there was necessarily a causal

6   relationship between the promotion and the volume, are you?

7               MR. MASTER:  Objection.

8               THE COURT:  Sustained.

9   Q.  I'd like to go through these exhibits that are in evidence

10  now, these promotions.  I'd like to start with I believe it's

11  Government Exhibit 101-9.  I think I have it over here.

12  Forgive me.

13              101-10 is the one I'll be relying on.  Do you see that

14  on 8/17, August 17 of 2007, there's a promotion that is

15  depicted on the chart 111-3?

16  A.  Yes.

17              MR. SREBNICK:  I'd like to publish for the jury,

18  because it's in evidence already, the promotion that you depict

19  on the chart.

20  Q.  Now, the promotion was preceded by a press release, do you

21  see it says there's a press release and a promo?

22  A.  Right, on the 16th.

23  Q.  Okay.  And rather than go through each and every one, I

24  want to use this one as a illustration.  This is Government

25  Exhibit 101-10.  And let me show the exhibit so you know which

1    is the one I'm working with here.  So everybody can see 101-10.

2             And do you see that this is a promotion, and I'm not

3    going to go through it word by word, but just some of the

4    highlights of the promotion:  Soon millions of American seniors

5    will carry the telephonic Heart One wherever they go.  And

6    Cardiac Network, OTC symbol CNWI, will be making millions for

7    investors who buy their $1 stock now.

8             Do you see that?

9    A.  Yes.

10   Q.  Towards the bottom there's a picture of a person depicted,

11   Jarred Wollstein of the Intelligent Investor Report.  He's

12   featured here at the bottom right.

13            And do you see there's more information provided about

14   Cardiac and the product.  It says with Cardiac Network's unique

15   patient monitors, which send lifesaving heart data over the

16   telephone in only seconds, the doctor or a trained heart

17   specialist can receive phone transmitted digital data that

18   tells if the patient is having a heart attack and this

19   technology is available now.

20            Do you see that?

21   A.  Yes.

22   Q.  Okay.  And then there's more information and we can get to

23   that later and, of course, it's in evidence so the jury can

24   read it.

25            Do you see there's page 2 and it provides some more

1    information, some illustrations about the product, the Heart

2    One.  Okay.

3              MR. MASTER:  Your Honor, I object.  Is there a

4    question?

5              MR. SREBNICK:  I'm publishing the document.  It's in

6    evidence.

7              THE COURT:  He's reading from a document in evidence.

8    I guess it's an exercise in responsive reading.

9    Q.  Page 3 of the document that's in evidence, and it provides

10   some information about heart attacks generally, provides some

11   information to the reader about Cardiac Network's heart saver

12   monitors and how the early stages of introduction.  You can see

13   that, right?

14             THE COURT:  Do you have a question for this witness

15   here?

16             MR. SREBNICK:  I do.

17   Q.  Do you recall that at the end of the 11-page promotion --

18   which when I say 11 pages, of course, this is a printout of

19   what might have appeared on the internet -- there is a

20   disclaimer; do you recall that?

21   A.  Not exactly.  I looked through a number of materials, so I

22   can't tell you what it said.

23   Q.  Do you recall that the promotion tells the reader that it's

24   a sponsored advertisement, correct, that it's a paid

25   advertising issue, correct?

1   A.  Correct.

2   Q.  That it does not purport to provide an analysis of any of

3   the company's financial position, correct?

4   A.  Yes.

5   Q.  Not in any way to be construed as an offer or solicitation

6   to buy or sell any security, correct?

7   A.  Correct.

8   Q.  The Intelligent Investor Report is a paid advertiser,

9   correct?

10  A.  Yes.

11  Q.  Cardiac Network is the featured company, correct?

12          MR. MASTER:  Your Honor, I object to this questioning.

13  The document is in evidence.  It says what it says.

14          THE COURT:  You know, Mr. Srebnick, you can read this

15  to the jury, but you don't need the witness here to agree with

16  your reading of what's in evidence.  Do you have questions for

17  him about how he prepared his charts?  I don't think you have

18  to go into this.  You can read the document to the jury at some

19  other time.  Do you have questions for the witness?  He's a

20  busy fellow.  You're a busy guy too.

21          MR. SREBNICK:  I will proceed in that way, your Honor.

22  Thank you.

23  Q.  We'll publish it later then, Mr. Melley, but this is the

24  document you relied on, correct?

25  A.  One of many.

1    Q.  Now, so when the chart indicates that there's all this

2    volume of trading activity that coincides with the promotion,

3    the chart does not tell us what motivated all of that activity,

4    correct?

5    A.  Correct.

6    Q.  Now, the next government chart that I'd like to look at,

7    Government Exhibit 111-4, this is also Cardiac.  It's a

8    different time period, August 31 of 2009.

9          Now, do you see that at the point where the volume is

10   the highest for that time period --

11   A.  Right, on 9/14.

12   Q.  Yes -- it happens to coincide, there were a series of

13   promotions preceding it, correct, within the month of

14   September?

15   A.  Yes.

16   Q.  Right.  But when the stock price appears to be at its

17   height according to this chart, the grand majority of buyers

18   and sellers are not among the red group, the Date Palm Capital

19   group, correct?

20   A.  Are you referring to a particular day or just from that

21   point on or?

22   Q.  On September 11, there appears to have been over a million

23   and a half shares traded and only is it 1 percent represent the

24   trades of -- excuse me.

25   A.  Correct, 1 percent for Date Palm.

D37LLEV1                     Melley - cross

1    Q.  The other 99 percent, those are other people you don't know

2    who they are, correct?

3    A.  Correct.

4    Q.  And likewise, on the next day that's illustrated,

5    September 14, 2009, that was the single largest trading volume

6    on this chart nearing 3.2 million, of which 93 percent of the

7    people trading that stock are not part of the selected group in

8    red.  They are people you don't know who they are --

9    A.  Correct.

10   Q.  -- fair statement.  Now, the stock price appears to have

11   during that time period ranged anywhere from under 10 cents to

12   as high as somewhere in the seventies, it looks to me.  You'll

13   correct me if I'm wrong.

14   A.  Yeah, I think it ranges from about 14 cents to, yeah, about

15   77, 78 cents.

16   Q.  There you go.  Now, on 9/17, September 17, 2009, there's

17   over a million shares traded, none of which is part of the Date

18   Palm Capital account volume, correct?

19   A.  Correct.

20   Q.  And there are all these promotions going on just before

21   9/17 and yet the stock price is coming down, correct?

22   A.  Yes.

23   Q.  Okay.  I'd like to now ask you some questions about the

24   charts you prepared for Banneker.

25   A.  Okay.

1   Q.  That's the jewelry company.  They also had promotions that

2   you tracked.  Correct?

3   A.  Yes.

4   Q.  We'll publish the disclaimers later, but you saw those

5   disclaimers that these were paid advertisements, right?

6   A.  Again, my focus with the promotions was the dates of the

7   issuance of the promotions.  So I can't say for certain which

8   ones had disclaimers or did not.

9   Q.  Okay.

10  A.  Or what the content was.

11  Q.  We'll get to that I guess through a different witness.

12          Now, let's take a look at Government Exhibit 110-2.

13  And so that we are all oriented, this is January 26 through

14  February 25 of 2009.  We have the dates along the horizontal

15  axis, price on the right axis, volume on the left axis.

16          Do you see that?

17  A.  Yes.

18  Q.  Now, during these paid advertisements, beginning sometime

19  in I guess that's right around February 2; do you see that?

20  A.  Yes, that's the first one for that period.

21  Q.  Now, there would seem to be some significant price

22  increases before that from 5 cents all the way to it looks like

23  close to I guess 18 cents or something?

24  A.  Correct, on very little trading.

25  Q.  And likewise from 10 cents to somewhere in the 20 cents

1    neighborhood on trading in the few I guess hundred thousand,

2    200, 300,000 shares, right?

3    A.  Yes.

4    Q.  Now, when you have low volume trading, does that affect the

5    shall we say the accuracy of the price that's being reflected?

6            MR. MASTER:  Objection.

7            THE COURT:  Sustained.

8    Q.  You were saying it's low volume.  Does that simply mean

9    there were just not a lot of transactions on that date?

10   A.  Correct.

11   Q.  Okay.  There may have only been one buyer willing to buy

12   the stock for a seller who needed to sell that day, correct?

13   A.  There may.  I'm not sure for those dates you're referring

14   to how many trades there were.

15   Q.  And when there's low liquidity, that means the seller who

16   needs to get rid of his stock is stuck with whatever some buyer

17   on that day is willing to pay, correct, because there's not a

18   lot of volume out there, correct?

19   A.  I couldn't tell you for the specifics of those days how

20   many buyers or sellers there were or what the reason was for

21   the price it was sold or purchased at.

22   Q.  Now, we do see the price seems to reach its pinnacle on

23   this time period of approximately fifty -- I'll say 52 cents,

24   53 cents, right around 2/6/2009; do you see that?

25   A.  Right.  Because after that on the 9th is when the forward

1  stock split occurred which, again, by a fraction of 12 split

2  the price.

3  Q.  What I want to make sure is clear from this chart, someone

4  looking at the chart sees there's this dip as if the stock

5  tanked, but that's not what happened here, is it?

6  A.  No, as indicated in the text box about the 12 for 1 stock

7  split.  So it's clear for the reason why there was that to some

8  degree.

9  Q.  So this price on 2/9 somewhere back in the under 10 cents

10  price range doesn't reflect that everybody who owned the stock

11  three days before lost all that money, correct?

12  A.  No.  From that point forward, it reflects what the price

13  was of the stock after the stock split.

14  Q.  I wanted to clarify that so that we understand what this

15  change reflects, okay?

16  A.  Sure.

17  Q.  Now, the highest volume was right --

18  A.  Yeah.

19  Q.  -- around the stock split, right?

20  A.  Correct, because the -- part of the point of a stock split

21  is, for a forward stock split, here for each share now there

22  were 12 shares traded.  So now there's more volume available in

23  the stock.

24  Q.  So if just before the stock split the price was let's say

25  fifty --

D37LLEV1               Melley - cross

1   A.  I think it was about 52, 53 cents.  And I think after the

2   split the next closing price, as you can see, it was about

3   6 cents that it closed at on the 9th.  Again, that's you have

4   one share becomes 12 shares and, therefore, the price declines

5   by factor of 12.

6   Q.  Okay.  So the person who on 2/6/09, February 6, '09 was

7   holding a single share at 52 cents, after the stock split he's

8   got 12 of those shares but now --

9   A.  At one-twelfth the price for each share.  The size of the

10  investment doesn't change in terms of the value.

11  Q.  But, in fact, the value of that share in this case happened

12  to go down in that time period because if we do the math, 52

13  divided by 12, 52 cents divided by 12 shares turns out to be

14  lower, lower than the price that it ended up being?

15  A.  Correct.  Now you have more shares to sell at that price.

16          So, again, just to clarify, the value of the

17  investment that you have doesn't change after the fact, even

18  though the price is now 6 cents where it was 52 the day before.

19  Q.  And it appears that most of the buyers and sellers and

20  perhaps maybe some short sellers, if there were any, were not

21  among the select account volume at that time period, correct?

22  A.  I mean in terms of the numbers, the select account volume,

23  again, you're referring to only a couple of accounts.  I

24  think -- I can't see the footer, but I believe this was for DML

25  and EZ English.  You're still referring to only two accounts

1    having, you know, I don't know.  I can't see it.

2    Q.  It says 8 percent.

3    A.  Two accounts representing 8 percent of the market can still

4    be fairly significant.

5    Q.  Particularly if they were some of the original owners of

6    the stock and had been issued shares of a high volume at the

7    beginning, right?

8    A.  For whatever reason.

9    Q.  Okay.  Did you track the float of these shares, meaning

10   what was the actual total volume of stock available for these

11   companies, Cardiac and Banneker?

12   A.  Well, for purposes of what a float is, float refers to the

13   number of shares that are available to freely trade in the

14   marketplace.

15           But to answer your question, I did not track the float

16   over the course of time in Banneker or the other three

17   securities.

18   Q.  So the charts don't tell us what percentage of all the

19   stock that's available is reflected in the actual trades

20   tracked here?

21   A.  Correct.  This is just based on what was actually traded

22   during those select time frames.

23   Q.  A few more questions and I'll be done.

24           With regard to the volume that you showed there, if

25   somebody is a day trader, someone who buys and sells stock on

1   the same day, he or she buys a thousand shares, sells it a few

2   minutes later, buys another thousand, sells it again, would

3   that all be added up for purposes of developing your chart?

4   A.  Again, for purposes of these charts with the volume, the

5   way Bloomberg calculates it as if somebody buys a hundred

6   shares and, like I said, maybe ten, 15 minutes later sells

7   those hundred shares somewhere else, those are different

8   transactions.  So Bloomberg adds it up by numerous

9   transactions.  But if it's a day trader to a market maker,

10  market maker to somebody else, that's considered one

11  transaction.  So it all depends on the timing of the trades.

12  Q.  And the chart doesn't tell us which one of those events

13  might have occurred because you weren't able to track that,

14  correct?

15  A.  In terms of which would have been a day trader transaction?

16  Q.  Right.

17  A.  Again, it's just based on the number of shares traded over

18  the course of the day.

19            MR. SREBNICK:  If I could just have a moment?

20            THE COURT:  Yes.

21            MR. SREBNICK:  Your Honor, I yield to Mr. Shargel.

22            THE COURT:  That means you're finished?

23            MR. SREBNICK:  Yes.

24            THE COURT:  Okay.  Mr. Shargel.

25            MR. SHARGEL:  He's from Miami.  It's all different.

1          MR. SREBNICK:  I tender the witness.

2          MR. SHARGEL:  Pass the witness.

3     CROSS-EXAMINATION

4     BY MR. SHARGEL:

5     Q.  Mr. Melley, good morning.

6     A.  Good morning.

7     Q.  My name is Jerry Shargel and I'm a lawyer for Mr. Levy.

8          You told us at the beginning of your testimony

9     yesterday that you were with FINRA, you told us what FINRA did,

10    right?

11    A.  Yes.

12    Q.  And you, sir, are an assistant director of the criminal

13    prosecution assistance group, right?

14    A.  Yes, now the director of the group.

15    Q.  You're the director of the group.

16         And that group is a group that's designed to aid law

17    enforcement, correct?

18    A.  Correct.  It's a unit separate from the regulatory

19    operations of FINRA.  The criminal prosecution assistance

20    group's only focus is to provide assistance in criminal

21    securities fraud matters.

22    Q.  So if a defense lawyer wanted to retain you and your firm

23    to -- FINRA, to aid in the defense in a case, that wouldn't

24    work, right?

25    A.  Correct.

D37LLEV1                    Melley - cross

1   Q.  And before you were with -- now chief or the director of

2   the criminal prosecution assistance group, you were with the

3   NSAD, right?

4   A.  NASD, which was the predecessor entity before FINRA merged

5   with certain regulatory functions of the NYSE in 2007.

6   Q.  And that was also a law enforcement department, was it not?

7   A.  Well, the criminal prosecution assistance group has existed

8   since 1998.  Again, CPAG was part of NASD at the time before

9   the name change, the merger, and became FINRA in 2007.

10  Q.  And at the NASD you were an examiner, correct?

11  A.  Before joining CPAG, yes, with the enforcement department.

12  Q.  And before that, before that -- you, by the way, are a

13  lawyer by trade or profession, right?

14  A.  Yes, licensed to practice in Maryland.

15  Q.  And you had a position back in the 1990s at the Maryland

16  state prosecutor's office, correct?

17  A.  Correct.  It was while I was in law school.  It was an

18  intern position.

19  Q.  So that was also a law enforcement job, correct?

20  A.  Yes.

21  Q.  Now, before you were at the Maryland prosecutor's office,

22  you worked for a company called Proud Foot Reports, right?

23  A.  Yes.

24  Q.  Glen Cove Long Island, right?

25  A.  Yes.

183

D37LLEV1              Melley - cross

Q.  And that was also connected to law enforcement, right?

A.  Not necessarily, no.  It's -- it was a company that did background checks for various employment, employers in the private sector.

Q.  In your resume you say that these were criminal background investigations that you did?

A.  One aspect of the job.  But for Proud Foot it wasn't solely a providing assistance to law enforcement.  My role within the employment was to assist in doing background checks for big employers.  But it was looking at, you know, if they had a criminal history, things like that.

Q.  How long have you been working on this case?

A.  I believe I was contacted by the government in November 2012.

Q.  And in November of 2012, between November 2012 -- let me ask this question first:  Before November 2012, had you done any work whatsoever in connection with this case?

A.  No, had not heard about it at all.

Q.  Nothing, right?

A.  No.

Q.  And when you started working with the prosecutors, you were focused, your duties were focused on the charts that you put before the jury yesterday and today, right?

A.  Yeah, that's been my sole focus in terms of providing assistance.

1    Q.  And you say that you gathered information, right?

2    A.  Gathered information and received information from the

3    government.

4    Q.  And you received information from other sources including

5    Bloomberg, right?

6    A.  Correct.

7    Q.  And the records of FINRA, right?

8    A.  Those were provided to me by the government.

9    Q.  And some of the records went back years so there were

10   records of the NASD, correct?

11   A.  Correct.

12   Q.  You did no independent investigation, right?

13   A.  No, that was not my responsibility.

14   Q.  I'm not suggesting it was.  But to make clear, you did no

15   independent investigation, right?

16   A.  Correct.

17   Q.  You said a moment ago that you -- that you got information

18   from the government and you gave information to the government,

19   correct?

20   A.  Correct.

21   Q.  The information you gave from the government is the

22   information that's contained on those charts that are in

23   evidence, right?

24   A.  Yes.

25   Q.  And you worked closely with the prosecutors, didn't you?

1   A.  I'm not sure what your definition of working closely is.

2   This is one of numerous matters I'm working on simultaneously.

3   Q.  Do you remember, sir, in February of 2013, just last month,

4   you were still working on the case right up to the beginning of

5   this trial, right?

6   A.  Correct.

7   Q.  And do you remember on February 20, 2013, in connection

8   with these charts, having communication with one of the

9   prosecutors in the case?

10  A.  I'm sure I did.  I was in communication at times with

11  assistant U.S. attorney Master.

12  Q.  Do you remember, sir, without personalizing it to which

13  prosecutor, do you remember saying to the prosecutor, calling

14  the prosecutor by his or her first name, let me know what you

15  think and I can make changes, others to follow.

16          That was in connection with the charts, right?

17  A.  Sure.  These charts I was --

18  Q.  Sir, there's no question before you.  That was -- my

19  question was that was in connection with the charts, right?

20  A.  Yes.

21  Q.  And you were getting information from the prosecutors in

22  connection with the charts, correct?

23  A.  Yes.

24  Q.  And you were placing that information on the charts that we

25  see in evidence, right?

1    A.  Yes.  It depends on the type of information.  I would be

2    getting dates, accounts, putting that stuff on the charts,

3    correct.

4    Q.  You got a little more than dates and accounts, didn't you,

5    didn't you get other information from the prosecutors?

6    A.  I got the accounts, the FINRA materials.

7    Q.  FINRA materials.  Were there NASD materials going back

8    before FINRA in connection with this case?

9    A.  Yeah, I'm not sure.  The ones I looked at, I'm pretty sure

10   because the Banneker, the Cardiac stuff would have been the

11   oldest in '07.  That one referral and those materials may have

12   been connected when we were still considered NASD.  I think

13   everything after that would have been FINRA.

14   Q.  When did that change?

15   A.  July of '07.

16   Q.  So you were in frequent touch, once you started working

17   last year, you were in frequent touch with the prosecutors,

18   right, yes?

19   A.  Yeah.  You know, at times.

20   Q.  Can't you answer that yes or no?  Were you in frequent --

21   A.  I guess --

22   Q.  Excuse me, if I may.  Weren't you in touch with the

23   prosecutors on a frequent basis?

24   A.  At times, yes.

25            MR. SHARGEL:  Now let me have -- I don't know how

D37LLEV1                    Melley - cross

1    we're going to do it.  Is there a way to put 110.3 on the

2    screen and on the screens here?

3              THE COURT:  What do you want, Mr. Shargel?

4              MR. SHARGEL:  I want Government Exhibit in evidence

5    110-3.

6              THE COURT:  Okay.  We're going to put it on the Elmo.

7    Is that what you want?

8              MR. SHARGEL:  Perfect.

9              THE COURT:  Okay.

10             MR. SHARGEL:  That's exactly what I want.

11   Q.  Do you see, do you see in the yellow, EZ English and EMC

12   Holdings trading accounts generated $268,714.10 in net proceeds

13   by the sale of Banneker -- that's the symbol BANI -- between

14   7/30 and 9/15; do you see that?

15   A.  Yes.

16   Q.  You put that on the chart, right?

17   A.  Yes.

18   Q.  But you didn't know that of your own independent knowledge,

19   did you?

20   A.  Meaning did I know at that time period what was happening

21   in those accounts?

22   Q.  Yes.  Did you know?

23   A.  Not until I received the information and examined the

24   information.

25   Q.  And examined the information, you examined the bank account

1  records?

2  A.  No, only brokerage account statements.

3  Q.  And based on the brokerage account statements, you

4  concluded that EZ English and EMC Holdings earned that much or

5  realized that much?

6  A.  Right, from any purchases and sales in BANI during the

7  period.

8  Q.  Who told you that EMC was relevant to this case?

9  A.  The government.

10 Q.  Did you do any independent investigation to see whether

11 there was any connection whatsoever between that company, EMC,

12 and David Levy or EZ English?

13 A.  No.

14 Q.  I have another question about this chart while we have it

15 on.  I don't want to get lost in charts, but let me direct your

16 attention to this chart 110-3.

17         MR. SHARGEL:  Judge, may I just stand closer so I can

18 see it myself?

19         THE COURT:  Yes.

20         MR. SHARGEL:  With the Court's permission.

21 Q.  Here the green, just to go back to basics, the green

22 represents price, correct?

23 A.  Correct, the closing price for each day during the period.

24 Q.  Do you know whether it was the bid or the ask?

25 A.  No, it's the actual last sale price.

1   Q.  Last sale price?

2   A.  Of each day.

3   Q.  So in other words, the price that it reached or ascertained

4   on each particular day?

5   A.  No, the last sale meaning the last trade of the day.  So

6   over the course of the day, the price could have been higher or

7   lower.

8   Q.  Could have fluctuated?

9   A.  Correct.

10  Q.  So here's, here's -- I don't like this dot.  Everyone can

11  see it.

12          So here on July 31, 2008, do you see that?

13  A.  Yes.

14  Q.  And July 31, 2008, the stock of Banneker is pretty high up,

15  right?

16  A.  Right.  I think closing price is about $1.60.

17  Q.  $1.60 a share, right?

18  A.  Correct.

19  Q.  That was one of the highest points of the calendar,

20  July 15, 2008, through September 15, 2008, that we have here,

21  right?

22  A.  Yes.

23  Q.  And the sales of the selected account volume -- and

24  selected by the government, right?

25  A.  In terms of the time period you mean?

D37LLEV1                    Melley - cross

1    Q.  In terms of the time period, they selected the time period.

2    They asked you to do a chart for the time period.  Right?

3    A.  Correct.

4    Q.  And they asked you, if I may, and they asked you to

5    ascertain that profit for those two companies, EZ English and

6    EMC Holdings, right?

7    A.  Correct.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D37rlev2                    Melley - cross

1    Q.  Based on that, you created this chart, right?

2    A.  Yes.

3    Q.  As you said in response to a question by Mr. Srebnick, you

4    had no idea who was trading or why, the people that are

5    represented in blue, right?

6    A.  Correct.

7    Q.  You see that on that day where this stock was trading at

8    $1.60 a share, that 2 percent, 2 percent of the so-called

9    select account volume was reflected, right, just 2 percent?

10   A.  2 percent relates to two accounts.

11   Q.  Relating to those two accounts, total 2 percent of trading,

12   right?

13   A.  Correct.

14   Q.  When the stock goes down in August of 2008 -- do you see

15   that, August 18, 2008?

16   A.  Right.

17   Q.  -- the price of the stock drops to what price?  80 cents?

18   A.  Yes, it looks like the high '70s by the 18th of August.

19   Q.  That's when these two companies, from your chart and from

20   the information that you have, decide to sell?

21        MR. MASTER:  Objection.

22   A.  I'm sorry.  I'm not following you.  They sold before, they

23   sold after.

24   Q.  They sold before and after.  But I'm asking you in

25   connection with this date when the stock price is about 80

D37rlev2                    Melley - cross

1    cents --

2    A.  On that day.

3    Q.  I'm sorry?

4    A.  I'm sorry.  On the 18th, were you asking if they sold it

5    all?

6    Q.  Yes.

7    A.  Right.

8    Q.  They sold, didn't they?

9    A.  On the 18th they did not.  They sold a large number of

10   shares on the day before, when it was trading at about a

11   dollar.

12   Q.  What percentage was it when it was trading at about a

13   dollar instead of a 1.60?

14   A.  I think they are responsible for it looks like 85 percent

15   or so.

16   Q.  Let me ask you this question.  When you came here, I don't

17   mean here to the courtroom, but when you came to the project,

18   you had physical custody of the FINRA records, they were

19   available to you?

20   A.  Yes.

21   Q.  You had literally well more than a hundred documents,

22   right?

23   A.  Right, primarily the FINRA records and the account

24   statements, correct.

25   Q.  You had the Bloomberg records as well, correct?

1  A.  Yes, the Bloomberg records.  I generated those into Excel

2  files, and they converted to the PDF, so they were online.

3  Q.  Who decided which of the FINRA or NASD records to use?

4  That was you, wasn't it?

5  A.  In terms of what records to use?

6  Q.  In terms of gathering the information that you have put on

7  these charts.

8  A.  The government provided to me the records that were

9  relevant for those time periods, so I would just review those

10  records for those time periods.

11  Q.  The records that were provided to you by the government?

12  A.  Right.

13  Q.  Let me show you two exhibits.

14          MR. SHARGEL:  May I approach, your Honor?

15          THE COURT:  Yes, you may.

16  Q.  Let me show you exhibits marked A-167 and 168.  I ask you

17  to take a look at 167 and 168.  Based on your work at NASD and

18  FINRA, do you recognize those documents?

19  A.  These look like summaries of telephone interviews

20  between --

21          MR. MASTER:  Objection, your Honor.

22  Q.  My only question was, do you recognize the documents?

23  A.  Not these particular ones, but I've seen records like

24  these.

25  Q.  You know that records like those are kept in the course of

D37rlev2                    Melley - cross

1   the ordinary business of NASD or FINRA?

