D38rlev1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA

4              v.                        11 Cr. 62 (PAC)

5    DONNA LEVY,
     DAVID LEVY,
6                                        Jury Trial
                   Defendants.
7    ------------------------------x

8
                                        New York, N.Y.
9                                        March 8, 2013
                                        11:00 a.m.
10
     Before:
11
             HON. PAUL A. CROTTY
12
                                        District Judge
13

14           APPEARANCES

15
     PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17   CARRIE H. COHEN
     HOWARD S. MASTER
18       Assistant United States Attorneys

19
     HOWARD M. SREBNICK
20   NOAH FOX
     ALEX ARTEAGA-GOMEZ
21       Attorneys for Defendant Donna Levy

22
     GERALD L. SHARGEL
23   ROSS M. KRAMER
     JENNIFER HAYS
24       Attorneys for Defendant David Levy

25

D38rlev1

1          (Trial resumed; jury present)

2      ZEV HELFER, resumed.

3          THE COURT:  Thank you for making it in today.  I know

4      it wasn't easy.  We won't be taking a morning break.  We will

5      go right to the luncheon recess.  You have placed your luncheon

6      orders.  We will take a short lunch and then resume this

7      afternoon a little bit earlier.

8          Mr. Helfer, I want to remind you that you are still

9      under oath.

10     CROSS-EXAMINATION

11     BY MR. SHARGEL:

12     Q.  Good morning, Mr. Helfer.

13     A.  Good morning.

14     Q.  When you were testifying on direct examination yesterday,

15     meaning when the prosecutor was asking you the questions, you

16     were asked a question about a company called HealthCare

17     Options, Inc.  Do you recall that question?

18     A.  I remember, yes.

19     Q.  Referring to Government Exhibit 201-49M --

20         MR. SHARGEL:  Is it possible to put that up on the

21     screen into moment?

22     Q.  I'm going to address your attention to the top line,

23     "Cardiac Network, Inc. expands sales reach through HealthCare

24     Options, Inc."  Do you see that?

25     A.  Yes.

D38rlev1                    Helfer - cross

1   Q.  Do you remember testifying yesterday that you had no idea

2   what this was about?

3   A.  Yes.

4   Q.  Do you recall saying yesterday that you never heard of

5   HealthCare Options, Inc.?

6   A.  Yes.

7   Q.  Sir, I direct your attention to what's been marked for

8   identification as Defense Exhibit C6.

9           MR. SHARGEL:  May I approach the witness, your Honor?

10          THE COURT:  Yes, you may.

11  Q.  I put this before you and I ask if you recognize it, sir.

12  Do you recognize it?

13  A.  Not really.

14  Q.  When you say not really, is your signature on the last

15  page?

16  A.  Yes.

17  Q.  Is it your testimony, sir, that that document with your

18  signature on the last page does not refresh your recollection

19  about that?

20  A.  No.

21  Q.  Put that aside for one moment.  Let me ask you this

22  question.  Did you control the bank account at Cardiac when you

23  were still in charge?

24  A.  Yes.

25  Q.  You were able to sign checks, right?

D38rlev1                    Helfer - cross

1    A.  Yes.

2    Q.  There was only one other person that was able to sign

3    checks, right?

4    A.  Yes.

5    Q.  That was Eric Buchwald, correct?

6    A.  Yes.

7    Q.  So only you and Eric Buchwald could sign checks, correct?

8    A.  Right.

9    Q.  Is it still your testimony as you sit there now that you

10   are not familiar with this company called HealthCare Options?

11   Is that still your testimony?

12   A.  Yes.

13   Q.  Let me show you first what's been marked for identification

14   as Exhibit BL.  I'm going to offer this other exhibit at a

15   later time.  But let me show you BL for identification.  Do you

16   recognize that document?

17   A.  Yes.

18   Q.  What do you recognize it to be?

19   A.  Signature card to the bank.

20   Q.  You're on that signature, correct?

21   A.  Correct.

22   Q.  Your signature appears on that, right?

23   A.  I answered it.

24   Q.  And Mr. Buchwald, his signature appears there as well,

25   right?

D38rlev1                    Helfer - cross

1   A.  Yes.

2   Q.  What official position did Mr. Buchwald have in the company

3   at that period of time?

4   A.  It says here secretary.

5   Q.  I'm not asking you about what it says there.  It's not in

6   evidence yet.  My question to you, sir, is, what position?  You

7   were the CEO, correct?

8   A.  Yes.

9   Q.  You actually acted as the CFO, chief financial officer, as

10  well, right?

11  A.  Yes.

12  Q.  You wore both hats, right?

13  A.  Yes.

14  Q.  You can put the exhibit down.  I'm going to ask you from

15  your memory, what was Mr. Buchwald's position?

16  A.  He was a vice president.

17  Q.  Let me show you, sir, what's been marked for identification

18  a Defense Exhibit C4.  I put Defense Exhibit C4 in front of you

19  and I ask if you recognize the documents that appear on those

20  pages.

21  A.  I do.

22  Q.  What do you recognize that to be?

23  A.  Payments to HealthCare Options.

24  Q.  By check?

25  A.  By check.

D38rlev1                    Helfer - cross

1    Q.  Who signed the check, Mr. Helfer?

2    A.  Myself.

3    Q.  I'm sorry?

4    A.  Myself.

5    Q.  You signed those checks.  Those checks are made out to

6    HealthCare Options, right?

7    A.  Correct.

8    Q.  If you take my word for it, if those are added up, those

9    would add up to more than $20,000?

10   A.  I'll take your word for it.

11          MS. COHEN:  Objection, your Honor.

12          THE COURT:  Overruled.

13   Q.  Sir, as you sit there now, do you want to look at that

14   further?  I see you continue to look.  Do you need more time to

15   look at it?

16   A.  I'm just not familiar with the name HealthCare Options.

17   Q.  But you, sir -- excuse me -- you, sir, in a company that

18   was desperate for money as you have explained, right?, you

19   wrote checks in the amount of more than $20,000 to HealthCare

20   Options.

21   A.  In 2007.

22   Q.  In 2007 you wrote checks in that exhibit --

23          MR. SHARGEL:  I offer that exhibit in evidence, your

24   Honor.

25          THE COURT:  Which one is that, Mr. Shargel?

D38rlev1                    Helfer – cross

1          MR. SHARGEL:  That is C4.

2          THE COURT:  Any objection to C4, Ms. Cohen?

3          MS. COHEN:  No, your Honor.

4          THE COURT:  C4 is in evidence.

5          (Defendant's Exhibit C4 received in evidence)

6    Q.  In 2007 you wrote more than $20,000 in checks to HealthCare

7    Options, and it's your testimony as you sit here now that you

8    have no idea what this company is?

9          MS. COHEN:  Objection, your Honor.

10         THE COURT:  Overruled.  Would you answer the question.

11   A.  I don't remember.

12         MR. SHARGEL:  I ask permission to publish the checks

13   at this time, your Honor.

14         THE COURT:  Yes.  This is C4 now, Mr. Shargel?

15         MR. SHARGEL:  C4, yes.  We are going to do this

16   quickly.  Jennifer, could you turn the pages so the jury sees

17   each page.  Take a moment with each page, please.

18   Q.  Do you see the date on that check, sir?

19         THE COURT:  Which one now?  That's the eleventh check

20   we have seen.

21   Q.  Check No. 2888.

22         THE COURT:  Do you see the date on it, Mr. Helfer?

23   A.  Yes.  March 31, 2008.

24         THE COURT:  March 31, 2008.

25         MR. SHARGEL:  That's the last one?  No.

1    Q.  Let me ask you this question, if I may.  Every month who

2    prepared the checks?  Who actually prepared the checks?

3    A.  My secretary.

4    Q.  Every month your secretary would present you with checks to

5    be signed, right?

6    A.  Correct.

7    Q.  You, as the person in charge of the company, every month,

8    month after month after month, would sign a check.  At times

9    things were very rough financially, right?  Yes?

10   A.  If you say so.

11   Q.  I don't want what I say so.  My question to you, sir, is

12   during this period of time in 2007 and 2008, you described

13   yesterday that you were having great financial difficulties,

14   correct?

15   A.  Yes.

16   Q.  There were times when you couldn't even take a salary,

17   right?

18   A.  Correct.

19   Q.  You couldn't even meet the expenses of the office, right?

20   A.  Correct.

21   Q.  You were desperate for cash, right?

22   A.  Correct.

23   Q.  You were seeking out lenders, right?

24   A.  Correct.

25   Q.  Sources of financial support, right?

1    A.   Yes.

2    Q.   Each and every month you are making out checks to

3    HealthCare Options, and your testimony, sir, is that you don't

4    have any idea what this company is?

5    A.   I don't remember.  It's six years ago.  I really honestly

6    don't remember.

7    Q.   Looking at what's been marked for identification as C6, now

8    that you had a chance to see the checks, I put the question to

9    you again, sir:  Is it not a fact that you entered into that

10   contract with HealthCare Options, Cardiac and HealthCare

11   Options?

12   A.   I don't remember.

13   Q.   But that's your signature at the last page, right?

14   A.   It is my signature.

15            MR. SHARGEL:  Your Honor with the foundation of the

16   checks, I offer it into evidence.

17            MS. COHEN:  No objection, your Honor.

18            THE COURT:  C6, Mr. Shargel?

19            MR. SHARGEL:  Yes, your Honor.

20            THE COURT:  C6 is in evidence.

21            (Defendant's Exhibit C6 received in evidence)

22            MR. SHARGEL:  May I retrieve those documents?

23            THE COURT:  Yes, you may.

24   Q.   When you were shown the exhibit 201-49M yesterday, we just

25   saw it on the screen a moment ago, that was the press release,

1    right?

2    A.  Yes.

3    Q.  When the press release that was on the screen, there it is,

4    when the press release -- that's not it.  That's the contract.

5    We need the press release, 201-49M.  I'll give you this one and

6    ask the question without the benefit of that press release?

7              THE COURT:  You're going to see it on the screen.

8              MR. SHARGEL:  We have it.

9    Q.  We had this before, when the first line said --

10             MR. SHARGEL:  Is it possible to zoom in on the San

11   Francisco, California portion?  Thanks so much.

12   Q.  "Cardiac Network expands sales reach through HealthCare

13   Options."  That's good news, right?, for the company at that

14   time, right?

15   A.  I don't remember who HealthCare Options was.

16   Q.  Didn't you say yesterday that you had no knowledge of this

17   press release?

18   A.  I'm still saying it.

19   Q.  You signed the agreement with HealthCare Options but you

20   have no knowledge of what this is about?

21   A.  It was six, seven years ago, and I really don't recall it.

22   Q.  You were asked the question yesterday, a different question

23   on a different topic, at page 289 of the record you were asked

24   about a company called DLM Marketing, right?  DML Marketing,

25   you remember that?

D38rlev1                    Helfer - cross

1   A.  Correct.

2   Q.  You remember saying yesterday that you never heard of that

3   company?

4   A.  I still say that.

5   Q.  You still say that you never heard of that company?

6   A.  No.

7   Q.  Let me show you what's been marked for identification as

8   Defense Exhibit B1.  Let me first ask you this question.  On

9   February 22, 2007, what was your role at Cardiac Network?

10  A.  I was the CEO of the company.

11  Q.  No question about that, right?

12  A.  No question about that.

13  Q.  Now let me show you what's been marked as Defense Exhibit

14  B1 for identification.  I ask you to look at it and tell me if

15  you recognize that, sir.

16  A.  I understand what it says here, but I don't recall.

17  Q.  You don't have any recollection of that?

18  A.  No.

19  Q.  Is the a check that's made out to Cardiac?

20  A.  Yes.

21  Q.  It was made out at a time, it was received at a time --

22  look at the endorsement on the back.

23  A.  February 23, 2007.

24  Q.  It's endorsed by -- we are not going to talk about the

25  content yet.  It was negotiated by Cardiac, was it?

1    A.  I don't recall.  I really don't recall.

2              MR. SHARGEL:  I offer this into evidence, your Honor.

3              MS. COHEN:  No objection, your Honor.

4              THE COURT:  B1 is in evidence.

5              (Defendant's Exhibit B1 received in evidence)

6              MR. SHARGEL:  I ask that it be published to the jury.

7    Hold on a second.

8    Q.  You see the check, right?

9    A.  I see it, yes.

10             MR. SHARGEL:  Could we focus in a little tighter on

11   the check itself.

12   Q.  DML Marketing Corp. writes a check to Cardiac Network,

13   Inc., right?

14   A.  Yes.

15   Q.  The proper title, the amount of, $3,394.67, correct?

16   A.  Yes.

17   Q.  In the legend portion of the check, the memo portion, it

18   says balance of $15,000 loan, right?

19   A.  Yes.

20   Q.  As you sit here now, did DML Marketing lend Cardiac

21   Network, Inc. $15,000?

22   A.  If you will give me the name of the owner of DML, it might

23   refresh my memory.  But the name DML does not ring a bell.

24   Q.  Let me see if I can help you.  You said that you had your

25   conversations in the main, for the most part, after you met the

D38rlev1                    Helfer - cross

1    Levys, with Donna Levy, remember that?

2    A.  When it came to press releases, yes.

3    Q.  Now I'm going to give you a name.  Donna M., Michelle,

4    Levy.

5    A.  OK.

6    Q.  Does it start to ring a bell here?

7    A.  No.

8         MR. SHARGEL:  Can you get closer.

9    Q.  Is that a clue?

10        MS. COHEN:  Objection, your Honor.

11        THE COURT:  Sustained.

12   Q.  Do you see the signature that says --

13   A.  I see the signature.

14   Q.  -- Donna M. Levy?

15   A.  I do.

16        MR. SHARGEL:  May I have a moment, your Honor?

17   Q.  After February 22, 2007, you asked Donna Levy for more

18   money, right?

19   A.  Donna, no.

20   Q.  Did you ever have a conversation about getting money from

21   Donna Levy?

22   A.  Donna Levy, no.  It was David Levy and Fotis Georgiadis.

23   Q.  Let me show you what's been marked for identification as

24   Defense Exhibit B2, B as in boy.

25        THE COURT:  Do you have a question, Mr. Shargel?

1            MR. SHARGEL:  Yes.  My understanding, as Mr. Srebnick

2   just reminded me, is that this exhibit is in evidence by the

3   stipulation.

4   Q.  In all events, procedure aside, do you recognize it?

5   A.  Yes.

6   Q.  What do you recognize it to be?

7   A.  It's a deposit and credit.  It's a ledger from the bank.

8   Q.  For what month is this?

9   A.  June 1, 2007.

10  Q.  I'm sorry?

11  A.  June 1, 2007.

12  Q.  Isn't it through June 30, 2007?

13  A.  29th.  Maybe the next page.

14           MR. SHARGEL:  May I, Judge?

15           THE COURT:  Yes.

16  Q.  If I could direct your attention.  Actually, it is in

17  evidence.  May I read it?  It says the account number and then

18  the statement period June 1, 2007 through June 30, 2007.

19           Here is my question to you, sir.  Look at a wire

20  transfer.  Well, we don't have to do that.  Let's just blow up

21  the bottom part, just blow it up.  Do you see on June 14, 2007

22  $30,000 is wired to the Cardiac account?

23  A.  Yes.

24  Q.  Do you who the originator of the wire is?

25  A.  DML.

1  Q.  DML Marketing Corp., right?

2  A.  Right.

3  Q.  The same name that appeared on the check, right?

4  A.  Right.

5  Q.  Is it your testimony even to this moment that you have no

6  idea what DML Marketing is?

7  A.  And I can explain it.

8  Q.  You will have your chance when it is redirect examination.

9  My question to you, sir, is, is it your testimony that DML

10  Marketing that wired $30,000 to you on June 14, 2007, you have

11  no knowledge?  Yes or no.

12  A.  No, I do have knowledge.  Here it is.  The money was

13  deposited or wired into the account, there is no doubt about

14  it.

15  Q.  Can you remember a single conversation about that money?

16  This is calling for a yes or no.

17  A.  No.

18  Q.  Do you remember a single conversation concerning this wire

19  transfer?

20  A.  No.

21  Q.  I'm sorry?

22  A.  No.

23  Q.  Let me show you what's been marked for identification as

24  Defense Exhibit A45.  I can take these papers away so we don't

25  have a paper clutter here.  Give me one moment.  Look at A45.

D38rlev1                    Helfer - cross

1    Have you had a chance to look at it?

2    A.  Yes.

3    Q.  What do you recognize this to be?

4    A.  The deposit highlighted?

5    Q.  Sir, you can read any part you wish.  Just tell us what it

6    is.

7    A.  A deposit and credit ledger.

8            MR. SHARGEL:  This is already in evidence, your Honor,

9    through stipulation.

10   Q.  This is $500,000?

11   A.  Correct.

12   Q.  Being deposited into Cardiac Network on August 23, 2007, do

13   you see that?

14   A.  Yes.

15   Q.  Do you remember this deposit?

16   A.  Yes.

17   Q.  This deposit was from Bedrock Ventures?

18   A.  Yes, sir.

19   Q.  That's from Mr. Georgiadis?

20   A.  Georgiadis, Fotis.

21   Q.  Fotis Georgiadis.  Now I want to show you another exhibit.

22   Let me show you what's been marked for identification as A48.

23   Actually again this is evidence.  I'm sorry that I misspoke.

24           MR. SHARGEL:  Your Honor, if I may approach.  A

25   procedural correction.  They are admissible.  The stipulation

1   is that they are admissible, so I have to actually move them in

2   evidence.  So I move Defense Exhibit A45 and I move Defense

3   Exhibit A48, both for identification, in evidence.

4              MS. COHEN:  No objection.

5              THE COURT:  A45 and A48 are received in evidence.

6              (Defendant's Exhibits A45 and A48 received in

7   evidence)

8   Q.  Now if we could zoom in on the top portion of that.  This

9   again is a reconciliation from the bank, right?

10  A.  Yes.

11  Q.  It shows money going in and money going out, right?

12  A.  Correct.

13  Q.  I'm going to address your attention to certain portions.

14  If you look at July 31, 2007, do you see that?

15  A.  Yes.

16  Q.  Eric Buchwald gets $4500, right?

17  A.  Yes.

18  Q.  I think you told us yesterday that Eric Buchwald was not on

19  salary.  Was he?

20  A.  He was in the beginning on salary for doing marketing.

21  Q.  For doing marketing?

22  A.  Yes.

23  Q.  This is after the $500,000 comes in?

24  A.  Again, I'm not sure if it was a loan return or it was a

25  part of his salary in the beginning.

1   Q.  A loan return?

2   A.  Yes.

3   Q.  What loan did you have with respect to Eric Buchwald?

4   A.  Before the new corporation put the money, David and Fotis,

5   they put some money, and we had to give it to them back.

6   Q.  Before you meet David Levy and, we had this yesterday,

7   before you meet Mr. Georgiadis, you had raised capital, right?

8   A.  From Dwight West.

9   Q.  From Dwight West and from Mr. Buchwald?

10  A.  Very little.  Very little, yes.

11  Q.  The money that Mr. Buchwald loaned to the company, was it a

12  loan or was it an investment?

13  A.  It was a loan.

14  Q.  The hundred that Eric Buchwald loaned, the company was the

15  old company, right, before David Levy comes on the scene,

16  right?

17  A.  Correct.

18  Q.  Did David Levy say that you could pay old debts with my

19  hundred?

20  A.  Of course.

21  Q.  The $4500 that Eric Buchwald took out was for a repayment

22  of a loan?

23  A.  Yes.  Again, don't hold me to it, I don't really recall.

24  Either it was a salary, but it looks like it was a loan return.

25  Q.  A salary in the round amount of $4500?

D38rlev1                    Helfer - cross

1    A.  I can't recall.  It's 2007.

2    Q.  Dwight West, what was his job?

3    A.  He did not have a job in the company.

4    Q.  On July 31, 2007, the same day that Eric Buchwald gets his

5    money --

6    A.  He got the same amount.

7    Q.  He received money in the same amount, right?

8    A.  Right.

9    Q.  Further down, on August 7, 2007, you get a check for $3965,

10   right?

11   A.  Right.

12   Q.  On the next page a company check -- by the way, speaking of

13   checks, did you ever write a check on the corporate account of

14   Cardiac Network to a California casino and the check bounced?

15   A.  Me?  No.

16   Q.  Who?  Who did that?

17   A.  I never did.

18   Q.  Do you have any knowledge -- excuse me, sir.  Do you have

19   any knowledge as you sit here now of a check, a check from

20   Cardiac Network, being drawn to a California casino that

21   bounced?

22   A.  No.

23   Q.  You don't remember any such check?

24   A.  I remember that one of the employees tried to cash his

25   check in a casino and it bounced.  That I do remember.  Who was

D38rlev1                    Helfer - cross

1   the employee, I don't recall.  But I'm not a gambling person.

2   Q.  It had nothing to do with gambling when on August 7, 2007,

3   you received $3,965 out of the corporation, right?

4   A.  Yes.  Part of my payroll.

5   Q.  Out of your payroll.  That was your net amount?

6   A.  That was the net amount.

7   Q.  The gross amount was how much?

8   A.  I don't recall.

9   Q.  You don't recall what your salary was when you were at

10  Cardiac Network?

11  A.  I don't recall the deductions, and so on.

12  Q.  The next page, if you would go to the next page.

13  A.  What number?

14  Q.  The number is A48.

15  A.  What page number?

16  Q.  It's page number 2.  You can see it right up there on the

17  screen.

18  A.  What check are you referring to?

19  Q.  I'm referring to August 17, 2007, a payment of $1,727.17 to

20  Porsche.

21  A.  Correct.

22  Q.  You told us yesterday, in response to questions put by the

23  prosecutor, about your relationship with Mr. Georgiadis and

24  that you took over payments on his wife's car, correct?

25  A.  The company did.

D38rlev1                         Helfer - cross

1    Q.   The company did?

2    A.   Correct.

3    Q.   Do you remember Mr. Georgiadis having a conversation with

4    you about Porsche and the checks that you were obligated to pay

5    through the company?

6    A.   That the company will pay the car payment.  It was very

7    clear.

8    Q.   Are you finished?

9    A.   Yes.

10   Q.   Do you remember Mr. Georgiadis saying that you ruined his

11   credit because you didn't keep up with the payments?

12   A.   Yes.  And I told him because they did not come up with the

13   money, the company didn't have the money to pay.

14   Q.   These checks are in 2007, right?

15   A.   Right.

16   Q.   All of the checks on this exhibit, right?  Do you remember

17   when the first check to Porsche bounced?  Do you remember that?

18   A.   No.

19   Q.   I think this question was put to you yesterday on direct

20   examination.  I'm still with exhibit -- it was actually the

21   next page of Exhibit A48.

22   A.   Page 3?

23   Q.   Page 3, yes, the next page.  This is at a time when, as we

24   saw from the exhibit yesterday, the company had no revenues.

25   Do you remember that?  That was in the projection sheet.  Sir,

D38rlev1                    Helfer - cross

1    before you get to that exhibit, I want to ask you some

2    preliminary questions.  Do you recall that we had an exhibit up

3    on the screen yesterday where there were projections that were

4    supplied to you by an individual and they were sent on to Mr.

5    Levy?  It was only yesterday.  Do you remember that?

6    A.  I saw so many papers yesterday.

7    Q.  Do you remember it said by 2010 the estimated income would

8    be $14 million a year?  Do you remember that?

9    A.  Yes, something like that.

10   Q.  Do you remember to the left of that entry it said that the

11   revenues for 2007 were zero, zero, zero and, as you pointed

12   out --

13   A.  Yes, I do remember.

14   Q.  Let me finish the question.  The company hadn't gotten

15   started at that point, correct?

16   A.  Correct.

17   Q.  So with no revenue in 2007, in the summer of 2007, with no

18   revenue, could we look to August 24, 2011, you draw this what

19   you say is your salary, $3,965.73.  Do you see that?

20   A.  Yes.

21   Q.  Then going further down to August 28, 2007, Eli Gang, Dr.

22   Gang, he gets $10,000, right?

23   A.  Right.

24   Q.  Dr. Gang wasn't on salary at that point, was he?

25   A.  It was agreed upon us that all the principals that did not

D38rlev1                    Helfer - cross

1   get paid on the LLC corporation will be able to draw the salary

2   that was missing or was not paid to them before.

3   Q.   Let me ask you this.  You have seen all of the contracts,

4   the term sheets, the share-for-share agreements.  Do you

5   remember those documents?  You have seen all the contracts that

6   were executed in connection with this new corporation, the

7   public corporation, right?

8   A.   Right.

9   Q.   Can you, sir, as you sit here now, point or refer us or

10  refer the jury to any portion of any contract that has the

11  provision that Dr. Gang would get $10,000 and that Mr. Buchwald

12  would get $10,000?  Do you have anything like that, sir?

13            MS. COHEN:  Objection, your Honor.

14            THE COURT:  Sustained.

15  Q.   Is there any evidence that you have -- by the way, do you

16  have any papers in your possession from 2007?

17  A.   No.

18  Q.   When you were preparing for your testimony, you were

19  reviewing documents, right?

20  A.   That was given to me by the prosecutor.

21  Q.   By the prosecutors?

22  A.   Right.

23  Q.   In other words, documents, like we do here, to refresh your

24  recollection, right?

