D3BLLEV1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA

4            v.                        11 Cr. 62 (PAC)

5  DONNA LEVY,
   DAVID LEVY,
6                                      Jury Trial
              Defendants.
7  ------------------------------x

8
                                      New York, N.Y.
9                                     March 11, 2013
                                      10:19 a.m.
10
   Before:
11
              HON. PAUL A. CROTTY
12
                                      District Judge
13

14            APPEARANCES

15
   PREET BHARARA
16      United States Attorney for the
        Southern District of New York
17  CARRIE H. COHEN
   HOWARD S. MASTER
18      Assistant United States Attorneys

19
   HOWARD M. SREBNICK
20  NOAH FOX
   ALEX ARTEAGA-GOMEZ
21      Attorneys for Defendant Donna Levy

22
   GERALD L. SHARGEL
23  ROSS M. KRAMER
   JENNIFER HAYS
24      Attorneys for Defendant David Levy

25

D3BLLEV1

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  Mr. Shargel, I understand there's

4     something you want to take up.

5          MR. SHARGEL:  Yes, your Honor.  We submitted last

6     night a proposed instruction.

7          THE COURT:  Yes.

8          MR. SHARGEL:  I don't think there's any quarrel about

9     the instruction.

10          THE COURT:  I'm sure there isn't.

11          MR. SHARGEL:  But the conversation if I may say that

12     I've had with Ms. Cohen is this:  We request and I think like

13     with any other piece of evidence that's admitted under Rule

14     105, limited admissibility, that you give the instruction at

15     the time that the testimony is going to be heard; and the

16     government thinks that you should wait until the instruction,

17     final instructions.

18          I don't mind having it in the final instructions as

19     well, but I certainly think where you have limited

20     admissibility that the jury should know that at the time it's

21     admitted.

22          THE COURT:  All right.  Ms. Cohen, have you submitted

23     a response?

24          MS. COHEN:  No, your Honor.  I mean the text of the

25     instruction the government does not object to.

D3BLLEV1

1          THE COURT:  I know.  I understand.

2          MS. COHEN:  But the government doesn't believe there's

3     any authority to give that type of instruction.  It's not

4     really a limiting instruction the same way a 404(b) would.

5          THE COURT:  Do you cite a case, Mr. Shargel?

6          MR. SHARGEL:  Yes, I cited a case for the instruction.

7          MS. COHEN:  In that case it was given as part of

8     the -- it was not given as part of the --

9          THE COURT:  Judge Elfvin up in the Western District of

10     New York, at the close of evidence he gave the instruction.

11     You want it right after he testifies.

12          MR. SHARGEL:  Yes, and I think that is common

13     practice.

14          THE COURT:  Really?

15          MR. SHARGEL:  Yes, I really do.

16          THE COURT:  All right.

17          MR. SHARGEL:  You know, Judge, it makes perfect

18     sense -- may I say this -- for the following reason.

19          THE COURT:  Sure.

20          MR. SHARGEL:  It makes perfect sense because

21     essentially you're saying you can consider this testimony --

22     let's put aside 105 and 404(b) -- you can consider this

23     testimony essentially for this, a limited purpose.  You are not

24     to -- I don't have it in front of me, but you are not to

25     consider it on the issue as evidence of codefendant's,

nonpleading codefendant's guilt, so.

THE COURT:  When is this going to come up?

MR. SHARGEL:  Today, this morning.  And just to finish
the thought, if the instruction were not given, then the jury
for the remainder of the trial until they hear the final
instructions would have --

THE COURT:  They already heard it in the preliminary
instructions.

MR. SHARGEL:  I don't think in the same words as the
*Prawl* case.

THE COURT:  I'm sure not.  I told you that you're
going to hear testimony from cooperators which has to be viewed
with close scrutiny.

MR. SHARGEL:  But you didn't address the issue that's
addressed in *Prawl*.

THE COURT:  I'm not going to come to this this
morning, so.  You don't want it before he testifies?

MR. SHARGEL:  No.  I just wanted it at the time that
he does testify.  That will happen this morning.

THE COURT:  OK.  The jury is here so we'll call them
in.

MR. SREBNICK:  Judge, I have one issue.  I think we
have an agreement.  May I be heard, on this witness, on
Mr. Fotis Georgiadis, that there will be no mention that your
Honor is the judge who would be sentencing him.

1          THE COURT:  There never is.

2          MR. SREBNICK:  And, indeed, that there should be no

3    mention along the lines of Mr. Shargel's issue that he has pled

4    guilty to conspiring with the defendants here in the courtroom

5    because that might lead the jury to believe that a judge has

6    made a finding that there indeed was a conspiracy with these

7    defendants.

8          MS. COHEN:  There will be no reference to the fact

9    that when he pled guilty it was in this courtroom.  Of course

10   there will be reference to the fact he pled guilty to

11   conspiring with these defendants.

12         MR. SREBNICK:  I object to that.

13         THE COURT:  Call in the jury.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning.  Everybody set your clocks

3     ahead?  Please be seated.

4          Call your witness.

5          MR. MASTER:  Your Honor, at this time the government

6     calls Fotis Georgiadis.

7      FOTIS GEORGIADIS,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10    DIRECT EXAMINATION

11    BY MR. MASTER:

12          THE COURT:  OK, Mr. Master.

13          MR. MASTER:  Thank you, your Honor.

14    Q.  Mr. Georgiadis, how old are you?

15    A.  Thirty-eight.

16    Q.  Where were you born?

17    A.  Germany.

18    Q.  How old were you when you came to the United States?

19    A.  Three.

20    Q.  And have you lived here since you were three years old?

21    A.  Yes.

22    Q.  Where did you grow up?

23    A.  In New London, Connecticut.

24    Q.  How far did you go in school?

25    A.  Eleventh grade.

1  Q.  Are you married?

2  A.  Yes.

3  Q.  How many children do you have?

4  A.  Three.

5  Q.  How old are they?

6  A.  Seven, four, and four.

7  Q.  Who else lives with you?

8  A.  My parents.

9  Q.  You're here as a cooperating witness for the government,

10 correct?

11 A.  Yes.

12 Q.  And as a cooperating witness you pleaded guilty to certain

13 crimes?

14 A.  Yes.

15 Q.  What crimes did you plead guilty to?

16 A.  Conspiracy to commit securities fraud and wire fraud and

17 securities fraud.

18       MR. SHARGEL:  I ask for the instruction, most

19 respectfully.

20       THE COURT:  Denied.

21       Go ahead.

22 Q.  And with whom did you conspire to commit securities fraud

23 and wire fraud?

24       MR. SREBNICK:  Objection, your Honor.

25       THE COURT:  Overruled.

1          You can answer the question.

2    A.   David Levy and Donna Levy.

3    Q.   And what security does the securities fraud charge relate

4    to?

5    A.   Cardiac Network.

6    Q.   And with whom did you commit securities fraud concerning

7    Cardiac Network?

8    A.   David Levy and Donna Levy.

9    Q.   Now, before you pleaded guilty, did you sign an agreement

10   between yourself and the United States Attorney's Office?

11   A.   Yes.

12   Q.   Did you read the agreement before you signed it?

13   A.   Yes.

14   Q.   I'm showing you what's been marked for identification

15   purposes as Government Exhibit 3503-13.

16          Do you recognize that document?

17   A.   Yes.

18   Q.   What is that document?

19   A.   This is my cooperation agreement.

20   Q.   And is your signature on the last page?  It's double-sided.

21   A.   Yes.

22   Q.   Now, have you been sentenced yet for the crimes you pleaded

23   guilty to?

24   A.   No.

25   Q.   What is your understanding about what you're obligated to

1    do under that agreement you signed with the United States

2    Attorney's Office?

3    A.   Testify truthfully, provide truthful information for my

4    criminal fraudulent conduct and any others that I know of,

5    testify, also attend meetings and provide documentation if I'm

6    called upon.

7    Q.   Are you allowed to commit any future crimes under that

8    agreement?

9    A.   No, sir.

10   Q.   Is your testimony today covered by that agreement?

11   A.   Yes.

12   Q.   What is your understanding of what the United States

13   Attorney's Office will do under that agreement if you live up

14   to the obligations that you just described?

15   A.   Write a letter.  It's called a 5K1 letter.

16   Q.   And what's your understanding of what information would be

17   in this 5K1 letter?

18   A.   All my bad criminal conduct and all the good conduct.

19   Q.   And when you say good conduct, what do you mean by that?

20   A.   Truthful testimony.

21   Q.   And what if any sentence recommendation would be in this

22   5K1 letter?

23   A.   Leniency.

24   Q.   Now, would it recommend that you receive any specific

25   sentence?

1   A.  No, sir.

2   Q.  What's the highest sentence you can get on these two

3   charges to which you pleaded guilty?

4   A.  Twenty-five years.

5   Q.  What's the minimum sentence you can get?

6   A.  Probation.

7   Q.  And what effect does the 5K1 letter have on the maximum

8   sentence, highest, or the minimum sentence?

9   A.  None.

10  Q.  If the government does write a letter on your behalf, what

11  could happen to your sentence?

12  A.  Receive a lighter sentence.

13  Q.  Who ultimately will decide your sentence?

14  A.  The judge.

15          MR. SREBNICK:  Objection, your Honor.

16          THE COURT:  Overruled.

17  Q.  Is the judge required to follow the government's

18  recommendation if the 5K1 letter is written?

19  A.  No, sir.

20          MR. SHARGEL:  I'm sorry, would the witness keep his

21  voice up, please.

22  A.  No, sir.

23  Q.  If you violate the agreement what could happen?

24  A.  The agreement will be null and voided and it will be torn

25  up.

1    Q.  If that happens, will you receive the 5K1 letter?

2    A.  No, sir.

3    Q.  As you sit here today, has the government promised you

4    that, no matter what, it will write you a 5K1 letter?

5    A.  No.

6    Q.  Have you been promised you're going to get a lower sentence

7    as a result of your cooperation?

8    A.  No, sir.

9    Q.  Have any promises at all been made to you about your

10   sentence?

11   A.  No.

12   Q.  Now, do you believe that the outcome of this case has any

13   effect on whether or not you get a 5K1 letter?

14   A.  No.

15   Q.  What's your understanding of what does matter?

16   A.  Telling the truth.

17   Q.  Why did you agree to enter into this cooperation agreement

18   with the government?

19           MR. SHARGEL:  Objection.

20           THE COURT:  Overruled.

21   A.  In hopes of getting a lighter sentence.

22   Q.  Now, besides writing this 5K1 letter to the judge, what

23   other promises did the government make if you hold up your end

24   of the cooperation agreement?

25   A.  None.

D3BLLEV1                    Georgiadis - direct

1    Q.  When did you enter into this cooperation agreement with the

2    government?

3    A.  Last month.

4    Q.  Had you been charged with any crimes prior to entering into

5    the cooperation agreement and pleading guilty?

6    A.  No, sir.

7    Q.  Were you a citizen at the time you entered into the

8    cooperation agreement with the United States?

9    A.  Yes.

10   Q.  When did you apply for citizenship?

11   A.  May of 2012.

12   Q.  And on what basis did you apply for U.S. citizenship?

13   A.  My wife and my children are American citizens.

14   Q.  There's a question on the citizenship application form that

15   asks have you committed any crime or offense for which you were

16   not arrested.  What was your answer to that question?

17   A.  No.

18   Q.  And what's the reason you answered the question that way?

19   A.  I hadn't been accused of committing a crime and I was

20   cooperating.  I thought I was going to get a nonprosecution.

21   And it hadn't been until after I became an American citizen I

22   sat down with the government and my attorney and at that time I

23   was explained of my criminal conduct, that I hurt people and --

24              MR. SHARGEL:  Judge, excuse me.  I object to what

25   someone else told him.

1    THE COURT:  Sustained.

2  Q.  Well, at that time what did you come to understand?

3         MR. SHARGEL:  Objection, same objection.

4         THE COURT:  Overruled.

5         MR. SHARGEL:  Foundation.

6         THE COURT:  Overruled.

7  Q.  Without saying what anyone told you, what did you come to

8  understand?

9  A.  I came to understand that what I have done was criminal and

10  I hurt people and at that time I wanted to accept

11  responsibility for what I'd done and I pled guilty.

12  Q.  Now, when was the first time you met with the government?

13  A.  June -- December of 2011.

14  Q.  Were you fully honest with the government at that meeting?

15  A.  No.

16  Q.  And what happened right after the meeting?

17  A.  I went home.  The government ended the meeting and I drove

18  home and I was nervous and scared.  I came to my house and I

19  told my dad that --

20         MR. SHARGEL:  Objection what he told his dad.

21         THE COURT:  Sustained.

22  Q.  What happened after you got home, without saying any

23  conversations that you had?

24  A.  I went home and my dad smacked me really hard in my face

25  and I was really scared and impatient and I wanted to call the

1  agent but he was in flight.  So I didn't sleep all night.  I

2  woke up very early in the morning and I called Agent Richard

3  Reinhardt and I explained to him that I was wrong and I wanted

4  to cooperate and to give me 24 hours to seek new counsel.

5  Q.  And is that what you did?

6  A.  Yes.

7  Q.  Now, before we get to Cardiac Networks, you were involved

8  in another stock scheme after Cardiac Networks, correct?

9  A.  Yes.

10  Q.  What was the name of the company?

11  A.  Empire Film Group.

12  Q.  What was the company looking for?

13  A.  Company was looking for financing to distribute their film

14  and make another film.

15  Q.  And how much money was the company looking for?

16  A.  $4 million.

17  Q.  And how did you agree to raise the money?

18  A.  By taking the company public and selling stock.

19  Q.  And how did you -- how were you able to sell the stock?

20  A.  Through stock promotion.

21  Q.  And how much money were you able to raise through stock

22  promotion?

23  A.  $4 million.

24  Q.  And how much money did you earn for yourself and others who

25  you worked with on top of the 4 million?

1    A.  2 million.

2            THE COURT:  We didn't hear that.

3            THE WITNESS:  2 million.

4    Q.  What do you mean by stock promotion?

5    A.  Hire somebody to do marketing on the company and the

6    company stock.

7    Q.  And to your knowledge, was the government aware of your

8    role in Empire Film Group before you brought it to the

9    government's attention?

10   A.  No.

11   Q.  Now let's get to how you came to be involved in the Cardiac

12   Network scheme.

13           When did you begin investing in penny stocks?

14   A.  Sometime in around 2003.

15   Q.  How successful was your first investment?

16   A.  Real successful.

17   Q.  How much money did you make?

18   A.  Around $400,000.

19   Q.  What did you do with the money?

20   A.  I reinvented it.

21   Q.  And how did you decide what -- what did you reinvest it in?

22   A.  I reinvested in penny stocks.

23   Q.  How did you decide what penny stocks to invest in?

24   A.  I would go on certain chat rooms and read about what others

25   were buying and it was like a community where you could see

1   what everybody else was buying, what was hot at the time in

2   different types of sectors.

3   Q.  And what contacts did you make with investor relations

4   firms at that time?

5   A.  Made a contact through an investment relations firm called

6   Equitalink with a gentleman who was doing investor relations

7   for companies, public companies.

8   Q.  What business were you in at the time?

9   A.  I was working at the pizzeria.

10  Q.  And what pizzeria was that?

11  A.  DeGreko's Pizzeria.

12  Q.  Whose business was that?

13  A.  My family's.

14  Q.  What did you do for the family business?

15  A.  Did anything from cook, clean, mop, answer phones.

16  Q.  And when you contacted these investors relation firms, what

17  kind of information were you looking for?

18  A.  Information about the various companies or information

19  regarding certain products the companies had, anything to get

20  any kind of knowledge of investment opportunities.

21  Q.  Now, did there come a time when you decided to use the

22  information you were learning to take the family business

23  public?

24  A.  Yes.

25  Q.  And what's the reason that you decided to do that?

D3BLLEV1                    Georgiadis - direct

1    A.  To expand my business into supermarket stores for frozen

2    pizzas and hoping to open up multiple stores.

3    Q.  And how much money did you think that you needed to do

4    that?

5    A.  Around a million dollars.

6    Q.  And approximately when was this?

7    A.  Around 2005.

8    Q.  And how did you learn about the steps you needed to take to

9    bring the company public?

10   A.  There was a website called PinkSheets.com.

11   Q.  And who did you end up finding on PinkSheets.com?

12   A.  I found a lawyer by the name of Laura Anthony.

13   Q.  What was your understanding of her role in taking companies

14   public?

15   A.  She helped take companies public via reverse merger and

16   helped find financing.

17   Q.  And who did she introduce you to?

18   A.  Her husband, Michael Anthony.

19   Q.  And how did he describe his role in taking companies

20   public?

21   A.  His role was that he would merge the companies into a

22   public shell and help raise capital.

23   Q.  And when you spoke with him, what was the business

24   proposition that he offered you?

25   A.  To raise me a million dollars; 50 percent of the proceeds

1   were to go to the company and 50 percent were to go to him.

2   Q.  And how did he say he was going to raise the money?

3   A.  By selling free trading stock.

4   Q.  And what kind of shares were you going to get as part of

5   the deal?

6   A.  Restricted.

7   Q.  And what did he say you would need to do in order to enable

8   him to sell the stock?

9   A.  I was supposed to put out press releases of anything the

10  company had going on at the time.

11  Q.  And what else did Michael tell you you needed to do in

12  order to help with the money raise?

13  A.  Seek stock promotion.

14  Q.  And what if any experience did you have with taking a

15  company public before?

16  A.  I didn't.

17  Q.  And what if any experience did you have with stock

18  promotion before?

19  A.  Not too much.

20  Q.  And what were you hoping to get out of the deal?

21  A.  A million dollars to expand my business.

22  Q.  And who -- did you end up going through with the deal?

23  A.  No.

24  Q.  Did you end up taking your company public?

25  A.  Yes, yes.

1   Q.  Now, I mentioned a couple -- you mentioned a couple terms

2   just a minute ago.

3            What do you mean by restricted shares?

4   A.  Shares that you cannot sell, insider shares.

5   Q.  And what do you mean by free trading shares?

6   A.  Free trading shares that you can sell.

7   Q.  And so you ended up -- did you end up accepting Michael

8   Anthony's offer?

9   A.  Yes.

10  Q.  And who did you hire to draft press releases?

11  A.  I hired a company by the name of Agoracom.

12  Q.  And how did you find Agoracom?

13  A.  I found them online through research.

14  Q.  And why did you pick them?

15  A.  I found them online through research.  I called them up,

16  spoke to them on the phone.  Gentleman that owned it was Greek

17  and he was a lawyer so I figured that, you know, it was a good

18  company.

19  Q.  And how did you disseminate press releases?

20  A.  Agoracom would help me draft up press releases.  I would

21  then send them over to my attorney for approval and then send

22  them to a company called MacReport media.  It's like business

23  wire where you send the press release to get disseminated.

24  Q.  Now, would you give Michael advance notice of the releases

25  before they were going out?

1    A.  Yes.

2    Q.  And what was the purpose of that, what did you understand

3    the purpose of that to be?

4    A.  For him to sell stock.

5    Q.  Did there come a time when you hired a stock promotor as

6    Michael had asked to you do?

7    A.  Yes.

8    Q.  What was the name of the person you hired for stock

9    promotion?

10   A.  Eddie.

11   Q.  And did Eddie say he could do to help you with the

12   promotion?

13   A.  He told me that he could help me by promoting through

14   various email lists.

15   Q.  And what did he say -- what did he say he could achieve

16   through sending out information in email lists?

17   A.  By bringing prospective buyers to buying the stock.

18   Q.  And when if ever did he use the term liquidity?

19   A.  He had told me that by using the email list it would bring

20   liquidity into the stock and basically buying into the stock.

21   Q.  And how much did you pay Eddie for his promotion services?

22   A.  Paid him 150,000 worth of stock.

23   Q.  What kind of stock?

24   A.  Free trading stock.

25   Q.  Now, did there come a time when you began issuing press

1    releases and using Eddie to promote the stock as Michael had

2    requested?

3    A.   Yes.

4    Q.   Approximately when did this happen?

5    A.   Sometime in 2006.

6    Q.   And what did you see happen to the stock after you started

7    sending out press releases and using this promotion?

8    A.   Volume came into the stock buying and the price went up.

9    Q.   Now, over the course of early 2006, did you give stock to

10   others as well to help with promotion?

11   A.   Yes.

12   Q.   And what's the reason you started using other promotors as

13   well?

14   A.   Well, because, you know, I was getting some complaints on

15   some of the emails that were going out.

16   Q.   And as 2006 progressed, how well was the frozen pizza idea

17   working out?

18   A.   Not too good.

19   Q.   And what's the reason for that?

20   A.   I ended up stopping the money raise through Michael

21   Anthony.

22   Q.   And why did you stop the money raise?

23   A.   The stock was going down and I didn't want to hurt the

24   stock so I decided to just stop the money raise with him.

25   Q.   And before you stopped the money raise, did there come a

1  time when you explored, when you tried to move DeGreko into a

2  different line of business?

3  A.  Yes.

4  Q.  What line of business was that?

5  A.  It was a technology called click to call.

6  Q.  And what did -- what steps did you actually take to develop

7  this click to call technology?

8  A.  I hired some people to develop this click to call

9  technology where it was a box that appeared on a website where

10  you would enter your cell phone number if you had a question

11  about a specific product and the number that you entered into

12  the box, your phone would ring within 30 seconds with a

13  representative being able to help you with any questions that

14  you had.

15  Q.  And how well did that idea work out?

16  A.  Well, we developed it, but we didn't have enough money to

17  market it.

18  Q.  And how much money in total did you get from Michael

19  Anthony as a result of your promotion and press release work?

20  A.  Roughly around $250,000.

21  Q.  And what if any stock were you able to sell?

22  A.  None.

23  Q.  And what's the reason for that?

24  A.  My shares were restricted.

25  Q.  Now, did there come a time when Michael Anthony asked you

1    to work as a stock promotor?

2    A.   Yes.

3    Q.   And what stock did that involve?

4    A.   A company called ikarma.

5    Q.   What role did Michael Anthony have in that deal?

6    A.   He took the company public and was helping them with

7    financing.

8    Q.   And how much stock did Michael Anthony give you to pay for

9    the promotion?

10   A.   Around $250,000 worth of stock.

11   Q.   Who did you hire to help with the promotion?

12   A.   I hired Eddie.

13   Q.   Did you maintain any email lists yourself?

14   A.   No.

15   Q.   Did you draft any promotional materials yourself?

16   A.   No.

17   Q.   Did you disseminate any promotional materials yourself?

18   A.   No.

19   Q.   Why did you hire Eddie to help with the stock promotion

20   related to ikarma?

21   A.   He was effective.

22   Q.   Effective where?

23   A.   He was an effective promotor.

24   Q.   And how did you know he was an effective promotor?

25   A.   Because he had brought in liquidity when I hired him on my

1  company and the stock actually went up.

2  Q.  And was Eddie the only stock promotor you hired for ikarma?

3  A.  No.

4  Q.  Now, how successful was the promotion for ikarma?

5  A.  It was successful.

6  Q.  And what if any concerns did you start hearing about the

7  promotion?

8  A.  I was getting complaints on emails that were going out,

9  people not wanting to receive certain emails.

10 Q.  And what's -- what did you hear those unwanted emails

11 referred to?

12 A.  They were called spam.

13 Q.  And what did you do when you learned that there was

14 spamming going on with the ikarma promotion?

15 A.  I called and I asked the promotors that I hired and talked

16 to them about it and they denied it.  So, I stopped the

17 promotion.

18 Q.  And did there come a time -- well, where did Eddie live?

19 A.  Lived in Florida.

20 Q.  And did there come a time when Eddie asked you to fly down

21 to Florida to meet with him?

22 A.  Yes.

23 Q.  And what was your understanding of the purpose of that

24 meeting?

25 A.  I was going down to Florida to speak to Eddie about

1    financing for my click to call technology.

2    Q.  And approximately when was that?

3    A.  Around 2007, 2006.

4    Q.  And what did you do when Eddie invited you down to talk

5    about financing?

6    A.  I flew down to Florida.

7    Q.  And what happened when you got down there?

8    A.  I flew down and -- I flew down to Florida.  We had lunch

9    and we were discussing finance opportunities.  He told me he

10   was going to introduce me to some financiers.  Shortly after

11   when we finished our conversation, I was going to fly out the

12   next morning and he invited me to go out to dinner that night

13   and asked me if I wanted to attend.  He was having some friends

14   that were going to join him.

15   Q.  And did you agree to join him for dinner?

16   A.  Yes.

17   Q.  And where did you meet?

18   A.  Met at a steak house somewhere in Fort Lauderdale.

19   Q.  And who else was at the dinner other than you and Eddie?

20   A.  Eddie's wife, David Levy, and Donna Levy.

21   Q.  And had you ever meet David Levy or Donna Levy before?

22   A.  No.

23   Q.  And what happened at the dinner?

24   A.  It was small talk.  Everybody, you know, I introduced

25   myself, talked about my company a little bit.  David was

1    talking about a company he had called The Tube that was

2    successful.

3    Q.  And what did Donna talk about?

4    A.  Donna was talking about a stock promotion that she was

5    upset about that was not going her way.

6    Q.  And did there come a time during that dinner when you had a

7    private conversation with David Levy?

8    A.  Yes.

9    Q.  And describe that conversation.

10   A.  Eddie had excused himself to go to the bathroom and David

11   came up to me and gave me his business card and told me that if

12   I ever need any help for marketing and promotion that Donna

13   does promotion.

14   Q.  And did there come a time when you actually made that call

15   to David Levy about promotion?

16   A.  Yes.

17   Q.  And what's the reason why you made that call?

18   A.  I had potential stock promotion deal.

19   Q.  And why didn't you continue using Eddie?

20   A.  Because I was receiving complaints from before about the

21   emails that were going out, so decided not to use him anymore.

22   Q.  And what happened when you called David Levy?

23   A.  Called David Levy and asked him if I could have Donna's

24   contact information and he gave them to me.

25   Q.  And what did you do when you got Donna's contact

1   information?

2   A.  I called her.

3   Q.  And what did you tell her about the opportunity and what

4   did she say to you?

5   A.  She told me to fly down to Florida to have a face-to-face

6   conversation.

7   Q.  Where were you living at the time?

8   A.  In Connecticut.

9   Q.  And what did you decide to do?

10  A.  To get on a flight and go to Florida.

11  Q.  And where did you meet initially?

12  A.  Met at the hotel that I was staying at.

13  Q.  And after you met at the hotel, where did you go?

14  A.  We went back to Donna's house.

15  Q.  And describe the house.

16  A.  Mediterranean style home on the Intercoastal.

17  Q.  And what if any cars did you see in the driveway?

18  A.  A Cadillac Escalade and a Porsche.

19  Q.  And what effect did the cars and the surroundings have on

20  you?

21  A.  It was wealthy.

22  Q.  Describe the conversation you had with her at her house

23  about the promotion.

24  A.  We talked about the promotion.  She told me how she worked.

25  Sometimes she would take stock and sometimes she would take

1    cash, depending on the deal.

2    Q.  What did she say about the budget requirement?

3    A.  Had to be a minimum budget of a hundred thousand dollars.

4    Q.  What did she describe as her fee for promotions?

5    A.  Fee was based on the total value of shares that went

6    through the specific stock for the day and the average price of

7    the stock for the day.

8    Q.  What was that fee?

9    A.  Excuse me?

10   Q.  You said it was based on that.  What percentage of that?

11   A.  10 percent.

12   Q.  What if any examples did she give about her past successes

13   at that meeting?

14   A.  She gave me examples of other stock promotions that she was

15   doing that were successful.

16   Q.  And what if any other expenses about did she say she needed

17   to cover?

18   A.  If she hired anybody else in regards to the stock

19   promotion.

20   Q.  And, again, approximately when did this conversation occur?

21   A.  Sometime in 2006.

22   Q.  And what if any research did she say she did on a stock

23   before deciding whether or not she would take the offer to

24   promote it?

25   A.  Research that was out there and disseminated already, press

1   releases or anything she could find out about the company.

2   Q.  What if anything did she say she wanted to know about the

3   float on the stock?

4   A.  She wanted to know about the float and how many shares were

5   in the public float.

6   Q.  What is your understanding of the term float means?

7   A.  Float is how many shares are in the public's hands that are

8   free trading.

9   Q.  And what kind of numbers did she say she was looking for in

10  terms of the float?

11  A.  The lower the better.

12  Q.  And why did she say was looking for a lower number?

13  A.  It would make the stock react better.

14  Q.  And what did she mean by react, what did you understand?

15  A.  It would make the stock go up fast.

16  Q.  Turning next to the press releases, what kind of story did

17  she say she was looking for?

18  A.  Anything going on with current events, hot topics, hot

19  sector, whether it's tech or biotech.

20  Q.  And what if anything did she say she looked for concerning

21  any past history of promotions?

22  A.  She would look for to see if the company had any past

23  promotions done to it.

24  Q.  And did she say why she looked for that?

25  A.  Because that would mean that the stock would be diluted,

1    had been diluted.

