D3crlev1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4           v.                          11 Cr. 62 (PAC)

5   DONNA LEVY,
    DAVID LEVY,
6                                       Jury Trial
                    Defendants.
7   ------------------------------x

8
                                        New York, N.Y.
9                                       March 12, 2013
                                        10:00 a.m.
10
    Before:
11
            HON. PAUL A. CROTTY
12
                                        District Judge
13

14          APPEARANCES

15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  CARRIE H. COHEN
    HOWARD S. MASTER
18       Assistant United States Attorneys

19
    HOWARD M. SREBNICK
20  NOAH FOX
    ALEX ARTEAGA-GOMEZ
21       Attorneys for Defendant Donna Levy

22
    GERALD L. SHARGEL
23  ROSS M. KRAMER
    JENNIFER HAYS
24       Attorneys for Defendant David Levy

25

D3crlev1

|   |   |
|---|---|
| 1 | (Trial resumed; jury present) |
| 2 | MICHAEL SWARTZBURG, resumed. |
| 3 | THE COURT:  Ms. Cohen. |
| 4 | Mr. Swartzburg, you're still under oath. |
| 5 | THE WITNESS:  Yes, sir. |
| 6 | DIRECT EXAMINATION |
| 7 | BY MS. COHEN: |
| 8 | Q.  Mr. Swartzburg, if we could turn back briefly to a document |
| 9 | we talked about yesterday, or you talked about yesterday, which |
| 10 | is in your binder as Government Exhibit 201-40.  It's sort of |
| 11 | in the middle of your binder.  It's the share reduction memo in |
| 12 | the Exhibit A. |
| 13 | A.  Yes. |
| 14 | Q.  Do you see that under Zev Helfer there is a number of |
| 15 | people listed:  Bedrock Ventures, which I believe you said was |
| 16 | Fotis's company? |
| 17 | A.  Yes. |
| 18 | Q.  And David Champion? |
| 19 | A.  Yes. |
| 20 | Q.  Have you ever met David Champion? |
| 21 | A.  No. |
| 22 | Q.  John Fisher.  Then there are some of Fotis's relatives in |
| 23 | the next three, Georgiadises, Kodel Investment, Moty Landau, |
| 24 | David Newren, Date Palm Capital. |
| 25 | A.  Yes. |

1   Q.  After the reduction, were the shares of Date Palm Capital

2   issued restricted or unrestricted?

3   A.  I believe they were unrestricted.

4   Q.  I believe you testified after the share reduction David

5   Levy also converted his promissory note to almost 2 million

6   free-trading shares, right?

7   A.  Yes.

8   Q.  After that happened, what success did you have finding

9   investors for Cardiac Network?

10  A.  I think we had moderate success.  We were able to bring

11  interested investors, accredited investors, into the company,

12  enough to support its base operations.  We still were looking

13  for larger investors to really expand the company.

14  Q.  When you say "we," who are you referring to?

15  A.  I say "we," mostly me.  There was the board of directors,

16  but I was really the one responsible for running the company.

17  Q.  Did you issue press releases regarding the activities of

18  Cardiac Networks during the time you were CEO?

19  A.  Yes.

20  Q.  I'm going to ask you to look at what is marked for

21  identification as Government Exhibit 201-41.  It is towards I

22  believe the beginning of the binder.

23  A.  Yes.

24  Q.  Do you recognize the documents that have been marked

25  Government Exhibit 201-41?

1    A.   Yes.

2    Q.   What do you recognize them as?

3    A.   These are press releases that I would issue whenever I had

4    news to report about the company.

5              MS. COHEN:  Your Honor, the government moves

6    Government Exhibit 201-41 into evidence.

7              MR. SHARGEL:  No objection.

8              THE COURT:  201-41 is received in evidence.

9              (Government's Exhibit 201-41 received in evidence)

10             MS. COHEN:  If we can run through these quickly.  Mr.

11   Dinet, if you could scroll through them.

12   Q.   Who wrote these press releases?

13   A.   I did.

14   Q.   What involvement did Donna Levy have in the press releases?

15   A.   No involvement in the press releases except maybe the

16   introduction.  When I first came on to the company, I wanted

17   everybody to kind of see what I was thinking about in terms of

18   introducing myself.

19   Q.   Other than the initial press release introducing you as the

20   new CEO, what involvement did Donna Levy have in the press

21   releases for Cardiac while you were CEO?

22   A.   None.

23   Q.   Who would decide when to issue a press release?

24   A.   I would.

25   Q.   When would you issue a press release?

1    A.  Generally, if we signed a new contract with a strategic

2    partner or some other event that was worthy of issuing a

3    release for.

4    Q.  You came in I believe in the summer, August, 2008,

5    September 2008?

6    A.  Yes.

7    Q.  In 2009 you were looking for funding, other investors,

8    right?

9    A.  Yes.

10   Q.  What happened to the finances of Cardiac Network through

11   2009?

12   A.  We always sort of were in a fire drill mode.  We did

13   receive money from various sources, investors, and the initial

14   money that I received from Fotis and David Levy.

15   Q.  I'm sorry to interrupt.  How much was that again?

16   A.  That was initially $40,000.  It allowed me to have a staff

17   of about 4 to 6 Cardiac technicians that would monitor heart

18   patients.  It allowed me to have an office manager, someone who

19   oversaw the clinical.  That was about it.

20   Q.  What happened when the fire drills didn't work out?

21   A.  I would either have to seek out money from small investors

22   that would put in 5, 10, $20,000, or I would go to Fotis or

23   David Levy and let them know that we were in need of emergency

24   funding.

25   Q.  What did David Levy say to you when you would ask him for

1    emergency funding?

2    A.  David Levy, especially in the beginning, was very

3    supportive.  He would help out and perhaps give small amounts

4    to money to make payroll.  That was more so in the beginning.

5    Q.  After the beginning, what happened to your requests to

6    David Levy for money?

7    A.  I continued to make requests, and in some cases again I was

8    able to get small amounts to help out.

9    Q.  What did David Levy say to you when you made other requests

10   for money in 2009 to help Cardiac Networks stay on its feet?

11   A.  David Levy did say that it's time for Cardiac Network to

12   stand on its own two feet.  He felt that he had put enough

13   money into the company previously and that it was really up to

14   the company to go out and find new investors and to try to make

15   a business.

16   Q.  Throughout 2009 how much money did David Levy give to

17   Cardiac Networks overall?

18   A.  I can remember, probably again from 2008 through 2009,

19   looking at a revised promissory note of about a hundred

20   thousand dollars.  So I would say about a hundred thousand

21   dollars, including the 20.

22   Q.  What do you mean when you say revised promissory note?

23   A.  After it reached about a hundred thousand dollars, we

24   agreed to put a new promissory note in place that would track

25   the money that had been invested.

1  Q.  When you say we agreed, who agreed to do a promissory note?

2  A.  David Levy and I discussed it and the board of directors

3  was OK with it.

4  Q.  What did the promissory note do?  What did it say?

5  A.  It was a promissory note that would have been similar to

6  the previous promissory note in that it was convertible.  So it

7  would document the amount of money invested as well as that I

8  have a provision for converting to stock.

9  Q.  Who was the promissory note between?

10  A.  It would either be David Levy or Date Palm Capital.  I

11  think it was possibly Date Palm Capital, but I'm not a hundred

12  percent sure.

13  Q.  Would the promissory note be one where Cardiac Network

14  agreed to pay back to David Levy or Date Palm Capital the

15  hundred thousand dollars or agree to convert the note into

16  shares in Cardiac Network, like the first promissory note?

17  A.  Yes.

18  Q.  Was Fotis's name or his company Bedrock Ventures part of

19  that promissory note?

20  A.  No.

21  Q.  What money did Fotis lend to the company in 2009?

22  A.  After the initial $20,000 in 2008, I did go back to Fotis

23  and also ask for additional funding.  I know for sure about

24  $5,000.  It may have been another $10,000, I don't remember.

25  Q.  What promissory note did Cardiac Networks enter into with

1  Fotis for the 5 or $15,000?

2  A.  We did not.

3          MR. SHARGEL:  Objection.

4          THE COURT:  I think it is 5 or 10, not 5 or 15.

5          MS. COHEN:  I thought it was 5 and then there would be

6  another 10.  My apologies.

7  Q.  How much did Fotis lend?  Let's go back over that so

8  there's no confusion.

9  A.  I think it was at least 5,000, and I think there might have

10 been roughly another $10,000, but I don't remember

11 specifically.

12 Q.  What promissory notes did Cardiac Network enter into with

13 Fotis for any amount of money that Fotis lent to Cardiac

14 Networks in 2009?

15 A.  We never did any other notes for Fotis.

16 Q.  What happened in 2010 to Cardiac Networks?  What was going

17 on?

18 A.  In 2010, due to a lack of funding and perhaps an

19 opportunity to look outside the company for newer technologies,

20 we stopped monitoring patients internally.  We continued to

21 monitor patients through an outsourced monitoring program with

22 Kaiser, and it became all about trying to save the business by

23 either looking for someone to acquire the company or some kind

24 of other relationship.

25 Q.  Why were you looking to be acquired or enter into some

1   other relationship with another company?

2   A.   The expenses of running the business the way it was was not

3   working.  We didn't have the money to do it.  So we had to look

4   for other alternatives for the business.

5   Q.   What alternative did you find?

6   A.   One of the things that came up, there were a couple of

7   potential strategic relationships.  But one of the ones that

8   came up strongly was Cardiac Network was approached by an

9   inventor of a new technology that said this person could

10  perhaps create a new cardiac monitor that would be better than

11  the ones we were using perhaps, and it would require us to

12  invest money into a prototype cardiac monitor in order to get

13  this new technology.

14  Q.   What discussions did you have with David Levy about working

15  with this new company to create the new technology?

16  A.   In order to get this new technology, it required an

17  investment.  I approached David Levy, investors, about trying

18  to get roughly a couple hundred thousand dollars that was being

19  asked for in order to invest in this new technology.

20  Q.   What did Levy say to you when you approached him for money

21  to invest in the new technology?

22  A.   He was not interested until some kind of a prototype or

23  other proof of concept was delivered.

24  Q.   What happened to your discussions with this other company

25  to develop new technology?

1  A.  The discussions led to us investing about 200 or a little

2  over $200,000 into this new technology.

3  Q.  Where did Cardiac Networks come up with the $200,000?

4  A.  Along with this new technology, an investor came forward

5  that said they believed in this new technology and that they

6  would be willing to put in initially $200,000 that was being

7  asked.  But the condition was it had to go to this new

8  technology, it could not be used for Cardiac's operations.

9  Q.  Did Cardiac accept the money and invest it in the new

10  technology?

11  A.  Dollar-for-dollar we took the 200,000 in and immediately

12  wired the 200,000 to the new technology company.

13  Q.  What happened after Cardiac Networks invested in the

14  company with the new technology?

15  A.  The inventor wanted more money before they would deliver

16  anything.

17  Q.  What happened to your employment at this time?

18  A.  Well, the investor, even though the inventor wanted more

19  money, still believed in the technology.  I was skeptical.  I

20  had also found some articles that made me even more skeptical

21  about the new technology.  So I chose to go -- I did not want

22  to support it.  As a result of not supporting it, it created a

23  conflict with me and these new investors.  Ultimately, that

24  conflict led to me being voted out as CEO.

25  Q.  When were you voted out as CEO of Cardiac Networks?

1    A.   May of 2011.

2    Q.   You testified earlier that in the beginning you got paid

3    your salary at half rate.  Do you recall that?

4    A.   Well, the deal was I would get paid my salary at half and

5    the rest would be deferred, but only so long as there was money

6    in the account.  After the first month I did receive $10,000,

7    which would have been about a month worth of salary, that first

8    month of September.  But it became obvious that for me to take

9    salary would take away my ability to make payroll for the

10   existing employees, so I stopped taking salary.

11   Q.   You testified earlier that as part of your deal coming in,

12   you were to get some stock or some options in Cardiac Network?

13   A.   Yes.  I received options as part of my initial agreement.

14   But as soon as I stopped taking salary, as part of the share

15   reduction, I was able to receive a little over 2 million

16   shares, actual shares in the company.

17   Q.   What kind of shares did you receive?

18   A.   Those were restricted shares, so I could not sell those.

19   Q.   Why were your shares restricted?

20   A.   They were restricted primarily because I'm considered an

21   insider as the CEO of the company.  So when shares were issued

22   to me as the CEO, they came with a restrictive legend.

23   Q.   I think you also said when you first started at the company

24   you reviewed all the outstanding shares in Cardiac Networks,

25   right?

1    A.   Yes.  I received a list of all of the outstanding shares

2    from our registrar.

3    Q.   What shares did you see that Cardiac had issued to a

4    company American Media?

5    A.   Consistent with when I first got to the company and

6    reviewed an agreement, I noticed that there were about

7    12 million shares issued to a company called American Marketing

8    Complex, which was actually then segregated into a group that

9    was all affiliated with American Marketing Complex.

10   Q.   What person was American Marketing Complex associated with?

11   A.   To me American Marketing Complex and a gentleman by the

12   name of Norman King were indistinguishable.

13   Q.   What did you learn about the shares that had been granted

14   to American Marketing Complex?

15            MR. SHARGEL:  May we have a foundation?  We have no

16   foundation from where he learned it.

17            THE COURT:  I thought he learned it from dealing with

18   the registrar.

19            MR. SHARGEL:  No, I don't think -- well, I don't want

20   to say.

21            MS. COHEN:  I'll rephrase, your Honor.

22            THE COURT:  Thank you.

23   Q.   What did you learn about the shares that had been granted

24   to American Marketing and how did you learn it?

25   A.   When I first came into the company, I was aware of

1  12 million shares issued as part of an agreement with the

2  company and American Marketing Complex and that I believed

3  those shares were -- I know they were restricted, but I didn't

4  believe they should ever have been issued in the first place.

5  Q.  Why did you form the belief that the shares should not have

6  been issued?

7  A.  Under the agreement that the shares were issued under, it

8  said that Cardiac Network would receive some form of value in

9  exchange for those shares.  I don't feel the company received

10  anything of value in exchange for those shares.

11  Q.  What discussions did you have with David Levy about those

12  12 million shares to American Marketing?

13  A.  David Levy knew about the issuance, which was what prompted

14  me to look for them.  David Levy also believed those shares

15  were issued improperly.

16  Q.  Who was responsible for issuing those shares?

17  A.  The previous CEO, Zev Helfer.

18  Q.  What did you do with respect to the 12 million shares that

19  had been issued to American Marketing?

20  A.  Our counsel tried to make some phonecalls to Norman King

21  explaining that we wanted those shares returned, and initially

22  Norman King agreed, but we never got the shares back.

23  Q.  What evidence of fraud did you find by Norman King or

24  American Media with respect to that deal?

25  A.  I believe they misled the company as to the value of what

 1  Cardiac Network was supposed to receive in exchange for those

 2  shares.

 3  Q.  What evidence of fraud did you find with respect to Zev

 4  Helfer and his decision to enter into that agreement?

 5  A.  No evidence, just bad decisions.

 6  Q.  I think you said when you came in as CEO you made Zev

 7  Helfer the VP of worldwide marketing, is that right?

 8  A.  Yes.

 9  Q.  When you made the decision to make Mr. Helfer VP of

10  worldwide marketing, was that before or after you had become

11  aware of the issue with the American Marketing shares?

12  A.  After.

13  Q.  Turning to the stock price of Cardiac Networks during the

14  time that you were CEO, in the beginning what was the stock

15  price?

16  A.  We were what is called a penny stock, so we were trading,

17  as I remember, maybe 20 cents a share seemed to be about an

18  average.

19  Q.  What had David Levy said to you in the initial discussions

20  you had with him before you joined the company about the share

21  price?

22  A.  I was informed that the share price at one point had been

23  trading as high as call it dollars per share instead of pennies

24  per share and there was a belief that that stock price could

25  eventually go up if the company rebuilt its business.

D3crlev1                    Swartzburg - direct

Q.  In the beginning, when you became the CEO of Cardiac

Networks, the share price, you said, was in pennies?

A.  About 20 cents a share, yes.

Q.  What happened to the stock price during the time you were

at Cardiac Networks as its CEO?

A.  It did fluctuate.  It went up, it went down.  There were a

couple of times it went up a lot, but mostly it stayed roughly

between 20 and 30 cents a share, sometimes as low as 10 cents a

share.

Q.  When were the few times that you recall the share price

went up a lot?

A.  Probably once a year, I think in 2009 and in 2010, there

were spikes.  Certainly in 2010.

Q.  Let's start with 2009.  What did you see regarding the

stock price in Cardiac Networks in 2009?

A.  I can remember at least once where the stock price did go

up, doubled, maybe as high as 40 centers a share.  At that same

time the volume of shares also increased.

Q.  What do you mean by the volume of shares?

A.  Aside from setting a price per share, when stock is traded

publicly there is a number of shares that trade in a given day.

Cardiac Network may have had call it 10,000 shares trading on a

given day.  When the price went up, the amount of shares that

traded went up as well.

Q.  How long did the stock price of Cardiac Network stay up at,

1    I think you said it was doubled up to 40 cents?

2    A.  I don't remember specifically, but it was more in days,

3    maybe a week.  It didn't stay up for very long, and it slowly

4    came back down again.

5    Q.  What was going on at Cardiac Networks that might have

6    caused an increase in the stock price, a doubling in the stock

7    price?

8    A.  Just regular operating activities.  Just, again, trying to

9    build the business.

10    Q.  Was there any big contract or any big event that would have

11    caused the stock price to double?

12    A.  Nothing that I could say was out of the scope of normal

13    building the business.

14    Q.  What conversations did you have with David Levy in 2009

15    when you saw the stock price double for a couple of days?

16    A.  Either as the price was going up or going down, I would ask

17    David Levy and the other investors if they were doing any

18    activity that would have cause the price to fluctuate.

19    Q.  What did David Levy say to you when you asked him why the

20    stock price was fluctuating in 2009?

21    A.  He said he wasn't doing any activity that would cause that

22    to happen.

23    Q.  Why did you ask David Levy about what he knew about why the

24    stock price was going up?

25    A.  I asked David Levy and other major shareholders because

1    they were the ones who had large blocks of stock.  They were

2    the only ones I could ask.

3    Q.  You said you asked other investors.  Did you ask Fotis why

4    the stock price was going up?

5    A.  Yes, I also asked Fotis Georgiadis, and he replied that he

6    was not doing any trading activity as well.

7    Q.  You said there was a second time that the stock price of

8    Cardiac Networks went up, and I believe you said that was 2010?

9    A.  Yes.

10   Q.  What do you recall the stock price going up to and what do

11   you recall about the volume?

12   A.  That one I also recall the stock price going up.  I'm sure

13   it went up at least to 40, maybe even as high as 50 cents a

14   share, from recollection.  The volume was also significantly

15   higher during that period of time as well.

16   Q.  What was going on in the company at the time in 2010 when

17   you recall the stock price getting as high as 40, maybe 50

18   cents, the volume being high?

19   A.  Again, similar, just business-building activities.

20   Q.  Was there any big event or big news that would have caused

21   the stock price to go up?

22   A.  Nothing that I could say specific to that.

23   Q.  What discussions did you have with David Levy when the

24   stock price went up again in 2010?

25   A.  Made similar inquiries, as I wanted to understand if there

1   was anything that either David Levy or Fotis Georgiadis was

2   aware of that would cause these swings.  Again, I was told that

3   it's nothing that they are doing.

4   Q.  Who said there is nothing that they are doing?  Do you

5   recall what David Levy said in sum or substance?

6   A.  He said he's not selling and Fotis said he was not selling.

7   Q.  When you saw the stock price go up in 2010, did it also go

8   back down?

9   A.  It did.

10  Q.  How long did it take to go up and go down?  How many days

11  was that?

12  A.  The actual cycle of going up and going down may have been a

13  little longer.  I almost want to say it was more like a month

14  than a week, for example.

15  Q.  I showed you and we went through a little bit Government

16  Exhibit 201-41, which were all the press releases you issued

17  when you were at Cardiac Networks, right?

18  A.  Yes.

19  Q.  Other than the press releases, what other promotional

20  material did you issue on behalf of Cardiac Networks when you

21  were its CEO?

22  A.  I did not issue any other materials.

23  Q.  What familiarity do you have with websites about penny

24  stocks?

25  A.  I don't.

D3crlev1                    Swartzburg - direct

1    Q.   What newsletters or email subscription services did you

2    subscribe to regarding penny stocks when you were at Cardiac

3    Networks?

4    A.   There were none that I subscribed to.

5    Q.   I'm going to ask you to look at Government Exhibit 102-6

6    through 102-23, which are all in evidence.

7         MS. COHEN:   Mr. Dinet, if we could start with 102-6.

8    A.   Yes.

9    Q.   Mr. Swartzburg, do you recognize Government Exhibit 102-6?

10   A.   No.

11   Q.   You have never seen it before?

12   A.   No.

13   Q.   Do you know anything about Best Stock Report?

14   A.   No.

15   Q.   Can you look at Government Exhibit 102-7.  Have you ever

16   seen Government Exhibit 102-7 before?

17   A.   No.

18   Q.   That's again a penny stock newsletter tracking from Best

19   Stock Report.

20   A.   During the time I was at Cardiac, I've never seen this.

21   Q.   Cardiac traded under the ticker symbol there CNWI, is that

22   right?

23   A.   Correct.

24   Q.   I ask you to look at Government Exhibit 102-8.  Have you

25   ever seen Government Exhibit 102-8?

1    A.  No.

2    Q.  This is dated September 4, 2009, right?

3    A.  Yes.

4    Q.  Do you see where it says, "CNWI could have its biggest day

5    ever tomorrow"?

6    A.  Yes.

7    Q.  Do you know what is being talked about in this newsletter?

8    A.  No.

9    Q.  I ask you to look at Government Exhibit 102-9.  Have you

10   ever seen Government Exhibit 102-9 before?

11   A.  No.

12   Q.  This is dated September 8, 2009, is that right?

13   A.  Yes.

14   Q.  Talking about the special bonus pick-up week, talking about

15   CNWI, do you see that?  Do you have any knowledge of that?

16   A.  No.

17   Q.  If you can please look at Government Exhibit 102-10.

18   A.  Yes.

19   Q.  Have you ever seen Government Exhibit 102-10 before?

20   A.  No.

21   Q.  Do you see it's talking about "Are you ready?" and it talks

22   about "CNWI is an extraordinary phenomenon.  At this point the

23   gains are so huge and easy, there is to do is just to shrug

24   your shoulders and laugh."  Any clue about what is going on,

25   being talked about in this newsletter?

1    A.  No.

2    Q.  Look at government Exhibit 102-11.

3    A.  Yes.

4    Q.  It's dated September 13, 2009, titled "This newsletter is a

5    pick of the week.  Do not miss out this time."  It's talking

6    again about CNWI.  Any knowledge about anything in this

7    newsletter Government Exhibit 102-11?

8    A.  No.

9    Q.  Look at Government Exhibit 102-12.

10   A.  Yes.

11   Q.  This is dated September 16, 2009.  "Important update on

12   CNWI.  Please read."  It's talking about "CNWI launched off in

13   the morning is at a new high of 94 cents."  Any idea what is

14   being talked about in this newsletter?

15   A.  No.

16   Q.  Look at Government Exhibit 102-13.

17   A.  Yes.

18   Q.  This is dated September 16, 2009.  It talks about "CNWI

19   back on track."  Any knowledge of this newsletter, Government

20   Exhibit 102-13?

21   A.  No.

22   Q.  Look at Government Exhibit 102-14.  This is dated September

23   9, 2009.  This is a Monster Penny Stock.  Have you ever seen

24   this before?

25   A.  No.

1   Q.  Do you know what is being talked about when they talk about

2   "CNWI is an extraordinary phenomenon" exclamation point?

3   A.  No.

4   Q.  Can you look at Government Exhibit 102-15.

5   A.  Yes.

6   Q.  This is another newsletter from MonsterPennyStocks.com.

7   Ever heard of MonsterPennyStocks.com?

8   A.  No.

9   Q.  This one is dated September 12, 2009.  Again, it is with

10  CNWI being number 1, the pick of the week.  Any knowledge about

11  Government Exhibit 102-15?

12  A.  No.

13  Q.  If you can look at Government Exhibit 102-16.

14  A.  Yes.

15  Q.  This is again from Monster Penny Stocks dated September 7,

16  2009.  It's talking again about stock price of CNWI.

17  A.  Yes.

18  Q.  Any knowledge about Government Exhibit 102-16?

19  A.  No.

20  Q.  Did you ever authorize any of these emails and newsletters

21  we have been looking at?

22  A.  No.

23  Q.  Look at Government Exhibit 102-17, which is another Monster

24  Penny Stock newsletter dated September 11, 2009.  It's talking

25  about "CNWI exploded right out of the gate this morning and

1    reached as high as 73 cents."  Do you have any knowledge of

2    what's written here in Government Exhibit 102-17?

3    A.  No.

4    Q.  Look at Government Exhibit 102-18, again from Monster Penny

5    Stock, dated September 2, 2009.

6    A.  Yes.

7    Q.  It talks about "The monster is out of its cage.  CNWI has

8    tendencies to just burst huge on any given day, as you can tell

9    from looking at the chart's history."  Do you have any

10   knowledge about anything in Government Exhibit 102-18?

11   A.  No.

12   Q.  Looking at Government Exhibit 102-19, which is another

13   email from Monster Penny Stocks, or newsletter, sorry, from

14   Monster Penny Stocks, dated September 11, 2009.

15   A.  Yes.

16   Q.  "Everyone needs to pay attention" exclamation point,

17   exclamation point.  It's talking about CNWI had its best chart

18   in the whole market.  Do you know anything about Government

19   Exhibit 102-19?

20   A.  No.

21   Q.  Looking at Government Exhibit 102-20, this is another

22   MonsterPennyStocks.com newsletter.  This one is dated September

23   9, 2009.  It's talking about CNWI and its diagnostic devices

24   and stock price.  Any knowledge about Government Exhibit

25   102-20?