2   A.  Correct.

3   Q.  It's the regular course of FINRA or NASD's business to keep

4   such records, right?

5   A.  Yes.

6           MR. SHARGEL:  I offer them in evidence.

7           MR. MASTER:  We object, your Honor.

8           THE COURT:  Sustained.

9   Q.  You were asked at the end of the day by Mr. Srebnick about

10  work that you did.  I want to focus you back on work that you

11  did.  I think he asked you a question about event studies.  Do

12  you remember that?

13  A.  Yes.

14  Q.  You know what an event study is?

15  A.  Right.

16  Q.  That's something an economist would do?

17  A.  Correct.

18  Q.  A Ph.D perhaps, right?

19  A.  Yes.

20  Q.  Did you on your own take a look at the market conditions on

21  the days of these trades?

22  A.  For these four stocks, no, I did not.

23  Q.  By market conditions, did you determine -- I just want to

24  make this clear for the jury -- did you determine whether the

25  entire market moved up when these stocks moved up?

D37rlev2                    Melley - cross

1    A.   That's not something I looked at.

2    Q.   Did you determine whether there was any news release in

3    connection with the market when the stock went down?

4    A.   No.

5    Q.   This was in the pretty serious days of the recession, July

6    15, 2008, to September 15, 2008, right?

7              MR. MASTER:  Objection.

8              THE COURT:  Sustained.

9    Q.   Did you take anything to do with the recession into account

10   when you were making this analysis?

11   A.   No, I did not.

12   Q.   Did you have a trading model of another heart monitor

13   provider?  That's an awkward question.  Did you have any other

14   trading model to look at?

15   A.   No.

16             MR. MASTER:  Objection.

17             THE COURT:  He's already answered.  The answer is no.

18   The objection is overruled.

19   Q.   Did you look at any comparable companies?  Comparable to

20   whether it be Banneker or whether it be Cardiac Network or any

21   of the other two stocks, did you look at any other companies to

22   see what was happening with their stock at the same period of

23   time?

24   A.   No, I did not.

25   Q.   This will be the last question on the subject.  Did you

1    take a look at anything to do with the news releases with other

2    heart monitor companies in the industry?

3    A.  No.

4              MR. SHARGEL:  May I have a moment, your Honor?

5              THE COURT:  Yes.

6              MR. SHARGEL:  I have no further questions.

7              THE COURT:  Thank you, Mr. Shargel.

8              Mr. Master, any redirect?

9              MR. MASTER:  Yes.

10   REDIRECT EXAMINATION

11   BY MR. MASTER:

12   Q.  Mr. Melley, you were just asked some questions about your

13   working relationship with the government.  Do you recall those?

14   A.  Yes.

15   Q.  Did the government tell you how to do math?

16   A.  No.

17   Q.  Did the government create any of the documents that you

18   summarized in those charts?

19   A.  No.  They were documents that came from, again, either

20   brokerage firms or the FINRA press releases, promotional

21   materials.  Again, the third source was the information I

22   gathered from Bloomberg.

23   Q.  Those were all business records created by people other

24   than the government, correct?

25   A.  Correct.

D37rlev2          Melley - redirect

1   Q.  What did you do with those materials?  Did the government

2   tell you how to add up the trades and add up the sales?

3   A.  No.  The government just gave me the time frames, gave me

4   the relevant materials for those time frames, and in the course

5   of creating the charts I was asked to summarize the trading in

6   those charts relevant to those stocks.

7   Q.  Is that what these charts represent, your effort to fairly

8   and accurately summarize the information?

9   A.  Yes.

10  Q.  You were asked some questions about Government Exhibit

11  111-4 by Mr. Srebnick.  Do you recall those questions?  You

12  were asked about that on certain days, on one particular day,

13  the sales were only -- I'm sorry -- that Date Palm Capital

14  represented only 1 percent of the total trading volume, do you

15  recall that?

16  A.  Yes.

17  Q.  But on other days, that same account represented much more

18  of the trading volume, isn't that right?

19  A.  Correct.  A number of days over 20 percent, one day over 60

20  percent.

21  Q.  In creating these charts, you had occasion to look at

22  Government Exhibit 1213, which was the source the trading

23  information for that summary chart, is that correct?

24        MR. SHARGEL:  Judge, I'm going to object to these

25  leading questions.

1              THE COURT:  Sustained.

2              MR. MASTER:  I'll rephrase, your Honor.

3              THE COURT:  Thank you.

4    Q.  What was the source of the trading information that you

5    used to create the trading data that you incorporated into this

6    summary chart?

7    A.  For this chart I believe it was the brokerage account

8    statements for Date Palm Capital, which I think was at BMA

9    Securities.

10   Q.  I'd like to establish the statement.

11             MR. MASTER:  If you wouldn't mind publishing the page

12   documenting -- publish the second page of that statement.  You

13   can leave that up there.

14   Q.  Do you recognize that statement?

15   A.  Yes.

16   Q.  What is the name of the individual who is receiving those

17   statements?

18   A.  David Levy.

19   Q.  When you compiled and summarized the trading information

20   contained on this statement, first of all, what, if any,

21   purchases of Cardiac Network did you see in this statement?

22   A.  For this month and time, I recall there being primarily

23   sales.  I'm not sure if there were any purchases during the

24   time period.

25             MR. MASTER:  May I approach, your Honor?

1            THE COURT:  Yes, you may.

2    Q.   Please take a look at the full statement.

3    A.   Reviewing the full September 2009 statement for Date Palm

4    Capital, there were only sales of Cardiac Network during that

5    period.

6    Q.   How much money did those sales generate during that month,

7    according to the statement?

8    A.   $666,710.65.

9    Q.   On how many days out of that month were there sales?

10   A.   On 11 days there were sales in September.

11   Q.   Out of how many total trading days in the month?

12   A.   Probably 20, 20-something.

13   Q.   If you wouldn't mind taking a look at the last page of that

14   or, I'm sorry, page 6 of 7 of that statement, reference to

15   something called a DWAC, D-W-A-C.

16   A.   This is on what page again?  I'm sorry.

17   Q.   Page 6 of 7.

18   A.   Oh, right.  At the bottom in terms of the securities

19   received and delivered, yes.

20   Q.   What does "DWAC" refer to?

21   A.   DWAC refers to -- to back up a bit, shares are often held

22   on behalf of an individual, someone else.  Actually, the

23   Depository Trust Company, DTC, is responsible for holding

24   shares in the name of brokerage firms and those customers at

25   those firms.  It is basically a system to track ownership of

1   shares throughout the marketplace in that security.  Basically,

2   the purpose of the DWAC is really just to help with that

3   accounting effort to receive and deliver shares.

4        Here it is saying received on, for instance, September

5   10th as well as September 22nd shares of Cardiac Network were

6   received via DWAC, and it has the CUSIP number.  That is just

7   to show that shares for Cardiac in the name of Date Palm

8   Capital to the attention of this account for David Levy were

9   received but they are being held somewhere else.

10  Q.  What is a CUSIP number?

11  A.  I'm sorry.  A CUSIP is similar to the charts we have, the

12  ticker symbol.  Each publicly traded company has both a ticker

13  symbol and a CUSIP number, which is just a unique identifier.

14  But unlike the ticker symbol, which is a 4-letter character,

15  the CUSIP number is just a string of numbers.  Again, it is a

16  unique identifier for each trading company.

17  Q.  According to the statement that is before you, what

18  happened to the shares that were DWAC'd in that Date Palm

19  Capital account within days of their receipt?

20  A.  On the 10th of September, the shares were received, shares

21  of Cardiac, 500,000, were received into the Date Palm Capital

22  account to the attention of David Levy.  There was a

23  subsequent, another receipt of shares, 300,000, on the 22nd of

24  September.  Again, this is just to track where the shares were.

25  They may have come from another account somewhere else or from

1  the company directly and are just put into this account at this

2  particular firm at this particular time.

3  Q.  Then what happens to those shares, looking at the trading

4  data?

5  A.  The shares, 500,000 are received on 9/10, and then

6  subsequent to that there are a number of sales of shares in

7  that account.  Then there is another receipt of shares on

8  September 22nd.  I don't know if there are additional

9  statements, but there may be additional sells of the Cardiac

10  shares based on the receipt of those 300,000 shares.

11  Q.  You were also asked some questions about the 12-for-1 stock

12  split in Banneker.

13  A.  Yes.

14  Q.  I want to ask you some questions about 110-2.

15          MR. MASTER:  If you wouldn't mind pulling that up.

16  Q.  You were explaining to the jury that the change in price

17  was affected by or the change in price between the 8th and the

18  9th was related in part to the 12-for-1 stock split, correct?

19  A.  Yes.

20          MR. MASTER:  If you wouldn't mind pulling up

21  Government Exhibit 110-1.

22  Q.  Can you explain for the jury, when there is a stock split,

23  how does this chart -- first of all, what is Government Exhibit

24  110-1?

25  A.  This was the closing price and market share volume analysis

1  for Banneker between January 2008 and December 2009.  This was

2  based on the Bloomberg data.

3  Q.  If you could explain to the jury how they are to interpret

4  the price information when there is a stock split during this

5  period?

6  A.  Sure.  In this case it was a forward stock split, meaning

7  for each individual share it was then divided up into 12

8  shares; however, the price of that one share then gets cut 12

9  different ways.  Again, I believe the share price the day

10 before the split was at about 52 cents.

11         And then the day after the split, basically 12 divided

12 into 50, each share is going to be worth pennies.  So the share

13 price is lower but there are more shares out there in the

14 market to trade.  Normally, then the volume would be much

15 higher because there are more shares traded among investors.

16         THE COURT:  In other words, if I have one share of

17 stock that is worth 48 cents and I got 12 shares in a 12-for-1

18 split, each one would be worth 4 cents?

19         THE WITNESS:  4 cents.

20         THE COURT:  If I had 12 shares at 4 cents, it would be

21 the same as having one share at 48 cents?

22         THE WITNESS:  Correct.  There is no change in value.

23 BY MR. MASTER:

24 Q.  When you are looking at pre-split prices versus post-split,

25 in other words, does the scale of the chart change at all?  How

1   is the chart affected by a split?

2   A.   The chart is affected in the sense that now you're dealing

3   with, in a sense, a different scale.  The trading will be much

4   larger, but the price at which those shares are traded will be

5   much smaller.

6   Q.   Looking at this chart, when, if at all, did the price of

7   Banneker increase above 10 cents a share after the split?

8   A.   That never happened over the course of this chart.

9           MR. MASTER:  Nothing further, your Honor.

10          THE COURT:  You are excused, Mr. Melley.  Thank you

11  very much.

12          MR. SHARGEL:  Your Honor?

13          THE COURT:  One question?

14          MR. SHARGEL:  It is responsive to the examination by

15  the prosecutor.

16          THE COURT:  All right.

17          MR. SHARGEL:  It's very short.

18  RECROSS-EXAMINATION

19  BY MR. SHARGEL:

20  Q.   DWAC, we saw that up there, right?

21  A.   Yes.

22  Q.   That dealt with, you said, on a certain date there were

23  500,000 shares that were noted on DWAC, right?

24  A.   Correct.  Those shares are then eligible to trade out of

25  that account.  I think it was early September.

1   Q.  Then a week or so later or two weeks later, I don't have it

2   in front of me, but like on the 26th --

3   A.  22nd, right.

4   Q.  -- on the 22nd an additional 300,000 shares came into the

5   brokerage house?

6   A.  Correct.

7   Q.  That was available for sale also?

8   A.  Correct.

9   Q.  Do you have any idea of your own personal knowledge how

10  much Mr. Levy invested in these companies?

11  A.  No, I do not.

12  Q.  Do you have any idea -- this will be my last question,

13  Judge -- about how many trades he made in connection with those

14  companies, how much stock he held?

15  A.  Over the course of all these four companies?

16  Q.  Yes.

17  A.  I don't know the total number, no.

18          MR. SHARGEL:  No further questions.

19          THE COURT:  OK, Mr. Melley.  Thank you very much.

20          THE WITNESS:  Thank you, your Honor.

21          (Witness excused)

22          THE COURT:  Next witness.

23          MS. COHEN:  Your Honor, would you like us to put on a

24  witness?  It is almost time for the mid-morning break.

25  Whatever your Honor prefers.

1          THE COURT:  I guess we will take our morning recess,

2   ladies and gentlemen.  We will resume in about 10 minutes.

3          (Jury not present)

4          THE COURT:  Who is your next witness?

5          MS. COHEN:  Zev Helfer, your Honor.

6          THE COURT:  All right.  Ten minutes.

7          (Recess)

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  The government will call its next witness.

3            MS. COHEN:  Your Honor, the government calls Zev

4     Helfer.

5            THE CLERK:  Please stand and state and spell your name

6     for the record.

7            THE WITNESS:  Zev Helfer, Z-E-V, first name.  Last

8     name is H-E-L-F-E-R.

9      ZEV HELFER,

10        called as a witness by the government,

11        having been duly sworn, testified as follows:

12            THE COURT:  Ms. Cohen.

13    DIRECT EXAMINATION

14    BY MS. COHEN:

15    Q.  Mr. Helfer, what is your educational background?

16    A.  I finished high school and then some college.

17    Q.  Where did you go to college?

18    A.  In Tel Aviv.

19    Q.  Tel Aviv is in Israel?

20    A.  Yes.

21    Q.  When did you come to the United States?

22    A.  1980.

23    Q.  What did you come to the United States in 1980?

24    A.  I wanted to start a new beginning.

25    Q.  When you came here, did you have some sort of visa to be

1    here?

2    A.  Yes.

3    Q.  Did that visa enable you to work?

4    A.  Yes.

5    Q.  What types of jobs have you had since coming to the United

6    States in 1980?  Just briefly.

7    A.  I came, I did not speak the language.  I started as a

8    driver, and at night I used to pump gas.  That's about it in

9    the beginning.

10   Q.  What happened after you were a driver and you pumped gas in

11   the beginning when you first came to the United States?

12   A.  I met an elderly physician that started to visit me on a

13   daily basis at the gas station.  After two, three months, he

14   came to me and he said, you are not here in this country to

15   pump gas and I'm tired of retiring, so I will open a medical

16   center and you will run it.

17   Q.  Where were you living at the time?

18   A.  Fort Lauderdale.

19   Q.  Did you open a medical center?

20   A.  Yes.

21   Q.  When was that?

22   A.  1980.

23   Q.  In general, what did the medical center do and what was

24   your involvement with it?

25   A.  Basically, we saw patients.  My involvement was the

1  management.  I did something very new.  With my own car I

2  picked up the patients and I brought them back, brought them in

3  to the clinic and from the clinic back home.  And it

4  mushroomed.

5  Q.  What happened when it mushroomed?

6  A.  I was approached by International Medical Centers.  They

7  received a pilot plan from the government to start a prepaid

8  Medicare HMO.

9  Q.  What did International Medical Centers approach your center

10  about?

11  A.  They asked me if I can be an HMO, and I said I can be

12  anything I want to be.  So he told me over the phone, Julio

13  Avelio and Michael Recarey told me that they are going to come

14  to visit.  It was on Friday, they will come Monday at 10

15  o'clock.  And that's what took place.  They came and they

16  explained me about this HMO.  We signed a contract, and in a

17  very short time we enrolled 4800 enrollees.

18  Q.  How long did you stay with the International Medical

19  Center?

20  A.  A few years.

21  Q.  What was your role and responsibilities at the medical

22  center?

23  A.  I managed it.

24  Q.  What happened after you left the International Medical

25  Center?

1    A.  I got involved in different diagnostic companies.

2    Q.  What do you mean by diagnostic companies?

3    A.  Like echo, ultrasound, event monitoring, laboratories.  I

4    owned two of the biggest, of the largest laboratories in south

5    Florida, privately owned.

6    Q.  What year are we in now?

7    A.  It was anywhere from 1984 or '85 to the early '90s.

8    Q.  After you worked owning these different diagnostic

9    laboratories or centers, what did you do next?

10   A.  I was doing some sales and I heard about the event

11   monitoring company.  A physician approached me and he said, I

12   have a problem, I can monitor but it's very hard for me to do

13   the job.  He explained me what it was, and I fell in love with

14   this procedure.

15   Q.  What do you mean by event monitoring?

16   A.  Event monitor is a monitor.  The simple one is what I have

17   right here.  It's a monitor.  The physician will prescribe it

18   to the patient.  Whenever the patient has an event, he feels

19   that he has some kind of a palpitation or arrhythmia problems,

20   he will place the monitor against the chest and he will push a

21   record button.  The monitor will beep for a certain time.

22   There are different kinds of monitors.

23        After the beeping stops, he will go to any phone and

24   he will dial a toll-free number that will ring in a receiving

25   station.  He will identify himself to the technician, and the

1   technician will tell him place the monitor against the

2   mouthpiece of the phone and push the "send" button.  It will

3   beep again.  This beep goes through the telephone line to the

4   receiving station, and it's being converted to an ECG, EKG

5   trace.

6          The tech is capable to identify any problem, any given

7   problem, and he can alert the patient.  In case of emergency,

8   he can send him to the emergency room and notify the referring

9   physician.

10  Q.  Can you pick up that what's been marked for identification

11  Government Exhibit 200.  Do you recognize what's in that case?

12  A.  Yes.  That's one of the monitors.

13  Q.  Referring to a heart monitor?

14  A.  Correct.

15         MS. COHEN:  The government moves Government Exhibit

16  200 into evidence.

17         MR. SHARGEL:  No objection.

18         THE COURT:  200 is received in evidence.  Mr.

19  Srebnick, you don't object, do you?

20         MR. SREBNICK:  No, your Honor.

21         THE COURT:  200 is in evidence.

22         (Government's Exhibit 200 received in evidence)

23         MS. COHEN:  Your Honor, permission to publish it to

24  the jury?

25         THE COURT:  Yes.

D37rlev2                      Helfer - direct

1    Q.  What are the benefits to the patient of having a heart

2    monitor like Government Exhibit 200?

3    A.  The advantage is it gives the patient a lot of peace of

4    mind.  Any time the people have any kind of an event, they will

5    get scared.  This way they understand that they are under

6    supervision and can reach somebody who can tell them that it is

7    a real event or it's only something that has to do with the

8    digestive system, for example, not necessarily was the heart.

9    Q.  What did you do after you, as you said, fell in love with

10   these heart monitors?

11   A.  I took over the companies of physician had.  We had a

12   problem at that time.  It was just a global procedure code for

13   the billing, 93268.  The only people who could bill for it were

14   a physician.  Unfortunately, physician did not pay.  So I hired

15   an attorney and we went to the original HCFA at the time to

16   date, the CMS office in Atlanta, and we were able to break down

17   the procedure to 93268TC, technical component, that was us for

18   us lending the monitors to the physicians and for the --

19   Q.  Let's back up for one minute.

20   A.  Sure.

21   Q.  When you say "us," what company are you talking about?

22   A.  Cardiac Technology.

23   Q.  Who was involved with Cardiac Technology?

24   A.  I had a partner by the name Jack Trekowsky.

25   Q.  What year are we in now?

D37rlev2                    Helfer - direct

1    A.  I'm sorry?

2    Q.  What year is this?  What year did you form that company?

3    A.  I want to say '85, '86.

4    Q.  Just explain, what did the company do with respect to the

5    heart monitors?  What was the role of the company versus the

6    doctor versus the technicians?

7    A.  The company, number one, purchased the monitors and lent it

8    to the physicians.  We owned a receiving station that had ECG

9    technicians that monitored the patient.  Versus the doctors,

10   who basically the nurse in the doctors' offices explained or

11   trained the patients how to use those monitors, and the doctor

12   used to do the billing, the interpretation for those

13   transmissions that we send them.

14   Q.  How did Cardiac Technologies at that time get paid?

15   A.  In the beginning we had a problem, like I said before, and

16   we had to fix it in the HCFA offices at the time.

17   Q.  By "HCFA," are you referring to the entity that governs

18   Medicaid?

19   A.  Correct, Health Care Finance Administration.  At that

20   point, when we were able to break it down to professional

21   component and technical component, we were able to collect

22   money.  We billed separately from the physicians.  It was no

23   involvement, no money changed hands.  We billed directly for

24   the technical component and the doctor billed for his

25   interpretation.

1    Q.   What happened with Cardiac Technologies?

2    A.   We closed it.  The reimbursement went down, and we closed

3    it probably a year, a year and a half after.

4    Q.   By "reimbursement," are you referring to the amount Cardiac

5    Technologies was paid by Medicare for reimbursement, or

6    Medicaid?

7    A.   Correct, for the technical component.

8    Q.   What did you do next?

9    A.   Sure enough, a few months later we found out that they

10   raised the reimbursement back again, and we opened a company in

11   Philadelphia by the name Cardiotrace.  It was a very successful

12   company.

13   Q.   What was your role at Cardiotrace?

14   A.   I managed it.

15   Q.   That was the same role you had at Cardiac Technologies?

16   A.   Yes.

17   Q.   When did you leave Cardiotrace?

18   A.   The company was closed around '93.

19   Q.   What did you do next?

20   A.   I got involved in laboratories.

21   Q.   What was your involvement, briefly, in laboratories?

22   A.   I managed it.

23   Q.   Did you manage that in Florida or Philadelphia or somewhere

24   else?

25   A.   The laboratories in Florida.

1    Q.  What type of labs were these?

2    A.  To analyze blood.

3    Q.  How long did you do that for?

4    A.  Up till 2005, '4 or '5.

5    Q.  What did you do in 2004 or '5?

6    A.  I was still in the health care industry.  I was doing some

7    sales until I heard that a friend of mine that I bought the

8    monitors for Cardiotrace from him, opened a company in Chicago

9    by the name of Life Watch.  I started to work for Life Watch

10   for a little bit, for like two years.  And that's it.

11   Q.  Life Watch was involved in the heart monitors, like

12   Exhibit 200?

13   A.  Correct.

14   Q.  What did you do after you worked with Life Watch?

15   A.  I was looking for investors because I wanted to open my own

16   company together with -- my own company.

17   Q.  What type of company were you looking to open?

18   A.  The same one like Life Watch, like Cardiotrace before.

19   Q.  The new company you were looking to open with deal with

20   heart monitors?

21   A.  Correct.

22   Q.  The same way you had been doing for years?

23   A.  Correct.

24   Q.  What happened with respect to your desire to open your own

25   company to do heart monitor work?

1    A.  I was introduced to a young gentleman by the name Dwight.

2    He was in the real estate business.  He claims that he likes

3    this business and he wants to invest.  Between Eric Buchwald

4    and myself and Dr. Eli Gang, my partners, we talked to him a

5    few times and we believed that he had enough, sufficient money,

6    to help us lift this project.

7    Q.  You mentioned Dwight.  Do you recall Dwight's last name?

8    A.  Dwight West.

9    Q.  Who was Eric Buchwald you mentioned?

10   A.  He passed away, my good friend for many, many years.

11   Q.  Who was Dr. Gang?

12   A.  Dr. Gang was -- he is a cardiologist, one of the top

13   cardiologists in the United States.  He's practicing in Cedar

14   Sinai in Beverly Hills.

15   Q.  What happened when you and Dr. Gang and Mr. West and Mr.

16   Buchwald got together?  Did you form a company?

17   A.  We formed company by the name of Cardiac Network LLC.

18   Q.  Was that a public company or private company?

19   A.  Private company.

20   Q.  What year did Cardiac Network LLC form?

21   A.  If I'm not mistaken, 2006.

22   Q.  After you formed Cardiac Network LLC, what happened with

23   that company?  What did you do?

24   A.  We bought the monitors.  We applied --

25            MR. SHARGEL:  Judge, I'm going to object to what we

1    did as opposed to what he did.

2    Q.  Who ran Cardiac Network LLC?

3    A.  Myself.

4         MR. SHARGEL:  Excuse me.  There is an objection.  I'm

5    sorry.

6         THE COURT:  The objection is sustained.  The question

7    has been rephrased.  Go ahead and answer the question.  What

8    was the question?  Rephrase it.

9    Q.  What did you do for Cardiac Network LLC?

10   A.  I managed the company.

11   Q.  What did Cardiac Network LLC do after it formed in 2006?

12   A.  We purchased monitors and we started to train technicians.

13   Since the days that I was involved in Cardiotrace, the

14   parameters that the government put in the quality and the

15   degree of education on the technician went up, and they all had

16   to be CCI certified.

17   Q.  What do you mean by CCI certified?

18   A.  Internationally certified.  That was the requirement.  You

19   could not use a regular technician who just graduated from

20   college.

21   Q.  First of all, where is the company located, Cardiac Network

22   LLC?

23   A.  In San Francisco.

24   Q.  Why was it located in San Francisco?

25   A.  Because of the reimbursement.  The reimbursement in every

1    state and in every locality is different.  For example, in

2    Florida there is four different localities.  The localities

3    that pays in general for any procedure, the highest is Miami

4    Dade, then comes Broward, and then comes Palm Beach, and then

5    the rest of the state.  The same is good between states.  It

6    was in the different states, there was different localities.

7    Like in California, if I'm not mistaken, there is nine

8    localities.

9            Since our business is over the phone, we can choose

10   wherever we want to be.  Obviously, we chose to be where the

11   reimbursement is the highest.

12   Q.  The reimbursement was the highest in San Francisco?

13   A.  Yes.  It was in addition in Alaska, but we couldn't find

14   technicians over there.

15   Q.  What happened with Cardiac Network LLC?

16   A.  The real estate business, as you all know, crashed, and Mr.

17   Dwight West ran out of money.  It was like very -- we did not

18   expect it to happen.  So we started to look for different

19   investors.  In the meantime we were under tremendous press

20   because we had employees that could not get paid.

21   Q.  What did you do to look for new funding for Cardiac Network

22   LLC?

23   A.  Between myself and my partners, we looked all over.

24   Q.  At some point were you introduced to David Levy?

25   A.  At some point my partner that passed away, Eric, was

1  talking to a business associate of his, John Fisher, and he

2  introduced him to Mr. David Levy.

3  Q. What time period was this when Eric Buchwald was introduced

4  to David Levy?

5  A. The end of 2006, the beginning of 2007.

6  Q. After Eric Buchwald was introduced to David Levy, did you

7  become introduced to David Levy?

8  A. Yes.

9  Q. When did you first meet David Levy?

10 A. I will dare to say that it was around November-December of

11 2006, maybe October.

12 Q. Was it a meeting?  Where did you come into contact with

13 David Levy?

14 A. John Fisher took Eric and myself to David Levy's house.

15 Q. Where was David Levy's house?

16 A. In Fort Lauderdale, on the water, on the Intracoastal.

17 Q. Who was at that meeting at David Levy's house?

18 A. It was David and his wife Donna, and it was John Fisher and

19 Eric and myself.  I think that in the house was their daughter

20 as well.