25  A.   Correct.

D38rlev1                    Helfer - cross

1    Q.  And to see if your memory, even though it was 2007 and

2    later years, to see if your memory could be revived, things

3    that you forgot you may remember if you see something that jars

4    your memory, you understand that, right?

5    A.  Absolutely.

6    Q.  During the trial preparation, and there is nothing wrong

7    with pretrial preparation, but during the trial preparation you

8    had a chance, as the prosecutors were questioning you, to look

9    at documents, right?

10   A.  Correct.

11   Q.  Do you remember seeing as you prepared for your court

12   appearance, this court appearance now, do you remember seeing

13   on any of those occasions that you were being prepared by the

14   prosecutor a document that provided for money to Dr. Gang and

15   Eric Buchwald?

16   A.  Number one, the oral agreement --

17   Q.  Yes or no.  That's a question that calls for --

18            MS. COHEN:  Objection, your Honor.

19            THE COURT:  You can't argue with the witness.

20            MR. SHARGEL:  I'm not arguing.

21            THE COURT:  It calls for a yes-or-no answer, Mr.

22   Helfer.  Answer the question yes or no.

23            THE WITNESS:  What is the question?

24            THE COURT:  Do you recall seeing anything that

25   suggests that Dr. Gang should get $10,000.

D38rlev1                    Helfer - cross

1    A.  No.

2    Q.  What about Eric Buchwald?

3    A.  No.

4    Q.  You testified on direct examination -- by the way, do you

5    remember an individual by the name of Frank Liu?

6    A.  I think it was a friend of David Levy from referring to the

7    same person.

8    Q.  A friend of David Levy who invested $350,000 in Cardiac

9    Network?

10   A.  I don't know the amount.  I know that he bought some

11   shares, but I don't know the amount.

12   Q.  You don't remember the amount?

13   A.  I don't remember the amount.

14   Q.  It was a substantial amount of money, wasn't it?

15   A.  I assume so, yes.  We went to visit him in LA.

16   Q.  That was more money that David Levy brought into the

17   company through a friend, correct?

18   A.  Not to the company.

19   Q.  Let me show you what's been marked for identification only

20   as 3516-6.  You are free to look at any other part, but I

21   direct your attention to paragraph 5.

22   A.  OK.

23   Q.  May I have it for a moment.  Do you remember having

24   meetings with Agent Reinhardt over here?  You recognize him,

25   right?

1    A.   Sure.

2    Q.   He was at some of those meetings taking notes?  You saw him

3    taking notes, correct?

4    A.   Sure.

5    Q.   Having read this document, does it refresh your

6    recollection that Frank Liu, L-I-U, invested $350,000 in

7    Cardiac Network?  Does that refresh your recollection?

8    A.   Yes.

9    Q.   In fact you told Agent Reinhardt, he didn't tell you, that

10   this -- let me finish the question -- that this $350,000

11   investment in Cardiac Network had been made by Frank Liu,

12   right?

13   A.   The way I said it was he did put a substantial amount of

14   money, and I think it was 350.  You just mentioned a different

15   amount.

16   Q.   You think it was $350,000, right?

17   A.   At the time I thought so, yes.

18   Q.   You said yesterday that you were not really familiar with

19   the workings of a public company, correct?

20   A.   Correct.

21   Q.   But you would write back and forth with the transfer agent

22   and give the transfer agent directions, right?

23   A.   No.

24   Q.   You never did that?

25   A.   When I was asked by David Levy or by Fotis Georgiadis to

D38rlev1                    Helfer - cross

1   send some paperwork to Amy from the transfer agent, I did so.

2   Q.  In other words, you were just following their directions,

3   right?

4   A.  Correct.

5   Q.  There was never a situation where you would do that on your

6   own, correct?

7   A.  It was one time that I wanted -- I cannot say one time, but

8   at least one time that I can recall that I wanted her to

9   unrestrict my -- our shares.

10  Q.  You wanted to get your shares unrestricted, which would

11  enable you to sell, right?

12  A.  Correct.

13  Q.  You knew that David Levy -- I think you said this yesterday

14  but I want to make sure.  You knew that David Levy had

15  unrestricted shares of Cardiac stock, right?

16  A.  Never knew it.

17  Q.  You never knew it?

18  A.  We found out later, towards 2008.

19  Q.  That's the first time that you --

20  A.  Correct.

21  Q.  -- knew it.  Do you remember meeting with representatives

22  from FINRA, or actually NASD back in August of 2007?

23  A.  I remember a phonecall, but I didn't know exactly who it

24  is.

25  Q.  Do you remember having a conversation with someone from

1   NASD?

2   A.  I vaguely remember being questioned by somebody.

3   Q.  I'm sorry.  Did you finish your answer?

4   A.  By somebody, yes.  I don't recall the name.

5   Q.  Someone from an enforcement authority, right?

6   A.  It sounded like it, yes.

7   Q.  You were asked questions and gave answers, right?

8   A.  Correct.

9   Q.  Then there came a time when you said you wanted to have

10  your lawyer present?

11          MS. COHEN:  Objection, your Honor.

12          THE COURT:  Sustained.

13  Q.  Do you remember asking that Laura Anthony, who yesterday

14  you described as Mr. Levy's lawyer, do you remember that Laura

15  Anthony was on the telephone conversation the next day?

16          MS. COHEN:  Objection, your Honor.

17          THE COURT:  Overruled.

18  A.  I remember talking to her after this phonecall, yes.

19  Q.  I'm asking you whether you recall a phonecall where not

20  only Laura Anthony was on the phone as your lawyer but the

21  conversation with the men from NASD was part of a conference

22  call and you were on.  You don't remember that?

23  A.  It never happened.

24  Q.  Never happened?

25  A.  It never happened.

1   Q.  Let me show you what's been marked as Defense Exhibit A168

2   for identification.  If you read the first couple of paragraphs

3   to yourself, I'll put a question.

4   A.  OK.

5   Q.  Having read that, does that refresh your recollection that

6   you had a conversation about Cardiac Networks with

7   representatives from NASD when your lawyer was on the phone as

8   well?

9   A.  No.

10  Q.  You don't recall that at all?

11  A.  No, I don't.

12  Q.  Do you recall Laura Anthony telling anyone in your presence

13  that there were 44 million 300 -- you have the paper.  May I

14  have it a moment -- 4,318,000 shares of Cardiac Network

15  belonged to Mr. Levy and they were free trading Date Palm

16  Capital, his company, and that they were freely tradeable

17  shares of Cardiac Network?

18  A.  This is more or less when we found out that their shares

19  were not restricted.  It was towards the end of 2007.  However,

20  the agreement that we signed in the beginning, our

21  understanding was that a hundred percent of the shares were

22  restricted.

23  Q.  Was it an agreement or was it the papers that you signed?

24  A.  It was an agreement.

25  Q.  Outside the papers that you signed?

1    A.  Yes, it was an agreement.  We were assured that a hundred

2    percent of the shares will be restricted.

3    Q.  Was that an agreement or was this in writing?

4    A.  I don't recall.

5    Q.  You don't recall that?

6    A.  No.

7    Q.  Do you remember a Dr. Reinberg?  Does that sound familiar

8    to you?

9    A.  Dr. Reinberg?

10   Q.  Reinberg, yes.

11   A.  Which one?

12   Q.  Marvin Reinberg.

13   A.  Yes, I do.

14   Q.  Do you remember that he made a contribution also, an

15   investment?

16   A.  No.

17   Q.  You don't remember that a doctor investing $300,000?

18   A.  No.

19            MR. SHARGEL:  May we have Government Exhibit 250-16.

20   I believe this is in evidence.  I don't think I have to move

21   this, is that correct, Ms. Cohen?

22            MS. COHEN:  That's correct.

23            MR. SHARGEL:  Thank you.  250.16.

24            THE COURT:  What is that, Mr. Shargel?

25            MR. SHARGEL:  What is it?

D38rlev1                    Helfer - cross

1          THE COURT:  Yes, what is it?

2          MR. SHARGEL:  It is an exhibit.

3          THE COURT:  It's in evidence.  Tell me what it is.  Is

4     it the share-for-share agreement?

5          MR. SHARGEL:  No, it is not the share-for-share

6     agreement.  This is something new, your Honor.

7          THE COURT:  OK, I'll wait.

8     Q.  This is a letter from a law firm.  250-16.  The Bates stamp

9     number is very, very small, but it's 3945 at the bottom right,

10    four pages in.  Again, this is in evidence.  I just wanted to

11    read a couple of portions.  We could read the whole thing at a

12    later time.  "Please be advised that Cardiac has placed" --

13    this is, by the way, written to you, right?  Is that your

14    address?  I'm not going to try to pronounce that, but is that

15    your address in Boca Raton?

16    A.  Yes.

17    Q.  Do you remember receiving this letter?

18    A.  No.

19    Q.  This is in 2009.  This is now July 7, 2009.  Is that too

20    far back for you to remember?

21         THE COURT:  The objection is sustained.

22    Q.  Let me ask you if you remember this.  This is in evidence.

23    "Please be advised that Cardiac has placed an administrative

24    hold on the 33 million shares with the company's transfer

25    agent, preventing their further transfer.  Please also be

D38rlev1                    Helfer - cross

1   reminded that you filed a sworn affidavit, swearing that the

2   shares that you are now trying to deposit into a brokerage

3   account were lost or stolen."

4           Do you remember receiving such a letter?

5   A.  I never seen this letter in my life.

6   Q.  Are you familiar with this Labertew & Associates law firm?

7   A.  Never seen this name.  And there is something else.  It

8   says Michelle.  That used to be my secretary.  She was not

9   there in 2009.

10  Q.  She wasn't there in 2009?

11  A.  No.  She left at the end of 2007, the beginning of 2008.

12  Q.  Where are you getting the name?

13  A.  Where it says on the top, the email, "Michelle@."

14  Q.  No, I respectfully suggest that says "Michael."

15  A.  OK.  I didn't see it.

16  Q.  You have the monitor in front of you?

17          THE COURT:  It's not on his monitor.  It's not on my

18  monitor.

19  A.  It is here, but I didn't see it.

20  Q.  Hold on.  You could read that one.  Sir, does that refresh

21  your recollection that you --

22  A.  I never seen this letter in my life.

23          MR. SHARGEL:  Could I have 94A, please.

24  Q.  You were asked about conversations that you had with

25  Michael Swartzburg.  Do you remember that?

D38rlev1                    Helfer - cross

1    A.  Yes.

2    Q.  There came a time that you were writing to Amy at Standard

3    Registrar and Transfer, the transfer agent, right?  Do you

4    remember that?

5    A.  Yes.

6    Q.  I'd asked you questions earlier about whether you gave her

7    directions, right?

8    A.  Yes.

9    Q.  You said that was largely at the suggestion of Mr.

10   Georgiadis and Mr. Levy, right?

11   A.  Correct.

12   Q.  Do you remember writing a letter to Amy at Standard

13   Registrar and Transfer in February of 2010, just two years or

14   so ago, three years?

15   A.  Can you read it to me?

16          MR. SHARGEL:  No.  I offer it into evidence.  Well, I

17   first have to get a little more foundation.

18   Q.  Do you recognize what has been marked for identification as

19   A94?

20   A.  Yes, I remember it very clearly.

21   Q.  You remember very clearly that you wrote a letter to -- may

22   I have it?

23   A.  Sure.

24   Q.  Your signature is on the letter?

25   A.  Yes.

D38rlev1                    Helfer - cross

1   Q.  You remember this event?

2   A.  Yes.

3              MR. SHARGEL:  I offer A94 in evidence.

4              MS. COHEN:  Your Honor, I'm waiting to see a copy.

5              THE COURT:  A94 is received in evidence.

6              (Defendant's Exhibit A94 received in evidence)

7              THE COURT:  Go ahead.

8              MR. SHARGEL:  If you could blow that up a little bit.

9   Q.  You're writing now on February 11th, or it was received on

10  February 11th in all events, and asked this woman Amy to please

11  find attachment 1682 for 13,975,000 shares of the common stock

12  of Cardiac Network.  By the way, before we get to the next

13  sentence, where were you in February 2010?  Are you still the

14  worldwide sales representative for the company?

15  A.  No.

16  Q.  You are completely out of the company, right?

17  A.  Completely out of the company.

18  Q.  Your signature is on the bottom.  You go on to say, "Kindly

19  transfer 6,987,500 of these shares to Eric Buchwald, who

20  resides in Boynton Beach, Florida," correct?

21  A.  Right.

22  Q.  Then you say, "Please also prepare a new certificate in my

23  name for the balance of" the same amount of shares, 6,987,000,

24  right?

25  A.  Correct.

1    Q.  Do you remember, sir, needing to fill out a questionnaire

2    for the transfer that you just asked for in that letter?

3    A.  I don't remember the exact piece of paper, but I believe I

4    did.

5    Q.  Let me show you what's been marked for identification as

6    A94A.  I ask you if you recognize that.

7    A.  I don't recognize it.

8    Q.  Your name is on it, isn't it?

9    A.  Yes, but it's not my handwriting.

10   Q.  Is it Eric Buchwald's handwriting?

11   A.  No.  I don't know.

12   Q.  Eric Buchwald you described on direct examination as your

13   very close friend, right?

14   A.  Right.

15   Q.  Are you able, sir, to recognize -- how many years were you

16   friends?

17   A.  Many years.

18   Q.  When you say many, give us an idea.  Decades?

19   A.  30 years.

20   Q.  That's decades.  So for decades you knew Mr. Buchwald.

21   Have you seen documents that Mr. Buchwald signed?

22   A.  Yes, but very few, very little.

23   Q.  Have you seen letters, correspondence that you may have had

24   with Mr. Buchwald over the 30 years?

25   A.  On the Internet.

D38rlev1                    Helfer - cross

1    Q.  So you don't recognize his handwriting?

2    A.  No, I don't.

3    Q.  Let me show you what's been marked for identification as

4    94B, A94B, as in boy.  I ask you if you recognize that

5    document.

6    A.  I see the document, but I don't recognize the handwriting.

7    It's not mine.

8    Q.  So I won't offer it.  Let me ask you a question.  You were

9    asked questions yesterday about Mr. Swartzburg, who replaced

10   you as the CEO and the president.  By whatever title, he was

11   the man in charge after you, right?

12   A.  Yes.

13   Q.  Do you remember that Mr. Swartzburg wrote a letter to --

14   withdrawn.  We are not going to talk about the letter.  Do you

15   remember having any conversations with Mr. Swartzburg?  You

16   were asked about that yesterday.  You said you had some

17   conversation.

18   A.  Yes.  At a certain point we wanted to buy the company.  I

19   called David Levy and I told him that we found an investor and

20   want to take the company over.  He said OK, talk to Michael

21   Swartzburg and he will give you the papers, which he never did.

22   I wanted specifically to know if the Medicare provider number

23   was still in effect.

24   Q.  Did Mr. Swartzburg in any of those conversations, in any of

25   those conversations after he left the company, say to you, Mr.

1    Helfer or Zev or whatever he called you, did he say to you that

2    you lied on those applications to have that stock transferred?

3    A.   No.

4    Q.   Do you remember him saying that to you?

5    A.   He never did.

6    Q.   He never accused you of that?

7    A.   No.

8    Q.   I want to ask you about one other point and then I'll sit

9    down.  The point is this.  When you first had a meeting, when

10   you first had a meeting at Mr. and Mrs. Levy's house in Fort

11   Lauderdale, Florida -- you remember the meeting, right?

12   A.   Yes.

13   Q.   Do you have a good recollection, a firm recollection of

14   what occurred at the meeting?

15   A.   More or less, yes.

16   Q.   Obviously, the discussion was about the investment

17   opportunity?

18   A.   Yes.  We were very happy that we will be able to get the

19   money and not close the company, the LLC.

20   Q.   Everyone was happy, right?

21   A.   We were happy at the time.

22   Q.   You brought a sample of the device, you brought that with

23   you, right?

24   A.   Correct.

25   Q.   You talked about its virtues and you talked about Dr. Gang,

D38rlev1                     Helfer - cross

 1  right?

 2  A.  Correct.

 3  Q.  Isn't it a fact, sir, that at that meeting at the Levys'

 4  home, when David Levy said to you how much money do you need to

 5  have invested in the company --

 6  A.  I said 400,000.

 7  Q.  400,000?

 8  A.  Yes.

 9  Q.  And he gave you a million 2, right?

10  A.  Absolutely.

11  Q.  He brought friends and other people around to invest in the

12  company as well?

13  A.  As far as I know, the million 2 came from him and from

14  Fotis Georgiadis.

15  Q.  On top of the million 2, you had $350,000 from Mr. Liu,

16  right?

17  A.  No, absolutely not.

18  Q.  You didn't have that?

19  A.  Absolutely not.  The only amount of moneys that Cardiac

20  Network received, it was a million 2, nothing else.

21          MR. SHARGEL:  I just have one more question.

22          THE COURT:  You mean one more subject area?

23          MR. SHARGEL:  One more subject area.  This is the

24  last, the absolute last.  May I stay here for a moment?

25  Q.  We raised the issue, the issue has been raised, about the

D38rlev1                    Helfer - cross

1    shares that Mr. Levy and -- I'll just talk about Mr. Levy --

2    that Mr. Levy held.  You said you only learned in 2008 that the

3    shares were unrestricted, right?

4    A.  The end of 2007, the beginning of 2008.

5    Q.  Do you remember when you were speaking to the prosecutors

6    on October 25, 2011, saying that you believe that the shares

7    given to David Levy and Fotis Georgiadis were not restricted?

8    Yes or no.

9    A.  Yes.

10            MR. SHARGEL:  No further questions.

11   A.  No, I'm sorry.  Can you rephrase the question?  It went

12   above my head.  I'm sorry.  What I said, and I will repeat --

13   Q.  There is no question before you.

14   A.  OK, go ahead.

15            MS. COHEN:  Your Honor.

16            THE COURT:  Do you want to rephrase the question or do

17   you want the court reporter read the question back?

18            MR. SHARGEL:  I'm happy to have the court reporter

19   read the question back.

20            (Question read as follows:  Do you remember when you

21   were speaking to the prosecutors on October 25, 2011, saying

22   that you believe that the shares given to David Levy and Fotis

23   Georgiadis were not restricted?  Yes or no.)

24   A.  Yes, they were.  We knew that they were restricted, and

25   towards the end of the year we found out -- at the end of 2007,

1  the beginning of 2008, we found out that they are not.

2  Q.  You didn't say a word in that conversation on October 25,

3  2011, when you were meeting with the prosecutors and you were

4  meeting with Agent Reinhardt, you didn't say a word about not

5  finding out until the end of 2007 and 2008, did you?

6  A.  But this is a fact that that's when we found out.

7          MR. SHARGEL:  I have no further questions.  I'm just

8  going to collect these documents.

9          (Continued on next page)

D38rlev1                    Helfer - cross

1          THE COURT:  Mr. Srebnick.

2          Thank you, Mr. Shargel.

3          MR. SHARGEL:  Thank you, Judge.

4    CROSS-EXAMINATION

5    BY MR. SREBNICK:

6          MR. SREBNICK:  May it please the Court, good morning

7    everyone or good afternoon at this point.

8    Q.  Mr. Helfer, my name is Howard Srebnick.  We're never spoken

9    before, have we?

10   A.  No.

11   Q.  I have some questions I'd like to ask you.  I represent

12   Donna Michelle Levy, and I'd like to ask you some questions

13   about your relationship to Donna Michelle Levy during the

14   course of your working for Cardiac Network.

15         Do you recall meeting Donna Michelle Levy sometime

16   late '06, early '07?

17   A.  Yes.

18   Q.  And do you recall at the time you held yourself out to be a

19   person affiliated with a company and a product that had great

20   potential?

21   A.  Yes.

22   Q.  You were optimistic about the potential of the product that

23   you were attempting to market?

24   A.  Still, still very optimistic about it.

25   Q.  It was a product, however, for which you and your company

1    did not have a patent, correct?

2    A.   Correct.

3    Q.   It was a product really that your company was going to be

4    marketing, but you did not have the exclusive in terms of

5    selling the product; is that correct?

6    A.   Correct.

7    Q.   And so the nature of the business of what we now know to be

8    Cardiac Network was selling a product that could help perhaps

9    millions of Americans who suffer from heart disease, correct?

10   A.   You can say so, but the millions is a little...

11   Q.   Speaking of millions, when you presented this business

12   opportunity to the Levys, you spoke in terms of millions, in

13   fact, millions of dollars of revenue, correct?

14   A.   No.

15   Q.   Do you recall preparing projections as the jury has already

16   seen projecting that this product and the company that you were

17   asking them to invest in could generate millions of dollars of

18   revenue?

19   A.   This business plan was created by Mr. Levy and his people.

20   Q.   Who was it that created that plan?

21   A.   Mr. Levy.

22   Q.   Let me ask you to take a look at Defense Exhibit A3.

23        MR. SREBNICK:  Can we put that on the screen?  I think

24   it's in evidence already.  Can we enlarge the -- yes, please.

25   Q.   Do you recall yesterday there was a discussion about an

D38LLEV2                          Helfer - cross

 1   email from Zev Helfer to David Levy which you had forwarded to

 2   David, having received it from your colleague and friend Eric

 3   Buchwald; do you see that?

 4   A.  I see.

 5   Q.  And so that we're all clear, the bottom half of that email

 6   chain shows that on April 11 of '07, there were projections --

 7   that's the subject matter -- sent from Buchwald to

 8   Zev@CardiacNetworkLLC.com, which Zev Helfer then forwarded to

 9   David Levy, correct?

10   A.  Correct.

11          MR. SREBNICK:  If we could turn the page and if we

12   could go to the top of the next page.  Before we get to

13   projections I just want to -- now, if we can enlarge the top

14   half so we can all see it.

15   Q.  Do you see that it's captioned projections?

16   A.  Yes.

17   Q.  And it's addressed to Eric Buchwald, your colleague?

18   A.  Yes.

19   Q.  From a John Abitante; do you see that?

20   A.  Yeah, but I don't know who he is.

21   Q.  And it says, Eric, I'm attaching the adjusted projections

22   and corrected all referencing errors as discussed.  I also

23   changed the years from 2005 to 2007 for obvious reasons, etc.

24   Respectfully, John Abitante, managing partner of a firm of CPAs

25   Ribotsky, Levine, and Co.

1              Do you see that?

2    A.   Yeah.

3    Q.   If we can turn the page, there's a table of contents that

4    this CPA firm has prepared, Cardiac Network Inc. financial

5    summary, and it provides, as we will see if we turn to the next

6    page, projections.  Correct?

7    A.   Cardiac Network Inc. was not in existence in these days.

8    Q.   These are projections, correct?

9    A.   It was Cardiac Network LLC.

10   Q.   I understand.  The whole point --

11   A.   Cardiac Network Inc. was done by David Levy and his people.

12   Q.   Let's take a look at the projections that Eric Buchwald

13   forwarded to you, then you forwarded it to David, as we've seen

14   from the email.

15   A.   I'm not sure because it's two separate companies.

16   Q.   Let's take a look at the projections.

17              MR. SREBNICK:  If we can go to the top left, there we

18   go.  If we can enlarge that.  Thank you.

19   Q.   And the CPA firm that forwarded it to Eric, Eric to you,

20   and you to David was projecting, in the top line, revenues in

21   year 2008 going from $0, if we could just point to it -- and

22   may I borrow the pointer.

23              This is 2007.  And of course in 2007 the company had

24   zero revenues.  And do you see projections for 2008 of a

25   million eight.  If we look to the right, for 2009, 11 million

1    plus.  For 2010, 44 million plus.

2    A.  I see that.

3            MR. SREBNICK:  If we could turn the page, Jen, to

4    page 6, and if we can enlarge that chart on page 6.

5    Q.  And the projections that were forwarded to David Levy with

6    a five-year income forecast by this certified public accounting

7    firm projecting over five years close to a hundred million

8    dollars of revenue, correct?

9    A.  Correct, but I still have a issue here.

10   Q.  Did Eric Buchwald forward it to you?

11   A.  According to this yes, but.

12   Q.  Did you forward --

13   A.  It's a little, it's a little doesn't make sense.

14   Q.  Did you tell that to David Levy, that the projections that

15   you were forwarding to him don't make sense?

16   A.  I really think that this was done by David Levy and his

17   people.  This was Cardiac Network Inc.  It's not Cardiac

18   Network LLC.  It's a different timetable.

19   Q.  April 2007 is when the email is prepared forecasting,

20   projecting what the potential revenues would be.  You

21   forward --

22   A.  -- understand what I'm saying.

23   Q.  Did you not forward it to David Levy, yes or no?

24   A.  Yes, I did.

25   Q.  In the email you forwarded to David Levy, was there

1    anything statement in the email, dear David, I think these

2    projections are too optimistic?

3    A.   I didn't read it so I don't know.

4              MR. SREBNICK:   If we can go back to page 2, which is

5    the cover letter email with Mr. Abitante's CPA firm, it's

6    page 2 of the exhibit.

7    Q.   Do you remember that I read to you, I am attaching the

8    adjusted projections and corrected all referencing errors as

9    discussed.  I also changed the years from 2005 to 2007 for

10   obvious reasons.