2    Q.  What did you understand the term diluted to mean?

3    A.  Too many shares that were sold.

4    Q.  And what --

5    A.  Prior.

6    Q.  And what did you understand that that -- what did you

7    understand that would mean in terms of the effectiveness of the

8    promotion?

9    A.  That the promotion wouldn't be as successful.

10   Q.  Now, did you end up working with her on promotion deals?

11   A.  Yes.

12   Q.  How many deals do you remember doing with her?

13   A.  Five.

14   Q.  And during which two years did you do these deals?

15   A.  2006 and 2007.

16   Q.  And how many promotion deals do you remember doing with

17   her?

18   A.  Five.

19   Q.  What companies were the subject of the deals?

20   A.  Material Technologies, Pizza International, Sao Luis

21   Mining, Mobile Ready, and Fire Sky Media.

22   Q.  And who brought each of these five deals to Donna?

23   A.  I did.

24   Q.  And who hired you?

25   A.  Other company consultants or other stock promotors.

1   Q.  And what were you told was the purpose of each promotion?

2   A.  The companies would either be seeking financing or would

3   need attention on the company and their specific product that

4   they had.

5   Q.  Do you know if those representations were accurate?

6   A.  No, I don't.

7   Q.  To your knowledge, were you Donna's only customer?

8   A.  No.

9   Q.  And how were you paid for each of the deals?

10  A.  Stock.

11  Q.  Back to the last question, how do you know that you weren't

12  Donna's only customer?

13  A.  She had said that she used to use other people and work

14  with other people.

15  Q.  Now, what kind of stock were you paid with?

16  A.  Free trading stock.

17  Q.  And over time, what did Donna ask you to do with free

18  trading stock that you were receiving?

19  A.  To trade it myself.

20  Q.  And why did Donna -- what did Donna say was the reason why

21  she wanted you to trade stock?

22  A.  That it would be better because we wouldn't be pointing

23  fingers at each other of who sold first and at what price each

24  of us had sold at.

25  Q.  And under this arrangement, who was going to provide the

1    direction for what to trade and when?

2    A.  She would provide me direction via instant message.

3    Q.  And how did she say she would know what to trade and when?

4    A.  She would monitor the stock with a system that's called a

5    level two system.

6    Q.  And what's your understanding of a level two system?

7    A.  It's a stock system where you can see the bid and ask and

8    see the multiple offers that are under current market.

9    Q.  And what was your reaction to this proposal?

10   A.  I agreed.

11   Q.  And after you agreed to the deal, how did you actually go

12   about deciding what to trade and when?

13   A.  She would tell me, you know, to put in an offer or to take

14   the bid out certain times of when the promotion was going on.

15   Q.  And for how long did her campaigns last, promotional

16   campaigns last for each of these deals?

17   A.  Sometimes they would last a couple days, sometimes one day.

18   Q.  And what happened to the stock each time she did these

19   campaigns?

20   A.  Stock would go up.

21   Q.  And what would you do with the stock, the free trading

22   shares you'd gotten once her campaign was underway?

23   A.  I would sell it.

24   Q.  And what did she tell you she would do for her promotional

25   campaign -- withdrawn.

1          And so you would sell stock.  What kind of offer did

2     she have you put into the market before she began the

3     promotional campaign?

4     A.   Over the price of what the offer was at.

5     Q.   And what did she say the purpose of that was?

6     A.   It was a gap up.

7     Q.   And what did you understand the term gap up to mean?

8     A.   It would mean that there was interest premarket before the

9     stock would open up and it would create the stock to go higher.

10    Q.   And was your understanding that your offer would appear on

11    this level two system?

12    A.   Yes.

13    Q.   And what was your understanding of the effect of seeing a

14    higher offer on the level two system would have on the market?

15    A.   Make people buy the stock more.

16    Q.   And what would you do if your initial offer was accepted?

17    A.   I would move up a couple ticks.

18    Q.   What do you mean by ticks?

19    A.   I would move up 2 cents or 5 cents.

20    Q.   And how frequently did Donna use the term gap up?

21    A.   She would use it all the time.

22    Q.   And, again, what, in the context of trading, trading these

23    penny stocks, what do you understand the term gap up to mean?

24    A.   Term gap up would mean is that the stock is gapping higher

25    than the current market price at the time.

D3BLLEV1                        Georgiadis - direct

1    Q.  So you used the term gap in the definition of gap up.

2            What do you mean by the term, I guess what do you

3    understand the difference between the current market price and

4    the offer to be?

5    A.  The current market price and the offer?

6    Q.  Well, just explain again.

7    A.  The current market price would be 50 cents, let's say, and

8    a gap up would be around 60.

9    Q.  And what would the number 60 represent?

10   A.  The number 60?

11   Q.  Yeah, in this example that you're giving.

12   A.  It would represent, it would represent the price that I

13   would put the stock to be sold at.

14   Q.  So the gap would be 10 cents?

15   A.  The gap would be 10 cents, yes.

16   Q.  And that would be the difference between your offer and the

17   current market price?

18   A.  Yes.

19            (Continued on next page)

20

21

22

23

24

25

D3brlev2                    Georgiadis - direct

1    Q.  How much money did you make altogether in these five deals?

2    A.  Several hundred thousand dollars.

3    Q.  How were the proceeds split?

4    A.  We paid for marketing costs, and after that we split it

5    50-50.

6    Q.  How did you end up sending her share of the proceeds to

7    her?

8    A.  By check or wire.

9    Q.  To what entity?

10   A.  DML Marketing.

11   Q.  Who did you understand was the owner of that entity?

12   A.  Donna.

13   Q.  I'd like you to take a look at some records that are on the

14   table next to you.  They are from Government Exhibits 1257 and

15   1230, 1257 being Spartan Securities Group, Bedrock Ventures,

16   Henson Bedrock Ventures, and 1230 being Bedrock Ventures

17   Wachovia account?

18   A.  Yes.

19   Q.  First of all, what is Bedrock Ventures?

20   A.  Bedrock Ventures was a marketing and investment company of

21   mine.

22   Q.  Who owned it?

23   A.  I did, I owned it.

24   Q.  Who helped you form it?

25   A.  My attorney.

D3brlev2                    Georgiadis - direct

1    Q.   Which attorney was that?

2    A.   Laura Anthony.

3    Q.   I'd like you to take a look at what is in front of you as

4    the Bedrock Ventures trading account February 1, 2007, and

5    February 28, 2007.  Do you see that, the first document?

6              THE COURT:  What number is that, Mr. Master?

7              MR. MASTER:  It's from Government Exhibit 1257.  It is

8    already admitted into evidence.  Your Honor, we are handing up

9    a copy.  We are going to put this on the screen your Honor, if

10   you wish, we can mark this for identification as 1257A.  It is

11   within 1257, which is a multihundred-page exhibit, 1C.

12   Q.   In any event, Mr. Georgiadis, can you see that on the

13   screen?

14   A.   Yes.

15   Q.   What document is in front of you?  Can you describe this

16   document?

17   A.   This is my stock brokerage statement.

18   Q.   For which month?

19   A.   For February.

20   Q.   Of what year?

21   A.   2007.

22   Q.   Did you trade Sao Luis Mining, one of the stocks that you

23   promoted with Donna that month?

24   A.   Yes.

25   Q.   I'd like you to turn to the fourth page of that document.

D3brlev2                    Georgiadis - direct

1   Do you see what is listed on February 13th and February 14th,

2   2007?

3   A.  Yes.

4   Q.  What is reflected on this document?

5   A.  Selling of Sao Luis Mining.

6   Q.  Does it reflect the proceeds from that sale?

7   A.  Yes.

8   Q.  Approximately how much money did you make from that sale?

9   A.  164,220.64.

10  Q.  Was there a subsequent sale when you made additional money?

11  A.  Yes.

12  Q.  I'd like you to take a look at the next page.  If you look

13  on the top of that page, there is something called a wire

14  transfer.  Do you see that?

15  A.  Yes.

16  Q.  Where did you transfer that money to after you earned it

17  from stock sales?

18  A.  To my Wachovia account.

19  Q.  Now I would like you to take a look at a subset of

20  Government Exhibit 1230.  We'll mark it 1230A for

21  identification.  Do you see on February 20, 2007, what is

22  reflected in this Wachovia statement?  Is that the wire

23  transfer?

24  A.  Yes.

25  Q.  That is the other side of the wire transfer?

1  A.  Yes.

2  Q.  What did you do the next day?

3  A.  I wired Donna the money.

4  Q.  Take a look at the second page of that document.  If you

5  could tell the jury where the payment to Donna is reflected.

6  A.  Right at the 200,000 funds transfer to Colonial Bank DML

7  Marketing.

8  Q.  That's on February 21st?

9  A.  Yes.

10  Q.  The description is marketing contract A1B1.  What did that

11  refer to?

12  A.  The marketing of Sao Luis Mining.

13  Q.  I'd like you to take a look at another set of trades and

14  transfers in May of 2007.  Is this a page from your May 2007

15  Bedrock Ventures trading account?

16  A.  Yes.

17  Q.  Does this reflect trades in Firesky Media?

18  A.  Yes.

19  Q.  Is that one of the companies that you just described as

20  doing promotions with Donna?

21  A.  Yes.

22  Q.  What were the proceeds from that transaction?

23  A.  $122,797 and one penny.

24  Q.  The day before you had made a trade in that stock?

25  A.  That's what?

1    Q.  The day before there is also some proceeds, correct?

2    A.  Yes.

3    Q.  Then I would like you to take a look at a page from your

4    June 2007 statement.  This as subset of June 2007 statement.

5    I'd like you to take a look at on June 4, 2007, something that

6    says "wire transfer."  Do you see that?

7    A.  Where?

8    Q.  June 4, 2007, it says, "cash, journal, wire transfer."

9    A.  Yes.

10   Q.  How much did you wire transfer out?

11   A.  $122,772 and one penny.

12   Q.  That is essentially all the proceeds from your sale of

13   Firesky Media?

14   A.  Yes.

15   Q.  Where did you wire that money to?

16   A.  My Wachovia account.

17   Q.  Now I'd like you to take a look at your June 2007 Wachovia

18   statement.  This is a subset of Government Exhibit 1230, 1230A

19   for identification.  Is that wire transfer in from your trading

20   account reflected on page 1 of this document?

21   A.  Yes.

22   Q.  Where is that reflected?

23   A.  What do you mean?

24   Q.  If you could explain to the jury where on this statement,

25   for the record.

D3brlev2                    Georgiadis - direct

1   A.   June 4th, $122,772 and one penny.

2   Q.   What did you do the day after you received that money?

3   A.   I wired money to Donna.

4   Q.   Is that reflected on page 2 of that document?

5   A.   Yes.

6   Q.   Explain to the record where that payment is reflected.

7   A.   On June 5th, I wired $70,600 to DML Marketing at Colonial

8   Bank.

9   Q.   It says in the memo line "invoice for May."  What did you

10  refer to when you said "invoice for May"?

11  A.   For the sale of Firesky Media.

12  Q.   What did the $70,800 represent?

13  A.   Her proceeds.

14  Q.   Her share of the proceeds?

15  A.   Her share of the proceeds, yes.

16  Q.   You said sometimes you sent payments to Donna by check?

17  A.   Yes.

18  Q.   I'm going to show you two checks that are again from

19  Government Exhibit 1230 marked for identification as Government

20  Exhibit 1230B.  Those are drawn from the same account, the

21  Bedrock Ventures Wachovia account?

22  A.   Yes.

23  Q.   Who are they made out to?

24  A.   DML Marketing.

25  Q.   What do those payments represent?

D3brlev2            Georgiadis - direct

1    A.  Other stock promotions, her proceeds and marketing costs.

2    Q.  Again it says on the memo line of the check -- this check,

3    which is dated March 30, 2007, and it's in the amount of

4    $165,959.50, states, "remaining Jan invoice and last half

5    March."  What did you refer to when you were referencing

6    invoices?

7    A.  It was the deals that we had done for January and for

8    March.

9    Q.  Why didn't you explicitly mention the names of the stocks

10   that you were promoting on these invoices, or on these memos?

11   A.  I just didn't.

12   Q.  Flip to the second page.  That is another check from

13   Government Exhibit 1230.  Is that from the same account?

14   A.  Yes.

15   Q.  It's to DML Marketing as well?

16   A.  Yes.

17   Q.  That's dated May 2, 2007, in the amount of $58,000, and

18   that states "April invoice."  What did you refer to when you

19   stated "April invoice"?

20   A.  The stock promotion that we had involvement in in April.

21   Q.  As you began working more with her over time, did there

22   come a time when she began disclosing more to you about her

23   methods for making the stock price and volume move?

24   A.  Say that again.

25   Q.  As you began working more with her, did there come a time

1    when she disclosed to you some of her methods for making a

2    stock price and the volume increase?

3    A.  Yes.

4    Q.  What did she say about how she used message boards to help

5    make the stock price and volume move?

6    A.  She would use some people that would go out and post on

7    specific -- on certain message boards about the stock

8    promotion.

9    Q.  What kind of information would they post?  What would be

10   the content of those posts?

11   A.  To get into the stock before the promotion starts,

12   basically.

13   Q.  What did she say was the main message board that she used

14   to draw people into purchasing the stock?

15   A.  There was a message board named Investors Hub, iHub.com.

16   Q.  What is a message board?

17   A.  A message board is a community where you go and seek

18   information about specific stocks and companies.

19   Q.  What, if anything, did she say she did with people who had

20   their own stock purchase recommendation mailing list?

21   A.  She would give them the stock promotion that she was

22   involved in, we were involved in, and they would promote it for

23   free.

24   Q.  What did she say was the purpose of leaking this --

25   withdrawn.  Where did she say she would give this information

1    out to these individuals?

2    A.   Before her promotion began.

3    Q.   What did she say was the purpose of giving them advance

4    notice of the promotion?

5    A.   Building a chart, basically.

6    Q.   What did you understand her to mean by building a chart?

7    A.   To have activity going on in the stock before the promotion

8    was to go out on the basis of when someone received the

9    promotion and would check on the stock, he would see that there

10   was activity prior to the promotion.

11   Q.   Who would actually be creating that activity?  Would it be

12   regular investors or would it be someone else?

13   A.   It would be other people.

14   Q.   Other people?

15   A.   It would be people that she would either leak it out to

16   that she worked with or friends, and so forth.

17   Q.   What did she say was the reason that people would go out or

18   would distribute these stock purchase recommendations

19   concerning the stocks you and she were promoting together for

20   free?

21   A.   Because they knew that Donna was a successful stock

22   promoter and she was effective, so they would have a gain to do

23   it because it would make them look good as well.

24   Q.   What did she say, if anything, about the use of people to

25   buy stock in advance of the start of her promotion?

1    A.  Say that again.  I didn't hear you.

2    Q.  What, if anything, did she say about the use of people to

3    buy stock that you were going to promote in advance of the

4    start of her promotion?

5    A.  She would use people to prebuy stock before the promotion

6    would go out.

7    Q.  What does prebuy mean?

8    A.  Prebuy is where you leak the information of the promotion

9    out before the promotion goes out so you could show a

10   consistent pattern of buying.

11   Q.  Show the consistent pattern of buying to whom?

12   A.  What's that?

13   Q.  Show the consistent pattern of buying to whom?

14   A.  To potential investors that would be buying the stock.

15   Q.  How would these potential investors learn about the stock

16   in the first place?

17   A.  Basically, via email.

18   Q.  Who, if anyone, did she say she worked with to send out

19   emails?

20   A.  She worked with others.  One in general was a company

21   called I believe Winning Media.

22   Q.  What was the goal of showing a pattern of buying stock

23   before a promotion began?

24   A.  To show a pattern that there's activity in the stock to

25   entice.  Usually, to do a promotion, most of the time there's

1    no activity in the stock.  So you would bring in buyers before

2    the promotion was to start so that when you received the

3    promotion, you would check the activity and it would entice you

4    to buy the stock.

5    Q.   Again, what did she say the intended effect would be of all

6    of these techniques that she used?

7    A.   Successful promotion.

8    Q.   What did you understand her to mean by success?

9    A.   Be able to make the stock go up.

10   Q.   Did there come a time when David Levy approached you with

11   an offer related to a company called Cardiac Networks?

12   A.   Yes.

13   Q.   Approximately when?

14   A.   Sometime in 2010.

15   Q.   How early that year?

16   A.   Mid '07.

17   Q.   How would he describe the offer initially?

18   A.   He described the offer as a really good opportunity in the

19   heart monitoring business and the founders were very

20   successful.  One of the founders had worked for Life Watch, and

21   there was a prominent doctor that was involved in the deal, and

22   he said that it was going to be the next best thing.

23   Q.   What was he looking for you to do?

24   A.   To help him finance the company.

25   Q.   How much did he say he wanted you to invest?

1    A.   Total money that the company was looking for at that time

2    was roughly around 3 to $500,000.

3    Q.   Did there come a time when the amount of money that the

4    company was seeking became greater?

5    A.   Yes.

6    Q.   Ultimately, how much money did the company need?

7    A.   Roughly around 1.2 million.

8    Q.   Had you ever done any business with David Levy before?

9    A.   No.

10   Q.   Did there come a time when you wet with the principals of

11   the company?

12   A.   Yes.

13   Q.   Where did you meet?

14   A.   We met in Florida.

15   Q.   Who was at that meeting, that initial meeting?

16   A.   It was me, David Levy, Zev Helfer, and Eric Buchwald.

17   Q.   What did you discuss with them at that meeting?

18   A.   We discussed about the financing of the company, structure,

19   taking the company public, the business plan of the company,

20   and so forth.

21   Q.   After the meeting, where did you go?

22   A.   Went back to David and Donna's house.

23   Q.   Did Zev Helfer or Eric Buchwald come with you?

24   A.   No.

25   Q.   Who was at the meeting at the house?

1    A.  Me, David, and Donna.

2    Q.  During the discussion at the house, what did David say

3    about the structure of the deal he was considering for Cardiac

4    Networks?

5    A.  He was considering the deal was going to be a 60-40 split,

6    60 percent for the insiders and 20 percent for my side and 20

7    percent for his side.

8    Q.  What kind of stock was David intending insiders to get?

9    A.  Restricted.

10   Q.  What kind of stock did David say that you and he would get?

11   A.  Free-trading.

12   Q.  Did you discuss who would promote the stock?

13   A.  Yes.

14   Q.  Who did you decide would promote the stock?

15   A.  Donna Levy.

16   Q.  What did David say attracted him most about the deal?

17   A.  The deal, basically the company was a sexy story, the heart

18   monitoring business was big for baby-boomers, and he thought

19   that it was going to be great.

20   Q.  What about the stock that you were going to receive?  What

21   attracted him about the stock?

22   A.  We were receiving all free-trading shares.  He said there

23   was paper there to last for years.

24   Q.  As you discussed the deal, what did David Levy say had to

25   be done with your 20 percent and his 20 percent take in the

1   company?

2   A.  It had to be broken up to people that we felt that we

3   trusted.

4   Q.  What did you understand the term "enough paper to last for

5   years" to mean?

6   A.  There was a lot of free-trading stock.

7   Q.  What did you understand to be meant when you referenced

8   enough free-trading stock to last for years?

9   A.  Meaning you could sell it in that time period.

10  Q.  When you refer to insiders, that the insiders would get 60

11  percent, who did you understand the insiders to be at that

12  time?

13  A.  Dr. Gang, Zev Helfer, Eric Buchwald.  That's all I

14  remember.

15  Q.  Getting back to the issue of breaking up the shares, how

16  many people did you say you need to distribute the shares to?

17  A.  As many as we wanted.

18  Q.  What did he say was the reason that you needed to put stock

19  in the name of people that you trusted?

20  A.  That we trusted, right.

21  Q.  Did he explain why you needed to put stock in the name of

22  people you trusted?

23  A.  To fall under the 5 or 10 percent rule.

24  Q.  What was your understanding of the 5 or 10 percent rule?

25  A.  My understanding was that if you were over 10 percent of a

1  holder of a stock, you're considered an insider.

2  Q.  What would happen if you're an insider?

3  A.  You wouldn't be able to sell.

4  Q.  What about the 5 percent rule?

5  A.  The same.

6  Q.  Your understanding is there would also be restrictions on

7  your ability to sell?

8  A.  Yes.

9  Q.  Who did David say he was using as the names of the people

10  who would be holding the stock?

11  A.  I believe one was his dentist, a family member, and another

12  friend.  I don't know who the other one was.

13  Q.  At that meeting how did you, David, and Donna decide how to

14  raise the money that the company was seeking?

15  A.  We were going to raise it by selling stock.

16  Q.  Where was the initial investment going to come from?

17  A.  It came from me.

18  Q.  What was your reaction to the deal?

19  A.  I liked the deal.  I accepted.

20  Q.  After you accepted, from whom did you acquire the shell and

21  the free-trading shares of this shell company?

22  A.  From Michael Anthony.

23  Q.  How did you split the costs of acquiring the shell and the

24  free-trading shares in the shell between yourself and David?

25  A.  David bought the shell and I bought the free-trading stock.

1    Q.  How much did that cost each of you?

2    A.  75,000 each.

3    Q.  Did there come a time when you signed a term sheet

4    memorializing the outlines of the deal?

5    A.  Yes.

6             MR. MASTER:  I'm going to publish what is already in

7    evidence as Government Exhibit 201-38.

8    Q.  If you could look at the screen, and here is a copy.  Do

9    you recognize that document?

10   A.  Yes.

11   Q.  What is that document?

12   A.  That document is the term sheet that we agreed upon with

13   Cardiac Network.

14   Q.  Could you look at the second page, the signature on the

15   second page.  I'm sorry.  The third page.

16   A.  Yes, that is my signature.

17   Q.  Who else's signature is on that?

18   A.  Zev Helfer.

19   Q.  Following the term sheet, did there come a time when you

20   actually acquired the shell and broke up the shares as David

21   recommended?

22   A.  Yes.

23   Q.  What was the name of the shell?

24   A.  Caspian Energy.

25            MR. MASTER:  I'd like to publish what is already in

 1    evidence as Government Exhibit 250-1.

 2            THE COURT:  OK.

 3    Q.  If you could take a look at 250-1.

 4    A.  Yes.

 5    Q.  Would you please explain to the jury who created that

 6    document.

 7    A.  I did.

 8    Q.  Could you explain to the jury how you came to create this

 9    document and to whom did you send it.

10    A.  I sent it to the transfer agent.

11    Q.  For what company?

12    A.  For Caspian Energy.

13    Q.  This is prior to the actual reverse merger, correct?

14    A.  Yes.

15    Q.  How did you come to create it?

16    A.  These are the names that I provided and David provided.

17    Q.  What was the purpose of your creating this document?

18    A.  What was the purpose of what?

19    Q.  Why did you create the document?

20    A.  I'm sorry.  I didn't hear you.

21    Q.  Why did you create it?

22    A.  It was to issue the stock in these various names.

23    Q.  Again, why were you breaking it up into various names?

24    A.  To not fall under the 5 or 10 percent rule.

25    Q.  If you could go through this list and say whose names came

D3brlev2                    Georgiadis - direct

1    from you and whose names came from David.

2    A.   Bedrock, Athanasios Georgiadis, Athanasios Georgiadis II,

3    Eftibia Georgiadis, Arkas Capital came from me.   Date Palm,

4    David Newren, Moti Landau, Kodel Investment, and David Champion

5    came from David.

6    Q.   Have you ever met David Champion?

7    A.   I met him one time, yes.   No, no, I'm sorry.   I met David

8    Newren one time.

9    Q.   But you never met David Champion?

10   A.   No.

11   Q.   What kind of shares were issued in the names of those

12   people?

13   A.   Free-trading shares.

14   Q.   Then it states, "Issue 2 certificates restricted shares in

15   the following names."   Those two names below are Zev Helfer and

16   John Fisher.   Who are those individuals?

17   A.   Zev was the CEO of the company, and John Fisher I believe

18   was a board member.

19   Q.   What kind of stock did they get?   There is a stamp right

20   next to it.

21   A.   They got restricted shares.

22   Q.   After you broke up the shares in this way, did there come a

23   time when you actually closed the deal?

24   A.   Yes.

25   Q.   At the time you closed the deal, who supplied the balance

D3brlev2                    Georgiadis - direct

1   of the -- well, what was the structure of the deal, first of

2   all?

3   A.  The structure of the shares?

4   Q.  The structure of the financing.

5   A.  The company was to receive 1.2 million in financing.

6   Q.  How much of that was equity and how much was a loan?

7   A.  200,000 of that was a loan.

8   Q.  What kind of loan was it?

9   A.  It was a loan that had a convertible note to it.

10  Q.  Can you explain to the jury what a convertible note is.

11  A.  A convertible note, that specific convertible note is if

12  the company doesn't have enough money to pay back the money,

13  they would be able to give you stock, 50 percent to the market.

14  So if the market was trading at 50 cents, you would get stock

15  at 25 cents.

16  Q.  At the time the note was issued, who were the holders of

17  that convertible note?

18  A.  Me and David.

19  Q.  You were joint owners?

20  A.  Yes.

21  Q.  When the deal closed, who provided the balance of the

22  financing?

23          MR. MASTER:  Just one moment.  I'm going to publish

24  201-6, which is already in evidence withdrawn, your Honor.

25  Q.  How soon after the deal closed did Donna start promoting

1    the stock?

2    A.  Roughly around 90 days after.

3    Q.  When did the promotion start?

4    A.  Sometime on or about June.

5    Q.  Did you have conversations with Donna about how she was

6    going to handle the promotion?

7    A.  Yes.

8    Q.  How big did she say the promotion was going to be?

9    A.  It was going to be big.

10   Q.  How much did she say she was prepared to spend on the

11   promotion?

12   A.  Up to a million dollars.

13   Q.  What did she say she was going to spend that money on?

14   A.  Opt-in email lists and the hiring of other people with

15   opt-in email lists, and other promotions.

16   Q.  Who did she say she was going to hire as a source for these

17   email lists?

18   A.  What do you mean?

19   Q.  What was the name of the company, one of the companies --

20   A.  One of the companies' names was Winning Media.

21   Q.  What, if any, involvement did the company's management have

22   in this stock promotion that she was managing?

23   A.  None.

24   Q.  Where was the money going to come from to fund the stock

25   promotion?

1    A.  By selling the stock in the open market.

2    Q.  Was the money going to come through the company or directly

3    the Donna?

4    A.  What do you mean the money?

5    Q.  The money to fund the stock promotion, was the company

6    going to see any of that money?

7    A.  Yes.

8    Q.  When Donna was going to be paying Winning Media, who would

9    you send the money to to fund Winning Media?

10   A.  I would send it to Donna.

11   Q.  Did there come a time when you discussed with Donna and

12   David plans for coordinating the selling of the stock with the

13   promotion?

14   A.  Yes.

15   Q.  What did Donna say she recommended concerning the trading

16   of the stock?

17   A.  Recommended that I be the seller of the stock because I was

18   a better stock trader.

19   Q.  Than who?

20   A.  Than David.

21   Q.  Did you discuss the trading of the stock with David as

22   well?

23   A.  Yes.  He said that he agreed.

24   Q.  Who was going to provide direction for what to trade and

25   when?

1   A.  Donna would provide direction via instant message.

2   Q.  Is that similar to how she had guided your trading

3   concerning the promotion-only deals?

4   A.  Yes.

5   Q.  Did you agree to that proposition?

6   A.  Yes.

7   Q.  How did you decide to split the proceeds once you had sold

8   the shares?

9   A.  The proceeds were split 50-50 after paying Donna's

10  marketing costs and funding the company.

11  Q.  What did David say he would do for you once you had sold

12  your shares in the open market to give you proceeds, fund the

13  promotion, and fund the company?

14  A.  That he would issue me 50 percent of the stock that I sold

15  of his own.

16  Q.  What did he say was the purpose of that?

17  A.  To be able to get paid the 50 percent of the proceeds.

18          THE COURT:  Would this be a convenient place, Mr.

19  Master?

20          MR. MASTER:  This would be fine.

21          (Recess)

22          (Continued on next page)

23

24

25

 1          (Jury not present)

 2          MR. SREBNICK:  Judge, you may not have been able to

 3     see it, but Mr. Shargel, Mr. Kraemer, myself, and Mr. Master

 4     did.  When questioned about his sentencing, who would be

 5     sentencing him, the witness, Mr. Georgiadis, looked over to you

 6     and then answered "the judge," which was a nonverbal way of

 7     communicating to the jury that which we had previously agreed

 8     would not be communicated to the jury, and that is that you

 9     were the sentencing judge in the case.

10          My concern, of course, is now the witness having said

11     that he pled to a conspiracy with David and Donna and now that

12     the jury has been communicated that you are the judge, it might

13     send a message to the jury that you have stamped your

14     imprimatur on this conspiracy having occurred with these three

15     individuals.  For that reason I had objected, and at this time

16     I would move for a mistrial.

17          THE COURT:  The request is denied.

18          MR. SHARGEL:  Short of a mistrial, do you think at

19     this point, your Honor, that it is appropriate to get an

20     instruction on the basis of his testimony that they are not to

21     misuse this testimony about a conspiracy in which he plain-out

22     says he conspired with David and Donna Levy?  I don't see the

23     down side, the prejudice.