1    A.  No.

2    Q.  Look at Government Exhibit 102-21, please.

3    A.  Yes.

4    Q.  This is another Monster Penny Stock newsletter dated

5    September 14, 2009.  Have you ever seen this before?

6    A.  No.

7    Q.  It's talking about "CNWI launched off this morning and hit

8    a new high of 94 cents."  Do you have any knowledge about

9    Government Exhibit 102-21?

10   A.  No.

11   Q.  Looking at Government Exhibit 102-22, which is a Monster

12   Penny Stock newsletter dated September 3, 2009, "CNWI was a

13   Monster as promised."  Do you know anything about this

14   newsletter?

15   A.  No.

16   Q.  You didn't authorize any of these newsletters, did you,

17   from Monster Penny Stocks?

18   A.  No.

19   Q.  Looking at Government Exhibit 102-23, this is again Monster

20   Penny Stock and it's dated September 9, 2009.  "CNWI is the

21   stock of steel."  Do you know anything about Government Exhibit

22   102-23?

23   A.  No.

24   Q.  Now I'm going to have you look at another exhibit.  We will

25   move it into evidence subject to connection later, but we are

1    allowed to publish it per our discussion with defense counsel.

2              MS. COHEN:  There is going to be a stipulation about

3    it later, your Honor.

4              MR. SHARGEL:  What number is that?

5              MS. COHEN:  605-7.  Pursuant to the stipulation the

6    government will read in evidence, Government Exhibit 605-7 was

7    issued from best damn penny stocks email address.

8    Q.  Do you know what Best Damn Penny Stocks is?

9    A.  No.

10   Q.  Ever heard of it before?

11   A.  No.

12   Q.  If you look through these emails from Best Damn Penny

13   Stocks, actually, if you look at the second one, for example,

14   which shows that it was sent on September 2, 2009, from

15   BestDamnPennyStocks.com, it talks about CNWI.  Do you have any

16   knowledge about anything in this email signed Sincerely, staff

17   at BestDamnPennyStocks.com"?

18   A.  No.

19   Q.  Did you ever authorize any emails to be sent out from Best

20   Damn Penny Stocks about CNWI while you were its CEO?

21   A.  No.

22   Q.  If you can turn to the next page.  Look at the top.  It's

23   another email sent on September 2, 2009, about CNWI.

24   A.  Yes.

25   Q.  Actually, if you go through this whole exhibit, have you

D3crlev1          Swartzburg - direct

1  ever seen any of these emails from Best Damn Penny Stocks about

2  CNWI, which were all sent out in 2009?

3  A.  No.

4  Q.  If you can look at what's been marked for identification as

5  Government Exhibit 605-6A, which again is subject to a

6  stipulation we will read into evidence and then move it in at

7  that time.  Pursuant to the stipulation, these are emails sent

8  in something called Monster Stock.  Have you ever heard of

9  Monster Stock.com?

10 A.  No.

11 Q.  Did you ever authorize any emails to be sent out from

12 MonsterStock.com?

13 A.  No.

14 Q.  I'm sorry.  Monster Penny Stock.

15 A.  No.

16 Q.  Let me start again.  Do you know what Monster Penny Stock

17 is?

18 A.  No.

19 Q.  Did you ever authorize any emails from Monster Penny Stock

20 regarding anyone at Cardiac Networks while you were its CEO?

21 A.  No.

22 Q.  Again, if you look through all of these emails which are

23 marked Government Exhibit 605-3, they are sent out in September

24 of 2009.

25          MR. SHARGEL:  Could we could the exhibit number again?

1  Q.  I'm sorry.  605-6A.  If you look at all these emails that

2  are printed out and marked for identification as Government

3  Exhibit 605-6A, they are all from an email address staff at

4  MonsterPennyStock.com.  Do you have any knowledge of any of

5  these emails?

6  A.  No.

7  Q.  Did you ever authorize any of these emails to be sent out?

8  A.  No.

9  Q.  Do you have any idea who the emails were sent to?

10 A.  No.

11 Q.  Do you have any idea who was responsible for sending the

12 emails?

13 A.  No.

14 Q.  If you can now turn in your binder to Government Exhibit

15 102-24.  These are in evidence.  Now we are in the 2010 time

16 period.  If you can look at the first document, Government

17 Exhibit 102-24, which is a newsletter from something called

18 Penny Stock Picks.  "CNWI could have you proposing by the end

19 of the week."

20      If you turn the page to the second page, it talks

21 about Cardiac Network.  "You may very well asked for CNWI's

22 hand in marriage over the next few days."  It talks about "Time

23 to do own due diligence on CNWI for tomorrow's trading day."

24 Do you have any knowledge of the any of the content here in

25 Government Exhibit 102-24?

1  A.  No.

2  Q.  Did you ever authorize any information to be put up on

3  Penny Stock Picks about CNWI?

4  A.  No.

5  Q.  If you can look at what is in evidence as Government

6  Exhibit 102-25.  This is again Penny Stock Picks.  This goes

7  back to 2009, September.

8  A.  Yes.

9  Q.  If you go to the second page, it talks about

10  "congratulating the savvy investors that took part in the CNWI,

11  a monstrous 200-plus win."  Do you have any knowledge about

12  Government Exhibit 102-25?

13  A.  No.

14  Q.  Did you authorize or ask Penny Stock Picks to put any

15  information up about CNWI?

16  A.  No.

17  Q.  Look at Government Exhibit 102-26.  Now we are in February

18  2010 again, and this is Penny Stock Legend.  You don't know

19  what Penny Stock Legend is, do you?

20  A.  No.

21  Q.  Again it's talking about CNWI and about "My new huge pick

22  is Cardiac Network, Inc."  Do you have any knowledge about

23  Government Exhibit 102-26?

24  A.  No.

25          MS. COHEN:  A moment to confer, your Honor?

1          THE COURT:  Yes.

2   Q.  Before we looked at these various newsletters and emails,

3   you talked about when you were looking for investors in 2009.

4   You also, I think, spoke earlier about there was some

5   volatility in the stock price of Cardiac Network when you first

6   came in.

7   A.  Yes.

8   Q.  What effect did the volatility in the stock price have on

9   your ability to find new investors for Cardiac Networks?

10  A.  The volatility, which really represents stock not just

11  going up but going up and down, does scare away investors

12  because it creates a little uncertainty in whether or not their

13  investment is going to have a nice steady increase versus

14  whether it could go up or down at any given time.

15  Q.  You said you had some shares in Cardiac Network when you

16  left?

17  A.  Yes.

18  Q.  What happened to your shares in Cardiac Network?

19  A.  I still have my shares.

20          MS. COHEN:  One moment, your Honor?

21          THE COURT:  Yes.

22  Q.  You still have your shares in Cardiac Network, you just

23  said?

24  A.  Yes.

25  Q.  What is the value of those shares?

1    A.   Zero.

2              MS. COHEN:  No further questions.

3              THE COURT:  Mr. Shargel.

4              MR. SHARGEL:  Yes, thank you, Judge.

5    CROSS-EXAMINATION

6    BY MR. SHARGEL:

7    Q.   We have been spending the last, I don't know, 15 minutes

8    going through each one of these exhibits and you were asked

9    questions about each one of the exhibits.  Obviously, you

10   remember that, right?

11   A.   Yes.

12   Q.   The common question that was asked again and again was did

13   you have any knowledge or did you authorize those reports to

14   issue information about Cardiac Network, correct?

15   A.   Correct.

16   Q.   You said you had no knowledge of it, right?

17   A.   True.

18   Q.   You are familiar with industry analysts, right?  You have

19   heard about stock analysts, correct?

20   A.   Yes.

21   Q.   A stock analyst sometimes specializes in the study of

22   various industries, right?

23   A.   Yes.

24   Q.   You knew that there was competition out there in the heart

25   monitoring world, if I may say that, correct?

1   A.  Yes.

2   Q.  You spoke a few minutes ago about new technology, right?

3   A.  Yes.

4   Q.  That was not some state secret.  People were looking at a

5   new technology, right?

6   A.  Yes.

7   Q.  Mr. Swartzburg, do you know of any requirement that an

8   analyst must tell you or get your permission to recommend a

9   stock?

10  A.  No.

11  Q.  If there is a newspaper article about a new technology and

12  a company that is the subject of the article, is the newspaper

13  writer supposed to get your authorization before he writes the

14  story?

15  A.  No.

16  Q.  Does the newspaper writing supposed to get your permission

17  before he writes the story?

18  A.  No.

19  Q.  What about a company like Merrill Lynch?  They recommend

20  stock, right?

21  A.  Yes.

22  Q.  If Merrill Lynch were to recommend stock, do they need to

23  get your permission?

24  A.  No.

25  Q.  Do they have to make certain that you as the CEO of the

D3crlev1                    Swartzburg - cross

1   company have knowledge of the recommendations they are making?

2   A.  No.

3   Q.  In other words, people who are in the business of

4   recommending stocks are free to recommend stocks without your

5   knowledge or participation, right?

6   A.  Right.

7   Q.  I'd like to go actually back to another subject, if I may.

8   The government had in evidence yesterday afternoon

9   Exhibit 201-40, and this morning again.  Do you want to take a

10  look at that in your binder.  201-40.

11  A.  Yes.

12  Q.  I'm going to show you what's been marked for identification

13  as Defense Exhibit A128.

14          MR. SHARGEL:  May I, Judge?

15          THE COURT:  Yes, you may.

16  Q.  I'm going to ask you to look in this situation at every

17  page.  I'm going to ask you if you recognize the document.

18  It's the same document as the government exhibit, correct?

19  A.  Yes.

20  Q.  The government went over this.  This was your plans, plans

21  that you had.  If you could refer to the document in evidence,

22  the government's version, this was the plan that you had to try

23  to revive the company, to revive its health, right?

24  A.  Yes.

25  Q.  One of the principal ideas that you had was a share

D3crlev1                    Swartzburg - cross

1    reduction program, right?

2    A.  Yes.

3    Q.  In other words, instead of owning 2 shares of stock, making

4    it as simple as possible, with the reduction program it would

5    be 1 share of stock, right?

6    A.  Yes.

7    Q.  This would increase the price and make it a more attractive

8    investment perhaps, right?

9    A.  Yes.

10   Q.  That's one of the things you were striving for, right?

11   A.  Yes.

12   Q.  There were also plans to have a lockup of certain stock,

13   right?

14   A.  There was what I will call a gentleperson's understanding

15   that the people participating in this would as part of the

16   share reduction also refrain from trading.

17   Q.  The participants were the investors and the major

18   shareholders, right?

19   A.  Yes.

20   Q.  Those are the people whose gentle cooperation, if I may use

21   that, the gentle cooperation you were seeking and obtaining,

22   right?

23   A.  Yes.

24          MR. SHARGEL:  If I may approach?

25   Q.  On Defense Exhibit 128 you know what it means to sign in

1    parts, right?

2    A.  Yes.

3    Q.  Signing in parts means, does it not, that everyone doesn't

4    have to get together, all the gentlepeople don't have to get

5    together at the same time to sign the document, correct?

6    A.  Correct.

7    Q.  They can send in a signature page with just their signature

8    and it's appended to the document, right?

9    A.  Right.

10   Q.  Back to 128.  I ask if you recognize this.  I'm going to

11   direct your attention to the last page.  I ask you if you

12   recognize that as part of that document.

13   A.  Yes.

14          MR. SHARGEL:  I offer Defense Exhibit A128 in

15   evidence.

16          THE COURT:  It's already in evidence.  I thought you

17   said it is admitted, A128.

18          MS. COHEN:  Your Honor, if I could understand what the

19   difference is?

20          MR. SHARGEL:  The difference is that Mr. Levy's

21   signature, I don't think we saw Mr. Levy's signature on this

22   document before I introduced.

23          THE COURT:  That is the difference between the two?

24          MR. SHARGEL:  That's the difference.

25          THE COURT:  OK.  A128 is received in evidence.

1                (Defendant's Exhibit A128 received in evidence)

2                MR. SHARGEL:  Thank you.  May we have it.  May we go

3    to the last page of that, right there.  And could you highlight

4    the signature on the right.

5    Q.  Do you recognize the signature, sir?

6    A.  Yes.

7    Q.  Whose signature do you recognize it to be?

8    A.  David Levy.

9    Q.  This is on behalf of Date Palm Capital, his company, right?

10   A.  Yes.

11   Q.  "Shareholder" means shareholder in Cardiac Network, right?

12   A.  Yes.

13   Q.  The date is 10-12-08, right?

14   A.  Yes.

15                MR. SHARGEL:  May I retrieve it, your Honor?

16                THE COURT:  Yes.

17   Q.  In other words, Mr. Levy agreed to this share reduction

18   program, right?

19   A.  Yes.

20   Q.  He agreed that he would take this step along with other

21   shareholders to try to help this company succeed, right?

22   A.  Yes.

23   Q.  Because that was the objective, to make what you thought

24   was a good idea, right?

25   A.  Yes.

1   Q.  You believed in the product, right?

2   A.  Yes.

3   Q.  You have long business experience, right?

4   A.  Yes.

5   Q.  You have an exquisite résumé of various companies that you

6   worked for and executive positions you held at those companies,

7   right?

8   A.  Thank you, yes.

9   Q.  A résumé you can be proud of, right?

10  A.  Yes.

11  Q.  This was one of your ideas because you believed in the

12  product, the heart monitor that was I guess the capstone of

13  this entire investment, right?

14  A.  Yes.

15          MR. SHARGEL:  We can use this A128 in evidence.

16  Jennifer, if we could have the first page.

17          MS. COHEN:  Your Honor, if I can clarify that.

18  Government Exhibit 201-40 on the last page is exactly the same

19  and has the same signature.

20          MR. SHARGEL:  Maybe there was something wrong with my

21  copy.

22          THE COURT:  If it's the same, it's the same.

23  Q.  No question about the fact that, whichever copy you're

24  looking at, Mr. Levy's signature is on the copy, right?

25  A.  Yes.

D3crlev1                    Swartzburg - cross

1   Q.  Because you have an independent recollection that Mr. Levy

2   had agreed to this, right?

3   A.  Yes.

4   Q.  Another step that you were taking, if we could go down the

5   page to item 1 and if we could highlight item 1, another

6   important step to try to get the company, to use your words

7   that you attribute to Mr. Levy, back on its feet or on its feet

8   was that 12 million shares, I'll read the whole thing, "the

9   surrendering of 12 million shares issued as part of a recently

10  voided transaction."  Do you see that?

11  A.  Yes.

12  Q.  What they are talking about, what you are talking about in

13  this agreement is the situation that you have at American

14  Marketing, right?

15  A.  Yes.

16  Q.  The man who was involved with American Marketing, that you

17  identified as being American Marketing, was a man named Norman

18  King, right?

19  A.  Yes.

20  Q.  This occurred during the stewardship of Mr. Helfer, right?

21  A.  Yes.

22  Q.  When Mr. Helfer was the CEO?

23  A.  Yes.

24  Q.  Voiding the 12 million shares, surrendering those

25  12 million shares and rendering them void, in other words, like

D3crlev1          Swartzburg - cross

1  they didn't exist, right, was an important part of your plan as

2  well, right?

3  A.  Yes.

4  Q.  To have the company regain its financial health?

5  A.  Yes.

6  Q.  Mend its financial fences, right?

7  A.  Yes.

8  Q.  Now I'm going to show you what's been marked for

9  identification as Defendant's Exhibit A121-A.  I put that

10  before you and ask if you recognize it.  The agreement, by the

11  way, that we just saw on the screen, I'll refer to A128, the

12  government version as well, that was dated in October of 2008,

13  correct?

14  A.  Yes.

15  Q.  I ask you if you recognize this document that I just put in

16  front of you.

17  A.  Yes.

18  Q.  What do you recognize it to be?

19  A.  This was my initial assessment of what I believed could be

20  done with the company.

21  Q.  Was that a PowerPoint presentation?

22  A.  Yes.

23          MR. SHARGEL:  I offer it into evidence, your Honor.

24          MS. COHEN:  No objection.

25          THE COURT:  A121-A is in evidence.

D3crlev1                    Swartzburg - cross

1              (Defendant's Exhibit A121-A received in evidence)

2    Q.  The first page, Cardiac Network, Inc., this is your work,

3    correct?

4    A.  Yes.

5    Q.  Shareholder proxy and company turn-around, right?

6    A.  Yes.

7    Q.  That is exactly what you wanted to do, you wanted to turn

8    around the company and make it profitable, right?

9    A.  Yes.

10   Q.  This is update August 19, 2008, do you see that?

11   A.  Yes.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. SHARGEL:  Can we have the next page, please.

2      Could we have the first item in bullets.

3      Q.   Now, one of the things that you wanted to do, and your

4      word, immediately, was transition of current CEO to temporary

5      advisory role.  Right?

6      A.   Correct.

7      Q.   Essentially you were kind of gently pushing him out of the

8      company, right?

9      A.   Yes.

10     Q.   Because he wasn't a very good CEO at all, was he?

11     A.   I didn't think so.

12     Q.   You remember, I think you said on direct examination that

13     one of the first meetings that you had with Mr. Helfer when you

14     sat down with him assuming your new role as CEO was to discuss

15     the business plan?

16     A.   Yes.

17     Q.   And he had a one-page document?

18     A.   Yes.

19     Q.   You remember that it was a one-page document, right?

20     A.   Maybe one and a half, but yes.

21     Q.   In your experience, with your resume, you haven't seen too

22     many one page or one page and a half business plans, right?

23     A.   Correct.

24     Q.   That was pretty, if I may use the word, shallow, right?

25     A.   Yes.

1    Q.  And you realized full well after those initial

2    conversations with him that this really wasn't helping the

3    company, he wasn't a guy who's really helping the company,

4    correct?

5    A.  I believe Zev Helfer had a good knowledge of the monitors

6    and the doctors but not the business.

7    Q.  He wasn't a businessman?

8    A.  Correct.

9    Q.  Fair statement?

10   A.  Fair statement.

11   Q.  So the next, actually, the third bullet going down, again

12   showing that this was part of your plan for rehabilitation was

13   to pursue surrender of any unauthorized issuance of Cardiac

14   Network Inc. shares, i.e., 12 million shares to marketing

15   consultant.  Right?

16   A.  Yes.

17   Q.  Now, I'd like to ask you, if I may.

18        MR. SHARGEL:  May I have a moment, your Honor.

19   Q.  I want to show you what's been marked for identification as

20   Defendant's Exhibit A211.  Do you recognize that?

21   A.  I recognize it.

22   Q.  What do you recognize it to be?

23   A.  This is a long time ago, but I recognize it as discussions

24   around these 12 million shares and how we're going to try and

25   get them back.

1   Q.  And this is a an email that's dated October 30, 2008,

2   correct?

3   A.  That's an email from our attorney, counsel.

4   Q.  Getting the shares back was an important objective, right?

5   A.  Yes.

6   Q.  And you knew and this exhibit that I put in front of you

7   was contemporaneous with what was occurring in connection with

8   the effort to get the 12 million shares back?

9   A.  Yes.

10            MR. SHARGEL:  I offer it into evidence.

11            MS. COHEN:  No objection, your Honor.

12            THE COURT:  A211 is in evidence.

13            (Defendant's Exhibit A211 received in evidence)

14   Q.  Now, the issuance of the 12 million shares was really a

15   topic of consternation, if you will?

16   A.  Yes.

17   Q.  One of the issues was would an investor, would an investor

18   invest with regard to what happened with the 12 million shares,

19   right?

20            THE COURT:  I don't understand the question.

21            MR. SHARGEL:  I'm going to withdraw the question.

22   Q.  Give me your words.  What was the problem with the

23   12 million shares and the fact that they had been issued?

24   A.  I had two problems with it.  One, it just increases the

25   number of shares outstanding, which in this case I didn't feel

1    was appropriate.

2    Q.  And it dilutes the shares, right?

3    A.  It dilutes the existing shareholders.

4    Q.  What was the other problem with it?

5    A.  The other problem was I didn't think that we received value

6    in exchange for those shares.  So even if the dilution had come

7    with value, it may have been a different story.

8    Q.  So when you say it didn't come with value, I want to drill

9    down on this a little further, if I may.

10           12 million shares were issued to American Marketing,

11   right?

12   A.  Correct.

13   Q.  And in return for 12 million shares, I think you said on

14   direct examination that they didn't receive anything really of

15   value, right?

16   A.  Yes.

17   Q.  But what they did receive was $7.8 million worth of

18   advertising and media credits, right?

19   A.  That's what the contract said, yes.

20   Q.  Well, you smile.  The idea of receiving $7.8 million worth

21   of advertising and media credits to a company that had less

22   than a hundred thousand dollars in the bank didn't make a whole

23   lot of sense, right?

24   A.  Right.

25   Q.  And in fact it was valueless, right?

1   A.  I believe so.

2   Q.  Even though it was a large sum of money by anyone's

3   standard, you couldn't pay salaries with it, right?

4   A.  Right.

5   Q.  You couldn't buy new heart monitors, could you?

6   A.  No.

7   Q.  You couldn't rent new office space, could you?

8   A.  No.

9   Q.  You couldn't increase the staff that would receive the

10  calls when someone was having a cardiac event, couldn't do

11  that, right?

12  A.  Correct.

13  Q.  In other words, it was worthless to the company?

14  A.  I believe so.

15  Q.  Now, there came a time -- and, by the way, could you define

16  for us, if you're able to, I'm sure you're able to, dilution of

17  the shares?  I want to go back.  What does that actually mean?

18  A.  What that means, if a company is worth whatever value is

19  assigned to it, the more shares that are outstanding the more

20  each -- the less each individual share is worth.

21  Q.  That's an adverse result, correct?

22  A.  To each individual share.

23  Q.  The shareholders would be losing out, right?

24  A.  The ones that didn't get the diluted shares would be losing

25  out.  The ones that got the extra shares would benefit.

D3CLLEV2                    Swartzburg - cross

1    Q.  Get an advantage that they're not entitled to; fair

2    statement?

3    A.  Yes.

4    Q.  So did there come a time when there was a -- by the way,

5    there was actually one more thing that I'd like to call to your

6    attention in connection with Defendant's Exhibit A11 now in

7    evidence.  Could we have that up.  A211, I'm sorry.

8            Now, this was an email authored by you?

9    A.  Yes.

10           MR. SHARGEL:  Could we sharpen the focus and come

11   closer.

12   Q.  This was -- stop right there, please -- this was from you

13   to the Georgiadis Group and Mr. Levy, right, Mrs. Levy, Judy

14   Crowhurst.

15           Judy Crowhurst introduced you to Mr. Levy, didn't she?

16   A.  Yes.

17   Q.  And she was a head hunter of sorts?

18   A.  Yeah, I guess.  She was a lot of different functions, I

19   suppose.

20   Q.  She's the one that came to you, it wasn't Mr. Levy, she's

21   the one that came to you and said, she made no --

22   A.  A networking person.

23   Q.  She was a networking person?

24   A.  Yes.

25   Q.  You're not one of those guys on LinkedIn, are you?

D3CLLEV2                    Swartzburg - cross

1          MS. COHEN:  Objection.

2          MR. SHARGEL:  Withdrawn.

3    Q.  So you're saying that I just don't feel right calling

4    public attention to a bad transaction that all have agreed

5    should be voided.  How could we possibly justify to the public

6    the issuance (and related dilution) of 12 million shares as

7    zero?  Would the people that have purchased shares in the last

8    two months decided differently if they know about the

9    12 million shares?  Fortunately, I don't think we need to go

10   there.  I am comfortable disregarding the 12 million shares

11   based on the representations and agreements made by Norman and

12   the unauthorized nature of the deal.

13          In other words, this was a topic that was making you

14   feel, as CEO, uncomfortable, right?

15   A.  Yes.

16   Q.  And how it would look for the company out in the market,

17   right?

18   A.  Yes.

19   Q.  OK.  Do you remember there coming a time when Norman King

20   and you said -- I don't remember the exact words, but on direct

21   examination you said that, what, dishonest man; is that an

22   overstatement?

23   A.  Yes, I'm sorry.  What was the question again?

24   Q.  Was he a dishonest man?

25   A.  I believed he was dishonest with the company.

1    Q.  That's what you were concerned with, the company, right?

2    A.  Correct.

3    Q.  Did there come a time when Norman King and American

4    Marketing brought a lawsuit?

5    A.  Yes.

6    Q.  And you had voided the 12 million shares, right?

7    A.  For purposes of the company and what I was representing, I

8    voided the transaction, did not accept those media credits, and

9    then attempted to get back the certificate.

10   Q.  And you wanted to be done with Norman King, right?

11   A.  Correct.

12   Q.  And Norman King had the temerity, the nerve, to bring a

13   lawsuit to retain the 12 million shares, right?

14   A.  He brought a lawsuit not to retain the 12 million shares,

15   but he did bring a lawsuit.

16   Q.  What was the, if you can give us just a short description,

17   what was the nature of the lawsuit?

18   A.  He felt that he was not able to get his restrictions

19   removed so that he could sell those 12 million shares in the

20   open market.

21   Q.  In other words, not only did he want to keep the 12 million

22   shares, he wanted to get them unrestricted so he could go out

23   and sell in the market?

24   A.  True.

25   Q.  So he could make a profit when he hadn't invested a

1   quarter?

2           MS. COHEN:  Objection, your Honor.

3           THE COURT:  Overruled.

4   Q.  Right?

5   A.  Yes.

6   Q.  Because the 7.8 million was like a fantasy, right?

7           MS. COHEN:  Objection, your Honor.

8           THE COURT:  Overruled.

9   A.  I believed it had no value.

10  Q.  Do you remember, sir, that the lawyer asking -- the lawyer

11  who was representing the company in connection with the lawsuit

12  asking you to help with the defense of the lawsuit?

13  A.  Yes.

14  Q.  And do you remember actually sitting down and crafting an

15  answer to the lawsuit?

16  A.  Yes.

17  Q.  And not only an answer, but counterclaims against Mr. King?

18  A.  Yes.

19  Q.  And counterclaims against Mr. Helfer too, right?

20  A.  In the context of a lawsuit, yes.

21  Q.  Let me, well, that invites, that begs a question.  Let me

22  ask it from here.

23          Well, when you were helping in connection with

24  preparing the defense, you were being honest, weren't you?