21 Q. Did their daughter attend the meeting?

22 A. I'm sorry?

23 Q. Did the daughter attending the meeting in any way?

24 A. No.

25 Q. When you refer to "Eric," you're referring to Eric

1    Buchwald?

2    A.   Yes.

3    Q.   What happened at the meeting in late 2006 at David and

4    Donna Levy's house?

5    A.   I explained them exactly what we do.  They liked the story,

6    especially David.  They liked the story, and he said that he's

7    interested and he will work on it and he will come up with

8    investors, additional investors to fund this company.

9    Q.   What did he say about what he would do with respect to

10   Cardiac Networks LLC at that first meeting?

11   A.   He said that he likes the story, it's a good story, it can

12   bring the investors, he can promote.  He believes that they can

13   promote the shares and we can be rich beyond belief.

14   Q.   What was the discussion about shares?

15   A.   At that point it was not that much discussion about shares.

16   Q.   At this point was Cardiac Network LLC a private or public

17   company?

18   A.   Private.

19   Q.   Did it have any shares?

20   A.   No.

21   Q.   What was David Levy explaining to you about shares and

22   becoming rich?

23   A.   That was probably a meeting or two later he told me that he

24   would look for investors and basically he wants -- he wants 40

25   percent, between him and the investors 40 percent more or less

1  of the total share of the company.

2  Q.  Let's stay with this first meeting for a minute.  What did

3  Donna Levy say at that first meeting?

4  A.  At the first meeting she said very little.  She just stated

5  that she can promote it very easily.

6  Q.  What did she say about how she would promote it or what she

7  would be promoting?

8  A.  At that meeting it was not said much.

9  Q.  What happened after that first meeting at David Levy's

10  house?

11  A.  We were communicating over the phone and we went back and

12  forth.  Then I came and we went to an attorney in Boca Raton.

13  Until one day he says, OK, I find --

14        MR. SHARGEL:  I'm sorry, Judge, I'm not sure of the

15  pronoun.  The attorney and "he says," I'm not sure who he is

16  talking about.

17        MS. COHEN:  I'll clear it up, your Honor.

18        THE COURT:  Thank you.

19  Q.  After the meeting at the house, you had several phonecalls

20  with David Levy?

21  A.  Correct.

22  Q.  What did David Levy say to you during those calls about

23  Cardiac Network LLC and his potential investment?

24  A.  In the beginning he was trying to -- we went back and

25  forth.  He didn't identify somebody until one day he did.  He

1    said that his name is Fotis, Fotis Georgiadis.

2    Q.  What did he tell you about Fotis?  Who was Fotis?

3    A.  He told me that Fotis has a clean shell that we will do a

4    reverse merger to and Fotis will help to bring the money to the

5    company.

6    Q.  What did you understand was a clean shell?

7    A.  The company has no liens against, no lawsuits against.

8               (Continued on next page)

1    BY MS. COHEN:

2    Q.  Back up for a minute.  At this point, Cardiac Network LLC

3    is a private company, right?

4    A.  Correct.

5    Q.  What were your discussions on these phone calls with David

6    Levy about what would happen to the structure of the company?

7    A.  Like I said before, he was talking about the company will

8    have a hundred million shares and he will have 20 million

9    shares and Fotis Georgiadis will have 20 million shares and all

10   the shares will be restricted.

11   Q.  So during the conversations, did David Levy mention, talk

12   to you about taking Cardiac Network to become a public company?

13   A.  Sure.

14   Q.  And in connection with that, David Levy told you he had

15   found a clean shell?

16   A.  Yes.

17   Q.  And you mentioned the term reverse merger?

18   A.  Yes.

19   Q.  What did David Levy say about a reverse merger?

20   A.  That Fotis has a clean shell and we're going to reverse,

21   which reverse meaning he will merge Cardiac Network, the

22   existing company, into the shell and the name of the shell was

23   Caspian Energy.

24   Q.  And did David Levy explain to you that Caspian Energy, the

25   clean shell, was a public company?

1    A.  Yes.

2    Q.  And what discussion of how much money David Levy would give

3    to Cardiac Network as part of this deal to take it public?

4    A.  He was saying that he will give a million dollar to the

5    company, plus he will give us a loan of $200,000.

6    Q.  And how much was Fotis to give to Cardiac Network as part

7    of this deal to take it public?

8    A.  What we understood is that --

9              MR. SHARGEL:  I object to the foundation.

10             THE COURT:  Ms. Cohen.

11             The objection is sustained.

12   Q.  From your discussions with David Levy, what did he tell you

13   about how much money he would put in versus how much money

14   Fotis would put in?

15   A.  I really didn't know at this time, but all together it was

16   a million two -- a million, 1 million, and then 200,000 in

17   loan.

18   Q.  What did David tell you he would get in return for the

19   $1 million investment?

20   A.  He will get 20 million shares and Fotis will get 20 million

21   shares.

22   Q.  And the $200,000, what did David Levy tell you about how

23   that would be structured?

24   A.  As a loan and will be paid back to them.

25             THE COURT:  By them you mean?

1          THE WITNESS:  To David and Fotis.

2    Q.  At some point I think you said you met with attorneys; was

3    that to do paperwork related to the reverse merger?

4    A.  No, I didn't meet with attorneys.  Everything was over the

5    phone and over the fax and emails.

6    Q.  I'm going to ask you to look at Government Exhibit, what's

7    been marked for identification Government Exhibit 201-31.  It

8    should be -- it's the third tab going from the front.

9    A.  There we go.

10   Q.  Just look at what's been marked for identification

11   Government Exhibit 201-31 and tell us if you recognize the

12   document?

13   A.  Yes, I do.

14   Q.  And without telling us the content of it, what is it?

15   A.  Basically he's telling me --

16   Q.  Without telling us what it says, just tell us what type of

17   document it is?

18   A.  We were talking about a letter of intent.

19   Q.  Is it an email, do you see up top, is it an email?

20   A.  Correct.

21   Q.  From who to who?

22   A.  David Levy to Zev Helfer.

23   Q.  And this, do you recall if this is a true and accurate copy

24   of an email you received?

25   A.  Yes.

1           MS. COHEN:  Your Honor, the government moves

2      Government Exhibit 201-31.

3           MR. SHARGEL:  No objection.

4           THE COURT:  201-31 is in evidence.

5           (Government's Exhibit 201-31 received in evidence)

6      Q.  Mr. Helfer, if you can tell us what this email is about,

7      please?

8      A.  David is telling me that he met with Fotis and he spend the

9      afternoon with his attorney the day before and she will have

10     the letter of intent done by the next day and he requested me

11     to sign that no later than the following day.

12     Q.  And you said letter of intent, that's what you understand

13     LOI to mean?

14     A.  Correct.

15     Q.  And the last line, realistically, we can have this deal

16     closed and funded within ten days --

17     A.  Correct.

18     Q.  -- that's the deal you were just talking about?

19     A.  Correct.

20     Q.  If you can look, please, at the next document which has

21     been marked for identification, Government Exhibit 201-32.

22     Just look at it and tell us if you recognize the document.

23     A.  Yes.

24     Q.  And what is the document, without telling us what it says,

25     what type of document is it?

1   A.   I basically asking if --

2   Q.   Is it an email from David Levy to you?

3   A.   Yes.

4   Q.   Is it a true and accurate copy of that email?

5   A.   Yes.

6            MS. COHEN:  Government moves Government Exhibit 201-32

7   in evidence.

8            MR. SHARGEL:  Without objection.

9            THE COURT:  201-32 received in evidence.

10           (Government's Exhibit 201-32 received in evidence)

11           THE COURT:  Publish it.

12  Q.   I think if you start at the bottom, it starts with your

13  email to David Levy.

14  A.   Okay.

15  Q.   Just tell us what papers you're referring to from the

16  attorney?

17  A.   The letter of intent.

18  Q.   And whose attorney were you getting the papers from?

19  A.   Attorney that they introduced me, Laura Anthony.

20  Q.   When you say they introduced you, who introduced you?

21  A.   David and Fotis.  I think it was David.

22  Q.   When you say David, you're referring to David Levy?

23  A.   David Levy.

24  Q.   And what was, did you forward the $25,000 to Aerotel, what

25  was that about?

1   A.  We owe Aerotel.  Aerotel is a company that we purchased the

2   heart monitors and we owe them $25,000 and they were kind of on

3   our back, so to speak.  They were waiting to get paid.

4   Q.  You mean Aerotel was on your back to get paid?

5   A.  Right.

6   Q.  Who eventually paid Aerotel?

7   A.  It was, if I'm not mistaken, it was Fotis that send the

8   wire, the money, to Aerotel directly.

9   Q.  And the response back up top to your email from David Levy,

10  the wire the money, does that refer to the money to pay Aerotel

11  for the monitors --

12  A.  Correct.

13  Q.  -- that Cardiac Network owed?

14  A.  Correct.

15  Q.  When was the next time -- you had these emails.  They refer

16  to a meeting.  David Levy was going to come out to meet with

17  you in San Francisco?

18  A.  Correct.

19  Q.  When did that happen, about?

20  A.  A few days after this email.

21  Q.  What was the purpose of that meeting?

22  A.  To sign documents.

23  Q.  And what were the documents going to do, what was the

24  purpose of those documents?

25  A.  To finalize the letter of intent, to make it happen and to

1    start to get funded.

2    Q.   And who drew up those documents, who drafted them?

3    A.   David Levy and his attorneys.

4    Q.   And what was his attorney's name that drafted those?

5    A.   If I'm not mistaken, it was Laura Anthony.

6    Q.   And did David Levy come to San Francisco?

7    A.   Yes, he did.

8    Q.   And did Fotis -- who did he come with?

9    A.   With Fotis.

10   Q.   And did you meet with David Levy and Fotis?

11   A.   Correct.

12   Q.   Where was that meeting?

13   A.   In San Francisco.

14   Q.   And where was it?

15   A.   In our office.

16   Q.   You say our office, you're referring to Cardiac Network

17   LLC?

18   A.   Cardiac Network's office.

19   Q.   Who was there?

20   A.   I was there.  I'm not sure if Mr. Eric Buchwald was there.

21   And Tracy, my secretary, was there at the time.

22   Q.   And David Levy and Fotis?

23   A.   Correct.

24   Q.   What did David Levy say at that meeting at Cardiac Network

25   LLC's office?

1   A.   That basically we need to reincorporate under Cardiac

2   Network Inc. because Cardiac Network LLC cannot be public

3   company.

4   Q.   And what else did David Levy say at that meeting?

5   A.   Basically we signed the documents and the money started to

6   be channeled.

7   Q.   I'm going to have you look, please, at Government

8   Exhibit 201-38.

9   A.   Okay.

10  Q.   Do you recognize that document?

11  A.   Yes.

12  Q.   And on the last page of what's been marked Government

13  Exhibit 201-38, is that your signature?

14  A.   Yes.

15  Q.   And do you recognize this as a true and accurate copy of a

16  document you signed?

17  A.   Yes.

18          MS. COHEN:  Your Honor, government moves Government

19  Exhibit 201-38 into evidence.

20          MR. SHARGEL:  No objection.

21          THE COURT:  201-38 is received in evidence.

22          (Government's Exhibit 201-38 received in evidence)

23  Q.   Just look at the first page, Mr. Helfer.

24  A.   Okay.

25  Q.   What is this document?

1    A.  Confidential term sheet.

2    Q.  What do you understand this document as?

3    A.  It was basically the agreement that we entered into.

4    Q.  And this was the agreement whereby -- your understanding of

5    it was that David Levy and Fotis would be giving Cardiac

6    Network LLC $1 million?

7    A.  Correct.

8    Q.  And the $200,000 as a loan?

9    A.  Correct.

10   Q.  And if you look here, it says the lender is Bedrock

11   Venture?

12   A.  Correct.

13   Q.  What is Bedrock Venture to your knowledge?

14   A.  It's a company that belongs to Fotis Georgiadis.

15   Q.  And who signed this document?

16   A.  I did and I think it was Fotis.

17          THE COURT:  Why don't you look at the last page and

18   tell us.

19   Q.  If you can look at the last page, there are two signatures

20   that appear there?

21   A.  Yeah.

22   Q.  Do you see, does your signature appear on the left?

23   A.  Yes.

24   Q.  And then on the right it says Fotis?

25   A.  Correct.

1   Q.  Do you do you recall signing this?

2   A.  Yes.

3   Q.  In Fotis's presence?

4   A.  Yes.

5   Q.  And did Fotis also sign in your presence?

6   A.  I don't remember.

7   Q.  Was this a document that was signed when Fotis and David

8   Levy came to visit you in San Francisco at Cardiac Network LLC

9   offices?

10  A.  Yeah, I think so, I think so.

11          MR. SHARGEL:  Move to strike "I think so."

12          THE COURT:  It's overruled.

13  Q.  When you signed this document, Government Exhibit 201-38,

14  what was your understanding of how Cardiac Network LLC would

15  get the million dollars?

16  A.  As soon as we will sign the documents, basically.

17  Q.  And the documents you're referring to are other documents

18  related to the reverse merger and to the clean shell?

19  A.  Correct.

20  Q.  You said David Levy said something to you at that meeting

21  of needing to change the name from Cardiac Network LLC to

22  Cardiac Network Inc.?

23  A.  Correct.

24  Q.  And I think you said he told you you needed to do that

25  because Cardiac Network Inc., you needed an Inc. to be a public

1  company?

2  A.  Correct.

3  Q.  Do you know whether that was true or not, did you have any

4  understanding of that?

5  A.  Not, but I had no reason to doubt it.

6  Q.  So what happened after this meeting where you signed that

7  Government Exhibit 201-38, which was the term sheet?

8  A.  We started to execute the contract.  We started to receive

9  the money.  We get and we started to -- the first things that

10  we did, we paid the employees and the rent.  And soon enough we

11  understood it's going to be a big company and we moved to a

12  different location within the city.  And that's it.

13  Q.  When you say we got the money --

14  A.  Company, Cardiac Network.

15  Q.  At some point did you get paperwork related to what you

16  called the reverse merger?

17  A.  Yes.

18  Q.  I'm going to ask you to look at Government Exhibit 201-1.

19  A.  Okay.

20  Q.  Just ask if you recognize this document?

21  A.  I do.

22  Q.  And do you recognize on the last page your signature on

23  this document?

24  A.  Yes.

25  Q.  And is this a true and accurate copy of a promissory note?

1    A.  Yes.

2            MS. COHEN:  Your Honor, the government moves

3    Government Exhibit 201-1 into evidence.

4            MR. SHARGEL:  No objection.

5            THE COURT:  201-1 is received in evidence.

6            (Government's Exhibit 201-1 received in evidence)

7    Q.  Actually, before we do Government Exhibit 201, I'm sorry.

8    Can you look at another document first, please.  It's marked

9    for identification Government Exhibit 201-34.

10   A.  Okay.

11   Q.  Do you recognize this document?

12   A.  Yes.

13   Q.  And do you see on the last page of the document, can you

14   flip through to page 15 of the document?

15   A.  Yes.

16   Q.  Do you see your signature on that document?

17   A.  Yes.

18   Q.  What do you recognize this document as?

19   A.  This was share-for-share exchange.

20   Q.  This is a true and accurate copy, you recognize this as a

21   true and accurate copy of that document?

22   A.  Correct.

23           MS. COHEN:  Your Honor, the government moves

24   Government Exhibit 201-34 into evidence.

25           MR. SHARGEL:  No objection.

1              THE COURT:  201-34 is received in evidence.

2              (Government's Exhibit 201-34 received in evidence)

3    Q.  Do you see on the first paragraph there it's an agreement

4    between Caspian Energy International, Date Palm Capital, and

5    Cardiac Network Inc.

6              You talked before about changing the name from Cardiac

7    Network LLC to Cardiac Inc. in order to take it public; do you

8    recall that?

9    A.  Yes, Cardiac Network Inc., a corporation.

10   Q.  Did you change the name of Cardiac Network LLC to Cardiac

11   Network Inc. at David Levy's request?

12   A.  Correct.

13   Q.  What is Date Palm Capital Inc.?

14   A.  As far as I know, it was or it is David Levy's corporation.

15   Q.  And what is -- Caspian Energy International I believe you

16   said before was the name of the public company that you were

17   going to merge the shares?

18   A.  Correct.

19   Q.  You were going to merge Cardiac Network Inc. into the clean

20   shell; is that right?

21   A.  Yes.

22   Q.  Is this the agreement that accomplished the reverse merger?

23   A.  Yes.

24   Q.  If you look at the last page of the document.

25   A.  Okay.

1   Q.  And it's signed by, who is it signed by?

2   A.  David Levy, Zev Helfer, and I guess David Levy again on the

3   bottom, and witnesses, Eric Buchwald, John Fisher.

4   Q.  And at the bottom it's Date Palm Capital, and who's signing

5   for Date Palm Capital?

6   A.  David Levy.

7   Q.  And why did John Fisher and Eric Buchwald have to sign this

8   reverse merger agreement?

9   A.  Because they require two witnesses to the signatures.

10  Q.  So tell us what your understanding of what would happen

11  after the reverse merger, who would get what shares as set

12  forth in Government Exhibit 201-34?

13  A.  Well, what we -- what I understood at the time that there

14  is a hundred thousand shares, all restricted.  It was 55,000 --

15  55 million shares to be split between myself, Mr. Dwight West,

16  and Dr. Eli Gang.  And it was another four million five hundred

17  shares that were allocated to Mr. John Fisher, and it was

18  40 million shares to Mr. Fotis Georgiadis and David Levy.

19  Q.  And I believe you said the original investors or partners

20  in Cardiac Network LLC were yourself, Eric Buchwald, Dwight

21  West, and Eli Gang?

22  A.  Correct.

23  Q.  There were no shares issued to Eric Buchwald?

24  A.  No.

25  Q.  Why was that?

1    A.  Because he had some kind of lawsuit with the government

2    regarding the IRS so he asks me to keep the shares, his shares,

3    and I agreed.

4    Q.  And why did John Fisher get about 4.5 million shares?

5    A.  John Fisher, for the introduction and for the fact that he

6    invested $20,000 in the company.

7    Q.  When you say invest, did John Fisher give $20,000 to

8    Cardiac Network LLC?

9    A.  Correct.

10   Q.  And John Fisher was a person that had introduced through

11   Eric Buchwald Cardiac Network to David Levy?

12   A.  Correct.

13   Q.  How did you understand the about 40 million shares that

14   were going to Fotis and David Levy were going to be divided up

15   between the two of them?

16   A.  20 million to Fotis Georgiadis and 20 million to David

17   Levy.

18   Q.  And you said before you thought that all the shares were

19   going to be issued as restricted shares, the hundred million

20   shares?

21   A.  Absolutely, me and the rest of the people involved.

22   Q.  And what do you mean by restricted shares?

23   A.  That you cannot go and sell them.  They are not available

24   on the market for one year.

25   Q.  And who told you that they would not be available on the

1    market for one year, they'd be issued as restricted?

2    A.   David Levy.

3    Q.   That applied to all the shares, a hundred million shares?

4    A.   Correct.

5    Q.   Were there some other shares that weren't restricted as

6    part of the reverse merger?

7    A.   I think that it was around another 4 million that they

8    needed in order to bring money to the company, 4 million and

9    change.

10   Q.   When you say they needed, you're referring to David Levy

11   and Fotis?

12   A.   Correct.

13   Q.   And how did you learn that there was another 4 million

14   shares that David Levy and Fotis would use to bring other money

15   to the company?

16   A.   We found it way later.

17   Q.   When you say we, you yourself discovered that later on?

18   A.   Correct.

19   Q.   We'll get to that later on.  We'll try to keep with the

20   chronology.

21   A.   Okay.

22   Q.   What did David Levy say about whose name the 40 million

23   shares would be issued in that were going to he and Fotis?

24   A.   He was very up-front.  He said from the beginning that part

25   will be in his name, part in his company's name, part in his

D37LLEV3                          Helfer - direct

1   different relatives, and so did Fotis.

2   Q.  And what did David Levy say about why he was going to

3   split?

4   A.  That's the way that he does business, and we didn't have

5   any reason to question him.

6   Q.  And when stock is issued in a public company, does it go

7   through some sort of transfer agent to actually issue the

8   certificates?

9   A.  Correct.

10  Q.  And did Cardiac Network Inc., when it became a public

11  company, have a registered agent to issue the shares?

12  A.  Correct, yes.

13  Q.  Who found that registered agent for Cardiac Network?

14  A.  I think that -- actually, I don't think.  I know Fotis

15  called me and he said to deal with Amy at Atlas or what later

16  on became -- they change name and I don't remember the name --

17  to get in touch with her.

18  Q.  And did you ever speak with Standard Registrar about how

19  the --

20  A.  That's the name.

21  Q.  -- 40 million shares to David Levy and Fotis would be

22  divided up, did you have any conversations with Standard

23  Registrar about those shares?

24  A.  Yes.

25  Q.  If we can look at Government Exhibit marked for

D37LLEV3                    Helfer - direct

1    identification as 250-1.

2    A.   Two --

3    Q.   250-1.

4              MS. COHEN:  Wait, before you do that actually, before

5    I ask you a question, Mr. Helfer.

6              Your Honor, if I could read a stipulation into

7    evidence?

8              THE COURT:  Yes.

9              MS. COHEN:  Your Honor, I reading what's been marked

10   for identification as Government Exhibit S-1.

11             It has the caption of the case.  It has the

12   introductory stipulation agreed to by the parties, same as the

13   one Mr. Master read into evidence yesterday.

14             No. 1.  If called to testify, a representative of

15   Standard Registrar and Transfer Company Inc. ("Standard

16   Registrar") would testify as follows:

17             A.   Standard Registrar served as the transfer agent

18   for Cardiac Networks Inc. ("Cardiac Networks") and Banneker

19   Inc. ("Banneker").  Standard Registrar was the successor to

20   Atlas Stock Transfer, and it took custody of and maintained all

21   records in Atlas Stock Transfer's possession concerning Cardiac

22   Networks and Banneker and their predecessor companies.

23             B.   Government Exhibits 250-1 to 250-30 are true and

24   accurate copies of records maintained by Standard Registrar

25   concerning Cardiac Network.

1          1C.  Government Exhibits 350-1 to 350-27 are true and

2     accurate copies of records maintained by Standard Registrar

3     concerning Banneker.

4          1D.  The records reflected on Government Exhibits

5     250-1 to 250-30 and 350-1 to 350-27 were created by a person

6     with knowledge of, or created from information transmitted by a

7     person with knowledge of, the information shown; were created

8     at or near the time the information became available to

9     Standard Registrar; and were created and maintained by Standard

10    Registrar as part of its regularly conducted business activity.

11         If called to testify, a representative of West Coast

12    Stock Transfer ("West Coast") would testify as follows:

13         2A.  West Coast served as the transfer agent for

14    Greenway Design Group Inc. ("Greenway Design").  West Coast was

15    the successor to Pacific Stock Transfer, and it took custody of

16    and maintained all records in Pacific Stock Transfer's

17    possession concerning Greenway Design and its predecessor

18    company.

19         2B. Government Exhibit 450-1 to 450-16 are true and

20    accurate copies of records maintained by West Coast concerning

21    Greenway Design.

22         2C.  The records reflected on Government

23    Exhibits 450-1 to 450-16 were created by a person with

24    knowledge of, or created from information transmitted by a

25    person with knowledge of, the information shown; were created

1   at or near the time the information became available to West

2   Coast; and were created and maintained by West Coast as part of

3   its regularly conducted business activity.

4           It is further stipulated and agreed that Government

5   Exhibits 250-1 to 250-30, 350-1 to 350-27, and 450-1 to 450-16

6   may be received in evidence at trial and that this stipulation

7   may be received in evidence at trial.

8           Signed by all the parties, dated March 6, 2013.

9           THE COURT:  S-1 and all the exhibits referred to are

10  received in evidence.

11          (Government's Exhibits S-1, 250-1 to 250-30, 350-1 to

12  350-27, and 450-1 to 450-16 received in evidence)

13          MS. COHEN:  And the stipulation itself, S-1.

14          THE COURT:  S-1, that's how I started.

15          MS. COHEN:  Thank you, your Honor.

16  BY MS. COHEN:

17  Q.  So, Mr. Helfer, if you can look at what's now in evidence,

18  please, as 250-1.

19          Do you recognize 250-1, have you ever seen it before?

20  A.  I cannot find it yet.

21  Q.  You can look at it maybe on the screen if it's easier.

22  A.  Okay.

23  Q.  Can you see Government Exhibit 250-1 okay?

24  A.  Yeah.

25  Q.  Have you ever seen that before, recognize that document?

1    A.   No.

2    Q.   Do you have any knowledge about anything in that document?

3    A.   No.

4    Q.   Now let's back up and going back into your notebook, if you

5    can look at what's marked for identification as 201-1, please.

6    It's going to be the fifth, fourth or fifth tab in the

7    notebook.

8    A.   Okay.

9    Q.   Just look at that document, tell me if you recognize it.

10   A.   201-1.

11   Q.   Actually, I admitted it last time and said we'd come back

12   to it.  So that's in evidence.  Let's talk about it.

13            MS. COHEN:  You can put it on the screen, please.

14   Thank you.

15   A.   Okay.

16   Q.   I recall you testified before about $200,000 that David

17   Levy and Fotis were going to give to Cardiac Networks as a

18   loan?

19   A.   Correct.

20   Q.   What do you recognize this document, 201-1 as?  Is that the

21   promissory note?

22   A.   It's a promissory note, yeah.

23   Q.   Is who is the promissory note between?  Maybe helps if you

24   look at the last page -- withdrawn, your Honor.

25            If you go to the last page of the document.

1   A.   Okay.  Cardiac Network and Caspian Energy International

2   Inc.

3   Q.   Was this promissory note signed before the reverse merger?

4   A.   I think so, yes.

5   Q.   And you see under Cardiac Network, is that your signature?

6   A.   Yes.

7   Q.   And who's signing for Caspian Energy International?

8   A.   David Levy.

9   Q.   That was the shell company you were going to merge into?

10  A.   Correct.

11  Q.   Under this note, was Cardiac Network agreeing -- Cardiac

12  Network agreeing to -- withdrawn, your Honor.

13          Under this Government Exhibit 201-1, the promissory

14  note, was Date Palm Capital on the first page, if you look on

15  the first page?

16  A.   Yes.

17  Q.   Date Palm Capital and Bedrock Ventures were going to do

18  what?