11             Wasn't Mr. Abitante's firm, the CPA firm, affiliated

12   either with you or Mr. Buchwald long before you all met the

13   Levys?

14   A.   I never met, I never spoke to Mr. John Abitante.  I don't

15   know who he is.  It looks like he's working for Mr. Levine and

16   Ribotsky, but I really don't know.

17   Q.   Do you know why he was sending it to your partner Eric

18   Buchwald?

19   A.   According to what it states here that he was making some

20   adjustment to existing business plan.

21   Q.   In all events when you met with Donna Levy in 2007, is it

22   fair to say you expressed great optimism for your product and

23   for the company?

24   A.   Yes.

25   Q.   And when I discuss millions of dollars of revenue, indeed,

D38LLEV2                    Helfer - cross

1    you were obtaining million -- over a million dollars in

2    investment from the Levy group, would it be fair to assume they

3    were expecting well in excess of a million dollars in revenue

4    from this company?

5    A.  I believe so, yes.

6    Q.  And did you not then express to them why the product could

7    be successful, did you tell them that it could be successful

8    because there were millions of Americans who suffer from heart

9    issues who were potential customers?

10   A.  Yes.

11   Q.  And did you tell them then that if you were successful in

12   marketing the product, this company over the long term could

13   generate millions of dollars a year in revenue?

14   A.  Yes.

15   Q.  Now, working with you at Cardiac Network you had an

16   assistant by the name of Michelle?

17   A.  Correct.

18   Q.  Would that be Michelle Dela Fuente?

19   A.  Correct.

20   Q.  For how long did Michelle Dela Fuente work for you?

21   A.  I will say a year.

22   Q.  A year?

23   A.  Just about.

24   Q.  Would that have been 2006 through 2007, more or less?

25   A.  2007, the beginning of 2006 through 2008, the beginning of

D38LLEV2               Helfer - cross

1    2008, I think.

2    Q.  Was she your office manager?

3    A.  Yes.

4    Q.  Was she somebody who would forward emails to you that came

5    to the company?

6    A.  Only when -- I was a lot on the road and only when it was

7    some kind of an emergency she will do that.  Otherwise, when I

8    came back to the office I will look at it.

9    Q.  So you would look at the emails yourself, correct?

10   A.  Correct.

11   Q.  Now, you saw the exhibit earlier B1.  In 2007, Donna Levy

12   through her company, DML Marketing, provided funding for

13   Cardiac, correct?

14   A.  The whole group, Fotis Georgiadis and the Levys all group

15   provided funding.  And I did not look who exactly sent the

16   money as long as the money came to the company.  That was my

17   concern.

18   Q.  Isn't it important to know who's lending money to the

19   company, particularly when the check makes quite clear that

20   this is a loan, bottom of the check?

21   A.  I see that.

22   Q.  Was that loan ever paid back to Donna M. Levy or DML

23   Marketing corporation?

24   A.  No, because we never received the money that we had an

25   agreement.

1    Q.  You saw the wire transfer that DML Marketing transferred to

2    Cardiac.  It was in the bank statement.  I believe that's B2,

3    bravo two.

4          Was DML Marketing ever paid back for that $30,000 wire

5    transfer that it sent to Cardiac Network?

6    A.  No, it was a part of the million two.

7    Q.  How do you know that if you weren't -- you had no

8    recollection yesterday of ever hearing the name DML Marketing.

9    Today you're telling us it's part of the million two?

10   A.  No.  You're twisting my words.  I said I didn't know and

11   please give me a name and when your colleague gave me the name,

12   I identify that it was Donna.  Now, Donna belongs -- I don't

13   control who gives the money, if it's Donna or David.  To us it

14   was Fotis, David, and Donna.

15   Q.  When this wire transfer for $30,000 came in from DML

16   Marketing Corp., did you make a record in the books of Cardiac

17   Network that DML Marketing had provided this money to your

18   company?

19   A.  No.  The group of the investors gave us the money.  This

20   was not any above and beyond the million two.  This was a part

21   of the million two.

22   Q.  And how do you know that today if you don't even remember

23   the name DML Marketing?

24   A.  It's not relevant.

25   Q.  I'm sorry?

1    A.  I don't think that it's relevant.  It was a group of

2    investors and they from different kind of sources send us

3    money, part in checks, part in wire transfer, and part was

4    evidently like you see here from Donna.  But it all fell into

5    the million two.

6    Q.  I'd like to ask you some questions now about the public

7    relations campaign, the press releases that you discussed

8    yesterday.

9          Now, isn't it a fair statement that with regard to the

10   press releases that were being issued to the public, Donna Levy

11   would send a copy by email to you for you to review before it

12   was released publicly?

13   A.  Yes.

14   Q.  And those press releases would be sent to you at your email

15   address for you to review, edit, make any changes, suggestions,

16   etc.; correct?

17   A.  Not in all times it was done.

18   Q.  Is it fair that Donna Levy sent to you advance copies of

19   proposed press releases so that you would have an opportunity

20   to comment, review, edit, whether you did it or not, an

21   opportunity was given to you and indeed others to make comments

22   about the proposed press releases, yes?

23   A.  We made our changes, yes.  The answer is yes.  We made our

24   changes.  However, sometimes those changes never materialized.

25   Q.  Sometimes --

1    A.  It was still advertised as we did not make any changes.

2    Q.  Now, there were other individuals that were within the

3    loop, within the circle of individuals involved in the press

4    releases?

5    A.  Correct.

6    Q.  That would include on occasion your assistant, Michelle

7    DeLa Fuente, she was included on some of the exchanges,

8    correct?

9    A.  She did not have the authority to do that.

10   Q.  But she would receive copies in advance at times, right?

11          THE COURT:  He shook his head yes.

12   A.  Yes.

13   Q.  Do you remember a company from Toronto, Canada, called

14   Agoracom?

15   A.  I remember Agoracom, yes.

16   Q.  Do you remember a Mr. George T-S-I-L-O-S-I-S?

17   A.  No.

18   Q.  Tsilosis?

19   A.  No.  I remember a name a gentleman by the name Jim.

20   Q.  Do you remember Jim Haron, H-A-R-O-N, from that company?

21   A.  I think that was his last name.  But I don't remember the

22   first name.

23   Q.  Do you remember another person from Agoracom named Carrie?

24   A.  No.

25   Q.  Do you remember another individual involved in the press

D38LLEV2                    Helfer - cross

1   releases and press campaign, Jarret Wollstein?

2   A.  I saw a press release when I was talking to the prosecutors

3   but I never knew that it went out.

4   Q.  Did you ever meet Jarret Wollstein in person?

5   A.  One time.

6   Q.  I'd like to now go through some of those press releases

7   with you.

8           MR. SREBNICK:  If we could publish Government

9   Exhibit 101-8.  101-8, is there anybody who can publish it?  If

10  not, I'll put it on the Elmo.  And if we can enlarge it, widen

11  it perhaps.

12          THE COURT:  It's on your screen.

13          THE WITNESS:  I barely can see it.

14          THE COURT:  Do you have a hard copy?

15          MR. SREBNICK:  I think it's in the binder, but I'd

16  have to approach the witness.

17          THE COURT:  Approach the witness.  He can't see it on

18  the screen.  He cannot see it on the screen.  He wants a hard

19  had copy.

20          MR. SREBNICK:  Understood.

21  Q.  101-8.

22  A.  I see it.

23  Q.  Very good.  Now, do you see that this press release was

24  published May 31, 2007?  I'm going to point to it on the

25  screen.  It may help you find it.

D38LLEV2                    Helfer - cross

1  A.  I do, I do.

2  Q.  And here's what it announces.

3          MR. SREBNICK:  May I publish it, Judge?

4          THE COURT:  It is published.  You want to read from

5  it?

6          MR. SREBNICK:  Yes, please.

7          THE COURT:  Go ahead.

8  Q.  Cardiac Network Inc. announced that the company's shares

9  will begin trading on the OTC Pink Sheets under its new trading

10 symbol CNWI.  And then it provides a few paragraphs about the

11 company, the product.

12         And I'd like to take a look at the approximately the

13 fourth paragraph where it says cardiovascular disease and

14 coronary heart disease are widespread, afflicting over

15 70 million people.  Heart attacks are the single biggest killer

16 in the United States alone.  Each year, about 1.1 million

17 Americans suffer a heart attack.  About 460,000 of those heart

18 attacks are fatal.  Those figures would change if those people

19 got to a hospital as fast as possible when a heart attack

20 happened.

21         Do you see that?

22 A.  Yes.

23 Q.  Now, I'd like to have you take a look at what is marked as

24 Defense Exhibit B9.

25         MR. SREBNICK:  And I would move it into evidence

1  without objection.  It's an email, Judge, and if we can ask the

2  Court to receive it, B9.

3           THE COURT:  Any objection?

4           MS. COHEN:  No, your Honor.

5           THE COURT:  B9 is in evidence.

6           (Defendant's Exhibit B9 received in evidence)

7           MR. SREBNICK:  And if we could publish?

8           THE COURT:  Yes.

9  Q.  Now, do you see that on the screen?  You don't have it on

10  the screen, Mr. Helfer?

11          THE COURT:  He does have it on the screen.

12          MR. SREBNICK:  OK, great.

13  Q.  Do you see that is an email dated May 9, 2007, about two

14  weeks before the press release that you just saw.  There's an

15  email to you from the email address luvmee40@aol, and you know

16  that to be Donna Levy's email address?

17  A.  Yes.

18  Q.  Directed to Zev@CardiacNetwork.net, do you see that?

19  A.  Yes.

20  Q.  As well as to Georgiadisgroup@AOL, as well as

21  David@DatePalmCapital.com; do you see the address lines?

22  A.  Yes.

23  Q.  And do you see the subject, quote, I hope the final one

24  ready to go.  Let me know.

25           Do you see that?

1  A.  Yes.

2  Q.  And if we look at the content of the email, what's embedded

3  in the email, is it fair to say that three weeks before the

4  email -- excuse me -- three weeks before the press release is

5  published that we just saw as Government Exhibit 101-8, there's

6  a draft of the email contains a draft of the press release; do

7  you see that?

8  A.  I see here.

9  Q.  And if we look at the fourth line, again, it refers to

10  cardiovascular disease and coronary heart disease being

11  widespread, affecting over 70 million people, single biggest

12  killer, 1.1 million Americans, 460,000 fatal heart attacks; do

13  you see that reference in the paragraph?

14  A.  Yes.

15  Q.  Now, do you have any experience in press releases and how

16  they are prepared prior to your relationship with the Levys?

17  A.  No.

18  Q.  The way these press releases worked, the Levys, excuse me,

19  Donna Levy would arrange with perhaps Agoracom or others to

20  have drafts of the press releases prepared, proposed, perhaps

21  edited, and then released; wasn't that the sequence of events?

22  A.  Should be.

23  Q.  OK.  And there would be proposed statements on behalf of

24  Zev Helfer, the CEO, to release to the press, right?

25  A.  OK.

1   Q.  In this one at the bottom it was proposed that you be

2   quoted, right at the bottom, We are extremely excited to offer

3   Cardiac Network Inc. publicly.  For the next 20 years, the U.S.

4   healthcare system could experience a tsunami of heart care, a

5   tsunami of heart care demand as millions of baby boomers turn

6   60.  We believe we are positioned to meet these demands.

7   Expect great things to come from Cardiac Networks in 2007 and

8   beyond, states Zev Helfer, CEO of Cardiac Network Inc.

9           You see it there?

10  A.  I see it.

11  Q.  Now, the choice of words "tsunami" may not have been yours

12  originally, correct?

13  A.  You can hear my language and this is -- I wish I could

14  speak like this.  My English is not on this level

15  unfortunately.

16  Q.  So the professionals put together proposed sound bite for

17  you to consider and adopt as your own, even if it would not

18  have been your choice of words, perhaps because the word

19  tsunami was a new word for you or not a word you would have

20  chosen, right?

21  A.  Fair to say, yes.

22  Q.  And so that email containing the tsunami quote -- we'll

23  call it that for ease of reference -- do you see it in what I'm

24  now going to show you as B5?

25          MR. SREBNICK:  Which we move into evidence without

D38LLEV2                    Helfer - cross

1    objection, your Honor, another email dated May 22, 2007.

2              THE COURT:  Is that correct, Ms. Cohen, you have no

3    objection?

4              MS. COHEN:  Yes, your Honor.

5              THE COURT:  B5 is in evidence then.

6              (Defendant's Exhibit B5 received in evidence)

7              MR. SREBNICK:  If we could publish that.

8    Q.  Do you see that in the evolution of a press release in May

9    of 2007, if we go to the top, about 13 days after the May 9

10   email, there is another draft of the proposed press release and

11   if we look to the bottom of the page -- thank you, Ms. Hays --

12   once again there is the what I'm going to call a sound bite or

13   a quote attributed to Zev Helfer and it contains the tsunami of

14   heart care demand, right, that stayed in the proposed press

15   release, right?

16   A.  Yes.

17   Q.  Now, I'd like to turn your attention to bravo 13.

18             MR. SREBNICK:  Which I would move into evidence at

19   this time, B13.

20             MS. COHEN:  No objection, your Honor.

21             THE COURT:  B13 is in evidence.

22             (Defendant's Exhibit B13 received in evidence)

23   Q.  This is an email dated May 25, 2007.  So this is three days

24   later.  This is now the third email that we're looking at in

25   preparation of a proposed press release for the company.

1            It appears that EP Gang -- would that be Dr. Eli

2    Gang's address?

3    A.  Yes.

4    Q.  Is sending to you, at Zev@CardiacNetwork.net, an email

5    saying, Zev, I made some changes in the text.  See attached.

6    Eli or Eli, is it Eli?

7    A.  Either way.

8    Q.  And then you forwarded the email to

9    DavidLevy@DatePalmCapital, right?

10   A.  I just see the top, yeah, yes.

11   Q.  It appears that it was sent at 10:54 to you and then a few

12   hours later you forwarded it to David Levy?

13   A.  Yes.

14   Q.  May I approach the witness with a hard copy or can you see

15   that OK?

16   A.  Please.

17            MR. SREBNICK:  May I, judge?

18            THE COURT:  Sure.

19            THE WITNESS:  Thanks a lot.

20   Q.  Now if we turn the page on the email, this is the proposed

21   edits, perhaps, of Dr. Eli Gang; do you see that one paragraph?

22   A.  Yes.

23   Q.  And so that those that are not familiar with how these

24   editing programs work, it appears that Eli Gang was proposing

25   that the first half of the paragraph be substituted by the

D38LLEV2                    Helfer - cross

1    second half of the paragraph.  He liked a different choice of

2    words in that press release.

3               MS. COHEN:  Objection, your Honor.

4               THE COURT:  Sustained.

5    Q.  Do you see the words underlined, quote, the heart line

6    provides the patient and his physician rapid access to a state

7    of the art transtelephonic EKG tracing that, when properly

8    utilized, might alert the patient to seek quick treatment for a

9    potentially life threatening cardiac event; do you see that

10   language?

11              THE COURT:  That's what it says.

12   Q.  Is that the language that Dr. Gang --

13              THE COURT:  That's the question.  Is that the language

14   that Dr. Gang proposed?

15              THE WITNESS:  Yes.

16              THE COURT:  OK.

17   Q.  And that language was meant, according to the email, to

18   substitute for the first four lines that have strike through,

19   lines drawn through them?

20   A.  I think so.

21              MS. COHEN:  Objection, your Honor.

22              THE COURT:  Sustained.  Strike the answer.

23   Q.  Now, if we can go then to the next Exhibit B4, that would

24   be an email Wednesday, May 30, 2007, at 3:34 p.m., and it's

25   titled from Donna Levy email address to Zev Helfer's address.

D38LLEV2                    Helfer - cross

1    Subject, here is the final release approved by all.

2            Do you see that?

3    A.  Yeah, I do, but I prefer to get the hard copy if you don't

4    mind.  Sorry.  It's the age.

5    Q.  And if we could look at the content of the proposed press

6    release, this one appears not to have the language from that

7    one paragraph that was subject to some proposed edits.  Do you

8    see that it's missing?  I think it's missing?

9            THE COURT:  Are you asking is the material that

10   Dr. Gang suggested be stricken is not in the press release; is

11   that the question?

12           MR. SREBNICK:  It's not in the email.  That whole

13   paragraph seems to --

14           THE COURT:  Is that the draft press release, is that

15   the question?

16           MR. SREBNICK:  That's the email of a proposed press

17   release.

18           THE COURT:  Is that your question?  He hasn't answered

19   the question.  Is that what you want to know?

20           MR. SREBNICK:  Yeah.

21           THE COURT:  Answer the question.

22   A.  It looks to me that it's there.

23   Q.  Show it to me.  That's what I'm asking.

24           THE COURT:  Just tell him what you think is in there.

25   A.  It says here what Dr. Eli Gang crossed.  It says heart line

D38LLEV2                    Helfer - cross

1    is a new heart attack detection and here it is.  Heart line is

2    a new heart attack detection.

3    Q.  You agree it's a little bit different than the way Dr. Gang

4    had written it?

5    A.  No, it's word by word.

6    Q.  Let me see it so I can compare.

7              MR. SREBNICK:  May I approach?

8              THE COURT:  Yes.

9    A.  This is the B4.  And this is the B13 and look at the top.

10   Q.  OK.  OK.  So actually if you compare them, it appears that

11   Dr. Gang's edits were not incorporated; am I correct?

12   A.  Correct.

13   Q.  And that the final version here does not include Dr. Gang's

14   edits, correct?

15   A.  Correct.

16   Q.  And it's sent back to you, if we could go to the top, and

17   it's proposed to be final; do you see that?

18   A.  I see it.

19   Q.  OK.  And so there was what I would call -- and perhaps

20   you'll have a different terminology -- an editorial decision

21   not to use Dr. Gang's proposed edits but to leave the original?

22             MS. COHEN:  Objection, your Honor.

23             THE COURT:  Sustained.  The objection has been

24   sustained.  You don't have to answer.

25   Q.  With the exception of that one editorial issue, was there

1  any other part of the press release that anybody proposed be

2  changed?

3  A.  No, but this one is a major one.

4  Q.  I understand.  Anything other than that one paragraph that

5  was approached to be changed?

6  A.  No.  But in the healthcare industry, you cannot put those

7  words.  You have to be accurate.  You cannot just, you know,

8  advertise in order to advertise.

9  Q.  We have the words that were chosen.  You were sent a copy.

10        MR. SREBNICK:  And then if we could go to B8, which I

11 would offer into evidence without objection.

12        MS. COHEN:  No objection.

13        THE COURT:  B8 is in evidence.

14        (Defendant's Exhibit B8 received in evidence)

15 Q.  Do you see that that's an email on May 31, the day I

16 believe of the press release that we saw, from Michelle Dela

17 Fuente -- that would be your assistant?

18 A.  Yes.

19 Q.  Addressed to you, subject, press release?

20 A.  Yes.

21 Q.  And it asks you to look at the fifth paragraph under "about

22 Cardiac Network" and fix the second line?

23 A.  I don't have it.

24 Q.  I'm sorry?

25 A.  I don't have it.  It's not on the screen as well.

1  Q.  I'll show you my copy.

2          MR. SREBNICK:  If I may, judge?

3          THE COURT:  Yes.

4  Q.  It's right here.

5  A.  OK.

6  Q.  Thank you.  Mr. Helfer, did you send any emails in response

7  to the proposed press release?

8  A.  I don't remember.

9          MR. SREBNICK:  I'd like to now offer into evidence

10  B10.

11          MS. COHEN:  No objection, your Honor.

12          THE COURT:  B10 is in evidence.

13          (Defendant's Exhibit B10 received in evidence)

14  Q.  Do you see this is another email.  This time it's from

15  David -- if we look to the bottom of the email, all the way at

16  the bottom, Jen -- from David Federson.

17  A.  Can't see.

18  Q.  From the webclipping.com team.  Do you need a copy?

19  A.  Yeah, I can't see.

20  Q.  This is B10.

21  A.  Sorry.

22  Q.  OK.  Let me know when you've had a chance to look at it.

23  A.  I did.

24  Q.  And that certainly alerted Michelle at your office, she

25  forwarded it to you, that the press release had been published,

1   correct?

2   A.  It looks like it, yes.

3   Q.  Now, are you familiar with a company called MacReport.net?

4   A.  No.

5   Q.  Wasn't that the company that Cardiac -- and I think you

6   were the one who did it -- contracted to distribute the press

7   releases to the news services?

8   A.  Maybe.  I can't recall.

9   Q.  Let me show you B6, which I offer into evidence.

10          MS. COHEN:  No objection, your Honor.

11          THE COURT:  B6 is in evidence.

12          (Defendant's Exhibit B6 received in evidence)

13  Q.  See if that refreshes your recollection that Cardiac hired

14  MacReport.net to issue the press releases, to disseminate press

15  releases?

16  A.  OK.

17  Q.  Does that refresh your memory?

18  A.  Not really, but...

19  Q.  Do you see that Sky Palmer, the senior account executive,

20  sent an email to your assistant Michelle, she then forwarded it

21  to you?

22  A.  I'm sure what took place is Fotis or Donna or David called

23  Michelle and told her to do so and she send it to me.  I'm not

24  familiar with Sky Palmer or with the MacReport.

25  Q.  Do you recall entering into a contract with the

1    MacReport.net and paying them on a regular basis to issue press

2    releases?

3    A.   Probably.

4    Q.   Let me show you what's Defense Exhibit B11, the bank

5    statement of Cardiac Network.

6              Mr. Helfer, there may be a binder right next to you

7    that my associate -- a big black binder that has all these

8    exhibits in it?

9    A.   It doesn't have it.  It doesn't have it.  I was looking for

10   it.

11             MR. SREBNICK:  Judge, if I may approach then.

12             THE WITNESS:  You want to take this?

13             THE COURT:  Why don't we just take a luncheon recess

14   now because lunch is served and we'll resume in 45 minutes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  We'll try to get organized over lunch

3    time.  Just step down and stretch your legs.

4          (Witness not present)

5          THE COURT:  Mr. Srebnick.

6          MR. SREBNICK:  Yes, your Honor.  Thank you, Judge.

7          THE COURT:  Maybe get organized over the lunch break

8    so he has what want him to have.

9          MR. SREBNICK:  I'll try.

10          THE COURT:  I gave that book to Mr. Srebnick.  He

11    gives it to you?

12          MS. COHEN:  It's actually the government's exhibits

13    that we had provided.

14          THE COURT:  All right.  We might -- how much longer do

15    you think you have, Mr. Srebnick?

16          MR. SREBNICK:  I have to go through the email traffic.

17    There were a lot of exhibits.  I would say it's going to be

18    another hour.

19          THE COURT:  OK.  I'd ask you during the break that

20    we're going to take that you get organized so that he has what

21    you need and we don't have the shuttling back and forth.

22          MR. SREBNICK:  We thought we were because we have it

23    displayed on the screen, but he can't read the screen.

24          THE COURT:  He can't read the screen.  Now that we

25    know that, we'll have to go to plan B.

D38LLEV2

1      MR. SREBNICK:  I'll try.

2      MS. COHEN:  We'll assist, your Honor, in whatever

3  photocopying that has to be done.

4      MR. SHARGEL:  Judge, is there any revised plan on this

5  afternoon?

6      THE COURT:  Well, I think we'll resume around 1:30 and

7  probably go to four, 4:30.  I'm going to check the weather

8  service.  Why?

9      MR. SHARGEL:  That's fine, just to make plans.

10     MS. COHEN:  Where you going?

11     THE COURT:  Cocktails?  You think it's Miller time

12  sooner?

13     MS. COHEN:  It's Friday early happy hour.

14     Your Honor, the other thing is we have witnesses we

15  flew in.  If we could go to five, if the weather permits, we

16  would prefer to do that.

17     THE COURT:  Fine.  That's what we'll do.  1:30.

18     MS. COHEN:  Thank you, your Honor.

19     (Luncheon recess)

20     (Continued on next page)

21

22

23

24

25

1    AFTERNOON SESSION

2    1:30 p.m.

3    (At the side bar)

4    THE COURT:  Mr. Srebnick, you can try your case any

5    way you want.  But with this witness, the point today was he

6    had seen these press releases and drafts many times and he had

7    all kinds of opportunities to make comments, which kind of

8    contradicts his testimony that he never saw the press releases.

9    It was something that was done.  Do you have to do it every

10   single time he saw a document?

11   MR. SREBNICK:  If we can all stipulate to what you

12   just said, I don't.

13   THE COURT:  If he saw it five times, if he saw it

14   once, you might be able to get through it and make the point to

15   the jury.  I'm not telling you how to practice law.  I'm just

16   making a suggestion based on my last experience with the jury,

17   who kept sending out notes saying it's too much, we can't

18   comprehend it all.

19   I leave it up to you.  But if the point is he saw

20   these things and could comment on them but chose not to, which

21   contradicts his testimony on direct, you have made that point

22   pretty well right now.  If you want to take a few more, take

23   them all, but consider what I said.

24   MR. SREBNICK:  I hear what you are saying.  I'm going

25   to streamline it.

D38rlev3

1          THE COURT:  I'm glad you gave him the book.  The

2     shuttling back and forth takes a lot of time.

3          MR. SREBNICK:  I'll try to speed this up as much as I

4     can, Judge.