24          THE COURT:  If you can give me a couple of cases that

25     say this is an appropriate instruction in the middle of the

1    trial -- there is no doubt it is an appropriate instruction at

2    the end of the trial.  I have always given a cooperator

3    instruction and I'm going to do so here.  I have never heard of

4    one being given in the middle of a trial, Mr. Shargel.

5            MR. SHARGEL:  Judge, if there was a case I could find,

6    I would have given it to you this morning.  There was no case.

7    But I can tell you from, trying cases in this district and in

8    the Eastern District, that it is common.  It is also common, as

9    your Honor knows, in 404(b) situations, the state of mind

10   exceptions to the hearsay rule, and all sorts of limiting

11   instructions are given during the course of the trial.

12           Another one, for example, pertinent to this case that

13   I didn't request, given the testimony, if I asked for an

14   instruction that the information on a chart, on a summary

15   chart, is no better than the underlying information, that's

16   given at the time that the chart is introduced into evidence,

17   not a week later or whatever time later when the instructions

18   are given.

19           THE COURT:  I don't want to keep the jury waiting.  We

20   are not going to get to this.  How much longer do you have with

21   this witness?

22           MR. MASTER:  I'll probably finish by lunchtime.

23           THE COURT:  We'll think about it at lunchtime.

24   Marlon, call in the jury.

25           (Continued on next page)

1          (Jury present)

2          THE COURT:  All right, Mr. Master.

3    BY MR. MASTER:

4    Q.  Mr. Georgiadis, approximately when did the Cardiac Network

5    stock promotion actually get started?

6    A.  Around June of 2007.

7    Q.  Who ran the promotion?

8    A.  Donna Levy.

9    Q.  Again, as the promotion developed, what involvement, if

10   any, did the company's management have in the stock promotion?

11   A.  None.  None.

12   Q.  How did you decide what shares to sell and when and at what

13   price?

14   A.  I would get instructions from Donna via instant message.

15   Q.  How were your trades coordinated with the promotion?

16   A.  The promotion would go out, and the next morning I would be

17   selling shares.

18   Q.  To your knowledge, was David selling any shares at that

19   time?

20   A.  Not to my knowledge.

21   Q.  Which of the shares that were controlled by you did you

22   sell?

23   A.  Shares that I had in Bedrock Ventures.

24   Q.  Did there come a time when you saw some of the promotions

25   that Donna was putting out, the stock promotions that Donna was

1    putting out for Cardiac?

2    A.  I saw some.

3    Q.  Was there one in particular that caused you particular

4    concern?

5    A.  Yes.

6    Q.  I'd like you to take a look at what is already in evidence,

7    Government Exhibit 101-10.  It's in front of you.

8         MR. MASTER:  If you wouldn't mind publishing that, Mr.

9    Dinet.

10   Q.  How did you come to see this promotion?

11   A.  She had sent it to me.

12   Q.  What in particular, to your mind, caused you greatest

13   concern?

14   A.  The price target of $50 on its way to a hundred dollars.

15   Q.  Where is that price target at 50 to $100 located?

16   A.  At page 6 of 11.

17        MR. MASTER:  Mr. Dinet, if you wouldn't mind turning

18   to page 6.  And if you could zoom in where it says "In 5 years

19   this stock could easily."  It's in the middle of the page.

20   Q.  Is that what you are referring to, Mr. Georgiadis?

21   A.  Yes.

22   Q.  "In 5 years this stock could easily be above $50, maybe

23   well on its way to $100"?

24   A.  Yes.

25   Q.  What concerns you about that representation?

1    A.  I thought it was unrealistic.

2    Q.  To whom did you communicate that concern?

3    A.  To Donna.

4    Q.  What did Donna say in response to your concern?

5    A.  She said the higher the better.

6    Q.  As the promotion got under way, how much was Donna spending

7    on promotional activities?

8    A.  Anywhere between 150 to $200,000 a week.  Sometimes it

9    would go to 50, but most of the time it would be at least a

10   hundred thousand.

11   Q.  How did you cover Donna's promotional expenses?

12   A.  I would sell stock to fund the -- to reimburse her her

13   money.

14   Q.  To cut to the chase, how much in proceeds did you make from

15   sale of Cardiac Network stock into these promotions between

16   June and November of 2007?

17   A.  $4.3 million.

18   Q.  If you could describe for the jury what you did with that

19   money.

20   A.  I funded the company for the remaining balance of

21   the million, I covered Donna's expenses of roughly around

22   a million dollars in marketing, then I split the proceeds with

23   David 50-50.

24   Q.  How did you send the proceeds to David?

25   A.  I sent it by wire, wire transfer.

D3brlev2                    Georgiadis - direct

1    Q.  What was the name of the entity that David used to receive

2    these funds?

3    A.  Date Palm Capital.

4    Q.  Of the million dollars that the company was getting in

5    financing, how much of that money came from your sale of

6    Cardiac Networks stock into these promotions that Donna was

7    funding?

8    A.  A million dollars.

9    Q.  100 percent?

10   A.  Yes.

11   Q.  What, if anything, did David do to compensate you for the

12   shares that you had sold to cover the promotional costs to pay

13   Donna's expenses and to give you and David each 50 percent of

14   profits?

15   A.  Say that again.  I didn't hear the question.

16   Q.  What did David do to compensate you for the shares that you

17   sold in the manner that you just described?

18   A.  He compensated me 500,000 shares, 50 percent of the shares

19   that I had sold.

20   Q.  So you had sold approximately a million shares to raise the

21   4.3 million?

22   A.  Yes.

23   Q.  Did there come a time when David told you about a lie he

24   had told to the company's management?

25   A.  Yes.

D3brlev2                    Georgiadis - direct

1   Q.  What did the lie concern?

2   A.  He got on the phonecall with Dr. Gang and Zev Helfer, and

3   they wanted to know about the activity of the shares that were

4   going through the stock.  He told them that it wasn't us and

5   that our shares were restricted.

6   Q.  Who told you about this conversation?

7   A.  David did.

8   Q.  What was your reaction to hearing this from David?

9           MR. SHARGEL:  Objection to reaction.

10          THE COURT:  Overruled.

11  Q.  What did you say in response?

12  A.  I told him, why would you do that?  We have free-trading

13  shares.

14  Q.  What did he say in response to that?

15  A.  He told me to go with it or this deal is going to blow up.

16  Q.  What did he say about their ability to find out what had

17  actually happened?

18  A.  They wouldn't find out, he said.

19  Q.  Did you agree to go along with the lie?

20  A.  I did.

21  Q.  Why did you agree to go along?

22          MR. SHARGEL:  Objection.

23          THE COURT:  Overruled.  Why did you go along?

24  A.  I didn't want the deal to blow up.

25  Q.  Now let's go back to how these payments from your over

D3brlev2                    Georgiadis - direct

1   $4 million in proceeds were distributed.  Who got paid first?

2   A.  It was a mixed.  Some of Donna's marketing costs got paid

3   and then the company was getting funded.  Then some of Donna's

4   marketing costs would get paid, and then the company got funded

5   in full.

6   Q.  Again, when you were sending money to cover the marketing

7   costs, did the company see any of that money?

8   A.  No.

9   Q.  Did there come a time when David approached you with

10  concerns about the speed with which you were funding the

11  company?

12  A.  Yes.

13  Q.  What did he tell you?

14  A.  He told me not to fund them so fast, that they were going

15  to spend all the money too quick, and to slow it down.

16  Q.  What did he say concerned him about the speed with which

17  you were funding it?

18  A.  He was concerned that they wouldn't be able to -- need us

19  anymore as far as that the money would be paid and they

20  wouldn't be able to put out press releases, and so forth.

21  Q.  So what did he want you to do?

22  A.  He wanted me to slow down the funding.

23  Q.  Now I'd like to direct your attention to the spring of

24  2008.  Did there come a time when you learned that the

25  Securities and Exchange Commission, or SEC, was inquiring about

1    the sale of Cardiac Network stock?

2    A.   Yes.

3    Q.   Who did you speak to after you learned about this?

4    A.   Called David.

5    Q.   What did you say to David and what did he say to you about

6    this SEC inquiry?

7    A.   He told me not to worry, that there's no victims, to keep

8    calm, and he didn't have any exposure because he didn't sell

9    any stock.

10   Q.   What did he tell you to say if there was any inquiry into

11   the money that you had sent him?

12   A.   That I purchased shares for them, that I purchased the

13   500,000 shares with the money.

14   Q.   Which 500,000 shares are you referring to?

15   A.   The 50 percent of the total amount of shares that I had

16   sold in the market.

17   Q.   How did he want you to describe the transfer of the funds

18   to him?

19   A.   As a purchase.

20   Q.   Of what?

21   A.   Of stock.

22   Q.   When the time came to actually respond to the SEC, did you

23   end up addressing that specific issue with the SEC?

24   A.   No.

25   Q.   Did you fully disclose all of the details of your secret

1    arrangement with David Levy and Donna Levy to the SEC?

2    A.  No.

3    Q.  Ultimately, what was the result of the SEC inquiry?

4    A.  There was no action brought on.

5    Q.  I want to ask you a couple of questions about a Porsche

6    Cayenne that you had leased during this time.

7    A.  Yes.

8    Q.  How did you acquire the Porsche?

9    A.  I acquired it at a dealership.

10   Q.  What kind of arrangement did you have for the Porsche?

11   A.  There was I believe a 36-month lease that I did.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D3BLLEV3                    Georgiadis - direct

1    BY MR. MASTER:

2    Q.  And who used the Porsche initially?

3    A.  I did and then I allowed my wife to use it.

4    Q.  And how did your wife like the Porsche?

5    A.  She didn't.  It was too bumpy.  At the time my son was two

6    and it was very dangerous, when we would strap him in the back,

7    his head would bobble all over the place.  So she didn't like

8    it at all.

9    Q.  At the same time your wife was complaining about the

10   Porsche, what if any needs did Zev have for a vehicle?

11   A.  Zev had a need, he had a need for a vehicle to go and

12   basically see doctors for the heart monitors.  David had

13   promised him to help him out and be able to get him a contact

14   where he would be able to get financing.  He didn't come

15   through in the end.

16   Q.  Who is "he," he didn't come --

17   A.  David didn't come through in the end in getting him

18   financing for the vehicle.

19   Q.  Getting Zev financing?

20   A.  Getting Zev financing.  So I had about a year and a half

21   left on my SUV and I asked Zev, I said, you know, I trust you.

22   If you want, we can draft up a single-page agreement and if

23   you're willing to take over my payments, I would be willing to

24   let you take over my lease.

25   Q.  And so what did you end up doing with the Porsche?

D3BLLEV3                    Georgiadis - direct

1    A.  I ended up giving it to Zev and he was making the payments.

2    Q.  Did Zev ask you for a Porsche or for another luxury

3    vehicle?

4    A.  No.  I believe at the time he was looking for something

5    around $15,000.  Just so happened that I had that specific

6    vehicle and I had a problem with it so I offered it.

7    Q.  What ended up happening with the vehicle?

8    A.  He turned it back in when the lease was up.

9    Q.  And what if any fees were owed at the time the vehicle was

10   returned?

11   A.  There were some excess fees because of over mileage.

12   Q.  And did Zev pay those fees?

13   A.  No, I did.

14   Q.  What happened to Zev in approximately September 2008?

15   A.  He got ousted from the company.

16   Q.  Did you agree to vote to oust him?

17   A.  I agreed at that time that he wasn't -- the company was

18   seeking more financing and he wasn't qualified to get -- to do

19   the financials and the P&Ls to bring the company to a reporting

20   status.

21   Q.  If you would stop for a second.

22        What do you mean by financials and P&Ls?

23   A.  Just basically the financial statements.  I didn't think

24   that he was that good at providing and getting all the

25   financial statements ready for potential funds.  If they wanted

1    to invest in the company, they were asking for a lot of

2    documentation.

3    Q.  What do you mean by reporting status?

4    A.  Reporting meaning that the company that Cardiac was, it was

5    a nonreporting Pink Sheet so it didn't have to report to the

6    SEC.  And we're looking to get the company to a reporting

7    status where they would have to put out Qs and Ks, quarterlies

8    and annual reports.

9    Q.  So a Q is quarterly?

10   A.  Is the quarterly.

11   Q.  And who is that quarterly report submitted to?

12   A.  It's submitted to the SEC.

13   Q.  And what is a K?

14   A.  A K is your yearly annual.

15   Q.  And who is that submitted to?

16   A.  To the SEC.

17   Q.  And what did you understand the benefit of becoming a

18   reporting company to be?

19   A.  It attracted a different level of financing.

20   Q.  Now, as discussions, as you had discussions about ousting

21   Zev, what if any accusations did David Levy make about Zev?

22   A.  Accused him of stealing money.

23   Q.  And what if any evidence did you have that Zev was stealing

24   any money?

25   A.  I didn't.

D3BLLEV3                    Georgiadis - direct

1    Q.  And did you ever uncover any evidence that Zev was stealing

2    money?

3    A.  No.

4    Q.  And what did you want Zev to continue doing even after he

5    left the CEO position?

6    A.  I wanted him to be the vice president of marketing.

7    Q.  And why did you want him to be the vice president of

8    marketing?

9    A.  I thought that he was the best suited because he came from

10   that background and had success at working at Life Watch, so I

11   figured he would be good at the marketing of the product.

12   Q.  After Zev was forced out of the company, what role did you

13   agree to serve in the company?

14   A.  I agreed to serve on the board of directors.

15   Q.  And who ended up taking over as CEO of the company?

16   A.  A gentleman by the name of Michael Swartzburg.

17   Q.  Who found Michael Swartzburg?

18   A.  David found him.

19   Q.  And what if any money did you and David give to Swartzburg,

20   Michael Swartzburg, upon his arrival at the company?

21   A.  We gave some pretty much emergency money to keep the lights

22   on.

23   Q.  And why did you agree to continue working with the company?

24   A.  I wanted to see it long term.

25   Q.  And during the fall of 2008, what else did you do to try to

1    help the company raise money?

2    A.  Who is that?

3    Q.  Well, I'd like to ask you, are you familiar with something

4    called a share reduction agreement?

5    A.  Yes.

6    Q.  What was that?

7    A.  I agreed to reduce my shares by 50 percent and we put it

8    out on the board of directors and it was approved for all major

9    shareholders and founding members of the company to reduce

10   their shares by 50 percent.

11   Q.  And what was your understanding of the purpose of that

12   share reduction agreement?

13   A.  It was to lower the market capital of the company, to

14   basically bring in some funds to invest in the company.

15   Q.  And what was your understanding of why the share reduction

16   would help that?

17   A.  It would be less shares out there.

18   Q.  And what did you believe that the new financing would be

19   asking for?

20   A.  They would be asking for shares.

21   Q.  And what else did you agree to do with your remaining

22   shares post reduction to help the company get financing?

23   A.  I agreed to enter into a lockup agreement.

24   Q.  And can you just explain what a lockup agreement is?

25   A.  It means that all the shares that I held and all the shares

1    that any affiliates of mine held were to be held in escrow out

2    of my control.

3    Q.  What is escrow?

4    A.  Escrow is a holder where they would hold those

5    certificates, could be a lawyer or it could be an escrow agent.

6    Q.  And what ability did you have after the shares were in

7    escrow to actually trade those shares?

8    A.  I didn't.

9    Q.  Now, what happened to the convertible note that had been

10   issued at the time of the merger?

11   A.  It got converted.

12   Q.  OK.  And was that after the share reduction agreement was

13   entered into?

14   A.  Yes.

15   Q.  And who were the initial owners of that convertible note?

16   A.  Me and David.

17   Q.  And what did David offer to do with your interest in the

18   convertible note?

19   A.  Buy me out.

20   Q.  And what did you agree to do after he offered to buy you

21   out?

22   A.  I agreed to give him my percentage.

23   Q.  In exchange for what?

24   A.  For a hundred something thousand dollars, approximately a

25   hundred thousand dollars.

1   Q.  Why did you agree to accept the offer?

2   A.  I didn't need any stock.

3   Q.  Did you in fact agree to sell your interest in the note?

4   A.  Yes.

5   Q.  And did David end up paying you the hundred thousand

6   dollars?

7   A.  No.

8   Q.  What did David end up doing with the note after you'd sold

9   your interest, given your interest to him?

10  A.  He converted it into free trading stock.

11  Q.  And was that after you had agreed to put your shares in

12  escrow?

13  A.  Yes.

14  Q.  And after you had agreed to the share reduction agreement?

15  A.  Yes.

16  Q.  Now I'd like to direct your attention to the fall of 2009.

17  What did you notice happening with the price and trading volume

18  of Cardiac Network's stock during that time?

19  A.  It was going up.

20  Q.  And what was the status of Cardiac Network stock before

21  this activity in the fall of 2009?

22  A.  Pretty dormant.

23  Q.  And what do you mean by dormant?

24  A.  Not a lot of activity at all.

25  Q.  And who did you conclude was selling stock at that time?

1    A.  Excuse me?

2    Q.  Who did you conclude was selling stock at that time?

3    A.  Well, the only one that had free trading shares was David.

4    Q.  And why did he have free trading shares?

5    A.  Because he converted that note.  And everybody else's

6    shares were locked up, including his.

7    Q.  That is his other than --

8    A.  Other than the note, yes.

9    Q.  -- converted.

10           And what if any developments with the company did you

11   see from your position as a board member that would have

12   justified the dramatic increase in the share price and trade

13   volume that you observed?

14           MR. SREBNICK:  Objection.

15           THE COURT:  Overruled.

16   Q.  You can answer.

17   A.  None.

18   Q.  And, again, what was the status of the company in the fall

19   of 2009?

20   A.  What do you mean by the status?

21   Q.  How much money did it have in the bank?

22   A.  Not a lot at all.  Minimal.

23   Q.  And how much revenue was it bringing in?

24   A.  Minimal.

25   Q.  And what was the status of your shares as of the fall of

D3BLLEV3                    Georgiadis - direct

1    2009?

2    A.  My shares were held, they were held in escrow.

3    Q.  And what involvement, if any, did you have in stock

4    promotion of Cardiac Network stock at that time?

5    A.  None.

6    Q.  And what if any shares were you able to sell during the

7    period of that promotion?

8    A.  None.

9    Q.  What if any conversations did you have with David Levy

10   about the promotion?

11   A.  None.

12   Q.  Why not?

13   A.  We weren't talking at the time.

14   Q.  Who did you talk to?

15   A.  I talked to Michael Swartzburg.

16   Q.  And what did you tell him?

17   A.  I asked him what was going on with the activity in the

18   company, that I noticed the volume and the price going up and I

19   didn't see any press releases or anything that the company had

20   going on that would have made it jump and act like that.  And I

21   said is there a promotion going on?  He says not that he knows

22   of, and that was that.

23   Q.  And what happened after the upward movement that you

24   observed and that caused you to react in this way?

25   A.  What happened what?

1  Q.  What happened to the stock after you observed it move up in

2  this way?

3  A.  Stock went down.

4  Q.  How far down?

5  A.  At least 50 percent.

6  Q.  And what happened to the trading volume?

7  A.  It ceased.

8  Q.  Now I'd like to direction to February 2010.  What did you

9  see happening again with the stock price and trading volume?

10  A.  I noticed a lot of shares in volume and price increase.

11  Q.  And as you saw the stock move again, who did you conclude

12  was selling the stock?

13  A.  David.

14  Q.  What was the status of your shares as you saw the promotion

15  begin?

16  A.  My shares were still locked up.

17  Q.  And what involvement if any did you have in promoting

18  Cardiac Network stock at that time?

19  A.  None.

20  Q.  And who did you talk to about the promotion that you

21  observed?

22  A.  Michael Swartzburg.

23  Q.  And, again, what was his reaction?

24          MR. SHARGEL:  Excuse me, your Honor.  I object on

25  hearsay grounds, Michael Swartzburg, based on the record that

1    we have in this case about what Michael Swartzburg said.

2              THE COURT:  Sustained.

3              MR. MASTER:  Yes, your Honor.

4    Q.  What did you end up trying to do in February 2010 with your

5    shares?

6    A.  I tried to get them out of the escrow.

7    Q.  And what did you do -- how successful were those efforts?

8    A.  Not successful at all.

9    Q.  Eventually were you able to get some of your shares

10   unrestricted?

11   A.  Yes.

12   Q.  And what did you do with shares that you were able to

13   unrestrict?

14   A.  I sold some.

15   Q.  Whose shares did you sell?

16   A.  Sold shares in my mother's and my father's name.

17   Q.  And what were the proceeds, approximately, of those share

18   sales?

19   A.  75,000 each.

20   Q.  What did you do with that money?

21   A.  Went into my parents' account.

22   Q.  And how much of that money did you give back to the

23   company?

24   A.  None.

25   Q.  What ended up happening with Cardiac Networks?

1   A.  Stock went down.

2   Q.  And what ended up happening with the actual operations of

3   the company?

4   A.  It ceased.

5   Q.  Now I want to ask you a few questions about a company

6   called Banneker.  I'd like to direct your attention back to

7   mid-2007.  Were you still on speaking terms with David Levy and

8   Donna Levy at that time?

9   A.  Yes.

10  Q.  And did there come a time when you met an individual named

11  Derrick Holmes at the Levy's house?

12  A.  Yes.

13  Q.  How did you end up meeting Holmes?

14  A.  David had called me and said that there was some potential

15  investors that were coming in to talk about investing in

16  Cardiac Network.  So I flew down to Florida to meet these

17  investors and talk about the company.

18  Q.  Did -- where was the meeting held?

19  A.  We first, they came to David and Donna's house.

20  Q.  And who do you remember being at that meeting?

21  A.  I remember Derrick Holmes, another guy by the name of Tim

22  Hardaway.

23  Q.  And who is Tim Hardaway?

24  A.  He's an ex-basketball player.  Another gal by the name of

25  Bree, and another guy named Ron.

 1   Q.  And what did you discuss at the meeting?

 2   A.  We were just having small talk and kind of bringing in

 3   Cardiac.  But they, meaning Derrick and this other guy, Ron,

 4   started talking more about their company which was Banneker.

 5   Q.  And what kind of company is Banneker?

 6   A.  It was a unique company.  It was a watch company and the

 7   watch had this wooden plate inside that represented Benjamin

 8   Banneker, the African-American slave that supposedly, I think,

 9   what Derrick said, built the first watch out of wood and that's

10   what the company represented.

11   Q.  And what if any celebrity involvement was there in

12   Banneker?

13   A.  They had celebrity involvement, Beyonce and Snoop Doggy.

14   Q.  And what was the status of the company at the time?

15   A.  Excuse me?

16   Q.  What kind of company was it, public or private?

17   A.  It was a private company.

18   Q.  And how much money did you understand them to be looking

19   for?

20   A.  I think it was roughly around a couple million dollars.

21   Q.  And what did you think about the opportunity?

22   A.  I think -- I thought it was a good company.

23   Q.  After Holmes and Hardaway and the others left, what if any

24   discussions did you have with David Levy and Donna Levy about

25   this opportunity?

1    A.   Talked about the opportunity and that it was -- Donna liked

2    it because it was a sexy story and it had a lot of celebrities

3    and celebritism tied to it and it was in a hot market, the

4    watches.  He was also doing class rings that were supposedly

5    being sold all over the country in different schools, and

6    Beyonce was developing a class ring at the time.  So everybody

7    liked the deal.

8    Q.   And what did David Levy and Donna Levy ask you to do with

9    Michael Anthony concerning Banneker?

10   A.   Acquire a shell.

11   Q.   And Michael Anthony is the person who you worked with

12   previously to acquire shells, correct?

13   A.   Yes.

14   Q.   Did you actually end up acquiring a shell and free trading

15   shares in preparation for Banneker deal?

16   A.   I only put in 50 percent of the money for the shell.  I

17   didn't acquire free trading shares of Banneker, no.

18   Q.   How much money did you put in for the Banneker deal?

19   A.   75,000, and David put another 75.

20   Q.   After that first meeting, how much additional interaction,

21   if any, did you have with Holmes?

22   A.   I think I spoke to Holmes one time.

23   Q.   So who was the primary point of contact with Holmes as the

24   Banneker deal was being negotiated?

25   A.   David.

D3BLLEV3                    Georgiadis - direct

1   Q.  And what did you understand David and Donna to be planning

2   with respect to Banneker?

3           MR. SHARGEL:  Objection, foundation.

4           THE COURT:  Overruled.

5   Q.  In other words, I'll just clarify.  Did you understand --

6   what kind of transaction concerning Banneker, the private

7   company, did you understand David and Donna to be planning?

8   A.  Reverse merger.

9   Q.  And what would be the result of the reverse merger?

10  A.  The company Banneker going public and receiving free

11  trading stock.

12  Q.  Did there come a time when you had another meeting with

13  David and Donna about the Banneker deal?

14  A.  Yes.

15  Q.  During that meeting what did David Levy say was another

16  reason why he liked the deal beyond the story?

17  A.  He said that Derrick Holmes was stupid and he would be

18  controllable.

19  Q.  Now, what ended up happening to the Banneker deal?

20  A.  It went public.

21  Q.  And what happened to the role that you had anticipated

22  playing in Banneker?

23  A.  They kicked me out of the deal.

24  Q.  They being who?

25  A.  David and Donna.

1   Q.  And did you have any conversation with David Levy where he

2   described why he was kicking you out of the deal?

3   A.  Yeah.  He said that, you know, he wanted me to concentrate

4   on Cardiac and I didn't have enough money to fund Banneker.

5   Q.  And what if anything did he say, what if any effect did he

6   say that the SEC inquiry you described earlier would have on

7   your ability to serve in a similar role on Banneker?

8   A.  Well, I had -- there was an SEC interview and it was best

9   that, he said, that I stepped away also because of that regard.

10  Q.  And why did he say you needed to step away from Banneker?

11  In other words, how would that hamper your ability to serve in

12  a similar role with Banneker?

13  A.  Because I was under an SEC investigation.

14  Q.  And after you were excluded from participating in the

15  Banneker deal, did you continue to have discussions with David

16  and Donna about Banneker into 2008?

17  A.  Yes.

18  Q.  And where were you both living at the time, both you and

19  David and Donna?

20  A.  Southern California.

21  Q.  And who else -- where were David and Donna living?

22  A.  Living in Beverly Hills.

23  Q.  And who else, if anyone, was living with David and Donna at

24  that time?

25  A.  It was a guy by the name of Christian.

1    Q.  And what role did Donna say that Christian was doing

2    playing with respect to Banneker?

3    A.  He was helping with the promotion of Banneker with the

4    message boards.

5    Q.  What message boards?

6    A.  InvestorsHub.

7    Q.  And what was he doing on InvestorsHub?

8    A.  He would go on InvestorsHub and tout the stock.

9    Q.  What do you mean by tout?

10   A.  Put recommendations on there that either a promotion is

11   coming or a press release is coming out, in that nature.

12   Q.  And what if any websites did Donna say she was developing

13   to help with the promotional activities?

14   A.  I believe it was a website called Wallstreetpremiere at

15   that time.

16   Q.  Who was the person who was going to run Wallstreetpremiere?

17   A.  She was.

18   Q.  She being Donna?

19   A.  Yes.

20   Q.  Now, what if any complaints did David say that he had about

21   Holmes when you were discussing Banneker with him in 2008?

22   A.  That he was spending too much money.

23   Q.  And what did David say he was considering doing with the

24   funding that he had promised Holmes?

25   A.  He was either going to stop it or slow it down.

1    Q.  And what involvement, if any, did you have in stock

2    promotions concerning Banneker?

3    A.  None.

4    Q.  What if any shares of Banneker did you acquire or sell?

5    A.  None.

6    Q.  Have you ever acquired any shares of a company called

7    Emerging World Pharma?

8    A.  No.

9    Q.  What if any involvement did you have in any stock promotion

10   concerning Emerging World Pharma?

11   A.  None.

12   Q.  When if ever have you acquired shares in a company called

13   Greenway Design Group?

14   A.  None.

15   Q.  What involvement if any did you have in any stock promotion

16   activity or stock sales concerning Emerging World Pharma or

17   Greenway Design Group?

18   A.  None.

19           MR. MASTER:  Just a moment, your Honor.

20           Nothing further.

21           THE COURT:  Mr. Shargel.

22           MR. SHARGEL:  Yes, sir.

23   CROSS-EXAMINATION

24   BY MR. SHARGEL:

25   Q.  Mr. Georgiadis, my name is Jerry Shargel and I represent

1  David Levy.

2          You and I just met.  We've never spoken before, have

3  we?

4  A.  No.

5  Q.  We've never met before; isn't that right?

6  A.  No.

7  Q.  Well, isn't that right meaning we never met before?

8  A.  No, we never met before.

9  Q.  So a few moments ago you -- by the way, when is the last

10 time you had a conversation with David Levy, when did you stop

11 talking as you reported?