25  A.  Yes.

1    Q.  You were being truthful, right?

2    A.  Yes.

3    Q.  You wouldn't deliberately tell a lie either to the lawyer

4    or incorporate a lie into the answer, right?

5    A.  No.

6    Q.  Let me show you what's been marked for identification as

7    Defendant's Exhibit A57, and I ask if you recognize that and

8    the document that's underneath.

9    A.  Yes.

10   Q.  What do you recognize it to be?

11   A.  It was sharing the proposed, because I understand it never

12   actually got filed, but the proposed countersuit.

13   Q.  And the proposed countersuit is something that you worked

14   on along with the lawyer, right?

15   A.  With the lawyer, yes.

16   Q.  And supplied the facts to the lawyer, right?

17   A.  Yes.

18   Q.  And then you sent it on through that email to David Levy,

19   right?

20   A.  Yes.

21        MR. SHARGEL:  I offer it in evidence.  Remind me of

22   that number please, A57.  I offer A57 into evidence.

23        MS. COHEN:  No objection, your Honor.

24        THE COURT:  A57 is received in evidence.

25        (Defendant's Exhibit A57 received in evidence)

1      MR. SHARGEL:  First page, could you zoom in on that.

2   Q.  To David Levy from you, Mr. Swartzburg?

3   A.  Yes.

4   Q.  And, Hi, David.  This is in March of 2011.  Hi, David.

5   Attached is the original -- it's email mistakes.  You meant to

6   say complaint, right?

7   A.  Yes.

8   Q.  Not compliant.  OK.  So previously provided and the

9   countersuit we will file.  If there is anything you would like

10  to see included, please let me know.

11      So could we -- and then you actually had the answer

12  and the counterclaims, right?

13  A.  Yes.

14      MR. SHARGEL:  Now, let me have page 3, if I may.

15  Page 3 of the counterclaims, paragraph 14.  Could you zoom in

16  on paragraph 14, please.

17  Q.  "In response to the allegations contained in paragraph 14,

18  defendants admit the terms of the June 25, 2008 agreement as

19  the same are contained therein."

20      The agreement was you had to agree that there was such

21  an agreement because Zev Helfer signed it, right?

22  A.  Yes.

23  Q.  However, defendants deny the remaining allegations, and

24  then there's some lawyer talk.  Let's get to this sentence

25  starting with "this conspiracy."

1          "Plaintiff's principal, Norman King," meaning the

2     plaintiff was American Marketing, right?

3     A.   Yes.

4     Q.   "And the then chief executive officer of Cardiac Network

5     Inc., Zev Helfer, acting in collusion" -- you know what that

6     word means, together, right?

7     A.   Yes.

8     Q.   "In collusion as part of a scheme to defraud others,

9     including defendants, and to pump up Cardiac Network's balance

10    sheet by adding 7.8 million phantom value in an attempt to make

11    the company more attractive to investors, obtain loans and

12    realize gains for both Mr. Helfer and Mr. King by means of the

13    scheme described hereafter.  At the time Cardiac Network had

14    less than $100,000 in cash and less than 500,000 in total

15    assets."

16         These are words that you helped author, correct?

17    A.   I helped author that, yes.  It was, again, I can only say

18    that in the context of preparing the lawsuit, I was not the

19    only person who had input into this paragraph.  But as part of

20    the defense team, I helped craft this paragraph.

21    Q.   "If recorded, the 7.8 million would have represented an

22    increase over 1500 percent in the total assets of the company.

23    Mr. Helfer then caused to be issued 12 million shares to Norman

24    King without approval of the board of directors or

25    authorization of Cardiac Network and with no intention or

1    belief by Mr. Helfer or Mr. King that Cardiac Network would

2    ever receive 7.8" -- next page, please.

3            Actually, next page.  I don't want to read the whole

4    thing, but let me ask you about some of the highlights.  "At

5    best, the cash equivalent credits may act as a coupon in

6    combination with cash."

7            In other words, this deal that Mr. Helfer made, not

8    only couldn't you spend the 7.8 million on anything other than

9    advertising credits, but you'd have to give American Marketing

10   even more cash or more money, right?

11   A.  Yes.

12   Q.  So it was an awful deal, wasn't it?

13   A.  Correct.

14   Q.  "But they were worthless to a company with less than

15   $100,000 in the bank, a fact known to both Mr. Helfer and King.

16   The fraudulent and improper issuance of the 12 million shares

17   was at the expense of the then existing shareholders."

18           You said Mr. Levy brought this to your attention and

19   said we got to undo this transaction.  Right?

20   A.  Yes.

21           MR. SHARGEL:  Let me go down to the bottom of this

22   paragraph, just raise it a little.  Still at the end of

23   paragraph 14.  I'm going to go down further.

24   Q.  "When this scheme was discovered, Mr. Helfer was removed

25   from" -- sorry -- "removed from office in August 2008 through a

1   vote and consent of the majority shareholders.  As a result of

2   the discovery of this scheme and conspiracy to defraud,

3   plaintiff was contacted by defendants and agreed to cancel and

4   void the June 25, 2008 agreement."

5           Mr. Helfer wasn't kicked out of the company because he

6   didn't like press releases, that wasn't the reason, right?

7   A.  Correct.

8   Q.  This was the reason, wasn't it?

9   A.  This is the reason that's quoted in the lawsuit.  I had

10  other reasons as well.

11  Q.  In addition to this?

12  A.  In addition to this.

13  Q.  I'm not even going to ask.

14          Let me ask you a question.  Would you have invested,

15  based -- how old are you, by the way?

16  A.  Forty-five.

17  Q.  And based on your long years at least 20 years of business

18  experience, would you have invested five or ten or $20 million

19  in a business with Mr. Helfer at the helm?

20          MS. COHEN:  Objection, your Honor.

21          THE COURT:  Sustained.

22  Q.  By the way, speaking of Cardiac Network, you had a

23  confidential private placement memorandum prepared, didn't you?

24  A.  Yes.

25  Q.  And you made, as common, projections as to the future of

1  the company, right?

2  A.  Say that one more time?  I'm sorry.

3  Q.  Yes.  You were seeking investors all along, right?

4  A.  Yes.

5  Q.  And every time you would meet with investors, I don't think

6  you used these words, but it was kind of like a dog and pony

7  show.  You had to tell about the company, show the monitor,

8  talk about projections, right?  I don't mean to denigrate it by

9  dog and pony show.  You had to come out and try to persuade the

10  investors that this was a good investment.  Right?

11  A.  I don't believe I gave projections, but I certainly talked

12  about the business.

13  Q.  Well, let me show you what's been marked as Defendant's

14  Exhibit 121, A121B, and I ask if you recognize this?

15  A.  Yes.

16  Q.  What do you recognize it to be?

17  A.  It is a confidential private placement memorandum.

18  Q.  Can you explain to the jury and to me what that means?

19  A.  So in order to go out and find investors, what you want to

20  do is give the investors an executive summary, summary of the

21  risk factors associated with investing, give them an accredited

22  questionnaire to make sure they have the financial wherewithal

23  to be able to invest in a risky company.  It's basically a

24  document to go out and find money.

25  Q.  The document that I've asked you to identify that's in

1   front of you, you recognize that, right?

2   A.  Yes.

3   Q.  And were you one of the authors if not the principal

4   author?

5   A.  Yes.

6   Q.  And you see that -- first I have to offer it into evidence.

7           MR. SHARGEL:  I offer --

8           THE COURT:  Mr. Shargel, you asked one of the authors

9   or principal author.  He said yes.  Which one was he?

10  Q.  Which one were you?

11  A.  I am one of the authors.  But, again, I'm the main person

12  who helped write it.

13          MR. SHARGEL:  May I offer it in evidence?

14          THE COURT:  A121B.  Have you seen it, Ms. Cohen?

15          MS. COHEN:  I think I'm looking at a different one.

16          No objection, your Honor.

17          THE COURT:  A121B is in evidence.

18          (Defendant's Exhibit A121B received in evidence)

19  Q.  When you say -- and I'm not quarreling with you -- when you

20  say you were one of the authors, who else at Cardiac at this

21  time, at the time this was created, I don't see a date on it,

22  but at the time this was created, who else was doing something

23  like this?

24  A.  This would had to have been circulated and authorized by

25  the board of directors.

1  Q.  So the board of directors would look at it, but you were

2  the person who actually authored or penned the document, right?

3  A.  Again, I took input from existing materials, from counsel

4  that we had working with me.  But, yes, I like to think I

5  drafted most of it.

6  Q.  Fair enough.  Now, I'd show you what's been --

7          MR. SHARGEL:  Is this up?  OK.  Can we go to page 11,

8  please.  And could we go to that in the first bullets, the

9  second of the three bullets.  Not those bullets.  Right there.

10 Q.  That was a projection, wasn't it, that you see up on the

11 screen?

12 A.  To me a projection is something you could -- this is part

13 of a plan.  I guess I'm confused because usually when I think

14 of projections, I think you put in a little more certainty.

15 And I certainly don't think that's a certainty statement.

16 That's just, that, to me, is aspirational.

17 Q.  Fair enough.  But you felt comfortable -- and, again, I'm

18 not quarreling with this -- putting your aspirations in this

19 important document, right?

20 A.  Yes.

21 Q.  You knew that investors would be, potential investors would

22 be relying on the document, right?

23 A.  Yes.

24 Q.  You expected that potential investors would, among other

25 steps toward due diligence, would read every page of this,

1    that's what your expectation was, right?

2    A.  Yes.

3    Q.  Now, you didn't think you were doing anything wrong when

4    you said three-year plan is to grow annual revenues to over

5    120 million, you didn't think you were doing anything wrong,

6    did you?

7    A.  No.

8    Q.  You didn't think you were out to fool the public, did you?

9    A.  No.

10   Q.  You didn't think you were going to take money from people

11   by fraud and deception or anything like that?

12   A.  No.

13   Q.  Now, you made an investor presentation with other documents

14   on September 17, 2008; do you remember that?  You can take that

15   one down.

16   A.  On that one there's a context there.

17          MR. SHARGEL:  Put it back up.

18   Q.  Tell me the context.

19   A.  Again, there's a second bullet point that says this will

20   only be accomplished if certain things happen such as capturing

21   a certain percentage of the market affected by this disease.

22   It doesn't say we're going to do it.  It says this is a plan

23   and in order to do that, you first have to capture some market

24   share.

25   Q.  That's a perfectly fair and honest statement to make to an

1    investor, right?

2    A.   OK.

3    Q.   In other words, if things fell right -- and maybe that's

4    too loose.  If things worked out the way you wanted them to

5    work out from the time you joined the company, you could reach

6    a goal of $120 million a year, right --

7    A.   Yes.

8    Q.   -- is that a fair statement, yes.

9             Let me show you what's been marked as Defendant's

10   Exhibit A126.

11            THE COURT:  What is it?

12   Q.   A126.  Do you recognize the document?

13   A.   Yes.

14   Q.   What do you recognize it to be?

15   A.   It's an investor presentation dated September 17, 2008.

16   Q.   And were you one of the if not the principal author?

17   A.   Yes.

18            MR. SHARGEL:  I offer it into evidence.

19            MS. COHEN:  No objection, your Honor.

20            THE COURT:  A126 is in evidence.

21            (Defendant's Exhibit A126 received in evidence)

22            MR. SHARGEL:  May we have it up on the screen?

23            THE COURT:  Yes, you may.

24            MR. SHARGEL:  Page, this is page, Bates No. is 54561.

25   Exactly.  So if you would highlight the penultimate bullet,

1  next to last.

2  Q.  "Upon receipt of venture funding proceeds, the plan is to

3  grow total annual revenues to over $140 million by year three."

4       Right?

5  A.  Yes.

6  Q.  Same situation, if things broke right and all your, you

7  know, fence mending worked, you could, the company could have

8  that potential, right?

9  A.  We were -- I believed if we were funded with venture funds

10  and all the other things you said, correct.

11  Q.  So, again, you weren't out to fool anybody, right?

12  A.  No.

13  Q.  These were honestly held beliefs, right?

14  A.  Yes.

15  Q.  The language may not have been as colorful as in the

16  exhibits that the government put up, you know, when asked if

17  you saw this or you saw that, but that was your goal and

18  objective, right?

19  A.  Yes.

20  Q.  Let me show you on December 31, 2008, I'll put before you

21  Defendant's Exhibit A212 and ask you if you recognize this

22  document.

23       MR. SHARGEL:  And I think this will be the last in

24  this series.

25       THE COURT:  We'll take our morning recess then after

1    that, Mr. Shargel.

2              MR. SHARGEL:  Very well.  I'll do this in less than

3    five minutes.

4    A.   This looks like an internally developed business plan.

5    Q.   Internally developed?

6    A.   Yes.

7    Q.   What does that mean as opposed to when you developed it?

8    A.   I mean the purpose of this is for management, me, to have

9    some kind of a business plan to execute.

10   Q.   This is the kind of thing you would have expected Zev

11   Helfer to show you, right?

12   A.   Yes.

13   Q.   And he didn't, right?

14   A.   No.

15   Q.   And your business plan, this business plan, internal, goes

16   to the board of directors, right?

17   A.   Yes.

18   Q.   And goes to major investors, right?

19   A.   I don't remember if I sent it out to investors.

20   Q.   At least the board of directors, right?

21   A.   Certainly the board of directors.

22   Q.   And there was some investors that were on the board of

23   directors as well, right?

24   A.   True.

25   Q.   And we see Section 3, where it says Section 3 -- I didn't

1   offer it.

2           MR. SHARGEL:  I offer A212 in evidence, Judge.

3           Do you want to do this after the break?  Maybe I'm

4   going too fast.

5           MS. COHEN:  No objection, your Honor.

6           (Defendant's Exhibit A212 received in evidence)

7           THE COURT:  Why don't we try to finish.

8           MR. SHARGEL:  Just one page on the Elmo.

9   Q.  You're telling your board of directors, people on the

10  inside that the projections of revenue for year 2009,

11  28 million, and then 2010, 104 million, and then 2011,

12  165 million, and you go on the gross profit margins, how much

13  money the shareholders and everyone is going to realize as a

14  result of this kind of expectation.

15          You weren't trying to fool anyone, were you?

16  A.  The context of this document is not for investors.  The

17  context of this document is to have some kind of objectives to

18  be measured by internally in the company.

19  Q.  What I'm asking you is this was honestly held beliefs on

20  your part, right?

21  A.  Again, this is not a document to discuss my beliefs.  This

22  is a document to present a business plan to management so that

23  we know what we're trying to accomplish.

24  Q.  So what you were trying to accomplish was money in these

25  sums, right, that was your hope and expectation, right?

1   A.   With all the other things falling into place, including

2   venture funding, yes, this was the idea that we wanted to work

3   towards.

4            MR. SHARGEL:  Very well.  May we take the break?

5            THE COURT:  Yes.  Morning break, about ten, 15

6   minutes.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  OK, Mr. Swartzburg.  You can step down.

3    Don't talk to the government now.  You're on cross-examination.

4           Mr. Shargel, did you want to say something?

5           MR. SHARGEL:  I anticipated a question as to how much

6    longer I'd be, and I would say no longer than 15 minutes.

7           THE COURT:  Mr. Srebnick.

8           MR. SREBNICK:  I'll be less than 15 minutes as well.

9           THE COURT:  OK.  See you in about ten minutes.  Thank

10   you.

11          (Recess)

12          THE COURT:  Please be seated.  Mr. Swartzburg will

13   come back.  We'll get started.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Mr. Shargel.

3        MR. SHARGEL:  Your Honor, I've looked at my notes and

4   I have no further questions.

5        THE COURT:  OK.  Mr. Srebnick.

6        Thank you, Mr. Shargel.

7        MR. SREBNICK:  Thank you, Judge.  May it please the

8   Court and good morning, everybody.

9   CROSS-EXAMINATION

10  BY MR. SREBNICK:

11  Q.  Good morning, Mr. Swartzburg.  My name is Howard Srebnick.

12  I have five or ten minutes of questions I'd like to go through

13  with you.

14        I'd like to start with publishing Government

15  Exhibit 102-3.  And while they're putting that up on the

16  screen, what I'd like to do is go through some of the press

17  releases and perhaps all, if I have them organized correctly,

18  all of the press releases that you submitted to the wire, so to

19  speak, so that they would be published.

20        OK, do you know what I'm referring to?

21  A.  Yes.

22  Q.  OK.  Let's take a look at Government Exhibit 102-3 and it's

23  already in evidence, I believe.  If you could just take a look

24  at that and see if you remember having issued the press

25  release?

1    A.  Yes.

2    Q.  OK.  This is a press release dated September 8 of 2009.

3    And do you see that it reports that Cardiac Network (Pink

4    Sheets symbol) reported today that it had expanded the number

5    of sites included in its research study support with Southern

6    California Permanente Medical Group?

7    A.  Yes.

8    Q.  Could you tell the jury what is Southern California

9    Permanente Medical Group?

10   A.  I believe it's part of Kaiser Permanente, which everybody

11   is most familiar with.

12   Q.  For those of us that are not, could you tell us a little

13   bit about Kaiser Permanente?

14           THE COURT:  We're in the east coast.

15           MR. SREBNICK:  East coast/west coast.

16   A.  Kaiser Permanente is primarily considered an HMO.  It's a

17   healthcare provider that insures, that gives people medical

18   insurance, and they also have hospitals, I guess primarily on

19   the west coast, but they're a big healthcare provider.  I

20   thought they're nationwide.

21   Q.  How big is Kaiser Permanente, are we talking a hundred plus

22   million dollar company?

23   A.  The Southern California Permanente group is a smaller

24   subset of what I believe is a larger organization that's

25   nationwide.  I don't know the exact size.

1    Q.  It's an enormous company, right?

2    A.  It's a big healthcare provider, yes.

3    Q.  According to the press release, Cardiac Network has been

4    providing cardiac monitoring for patients in the study since

5    January 2008; do you see that?

6    A.  Yes.

7    Q.  And could you explain to the jury what this study was and

8    why this was an important event to Cardiac?

9    A.  Cardiac Network was under contract to provide cardiac

10   monitoring services to patients as part of a research study

11   that Southern California Permanente Group was doing; but it

12   also presented a chance to present to the larger Kaiser group

13   an opportunity to monitor cardiac patients, again, as part of

14   this larger network.

15   Q.  So was the idea that Cardiac Network by linking up with

16   this very large company, Kaiser Permanente, would give Cardiac

17   access to many, many more patients and, therefore, much more

18   revenues over time?

19   A.  That was the idea, yes.

20   Q.  I'd like to take a look now at Government Exhibit 102-4 and

21   have you take a look at that and see if you recognize it?

22   A.  Yes.

23   Q.  Is this one of the press releases that you authored and had

24   released on to the wire?

25   A.  Yes.

1    Q.  September 10, 2009, Cardiac Network (Pink Sheets) reported

2    today that it is continuing the expansion of its technology

3    development initiatives for its products and services in

4    anticipation of servicing its agreement with American Wholesale

5    Health, or AWH, that was announced on June 22, 2009.

6            Do you see that?

7    A.  Yes.

8    Q.  Could you explain to the jury what this technology

9    development initiative was?

10   A.  We had to create a software and expand the number of

11   Cardiac monitoring stations we had in place so that we could

12   basically monitor more patients around the clock in order to

13   service this initiative.

14   Q.  The next sentence then indicates, The expanded platform

15   will allow AWH to market Cardiac Network's monitoring services

16   to its members nationwide under its umbrella of medical

17   services.

18           What does that mean?

19   A.  What it means is they were going to take what our model

20   was, which was a subscription cardiac monitoring service

21   whereby people would sign up, they'd pay a monthly fee and have

22   access to our heart monitoring 24/7.  What this means is that

23   this company would brand, take our monitoring, put their brand

24   on it and use it for their customers.

25   Q.  Last paragraph:  Under the terms of the agreement, AWH will

1    bundle Cardiac Network's heart monitoring services with other

2    services offered as part of AWH memberships.  The monitoring

3    program will generate revenues through product sales and

4    monthly billings to subscribers for its various monitoring

5    services.

6            Is that consistent with what you've been describing to

7    the jury?

8    A.  Yes.

9    Q.  I'd like to publish for the jury now Government

10   Exhibit 102-5.  And when you see it on the screen, if you could

11   take a look at it and see if you remember this press release

12   that was issued?

13   A.  Yes.

14   Q.  OK.  September 14, 2009, Cardiac Network (Pink Sheets)

15   reported today that it will be offering its current inventory

16   of monitors at or below cost to patients through its retail

17   networks as it makes preparations for its next generation of

18   Cardiac monitoring.

19           Could you explain to the jury what this initiative

20   was?

21   A.  This I believe, as I remember, was part of this HeartOne

22   Club whereby we would offer some of our older monitors, instead

23   of renting them or leasing them, we would offer the people who

24   had signed up for this new program to actually buy the monitors

25   so that we can get new monitors in its place.

1    Q.  OK.  Now, the HeartOne Club, I think, I don't think it will

2    be necessary to put it up on the screen, but that was one of

3    the potential sources of revenue for the company measuring in

4    tens of millions of dollars over time, according to some of the

5    aspirations?

6    A.  Yes.

7    Q.  I'd like to now publish Government Exhibit 102-1 -- only

8    got two more to go -- 102-1 and see if you can take a look at

9    that and tell us about that press release that you issued?

10   A.  So this press release discusses a memorandum of

11   understanding which was signed with Pacific Innovations LLC,

12   and this is what I alluded to earlier, the new technology that

13   Cardiac Network invested in to hopefully get a new prototype

14   monitor.

15   Q.  So Government Exhibit 102-1, you see it's dated February 4,

16   2010, Cardiac Network (Pink Sheets) announced today that it has

17   signed a memorandum of understanding with Pacific Innovations

18   LLC, a private technology development company, to complete the

19   development of a new technologically advanced cardiac

20   monitoring system exclusively for Cardiac Network.

21        Right?

22   A.  Correct.

23   Q.  Again, this was a development that was hopefully going to

24   provide revenue to the company over time, correct?

25   A.  Yes.

1    Q.  Last exhibit, Government Exhibit 102-2.  Do you recognize

2    this as one of your press releases?

3    A.  Yes.

4    Q.  Government Exhibit 102-2.  February 9, 2010, Cardiac

5    Network (Pink Sheets) confirmed today that it has begun

6    executing the terms under a binding letter of intent signed

7    with Pacific Innovations, a private technology development

8    company.  The letter of intent is for a worldwide license

9    agreement granting Cardiac Network an exclusive right to

10   license all intellectual property related to a new

11   technologically advanced Cardiac monitoring system.

12            Correct?

13   A.  Correct.

14   Q.  If you could just describe why this press release went out

15   and why it was an important development for Cardiac?

16   A.  Under the second paragraph, it confirmed that we paid the

17   deposit towards that fee and that was the $200,000 that came in

18   from the investor that we forwarded on to the -- to the

19   inventor.

20   Q.  Now I'd like to ask you just generally then, now that we've

21   seen the press releases you issued, explain to the jury the

22   importance of press releases and why you felt these press

23   releases should go out to the public.

24   A.  These press releases do two things:  One, it lets the

25   public know what's going on with the company, especially when

1   these type of events occur.  The second thing it does is allows

2   me to openly discuss these press releases with either current

3   or potential investors without having them have information

4   that nobody else has.

5   Q.  So on the one hand, it makes public that which would

6   otherwise be what they call inside information perhaps?

7   A.  Yes.

8   Q.  And No. 2 is it alerts the investing public as to what's

9   going on with this publicly traded company, correct?

10  A.  Yes.

11  Q.  It gives potential investors information that they may

12  choose to read in making a decision about whether they too

13  would like to become shareholders of Cardiac Network, correct?

14  A.  Correct.

15  Q.  Now, I'd like to ask you a few questions about the

16  promotions that I think the prosecutor asked you about, that

17  Mr. Shargel asked you about.

18          And without having to put them up on the screen, do

19  you recall that you were shown a series of reports that

20  Mr. Shargel asked you about, do you recall that the first set

21  of reports, I think it's Government Exhibit 102-6 through 23,

22  were all dated in September of 2009?

23  A.  I believe so.

24  Q.  Do you see that?  I think the prosecutor took you one by

25  one and called out the dates.

1    A.  Yes.  I remember there were 2009, and I think there were a

2    couple others at the end that may have been 2010.

3    Q.  We'll get to those.  In terms of the series 102-6 through

4    23 were newsletters -- we'll call them that -- newsletters from

5    September of 2009.

6            And if you could just take a look and if you need a

7    minute, I can put them on the screen, but --

8    A.  I'm fine.  Yes, September of 2009.

9    Q.  Then I'd like you to take a look at Government Exhibits

10   102-24 and 102-26.  Those were the newsletters, if you look at

11   the dates, I believe February 9 and February 10 -- excuse me, I

12   did say that right -- February 9 and February 10 of 2010.

13           MR. SREBNICK:  Maybe we can put that on the screen, if

14   we could, 102-24 and 102-26, just for the dates.

15   Q.  Do you see on the screen if we look to the left, on the

16   bottom left it says posted on February 9, 2010?

17   A.  Yes.

18           (Continued on next page)

19

20

21

22

23

24

25

1    Q.  That's Government Exhibit 102-26.  And if we look at

2    102-24 -- maybe I got them backwards here.  102-24, forgive me,

3    says 09 February 2010 on the left hand of the screen.  Let's

4    see, do we have a date on 102-26?  Can we go to 102-26.  There

5    it is, top right of the screen.  You have to scroll down right

6    at the top.  Do you see that, 2010/2/10?  I guess that would be

7    the European way of saying 2010 February 10.  Do you see that?

8    A.  Yes.

9    Q.  So we have California, East Coast, and now Europe.  We have

10   the dates now clear to us.  There were a series of newsletters

11   in September of 2009 that were shown by the prosecutor and then

12   a couple in February of 2010.  Do you see that?

13   A.  Yes.

14   Q.  Do you agree that these newsletters coincide with the press

15   releases that I just went through with you?  There were several

16   press releases from September of 2009, right?

17   A.  Yes.

18   Q.  Then there was another couple of press releases from

19   February of 2010, right?

20   A.  Yes.

21   Q.  Were those the only press releases that you recall issuing

22   on behalf of the company?