19  A.   Would be the lender.

20  Q.   The lender of the $200,000?

21  A.   Correct.

22  Q.   To Cardiac Network?

23  A.   Correct.

24  Q.   So this agreement guaranteed that Cardiac Network would pay

25  that money back?

1    A.  Correct.

2    Q.  Or convert it or they would, if you also look at the

3    document, how would Cardiac Network pay the $200,000 back to

4    Date Palm and Bedrock Ventures, through money or shares?

5    A.  Money, including 9 percent interest per year.

6    Q.  Okay.  If you look at paragraph 2, did you have any

7    understanding as to whether the note could be converted to

8    stock at the holder's option, meaning Date Palm Capital and

9    Bedrock?

10   A.  Yes.

11   Q.  You see that there.  Did you have an understanding as to

12   how that would work?

13   A.  Yes.

14   Q.  How would that work?

15   A.  Basically they can choose to get it in money or the lender

16   may choose to get shares instead.

17   Q.  And the lender here being Date Palm Capital and Bedrock

18   Ventures?

19   A.  Correct.

20   Q.  And Date Palm was David Levy's company and Bedrock Ventures

21   was Fotis's company, as you understood it?

22   A.  Correct.

23   Q.  Who drafted this promissory note that you signed,

24   Government Exhibit 201-1?

25   A.  We received it from David Levy's attorney, I believe, or

D37LLEV3                    Helfer - direct

1    David Levy.  I can't recall who exactly gave it to us.

2    Q.  When you say we received it, did you receive this

3    promissory note from David Levy or his attorney?

4    A.  Yes.  Cardiac Network.

5    Q.  Did you have your own attorney with respect to this deal?

6    A.  No.

7    Q.  No?

8    A.  No.

9    Q.  And did you have any experience in taking companies public

10   at the time --

11   A.  Never.

12   Q.  -- you took Cardiac Network LLC public?

13   A.  Never.

14   Q.  Okay.  After -- actually, I'm just going to have you look

15   at another document, please.

16           Government Exhibit 201-30, which is in your binder.

17   It should come right after the promissory note, a couple down.

18   A.  Okay.

19   Q.  Okay.  I just ask you if you ever saw Government

20   Exhibit 201-30 before, do you recognize it?

21   A.  I think so, yes.

22   Q.  Okay.  And is it an email between yourself and David Levy?

23   A.  Yeah.  David Levy sent it to me, and I see CC to Dr. Eli

24   Gang and to John Fisher and Eric Buchwald.

25   Q.  And is it true and accurate copy of the email as you

1    remember it?

2    A.  Yes.

3            MS. COHEN:  Your Honor, the government moves

4    Government Exhibit 201-30 into evidence.

5            MR. SHARGEL:  No objection.

6            THE COURT:  201-30 is received in evidence.

7            (Government's Exhibit 201-30 received in evidence)

8    Q.  Do you see, perhaps start on the bottom.  Actually, we can

9    start at the top because I think that's where the chain starts.

10           Start at the top, it's an email from David Levy to

11   yourself, Eli Gang, John Fisher, and Eric Buchwald?

12   A.  Yes, ma'am.

13   Q.  That's on Tuesday, April 24, 2007?

14   A.  Yes.

15   Q.  And what is David Levy telling you to do?

16   A.  To attach -- to sign the documents and send it back to

17   Laura Anthony as soon as possible.

18   Q.  What type of documents are you being asked to sign and send

19   back?

20   A.  Board resolution and shareholder consent.

21   Q.  What did these documents relate to?

22   A.  The name change, the name change.

23   Q.  Changing the name from Cardiac Network LLC to Cardiac

24   Network Inc.?

25   A.  Yes.

1   Q.  It also says, We must get that done before they will give

2   us the new symbol?

3   A.  Yes.

4   Q.  Does the new symbol refer to the ticker symbol?

5   A.  Ticker.

6   Q.  So it could be a publicly traded company?

7   A.  Correct.

8   Q.  Now look at what's been marked Government Exhibit 201-48.

9           Actually, if you go back one more, 201-30, the one you

10  were just looking at, just to finish off the document.

11          On the bottom, you're also forwarded an email between

12  Laura Anthony and Georgiadis Group.  Is that Fotis Georgiadis?

13  A.  Yes.

14  Q.  And Laura Anthony, that was the attorney you referred to

15  before that David Levy had?

16  A.  Correct.

17  Q.  So if you look at the next document marked for

18  identification as Government Exhibit 201-48.

19  A.  Okay.

20  Q.  Do you recognize this document?

21  A.  Yes.

22  Q.  And do you recognize your signature on the last -- not the

23  last page -- on the second page?

24  A.  Yes.

25  Q.  And do you recognize your signature also on the last page

1    of the document which is an attachment?

2    A.  Yes.

3    Q.  And do you recognize this document to be a board resolution

4    for the name change and an amendment changing the name?

5    A.  Correct, yes.

6    Q.  Is that a true and accurate copy?

7    A.  Yes.

8              MS. COHEN:  Your Honor, the government moves

9    Government Exhibit 201-48 into evidence.

10             MR. SHARGEL:  No objection.

11             THE COURT:  201-48 is received in evidence.

12             (Government's Exhibit 201-48 received in evidence)

13   Q.  So the board of directors of Caspian Energy International,

14   that's again that clean shell that David Levy found for you to

15   merge into; is that right?

16   A.  Correct.

17   Q.  Did you know that you were -- who were the four board

18   members according this document of Caspian Energy

19   International, who became the board members?

20   A.  It was John Fisher, it was myself, and Eli Gang, Dr. Gang,

21   and Eric Buchwald.

22   Q.  And who drew up this board resolution?

23   A.  We received it I guess from Laura Anthony.

24   Q.  When you say we received it, did you receive it from Laura

25   Anthony?

1    A.   Correct.

2    Q.   Did everyone who was on the board of Caspian Energy, the

3    clean shell, have to sign this document?

4    A.   Yes, ma'am.

5    Q.   And did you have any knowledge of what that meant to be on

6    the board of Caspian Energy or how this all worked?

7    A.   I had an idea but very vague.

8    Q.   You understood this was the way to take the company public?

9    A.   Correct.

10            MR. SHARGEL:   I've been loathe to object.   But there's

11   so much leading going on here, I have to object.

12            THE COURT:   Okay.   Overruled.   Take this up at lunch

13   break.

14            Okay.   Go ahead, Ms. Cohen.

15            MS. COHEN:   Thank you, your Honor.

16   Q.   Just look at the last page of Government Exhibit 201-48.

17   A.   Okay.

18   Q.   What is that?

19   A.   It states that Caspian Energy International, a corporation

20   organized and existing under the general law of the State of

21   Delaware, name change.

22   Q.   And what are you changing, what are you signing here,

23   changing the name from what to what?

24   A.   From Caspian Energy International Inc. to Cardiac Network

25   Inc.

1    Q.  So after the company became public, it became Cardiac

2    Network Inc., public company?

3    A.  Right.

4    Q.  And you received, I think you said you were receiving about

5    55,000 shares?

6    A.  Million, 55 million.

7    Q.  55 million, my apologies.

8            If you can look at Government Exhibit 201-35 for

9    identification.

10   A.  Okay.

11   Q.  And just tell me do you recognize the document and is it a

12   true and accurate copy?

13   A.  I do, I recognize it.

14   Q.  Without telling us what's in it, is it a letter you wrote

15   to Atlas Stock Transfer Corp.?

16   A.  Yes, ma'am.

17           MS. COHEN:  Your Honor, government moves Government

18   Exhibit 201-35 into evidence.

19           MR. SHARGEL:  No objection.

20           THE WITNESS:  Correct.

21           THE COURT:  201-35 is in evidence.

22           (Government's Exhibit 201-35 received in evidence)

23   Q.  Mr. Helfer, if you can just explain what this letter you

24   wrote is about?

25   A.  I'm asking Amy from Atlas Stock Transfer Corporation to

1   divide the fifty five hundred -- fifty-five million five

2   hundred shares to Dr. Eli Gang, to myself, and to Dwight West.

3   Q.  I believe you said earlier that within your 33,300,000

4   shares included shares that you were holding for Eric Buchwald?

5   A.  50 percent of it, correct.

6   Q.  Did the stock transfer corporation issue you those shares?

7   A.  Yes, ma'am.

8   Q.  If you look at the face of Government Exhibit 201-35, it's

9   stamped restricted stock?

10  A.  Correct.

11  Q.  Was that a stamp you put on it?

12  A.  No.

13  Q.  When you got -- did you get actual stock certificates back

14  from the stock transfer corporation?

15  A.  Correct.

16  Q.  What was stamped on them?

17  A.  Restricted stock.

18  Q.  You understood that was stock you couldn't sell for more

19  than a year?

20  A.  For a year.

21  Q.  For a year?

22  A.  Not more than a year, for one year.

23  Q.  Okay.  Let's talk about now you started getting the money

24  from David Levy and Fotis, the million dollars they said they'd

25  invest?

1    A.   Yes.

2    Q.   And the $200,000 as a promissory loan?

3    A.   Correct.

4    Q.   Explain how that money came in to Cardiac Network Inc.

5    A.   The first amount of money of $25,000 went to Aerotel in

6    Israel in order to satisfy the debt that we have, and the rest

7    of the money came in chunks of money in -- usually it was wired

8    from Fotis, from Bedrock, to us.

9    Q.   And after Cardiac Network began to get money again, what

10   was it doing with respect to its business?

11   A.   Well, we bought additional monitors.  We moved the office

12   to a bigger facility.  We started to recruit technicians and to

13   train them, to CCI certify them, and to buy computers and

14   equipment and furniture for the office.

15   Q.   And you talked about before needing a provider number to

16   get reimbursed?

17   A.   Correct.

18   Q.   For Medicaid?

19   A.   Medicare.

20   Q.   Medicare, sorry.  For Medicare?

21   A.   Correct.

22   Q.   What were you doing to get a Medicare provider number for

23   Cardiac Network Inc. at the time?  This is we're in the spring

24   of 2007.

25   A.   We applied for the Medicare provider number before we

1    turned public.  And when we checked on it, they told us that it

2    will take 90 days to obtain the number and, unfortunately, it

3    was it took much, much longer.

4    Q.  Why did it take much, much longer?

5    A.  We have no idea.  It's basically we had an operation.  We

6    had to show, in order to obtain the provider number, we needed

7    to be inspected and we needed to show proof that we were open

8    24/7.  So we had to maintain all those technicians around the

9    clock, two technicians, three technicians around the clock, and

10   we were waiting for Medicare to come to inspect.

11           Now, they can come after one day or they can come

12   whenever they want.  They, obviously, are not going to tell us

13   when they're going to come.  And, unfortunately, we waited

14   almost 14 months for them to come.

15   Q.  During the time you were waiting, starting in the

16   beginning, who -- how were you being paid, first of all, when

17   it became Cardiac Network Inc., how were you paid?

18   A.  I was paid by direct deposit from the company.

19   Q.  Were you a salaried employee?

20   A.  Correct.

21   Q.  And who else was on the payroll of Cardiac Network Inc.?

22   Just types of jobs, not people's names.

23   A.  Okay.  It was the technicians, the salespeople, and Dr. Eli

24   Gang and Eric.

25   Q.  Eric Buchwald?

1    A.  Correct.

2              THE COURT:  All right.  We'll take our luncheon recess

3    now.  We'll resume at 2 o'clock.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Mr. Helfer, you can step down.

3          (Witness not present)

4          THE COURT:  Please be seated.

5          Okay, Mr. Shargel.

6          MR. SHARGEL:  Judge, for much of the direct

7     examination, recognizing that he speaks English with an accent

8     and he has his own lexicon, I didn't rise to object.

9          THE COURT:  You were very patient.

10          MR. SHARGEL:  I was very patient.  And but I think

11     that matters are being made worse, with all respect, by

12     Ms. Cohen's continual leading of the witness.  I'd like to hear

13     what he did and that's the basis or the foundation for his

14     testimony.  We go back and forth with we and he and then the

15     leading questions come with didn't you do this, this, and that,

16     and the answer that's sought is a yes or no.  Obviously, a yes.

17          So I would just ask that we conform more carefully,

18     that the prosecutor conform more carefully to the rules of

19     evidence.

20          THE COURT:  I have allowed some of the questions

21     because of the very reasons that you've suggested, Mr. Shargel.

22     English is not his first language, he's older, he flew in.

23          But, Ms. Cohen, there's an awful lot of leading going

24     on.

25          MS. COHEN:  Your Honor, I was only trying to do it to

1   help out with the "we."

2           THE COURT:  You're going to get into some critical

3   areas this afternoon, and Mr. Helfer is going to have to

4   testify on his own in response to nonleading questions.

5           And I'll sustain objections that you have,

6   Mr. Shargel, if there is in fact leading.  I thought today was

7   most of this stuff is preliminary.

8           MR. SHARGEL:  I understood that.

9           THE COURT:  Okay.

10          MR. SHARGEL:  Judge, may we approach on a matter

11  related to the witness that I'd like to take up with the Court

12  and the government at side bar?

13          THE COURT:  Okay.

14          (At the side bar)

15          THE COURT:  Why are we at the side bar?

16          MR. SHARGEL:  It's a sensitive matter with respect to

17  the witness and I don't know who's in the audience.  And I'm

18  sure we have a sequestration order with witnesses.

19          THE COURT:  Go ahead.

20          MR. SHARGEL:  Different prosecutors do it different

21  ways, and I don't know if Ms. Cohen is saving the Giglio/Brady

22  material for the end.  But if there's nothing more to disclose,

23  if the government has nothing more to disclose, there's a

24  serious problem that Mr. Srebnick raised by doing slight

25  internet research.

1    MR. SREBNICK:  Actually, the witness mentioned a name

2  that was familiar to me, Recarey.  Said that he had worked for

3  Recarey, mentioned two first names, I think Ernesto and I think

4  somebody else, and mentioned a company, International Medical

5  Centers.

6    The name Recarey was immediately familiar to me

7  because he's one of the most famous fugitives in south Florida

8  history because of his relationship to the governor back then.

9  And the board of International Medical Centers, for which this

10  witness claims he managed, was the subject of perhaps the

11  largest Medicare fraud to date back in the 1980s.  His boss, I

12  guess, Mr. Recarey, because a fugitive and there was a manhunt

13  by the U.S. marshals.

14    I was able to track down from the government website a

15  small snippet.  But it says in October of '87, Miguel Recarey,

16  former president and chairman of the board of International

17  Medical Centers, failed to appear for a hearing in United

18  States District Court, Southern District of Florida, Miami, on

19  charges of bribing an officer of an employee welfare fund,

20  bribing federal grand jury witnesses, illegal wiretapping.

21    He was also indicted in February 1988 on charges of

22  conspiracy to defraud the United States, obtaining by fraud and

23  misapplying U.S. government funds, wire fraud, false statements

24  concerning Medicare payments received by International Medical

25  Centers.  And then he became a fugitive.

1           THE COURT:  What year is this?

2           MR. SREBNICK:  1987.  First I hear the name Recarey,

3    first I hear the name of the company.  But what I'd ask the

4    government to do is determine whether this witness was an

5    unindicted coconspirator since he was the manager of the

6    company that was the subject of this massive Medicare fraud.

7    Was he a cooperating government witness against Recarey?  I

8    don't know the man's status, but we're hearing this for the

9    first time.  I assume the prosecutors are hearing this for the

10   first time.  And it's only because the name Recarey means much

11   to a Miami lawyer that I was able to flag the issue.

12          MR. SHARGEL:  May I put one more thing before you.  I

13   don't want to give up my cross-examination, but there's one

14   more matter that was not mentioned by him on this career

15   history as he furnished his career history also involving the

16   Southern District of Florida with a completely different type

17   of company.

18          I want to keep this general, but I would ask the

19   prosecutors to interview the witness to see if he was a

20   cooperator or unindicted coconspirator or, God only knows, a

21   defendant in another criminal case in Florida.

22          MS. COHEN:  Two responses.  First is, as I understand,

23   International Medical Center, they were a huge company and

24   there were different franchisee centers.  So I think Mr. Helfer

25   managed a couple of franchisee centers and had nothing to do

1   with the corporate International Medical Center.

2          Of course, we've asked him certain questions for our

3   disclosure obligations, and he did not disclose that he was an

4   unindicted coconspirator or any involvement in either of the

5   two companies.

6          THE COURT:  You'll inquire.

7          MS. COHEN:  I will inquire and report back to the

8   Court.  If he has no involvement, I don't think it's valid

9   ground for cross or no knowledge of.

10         THE COURT:  But you have to make an inquiry.

11         MS. COHEN:  I will, your Honor.

12         MR. SREBNICK:  What I would ask is this U.S.

13  Attorney's Office contact U.S. Attorney's Office in Florida to

14  determine whether there was any issue with regard to Mr. Helfer

15  being either a target, a subject, an unindicted coconspirator.

16         And for the record, the spelling is R-E-C-A-R-E-Y.

17         MS. COHEN:  We can try to do this.  I don't know if

18  we'll get an answer from the 1980s.

19         THE COURT:  Obviously, you've got to make an inquiry

20  beyond Mr. Helfer.

21         MS. COHEN:  Correct.  We will contact the U.S.

22  attorney office.

23         THE COURT:  I don't know if there's anybody at the

24  U.S. attorney.  Maybe you ought to have Mr. Reinhardt do leg

25  work on this.

1        MS. COHEN:  We'll do it at lunch.

2        MR. SHARGEL:  As to my matter with a different company

3    I'm specifically not naming, I have more than a good faith

4    basis to ask questions about it and I will be asking questions

5    about it.

6        MS. COHEN:  If you want us to find out anything, make

7    an inquiry, I need to know the name of the company.

8        MR. SHARGEL:  The man knows whether he was a target, a

9    subject, a cooperator, a conspirator.  I'll leave it at that.

10   I'll be satisfied with your efforts to get that information.

11   Otherwise, I'll try to get it from the witness as I'm

12   cross-examining him.

13       THE COURT:  Okay.  We'll resume at 2 o'clock.

14       (Luncheon recess)

15       (Continued on next page)

16

17

18

19

20

21

22

23

24

25

2:00 p.m.

(At the side bar)

MS. COHEN:  We have spoken to the witness.  He

actually did not work for International Medical Centers.  His

company was an affiliate provider, meaning International

Medical Centers was like an HMO.  His company was asked to

become an affiliate provider so they could tap into HMO

patients.  He has no knowledge of anything related to the

company International Medical Center itself.  It's a huge,

multimillion-dollar company.  He met Migel Recarey once, twice,

the first time when Recarey asked him to be an affiliate

provider and the second time -- Mr. Master?

MR. MASTER:  I didn't ask him that, but I did ask him

how long before the indicted conduct he left this company.  He

said it was several years.  The indictment I believe is dated

1988.  He left several years before.  He had no involvement in

the management.

MS. COHEN:  He wasn't at the company, the

International Medical.  He ran a separate company.

THE COURT:  Was he a target of the investigation?

MS. COHEN:  I can't imagine that he was, because he

wasn't anywhere near it.  I have found the AUSA that handled

that case.  He is still with the U.S. Attorney's office in

Miami.  I have emailed the AUSA and left a voicemail message.

D37rlev4

1    At this point it is my understanding that we are not going to

2    go into it on cross at all unless I get an email or voicemail

3    back indicating that it somehow was related to.

4                THE COURT:  Will you get it today?

5                MS. COHEN:  Yes.

6                THE COURT:  All right.  Mr. Srebnick?

7                MR. SREBNICK:  We'll wait to hear from the prosecutor

8    in Miami, who I happen to know, so I'm sure we will hear back.

9                THE COURT:  Anything else?

10                MR. SHARGEL:  Thank you, Judge.  No, sir.

11                MS. COHEN:  To answer Mr. Shargel's need to make an

12    inquiry whether there is any Giglio material regarding any

13    Medicaid fraud with regard to any prior employment, the answer

14    is no.

15                MR. SHARGEL:  Thank you.

16                THE COURT:  The jury is all here, so we will call them

17    in.

18                (Continued on next page)

19

20

21

22

23

24

25

1          (In open court; jury present)

2    ZEV HELFER, resumed.

3          THE COURT:  Ms. Cohen, do you want to resume?

4          MS. COHEN:  Thank you, your Honor.

5    DIRECT EXAMINATION (continued)

6    BY MS. COHEN:

7    Q.  I believe before the lunch break you were talking to us

8    about what Cardiac Networks did after it got the infusion of

9    cash from David Levy and Fotis, just to orient you back.  What

10   was the company doing?

11   A.  We trained technicians.  We certified them.  We talking to

12   Medicare about the provider number on a daily basis.  We built

13   the place, the receiving station.  We trained salespeople.  And

14   we got ready for the times that Medicare will grant us the

15   provider number.

16   Q.  During that time period, what were you doing on a day-to-

17   day basis?

18   A.  Managing the company.

19   Q.  At this time sort of when you were running the company, and

20   now we're in spring-summer-fall '07, what were your

21   conversations with David Levy?  What were they about in

22   general?

23   A.  Most of the time it was about press releases.  He wanted

24   some more fresh material all the time.  Every time that we got

25   provider number from Blue Cross, for example, or Blue Shield --

1   over there it is separated -- he wanted to know about it so he

2   can have a press release done.  Actually, was more Donna than

3   David.  But all the time they asked for new, fresh events in

4   order for me to bring it to them so they can have a press

5   release done.

6   Q.  What were your conversations with Donna Levy about press

7   releases to be issued by Cardiac Networks?

8   A.  Just give me new material, give me new material all the

9   time.  It was like never-ending story.  New material, give it

10  to me, give me more material and more events.

11  Q.  What was the purpose of issuing press releases?

12  A.  So they can notify the public.

13  Q.  About what?

14  A.  About what the company's doing and how it's doing.

15  Q.  I'm going to ask you to look in your binder that has been

16  marked as Government Exhibit 201-49A through M, although there

17  is no I.

18  A.  201?

19  Q.  Dash 49A, and it goes through M, although there is no I.

20  A.  OK.

21  Q.  If you could flip through each one quickly and let us know

22  if you recognize them, and if you do, what are they.

23  A.  Press releases.

24  Q.  Press releases from whom?

25  A.  Cardiac Network press releases.

1    Q.  Are they true and accurate copies of the press releases

2    while you were the head of Cardiac Networks?

3    A.  I believe so.

4           MS. COHEN:  Your Honor, the government moves

5    Government Exhibits 401-49A through M, although there is no I.

6           MR. SREBNICK:  201 or 401?

7           MS. COHEN:  201.  I'm sorry if I misspoke.

8           MR. SREBNICK:  Judge, may I have a moment?

9           THE COURT:  I'm going to take 201-49A through M, with

10   the exception of I.  If there is a problem, Mr. Srebnick, we

11   will strike the exhibits.  Let's get on with the testimony.

12           **(Government's Exhibits** 201-49A through M, except I,

13   received in evidence)

14   BY MS. COHEN:

15   Q.  What was your understanding as to why Cardiac Networks

16   would issue press releases?

17   A.  To promote the stock.

18   Q.  Where did you get that understanding from?

19   A.  From David and Donna and Fotis.

20   Q.  Is that what any of those individuals told you?

21   A.  Yes.

22   Q.  Do you recall if David Levy told you we have to issue press

23   releases to get the stock up?

24   A.  Yes.

25   Q.  Do you recall if Donna Levy told you we need to issue press

1   releases to get the stock up?

2   A.   Yes.

3   Q.   Now looking at Government Exhibit 201-49A.

4   A.   OK.

5        MS. COHEN:   We can put it on the screen.   Thank you.

6   Q.   What is this press release about?

7   A.   It talks about the new ticker CNWI.

8   Q.   Who wrote Government Exhibit 201-49A?

9   A.   I have no clue.

10  Q.   Did you write it?

11  A.   Yes.

12  Q.   Did you write the text here in Government Exhibit 201-49A?

13  A.   No.

14  Q.   Who was responsible for putting it together?

15  A.   I'm sorry?

16  Q.   Who was responsible for putting the words that are found in

17  Government Exhibit --

18  A.   I don't know exactly, but usually the press releases were

19  done by Donna.

20  Q.   If you can look this press release and read through.   The

21  last sentence on the first page at the bottom, which carries

22  over to the next page, is a quotation from you as CEO of

23  Cardiac Networks, Inc.  Do you see that quotation?

24  A.   Correct.

25  Q.   Your title of Cardiac Networks was CEO, is that right?

1    A.   Yes.

2    Q.   Chief executive officer?

3    A.   Right.

4    Q.   Going back to the first page for a minute, the beginning of

5    the quote, the second line.

6    A.   OK.

7    Q.   The second line there, where it says, "For the next 20

8    years the U.S. health care system could experience a tsunami of

9    heart care demand as millions of baby-boomers turn 60."  Do you

10   know who wrote that sentence?

11   A.   Donna.

12   Q.   How do you know that?

13   A.   Because she used this term "tsunami" and "baby-boomers"

14   many, many times, many occasions.

15   Q.   Looking on that first page again, please, the second

16   paragraph, the third sentence, where it says 70 million people,

17   the beginning of that sentence.

18   A.   OK.

19   Q.   "Cardiovascular disease and coronary heart disease are

20   widespread, afflicting over 70 million people.  Heart attacks

21   are the single biggest killer in the United States alone.  Each

22   year about 1.1 million Americans suffers a heart attack.  About

23   460,000 of those heart attacks are fatal."

24           Do you know where the numbers there, the 1.1 million

25   Americans and 460,000 heart attacks are fatal, where those

1    numbers came from?

2    A.  I have no idea.

3    Q.  I'm going to ask you to look at Government Exhibit marked

4    for identification as 201-43.  It's behind the 49A through M

5    series in your book.

6    A.  I do not see it.

7    Q.  It comes right after 201-49M.

8         THE COURT:  201-43?

9         MS. COHEN:  Right.  201-43 in the book Mr. Helfer is

10   looking at comes right after 201-49M, the next tab.  I can hand

11   it up to him.

12   Q.  Government Exhibit 201-43?

13   A.  It's not here.  OK.

14   Q.  Do you recognize that document?

15   A.  Yes.

16   Q.  Without telling us what it says, what is the document?

17   A.  It's an announcement that Cardiac Network begins trading

18   under the new symbol.

19   Q.  Does it have an email on top?

20   A.  From David Levy to Zev Helfer.

21   Q.  Is this a true and accurate copy of an email you received

22   from David Levy?

23   A.  Yes.

24         MS. COHEN:  The government moves Government Exhibit

25   201-43 into evidence.