5          THE COURT:  Thank you very much.

6          MS. COHEN:  Your Honor, Howard is working on printing

7     something, but we can start without him, with your permission.

8          THE COURT:  Yes, OK.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D38rlev3

1          (In open court; Jury present)

2     ZEV HEFLER, resumed.

3          MR. SREBNICK:  May it please the Court I believe the

4     notebook now containing the defense B exhibits, and I say B,

5     bravo, but we now know B means the B series.  I'd like to start

6     with B6, which is where we left off.  I'm going to try to speed

7     this up as best as I can.  Jennifer, if I could have B6.

8     CROSS-EXAMINATION (continued)

9     BY MR. SREBNICK:

10    Q.  Mr. Helfer, we were looking at B6.  If we could quickly

11    show this is reporting MacReport.net.  Sir, I have the bank

12    records if we need to look at them.  You will tell me if you

13    need to refresh your memory.  Isn't it true that Cardiac hired

14    MacReport.net and that you were involved in that in paying them

15    on a monthly basis?

16    A.  It's true.

17    Q.  MacReport.net was involved in disseminating press releases,

18    distributing the press releases, true?

19    A.  Yes.

20    Q.  Your assistant Michelle de la Fuente was involved in a

21    assisting in the process of getting to MacReport.net those

22    press releases, true?

23    A.  Yes.

24    Q.  If we look at the bottom of the page.  Right before Sky

25    Palmer's signature, the last paragraph, do you see where Sky

D38rlev3

1    Palmer writes to you and says -- excuse me -- to Michelle and

2    says, "If you have any questions or concerns, please don't

3    hesitate to call.  Also, as per our conversation, please do not

4    forget to have Zev send us confirmation via email stating that

5    you, Michelle, are duly authorized."  Do you see that?

6    A.  I see it.

7    Q.  Great.  Let's move forward to a couple of questions about

8    Michelle de la Fuente.  Do you recall that you participated in

9    June of 2007 in arranging that she, too, would be a stockholder

10   of the company?

11   A.  Yes.

12           MR. SREBNICK:  If we could quickly put B17 on the

13   screen.

14   Q.  Do you recall a letter you wrote to Atlas Stock Transfer

15   issuing 300 shares to Michelle de la Fuente?

16   A.  Yes.

17           MR. SREBNICK:  I move B17 into evidence.

18           MS. COHEN:  No objection, your Honor.

19           THE COURT:  B17 is in evidence.

20           (Defendant's Exhibit B17 received in evidence)

21           MR. SREBNICK:  If we put B18 on the screen.  Without

22   objection, Judge, B18 I moved into evidence.

23           MS. COHEN:  No objection.

24           THE COURT:  B18 is in evidence.

25           (Defendant's Exhibit B18 received in evidence)

D38rlev3

Q.  You see there is an email dealing with the restriction

legends on certain certificates of her stock?

          MS. COHEN:  Objection, your Honor.

          THE COURT:  Sustained.

Q.  Excuse me.  Forgive me.  I withdraw that.  Let's read it.

"Dear Amy.  Please remove restriction legends off certificate

numbers," and then it has the numbers.  "Thank you.  Best

regards, Zev."  Do you see that?

A.  I do.

Q.  That's B18.  Now I'd like to move forward in time to the

period where Agoracom, A-G-O-R-A-C-O-M, was in charge of

Cardiac's press releases.  Do you recall that occurring?

A.  I do.

Q.  Do you recall that you had a contact there you previously

identified as Jim Haron, correct?

A.  Correct.

Q.  Do you recall that Cardiac actually entered into a written

agreement with Agoracom?

A.  Yes.

Q.  Do you recall that the agreement included a person by the

last name of Tsiolis, is the best I can pronounce it?

A.  I don't recall it.

Q.  Let me direct your attention to B33, which I would move

into evidence, which is a correspondence between Agoracom and

Cardiac?

1          MS. COHEN:  No objection, your Honor.

2          THE COURT:  What is the exhibit number?  B31?

3          MR. SREBNICK:  B33.

4          THE COURT:  B33 is in evidence.

5          (Defendant's Exhibit B33 received in evidence)

6   Q.  You see it is August 8, 2007?

7   A.  What number?

8          THE COURT:  B33.

9   Q.  Do you see there is a person by the name of Carrie

10  Gartland.  I had asked you about a Carrie earlier.  Do you see

11  that name now?

12  A.  Yes.

13  Q.  It is addressed to Cardiac Network, Dear Zev, do you see

14  that?

15  A.  Yes.

16  Q.  It deals with the executed copy of the agreement between

17  Cardiac and Agoracom, correct?

18  A.  Yes.

19  Q.  If we could go to the signature page, which I think has the

20  number 429 at the bottom.  Thank you, Jennifer.  The reason I

21  asked you about George Tsiolis is because you notice there he

22  is the person who signs on behalf of Agoracom?

23  A.  Fair, right.

24  Q.  Did you ever meet Mr. Tsiolis?

25  A.  Never.

D38rlev3

1  Q.  Did you know the company was in Canada, Agoracom?

2  A.  Yes, I did know that.

3  Q.  Let me move into evidence, but we don't need to go through

4  them a series of checks.  Do you recall that Cardiac paid

5  Agoracom $5,000 a month pursuant to that agreement?

6  A.  Yes.

7          MR. SREBNICK:  Judge, I would offer without objection

8  B27, 28, 30, and 31 as examples of those checks.

9          MS. COHEN:  One moment, your Honor.  27, 28?

10          THE COURT:  30 and 31.

11          MS. COHEN:  Thank you, your Honor.  No objection, your

12  Honor.

13          THE COURT:  27, 28, 30, and 31 are in evidence.

14          (Defendant's Exhibits 27, 28, 30, and 31 received in

15  evidence)

16  Q.  If I could ask you to pull up B33 again.  That's the

17  contract.  And if we could go to paragraph 5 of that contract,

18  entitled "Duties of Company."  If we publish that one

19  paragraph, 5.1, it provides that "Cardiac shall supply Agoracom

20  on a regular and timely basis with all approved data and

21  information about Cardiac, its management, products, and

22  operations," etc.  Do you see that?

23  A.  Yes.

24  Q.  Then it provides in that same paragraph that "Cardiac shall

25  be responsible for advising Agoracom of any facts which would

1  affect the accuracy of any prior data or information."  Do you

2  see that?

3  A.  Yes.

4  Q.  Moving along, I'd like to now discuss with you some of the

5  activity between Cardiac and Agoracom.  Would it be fair to say

6  Agoracom was now going to be in charge of investor relations on

7  behalf of Cardiac?

8  A.  Yes.

9  Q.  By investor relations do we mean stockholders, people who

10  buy the stock or might consider buying the stock, who to

11  contact at Agoracom for information?

12  A.  I would say that they were more in charge on press

13  releases.

14  Q.  Let's take a look at B24, which I offer into evidence, an

15  email August 8, 2007.

16          THE COURT:  Any objection, Ms. Cohen?

17          MS. COHEN:  No objection, your Honor.

18          THE COURT:  B24 is received in evidence.

19          (Defendant's Exhibit B24 received in evidence)

20  Q.  You see it is an email from Jim at Agoracom, August 8,

21  2007, to Donna's email address with a copy to you, to Fotis, to

22  someone else at Agoracom?

23  A.  Yes, I do.

24  Q.  Mr. Jim Haron on behalf of Agoracom is asking in the second

25  paragraph, "Also, for press releases please forward to me the

D38rlev3

1    five key points of your press release.  This is the who, why,

2    where," etc.  Do you see that?

3    A.  Yes.

4    Q.  The next sentence in that paragraph says, "Once received, I

5    will then write the press release for you.  If you need

6    anything, please do not hesitate to contact me at the numbers

7    provided below."

8    A.  I see that.

9    Q.  I'd like to take a look at B25, B25, an email, Monday,

10   August 13, 2007.

11   A.  OK.

12   Q.  That is an email from Agoracom both to you and to Donna

13   Levy indicating, "As you are aware, Agoracom does not take

14   phonecalls from investors and information gatherers.  We

15   instruct everyone to go to the company's official IR HUB which

16   will be active tomorrow," etc.  Do you see that?

17   A.  Yes.

18             THE COURT:  Is this in evidence?

19             MR. SREBNICK:  I offer it into evidence.  Forgive me.

20             MS. COHEN:  No objection your Honor.

21             THE COURT:  B25 is in evidence.

22             (Defendant's Exhibit B25 received in evidence)

23             MR. SREBNICK:  I would offer B26, an email dated

24   August 10, 2007, from Agoracom, I believe without objection.

25             MS. COHEN:  No objection, your Honor.

1          THE COURT:  B26 is in evidence.

2          (Defendant's Exhibit B26 received in evidence)

3    Q.  Do you see that Mr. Haron from Agoracom is writing to you

4    all and he states, "Do you have a Word document of all the

5    items on the Cardiac Network website?  As you know, the website

6    is all Flash-related, and getting things from there is very

7    difficult.  Also, is there a list of officers from the company?

8    This being a Pink Sheet company, information is scarce, so if I

9    can be provided with as much as possible, then the IR Hub can

10   be completed."  Do you see that?

11   A.  I do.

12   Q.  I'd like to discuss with you another press release issued

13   by the company, I believe it is Government Exhibit 101-7.

14         THE COURT:  Does he have it, Mr. Srebnick?

15         MR. SREBNICK:  It's not in that notebook, but we'll

16   get it for him.

17   Q.  Can you see the headline on your screen?

18   A.  I can see.

19   Q.  Just the headline, right?  That's all.

20   A.  Yes.

21   Q.  Now I'd like to turn your attention to some emails about

22   that press release B19, which I would offer into evidence.

23   A.  B19?

24   Q.  B19, yes, please.

25         THE COURT:  Any objection to B19, Ms. Cohen?

D38rlev3

1          MS. COHEN:  No objection, your Honor.

2          THE COURT:  B19 is in evidence.

3          (Defendant's Exhibit B19 received in evidence)

4    A.  OK.

5    Q.  If we can put that on the screen.  You see that B19 is an

6    email August 9, 2007, from your assistant Michelle to Zev.

7    It's a forwarding of an email that says, "Feel free to make any

8    corrections or add what you think is important."  Do you see

9    that language?

10   A.  Yes.

11   Q.  If we can go to the headline of that email -- excuse me --

12   of the proposed press release, "Cardiac Network receives

13   Medicare approval to bill for its Cardiac telemetry services,"

14   correct?

15   A.  Yes, sir.

16         MR. SREBNICK:  If we could then move into evidence

17   B20, which is --

18         MS. COHEN:  No objection, your Honor.

19         THE COURT:  B20 is in evidence.

20         (Defendant's Exhibit B20 received in evidence)

21   Q.  Is that the contract or the letter regarding the telemetry

22   services?

23   A.  That's the providership number that was granted to us by

24   Medicare, correct.

25   Q.  That's the subject of the press release, correct?

D38rlev3

1    A.  Yes.

2                MR. SREBNICK:  If I could offer now B21 into evidence.

3                MS. COHEN:  No objection, your Honor.

4                THE COURT:  B21 is in evidence.

5                (Defendant's Exhibit B21 received in evidence)

6                MR. SREBNICK:  And if we could publish that on the

7    screen.

8    Q.  Do you see that is an email from the MacReport to you

9    regarding the paid invoice for that press release.  Do you see

10   that?

11   A.  I do.

12               MR. SREBNICK:  If I could have a moment.

13   Q.  Now I'd like to publish on the screen, I hope we have it,

14   Government Exhibit 101-11.  I think that is a government

15   exhibit that is already in evidence.  Or 101-9 or 101-10.  They

16   are all similar.

17               THE COURT:  Which one do you want?

18               MR. SREBNICK:  Whichever one is easiest for Becky to

19   get.  We can do 10.  101-10 we'll have on the screen in a

20   moment, Judge.  It should already be in evidence.

21               THE COURT:  I think you're going to have to look on

22   the screen.

23               MR. SREBNICK:  Right.

24               THE WITNESS:  I do have it.

25   Q.  This is something I think that was discussed yesterday.

1    This is a promotion titled "Soon millions of American seniors

2    will carry the telephonic HeartOne wherever they go."  Do you

3    see the title?

4    A.  Yes.

5    Q.  There is a picture there of Jarret Wollstein.  Do you

6    recognize him as someone you met in person, if you can

7    recognize it from the picture?

8    A.  Not really.  I don't remember the way he looks.

9    Q.  If we turn to page 2 of this promotion, there are some

10   illustrations which again are hard to see on the print copy and

11   some description of how the product might work, correct?  Do

12   you see that?

13   A.  Yes, I do.

14   Q.  Now I would like to go to page 5 of 11, where it talks

15   about that $592 million that you think you commented on

16   yesterday.

17   A.  Yes.  Wait, I don't have it.

18   Q.  That's at page 5 of 11.  I'd like to highlight the top

19   half.

20           THE COURT:  Just a minute.

21           MR. SREBNICK:  Sorry.

22   A.  I don't think I have it.  OK, thank you.

23   Q.  For once I'd like to read the promotion, just the section

24   that is there, so we can all read it together so it is clear

25   exactly what it is saying about this 592 million.  Read along

D38rlev3

1   and tell me if I have read it correctly so we publish it

2   correctly.

3         "For a $1 stock, the potential revenue is outrageous.

4         "Now let's say that the typical general practitioner

5   or internist has 500 patients and wants 5 monitors to meet his

6   patient load.  I've done the numbers, and here's why I'm so

7   sure this $1 stock is going to explode.

8         "If a doctor has 5 units and prescribes each of them

9   just once a month, that doctor generates a minimum income to

10  Cardiac Network of $1,645 a month (5 times $329 equals $1,645)

11  or $19,740 a year."

12        THE COURT:  Do you have a question here, Mr. Srebnick?

13        MR. SREBNICK:  I'd like to publish it.

14        THE COURT:  The jury can read it.  Why don't you ask

15  the question.

16        MR. SREBNICK:  I'll give them a chance to read it

17  then.

18        THE COURT:  What is the question?

19  Q.  Is it fair when one reads this that this is simply some

20  sort of projection on the basis that if so many doctors

21  prescribe so many patients based on a price per unit, then the

22  potential for this product could be revenues of 592 million a

23  year?

24  A.  No.

25        MS. COHEN:  Objection, your Honor.

D38rlev3

1          THE COURT:  The objection is sustained.

2          MR. SREBNICK:  I'll move on, Judge.

3          THE COURT:  Thank you.

4   Q.  In terms of your view of what the potential of the stock of

5   Cardiac could achieve, back when the stock was well below $3

6   did you not tell FINRA or NASD back in 2007, during a meeting

7   Mr. Shargel asked you about, that you thought that $5 a share

8   was achievable?

9   A.  I don't know.  I don't remember.

10  Q.  In fact, did you not tell the regulators that were

11  interviewing you in their capacity as regulators that you

12  thought 20 to $30 was an achievable stock price for Cardiac?

13  A.  I doubt that I said that.

14  Q.  I want to be sure now.  Did you not tell --

15  A.  I don't remember.  I really don't remember.

16  Q.  If you have any memory at all, what price did you tell the

17  regulators you thought was an achievable price for the shares

18  of Cardiac?

19  A.  No, I don't remember.

20  Q.  When you met with those regulators, they asked you about

21  this promotion, did they not?

22  A.  Who are the regulators?

23  Q.  From NASD.

24  A.  You mean --

25  Q.  In August of 2007.

D38rlev3

1    A.   I didn't meet anyone of them.

2    Q.   Over the telephone didn't you have a conversation with

3    them?

4    A.   Yes, I did.

5    Q.   A telephone meeting, do you recall that?

6    A.   OK.  Very vaguely.

7    Q.   Let me make sure I'm clear.  When I'm referring to a

8    meeting, I'm including through the telephone.

9    A.   OK.

10   Q.   Did you indicate to them, first, that you thought that the

11   stock price of $5, $20, or $30 was achievable?  Do you recall

12   that?  Yes or no.

13   A.   No, I don't recall it.

14   Q.   Do you recall telling those regulators on the telephone

15   that in fact you had reviewed a draft of this report that we

16   have just shown on the screen?

17   A.   I don't recall the conversation, sir.

18   Q.   I'm sorry?

19   A.   I don't recall the conversation.

20        THE COURT:  He does not recall the conversation.

21   Q.   Let me establish for you, move into evidence, B41.

22        MS. COHEN:  No objection, your Honor.  It is also in

23   evidence I believe.

24        THE COURT:  B41 is in evidence again then.

25        (Defendant's Exhibit B41 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  I think yesterday you testified about this email.  Do you

2  recall?

3  A.  Yes, I did.

4  Q.  That's June 26th of 2007.  Do you see that?

5  A.  Yes.

6  Q.  I'd like to show you and move into evidence B40, an email

7  from July 23, 2007.

8          MS. COHEN:  No objection, your Honor.

9          THE COURT:  B40 is in evidence.

10          (Defendant's Exhibit B40 received in evidence)

11  Q.  Do you see that is an email, "Zev, read this over and over.

12  Make sure there are no mistakes in it.  Soon it will go up on

13  the Web, so we want to make sure we are not telling any lies or

14  mistruths.  It has to be perfect.  I love it.  Donna."

15  A.  I do see it.

16          MR. SREBNICK:  Is there another page to that?

17  Q.  There was an attachment to that.  Do you see that?  It's

18  not on the email we have.  Do you see there is an attachment,

19  final Cardiac copy?

20  A.  I see that.

21  Q.  Do you know what that attachment was?

22  A.  I don't remember.

23  Q.  When you met with Mr. Wolfer -- what was his name?

24  Wollstein.  Do you recall discussing what he would be doing?

25  A.  Yes.

D38rlev3

1   Q.   Was he going to be writing about the company?

2   A.   He's supposed to do some marketing for the heart club.

3           MR. SREBNICK:  If I could publish B39.

4           THE COURT:  Is that in evidence?

5           MR. SREBNICK:  I move it into evidence.

6           MS. COHEN:  No objection, your Honor.

7           THE COURT:  B39 is in evidence.

8           (Defendant's Exhibit B39 received in evidence)

9           MS. COHEN:  I believe it is also a government exhibit.

10  Q.   Do you see that it is an email from Donna to you dated July

11  23, 2007?

12  A.   Yes.

13          MR. SREBNICK:  If we can show the whole what is

14  embedded in the press release, if you can get the whole top

15  half.  I don't know if that helps.  Maybe just half.

16  Q.   Do you see that the $592 million number that eventually

17  makes it into Mr. Wollstein's investor report, whatever he

18  publishes, was actually reviewed and shown to you before it was

19  published?

20  A.   I see that.

21  Q.   I'd like to now go to the next press release.  It's a press

22  release August 15, 2007.  I believe it is a Government Exhibit

23  201-49C, I think is how it was presented yesterday.  If we

24  could orient the jury by putting it on the screen, if possible.

25  Thank you Becky, so much.  If we could perhaps zoom in.

1          Do you see this was an August 15, 2007, press release

2     announcing that Agoracom would be handling investor relations?

3     Do you see that?

4     A.   Correct.

5     Q.   Do you recall that that was also a subject of emails to you

6     where you were reviewing the proposed press release?  I have

7     the emails.  If you don't recall, I can go through it.

8     A.   I believe you.

9     Q.   The procedure would be similar, where drafts of the

10    proposed press releases would be circulated to you and then

11    eventually they would be released to the public either through

12    MacReport.net or some other source, correct?

13    A.   Yes, after corrections supposed to be implemented.

14    Q.   There was a press release, the next one I'd like to go

15    into, August 23, 2007.  I have it as Government Exhibit 101-3.

16    We don't need to publish it.  I think we can all remember.  The

17    one about Cardiac Network partners up with Tierra Technologies

18    to provide the IT infrastructure.

19    A.   Yes.

20              MR. SREBNICK:  Do you have a different exhibit number?

21              MS. COHEN:  It's Government Exhibit 201-49F.

22              MR. SREBNICK:  201-49F.

23    Q.   Do you recall that that press release was also the subject

24    of email exchanges before it was released?  Do you recall that?

25    A.   Maybe.

D38rlev3

1    Q.  Let me show you what I move into evidence now, B46, an

2    email.  I offer B46.

3          MS. COHEN:  No objection, your Honor.

4          THE COURT:  B46 is in evidence.

5          (Defendant's Exhibit B46 received in evidence)

6    Q.  Do you see that on the screen?  It's from Jim at Agoracom

7    to you and to Donna with an attachment which is the press

8    release for the Tierra Technologies.

9    A.  I do.

10          MR. SREBNICK:  Very good.  Now I'd like to offer into

11   evidence B52, an email September 4, '07.  Any objection?

12          MS. COHEN:  No objection, your Honor.

13          THE COURT:  B52 is in evidence.

14          (Defendant's Exhibit B52 received in evidence)

15   Q.  Do you see this is an email from Jim at Agoracom to you

16   with a copy to Donna?  The subject is the Humana press release,

17   and it has an attachment.  Do you see that?

18   A.  Yes.  I don't see the attachment, though.

19   Q.  The email reflects that there was an attachment.

20   A.  OK.

21   Q.  Do you recall writing any emails in response to this one,

22   to Jim at Agoracom?

23   A.  No.

24   Q.  Now I'd like to move on to the next one, a press release.

25   Do you remember one in September of 2007, September 14,

D38rlev3

1  regarding MRM Medical?

2  A.  Yes, I remember.  What number is it?

3  Q.  Let me show you B55, which I offer into evidence at this

4  time.

5          MS. COHEN:  No objection, your Honor.

6          THE COURT:  B55 is in evidence.

7          (Defendant's Exhibit B55 received in evidence)

8  Q.  Once again it's Jim Haron at Agoracom sending you, Donna,

9  an email with an attachment entitled MRM press release.  Do you

10  see that?

11 A.  Yes.

12 Q.  Do you recall that press release or --

13 A.  I do.

14 Q.  Today do you recall it?

15 A.  I do.

16         MR. SREBNICK:  I'd also like to move into evidence

17 B56, B bravo 56, another email.

18         MS. COHEN:  No objection, your Honor.

19         THE COURT:  B56 is in evidence.

20         (Defendant's Exhibit B56 received in evidence)

21         MS. COHEN:  I think this is also a government exhibit.

22 Q.  I'd like to start at the bottom.  You see Donna sends an

23 email to Jim at Agoracom that says "Check with Zev see if it is

24 OK.  There is one mistake.  MRM in one paragraph you have MDM."

25 Do you see where it says that?

D38rlev3

1    A.  I see.

2    Q.  Do you see that Donna appears to have caught a typo-

3    graphical error?

4    A.  I do.

5    Q.  Then if we look to the top of the page, Jim sends to Donna

6    and you the updated press release regarding MRM.  He says,

7    "Disregard the earlier PR.  This is the latest."  To you see

8    that?

9    A.  I do.

10        MR. SREBNICK:  I would like to move into evidence and

11   publish B57.  I believe there is no objection either, Judge.

12        THE COURT:  I haven't heard one.

13        MS. COHEN:  I'm just trying to find it, your Honor.

14   No objection, your Honor.

15        THE COURT:  B57 is in evidence.

16        (Defendant's Exhibit B57 received in evidence)

17   Q.  This is an email from Jim at Agoracom to you with a copy to

18   Donna at 2:11 in the afternoon on September 13.  "Zev, just

19   confirm with Donna that the press release is OK to go tomorrow

20   at 9:00 a.m. Eastern.  Jim."  Do you see that?

21   A.  I do.

22   Q.  Do you recall that on September 13 Cardiac paid

23   MacReport.net to distribute that press release?

24   A.  If you say so.  I don't have the ledger in front of me.

25   Q.  Take a look at B54, which I move into evidence at this

1    time.

2    A.   B?

3    Q.   B54.

4         THE COURT:  Any objection, Ms. Cohen?

5    A.   OK.

6         THE COURT:  Just a minute now.

7         MS. COHEN:  No objection, your Honor.

8         THE COURT:  B54 is in evidence.

9         (Defendant's Exhibit B54 received in evidence)

10   Q.   Do you see this is an email from the MacReport confirming

11   payment?  Do you see that?

12   A.   I see that.

13   Q.   I have the bank records.  Does that refresh your memory

14   that it was paid for?

15   A.   Yes.

16   Q.   Next, press release October 10, 2007, Government Exhibit

17   201-49J.  Do you remember the press release about Cardiac

18   Network receives Blue Shield of California approval?

19   A.   I remember, yes.

20   Q.   Do you recall that actually you were the one who made sure

21   that MacReport.net got paid to issue that press release?

22   A.   I believe you, yes.

23   Q.   Then we will move on to the next press release.  October

24   16, 2007, do you recall a press release?  It's 201-49K.

25   A.   I don't have it.

1  Q.  I'll read you the title, see if you remember.  "Due to

2  recent approvals of Blue Shield of California, Medicare, and

3  other insurance companies, Cardiac Network, Inc. has expanded

4  its capacity."  Do you recall that one?  If you don't, you

5  don't.

6  A.  No.

7  Q.  Let's take a look at B62, if I could offer that into

8  evidence at this time.  B62.

9        MS. COHEN:  No objection, your Honor.

10        THE COURT:  B62 is in evidence.

11        (Defendant's Exhibit B62 received in evidence)

12        MR. SREBNICK:  If we could take a look at that.  Bear

13  with me.  I'm moving as quickly as I can.