12 A.  When did I stop talking to him in what?

13 Q.  When did you stop talking to him?

14 A.  I believe sometime in 2008, I think, late 2008, early 2009,

15 somewhere around there.

16 Q.  So for the past four years or so, you and he haven't

17 exchanged a word, right?

18 A.  No.

19 Q.  And that wasn't just by some coincidence, right?

20 A.  What do you mean?

21 Q.  In other words, you stopped talking to him because of

22 feelings that you had toward him, right?

23 A.  Stopped talking to him because I didn't want to do business

24 with him anymore.

25 Q.  You didn't want to do business with him anymore after that

1    time in 2008 and 2009, right?

2    A.  Right.

3    Q.  You said a few moments ago in connection with Mr. Holmes

4    from the Banneker company -- do you remember being asked

5    questions about Mr. Holmes?

6    A.  Yes.

7    Q.  And do you remember recounting that David Levy said that

8    Mr. Holmes was spending too much money, right?

9    A.  Yes.

10   Q.  That wasn't in connection with Banneker business, was it?

11   A.  It was money that he was getting funded for Banneker.

12   Q.  And he was taking that money that was being funded for

13   Banneker and spending it elsewhere; wasn't that right?

14   A.  I don't know where he was spending it.

15   Q.  Isn't it a fact, sir, that Mr. Levy said to you that

16   Mr. Holmes was spending money on shopping and buying things for

17   himself with money that had been invested; didn't he tell you

18   that?

19   A.  He might have.

20   Q.  Now, you had a number of companies that either went public

21   or tried to bring public before you even met Mr. Levy, right?

22   A.  I had one, yes.

23   Q.  The pizza business, your family pizza business, that was

24   one, right?

25   A.  Yes, yes.

1    Q.  There was another company that you said with this direct

2    dialing; do you remember that?

3    A.  Yes.

4    Q.  And were there any other efforts, am I leaving anything out

5    about your efforts to take companies public before the day that

6    you meet David Levy for the first time in your life?

7    A.  No.

8    Q.  So when you met David Levy, it was in connection with and

9    you spoke to David Levy about Cardiac Network.  Remind us again

10   when that was.

11   A.  That was sometime in either late 2006, early 2007.

12   Q.  And that very first meeting took place where?

13   A.  Over the phone.

14   Q.  And you later met with him in person?

15   A.  Yes.

16   Q.  And where did you meet with him in person?

17   A.  In Florida.

18   Q.  And his house in Florida?

19   A.  At a restaurant.

20   Q.  At a restaurant.  Did you go back to his house?

21   A.  Yes.

22   Q.  And David Levy was excited about that company, right?

23   A.  Yes.

24   Q.  Cardiac Network, yes?

25   A.  Yes.

1   Q.  And he was getting you excited about it, right?

2   A.  Yes.

3   Q.  Because you thought it made good business sense, right?

4   A.  Yes.

5   Q.  And you thought that this was a business with a future,

6   correct?

7   A.  Yes.

8   Q.  Did you ever get to see the Cardiac monitor?

9   A.  Yes.

10  Q.  Where did you see it, down in Florida?

11  A.  Saw it at that lunch meeting.

12  Q.  By the way, forgive me for digressing for a moment.

13          Did you ever hear of a company called Target

14  Development Group?

15  A.  Yes.

16  Q.  That was a company that you were involved with, right?

17  A.  Yes.

18  Q.  In fact, that was after Cardiac, right?

19  A.  Yes.

20  Q.  After you stopped talking to David Levy, right?

21  A.  Yes.

22  Q.  And Target Development Group, you were selling stock from

23  an empty shell, right?

24  A.  Wrong.

25  Q.  Sir, what was the product that Target Development Group was

1    selling, developing, manufacturing, or any of those things?

2    A.  There were DVDs.  There was a merger.

3    Q.  Merger with what, a reverse merger?

4    A.  No.  A stock swap with a company called Hanover House.

5    Q.  What happened to that company, Target Development Corp.?

6    A.  Still exists.

7    Q.  Are you still a shareholder?

8    A.  No.

9    Q.  Do you have any equity or ownership interest in that

10   business?

11   A.  No.

12   Q.  Let me ask you this question:  When you obtained, when you

13   first had a discussion about obtaining shares of Cardiac

14   Network, can you think back to that time?

15   A.  Yes.

16   Q.  And you had meetings with people from a company called

17   Century Capital Partners; do you remember that?

18   A.  Yes.

19   Q.  And you were interested in getting free trading stock,

20   right?

21   A.  Yes.

22   Q.  And when you had that, you had those conversations with

23   Century Capital Partners and Mr. Levy, you wanted to make

24   certain that you had free trading stock, right?

25   A.  I asked for free trading stock.

D3BLLEV3                    Georgiadis - cross

1   Q.  And you asked for free trading stock at meetings that you

2   had, subsequent meetings that you had in connection with this

3   business, Cardiac Network, correct?

4   A.  Yes.

5   Q.  And you were assured that your stock would be free trading,

6   right?

7   A.  Yes.

8   Q.  And you were assured and you heard that David Levy's stock

9   would be free trading, correct?

10  A.  Yes.

11  Q.  As a matter of fact, you had a meeting not only in Florida

12  meeting Zev Helfer and others, Eric Buchwald was one of them,

13  right?

14  A.  Yes.

15  Q.  That meeting in Florida, David Levy was there, right?

16  A.  Yes.

17  Q.  You had a meeting out in Los Angeles, didn't you?

18  A.  Yes.

19  Q.  You met with Dr. Gang, right?

20  A.  Yes.

21  Q.  Because before you actually invested in and before you got

22  involved with Cardiac, you wanted to do some due diligence;

23  isn't that a fair statement?

24  A.  Needed to meet Dr. Gang, yeah.

25  Q.  And meeting Dr. Gang was in an effort to do your due

1   diligence, right?

2   A.  Yes, that, and also Dr. Gang I think at that time requested

3   for a meeting.  He was the third person in the group.  But he

4   was all the way out here in L.A. so we came out here to see

5   him.

6   Q.  When you say here, it's the other coast, right, Los

7   Angeles?

8   A.  I'm sorry.  He was in Los Angeles, yes.

9   Q.  So you went out to see Dr. Gang.  You knew what his role in

10  the company was, right?

11  A.  Yes.

12  Q.  And that he was the medical adviser, right?

13  A.  Yes.

14  Q.  And you learned or you were told that Dr. Gang was a

15  cardiologist of some prominence?

16  A.  Yes.

17  Q.  Well-known throughout the United States, right?

18  A.  Yes.

19  Q.  You used the word this was a sexy company; do you remember

20  using that word?

21  A.  Yes.

22  Q.  Sexy meaning that it was an interesting company with a good

23  product, seemingly very good product, right?

24  A.  Yes.

25  Q.  As you saw, there was -- by the way, did you receive a

1    prospectus or a prediction of what the company would be earning

2    in the short years ahead?

3    A.   I don't remember.  I remember some type of business plan.

4    Q.   A business plan that was presented to you by whom?

5    A.   I believe it was by Zev.

6    Q.   One of the reasons that you wanted free trading stock was

7    because you had a fair amount invested in the business, right?

8    A.   I wanted protection for my investment, yes.

9    Q.   You wanted your investment to be protected and you believed

10   then, as you likely believe now, that that's a good way to

11   protect your investment, right?

12   A.   It's what I asked for.

13   Q.   Because if you have restricted shares, that wouldn't be

14   very protective because they would be totally illiquid, right?

15   A.   Well, the restrictions do come off at one point in time.

16   But at that moment, yes, they would be illiquid.

17   Q.   Because the restriction may come off, but that could be a

18   year or so down the road, right?

19   A.   Correct.

20   Q.   And your confidence in the company was also exhibited by

21   the fact that you gifted a number of shares, gifted a number of

22   shares to family members, right?

23   A.   I put stock in family member's name, yes.

24   Q.   Because you saw this as a long-time investment, right?

25   A.   Well, there was a rule that we needed to get around which

1   is five to ten percent rule that I was told.

2   Q.  Do you remember telling, putting the five or ten percent

3   rule to one side for the moment, do you remember saying that

4   you saw this as a long-term investment, in other words, you

5   believed in the product and you saw the possibility of this

6   becoming a long-term investment?

7   A.  Yes.

8   Q.  No question about that, right?

9   A.  Yes.

10  Q.  This was a real, as you saw it then, a real possibility of

11  becoming a significant company and moving from penny stocks and

12  Pink Sheets onto the big board, the New York Stock Exchange, or

13  some other much more significant stock exchange, right?

14  A.  Depends, I guess, on the business and how it progressed.

15  Q.  Now, do you remember, sir, you told us about meeting with

16  people from the SEC.  When I say people, we know what we're

17  talking about, investigators, right, from the SEC?

18  A.  I didn't say I met with any SEC investigators.  I said I

19  received a questionnaire.

20  Q.  And you filled out that questionnaire, right?

21  A.  I seeked legal counsel.

22  Q.  And legal counsel or not, were there some things on that

23  questionnaire filled out by you that were not true?

24  A.  I can't go into my client-attorney privilege.

25  Q.  I'm not asking about any communication that you had with

1    your client.  You're the one, as you said a moment ago, that

2    filled out the questionnaire, right?

3    A.   I sat down with my attorney and I answered the questions.

4    Q.   Well you're the one that had the information, right?

5    A.   I had the information, yes.

6    Q.   The attorney wasn't the one who was investing, was he?

7    A.   No, sir.

8    Q.   You were investing and you knew what the answers to the

9    questions were, right?

10   A.   Yes.

11   Q.   And now, my question to you, sir, on that day, when you

12   filled out that questionnaire for the SEC, did you

13   deliberately, willfully, and intentionally say things that were

14   not true?

15   A.   Yes.

16   Q.   In December of 2010, actually, December of 2011, do you

17   remember having a meeting with representatives of the U.S.

18   Attorney's Office in this district and an investigator from

19   this district?

20   A.   Yes.

21   Q.   In fact, the investigator is seated right there at the

22   prosecution table, you recognize him full well, don't you?

23   A.   Yes, sir.

24   Q.   That's Mr. Reinhardt over there, correct?

25   A.   Yes, sir.

D3BLLEV3                      Georgiadis - cross

1    Q.  And in December of 2011, you met with Mr. Reinhardt and one

2    of the prosecutors at this table, right?

3    A.  Yes, sir.

4    Q.  Where did that meeting take place?

5    A.  Took place at my lawyer's office in California.

6    Q.  And you were asked a number of questions, right?

7    A.  Yes, sir.

8    Q.  And you answered those questions, didn't you?

9    A.  Yes, sir.

10   Q.  You weren't in any U.S. Attorney's Office, you were in your

11   own lawyer's office out in Huntington Beach, California, right?

12   A.  Irvine, California, sir.

13   Q.  I'm sorry?

14   A.  Irvine, California.

15   Q.  Irvine, California?

16   A.  Yes, sir.

17   Q.  So the location Spectrum Law Group, that was your

18   attorney's firm, right?

19   A.  Yes, sir.

20   Q.  And it said Huntington -- forget what it said.  Remind me

21   again, we're from New York.  Where in California?

22   A.  Irvine, California.

23   Q.  Irvine, California.  Just so we know, where is Irvine,

24   California in relation to Los Angeles?  Just a matter of

25   geographical interest.

1    A.  OK.  Are you asking me a question where Irvine is?

2                THE COURT:  Where is Irvine in relation to Los

3    Angeles?

4                THE WITNESS:  It's about 45 minutes away from Los

5    Angeles in Orange County.

6    Q.  How long was the meeting that you had?

7    A.  Pretty much lasted all day.

8    Q.  All day?

9    A.  From I'd say 10 o'clock till 5:30.

10   Q.  10 o'clock in the morning until 5:30 in the afternoon?

11   A.  I believe so.

12   Q.  Before the meeting started, do you remember the prosecutor

13   telling you certain things about the conditions of the meeting?

14   A.  Yes, sir.

15               MR. SHARGEL:  Your Honor, before I go any further, I'd

16   like to read a stipulation that was entered into this morning.

17               THE COURT:  All right.

18               MR. SHARGEL:  It will be marked, I think on

19   stipulations we're up to C6, if memory serves.

20               THE COURT:  All right.

21               MR. SHARGEL:  We'll mark this for identification and I

22   will offer it in evidence.

23               Once again, it's stipulated and agreed -- and I'm

24   going to just say --

25               THE COURT:  Skip the parties.

1          MR. SHARGEL:  -- the lawyers on both sides.

2          Fotis Georgiadis signed a proffer agreement at the

3    time of his meeting with the United States Attorney's Office

4    for the Southern District of New York on December 13, 2011,

5    that is identical to the one he signed on January 30, 2013, and

6    it is identified as 3503-16 in the 3500 material provided by

7    the government.

8          And I offer this stipulation into evidence, if I may.

9          MS. COHEN:  No objection, your Honor.

10          THE COURT:  OK.  The stipulation is received in

11    evidence.

12          (Defendant's Exhibit C6 received in evidence)

13    Q.  When you prepared for your testimony here today, you were

14    asked questions about proffer agreements, right?

15    A.  From who?

16    Q.  Proffer agreement, by the prosecutors as they were

17    preparing your testimony.  They asked you questions.  They

18    prepped you.  There's nothing wrong with it.  They prepped you

19    for answers in connection with proffer agreements.  Right?

20    A.  I don't know about the proffer agreement, if they --

21    Q.  The stipulation that I just read.

22    A.  OK.

23    Q.  Did that come as a surprise to you or did you know it was

24    coming?

25    A.  I know I signed a proffer agreement.  But I don't know what

D3BLLEV3                     Georgiadis - cross

1    you're talking about with the government and the proffer

2    agreement.

3    Q.  So on -- since we have this stipulation, I'm now referring

4    to 3503-16, which is a proffer agreement from January 30, 2013,

5    with the understanding that it's identical to the one you

6    signed on December 13, 2011.

7    A.  Yes.

8    Q.  Do you have that, we're on the same page?

9    A.  Yes, sir.

10   Q.  So before you actually started talking to the government

11   that morning at 9:30 or whatever time it was, before you

12   started talking to the government, the government laid out the

13   understandings that would surround the proffer agreement that

14   you were making, right?

15   A.  Yes, sir.

16   Q.  You understood or you were told that a proffer agreement

17   served a certain role, you understood what you were doing,

18   right?

19   A.  Yes, sir.

20   Q.  You have to answer orally.

21   A.  Yes, sir.

22   Q.  You had the benefit of counsel, right?

23   A.  Yes, counsel was there.

24   Q.  Your lawyer was at the meeting as well, at that point

25   Mr. Rosenbaum, right?

1   A.   Yes, sir.

2   Q.   And you were asked, you were told by the prosecutor that

3   the purpose of this meeting was to see whether you would be

4   eligible for a cooperation agreement; do you remember him

5   telling you that?

6   A.   If I was eligible for a cooperation agreement?

7   Q.   Yes.  In other words, that the information you were giving

8   was pursuant to an agreement.  Let me show you what's been

9   marked as 3503-16.

10          MR. SHARGEL:  Permission of the Court?

11          THE COURT:  Yes.

12  Q.   And I ask you to take a look at that and I ask if you

13  recognize that as the proffer agreement, even though that has a

14  different date because one was lost, the proffer agreement of

15  December 13, 2011.

16  A.   I remember signing this.

17  Q.   That's your signature on the last page, right?

18  A.   Yes, sir.

19  Q.   And when you signed it, if I may retrieve it, you knew what

20  it meant, right?

21  A.   Yes.

22  Q.   You were there to talk to the government -- when I say the

23  government, people representing, the two people representing

24  the government that day -- you were there to talk to the

25  government about the possibility of you becoming a cooperating

1    witness, right?

2    A.  Are we talking in December?

3    Q.  December of 2011, yes.

4    A.  I was there being asked questions.

5    Q.  Did you receive a subpoena to go to that meeting?

6    A.  Yes.

7    Q.  So you were there because of a subpoena?

8    A.  I received a subpoena, yes.

9    Q.  And once you got there, did the prosecutor explain to you

10   what a proffer agreement was?

11   A.  I believe he did, yes.

12   Q.  And when he explained it to you, he told you that this

13   interview was taking place in order to determine whether they

14   would offer you a cooperation agreement, right?

15   A.  I don't remember that.  He might have.  I don't remember.

16   Q.  You just don't remember?

17   A.  I don't remember that meeting took place for me to be

18   eligible for a cooperation agreement.

19   Q.  Let me ask you this:  Did you understand that that meeting,

20   were you told by the prosecutor that to lie to a federal

21   agent -- and Mr. Reinhardt is a federal agent, make no mistake

22   about it -- to lie to a federal agent is a violation of the

23   federal criminal law; were you told that?

24   A.  Yes, sir.

25   Q.  You clearly understood that, right?

D3BLLEV3          Georgiadis - cross

1    A.  Yes.

2    Q.  And were you told, sir, on that day in December 2011 that

3    to lie to an assistant United States attorney, from whatever

4    district, is a federal crime?

5    A.  Yes, sir.

6    Q.  You understood full well that day, sir, that lying was a

7    crime, right?

8    A.  Yes, sir.

9    Q.  And you told us that you came home and your daddy smacked

10   you and this one and you had all kinds of reactions to what

11   occurred, right?

12   A.  Yes, sir.

13   Q.  You felt very badly on the inside, right?

14   A.  Yes.

15   Q.  And because you knew, just like your father knew before he

16   smacked you, that you went and lied about certain things to an

17   assistant United States attorney and special federal agent

18   Mr. Reinhardt, right?

19   A.  I did, sir.

20   Q.  You committed a crime, right?

21   A.  I wasn't truthful and I tried to make it right right away.

22   Q.  Not my question.  You committed a crime, right?

23   A.  Yes, yes.

24   Q.  That was right in the agreement, paragraph 2.  The

25   agreement that you signed, it said that if you lied, your words

1   could be used against you because you committed a crime.

2   Right?

3   A.  It was wrong.

4   Q.  I didn't ask you whether you were wrong or right.  I just

5   wanted to ascertain, you knew within hours of leaving that

6   meeting that you, sir, had committed a crime, yes or no?

7   A.  I knew within hours of leaving that meeting that what I had

8   done was wrong and I needed to make it right right away and I

9   was going to call, but Mr. Reinhardt was in flight.  He had

10  left.

11  Q.  Are you done?

12  A.  Yes, sir.

13  Q.  There are lots of things in life that we do that are wrong.

14  I'm not asking you about things that we do that are wrong.

15  That happens to me every day.

16          My question to you, sir, my question to you is did you

17  know after leaving that meeting, whether it was minutes or

18  hours or days, did you know after leaving that meeting that you

19  had committed a federal crime, a crime; do you understand that?

20  A.  In my head, no.  In my head I didn't think I committed a

21  crime.  I thought that, you know, by calling that I was

22  changing it and I was making it right.

23  Q.  And that took you off the hook for the crime?

24  A.  That's what I thought.

25  Q.  Did Mr. Reinhardt -- you reached Mr. Reinhardt, right?

1    A.  Reached him in the morning, yes.

2    Q.  You told him in the morning that you had lied, right?

3    A.  I told him that I wanted to cooperate and I felt bad how

4    the meeting went and I wasn't truthful and to give me 24 hours

5    to seek new counsel.

6    Q.  So you sought new counsel, right?

7    A.  Yes, sir.

8    Q.  You retained new counsel, right?

9    A.  Yes.

10   Q.  And then and then what happened, you went, had another

11   meeting with Mr. Reinhardt?

12   A.  No.

13   Q.  No, right?

14   A.  No.

15   Q.  You didn't have a meeting in December of 2011 at all,

16   right, no meeting?

17   A.  No.

18   Q.  You're shaking your head but you have to answer.

19   A.  I only had that one meeting in December of 2011.

20   Q.  We're past that meeting now.

21   A.  Because you said 2011.  I got confused.

22   Q.  You had the meeting in December of 2011.

23   A.  OK.

24   Q.  And I'm asking you, sir, did you meet with Mr. Reinhardt or

25   any, either of the prosecutors later in December, say around

D3BLLEV3                    Georgiadis - cross

1    Christmas time in December of 2011?

2    A.   No, sir.

3    Q.   And did you meet with them to correct it and make it right?

4    Do you remember you just said a few moments ago you were going

5    to make it right?

6    A.   To seek new counsel.

7    Q.   You sought new counsel and you weren't going to make it

8    right by seeking new counsel.  You said you were going to come

9    in and tell the truth.  Right?

10   A.   And I started cooperating to my attorney, my new attorney.

11   Q.   To your new attorney?

12   A.   Yes.

13   Q.   But your new attorney didn't work for the government,

14   right?

15   A.   No, he didn't.

16   Q.   He was a private attorney that was retained by you, right?

17   A.   Yes, sir.

18   Q.   As you pointed out a few minutes ago, you made that

19   reference to privilege, he was your attorney, right?

20   A.   Yes, sir.

21   Q.   So my question to you is about government attorneys,

22   assistant United States attorneys, special agents like Agent

23   Reinhardt.  Did you have a meeting with Agent Reinhardt or any

24   prosecutor in January of 2012?

25   A.   Yes.

1   Q.  You had a meeting?

2   A.  January of two thousand what?

3   Q.  Twelve, '12.

4   A.  No, no, I didn't.  No, I'm sorry, confusing the dates.

5   Q.  Three weeks, one week, two weeks.  Your meeting that you

6   said you lied at was December 13?

7   A.  Right, no, I didn't.  No, sir.

8   Q.  No meeting in January, right?

9   A.  No.

10          THE COURT:  OK.  Is this a convenient place to break,

11  Mr. Shargel?  It's about lunch time.

12          MR. SHARGEL:  Sure.  One more question.

13  Q.  No meeting in February, right?

14  A.  No, sir.

15          THE COURT:  OK.  Thank you.  Want to take care of

16  three months.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  OK, Mr. Georgiadis, you can step down.

3            Mr. Georgiadis, you're on cross-examination now so

4    don't talk to the government during lunch break.

5            THE WITNESS:  OK.

6            (Witness not present)

7            THE COURT:  Anything to take up?

8            MR. SHARGEL:  No, sir.

9            THE COURT:  Mr. Shargel, I'll have an answer for your

10   question right after lunch break.

11           MR. SHARGEL:  Very well.  Thank you.

12           (Luncheon recess)

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D3BLLEV3          Georgiadis - cross

2:00 p.m.

3      (Jury not present)

4          THE COURT:  I want to tell you I considered this issue

5  that I said to Mr. Shargel I'd consider.  I'm disposed to grant

6  the application.  Ms. Cohen?

7          MS. COHEN:  That's fine, your Honor.

8          MR. SHARGEL:  Thank you, your Honor.

9      (Jury present)

10 FOTIS GEORGIADIS, resumed.

11         THE COURT:  Mr. Shargel.

12         MR. SHARGEL:  Is your Honor going to give that

13 instruction now?

14         THE COURT:  At the end.

15 CROSS-EXAMINATION (continued)

16 BY MR. SHARGEL:

17 Q.  Before the break, I'm not going to go through every month

18 of the year, but the fact is that in 2012, I stopped at

19 February before the break, and I ask you now:  March, April,

20 May June you still didn't see the government, right, not you

21 personally?

22 A.  2012?

23 Q.  2012.

24 A.  No, I didn't.

25 Q.  No contact.  You yourself had no contact or meeting with

D3BLLEV3                          Georgiadis - cross

1   the agents or the prosecutor, right?

2   A.  No.

3   Q.  You're shaking your head.  You have to answer.

4   A.  No, sir.  No.

5   Q.  Continuing through the rest of the year, through 2012,

6   right up to New Year's Eve 2012, still no contact, correct?

7   A.  No.

8   Q.  It's in January of 2013.  Do you remember the date, by the

9   way?

10  A.  Sometime in the end of January.

11  Q.  January 30, 2013, ring a bell?

12  A.  Yes.

13  Q.  Shortly before this trial was about to begin?

14  A.  Yes.

15  Q.  You understood full well why it was that you personally had

16  no contact with the agents from December of 2011 to January of

17  2013.  You understood why, correct?

18  A.  I was cooperating through my attorney.

19  Q.  Sir, you understood the reason for the delay.  It had

20  nothing to do with cooperation with your attorney.  I'm asking

21  you, sir, did you or did you not understand the reason why it

22  was that your personal contact with the government was put off?

23  A.  I was cooperating through my attorney.

24  Q.  Sir, your attorney had how many meetings with the

25  government from the time in December 2011 to January of 2013,

D3BLLEV3                    Georgiadis - cross

1    if you know?

2    A.  I don't know.

3    Q.  You, sir, were waiting to see if you could become a

4    citizen, right?

5    A.  No.

6    Q.  Sir, do you understand --

7    A.  What do you mean I was waiting?

8    Q.  You were waiting because your attorneys asked the

9    government not to have any further meetings with you until your

10   citizenship application was completed and approved.  You knew

11   that, didn't you?

12   A.  I can't get into my attorney-client privilege, sir.

13   Q.  Sir, I ask as you sit here now, on the basis of your

14   knowledge today, present knowledge, isn't it a fact, sir,

15   privilege issues aside, is it not a fact that you did not have

16   contact with the government as a benefit to you to apply for

17   and become a United States citizen?

18   A.  I was cooperating through my attorney, sir.

19   Q.  You gave us that answer.  I put the question again to you.

20   Sir, is it not a fact that you expressly asked the government

21   and your attorneys expressly asked the government on your

22   behalf not to have any contact with you until you applied for

23   and became a United States citizen?  Yes or no, sir.

24   A.  I don't know that, sir, no.

25   Q.  You don't know that as you sit here now?

1    A.  No.

2    Q.  In December of 2011, at that time that you had the meeting,

3    in mid December 2011, were you a United States citizen?

4    A.  No, sir, I wasn't.

5    Q.  Were you a United States citizen at any time during the

6    acts that you told us that you engaged in?  Were you a United

7    States citizen?

8    A.  The what?

9    Q.  The acts that you said that you engaged in at the time you

10   had the conversations with my client and others, were you a

11   United States citizen?

12   A.  At the time I had contact with your client?

13   Q.  Yes.

14   A.  In the years of when?

15   Q.  In the years of 2007, 2008, and 2009, were you a United

16   States citizen?

17   A.  No, I was not, sir.

18   Q.  Were you a United States citizen in 2010?

19   A.  No, I was not, sir.

20   Q.  Were you a United States citizen in 2011?

21   A.  No, I was not.

22   Q.  Do you know as you sit here now that if a noncitizen such

23   as yourself, as you described it, if a noncitizen is convicted

24   of a felony, that person is deported from the United States?

25   You know that, right?

D3BLLEV3          Georgiadis - cross

1    A.  Yes, sir.

2    Q.  You said on direct examination you have been in the United

3    States since you're 3 years old, right?

4    A.  Yes, sir.

5    Q.  You said in your direct examination that you had children

6    here in the United States, right?

7    A.  American citizen children, yes.

8    Q.  American citizen wife also, right?

9    A.  Yes, sir.

10   Q.  But you knew full well that if you were convicted of a

11   felony, you would be deported.  Whether you were here at 3

12   years old, 2 years old, or 1 year old, you knew that, didn't

13   you?

14   A.  I knew what?

15   Q.  You knew that you had an application for citizenship

16   pending, and you didn't want anything to happen in connection

17   with your case until that application was pending?

18   A.  Sir --

19   Q.  I'm sorry.  I misspoke.  Until that application was

20   resolved.

21   A.  Sir, I wasn't being accused of a crime.  I seeked advice

22   from my counsel.  He told me to seek advice from immigration

23   counsel.  We didn't know our outcome in the case.  And I did

24   what my counsel advised me to do.  I cannot go into client-

25   attorney privilege on that, sir.

D3BLLEV3                    Georgiadis - cross

1    Q.  Who told you that when you came here this morning, you

2    wouldn't be able to go into privileged communications?

3    A.  Who told me what?

4    Q.  Who told you to assert the lawyer-client privilege?

5            MR. MASTER:  Objection, your Honor.

6    A.  My attorney.

7            THE COURT:  Overruled.  Your attorney told you?

8            THE WITNESS:  Yes.

9            THE COURT:  His attorney told him, Mr. Shargel.

10   Q.  Did you know, sir, from meetings with the government or

11   from other information that you had available to you, that your

12   attorneys had reached out to the government on your behalf?

13   A.  When?

14   Q.  In 2012.

15   A.  I'm not understanding the question.

16   Q.  Then I'll put it more clearly if you're not understanding

17   the question.

18   A.  OK.

19   Q.  You said a short while ago that you were cooperating with

20   the government through your attorneys, right?

21   A.  Yes, sir.

22   Q.  That you yourself, the source of the information, met with

23   no one from the government during 2012, right?

24   A.  The what?

25   Q.  You were the source of the information, right?

1   A.  Yes, sir.

2   Q.  Your attorney wasn't with you when you had these meetings,

3   right?  Your attorney, Mr. Nessum, the attorney that you hired

4   when you were told to get another attorney.