23   A.  No.

24   Q.  There were more as well?

25   A.  Yes.

1    Q.  Is it fair to say, though, that the newsletters that were

2    shown by the prosecutor do coincide with news being issued by

3    the company?

4    A.  In the same month, yes.

5    Q.  In fact, pretty much on the same days, correct?

6    A.  I'd have to go back and look.

7    Q.  We'll look for ourselves.  Now, would you agree that the

8    press releases that you had issued, as you described earlier,

9    were significant event in the life of this company?

10   A.  They were developments, sure.

11   Q.  Because you felt that they were developments, you notified

12   the public, right?

13   A.  Yes.

14   Q.  The public could, if it wanted to, choose to read and react

15   to that information, correct?

16   A.  Yes.

17   Q.  Others could choose to publicize that information even

18   further.  Newsletters could further report about the company

19   based on your press releases, correct?

20   A.  Yes.

21   Q.  If The Wall Street Journal wants to write about a press

22   release, like Mr. Shargel asked you about, they don't need to

23   ask for your authorization to do so, correct?

24   A.  Correct.

25   Q.  If Barron's or The Financial Times or any of these other

1    news services want to run with your press release, they can to

2    that, right?

3    A.  Yes.

4    Q.  It's called a press release so that the press reports it,

5    right?

6    A.  Yes.

7    Q.  By the way, did Donna Levy have anything to do with you

8    issuing the press releases?

9    A.  No.

10           MR. SREBNICK:  Thank you.

11           THE COURT:  Ms. Cohen.

12   REDIRECT EXAMINATION

13   BY MS. COHEN:

14   Q.  Mr. Srebnick was just talking about an example of the Wall

15   Street Journal writes a story about a press release.  Mr.

16   Shargel asked you some questions using Merrill Lynch as an

17   example when they write a report about a stock.  Do you recall

18   that?

19   A.  Yes.

20   Q.  When Merrill Lynch writes a report on your stock, do you

21   expect those reports to contain true and accurate information?

22   A.  Yes.

23   Q.  When The Wall Street Journal writes an article about a

24   press release you put out, do you expect that article to

25   contain true and accurate information?

1     MR. SHARGEL:  I object to the form of that question.

2     THE COURT:  Overruled.

3  A.  Yes.

4  Q.  I think Mr. Shargel asked you questions about volatility in

5  the market and how that would affect shareholders out there and

6  what they would think about that.  Do you recall those

7  questions on cross-examination?

8  A.  Yes.

9  Q.  How would it look for Cardiac Networks in the marketplace

10 if a major shareholder, like Date Palm Capital, was selling its

11 shares in the marketplace?

12     MR. SREBNICK:  Objection.  Calls for a 701 opinion.

13     THE COURT:  Overruled.

14 A.  Any large amount of selling, whether the public knows it's

15 Date Palm or any other large shareholder, any large amount of

16 selling would have a negative impact on the stock price, in my

17 opinion.

18 Q.  How long after the share reduction, the voluntary share

19 reduction, at Cardiac Networks did David Levy exercise and

20 convert the promissory note and get about 2 million free-

21 trading shares?

22 A.  My recollection is the intent to convert was in September

23 and the actual issuance happened in November.

24 Q.  When in relation to the reduction in shares was the actual

25 conversion by David Levy?

1    A.   After.

2    Q.   Do you recall how long after?

3    A.   Within a month.

4    Q.   You were asked a lot of questions by Mr. Shargel about the

5    lawsuit by Norman King and American Marketing.  Do you recall

6    being asked about that on cross-examination?

7    A.   Yes.

8    Q.   You were shown a document in evidence, Defendant's Exhibit

9    A57.

10              MS. COHEN:  If we could pull that up somehow, maybe on

11   the ELMO.

12   Q.   Do you recall when you saw A57, an email you sent to David

13   Levy regarding that lawsuit, right?

14   A.   Yes.

15   Q.   What was David Levy's involvement in responding to the

16   lawsuit filed by Norman King against Cardiac Networks?

17   A.   The lawsuit named the company, David Levy, Fotis

18   Georgiadis, and the transfer agent, and the involvement was to

19   collectively come up with a defense against the lawsuit.

20   Q.   Was David Levy involved in coming up with a defense to the

21   lawsuit?

22   A.   Yes.

23   Q.   Cardiac Networks had an attorney who was involved in coming

24   up with a defense to the lawsuit, is that right?

25   A.   Yes.

1    Q.  Mr. Shargel showed you in the document that is in evidence

2    as A57 that there was a draft of what he called a counterclaim?

3    A.  Yes.

4    Q.  Do you know if that counterclaim was ever filed?

5    A.  This all happened after I left the company, but I was told

6    the counterclaim was never filed.

7            MR. SREBNICK:  Objection to what he was told.

8            THE COURT:  You can't say what you were told.

9    Q.  Do you know if the counterclaim was ever filed?

10   A.  The counterclaim was never filed.

11   Q.  What evidence do you have that Zev Helfer was engaged in

12   some sort of scheme to defraud or collusion?

13   A.  I have no direct evidence.

14   Q.  What evidence did you have that Zev Helfer had conspired to

15   defraud the company with Norman King?

16   A.  No direct evidence.

17           MS. COHEN:  A moment to confer, your Honor?

18           THE COURT:  Yes.

19           MS. COHEN:  No further questions, your Honor.

20           MR. SHARGEL:  May I, Judge?

21           THE COURT:  Very briefly.

22           MR. SHARGEL:  Very briefly.

23   RECROSS-EXAMINATION

24   BY MR. SHARGEL:

25   Q.  Do you remember that you presented the idea of

1    counterclaims to Mr. Levy?

2    A.  Yes.

3    Q.  In other words, that was something that you reported to him

4    as to the progress of the lawsuit, right?

5    A.  Yes.

6    Q.  I show you what's been marked for identification as A56.

7    I'm just going to be five minutes.  Before I put this up there

8    or put it before you, a person in any corporation who has free-

9    trading shares is entitled to sell them at his or her

10   discretion, right?

11   A.  Yes.

12   Q.  Unrestricted means unrestricted, no restrictions, correct?

13   A.  I will say normally yes, unless there's other criteria that

14   would cause that person to be otherwise restricted.  In other

15   words, even if I had unrestricted legends on my shares, I still

16   could not have sold shares as the CEO without meeting other

17   criteria.

18   Q.  Because of your position?

19   A.  Because of my position.

20   Q.  But you knew full well that David Levy had unrestricted

21   shares?

22   A.  Yes.

23   Q.  Let me show you again what's been marked as A56 for

24   identification.  Do you recognize that?

25   A.  Yes.

**D3crlev3**          Swartzburg - recross

1   Q.  What do you recognize it to be?

2   A.  An email discussing strategies for addressing this lawsuit.

3   Q.  It's an email that went from you to David Levy?

4   A.  Yes.

5           MR. SHARGEL:  I offer it into evidence.

6           MS. COHEN:  No objection, your Honor.

7           THE COURT:  A56 is in evidence.

8           (Defendant's Exhibit A56 received in evidence)

9           MR. SHARGEL:  We will publish that at another time.  I

10  can read it to the jury another time.

11  Q.  I want to ask you one more question before I sit down.

12  Under the terms of the conversion note -- do you know what I

13  mean when I say "conversion note"?

14  A.  Yes.

15  Q.  Was that the note that was in the amount of $200,000?

16  A.  Yes.

17  Q.  The whole purpose of making it a convertible note was that

18  it could be changed, that's what it means by "conversion,"

19  right?

20  A.  Yes.

21  Q.  Meaning that instead of having a note where the company is

22  liable to pay or agrees to pay money, in other words, pay the

23  loan back, in its simplest terms, right?

24  A.  Yes.

25  Q.  In fact, there was even interest, in those years there was

1   9 percent interest, right?

2   A.   I don't remember the exact percent, but yes, there was

3   interest.

4   Q.   There was interest.  One option was that David Levy could

5   wait and get paid back $200,000 in cash, but he converted that

6   note to stock, right?

7   A.   Yes.

8   Q.   When he received the stock, that was according to the terms

9   of the note he was entitled to do that, right?

10  A.   Yes.

11  Q.   He was entitled to get that unrestricted stock, correct?

12  A.   I can't make the comment about restricted or unrestricted,

13  but he certainly was entitled to convert the note.

14  Q.   Certainly was entitled to convert the note to stock, right?

15  A.   Yes.

16          MR. SHARGEL:  I have no further questions.

17          MS. COHEN:  Your Honor, briefly?

18          THE COURT:  One.

19  FURTHER REDIRECT EXAMINATION

20  BY MS. COHEN:

21  Q.   You said there was other criteria when someone can't sell

22  even if the stock is unrestricted?

23  A.   Correct.

24  Q.   What other criteria are you talking about?  You talked

25  about yourself as an insider.

1   A.  It is my understanding that insiders, such as myself, or an

2   affiliate who owns a certain percentage, I believe it is 10

3   percent or more, has additional restrictions on whether they

4   could sell their shares.

5   Q.  You say an affiliate who owns 10 percent or more.  Do you

6   mean an entity or person who owns 10 percent or more shares in

7   the company?

8   A.  Yes, 10 percent of the outstanding common shares.

9   Q.  That entity or person who owns 10 percent or more of the

10  shares of the company also has restrictions on their ability to

11  sell?

12  A.  There are additional restrictions.

13          MS. COHEN:  No further questions.

14          MR. SHARGEL:  Judge, may I?

15          THE COURT:  No, no.  All good things come to an end.

16          You are excused.

17          (Witness excuse)

18          THE COURT:  Call your next witness.

19          MS. COHEN:  Your Honor, the government calls Alan

20  Weiner.

21   ALAN WEINER,

22      called as a witness by the government,

23      having been duly sworn, testified as follows:

24          THE WITNESS:  Alan Wendel Weiner.  A-L-A-N,

25  W-E-N-D-E-L, W-E-I-N-E-R.

1          THE COURT:  Please sit down, Mr. Weiner.  Get yourself

2     right up to the microphone make yourself comfortable.

3          MS. COHEN:  May I inquire, your Honor?

4          THE COURT:  Yes.

5     DIRECT EXAMINATION

6     BY MS. COHEN:

7     Q.  Mr. Weiner, what is your educational background?

8     A.  Graduated from Armstrong State College in Savannah,

9     Georgia, got an MBA while working at Coca-Cola company at

10    Mid-America College.

11    Q.  Where do you live now?

12    A.  Atlanta, Georgia.

13    Q.  Can you briefly describe your work history after receiving

14    your MBA.

15    A.  Really it was after college.  I started and have been in

16    the foods service business about 25 years, spent most of my

17    career at the Coca-Cola company, a company called Valassis, and

18    currently a company called Focus Brands.

19    Q.  What do you do at Focus Brands now?

20    A.  I lead a group that is responsible for putting food in

21    restaurants, grocery stores, Carvel, a portfolio of brands that

22    we own.

23    Q.  How long have you been with Focus Brands?

24    A.  A little over two and a half years.

25    Q.  Do you know someone named Will Goldstein?

1   A.  Yes, I do.

2   Q.  How do you know Will Goldstein?

3   A.  My children and his children grew up together.  I mean I

4   have young children.  I've known Will in the business

5   community, or at least in the Jewish community, in Atlanta.

6   That's how I got to know him.

7   Q.  At some point in time did you work with Will Goldstein?

8   A.  Yes.  I had left Valassis to go work for a small company

9   and got recruited away, and then three months after that they

10  cleaned house.  I was part of that.  Then had started to do

11  some work with Will.

12  Q.  What work was Will doing at the time you began working with

13  him?

14  A.  Will was working for Valassis as a serial entrepreneur.  He

15  had just purchased a company called Find.com.  My goal was to

16  help him further that out.  It was like a search engine, just

17  like Google.

18  Q.  When did you start working with Will Goldstein on Find.com?

19  A.  Sometime in early March of 2009.

20  Q.  When you started working with Will Goldstein on Find.com,

21  what type of work were you doing?

22  A.  Really trying to help grow it from its inception -- he

23  hadn't done anything with it -- anywhere from trying to develop

24  programs to attract users, frequency, different methodologies,

25  the type of search engine that it could become.

D3crlev3                    Weiner - direct

1    Q.  What work did you do with Will Goldstein for Find.com to

2    try to find investors for Find.com?

3    A.  Will had created a private placement memorandum, and then

4    eventually we met with some investors, so we talked about the

5    opportunity.

6    Q.  Did there come a time when you met with David Levy and

7    Donna Levy?

8    A.  Yes.

9    Q.  When was that?

10   A.  Latter part of May of 2009.

11   Q.  What was the purpose of your meeting with David Levy and

12   Donna Levy?

13   A.  Will had known of David through I guess other business

14   associates, so Will had an interest in trying to learn more

15   about what David did.  That was the initial time we met him.

16   Q.  Where was this meeting?

17   A.  At David Levy's home.

18   Q.  Where was that house?

19   A.  Fort Lauderdale.

20   Q.  Who was at the meeting?

21   A.  It was myself, Will, David, and Donna Levy.

22   Q.  What did David Levy say at this meeting at his house in

23   Florida?

24   A.  Basically, David had talked about the type of business --

25   not the type of business, but how he went about his business,

1    saying I can help you raise money for your company, not to

2    exceed like the 5 to $6 million range, I can help you

3    understand the type of shell that you need to have in order to

4    do that.  It was more about what you need to do to go out and

5    to publicly trade that, to trade something.

6    Q.  Let's back up a little bit.

7    A.  Yes.

8    Q.  What did David Levy explain to you at this meeting that he

9    did?  What was his business?  What was he providing?

10   A.  David basically said he helped people, small startup

11   companies or small companies, helped them raise money, the

12   needed cash to do other things within their business.

13   Q.  What did David Levy say about the 5 to $6 million range?

14   A.  David had said that's below the radar screen.  He said when

15   you get over that 10 to $12 million or somewhere in that area,

16   you create a lot more attention.

17   Q.  If you can explain for the jury, what was getting over $10

18   to 12 million or 5 to 6?

19           MR. SHARGEL:  Judge, I object to this as asked and

20   answered.

21           THE COURT:  Overruled.

22   A.  Could you repeat the question.

23   Q.  Sure.  What was David Levy saying about the 10 to

24   20 million?  Where was that going?  Can you explain that.

25   A.  It was 10 to 12.

Q.  10 to 12.

A.  What David had said was creating a lot more visibility at that higher level was not the right thing to do, that they had had success at that smaller, mid-size range.

Q.  The 10 to $12 million range, what was that?  The value of the company, the value of the stock, something else?

A.  I'm sorry.  It was, I guess, the money that you would raise from selling of the shares of the stock.

Q.  What did David Levy say about staying below the radar?

A.  That was the right thing to do.  It was a lot easier to do that, they had recent success doing that.

Q.  What did he say that he could do with respect to helping small businesses grow and staying below the radar?

A.  He had a network.  He had people that could help trade, he had people that could help promote.  That's what he did.  He helped organize it.  He had all of those key components.

Q.  You mentioned that David Levy said that you needed to have a shell.  What did David Levy say about the shell?

A.  He had said that you need to have a clean shell with free-trading shares.  It was more about that.  There was a number of 2 to 2½ million shares.

Q.  2 to 2½ million shares in what?

A.  In the shell.

Q.  At this time when you were meeting, you and Will were meeting and Donna and David Levy at their house, was Find.com a

1   private or a public company?

2   A.  Private.

3   Q.  What did Donna Levy say at this meeting?

4   A.  Donna really was more about talking about the news.  David

5   did most of the talking.  Donna more or less talked about her

6   role and what she did.  That was really it.

7   Q.  What did Donna Levy say her role would be in helping the

8   business?

9   A.  She worked in helping with the news.  Her job was to take

10  the news and help promote it.  She worked with their promotion

11  company or their email company.

12  Q.  What did David Levy say at the meeting about what Donna

13  Levy could do?

14  A.  I'm sorry?

15  Q.  What did David Levy say at this meeting about what Donna

16  Levy's role was?

17  A.  It was very divided roles.  David was more the

18  orchestrator, and Donna really facilitated all of that with the

19  email, like I said, the email company.

20  Q.  How did the meeting come to an end?  What was decided at

21  the end of this meeting?

22  A.  It was really decided that the next steps would be to meet

23  with somebody else that actually did the trading.  So that was

24  really the next steps.

25  Q.  Back up for a minute.  You talked about an email and people

1  who did an email.

2  A.  Mm-hm.

3  Q.  What names were discussed by David Levy at this meeting?

4  A.  It was not necessarily names of individuals but names of

5  companies.  It was like I recall two, Best Damn Penny Stocks

6  and Wall Street Premiere.

7  Q.  What was said about Best Damn Penny Stocks and Wall Street

8  Premiere at this meeting?

9  A.  That they go out and advertise in certain spots and they

10  constantly are replenishing their inventory of people that are

11  opting in, I guess, for their newsletters.

12  Q.  When you say they were discussing, was David Levy

13  discussing, telling you about Best Damn Penny Stocks and Wall

14  Street Premiere?

15  A.  It was more Donna that it was David.

16  Q.  Who was the person that would do the trading in the stock?

17  A.  I'm sorry?

18  Q.  Who was the person that David Levy said was responsible for

19  trading in the stock when the company went public?

20  A.  At that point he had said there is another somebody, but it

21  wasn't guaranteed.  He had mentioned a guy by the name of Pete

22  Veugler.

23  Q.  Who did David Levy say Pete Veugler was?

24  A.  It was something that he had worked with in the past,

25  recently, that they had partnered with.

D3crlev3                    Weiner - direct

1  Q.  At the end of the meeting, what did David Levy say that you

2  and Will were to do next?

3  A.  At some point to meet with Pete, they would facilitate a

4  meeting with Peter, Pete.

5  Q.  What did Donna Levy say at this meeting about what Peter

6  Veugler did?

7  A.  He just traded the stock.  That's all really Pete did.  He

8  just traded the stock.

9  Q.  What did Donna and/or David Levy say at the meeting about

10 how Peter Veugler trading the stock would coincide or not with

11 the press releases and the emails?

12 A.  Can you repeat the question?

13 Q.  Sure.  I'll rephrase it.

14 A.  Yes.

15 Q.  What did David Levy say at this meeting about how Peter

16 Veugler's trading would work vis-a-vis the press side of the

17 operation?

18 A.  It was all about having enough news to go over for a period

19 of a few days, whether it was three or four days.  Pete talked

20 about -- excuse me.  Donna had talked about having enough news

21 to go through, like I said, that three or four days, so when

22 Pete is trading, they would have enough email I guess to go

23 through that three or four days with the news.

24 Q.  What was the purpose of having news?  What did David Levy

25 or Donna Levy tell you at the meeting was the purpose of having

1  the news go out for three or four days?

2  A.  To help with the potential investors, I guess, to come into

3  the company.

4          MR. SHARGEL:  Your Honor, I object to his guess.  Move

5  to strike.

6          THE COURT:  Granted.  You can't guess.  You have to

7  tell us what you know.

8  A.  It was to have potential investors opt in and purchase the

9  stock.

10  Q.  When was the next time you spoke with David Levy and Donna

11  Levy?

12  A.  I actually saw them in California.

13  Q.  Where did you see them?

14  A.  At the Beverly Hills Hilton, I believe.

15  Q.  Who was at the Beverly Hills Hilton?

16  A.  It was myself, Will, and Donna and David.

17  Q.  When was this meeting?

18  A.  Approximately a month later.

19  Q.  You said the first meeting was in or about late May 2009?

20  A.  Mm-hm.

21  Q.  This was in or about late June 2009?

22  A.  Mm-hm.

23  Q.  What was the conversation at the Beverly Hills --

24          THE COURT:  Excuse me.  You have to say yes.

25  A.  I'm sorry.  Yes.

D3crlev3                    Weiner – direct

1      MS. COHEN:  Sorry, your Honor.

2   Q.  What was the conversation at the Beverly Hills Hilton

3   between yourself, Will, David Levy, and Donna Levy?

4   A.  It was David had asked some questions centered around the

5   shell, how is the progress going on that.  It was more what

6   type of news were you preparing to have.  Then it was about the

7   upcoming meeting with Pete Veugler.

8   Q.  What upcoming meeting with Peter Veugler?

9   A.  Will and I were planning to see Pete and spend some time

10  talking to him about what he did and his role.

11  Q.  Did there come a time where you and Will Goldstein met with

12  Pete Veugler?

13  A.  I'm sorry?

14  Q.  Did there come a time where you and Will Goldstein met with

15  Pete Veugler?

16  A.  Yes, ma'am.

17  Q.  Where was that meeting?

18  A.  In Las Vegas.

19  Q.  When was that in relation to the meeting you just talked

20  about in the Beverly Hills Hilton?

21  A.  Shortly thereafter.

22  Q.  What did Peter Veugler say at the meeting in Las Vegas?

23  A.  Basically, what Pete said was he talked about his role in

24  the trading of what he did, helped us understand what David did

25  and what Donna did.  Then he talked about -- he had

1    mentioned -- that was the first time I had heard Eric

2    Cusimano's name, the email company.

3    Q.  What did Peter Veugler tell you about what David Levy did

4    versus what Donna Levy did?

5    A.  Pete said Donna will work with the news that was coming out

6    and David was more the orchestrator.

7    Q.  What did Peter Veugler say about Eric Cusimano?

8    A.  I'm sorry?

9    Q.  What did Peter Veugler say about Eric Cusimano?

10            MR. SHARGEL:  Objection.  Hearsay confrontation.

11            THE COURT:  Overruled.

12   A.  That he had been working with Donna and David for a period

13   of time.  He said that his lists were very good and that he had

14   a very good track record, that they worked together in writing

15   their articles.

16   Q.  When you say "he," you're talking about Eric Cusimano?

17   A.  Yes, ma'am, yes.

18   Q.  What did Peter Veugler say about how he worked with Donna

19   and David Levy, about his trading?

20   A.  It was recent that they had worked together on another

21   company's needs and that Pete said that from the money part, he

22   talked about the shares in the shell and how it needed to be.

23   Then, at the end of the day Pete said that there was a 50

24   percent share, 50 percent for you as the company and then 50

25   percent back to the group that was doing the work, between

1   himself, Pete, and David.

2   Q.  What did Peter Veugler say about how the 50 percent that

3   went back to Donna and David Levy and himself would get divided

4   up?

5   A.  A third, a third, and a third.

6   Q.  Would that be cash or shares or something else?

7   A.  I believe it was wires.  I don't know that.  I don't know.

8   I assume it was cash from the proceeds.

9           MR. SHARGEL:  I move to strike.  He doesn't know.

10          THE COURT:  Strike it out.  The jury is instructed to

11  ignore it.

12  Q.  If you could back up for a minute.  What was the structure

13  going to be for the company that was going to be taken public?

14  What was Peter Veugler telling you how it would work when the

15  company became public?  What would happen to the shares?

16  A.  Can you repeat that, please?

17  Q.  Sure.  I'll withdraw it.  I'll rephrase it.  What did Peter

18  Veugler say to you about how the shares in the company would be

19  divided up after it was merged into the clean shell?

20  A.  They would be free-trading shares and that somebody or he

21  would actually trade the shares.

22  Q.  Peter Veugler would trade all the shares in the new

23  company?

24  A.  Yes, ma'am.

25  Q.  Then what did Peter Veugler tell you would happen to the

D3crlev3          Weiner - direct

1   proceeds from selling those shares?

2   A.   Those were the proceeds that were shared.  That was the 50

3   percent to himself, I guess Eric Cusimano, and David, and then

4   the other 50 percent was to go back to the company.

5   Q.   What did Peter Veugler say about the timing of different

6   emails or news with his trading?

7   A.   The news was really supposed to be at the end of the day.

8   It was about making sure that you had news to go out before the

9   first day, the end of the first day, before the second day, end

10  of the second day.  It was all about that timing.  The greater

11  the news, the best news somewhere around the second day,

12  depending on what the company was going to do, what type of

13  event it was going to have.

14  Q.   What would happen towards the end?  How many days' cycle

15  did Peter Veugler explain to you the news would be?

16  A.   Ideally three to four.  He said the people that come in on

17  the first, second, and third days usually did fairly well,

18  sometimes on the fourth day they did not.  He said, hopefully

19  the down side is not dramatic.

20          MR. SHARGEL:  Judge, I am going to object to this and

21  ask to approach on the basis of a document that was sent by the

22  government.

23          THE COURT:  Come over to the side bar.

24          (Continued on next page)

25

1     (At the side bar)

2          MR. SHARGEL:  Your Honor, in short, on February 20,

3     2013, we received a letter from the government saying that --

4     you remember that this was a motion -- I don't if I actually

5     went to a motion.  If you read this paragraph on page 2 -- he

6     hasn't mentioned the letters MCGI, but what we have here is

7     they said they would not elicit it on direct examination.  They

8     have now opened the door to something.  I don't know why they

9     are going about eliciting the timing of trades with MCGI.  That

10    is a topic they said they said they are staying away from.

11         MS. COHEN:  Your Honor, we haven't elicited anything

12    about MCGI.  We are eliciting a conversation where Peter

13    Veugler is explaining to him how he works with Donna and David

14    Levy.  We are not going to elicit any testimony about MCGI.

15         MR. SHARGEL:  It is a specific stock, and they are

16    talking about how they get 50 percent and how the trades are

17    done and the timing of the trades is so important.  This is

18    precisely what we are told they wouldn't elicit.

19         THE COURT:  Ms. Cohen, does this deal with MCGI?

20         MS. COHEN:  Does what?

21         THE COURT:  His testimony.

22         MS. COHEN:  No.  He is talking about he had several

23    meetings with David and Donna Levy and then with Peter Veugler

24    to explain what these guys did for business and how it worked.

25    They then later on did a deal with MCGI the next year.  We are

1    not going to go into that.

2              MR. SHARGEL:  The company that he is talking about

3    now, about how they split up the shares and the timing, is that

4    company.

5              MS. COHEN:  No.  What he is talking about in general

6    is what Peter Veugler explained to him how it worked in

7    general, how he worked with their clients.