1          MR. SHARGEL:  No objection.

2          MR. SREBNICK:  No objection.

3          THE COURT:  201-43 is in evidence.

4          (Government's Exhibit 201-43 received in evidence)

5   Q.  Sticking with Government Exhibit 201-43, do you recall

6   getting email from David Levy on or about May 22, 2007, with

7   the text that looks like -- tell me what you think this is.

8   What was this email about?

9   A.  We made some correction to this what is supposed to be a

10  press release.  We sent it back to David and Donna.

11  Q.  When you say "we," who are you referring to?

12  A.  Dr. Eli Gang and myself.

13  Q.  On the second page of Government Exhibit 201-43 is there an

14  email with Dr. Gang, between you and Dr. Gang, about the text

15  of this press release?

16  A.  Yes.

17          MS. COHEN:  I don't know if on the ELMO there is a way

18  to put it side by side, I guess not, with 49A.

19  Q.  If you go back now to your notebook, to that first press

20  release, 49A, please.  49A, which is the press release issued,

21  was the email which is Government Exhibit 201-43 about the text

22  of 49A?

23  A.  OK.

24  Q.  Was Government Exhibit 201-43, which is the email, was that

25  about the text that was going to go into Government Exhibit

1    201-49A?

2    A.  Yes.

3    Q.  The suggestions that you and Dr. Gang made to the text,

4    were they made in the actual release Government Exhibit

5    201-49A?

6    A.  No.

7    Q.  Where do you see that?

8    A.  I see that it's -- I'll tell you in a second.

9         MS. COHEN:  If you can pull up on the ELMO to the

10   red-lined part of 201-43.

11   A.  You can see in the third paragraph that it shows exactly

12   without our correction, without our agreement.

13   Q.  When you say "our correction," you're referring to yourself

14   and Dr. Gang?

15   A.  Correct.

16   Q.  If I could ask you to look now at 201-49B, which is the

17   next press release in your binder.

18        MS. COHEN:  You can put it up on the screen.  It's in

19   evidence.  Thank you.

20   Q.  Who wrote this press release?

21   A.  Donna.

22   Q.  What were your discussions with Donna Levy about the press

23   release in 201-49B?

24   A.  We received the Medicare provider number, and I told her

25   that we received, and she came up with this press release.

D37rlev4                    Helfer - direct

1    Q.  I ask you to look at 201-49C, which is the next press

2    release.

3    A.  OK.

4         MS. COHEN:  I ask you to put that up on the screen, in

5    evidence.

6    Q.  What is this press release about?

7    A.  Cardiac Network retains Agoracom as investor relations,

8    public relations company.

9    Q.  How did it come about that Cardiac Network hired Agoracom?

10   A.  I got a phonecall from forty Georgiadis and he told me to

11   use Agoracom.

12   Q.  What was Cardiac Networks using Agoracom to do?

13   A.  To coordinate the press releases that Donna was writing.

14   Q.  What was your involvement in drafting Government Exhibit

15   201-49C?

16   A.  None.

17   Q.  If you can look at 201-49D, please.

18   A.  OK.

19   Q.  What is this press release about?

20   A.  It talks about launching a website.

21   Q.  What is the date?  I should have done this.  I'm sorry.

22   What is the date of 49D?

23   A.  August 16, 2007.

24   Q.  If you can flip back to B and C and tell us the dates.

25   A.  201-49C is August 15, 2007.

1   Q.  That's the one about Agoracom?

2   A.  This is the one about Agoracom, correct.

3   Q.  And 49B, which is about the Medicare provider, what it is

4   date on that?

5   A.  August 9, 2007.

6   Q.  I'm sorry.  Getting back to 49D, which is where we were at.

7   A.  49E?

8   Q.  49D.

9   A.  D, OK.

10  Q.  What was your involvement on this press release regarding

11  announcing the launch of Cardiac Network's website?

12  A.  Very little.

13  Q.  Do you see there is a quote from you in this press release

14  and in some of the others?

15  A.  Yes.

16  Q.  What was your involvement in that quotation?

17  A.  None.

18  Q.  Looking at 201-49E, please.

19  A.  OK.

20  Q.  What is the date of this press release?

21  A.  August 20, 2007.

22  Q.  What is it about?

23  A.  Medicare provider number again.

24  Q.  What was the reason there was another press release about

25  the Medicare provider number?

1    A.   I have no idea.

2    Q.   Was there anything new that was being reported in this

3    press release, Government Exhibit 201-49E?

4    A.   Not that I know of.

5    Q.   Whose decision was it to issue the presses releases we have

6    been looking at so far, Government Exhibits 49A through E?

7    A.   Donna Levy.

8    Q.   I'm going to ask you to look at what's been marked

9    Government Exhibit 201-15.

10   A.   201-15?

11   Q.   Yes.  I'll walk it up to you.  I ask you to look at that

12   document and let us now if you recognize it.  And if so, what

13   is it?

14   A.   It's an email from Agoracom to a gentleman by the name Jim.

15   What he is asking Donna here is the first draft.

16   Q.   Without telling us what it is, it is not in evidence yet,

17   you recognize this as emails you were cc'd on or received when

18   you were at Cardiac Networks?

19   A.   Yes, I was cc'd, right.

20   Q.   Is this a true and accurate copy of the email you received?

21   A.   I believe so, yes.

22        MS. COHEN:  Your Honor, the government moves

23   Government Exhibit 201-15 into evidence.

24        MR. SREBNICK:  No objection.

25        THE COURT:  201-15 is in evidence.

1              (Government's Exhibit 201-15 received in evidence)

2    Q.  Do you see on the bottom there is an email from

3    luveme40@aol.com?

4    A.  Yes.

5    Q.  Whose email address is that?

6    A.  Donna's.

7    Q.  It is to Jim H. at Agoracom?

8    A.  Yes.

9    Q.  Is that August 19, 2007?

10   A.  Correct.

11   Q.  What is being talked about in the email from Jim at

12   Agoracom to Donna Levy?

13   A.  Basically, he wants to know how Medicare coverage works for

14   patients, their doctors, and so on.

15   Q.  Then up top you're cc'd on an email, is that right?

16   A.  Yes.

17   Q.  Who is the email from and to?

18   A.  Agoracom.

19   Q.  To who?

20   A.  To Donna.

21   Q.  What is it about?  It's attaching what?

22   A.  It's a draft of a press release.

23   Q.  This is August 20th.  If you look at that press release,

24   the last one you just looked at, which is 49E.

25   A.  OK.

1    Q.  That is dated August 20, 2007?

2    A.  Yes.

3    Q.  Does the email conversation in Government Exhibit 201-15

4    relate to the press release 201-49E?

5    A.  Yes.  I'm sorry?

6    Q.  I just didn't hear if you said yes or no.

7    A.  I didn't hear the question.  Can you repeat?

8    Q.  Sure.  Does the email conversation in Government Exhibit

9    201-15 relate to the press release Government Exhibit 201-49E?

10   A.  Yes.

11   Q.  If you can now go back to the press releases.  We are on

12   49F, 201-49F.

13   A.  OK.

14   Q.  What is the date of this email?

15   A.  October 1, 2007.

16   Q.  I'm sorry.  I said email.  I meant press release.  What is

17   the date of the press release?

18   A.  October 1, 2007.

19   Q.  Are you on F?

20   A.  I'm sorry.  I was on G.

21   Q.  Looking at Government Exhibit 201-49F, what is the date of

22   this press release?

23   A.  August 23, 2007.

24   Q.  What is this press release about?

25   A.  It's announcement about Tierra Technologies providing IT

1    infrastructure.

2    Q.  Whose idea was it to issue this press release about Tierra

3    Technologies?

4    A.  Like I said before, we were looking for -- I was pressed by

5    Donna, David, and Fotis all the time to come up with all kinds

6    of new press releases, material.  Here we hired a husband and

7    wife to be in charge on the network in case the computers, the

8    network, will go down, and made a big issue out of it.

9    Q.  What was Tierra Technologies to do for Cardiac Networks

10   that was the subject of this release?

11   A.  In the computer world every once in a while the network

12   will fall and you need to fix it.  In our case it was very

13   important because, you know, we needed to make sure that the

14   receiving station is working.  So we brought them in-house, we

15   gave them a little office, and they conducted their own

16   business in this room.  Basically, they fixed our computers

17   every time that the network failed.

18   Q.  Why was Tierra Technologies the subject of a press release

19   by Cardiac Networks regarding what it was doing to its backup

20   computer system?

21   A.  We started to run out of good material, so we used that.

22   Q.  Whose idea was it to issue a press release about Tierra

23   Technologies?

24   A.  Donna's.

25   Q.  I'm going to ask you to look at Government Exhibit 201-49G,

1    please.

2    A.   OK.

3    Q.   What is this press release about, Government Exhibit

4    201-49G?

5    A.   That we became a Humana provider in Florida starting

6    October 1st, 2007.

7    Q.   What would it mean to be provider?

8    A.   To be able to see the Humana Gold Plus plan patients,

9    Medicare recipient prepaid program.

10   Q.   Did this press release get issued, Government Exhibit

11   201-49G?

12   A.   Yes.

13   Q.   What happened after it was released regarding Cardiac

14   Networks?

15   A.   We got the message that we are --

16           MR. SREBNICK:  Objection.  Hearsay.

17           THE COURT:  Overruled.

18           MR. SREBNICK:  Confrontation as well, your Honor.

19           THE COURT:  Overruled.

20           MS. COHEN:  Your Honor, if I could try to rephrase the

21   question, I'm happy to.

22           THE COURT:  OK.

23   Q.   With respect to being a Humana network, what happened after

24   this press release was issued?  Without telling us who said

25   what, what happened to Cardiac Network's ability to be provider

1   or to be listed with Humana?

2   A.   They deny us for like two weeks.  And then, when they

3   reissue our providership, it was just for the three, the

4   tri-county, meaning Miami Dade, Broward, and Palm Beach, versus

5   the whole state.

6   Q.   Why did your get reduced to those three counties versus the

7   whole state?

8   A.   Because we were not allowed to do a press release until we

9   get the documents in our hand, and unfortunately it wasn't the

10  case.

11  Q.   Did you inform Donna Levy that the Humana contract wasn't

12  to be issued to the public yet?

13  A.   Sure.

14  Q.   Before the press release actually was issued?

15  A.   Sure.

16  Q.   Looking at Government Exhibit 201-49H, please, what is the

17  date of this press release?

18  A.   September 14, 2007.

19  Q.   What is this about?

20  A.   We hired a company by the name MRM to do some credentialing

21  and to help us to get providership to different health plans in

22  the United States.

23  Q.   Why was your work with MRM the subject of a press release?

24  A.   Because it was another thing to notify the public, another

25  press release basically.

D37rlev4                         Helfer - direct

1   Q.  Who decided to issue a press release about MRM?

2   A.  Donna.

3   Q.  If you could look at Government Exhibit 201-19 and 201-20,

4   which are in your book behind the press releases.

5   A.  201-19?

6   Q.  I'll hand them up to you.  They have been only marked for

7   identification.  Do you recognize those documents?  And if so,

8   what are they?

9   A.  I remember, yes.

10  Q.  Do you recognize 201-19 and 201-20?

11  A.  I'm sorry?

12          MR. SHARGEL:  I'm sorry.  He just made a comment

13  couldn't hear.

14          THE COURT:  It's been a long time, he said.

15          MR. SHARGEL:  Thank you.

16          THE COURT:  If you just answer the questions Ms. Cohen

17  asks you, it will go a lot faster.

18  Q.  Do you recognize Government Exhibit 201-19 and 201-20?

19  A.  Yes, I do.

20  Q.  Do you recognize them as emails that you were copied on?

21  A.  Yes.

22  Q.  While you were at Cardiac Networks?

23  A.  Yes.

24  Q.  Are they true and accurate copies of emails that you

25  received when you were at Cardiac Network?

1   A.  Yes.

2           MS. COHEN:  The government moves Government Exhibits

3   201-19 and 20 into evidence.

4           MS. BROWN:  No objection.

5           MR. SREBNICK:  No objection.

6           THE COURT:  201-19 and 20 are received in evidence.

7           **(Government's Exhibits** 201-19 and 20 received in

8   evidence)

9           MS. COHEN:  If we can put that one up on the screen.

10  Starting with 201-19 is fine.  Actually, if you can start the

11  other way, with 201-20.  Thank you.

12  Q.  This is an email you recall being cc'd on it?  Do you see

13  here that you were cc'd on it?

14  A.  Yes.

15  Q.  Who is it between?

16  A.  Agoracom Jim and Donna Levy.

17  Q.  It also forwards on the bottom an email between Donna Levy

18  and Jim at Agoracom, is that right?  On the bottom, the second.

19  A.  Yes.

20  Q.  What is this email about?

21  A.  It talks about their ability to have, basically to recruit

22  some more health plans that we can become their provider.

23  Q.  Do you see on the bottom of Government Exhibit 201-20, if I

24  can draw your attention to the bottom, where it talks about

25  MDM?

1   A.  Right.

2   Q.  And sending you an updated PR?

3   A.  MDM, it's a mistake.  It's not a company.  Not that I know

4   of.  It's MRM.

5   Q.  Do you know if this email Government Exhibit 20 relates to

6   the press release that we just looked at, Government Exhibit

7   49H?

8   A.  I believe so.

9   Q.  If you can look now at Government Exhibit 201-19.

10  A.  OK.

11  Q.  Which is dated September 13, 2007, 20 minutes after the

12  email that was sent 201-20, talking about the re subject MRM

13  press release.

14  A.  Right.

15  Q.  Do you recall if Government Exhibit 201-19 relates to the

16  press release that was issued under 201-49H?

17  A.  Yes.

18  Q.  If you can now go back in your binder and look at 201-49J

19  in evidence.

20  A.  October 10, 2007?

21  Q.  Correct.  What is this press release about?

22  A.  That we received providership from Blue Shield of

23  California.

24  Q.  Did you write this press release?

25  A.  No.

1    Q.  If you can look, there is another quote from you, that

2    fourth paragraph right there, where it talks about, "This is

3    another great moment for Cardiac Network.  It will enable us to

4    expand our Cardiac telemetry services to an additional

5    3.2 million members."  Do you know where that number 3 --

6    A.  I have no idea.

7    Q.  Do you know where the number 3.2 million members came from?

8    A.  I have no idea.

9    Q.  If you can look at 201-49K.  What is the date on that

10   email -- I mean that press release?

11   A.  October 16, 2007.

12   Q.  What is this press release about?

13   A.  That we expanded our network capacity.

14   Q.  Did you have any involvement in writing Government Exhibit

15   201-49K?

16   A.  No.

17   Q.  What was new in Government Exhibit 201-49K from the press

18   release six days before, Government Exhibit 201-49J?

19   A.  Basically, nothing.

20   Q.  If you can look at Government Exhibit 201-49L.

21   A.  OK.

22   Q.  What is this press release about?

23   A.  That we're going to launch the heart club program.

24   Q.  What was the heart club program?

25   A.  Unlike the regular Medicare recipients and the insurance

1    recipients, we wanted to approach the public with an

2    infomercial and all kind of advertisements for people with

3    heart condition to go ahead and to purchase monitors and then

4    to pay a monthly fee for our unlimited number of scans and to

5    have a professional read it and send the results to their

6    physician or to them, whatever they decide.

7    Q.  Did Cardiac Networks, Inc. ever launch the heart club?

8    A.  No.

9    Q.  Why not?

10   A.  Number one, we never had the money to purchase the

11   monitors.  Number two, we did not have enough computers, and

12   the receiving station was not sufficient for that, it was not

13   ready for that.

14   Q.  If you can look now at Government Exhibit 201-49M.  This is

15   the last press release I'm going to show you.

16   A.  OK.

17   Q.  What is this press release about?

18   A.  November 6, 2007.  I have no idea.  I don't know who

19   HealthCare Options, Inc. is.

20   Q.  If you could look at Government Exhibit 201-24.  If you

21   flip through, you should find it.

22   A.  OK.

23   Q.  Without telling us what it says, do you recognize this

24   document?

25   A.  Yes.

D37rlev4                    Helfer - direct

1    Q.  What do you recognize it as?  Is it an email from Donna

2    Levy to you?

3    A.  Correct.

4    Q.  And another individual Charles Payne?

5    A.  Yes.

6    Q.  Is it a true and accurate copy of an email you received?

7    A.  I believe so, yes.

8          MS. COHEN:  Your Honor, the government moves

9    Government Exhibit 201-24 into evidence.

10          MR. SHARGEL:  No objection.

11          THE COURT:  201-24 is in evidence.

12          (Government's Exhibit 201-24 received in evidence)

13    Q.  Who is Charles Payne?

14    A.  He is a business analyst for Fox Network.

15    Q.  What is this email about?

16    A.  Basically, Donna and David and Fotis wrote a full-page ad

17    in USA Today.

18    Q.  About what?

19    A.  About the potential that Cardiac Network has.

20    Q.  I'm going to show you what's been marked for identification

21    as Government Exhibit 201-51.  I have a copy if you can't find

22    it.  Do you recognize it?  Then tell us what it is.

23          MR. SHARGEL:  What number is it?

24          MS. COHEN:  201-51.

25    A.  Basically, this is --

D37rlev4                    Helfer - direct

1   Q.  Wait.

2           MS. COHEN:  I apologize, your Honor.  May I have a

3   moment?

4           (Pause)

5           THE COURT:  What is the problem, Ms. Cohen?

6           MR. SREBNICK:  Rule 16 issue, Judge.

7           THE COURT:  Can you go on to something else, Ms.

8   Cohen?

9           MR. SHARGEL:  I'll move on to another subject.  We'll

10  handle that later.

11  Q.  Other than the press releases you just looked at, what type

12  of other promotional materials were put out for Cardiac Network

13  during the time you were CEO?

14  A.  Brochures.

15  Q.  Do you recall if there were any videos or other

16  advertisements?

17  A.  Yes.  It was a website with a video.

18  Q.  What was your role in the video on the website?

19  A.  I did not appear.  Dr. Eli Gang was there and Dwight West

20  was there and a few technicians.

21  Q.  What was the purpose of the video?

22  A.  It was supposed to be informative to the public.  It was

23  supposed to be informative to potential investors.

24  Q.  Where was the video supposed to go?

25  A.  On the Web.

D37rlev4                    Helfer - direct

1    Q.  On what web?

2    A.  On the Cardiac Network.

3    Q.  Cardiac Network's website?

4    A.  Yes.

5    Q.  Were you aware of any other promotional materials put out

6    by Cardiac Networks while you were CEO?

7    A.  No.

8    Q.  I'm going to ask you to look at Government Exhibit marked

9    for identification 201-11.

10   A.  OK.

11   Q.  Do you recognize that document?

12   A.  No.

13   Q.  Do you recognize up top there is an email forwarding it?

14   A.  Yes.

15   Q.  Do you recognize that as your email address?

16   A.  Correct.

17   Q.  Do you recall getting this email from Donna Levy to you?

18   A.  I guess I did.

19   Q.  Do you recall if this is a true and correct copy of the

20   email you got?

21   A.  I guess I did.

22          MS. COHEN:  Your Honor, the government moves

23   Government Exhibit 201-11, which has a Bates number on it.

24          MR. SREBNICK:  No objection.

25          THE COURT:  201-11 is received in evidence.

D37rlev4                         Helfer - direct

1          (Government's Exhibit 201-11 received in evidence)

2    Q.  Do you see on the top it's an email from Donna Levy to you

3    dated July 23, 2007, re FYI?

4    A.  Yes.

5    Q.  It says, "Is the numbers that he did wrong?  You add it up

6    and see if it is OK.  He talked about this with you, remember."

7    Who is the "he" being talked about there, do you know?

8    A.  No.

9    Q.  Do you recall what the text below is about?

10   A.  It talks about fantastic numbers that I will never agree

11   to, 592 million.

12   Q.  That number right there.  What do you mean you would never

13   agree to it?

14   A.  I would never agree to advertise a number such as this.

15   Q.  Why not?

16   A.  Because I don't believe in it.

17   Q.  What do you mean you don't believe in it?

18   A.  I don't think that it's achievable, 592.  It's a nice

19   number.

20   Q.  Was it an accurate number?

21   A.  Not at all.

22   Q.  Do you know what the text was being used for?

23   A.  I believe, if I'm not mistaken, that it was talking about

24   the heart club.

25   Q.  Do you know where this text was going to go?  Was it going

1    to go into a press release or something else?  Any knowledge

2    about that?

3    A.  No.

4    Q.  I'm going to show you Government Exhibit 101-09, which is

5    in evidence.

6    A.  101-09?

7    Q.  Correct.

8    A.  OK.

9    Q.  Do you recognize Government Exhibit 101-09?

10   A.  No.

11   Q.  Do you see there is a person on the bottom there, if we

12   could move it up a little bit, Jarret?

13   A.  Wollstein?

14   Q.  Yes.  Do you recognize that name?

15   A.  Yes.

16   Q.  How do you recognize that name?

17   A.  He came to my office and he was supposed to promote the

18   heart club.

19   Q.  Who introduced you to Jarret Wollstein?

20   A.  Donna Levy.

21   Q.  Other than discussing the heart club with him, what other

22   discussions did you have with him?

23   A.  None.

24   Q.  Did you ever discuss with Jarret Wollstein the content here

25   or the fact of Government Exhibit 101-9?

1    A.  No.

2    Q.  You have to say yes or no for the court reporter.

3    A.  No.

4    Q.  If you can look at the last page of Government Exhibit

5    101-9, particularly the top of it.

6    A.  11, 11?

7    Q.  Yes, 11 of 11, the last page, correct?

8    A.  Yes.

9    Q.  It says funded by DML Marketing?

10   A.  Never heard this name.

11   Q.  You don't know the name DML Marketing?

12   A.  Absolutely not.

13   Q.  If I can have you look at Government Exhibit 101-10 in

14   evidence.

15   A.  OK.

16   Q.  Have you ever seen Government Exhibit 101-10?

17   A.  No.

18   Q.  Do you know anything about it?

19   A.  No.

20   Q.  What is the date of this document on the bottom?

21   A.  August 17, 2007.

22   Q.  If you can go back one to 101-9, what was the date of that

23   document?

24   A.  August 15, 2007.

25   Q.  If you can look at Government Exhibit 101-11.

1    A.  OK.

2    Q.  Have you ever seen that document before?

3    A.  No.

4    Q.  What is the date of that document?

5    A.  8/28/2007.

6    Q.  If you go to the last page of 101-10 and 101-11 -- but on

7    the screen you can put up either -- do you see that name DML

8    Marketing again, sort of in the middle?

9    A.  I don't.  I do not.

10   Q.  Are you looking at Government Exhibit 101-11?

11   A.  Yes.

12          THE COURT:  Look at the final page.

13          MS. COHEN:  I'm sorry, your Honor?

14          THE COURT:  I said look at the final page.

15   Q.  Correct.  If you look at the final page there or the page

16   before, 10 of 11, in the middle do you see the name DML

17   Marketing, sixth line down?

18   A.  Yes, I do.  It's one page before the last page.  OK.  Yes,

19   I do.

20   Q.  You don't know who DML Marketing is?

21   A.  Never heard of this name.

22   Q.  If you can look at 101-12, I think is what we were up to.

23   A.  OK.

24   Q.  The date of that document?

25   A.  September 5, 2007.

D37rlev4                    Helfer - direct

1    Q.  Have you ever seen this before?

2    A.  No.

3    Q.  Do you know anything about it?

4    A.  No.

5    Q.  If you look at Government Exhibit 101-12, the third

6    paragraph there in bold talks about "Buy the $3 stock of

7    Cardiac Network now before a rush of new Medicare payments send

8    it soaring"?

9    A.  Yes.

10   Q.  Do you know what that is about?

11   A.  No.

12   Q.  If you go back to Government Exhibit 101-11 and you look

13   again at the bold up top, where it says, "Buy the $2 stock of

14   Cardiac Network now before a rush of new Medicare payments send

15   it soaring."

16   A.  I see that.

17   Q.  Do you know anything about that?

18   A.  No.

19   Q.  The one before that one, dated 8/17/2007, do you see on the

20   bold, "Cardiac Network work will be making millions for

21   investors who buy their $1 stock now"?

22   A.  I see that.

23   Q.  Do you know anything about that?

24   A.  No, I don't.

25   Q.  I'd have you look, please, at what has been marked for

1    identification as Government Exhibit 201-14 in your book.

2    A.  OK.

3    Q.  Without telling us what it says, do you recognize it and

4    what is it?

5    A.  I don't.

6    Q.  Do you recognize the emails up top as being your email

7    address?

8    A.  Yes.

9    Q.  It was sent to you by Donna Levy?

10   A.  Donna Levy.

11   Q.  Do you recall getting this email from Donna Levy?

12          MS. COHEN:  Before I do that, your Honor, the

13   government moves Government Exhibit 201-14 into evidence, which

14   was produced by Cardiac.

15          MR. SREBNICK:  No objection.

16          THE COURT:  201-14 is in evidence.

17          (Government's Exhibit 201-14 received in evidence)

18   Q.  Do you recognize this document?

19   A.  I see what it says, but I will never -- there is no

20   numbers.  It's all Xs.  To me it doesn't even mean anything.

21   Q.  Do you see the subject line says "Zev, fill this in"?  Do

22   you have any recollection of whether you filled in the Xs

23   there?

24   A.  No.

25   Q.  You didn't or you have no recollection?

D37rlev4                    Helfer - direct

1    A.  I did not.

2    Q.  You did not.  If you would look back, please, as Government

3    Exhibit 101-09, which was the first $1 a share one.  101-09.

4    Do you have it?

5    A.  OK.

6          MS. COHEN:  If you can put up the third page of

7    Government Exhibit 101-9, please.

8    Q.  Look under the chart at that first paragraph there.

9    A.  OK.

10   Q.  If you could compare that to Government Exhibit 201-14,

11   please.

12         MS. COHEN:  Is there a way to do it side by side at

13   all?

14   A.  OK.

15   Q.  Does looking at that refresh your recollection if you gave

16   numbers at all?

17   A.  I never gave any numbers.

18   Q.  Do you know where the numbers came from that appear on the

19   third page of Government Exhibit 101-09?

20   A.  I have no idea.

21   Q.  When you were the CEO of Cardiac Networks, did you

22   authorize any emails to go out promoting Cardiac Networks?

23   A.  Maybe.

24   Q.  If you can look at Government Exhibit in evidence 101-13.

25   That's the one that's been redacted.  Do you see it in your

1    book there?