14  Q.  B62, if we go to the end of the chain of emails at the

15  bottom of the page, do you see that it's an email from Peter

16  Priel of Tierra technology to Zev Helfer and Michelle de la

17  Fuente, the assistant?

18  A.  Yes.

19  Q.  Then, if we go up to the middle of the page, the email from

20  Zev Helfer to Agoracom, PR items, it says, "Jim, as per our

21  phone conversation, I am sending some information to you on our

22  huge network expansion.  It will greatly improve the service to

23  the referring physicians and their patients."  Do you see you

24  sent that email to Jim?

25  A.  I do.

D38rlev3

1    Q.  Then at the top of the page, Jim from Agoracom sends to you

2    on October 15, 2007, "Zev, Donna mentioned something about

3    receiving a third shipment of transmitters from Israel.  Do we

4    want to mention something about that?  Jim."  Do you see that?

5    A.  I do.

6            MR. SREBNICK:  That's October 15, 2007, at 12:44 p.m.

7    I'd like to offer B63, Judge, which is an email October 15,

8    2007, at 1:15 p.m.

9            MS. COHEN:  No objection, your Honor.

10           THE COURT:  B63 is in evidence.

11           (Defendant's Exhibit B63 received in evidence)

12   Q.  Do you see 30 minutes later, roughly, there is an email

13   from Jim at Agoracom to you and to Donna, Donna is

14   Luvmee40@aol, subject infrastructure PR, and Jim is asking,

15   "Please review the attached PR and let me know of any changes."

16   Do you see that?

17   A.  I do.

18   Q.  PR means press release, correct?

19   A.  Correct.

20           MR. SREBNICK:  I would now move B64 into evidence,

21   your Honor, I think without objection.

22           MS. COHEN:  No objection, your Honor.

23           THE COURT:  64 is in evidence.

24           (Defendant's Exhibit B64 received in evidence)

25           MR. SREBNICK:  If we could publish the top of the

1  page, top half.

2  Q.  From Jim at Agoracom to Zev Helfer, 1:17 p.m. on October

3  15.  The subject is PR.  It's titled "Cardiac Network, Inc.

4  expands network capacity and takes shipment of additional

5  monitor/transmitters."  Do you see that.

6  A.  I do.

7  Q.  On this one Donna doesn't appear to be copied, at least not

8  according to the email we have here, right?

9  A.  Right.

10  Q.  Next, the press release that's been shown to the jury as

11  Government Exhibit 201-49L, the announcement of the HeartOne

12  Club, do you remember that press release?

13  A.  I don't have it in front of me.

14  Q.  Do you remember from your own memory?

15       THE COURT:  You remember there is a press release on

16  HeartOne?

17       THE WITNESS:  Yes, I do.

18       MR. SREBNICK:  Good.

19  Q.  Do you recall that the issue of HeartOne was a business

20  idea that you in fact discussed with those regulators on the

21  telephone who interviewed you, the NASD?  They asked you about

22  it and you talked to them about it, do you recall?

23  A.  No, I don't recall the details of this conversation.

24  Q.  Do you recall that this idea of the HeartOne Club -- you

25  did discuss it with Donna, correct?

1  A.  Yes, I did.

2  Q.  Donna suggested that perhaps it would make sense to

3  register some web names or domain names?

4  A.  Yes, she did.

5  Q.  So that if it was successful, you all would have the

6  website, so to speak, or the web address I guess it's called?

7  A.  A separate website, correct.

8  Q.  Let me show you B66?

9      MR. SREBNICK:  If I could offer that into evidence

10  without objection, Judge.

11     MS. COHEN:  No objection, your Honor.

12     THE COURT:  66 is in evidence.

13     (Defendant's Exhibit B66 received in evidence)

14     MR. SREBNICK:  If we could publish it.  I'm moving as

15  quickly as I can.  I hope everybody bears with me.

16  Q.  Donna says, "The visit to Godaddy.com website" -- and for

17  those of us who don't see commercials on TV, Go Daddy is where

18  domain names are purchased by people and companies?

19     MS. COHEN:  Objection, your Honor.

20     THE COURT:  You're testifying now?

21     MR. SHARGEL:  I'm asking him.

22     THE COURT:  Objection sustained.

23  Q.  Do you know what Go Daddy is?

24  A.  Yes, I do.

25  Q.  Please tell us what Go Daddy is.

1  A.  It's a place that you can register.  It's a company that

2  you can register a website.

3  Q.  Donna is proposing to register the websites under those

4  names so that they become the property, so to speak, of

5  Cardiac?

6          MS. COHEN:  Objection, your Honor.

7          THE COURT:  Sustained.

8  A.  Of the heart club.

9          THE COURT:  Sustained.  You don't have to answer.

10  Q.  What was Donna proposing?

11  A.  Different kinds of names.

12  Q.  This is September 10 of 2007, right, the email?

13  A.  Yes.

14  Q.  As early as September '07 there is this discussion about

15  HeartOne Club.  I would like to now turn to some emails in

16  November of 2007.

17          MR. SREBNICK:  B67 I offer into evidence.

18          MS. COHEN:  No objection, your Honor.

19          THE COURT:  B67 is in evidence.

20          (Defendant's Exhibit B67 received in evidence)

21  Q.  Do you see it's an email from Donna to you, November 8,

22  2007?  Excuse me.  November 6, 2007.  I need to check my

23  glasses.  If we could publish just the top half of the email,

24  the entire top half.  It's a press release that's going to

25  announce that Cardiac will launch, not it has launched but will

1  launch the HeartOne Club, right?

2  A.  It refers to launch.

3  Q.  The first sentence is, "Cardiac Network today announced

4  that they will launch the HeartOne Club," blah-blah-blah,

5  right?

6  A.  Correct.

7  Q.  That's the first draft.  I'd like to show you B68, the next

8  email.  The one we just saw was 1:33 p.m.

9        MR. SREBNICK:  I'd offer B68, Judge, an email at 2:27

10 p.m. that same day.

11       MS. COHEN:  No objection.

12       THE COURT:  Received in evidence B68.

13       (Defendant's Exhibit B68 received in evidence)

14 Q.  You see this appears to be an email.  If we can just do the

15 top half to make it easy for the jury.  Its subject is New One.

16 Do you remember this, that there were some edits made to the

17 email -- excuse me -- to the proposed press release, and it was

18 emailed from Donna to you?  Do you recall that?

19 A.  Probably, yes.

20 Q.  Let's go to B69.

21       MR. SREBNICK:  Judge, I'd offer B69.

22       MS. COHEN:  No objection.

23       THE COURT:  Is this another draft of the same press

24 release?

25       MR. SREBNICK:  Yes, it is.

1          THE COURT:  How many drafts are we going to see?

2          MR. SREBNICK:  It's a revised draft, Judge, I should

3    say, not the exact same draft.  It's a revised draft.

4          THE COURT:  How many drafts are we going to see of the

5    press release?

6          MR. SREBNICK:  I think one this is the last one.

7          THE COURT:  Good.  I hope so.

8          MR. SHARGEL:  That's correct.

9          MR. SREBNICK:  That's the business.

10   Q.  "Donna sends you the final copy that should go out at 2:48

11   p.m.," do you see that?

12   A.  Yes.

13   Q.  Very good.  Do you recall that Cardiac paid for this press

14   release to be issued, paid to MacReport.net?

15   A.  If you say so, I believe you.

16         MR. SREBNICK:  Judge, I'll offer, and we don't need to

17   publish now, B65 and B70.  I move into evidence the emails and

18   payments that deal with that issue.

19   A.  What number?

20         THE COURT:  65 and 70.  Any objection, Ms. Cohen?

21         MS. COHEN:  No objection, your Honor.

22         THE COURT:  B65 and B70 are in evidence.

23         (Defendant's Exhibits B65 and B70 received in

24   evidence)

25         MR. SREBNICK:  Now I'd like to show you what I need to

1    mark as a different number because we don't have it premarked.

2    Judge, I'm going to mark B89.  May I approach the witness?

3    It's the only copy.

4                THE COURT:  Yes.

5                MR. SREBNICK:  Is there any objection to B89?

6                MS. COHEN:  No, your Honor.

7                MR. SREBNICK:  I move into evidence B89.

8                THE COURT:  B89 is received in evidence.

9                (Defendant's Exhibit B89 received in evidence)

10   Q.  Do you see this is an email?  I don't know how good your

11   eyes are.

12   A.  Not so good.

13   Q.  That makes two of us.  From Zev Helfer to Eli Gang, January

14   31 of 2008.  Do you see that?

15   A.  Yes, I do.

16               MR. SREBNICK:  Now let me publish it to the jury, if I

17   could, on the ELMO.

18               THE COURT:  Yes.

19   Q.  It appears to be an email from you to Eli Gang with an

20   attachment Cardiac underscore network underscore inc2.doc.  Do

21   you see that?

22   A.  Yes.

23   Q.  You use the words "try this," do you see that?

24   A.  Yes.

25   Q.  If I turn the page, do you see that this is a proposed

1  press release that in fact you are sharing with Dr. Gang to

2  announce the launching of HeartOne that had been previously

3  delayed?  Do you see that in the first paragraph?

4  A.  Yes, I do.

5  Q.  I'll pull it off the screen for a moment.  Do you remember

6  that one of the early press releases had language in it about

7  cardiovascular disease affecting 70 million people, etc.?

8  A.  Yes.

9  Q.  We talked about that at the beginning of my examination.

10 A.  Yes, I do.

11 Q.  Do you see that you incorporated it into this proposed

12 press release that you sent to Eli Gang?

13         MS. COHEN:  Objection, your Honor.

14         THE COURT:  Sustained.

15 Q.  Do you see that that language appears in this press

16 release, the language about 70 million people, 1.1 million

17 Americans suffering heart attacks, etc.?

18 A.  Yes.  I forwarded the email that I received from Donna.

19         THE COURT:  Do you have a question, Mr. Srebnick?

20         MR. SREBNICK:  Yes, I do.

21 Q.  Yesterday you were asked about a press release regarding

22 this company called HealthCare Options.  Yesterday you had no

23 recollection of that press release, correct?

24 A.  Correct.

25 Q.  In fact, yesterday you had no recollection of HealthCare

1    Options at all, correct?

2    A.   Correct.

3    Q.   Today Mr. Shargel showed you documents that show that your

4    company was actually paying and had hired HealthCare Options,

5    correct?

6    A.   This is true.

7    Q.   That there was a contract with HealthCare Options between

8    Cardiac and HealthCare Options, correct?

9    A.   This is true.

10   Q.   With your signature on it, correct?

11   A.   This is true.

12   Q.   Would it be fair to say, then, that you had simply

13   forgotten about HealthCare Options, the press release about

14   HealthCare Options, the contract about HealthCare Options when

15   you testified to the jury yesterday?

16            MS. COHEN:  Objection, your Honor.

17            THE COURT:  Sustained.

18   Q.   Had you forgotten about it?

19            MS. COHEN:  Objection.

20            THE COURT:  Sustained.

21   Q.   Why did you tell the jury under oath yesterday that there

22   had never been any relationship between HealthCare Options and

23   Cardiac?

24            MS. COHEN:  Objection.

25            THE COURT:  Sustained.

D38rlev3

1    Q.  Do you want to change your testimony from yesterday?

2              THE COURT:  Sustained.

3              MR. SREBNICK:  Judge, I have one more area, and I'll

4    be done.

5              THE COURT:  Are you going to get to that area now?

6              MR. SREBNICK:  Yes, Judge.  I just need one minute.  I

7    have done my best to shorten it up.  Thank you.

8              Judge, I have good news.  I'm all done.  Thank you.

9              MS. COHEN:  The government has no redirect, your

10   Honor.

11             THE COURT:  Mr. Helfer, you are excused.  Thank you.

12             (Witness excused)

13             THE COURT:  Mr. Master?

14             MR. MASTER:  At this time the government calls Eli

15   Gang.

16    ELI GANG,

17       called as a witness by the government,

18       having been duly sworn, testified as follows:

19             THE COURT:  Doctor, could you spell your name for the

20   record, please.

21             THE WITNESS:  Yes.  The last name is gang, G-A-N-G.

22             THE COURT:  Go ahead, Mr. Master.

23   DIRECT EXAMINATION

24   BY MR. MASTER:

25   Q.  Where were you born, sir?

1    A.   Israel.

2    Q.   When did you move to the U.S.?

3    A.   1960.

4    Q.   Where did you grow up?

5    A.   Brooklyn.

6    Q.   Where did you go to college?

7    A.   Columbia College.

8    Q.   Where did you go to medical school?

9    A.   Columbia University in New York.

10   Q.   Where did you do your post-doctoral training?

11   A.   In the Columbia system, Roosevelt Hospital and Columbia

12   University, the main hospital.

13            THE COURT:  Doctor, could you speak right into the

14   microphone, please.  Pull your chair up.  Thank you.

15   Q.   For how long have you been a practicing physician?

16   A.   30 years or so.

17   Q.   What is your area of specialty?

18   A.   Cardiology and clinical electrophysiology.

19   Q.   Could you explain to the jury what that means.

20   A.   Yes.  Electrophysiology is a subsection, a subspecialty of

21   cardiology that deals with rhythm disturbances of the heart.

22   Q.   Where do you work now?

23   A.   In Los Angeles at Cedar Sinai Medical Center and in a

24   private practice group, a multispecialty group, cardiology

25   group mostly.

1    Q.  What, if any, faculty positions do you have?

2    A.  I'm at the UCLA Medical School, clinical professor of

3    medicine.

4    Q.  How many publications have you authored?

5    A.  About 130.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. MASTER:

2    Q.  And how many patents have you obtained?

3    A.  With my name on them, about 12.  Then I cooperated on about

4    50 others.

5    Q.  How do you know Zev Helfer?

6    A.  I met him about 25 years ago, 20 years ago, thereabouts.

7    Q.  How did you meet him?

8    A.  Yeah, he was at the time running a company that did cardiac

9    monitoring and it turns out we have mutual friends from Israel

10   and I was introduced to him and thought I might do business

11   with him.  It turned out I didn't at the time.

12   Q.  And I'd like to direct your attention to 2006.  Did there

13   come a time when Zev contacted you during that year with a

14   business idea?

15   A.  Yes.  He called me around 2006 and said he thought about

16   starting another Cardiac monitoring company and would I be

17   interested in being the medical director and I said yes.

18   Q.  What was the concept?

19   A.  The concept, which is already and has been and was before

20   then readily available to doctors, is that patients can wear

21   monitoring or employ monitors for heart rhythm disturbances.

22   They can take it home with them.  They can take it anywhere

23   they want to and should they have symptoms or not, there are

24   different units with different technologies, the information

25   can be sent over the telephone at the time -- now it's done

1    through cell phone technology -- to a 24/7 monitoring station

2    that can determine if the patient has a real rhythm problem or

3    not.  It's a service to physicians and to patients.

4    Q.  And from where were you going to get the technology?

5    A.  There are a few companies that make that kind of a

6    recording system and work stations available.  The one that we

7    ultimately chose was an Israeli company called Aerotel.

8    Q.  Who identified that technology?

9    A.  That company?

10   Q.  Yes.

11   A.  I think it may have been Zev, but I'm familiar with the

12   company.

13   Q.  And what did you think of the technology?

14   A.  It was state of the art at the time.

15   Q.  Now, who was going to provide the funding for this idea?

16   A.  Well, at first we didn't know, but ultimately it turned out

17   to be David Levy and Fotis.

18   Q.  Now, we'll get to that in a moment.  Who initially was

19   going -- to your understanding was going to provide the

20   funding?

21   A.  I don't know if there was funding initially that provided,

22   but there was at least one investor that was introduced to me

23   whose name I forget now, someone from Florida who had put in

24   some money, some initial seed money.

25   Q.  And what happened to that initial seed money?

1    A.   I think it was expended in the setting up of the company.

2    So, it was not sufficient.

3    Q.   And, again, did there come a time when you learned that Zev

4    had met David Levy in connection with his efforts to find

5    additional funding for the company?

6    A.   Yes.

7    Q.   When is the first time you met David Levy?

8    A.   Sometime in the winter of 2007, I think, early 2007.

9    Q.   And who if anyone was with him when you met him?

10   A.   So Fotis was there, and I'm not a hundred percent sure

11   whether Zev was there or not.

12   Q.   Where did you meet?

13   A.   Few blocks from my office in Los Angeles at a restaurant.

14   Q.   And what if anything did David and Fotis say they were

15   prepared to do for the company at that meeting?

16   A.   They were prepared to invest in the company.

17   Q.   How specific were they at that initial meeting?

18   A.   I think pretty specific.  They said they had the funds with

19   which to invest and that they were interested.  I think the

20   purpose of my meeting them was to describe the technology and

21   the concept of the company and the interaction between the

22   patients, physicians, and the company and what the business

23   plan would be in that respect.

24   Q.   Now, did you discuss exactly how much funding they would be

25   prepared to provide at that initial meeting?

1  A.  I don't recall.

2  Q.  And following that meeting, what if any contact with them

3  did you have over the next several weeks?

4  A.  I think there was several phone calls and there was one

5  more face-to-face meeting in my office a few weeks later.

6  Q.  And during those subsequent phone calls and face-to-face

7  meetings, what specifically did David say that he and Fotis

8  were willing to give the company in the way of initial

9  financial support?

10  A.  There was going to be about a million dollars.  Ultimately

11  I think it became a million point two.

12  Q.  And what else did David Levy say he was prepared to do for

13  the company, if anything, beyond that 1.2 million?

14  A.  They were going to support the company.  This was their

15  investment.

16  Q.  And what did you understand that to mean?

17        MR. SHARGEL:  Objection.

18        THE COURT:  Overruled.

19  Q.  What did you understand "support the company" to mean

20  beyond the 1.2 million?

21  A.  That this was their investment.  If more funds were needed

22  that they would back us up.

23  Q.  Now, based on your dealings with David Levy and Fotis, what

24  led you to the conclusion that they could actually deliver on

25  this commitment?

1   A.  Well, I didn't see their bank accounts, no.  But they spoke

2   and they said that they had business experience and that they

3   had the money.  Zev told me he had visited David's home.

4           MR. SHARGEL:  Objection to what Zev told him.

5           THE COURT:  Sustained.

6   Q.  Did there come a time when you were given a draft of a

7   letter of intent concerning the deal?

8   A.  Yes.

9   Q.  What did you do when you saw the draft?

10  A.  I read it.  I think I made some comments on it and,

11  ultimately, it was accepted.

12  Q.  Now, what was your understanding of what David and Fotis

13  would get in return for this investment, this initial

14  investment?

15  A.  Shares in the company that was going to be formed.

16  Q.  And what did you understand you would be getting once this

17  company was formed?

18          MR. SHARGEL:  Objection to the foundation.

19          THE COURT:  Give a little more foundation, Mr. Master.

20  Q.  Well, you just testified that you understood David and

21  Fotis would be getting shares in the company in return for

22  their initial investment.

23          What were you intending to do for this company once it

24  was formed?

25  A.  What was my role in the company?

1   Q.   Yes.

2   A.   Right.  I was going to be the medical director of the

3   company, so I would be in charge of making sure that the

4   medical aspects of it functioned appropriately.

5   Q.   And what if any role would you have on the company's board

6   of directors?

7   A.   A seat on the board.

8   Q.   And what, among other things, were you expecting to receive

9   in exchange for the services you were going to be providing to

10  that company?

11  A.   I was promised shares in the company as well.

12  Q.   And what kind of shares did you understand that you would

13  be receiving based on your conversations with David Levy?

14  A.   Restricted shares, shares that couldn't be traded for a

15  period of time.

16  Q.   And did you -- what was your understanding at the time of

17  how long you would be unable to trade your shares?

18  A.   About one year.

19  Q.   Now, what kind of shares did David Levy tell you that he

20  and Fotis would be getting?

21  A.   Same shares, restricted shares.

22  Q.   And what did he say about how your shares would be treated

23  vis-a-vis his shares and Fotis's shares?

24  A.   Exactly the same way.

25  Q.   And what was your understanding of how this transaction

1    would occur?

2    A.  Well, I was introduced to the concept of a reverse merger,

3    which I did not know much about before.  So an existing

4    company -- do you want me to speak about this?

5              THE COURT:  Yes.

6              THE WITNESS:  Certainly not my area of expertise.

7              THE COURT:  He asked you to give us the best of your

8    understanding, Doctor.

9              THE WITNESS:  OK.

10   A.  An existing company that was on the stock exchange on the

11   bulletin board would act as a recipient or as a shell for into

12   which our company would fold and the shares would be named

13   Cardiac Network, which was the name of our company, and that

14   company would become listed instead of that company on the

15   bulletin board.

16   Q.  Now, how much experience, if any, did you have with taking

17   companies public prior to this?

18   A.  None.

19   Q.  Now, who drafted the documents related to this merger?

20   A.  I didn't and Zev didn't, so I presumably --

21             MR. SHARGEL:  Excuse me.  I object to that,

22   "presumably."

23   Q.  Who provided you with copies of the documents to be

24   reviewed?

25   A.  David and Fotis gave us the copy.

D38LLEV4                     Gang - direct

1    Q.  Did you retain separate counsel in reviewing the documents?

2    A.  No.

3    Q.  Now, in these discussions about the merger, how if at all

4    did David say that he would be raising money for the company?

5    A.  He didn't.  He said he was investing.

6    Q.  And so what was your understanding of what he meant by when

7    he said he would be investing?

8    A.  I assumed that Fotis and David had funds.

9         MR. SHARGEL:  I object to the "assumed."

10        THE COURT:  Doctor, you got to tell us what you know.

11   You can't be guessing and assuming.  If you know, you can say.

12   If you don't know, then you don't know.

13        All right, Mr. Master.

14        MR. MASTER:  Yes, your Honor.

15        THE WITNESS:  I assume that I don't know.

16        MR. SHARGEL:  All right.  Got me.

17        THE COURT:  Mr. Shargel doesn't object to that.

18   Q.  How many shares did you receive as part of the merger?

19   A.  Something around 5 million.

20   Q.  And how much did you receive from the company?

21   A.  I think something to that order, right.

22   Q.  And how many shares, if any, did you receive from David?

23   A.  500,000.

24   Q.  And what was the status of the shares you received from the

25   company, that is, restricted versus unrestricted?

D38LLEV4                    Gang - direct

1    A.  They were all restricted.

2    Q.  So the shares you received from David were restricted as

3    well?

4    A.  Yes.

5    Q.  Now, what -- you just stated that in your prior testimony

6    that you were going to be medical director of this company.

7    Did you in fact serve in that capacity?

8    A.  Yes, I did.

9    Q.  And what if any compensation did you agree to receive for

10   those roles on the board and as medical director?

11   A.  Sometime after the company was formed, I was given an

12   agreement or I was offered an agreement to get $5,000 a month

13   for that role serving as medical director.

14   Q.  I'm going to show you what's been marked for identification

15   as 201-29.  Do you recognize that document?

16   A.  Yes.

17   Q.  How do you recognize it?

18   A.  It's got my electronic signature at the bottom, an email.

19          MR. MASTER:  Your Honor, at this time the government

20   offers 201-29.

21          MR. SHARGEL:  No objection.

22          THE COURT:  201-29 is received in evidence.

23          (Government's Exhibit 201-29 received in evidence)

24   Q.  If you can just start at the bottom.  Do you recall

25   discussing with David Levy and Zev your expectations of

1    receiving money from Cardiac Networks for the services you were

2    intending to provide?

3    A.   Yes.

4    Q.   And what was David Levy's reaction in response to your

5    request for funding or, I'm sorry, for compensation from the

6    company?

7    A.   I don't recall that he had any specific response.

8    Q.   Well, do you recall that he opposed it?

9    A.   No, he did not oppose it.

10   Q.   And for how long did you actually draw that $5,000 monthly

11   compensation?

12   A.   A few months.

13   Q.   And then what happened?

14   A.   Then the company ran out of funds and I stopped getting it.

15   Q.   Did you continue to provide unpaid services for the company

16   after that?

17   A.   Yes.

18   Q.   Now, with respect to the money that was brought in as a

19   result of this investment from David Levy and Fotis, what did

20   you do with that money -- what did the company do with the

21   money?

22   A.   What did the company do.  Well, immediately there were

23   large expenses in buying the equipment that I started

24   describing to you, the actual monitors, the work stations.  We

25   had to hire technicians.  We had to train the technicians.  We

484

1    had to pay them while they were studying to pass the California

2    state exam for medical ECG technicians.  We had to pay rent to

3    an office, salaries to secretarial help, and to the chief

4    technician who was in charge of the other technicians.

5    Q.  And for how many hours a day did you have to keep this

6    operation?

7    A.  Twenty-four hours a day, seven days a week in order to

8    comply with regulations.

9    Q.  And for how long did it take you to get your Medicare

10   number?

11   A.  Longer than expected.  It took close to a year.

12   Q.  And what effect did that have on the company's business?

13   A.  Well, it was stultifying because where you thought you

14   could provide service to the doctors without a Medicare

15   license, you can't.  So we didn't really operate as a

16   functional company for a lot longer than anticipated.

17   Q.  And even without a Medicare number, what sort of expenses

18   did the company have to incur?