5   A.  Which meetings?

6   Q.  The meetings that your attorneys had with the government,

7   you were not present, you were not questioned directly by

8   anyone from the government, right?

9   A.  No, sir, I wasn't.

10  Q.  You knew and understood full well why you weren't in

11  contact with the government, didn't you?

12  A.  We were cooperating.  Through my attorney, I was

13  cooperating, sir, with the government.

14  Q.  Are you finished?

15  A.  Yes, sir.

16  Q.  In other words, your attorneys were speaking to the

17  government on your behalf?

18  A.  I would assume so.

19  Q.  You authorized the attorneys to make statements to the

20  government that had previously been confidential between you

21  and the attorneys?

22  A.  I don't know if I authorized.  I was just having

23  discussions with my attorney and presenting documentation to my

24  attorney, and my attorney would handle it, sir.

25  Q.  As you said a while ago, a very short while ago, your

D3BLLEV3                    Georgiadis - cross

1    attorneys were cooperating with the government, right?

2    A.   Yes.

3    Q.   So you knew that the attorneys were giving the government

4    information, right?

5    A.   I thought that's how it worked.

6    Q.   That's not my question.  You knew that your attorneys were

7    giving information to the government?

8    A.   I don't know if they talked on a daily basis, but I do know

9    that they were talking to the government, yes, sir.

10   Q.   I'm not asking about on a daily basis.  Your last answer

11   was you knew they were talking to the government, right?

12   A.   Yes.

13   Q.   You authorized them to talk to the government?

14   A.   I don't know if I used that word, "I authorize you to speak

15   to the government."  Yes, I think so, yes.

16   Q.   Did you ever stop them?  Did you ever say, don't talk to

17   the government, don't give up my secrets?

18   A.   No, no, no, I didn't.

19   Q.   They were working on your behalf to persuade the government

20   that the case should be resolved in a certain way, right?

21   A.   They were working with the government, sir, yes.

22   Q.   When you say working with the government --

23   A.   They were cooperating with the government:  Documentation,

24   my discussions that I had with my attorney.  I don't know how

25   he placed those discussions with the government; I wasn't

1  there.

2  Q.  That was something that you authorized him to do, right?

3  A.  Yes, sir.

4       MR. SHARGEL:  I have an application to make, your

5  Honor, at the appropriate time, that the lawyer-client

6  privilege has been waived by his authorization to have the

7  attorneys talk to the government.

8       THE COURT:  OK.  Are you making it now?

9       MR. SHARGEL:  I'm ready to make it now.  I can make it

10 now.

11      THE COURT:  I'll reserve on it.  Go on to the next

12 question.

13      MR. SHARGEL:  Very well.

14 BY MR. SHARGEL:

15 Q.  The next question is that you didn't meet with the

16 government again, you didn't meet with the government lawyers

17 again -- now I'm talking not about your attorneys, I'm talking

18 about you yourself -- until January of 2013, right?

19 A.  Yes.

20 Q.  I think you said the end of January 2013, right?

21 A.  Yes.

22 Q.  You knew when the trial in this case started, right?  March

23 4, 2013.

24 A.  Yes.

25 Q.  Do you remember meeting with the government and discussing

1    another proffer session with you personally?

2    A.   In January.

3    Q.   On January 30, 2013?

4    A.   Yes.

5    Q.   This was the same proffer agreement that you entered into

6    and signed as we had it before the lunch hour that they signed

7    back in 2011, right?

8    A.   Yes.

9    Q.   I think I showed you this once.  If necessary, I'll show it

10   to you once more.  It's been marked for identification as

11   3503-16.  I think you said before that you recognized the

12   signature.

13           MR. SHARGEL:  May I stay here for one moment, your

14   Honor?

15           THE COURT:  Yes.

16   Q.   I think you said you recognize the signature at the bottom

17   of the page, page 2?

18   A.   Yes.  My signature?

19   Q.   Yes.

20   A.   Yes.

21   Q.   You signed it, right?

22   A.   Sure.

23   Q.   May I have it?

24   A.   Yes.

25           MR. SHARGEL:  I offer this into evidence.

1          MR. MASTER:  No objection.

2          THE COURT:  3503-16, Mr. Shargel?

3          MR. SHARGEL:  Yes, sir.

4          THE COURT:  It is received in evidence.

5          (Defendant's Exhibit 3503-16 received in evidence)

6          MR. SHARGEL:  Could we publish this, Jennifer, blowing

7     up the first paragraph.

8     Q.   You read the agreement before you signed it, right?

9     A.   Yes, sir.

10    Q.   The prosecutor again, as is his obligation, explained the

11    terms of the agreement to you, right?

12    A.   Yes, sir.

13    Q.   You had ample opportunity to consult your lawyer in

14    connection with this agreement, right?

15    A.   Yes.

16    Q.   You said on direct examination that you expect and hope to

17    get a 5K1.1 letter, right?

18    A.   Part of my cooperation agreement, sir, yes.

19    Q.   That's part of your cooperation agreement?

20    A.   Yes.

21    Q.   Before we get to that in any detail, let's go back to this.

22    This is not a cooperation agreement.  You understood that that

23    day, right?

24    A.   Yes.

25    Q.   How many hours did this session take place, over what

1   period of time, as best you can recall?  This is just thinking

2   back to January of '13.  How long did it take?

3   A.  Which meeting are you talking about, the one in 2011 or the

4   one in --

5           MR. SHARGEL:  Can we have the date up here on this

6   one.

7           THE COURT:  He is asking about the date that this

8   agreement was signed but you.

9           THE WITNESS:  Oh, OK.

10          THE COURT:  How long was that meeting?

11  A.  That meeting was pretty much the full morning, full

12  afternoon, all day.

13  Q.  So it was, again, like it was back in 2011, you met

14  literally for hours, correct?

15  A.  We met for hours, yes.

16  Q.  Started at 9:30 in the morning and went until 5:30 in the

17  afternoon or later, right?

18  A.  Something like that, yes.

19  Q.  What was your understanding of what the government wanted

20  to -- withdrawn.  Let's go back to this blow-up of paragraph 1.

21  You have a cooperation agreement.  You testified to that on

22  direct examination, right?

23  A.  Yes.

24  Q.  One that is signed and executed.  We'll get to that a short

25  while later.  Here it says, "This is not a cooperation

1    agreement.  The client has agreed to provide the government

2    with information and to respond to questions so that the

3    government may evaluate the client's information and responses

4    in making prosecutive decisions."  Do you understand what that

5    means?

6    A.  I think so.

7    Q.  What decisions are they talking about?

8    A.  The decisions that they are going to make on me.

9    Q.  As to whether you get a cooperation agreement, right?

10   A.  Whether they are going to prosecute me.

11   Q.  Whether they are going to prosecute you and whether you're

12   going to get a cooperation agreement?

13   A.  I didn't know that, no.

14   Q.  Did you read paragraph 2 before you signed it?

15   A.  I did read it, yes, but -- I guess if that's what you say,

16   sure, yes.

17   Q.  "By receiving client's proffer, the government does not

18   agree to make a motion on the client's behalf or enter into a

19   cooperation, plea agreement, immunity, or nonprosecution

20   agreement."  Do you see that language?

21   A.  Yes.

22   Q.  Finally, "The government makes no representation about the

23   likelihood that any such agreement will be reached in

24   connection with this proffer."  You understood what that meant,

25   right?

1   A.  Yes.

2   Q.  You knew on January 30, 2013, just six weeks or so ago, you

3   knew full well what the government wanted to hear before they

4   gave you a cooperation agreement, isn't that right?

5   A.  I knew what they wanted to hear?

6   Q.  Yes, knew what they wanted to hear.

7   A.  I went in there and spoke the truth, sir.

8   Q.  Sir, that's not my question.  You knew, did you not,

9   exactly what the government wanted to hear?

10  A.  How would I know that?

11  Q.  Because they told you.

12  A.  When?

13  Q.  In that meeting.

14  A.  They told me to say things?  I'm not understanding.

15  Q.  Let me finish the question.  On January 30, 2013, they told

16  you what they wanted?

17  A.  What did they want?

18  Q.  My question to you, sir, is, as you sit here now, do you

19  have any recollection of being told at that meeting on January

20  30, 2013, precisely what the government wanted to hear?

21  A.  No.  They didn't tell me what they wanted to hear.  I was

22  in there to tell my story, to tell the truth.

23  Q.  Do you remember that there was a question as to what would

24  happen to you at or about the time that you made this proffer

25  on January 30, 2013?

1  A.  What was the question?

2  Q.  Do you remember, sir, asking through your lawyers that you

3  wanted a civil disposition of this case?  Do you remember that?

4  A.  I don't remember using the "civil disposition" word.  I

5  don't even know what that means.

6  Q.  Do you remember telling your lawyers that you didn't

7  believe that this was a crime, that you hadn't committed any

8  crime, that maybe it was a little wrong but you didn't commit

9  any crime?  Do you remember saying that?

10  A.  I told my lawyer that before.  In that meeting there was

11  discussions of what I had done and I heard -- in that meeting

12  there was discussions of all my activities, all my fraudulent

13  activities, sir.  That meeting is where I understood that I

14  hurt people.  I sold stock, I conspired with others to

15  manipulate stock.  In that meeting is where I accepted

16  responsibility and I pled guilty, sir.

17  Q.  You pled guilty, sir --

18  A.  Yes, pled guilty to securities fraud and wire fraud and

19  securities fraud.

20  Q.  Excuse me, sir, there is no question before you.

21          THE COURT:  You have to wait for a question.

22          THE WITNESS:  I'm sorry.

23  Q.  Before we get to the point of your pleading guilty, do you

24  remember that your lawyer was told by the government, your

25  lawyer was told by the government and your lawyer conveyed it

1  to you, that if you wished to cooperate with the government,

2  you would need to plead guilty to conduct related to Cardiac

3  Networks and other market manipulation activity that he

4  disclosed?  Do you remember being told that?

5  A.  No.

6  Q.  As you sit here now, you were never told -- let me put it

7  another way.  Do you remember being told that in order to get

8  the benefits of cooperation, in order to get not this proffer

9  agreement but a cooperation agreement, you had to implicate

10 Cardiac?  Do you remember that, sir?

11 A.  No, sir.

12 Q.  Let me show you what's been marked for identification as

13 Defense Exhibit 210, two-one-zero.

14         MR. SHARGEL:  May I, Judge?

15         THE COURT:  Yes.

16 Q.  I direct your attention to the first paragraph of that

17 document.  You're free to look anywhere else you would like.

18 But I would ask you to read that to yourself under our rules.

19 When you get done reading that, I'll put a question to you.

20 A.  Yes, sir.

21 Q.  Is that page 7 of 8 that you are reading?

22 A.  Yes.

23 Q.  Having read that, sir, having read that paragraph, does

24 that refresh your recollection --

25 A.  I'm reading page 6 of 8, not 7 of 8.

D3BLLEV3                    Georgiadis - cross

Q.  Forgive me.  Would you go to page 7, top paragraph.

A.  7?

Q.  Yes.  Top paragraph.

A.  You had it on 6.  Sorry.  The naturalization process, is

that the one, the right one?

Q.  Yes, the naturalization process.

A.  OK.

Q.  You were going through the naturalization process all

through 2011.

A.  Do you want me to read it?

Q.  Yes, please.

A.  OK.

Q.  Sir, does that refresh your recollection that you were told

several days after the proffer session that if you wished to

cooperate with the government, if you wished to cooperate with

the government, you would need to plead guilty to criminal

conduct related to Cardiac Networks and other market

manipulation with Cardiac Networks being specifically named?

A.  Yes.

Q.  You were also told back in 2012 -- and I want to make clear

that I'm shifting the time frame here just a little bit -- back

in 2012 the government informed you through your counsel that

they would await the naturalization process.  You remember

that, don't you?

A.  No.

D3BLLEV3                    Georgiadis - cross

1    Q.  You have no recollection of that whatever?

2    A.  Is it on this paper somewhere?

3    Q.  Yes, it is on that paper somewhere.

4    A.  Where?

5    Q.  You're free to read through that paper.

6    A.  Where is that?  What paragraph is it that the government is

7    saying that, sir?

8    Q.  The government is saying that on -- give me one moment and

9    I'll tell you.

10   A.  That they are waiting for me to become a citizen.  I don't

11   see it.

12   Q.  Yes.  It's the second paragraph on page 6 of 8.

13   A.  6 of 8?

14   Q.  Yes.  Have you read it?

15   A.  Yes, sir.

16   Q.  Having read that, does that refresh your recollection, and

17   I'm specifically looking at the middle paragraph, does that

18   refresh your recollection that the government said that they

19   would accede or agree to the proposal that you await your

20   naturalization process but that there were two conditions in

21   place?  Does that refresh your recollection?

22   A.  They had this conversation with my attorney, I guess.  Yes,

23   it says it on here.

24   Q.  I'm not asking what it says on there.  Wasn't your

25   naturalization something important to you?

D3BLLEV3              Georgiadis - cross

1   A.  Something that I was advised by counsel, sir, and I can't

2   go into my attorney-client privilege.  I had a counsel that was

3   advising me.

4   Q.  I am not asking you about how your counsel felt.  I'm

5   asking you whether the naturalization process -- you were not a

6   citizen when this investigation began.  Was the naturalization

7   process important to you?  Yes or no.

8   A.  I didn't know my outcome, but yes, sure.

9   Q.  You don't want to be deported, is that a fair statement?

10  A.  Yes, fair statement.

11  Q.  It's not a question of what your attorneys are thinking.

12  It's what you're thinking.  You want to stay in the United

13  States, right?

14  A.  I can't go into conversations I had with my attorney, sir.

15  Q.  I'm not asking about conversations you had with your

16  attorneys.  I'm asking about thoughts that you had in your own

17  head.  Can we stay with that?  Excuse me, sir, I haven't

18  finished the question.  Just for frame of reference, you

19  understand that I'm asking you about the thoughts that were in

20  your head.  In 2012 did you want to be deported?  Yes or no.

21  A.  I wasn't being deported in 2012.

22          THE COURT:  Listen, Mr. Georgiadis, you have to answer

23  the question.  In 2012 did you want to be deported?

24  A.  No, sir.

25  Q.  In 2013, right up to this minute on that witness stand, do

1  you want to stay in the United States?

2  A.  Yes, sir.

3  Q.  You wouldn't want your naturalization to be revoked, would

4  you?

5  A.  No, sir.

6  Q.  There came a time in May of 2012 when you, sir, filled out

7  a form, a questionnaire, an application in relation to the

8  naturalization process?  Yes or no.

9  A.  Yes, sir.

10  Q.  You remember that form full well, don't you?

11  A.  I filled it out with my attorney, sir, yes.

12  Q.  Having reference once again, if you need your recollection

13  refreshed, to that paragraph 6, you were warned by the

14  prosecutors that they would delay the naturalization process,

15  go along with that, but you, sir, could not commit any fraud in

16  connection with that process?  You know that, don't you?

17  A.  I didn't have conversations with the prosecutors, sir.

18  Q.  You knew from conversations, nonprivileged conversations,

19  with your attorneys that they were reporting back from the

20  government saying that the government will accede to your

21  request to delay it but you cannot commit fraud in connection

22  with the process, you cannot defraud the immigration service?

23  Do you remember that?

24  A.  I can't go into conversations, sir, I had with my attorney.

25  Q.  I'm not asking about conversations you had with your

1   attorney.

2   A.   Sure you are.  That's what you said.

3   Q.   Were you made aware of the fact -- let me ask you this way.

4   Did you think it was OK with the government for you to commit

5   fraud in connection with your naturalization process?

6   A.   How did I commit fraud?

7   Q.   I didn't ask you that question.  Did you think it was all

8   right with the government if you would go ahead, you had the

9   green light to go ahead and commit fraud in connection with the

10  process?

11  A.   I'm not understanding the question, sir.

12  Q.   Then let me be more specific.

13  A.   OK.

14  Q.   Is it not a fact as you sit here now, and I'm not asking

15  for anything having to do with attorneys, isn't it a fact as

16  you sit here now that you, sir, Mr. Georgiadis, committed fraud

17  against the United States of America when you made that

18  application for naturalization?

19  A.   No, sir.

20  Q.   Then let me show you what's been marked as 3503-31 for

21  identification.

22          MR. SHARGEL:  May I approach the witness, your Honor?

23          THE COURT:  Yes, you may.

24  Q.   I put this in front of you and ask if you recognize it.

25  A.   Yes, sir.

1    Q.   What do you recognize it to be?

2    A.   My application.

3    Q.   Is it signed by you?

4    A.   I would assume so, yes.

5         THE COURT:  Don't assume.  Turn to the signature page.

6    A.   Yes, sir.

7    Q.   Did you understand that you were signing under penalties of

8    perjury?

9    A.   Yes, sir.

10        MR. SHARGEL:  May I have it back, your Honor?

11        THE COURT:  Yes.

12   Q.   I don't want to ask you a question with my back to you.

13   I'll turn around and ask you this question.  You told us this

14   morning that in December, I think it was December 11, 2011 you,

15   in a conversation, not your attorneys, you yourself in

16   conversation with people that are sitting at this table, that

17   you lied, right?

18   A.   Yes.

19   Q.   You said that you knew that you were advised that lying to

20   an agent was a crime, right?

21   A.   Yes.

22   Q.   You said you knew at the time that you were involved in

23   manipulating stocks, you said you knew that, right?

24   A.   At the time of?

25   Q.   At the time that you were filling out this application.

1    A.  This naturalization application?

2    Q.  Yes, in May of 2012.  You knew it?

3    A.  You know, look --

4    Q.  Excuse me, sir.  Can you answer the question?

5    A.  I knew I had done wrong, sir.

6              MR. SHARGEL:  Your Honor, this is just a speech

7    without a question.

8              THE COURT:  You have to listen to the question and

9    answer the question.  Try again, Mr. Shargel.

10             MR. SHARGEL:  Yes, sir.

11   Q.  Do you remember, sir, and you can turn to the page, do you

12   remember a question under "moral character"?  Do you see that,

13   "moral character"?

14   A.  There's a lot of things here.  Which page?

15   Q.  You know what moral character is, right?

16   A.  I have an idea, yes.

17   Q.  15.

18             MR. SHARGEL:  I think I have to offer this in evidence

19   first.  I offer it into evidence 3503-31.

20             MR. MASTER:  No objection.

21             THE COURT:  3503-31 is received in evidence.

22             (Defendant's Exhibit 3503-31 received in evidence)

23   Q.  I don't need to publish, because there is only one question

24   I'm going to ask you about, question number 15.  "Have you ever

25   committed a crime or offense for which you were not arrested?"

1    A.  No.

2    Q.  I'll read it once more.

3    A.  You don't have to.  I understood it.

4    Q.  You understood it?

5    A.  Yes.

6    Q.  Your answer was "no."

7    A.  Yes.

8    Q.  You knew that day when you filled out this application that

9    you lied to the SEC, as you told us this morning?  Yes or no.

10   A.  Yes.

11   Q.  You knew that in December of 2011, months before you filled

12   out this application, that you lied to these agents?  Yes or

13   no.

14   A.  Yes, but I tried to -- yes.

15   Q.  You knew when you filled out this application on May 24,

16   2011, that you had lied about manipulation of stock back in

17   December.  You knew that, didn't you?

18   A.  Say that again.

19   Q.  You knew when you filled out this application on May 24,

20   2012, that you had committed federal offenses relating to

21   manipulation of stock.  You knew that, didn't you?

22   A.  No, sir, I didn't.

23   Q.  You answered it 'no.'  Even if you were confused about

24   manipulation of stock, you answered it "no" despite the fact

25   that you had lied to these authorities at the table and to the

D3BLLEV3                    Georgiadis - cross

1   Securities and Exchange Commission.  You knew that, didn't you?

2   A.  Yes.

3   Q.  You have to answer orally.

4   A.  Yes.  Yes, sir.

5   Q.  As you sit here now, you don't want this naturalization and

6   citizenship to be revoked, do you?

7   A.  No, sir.

8   Q.  You understand as you sit here now that it can be revoked

9   for false information on a application for citizenship.  You

10  know that, don't you?

11  A.  Yes, sir.

12  Q.  Did anyone assure you that you wouldn't be deported and

13  have your citizenship papers ripped up because of your

14  cooperation here?

15  A.  Say that again.

16         THE COURT:  I didn't understand the question.  Do you

17  want to try again?

18         MR. SHARGEL:  Sure.

19  Q.  Did anyone from the government assure you, assure you, that

20  your citizenship would not be ripped up, would not be revoked,

21  and you would not be deported?

22  A.  No, sir.

23  Q.  As you sit here now, sir, as you sit here now, one of the

24  things hanging over your head like a Damoclean sword is your

25  citizenship situation, right?

1   A.  That and 25 years.

2   Q.  We're going to get to that, too.  That and 25 years in

3   prison, right?

4   A.  Yes, sir.

5   Q.  You understand, and you were asked questions about this on

6   direct examination, about the cooperation agreement that was

7   reached on February 14, 2013, you understand that, right?

8   A.  Asked questions by whom?

9   Q.  I'm sorry?

10  A.  Direct questions by whom?

11  Q.  When I say direct questions, that's lawyer's talk.  I'm

12  sorry.  You were asked questions by this gentleman over here,

13  Howard Master, right?

14  A.  Yes, sir.

15          MR. SHARGEL:  Are you all right?

16          MR. MASTER:  Yes.

17          THE COURT:  It was nice to inquire.

18          MR. SHARGEL:  I'm sorry, Judge, I didn't hear what you

19  said.

20          THE COURT:  I said you're nice to inquire.

21  Q.  You were asked by Mr. Master about what you understood this

22  agreement to be, right?

23  A.  Yes.

24  Q.  When I say "this," -- well, let me ask you a question.

25  When Mr. Master asked you these questions, you understood the

1    agreement that you entered into, right?  Yes?

2    A.  Can I see the agreement?  What agreement are you referring

3    to?  There's a lot of agreements here.

4    Q.  I show you what's marked as 3503-13.  Look at any page you

5    wish.  It's not long.

6    A.  The cooperation agreement?

7    Q.  Yes, that's your cooperation agreement?

8    A.  Yes.

9    Q.  You were asked by Mr. Master about whether you received any

10   promises by the government.  Do you remember those questions?

11   A.  Yes.

12   Q.  The promises by the government were in terms of this 5K1.1

13   letter, right?

14   A.  Yes.

15   Q.  If you were a successful cooperator, then you would receive

16   a 5K1.1 letter, right?

17   A.  Yes.

18   Q.  You received another benefit, didn't you?

19   A.  What's that?

20   Q.  I'm asking, can you think of any other benefit you

21   received?

22   A.  No.

23   Q.  Did you receive assurance -- is it not a fact that you,

24   sir, were promised by the government that you would not be

25   prosecuted for the false statements that you confessed to

1    making on that long day out in California in December of 2011?

2    A.  I don't remember hearing promises like that.  Do you have

3    anything to refresh my recollection?

4    Q.  Yes, the writing that is right in your lap.  Do you want to

5    take a look at page 2.  There is a yellow Post-it.  You could

6    read it to yourself and then I'll put a question.

7    A.  Which paragraph is it?

8         THE COURT:  The one with the yellow Post-it right

9    alongside it.

10   Q.  I think there may be a yellow Post-it and yellow

11   highlighter.

12        MR. SHARGEL:  May I approach for a second?  I don't

13   want to be on the wrong paragraph.

14   Q.  Page 2 going on to page 3, that paragraph?

15        THE COURT:  The bottom of page 2 to the top of page 3?

16        MR. SHARGEL:  Yes, sir.

17        THE COURT:  OK.

18   A.  Yes, this was part of my agreement.

19   Q.  That was part of the agreement?

20   A.  Yes.

21   Q.  Having read it, does that refresh your recollection that

22   you get protection against any prosecution in connection with

23   the statements that you claim were false in December of 2011?

24   A.  I thought it all fell all together.

25   Q.  You thought it all fell together?

1    A.  Right.

2    Q.  Now that you have had an opportunity to refresh your

3    recollection, it wasn't all fallen together, it was a separate

4    promise that was made that you wouldn't be prosecuted for

5    perjury, false statement, obstruction of justice in connection

6    with your all-day marathon session with the government on

7    December 11, 2011, to December 16th, yes?

8    A.  Yes, sir.

9    Q.  It does refresh your recollection.  You received that as

10   part of the bargain, right?

11   A.  Yes, sir.

12   Q.  In connection with lying to any regulatory authority --

13           THE COURT:  To who?

14   Q.  A regulatory authority.

15   A.  Yes.

16   Q.  You understand that the SEC is a regulatory authority,

17   right?

18   A.  Yes.

19   Q.  You're not going to be prosecuted for that either, right?

20   A.  No.

21   Q.  I said right.  You're not going to be prosecuted for that?

22   A.  I was wrong.  No.

23   Q.  You got me confused.

24   A.  I was wrong in lying, sir.  But no, I'm not going to be

25   prosecuted that I know.

1   Q.  You were wrong in lying?

2   A.  Right.

3   Q.  But you're not going to be prosecuted?

4   A.  Not that I know of, no.

5   Q.  Did you ever lie to any other regulatory authority?

6   A.  What do you mean by did I rely?  Did I rely or lie?

7   Q.  Lie, L-I-E.

8   A.  No, sir.

9   Q.  Did you ever get interviewed by the NASD?

10  A.  No.

11  Q.  Did not?

12  A.  No, sir.

13  Q.  So the regulatory authority that is part of your promises

14  is only the SEC?

15  A.  Yes.

16  Q.  In connection with this 5K1 letter, were the contours or

17  details explained to you?  Not by your lawyers.  I have an

18  application about that.  Not by your lawyers, but by the

19  government lawyer, the prosecutor, the Assistant United States

20  Attorney.

21  A.  I'm sure he knows.  There was a lot explained to me in the

22  5K1 letter.  The way I understand it, it's all of my fraudulent

23  activity, my wrongdoing, and all my good conduct.

24  Q.  This is important to you because this is the vehicle to get

25  out of doing 25 years in prison, right?

D3BLLEV3                    Georgiadis - cross

1    A.  Yes, sir.

2    Q.  As you said on direct examination, you could get as low as

3    no jail or probation, right, in return for your cooperation?

4    A.  Could.

5    Q.  Certainly, that's what you want, right?

6    A.  Yes.

7    Q.  You understood, did you not, that you can't get a 5K1

8    letter unless you provide substantial assistance to the

9    investigation or prosecution of another person, right?

10   A.  Yes.

11   Q.  In other words, if you go in and just say what you did

12   without implicating another person, there is no 5K1 letter,

13   right?

14   A.  I was told in coming in and telling the truth.

15   Q.  I got that.  My question to you is, you understand the

16   5K1.1 letter, 5K1.1 of the federal sentencing guidelines, you

17   don't get any benefit or even a chance under that provision

18   unless you provide, quote, substantial assistance to the

19   investigation or prosecution of another person, not you, right?

20   A.  I didn't know that.  I just thought that telling the truth

21   is --

22   Q.  That would do it?

23   A.  Yes, sir.

24   Q.  You went in and a lot of things said in December of 2011

25   were true, right?  You weren't lying all day from 9:30 to 5:30,

1    were you?

2    A.   No.

3    Q.   Do you remember saying during that session in 2011 that you

4    purchased 500,000 shares of Cardiac at $2.25 or $1,125,000 from

5    David Levy?

6    A.   Yes.

7    Q.   You said you had a contract?

8    A.   Yes.

9    Q.   Did you produce the contract?

10   A.   No, sir.

11   Q.   Did you have the contract?

12   A.   No, sir?

13   Q.   But you were interested -- you said, what, you got kicked

14   out of the company, out of Cardiac?

15   A.   No, that was Banneker.

16   Q.   Banneker, you got kicked out of the company?

17   A.   Yes.

18   Q.   That didn't help your relationship with David Levy, you

19   being kicked out of the company?

20   A.   I didn't have enough money supposedly to fund the company.

21   That's why I was being thrown out.

22   Q.   That's why you were being thrown out?

23   A.   Yes.

24   Q.   When you were being thrown out of Banneker, was that at or

25   about the same time when you weren't talking to David Levy?

1    A.  I don't remember.

2    Q.  I'm sorry?

3    A.  I don't remember.

4    Q.  You said in December of 2011 that you were trying to get

5    rid of David Levy, right?

6    A.  Get rid of him?

7    Q.  Buy him out of the company, buy his shares, by his shares

8    of Cardiac.

9    A.  Yes, I wasn't being totally truthful, sir.

10   Q.  What do you mean you weren't being totally truthful?

11   A.  I wasn't being totally truthful in that meeting, sir.

12   Q.  What you were doing was you were taking some things that

13   were true and some things that were lies and mixing them

14   together?  Yes or no.

15   A.  No.

16   Q.  You said you weren't being totally truthful.

17   A.  I made some misstatements in that meeting, sir, yes, I did.

18   Q.  Did the government ever ask you to identify in writing

19   which were your misstatements and which weren't your

20   misstatements?  Did they ever do that?

21   A.  I believe so, yes.

22   Q.  When did you do that, sir?

23   A.  I believe that was done at my second meeting when I sat

24   down with them.