8              THE COURT:  You can't say we are not going to deal

9    with MCGI, or whatever the initials are, and then deal with it

10   by just not naming the company.  You're saying you have an

11   independent basis, there is an independent basis for his

12   testimony?

13             MS. COHEN:  This is a year before MCGI, and he is

14   meeting with Peter Veugler at David Levy's insistence to find

15   out how they work.

16             THE COURT:  On that basis, the objection is overruled.

17             MR. KRAMER:  Your Honor, may I say one thing?  This

18   sentence in the government's letter that Mr. Weiner would

19   describe a meeting at Veugler's condominium in Florida during

20   which he carefully instructed Veugler about the timing of

21   trades is exactly what he is testifying to.

22             MS. COHEN:  He is not.  That is a meeting a year later

23   at the condominium.  This is a different meeting.

24             THE COURT:  The objection is overruled.

25             (In open court)

1   Q.  After you met with Peter Veugler and he explained to you

2   how he worked with Donna and David Levy and Eric Cusimano, what

3   was the next time you spoke with David and Donna Levy?

4   A.  I may have spoken -- is it on?

5        THE COURT:  We will have to use the old-fashioned

6   voice projection.  Raise your voice.

7   A.  I may have spoken to him, but I saw him, met with David, in

8   New York.  It was probably, again, about several weeks later,

9   maybe a month later, I met David and Donna as well as Eric

10  Cusimano and his spouse or fiancée at that point in time.

11  Q.  This is in or about late summer 2009, is that where we are?

12  A.  I don't think it is late summer.  I think it is early to

13  mid summer.

14  Q.  What was the purpose of your meeting with Eric Cusimano,

15  Donna, and David Levy?

16  A.  It was ironic, that meeting.  David and Donna were crossing

17  the country, I think, in their bus.  At that point it was more

18  meeting Eric and understanding what Eric did and how he did it

19  and the writing and more about the newsletter.

20       MR. SHARGEL:  I'm sorry.  It's not projecting back

21  here.

22  A.  I'm sorry.  The meeting was more to meet Eric and talk to

23  Eric, understand about his writing and how he did it, talk a

24  little bit more about how he had been successful, again, the

25  content of his writing.  Like when I started, it wasn't

D3crlev3                    Weiner - direct

1    intentional to meet David there.  It's just that we were there

2    for other things and he was going through there, like I said,

3    on his bus.

4    Q.  Where was the meeting with Donna and David Levy and Eric

5    Cusimano?

6    A.  It was at a restaurant.

7    Q.  Was Will Goldstein also there?

8    A.  Yes, ma'am.

9    Q.  What did Eric Cusimano tell you he did with respect to

10   writing?

11   A.  That he and Donna worked together, that they took the press

12   releases and made them their own.  They took them and made them

13   their own to speak to their users or people that had signed up.

14   Q.  What did Eric Cusimano tell you about what newsletters he

15   had and what email databases he had?

16   A.  Eric talked about a number that he had had in totality.  It

17   was 70 to 80,000 people that had signed up.  He mentioned

18   several sites.  I can only recall two.  Like I said when I

19   started, it was Best Damn Penny Stock and then Wall Street

20   Premiere I think is the name.

21          THE COURT:  Best Damn Penny Stock and what was the

22   second one?

23          THE WITNESS:  Wall Street Premiere.

24   Q.  This meeting you said was in a restaurant in New York?

25   A.  Yes, ma'am.

1    Q.   Was it in Manhattan?

2    A.   I think so, yes.

3    Q.   When was the next time you saw David and/or Donna Levy?

4    A.   It was down in Atlanta, Georgia.

5    Q.   You talked about they were taking a bus tour.  What did you

6    mean by that?

7    A.   David and Donna had a bus that I guess each year they took

8    time and went on the road.  I don't know exactly all the parts,

9    but I saw them in southern California, New York, and then in

10   Atlanta via their bus.

11   Q.   When you saw David and Donna Levy in Atlanta, this is again

12   2009?

13   A.   Yes, ma'am.

14   Q.   When is it in relation to the meeting in Manhattan?

15   A.   It's probably a couple of weeks later.  In addition to

16   David and Donna, it was myself, Will, and I believe there was

17   one of Will's other partners there.

18   Q.   Where was this meeting?

19   A.   It was at a restaurant.

20   Q.   What did David Levy say at this meeting?

21   A.   It was more, again, conversation around where the shell

22   was, did you have everything in the right manner, really more

23   discussion of the type of news that we were considering to help

24   promote the company.

25   Q.   Was this a discussion specific to Find.com?

1    A.  Yes, ma'am.

2    Q.  When was the next time you met with Donna and David Levy?

3    A.  It was probably a few weeks later than that down in

4    Florida.

5    Q.  Was that meeting at their house in Florida?

6    A.  Yes, ma'am, in Fort Lauderdale.

7    Q.  What did you see when you went to the house in Florida?

8    A.  Can you be a little more specific?

9    Q.  Sure.  What type of cars did you see when you went to Donna

10   and David Levy's house in Florida?

11   A.  They drive a Bentley.

12   Q.  Did you see any other?  Did you see any boats at the house?

13   A.  They had a boat that was docked outside, had a motorcycle.

14   Very luxurious items.

15   Q.  What did David Levy tell you at his house?

16   A.  David talked.  More it was going back to parts of where we

17   started about saying below the radar screen, don't be lavish,

18   stay below the radar screen, put things in other people's

19   names.  He had mentioned that more than once.

20   Q.  What did David Levy tell you about any work he did in

21   Panama?

22   A.  At some point moving forward into 2010 David I know went

23   back and forth, I don't know for what reasons, but said at some

24   point in time he could help maybe trading or doing emails out

25   of there.  But nothing more than that.

1          THE COURT:  We will take our luncheon recess now.  In

2     the meantime, we will work on the microphones so everybody can

3     hear what people are saying.

4          THE JUROR:  If he could adjust it toward him.

5          THE COURT:  It is lunchtime anyway.  We'll take our

6     luncheon break, work on the acoustics, and see you at 2

7     o'clock.

8          (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3CLLEV4

1           AFTERNOON SESSION

2              2:05 p.m.

3       (Jury not present)

4       THE COURT:  We're still waiting for the jury or some

5   of them.  Want to bring Mr. Weiner in?

6       (Witness present)

7       MR. SHARGEL:  Your Honor, may I say something?

8       THE COURT:  Yes.

9       MR. SHARGEL:  I hope it's all right with the Court,

10  but we planned to put in jury instructions, not like the

11  government boilerplate, but specific instructions on Friday.

12  Would that work for the Court?

13      THE COURT:  Yeah.  I had some hope you were going to

14  do it jointly.

15      MR. SHARGEL:  I don't have any problem with most of

16  the boilerplate that we have.  I know we have to have a charge

17  conference on some key issues.  There's 200 pages and a lot of

18  boilerplate.  I think there's some issues --

19      THE COURT:  How much of the boilerplate do you think

20  we really need?

21      MR. SHARGEL:  I don't think we need 200 pages.  I

22  don't think we need a charge that goes on for six hours.

23      THE COURT:  I agree with that.

24      MS. COHEN:  Your Honor, the government had tried to

25  submit it as a joint request, but the defense said they want to

1    submit their own.

2              THE COURT:  OK.  Fine.

3              So are you still thinking you'll be finished on

4    Friday?

5              MS. COHEN:  Yes.  I think even possibly Thursday, your

6    Honor.

7              THE COURT:  And when should we have the charging

8    conference, Mr. Shargel, Friday?

9              MR. SHARGEL:  Friday.  I suppose Friday.  We'll get

10   our request in in the morning.  If you put it on for the

11   afternoon, is that too tight?

12             THE COURT:  If you want me to read them it's too

13   tight.  You want a spontaneous reaction, I'll give you that

14   right away.

15             MR. SHARGEL:  We'll try for Thursday night.

16             THE DEPUTY CLERK:  Judge, the jury is here now.

17             THE COURT:  OK, Marlon, call them in.

18             Are we all set?

19             MR. SHARGEL:  Yes.

20             (Continued on next page)

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Good afternoon.  Please be seated.

3        All right, Ms. Cohen.

4        MS. COHEN:  Thank you, your Honor.

5    BY MS. COHEN:

6    Q.  I believe right before the lunch break you were telling the

7    jury what David Levy told you about his business dealings in

8    Panama; do you recall that?

9    A.  Yes.

10   Q.  What did David Levy tell you about his business dealings in

11   Panama?

12   A.  It wasn't necessarily his business dealings.  He just said

13   he may have the opportunity to trade and do email out of that

14   area.

15   Q.  And by that area, did David Levy use the word Panama?

16   A.  Yes.

17   Q.  And you also you testified already on direct about a

18   meeting with Peter Veugler in Las Vegas?

19   A.  Yes.

20   Q.  Do you recall that meeting?

21   A.  Yes.

22   Q.  What did Peter Veugler say about how the proceeds that

23   would go to Peter Veugler, Eric Cusimano, Donna and David Levy

24   would be divided up in any deal?

25   A.  David would do that.

1    Q.  Are you familiar with a company called Banneker?

2    A.  By name only.

3    Q.  How are you familiar with it by name only?

4    A.  Sometime in 2010, you know, during a conversation with

5    David, I was there.  It wasn't directly with me.  He referred

6    to them as a company that you might have ability to do it more

7    than once, to go out and promote the company more than once,

8    and that was it.

9              MS. COHEN:  No further questions, your Honor.

10             MR. SHARGEL:  May I inquire from here?  It's very

11   short.

12             THE COURT:  Yes.  Wherever you're most comfortable.

13             MR. SHARGEL:  Thank you, sir.

14   CROSS-EXAMINATION

15   BY MR. SHARGEL:

16   Q.  Did you, sir, ever invest in Greenway Design?

17   A.  Excuse me?

18   Q.  Greenway Design Group, did you ever invest in that

19   business?

20   A.  No, sir.

21   Q.  Did you ever invest in Banneker?

22   A.  No, sir.

23   Q.  Did you ever invest in Cardiac Network?

24   A.  No, sir.

25   Q.  Did you ever invest in Emerging World Pharma?

1   A.  No, sir.

2   Q.  Did David Levy ever invest in Find.com to your knowledge?

3   A.  I don't know.

4           MR. SHARGEL:  No further questions.

5           THE COURT:  Thank you, Mr. Shargel.

6           Mr. Srebnick.

7           MR. SREBNICK:  One moment.

8           Judge, I have no questions of the witness.  Thank you.

9           THE COURT:  Thank you very much.  You're excused,

10  Mr. Weiner.

11          THE WITNESS:  Thank you very much.

12          (Witness excused)

13          THE COURT:  Next witness.

14          MS. COHEN:  Your Honor, at this time the government

15  would like to read a stipulation into evidence and publish two

16  exhibits that relate to that stipulation.

17          THE COURT:  All right.

18          MS. COHEN:  The stipulation has the caption of the

19  case and it's stipulated and agreed to by the parties in the

20  case that:

21          No. 1.  Government Exhibits 701-1 and 701-2 are true

22  and accurate copies of documents that were in David Levy's

23  possession on December 17, 2011, and that they were inspected

24  and photocopied on that date by the United States customs and

25  border protection officer at the Miami International Airport

1    upon David Levy's return to the United States from Panama.

2           It's further stipulated and agreed that Government

3    Exhibits 701-1 and 701-2 may be received in evidence at trial

4    and that this stipulation may be received in evidence at trial.

5           It's dated and signed by all the parties and the

6    stipulation is marked S-6.

7           The government moves S-6 and Government Exhibits 701-1

8    and 701-2 into evidence.

9           THE COURT:  They're received in evidence.

10          (Government's Exhibits S-6, 701-1, 701-2 received in

11   evidence)

12          MS. COHEN:  Mr. Dinet, if we can just publish, please

13   start with the first one, Government Exhibit 701-1.

14          Turn to the fifth page.  Turn to the next page.  Next

15   page.  Go a few pages in.  To the last page.  And if you can

16   just go back to the first page for a minute and highlight the

17   first entry there, Cascata Capital LLC.

18          If you can look at the second document in evidence,

19   Government Exhibit 701-2, which is also a document that is part

20   of the stipulation that was in David Levy's possession on

21   December 17, 2011.  Turn to the fourth and fifth page.

22          Thank you, your Honor.

23          One moment, your Honor, to confer.

24          THE COURT:  Yes.

25          MS. COHEN:  If you can go to the third name up from

1   the first block where it says Brett Taylor and if you can

2   highlight that, please.

3           Now if I can publish a document that is in evidence

4   through a stipulation -- it's not previously been published --

5   Government Exhibit 1500-20.  If you can just blow up the email

6   part.

7           Thank you.

8           MR. MASTER:  And, your Honor, there's two other

9   documents we'd like to publish.

10          MR. SHARGEL:  May we have a stipulation that I am not

11  the Jerry that's in the email?

12          MS. COHEN:  So stipulated, your Honor.

13          MR. MASTER:  Just two other documents to be published,

14  one already admitted subject to connection by future

15  stipulation the parties intend to enter into.

16          This has previously been described as emails related

17  to bestdamnpennystocks.com, and the client ID associated with

18  that is 323895.  And I'm just going to publish, introduce and

19  publish subject to connection Government Exhibit 605-9, which

20  are billing records associated with this account, client ID

21  323895, as well as several other accounts.  And it lists

22  billing points of contact for 323895, bestdamnpennystocks, and

23  the names listed are David Levy, Eric Cusimano, and G.S. Media

24  Inc.

25          At this time the government calls Derrick Holmes.

1    DERRICK M. HOLMES,

2        called as a witness by the Government,

3        having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. MASTER:

6            THE COURT:  Mr. Master.

7            MR. MASTER:  Yes.  Thank you, your Honor.

8    Q.  Good afternoon, Mr. Holmes.

9    A.  Good afternoon.

10   Q.  Where were you born?

11   A.  I was born in Waterloo, Iowa.

12   Q.  And where do you live now?

13   A.  Aurora, Colorado.

14   Q.  What do you do for a living?

15   A.  I'm sorry?

16   Q.  What do you do for a living?

17   A.  I own my own watch and clock company.

18   Q.  What's the name of the company?

19   A.  Banneker Inc., Banneker watches.

20   Q.  And who is Banneker Inc. named after?

21   A.  It's named after Benjamin Banneker.  Benjamin Banneker made

22   the first clock in America back in the 1700s.

23   Q.  And why did you decide to name your company after him?

24   A.  Well, you know, with our watches and our clocks, we use

25   exotic woods.  Banneker made the first clock in America

1    entirely out of wood.  So all our watches pay homage to his

2    clock.

3    Q.  Now I'm going to show you what's been marked as 300-A and

4    300-B.  Do you recognize these items, sir?

5    A.  Yes.

6    Q.  How do you recognize them?

7    A.  They're watches from my watch line.

8    Q.  Are they your new collection or an older collection?

9    A.  This is older collection.

10        MR. MASTER:  Your Honor, the government would offer

11   Government Exhibit 300-A and 300-B and request permission to

12   publish them to the jury.

13        MR. SHARGEL:  No objection.

14        THE COURT:  300-A and B are received and you can give

15   them to the jury.

16        (Government's Exhibits 300-A, 300-B received in

17   evidence)

18   Q.  Now, when did you found Banneker, sir?

19   A.  2003.

20   Q.  And what prior experience did you have in the jewelry

21   business before founding Banneker?

22   A.  I founded my first company was Marquee Watch and it was

23   founded in 1999.

24   Q.  And what did you do with Marquee Watch?

25   A.  Marquee was a company that featured athletes, either their

1  signature or their likeness inside of the watch, professional

2  athletes mainly.

3  Q.  And when did you found that company?

4  A.  1999.

5  Q.  And who was the first person you put on the face of a

6  Marquee Watch?

7  A.  The first person we actually signed was Curt Warner.

8  Q.  And who's Curt Warner?

9  A.  Curt Warner at the time we signed him was the quarterback

10  for the St. Louis Rams.

11  Q.  And after you signed Curt Warner, did there come a time

12  when you began signing additional athletes to appear on the

13  face of your watches?

14  A.  Yes.

15  Q.  And in connection with that activity, did there come a time

16  when you met someone named Tim Hardaway?

17  A.  Yes.

18  Q.  And so who is Tim Hardaway?

19  A.  Tim Hardaway is, he was a former professional point guard.

20  He played for Golden State Warriors and then for the Miami

21  Heat.

22  Q.  And was he still a professional athlete at the time that

23  you met him?

24  A.  Yes.

25  Q.  And did he have any awards or acclaim when you tried to

1  sign him?

2  A.  When, yeah, he was an all-star.  Think he had been an

3  all-star three or four times at that point.  He ended up like

4  being a five time NBA all-star.

5  Q.  Now, did there come a time when you discussed your ideas

6  for the Banneker watch company with Tim Hardaway?

7  A.  Yes.

8  Q.  And what was Tim Hardaway's reaction to the idea, without

9  saying the substance of what he said, what was his reaction?

10  A.  You know, he thought it was a great concept.  He liked the

11  history and the correlation between Banneker's clock and what

12  we would do with the wood and the watches.  So he liked it,

13  liked the idea a lot.

14  Q.  And what if any money did Tim Hardaway give to help kick

15  off the Banneker watch idea?

16  A.  You mean in terms of like?

17  Q.  The corporation.

18  A.  Yeah, you mean what amount did he put in?

19  Q.  Yes.

20  A.  At first he put in $10,000.  And then a little later on he

21  put in I think like a hundred thousand dollars.

22  Q.  And what kind of company was Banneker at the time that Tim

23  Hardaway made these initial investments?

24  A.  We were private, private company.

25  Q.  And what role did Tim Hardaway end up playing in the

1    company?

2    A.   He became the president of the company.

3    Q.   And what did you use the money for that Tim Hardaway had

4    given you to help start up Banneker?

5    A.   At the time, you know, we were working on watch designs,

6    getting prototypes put together, overall operations of the

7    business, office, and travel and...

8    Q.   And when did Tim put in this, well, 10,000 and then hundred

9    thousand?

10   A.   When?

11   Q.   Yes.

12   A.   He first invested in Marquee Watch so that was 1999, and

13   then he invested into Banneker right around 2003.

14   Q.   And what if any ownership stake in Banneker watches did Tim

15   Hardaway get in exchange for his investment?

16   A.   You mean in terms of like percentage?

17   Q.   Yes.

18   A.   I believe it was somewhere around 15, 15 percent.

19   Q.   And over time, while your company was still private, who

20   else put in money to help the company?

21   A.   Thor Construction was one of our investors, and also

22   Charles Riehle was one of our investors.

23   Q.   And who's Charles Riehle?

24   A.   Charles Riehle is a friend of mine from Iowa.

25   Q.   And who is Thor Construction?

1  A.  Thor Construction is a company from Minneapolis.

2  Q.  And did they loan you money as well as give you some equity

3  ownership stake?

4  A.  Yeah.  It was in -- they invested in the company and, you

5  know, got an equity stake in the business.

6  Q.  And what percentage of the company did Mr. Riehle and Thor

7  Construction get?

8  A.  Thor Construction, I believe, I think they retained around

9  5 percent; and Charles around 5 percent, maybe a little bit

10  more.

11  Q.  And what did you do with the money that Mr. Riehle and Thor

12  Construction put into the company?

13  A.  We actually got a website put together.  We did our first

14  line, full line of watches, several different styles.  You

15  know, we obviously also did some traveling, some more designs,

16  and just kind of general overall operations of the company.

17  Q.  And who designed the watches?

18  A.  I did myself.

19  Q.  And who if anyone helped you design the watches?

20  A.  I would have different designers that would, you know, work

21  with me that were actually, you know, good on the computer and

22  was able to photoshop and really put those things together.  So

23  I had various different other artists that worked along with

24  me.

25  Q.  And how long did it take you to design a watch?

1  A.  Oh, it, you know, sometime I could design a watch maybe in

2  a couple hours and sometime it take a couple weeks, you know,

3  with changes.  Kind of depends on how I was inspired or how it

4  ended up looking, you know.  So it varied.

5  Q.  And how much travel did you do to help build the business?

6  A.  A lot, a lot of traveling.  You know, probably, you know,

7  15 days out of a month a lot of times, off and on sporadically

8  I would travel those early years and in general.

9  Q.  And where would you go on your travels?

10  A.  I was going to Minneapolis a lot, Chicago, New York, Los

11  Angeles, Miami.

12  Q.  And what was the purpose of your travels, what were the

13  things you were trying to accomplish through your travels?

14  A.  You know, a lot of meeting with celebrities, potential

15  investors, you know, working on trying to put together

16  distribution, talking maybe to different watch companies and

17  that.

18  Q.  How many full-time employees were there of Banneker watches

19  at that time?

20  A.  At that time it may have been maybe three, three that were

21  pretty much full time.

22  Q.  And who was the CEO of the company?

23  A.  Myself.

24  Q.  And who actually was responsible for selling the watches

25  once they were made?

1    A.  You know, we sold on the website.  We had some, some sales

2    reps that was repping the product.  We actually worked with a

3    company called Jostens and sold a number of watches that way

4    through them as well.

5    Q.  And who did you sell your watches to, did you sell directly

6    to individuals or were there also distribution deals?

7    A.  It was mainly to like individuals.  We never really had a

8    strong distribution network set up.

9    Q.  And how many -- how much time did you put into the company

10   per week to build it?

11   A.  You know, pretty much around the clock, you know.  When

12   you're not physically working, you're thinking about it.  So I

13   don't know in hours, maybe 80 hours, if not more, you know what

14   I mean.  When you have your own business, you never really stop

15   working.  So if you're not physically working, you're thinking

16   about it, thinking about what you can do to get ahead or keep

17   the lights on or whatever you need to do, constant.

18   Q.  Now, you referenced a relationship that you had with a

19   company called Jostens.  What is Jostens?

20   A.  Jostens is a company that sells graduation products that,

21   actually, they're the largest global grad product provider.

22   Q.  What's a grad product?

23   A.  For graduation, like graduation rings and caps and gowns

24   and tassels and yearbooks and that type of thing.

25   Q.  And what if any work did you do with Jostens in 2006?

1    A.  Well, one of the first things that the relationship that we

2    worked on was we actually made the 2006 NBA championship

3    watches for the Miami Heat.

4    Q.  And for what team was Tim Hardaway playing at the time you

5    made the watches?

6    A.  Yeah, the Miami Heat.

7    Q.  And in 2007, what contract did you begin negotiating with

8    Jostens?

9    A.  We began to negotiate a consulting agreement whereas we

10   became a vendor and developing product for urban line of

11   graduation jewelry that was watches and clocks, watches,

12   earrings, pendants.  And then we even did a deal where we

13   brought Beyonce to do a particular class ring, the first time

14   it was ever done where she designed a ring that could be sold

15   to the sophomores, juniors, and seniors.

16   Q.  And for what class years was this consulting arrangement?

17   A.  What?  I'm sorry.

18   Q.  For which years was this consulting agreement going to

19   last?

20   A.  For the Banneker graduation jewelry, it was class of 2008,

21   2009, and 2010.

22   Q.  That was the agreement that you had, you were reaching with

23   Jostens in 2007, correct?

24   A.  Yes.

25   Q.  Now I'd like to direct your attention to mid-2007.  First

1    of all, as of that time, what if any complaints did you have

2    from your initial investors about the way you were managing

3    your company?

4    A.  Ask that question again.  I'm going to make sure I'm clear.

5    Q.  Had any of your initial investors ever complained that you

6    were mismanaging the money?

7    A.  No, not to me, not that I know of.

8    Q.  What kind of additional financing were you looking for to

9    help you build your company?

10   A.  Well, yeah, we were -- we had a business plan at that time

11   and to really expand and to grow our business.  We were looking

12   for I think it was somewhere in the neighborhood of 2.5 million

13   was in our business plan, I believe, at that time.

14   Q.  What did you want to do with that 2.5 million that you were

15   hoping to get?

16   A.  We wanted to be able to really put together an extensive

17   line of the Banneker product, as well as putting in the

18   marketing dollars that it really takes to get behind a product

19   and give it market thrust.

20   Q.  And how much money did you believe it was going to cost to

21   create this new line of urban graduation jewelry?

22   A.  With the Jostens deal?

23   Q.  Yes.  Was Jostens funding that or were you going to have to

24   fund that?

25   A.  We had to fund it.  They were providing the distribution

1  and the sales team.

2  Q.  How much money did you think it was going to cost to

3  fulfill that contract?

4  A.  I knew it was going to be close to a half million dollars.

5  It came in somewhere around 400, I think around 400,000, if I'm

6  not mistaken, that we had invested.

7  Q.  When you're making jewelry or watches, what kind of costs

8  do you have?  In addition to paying your own expenses and

9  marketing, what do you have to do to actually be able to sell

10  something?

11  A.  I mean I have to warehouse the product.

12  Q.  How about making the product?

13  A.  Oh, yeah, we have to have the product manufactured.

14  Q.  And what costs were there associated with that?

15  A.  You know, there is when -- just the nuts and bolts of

16  having a watch made is there's a wholesale cost in which the

17  product costs or it's the cost and then it's wholesale and then

18  it's a retail cost that you market up in order to get paid.

19  But what you have in the watch is what you pretty much have to

20  pay for it, for each watch to get made.

21  Q.  Did you manufacture the watches yourself?

22  A.  No.

23  Q.  Who did you have manufacture the watches?

24  A.  We had a couple manufacturers.  Think Tank was one of our

25  manufacturers.  And also worked with Fossil, they manufactured

1    some product for us as well.

2    Q.  Now, in connection with your efforts to raise money for

3    Banneker, to fund the manufacturing and all the other things

4    you described, did there come a time when you met David Levy

5    and Donna Levy?

6    A.  Yes.

7    Q.  How were you introduced to them?

8    A.  I met David and Donna Levy through a friend, a mutual

9    friend of mine who I met through Tim Hardaway.

10   Q.  What was the name of your friend?

11   A.  Bree is what we call her, Bree.

12   Q.  Do you know her full name?

13   A.  Sabrina.

14   Q.  And how did you -- where did you first meet the Levys?

15   A.  I first met them at their home.

16   Q.  Where is their home located, which home?

17   A.  Well, it was in Fort Lauderdale.

18   Q.  And approximately when was this?

19   A.  It was sometime in 2007.  I think late summer or sometime

20   in 2007.