2    A.  OK.

3    Q.  Do you recognize this email in Government Exhibit 101-13?

4    A.  No.

5    Q.  Do you have any idea what Day Trading Coach is?

6    A.  No.

7    Q.  The date of this is August 23, 2007?

8    A.  August 24, 2007.

9    Q.  It talks about Cardiac Network and some news.  Did you ever

10   authorize this email?

11   A.  No.

12   Q.  Do you know anything about it?

13   A.  No, and I don't know the name.

14   Q.  Looking at Government Exhibit 101-14, which is in evidence,

15   do you know what Buysin.net is?

16   A.  No.

17   Q.  If you look at page 2, the first full paragraph talks about

18   Cardiac Network, right?

19   A.  Yes.

20   Q.  Did you have any involvement in this email?

21   A.  No.

22   Q.  Do you know anything about it?

23   A.  No.

24   Q.  Looking at Government Exhibit 101-15.

25   A.  OK.

D37rlev4                    Helfer - direct

1   Q.  On the second page of Government Exhibit 101-15 you will

2   see -- keep going down -- on the bottom there it's contact

3   Microcapmedia.com.  Do you see that?

4   A.  Never heard of them.

5   Q.  Go back to the first page, please, of Government Exhibit

6   10115.  Do you see in the third paragraph, where it talks about

7   Cardiac Network, what it's currently trading at, and that you

8   recently announced the launch of a new website?  It talks about

9   the website.  Do you know anything about that, about how this

10  came to be in this email?

11  A.  No.

12  Q.  Did you authorize this email to go out?

13  A.  Absolutely not.

14  Q.  Looking at Government Exhibit 101-16, if you will turn to

15  the last page -- sorry -- the second-to-last page, do you see

16  the contact is something called Redhotpennystocks.com?  Do you

17  see that?

18  A.  Yes.

19  Q.  Do you know what Redhotpennystocks.com is?

20  A.  No.

21  Q.  Did you ever authorize Redhotpennystocks to talk about

22  Cardiac Networks?

23  A.  Never.

24  Q.  You will see where it talks about Cardiac Networks in this

25  exhibit, Government Exhibit 101-16, if you flip through it, I

1    think it is on page 3 of 7 now, under August 17.

2    A.  Just a second.

3    Q.  It's about the launch of the website.  Do you see that?

4    A.  Yes.

5    Q.  Do you know anything about this email?

6    A.  No.

7    Q.  If you can turn to Government Exhibit 101-17.

8    A.  OK.

9    Q.  On the first page here it says it's from Boonmarket.com?

10   A.  Never heard of them.

11   Q.  You see it talks about Cardiac Network below there?

12   A.  Yes.

13   Q.  Your news from August 16, 2007, again about the website, do

14   you know anything about that?

15   A.  No.

16   Q.  You don't anything about this email, Government Exhibit

17   101-17?

18   A.  No.

19   Q.  Did you authorize it to go out?

20   A.  No.

21   Q.  Looking at Government Exhibit 101-18, this is from an email

22   OTCpicks.com.  Do you know anything about OTCpicks.com?

23   A.  No.

24   Q.  Did you ever authorize any email to go out on OTCpicks.com?

25   A.  No.

D37rlev4                    Helfer - direct

1  Q.  If you look at the fifth page, it talks again about Cardiac

2  Network and it talks again about the launch of the website.

3  A.  OK.

4  Q.  You didn't authorize that on August 16, 2007?

5  A.  No.

6  Q.  Which is what the email is dated on the first page, from

7  OTCpicks.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. COHEN:

2    Q.  Looking at Government Exhibit 101-19.

3    A.  Okay.

4    Q.  This is OTCstockexchange.com, do you know what that is?

5    A.  No.

6    Q.  Do you see the date there is August 16, 2017, third

7    paragraph down, it talks about Cardiac Network.

8             Do you know anything about that, about this email?

9    A.  No.

10   Q.  You didn't authorize Government Exhibit 101-19?

11   A.  No.

12   Q.  Look at Government Exhibit 101-20.

13   A.  Okay.

14   Q.  It's in evidence.  Do you see it says bullish alerts?

15   A.  Yeah.

16   Q.  Do you know what bullish alerts.net is?

17   A.  No.

18   Q.  Do you see it says Cardiac Networks?

19   A.  Yes.

20   Q.  And it's about what you're trading and what you're doing.

21            Do you know anything about this on August 16, 2007?

22   A.  Not at all.

23   Q.  You can look at the next one, Government Exhibit 101-21.

24   A.  Okay.

25   Q.  This is from something OTCpicks.com.  Do you know what that

1   is?

2   A.  Never heard of them.

3   Q.  Do you see where it says Cardiac Network --

4   A.  Yes.

5   Q.  -- dated August 16, 2007, talks about Cardiac Network.

6           Did you authorize this?

7   A.  No.

8   Q.  Know anything about it?

9   A.  No.

10  Q.  Look at Government Exhibit 101-22.

11  A.  Okay.

12  Q.  This is again from redhotpennystock.  You don't know what

13  redhotpennystock is, do you?

14  A.  No.

15  Q.  It's August 15, 2007.  And if you go down on it, if you go

16  to the second page, talks about Cardiac Network?

17  A.  Right.

18  Q.  You don't know anything about how this information of

19  Cardiac Network got into this email?

20  A.  Never heard about this company.

21  Q.  Government Exhibit 101-23 in evidence.

22  A.  Just one second.

23  Q.  From something called twintrader.com; have you ever heard

24  of that?

25  A.  No.

1   Q.  This is August 13, 2007.  If you go to the fourth page

2   where it says Cardiac Network, quoting how much the share price

3   is up and talking about what's going on at Cardiac Network, do

4   you know anything about how this information got in this email?

5   A.  Absolutely not.

6   Q.  Do you know who these emails are sent to?

7   A.  I have no clue.

8   Q.  Look at Government Exhibit 101-26.  This one, again, from

9   OTCpicks.  Any knowledge about Government Exhibit 101-26?

10  A.  No.

11  Q.  Can you see where it talks about Cardiac Network on the --

12  A.  Yes.

13  Q.  -- second page?

14  A.  Yep.

15  Q.  And there's a quote from you on that?

16  A.  Never heard of this company.

17  Q.  This company, what are you referring to?

18  A.  OTCpicks.

19  Q.  And your quotation here, do you know anything about that

20  quotation?

21  A.  No.

22  Q.  Looking at Government Exhibit 101-27, appears to be

23  redhotpennystock?

24  A.  Okay.

25  Q.  Do you know what this is about or who puts this out,

1    anything about this?

2    A.  I have no idea.

3    Q.  Again, this talks about Cardiac Network on the fourth page

4    towards the bottom, talking about a press release you issued

5    August 9, 2007?

6    A.  I see that.

7    Q.  Looking at Government Exhibit -- I think this is the last

8    one -- Government Exhibit 101-28.  This is the last one in this

9    series.

10   A.  Okay.

11   Q.  This is again redhotpennystock.  Do you know anything about

12   this email, June 1, 2007?

13   A.  No.

14   Q.  About Cardiac Network there.  And announce shares would

15   begin trading on the OTC Pink Sheets under the trading symbol

16   CNWI?

17   A.  I see it.

18   Q.  You don't know anything about this or this email?

19   A.  No, no idea.

20        MR. SHARGEL:  Objection.  My afternoon objection to

21   leading.  That's all I can say.

22        THE COURT:  Sustained.

23        MS. COHEN:  I'm done with that series.  Thank you.

24        THE COURT:  We're going to move on to something else

25   then?

1           MS. COHEN:  Yes, your Honor.

2      Q.  What discussions did you have with Donna Levy about

3      promoting Cardiac Network on any websites or through any

4      emails?

5      A.  We had a lot of conversation, but basically I had not too

6      much input.

7      Q.  All the documents we just looked at, that 101 series

8      through 101-28, what discussions did you have with Donna Levy

9      about those?

10     A.  None.

11     Q.  What discussions did you have with David Levy about them?

12     A.  None.

13     Q.  There was a time at Cardiac Network when the stock first

14     became public.  Do you recall what it traded at, what the share

15     price was?

16     A.  It started very low.  I don't recall.  I think in the

17     pennies.

18     Q.  And do you recall if the stock price went up at some time?

19     A.  It went up all the way to $3.40, 45 cents.

20     Q.  What happened to the stock price after it went up to $3 --

21     A.  Started to drop.

22     Q.  What conversations did you have with David Levy when the

23     stock price began to drop?

24     A.  People don't buy, he said to me.  People -- something like

25     that.

D37LLEV5                         Helfer - direct

1   Q.  What did you ask him -- tell me about the conversation

2   between you and David Levy when the stock price began to drop

3   from the $3.40 or so price.

4           MR. SHARGEL:  Objection.  Asked and answered.

5           THE COURT:  Overruled.

6   Q.  Please tell the jury about the conversation with David Levy

7   that you had with him when the stock price began to drop from

8   its high of $3 and about 40 cents?

9   A.  Well, first of all, we discovered that not all the stock is

10  restricted.  We were under the impression or at least I was

11  under the impression that a hundred percent of the stock is

12  restricted.  And we discovered that the stock was not, our part

13  was restricted, but David Levy's stock and Fotis Georgiadis's

14  stock was not restricted.  That was a discovery and basically

15  when I asked why the stock is, you know, stop going up or

16  starting to go down actually, you know, people don't buy.  We

17  cannot promote.  It was some kind of argument between David and

18  Donna and Fotis.

19  Q.  I don't mean to interrupt, your Honor.

20          What did David Levy say to you when you asked him why

21  is the stock going down?

22          MR. SHARGEL:  Asked and answered twice, your Honor.

23          THE COURT:  Overruled.  Go ahead and answer.

24  A.  We don't have enough promotion material.

25  Q.  And when did you learn that the stock was not being -- was

1   unrestricted that David Levy and Fotis held?

2   A.   More or less at the same time.

3   Q.   How did you learn that -- withdrawn, your Honor.

4        How did you learn that the stock that David Levy --

5   A.   I started --

6   Q.   Fotis held --

7        THE COURT:  Excuse me.

8        She's going to ask a question.  You have to wait until

9   she finishes asking the question, then you can answer.

10       Start again.

11       MS. COHEN:  Thank you, your Honor.

12  Q.   When did you learn -- withdrawn, your Honor.

13       Why did you believe that the stock that David Levy and

14  Fotis held in Cardiac Network was restricted stock?

15  A.   Because we were told that it was restricted, a hundred

16  percent of the shares were restricted.

17  Q.   Who told you that?

18  A.   David Levy and Fotis.

19  Q.   And when did you learn that the stock that David Levy and

20  Fotis held was not restricted stock?

21  A.   Towards the end of 2007.

22  Q.   How did you learn that?

23  A.   We started to see -- I started to receive from the transfer

24  agent all kind of paperwork that testifies that part of their

25  stock is being sold as well.

1    Q.  And what were your conversations with David Levy, to the

2    extent you haven't already told us about them, about David Levy

3    selling the stock?

4    A.  We basically were in a situation that we were promised from

5    them to get more money, and we couldn't make too much out of it

6    because we were waiting for this 5 million, 10 million.  Fotis

7    even said 20 million to come, and those moneys didn't come.  We

8    were afraid that they won't come.  So we didn't created an

9    issue when we found out that their stock is not restricted.

10   Q.  When did David Levy or Fotis promise you that Cardiac

11   Network would get millions of dollars in funding?

12   A.  From the beginning.

13   Q.  In the beginning how much funding -- I believe you

14   testified you got a million, that Cardiac Network got a million

15   dollars, and 200,000 in the form of a promissory?

16   A.  Correct.  And we had no reason why not to believe that the

17   rest of the money that they promised will come, but they

18   didn't.

19   Q.  Why did you have no reason to believe that the rest of the

20   money would come?

21   A.  Because they came in good faith and they put a million

22   dollars and then additional $200,000 loan.

23   Q.  And what happened, what happened -- did there come a time

24   that Cardiac Network used up the money that had it been given

25   by David Levy and Fotis, the 1.2 million?

1    A.  We asked them for the rest of the money and the money never

2    arrived.

3    Q.  What did David Levy say to you when you asked him for more

4    money?

5    A.  He said that he has a misunderstanding with Fotis.  They

6    started to argue.  Fotis didn't want to promote and we didn't

7    give them enough material to promote.  So, they're not

8    promoting.  That's why the stock is coming down.

9    Q.  What did you do after Cardiac Network was running low on

10   money?

11   A.  We started to look for different investors.

12   Q.  And what investors if any did you find?

13   A.  We found one gentleman that we checked him with an attorney

14   and he offered to programs that will give us $20 million in

15   marketing credits.  The attorneys that we hired gave -- she

16   gave the blessing and we gave him 12 million shares for that.

17   Q.  What was the name of the individual you gave 12 million

18   shares?

19   A.  Norman King.

20   Q.  What was the name of Norman King's company?

21   A.  American something.  I don't remember.

22   Q.  Did that money ever come to Cardiac Network?

23   A.  It was not money.  It was credits.

24   Q.  How would that work?

25   A.  Basically it's amounts that we can put to the bottom line

D37LLEV5                    Helfer - direct

1    of Cardiac Network to show that we are solid and we can go and

2    borrow money and show it to investors or to the banks.

3    Q.  And how many shares were issued to Norman King or his

4    company, American whatever the last name was?

5    A.  12 million.

6    Q.  12 million shares in Cardiac Networks?

7    A.  Correct.

8    Q.  What happened after you spoke with Norman King regarding

9    that deal?

10   A.  Short time after we -- when I say we, I mean Eric and

11   Dr. -- Eric Buchwald, Dr. Eli Gang, and myself agreed to it, we

12   were voted out.

13   Q.  Who voted you out?

14   A.  David Levy and Fotis, they called majority, they exercised

15   the majority, exercise and they voted us out.

16   Q.  What were your discussions with David Levy about that deal

17   with Norman King?

18   A.  It was almost no discussion whatsoever.  It was objection.

19   Q.  What did David Levy tell you about his objection to the

20   Norman King deal?

21   A.  He didn't.  I just got a phone call from Fotis saying what

22   did you do, how could you do it, and you diluting our shares.

23   And I told him you guys promised to bring more money that you

24   never delivered.

25   Q.  And, again, why were you entering into that agreement with

1   Norman King and issuing him those shares, 12 million shares?

2   A.  They found out like a week later.

3   Q.  The question was why, what was the purpose of bringing

4   Norman King?

5   A.  So we can have more tools to recruit investors to Cardiac

6   Network at the time.

7   Q.  And when is this about in time when Cardiac Network ran out

8   of money?

9   A.  The beginning of 2008.

10  Q.  How did you pay Cardiac Network's bills at that time?

11  A.  We borrowed money.

12  Q.  From who?

13  A.  $50,000 from Dr. Eli Gang and $120,000 from Eric Buchwald.

14  Q.  And you said you had been on salary, on payroll?

15  A.  Correct.

16  Q.  Did there come a time when you stopped getting paid?

17  A.  For eight months I did not pick up any payroll check.

18  Q.  Whose decision was it to stop paying you your payroll

19  check?

20  A.  Mine.

21  Q.  Why?

22  A.  I wanted to help the company to find, you know, to be able

23  to pay the payroll and to continue the day-to-day operation.

24  Q.  And when you were at Cardiac Networks, what role did you

25  have in visiting doctors?

1    A.  I did a lot of marketing.  Most of the time I was out of

2    the office.

3    Q.  And how did you travel when you were out of the office for

4    work for Cardiac Network?

5    A.  Sometimes by planes, sometimes by a car.

6    Q.  What car did you have?

7    A.  A Porsche.

8    Q.  Whose Porsche was it?

9    A.  Fotis's wife.

10   Q.  How did it come about that you were driving Fotis's wife's

11   Porsche?

12   A.  She had a new baby.  She delivered a new baby.  It was a

13   Porsche SUV and the ride was too hard, so they gave the car to

14   the company.

15   Q.  Who's they gave the car?

16   A.  Fotis and his wife.

17   Q.  And what did you do with that car that you used when you

18   drove Cardiac Networks when you were voted out of the company?

19   A.  I'm sorry?

20   Q.  What did you do with the car?

21   A.  I returned it.  I returned it to the dealership by the end,

22   by the end of the lease.

23   Q.  When you were voted out of the company?

24   A.  Correct.

25   Q.  Did you still work for the company, for Cardiac Networks?

1    A.  First of all, like two months I -- six weeks I was not

2    allowed to get back there.  And then Michael Swartzburg, the

3    guy who replaced me, called me and said I'll be in charge, his

4    term was worldwide marketing.

5    Q.  What was your understanding as to what you were supposed to

6    do as head of worldwide marketing for Cardiac Networks?

7    A.  To market the event monitors.

8    Q.  And how many shares did you hold at that time in Cardiac

9    Networks?

10   A.  33 million that were half mine and half Eric Buchwald.

11   Q.  I'm going to ask you to look at what's been marked for

12   identification Government Exhibit 201-42, which is towards the

13   end of your binder.  It's the last document.

14   A.  Okay.

15   Q.  Do you recognize this document?  Without telling us what it

16   says, what is it about?  Do you recognize this document?

17   A.  Yes.

18   Q.  What is it, Government Exhibit 201-42?

19   A.  It's a document that calls for the division of my

20   33 million shares between me and Eric.

21   Q.  Page 2, is that your signature?

22   A.  Yes.

23   Q.  Is it a true and accurate copy of your signature and the

24   agreement you shared?

25   A.  Yes.

D37LLEV5                     Helfer - direct

1    Q.  Signed?

2    A.  Yes.

3         MS. COHEN:  The government moves Government

4    Exhibit 201-42.

5         MR. SHARGEL:  No objection.

6         THE COURT:  201-42 is received in evidence.

7         (Government's Exhibit 201-42 received in evidence)

8    Q.  What is the first page of Government Exhibit 201-42?

9    A.  It's a letter that I sent to Michael -- that was the person

10   who replaced me as CEO of the company -- and I told him to

11   split the shares and...

12   Q.  You talk about, do you see the stock restructuring and

13   you're only allocating 50 percent of your shares?

14   A.  Right.

15   Q.  What are you talking about there with the stock

16   restructuring?

17   A.  One day I'm receiving a call from Michael Swartzburg, the

18   person who replaced me, and he said that all the shares in the

19   company will be reduced 50 percent across the board to

20   everybody.  And from 16 million shares I ended up with

21   8 million shares, something to this, more or less this number.

22   Q.  If you look at the second page Government Exhibit 201-42,

23   what is this document?

24   A.  That's the breakdown of the shares at the time after the

25   restriction.

1   Q.  After the restriction or after the reduction?

2   A.  After the reduction.  I'm sorry.  Thanks.

3   Q.  Did you agree to reduce your shares voluntarily?

4   A.  Yes.

5   Q.  Or something else?

6   A.  Yes.

7   Q.  What did you do after -- you said you were head of

8   worldwide marking.  How long did that last for Cardiac Network?

9   A.  Nothing.  Not even a day.  It was maybe two, three minutes.

10  I left San Francisco and I came back to Florida.

11  Q.  Did you get paid for any work you did?

12  A.  Maybe once or twice, $500.

13  Q.  And what happened to the shares you held in Cardiac Network

14  after you left working for Cardiac Network?

15  A.  I started -- we found out that the company did not allow to

16  unrestrict our shares, meaning Eric, mine, and Dr. Eli Gang and

17  probably some more.  I don't know about the rest.  And I had to

18  hire attorneys to remove the restriction of the stock.

19  Q.  And what were your conversations with David Levy?

20  A.  No, no conversation.

21  Q.  No conversations.  And were you eventually able to remove

22  the restrictions on your stock in Cardiac Networks?

23  A.  Yes, when it went down to 4 cents and then to a quarter of

24  a penny.

25  Q.  So did -- what did you do with your shares in Cardiac

D37LLEV5                    Helfer - direct

1    Network?

2    A.  I sold them.

3    Q.  How much money did you get from your sale of your 8 million

4    or so shares?

5    A.  Like all together maybe 30,000.

6    Q.  After you left Cardiac what tax problems -- withdrawn, your

7    Honor.

8            When you were with Cardiac Networks, what payroll

9    taxes were paid for the employees towards the end of your time

10   there?

11   A.  In the very end, we ran out of money and we did not pay the

12   payroll tax for like a month or two in my time.  And Michael

13   took my spot, took over, the first conversation that I had with

14   him is that there is -- that we owe money to the IRS and to the

15   state of California.  And he said I'm a CPA, don't worry about

16   it, I know what to do.

17   Q.  What tax liens do you have against you related to the

18   payroll tax that wasn't paid for Cardiac?

19   A.  $82,000.  $4,000 by the state of California and $78,000 by

20   the IRS.

21   Q.  And why do you have those tax liens against you?

22   A.  Because when you go and you apply for a tax ID number, you

23   have to give your social security number.  I was the one who

24   formed Cardiac Network Inc. and LLC at the time, and that was

25   the only social security on record for the IRS.  And they put

1    the lien on me even though I left the company already many

2    years ago, and the lien just went into effect two years ago.

3    So it was like two years later.

4              MS. COHEN:  Your Honor, a moment to confer.  I think I

5    may be almost done.

6              THE COURT:  Yes.

7              MS. COHEN:  A few more questions.

8    Q.  You talked about that reduction in shares that you signed

9    that Exhibit A?  It's still on the board there.

10   A.  Right.

11   Q.  Why did you agree to reduce your shares in Cardiac Network?

12   A.  To help the company.

13   Q.  And when you were talking when you ran out of money, and I

14   think you testified you talked to David Levy about getting more

15   money?

16   A.  Right.

17   Q.  And you didn't get any more money from David Levy for

18   Cardiac Networks, right?

19             MR. SHARGEL:  Judge, I'm going to object to this

20   leading.

21             THE COURT:  Sustained.

22   Q.  What did David Levy tell you about giving Cardiac Networks

23   more money?

24   A.  At that point he just didn't give.  We barely talked.

25   Q.  Did David Levy give you any reason why he wasn't giving you

D37LLEV5                    Helfer - direct

1   any more money?

2            MR. SHARGEL:  Objection.

3            THE COURT:  Sustained.

4   Q.  Did you have a conversation with David Levy about David

5   Levy giving more money to Cardiac Networks when the money ran

6   out?

7            MR. SHARGEL:  Objection.

8            THE COURT:  Overruled.

9   A.  Yes.

10  Q.  What did David Levy say to you?

11  A.  They all promised us -- when I say they, I mean David Levy

12  and Fotis as well -- they promised to get us 5 million,

13  10 million, 20 million, it's not going to be a problem.

14  Q.  When you talked to David Levy about getting more money into

15  the company when the money ran out, what did David Levy say to

16  you?

17  A.  That because Fotis doesn't want to promote the stock, help

18  promoting the stock.  And I really don't understand what

19  exactly it was, he cannot continue to promote.  That's why

20  there is no more money.

21  Q.  How many shares of Cardiac Network did you sell in 2007?

22  A.  None.

23  Q.  How many shares of Cardiac Network did you sell in 2008?

24  A.  None.

25  Q.  How many shares did you sell of Cardiac Network in 2009?

1    A.  All my shares.  2009, 2010, all my shares, when it reached

2    a quarter, half a cent, quarter of a cent.

3    Q.  That was after you left the company?

4    A.  Way after I left the company.  In the interim I had to hire

5    attorneys to remove the restriction.

6            MS. COHEN:  No further questions, your Honor.

7            THE COURT:  All right.  Ladies and gentlemen, we'll

8    take our afternoon recess, resume in about ten minutes.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury not present)

2        THE COURT:  You can step down.  Stretch your legs.

3        THE WITNESS:  Thank you.

4        THE COURT:  Can you step out of the courtroom, sir.

5   Thank you.

6        (Witness not present)

7        THE COURT:  Please be seated.

8        MR. SHARGEL:  Judge, I just have one logistical issue

9   and I wanted to run it by the Court and the government to see

10  if we can have their cooperation.

11       There are a number of documents that we had premarked

12  because you'll remember, this isn't a complaint, but we got the

13  Government Exhibit list rather late last week.  And we had

14  premarked exhibits that we knew that we wanted to put into

15  evidence.  So the documents have been admitted into evidence.

16  I would gladly work with the government's documents in evidence

17  except that we have a computer program that allow us to

18  actually blow up a portion that I point to and I think it's a

19  better presentation.

20       So what I'm asking is, what I'm asking is if we can

21  put in the document that has a defense exhibit sticker on it

22  but understand that it's a Government Exhibit.  We could even

23  announce the number if the government would help us with that.

24       MS. COHEN:  Your Honor, we'll help announcing what

25  Government Exhibit it is.  That's fine.

1          THE COURT:  I don't have any trouble with that.

2          MR. SHARGEL:  That was pretty easy.

3          THE COURT:  That was pretty easy.

4          MS. COHEN:  Your Honor, I apologize.  We hoped to have

5   ours on computer too but Mr. Dinet was ill today.

6          THE COURT:  How did you get yours on a computer?  You

7   have a separate computer?

8          MR. SHARGEL:  Yes.  Ms. Hays is in charge of that

9   project.

10          THE COURT:  So you're going to use your exhibits, but

11  your exhibits --

12          MR. SHARGEL:  Identical, same thing.

13          THE COURT:  -- duplicates of what is already in

14  evidence, and we'll identify that for the jury as we go along.

15          MR. SHARGEL:  Yes.

16          MS. COHEN:  I'll try to identify it as we go along.

17          MR. SHARGEL:  Yes, like the share for share agreement.

18          THE COURT:  Anything else?

19          MR. SHARGEL:  No, sir.

20          THE COURT:  Okay.  See you in a few minutes.

21          (Recess)

22          (Continued on next page)

23

24

25

D37LLEV5                    Helfer - direct

1            (Jury present)

2            THE COURT:  All right, Mr. Shargel.

3            MR. SHARGEL:  Thank you, Judge.

4    CROSS-EXAMINATION

5    BY MR. SHARGEL:

6    Q.  Mr. Helfer, my name is Jerry Shargel and I'm the lawyer for

7    David Levy.

8            We have never met, right?

9    A.  Never.

10   Q.  We have never spoken, correct?

11   A.  Correct.

12   Q.  Now, you told us at the beginning of your testimony about a

13   long history in the healthcare field, correct?

14   A.  Correct.

15   Q.  And after the gas station and the car service, you found

16   your way, as you told us this morning, into the healthcare

17   field and went from business to business.  You outlined your

18   career.  Right?

19   A.  Correct.

20   Q.  And would you agree that that sounded like a pretty

21   thorough outline, a detailed outline of where you went,

22   business after business?

23   A.  I believe so.

24   Q.  Now, there came a time, did there not, when you were in a

25   business other than the healthcare field; isn't that right?