19   A.  Well, the technicians needed to be paid, salaries needed to

20   be paid, rent needed to be paid, those sorts of things, and the

21   equipment purchased early on, wiring of the office for this

22   kind of a system.

23   Q.  Now, what was the status of the company's finances by early

24   2008?

25   A.  Not very good.

1   Q.  All right.  Let's go back to the summer of 2007.  At that

2   time, what if anything were you doing to check the price of

3   Cardiac Network's stock?

4   A.  Occasionally checked it on the internet.

5   Q.  And did there come a time when you noticed the price of

6   Cardiac Network stock start to increase significantly?

7   A.  I was about to change my name to Donald Trump.  Yes, the

8   stock price went up, yeah.

9   Q.  Well, during the summer of 2007, what if any ability did

10  you have to sell any of your Cardiac Network shares?

11  A.  None.  They were restricted shares.

12  Q.  How high do you remember the stock going?

13  A.  Over $3.

14  Q.  And what happened, what do you remember happening to the

15  stock after it reached that peak of over $3?

16  A.  It went down.

17  Q.  How far did it go down?

18  A.  To below a dollar, ultimately to pennies.

19  Q.  And during this time, what did you observe happening to the

20  trading volume or the number of shares being exchanged?

21  A.  To the extent that I followed it, there were days when

22  there were many millions of shares traded, other days when

23  there weren't.

24  Q.  Now, did there come a time when you asked David Levy

25  whether he or Fotis were selling their shares during this

D38LLEV4                    Gang - direct

1   period of increased price and volume?

2   A.  Yes.

3   Q.  And what did David Levy tell you in response to your

4   questions?

5   A.  We have the same restricted shares you do.

6   Q.  And what did he say about whether he was selling any of his

7   shares?

8   A.  Not selling.

9   Q.  Did there come a time when you asked Fotis the same

10  question?

11  A.  Yes.

12  Q.  What was his answer?

13  A.  Multiple times the same answer.

14  Q.  Which is?

15  A.  We all have restricted shares.  Doc, we're all in the same

16  boat.

17  Q.  Now, what reason if any did David give you for the movement

18  in the trading price and volume that you observed?

19  A.  It was either David or Fotis, I can't be a hundred percent

20  sure.

21          MR. SHARGEL:  Excuse me, I object to it.

22          THE COURT:  Overruled.

23          What were you told?

24          THE WITNESS:  I was told that there were people who

25  held the initial shares from the company -- Triten Energy was

1    it -- the name of the company that was the shell into which

2    Cardiac Network became integrated with -- sorry, I ended the

3    sentence with a preposition -- and that there were people who

4    had freely traded shares that were able to sell their shares at

5    these -- there were people who had nonrestricted shares.

6    Q.  Who were those people?

7    A.  As I understood it, they were the initial shareholders of

8    the prior company who still had shares.

9    Q.  And as time passed and as the company's finances worsened,

10   did there come a time that you returned to that same topic of

11   conversation with David Levy?

12   A.  Yes.

13   Q.  And what did you ask David Levy as the company's finances

14   were declining and what did he say in response?

15   A.  I made multiple phone calls in trying to get them to

16   support their investment in the company because the company was

17   essentially had no money.  The company was still a good

18   company.  The concept was still a good concept.  The technology

19   was still state-of-the-art technology, but the company couldn't

20   pay its rent.  I asked him to invest more money to keep the

21   company afloat until we could execute on the business plan.

22   Q.  And what was his answer?

23   A.  Don't have money.  I already put in a million point two, we

24   did.  We don't have any money.  We can't invest any more.

25   Q.  And when if ever did you return to this topic of whether

1  David Levy was selling any of his shares in the company?

2  A.  I'm sorry?

3  Q.  In the context of this conversation, did there come a time

4  when you asked David Levy whether he was making money off the

5  sale of shares?

6          MR. SHARGEL:  Object to the form of the question.

7          THE COURT:  Overruled.

8  A.  Yeah.  More than a year after the company was formed, you

9  know, officially, to my understanding, the restriction of the

10 shares would no longer be valid.  When I asked for more money

11 for the company to survive, I think I asked on multiple

12 occasions are shares being sold and can we have money to

13 support the company and keep it alive.

14 Q.  And what did David Levy tell you in response?

15 A.  That shares are not being sold.

16 Q.  And how about whether there were -- whether he had any

17 money left to invest in the company?

18 A.  None.

19 Q.  And what did Fotis tell you in response to those same

20 questions?

21         MR. SHARGEL:  Objection.

22         THE COURT:  Overruled.

23 A.  Same answer.  We put in a million two into a company.  The

24 company is not doing well.  We're not going to put any more

25 money into it.  We have no money.

1   Q.  What did you try to do to get financing for this company

2   after David Levy and Fotis said they had no more money to give?

3   A.  Well, various other investors were sought and then various

4   other people got involved in trying to invest in the company.

5   It was not successful.

6   Q.  And did there come a time when you started taking money out

7   of your own savings to help support the company?

8   A.  Yes.

9   Q.  How much money did you put in to help support the company?

10  A.  Somewhere between 40 to $50,000.

11  Q.  And, again, during this time, what happened to the $5,000 a

12  month that you were supposed to be receiving for those services

13  that you were providing to the company?

14  A.  It had long since stopped.

15  Q.  And at that time who if any of the initial, who else if any

16  of the founders started putting in their own savings to help

17  the company?

18  A.  Eric Buchwald put in money as well, his own personal money.

19  Q.  And during the period of your involvement in the Cardiac

20  Networks, how much additional money if any did David Levy put

21  into the company?

22  A.  I recall ten to $20,000 or so.

23  Q.  During the course of your work with Cardiac Networks, what

24  if any involvement did you have in approving press releases?

25  A.  I didn't approve them, but I had a chance to see a couple

1  of them sent to me by email, a couple of them.

2  Q.  And when you did see the certain press releases, what did

3  you look for?

4  A.  For what I thought was a realistic representation of what

5  we were doing.

6  Q.  And what would happen if you saw something that you thought

7  was unrealistic?

8  A.  I made some changes, as I recall, but I don't remember the

9  specifics.

10  Q.  And when you did make some changes or proposed changes,

11  what if any knowledge do you have about whether those changes

12  made their way into the final press release?

13  A.  I don't know.

14  Q.  And what if any involvement did you have with any

15  promotions by third parties concerning Cardiac Network's stock?

16  A.  None.  We did do one promotional video that I participated

17  in, a video that was shown on the internet about the technology

18  of the company.

19  Q.  Was that in the context of promoting the stock or promoting

20  the actual business?

21  A.  No, promoting the company, the services offered by the

22  company.

23  Q.  When if ever did Donna Levy -- withdrawn.

24        Who to your understanding was responsible for press

25  releases for this company?

1    A.  Donna, among others.

2    Q.  And when if ever did Donna check medical facts or figures

3    with you as far as you can recall?

4    A.  I don't remember.

5    Q.  Well, do you remember any occasion on which Donna Levy

6    checked medical facts and figures with you?

7    A.  No, not specifically.

8    Q.  Now, how much gross revenue did you think that the company

9    realistically could earn if you carried out your business plan

10   successfully?

11   A.  Between 50 to a hundred million a year I thought was

12   reasonable based on what at least one other company that is

13   successful is doing right now.

14   Q.  I'd like to direct your attention to the summer of 2008.

15   Did there come a time when you were presented with a proposal

16   from an entity called American Marketing Complex?

17   A.  So far I've got a blank screen.

18   Q.  There's no exhibit before you.  Let me ask the question

19   again.

20        In the summer of 2008 did there come a time when you

21   were presented with a proposal from an entity called American

22   Marketing Complex?

23   A.  Norman, yes.  Norman someone.

24   Q.  And what do you remember about it?

25   A.  I remember actually not understanding it very well.  We

1    were going to get some kind of marketing credits in return for

2    shares from the company and that would somehow translate into

3    money for the company and how we went from point A to point B

4    wasn't clear to me.

5    Q.  And what if anything did the company do to vet this

6    proposal from American Marketing Complex?

7    A.  We hired or the company hired a securities attorney here in

8    New York.

9    Q.  And what was the result of that review by the securities

10   attorney?

11          MR. SHARGEL:  I object to that.

12          THE COURT:  Overruled.

13          MR. SHARGEL:  Hearsay objection.

14          THE COURT:  I know.  It's overruled.

15   A.  We were told that it was something that we should pursue or

16   that it was a reasonable thing to do.

17   Q.  And what was your understanding of what happened with that

18   proposal?

19   A.  I think shares were authorized to Norman King but funds

20   were never received.  The company never received funds.

21   Q.  And what happened soon after that deal was signed?

22   A.  The company went, you know, belly up.  Well, not

23   completely, but became dysfunctional.

24   Q.  And what happened to Zev Helfer soon after the deal was

25   signed?

1   A.  He was shown the door.

2   Q.  What if any involvement did you have in showing Zev Helfer

3   the door?

4   A.  None.

5   Q.  And what if any continued involvement did you have in the

6   company after Zev was forced out?

7   A.  Zev's replacement asked me to stay on and I stayed on for a

8   couple more months and then I resigned.

9   Q.  And how much revenue was the company taking in when you

10  resigned?

11  A.  To my knowledge, none.

12  Q.  And what's the reason that you resigned?

13  A.  I was unhappy with the direction of the company and thought

14  there was more harm than good coming to me from being a part of

15  that company.

16  Q.  After you left, did there come a time when you and Zev

17  tried to buy the company back from David?

18  A.  Yes.  In an attempt to keep the company viable, Zev found

19  an investor or investors who said they would possibly consider

20  investing in Cardiac Network.

21          MR. SHARGEL:  I object to what was said.

22          THE COURT:  That's hearsay, Mr. Master.

23          MR. MASTER:  Yes, your Honor.

24  Q.  If you could just answer, did there come a time when you

25  and Zev tried to buy the company back?

1    A.  So the answer is yes.

2    Q.  And what happened to that proposal?

3    A.  It was rejected by David and Fotis.

4    Q.  Now, what happened to those millions of shares in

5    restricted stock that you held in Cardiac Networks?

6    A.  Well, about two years later they became unrestricted and I

7    got a certificate bearing some number of shares which I gave a

8    brokerage house here in New York.

9    Q.  And what did you do after the shares arrived in the

10   brokerage house?

11   A.  I told the broker to sell enough shares that would make up

12   for the loss that I had incurred and eventually he did.  So,

13   eventually I broke even.

14   Q.  When you say break even, what do you mean?

15   A.  Eventually I netted somewhere between 40 to $50,000 from

16   shares being sold over the period of a few months, I think.

17   Q.  And when if ever did you get compensated for the unpaid

18   labor that you've given to that company?

19   A.  No, I did not.  I meant out-of-pocket money that I'd spent.

20   Q.  And back to the question about trying to buy the company

21   back, approximately when or how long after Zev was forced out

22   of the company did you and Zev try to buy the company back?

23   A.  Within six to 12 months, I think.

24   Q.  And why did you want to buy the company back?

25   A.  Well, I still believed in the concept and I still believe

1    in the technology.  The technology and the concept are very

2    viable, so I thought we still might be able to make a go of it.

3    Q.  And were you able to sell all of your shares of Cardiac

4    Networks when you gave those shares to the broker?

5    A.  No, I didn't want to and I didn't.  Bottom line is I

6    didn't.

7    Q.  And what is the status of your remaining holdings in

8    Cardiac Networks?

9    A.  I think they're worth a few pennies.  They show up on my

10   monthly statement, but they're essentially worthless.

11             MR. MASTER:  No further questions.

12             THE COURT:  Mr. Shargel.

13             Would the jury like to take the afternoon recess now?

14             Mr. Shargel.

15             MR. SHARGEL:  I would like to.

16             THE COURT:  You would.  Why don't we take a 15-minute

17   break.

18             (Recess)

19             THE COURT:  Mr. Shargel.

20             MR. SHARGEL:  Thank you, Judge.

21   CROSS-EXAMINATION

22   BY MR. SHARGEL:

23   Q.  Mr. Gang, good afternoon.

24   A.  Good afternoon.

25   Q.  My name is Jerry Shargel.  I'm David Levy's lawyer in this

1   matter.

2          You met David Levy for the first time in California?

3   A.  Yes.

4   Q.  In fact, you had a meeting in Beverly Hills, is that where

5   your office is?

6   A.  Yes.

7   Q.  And it was at a restaurant you met him for the first time?

8   A.  Yes.

9   Q.  And at that restaurant you discussed the prospective

10  relationship with David Levy, right?

11  A.  Yes.

12  Q.  And you had heard about David Levy from your friend,

13  Mr. Helfer, right?

14  A.  Correct.

15  Q.  And after the meeting, when in relation to the meeting in

16  Beverly Hills did the term sheet get generated?

17  A.  I can't --

18  Q.  Approximately.  I'm not trying to pin you down --

19  A.  OK.

20  Q.  -- a month or day.  But approximately?

21  A.  A few weeks.

22  Q.  A few weeks later the term sheet arrived, right?

23  A.  Yes.

24  Q.  And you are a physician, but you've had, as I think you

25  described, business relationships as well, right?

1  A.  Limited.

2  Q.  But some business relationships, right?

3  A.  Yes.

4  Q.  You know, I mean you've been defining terms like reverse

5  merger and as you understood it and restricted stock.  You

6  learned that over the years, right?

7  A.  Yes.

8  Q.  And over the years you probably entered into many

9  contracts, right?

10  A.  No, actually very few.

11  Q.  There were inventions with your name on it, you told us

12  about that, right?

13  A.  Yes.

14  Q.  And you had other business relationships in connection with

15  those ventures or not?

16  A.  Yes, one.

17  Q.  And so --

18  A.  I was quibbling with the word many.  You said many.

19  Q.  To remove the quibble, you know what a contract is, right?

20  A.  Yes.

21  Q.  And you know that when parties sign a contract, they are

22  bound by the terms, right?

23  A.  Yes.

24  Q.  And you know that the contracts supersede any side

25  agreements or side deals, right?

1              MR. MASTER:  Objection.

2     Q.  If you know.

3              THE COURT:  Overruled.  If you know.

4     A.  Yes.

5     Q.  So let me show you what's been marked I believe -- in

6     evidence, not marked, well, marked in evidence as 201 I think

7     it's 38, the confidential term sheet.  This is a document

8     that's already in evidence.  We'll have it up on the screen in

9     a moment.  We have it as A5, Jen.

10             All right.  So you recognize this document, don't you?

11    A.  Yes.

12    Q.  And you see that and let me cut right to the chase.

13             You see that in the transaction summary, do you see

14    that this transaction, this transaction shall consist of two

15    separate financings.  The first financing will be a short-term

16    bridge loan, $200,000, and the second financing transaction

17    will be a private placement of up to $1 million.

18             Right?

19    A.  Yes.

20    Q.  And this was expected of Fotis and Mr. Levy to provide that

21    financing, right?

22    A.  Yes.

23    Q.  And clearly it says up to $1 million, right?

24    A.  Yes.

25    Q.  Have you, sir, ever seen a document, an email or any other

1    paper, that suggests that Mr. Levy was promising more than

2    $1 million?

3    A.   Document?

4    Q.   Yes, a document.

5    A.   No.

6    Q.   Email?

7    A.   Conversations, yes.

8    Q.   Contract?

9    A.   Conversations, yes; document, no.

10   Q.   Conversations in Beverly Hills?

11   A.   No, by telephone.

12   Q.   Let me ask you a question.  If it turned out after a period

13   of time -- and you told us on direct examination that the

14   company received the $1.2 million, right?

15   A.   Yes.

16   Q.   And even some more was invested, small amounts as you

17   remember after that, correct?

18   A.   Yes.

19   Q.   You have to answer orally.

20   A.   Yes.  The answer is yes.

21   Q.   But what if -- and you were asked several times by

22   Mr. Master about what your understanding was of conversations

23   that you had with David Levy, right?

24   A.   Yes.

25   Q.   What was your understanding of how much money David Levy

1    would be obligated to put in addition to $1.2 million -- I'll

2    say that for rough number, right -- what was your understanding

3    of what he was required to put into the company if he hated,

4    despised, and loathed Zev Helfer after the initial investment,

5    what was your understanding there?

6    A.  His hating, despising, and loathing of Zev Helfer never

7    came up.

8    Q.  That wasn't my question.  I said did you have any

9    understanding, if he were disappointed with Helfer's style of

10   management -- I'll withdraw that question.  I'll put another

11   one.

12            What if he lost confidence in Zev Helfer and you, was

13   he still obligated under some contract to just keep feeding

14   money into this business; is that your understanding?

15   A.  You're waiting for my answer?

16   Q.  Yes, I'm waiting for your answer.

17   A.  The answer is no.  A bad investment is a bad investment.

18   We had verbal assurances, but I had no written agreement that

19   he would invest more.

20   Q.  And even with verbal assurances, he had the right like any

21   of us in this courtroom to change his mind, right?

22   A.  Yes.

23   Q.  Because there was nothing like that contract that bound him

24   to supply more, right?

25   A.  There was no other contract.

1   Q.  Now, you told us the number of times in response to

2   questions, look, you're a well-known and respected

3   cardiologist.  Business is not your thing.  So that was the

4   import of your testimony on direct.  Right?

5   A.  Yes.

6   Q.  But after this term sheet -- there came a time you saw this

7   term sheet, right?

8   A.  Yes.

9   Q.  And you were very interested.  This was a business venture.

10  You were very interested in the outcome.  Right?

11  A.  Yes.

12  Q.  The outcome always starts with the first step and the first

13  step is a contract of sorts like this term sheet, right?

14  A.  Yes.

15              MR. MASTER:  Objection.

16              THE COURT:  Overruled.

17              MR. SHARGEL:  Made me lose my train of thought but I

18  got it back.

19              THE COURT:  Good.  Hang on to your hats.

20  Q.  Let me show you what's been received in evidence as we

21  have --

22              MR. SHARGEL:  It's A6, Jen.

23              At a later time we'll put on the record the Government

24  Exhibit number is.

25  Q.  This is a an email from you, EPGang@aol, that's accurate?

1   A.  That's me.

2   Q.  And you're familiar with this document, right?

3   A.  Yes.

4   Q.  Because even in preparation for your testimony you reviewed

5   it, right?

6   A.  Yes.

7   Q.  And the prosecutors -- I know it goes back to 2007, but the

8   prosecutors -- nothing wrong with it -- but the prosecutors

9   showed you the document again and prepared your testimony,

10  right?

11  A.  Yes.

12  Q.  And you have a full recollection of this event, sending

13  this email, right?

14  A.  Yes.

15  Q.  And are all six of these issues with respect to the term

16  sheet your original ideas or did you show it to someone who had

17  perhaps more business experience?

18  A.  So that's a good question.  You've heard the expression of

19  doctor playing God.  I may have been doctor playing attorney

20  here.

21         I can't recall exactly how I came up with all these

22  six points.  I may have shown it to an attorney friend.  I just

23  simply cannot recall whether I came up with these points or

24  showed it to someone.

25  Q.  You said on direct examination that you didn't consult a

 1  lawyer, that you just relied on what you were being told by

 2  Mr. Levy and Fotis, right?

 3  A.  We did not retain an attorney for this transaction.

 4  Q.  Did David Levy ever say, Doctor, don't get a lawyer

 5  whatever you do, anything like that in words or substance?

 6  A.  No.

 7  Q.  Did he ever say it's not a good idea, you just rely on us.

 8  Go don't go to a lawyer.  He didn't say anything like that?

 9  A.  I don't remember him saying anything like that.

10  Q.  By the way, one more exhibit I want to show you and it's

11  this.  This is A38.

12          MR. SHARGEL:  This is another document, Judge, it's in

13  evidence as a Government Exhibit and we'll supply the

14  appropriate number.

15          THE COURT:  Thank you.

16          MR. SHARGEL:  Can I see the bottom part.

17  Q.  So this is an email that you write in May 29, 2007.  And it

18  says thanks for sending me the employment agreement.  Before

19  signing it, I would like to request that the description of the

20  agreement be changed to a long-term consulting agreement

21  instead of employment or something similar to that, so that I

22  have no conflicts with my current cardiology partnership.

23          Do you see that?

24  A.  Yes.

25  Q.  So what conflicts might you have had with your current

1    cardiology partnership?

2    A.  Well, just the terminology.  If I'm already a partner

3    there, I don't want to be employed by someone else.  But we all

4    have consultancies that we do.  So I think our group's attorney

5    suggested that I use the word consulting.

6    Q.  You went to an attorney with respect to this?

7    A.  We have an attorney, the group has an attorney.

8    Q.  Well, was this because you didn't want to share any of your

9    income or hopeful wealth from Cardiac Network with your

10   partners?

11   A.  We each have outside interests.

12   Q.  If it's an outside interest like a consultancy, you don't

13   have to share it with your partners, right?

14   A.  That's right.

15   Q.  If it's employment, that's a different story, right?

16   A.  We're not supposed to be doing what we're doing during the

17   daytime.

18           (Continued on next page)

19

20

21

22

23

24

25

D38rlev5                    Gang - cross

1    Q.  You said a couple of times that you were led to believe or

2    you were told -- actually, forget led to believe -- that you

3    were told that David Levy had restricted shares, right?

4    A.  That's correct.

5    Q.  But you knew, you said this on direct examination, that

6    there were shares that came from the shell company, the name of

7    which you didn't recall, but that shares came from the shell

8    company that were being held, correct?

9    A.  Either David or Fotis gave me that explanation, yes.

10   Q.  You didn't remember the name.  Does the name Caspian Energy

11   ring a bell?

12   A.  That's right, it was an energy company.

13   Q.  That energy company, Caspian Energy, was the company that

14   was merged with Cardiac to form the Cardiac public company,

15   Cardiac Network, correct?

16   A.  Yes.

17   Q.  Did you know, sir, at the time that the person who acquired

18   the shell and held the unrestricted shares was David Levy?

19   A.  No.

20   Q.  You sold your shares and you got $50,000 at the end of the

21   day, you realized $50,000 from the sale of shares, right?

22   A.  More or less.

23   Q.  You said that that covered what you had taken out of

24   pocket, what you had put in, right?

25   A.  Yes.

D38rlev5                    Gang - cross

1   Q.  You were asked questions on direct examination about

2   American Marketing, right?

3   A.  Yes.

4   Q.  What is your understanding of this relationship with

5   American Marketing?

6   A.  It was never brought to fruition, as far as I know.

7   Q.  You didn't get a dollar out of American Marketing, right?

8   A.  That's correct.

9   Q.  The company didn't get a dollar out of American Marketing,

10  right?

11  A.  As far as I know.

12  Q.  But you know that 12 million shares were issued and given

13  to American Marketing, isn't that right, you knew that?

14  A.  I knew that was being discussed, yes.

15  Q.  And you knew that the company issuing 12 million additional

16  shares would dilute the stock of the company and render it less

17  valuable?

18  A.  Yes.

19  Q.  You knew that?

20  A.  The company was in dire straits at the time, yes.

21  Q.  Have a good trip back to LA.

22  A.  Thank you.

23          MR. SHARGEL:  That's all I have, Judge.

24          THE COURT:  Thank you, Mr. Shargel.

25  CROSS-EXAMINATION

1   BY MR. SREBNICK:

2   Q.  Good afternoon, Dr. Gang.  My name is Howard Srebnick.  I

3   only have a few questions.  I don't believe I have any

4   documents to show you.  What I would like to ask you is you

5   discussed with the jury a projection that you thought might be

6   reasonable for the product that Cardiac would be selling.  I

7   believe you were projecting perhaps revenues upwards of

8   50 million, maybe even a $100 million a year?

9   A.  Yes.

10  Q.  What time frame did you think it would take for Cardiac

11  Network to achieve between 50 and a hundred million in sales?

12  A.  I don't have a time frame in mind.

13  Q.  When did you first become associated with the product that

14  Cardiac Network was attempting to market?

15  A.  Around that same period of time, 2007, 2006-2007 time

16  frame.

17  Q.  Do you recall when you were first introduced to the event

18  monitor, the heart monitor that we have heard a bit about, the

19  actual product itself?

20  A.  The event monitor has been around for decades.  Various

21  iterations of it I have known for years.

22  Q.  The relationship with a company in Israel, I believe it is

23  Aerotel?

24  A.  Aerotel, yes.

25  Q.  Was Aerotel going to be the manufacturer of the product

1    that your company then would sell here in the USA?

2    A.  Aerotel was manufacturing it for years already and selling

3    it worldwide.

4    Q.  Could you tell us what was the business model that you were

5    proposing that you thought would generate upwards of a hundred

6    million in sales?  What was it that was going to be new that

7    would create this kind of revenue?

8    A.  There was a need for that.  There still is a need for that.

9    Many doctors use it.  We use similar products in our practice

10   every day, different companies.  I felt that the market was

11   underpenetrated, that with proper education of physicians,

12   general practitioners, internists, cardiologists, more people

13   would utilize this service and that the market was there that

14   we could participate in it.

15   Q.  Did you say that you have learned from other companies that

16   offer similar product that those companies, based on your

17   research, could generate revenues of 50 to 100 million?

18   A.  Yes.

19   Q.  So you thought that Cardiac Network could participate in

20   the enterprise of this product and compete with those companies

21   and generate similar revenues, right?