25   Q.  You were writing and saying what was true and what was not

1    in your own hand?

2    A.   No.

3    Q.   You never did that, did you?

4    A.   No, not me doing that.

5         MR. SHARGEL:  Your Honor, at this time -- this may be

6    something you reserve on -- I'm going to offer in evidence

7    under United States v. GAF Corporation and U.S. v. McKeon

8    Defense Exhibit A210.

9         THE COURT:  What is A210?

10        MR. SHARGEL:  May I hand it up?

11        THE COURT:  Yes.

12        MR. SHARGEL:  This is a Giglio disclosure.

13        May I have a moment, your Honor?

14        THE COURT:  I'll reserve on it.

15        MR. SHARGEL:  Very well, your Honor.

16        May I have just one moment, please.

17   Q.   Here is the question I have for you.  Toward the end of the

18   direct examination, you were asked questions about a Porsche

19   and Zev Helfer, right?

20   A.   Yes, sir.

21   Q.   You told us that it was your wife's car but for family

22   reasons it wasn't a suitable car for you, correct?

23   A.   It wasn't suitable for my wife.

24   Q.   Your wife and your child, right?

25   A.   And my child, yes.

D3BLLEV3                    Georgiadis - cross

1    Q.  You told us that just by coincidence Zev Helfer was looking

2    for a car, it all worked out, he finished the lease, right?

3    A.  Yes.

4    Q.  No problems, right?

5    A.  No.

6    Q.  I'm sorry, I can't hear you.  You have to speak up.

7    A.  No.

8    Q.  Let me show you what's been marked for identification --

9            MR. SHARGEL:  Does the government have a copy of this?

10   Q.  -- as Defense Exhibit A169.  I ask you to take a look at

11   that and tell me if you recognize it.  Do you recognize it?

12   A.  Yes.  It's an email from me.

13   Q.  On the subject of the Porsche, the same Porsche you

14   testified about on direct examination, right?

15   A.  Yes.

16           MR. SHARGEL:  I offer it into evidence.

17           MR. MASTER:  No objection.

18           THE COURT:  A169 is in evidence.

19           (Defendant's Exhibit A169 received in evidence)

20   Q.  This will be my last area here.  "First let me start off by

21   saying sorry for the loss.  Now I want to get something off my

22   chest.  As you know, I let you use my car when you were in a

23   desperate situation."  Zev was kind of broke, wasn't he?

24   A.  He didn't have good credit.

25   Q.  He had bad credit.  That is the opposite of good credit,

1   right?

2   A.  He didn't have good credit to get a vehicle.

3   Q.  Any vehicle, let alone a Porsche?

4   A.  I don't think he wanted a Porsche.  He was looking for a 10

5   or $15,000 car.

6   Q.  You testified to this morning, the Porsche story I'll say.

7   It's truthful, right, truthful testimony, an accommodation?

8   A.  Yes.

9   Q.  "As you know, a desperate situation.  I won't go any

10  further on that.  Today I'm sitting here with a car payment due

11  and 10 days late, late for the second time.  I have made two

12  payments on the car that you and your family are driving and

13  never reimbursed.  You didn't even have the common courtesy to

14  call or email that you couldn't make the payment.  You have

15  ruined my wife's credit with Porsche.  I didn't want to give

16  the car in the first place."

17          Can I ask you the question?  I thought you were glad

18  to give him a car in the first place.  The answer to that?

19          THE COURT:  Is that a question that you want an answer

20  to?

21          MR. SHARGEL:  Yes, it was a question.

22  Q.  Were you glad to give him the car in the first place?

23  A.  I was his last resort, sir.

24  Q.  Where was I?  "You didn't even have the common courtesy to

25  call or email that you couldn't make the payment.  You have

1    ruined my wife's credit with Porsche.  I didn't want to give

2    you the car in the first place, for reasons being that here we

3    are and I'm getting the shaft for helping out a friend/business

4    associate.

5         "My wife is furious with me and I can't blame her.  I

6    have entered you into my life, my house, and most important to

7    my family, and you treated me now with disrespect.  I went as

8    far as getting you an attorney knowing you don't have the money

9    to retain one.  I spent 1500 upon delivering you the car to

10   make sure that you were happy and safe.

11        "You have," all caps, "no idea how much you hurt me by

12   making me look like I made a wrong decision in front of my

13   wife," exclamation marks four times.  "Next week I will fly to

14   San Francisco to pick up the car.  I will make this month's

15   payment, so now there are 2 payments that's owed, a half a

16   year's payments and 20,000 excess mileage that I will be

17   charged.

18        "If you want to reimburse me, fine.  If not, I hope

19   one day this doesn't happen to you.  This will not make or

20   break me.  I will live through it as always.  But again shame

21   on me for trusting you."

22        What is your opinion of Zev Helfer's character for

23   integrity and honesty?

24   A.  I think he is an honorable man.

25   Q.  Honorable man as expressed in this letter.  No further

1   questions.

2           THE COURT:  Ladies and gentlemen, we will take our

3   afternoon recess now.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury not present, witness not present)

2            THE COURT:  Yes, Mr. Shargel?

3            MR. SHARGEL:  Your Honor, very quickly.  I don't want

4    to cut into your break.  There are two issues before the Court.

5    I hope that they can be resolved before he leaves the stand.

6    One is this lawyer-client privilege.  His lawyers were on his

7    behalf intermediaries between the government and him.

8    Obviously, there is authorization or waiver because the lawyers

9    were sharing with the government.

10            THE COURT:  That's the way it seems to me, Mr. Master.

11            MR. MASTER:  Your Honor, his defense counsel was

12   providing factual information to the government.  We certainly

13   permitted Mr. Shargel -- we produced the notes of those

14   attorney proffers to Mr. Shargel as 3500 for Mr. Georgiadis.

15   He is welcome to inquire as to those subject matters.  I don't

16   think that that is a wholesale waiver of any attorney-client

17   privilege conversations that Mr. Georgiadis might have had with

18   his attorney seeking legal advice as to how the case should be

19   resolved.  I disagree.

20            MR. SHARGEL:  It is not only a matter of --

21            THE COURT:  You haven't asked him a question about it.

22   You said attorney-client privilege and went on to something

23   else.

24            MR. SHARGEL:  Yes, because I respected that until I

25   had a ruling from you.

1          THE COURT:  You didn't ask me for a ruling until right

2     now.

3          MR. SHARGEL:  I asked for a ruling during his

4     examination.  You said you would reserve on that.

5          MR. MASTER:  Your Honor, I don't think that that is a

6     blanket waiver of attorney-client privilege.

7          MR. SHARGEL:  I think I can make this short.

8          THE COURT:  Yes.  What do you want?

9          MR. SHARGEL:  I want to put the Brady disclosure in

10    because he is hiding behind the attorney-client privilege when

11    clearly the lawyers are bringing information back to him on

12    what the government is saying.  This is a statement of a party

13    opponent, very narrow area, where it's something that was

14    submitted in connection with the litigation.  United States v.

15    GAF.  In other words, usually, the government is not a party

16    within admissions of a party opponent.  But there are narrow

17    exceptions found in United States v. GAF Corporation, and on

18    the flip side where the lawyer Michael Kennedy was disqualified

19    and his opening statement was admitted into evidence because it

20    was contrary to an earlier opening statement that he made in

21    United States v. McKeon.

22         MR. MASTER:  Your Honor, with respect to that, Mr.

23    Shargel didn't let me know -- well, I understand why he is

24    making the application.  I'm not familiar with the legal

25    standard.

1      THE COURT:  I'm not, either.  If you were having a

2  conversation with Mr. Georgiadis's lawyer and he says this is

3  what Fotis wants and you tell him no, he can't have it, and he

4  goes back and repeats the same thing to Mr. Georgiadis, where

5  is the attorney-client privilege?

6      The privilege, as I understand it, comes from the

7  client imparting knowledge and information on which the lawyer

8  bases his advice.  It doesn't seem to be applicable to the

9  government telling Mr. Georgiadis's attorney what the

10  consequences are.  Do you agree with that?

11      MR. MASTER:  Yes, that is certainly correct.

12      THE COURT:  What more do you want than that?

13      MR. SHARGEL:  I don't want to go further.  I just want

14  to introduce this, which essentially memorializes -- I'm

15  confident that it's accurate -- what the government is telling

16  the lawyer that is being conveyed to him.  He's sitting there

17  saying, I don't know, I don't know.

18      MR. MASTER:  I don't know what is ultimately conveyed

19  to Mr. Georgiadis, but I do know that --

20      THE COURT:  You do know what you conveyed to his

21  attorney.

22      MR. MASTER:  Absolutely.

23      THE COURT:  And you're not claiming privilege on it,

24  you can't claim privilege on it.

25      MR. MASTER:  Absolutely no.

1         MR. SHARGEL:  I am offering into evidence Defendant's

2    Exhibit A210.

3         MR. MASTER:  Your Honor, with respect to that, I would

4    like an opportunity to make a brief review of the case and

5    consult with my appeals unit.

6         THE COURT:  You don't need him to do that.

7         MR. SHARGEL:  No, that's fine.  I can publish this at

8    a later time.

9         MR. MASTER:  Absolutely.  In the event we don't oppose

10   or your Honor rules it is admissible, we could publish it at

11   any point and would be able to deal with it.

12        THE COURT:  Mr. Srebnick, you wanted to raise

13   something before.  I didn't want to cut you off.

14        MR. SREBNICK:  It doesn't deal with Mr. Georgiadis.

15   It deals with the tape.  We can take it up after Mr.

16   Georgiadis, at your pleasure.

17        THE COURT:  I don't think we will get through with Mr.

18   Georgiadis today.

19        MR. MASTER:  I think we will.

20        THE COURT:  I stand corrected.

21        MR. SHARGEL:  I'm done and the other defendant is

22   going.

23        THE COURT:  You're going to be brief, right?

24        MR. SREBNICK:  Briefer than Mr. Shargel.  I think I

25   will be very brief.

1    THE COURT:  Do you want to take up the issue?  I don't

2  want to foreclose you.

3    MR. SREBNICK:  Sure.  Judge, these relate to the

4  tapes, what we call the wiretaps.  They are marked -- they are,

5  I believe, on your lectern; I believe it was left for you --

6  government exhibits in the 700 series.  In particular, the one

7  I would like the Court to look at is 700-5-T.  It's a

8  transcript.

9    THE COURT:  Mr. Srebnick, I have Defendant's Exhibits

10  90, 91, and 92 here.

11    MS. COHEN:  We are passing up a copy, your Honor.

12    THE COURT:  Go ahead.

13    MR. SREBNICK:  What that relates to are tape

14  recordings of Donna Levy's voice with some other individuals.

15  The 700 series, the first two, which is 700-1 and 700-2, we

16  believe address the EWPI events, that's the Emerging World

17  Pharma.  Number 3, number 4, number 5, meaning 700-3, -4, -5,

18  appear not to deal with EWPI; we understand the government to

19  take the position it deals with a different stock, MCGI.  As

20  well as number 6, which makes a passing reference to EWPI but

21  also deals with MCGI.

22    Could I ask the Court to turn its attention in

23  particular to 700-5, and in particular the bottom of page 2.

24    THE COURT:  Page 2 of 5?

25    MR. SREBNICK:  Yes, please.

1          THE COURT:  Donna joins the conversation with sales.

2          MR. SREBNICK:  Yes.  Donna Levy is speaking to Phoebe.

3   Phoebe says, "What's going on?"

4          Levy says, "Not too much.  I'm trying to explain to

5   him there's a particular situation that I cannot say, because

6   if I told you this information, it would be true inside

7   information."

8          Then the dog is barking.

9          "There's something that's going to happen that is

10  going to be monstrous after about three or four days.  I've

11  tried to explain it to him the best I could without saying it

12  because I could not say it."

13         Next page.

14         She then says, "So we could go to jail for this, you

15  know what I'm saying?"

16         "I gotcha, I gotcha, I gotcha."

17         Then Donna says, "It's not like normal everyday stuff

18  that happens with these where I could say, you know, let's

19  write about this company and that company.  It's not like that.

20  It's something that's going to be wild."

21         Those statements apparently, according to the

22  government, deal with MCGI, Donna telling this person she can't

23  disclose certain information because it would be inside, it

24  would subject her to jail, etc.  I am objecting for two

25  reasons.

D3BLLEV5

1          THE COURT:  You're objecting to that portion you just

2     read?

3          MR. SREBNICK:  Anything about MCGI.  But I'm

4     highlighting that in particular because I think it's the one

5     that would confuse the jury, this business about inside

6     information, Donna saying she can't disclose it, etc.

7          The government had already told us by letter that it

8     would not be proceeding with the MCGI events.  In a letter

9     dated February 20, 2013, the date before we had our final

10    pretrial conference, the government said in an effort to

11    streamline the trial, the government no longer seeks to

12    introduce proof of the MCGI stock fraud as substantive evidence

13    of the conspiracy charged in Count One of the indictment.  It

14    then goes on in the next page, the government, specifically

15    having previously identified the wiretaps as being the evidence

16    for MCGI.

17         The Court may recall the next day during our pretrial

18    conference the government was abandoning MCGI.  It seems to now

19    be reappearing.  I object.

20         THE COURT:  OK.  Mr. Master.

21         MR. MASTER:  Your Honor, this has been known to the

22    defense for some time that we would be seeking to introduce

23    these tapes.  This tape at issue that makes no specific

24    reference to MCGI.  It's evidence of Donna Levy's means and

25    methods for carrying out this conspiracy.  We are not trying to

1    offer any independent evidence about the operation of the MCGI

2    scheme.  It simply is evidence that she's dealing with and, as

3    Mr. Georgiadis described, she leaks information to other

4    promotors to try to get them to go out on stock in order to try

5    to increase the impact of all the promotions that she's

6    involved in.

7         We're not going to be referencing MCGI in our

8    summation.  This is just simply how she talks about stock and

9    how she talks about her promotions.  It's very straightforward.

10        MR. SREBNICK:  One last point.  The date of the

11   conversation, May 7, 2010, which is after Cardiac, after

12   Banneker, and after EWPI, so it's post events.

13        MR. MASTER:  It's during the charged period of the

14   conspiracy.

15        THE COURT:  The objection is overruled.

16        See you in about five minutes.

17        (Recess)

18        THE COURT:  Marlon, call in the jury.

19        MR. SREBNICK:  Judge, while the jury is coming in,

20   given the Court's ruling on the tapes issue that you just ruled

21   on, we have no objection to the authenticity of the tapes.

22   We're going to sign a stipulation.  I want the record to be

23   clear we're not waiving our object by stipulating.

24        THE COURT:  You're not waiving your objection.

25        MR. SREBNICK:  Understood.

1           THE COURT:  Understood, sir, yes.

2           MR. SHARGEL:  Judge, did I misinterpret something you

3      said earlier?  I asked again for the instruction.  It wasn't

4      like a renewal of the application.  I thought what you said to

5      me after the lunch is you were going to give it.  Was I wrong?

6           When the witness is done.

7           THE COURT:  When the witness is done.

8           MR. SHARGEL:  Thank you.

9           THE COURT:  Did you want it -- I didn't know.  I

10     thought it would be appropriate at the end of the testimony.

11          MR. SHARGEL:  That's fine.  That's fine, Judge.  Thank

12     you.

13          (Witness present)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.

3          Mr. Srebnick, any time you're ready.

4          MR. SREBNICK:  Thank you, Judge.  May it please the

5    Court, and good afternoon, everybody.

6    CROSS-EXAMINATION

7    BY MR. SREBNICK:

8    Q.  Mr. Georgiadis, I'd like to ask you a few questions about

9    the meeting you had in Los Angeles in December of 2011 with

10   representatives of the government.  You know which meeting I'm

11   referring to?

12   A.  Yes.

13   Q.  During that meeting you were discussing with the government

14   several stock investments that you were involved in including a

15   company called ikarma?

16   A.  Yes.

17   Q.  You also discussed with the government your involvement in

18   another stock deal involving DeGreko, that's the pizza company

19   that your family had an interest in that was going public?

20   A.  Yes.

21   Q.  During that meeting in December of 2011 in California, did

22   you discuss with the government your involvement in a company

23   called Empire?

24   A.  Yes -- no.  In 2011?

25   Q.  That's my question.  In 2011, in California, did you tell

D3BLLEV5                    Georgiadis - cross

1    the government about your involvement with the stock deal that

2    we called Empire?

3    A.   No, no, I didn't, no.

4    Q.   During that meeting in December of 2011 in California, did

5    there come a time that the government terminated the meeting?

6    A.   At the end of the meeting, yes.

7    Q.   The meeting ended in a way that communicated to you that

8    the government was not interested in hearing from you any

9    further?

10   A.   I don't know about not hearing me any further but they

11   weren't happy; that's for sure.

12   Q.   The government communicated to you that the information you

13   were giving to the government was not acceptable to the

14   government, correct?

15   A.   I don't know about if it wasn't acceptable, but it didn't

16   go well.  I wasn't truthful at the meeting, no.

17   Q.   The government ended the meeting and that's when you went

18   home and you had this event with your father and you decided

19   you were going to say something different to the government in

20   the future, correct?

21   A.   Yes.

22   Q.   Now, when you eventually negotiated a plea agreement in

23   your favor with the government, isn't it true, sir, that the

24   plea agreement guarantees that you will not be prosecuted for

25   any criminal activity related to the stock that we've called

D3BLLEV5                    Georgiadis - cross

1   ikarma, correct?

2   A.  I thought I was accepting responsibility for everything,

3   but the charge is on Cardiac, yes.

4   Q.  So to make it clear I'm going to repeat the question.

5           The plea agreement that you negotiated with the

6   government, and I believe it is in evidence as exhibit -- it's

7   not in evidence yet.  One moment.

8           THE COURT:  3503-13.

9   Q.  It's not in evidence but I think you saw it, 3503-13.  You

10  understand your agreement with the government means that you

11  will not be prosecuted for any criminal activity in connection

12  with the stock deal ikarma, correct?

13  A.  Yes.

14  Q.  The plea agreement you negotiated with the government

15  roughly a month ago also protects you from being prosecuted for

16  any criminal activity with respect to the stock deal we've

17  called DeGreko, correct?

18  A.  Yes.

19  Q.  In addition, even though you didn't disclose to the

20  government in December of 2011 anything about Empire, you were

21  able to include in the protection you're receiving from the

22  plea agreement that you will not be prosecuted for any criminal

23  activity related to your involvement with the stock deal known

24  as Empire, correct?

25  A.  Yes.

1   Q.  These three companies -- DeGreko, ikarma, Empire -- were

2   stock deals in which Donna and David Levy had no involvement,

3   correct?

4   A.  Yes.

5   Q.  You were facing exposure from the government for three

6   stock deals for which the Levys had no exposure and you've been

7   able to avoid any criminal exposure for those three deals by

8   reaching what Mr. Shargel told you about and you talked about,

9   a substantial assistance agreement, correct?

10  A.  The cooperation agreement?

11  Q.  Yes.

12  A.  Yes.

13  Q.  Now, all three of those companies -- Empire, ikarma and

14  DeGreko -- were the subject of inquiries by the regulators

15  around the years that you were involved with those companies,

16  correct?

17  A.  I believe ikarma and Empire was, yes.

18  Q.  Now, in exchange for your cooperation agreement, you are

19  obligated, if you want to get a 5K1 letter, you are obligated

20  to provide substantial assistance in the prosecution and

21  investigation of another person, correct?

22  A.  Obligated to testify truthfully, provide truthful

23  information about my criminal conduct, fraudulent conduct, and

24  any others that I know of, attend meetings, and present

25  documentation when I'm called upon.

D3BLLEV5                    Georgiadis - cross

1    Q.  Are you familiar with the provisions of 5K1 under the

2    sentencing guidelines, have you studied them, have you reviewed

3    them either with your lawyer or with the prosecutors, have you

4    ever looked at them?

5    A.  No, I haven't.

6    Q.  Isn't it true, sir, that 5K1 requires that you provide

7    substantial assistance in the investigation or prosecution of

8    another person, isn't that what is required under 5K1, or do

9    you simply not know because you've never looked at the

10   provision?

11   A.  I know how I was explained to it in terms that I

12   understand.  I don't know what you mean by substantial.  I

13   don't understand.

14   Q.  Do you know that it's up to the government and the

15   government alone to decide whether you qualify for such a

16   letter, only the government can file that letter for you,

17   right?

18   A.  Yes.

19   Q.  So if you want to obtain the benefit of that letter,

20   whatever it might be, you're counting on the government to go

21   to bat for you; fair statement?

22   A.  If I tell the truth, yeah.  If I testify --

23   Q.  You're counting on the government, correct?

24   A.  To write the letter?

25   Q.  Yes.

D3BLLEV5                    Georgiadis - cross

1   A.  Yes.  They're the ones that write the letter, yes.

2   Q.  And they have the right not to write the letter if they

3   don't want to, correct?

4   A.  If I don't hold my end of the bargain, yes.

5   Q.  They have the total discretion, the government, in deciding

6   whether to write it or not to write it, correct?

7   A.  Like I said, if I go against the agreement, yes, they

8   can -- they will not write it and they don't have to.

9   Q.  Now --

10  A.  As far as I know.

11  Q.  You told the ladies and gentlemen of the jury that the

12  sentencing range to which you're exposed could result in a

13  sentence as high as 25 years in prison, correct?

14  A.  Yes.

15  Q.  And do you know that parole has been abolished?

16  A.  What does that mean?

17  Q.  You know there's no parole, if you are sentenced to 25

18  years, there's no such thing as parole anymore, you'll do just

19  about all of 25 years, maybe a little bit of good time credit,

20  correct?

21  A.  I didn't know that, no.

22  Q.  Do you recall being informed that parole is abolished at

23  the time you entered your plea?

24  A.  I don't remember, no.

25  Q.  OK.  If I could just have a moment.

1        You certainly understood that a sentence of 25 years

2    would be a life altering event for you?

3    A.  Sure, yes.

4    Q.  Married, three children, it's an awfully powerful threat,

5    isn't it?

6    A.  Yes.

7    Q.  And it motivates somebody, doesn't it, having that hanging

8    over your head, it motivates you to please those who can make a

9    difference in the outcome of that situation, right?

10   A.  Motivates me to tell the truth.

11   Q.  It motivates you to get a substantial assistance letter,

12   doesn't it?

13   A.  Motivates me to tell the truth, sir.  Regardless of the

14   outcome of this trial, as long as I tell the truth, I get the

15   letter.

16   Q.  The government -- well, we'll get to that in a moment.

17        Let me ask you this, Mr. Georgiadis:  When you went

18   into the meeting in December of 2011 in California, I thought I

19   understood you to say that you did not believe you had

20   committed any crime in connection with the stock deals; is that

21   a fair statement?

22   A.  Yeah.

23   Q.  Sorry?

24   A.  Yes.

25   Q.  And so at least as of December of 2011, it was your

1    understanding that you had complied with the law with regard to

2    the stock deals, correct?

3    A.  Well, I know there was wrongdoing, but I didn't think it

4    was criminal, no.

5    Q.  Someone had to convince you that what you did was criminal

6    in order to get you to change your story?

7    A.  Sat down with the government and my attorney and I can't

8    get into conversations me and my attorney had.

9    Q.  The government convinced you that what you did was

10   criminal?

11   A.  The government told me --

12   Q.  I'm not asking you what they told you.  Did the government

13   convince you that what you did was criminal?

14   A.  No.

15   Q.  Did what the government tell your lawyer who then told you

16   that what you did was criminal convince you?

17   A.  My lawyer sat me down and explained things to me.  I made

18   my own decision.

19   Q.  Mr. Georgiadis, did you ask your lawyer, your new lawyer in

20   December of 2011 to delay --

21   A.  Of 2012?

22   Q.  I'm sorry.

23   A.  My old lawyer was in 2011.

24   Q.  When did you retain the new lawyer who ultimately

25   negotiated the deal for you?

1   A.  I believe right in the beginning of 2012, like right there,

2   OK, so Ronald Nessum.

3   Q.  Mr. Ronald Nessum was the new lawyer who ultimately

4   negotiated the deal on your behalf, correct?

5   A.  He was the one that was talking with the government, yes.

6   Q.  So that we get the time line, you retain him in

7   approximately January of 2012, correct?

8   A.  Yes.

9   Q.  But you don't actually meet with the government yourself,

10  face to face, for yet another year until January of 2013,

11  correct?

12  A.  I was cooperating through my attorney, sir.

13          THE COURT:  Answer his question.  His question was in

14  2012 -- Mr. Srebnick, correct me if I'm wrong -- you didn't

15  meet with the government?

16          THE WITNESS:  In 2012, no, sir, I didn't, no.

17  Q.  So the first time you meet with the government again is

18  January of 2013, a year after you hired the lawyer, correct?

19  A.  Yes, sir.

20  Q.  And then you end up entering your guilty plea or resolving

21  your case in February of 2013, correct?

22  A.  Yes, sir.

23  Q.  Now, in January of 2013, had you already begun the process

24  of applying for citizenship?

25  A.  Of January 2013?

1    Q.  Excuse me, January of 2012, forgive me.

2              In January of 2012, had you already begun the

3    application process for citizenship?

4    A.  I retained counsel and we had to go through the process

5    because you have to get, you know, FBI fingerprints.  They take

6    like 45 days.  And then you have to, you know, records and so

7    forth.  So it's a process.  So I engaged in the process shortly

8    after retaining my counsel.

9    Q.  Who did you retain first, your criminal counsel,

10   Mr. Nessum, or your immigration counsel?

11   A.  My criminal counsel, Mr. Nessum.

12   Q.  So you had not yet even begun the immigration process when

13   you learned that the government was proposing to prosecute you,

14   correct?

15   A.  There was no proposal of prosecution, sir.  No one accused

16   me of a crime.  And at the same time, you know, I thought I had

17   a good chance at a nonprosecution because we were cooperating

18   and I thought, you know, it was good.

19   Q.  OK.  And, in fact, you thought that what you had done may

20   not have been --

21   A.  Criminal.

22   Q.  -- may not have been right, you didn't think that you had

23   violated the securities laws, correct?

24   A.  I didn't think it was criminal.

25   Q.  You didn't think you violated the securities laws, correct?

1   A.   Yeah.

2   Q.   You didn't think you had committed wire fraud, correct?

3   A.   Yes.

4   Q.   You didn't think you had committed mail fraud, correct, you

5   had to be convinced --

6   A.   Mail fraud?

7   Q.   You didn't think you had committed mail fraud, correct?

8            MR. MASTER:  Objection.

9            THE COURT:  Sustained.

10            MR. SREBNICK:  I'll move on.

11            THE COURT:  Thank you.

12   Q.   Now, so in January of 2012, after you had that California

13   meeting with the government, it was then for the first time --

14   A.   December of 2011 I had the California meeting.

15   Q.   I'll sorry again.  My bad.

16            You have the meeting in December 2011.  You hire a

17   lawyer in January 2012 to represent you in the criminal

18   investigation.  Then you hire immigration lawyer in 2012 to

19   start the process of applying for citizenship.  Correct?

20   A.   Yes, sir.

21   Q.   Did you ask your lawyers to communicate to the government

22   that they delay interviewing you so that you could first

23   complete the immigration citizenship process?

24   A.   No, sir.

25   Q.   Did your lawyer discuss with you that he had asked the

1    government to do that on your behalf?

2              MR. MASTER:  Objection.

3    A.  I can't talk to you about what me and my attorney

4    discussed, sir.

5    Q.  Did your lawyer tell you that the government had agreed on

6    your behalf to postpone interviewing you until you became a

7    U.S. citizen?

8    A.  Did my lawyer tell me that the government?

9    Q.  Yes.

10   A.  I don't remember.

11   Q.  Do you know why, sir, it took an entire year before the

12   government went with you again, wasn't it something you and

13   your lawyer asked of the government that they not interview you

14   until you became a U.S. citizen?

15   A.  Sir, I can't go into conversations I had with my lawyer,

16   but we were cooperating.  I was cooperating through my lawyer.

17   Like I said, after I became an American citizen, flew back to

18   New York, sat down with the government and my attorney at that

19   time, explained my actions, took my responsibility.

20             MR. SREBNICK:  One moment, your Honor.

21             THE COURT:  Yes.

22             MR. SREBNICK:  Your Honor may we have a short side bar

23   on this issue of privilege?

24             THE COURT:  No.  Ask a question.  You already had a

25   side bar on this.  We talked about it at recess.

D3BLLEV5                    Georgiadis - cross

1    Q.  Did your lawyer tell you that you would be subject to

2    deportation, you wouldn't qualify for citizenship if indeed you

3    pled guilty to a federal crime?

4              MR. MASTER:  Objection.

5              THE COURT:  Sustained.

6    Q.  Who told you, if anybody, that it would benefit you to

7    first become a U.S. citizen before meeting again with the

8    government or resolving your exposure?

9              MR. MASTER:  Objection.

10             THE COURT:  Sustained.

11   Q.  Did you know that it was to your advantage to first become

12   a U.S. citizen before meeting with the government again?