21   Q.  And who came with you to the meeting?

22   A.  It was Tim, Bree, and myself.

23   Q.  And describe their home.

24   A.  You know, it's a nice really nice home.

25   Q.  Where is it located?

1    A.  It's located in Fort Lauderdale.  I don't remember the

2    street or the address.

3    Q.  What if any cars did you see in the driveway?

4    A.  They owned, I think they owned an Escalade.  I don't know

5    if they owned it or leased it, but an Escalade was one of the

6    vehicles.

7    Q.  Did you see any other vehicles in the driveway as well?

8    A.  I don't know if I seen any at that time but, you know.

9    Q.  In a subsequent meeting or subsequent visit, did you see

10   any other vehicles in their home?

11   A.  Yeah, they had another vehicle.

12   Q.  And what kind?

13   A.  I think it was a Bentley.

14   Q.  And what effect did it have on you to see their living

15   situation?

16   A.  Well, I mean, you know, the conversation that we had, you

17   know, I felt that they were people who could make things

18   happen, for sure.

19   Q.  Now, when you arrived at their home with Bree and Tim

20   Hardaway, who else was at the home besides David Levy and Donna

21   Levy?

22   A.  I don't know if there was anybody there when I first -- I

23   think it was just us, I believe, when I first came there that I

24   can remember.

25   Q.  Did there come a time when you met an individual named

1    Fotis?

2    A.  Yes, yeah.

3    Q.  When did you meet Fotis?

4    A.  It was on one of my trips there.  I mean maybe the second

5    time or so that I came I had an opportunity to meet Fotis.

6    Q.  And what was your understanding of his relationship with

7    the Levys at that time?

8    A.  I knew they were friends.  I believe that they may have

9    been working together in some respects.

10   Q.  Now, at this first meeting, what did the Levys -- well,

11   what did David Levy explain that he and Donna could do to help

12   your company?

13   A.  Well, we were just talking about possibilities, you know.

14   They knew that we were trying to raise money and they were

15   basically telling me that it was a possibility that they could

16   take the company public and just kind of some of the details of

17   what that would entail.

18   Q.  Had you ever worked for a public company before?

19   A.  No.

20   Q.  Have you ever taken a company public before?

21   A.  No, no, I haven't.

22   Q.  So what was the source of the -- did you have any

23   independent source of information for what they were

24   describing?

25   A.  You know, no.  You know, of course you know about NASDAQ

1  and those type of things, but I never had bought any stock or

2  owned any stock or, you know, I never done anything with public

3  companies, you know, or anything of that nature.

4  Q.  Now, what if anything did David Levy say about a company

5  called Cardiac Networks at this first meeting?

6  A.  I don't know if it was the first meeting or it may have

7  been the second meeting, but I know they had had some success

8  with the company that they had taken public, Cardiac Network,

9  and they were, you know, saying that, you know, kind of showing

10  us that the company was doing well and what they were doing and

11  I was impressed with the technology of Cardiac Network and

12  that.

13  Q.  And that's what David described to you?

14  A.  I'm sorry?

15  Q.  In other words, did you have any independent knowledge of

16  Cardiac Networks other than what they were describing to you?

17  A.  Oh, no, no.

18  Q.  And how much money did you ask for from David Levy and

19  Donna Levy?

20  A.  Well, you know, I think -- I'm trying to see if that point

21  had we sent the business plan.  I think our business plan,

22  again, I believe it had, I think we were asking for two and a

23  half million or somewhere in that neighborhood.

24  Q.  And did there come a time when David Levy agreed to give

25  you $2 million to help you build your company?

1   A.  Yes.

2   Q.  And in exchange for what?

3   A.  When you say in exchange for, let me understand.

4   Q.  What did he want to do with your company after -- in

5   connection with him giving you $2 million?

6   A.  Well, taking the company public and through that, it was an

7   amount of stock that I believe would -- that they would get or

8   a certain percentage of the public company, I believe, that

9   they would get for that.

10  Q.  Now, did there come a time when you entered into what's

11  known as a letter of intent documenting the agreement between

12  yourself and your company and David Levy?

13  A.  Yes.

14  Q.  Now, did you retain a signed copy of this letter of intent?

15  A.  I did.

16  Q.  And do you still have that signed copy?

17  A.  I wouldn't know where it is if I did, no.

18  Q.  And I'm going to show you, in preparation for your

19  testimony here today, were you shown an unsigned copy of a

20  letter of intent?

21  A.  Yes.

22  Q.  Do you recognize that document?

23  A.  Yep, it looks familiar.

24  Q.  And how do you recognize it?

25  A.  It looks similar to the letter of intent that we ended up

1   executing.  It's been a while, but it looks, you know, it looks

2   like what we signed.

3   Q.  It contains the terms of the agreement that you remember?

4                MR. SHARGEL:  Object to the leading.

5                THE COURT:  Overruled.

6                MR. MASTER:  At this time the government offers

7   Government Exhibit 802-8.

8                MR. SHARGEL:  I object on the foundation as to what it

9   is.

10                THE COURT:  Sustained.

11                Do you have another question, Mr. Master?

12                MR. MASTER:  Yes.

13  Q.  This contained the terms of the agreement that you remember

14  entering into with David Levy?

15                MR. SHARGEL:  Object to the leading.  I'm sorry.

16                THE COURT:  Overruled.  Go ahead.  What's the

17  question?

18  Q.  Does this contain the terms of the agreement you remember

19  entering into with David Levy?

20  A.  It looks like what pretty much what we had agreed on, yes.

21  It looks.

22                MR. MASTER:  Government offers Government

23  Exhibit 802-8.

24                MR. SHARGEL:  Objection, foundation.

25                THE COURT:  Sustained.

1          MR. MASTER:  OK.  Just one moment.

2          THE COURT:  Do you have a question, Mr. Master?

3          MR. MASTER:  Yes, your Honor.  I'll proceed.

4          THE COURT:  Thank you.

5     Q.  All right.  Just to the extent that this document refreshes

6     your memory, just take a look at it and see if it refreshes

7     your memory at all as to the terms of your agreement with David

8     Levy.

9          MR. SHARGEL:  I object to that question.

10         THE COURT:  Overruled.

11    Q.  When you finished reviewing the document, please set it

12    aside and tell me if it refreshes your memory.

13    A.  Yeah, again, it looks like.

14    Q.  So, again, how much money did David Levy agree to give to

15    Banneker watches?

16    A.  We talked about $2 million.

17    Q.  And what did David Levy agree to do with Banneker watch,

18    the private company?  In other words, what was he going to

19    convert the private company Banneker into?

20    A.  Into a public company, into a -- from, you know, from what

21    I understand, it's a shell and it takes the shell in order to

22    go public.  We were doing like a reverse merger into a shell to

23    take the private company public.

24    Q.  Who explained that to you?

25    A.  David did.

1    Q.  And who was going to cover the costs of taking the company

2    public?

3    A.  Date Palm Capital was, David.

4    Q.  Date Palm Capital, whose company was that?

5    A.  It's David's company that I understand.

6    Q.  Who was going to manage the company under this agreement

7    once you took the company public?

8    A.  Date Palm Capital.

9    Q.  Who was actually going to be the CEO of the company once it

10   was a public company, who was going to run the company?

11   A.  Myself.

12   Q.  And how much of the company, the public company, was David

13   going to own and how much were you and the folks who work with

14   you going to own once the company went public?

15   A.  You know, I believe, I think they were getting 25 percent

16   of the company or something to that effect.  Again, I don't

17   totally remember, but that's what I'm -- that's what I think it

18   was, something right in there, and we were going to retain the

19   rest.

20            MR. SHARGEL:  Move to strike.

21            THE COURT:  Overruled.

22            That's your best estimate, Mr. Holmes?

23            THE WITNESS:  Yes.

24            THE COURT:  That's your best estimate?

25            THE WITNESS:  Yes, sir.

1    Q.  OK.  Now, after you signed this letter of intent with Date

2    Palm Capital, did there come a time when David Levy proceeded

3    to acquire a shell and to initiate steps to take your company

4    public?

5    A.  Yes.  I guess my understanding was that they already owned

6    a shell, I thought, you know, and again.

7    Q.  What did David tell you?

8    A.  I believe that he said that we have a shell and it takes a

9    shell, we want to do a reverse merger, put your company in the

10   shell.  That way you're public.  We can raise money, you know,

11   and that was kind of my understanding of it.

12   Q.  Now, as you were negotiating this with David Levy, did

13   there come a time when Donna Levy explained how she could help

14   your company?

15   A.  Yeah.  I mean Donna basically was kind of explained to me

16   how, you know, with the public company, the thing that makes a

17   public company be visible is that, you know, people have to

18   know about the company and that's what she specialized in as I

19   guess the PR work of getting the news out to potential people

20   who wanted to buy stock in the company to know about what you

21   do, the story, who you are, that kind of thing.

22   Q.  And what role if any did she say she could play in

23   investors relations?

24   A.  In -- say that again?

25   Q.  Not just press, but investor relations, what role did she

1  say she could do in investor relations?

2  A.  Yeah, the same thing.  I mean she would pretty much handle,

3  you know, that end of the business.

4  Q.  And did you agree to let her serve in those roles for the

5  business?

6  A.  Yes.

7  Q.  What experience did you have with press relations and

8  public relations for a publicly traded company?

9  A.  Not any.

10  Q.  Now I'd like to show you what's already in evidence as

11  Government Exhibit 350-5.  Could we pull that up on the screen.

12  And here's a paper copy.  If you wouldn't mind publishing that.

13  If you could just take a look at that.

14        Mr. Holmes, do you recognize, have you seen that

15  document before your preparation for your testimony today?

16  Just turn to the second page.

17        Are you familiar with a company called Cumetrix Data

18  Systems Corp.?

19  A.  Yes.

20  Q.  How did you become familiar with it?

21  A.  You know, I knew that it was the prior company that had

22  been in the shell, you know, I believe.

23  Q.  And if you just turn to page 3.  It's a letter from someone

24  named Laura Anthony.

25        Do you know, have you ever used an attorney named

1   Laura Anthony for anything?

2   A.  I haven't.

3            (Continued on next page)

D3crlev5                    Holmes - direct

1    Q.  Do you know approximately when the merger process began?

2    A.  I know it was in the fall of 2007.

3    Q.  When did the merger actually close?  Did it close in 2007

4    or not until 2008?

5    A.  I believe it was 2007.

6    Q.  Now I'd like to show you what is already in evidence as

7    Government Exhibit 350-4.  Prior to your testimony today, have

8    you seen Government Exhibit 350-4?

9           MR. MASTER:  If you wouldn't mind publishing that, Mr.

10   Dinet.

11   A.  What is your question again?  I'm sorry.

12   Q.  Had you seen this document before you were prepared to

13   testify today or it was shown to you today?

14   A.  No.

15   Q.  If you wouldn't mind turning to the second page.  Had you

16   seen any document previously in which David Levy named himself

17   president of Banneker, Inc. before?

18   A.  I think I have.

19   Q.  Was this Banneker, Inc. in operation at the same time as

20   your private company Banneker?

21   A.  No.  To be honest, I don't know for sure.

22   Q.  I'm going to show you what has already been introduced into

23   evidence as 350-9.

24          MR. MASTER:  If you wouldn't mind publishing that.

25   Q.  If you wouldn't mind turning to the second page of that

1    document.  Prior to your preparation for your testimony here

2    today, what, if any, awareness did you have that David Levy,

3    while acting as president and CEO of Banneker, Inc., issued

4    unrestricted shares to these entities EZ English, Inc. and L.

5    Paul and Associates?

6    A.  No, I wasn't aware of that.

7    Q.  It references an entity called EZ English, Inc.  Are you

8    familiar with that entity?

9    A.  No.

10   Q.  It references something called 504 certificates, the 504

11   certificates should be issued without restrictive legend.  Are

12   you familiar with something called Rule 504?

13   A.  Yes.

14   Q.  How did you become familiar with Rule 504?

15   A.  I had heard it a few times.  I don't know if it was from

16   David or whatever.  I have heard the term.

17   Q.  What is your understanding of the term?

18   A.  My understanding of 504 is that you can -- 504 is like an

19   apparatus to bring investment money into your company by

20   issuing shares, is what I understand.

21   Q.  If you could turn to the third page, there is something

22   called a conversion notice related to a convertible note issued

23   by Banneker, Inc.  Do you recall issuing any convertible notes

24   to an L. Paul and Associates.

25   A.  No.

1    Q.  If you could turn to the next page.  This relates to a

2    convertible note issued by Banneker, Inc. to this entity

3    EZ English.  Do you recall issuing a convertible note to an

4    entity called EZ English in your capacity as CEO of Banneker?

5    A.  No.

6    Q.  It lists an individual named Yael Tal as president of

7    EZ English.  Do you know who Yael Tal is?

8    A.  No.

9    Q.  Collectively, if you turn back to the second page, this

10   relates to 1 million shares of common stock issued in the name

11   of Banneker, Inc. and it states "without restrictive legend."

12   What knowledge, if any, did you have that these million shares

13   were being issued in the name of your company?

14   A.  I didn't have any knowledge of it.

15   Q.  When did you start getting money from the Levys for your

16   company?

17   A.  If I recall, it was like the fall of 2007.

18   Q.  To cut to the chase, of the $2 million that initially was

19   promised to you, how much money did you end up receiving from

20   David Levy and Donna Levy?

21   A.  You know, all together it was in the neighborhood of I

22   think 700,000 maybe.  I don't know.  600,000, 700,000,

23   something like that.

24   Q.  When was most of that money received?  In other words, was

25   it over a long period of time or was it . . .

D3crlev5                    Holmes - direct

1    A.  It was over -- in 2007 and 2008, the end of 2007 and 2008.

2    Q.  After the merger closed, what, if any, shares did you issue

3    to those who had helped you with building your company?

4    A.  I issued some stock.  I had a list of people that had been

5    either investors or instrumental in the company that I ended up

6    issuing some stock to or shares to.

7    Q.  Was that a list that you supplied to an entity called a

8    transfer agent?

9    A.  Yes, I'm sure.

10   Q.  Had you ever worked with a transfer agent before?

11   A.  No.

12   Q.  Did you execute some documents also so that David Levy

13   could have shares issued to him and others associated with him?

14   A.  I'm sure.

15   Q.  I'm going to show you what's been previously introduced

16   into evidence as Government Exhibits 350-10 and 350-11.  First

17   let's go to 350-11.

18            MR. MASTER:  Would you mind publishing that, Mr.

19   Dinet.

20   Q.  There are 15 names on a list on that first page.  It's in

21   the name of an entity called Standard Registrar and Transfer

22   Company, Inc.  Do you recognize the name of that entity,

23   Standard Registrar and Transfer Company Inc.?

24   A.  Yes.

25   Q.  Who are they?

D3crlev5                    Holmes - direct

1   A.  They are a transfer agent, a stock transfer company out of

2   Draper, Utah.

3   Q.  What role did they serve for public company Banneker?

4   A.  They served as our transfer agent.

5   Q.  If you could turn to the second page.  On the second,

6   third, and fourth pages there is a list of shares issued to a

7   number of individuals, including yourself, Tim Hardaway, Thor

8   Construction, Charles Riehle.  Who supplied the names for this

9   list?

10  A.  If I recall, I did.

11  Q.  Are these all people who you wished to give shares to in

12  Banneker upon its going public?

13  A.  Yes.

14  Q.  If you could turn to the fourth page of that document, it

15  states, "Each of the certificates shall bear the standard

16  restrictive legend.  If you have any questions or comments,

17  please contact us."  It is signed "Yours very truly, Banneker,

18  Inc."  Who signs for Banneker, Inc. in this document?

19  A.  David Levy.

20  Q.  What was your understanding what it meant to have

21  restricted shares?

22  A.  What was my understanding of restricted shares?

23  Q.  Yes.

24  A.  My understanding of restricted shares is they are

25  restricted for 6 to 12 months.  I think it's like 12 months.

1  Q.  When they are restricted, are you allowed to sell them?

2  A.  No.  When they are restricted, no, you can't sell them.

3  Q.  Under the terms of your deal with David Levy, what

4  understanding did you have about the shares that he was to

5  receive?  Would they be restricted or unrestricted?

6  A.  If I recall, I think they are unrestricted.

7  Q.  If you wouldn't mind taking a look at Government Exhibit

8  350-10.

9        MR. MASTER:  If you could publish 350-10, Mr. Dinet.

10 Q.  Do you recognize that list?

11 A.  No, I don't.

12 Q.  If you wouldn't mind taking a look at the second page.

13 Actually, I'm sorry, the fourth page.  There are a number of

14 individuals and entities listed on here.  Do you know as you

15 sit here today who supplied the list of names for this page and

16 then the next page, for this list?  Do you recall?

17 A.  You're asking me who did?

18 Q.  This relates to an issuance of shares without restrictive

19 legend.

20 A.  OK.

21 Q.  In the name of Banneker, Inc.  Do you see that?

22 A.  Yes.

23 Q.  It's dated February 12, 2008.  Do you remember how David

24 Levy told you who he wanted to have receive shares in Banneker?

25 A.  I believe so.

1   Q.  What did he do?  What did he do to tell you who he wanted

2   to have receive shares in Banneker?

3   A.  I believe that he just basically -- I think he just told me

4   that these are some of the people that he wanted to receive

5   shares from their end.

6   Q.  Did you know an individual named David Champion, the first

7   person on the list?

8   A.  No.

9   Q.  Did you know an entity called Kodel Investment in Ontario,

10  Canada?

11  A.  No.

12  Q.  How about any of the other people on this list, or

13  entities?  If you could take a look.

14  A.  Yes, I don't know any of these people.

15  Q.  On the second page of that list there is a signature.  If

16  you wouldn't mind turning to that.  Is that your signature?

17  A.  Yes, it is.

18  Q.  Do you remember authorizing unrestricted shares in Banneker

19  to be issued in the names of these individuals and entities?

20  A.  I believe so.

21  Q.  I want to ask you some questions about what happened as you

22  began getting money in for the company.  What was your plan for

23  spending the $2 million?

24  A.  Like I said, we had a business plan.  It was we wanted to

25  expand our product line, get several different styles of

D3crlev5                    Holmes - direct

1    watches, clocks.

2    Q.  What did you want to do --

3           MR. SHARGEL:  I don't know if he finished answering

4    the question.

5           THE COURT:  Had you finished, Mr. Homes?

6           THE WITNESS:  Yes, pretty much.

7    A.  Marketing, stuff like that.

8    Q.  What did you intend to do first with the money that you had

9    wired from David Levy?

10   A.  The first money was to pay back some of our early

11   investors.

12   Q.  Did you communicate that plan to David Levy?

13   A.  Yes.

14   Q.  What did you do with some of the first money you got in?

15   A.  I paid back some of our early investors.

16   Q.  After that, what did you start spending the money on?

17   A.  After that, that was like some of our first round of money.

18   The second moneys was to fulfill the relationship with Jostens.

19   So we had class jewelry made, so I paid for the class jewelry.

20   Q.  How expensive was that?

21   A.  I know it was close to 300,000 -- about 350,000 at least,

22   almost close to 400,000 if I remember.

23   Q.  What were you intending to do with the next money after you

24   had, I guess, designed and manufactured the Jostens jewelry?

25   A.  The next money was going to be to really blow the Banneker

D3crlev5                    Holmes - direct

1    watch line out.  We had planned on doing watches and clocks.

2    Q.  What about money for marketing?  Were you intending to

3    market all these products?

4              MR. SHARGEL:  I object to the leading.

5    A.  Yes.

6              MR. SHARGEL:  Excuse me.  I object to the leading.

7              THE COURT:  Overruled.

8    Q.  What, if anything, were you intending to spend on marketing

9    for these products?

10   A.  I can't remember the exact numbers, to be honest, of what

11   the line items on our business plan were.  We were going to try

12   to spend a pretty nice amount of money on the marketing of the

13   product.

14             THE COURT:  Did you have a view, Mr. Homes, as to what

15   a nice amount of money was?

16             THE WITNESS:  I'm sorry?

17             THE COURT:  You say you spent a nice amount of money

18   on marketing.  What is a nice amount of money on marketing?

19             THE WITNESS:  I think maybe 50,000, a hundred thousand

20   maybe.  Again, I'm just off, what I'm thinking.  But I know we

21   were going to spend a lot of money on magazine ads, promos, and

22   different things like that.

23   Q.  How did you compensate yourself for your work for Banneker?

24   A.  Basically, the way I was receiving the money and like some

25   of the people I owed, I was basically paying back some of the

1    debts.  And a lot of the money, again, went into some of the

2    product.  So I wasn't able to pay myself a salary.  I work out

3    of my home.  I had another office, but I worked out of my home

4    mainly.

5    Q.  So when you had living expenses, what did you do after the

6    funds that came in to Banneker?

7    A.  I would take some money.  I would make some withdrawals of

8    money in order to have money to live on.

9    Q.  How about when you traveled?  Did there come times after

10   this became a public company that you traveled?

11   A.  Yes, a lot of traveling.

12   Q.  How did you cover the travel expenses related to Banneker?

13   A.  I covered the travel expenses with the Banneker business

14   card.  Sometimes I would get cash out if I needed cash for

15   travel.

16   Q.  When, if ever, did Banneker host events or parties?

17   A.  We hosted a nice amount of parties.  We would have investor

18   parties.  We would have parties with celebrities.  If we went

19   to like an all-star game, we would have a party.  If we went to

20   the Super Bowl, we would have a party.  There was always

21   something going on.

22   Q.  How would you cover the expenses related to these events or

23   parties?

24   A.  I would pay for that with the Banneker money tagged as

25   entertainment money.

Q.  How, if at all, did you record your expenses?  What was the

purpose of those parties and events?

A.  To promote the product, to promote the brand.

Q.  Did there come a time when you retained an accountant named

Roy Willis Gentry, Inc.?

A.  Yes.

Q.  In fact, who helped pay for some of the accounting work

that Roy Willis Gentry did?

A.  I believe sometimes David would.

Q.  Did you report your expenses to Roy Willis Gentry?

A.  Yes.

Q.  Did Roy Willis Gentry prepare reports and tax returns for

the business based on the information you provided him?

A.  Yes.

Q.  Did there come a time when Roy Willis Gentry also prepared

your personal tax returns as well?

A.  Yes.

Q.  When you took money out of the business for personal

expenses, what, if any, information would you provide to Roy

Willis Gentry about these personal expenses that you were

incurring?

A.  I believe that he handles all of it.  We would have

meetings.  We had to file our taxes quarterly through the

business, so we would meet every 90 days or so and kind of go

through everything.

D3crlev5                    Holmes - direct

1   Q.  When you met with your accountant, did you seek his advice

2   on how to properly account for various expenses that you

3   incurred?

4   A.  Yes.  He used to advise me and tell me what would go in

5   what category, what would be entertainment, what would be kind

6   of -- what all of it would be.

7   Q.  What would you do when he gave you advice as to how to

8   account for various expenses?

9   A.  I tried to put it together.  One of the things I did with

10  Banneker is I used my business card only.

11  Q.  So it was all --

12  A.  Everything I did businesswise down to the penny was

13  recorded off my Banneker business card.  That was one of the

14  things he told me to do for sure.

15  Q.  Once it was recorded on the Banneker business card, what

16  would you do with Roy Willis Gentry to account for what should

17  be accounted for on your personal tax return and what should be

18  accounted for on your corporate tax return?

19  A.  Just itemize what was entertainment, what was travel, what

20  was lodging, and that type of thing.

21  Q.  By the way, what do you mean by your Banneker business

22  card?  That was a credit card?

23  A.  Yes.

24  Q.  Did you fully disclose all of the details of your

25  expenditures on that Banneker business card to your accountant?

D3crlev5                    Holmes - direct

1    A.  Yes.  Yes, I would give him the statements.

2    Q.  I'm going to show you what's been marked for

3    identification, and I think it is being admitted by stipulation

4    of the parties, as Government Exhibits 301-1, 301-2, 301-3, and

5    301-4.  If you want mind taking a look at these documents, sir.

6    Do you recognize those four items, sir?

7    A.  Yes.

8    Q.  What are they?

9    A.  It is some of our quarterly filings.

10   Q.  Related to what entity?

11   A.  For Banneker, Inc.

12   Q.  Prepared by whom?

13   A.  Prepared by my accountant, Roy Gentry.

14   Q.  Do you recognize these documents?

15   A.  Yes.

16          MR. MASTER:  At this time the government offers

17   Government Exhibits 301-1, 301-2, 301-3, and 301-4.

18          MR. SHARGEL:  No objection.

19          THE COURT:  Received in evidence.

20          (**Government's Exhibits** 301-1, -2, -3, and -4 received

21   in evidence)

22          THE COURT:  I think we'll take our afternoon recess

23   now.

24          (Recess)

25   Q.  Mr. Homes, just a couple of more questions about your

D3crlev5              Holmes - direct

1    relationship with your accountant.  When, if ever, did your

2    accountant refuse to sign off on your corporate tax returns or

3    personal tax returns because of anything that he saw was

4    improper?

5    A.  Never.

6    Q.  When did David Levy or Donna Levy ever complain to you

7    about how you accounted for various expenses related to the

8    company?

9    A.  I don't remember us having that conversation.

10   Q.  Now let me ask you a couple of questions about Donna's role

11   once the company became public.  Do you recall Donna Levy

12   creating an email account BannekerInc@gmail.com?

13   A.  I believe so.

14   Q.  In front of you is what has been marked for identification

15   as Government Exhibit 301-9.  Do you see what is in front of

16   you that has been marked for identification?

17   A.  OK.

18   Q.  Do you recognize that document?

19   A.  Yes, it looks familiar.

20   Q.  What is it?

21   A.  Did you say what is it?

22   Q.  Yes.  Well, withdrawn.  Do you recognize an email address

23   on the top of that page?

24   A.  Yes.

25   Q.  What is the email address and who do you remember it being

D3crlev5                    Holmes - direct

1   associated with?

2   A.  To Donna.

3   Q.  What is the email address that you remember her creating

4   for Banneker?