1   A.  In a gas station maybe?

2   Q.  No, not a gas station, sir, but another business where you

3   were selling partnership interests to the public having nothing

4   whatever to do with heart monitors or health related issues?

5   A.  No.

6   Q.  Never?

7   A.  Never.

8   Q.  Did you ever hear of a company, sir, named Mile High

9   Partners LLP?

10  A.  No.

11  Q.  Well, let me show you what's been marked for

12  identification.

13          MR. SHARGEL:  With permission of the Court, may I

14  approach?

15          THE COURT:  Yes, you may.

16  Q.  A59 for identification.  I'm going to show you this.  You

17  may take a moment.

18          And I'll ask you if you recognize your signature at

19  the bottom of the page?

20  A.  It's not my signature.

21  Q.  Are you, sir, saying that's not your signature?

22  A.  Yes.

23  Q.  You've testified here this afternoon and this morning about

24  other documents that you've signed, right?

25  A.  Correct.

1   Q.  You have told us about contracts that you entered into and

2   agreements that you've reached, right?

3   A.  Correct.

4   Q.  And those agreements were often, as you testified, signed

5   by you, right?

6   A.  Correct.

7          MR. SHARGEL:  Let me see what's been marked as A2, if

8   I may just have a moment.

9          THE COURT:  Yes.

10  Q.  And, actually, while Mr. Kramer is getting that document,

11  let me show you with the Court's permission a companion

12  document, A60, for identification, and I ask you to look at

13  that.

14         Do you recognize it, sir?

15  A.  No.

16  Q.  Well, are you saying that that's not your signature or that

17  was a stamp?

18  A.  It's exactly what I'm saying.  It's not my signature.  And

19  I don't know if it's a stamp, but that's not my signature.

20  Q.  That's not your signature?

21  A.  No.

22  Q.  So you have never been associated with that company?

23  A.  No.

24  Q.  And you never asked investors to invest in a company other

25  than Cardiac, right?

D37LLEV5                    Helfer - cross

1    A.  Not only Cardiac, I had some laboratories.  But I never saw

2    this paper.

3    Q.  Let me show you what's already -- what I will mark for

4    identification as Defendant's Exhibit A2, and I ask you -- may

5    I just stay here for one moment?

6              THE COURT:  Yes, you may.

7              MR. SHARGEL:  Thank you.

8    Q.  I ask you to take a look at the signature at the bottom of

9    the page.

10             THE COURT:  On A2?

11             MR. SHARGEL:  On A2.

12   A.  This is my signature.

13   Q.  That is your signature?

14   A.  Yes.

15   Q.  That's one of the many documents that were shown as your

16   signature, yes?

17   A.  Yes.

18   Q.  You said near the end of your direct examination that you

19   had asked David Levy for additional money beyond the million

20   dollars and the $200,000 loan; do you remember that?

21   A.  Yes.

22   Q.  And you said, did you not, that Mr. Levy had promised you

23   additional moneys, right?

24   A.  Yes.

25   Q.  Moneys that would make that million dollars or the

1   $1.2 million pale by comparison, right?

2   A.  Correct.

3   Q.  You said that he had offered on occasion that he would

4   raise $10 million for you?

5   A.  I said 5 million, 10 million, and 20 million.  It was

6   between him and Fotis Georgiadis.

7   Q.  So you were relying on the fact that they were going to

8   supply 5 million or 10 million or 20 million, right?

9   A.  Correct.

10  Q.  You've entered into contracts before, have you not?

11  A.  Yes, I did.

12  Q.  And you saw the contract -- may I have A9 -- you saw the

13  share for share agreement?

14          MR. SHARGEL:  May we have that number, the government

15  number?

16          MS. COHEN:  Government Exhibit 201-34.

17          MR. SHARGEL:  And A9, can we have that up on the

18  screen.

19  Q.  Now, if you would put, first of all, A9 you recognize from

20  your direct examination.  As was pointed out you had --

21  A.  Correct.

22  Q.  -- Government Exhibit number on it, but we're going to use

23  the computer with this copy of the exhibit.

24          You recognize this exhibit, don't you?  I know it's a

25  little fuzzy, but you have that monitor right front of you.

1   A.  I have it there too.

2   Q.  And you have it there as well.

3          So you recognize the document.  The document is in

4   evidence.  Right?

5   A.  Correct.

6   Q.  And the document is one you reviewed before in preparation

7   for your testimony, right?

8   A.  Yes.

9   Q.  And you're familiar with its contents, correct?

10  A.  Yes.

11  Q.  Now, you told us, you told us, did you not, that the

12  contract, to arrive at this contract that you relied on David

13  Levy, right?

14  A.  Yes.

15  Q.  You said, for example -- you'll correct me if I'm wrong --

16  you said that you were not a very sophisticated man in the

17  world of stocks and stock related issues, right?

18  A.  You can say so.

19  Q.  You know very little about public companies, correct?

20  A.  Correct.

21         MR. SHARGEL:  Will you on page 3, Jennifer, blow up

22  the small Roman numeral 18 or eight, I'm sorry.

23  Q.  Did you represent in the contract that you were capable of

24  evaluating the merits and risks of an investment in the common

25  stock because he is a sophisticated investor by virtue of his

D37LLEV5                    Helfer - cross

1   prior investments and has experience in investments similar in

2   the nature to the common stock, including investments in

3   unlisted and unregistered securities, and has knowledge and

4   experience in financial and business matters in general; did

5   you make that representation?

6   A.   This contract was done by Laura Anthony which David Levy

7   and Fotis supplied us with.  We did not have an attorney.

8   Q.   Did you read the contract before you signed it?

9   A.   I probably did.

10  Q.   Why, do you sign contracts involving large amounts of money

11  without reading it?

12  A.   I would say no.  However, I had some partners who read it

13  as well.

14  Q.   You said you signed this contract as well, right, yes?

15  A.   I need to see it.  I believe so.

16  Q.   In signing it, if you'll look at the last page of the

17  document, page 15.

18       MR. SHARGEL:  Isn't technology wonderful?  We have it.

19  Q.   That's your signature?

20  A.   Yes.

21  Q.   And you had represented that you read this, right?

22  A.   Yes.

23  Q.   Do you remember reading -- and can we look at page 13,

24  paragraph 10.2.  Do you see this paragraph that says that this

25  is the entire agreement, this agreement together with the

D37LLEV5                     Helfer - cross

1    promissory note, including documents delivered pursuant hereto,

2    sets forth all the promises, covenants, agreements, conditions,

3    and understandings among the parties -- I don't need to read

4    the whole thing, but you've seen this in contracts before,

5    right?

6    A.  Yes, I did.

7    Q.  And that means the import, if you understand it this way --

8    I'm asking for your understanding, not mine -- your

9    understanding is that no side agreements exist, right, that

10   representation is being made?

11   A.  Well, at the moment that we signed it, you're correct.

12   Q.  At the moment you signed it you understood that the

13   agreement was that Mr. Levy and Fotis, as well, Georgiadis,

14   right, Fotis Georgiadis, that you and Fotis Georgiadis -- that

15   Mr. Levy and Fotis Georgiadis were to supply up to $1 million,

16   right?

17   A.  Yeah, but this was immediately reversed by them themselves.

18              (Continued on next page)

19

20

21

22

23

24

25

D37rlev6                    Helfer - cross

1    Q.  Well, in the time that you were at Cardiac Network, did you

2    ever see a piece of paper, a shred of paper, where David Levy

3    promised to supply 5 or 10 or $20 million to you?  Did you ever

4    see that?

5    A.  Absolutely not.

6    Q.  Did you ever say, David, why don't you give me a contract

7    or a letter or an email that says that you're going to give me

8    5 or 10 or $20 million for that business?

9    A.  Well, no.

10   Q.  Could you answer that yes or no?

11            THE COURT:  He did.  He answered it no.

12            MR. SHARGEL:  I thought he started to say something

13   else.

14   Q.  Let me show you what's been marked in evidence A5, the

15   confidential term sheet.  This confidential term sheet dated

16   February 1, 2007, set forth the terms of what money?

17   A.  A million dollars and $200,000 loan for a year.

18   Q.  That was the writing, right?

19   A.  Correct.

20   Q.  From February 1st of 2007 right up to the time that you

21   walked out of the door of Cardiac Network and never returned

22   again, there was never any writing that said that you were

23   going to get a nickel more, right?

24   A.  Right.

25   Q.  Not a nickel more?

D37rlev6                    Helfer - cross

1    A.  You're absolutely right.

2            MS. COHEN:  Your Honor, this is Government Exhibit

3    201-38.

4            THE COURT:  Thank you.

5    Q.  In connection with this term sheet, you as an

6    unsophisticated investor, unsophisticated in the way of the

7    stock market, you went over that term sheet, didn't you?

8    A.  Yes.

9    Q.  You went over it with Dr. Gang, right?

10   A.  Of course.

11   Q.  Dr. Gang was not only a business colleague, but Dr. Gang

12   was a friend of yours, right?

13   A.  Correct.

14   Q.  That's how he got associated with Cardiac Network in the

15   first place, through your friendship, right?

16   A.  You are absolutely correct.

17   Q.  He was involved in Cardiac long before you met David Levy,

18   right?

19   A.  Absolutely correct again.

20   Q.  Dr. Gang, would you describe him as sophisticated in the

21   world of stocks and investments?

22           MS. COHEN:  Objection.

23           THE COURT:  Do you want to rephrase it?

24   Q.  Did you ever discuss any of the terms and conditions of

25   that term sheet with Dr. Gang?

D37rlev6                    Helfer - cross

1    A.  I'm sure we did.

2    Q.  Did Dr. Gang give you his opinion in connection with that

3    term sheet?

4    A.  I'm sure he did.

5              MR. SHARGEL:  Do you have A6?

6    Q.  I show you a copy of what's been marked for identification

7    as Defense Exhibit A6.  I ask you if you recognize that.

8    A.  Yes, I do.

9    Q.  Do you recognize that as an email that you received from

10   Dr. Gang, right?

11   A.  You are absolutely correct.

12   Q.  That email was received by you on February 3, 2007, wasn't

13   it?

14   A.  Yes.

15   Q.  On February 3, 2007, Dr. Gang set forth issues that he had

16   with respect to the term sheet, changes that needed to be made,

17   as he said, right?

18   A.  Correct.

19             MR. SHARGEL:  I move this into evidence, your Honor.

20             THE COURT:  A6 is received in evidence.

21             (Defendant's Exhibit A6 received in evidence)

22             THE COURT:  Do you want to publish it?

23             MR. SHARGEL:  Yes.  May we have it up on the screen.

24   May we have it made readable on the screen.

25   Q.  This is during that period of time when you were

1    negotiating on the issue of whether David Levy and Fotis

2    Gerulaitis -- do I that I have that right?

3    A.  Georgiadis.

4              MR. SHARGEL:  May I refer to him on a first-name

5    basis?

6              THE COURT:  Are you on a first-name basis with him?

7              MR. SHARGEL:  When he comes here as a witness, I

8    won't.

9              MS. COHEN:  Your Honor, we have no objection.  That's

10   how we did it, too.

11             THE COURT:  All right.

12   Q.  We don't have to make this a long story.  You received this

13   from Mr. Gang, Dr. Gang, and the objections Dr. Gang had and

14   changes, as he said on the first line.  "Per our telephone

15   conversation with David Levy today, the following are changes

16   that need to be made to his term sheet."  Six changes are set

17   forth, right?

18   A.  Yes.

19   Q.  You understood the issues regarding those changes, right?

20   A.  Yes.

21   Q.  Each one of those six items you had no question about?  You

22   were able to ask David Levy, and as part of the conversation

23   that you and Dr. Gang had with David Levy, you knew full well

24   the issues involved, right?

25   A.  Of course.

D37rlev6                    Helfer - cross

1    Q.  You weren't just blindly or blithely signing documents just

2    because they were presented to you either by the lawyer Laura

3    Anthony, or David Levy for that matter?  Right?

4    A.  No.

5    Q.  You knew these issues, didn't you?

6    A.  Of course I knew.

7    Q.  You said you didn't have a lawyer but you consulted a

8    venture capitalist, you or Dr. Gang consulted a venture

9    capitalist, right?

10   A.  Like who?

11   Q.  Like the person who did the red-lining on the term sheet,

12   the confidential term sheet.  I put before you what's been

13   marked for identification as A8.  I ask you to look at that,

14   and then I'll put a question to you.

15   A.  To tell you the truth, I don't remember.

16   Q.  You don't remember receiving what?

17   A.  Seeing the document.  I saw the document later, but I don't

18   remember at the time seeing this document.

19   Q.  May I have it?

20   A.  Sure.

21       MR. SHARGEL:  This is being admitted pursuant to

22   stipulation, your Honor.  If I may have a moment to read the

23   stipulation.

24       "It is hereby stipulated and agreed" -- let me just

25   say between the parties.  Everyone knows who the parties are.

D37rlev6                    Helfer - cross

1          THE COURT:  Yes.  Tell me what stipulation number it

2    is so the record will reflect.

3          MR. SHARGEL:  I don't think we gave it a number.

4    Let's just say C1 for identification.

5          THE COURT:  All right.

6          MR. SHARGEL:  It is between and among all the lawyers,

7    the same lawyers everyone has heard about.  "If called as a

8    witness, a records custodian from Cardiac Network would testify

9    as follows:  Documents produced in government discovery with

10   the Bates numbers 41587, 41693, 49476 to 49515, 50339 to 50926,

11   51606 to 51810, 54890 to 54912, and 549076 to 549820 were

12   retrieved from the files of Cardiac Network.

13         "The documents included within this Bates number range

14   were created by a person with knowledge of, or created from

15   information transmitted by a person with knowledge of the

16   information shown, were created at or near the time the

17   information became available and were created and maintained by

18   Cardiac Network as part of its regularly conducted business

19   activity.

20         "If called as a witness," page 2, "a records custodian

21   from Bedrock Ventures would testify as follows:  Documents

22   produced in government discovery with Bates numbers 53690 to

23   54889 were retrieved from the files of Bedrock Ventures.  The

24   documents included within this Bates number range were created

25   by a person with knowledge of, or created from information

1  transmitted by a person with knowledge of, the information

2  shown; were created at or near the time the information became

3  available; and were created and maintained by Bedrock Ventures

4  as part of its regularly conducted business activity."

5      Only three more lines.

6      "It is further stipulated and agreed that Bates number

7  documents 41587 to 41693, 19476 to 49515, 50339 to 50296, 51606

8  to 51810, 54890 to 54912, and 549076 to 549820 may be received

9  as evidence at the trial, and that this stipulation may be

10  received in evidence at trial."

11      I offer as C1 the stipulation.

12      THE COURT:  C1 and the documents referred to are

13  received in evidence.

14      MS. COHEN:  Your Honor, the documents in that

15  stipulation are not being moved in evidence.  Just the

16  stipulation.

17      THE COURT:  I thought he said they were.

18      MR. SHARGEL:  No, not all of them.  That was the

19  stipulation.  And the exhibit number is the stipulation itself.

20      THE COURT:  A8 is now in evidence?  Is that that is in

21  the document range?

22      MR. SHARGEL:  Yes, A8 is now in evidence.

23      (Defendant's Exhibit C1 received in evidence)

24      MR. SHARGEL:  I would like to publish A8.  Could we

25  blow it up a little bit, please.  Let's do the top half.

D37rlev6                    Helfer - cross

1    Q.  I'm not going to read all this, because that can be done at

2    another time.  Mr. Helfer, you would agree with me that this is

3    the confidential term sheet that we have been talking about all

4    the while, right?

5    A.  Yes.

6    Q.  This is a confidential term sheet that spelled out that the

7    lender of the money here is Bedrock Ventures, right?

8    A.  Correct.

9    Q.  This spelled out all the elements of the transaction,

10   right?

11   A.  Correct.

12   Q.  If you could go to the bottom half.  I'm not going to read

13   it.  We'll read it at a later time, portions of it at a later

14   time.  The red-lining, the only thing I wanted to point out,

15   you see that the red-lining continues, right?

16   A.  Yes.

17   Q.  Then the red-lining on the next page, there is comment A12

18   on the right part of the red-lining, the corrections, if you

19   will.  A12, "'Full ratchet antidilution protection' is harsh.

20   Basically it guarantees investors the ability to keep their

21   ownership percentage in case the company raises additional

22   money."

23         This is all finance talk, right?  I want to get to the

24   last sentence.  "Sells additional shares at a lower price per

25   share than that originally paid by the investor.  This is an

1    incredibly punitive and very rarely used in my business

2    (venture capital)."  Do you see that?

3    A.  Yes.

4    Q.  You know what a venture capitalist is, right?

5    A.  Yes.

6    Q.  As you sit here now, thinking back to this term sheet which

7    you signed, do you know who that venture capitalist is?

8    A.  Yes.  It's David and Fotis.

9    Q.  In my business, venture capitalist?  In other words, is it

10   your testimony, sir, that David Levy was making these

11   corrections?

12   A.  I don't remember.

13   Q.  Do you have any recollection whatever of receiving, without

14   the details that are on this piece of paper, of receiving

15   suggestions or corrections made on your behalf as to how this

16   could be made a better document?

17   A.  I don't remember.

18   Q.  I hand up before you, on the question of your signature, A2

19   for identification.  It is not in evidence, so I'm going to put

20   it before you and ask you to look at what has been marked for

21   identification as Defense Exhibit -- I'll switch with you.

22   This is a clean copy.  I put before you A2 for identification

23   and ask if you recognize it.

24   A.  Yes, I do.

25   Q.  What do you recognize it to be?

1    A.   It was the partnership agreement.

2    Q.   The partnership agreement with whom?

3    A.   Cardiac Network LLC.

4    Q.   I'm sorry?

5    A.   Cardiac Network LLC.

6    Q.   This wasn't a partnership agreement with David Levy or

7    Fotis, was it?

8    A.   No.

9    Q.   This was a Cardiac Network contract, right, for a

10   partnership?

11   A.   Between --

12   Q.   You could read from it.  It's not in evidence yet, but I am

13   going to offer it right now.

14           MR. SHARGEL:  I offer it into evidence.

15           MS. COHEN:  No objection.

16           THE COURT:  A2 is received in evidence.

17           (Defendant's Exhibit A2 received in evidence)

18   Q.   This document or this partnership agreement was before you

19   even met David Levy yet, right?

20   A.   Correct.

21   Q.   Before you had that meeting at his house?

22   A.   You're correct.

23   Q.   So this was a partnership you entered into with yourself,

24   Mr. Buchwald, Eric Buchwald, right?  You have to answer orally.

25   A.   Yes.

D37rlev6                    Helfer - cross

1    Q.    And Mr. West, right?

2    A.    Dwight West, correct.

3    Q.    Dwight West.  Do you recall the terms and conditions of

4    this partnership agreement?

5    A.    No.

6    Q.    Do you know whether Dwight West ever made an investment in

7    the Cardiac venture?

8    A.    Sure did.

9    Q.    A significant amount of money, right?

10   A.    Sure did.

11   Q.    Before he even met Mr. Levy, correct?

12   A.    Sure did.

13   Q.    Mr. West made a capital contribution, correct?

14   A.    Correct.

15   Q.    In fact, it says all the partners should make a capital

16   contribution, correct?

17   A.    I didn't read it.  I don't remember.  You're talking about

18   6 years ago, maybe more.

19              MR. SHARGEL:  May we have page the Bates stamp number

20   549337.

21   Q.    Do you see the paragraph (i) where it says, "On the

22   effective date of this agreement and continuing thereafter,

23   each partner shall contribute capital to the partnership as

24   necessary and if applicable shall convey, transfer and assign

25   to the name of the partnership all of its right, title, and

D37rlev6                    Helfer - cross

1    interest in and to the properties, real, personal, and mixed"?

2          Capital contributions are mentioned in the first line

3    of this paragraph, right?

4    A.  Yes.

5    Q.  How much did you put into this business?

6    A.  Zero.

7    Q.  Zero?

8    A.  Zero.

9    Q.  Were you exempted from putting money into the partnership?

10   A.  I was at the time working and I did not get paid.

11   Q.  Working where and did not get paid?

12   A.  In Cardiac Network LLC.

13   Q.  But this was before you even meet Mr. Levy, right?

14   A.  It was before Mr. Levy.

15   Q.  You were working at Cardiac and you were not getting paid.

16   In other words, you didn't have any money?

17   A.  We didn't have any money.

18   Q.  Not we.  You didn't have any money, right?

19          MS. COHEN:  Objection, your Honor.

20          THE COURT:  Overruled.

21   Q.  You didn't have any money?

22   A.  OK.

23   Q.  You told us that Mr. Buchwald made a significant

24   contribution, right?

25   A.  Not to here.  Not to this company.

D37rlev6                    Helfer - cross

1    Q.  Didn't you say a few moments ago that Mr. West -- you have

2    a partnership agreement here -- that Mr. West made a

3    contribution, right?

4    A.  I did say that.

5    Q.  And Mr. Buchwald made a contribution as well?

6    A.  Absolutely not.

7    Q.  Who else made contributions here?

8    A.  Only Mr. West.

9    Q.  How much was his contribution?

10   A.  Like over $300,000.

11   Q.  Did he ever get it back?

12   A.  No.  He promised a lot more.

13   Q.  No, that was the end of the answer.  You acknowledged, read

14   and acknowledged, this contract, did you not?

15   A.  I did.

16   Q.  This is at a time in April of 2006, before you met Mr.

17   Levy, you still tell us that you are unfamiliar with stock

18   market transactions and running a public company or anything

19   like that?

20   A.  Today my knowledge is better than it used to be.

21   Q.  I'm going to ask you a question about your knowledge on

22   April 18, 2006.  Do you remember back then when you signed the

23   document?

24   A.  Yes.

25   Q.  Do you remember that part of this document, a document that

you said on the last page that you read and acknowledged all of

the document, do you remember saying that?

A.  Yes.

Q.  Do you remember the discussion in the document, or the

provisions, I should say -- there is no discussion -- the

provisions of the document what would happen if there were a

reverse merger?

A.  I don't recall.  It was 7 years ago.

Q.  I'm sorry?

A.  It was a long time ago.  I don't recall.

Q.  Well, you've been -- never mind.

          MR. SHARGEL:  Could you put on page 2, second page,

paragraph (b).

Q.  Do you see where it says the name of the partnership is

Cardiac Network LLC and the partnership's business and affairs

shall be conducted under that name?  "This agreement, however,

shall attach to and continue to be effective should a merger,

reverse merger, acquisition, plan of reorganization, public

offering" -- do you know what a public offering is?

A.  Yes.

Q.  A public offering is when you offer stock to the public to

invest in your company, right?

A.  Yes.

Q.  And a name change, because of the possibility of a reverse

merger, right?  Yes?

1    A.  Yes.

2    Q.  "And the like occur and shall become part of and adopted by

3    either of the aforementioned in its entirety."  In other words,

4    the partnership would still remain intact even if there were a

5    reverse merger and a public offering, right?

6    A.  Correct.

7    Q.  When you read those words, when you read those words on

8    April 18, 2006, you knew full well what they meant, right?

9    A.  Absolutely.

10   Q.  And you knew what promise was held by the company going

11   public, right?

12   A.  Absolutely.

13   Q.  You knew as a grown man that that involved changing the

14   structure of Cardiac Network from a private company to a public

15   in which shareholders held an interest, right?

16   A.  Correct.

17   Q.  By the way, you told me just a moment ago or told the jury,

18   more importantly, just a moment ago that Mr. Buchwald didn't

19   contribute any money?

20   A.  Not to LLC.

21   Q.  Not to LLC?

22   A.  No.

23   Q.  Let me show you what's been marked for identification as

24   3513-9.  I put this before you and direct your attention to the

25   paragraph 5.  You can read any portion you wish.  Excuse the

D37rlev6                    Helfer - cross

1   marking.  You don't have to read them.  Just read the printed

2   part to yourself.

3   A.  OK.

4   Q.  Having read that, does that -- may I?

5   A.  Sure.

6   Q.  Does that refresh your recollection that Mr. Buchwald

7   contributed $150,000?

8   A.  No.  The answer is no.

9   Q.  Mr. Buchwald didn't have any shares of the new company that

10  was formed later on, did he?

11  A.  No.

12  Q.  Because you were holding these shares, right?

13  A.  Correct.

14  Q.  You were holding these shares --

15  A.  Yes.

16  Q.  -- so the IRS -- was it the IRS? -- so the IRS couldn't get

17  money from Buchwald, right?

18  A.  No, absolutely not.

19  Q.  That wasn't why?

20  A.  No.

21  Q.  You were holding his shares, right?

22  A.  Because he asked me to.

23  Q.  He asked you to, of course -- sir, let me finish the

24  question, if I may.

25  A.  Please.

D37rlev6                    Helfer - cross

1    Q.  He asked you to hold his shares because he was trying to

2    evade payment to the IRS, correct?

3    A.  I don't know his reason.

4    Q.  But on direct examination you did know, because on direct

5    examination you, sir, testified that you were holding his

6    shares so the IRS wouldn't get it.

7    A.  The answer is no.

8    Q.  The answer is no what?  Do you remember, sir, testifying

9    this morning in front of this jury and this judge that the

10   reason that you held Buchwald's shares was to keep him from

11   being levied upon by the IRS?  In words or substance, didn't

12   you say that?

13   A.  No.

14   Q.  Do you do you know that by your oath, sir?

15   A.  That was not my words.  My words was that he had some

16   issues with the IRS and he asked me to hold his shares.  As a

17   friend for 30 years, I was willing to do that.  What was his

18   reason, it was his reason, it was not my reasons.

19   Q.  You were willing to help Mr. Buchwald commit a federal

20   crime, sir?

21              MS. COHEN:  Objection, your Honor.

22   A.  No.

23              THE COURT:  Sustained.

24   A.  No.

25              THE COURT:  Strike the answer.  The objection has been

1    sustained.

2    Q.  He told you that he had an IRS issue?  By the way, at this

3    time you didn't yet have an IRS issue yourself, did you?

4    A.  No.

5    Q.  What did you think when he asked you to hold his assets,

6    his shares of stock?  What did you think was going to happen

7    and what do you think he had in mind?  This was a friend of

8    yours for many years.

9              MS. COHEN:  Objection, your Honor.

10             THE COURT:  Sustained.

11             MR. SHARGEL:  If he knows.

12             THE COURT:  Sustained.

13   Q.  You told us on your direct testimony about this company

14   American, and then you couldn't think of the last name, right,

15   the second name?  American.  Remember the credits, the

16   advertising credits?