22   A.  Yes.

23   Q.  How many millions of Americans could be potential customers

24   for this product?

25   A.  I don't know the exact number, but many.

1  Q.  It would be in the millions, right?

2  A.  Millions, yes.

3  Q.  Millions of Americans suffer from heart disease?

4  A.  Yes, and the population is getting older.

5  Q.  Is it one of the number one causes of death in the United

6  States?

7  A.  Yes.

8  Q.  Do you believe that a product like this could save lives?

9  A.  Yes.

10  Q.  It could alert a patient to a scenario, an event in his

11  body that could be a heart attack, and it would allow him to

12  communicate that event to a physician rapidly?  Is that the

13  idea?

14  A.  That's the purpose.

15         MR. SREBNICK:  If I could have a moment, Judge.

16  Q.  Do you think a product like this could improve a patient's

17  chance of surviving a heart attack?

18  A.  Possibly.

19  Q.  Was the idea that within minutes it could determine whether

20  the person was actually suffering a heart attack versus

21  indigestion?

22  A.  That's not its strong suit.  The strong suit of this

23  technology is patients who have irregular heart rates, rapid

24  heart rates, lightheadedness, if they can transmit or be

25  monitored this way, you could potentially avoid an emergency

D38rlev5                    Gang - cross

1    room visit or make the diagnosis and send someone to the

2    emergency room.

3    Q.  But it would be fair to say that this product was offering

4    like a detection service that could dramatically improve a

5    patient's chances of surviving a heart attack?

6    A.  Yes.

7    Q.  Could it help patients determine within five minutes if

8    they were having a heart attack or a potential Cardiac problem

9    so they could obtain quick treatment?

10   A.  Yes.  Heart attacks are not diagnosed just that way, but it

11   could help in it, yes.

12           MR. SREBNICK:  I won't publish this document now,

13   Judge.  I'll do it later.  Thank you very much.

14           MR. MASTER:  No redirect, your Honor.

15           THE COURT:  Dr. Gang, thank you very much.

16           (Witness excused)

17           THE COURT:  Mr. Master, next witness.

18           MS. COHEN:  Your Honor, the government calls Dr. David

19   Champion.

20    DAVID CHAMPION,

21      called as a witness by the government,

22      having been duly sworn, testified as follows:

23           THE CLERK:  Could you please say and spell your name

24   for the record.

25           THE WITNESS:  David M. Champion.  D-A-V-I-D,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    C-H-A-M-P-I-O-N.

2              THE COURT:  Doctor, please sit down, make yourself

3    comfortable.  Speak right into the microphone.

4              All right, Ms. Cohen.

5    DIRECT EXAMINATION

6    BY MS. COHEN:

7    Q.  Where do you live?

8    A.  I live in New Port Richey, Florida.

9    Q.  What do you do for a living?

10   A.  I'm a general dentist.

11   Q.  Do you know David Levy?

12   A.  Yes, ma'am.

13   Q.  What is your relationship with him?

14   A.  Close friend.

15   Q.  How long have you been close friends with David Levy?

16   A.  Approximately 15 years.

17   Q.  Do you know his sister, Yael Tal Levy?

18   A.  Yes, ma'am.

19   Q.  Where does she reside?

20   A.  I believe she lives in Israel.

21   Q.  What does she do in Israel?

22   A.  I believe she's a homemaker.

23   Q.  Do you know Donna Levy?

24   A.  Yes, ma'am.

25   Q.  What is your relationship with Donna Levy?

D38rlev5                    Champion - direct

1    A.   Close friend.

2    Q.   How long have you been close friends with Donna Levy?

3    A.   The same, about 15 years.

4    Q.   In addition to being close friends with Donna and David

5    Levy, do you do dental work for them?

6    A.   Yes, ma'am.

7    Q.   Have you ever heard of the name of a company called Cardiac

8    Networks Inc.?

9    A.   No, ma'am.

10   Q.   Have you ever heard the name of a company called Banneker

11   Inc.?

12   A.   No, ma'am.

13   Q.   Do you own any shares in a company called Cardiac Networks?

14   A.   No, ma'am.

15   Q.   Do you own any shares in a company called Banneker Inc.?

16   A.   No, ma'am.

17   Q.   Do you own shares in any publicly traded company?

18   A.   No, ma'am, other than my pension plan at my office.

19   Q.   What is your knowledge about shares in the marketplace and

20   how they are issued and traded?

21   A.   Zero, unfortunately.

22   Q.   What discussions have you had with David Levy at any time

23   about shares in any stock?

24   A.   There was a discussion about giving me some shares.  What

25   stock, I don't know.

1    Q.  What did David Levy tell you about giving you some shares?

2             MR. SHARGEL:  Objection.  Relevance.

3             THE COURT:  Overruled.

4    A.  I'm sorry.  Could you repeat that?

5    Q.  What did David Levy say to you about giving you shares in

6    some stock?

7    A.  He just said that he was going to give me some shares and

8    to sign a paper of some sort.

9    Q.  What type of paper did David Levy ask you to sign?

10   A.  Unfortunately, I don't know.

11   Q.  Did you sign the piece of paper that David Levy gave you?

12   A.  Yes.

13   Q.  Do you know what company it related to any way?

14   A.  No, ma'am.

15   Q.  Did you get shares in any company from David Levy?

16   A.  No, ma'am.

17   Q.  Do you recall when this conversation with David Levy was

18   where you signed a piece of paper at his request?

19   A.  Very difficult.  I'm not sure.  I would say anywhere from

20   three to five years ago, but that's a guess.

21   Q.  What money did David Levy give you related to any shares in

22   any company that he held for you?

23   A.  None.

24   Q.  Did you ever give David Levy authority to sign any

25   documents in your name?

D38rlev5                    Champion - direct

1    A.  No.

2    Q.  I'm going to ask that you look at what is in evidence as

3    Government Exhibit 201-40.

4    A.  Yes, ma'am.

5    Q.  Have you ever seen this document before?

6    A.  No, ma'am.

7    Q.  If you can turn to page 3 of the document, which has

8    Exhibit A.

9    A.  Yes, ma'am.

10   Q.  Do you see where it says your plea on the your name on the

11   right-hand side, David Champion, as a shareholder?

12   A.  Yes, ma'am.

13   Q.  Did you sign this document, Exhibit A?

14   A.  No, ma'am.

15   Q.  Does your signature appear above your name?  Is that your

16   signature?

17   A.  No, ma'am.

18   Q.  I'm going to ask you to look at what's been marked for

19   identification, Government Exhibit 201-50.

20   A.  OK.

21   Q.  Tell me if you recognize the document, and if you do, what

22   is it.

23   A.  Yes, ma'am.  It is a copy of my signature that I sent to

24   Mr. Reinhardt.

25           MS. COHEN:  Your Honor, the government would move

1  Government Exhibit 201-50 into evidence.

2          MR. SHARGEL:  Without objection.

3          THE COURT:  201-50 is received in evidence.

4          (Government's Exhibit 201-50 received in evidence)

5  Q.  David Champion, is that your handwriting and your signature

6  on Government Exhibit 201-50?

7  A.  Yes, ma'am.

8  Q.  I'm going to ask you to look at what is in evidence as

9  Government Exhibit 250-1.

10  A.  Yes, ma'am.

11  Q.  It's a note to Atlas Stock Transfer, attention Amy.  Do you

12  know what Atlas Stock Transfer is?

13  A.  No, ma'am.

14  Q.  Do you have any idea what this document is about?

15  A.  No, ma'am.

16  Q.  Do you see where it says your name, you're the last name

17  listed in the first block of names, David Champion?

18  A.  Yes, ma'am.

19  Q.  136,250 shares?

20  A.  Yes, ma'am.

21  Q.  Do you have any idea what that's about?

22  A.  No, ma'am.

23  Q.  I'm going to ask you to look at what is in evidence as

24  Government Exhibit 250.

25  A.  250-11?

D38rlev5                    Champion - direct

1    Q.  Correct.  Sorry.  250-11.  That's a document that on top

2    says a company Standard Registrar and Transfer Company.

3    A.  Yes, ma'am.

4    Q.  Do you know what that company is?

5    A.  No, ma'am.

6    Q.  Have you ever seen this document before?

7    A.  No, ma'am.

8    Q.  Do you see your name appears twice where it says, "We

9    acknowledge receipt of certificates of stock in the above

10   company"?  The above company is listed as Cardiac Networks,

11   Inc., in the amount of 4.3 million shares and some change.  And

12   then, "In accordance with your request, we hand you herewith

13   the following certificates," and your name appears second on

14   that line, second line, certificate number 1664, David

15   Champion, 4,318,182 shares.  Do you have any knowledge about

16   those shares?

17   A.  No, ma'am.

18   Q.  Did you ever receive any of those shares in Cardiac

19   Network?

20   A.  No, ma'am.

21   Q.  If you can look at the second page, there is a handwritten

22   note on the bottom from the Mosaic Hotel.  "Hi, Amy.  Please

23   change down these 4 certs and FedEx them back to me.  Thanks,

24   David."  Do you know anything about that note?

25   A.  No, ma'am.

1  Q.  Did you have any discussions with David Levy about that

2  note?

3  A.  No, ma'am.

4  Q.  Then if you flip two more pages and then two more, you will

5  find a certificate or document that has your name on it, a

6  document that says Caspian Energy International to certify that

7  David Champion has 4 million-plus shares.

8  A.  Yes, ma'am.

9  Q.  Have you found that document?

10  A.  Yes, ma'am.

11  Q.  Have you ever seen that certificate in your name before?

12  A.  No, ma'am.

13  Q.  You haven't seen it before?

14  A.  No.

15  Q.  Do you know anything about it?

16  A.  No, ma'am.

17  Q.  I'm going to ask you, please, to look at Government Exhibit

18  350-10 in evidence.  This is another document that's from the

19  Standard Registrar and Transfer Company.  Do you have any

20  knowledge about anything in this document?

21  A.  No, ma'am.

22  Q.  Ever seen it before?

23  A.  No, ma'am.

24  Q.  Do you see your name appears first in line there?  "In

25  accordance with your request, we hand you herewith the

1    following certificates:  Certificate No. 1028 in the name of

2    David Champion, 500,500 shares."  Do you know anything about

3    those shares in Banneker?

4    A.  No, ma'am, I don't.

5    Q.  Did you ever get 500,500 shares of Banneker stock?

6    A.  No, ma'am.

7    Q.  I'm going to ask you to turn to the fourth page of the

8    document.  Do you see under name and address -- this is a

9    letter from Banneker requesting that the stock agent issue

10   certificates of shares.  Do you see the first block where it

11   has your name, David Champion?

12   A.  Yes, ma'am.

13   Q.  Do you see your address is listed as 3109 Northeast 23rd

14   Court, Fort Lauderdale, Florida, 33305?

15   A.  Mm-hm.

16   Q.  Is that your address?

17   A.  No, ma'am.

18   Q.  Whose address is that?

19   A.  I believe it's Mr. Levy's.

20             MS. COHEN:  No further questions, your Honor.

21             MR. SHARGEL:  I have no questions, your Honor.

22             MR. SREBNICK:  No questions, Judge.  Thank you.

23             THE COURT:  Doctor, you are excused.  Thank you very

24   much.

25             (Witness excused)

D38rlev5                    Habayeb - direct

1          THE COURT:  Your next witness.

2          MR. MASTER:  At this time the government calls Tarik

3   Habayeb.

4    TARIK HABAYEB,

5       called as a witness by the government,

6       having been duly sworn, testified as follows:

7          THE CLERK:  Say and spell your name for the record.

8          THE WITNESS:  Tarik Habayeb.  T like Thomas, A-R-I-K.

9   Last name H like Henry A-B like boy A-Y-E like Edward -- no,

10  I'm sorry.  Let me start the last name from the beginning.

11         THE COURT:  Just spell it.

12         THE WITNESS:  H-A-B-A-Y-E-B.

13         THE COURT:  Please sit down.  Please get right up to

14  the microphone.

15         Mr. Master.

16         MR. MASTER:  Yes, your Honor.

17  DIRECT EXAMINATION

18  BY MR. MASTER:

19  Q.  How old are you?

20  A.  34.

21  Q.  Where do you live?

22  A.  Springfield, Virginia.

23  Q.  How far did you go in school?

24  A.  I have three Bachelor's degrees.

25  Q.  From what school?

1    A.  Virginia Tech.

2    Q.  In what fields?

3    A.  Biology, finance, and accounting.

4    Q.  How many siblings do you have?

5    A.  Two.

6    Q.  Where do you work?

7    A.  I work for a nonprofit called NIRI, the National Investor

8    Relations Institute.

9    Q.  What is the National Investor Relations Institute?

10   A.  It's a professional association that promotes the investor

11   relations profession.

12   Q.  In what capacity?

13   A.  Its mission statement is to advance the investor relations

14   profession via the promotion of sound practices, such as

15   financial disclosure in a timely and fair manner, so the

16   general public can make informed investing decisions.

17   Q.  What do you do for them?

18   A.  I'm an accounting manager.

19   Q.  In your daily work, what do you do as the accounting

20   manager?

21   A.  I manage the payables and the receivables and I do

22   financial analysis.

23   Q.  For how long have you worked there?

24   A.  Over 7 years.

25   Q.  I'd like to direct your attention to 2008.  How old were

1    you and how old was your father at that time?

2    A.  I was 29 and my father was 75.

3    Q.  What was your father's employment status?

4    A.  He was retired at that time.

5    Q.  How much in savings had your father accumulated for living

6    off of after he retired?

7              MR. SHARGEL:  Objection, foundation.

8              MR. SREBNICK:  Objection.  I have a relevance issue

9    I'd like to raise at side bar.

10             THE COURT:  Overruled.

11   Q.  To your knowledge.

12   A.  Probably, I'd say, including all of the sources of his

13   retirement income, about 7, 800,000 maybe.

14   Q.  What did your father do for a living before he retired?

15   A.  He was an electrical engineer for the Department of

16   Defense.

17   Q.  Did there come a time in 2008 when your father asked if you

18   would be interested in helping him invest the money that he had

19   in his retirement fund?

20             MR. SHARGEL:  I'm going to object to hearsay.

21             THE COURT:  Overruled.  Finish the question.

22   Q.  Did there come a time during that year when your father

23   asked you if you would be interested in helping him invest the

24   money that he had saved?

25   A.  Yes.

1    Q.  About how much money did he ask for your help in investing?

2    A.  About $450,000.

3    Q.  What, if any, investment experience did you have before

4    your father asked you to help?

5    A.  I had very little investment experience.

6    Q.  What was your reaction to your father's offer?

7              MR. SHARGEL:  Objection.

8              THE COURT:  Overruled.

9    A.  I was very excited.

10   Q.  What excited you about this opportunity?

11   A.  I was excited because I was always interested in the

12   financial markets, and I wanted to demonstrate to my father

13   that I could handle his retirement in a safe way and get a

14   decent return on it.

15   Q.  What did you hope to do with the money in his retirement

16   fund?

17   A.  Hoped to grow his account as much as possible.

18   Q.  What was the retirement fund invested in at the time that

19   you first were asked by your father to help him invest?

20   A.  Mostly blue chip investments.

21   Q.  What do you mean by blue chip?

22   A.  Stocks:  Exxon, Microsoft, Apple.

23   Q.  What did you do to decide how, if at all, to change the

24   make-up of your father's retirement portfolio?

25   A.  I did some research on the Internet.  I started with a

1    website called Investorshub.com and just tried to gain ideas as

2    to where to start.

3    Q.   What sort of opportunities were you looking for?

4    A.   Since my father was at that time 75 and I knew --

5    obviously, I liked to think he's going to be around for a long

6    time, but realistically he's probably not going to be, so I

7    wanted to find investments that would show a substantial return

8    that he could be around to see.

9    Q.   When you got to this iHub website, what sorts of

10   information did you look for?

11   A.   I was looking for opportunities that would enable me to

12   grow the account as quickly as possible with as little risk as

13   possible.

14   Q.   What, if any, other websites did you see recommended on

15   iHub?

16   A.   There was a variety of them.  Best Damn Penny Stocks was

17   one, the Stock Twitter, Monster Penny Stocks, among a slew of

18   others, but those were the ones that stand out.

19   Q.   Do you recall today who recommended visiting these websites

20   for investing advice?

21   A.   A variety of different posters on Investors Hub.  I

22   couldn't recall specifically.  There was a good number of

23   posters on the Investors Hub message boards that were promoting

24   those sites.

25   Q.   Do you know who the people were that were actually posting?

1    A.  No.

2    Q.  I'd like to show you something that's been marked for

3    identification as Government Exhibit 708.  Do you recognize

4    what is depicted in Government Exhibit 708?

5    A.  Yes.

6    Q.  What is it?

7    A.  It's the home page for Best Damn Penny Stocks.

8    Q.  How do you recognize it?

9    A.  What stands out is the banner at the top.

10            MR. MASTER:  The government offers Government Exhibit

11   708.

12            MR. SHARGEL:  I have no objection.

13            THE COURT:  No objection?

14            MR. SHARGEL:  No, sir.

15            MR. SREBNICK:  No objection.

16            THE COURT:  708 is in evidence.

17            (Government's Exhibit 708 received in evidence)

18   Q.  The ends of this website are cut off, is that correct?  In

19   other words, it's not the full width of the web page, right?

20   A.  Yes.

21   Q.  Now that it is published, can you explain to the jury what

22   about that website is distinctive to you.

23   A.  I would say the format, how they have the rectangular boxes

24   for the links for home, services, contact us, legal disclaimer,

25   privacy policy.  That just stuck in my mind, that format that

1    they use for the header there.

2    Q.  Based on what you read on iHub and your review of the Best

3    Damn Penny Stocks website, what was your understanding of how

4    Best Damn Penny Stocks determined what stocks to recommend?

5    A.  My understanding was that they did fundamental analysis,

6    technical analysis.  In addition, they had their own

7    proprietary formula for selecting various stocks that they felt

8    would appreciate in value in a very short period of time.

9    Q.  What was your understanding based on what you read on this

10   website about the success rate of their recommendations?

11   A.  Their success rate, my understanding was it was impeccable,

12   perfect.

13   Q.  How did you access this website?  In other words, is it

14   publicly accessible?

15   A.  Yes.

16   Q.  You accessed it just like you would access any other

17   website, right?

18   A.  Yes.

19   Q.  Available to the general public?

20   A.  Yes.

21   Q.  I'd like you to read just where it says, "Sign up below" --

22   well, it says right there, "Sign up below now to make sure you

23   never lose again."  Do you see that?

24   A.  Yes.

25   Q.  Do you remember seeing that?

1   A.  Yes.

2   Q.  What did you do?

3   A.  I signed up.

4   Q.  On this website, I'd like you to turn to what is on page 2.

5   If you wouldn't mind turning to page 2.  I'm sorry.  Page 3.

6   My mistake.  It says, "Look at our 2008 penny stocks track

7   record below."  Then there is a list of ticker symbols.  Do you

8   see that?

9   A.  Yes.

10  Q.  What was your understanding of what this website was

11  telling you about its track record?

12  A.  My understanding was their track record was excellent.

13  Q.  What effect did that chart, seeing that chart, have on you?

14  A.  After signing up, it enticed me to follow their

15  recommendations very closely.

16  Q.  Now turn to page 4, please.  Could we go to the top first.

17  Do you see where it says, "Sign up free below to get in-depth

18  technical analysis of your favorite penny stocks daily"?

19  A.  Yes.

20  Q.  What effect did it have on you to hear that they were

21  offering in-depth technical analysis?

22  A.  That gave me greater confidence that they not only knew

23  what they were doing, they were cream of the crop at picking

24  stocks that had the potential for substantial gain in a short

25  amount of time.

1  Q.  Now look at the bottom of that page.  Do you see where it

2  says, "To find and pick the best penny stocks, we look at many

3  aspects of a single stock at a time.  Being sure to look at

4  that specific stock and not at the timing may have an uproar of

5  success.  That that success may not last long and in time

6  become a loss.  You can't time the stock market, but you can

7  find a stock that has a good history of success to help our

8  choice."  Then it goes on to talk about how they look for penny

9  stock hits that produce large and consistent gains.  Do you see

10  that?

11  A.  Yes.

12  Q.  What effect did this language have on you?

13  A.  It just further -- I looked at it as -- the language in

14  here is sort of the language that you would see in many

15  disclaimers, so I didn't honestly think much of it.

16  Q.  You stated that you signed up for another website as well

17  or another service called Monster Penny Stocks, do you recall

18  that?

19  A.  Yes.

20  Q.  What, if any, relationship between Monster Penny Stocks and

21  Best Damn Penny Stocks were you aware of?

22  A.  I was not aware of any relationship.

23  Q.  What, if any, disclosures were there that you saw

24  concerning any connection between those two sites?

25  A.  I didn't see any disclosures indicating there was any

1    connection.

2    Q.  Were there times when some of these services that you

3    signed up for would recommend the same stock or stocks?

4    A.  At times, yes.

5    Q.  What effect did it have on you when there were multiple

6    sites or multiple sources of information making the same

7    purchase recommendation?

8    A.  That strengthened my conviction that it was a potential

9    good investment to make.

10   Q.  Did there come a time after you began subscribing to these

11   various email services, including Best Damn Penny Stocks, that

12   you actually began investing some of your father's retirement

13   fund in penny stocks?

14   A.  Yes.

15   Q.  About how many different penny stocks did you invest in

16   with your father's retirement money?

17   A.  Probably around 50 in total.  This is at various times over

18   about a year and a half or so.

19   Q.  I'll cut to the chase.  What happened to your father's

20   retirement money?

21   A.  It disappeared pretty much.

22   Q.  How much was left before your father shut down the account?

23   A.  $17,000.

24   Q.  What was the primary driver of your decision to make those

25   investments that lost all your father's retirement money?

1   A.  Sites like Best Damn Penny Stocks.

2            MR. SHARGEL:  I object to this.  I object to "sites

3   like."  Most respectfully, that is too vague and without

4   foundation, "stocks like" or "sites like."

5   Q.  How about this.  Were there times when you would make a

6   stock purchase decision based on something you read in Best

7   Damn Penny Stocks?

8   A.  Yes.

9   Q.  Were there times when you would make a stock purchase

10  decision based on what you read on Stock Twitter?

11  A.  Yes.

12           MR. SHARGEL:  I object to the leading.  I object to

13  the leading.

14           THE COURT:  Overruled.

15  Q.  Were there times when you would make a stock purchase

16  decision based on what you read in Monster Penny Stocks?

17  A.  Yes.

18           MR. MASTER:  Just a moment.

19  Q.  I'm going to show you what's been marked for identification

20  as 605-7A.  In preparation for your testimony today, were you

21  asked to review the items in this document?

22  A.  Yes.

23  Q.  Do you recognize them?

24  A.  Yes.

25  Q.  What are they?

1    A.   They are messages from Best Damn Penny Stocks.

2    Q.   Concerning what stock?

3    A.   CNWI.

4    Q.   What is CNWI?

5    A.   It's a penny stock that I believe was in the medical field.

6    Q.   Sir, did there come a time when you actually invested money

7    in CNWI?

8    A.   Yes.

9    Q.   How much money did you invest?

10   A.   Approximately between 80 and $100,000.

11   Q.   When did you make that investment?

12   A.   It was in February of 2010.

13   Q.   Prior to making the decision to invest, did you see stock

14   purchase recommendations concerning CNWI on various websites?

15   A.   Yes.

16   Q.   Did some of the websites include Best Damn Penny Stocks?

17   A.   Yes.

18           MR. MASTER:  Your Honor, at this time the government

19   would offer as Government Exhibit 605-7A.

20           MR. SREBNICK:  May I see it?  Thank you, Judge.

21           THE COURT:  Any objection?

22           MR. MASTER:  Your Honor, at this time the government

23   offers it subject to connection.

24           THE COURT:  It is admitted subject to connection.

25           (Government's Exhibit 605-7A received in evidence)

1   Q.  I'd like you to turn, if you would, to the fifth page of

2   that document.  While our paralegal specialist is pulling that

3   up, could you tell the members of the jury what email account

4   you used when you signed up for these various websites.

5   A.  I used my Yahoo email account.

6   Q.  Can you spell it out for the record.

7   A.  Sure.  It's V for Virginia, T for tech, C for cat, P for

8   Peter, A for Apple, zero 4@yahoo.com.

9   Q.  Where these stock purchase recommendations sent to that

10  account?

11  A.  Yes.

12  Q.  How regularly would you open the emails, the stock purchase

13  recommendation emails, when you received them?

14  A.  Frequently, multiple times a day.

15  Q.  I also want to finish your testimony on how much money you

16  invested in CNWI.  You stated that you invested between 80 and

17  a hundred?

18  A.  Yes.

19  Q.  How much money did you lose?

20  A.  We lost, it was in the low 40s thousand dollars.

21  Q.  How long did it take you to lose that money?

22  A.  One month.

23  Q.  How long after you purchased the stock in Cardiac Networks

24  based on the stock purchase recommendations did the value of

25  your investments start to decline?

1   A.  Started to decline very quickly, within days.

2   Q.  Looking at this page here, this stock purchase

3   recommendation, it states, "Again, we have a 5-variable formula

4   in which we created to spot these moves before they happen on a

5   consistent basis.  I do not want to reveal them, as it would be

6   like a magician giving his trick away, but I will share it with

7   you a couple."