13   A.  Sir, after I retained my new counsel, like I said, I wasn't

14   charged with a crime.  I wasn't being charged with a crime.  We

15   analyzed everything.  I did not know my outcome.  I was advised

16   to seek immigration counsel and that's what I did.  And I can't

17   go into depth conversations about my attorney-client privilege.

18   I'm sorry.

19   Q.  Mr. Georgiadis, I'd like to ask you a few questions now

20   about Donna Levy.

21             You knew Donna Levy was the principal or the owner of

22   DML Marketing, you learned that during the course of meeting

23   her?

24   A.  Yes.

25   Q.  And you understood that she would be involved in investor

1    awareness campaigns?

2    A.   Yes.

3    Q.   Promoting --

4    A.   Stock promotion, yes.

5    Q.   And, indeed, part of what Donna Levy did in order to

6    promote stock and create investor awareness was to obtain lists

7    of individuals that were interested in such information about

8    penny stocks, right?

9    A.   That's what she told me, yes.

10   Q.   And, indeed, took great pains to what we call scrub emails

11   to make sure that only folks opting in would receive emails,

12   correct?

13   A.   Yes.

14   Q.   Yes?

15   A.   Yes.

16   Q.   Rather than those spam emails, it was people who wanted to

17   opt in, that was the focus of DML Marketing's campaign,

18   correct?

19   A.   That's what she told me, yes.

20   Q.   You told the jury that some of these promotion campaigns

21   could last a day, it could last a couple days, correct?

22   A.   Yes.

23   Q.   And the whole idea of a promotion campaign, of course, was

24   to generate interest in the stock, correct?

25   A.   To address liquidity in the stock.

1    Q.  To generate volume in a stock that might have been dormant

2    because of low liquidity, correct?

3    A.  Yes.

4    Q.  And Donna seemed to get the job done, right?

5    A.  Yes.

6    Q.  Many of these stocks might have had no activity for months

7    before an investor awareness campaign, right?

8    A.  True, yes.

9    Q.  And that information could be obtained by members of the

10   public, they could see what activity had occurred with this

11   stock prior to the investor awareness campaign, right?

12   A.  If somebody looked, it's public knowledge, yes.

13   Q.  Then you used the term -- I want to make sure we clarify --

14   you talked about level two; do you remember talking about level

15   two?

16   A.  Yes, sir.

17   Q.  Are you referring to the level one, level two, and level

18   three in terms of the different services available for

19   subscribers to gain information about, public information about

20   the transactions involving penny stocks?

21   A.  No.  I was referring to the level two of where you monitor

22   the stock.  So you see the pricing of the stock, the bid and

23   the offer, with the additional market makers stacked on each

24   side, charts, you can see the charts.

25   Q.  Public information if one wants to get it, right?

1   A.  Oh, yeah.  You have to pay, but yes.

2   Q.  That's why I said you can subscribe, meaning Donna can go

3   out and pay and obtain information that anybody can obtain if

4   they want to do the research, correct?

5   A.  Yes, sir.

6              MR. SREBNICK:  One moment, your Honor.

7              THE COURT:  Yes.

8   Q.  You told the jury about an example I thought you used where

9   a stock price was at 50 cents and then somebody might put in an

10  offer at 60 cents?

11  A.  Sure.

12  Q.  And when you say an offer, you mean an offer to sell?

13  A.  Yes.

14  Q.  That means that even though on a particular day the

15  reported price, whatever that means in a penny stock, there may

16  have been no volume, right -- is that the last price, what does

17  price mean?

18  A.  I was giving an example.  I don't know what the price was.

19  Q.  I'm saying in a case where you say the price is 50, is that

20  the last reported price in your hypothetical?

21  A.  It would be the asking price, the offer price, on the

22  right-hand column, right.

23  Q.  So folks are offering to sell it at 50 and then another

24  person might put in an offer to sell it at 60, correct, was

25  that the scenario that you were --

D3BLLEV5                    Georgiadis - cross

1    A.  Folks would be offering to sell it at 50, right.  You would

2    have an offer in at 50 and you can gap up the stock by going

3    right to 60.

4    Q.  If people are willing to sell it at 50 and a new person

5    comes in and offers to sell it at 60, not likely that that 60

6    cents offer to sell is going to be filled if someone is willing

7    to sell it for 10 cents cheaper, right?

8    A.  Yeah, you can see the demand.  That's why I'm saying you

9    can see it on the level two.  There's a 50 cent offer and then

10   you're going to 60, yours is going to execute first.

11   Q.  Now, the whole idea of an investor awareness campaign is to

12   get more and more people interested in the stock, right?

13   A.  Yes.

14   Q.  And it's a public event, correct, it's shot out to anybody

15   who wants to subscribe to this information, correct?

16   A.  Yes.

17   Q.  It's emailed to subscribers, it's put on websites, it could

18   be blogged, correct?

19   A.  Sure.

20            MR. SREBNICK:  If I could just have a moment.

21            Your Honor, I have no further questions of the

22   witness.  Thank you.

23            THE COURT:  Thank you, Mr. Srebnick.

24            Mr. Master.

25   REDIRECT EXAMINATION

1    BY MR. MASTER:

2              MR. MASTER:  First, your Honor, I would offer the

3    defendant's cooperation agreement, 3503-13, into evidence.

4    There have been a number of questions about it.

5              THE COURT:  Any objection?

6              MR. MASTER:  I want the jury to be able to consider

7    it.

8              THE COURT:  3503-13, the cooperation agreement, is

9    received in evidence.

10             (Government's Exhibit 3503-13 received in evidence)

11   Q.  And then I want to ask you a couple questions about this

12   email you sent about the Porsche.  It was A169.

13   A.  Yes.

14   Q.  Do you have a copy in front of you?

15   A.  Yes, I have it here.

16   Q.  What's the date on that email?

17   A.  June 13, 2008.

18   Q.  Fair to say you were upset to learn you had some additional

19   costs associated with the Porsche, right?

20   A.  Yes.

21   Q.  And what was your state of mind when you sent this email?

22   A.  I was upset and angry.

23   Q.  And even after you sent that email, did you continue to

24   work with Zev for -- with Zev at Cardiac Networks?

25   A.  Yes.

1    Q.  And did you continue to have a good working relationship

2    with him?

3    A.  Yes.

4            MR. SHARGEL:  Object to the leading.

5            THE COURT:  Sustained.

6    Q.  How would you describe your working relationship with Zev

7    even after you sent this email about the Porsche?

8    A.  We went back to normal.  We made up.  We had -- we made up

9    beforehand.

10   Q.  And even after this, what role did you ask Zev to serve in

11   at Cardiac Networks?

12   A.  The vice president of marketing and sales.

13           MR. MASTER:  Just one moment, your Honor.

14           Nothing further.

15           THE COURT:  Gentlemen?

16           MR. SHARGEL:  I'm finished.

17           THE COURT:  Mr. Georgiadis, you're excused.  Thank you

18   very much.

19           (Witness excused)

20           THE COURT:  Ladies and gentlemen, you've just heard

21   the testimony of Fotis Georgiadis who is, as you know, a

22   cooperating witness.  I will have further instructions for you

23   at the end of the trial on how to consider the testimony of a

24   cooperating witness, but there is one aspect of his testimony

25   that I want to instruct you on right now.

1    Mr. Georgiadis has pled guilty to charges arising out

2    of this case.  I instruct you now that you are to draw no

3    conclusion or inferences of any kind about the guilt of the

4    defendants on trial here merely from the fact that

5    Mr. Georgiadis pleaded guilty to criminal charges.  His

6    decision to plead guilty was a personal decision for him, and

7    he made that decision about his own guilt.  It may not be used

8    by you in any way as evidence against or unfavorable to the

9    defendants on trial here.

10    Call your next witness.

11    MS. COHEN:  Your Honor, at this time we'd like to read

12    a stipulation into evidence.  And then we're going to play

13    recordings, and we have binders to hand out of the transcripts

14    of the recordings.

15    THE COURT:  OK.  Go ahead, Ms. Cohen.

16    MS. COHEN:  Thank you, your Honor.  It's marked for

17    identification as Government Exhibit S-1.  It's a stipulation

18    by the parties.  It has a heading of the case, and it's

19    stipulated by and between the parties.

20    No. 1.  Government Exhibit 700 is a true and accurate

21    copy of a disk containing recordings and information

22    intercepted pursuant to court authorized interceptions of wire

23    (i.e. telephone) communications over telephone number

24    (917)687-8069.

25    2.  Government Exhibits 700-1, 700-2, 700-3, 700-4,

700-5, and 700-6 are recordings of calls intercepted pursuant

to the court authorized wiretap and are a subset of recordings

contained on Government Exhibit 700.

3.  Government Exhibit 700-1-T, 700-2-T, 700-3-T,

700-4-T, 700-5-T, and 700-6-T are transcripts of the recordings

contained in 700-1, 700-2, 700-3, 700-4, 700-5, and 700-6

respectively.  These transcripts accurately convey the

following information concerning the recordings:  the date and

time of the telephone conversation, the participants in the

conversation, whether the call was incoming or outgoing, and

the number of the other telephone the call was placed to or

from as applicable.

4.  Government Exhibits 520, 521, and 525 are true and

correct copies of recordings of consensually monitored calls

between Joseph Saranello and David Levy maintained in the

custody of a federal law enforcement agent who was supervising

recordings made by Saranello.

5.  Government Exhibits 520-T, 521-T, and 525-T are

transcripts of recordings contained in Government Exhibit 520,

521, and 525 respectively.  These transcripts accurately convey

the following information concerning the recordings:  the date

and time of the telephone conversation and the participants in

the telephone conversation.

It is further stipulated and agreed that Government

Exhibits 700-1, 700-2, 700-3, 700-4, 700-5, 700-6, and actually

1    just ending at 700-6, 520, 521, and 525, and transcripts

2    700-1-T, 700-2-T, 700-3-T, 700-4-T, 700-5-T, 700-6-T, 720-T and

3    721-T, 725-T may be received --

4              THE COURT:  You mean 520, 521, 525.

5              MS. COHEN:  My apologies, your Honor.  520-T, 521-T,

6    and 525-T may be received in evidence at trial and that this

7    stipulation may be received in evidence at trial.

8              A moment, your Honor.

9              THE COURT:  They're received in evidence.

10             MS. COHEN:  Your Honor, it's been signed by the

11   parties and it's marked as Government Exhibit S-5.  We move

12   stip S-5 and the exhibits.

13             THE COURT:  S-5 and the exhibits referred to are

14   received in evidence.

15             (Government's Exhibits S-5, 700-1, 700-2, 700-3,

16   700-4, 700-5, 700-6, 520, 521, 525, 700-1-T, 700-2-T, 700-3-T,

17   700-4-T, 700-5-T, 700-6-T, 520-T, 521-T, 525-T received in

18   evidence)

19             MR. MASTER:  May we distribute the transcript binders?

20             THE COURT:  You may distribute the transcript binders,

21   yes.

22             MR. SHARGEL:  Judge, may we approach?

23             (Continued on next page)

24

25

1          (At the side bar)

2          MR. SHARGEL:  Ms. Hays just came over to me and thinks

3   Mr. Master may have misspoken because when he offered the

4   cooperation agreement, he said defendant's cooperation

5   agreement.  And what Jennifer said was that members of the jury

6   looked over at David.  I don't know.  She has better ears than

7   I do.

8          THE COURT:  What do you want me to do?

9          MR. MASTER:  It's always possible I misspoke.

10          MR. SHARGEL:  I misspeak all the time.

11          THE COURT:  You're forgiven.  Do you want to give me

12   the document and I'll be happy to say it's the cooperation

13   agreement.

14          MR. MASTER:  Absolutely.

15          MR. SHARGEL:  Just get the agreement.  Thank you,

16   Judge.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, some of us make have

3     misspoken.  3503-13 is the cooperation agreement between the

4     government and Mr. Fotis Georgiadis.  It's not a cooperation

5     agreement with anybody else except Mr. Georgiadis.  It's

6     3503-13.

7          OK.  Going to play the tapes now?

8          MR. MASTER:  Yes, your Honor.  May we proceed?

9          THE COURT:  Yes.

10          MR. MASTER:  We'll begin with Government

11     Exhibit 700-1-T.  And if the jury can just turn to that first

12     tab, Government Exhibit 700-1, and it's a call that occurred on

13     April 5, 2010, between Donna Levy and an individual named Sal

14     Fede.

15          (Audio recording played)

16          MR. MASTER:  Now next the government is going to play

17     700-2, and request the jury go to 700-2-T, call on April 6,

18     2010, between Donna Levy and Sal Fede.

19          (Audio recording played)

20          (Continued on next page)

21

22

23

24

25

D3brlev6

1          MR. MASTER:  At this time the government will play

2     Government Exhibit 700-3 and would request the jury turn to

3     700-3-T.  It's a conversation between Donna Levy and Sal Fede

4     on April 30, 2010.

5          (Audio played)

6          MR. MASTER:  Now we are going to play Government

7     Exhibit 700-4, request that the jury follow on 700-4-T, the

8     call taking place on May 7, 2010, between Donna Levy and Sal

9     Fede.

10         (Audio played)

11         MR. MASTER:  Now the government is going to play

12    Government Exhibit 700-5, and it requests the jury to follow

13    along on 700-5-T.  It's a call from later that day, May 7,

14    2010, between Donna Levy and Sal Fede and Jeffrey Hurwitt.

15         (Audio played)

16         MR. MASTER:  Finally, your Honor, at this time the

17    government would play Government Exhibit 700-6 and request that

18    the jury follow along at 700-6-T.  It's a call of May 10, 2010,

19    between Donna Levy and Sal Fede.

20         (Audio played)

21         MR. MASTER:  Your Honor, we are going to play the

22    remainder of the calls later in the trial.

23         THE COURT:  OK.

24         MR. MASTER:  At this time the government calls Michael

25    Swartzburg.

1    MICHAEL SWARTZBURG,

2        called as a witness by the government,

3        having been duly sworn, testified as follows:

4            THE WITNESS:  Michael Charles Swartzburg.

5            THE CLERK:  Please spell your name for the record.

6            THE WITNESS:  Michael, M-I-C-H-A-E-L, Charles,

7    C-H-A-R-L-E-S, Swartzburg, S-W-A-R-T-Z-B-U-R-G.

8            THE COURT:  Please sit down, Mr. Swartzburg, make

9    yourself comfortable.

10   DIRECT EXAMINATION

11   BY MS. COHEN:

12   Q.  Mr. Swartzburg, what is your educational background?

13   A.  I have a Bachelor's degree in business administration from

14   California State University of Northridge with an option in

15   accounting.

16   Q.  Where do you work now?

17   A.  I work at a company called Mack Pharmaceuticals.

18   Q.  In general, what do you do there?

19   A.  I do finance accounting.

20   Q.  Can you give the jury, please, a brief history of your work

21   after graduating from school leading up to your current job.

22   A.  After graduating from California State University at

23   Northridge, I went to a CPA firm, Ernst & Young.  Back then it

24   was one of the Big Six accounting firms.  I stayed there for

25   about four years.  After the third year I transferred to San

1    Jose and continued to work out of that office.  After that, I

2    then went to several companies.  One of those companies was

3    Verifone, Hewlett Packard, Boston Scientific, several other

4    companies.

5    Q.  What happened in or about 2006?  Where were you working?

6    A.  In 2006 I was in Los Angeles.  I was at one point working

7    at a company that is a partner of Cisco.  They make routers for

8    securities and security for those routers.  After that, in

9    about 2007, I went and started doing some different projects.

10   Q.  What project did you learn about in or about 2007-2008?

11   A.  I was working at a project which was meant to produce

12   concert events, musical events, similar to the Live Aid type of

13   event where you would have multiple broadcasts.  After that I

14   continued to do some other musical, entertainment type

15   projects.

16   Q.  At some point did you get introduced to a company called

17   Cardiac Networks?

18   A.  I did.

19   Q.  Where was that?

20   A.  That's right around August of 2008, after I'd finished some

21   of those musical projects.

22   Q.  How did it come about that you were introduced to Cardiac

23   Networks?

24   A.  Through a mutual friend of one of the musical projects, I

25   was introduced to some of the larger shareholders of Cardiac

1  Network.

2  Q.  Who were you introduced to?

3  A.  I was introduced to David Levy, I was introduced to Fotis

4  Georgiadis.

5  Q.  When was the first time you met with David Levy and/or

6  Fotis?

7  A.  To the best of my recollection, it was around August of

8  2008.

9  Q.  Where did you meet in August of 2008 with David Levy and

10  Fotis?

11  A.  They were informal meetings.  I was introduced at I think

12  it was a lunch at a restaurant.

13  Q.  Who was at the lunch meeting?

14  A.  There were, again, a couple of these sort of lunch informal

15  meetings.  At one point I had met with David Levy, Donna Levy,

16  Fotis Georgiadis.  There was another lady named Judy Crowhurst

17  I met with as well.

18  Q.  What was the purpose of these meetings with David Levy,

19  Fotis, Donna Levy, and Judy Crowhurst?

20  A.  It was really just to explore my interest in working with

21  some of the companies that they were affiliated with.

22  Q.  What did David Levy say to you during these meetings?

23  A.  Just that there was a company that he was invested in that

24  needed help, that company was called Cardiac Network, and that

25  it is a company that had potential.

1    Q.  What did he tell you about what his interest was in you

2    vis-a-vis Cardiac Networks?

3    A.  He stated that he was concerned that the company was not

4    being run properly by the then-current CEO and that perhaps I

5    could step in and offer some assistance to be determined.  We

6    kind of explored the different types of ways I might become

7    involved with the company.

8    Q.  What did Donna Levy say at these lunch meetings, at the

9    lunch meeting or some of the other meetings you had?

10   A.  Similar.  She was concerned that the management, the CEO,

11   was not running the company properly but that it had great

12   potential if run by the right person.

13   Q.  After you had a few of these conversations and meetings

14   with Donna Levy and David Levy -- and you said Fotis was there

15   as well, is that right?

16   A.  Off and on.  At least one of the meetings I met with Fotis

17   as well.

18   Q.  What happened after these initial meetings?

19   A.  To the best of my recollection, we decided that I should go

20   up and meet with that then current CEO under the guise of maybe

21   offering assistance with a business plan.  So I flew up

22   probably call it August 18th, 19th, somewhere in that range, to

23   meet with the CEO, Zev Helfer.

24   Q.  We are in 2008, is that right?

25   A.  That's in August of 2008.

1   Q.  Did you meet with Zev Helfer when you flew to California in

2   August of 2008?

3   A.  Yes, I did.

4   Q.  What happened at the meeting with Zev Helfer?

5   A.  He showed me around the company.  He introduced me to the

6   process of cardiac monitoring, showed me the staff.  I asked

7   him for a business plan.  He showed me what he said was his

8   business plan.  Then I went back and sort of reported back my

9   assessment.

10  Q.  Who did you report back to?

11  A.  Again, David Levy and Fotis Georgiadis.

12  Q.  What was the discussions between yourself, David Levy, and

13  Fotis, after you had met with Zev Helfer?

14  A.  They asked if I was interested.  I said I was interested.

15  I said that I could produce a business plan.  They said they

16  could basically have me voted in to replace Zev Helfer.

17  Q.  How did they explain to you that you would be voted in to

18  replace Zev Helfer?

19  A.  They stated that the method for which I would be voted in

20  would be a vote of the shareholders, and that if a majority of

21  the shareholders voted me in, I could then assume the role of

22  CEO.

23  Q.  Did you accept that offer from David Levy?

24  A.  I did.

25  Q.  What happened next?

1    A.   The attorney working I believe with Fotis drew up two

2    documents.  They drew up a shareholder resolution which

3    required shareholders to vote.  They drew up a second, a board

4    resolution.  Assuming the first resolution went through, then

5    they would reconstitute the board of directors with a new set

6    of board of directors.

7    Q.   What was your understanding of who held shares in Cardiac

8    Network and who was entitled to vote at this time?

9    A.   It was my understanding that there were significant

10   shareholders.  One of them was the former CEO, who probably

11   held about call it 33 percent.  There was another significant

12   shareholder by the name of Dwight West, who probably held about

13   call it 16 percent.  Between the two of them, they held about

14   50 percent.  Then, the other 40 to 50 percent was held by

15   perhaps a dozen other individuals.

16   Q.   You say the former CEO.  Who are you referring to?

17   A.   That former CEO is Zev Helfer.

18   Q.   At the time before you came in as CEO, what was your

19   understanding as to who he would what shares in Cardiac

20   Network?

21   A.   It was my understanding that Zev held, again, call it a

22   roughly one-third interest.  You had another shareholder by the

23   name of Dwight West, who held roughly 16 percent or 16 million

24   shares.  There was roughly about 100 million shares, so the

25   math actually works.  There was David Levy and/or company that

1    had, I don't remember the exact number of shares, but between

2    David Levy, Fotis Georgiadis, Fotis's family, several other

3    shareholders that all I guess somehow knew each other, that

4    made up the other 50 percent.

5    Q.  What was your understanding with respect to the shares held

6    by David Levy and his friends and family and Fotis and his

7    friends and family with respect to what type of shares they

8    held?

9    A.  I was introduced to the concept of some shares are what is

10   called free-trading shares, which means you can go out there

11   and trade them or deposit them with a broker, and there are

12   some shares that are restricted from trading either because

13   they weren't registered or for some other reason they were

14   restricted from being able to trade publicly.

15   Q.  Who introduced you to the concept of restricted shares

16   versus free-trading shares?

17   A.  That was discussed in the initial meeting with David and

18   Fotis just so that I understood kind of what I was getting

19   into.

20   Q.  What did David Levy tell you about who held restricted

21   shares in Cardiac Network and who held free-standing shares?

22   A.  It was my recollection that David Levy, Fotis Georgiadis, I

23   suppose Fotis's family, and several others held unrestricted

24   shares, whereas Zev Helfer, Dwight West, I think Eli Gang was

25   the medical director, they held restricted legends on their

1    shares.

2    Q.  What were your discussions about how you were going to be

3    paid if you came in as the new CEO of Cardiac Networks?

4    A.  The discussion, I offered up what I felt was reasonable,

5    and it was agreed that I would get a salary and the opportunity

6    to get shares in the company.

7    Q.  Was there any agreement about how you would get shares in

8    the company at the time before you came in?

9    A.  The initial conversation was stock options and a salary of

10   $250,000, of which only half of it would be paid, the other

11   half deferred, assuming the company was able to raise call it

12   $10 million or more.  Even the half that I was to be paid,

13   obviously it assumed there would be money in the bank to pay

14   me.  Very quickly into the company, there was another

15   discussion about giving me actual shares in lieu of some of

16   that salary.

17   Q.  Who were you having these discussions about your shares,

18   the options, and your salary with?

19   A.  The initial conversation, again, bringing me on board, was

20   with David and Fotis to come into the company, sort of my

21   expectations.  Once I was in the company, that was a discussion

22   that also happened with David and Fotis but mostly with the

23   board of directors.  Eventually, I put forth a communication to

24   the same significant shareholders that had voted me in, I put

25   forth a communication that would discuss me getting more

1    shares.

2    Q.  Let's talk about getting you voted in.  If you could look

3    at what's been marked for identification Government Exhibit

4    201-44 in the binder in front of you.  It should be the first

5    document.

6    A.  Yes.

7    Q.  Without telling us what it says, do you recognize the

8    document?

9    A.  Yes.

10   Q.  What do you recognize it as?

11   A.  These are minutes to a board of directors meeting which

12   also has exhibits.

13   Q.  Does your signature appear on certain of the exhibits?

14   A.  Yes.

15   Q.  Is this a true and accurate copy of the documents as you

16   recall them?

17   A.  Yes.

18          MS. COHEN:  Your Honor, the government moves

19   Government Exhibit 201-44 into evidence.

20          MR. SHARGEL:  No objection.

21          THE COURT:  201-44 is received in evidence.

22          (Government's Exhibit 201-44 received in evidence)

23   Q.  Turn to the first page and explain to the jury what these

24   minutes are about.

25   A.  What these minutes discuss is, again, this resolution and

1    action that was taken.  The first action is to reconstitute the

2    board of directors with a new board of directors and then to

3    delete former officers and replace those former officers with

4    me.

5    Q.  The date of this board meeting is September 4, 2008, is

6    that right?

7    A.  Yes.

8    Q.  You attended this board meeting, right?

9    A.  Yes.

10   Q.  What happened?  What was voted on at this board meeting on

11   September 4, 2008?  Who was deleted and who was added?

12   A.  Who was deleted is Zev Helfer, Eli Gang, and Dwight West.

13   Q.  We see that on the third page of the document?

14   A.  Yes.  And added is myself serving as the CEO/president, the

15   chief financial officer, and adding Keith Rosenbaum as the

16   secretary.

17   Q.  Who is Keith Rosenbaum?

18   A.  Keith is an attorney that was working with Fotis.  He is

19   also one that helped draft these actions.

20   Q.  If you turn to the last page of the minutes, which is the

21   fifth page, is that your signature that appears there approving

22   the minutes?

23   A.  Yes.

24   Q.  If you can turn to Exhibit A to the minutes, which is the

25   next page.  What is Exhibit A to the minutes?

1    A.  It's called an action by unanimous written consent of the

2    board of directors of Cardiac Network.

3    Q.  Is this the action removing Zev Helfer, Eli Gang, and

4    Dwight West?

5    A.  Yes.

6    Q.  And replacing them with yourself?

7    A.  Yes.

8    Q.  Again, on the last page, which is the third page of

9    Exhibit A, is that your signature?

10   A.  Yes.

11   Q.  If you turn a couple more pages you get to Exhibit B of the

12   minutes.

13   A.  Yes.

14   Q.  What is Exhibit B?

15   A.  Exhibit B is the employment agreement that would basically

16   discuss my role in the company, the things that I was going to

17   accomplish, objectives, as far as turning around the company.

18   It also discussed some salary and contemplated some stock

19   options.

20   Q.  The salary being discussed there, you are referring to

21   paragraph 3 on the first page?

22   A.  Yes.

23   Q.  That's the 250 base salary you told us about before taken

24   at half pay?

25   A.  Yes.

1   Q.  If you look at the last page of this employment agreement,

2   which is the fifth page of it, is that your signature there?

3   A.  Yes.

4   Q.  It says it is subject to board ratification, right?

5   A.  Yes, which essentially that is what this board meeting

6   does.  By attaching the exhibits, it essentially ratifies the

7   employment agreement.

8   Q.  What was the state of Cardiac Network's financial affairs

9   when you stepped in as CEO?

10  A.  When I stepped in, the company essentially had no funds to

11  operate.

12  Q.  When you stepped in, did you review the books and records

13  of Cardiac Networks?

14  A.  Yes.

15  Q.  What did you find?

16  A.  I found a lot of money had been spent trying to generate

17  business.  It seemed like it was not working successfully.

18  Q.  What did you do when you stepped in as CEO for money to run

19  the company?

20  A.  One of the requirements for me to step in was there had to

21  be money for me to operate, at least to get started.  Fotis

22  Georgiadis and David Levy agreed to each put in $20,000 to at

23  least get me started when I took office.

24  Q.  Did David Levy and Fotis forward to the Cardiac Networks

25  the $40,000 total they promised?

1   A.  Yes.

2   Q.  Did they get any stock or anything else, a promissory note,

3   any other document in return?

4   A.  Not at that time.

5   Q.  What was Zev Helfer's role when you stepped in as CEO to

6   replace him?

7   A.  The day that I stepped in, I met with Zev to assess his

8   attitude and how he felt about helping the company going

9   forward.  Based on that discussion, I agreed to keep Zev on as

10  a VP of marketing and sales.

11  Q.  Why did you agree to keep Zev Helfer on as a VP of

12  marketing and sales?

13  A.  My role in stepping in really was to help build a business

14  plan.  But Zev Helfer, as long as he cooperated, was helpful

15  with understanding the contracts, the doctors, how the medical

16  devices worked, and how the heart monitoring performed.

17  Q.  When you came on board, what discussions did you have with

18  David Levy about any promissory notes that existed between

19  himself or one of his companies and Cardiac Networks?

20  A.  Within the first two weeks, David had notified me that

21  there was a note outstanding, it was debt, but it was

22  convertible debt, and that I would be receiving a notice that

23  David wished to convert that debt into actual stock per the

24  agreement.

25  Q.  What did you ask him about why he wanted to convert the

1   note into stock?

2   A.  I just asked if there was a purpose.  Of course, coming in,

3   I was concerned that he wasn't going to be able to sell, only

4   because that would affect the stock price and other things that

5   I was concerned about.  He said he needed his converted just in

6   case.

7   Q.  What did he say about whether he intended to sell the

8   shares he was going to convert?

9   A.  He said he did not intend to sell the shares.

10  Q.  Was this discussion with David Levy when he contacted you

11  to say he wanted to convert his note the first time you learned

12  of the promissory note?