5   A.  Yes.

6   Q.  What?  Go ahead.

7   A.  Is your question is this the email that I believe she

8   created?

9   Q.  Yes.

10  A.  Through Banneker or for Banneker?

11  Q.  Yes.

12  A.  I believe so, yes.

13  Q.  What email address do you remember her using for Banneker?

14  A.  This would be it that I remember, yes.

15  Q.  What is this, if you could explain to the jury.

16  A.  I'm sorry.  It's BannekerInc@gmail.com.

17  Q.  Did you have the ability to access BannekerInc@gmail.com?

18  A.  No, I didn't.

19  Q.  Who actually, to your knowledge, was the only one who had

20  the ability to send and receive emails from

21  BannekerInc@gmail.com?

22  A.  I believe it would be Donna.

23  Q.  What role did she take in handling press relations for the

24  company?

25  A.  She actually was the press representative for the public --

1    for Banneker, Inc.

2    Q.   Who drafted press releases for Banneker, Inc.?

3    A.   To my knowledge, I believe she drafted them.  I don't know

4    if she had help or did it some other way sometimes, but I

5    believe it was mainly her working on the press releases.

6    Q.   Who handled investor relations for Banneker, Inc.?

7    A.   I believe that also was Donna's role as well.

8    Q.   Did there come a time when investors would complain to you

9    about things happening with Banneker stock?

10   A.   Yes.  You know, you would always get calls of investors

11   complaining about the stock or the stock price, if it wasn't

12   moving fast enough for them or whatever, that type of thing.

13   Q.   What did Donna tell you to do if someone complained to you

14   about something related to Banneker stock?

15   A.   She would always say, just refer them to investor

16   relations.

17   Q.   Which was?

18   A.   She handled investor relations.

19   Q.   So she would refer these people to her?

20   A.   Correct.

21   Q.   In preparation for your testimony here today, you were

22   asked to review certain press releases issued in the name of

23   Banneker, Inc.  Do you recall that?

24   A.   Yes.

25   Q.   Did you recognize all of the press releases that were

D3crlev5                    Holmes - direct

1    issued in the name of Banneker, Inc.?

2    A.  I won't say I recognize all of them because, again, it's

3    been a long time.  Most of them were familiar to me.

4    Q.  I'd like you to take a look at what's already in evidence

5    as Government Exhibit 103-1.

6               MR. MASTER:  If we could pull that up, Mr. Dinet.

7    Q.  If you could take a look at the screen, Mr. Homes.  Do you

8    recognize that press release?

9    A.  I remember it, yes.

10   Q.  With respect to that press release, do you recall Donna

11   sharing details of that press release with you prior to its

12   issuance?

13   A.  I believe so.

14   Q.  That was issued July 29th of 2008?

15   A.  Yes.

16   Q.  What do you recall this press release relating to?

17   A.  This press release was related to our launch with Jostens,

18   with the urban jewelry, and the clothing line that we did, and

19   Beyonce.

20   Q.  Who handled the distribution of these press releases?

21   A.  To my knowledge, it was Donna, I believe.

22   Q.  I'd like you to now take a look at what is in evidence as

23   Government Exhibit 103-2.  Do you recall this document?  It's a

24   press release August 6, 2008, Banneker, Inc., "No high school

25   student left behind."  Do you recall that?

1    A.   Yes.  It looks real familiar, yes.

2    Q.   What does this press release relate to?

3    A.   It was a concept that was coined basically saying that we

4    wanted to make sure that all students had an opportunity to

5    have something that really speaks to them in terms of

6    graduation jewelry product.

7    Q.   Do you recall seeing this before it was issued?

8    A.   I'm sorry?

9    Q.   Do you recall seeing this before it was issued?

10   A.   Yes.  Like I say, it looks familiar.  I'm sure I have.  I

11   remember the "no high school student left behind" slogan.

12   Q.   I'd like to ask you some questions about the Levys' funding

13   of your company and what started to happen after you got in the

14   first, I guess, half a million or so in funding.

15            MR. SHARGEL:  I object to this.  It was 6 or $700,000

16   dollars, it was not $500,000.

17            MR. MASTER:  I'll rephrase, your Honor.

18            THE COURT:  Thank you.

19   Q.   What started to happen to the funding that you were

20   expecting to receive from these?

21   A.   I can't remember exactly the time frame that all of the

22   money was supposed to come in.  I remember there was delays on

23   when some of the rest of the funding was supposed to come in.

24   Q.   How was that affecting your business?

25   A.   How would that affect?

D3crlev5                    Holmes - direct

1  Q.  How were the delays affecting your business?

2  A.  There was things that we were planning on doing with the

3  other funding that was supposed to come in.  So, of course, we

4  would have to delay our plans.

5  Q.  At the same time that you were experiencing delays in

6  funding, what, if any, contact did you have from other

7  individuals who were looking to invest in Banneker?

8  A.  Let me understand the question.  I'm sorry.

9  Q.  Did there come a time when individuals other than the Levys

10  offered to invest money in Banneker?

11  A.  From the very beginning we had a group, before we went

12  public we had a group that was looking at putting the 2.5 in.

13  Q.  Did they end up putting that 2.5 in?

14  A.  No, they didn't.

15  Q.  Did there come a time when individuals started approaching

16  you with offers related to what you previously described as a

17  Rule 504?

18  A.  Oh, yes.

19  Q.  What kind of offers were they giving you?

20  A.  Basically, for a certain amount of stock versus a certain

21  amount of money that they would put in.

22  Q.  In other words, what did they offer you?  They offered you

23  cash?

24  A.  Yes.

25  Q.  In exchange for what?

D3crlev5                    Holmes - direct

1   A.   In exchange for stock.

2   Q.   Did there come a time when you entered into a Rule 504

3   agreement with an entity called Mazuma Holding Corp.?

4   A.   Yes.

5   Q.   I'd like to show you what's been marked for identification

6   as Government Exhibit 350-19.  It's already in evidence,

7   actually.

8        MR. MASTER:  Mr. Dinet, if you could publish page 13

9   of Government Exhibit 350-19.  That's a document dated May 14,

10  2008.  It relates to issuance of 80,000 shares in the name of

11  Mazuma Holding Corp.  If you could turn to the next page, Mr.

12  Dinet.

13  Q.   Do you recall being approached by an individual who worked

14  with Mazuma Holding Corp. with an offer to provide financing

15  for the company in exchange for 80,000 shares?

16  A.   Yes, I remember.

17  Q.   If you could turn to the next page.  How much money did

18  Mazuma agree to give you in exchange for the 80,000 shares?

19  A.   I think it was around 40, $50,000.

20  Q.   It states here 80,000 shares at $50,000.  Does that --

21  A.   That sounds right.

22  Q.   What was your financial position at the time that you

23  entered into this agreement?

24  A.   The company was in need of some additional dollars at that

25  time.

D3crlev5                    Holmes - direct

1    Q.  Do you recall how many shares were issued to David Levy and

2    affiliates?  That's back on Government Exhibit 350-10.  That's

3    6 million shares.  Do you recall that?

4    A.  Yes.

5    Q.  The Rule 504 related to the issuance of 80,000 shares,

6    right?

7    A.  80,000, yes.

8    Q.  Did you discuss the issuance of the 80,000 shares with the

9    Levys before you actually entered into that Rule 504?

10   A.  No, I don't think so.

11   Q.  Did there come a time when you heard from David Levy and

12   Donna Levy about this Rule 504?

13   A.  Yes.

14   Q.  Do you know how they found out about the Rule 504?

15   A.  I don't know.

16   Q.  What did David Levy say to you about the Rule 504?

17   A.  I remember having a conversation where he basically said

18   that it's not good to do 504s, it could hurt your stock price,

19   and he asked me not to do any more 504s.

20                (Continued on next page)

21

22

23

24

25

D3CLLEV6                    Holmes - direct

1   BY MR. MASTER:

2   Q.  And what did you say to him about the reason why you had

3   done the 504?

4   A.  Well, you know, the first 504, of course, at that time we

5   all knew that we were in the middle of not getting some money

6   that we had coming.  But I didn't realize, you know, that, that

7   it could, you know, hurt the stock price at the time.  I just

8   got a call about selling some stock and, you know, the company

9   needed money, so I did the 504.

10  Q.  And did you speak with Donna as well about the 504 or just

11  David?

12  A.  You know, I think we all talked about it, you know, you

13  know, Donna was encouraging me not to do one as well, not to do

14  504s, you know.

15  Q.  And so after May of 2008, what started happening to the

16  money that you were expecting to receive from the Levys?

17  A.  You know, it was, there was periods of time where we were

18  promised we were going to get a certain amount of money, we

19  wouldn't, and then that would be pushed back, you know, a

20  little further and wouldn't get it.

21  Q.  Describe conversation you had with David Levy in the summer

22  of 2008 about the money that you were expecting to receive.

23  A.  Well, you know, we were, you know, we would basically talk

24  about it.  I would be saying, hey, when are we going to get the

25  money, when is some more of the money going to come in?  He

1    would say I'm working on it, working on putting it together.

2    And I just told him, hey, we need it.

3           Most of the money from the onset, again, some of the

4    first money that came in went to investors and it went to --

5    the bulk of that money went to the grad jewelry and that.  So

6    we were looking for some of that other money to try to execute,

7    execute what we wanted to do, so.

8    Q.  And what during the summer of 2008, what would happen when

9    the deadline that David Levy had set for providing you with the

10   money you were expecting had passed, what would happen?

11   A.  You know, we would end up talking and we would end up

12   extending the deadline.

13   Q.  OK.  And what effect did it have on your business that the

14   deadline kept on getting extended without the balance of money

15   being received?

16   A.  You know, it affected us because, you know, we weren't able

17   to, we weren't able to actually have the other money that we

18   had planned on and planned on having to really go out and get

19   the product made that we wanted to get, to do the marketing and

20   all, some of the other things that we wanted to be able to do.

21   Q.  By the way, how did, when you were discussing this money

22   raise with David Levy and Donna Levy, how did they say they

23   would actually be raising the money for your company?

24   A.  You know, from what I understood, it would be raised

25   through the sale of stock.

1    Q.   In Banneker?  In stock of what?

2    A.   Yeah, of Banneker, Banneker stock.

3    Q.   What if any understanding did you have as to how they would

4    actually accomplish the money raise?

5    A.   You know, a lot of it I didn't know, I didn't know a lot of

6    the ins and outs of it.  You know, I know at one time we had

7    talked about doing a -- man, I can't think of the term right

8    now, but it was one way we were going to try to bring money in

9    together once we got everything situated, but we never ended up

10   doing that.  But I can't even think of the name of it.  I

11   apologize.

12   Q.   What if anything did they explain to you about the role

13   that, for example, press releases played in raising money?

14   A.   You know, I knew press releases were, you know, were

15   central to potential investors being able to decide whether

16   they wanted to buy the stock or not.

17   Q.   And what if any discussions did you have with them about

18   stock promotion activity related to Banneker stock?

19   A.   I don't know if we had a lot of conversation, you know, per

20   se about it other than, you know, my main focus was to

21   concentrate on growing the business and, you know, through

22   growing the business, we would be able to create situations

23   from the business that we could then tell, you know, release

24   press about what was going on in terms of, you know, with the

25   company that was exciting.

1    Q.  And so what role if any did you play in stock promotion of

2    Banneker stock?

3    A.  I didn't play any role in the promotion of the stock.

4    Q.  And what kind of shares did you have throughout 2008?

5    A.  My stock was restricted stock.

6    Q.  So what if any shares were you able to sell in 2008?

7    A.  None of my personal stock at all.

8    Q.  Now, did there come a time when you again did a 504 with

9    Mazuma Holdings?

10   A.  Yeah, I did.

11   Q.  And what's the reason that you went back to Mazuma Holdings

12   for additional funding?

13   A.  Well, that particular time, you know, it was another

14   deadline that we had pushed back that we were supposed to be

15   getting more money into the company.

16   Q.  Whose deadline?

17   A.  Well, David's deadline.  It was that we -- it was a

18   particular time where we were supposed to get more money in for

19   sure, the money was going to come.  And I, you know, I didn't

20   do it to be vindictive, but I said, look, if we don't get money

21   in, I'm going to have to do another 504 here because we're

22   dying on the vine here.  We got into a little skirmish about

23   it, had a little words.

24          But basically, you know, we were kind of like family,

25   you know, so we were close, you know.  I didn't -- I love those

1    guys, I still do.  So it was like, you know, you get mad but,

2    you know, I ended up saying, hey, this is what I got to do and

3    I did a 504.

4           THE COURT:  You say you love those guys, you're

5    talking about the Levys?

6           THE WITNESS:  Yeah.

7           THE COURT:  OK.

8    Q.  I'd like to go back to Government Exhibit 350-19, page 6,

9    please, if you wouldn't mind looking at the screen.  And it's a

10   document related to the issuance of shares, 333,333 shares to

11   Mazuma Holding dated October 29, 2008.  And if you could just

12   turn to the next page.

13          And having reviewed this in preparation for your

14   testimony today, do you recall authorizing the issuance of

15   those shares, additional shares to Mazuma Holdings?

16   A.  Yes.

17   Q.  And, again, what's the reason that you authorized the

18   issuance of these shares?

19   A.  We needed money into the company.

20   Q.  And what happened to the money that the Levys were

21   promising?

22   A.  That money, we didn't get that money.

23   Q.  And going into the end of 2008 and the beginning of 2009,

24   what was the company's financial position?

25   A.  You know, we were expecting to have the rest of that money,

1    it was another 700 some thousand dollars by the end of that, of

2    that year, of 2008 I believe it was.

3           And then we were going to raise an additional

4    $2 million, private placement is what we were going to do.

5    That's what I was thinking of.  We were going to raise some

6    additional money after we got that money in so we could really

7    kick things off so.

8    Q.  Who told you that they were going to raise an additional

9    $2 million -- that an additional $2 million would be raised

10   through private placements?

11   A.  We talked about it -- Donna, David, myself, Tim -- we had

12   talked about that we could raise some additional money to

13   really kick the company off, and it was through private

14   placement that we were going to raise that money.

15   Q.  Now, you stated that you loved the Levys.  But what was the

16   status of your relationship as of early 2009, were there any

17   strains in your relationship?

18   A.  Yeah, our relationship was strained.  It was strained

19   because, you know, a lot of things didn't happen that, you

20   know, we were expecting and hoping to happen, you know.  And we

21   were -- things were tight, you know, for the company at the

22   time.  And, you know, per our contract, we had money that was

23   coming to us that didn't come.  So, you know, it was pretty

24   tense at that point.

25   Q.  Now, did there come a time when you learned that Banneker

1    stock was undergoing a 12 for one forward stock split?

2    A.  Yes.

3    Q.  And what role did you play in deciding whether or not to go

4    forward with a forward stock split of Banneker stock?

5    A.  You know, if I recall, man, and, again, I know that we had

6    had some discussions about that.  But, you know, things weren't

7    great with us during that time and I had lost a lot of, you

8    know, confidence in what could really happen based on being

9    able to really get things fulfilled and that.

10   Q.  So do you recall authorizing a forward stock split?

11   A.  No, I don't recall authorizing that.

12   Q.  I'd like to publish what's been in evidence as Government

13   Exhibit 350-7.  If you could just take a look at that.

14            MR. MASTER:  And, Mr. Dinet, if you could put that up

15   on the screen.

16   Q.  Now, first of all, is this your handwriting on the first

17   page of the document?

18   A.  On the first page of the document, no, it doesn't look like

19   my handwriting, no.

20   Q.  And is your address listed on this document?

21   A.  No.

22   Q.  I'd like you to take a look at the second page of the

23   document.  It states 12 for one forward and it relates to a

24   stock split.

25            Do you recall seeing this document?

1   A.  I don't recall seeing it.

2   Q.  And I'd like you to take a look at the third page of the

3   document.  It's signed by someone named Amy Merrill.

4           Do you recall who Amy Merrill was or is?

5   A.  Yes.

6   Q.  Who is she?

7   A.  Amy Merrill works for Standard Registrar, the transfer

8   company.

9   Q.  And what if any working relationship did you have with Amy

10  Merrill at this time in early 2009?

11  A.  I didn't.

12  Q.  And who handled all the transactions with the transfer

13  agent at this time?

14  A.  Date Palm Capital did.

15  Q.  And who's Date Palm Capital?

16  A.  I guess it would be David and, you know, whoever else may

17  have, you know, worked.  I don't know really how they work

18  together, you know, in terms of the transfer agent and them.  I

19  just assume it was David.

20  Q.  But Date Palm Capital you knew to be David's company?

21  A.  Yes, David's company, that I know, yes.

22  Q.  I'd like you to turn to the next page.  Do you see your

23  email address anywhere on this document related to the forward

24  stock split?

25  A.  No, I don't.

1   Q.  Turn to the next page.  Do you see your email address on

2   anything related to this, on anything on this page related to

3   the forward stock split?

4   A.  No, I don't.

5   Q.  Now turn to the next page.  Do you see your email address

6   on anything related to the forward stock split on this page?

7   A.  No, I don't.

8   Q.  I'd like you to turn to the next page.  That's a document

9   dated January 12, 2009, issued in the name of Banneker.

10          Do you see there where it's related to the planned 12

11  for one forward stock split, do you see there on that page?

12  A.  Yes.

13  Q.  And it states on behalf of the company's board of

14  directors, I hereby authorize you to set the record date for

15  the 12 for one forward stock split to be January 25, 2009.

16          Do you see that in the second paragraph?

17  A.  Yes.

18  Q.  And then I'd like you to look at the next page.  And it

19  states sincerely -- it's a document that states "Sincerely,

20  Derrick M. Holmes, Secretary."

21          Do you recognize that signature?

22  A.  It's my signature.

23  Q.  It's your name?

24  A.  It's my name.  No, it doesn't look like my signature.

25  Q.  Do you remember authorizing anyone else to sign your name

1    for you related to this stock split?

2    A.  I don't remember.

3    Q.  And then I'd like you to look at the next page.  It states,

4    "ATT Amy, I'll FedEx this check to you today.  Please send the

5    letter and if Banneker doesn't pay the bill, I will pay it

6    myself.  Thanks."

7            And do you recognize that signature?

8    A.  Yeah, looks like David's signature.

9    Q.  Do you remember writing any checks authorizing the forward

10   stock split and fund -- paying the fees related to the forward

11   stock split in the name of Banneker?

12   A.  No.

13   Q.  And this letter that is written in your name, do you

14   remember writing this letter?

15   A.  No.

16   Q.  And then I'd like you to take a look at Government

17   Exhibit 103-3.  It's already in evidence.  It's a press release

18   related to a forward stock split.

19          Do you remember reviewing this document related to the

20   forward stock split before it was issued?

21   A.  You know, it looks familiar, but I can't say a hundred

22   percent.

23   Q.  And do you remember seeing it before it was issued and

24   authorizing it?

25   A.  To be honest, I really don't know.  I can't remember to be

1   honest.

2   Q.  OK.  Now, do you recall seeing a lot of activity in

3   Banneker stock in February of 2009, around the time of this

4   forward stock split?

5   A.  I remember it more after.  I didn't really follow it, you

6   know, like that.

7   Q.  Well, after it happened, do you remember seeing on the

8   chart a lot of activity related to Banneker stock?

9   A.  Afterwards, yes.

10  Q.  And how much more money did you get from the Levys after

11  you saw all that activity in the stock in February 2009?

12  A.  I don't know exactly.  I know it wasn't much.

13  Q.  Under $5,000?

14  A.  That probably would be about accurate.

15  Q.  Under $5,000 total after this activity?

16  A.  Yeah, I believe so, if that.

17  Q.  And did there come a time -- well, actually, withdrawn.

18          What effect did it have on your business that the

19  Levys had stopped funding the company?

20  A.  You know, it was, it was tough.  You know, it was tough

21  because you -- I really believed that that money, I believed

22  that the money was going to come through, that things were

23  going to turn around and we would end up getting the rest of

24  the money and I never, never thought that we wouldn't, even all

25  the way to the end.

1    Q.  By the way, it references here in this press release there

2    was a special meeting of the board of directors in which the 12

3    for one forward stock split was authorized.

4            Do you remember attending any special meeting with the

5    board of directors related to this stock split?

6    A.  I don't recall.

7    Q.  So based on the money that you received from the Levys,

8    what happened to your plans to build out a new line of Banneker

9    watches?

10   A.  Well, you know, we weren't able to, we weren't able to

11   execute that.

12   Q.  What happened to your plans to spend substantial amount of

13   money on marketing for the watches and for the graduation line?

14   A.  Yeah, we weren't able to execute that.

15   Q.  And what happened to the stock after all the activity that

16   you'd observed in February 2009, what happened to the price and

17   trading volume of the stock?

18   A.  You know, it was -- it wasn't in good shape.

19   Q.  Now, did there come a time when you had a conversation with

20   Donna Levy concerning the activity that you'd observed

21   happening with Banneker stock?

22   A.  Say that again.  I'm sorry.

23   Q.  Did there come a time when you had a conversation with

24   Donna Levy about what you'd observed happening with Banneker

25   stock, the stock price and trading volume?

1          THE COURT:  Do you want to fix a time, the time this

2     activity was going on?

3          MR. MASTER:  Yes, your Honor.  Withdrawn.  I'll ask

4     additional questions.

5     Q.  After you were only getting the less than $5,000 from the

6     Levys, what did you try to do to get the money that they said

7     they were going to give you?

8     A.  You know, I think I called to chat with them to see, you

9     know, if we were going to be able to try to bring the money in.

10    Q.  And how successful were your efforts to reach them?

11    A.  You know, not good.  I think I spoke to them maybe -- I

12    think I may have spoke to Donna one more time or so after that

13    time.  And, you know, she was basically told me that things

14    were tight for them, things were, you know, tight in general

15    and that, you know, there wasn't no more money forthcoming, so.

16    Q.  And approximately how long after February 2009 did this

17    occur?

18    A.  It may have been three, four months, five months later,

19    maybe.

20    Q.  And, again, what did you ask, what did you say to her and

21    what did she say to you?

22    A.  You know, I can't remember the whole conversation, but I

23    just remember knowing that -- that we weren't, you know, that

24    we weren't ever going to get, you know, the rest of the

25    contract fulfilled.

1    Q.  What did you say to her about the status of the stock,

2    Banneker stock?

3    A.  I think I may have asked her about the stock, the price, I

4    mean where the stock was and that, but I don't remember

5    specifically to be honest.

6    Q.  OK.  And, again, what was her reaction when you asked her

7    to send the rest of the money?

8    A.  Oh, no, she just told me that there was no money.  She said

9    they didn't have money and that, you know, basically there

10   would be no more money coming to Banneker basically, you know,

11   any time soon at least.  I took that as a never, you know.

12   Q.  Now, in preparation for your testimony today, did there

13   come a time when you were asked to review some stock promotions

14   related to Banneker, do you recall that?

15   A.  Yes.

16   Q.  I'm just going to quickly go through some documents that

17   are already in evidence.

18            MR. MASTER:  Mr. Dinet, if you just pull up 103-19.

19   Q.  And it's from an entity called stockreads.com.  It's dated

20   August 6, 2008.

21            Had you seen this document before your preparation for

22   trial testimony?

23   A.  No, I hadn't.

24            MR. SREBNICK:  If I could just reserve an objection,

25   we can take it up at the break.

1          THE COURT:  All right.

2          MR. SREBNICK:  We've discussed it with counsel

3     earlier.

4          THE COURT:  Thank you, Mr. Srebnick.

5     Q.  And then August -- I'd like to turn to Government

6     Exhibit 103-22.  This is stockreads, August 7, 2008.

7          Have you seen this before your preparation for trial

8     today?

9     A.  I don't believe so, you know.

10    Q.  How about Government Exhibit 103-21, do you recall seeing

11    this before your preparation for trial testimony?

12    A.  I don't.

13    Q.  How about Government Exhibit 103-23, have you seen this

14    document before?

15    A.  It doesn't look familiar.

16    Q.  How about Government Exhibit 103-17?

17    A.  Somewhat familiar.  I may have seen it.

18    Q.  OK.  Pink Sheet alert.

19         How about 103-12?

20    A.  I think that it looks familiar somewhat.

21    Q.  Have you heard of the Wall Street Premiere Alert before?

22    A.  I heard of them.

23    Q.  And how did you hear of them?

24    A.  I don't recall to be honest.

25    Q.  Did you have any role in issuing this Wall Street Premiere

1    Alert?

2    A.  Not that I know of.  Again, you know, I know Donna would

3    run some of the press releases by me.  I don't remember them

4    all.  I don't remember which ones.  But a lot of times she

5    would run some of the press releases for approval and -- or ask

6    me my opinion on some of the things, so I do know that.  But I

7    don't know which ones and that, but.

8    Q.  OK.  How about 103-43?  It's dated February 2, 2009.

9    A.  That doesn't look familiar.

10   Q.  Dr. Stockpick.

11          How about 103-42, Pinnacle Digest, do you know

12   anything about an entity called Pinnacle Digest?

13   A.  Never heard of them really.

14   Q.  How about 103-41?

15   A.  It doesn't look familiar.

16   Q.  How about Government Exhibit 103-40?  Document dated

17   February 4, 2009, OTCpicks.com, and it references a number of

18   stocks including BANI.

19          B-A-N-I is the ticker symbol for your company,

20   correct, B-A-N-I, BANI?

21   A.  Yes, BANI.  No, it doesn't look that familiar.

22   Q.  How about 103-39?

23   A.  No.

24   Q.  Dr. Stockpick also dated February 4, 2009.

25          How about 103-38, February 5, 2009?

D3CLLEV6                    Holmes - direct

```
 1    A.  No.
 2              MR. MASTER:  103-38, Mr. Dinet.
 3    Q.  Bull and advantage.com alert related to Banneker and other
 4    stocks, does that look familiar?
 5    A.  No, it doesn't.
 6    Q.  How about 103-36, February 6, 2009, realpennies.com,
 7    Banneker, does that look familiar?
 8    A.  No.
 9    Q.  How about 103-35, February 9, 2009, OTCpicks.com, does that
10    look familiar to you?
11    A.  No.
12    Q.  How about 103-34?
13              THE COURT:  Do you have much more of this, Mr. Master?
14              MR. MASTER:  No, your Honor.
15    Q.  It's February 10, 2009.  Does that look familiar?
16    A.  No.
17    Q.  You've never spoken with Pinnacle Digest before?
18    A.  No, I haven't.
19              MR. MASTER:  And then the final set, your Honor,
20    permission to publish subject to connection.
21    Q.  It's bestdamnpennystocks related to Banneker, 605-7B.  If
22    you can just take a look on the screen.  It states, I want
23    everyone to drop everything and stop researching BANI
24    immediately.
25              MR. SREBNICK:  It says start.
```

1    Q.  Start.  And it's dated January 30, 2009.

2             Are you familiar with an entity called

3    bestdamnpennystocks?