17   A.  Yes.

18   Q.  You know exactly what I'm talking about, right?

19   A.  Yes, Norman King.

20   Q.  Norman King?

21   A.  Correct.

22   Q.  You turned to Norman King when you couldn't get any more

23   money out of David Levy, right?

24   A.  Correct.

25   Q.  This was already in what year?  2011?

1  A.  2009.

2  Q.  2009?

3  A.  2008, 2009, I'm not sure.

4  Q.  You actually had a written contract with Norman King,

5  right?

6  A.  Correct.

7  Q.  Let me show you what's been marked for identification as

8  A51.

9        MR. SHARGEL:  May I have a moment, your Honor?

10        THE COURT:  Yes.

11  Q.  Let me put before you what's been marked as A51 for

12  identification.  I'll take these papers out of your way.

13  A.  Thanks.  OK.

14  Q.  Do you recognize it?

15  A.  Dated 6/30/08.

16  Q.  I didn't ask you to read from it.  Do you recognize the

17  document?

18  A.  Yes.

19  Q.  What do you recognize it to be?

20  A.  I'm sorry?

21  Q.  What do you recognize it to be?

22  A.  It was the American Marketing Complex, Inc. stock agreement

23  between them and Cardiac Network.

24  Q.  This was a number of years ago as well.

25        MR. SHARGEL:  First, I offer it into evidence, your

1    Honor.

2              MS. COHEN:  I just need to look at it, your Honor.

3              THE COURT:  What is the number, Mr. Shargel?

4              MR. SHARGEL:  A51.

5              THE COURT:  A51 is received in evidence.

6              (Defendant's Exhibit A51 received in evidence)

7    Q.  This is a contract between you, a contract that you got

8    involved in with Norman King, right?

9    A.  Yes, sir.

10   Q.  You didn't tell David Levy when you were doing this, right?

11   A.  We did not talk for a few months at the time.

12   Q.  You didn't tell him, right?

13   A.  Absolutely not.

14   Q.  You didn't tell Fotis, did you?

15   A.  No, absolutely not.

16   Q.  Did you tell any of the lawyers that were involved in the

17   case?  It wasn't a case yet.

18             MS. COHEN:  Objection, your Honor.

19   A.  Who were the lawyers?

20   Q.  Did you tell Laura Anthony?

21             THE COURT:  Start all over again.

22   Q.  Did you tell Laura Anthony about this?

23   A.  No.

24   Q.  Did you tell any other lawyer that you can recall?

25   A.  Yes.

D37rlev6                    Helfer - cross

1    Q.  Who was that?

2    A.  Andrea Catagna.  She was examining this agreement, and she

3    gave the blessing for it.

4    Q.  Who is this woman?

5    A.  She is an attorney.

6    Q.  Does she represent Cardiac Network?

7    A.  She was representing us because we hired her to look over

8    this contract.

9    Q.  Who is "us"?

10   A.  Cardiac Network, Eli, and Eric, and myself.

11   Q.  Who is Eric?

12   A.  Eric Buchwald.

13   Q.  Who is the Eli?  Is that gang?

14   A.  Dr. Eli Gang.

15   Q.  Dr. Eli Gang?

16   A.  Yes.

17   Q.  They were involved in this as well, right?

18   A.  Of course.

19   Q.  The terms of this agreement, you said on direct examination

20   that it was, correct me if I'm wrong, something like

21   $20 million in credits, in media credits, right?

22   A.  Correct.

23   Q.  Let me put page 8 up on the screen.

24        MR. SHARGEL:  You had the right page, page 8.

25   Q.  By the way, did anybody else sign this but you and Norman

D37rlev6                    Helfer - cross

1    King?

2    A.  No.

3    Q.  I'm sorry?

4    A.  No.  Only myself.

5    Q.  Just yourself and Norman King, right?  This says, does it

6    not, that it is 12 million shares, right, that you were giving

7    to American Marketing Complex, right?

8    A.  Correct.

9    Q.  Do you need more time to look at it?  I'm not rushing you.

10   A.  No.  I believe what you say.

11   Q.  You can see it right up on the screen.  It's in evidence

12   now.  Shares of common stock, quantity, that's the item that

13   was being sold, and it's obviously Cardiac Network, and

14   quantity 3 million shares at 65 cents each?

15          THE COURT:  12 million shares.

16          MR. SHARGEL:  12 million.  I'm sorry.  What did I say?

17          THE COURT:  3.

18   Q.  12 million shares, even better, at 65 cents each?

19   A.  That's what it says.

20   Q.  The total is $7,800,000, right?

21   A.  I assume so, yes.

22   Q.  The total, it says right there total $7,800,000, right?

23   And you were going to put that on the balance sheet of the

24   company, right?

25   A.  Correct.

1    Q.  As you said on direct examination kind of late this

2    afternoon, you said on direct examination that this would

3    enable you to show a stronger financial picture, right?

4    A.  Correct.

5    Q.  Because at this time, as you have told us, things were

6    going very badly, right?

7    A.  Correct.

8    Q.  Mr. Levy and Fotis decided they weren't giving you any more

9    money, right?

10   A.  Correct.

11   Q.  And made that clear to you, either by not answering your

12   calls or just plain refusing, right?

13   A.  Yes.

14   Q.  So now you took 12 million shares.  By the way, were they

15   your shares?

16   A.  It was the company's shares.

17   Q.  The company's shares.  You took 12 million shares.  There

18   was concern by others about diluting the shares, right?  You

19   understand what diluting means, right?

20   A.  At the time we had a majority.

21   Q.  You have 7,800,000 on your books now under the asset

22   column, right?

23   A.  Correct.

24   Q.  You said that you could show that financial picture to

25   prospective lenders, right?

D37rlev6                    Helfer - cross

1    A.  Potential investors, yes.

2    Q.  Potential investors, lenders, and banks, right?

3    A.  Correct.

4    Q.  Walking into a bank with a balance sheet that showed an

5    asset, among other assets you may have had, of almost

6    $8 million, right?

7    A.  Correct.

8    Q.  If an investor saw -- I'm sorry.  I withdraw that question.

9    What can you buy with media credits?

10   A.  It just shows a better, stronger bottom line, and we can

11   show it.  Then again, just remember we had an attorney that

12   gave us the blessing.

13   Q.  They gave you a blessing.  If you showed this to a bank,

14   you wouldn't want them to believe that you really had an asset

15   of $7,800,000, would you?

16   A.  It would be full disclosure.  Nothing will be hidden.

17   Q.  Nothing would be hidden?  How could you spend, in the

18   financial condition that you were in -- unable to meet

19   salaries, unable to buy the equipment, unable to meet

20   obligations, unable to continue the business.  This was a deal

21   that you entered into in order to help the financial picture of

22   the company, and you couldn't pay one quarter in salary out of

23   that $7,800,000, could you?  Not a quarter?

24   A.  We could not.  That's why Eli and Eric Buchwald put some

25   money, so we will be able to sustain and to go forward.

D37rlev6                    Helfer - cross

1    Q.  You can only sustain with that $7,800,000 if you were

2    making a false statement to a lender?

3    A.  No, it's not true.  We intended a full disclosure here.

4    Q.  Where, sir, is the full disclosure?  Tell me where I can

5    find the full disclosure that this was not a real asset.

6              MS. COHEN:  Objection, your Honor.

7              THE COURT:  Overruled.  You can answer.

8    A.  We intended to tell any investor the full picture.  In

9    other words, transparency was very important here, and we

10   intended to tell them exactly what's going on.  We intended to

11   tell them how we arrived to this figure.  Unfortunately, we

12   didn't have the chance to introduce this document to any

13   investor, because we were voted out right after.

14   Q.  This will be my last question on the subject, at least for

15   this afternoon.  Did you think that with full transparency

16   anyone would lend you money based on -- may I finish the

17   question? -- based on the finances of the company?

18   A.  We were desperate, and as such we were willing to do or I

19   was willing to do anything that we could in order to find an

20   investor and to rejuvenate the company.

21   Q.  Isn't it this effort to rejuvenate the company that got you

22   voted off the board of directors and out of the company when

23   Michael Swartzburg came in and claimed that this was an

24   outright fraud?

25   A.  He never claimed that.

D37rlev6                    Helfer - cross

1    Q.  He never claimed that this was an outright fraud?

2    A.  He never claimed it.  He never did.

3    Q.  You had discussions with Michael Swartzburg about this?

4    A.  About this, very little.

5    Q.  Very, very little?

6    A.  Yes.

7    Q.  Michael Swartzburg is the person that became the CEO of

8    Cardiac Network, right?

9    A.  We didn't talk much.

10   Q.  He was the one that brought you in and said that you could

11   be, I know it lasted only a short while, but you could be the

12   worldwide representative, right?

13   A.  Because he didn't have any clue what are those monitors.

14   He didn't know how the business worked.  He never been in the

15   medical field before.

16   Q.  Never been in the medical field before?

17   A.  He never been in the medical field before, and he came with

18   a lot of false representation.

19   Q.  My question is, did you discuss, as the worldwide

20   representative, did you discuss with Michael Swartzburg any of

21   the issues pertaining --

22   A.  Very little.  Very little.

23   Q.  When you say very little, could you think back to that

24   time.  Could you think back to this time and tell me if you

25   recall any conversation on this topic, any conversation that

1    you could recall on this topic.

2    A.  Basically, he said that we made a mistake.  I explained him

3    that we didn't have the money and we didn't have a choice, we

4    were pushed with our back to the wall.  And that was it.

5    Q.  Do you remember that Michael Swartzburg talked about filing

6    a lawsuit against American Marketing?  Did he ever tell you

7    that?

8    A.  No.  I remember that he said to me very clearly that those

9    shares, he doesn't recognize those shares.

10   Q.  Is it your testimony, sir, that Michael Swartzburg never

11   said to you that this was part of a conspiracy and scheme to

12   defraud Cardiac Network, that that $7,800,000 transaction was a

13   scheme to defraud the company that you were affiliated with?

14   A.  He never said it.

15   Q.  He never said that?

16   A.  Never.

17   Q.  You understand that Michael Swartzburg is going to be a

18   witness here, right?

19   A.  Please.

20   Q.  My question to you, sir --

21   A.  The answer is yes.

22   Q.  You know as you sit here ---

23   A.  No, I don't know.  You just told me.

24   Q.  Were you aware of the fact or during any conversation with

25   Michael Swartzburg, did he tell you that you were acting in

1  collusion with Norman King to pump up the stock of Cardiac in a

2  scheme to defraud?  Did he tell you that?

3  A.  No.

4  Q.  Did he tell you that Cardiac at the time that you entered

5  into this transaction had less than $100,000 in cash and less

6  than $500,000 in total assets and that the $7.8 million was

7  ridiculous?

8  A.  Never even once he brought those figures.

9  Q.  And never once did he say to you that that investment you

10 made was nothing more than a fraud because it was worthless?

11 A.  He never said it.

12        MR. SHARGEL:  May I have one moment, your Honor?

13        THE COURT:  Sure.

14 Q.  I'm going to show you what's been marked for identification

15 as Defendants' Exhibit A3.  I'll take A51 away and show you A3.

16 Could you take a look at that document and tell me whether you

17 recognize it.

18 A.  OK.

19 Q.  Do you recognize it?

20 A.  Yes.

21 Q.  What do you recognize it to be?

22 A.  Business plan.

23 Q.  Who drew up this business plan?

24 A.  David, David Levy.

25 Q.  David Levy wasn't with the company at this time, was he?

1    A.  Yes, he was.

2    Q.  What is the date?

3    A.  April 11, 2007.

4    Q.  When was the share-for-share agreement signed?  April 17th,

5    correct?  Correct?

6    A.  I'm not sure.

7         MR. SHARGEL:  Do you want to get A9.

8         We agree -- stipulations are formal -- we have agreed

9    that --

10         MS. COHEN:  Government Exhibit --

11         MR. SHARGEL:  We have the date up there, April 17,

12    2007.

13         THE COURT:  That is the date of the share agreement.

14         MR. SHARGEL:  That is the date of the share agreement,

15    right.

16    Q.  Before this, there was a term sheet, but the share

17    agreement is the ultimate contract, correct?

18    A.  OK.

19    Q.  These projections were presented to David Levy, weren't

20    they?

21    A.  I don't remember.

22    Q.  Do you remember a man by the name of John Avatante?

23    A.  No.

24    Q.  If you would look at the second page of Defense Exhibit A3.

25         MR. SHARGEL:  I'm offering it now in evidence.

1          THE COURT:  Any objection?

2          MS. COHEN:  No objection, your Honor.

3          THE COURT:  A3 is in evidence.

4          (Defendant's Exhibit A3 received in evidence)

5   Q.  If you look at the second page, you see that John Avatante

6   sends this to your friend Eric Buchwald, right?

7   A.  Yes.

8   Q.  Eric Buchwald you told us is now deceased, right?

9   A.  Yes.

10  Q.  On the first page of A3 in evidence, Mr. Buchwald sends the

11  projections --

12  A.  What page?  I'm sorry.

13  Q.  Page 1, first page.  Mr. Buchwald sends the projections to

14  you.  That's your email address.  Zev at Zev1, that's one of

15  your email addresses.  There are actually two email addresses

16  for you.

17  A.  It says from Zev.  Are we talking about this page?

18  Q.  No.  We are talking about the one below it.  Email goes in

19  reverse.  This is what we are talking about.  From Eric

20  Buchwald.

21  A.  I see it.

22  Q.  To you, right?

23  A.  Yes.

24  Q.  You have two of your email addresses there, so you surely

25  got it, right?

D37rlev6                    Helfer - cross

1    A.  I'm sure I did.

2    Q.  Then what you do is you look at the top of that email on

3    page 1, you send these projections on to David Levy, correct?

4    A.  Probably, yes.

5    Q.  Probably yes?  If you look at the email --

6    A.  According to the paper, I did send it to David Levy, no

7    doubt.

8    Q.  This is your email address on the "from" line, right?

9    A.  Right.

10   Q.  On the first page of Exhibit A3, right?

11   A.  Correct.

12   Q.  The subject matter is projections, isn't it?

13   A.  Yes.

14   Q.  The addressee is David Levy at Date Palm Capital, right?

15   A.  Yes.

16   Q.  So you're sending him these projections before he ever

17   signs the share-for-share agreement, right?  Do we have that

18   now?

19   A.  Yes.

20   Q.  Let me ask you some questions about these projections.

21       MR. SHARGEL:  This is a page of those projections.

22   Q.  By the way, you sent him the projections because you wanted

23   to essentially excite his interest in this company, right?

24   A.  You're probably right, yes.

25   Q.  That's why as a businessman, you don't have to be a stock

D37rlev6                    Helfer - cross

 1    market genius, but as a businessman if you give optimistic --

 2    A.  You're right.

 3    Q.  I was going to finish the question before I was right.  You

 4    would give optimistic projections, right?  So let's look here.

 5    The revenue for 2007, the year that we are in, the revenue is

 6    0, 0, 0 total revenue 0, right?

 7    A.  Right.

 8    Q.  This is a company in very bad shape, right?

 9            THE COURT:  I believe it hasn't started yet.

10    A.  The company did not start.

11    Q.  You didn't have any big assets to invest in the company at

12    the beginning, did you?

13    A.  The company did not start.

14    Q.  It did not start?  You had nothing in 2007?

15    A.  No, nothing.

16    Q.  So we are starting from zero, right?

17    A.  Right.

18    Q.  Remember when the prosecutor was putting up numbers or news

19    releases on the screen and you said, ho, numbers, there are

20    millions of dollars, and you said that's way too high, in words

21    or substance, right?  You remember that, right?

22    A.  Yes, $592 pillion, half a billion dollars, in my book

23    592 million is a lot of money.

24    Q.  A lot of money by any analysis.  Except Mayor Bloomberg,

25    right?  You project that when the business gets started, the

1    revenues are going to go up, right?

2    A.  Correct.

3    Q.  You have in the year 2010, even though this is April of

4    2007 and you haven't even gotten started yet, and the revenues

5    for 2007 are zeros -- right?

6    A.  Yes.

7    Q.  You project total revenues in the year 2010 of $44,416,956,

8    do you see that?

9    A.  Yes.

10   Q.  Did you think, sir, that that was reasonable or was it a

11   very rosy picture?

12   A.  No, it was reasonable.

13   Q.  Now it's April of 2007.  You believed that in less than 3

14   years this was a business that was going to do $44 million a

15   year plus?

16   A.  Correct.

17   Q.  At this point Mr. Levy had either given you or agreed to

18   give you the total of $1 million plus $200,000 as a loan,

19   right?  You have to answer orally.

20   A.  Yes.

21   Q.  For which he had the option of taking payment with 9

22   percent interest or stocks, correct?

23   A.  Yes.

24   Q.  By the way, did you tell us that Dr. Gang took a salary?

25   A.  Yes.

D37rlev6                    Helfer - cross

1    Q.  How long was he on salary?

2    A.  Short time.

3    Q.  Do you remember having a meeting in Beverly Hills with Dr.

4    Gang and David Levy, having a meeting?

5    A.  We had many meetings.

6    Q.  Do you remember a meeting early on when David Levy met Dr.

7    Gang for the first time?

8    A.  I was not there the first time.

9    Q.  Do you remember any subsequent time when you were there at

10   the same time that Dr. Gang was there?

11   A.  Probably.  We met many times, so I cannot -- probably one

12   of the times Dr. Eli Gang was involved.

13   Q.  You told David Levy who Dr. Gang was, right?

14   A.  Sure.

15   Q.  You told him, just like you told the jury, that Dr. Gang

16   was a very, very prominent physician, right?

17   A.  Correct.

18   Q.  A very well known cardiologist, correct?

19   A.  Correct.

20   Q.  Probably one of the best known names in America, if not the

21   world, in cardiology, right?

22   A.  America.

23   Q.  You knew that that was something that would impress an

24   investor, right?

25   A.  It should.

1  Q.  It should.  But it did, and you knew that it would impress

2  an investor, and you told David Levy about Dr. Gang, right?

3  A.  Yes.

4  Q.  Do you remember subsequent meetings with Dr. Gang and David

5  Levy?

6  A.  Very few.

7  Q.  Do you remember David Levy, once the share for share

8  agreement was signed, getting actively involved in promoting

9  the company?  Do you remember that?

10 A.  Not that I knew of.  Very little.

11 Q.  There was a promotional film, right, video?

12 A.  Yes.

13 Q.  You used the words, I wrote them down, you used the words

14 "a supposed promotional video."  Do you remember saying that?

15 Do you remember using that word?

16 A.  No.

17 Q.  Did you have any quarrel with the video in any way?

18 A.  No.

19 Q.  Didn't David Levy tell you that he was going to pay for the

20 video?

21 A.  It's 7 years ago, 6 years ago.  I really don't recall.

22 Q.  Do you think you were recalling more on direct examination

23 than cross-examination?

24 A.  No.

25         MS. COHEN:  Objection, your Honor.

D37rlev6                    Helfer - cross

1           THE COURT:  Sustained.

2     A.  Not at all.

3     Q.  Do you remember there being a choice between whether it

4     would be a $4,000 project or a $6,000 project in the making of

5     the video?

6     A.  No.  But I remember that we paid for it, the company paid

7     for it.

8     Q.  The company paid for it?

9     A.  Yes.

10    Q.  Do you remember David Levy in an email to you saying that

11    he was going to pay for it?

12    A.  No.

13    Q.  Do you remember getting an email from him?

14    A.  I really don't remember.

15    Q.  No recollection of that?

16    A.  No.

17          MR. SHARGEL:  Judge, I have to read a stipulation.

18    Then, with the Court's permission, I'd like to spend the last

19    five minutes but with a 4 minute and 15 second video.

20          THE COURT:  Just so long as you go to 5 o'clock.

21          MR. SHARGEL:  I can do that.  I have some questions

22    after that.

23          THE COURT:  That's perfectly all right.

24          MR. SHARGEL:  This is a short stipulation with not a

25    lot of numbers.  "It is stipulated and agreed with all the

D37rlev6                    Helfer - cross

1    lawyers that Defense Exhibit A166 is a true and accurate copy

2    of a video available on the website for Cardiac Network, Inc.

3    on or about April 18, 2010."  So from 2010 it's available on

4    the website.  "It is further stipulated and agreed that Defense

5    Exhibit A166 may be received in evidence at trial and that this

6    stipulation may be received in evidence at trial as well."

7              We will identify this as C2 now in evidence.

8              THE COURT:  All right.  Received in evidence.

9              (Defendant's Exhibits A166 and C2 received in

10   evidence)

11

12             MR. SHARGEL:  May we play that?

13             THE COURT:  Yes, you may.

14             (Video shown)

15             MR. SHARGEL:  Judge, may I take advantage of the one

16   or two minutes that are left?

17             THE COURT:  Yes.

18   Q.  Let me show you what's been marked for identification as

19   A33.  I ask if you recognize that.  You can read any part you

20   want, but I'm going to point my finger to you about reading

21   this portion.  Have you had a chance to read it?

22   A.  OK.

23   Q.  May I?

24   A.  Sure.

25   Q.  Do you recognize that this is an email that was sent to you

D37rlev6                    Helfer - cross

1   on May 15, 2007?

2   A.  Yes.

3   Q.  Yes?

4   A.  Yes.

5   Q.  Now Mr. Levy is part of the business, right?

6   A.  Yes.

7   Q.  He is a major shareholder at that time, right?

8   A.  Yes.

9   Q.  One of the things that he was working on, because he had

10  been in the entertainment industry, was the production of that

11  video, right?

12  A.  He helped to --

13  Q.  And he said -- I'm sorry?

14  A.  He introduced us to those people, yes.

15  Q.  Those people from the entertainment industry said there was

16  a $4,000 project -- we'll put that aside.  Didn't Mr. Levy say

17  in this email that he would pay for it?

18  A.  Yes.

19  Q.  And you could pay him back at some later time when things

20  get going?

21  A.  No.  What he said --

22          MR. SHARGEL:  I offer it into evidence.

23          MS. COHEN:  Your Honor, if the witness could finish.

24          MR. SHARGEL:  I was watching the clock even though I

25  wasn't facing it, and I was going to read the answer to the

D37rlev6                    Helfer - cross

1    question.  That's what I wanted to do.

2            THE COURT:  I think Mr. Helfer had an answer and you

3    cut him off.

4    Q.  What is your answer?

5    A.  What's the question?

6    Q.  The question is, didn't Mr. Levy say, I will pay him,

7    meaning the producer of that video, I will pay him and the web

8    guys for the website to get things done quick and you will

9    reimburse me when the money starts to flow?  He said that to

10   you, didn't he?

11   A.  I don't recall whatever.  What I do recall is there was

12   another payment to the people who made the movie that we paid

13   directly.  I don't remember how much.

14   Q.  When did that happen?

15   A.  When they came to the office and they shot this commercial.

16           MR. SHARGEL:  May I continue tomorrow morning?

17           THE COURT:  Yes.  Ladies and gentlemen, it is the end

18   of the day.  Remember what I said.  Keep open minds, don't do

19   any research, don't talk about the case.  We'll see you

20   tomorrow morning at 10 o'clock.  Thank you very much.

21           (Jury not present)

22           THE COURT:  Before you leave, Mr. Helfer, you are on

23   cross-examination now, so please don't talk to the government

24   about your testimony.

25           THE WITNESS:  No, no.

1          THE COURT:  Thank you.  Have a nice evening.

2          (Witness not present)

3          THE COURT:  Do we have anything to take up?

4          MS. COHEN:  Not from the government, your Honor.

5          MR. SHARGEL:  Not from the defense.

6          THE COURT:  For my own purposes, how much longer do

7    you have?  I'm not trying to limit you, but what is your best

8    estimate?

9          MR. SHARGEL:  45 minutes, no more than an hour.  Maybe

10   when I get back and start working on it, I could shorten it.

11         THE COURT:  Mr. Srebnick, do you have any questions?

12         MR. SREBNICK:  I have a lot of exhibits to go through

13   with the witness.  It's going to take well over an hour to get

14   through the stack of exhibits, which I have already previewed

15   with the government.

16         THE COURT:  What are the exhibits?  Press releases?

17         MR. SREBNICK:  Press releases, email traffic.  It's

18   lengthy.

19         THE COURT:  OK.  It's like taking an Ambien.  How many

20   more witnesses?  We'll get Mr. Helfer on and off in the

21   morning.  Do you have witness for tomorrow?

22         MS. COHEN:  We do.  Considering the pace of this, we

23   now have witnesses to fill up tomorrow until 5 o'clock.

24         THE COURT:  See you tomorrow morning.

25         (Adjourned to 10:00 a.m., March 8, 2013)

1                    INDEX OF EXAMINATION

2    Examination of:                            Page

3    PETER J. MELLEY

4    Cross By Mr. Srebnick  . . . . . . . . . . . 162

5    Cross By Mr. Shargel . . . . . . . . . . . . 181

6    Redirect By Mr. Master . . . . . . . . . . . 196

7    Recross By Mr. Shargel . . . . . . . . . . . 203

8    ZEV HELFER

9    Direct By Ms. Cohen  . . . . . . . . . . . . 206

10   Cross By Mr. Shargel . . . . . . . . . . . . 319

11                   GOVERNMENT EXHIBITS

12   Exhibit No.                             Received

13    S-1, 250-1 to 250-30, 350-1 to 350-27,  . . . 241

14          and 450-1 to 450-16

15    200   . . . . . . . . . . . . . . . .210

16    201-31   . . . . . . . . . . . . . . .225

17    201-32   . . . . . . . . . . . . . . .226

18    201-38   . . . . . . . . . . . . . . .229

19    201-1   . . . . . . . . . . . . . . . .233

20    201-34   . . . . . . . . . . . . . . .234

21    201-30   . . . . . . . . . . . . . . .246

22    201-48   . . . . . . . . . . . . . . .248

23    201-35   . . . . . . . . . . . . . . .250

24    201-49A through M, except I,    . . . .265

25    201-43   . . . . . . . . . . . . . . .269

201-15    . . . . . . . . . . . . . .274

201-19 and 20    . . . . . . . . . .280

201-24    . . . . . . . . . . . . . .284

201-11    . . . . . . . . . . . . . .287

201-14    . . . . . . . . . . . . . .292

201-42    . . . . . . . . . . . . . .311

DEFENDANT EXHIBITS

Exhibit No.                                  Received

A166 and C2    . . . . . . . . . . . .363

A2    . . . . . . . . . . . . . . . .336

A3    . . . . . . . . . . . . . . . .356

A51    . . . . . . . . . . . . . . . .346

A6    . . . . . . . . . . . . . . . .329

C1    . . . . . . . . . . . . . . . .333