8          You have testified earlier that you understood, based

9   on your review of these websites, that there was some sort of

10  secret formula that they had, right?

11  A.  Yes.

12  Q.  What effect did statements like the one I just read have on

13  your decisions to invest?

14  A.  It reinforced my decision to invest because it definitely

15  led me to believe that they were privy to information that I

16  wasn't that enabled them to make these picks that had the

17  potential for substantial gains in a short amount of time.

18  Q.  At the bottom there is some smaller print.  Do you see

19  that?

20  A.  Yes.

21  Q.  Continuing to the next page.  Do you see that language?

22  A.  Yes.

23  Q.  What is your understanding of what that language

24  represents?  Is there a term that you would use to refer to

25  that?

1    A.  "Disclaimer."

2    Q.  How often did these stock purchase recommendations contain

3    disclaimers?

4    A.  All of them did.

5    Q.  How often did you read them carefully?

6    A.  Almost never.

7    Q.  What effect did it have on you to see that there was a

8    disclaimer in fine print below these --

9              MR. SHARGEL:  Object to "fine print."

10             THE COURT:  Sustained.

11   Q.  What effect did it have on you to see these disclaimers

12   under the stock purchase recommendations?

13   A.  No effect.

14   Q.  What is the reason for that?

15   A.  Because disclaimers are ubiquitous.  My impression was the

16   disclaimer was stating that, as with any investment, there is a

17   substantial risk of loss, and that's of course true with any

18   investment.  I was under the impression the risk I was

19   subjecting myself to was general market risk.

20   Q.  You say that you almost never read them.  Were there times

21   that you did read them?

22   A.  Yes.

23   Q.  Were there times when you would read disclaimers and see

24   statements indicating -- actually, I would like you to turn to

25   the next page, if you wouldn't mind.  Actually, starting at the

1  very bottom, where it says, "It should be assumed that the

2  owners of Bestdamnpennystocks.com own positions in companies

3  profiled and may buy or sell any time before, during, or after

4  investor relations services Bestdamnpennystocks.com,

5  affiliates, and friends and family of Bestdamnpennystocks.com

6  may not have a position in such securities."

7           Then it goes on and states, "The position may have

8  been acquired prior to the publication of any website

9  information or email alert.  You should also be aware that the

10  aforementioned parties do have the right to sell their

11  positions at any time without further notification."

12           What effect did it have on you as the reader of this

13  when you would hear that the people putting out this email

14  stock purchase recommendation service owned a position, might

15  own a position, in the securities?

16  A.   It reinforced my decision that it was a potential good

17  investment to make because they were kind of putting their

18  money where their mouth was, so to speak.

19  Q.   Based on your reading of these disclaimers, where, if at

20  all, did you gain an understanding that the individuals paying

21  for this would be selling their interest in the stock to you?

22  A.   I wasn't aware of that.

23  Q.   Had you known that, would it have affected your decision to

24  invest?

25  A.   Yes.

1        MR. MASTER:  Nothing further, your Honor.

2   CROSS-EXAMINATION

3   BY MR. SHARGEL:

4   Q.  Good afternoon.

5   A.  Good afternoon.

6   Q.  Sir, you come from where?

7   A.  Springfield, Virginia, is where I live.

8   Q.  You have spoken to the government lawyers before in

9   connection with this case, right?

10  A.  Yes.

11  Q.  You spoke to investigators in connection with this case?

12  A.  Yes.

13  Q.  Do you see Agent Reinhardt over there?  You met him before,

14  right?

15  A.  Yes.

16  Q.  You met the prosecutors of the case before, right?

17  A.  Yes.

18  Q.  Was it always on the telephone or did you come up here to

19  New York?

20  A.  I started out on the telephone, and then I've been here the

21  last couple of days.

22  Q.  How many hours would you say you met with the prosecutors?

23  A.  About three hours in person.

24  Q.  How much time on the telephone?

25  A.  Probably an hour or so total on the phone.

D38rlev5                    Habayeb - cross

1    Q.  During all those discussions that you had with the

2    prosecutors or the agent in the case, did the topic of

3    restitution ever come up?

4    A.  Um --

5    Q.  Yes or no.

6    A.  Yes.

7    Q.  Restitution means that you may get your money back?  Is

8    that what you are looking for?

9    A.  My understanding was that the possibility of that was slim

10   to none.

11   Q.  Where did you get to think that it was from slim to none?

12   Withdrawn.  Your work has to do with investments and

13   disclosures, right?

14   A.  Yes.

15   Q.  Essentially, you're in this industry or field of

16   investments, right?

17   A.  I'm on the accounting side.  I'm not in the investor

18   relations field.

19   Q.  You knew full well when you came to New York or you got on

20   that telephone, you knew what restitution was, right?

21   A.  Yes, I knew what restitution was.

22   Q.  When you discussed that with the prosecutors or the agent,

23   no one said slim to none, no one said that, did they?

24   A.  No, they did say that.

25   Q.  That you had no chance of receiving restitution?

1  A.  They didn't say no chance, but they said the chance was

2  very small.

3  Q.  Would you be interested in getting your money back?

4  A.  Of course.

5  Q.  Let me ask you this question.  There comes a time, and I'm

6  not going to go over the whole story with you, but there comes

7  a time when you are tasked with investing your father's money,

8  right?

9  A.  Yes.

10  Q.  You said you welcomed that opportunity, and so on and so

11  forth, right?

12  A.  Yes.

13  Q.  He had about $400,000 to invest, right?

14  A.  450,000, yes.

15  Q.  450,000.  You started out by purchasing blue chip stocks,

16  right?

17  A.  When I took over active management of the portfolio, blue

18  chip type positions were already in the portfolio.

19  Q.  They were already in the portfolio?

20  A.  Yes.

21  Q.  You said that there was stock like Apple and Microsoft and

22  other blue chip stocks, they were already in the portfolio?

23  A.  Yes.

24  Q.  When you had control of the $450,000, did you then start

25  investing in other kinds of stocks?

D38rlev5                      Habayeb - cross

1    A.   Yes.

2    Q.   Did you first buy blue chips?

3    A.   No.

4    Q.   Did you buy anything that was somewhere between penny

5    stocks and blue chips?

6    A.   Yes.

7    Q.   You studied those companies?

8    A.   Yes.

9    Q.   You made reference to CNWI, do you remember?

10   A.   Yes.

11   Q.   You were asked by Mr. Master, the prosecutor, what does the

12   company do, right?

13   A.   Yes.

14   Q.   You weren't exactly sure.  You said it was something to do

15   with medical services, right?

16   A.   Yes.

17   Q.   After reading these websites, did you ever want to find out

18   what the company did?

19   A.   Yes, I did, and there wasn't that much information to find.

20   Q.   Did you have any idea as to what resources might be

21   available to you to find out what the company did?

22   A.   I had a pretty good idea, yes.

23   Q.   Were you able to find those resources?

24   A.   Some.

25   Q.   Did you study facts and figures relating to the company, or

1    were they not available to you?

2    A.  I studied as much as I could.

3    Q.  Do you remember what you studied specifically with this

4    company CNWI?

5    A.  I don't recall exactly.  I believe I made an attempt to

6    obtain the company's financials.

7    Q.  Did you look at those financials?

8    A.  I don't recall being able to obtain the financials.

9    Q.  But you invested anyway?

10   A.  Yes.

11   Q.  You say you invested in over 50 different companies?

12   A.  Yes.

13   Q.  Because you were interested in making -- and these are your

14   words, not mine -- a substantial gain in a short amount of

15   time?

16   A.  Yes.

17   Q.  You were 29 years old that year.  You're 35 or 36 now?

18   A.  34.

19   Q.  34 years old.  34 years old and the experience you have

20   gained in the last 7 years or so with this company that you

21   work for, there's not many cases where you have substantial

22   gain in a short amount of time in startup companies, is it?

23            MR. MASTER:  Objection.

24            THE COURT:  Overruled.

25   A.  There are some.

1   Q.  There are some, of course.  But did you know that you were

2   investing in startup companies at the time that you took your

3   father's money and went from blue chip stocks like Apple and

4   Microsoft and started investing in startup companies?  Were you

5   aware of that?

6   A.  Yes.

7   Q.  You knew full well when you were 29 and when you are 34

8   that there is a high degree of risk in startup companies,

9   right?

10  A.  Yes.

11  Q.  That's what those disclaimers, whether it was this website

12  or some other website, that's what those disclaimers were

13  about, right?

14  A.  My understanding was the disclaimers were explaining that

15  there was general market risk, as with any other investment.

16  Q.  The disclaimers said there was a high degree of risk and

17  you may lose all your money, didn't it have words like that?

18  A.  Yeah, but all disclaimers have words like that.

19  Q.  Yeah, but disclaimers are there for -- do you understand

20  now, based on your work experience, that disclaimers are there

21  for a purpose?

22  A.  Of course.

23  Q.  So that people don't make investments blind?

24  A.  Yes.

25          MR. SHARGEL:  I have no further questions.

D38rlev5                    Habayeb - cross

1          THE COURT:  Mr. Srebnick.

2          MR. SREBNICK:  Yes, Judge.

3    CROSS-EXAMINATION

4    BY MR. SREBNICK:

5    Q.  Mr. Habayeb, my name is Howard Srebnick.  I would like to

6    ask you some questions.  I represent Donna Levy.  You don't

7    know Donna Levy?

8    A.  No.

9    Q.  We have never spoken before, you and I, correct?

10   A.  Correct.

11   Q.  You told us your background includes three Bachelor's

12   degrees, two of them in the field of one finance and one

13   accounting?

14   A.  Yes.

15   Q.  Do you know how to read a balance sheet?

16   A.  Yes.

17   Q.  Do you know how to read a financial statement?

18   A.  Yes.

19   Q.  Do you know what revenues of a company are?

20   A.  Yes.

21   Q.  Do you know what expenses of a company are?

22   A.  Yes.

23   Q.  Do you know that revenue minus expenses will determine the

24   gross profits of a company?

25   A.  Yes.

1  Q.  There might be other expenses of a company that might be

2  taxes, etc., and that a company may or may not have earnings

3  after taxes, correct?

4  A.  Yes.

5  Q.  I'll cut right to the chase.  What were the earnings of

6  Cardiac Network, Inc. at the time you invested your father's

7  retirement money in it?

8  A.  There weren't any earnings.

9  Q.  What were the dividends that this stock was going to pay

10  your father for investing in the stock when you made that

11  decision to buy?

12  A.  There were no dividends.

13  Q.  No earnings, no dividends.  And you know what those terms

14  mean because of your education and your background, correct?

15  A.  Yes.

16  Q.  You knew that this was a penny stock, right?

17  A.  Yes.

18  Q.  You know that the difference between a penny stock and what

19  Mr. Shargel calls a blue chip stock is that with regard to blue

20  chip stocks that your father had invested in, there is

21  financial information available to the public about the blue

22  chip companies, correct?

23  A.  Yes.

24  Q.  One can go to, whether it be a website or a brokerage house

25  or for that matter the library, and learn about the history of

D38rlev5                    Habayeb - cross

1    the company, correct?

2    A.  Yes.

3    Q.  One can look at those financial statements of a company, a

4    blue chip company, right?

5    A.  Yes.

6    Q.  For a blue chip company, someone who wants to invest in

7    such a company can look at the balance sheets and the earning

8    statements of that company for years past, correct?

9    A.  Yes.

10   Q.  But even with a blue chip company, even a company like

11   Apple, the stock can go down, correct?

12   A.  Yes.

13   Q.  Earnings can go down?

14   A.  Yes.

15   Q.  Revenues can go down?

16   A.  Yes.

17   Q.  But with regard to penny stocks, you as a person

18   considering putting money into such a stock, such information

19   is simply not available to the public, correct?

20   A.  Yes.

21   Q.  There is no registration requirement for these stocks,

22   correct?

23   A.  Yes.

24   Q.  You knew, sir, based not only on your education, not only

25   on your Bachelor's degree, not only on your accounting

1    training, and not only from your finance training, you knew

2    from all of your experience by age 29, you knew that a penny

3    stock was a much different type of, shall we say, gamble than

4    putting your father's money in blue chip stocks, correct?

5    A.   It was a different type of investment.  I wouldn't classify

6    it as a gamble, though.

7    Q.   You had no information that a particular penny stock

8    company even makes money, correct?

9    A.   Sometimes there is information, sometimes there isn't.

10   Q.   Cardiac Network, the one that I think you told us about,

11   you were investing in a company that had no earnings yet,

12   correct?

13   A.   Yes.

14   Q.   You told us earlier that sometimes you would make

15   investment decisions based on fundamentals or fundamental

16   analysis, other times on technical analysis, correct?

17   A.   No.  I was describing the how Best Damn Penny Stocks

18   chooses their picks.  My understanding was they did technical

19   analysis, fundamental analysis, and they had also had their own

20   proprietary formula.

21   Q.   I'd like to define those terms, if we could.  Fundamental

22   analysis, as those terms are used in the industry, means

23   studying the fundamentals of the company that one might be

24   buying stock in.  I ended with a preposition.  Right?

25   A.   Yes.

1    Q.  Now, to study the fundamentals of the company, there needs

2    to be financial information about the company, correct?

3    A.  Yes.

4    Q.  There needs to be a balance sheet?

5    A.  Yes.

6    Q.  There needs to be an income statement?

7    A.  Yes.

8    Q.  But with regard to a company like Cardiac Network, no such

9    fundamental information was available when you made a decision

10   to buy the stock, correct?

11   A.  Yes.

12   Q.  So, what actually you were -- I won't use the word gamble,

13   but what you were putting money into was technical analysis of

14   this stock, right?

15   A.  Yes.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1   BY MR. SREBNICK:

2   Q.  Technical analysis is something completely different.  It

3   has nothing to do with the fundamentals of a company, correct?

4   A.  Yes.

5   Q.  It's somebody looking at the movement of a stock price on a

6   graph and saying that looking at the stock price as it went up

7   or down in the past, they're going to guess or they're going to

8   predict which way that stock price is going to go in the

9   future, right?

10  A.  Yes.

11  Q.  That's what technical analysis is, right?

12  A.  Yes.

13  Q.  It really makes no difference what the name of the company

14  is.  It could be Cardiac, it could be widget, it could be

15  anything.  What a technical analysis does is it says forget

16  about the company and what it does for a business.  Let's look

17  at how the stock price moved over time and we're going to

18  predict where it's going to go in the future.  Right?

19  A.  Yes.

20  Q.  You, sir, know with three bachelor's educations, with

21  experience in this industry, nobody can predict which way a

22  stock is going to go based on this type of technical analysis,

23  right?

24  A.  Yes.

25  Q.  And so in fact it is a gamble if you're going to put your

1  father's money based on technical analysis, it's a gamble,

2  isn't it?

3  A.  I would not classify it as a gamble.  Technical analysis is

4  powerful in its own right.  And it, you know, it has the

5  capability of producing returns if somebody knows what they're

6  doing.

7  Q.  You, sir, were a day trader as well, were you not?

8  A.  Yes.

9  Q.  Which meant that you would buy a stock in one instance and

10  within minutes you would try to sell it, correct?

11  A.  Sometimes.

12  Q.  Which meant that, again, what the company did, whether it

13  produced Cardiac monitors, widgets, sandwiches, it didn't

14  really matter what the company did.  You were trying to play

15  that little movement in the stock.  Right?

16  A.  Yes.

17  Q.  And you did that with upwards of 70 plus companies, right?

18  A.  Around there, yes.

19  Q.  You took your father's money out of blue chip stocks,

20  long-term investment stocks, and you made the decision for your

21  father to put his money in day trading, trying to predict which

22  way a stock would hiccup within minutes so you could make a

23  quick profit, correct?

24  A.  Sometimes.  And sometimes I bought stocks like Cardiac

25  Networks with the intent to hold them for a longer period.

1    Q.  Without any fundamental information, correct?

2    A.  Correct, sometimes without fundamental information, and

3    sometimes with some fundamental information.

4    Q.  Now I'd like to ask you about the disclaimers that were

5    available to you, which I believe you told this jury were

6    ubiquitous -- and maybe we should spell that word.

7              THE COURT:  Don't spell it.  Just tell us what it is.

8    It means everywhere, right?

9              MR. SREBNICK:  I knew how to spell it but not what it

10   meant.

11   Q.  It means everything, right?

12             THE COURT:  Everywhere.

13             MR. SREBNICK:  Everywhere.  See, I didn't know what it

14   meant.

15   Q.  These disclaimers are everywhere, sir, are they not?

16   A.  Yes.

17   Q.  And while the prosecutor referred to it as the fine print,

18   indeed, the disclaimer that was shown to you on the screen was

19   in exactly the same size print to my eye, which is not perfect,

20   when we saw it on the screen.

21             MR. SREBNICK:  And I would ask it be published at this

22   time if we could do that.  I believe it's in evidence already.

23   I think it's 605-7.

24             THE COURT:  605-7A.

25             MR. SREBNICK:  If I could ask it be put back up on the

1    screen, please.

2              THE COURT:  What's your question, Mr. Srebnick?

3              MR. SREBNICK:  I'd like to put the disclaimer back on

4    the screen.

5              THE COURT:  The size of the print?

6              MR. SREBNICK:  And the content of it as well.

7              THE COURT:  OK.

8              MR. SREBNICK:  May I have the pointer?

9              THE COURT:  Do you want to go over and point with your

10   finger.

11             MR. SREBNICK:  Yes, please.

12             I'd like to turn to page No. 5, I believe, on the

13   exhibit.

14             THE COURT:  That's four that you have up.

15             MR. SREBNICK:  Next page.  Let me use the Elmo.

16             May I use the Elmo?

17             THE COURT:  Yes.

18             MR. SREBNICK:  605-7.

19   Q.  We already heard that the very first thing the disclaimer

20   tells you is to never invest in any stock featured on our site

21   or emails unless you can afford to lose your entire investment.

22   You saw that but disregarded that, correct?

23   A.  I didn't disregard that.  I saw that and, like I said,

24   that's the sort of thing you'll see from disclaimer from

25   Goldman Sachs or from anywhere else in which they're advising

1   you on investments.

2   Q.  Goldman Sachs is a registered investment adviser, correct?

3   A.  Yes.

4   Q.  Bestdamnpennystocks told you point blank they are not a

5   registered investment adviser, correct?

6   A.  Yes.

7   Q.  Right there on the third line, right?

8   A.  Yes.

9   Q.  Not only that, but bestdamnpennystocks.com told you in

10  their printed disclaimer, which is the same size font as CNWI

11  last line up there, that they are going to be compensated.

12  It's right here right where my finger is, if you can see it,

13  third line from the bottom.  They expect to be compensated

14  $150,000 cash from a noncontrolling third party for a Cardiac

15  investor relations service.

16          Do you see that?

17  A.  Yes.

18  Q.  They're telling you that they have a conflict of interest

19  because they're being paid by Cardiac to advertise the stock.

20          MR. MASTER:  Objection.

21          THE COURT:  Overruled.

22  Q.  They disclose to you --

23          THE COURT:  I think that -- I'm taking that as a

24  question.

25          MR. SREBNICK:  It is.

1                THE COURT:  He didn't answer.

2      Q.  Do you see it?

3      A.  Yes.

4      Q.  So you're being told by bestdamnpennystocks we are not

5      Goldman Sachs.  No, we are not a paid adviser.  We are an

6      advertiser being paid to advertise this company?

7      A.  Yes.

8      Q.  And disclaimers like that are ubiquitous, are they not?

9      A.  I was speaking in general terms, sir.

10               MR. SREBNICK:  Judge, that's all I have.

11               MR. MASTER:  No redirect, your Honor.

12               THE COURT:  You're excused.  Thank you very much.

13               Do you have another short witness?

14               MR. MASTER:  No, your Honor.

15               THE COURT:  Ladies and gentlemen, that finishes the

16     witnesses for today.  We'll resume on Monday morning at

17     10 o'clock.  Remember my instructions.  Don't do any research.

18     Keep open minds.  Don't discuss the case.

19               It's going to be much nicer tomorrow than it was

20     today.

21               MR. SREBNICK:  Your Honor, I think tomorrow is

22     Saturday.  Are we expected to be here tomorrow?

23               THE COURT:  Yes, Mr. Srebnick.  You'll be the only

24     one.

25               Have a nice weekend.

D38LLEV6

```
 1          (Jury not present)

 2          THE COURT:  I want to bring to your attention that

 3    juror No. 12, Mr. Knibb, you remember him.  He has a problem

 4    with family court and he wants to -- tell us exactly what he

 5    wants.

 6          THE LAW CLERK:  Your Honor, he would just like the

 7    Court to either call family court or write a letter on his

 8    behalf seeking an adjournment of the child support hearing that

 9    he had difficulty scheduling for some time.

10          MR. SHARGEL:  We knew about that going in.

11          THE COURT:  I'm going to ascertain the information,

12    you know, where he wants me to write and I'll get him both a

13    write and call.

14          MS. COHEN:  Thank you, your Honor.

15          MR. SHARGEL:  Thank you, your Honor.  Have a good

16    weekend.

17          THE COURT:  How are we doing for witnesses next week?

18          MS. COHEN:  We're doing well.  We're have them lined

19    up for the entire week.

20          THE COURT:  And you'll have them in the witness room.

21          MS. COHEN:  Apologies again, your Honor.  Yes.

22          THE COURT:  You let the defense know what the order of

23    witness is?

24          MS. COHEN:  Yes, your Honor.  I emailed them last

25    night who was for Monday, possibly was for Tuesday, and we're
```

1   going to regroup and send them the order.

2           THE COURT:  Any complaints or observations,

3   Mr. Shargel?

4           MR. SHARGEL:  No complaints.  No observations.

5           THE COURT:  OK.  All right.  Everybody have a nice

6   weekend.

7           MR. SHARGEL:  You as well, your Honor.

8           MS. COHEN:  Thank you, your Honor.

9           (Adjourned to March 11, 2013, at 10 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       INDEX OF EXAMINATION

2       Examination of:                         Page

3       ZEV HELFER

4       Cross By Mr. Shargel . . . . . . . . . . . . 370

5       Cross By Mr. Srebnick  . . . . . . . . . . . 409

6       ELI GANG

7       Direct By Mr. Master . . . . . . . . . . . . 469

8       Cross By Mr. Shargel . . . . . . . . . . . . 493

9       Cross By Mr. Srebnick  . . . . . . . . . . . 505

10      DAVID CHAMPION

11      Direct By Ms. Cohen  . . . . . . . . . . . . 509

12      TARIK HABAYEB

13      Direct By Mr. Master . . . . . . . . . . . . 517

14      Cross By Mr. Shargel . . . . . . . . . . . . 533

15      Cross By Mr. Srebnick  . . . . . . . . . . . 539

16                      GOVERNMENT EXHIBITS

17      Exhibit No.                             Received

18       201-29    . . . . . . . . . . . . . .480

19       201-50    . . . . . . . . . . . . . .513

20       605-7A    . . . . . . . . . . . . . .528

21       708  . . . . . . . . . . . . . . . . .522

22                      DEFENDANT EXHIBITS

23      Exhibit No.                             Received

24       27, 28, 30, and 31    . . . . . . . . .442

25       A45 and A48   . . . . . . . . . . . .385

1    A94 . . . . . . . . . . . . . . .402

2    B1  . . . . . . . . . . . . . . .380

3    B10 . . . . . . . . . . . . . . .431

4    B13 . . . . . . . . . . . . . . .425

5    B17 . . . . . . . . . . . . . . .439

6    B18 . . . . . . . . . . . . . . .439

7    B19 . . . . . . . . . . . . . . .446

8    B20 . . . . . . . . . . . . . . .446

9    B21 . . . . . . . . . . . . . . .447

10   B24 . . . . . . . . . . . . . . .443

11   B25 . . . . . . . . . . . . . . .444

12   B26 . . . . . . . . . . . . . . .445

13   B33 . . . . . . . . . . . . . . .441

14   B39 . . . . . . . . . . . . . . .453

15   B40 . . . . . . . . . . . . . . .452

16   B41 . . . . . . . . . . . . . . .451

17   B46 . . . . . . . . . . . . . . .455

18   B5  . . . . . . . . . . . . . . .425

19   B52 . . . . . . . . . . . . . . .455

20   B54 . . . . . . . . . . . . . . .458

21   B55 . . . . . . . . . . . . . . .456

22   B56 . . . . . . . . . . . . . . .456

23   B57 . . . . . . . . . . . . . . .457

24   B6  . . . . . . . . . . . . . . .432

25   B62 . . . . . . . . . . . . . . .459

1    B63  . . . . . . . . . . . . . .460

2    B64  . . . . . . . . . . . . . .460

3    B65 and B70  . . . . . . . . . . .465

4    B66  . . . . . . . . . . . . . .462

5    B67  . . . . . . . . . . . . . .463

6    B68  . . . . . . . . . . . . . .464

7    B8   . . . . . . . . . . . . . .430

8    B89  . . . . . . . . . . . . . .466

9    B9   . . . . . . . . . . . . . .422

10   C4   . . . . . . . . . . . . . .375

11   C6   . . . . . . . . . . . . . .377

12

13

14

15

16

17

18

19

20

21

22

23

24

25