13  A.  Yes.

14  Q.  How much was the promissory note for?

15  A.  $200,000.

16  Q.  What did David Levy say about how conversion would work?

17  A.  David Levy said that I would get help from his attorney in

18  verifying the conversion formula.  There is a formula for

19  converting dollars to shares.  I did receive from his attorney

20  a letter that explained how the conversion process worked.

21  Q.  I'm going to ask you to look first in your binder at what

22  actually is in evidence -- you can put it up, Mr. Dinet -- as

23  Government Exhibit 201-1.

24  A.  Yes.

25  Q.  I ask you if you recognize Government Exhibit 201-1.

1   A.  Yes.

2   Q.  What is it?

3   A.  It is a convertible promissory note for $200,000.

4   Q.  Is that the promissory note that David Levy called you

5   about after you first joined the company?

6   A.  Yes.

7   Q.  What is it you see in the first paragraph there?  It talks

8   about Cardiac Network, and then it's an agreement between

9   Cardiac and Date Palm Capital.  What is Date Palm Capital?

10  A.  I believe Date Palm Capital is a company affiliated or

11  controlled or owned by David Levy.

12  Q.  Do you see there is another company there, Bedrock Ventures

13  LLC.  What is Bedrock Ventures LLC?

14  A.  I was under the impression that Bedrock Ventures is a

15  company either controlled or owned or affiliated with Fotis

16  Georgiadis.

17  Q.  Your discussions about this promissory note 201-1 were with

18  David Levy, correct?

19  A.  Yes.

20  Q.  How did it come about that you first saw a copy of

21  Government Exhibit 201-1?

22  A.  My recollection is it was faxed to me, although later I did

23  find it in the files of Cardiac Network.  My first viewing of

24  this I believe was through a fax.

25  Q.  Who faxed it to you?

D3brlev6          Swartzburg - direct

1   A.   That I believe came from David Levy's attorney.

2   Q.   You talked about a letter you received from David Levy's

3   attorney about the note?

4   A.   Yes.

5   Q.   If you can turn to Government Exhibit 201?

6   A.   Dash 6?

7   Q.   Dash 6, which would be the next document in your binder.  I

8   ask you if you recognize the document.  If you do, what is it?

9   A.   This is called a notice of exercise, which to me is really

10  a notice of intent to convert the note into shares.

11  Q.   Do you recognize this document marked for identification as

12  Government Exhibit 201-6?

13  A.   Yes.

14          MS. COHEN:  Your Honor, the government moves

15  Government Exhibit 201-6 into evidence.

16          MR. SHARGEL:  No objection.

17          THE COURT:  201-6 is in evidence.

18          (Government's Exhibit 201-6 received in evidence)

19  Q.   If you can explain to the jury, please, what your

20  understanding -- first of all, did you receive this letter from

21  William Aul on or about September 5, 2008?

22  A.   Yes.

23  Q.   Who was William Aul?

24  A.   William Aul, it is my understanding that that is an

25  attorney working with David Levy.

1    Q.  What did you understand this letter to tell you?

2    A.  I understood this letter basically restated what I had

3    pretty much already known, that there was an attempt to convert

4    the $200,000 note into actual shares.

5    Q.  I ask you to please look at what should be the next

6    document in your binder but maybe one ahead of that, Defense

7    Exhibit A in evidence, A137.

8              MS. COHEN:  I'm sorry, your Honor.  I'll ask some

9    questions and then I'll move it into evidence.

10   Q.  I ask you to look at what's been marked for identification

11   as Defense Exhibit A37.

12             THE COURT:  A37 or 137?

13             MS. COHEN:  A137.  I apologize, your Honor.

14   Q.  Look at this document.  Do you recognize it?

15   A.  Yes.

16   Q.  Is it a true and accurate copy of a letter you received?

17   A.  Yes.

18             MS. COHEN:  Your Honor, the government moves Defense

19   Exhibit A137 into evidence.

20             MR. SHARGEL:  May I have a moment to see that once

21   more?  I have no objection.

22             THE COURT:  A137 is in evidence.

23             (Defendant's Exhibit A137 received in evidence)

24   Q.  Could you tell the jury what is the letter.  Do you recall

25   receiving this letter from Bill Aul to yourself?

1    A.  Yes.

2    Q.  In November 2008?

3    A.  Yes.

4    Q.  What is this letter?  What was your understanding of what

5    this letter meant?

6    A.  To my understanding, this letter is that along with the

7    issuance and the conversion of the note, this letter from the

8    attorney is a requirement to making that shares free of

9    restrictive legends.  In other words, they would be able to be

10   freely traded.

11   Q.  After you got this letter, what happened with respect to

12   the shares at issue in this letter?

13   A.  I believe that I had forwarded this letter along with these

14   various instructions to the transfer agent that is responsible

15   for not only issuing shares but either adding or removing

16   restrictions on the shares.

17   Q.  Before we get to that, let me back up for a minute.  When

18   you first got to the company, you had this conversation with

19   David Levy about the promissory note, right?

20   A.  Yes.

21   Q.  What else did you do with respect to any shares of the

22   company that were outstanding?

23   A.  When I got to the company, as I referred to this

24   100 million shares that were outstanding, some of which were

25   owned by various individuals, I felt that that was too many

1    shares to be outstanding for a new investor to come in.  They

2    would be intimidated by that many shares outstanding.  So I

3    approached the larger shareholders and asked them to sign an

4    agreement to voluntarily reduce their shares in half.

5    Q.  Why were you concerned that there were, as you said, so

6    many outstanding shares?

7    A.  I think a new investor coming into a company doesn't want

8    to feel like they are going to put all this money into a

9    company and have just a very small percentage.  Having less

10   shares outstanding allows that person to come in and have a

11   greater percentage for their money.

12   Q.  At the time when you first came in, did you understand that

13   you needed to look for new investors to get some more money

14   into the company?

15   A.  Yes.  One of the things that is actually built into my

16   agreement is to go out and find funding sources for the company

17   at the time I took office.

18   Q.  Before asking different shareholders to reduce their

19   shares, who did you discuss this idea of share reduction with?

20   A.  I discussed this with David Levy, Fotis Georgiadis, the

21   board of directors.

22   Q.  What did David Levy say with respect to the reduction in

23   shares?

24   A.  After I explained my reasoning behind it in that it would

25   allow me to better approach investors, he thought that that was

1   a good idea.

2   Q.  Did you have a similar discussion with Fotis?

3   A.  Yes.

4   Q.  What did Fotis say about your proposal to reduce the

5   shares?

6   A.  After hearing my proposal, he also agreed to it.

7   Q.  If I can have you look, please, at what's been marked for

8   identification as Government Exhibit 201-40, which is in your

9   binder.  I ask you to look at this document and, if you

10  recognize it, tell us briefly what it is.

11  A.  Got it.  This is a memorandum of agreement.  This is the

12  document that was created to discuss and memorialize the

13  agreement to reduce those shares outstanding.

14  Q.  This is a document that you sent out and was signed by you?

15  A.  Yes.

16  Q.  Is this a true and accurate copy of the document that you

17  sent out?

18  A.  Yes.

19          MS. COHEN:  Your Honor, the got moves Government

20  Exhibit 201-40 into evidence.

21          MR. SHARGEL:  Without objection.

22          THE COURT:  201-40 is received into evidence.

23          (Government's Exhibit 201-40 received in evidence)

24  Q.  Mr. Swartzburg, if you could walk us through this letter.

25  This is written by you, is that right?

1    A.   Yes.

2    Q.   Who was it sent to?

3    A.   Selective shareholders, which essentially is the

4    shareholders that wanted to vote to reduce their shares.

5    Q.   Which shareholders were you asking to vote?

6    A.   Now I'm actually including all the major shareholders,

7    including Zev Helfer, the previous CEO, Dwight West, and the

8    other names that I had previously mentioned as significant

9    shareholders.

10   Q.   If you can walk us through the first paragraph.

11   A.   I basically have a real transparent and tough discussion

12   with the shareholders where I say the company is in jeopardy of

13   shutting its doors, we need to go out and raise money to get

14   funding, that I would like to immediately try and find a

15   $300,000 bridge loan from some source, and that I would like to

16   target 10 to $12 million from venture funds located in the

17   area.

18   Q.   What are venture funds?

19   A.   Venture funds, and this is all sort of in the San Francisco

20   Bay area.  It is very common to have venture funds in that

21   area.  They are the ones who will give money to a small company

22   or startup company before it gets much larger.  That's really

23   considered seed money to really develop the business.

24   Q.   Do you see the second paragraph, where you talk about "Our

25   current capitalization structure of over 116 million shares

1  issued and outstanding"?

2  A.   Yes.

3  Q.   Explain for us what you meant in this paragraph, talking

4  about the float and the stock being volatile.

5  A.   There is 116 million shares outstanding, which means if the

6  shares were at a dollar a share, the company somehow is worth

7  $160 million.  I thought it would be very difficult to bring in

8  new investors with that kind of large amount of shares

9  outstanding and actually get a good valuation.

10         So What this discussed is we want to take down that

11  number but at the same time there are shares that are in the

12  hands of the public.  These are shares that I don't know who

13  owns them, but they are smaller amounts of shares that are

14  traded freely in the public.  I did not want their shares to be

15  affected.  I didn't want to go out to these anonymous people

16  and arbitrarily reduce their shares in half.  This discusses

17  voluntarily reducing the significant shareholders but not

18  messing with the float.

19  Q.   The float refers to the --

20  A.   The shares that are out there in the general public.

21  Q.   You say here the stock is volatile as it is.  What did you

22  mean by that?

23  A.   Volatile basically means the stock at any moment could go

24  up, down, it could go up significantly, down significantly.

25  What I wanted to do was try and create a more stable company

1   and thereby attract investors that might get scared away when

2   the stock price is constantly going up and down.  That is what

3   volatility refers to, the stock price constantly going up and

4   down.

5   Q.  When you look at the next page, that's where you sign it

6   and you talk about Exhibit A?

7   A.  Yes.

8   Q.  Reduction and allocation of shares.

9   A.  Yes.

10  Q.  How much were you asking each of the major shareholders to

11  voluntarily reduce their shares by, what percentage?

12  A.  I was asking them to cut their shares in half.

13  Q.  If you can look at Exhibit A, please, the next page.

14  A.  Yes.

15  Q.  What is shown here in the chart?

16  A.  The chart shows the amount of shares that were then

17  currently owned by each of the people listed, each of the

18  individuals listed.  You see at the top the larger shareholder

19  was Zev Helfer, which was the former CEO.  Those shares would

20  be subject to a 50 percent reduction.

21       After the 50 percent reduction, there would be some

22  reallocation of shares to give me common shares in the company

23  as well as the secretary and another person.  What that did was

24  it meant that I could get shares in the company without having

25  to issue new shares.  It would come out of the reduction.

1    Q.  Do you see under the notes part it talks about, under Zev

2    Helfer, the block of people there and the entities are all,

3    under the notes column, listed as free-trading shares.  What

4    did you mean by that?

5    A.  Correct.  Where I listed them as free-trading shares, I was

6    trying to make the point that those had value and that if we

7    needed to, we may need to pull some of those for this potential

8    bridge loan.  What I was referring to is, as I understood it,

9    those were the shares that did not have restrictions on them at

10   the time.

11   Q.  But the 33 million shares owned by Zev Helfer were

12   restricted shares?

13   A.  Correct.

14   Q.  As well as the shares by Dwight West and Eli Gang, if I'm

15   reading it right, is that right?

16   A.  Yes.  Their shares had restrictive legends on them that

17   would make them not easily tradeable.

18   Q.  How did you get approval from the majority shareholders as

19   listed here to reduce their shares in half?

20   A.  By then I did know more people than when I first came into

21   the company.  Some of those names, for example, Zev, David

22   Levy, John Fisher, who was also a board member, Bedrock

23   Ventures, I was able to approach them directly and have them

24   give me their signatures.  Some of the other ones I didn't know

25   and asked for help to collect those signatures and was able to

1   get help collecting those signatures.

2   Q.  Who helped you collect the signatures for the voluntary

3   share reduction?

4   A.  Fotis Georgiadis helped me collect shares that I believed

5   were owned by his family.  I wasn't exactly sure of the exact

6   relationships other than they had the same last name.  Those

7   shareholders Fotis helped me collect.  There was probably a few

8   names that David Levy helped me track down as well.

9   Q.  Who was included in the names David Levy helped you track

10  down?

11  A.  I don't remember it all exactly.  I think Moty Landau, I

12  believe.  I'm not sure about David Newren, but I believe maybe

13  David Champion possibly.

14  Q.  When you say helped you track down, what do you mean by

15  that?

16  A.  I needed their signatures faxed to me, so I needed somebody

17  to contact them, provide a fax number, and help me get them to

18  fax me their signatures.

19  Q.  Do the rest of the pages of Exhibit A show the signatures

20  that you collected through David Levy and Fotis for the share

21  reduction?

22  A.  Correct.

23  Q.  The promissory note that David Levy had that he was going

24  to convert to shares, were those shares included in the

25  reduction?

1    A.  No.

2    Q.  What were your conversations with David Levy about those

3    shares?

4    A.  There were a couple of points that were made in the

5    discussion whether or not that would be subject.  One is it was

6    a $200,000 promissory note.  By reducing the shares, reducing

7    those shares would be basically forgiving half the note, for

8    example.

9         There was a discussion of if it really was going to be

10   subject, why not just wait and convert after reduction.  In

11   fact, I think what happened was by the time it was issued, it

12   was probably after executing the shareholder reduction

13   agreement anyways.

14   Q.  I'm going to ask you to look at what is in evidence as

15   Government Exhibit 250-30, please.  Mr. Dinet, if you could put

16   that on the screen.  While you are doing that, who was the

17   transfer agent for Cardiac Networks when you came in?

18   A.  We used a company called Standard Registrar and Transfer

19   Company.

20   Q.  Do you recognize Government Exhibit 250-30?  You can flip

21   through it.

22   A.  Yes, I recognize the content of it.  I don't remember

23   actually if I saw this, but I certainly recognize what's in it.

24   Q.  What is shown on the first page of Government Exhibit

25   250-30?

1    A.  That is showing the issuance of the converted note, roughly

2    the $200,000 under the formula converted to 1,888,154 shares.

3    Q.  This was done on top it says November 17, 2008, is that

4    about right?

5    A.  Yes.

6    Q.  Was that before or after the share reduction?

7    A.  The share reduction agreement was, I believe, and I have to

8    go back and look, I think it was October.  By the time we got

9    done executing the submission of the shares and the reduction

10   and then the reissuance, it's around that same time.

11   Q.  But the shares that are shown here, the 1.8 million-plus

12   shares, were not subject to the reduction?

13   A.  No.

14   Q.  If you flip to the sixth page of this document, you will

15   see a fax cover sheet from you to Standard Registrar.

16   A.  Yes.

17   Q.  What is this fax cover sheet?

18   A.  What this does is per the instructions discusses the

19   issuance of the shares.

20   Q.  Whose instructions were they?

21   A.  The shareholder, in this case David Levy.

22   Q.  If you turn to the next page, you see you are faxing the

23   corporate resolution?

24   A.  Yes.

25   Q.  What was that corporate resolution doing?

D3brlev6                    Swartzburg - direct

1    A.   The corporate resolution just further documents the

2    issuance of the shares in accordance with -- it references the

3    note, it references the formula.

4    Q.   On the second page of the resolution?

5    A.   Yes.

6    Q.   The shares were to Date Palm Capital, sent to the law

7    offices of William Aul, is that right?

8    A.   Yes.

9    Q.   You signed this?

10   A.   Yes.

11   Q.   After the reduction in shares, were new share certificates

12   issued to the majority shareholders who voluntarily agreed to

13   reduce their shares?

14   A.   Yes.

15   Q.   What type of shares were issued?

16   A.   The transfer agent, and I'm not going to get into whether

17   it was rightly or wrongly, reissued the certificates at the 50

18   percent reduction but they put restrictive legends on them when

19   the certificates were issued.

20   Q.   What did that mean?

21   A.   That means that regardless of how the shares came to the

22   transfer agent, the transfer agent issued them as if they were

23   restricted from trading, no different from any other new

24   issuance.

25   Q.   Do you know how the certificates for the different majority

1    shareholders got sent out to the shareholders, who received

2    them on behalf of the shareholders?

3    A.   I believe what we decided to do is send them to Bill Aul,

4    who was the attorney, to sort of hold on to them as we

5    continued to restructure the company.

6    Q.   When you say we had these discussions, who are you

7    referring to?

8    A.   It's mostly me, but we did have a board of directors, and

9    everybody who participated seemed to be OK with this attorney

10   holding on to them, especially since they had restrictive

11   legends anyway so nobody could really trade them.

12   Q.   Who attorney with a William Aul?

13   A.   William Aul was David Levy's attorney, but also did some

14   legal services for the company direct.

15   Q.   I'm going to ask you to look at what is in evidence -- so

16   you can put it up on the screen, Mr. Dinet, please --

17   Government Exhibit 250-12.  Do you see there is a note at the

18   bottom there, Mr. Swartzburg?

19   A.   Yes.

20   Q.   It reads, "From Mosaic Hotel in Beverly Hills.  Hi, Amy.

21   Please change down these 4 certs and FedEx them back to me.

22   Thanks.  David."  Do you know anything about any request to Amy

23   from David to send shares?

24   A.   I don't think so.  I don't remember any.

25   Q.   Do you know who Amy is?

1  A.  Amy.  There is an Amy that was at Standard Registrar that I

2  was dealing with, but I don't know if that's the same Amy.

3  Q.  If you can look at what the four certificates are that are

4  included in Government Exhibit 250 that are referred to in the

5  note to Amy from David.  I ask if you ever got these shares

6  back yourself.  There is one, third page, to Moty Landau.

7  Fifth page, there is one to David Champion.  Sixth page, there

8  is one to Kodel Investment.  Seventh page, there is one to

9  David Newren.

10 A.  I don't believe I ever received those certificates.

11            THE COURT:  You did or did not?

12            THE WITNESS:  I did not.

13 Q.  After the reduction, the voluntary reduction, what type of

14 shares did Fotis Georgiadis get, restricted or free-trading?

15 A.  I believe Fotis had unrestricted shares held in Bedrock

16 Ventures, and the certificates that were issued in name to

17 Fotis's what I believe are family members I believe carried a

18 restrictive legend on them.

19 Q.  What conversations did you have with Fotis at the time he

20 received his reduced shares some of which for his family

21 members or for him had restricted and unrestricted stamps on

22 them?

23 A.  He was very upset.  He stated that they went in

24 unrestricted, they should have come back out unrestricted, and

25 he wanted me to help him remove the restrictions.

D3brlev6                    Swartzburg - direct

Q.  What did he say about David Levy's shares that he had

received back after the reduction?

A.  Fotis believed that David had better treatment.  I think he

felt that maybe David had some unrestricted shares and that he

should also, Fotis should also, have unrestricted shares.

            THE COURT:  Ms. Cohen, is this a convenient place to

break?

            MS. COHEN:  It's perfect, your Honor.

            THE COURT:  Ladies and gentlemen, we are going to

break now and resume at 10 o'clock.  Remember the instructions.

No independent research, don't talk about the case.  Safe home

tonight.  See you tomorrow morning at 10 o'clock.  Please leave

the binders right there.  We'll pick them up.  Thank you.

            (Continued on next page)

1          (Jury not present; witness not present)

2          THE COURT:  Are we going to get to the David Levy

3     transcripts tomorrow?

4          MR. MASTER:  No, your Honor.

5          THE COURT:  Let's pick up the books then.

6          MS. COHEN:  We will collect them, your Honor.

7          THE COURT:  Does anybody want to take up anything?

8     You're going to check on the attorney-client matter?

9          MR. MASTER:  Yes, your Honor, I'll check on the issue

10    under U.S. v. GAF, what our position is, and we'll report back

11    to you.

12         THE COURT:  Let me tell you what my position is

13    subject to further argument.

14         MS. COHEN:  Please.

15         THE COURT:  What you told Mr. Georgiadis attorney is

16    not privileged.

17         MR. MASTER:  Absolutely, clearly.  The only issue is

18    the admissibility of the letter as opposed to some other

19    information.  I agree with that statement.

20         THE COURT:  Mr. Shargel?

21         MR. SHARGEL:  The only thing that I was going to say

22    is it even goes beyond the subject of attorney-client

23    privilege.

24         THE COURT:  He is saying attorney-client privilege.  I

25    didn't understand what the claim was.

1          MR. SHARGEL:  I didn't understand the claim either.

2     You have this witness who is saying something different than

3     what the government knows to be the truth of what occurred

4     here.  Whether we say that it's because of GAF or whether we

5     say it's because there is no privilege, the fact is that the

6     government has to make known to the jury, literally, they have

7     to make known that this testimony is contradicted by earlier

8     representations between the government and at least this

9     witness's attorney, the attorneys.

10         There is no question about the fact that certain

11    information was conveyed to him through his attorneys.  There

12    is also agreement that it is coming back saying that he is

13    willing to cooperate, he wants to cooperate, but he wants this

14    year to go by.

15         However we get there, however we get there, the

16    information that is in the Giglio disclosure, a respectful and

17    substantive Giglio disclosure, should be known by the jury.  I

18    believe that those are the true facts as opposed to this

19    hedging and ducking behind the lawyer-client privilege, then

20    sticking his head out.

21         THE COURT:  Nobody asked you to say would you instruct

22    him there is no attorney-client privilege.

23         MR. SHARGEL:  I think I did, Judge.

24         THE COURT:  You asked very generally would I rule on

25    it.  I'm more than happy to rule on it.  You should have called

1    it to the witness's attention, and to my attention, did your

2    lawyer tell you X.  You didn't say that, Mr. Srebnick.

3            MR. SHARGEL:  Mr. Srebnick did say that.  And I said

4    it as well.  I think we both said it.  We can point it out in

5    the record tomorrow.

6            THE COURT:  The record will speak for itself.

7            MR. SHARGEL:  This can be repaired, is the point.

8            MR. SREBNICK:  Judge, from my perspective, the only

9    point beyond the impeachment is to simply communicate to the

10   jury that a benefit was conferred to Mr. Georgiadis that he is

11   not acknowledging.  The government conferred the benefit of

12   delaying this entire investigation so that he could become a

13   citizen.  That is the benefit that the jury needs to know Mr.

14   Georgiadis received, even if he doesn't want to admit he

15   received it, because there is no dispute that he did.  I think

16   that's got to be stipulated to.  Otherwise, we may have to call

17   the lawyer in to the trial, and that would really muck things

18   up.

19           THE COURT:  You can call Mr. Georgiadis back.

20           MR. SREBNICK:  He is going to continue to deny it,

21   apparently.  The government may be our best witness at this

22   point.

23           MR. MASTER:  Your Honor, first of all, I think the

24   Giglio letter speaks for itself, which is why I am going to

25   consult with our appeals unit about this.  I think it conveys

1    exactly what happened.  There was no side deal or secret

2    benefit.  What happened was, as conveyed in the letter, Mr.

3    Georgiadis did retain counsel.

4         We did not charge Mr. Georgiadis, we had no present

5    intention of charging Mr. Georgiadis, although we had

6    subpoenaed him.  I'll note that for the record, Mr. Nessum did

7    say that Mr. Georgiadis wanted to cooperate fully.  He gave

8    factual information via attorney proffer, which is very common,

9    as Mr. Shargel knows and as Mr. Srebnick knows, having

10   represented many defendants who have tried to provide

11   information to the government initially through attorney

12   proffers.

13        He stated, he did state, and this is made clear in the

14   Giglio disclosure, that Mr. Georgiadis would like to come in

15   and cooperate.  He did state that he was in the process of

16   applying for citizenship and requested that the government --

17   he stated that he would not bring Mr. Georgiadis in until that

18   process was completed.  We had no ability to compel him to

19   testify unless we immunized him, which we didn't do.

20        So, that's what happened, not a secret side agreement.

21        THE COURT:  Is any of that attorney-client privilege?

22        MR. MASTER:  Absolutely not.

23        THE COURT:  What about his testimony then to the

24   contrary?

25        MR. MASTER:  His testimony, he was asked about his

 1    discussions with counsel.  That's why I'm going to confer with

 2    the appeals unit.

 3            THE COURT:  His discussions with counsel.  I believe

 4    the attorney-client privilege depends upon the client

 5    communicating with the attorney.  That's what's privileged.

 6    Certainly the communication from the government to Mr.

 7    Georgiadis via his attorney is not privileged under any stretch

 8    of the imagination.

 9            MR. MASTER:  That is true.  The only thing that I

10    don't know about, because I'm not -- Mr. Georgiadis's counsel

11    did not waive the privilege, as indicated in the letter.

12            THE COURT:  What privilege is there?

13            MR. SHARGEL:  It's not the lawyer's privilege.  It's

14    the client's privilege.

15            MR. MASTER:  On behalf of his client.  Your Honor

16    let's table this for the moment.  I will consult with our unit.

17    I think that there is some way in which it's clear what

18    happened will be put into the record.  I hope that we can agree

19    with Mr. Shargel and Mr. Srebnick on how to do that.

20            MR. SHARGEL:  Judge, I hope we can agree also.  I want

21    to put one point before your Honor before we adjourn.  There is

22    a deliberately created false impression that is before the jury

23    right now.  I'll tell you what it is.

24            THE COURT:  What is it?

25            MR. SHARGEL:  That he cooperated through his

1    attorneys.  Yes, I know what an attorney's proffer is and Mr.

2    Srebnick knows what an attorney's proffer is.  But if you look

3    at the two proffer notes, there are two occasions where the

4    attorney comes in, maybe even on the telephone.

5         One, as I recall, doesn't even refer to the Levys at

6    all.  The second does refer to the Levys in the briefest of

7    terms without any detail, without any flesh on the bone.  It's

8    not like, yeah, I'm cooperating because I just want to stay

9    away from the government's offices but I'll tell everything I

10   know to my lawyers, who will make a proffer to the government.

11   It didn't happen that way.

12        This is a farce.  This witness is ducking behind, as I

13   said, a privilege that doesn't exist.  He wants to attribute

14   question 15, that's where he goes to the lawyer-client

15   privilege.  That's why he answered question 15 the way he did,

16   that there is no crime that he ever committed that he didn't

17   get arrested for.

18        Obviously, there are three crimes.  There is the crime

19   with respect to his lying -- well, I don't have to go through

20   all three.  You know them.

21        THE COURT:  You have already addressed all this before

22   the jury.

23        MR. SHARGEL:  I did.  I wasn't satisfied.

24        MR. MASTER:  He can address it at summation.  Your

25   Honor, let's take this up in the morning.  I'm hoping that we

1  will be able to each agreement.

2          THE COURT:  Mr. Srebnick, anything?

3          MR. SREBNICK:  I'm going to consult with my appellate

4  section, as well.

5          MR. SHARGEL:  Which, by the way, is his brother.

6          MR. SREBNICK:  My brother.

7          THE COURT:  Mr. Shargel, could you give us the cites

8  for GAF and McKeon?

9          MR. SHARGEL:  I know there are several GAFs.  If I

10  may, I put in bill of particulars also.  There are two

11  different bill of particulars that had been served.  The

12  question was under the --

13          THE LAW CLERK:  Both Second Circuit cases?

14          MR. SHARGEL:  Yes.

15          THE COURT:  What was GAF?

16          MR. SHARGEL:  I don't remember.  The McKeon is the

17  Irish gun runners case.

18          THE COURT:  He was arrested right after he received

19  communion.

20          MR. SHARGEL:  Right.  The holding of the case is that

21  the government may be subject to admission of a party opponent,

22  or now it's been retitled statement of an opposing party.

23          THE COURT:  OK.

24          MR. SHARGEL:  Thank you, your Honor.

25          (Adjourned to 10:00 a.m., March 12, 2013)

INDEX OF EXAMINATION

Examination of:                              Page

FOTIS GEORGIADIS

Direct By Mr. Master . . . . . . . . . . . . 560

Cross By Mr. Shargel . . . . . . . . . . . . 638

Cross By Mr. Srebnick . . . . . . . . . . . 708

Redirect By Mr. Master . . . . . . . . . . . 725

MICHAEL SWARTZBURG

Direct By Ms. Cohen . . . . . . . . . . . . . 733

GOVERNMENT EXHIBITS

Exhibit No.                                 Received

 S-5, 700-1, 700-2, 700-3, 700-4, 700-5, . . . 729

          700-6, 520, 521, 525, 700-1-T,

          700-2-T, 700-3-T, 700-4-T,

          700-5-T, 700-6-T, 520-T,

          521-T, 525-T

201-44    . . . . . . . . . . . . . . .741

201-6     . . . . . . . . . . . . . . .748

201-40    . . . . . . . . . . . . . . .752

3503-13   . . . . . . . . . . . . . . .725

DEFENDANT EXHIBITS

Exhibit No.                                 Received

3503-16   . . . . . . . . . . . . . . .671

3503-31   . . . . . . . . . . . . . . .683

A137      . . . . . . . . . . . . . . .749

1   A169   . . . . . . . . . . . . . .695

2   C6    . . . . . . . . . . . . . .651

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25