4    A.  I may have heard of them, I don't know when, but I'm not

5    going to say familiar.

6    Q.  Did you ever hire bestdamnpennystocks help promote Banneker

7    stock?

8    A.  No, I didn't.

9    Q.  And then if you could turn to the third page, there's

10   another email dated January 31, 2009, also about Banneker from

11   bestdamnpennystocks.

12            Have you seen that before your preparation for trial

13   testimony?

14   A.  I don't remember seeing it.

15   Q.  Then there's another one on February 2, if you could just

16   take a quick look at that.  It's the fourth page.

17            Do you recognize that?

18   A.  No.

19   Q.  And then there's another one the next day, next page, do

20   you recognize that?

21   A.  No, I don't, but.

22   Q.  And how about the next day, February 4, 2009, there's

23   another promotion.  And I'm just going to continue.  There's

24   another promotion February 5, this is the next page.  Turn to

25   the next page, Mr. Dinet.  And then turn to the next page,

1   there's another promotion the next day.  It's actually two.

2   A.  Yeah, they don't look familiar.

3          THE COURT:  They do or they don't?

4          THE WITNESS:  They do not.  But, you know, again, I --

5   I mean that wasn't what I did.  But I don't, you know, it

6   doesn't look familiar.

7   Q.  If you just could flip through, look at the additional

8   promotions on February 6, February 7, February 8, February 9,

9   February 10, and February 11.

10         Do any of those look familiar to you?  You could just

11  take a look at the document just to -- do any of those look

12  familiar to you?

13  A.  No, none of these look familiar to me.

14  Q.  Did you authorize any of those to be issued?

15  A.  Not that I remember.

16         MR. MASTER:  One moment, your Honor.

17         Nothing further.

18         THE COURT:  Mr. Shargel.

19  CROSS-EXAMINATION

20  BY MR. SHARGEL:

21  Q.  Mr. Holmes, my name is Jerry Shargel.  I'm David Levy's

22  lawyer and I have some questions for you.

23  A.  OK.

24  Q.  So it's the case, is it not, that before you ever meet

25  David Levy and his wife, Donna Levy -- remind us when that was,

D3CLLEV6                    Holmes - cross

1   by the way?

2   A.  Say that again?  I'm sorry.

3   Q.  As best you can recall, just as best you can recall, when

4   do you first meet them?

5   A.  Where did I or when did I?

6   Q.  That was down in Florida, but when?  I'm looking for the

7   approximate time.

8   A.  It was sometime in the fall of 2007.

9   Q.  Fall of 2007.  And by that time, you already had investors

10  that you had been dealing with for a number of years, right?

11  A.  Investors that --

12  Q.  When Banneker was private, before any public offering, when

13  Banneker was private, you had investors, correct?

14  A.  Yes.

15  Q.  And one of the investors -- I'll pick one of them -- was

16  Tim Hardaway, right?

17  A.  Correct.

18  Q.  Tim Hardaway was a five-time all-star NBA player, right?

19  A.  Yes.

20  Q.  You knew and it was public knowledge, published in

21  newspapers, that this is a man that earned a lot of money

22  during his career, correct?

23  A.  Correct.

24  Q.  And you went to Mr. Hardaway and you borrowed some money,

25  correct?

1    A.  I didn't borrow money.

2    Q.  He invested money, and what did you give him in return?

3    A.  He invested money and in return he got ownership in the

4    company.

5    Q.  What percentage was his ownership?

6    A.  I think, like I said, around 15 percent.

7    Q.  And how much did he pay to acquire that equity interest in

8    the company?

9    A.  I don't know for sure the numbers.  I think it's maybe

10   around a hundred thousand, maybe more, I don't know.

11   Q.  Let me show you what has been marked as Defendant's Exhibit

12   A173.

13            MR. SHARGEL:  And by stipulation, your Honor, I'm

14   offering it.  It's by stipulation admissible.

15            THE COURT:  All right.  It's admitted then.

16            (Defendant's Exhibit A173 received in evidence)

17   Q.  I show you what's been marked as Defendant's Exhibit 173.

18            Do you think it would help if I return some of these

19   papers to Mr. Master.  I'll right back with you.

20            I put in front of you what's been marked as A173.  By

21   the way, before I ask you a question about the exhibit now in

22   evidence -- actually, we put it up on the screen -- before I

23   even ask you any questions about this, had you ever been to Tim

24   Hardaway's house?

25   A.  Yes.

1   Q.   And did he have nice cars?

2   A.   Yes.

3   Q.   And did he have a nice house?

4   A.   Yes.

5   Q.   And did he have all the trappings of success and wealth?

6   A.   I mean Tim wasn't -- Tim was not a flashy kind of guy, but

7   you could tell, you know, he wasn't a derelict.

8              THE COURT:  Big range there, Mr. Holmes.

9   Q.   All right.  Looking at A173, does that refresh your

10  recollection looking at that the amount of the note with Tim

11  Hardaway, whose address in Miami, Florida -- was he with the

12  Heat at that time, the Miami Heat?

13  A.   Uh-huh.

14  Q.   And it was $320,000 that he invested?

15  A.   Yes.

16  Q.   And you had other investors as well, right?

17  A.   Correct.

18  Q.   And by the way, back in 2004 -- you didn't know the

19  Levys -- back in 2004, did you have the idea of one day taking

20  Banneker public?

21  A.   No.

22  Q.   Absolutely not, right?

23  A.   Not that I can remember, no.

24  Q.   Let me show you what has been marked as Defendant's

25  Exhibit 170.

D3CLLEV6                    Holmes - cross

1          MR. SHARGEL:  And by stipulation deeming it

2     admissible, I offer it in evidence, your Honor.

3          THE COURT:  OK.  170 is received in evidence.

4          (Defendant's Exhibit 170 received in evidence)

5     Q.  I'm going to -- do you recognize 170?

6     A.  Let me look at it.

7     Q.  Is it Charles Riehle in that one, do you see the second

8     line?  Maybe you can see it easier on the screen.  The second

9     line it says promises to pay to the order of Charles Riehle?

10    A.  Yes.

11    Q.  Now, is Charles Riehle buying an interest in the company or

12    was he lending you money?

13    A.  He was buying an interest in the company and investing in

14    the company.

15    Q.  Well, do you see that the document that's on the screen is

16    not an investment in a company but a promissory note?

17          You were promising to pay him back, weren't you?

18    A.  No.

19    Q.  You weren't promising to pay him back?

20    A.  In terms of his investment, the company, not me personally.

21    Q.  So you had no personal liability.  This was on behalf of

22    the company.  Right?

23    A.  Yes, I'm sure.

24    Q.  Now, I asked you a moment ago, and I'll put the Tim

25    Hardaway promissory note back in a moment, but I asked a moment

1  ago about whether you intended to go public back in 2004 and

2  you said no, right?

3  A.  I said I didn't recall it, but I'm sure that I didn't.

4  Q.  You're sure that you didn't.  Could you highlight the third

5  paragraph from the bottom, please, actually, or the fourth from

6  the top, the one that starts an additional -- an additional

7  inducement for lender.

8         Now, the lender is Mr. Riehle, right, yes?

9  A.  OK.

10 Q.  Borrower agrees to grant lender 195,000 shares of Banneker

11 Inc. stock.  Said stock will be issued at the time Banneker

12 becomes a publicly traded company; however, such stock shall be

13 issued as restricted stock.

14        Do you see that?

15 A.  Uh-huh.

16 Q.  And could you just put up for a moment 173 in evidence.

17        Do you see the an additional inducement -- the date of

18 this is May 7, 2007; the other was 2004 -- as additional

19 inducement and interest for lender, borrower agrees to grant

20 lender 1,546,875 shares of Banneker Inc. stock.  Said stock

21 will be issued at the time Banneker becomes a publicly traded

22 company; however, such stock shall be issued as restricted

23 stock.

24        You knew in 2004 that you wanted to be a public

25 company, right?

1    A.  Incorrect.

2    Q.  Incorrect?

3    A.  Yes.  Is this signed?

4    Q.  No, this is not signed, but let me ask you a question about

5    signed.

6            Do you remember referring to a term sheet that you had

7    with the Levys after you met them in the fall of 2007?

8    A.  No.

9    Q.  Do you remember in response to questions by the prosecutor

10   that the prosecutor asked you about whether there was a term

11   sheet that you had with Mr. Levy?

12   A.  Was that a letter of intent?

13   Q.  Letter of intent, term sheet, by whatever words or

14   description.

15   A.  Well, I remember talking about a letter of intent, not a

16   term sheet.

17   Q.  A letter of intent is basically what the deal is, right?

18   A.  A letter of intent is what the intent is on, is what you're

19   intending on entering into in terms of business, what I

20   understand.

21   Q.  By the parties, in other words, two parties, it could be

22   more than two parties, enter into a letter of intent as to what

23   their understanding of the agreement is, right?

24   A.  Correct.

25   Q.  That's a fair statement, isn't it?

1    A.   Indeed.

2    Q.   Well, the letter of intent on which you claim that Mr. Levy

3    was promising to raise $2 million you lost?

4    A.   No, I never said I lost.

5    Q.   Can't find it?

6    A.   I tossed.

7    Q.   You tossed?

8    A.   Correct.

9    Q.   In other words, you actually have a memory of throwing the

10   document away?

11   A.   I remember throwing all the documents away related to me

12   going public with the Levys when I moved.

13   Q.   Let me see.  You moved when?

14   A.   I don't remember when it was.  But during the time when I

15   moved, after our relationship was over, I had a box of

16   different things and I remember getting rid of it.  I had no

17   use for it.

18   Q.   So you had the term sheet that had been signed by Mr. Levy,

19   as you've testified, right?

20   A.   At some point I did.

21   Q.   And this is your move to Aurora, Colorado?

22   A.   Yes.

23   Q.   And when you moved to Aurora, Colorado, where were you

24   moving from?

25   A.   I was moving from Aurora to Aurora in Aurora.

1  Q.  In other words, you were from Aurora?

2  A.  No.

3          THE COURT:  He's from Iowa.

4          MR. SHARGEL:  Sorry?

5          THE COURT:  He's from Iowa.

6          THE WITNESS:  I'm from Iowa.

7  Q.  When did you move to Aurora, Colorado, if I may know that?

8  A.  I moved to Aurora, Colorado in 1983, '84.

9  Q.  And was there -- seriously -- was there --

10 A.  I moved several times while being in Aurora.

11 Q.  When was the last move?

12 A.  Last move was probably two and a half years ago, maybe.

13 Q.  Two and a half years ago?

14 A.  Correct.

15 Q.  So it was sometime during 2011, approximately, '10, middle

16 of '10, '11?

17 A.  Right around in there somewhere.

18 Q.  And your testimony is in that move, you took all the papers

19 relating to Mr. and Mrs. Levy and going public, as you said,

20 and tossed them away?

21 A.  No.  I'm not saying I took all of them.

22 Q.  I'm sorry?

23 A.  I'm not saying I took all of them.  I'm saying there was

24 some things in a box that was related to my -- me going public

25 and that.  And some of those papers I looked through as I was

1    downsizing, going from my place to that place, and there was no

2    further need for me to keep some of that paperwork.

3            So I'm not going to say all of it is gone.  I don't

4    know -- I have some stuff in storage, but I remember throwing

5    some things away that were related.

6    Q.  And the term sheet you remember being or the memo of

7    understanding --

8    A.  I don't remember what all was in there.  I don't remember

9    what all was tossed.  I just remember some of the things that

10   were there.

11   Q.  The bottom line is you don't have it now, right?

12   A.  I may, but I don't know if I do, but it's a real

13   possibility I don't because there's a lot of things that got

14   tossed.

15   Q.  When the government first notified you that you were going

16   to be called as a witness in this case, do you remember when

17   that was?

18   A.  On or about.

19   Q.  And when was it?  Share it with us.

20   A.  I don't know for sure.  It was over a year ago.

21   Q.  And you've met with the government a number of times?

22   A.  No.

23   Q.  Did anyone from the government on the telephone, any

24   prosecutor or the agent -- you know Agent Reinhardt, you've met

25   him, have you?  He's not here right now, but do you remember

1  Agent Reinhardt?

2  A.  Yes.

3  Q.  Did anyone say to you from the prosecution team, could you

4  see whether you could find that document?

5  A.  Yes.

6  Q.  And in response to that, to that question or request that

7  you try to find that document, did you conduct a search?

8  A.  Well, it wasn't just that document.  It was documents, you

9  know, in general related to this case.

10  Q.  Let me show you what's been marked for identification as

11  176, A176.

12        MR. SHARGEL:  Is that part of the stipulation?

13  Q.  Could you take a look at that, please.  Do you know what

14  that is?

15  A.  It looks familiar.  It looks like a business plan, Banneker

16  business plan.

17  Q.  You're the CEO of Banneker.  Do you recognize it as a

18  business plan?

19  A.  It looks, again, like I said, it looks familiar.

20        MR. SHARGEL:  Well, I offer it into evidence as a

21  Banneker business plan.

22        THE WITNESS:  OK.

23        MR. SHARGEL:  You don't get to rule.  Request.

24        THE COURT:  Do you have any objection, Mr. Master?

25        MR. MASTER:  No.  Go ahead.

1          THE COURT:  A176 is in evidence then.

2          (Defendant's Exhibit A176 received in evidence)

3          MR. SHARGEL:  At the end of the day everyone could

4     just use a good laugh, so we're drawing no inference here.

5     Q.  There we have Banneker watches and the business plan and

6     it's dated -- I'm going to give a copy to the government --

7     it's dated January 15, 2007.  There are just two or three pages

8     I want to call to your attention.

9          MR. SHARGEL:  Do you have page 6, Jennifer?

10    Q.  Business plan was in order to attract investors, right?

11    A.  Correct.

12    Q.  All right.  Page 6, could you -- I'm sorry, page 5, let's

13    go to page 5.  And on the bottom right, the number on the right

14    side, actually, if you could blow up that whole portion right

15    there.  Requirements, actually, we're going to have to go to

16    the narrative at the top of the page.  I'm sorry.  Forgive me.

17         Startup summary.  Banneker watch's startup costs will

18    include the following startup costs for the business.  You go

19    down to describe what you need, legal and syndication fees and

20    so on and so forth, as you described in your direct testimony,

21    correct?

22    A.  Mm-hmm.

23    Q.  That's the initial production of watches estimated at eight

24    watches at 250 each because you're going to develop an interest

25    in the watches, right?

D3CLLEV6                    Holmes – cross

1    A.   Yes.

2    Q.   Now, can we go down to the actual costs.  Do you see where

3    it says requirements, and once again you have the itemization

4    right down to travel and entertainment, etc., legal for lawyers

5    and how much money is needed, total startup expenses, right.

6         Total startup expenses, $115,000, startup assets, cash

7    required, other current assets, initial watch inventory, total

8    assets, 450,000.

9         Total requirements, what you were telling people that

10   you needed to borrow was not $2 million, it was $565,000; do

11   you see that?

12   A.   I see that.

13   Q.   And that's something that was issued by your company,

14   right?

15   A.   Yes.

16   Q.   We turn to the next page, page 6.

17        So you have nothing in your possession where David

18   Levy promised to give you $2 million and signed it, right?

19   A.   Again --

20   Q.   Tossed it.

21   A.   -- let me be crystal clear with you on this.  I have things

22   in storage.  It was some of the things that were in the box

23   that was related to me going public and some information and I

24   threw that out.  So in my storage, I don't know what all I may

25   have.

1   Q.  You knew the subject matter of your testimony when you came

2   here to be a witness, right?

3   A.  Correct.

4   Q.  So on this page, once again, total funding, $565,000, see

5   that, total funding.

6           And you also made projections in connection with this

7   business, right?

8           MR. SHARGEL:  Told I have to use the Elmo for the

9   page 2.  Could I have the Elmo?

10          Judge, it's two minutes to five.  I think I'd like to

11  end with another subject, so I'm not going to fool around with

12  the Elmo.

13          THE COURT:  OK.

14          MR. SHARGEL:  And we've been sitting through this.

15  Q.  So let me ask you a question.  It's going to take two

16  minutes.  I'm going to just ask you this question and we'll

17  resume tomorrow morning.

18          When you came in or by whatever means, telephone,

19  meeting, when you spoke to representatives of the government on

20  March 2, 2013, a week ago Saturday, were you in New York a week

21  ago Saturday?

22  A.  A week ago Saturday, I may have been.  I know I was just

23  here a couple weeks ago, so.

24  Q.  Could I have Government Exhibit 350-19, please.  You told

25  the government on -- that's not the right number.  Page 7.

1          You told the government on that Saturday, March 2,

2     2013, that you didn't even know who Mazuma Holdings was, and

3     you also told them that that signature at the bottom of the

4     page was a forgery, yes or no?

5     A.  No.

6     Q.  Is it your testimony, sir, that you did not tell government

7     investigators or assistant United States attorneys that you

8     were not aware of the identity of Mazuma Holdings or the

9     issuance of some opinion letter in connection concerning Mazuma

10    Holdings, do you recall telling the government that, yes or no?

11    A.  Correct, I told them that I remember the name, but I

12    couldn't remember exactly what connection it was.

13    Q.  So why did you tell them that signature that you recognized

14    on direct examination as your signature, why did you tell them

15    that signature wasn't yours?

16    A.  Why did I tell them that?

17    Q.  Yeah, why did you tell them that?

18    A.  Because that signature is not mine.

19    Q.  That signature is not yours?

20    A.  Correct.

21          THE COURT:  I think, Mr. Shargel, you have one more

22    question?

23          MR. SHARGEL:  No.

24          THE WITNESS:  What is your question again?  I'm sorry.

25    Q.  My question is --

1    A.  I'm missing --

2            MR. SHARGEL:  May I, Judge?

3            THE COURT:  Yes.

4    Q.  My question is on March 2, 2013, which was a week ago

5    Saturday, is it not a fact, sir, that you, in discussions with

6    the United States Attorney's Office or their representatives,

7    said that you were not aware of the identity of Mazuma

8    Holdings; do you remember telling them that?

9    A.  I remember telling them that the name sounded familiar, but

10   I couldn't exactly place where I knew them from.

11   Q.  And now less than a week and a half later, now you are by

12   your oath testifying about dealings and transactions with

13   Mazuma Holdings, sir?

14   A.  I remember the name Mazuma Holdings and then later on it

15   came to me that that was who I ended up doing the 504 with.  I

16   never met these people, didn't really know them.  I did a

17   transaction with them twice.  So I knew the name but I couldn't

18   really put it together.

19   Q.  Did you put together -- and this is the last question,

20   Judge -- did you put together the fact that they had given you,

21   Mazuma Holdings had given you $140,000, you put that together?

22   A.  I knew that we had done some 504s, so I did put that

23   together, yes.

24           THE COURT:  All right.  We're going to break now and

25   resume tomorrow morning at 10 o'clock with Mr. Holmes.  Thank

1    you very much.

2              (Jury not present)

3              THE COURT:  Mr. Holmes, let me instruct you on the

4    record.  You're on cross-examination now so don't talk to the

5    government.  All right?

6              THE WITNESS:  OK.

7              THE COURT:  OK.  You can talk to the government but

8    not about your testimony.

9              THE WITNESS:  OK.

10             THE COURT:  Thanks very much.  Good night.  You can

11   step down.

12             (Witness not present)

13             THE COURT:  Mr. Srebnick, you had something you wanted

14   to raise?

15             MR. SREBNICK:  Yes.  You are correct.  Just not

16   urgent.

17             THE COURT:  Not urgent.

18             MR. SREBNICK:  The issue is we need to take up at some

19   point whether the government will be able to prove up that some

20   of the press premotions that have been shown to witnesses and

21   that were made part of the charts are tied to Donna Levy.

22             There are certainly some that the government can

23   prove.  There are others we expect to turn out to just be folks

24   that were copying and pasting and had no connection to Donna

25   Levy, just happened to be running their own promotion campaign.

1        THE COURT:  OK.  That's all?

2        MR. SREBNICK:  I want to make sure that was understood

3   on the record.  We had discussed that with government counsel,

4   and we'll take it up at the end of the case.

5        MS. COHEN:  Your Honor, we had told defense that we

6   would match some of it through the bank records.  But in any

7   event, if someone cut and pasted from one of Donna Levy's

8   sites, that would be relevant and admissible.

9        MR. SHARGEL:  Your Honor, I would like to put one

10  thing on the record.  We have the same situation that we had

11  before in connection with the Giglio disclosure where there was

12  an inconsistency about the naturalization process.

13       Here in a letter to us dated March 3, 2013, and the

14  reason I kept saying March 2 is because the letter says

15  yesterday.  Yesterday Mr. Holmes was asked to review

16  documents -- and I'm paraphrasing, but I have Mr. Master

17  standing right next to me.  Government Exhibit 350-19 -- which

18  was just on the screen -- concerning issuance of shares to

19  Mazuma Holdings was not his -- I'm sorry.  He indicated,

20  however, that the purported signatures and initials concerning

21  350-19 concerning issuance of shares to Mazuma Holdings was not

22  his and he was not aware of the identity of Mazuma Holdings.

23  This is a company that gave him $140,000 four years ago.

24       The bottom line is it's a prior inconsistent

25  statement.  I think we can do it through stipulation the same

D3CLLEV6                    Holmes - cross

1   way that we're in the process of doing it with the other issue

2   with --

3          THE COURT:  I was going to ask you what happened to

4   that other issue?

5          MR. SHARGEL:  We're just working on the wording of the

6   stipulation.  It could be read later.  It's not that it has to

7   be announced at the moment.

8          THE COURT:  OK.

9          MR. SHARGEL:  We'll deal with it.  We can get it done

10  by tomorrow.  I think it's all right in its present form.

11  We'll have the stipulation tomorrow.

12         THE COURT:  All right.  On this topic or on the other

13  topic?

14         MR. SHARGEL:  I would ask the government to draw, as

15  it did before, a stipulation on this topic as well.

16         THE COURT:  All right.

17         MR. MASTER:  We'll discuss with counsel and we'll

18  advise the Court in the morning.

19         THE COURT:  Ms. Cohen, what do you intend to do with

20  Mr. Srebnick's?

21         MS. COHEN:  As I informed Mr. Srebnick, we would go

22  through the bank records and show him how the different

23  websites connect Donna Levy, the unindicted coconspirators,

24  Eric Cusimano, and we would flag that for him.

25             And as to those we can't connect through any bank

1    records, if the text is lifted directly from a promotion that

2    Donna Levy did, we think it's relevant and admissible anyway.

3            THE COURT:  So I understand that you're taking the

4    world in two parts.  One part you can show a connection.

5            MS. COHEN:  Correct, your Honor.

6            THE COURT:  The other part will say Donna Levy issued

7    and someone else cut and paste and rebroadcast her news and

8    information?

9            MS. COHEN:  Correct.  I don't know if that exists,

10   your Honor, so we're going to take some time tonight and look

11   through it and we'll reconvene with defense counsel and report

12   back to the Court.

13           THE COURT:  I guess we have to wait, Mr. Srebnick.

14           MR. SREBNICK:  There's a third category which is some

15   of these websites just do their own "technical analysis" and

16   say look at Cardiac go, get in while it's hot.  Some of those

17   are I believe in the Government Exhibits and appear to be third

18   parties that are watching Cardiac go, so to speak, and trying

19   to get their members to follow along.  So we'll work it out

20   with the government and report back to you hopefully tomorrow.

21           THE COURT:  All right.  Fine.  Anything else?

22           MR. MASTER:  No, your Honor.

23           THE COURT:  I have an afternoon calendar.

24           MS. COHEN:  Thank you.

25           (Adjourned to March 13, 2013 at 10 a.m.)

1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    MICHAEL SWARTZBURG

4    Direct By Ms. Cohen . . . . . . . . . . . 774

5    Cross By Mr. Shargel . . . . . . . . . . . 802

6    Cross By Mr. Srebnick . . . . . . . . . . 836

7    Redirect By Ms. Cohen . . . . . . . . . . 847

8    Recross By Mr. Shargel . . . . . . . . . . 850

9    Redirect By Ms. Cohen . . . . . . . . . . 853

10   ALAN WEINER

11   Direct By Ms. Cohen . . . . . . . . . . . 855

12   Cross By Mr. Shargel . . . . . . . . . . . 878

13   DERRICK M. HOLMES

14   Direct By Mr. Master . . . . . . . . . . . 882

15   Cross By Mr. Shargel . . . . . . . . . . . 943

16                    GOVERNMENT EXHIBITS

17   Exhibit No.                          Received

18    S-6, 701-1, 701-2  . . . . . . . . . . . 880

19    300-A, 300-B . . . . . . . . . . . . . . 883

20    301-1, -2, -3, and -4  . . . . . . . . . 916

21    201-41   . . . . . . . . . . . . . .776

22    301-1, -2, -3, and -4  . . . . . . .916

23                    DEFENDANT EXHIBITS

24   Exhibit No.                          Received

25    170  . . . . . . . . . . . . . . . .947

964

1    A121-A  . . . . . . . . . . . . . .811

2    A121B  . . . . . . . . . . . . . .827

3    A126  . . . . . . . . . . . . . .830

4    A128  . . . . . . . . . . . . . .807

5    A173  . . . . . . . . . . . . . .945

6    A176  . . . . . . . . . . . . . .954

7    A211  . . . . . . . . . . . . . .814

8    A212  . . . . . . . . . . . . . .833

9    A56  . . . . . . . . . . . . . .852

10   A57  . . . . . . . . . . . . . .821

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25