D3DLLEV1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

       v.                11 Cr. 62 (PAC)

DONNA LEVY,
DAVID LEVY,
                      Jury Trial
        Defendants.

------------------------------x

                      New York, N.Y.
                      March 13, 2013
                      10:37 a.m.

Before:

       HON. PAUL A. CROTTY

                      District Judge

     APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
CARRIE H. COHEN
HOWARD S. MASTER
    Assistant United States Attorneys

HOWARD M. SREBNICK
NOAH FOX
ALEX ARTEAGA-GOMEZ
    Attorneys for Defendant Donna Levy

GERALD L. SHARGEL
ROSS M. KRAMER
JENNIFER HAYS
    Attorneys for Defendant David Levy

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  I guess there was problems on the subway

4    this morning.  Some of the jurors were late.

5          Marlon, will you call in the jury.

6          (Jury present)

7          THE COURT:  Good morning.

8          Mr. Holmes, you're still under oath.

9          THE WITNESS:  Yes, sir.

10         THE COURT:  Mr. Shargel.

11         MR. SHARGEL:  Thank you, your Honor.

12    DERRICK M. HOLMES, resumed.

13   CROSS-EXAMINATION (cont'd)

14   BY MR. SHARGEL:

15   Q.  Mr. Holmes, good morning.

16   A.  Good morning.

17   Q.  I would like to start by asking you something that occurred

18   after the company, after Banneker went public and started

19   selling shares.  I want to focus your attention on that time

20   frame.

21         You understood after conversations with Bill Aul, you

22   know who Bill Aul is, right?

23         THE WITNESS:  Your Honor, if it pleases the Court, can

24   I address you?

25         THE COURT:  Yeah.

1            THE WITNESS:  After speaking with my counsel --

2            MR. SHARGEL:  Your Honor, can we have this outside the

3      presence of the jury.  I don't know what's going to be said.

4            THE COURT:  Why don't you go ahead and pose a

5      question.

6            Do you know Mr. Aul?

7            That's the question, isn't it?

8      Q.  You know Mr. Aul, right?

9            THE COURT:  Do you know Mr. Aul?

10           MR. SHARGEL:  I'm not going to ask you about any

11     conversations you had with a lawyer.

12           THE WITNESS:  Can I address the Court?

13           THE COURT:  We'll ask the jury to step out.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.

3          What is it you want to say?

4          THE WITNESS:  After speaking with my counsel and the

5     fact that I'm not represented, the fact that I don't have a dog

6     in this fight, the fact that I was subpoenaed and I came, I

7     never filed any charges against the Levys, it's my counsel

8     advised me that it's prudent at this juncture for me to take

9     the Fifth Amendment.  Not to mention, Mark Twain said anyone

10    who represents themselves has a fool for a lawyer.

11         THE COURT:  Has a fool for a client.

12         THE WITNESS:  Fool for a client.

13         So at this point there's no probative value for my

14    company or myself to even answer any more questions.

15         THE COURT:  Are you going to refuse to answer any

16    questions on the grounds of the Fifth Amendment?

17         THE WITNESS:  Absolutely.

18         THE COURT:  Mr. Master.

19         Ms. Cohen?

20         MS. COHEN:  Your Honor, I would suggest --

21         MR. SHARGEL:  Judge, may we have outside the presence

22    of the witness?

23         THE COURT:  We'll do it at the side bar.

24         (At the side bar)

25         THE COURT:  Yeah.

1          MS. COHEN:  Your Honor, the government would suggest

2     the government reach out to speak to his counsel.

3          MR. MASTER:  Whoever that is.

4          MS. COHEN:  Whoever that is and try to --

5          MR. SHARGEL:  I think he was saying he doesn't have

6     counsel.

7          THE COURT:  He doesn't have counsel here.

8          MS. COHEN:  Here.

9          THE COURT:  I understood he spoke with his counsel

10    last night.

11         MS. COHEN:  That the government reach out to his

12    counsel and talk to his counsel to determine whether there is a

13    legitimate basis to assert the Fifth Amendment and what is

14    going on.

15         MR. SHARGEL:  I don't quarrel with that.

16         MR. MASTER:  This is news to us.

17         THE COURT:  I gather.

18         MR. SHARGEL:  News to all of us.

19         THE COURT:  News to all of us.

20         Do we have another witness?

21         MR. MASTER:  We do.

22         THE COURT:  Who?

23         MS. COHEN:  Ben Lafrancois.  He is the chief executive

24    officer of Greenway Design.

25         THE COURT:  OK.  What should we tell Mr. Holmes?

D3DLLEV1

1    We're going to excuse him now.  He's to remain here.

2              MS. COHEN:  I wouldn't excuse him because he's still

3    under subpoena and still on the witness stand.

4              THE COURT:  We're going to take him off the stand.

5              MS. COHEN:  Or perhaps we can take maybe in 15 minutes

6    if we talk to counsel, we can work it out and then Mr. Shargel

7    can finish his cross or at least understand what's going on.

8              THE COURT:  Do you want to take another witness?  I

9    don't know how long this is going to take.  I don't want to

10   keep the jury waiting.

11             MR. SHARGEL:  The only problem I have is that

12   speculation can run wild about what's going on in the jury

13   room.  So I think we have to deal with the problem now, most

14   respectfully.

15             MS. COHEN:  I agree.

16             MR. SHARGEL:  Does that make sense to everyone?

17             MR. MASTER:  Absolutely.

18             THE COURT:  I'll call the jury in, adjourn until

19   noontime.

20             MS. COHEN:  That makes sense, your Honor.

21             THE COURT:  All right.

22             (In open court; jury not present)

23             THE COURT:  I'm going to ask Mr. Holmes who his

24   counsel is.

25             MR. SHARGEL:  The same instruction applies since this

1   is on cross-examination, and he is on cross-examination, that

2   the government is not going to speak to him.  He is represented

3   by counsel.

4            THE COURT:  Correct.  All right.

5            MS. COHEN:  We'll only talk to him to get the phone

6   number.

7            THE COURT:  Mr. Holmes, could you tell us who your

8   lawyer is?

9            THE WITNESS:  Thomas Frerichs.

10           THE COURT:  Where does he -- do you have his phone

11  number?

12           THE WITNESS:  Yes.

13           THE COURT:  What is his number?

14           THE WITNESS:  (319)290-4444.

15           THE COURT:  And where is that?

16           THE WITNESS:  He's in Waterloo, Iowa.

17           THE COURT:  All right.  So the government will call

18  your attorney.

19           I'm going to instruct you now, Mr. Holmes, you're not

20  to speak with the government.

21           THE WITNESS:  OK.

22           THE COURT:  We're going to see if we can work out this

23  problem with your attorney.  I'm going to -- anything else?

24           MS. COHEN:  No, your Honor.  After we speak with,

25  hopefully we speak with Mr. Holmes' attorney, we will provide

1    Mr. Holmes with a phone in the witness room to talk to his

2    attorney.

3           THE COURT:  Would you stay in the witness room until

4    we resolve this problem?

5           THE WITNESS:  If I can go somewhere else, your Honor,

6    it's freezing in there.

7           THE COURT:  It's freezing.  Do you want to go down to

8    the cafeteria?

9           THE WITNESS:  I'd go anywhere else other than there if

10   you'd be so kind.

11          THE COURT:  Go down to the cafeteria.  Don't leave the

12   building.  We'll try to resolve this.

13          THE WITNESS:  Yes, sir.  No, I won't.

14          (Witness not present)

15          THE COURT:  Call the jury in.

16          What do you want me to tell the jury?  We hit a bump

17   in the road?

18          MR. SHARGEL:  I like bump in the road.

19          MS. COHEN:  I don't love bump in the road.

20          MR. MASTER:  We're not crazy about that.

21          THE COURT:  Matter to take up.

22          MS. COHEN:  Matter to resolve and we will resume back

23   at noon.

24          THE COURT:  Marlon.  OK.

25          (Continued on next page)

1          (Jury present)

2          THE COURT:  We've come upon a matter that we have to

3     discuss and it's going to take us a little bit of time.  So I

4     don't want you sitting in the jury room.  I'm going to adjourn

5     the morning proceedings until about -- we're going to be able

6     to work this out in an hour or so -- until 12:15.  So you can

7     take a walk, get a cup of coffee, we'll resume at 12:15.  Thank

8     you very much.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  I have no idea what the basis for the

3    Fifth Amendment claim is.  Maybe he's tired of testifying.

4          MS. COHEN:  Correct.  The government does not see a

5    basis, but we'll speak with his counsel.  Perhaps his counsel

6    can explain that to him.

7          MR. MASTER:  Just to be clear, we don't believe not

8    having a dog in the fight is a valid basis.  We don't think

9    that not having a dog in the fight is a valid basis for

10   asserting the Fifth.

11         THE COURT:  All right.  I'll take your counsel on what

12   the next step should be if he persists in taking the Fifth

13   Amendment.

14         MS. COHEN:  We will look at, we'll look at that while

15   we're --

16         THE COURT:  Mr. Shargel, Mr. Srebnick, I invite your

17   input as well.

18         MR. SHARGEL:  Very well.

19         THE COURT:  We'll reconvene at ten after 12.

20         (Recess)

21         (Continued on next page)

22

23

24

25

1             (12:25 p.m.)

2             THE COURT:  I understand the problems have been worked

3     out and Mr. Holmes is going to testify.

4             MS. COHEN:  Correct, your Honor.

5             THE COURT:  We asked the jury to get lunch.  I intend

6     to go to 5 o'clock.  Maybe we'll take two 15-minute breaks.

7             MS. COHEN:  That's fine with the government, your

8     Honor.

9             THE COURT:  Mr. Shargel?

10            MR. SHARGEL:  Yes, your Honor.

11            MR. SREBNICK:  Yes, your Honor.

12            MR. SHARGEL:  It may be necessary for me to ask for a

13    recess in light of Mr. Levy's condition.

14            THE COURT:  Sure.  If it comes up, ask.

15            MR. SHARGEL:  Very well.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Thank you for your patience.  All right,

3   Mr. Shargel.

4          MR. SHARGEL:  Thank you, your Honor.

5   BY MR. SHARGEL:

6   Q.  Mr. Holmes, good afternoon.

7   A.  Good afternoon.

8   Q.  I was asking you before we broke about the period of time

9   when Banneker went public.  You recall that, right?

10  A.  The period of time when we went public?

11  Q.  This period of time when shares were issued.

12  A.  OK.

13  Q.  Do you recall when that was, approximately?

14  A.  In the fall of 2007, I believe.

15  Q.  You received a certain amount of shares in the company,

16  right?

17  A.  I received?

18  Q.  Shares in the company.

19  A.  Yes.

20  Q.  You knew that David Levy received shares in the company,

21  correct?

22  A.  Yes.

23  Q.  Your shares were restricted shares, correct?

24  A.  Correct.

25  Q.  You understood that to mean that you couldn't sell those

D3drlev2                    Holmes - cross

1    shares for a period of time, right?

2    A.  Correct.

3    Q.  That period of time, as it was described to you, was one

4    year, right?

5    A.  Correct.

6    Q.  You knew at the time that Mr. Levy had unrestricted, or

7    free-trading shares, correct?

8    A.  I recall, I believe so, yes.

9    Q.  Let me go back to the time a little earlier than this, when

10   you first met David Levy.  Do you recall when that was?  Could

11   you remind the jury about when that was.

12   A.  Yes.  That was sometime again in the late summer or early

13   fall 2007.

14   Q.  That was the first meeting that you had at his house in

15   Fort Lauderdale, Florida?

16   A.  Correct.

17   Q.  You actually took a plane.  You knew you were going to have

18   a meeting with Mr. Levy, you had spoken to Bree Foster, you

19   remember Bree Foster, right?

20   A.  I do.

21   Q.  She is the one who suggested you have a meeting with Mr.

22   Levy?

23   A.  Yes.

24   Q.  She was with you at the time of that meeting in Fort

25   Lauderdale, Florida?

D3drlev2                    Holmes - cross

1   A.  Yes.

2   Q.  You were there, Mr. and Mrs. Levy were there, right?

3   A.  Correct.

4   Q.  Tim Hardaway came along?

5   A.  Yes.

6   Q.  Because he was a major investor in the company at the time,

7   correct?

8   A.  He was the president of the company.

9   Q.  He was actually the president of the company and had an

10  equity interest in the company, right?

11  A.  Correct.

12  Q.  I think you told us yesterday that it was something like 15

13  percent, fair statement?

14  A.  I believe that's pretty accurate, yes.

15  Q.  That's your best recollection, right?

16  A.  Yes, it is.

17  Q.  When you met with Mr. Levy, and I know Mrs. Levy, we know

18  everyone who was there, but when you met with Mr. Levy you

19  brought some facts and figures along, right?

20  A.  I don't recall.

21  Q.  Yesterday we were referring during cross-examination about

22  the presentation that you had, the business plan as you

23  described it.

24  A.  Yes.  But, to be honest, I didn't really recognize that

25  particular business plan.  We had so many.  We had several

1    business plans.  I can't say for sure that that was the one, if

2    that's your question.

3    Q.  The business plans that you drew or drafted, did those

4    business plans include projections of what you might expect in

5    renew in the years head?

6    A.  Most business plans do.  But, again, I can't be specific,

7    because I don't remember what particular business plan was

8    presented, if any, at that meeting.

9    Q.  Again help us with the timing of the meeting.  When did it

10   occur, as best you can recall?

11   A.  It was sometime in the summer or the fall 2007.

12        MR. SHARGEL:  We have in evidence Government

13   Exhibit -- actually, our Exhibit A176.  Could we have that.

14   This is in evidence, your Honor.

15        THE COURT:  Do you want to put it up?

16        MR. SHARGEL:  Yes.  I'm going to put this on the ELMO,

17   with the permission of the Court.

18        THE COURT:  Yes.

19   Q.  Do you see the words at the top "Banneker Watches 5 year

20   unit and revenue forecast"?  Do you see that?

21   A.  Yes.

22   Q.  Obviously, you and the investors in the company were

23   interested in the potential for the business?  That's a fair

24   statement, isn't it?

25   A.  I believe so, yes.

1    Q.  You had looked carefully into what the market might be in

2    connection with the watches that you were designing, and you

3    were optimistic about what might have occurred for the

4    business, right?

5    A.  You know, not so much myself, but maybe some of the other

6    people in the company that basically may have handled the

7    numbers in that.

8    Q.  But you, as the chief executive officer of the company,

9    knew what was in these business plans, right?

10   A.  I would try to familiarize myself with it.

11   Q.  Let me put the first page of this document on.  I'll get

12   back to the other one.  This is the first page of Defense

13   Exhibit A176.  It's dated January 15, 2007, right?  Do you see

14   that date?

15   A.  Yes, I see it.

16   Q.  The address is on the bottom, Banneker Watches, and the

17   address in Denver, Colorado, and the telephone number.  We can

18   see that your email address is on there as well, right?

19   A.  Yes.

20   Q.  If someone reading this was interested in Banneker Watches

21   to any degree, you were the contact information, right?

22   A.  Correct.

23   Q.  That would inform us that you actually read this and were

24   familiar with the content, right?

25            MR. MASTER:  Objection.

1    A.  Not necessarily.

2    Q.  If someone called on the telephone and said is this Mr.

3    Holmes from Banneker Watches and the person were to ask a

4    question, you would have an answer or be able to find the

5    answer, correct?

6    A.  Or I would advise them to one of my other officers who

7    handles the numbers.

8    Q.  In other words, you wouldn't give them the numbers

9    yourself, the hypothetical person who called and asked about

10   the company?

11   A.  Correct.

12   Q.  Do you remember, sir, whether this was the business plan

13   that you brought with you to that August meeting in 2007 with

14   Mr. Levy?

15   A.  You know what, it could be.  Again, that's been six years

16   ago.  I really don't remember.

17   Q.  Let's turn to the page that we had on the ELMO before.

18   Let's look at the total retail revenue, growth of the revenue.

19   That's growth of the company, right?

20   A.  Yes.

21   Q.  At the time this was drawn in 2007, did you have any

22   revenue at all?

23   A.  Yes.

24   Q.  Do you remember, ballpark figure, do you remember what the

25   revenue was?

D3drlev2                    Holmes - cross

 1  A.  I don't.

 2  Q.  Do you know whether it was in the millions or the hundreds

 3  of thousands?  Do you know that?

 4  A.  I don't.  I know it wasn't in the millions.  I don't know

 5  exactly what it was, to be honest.

 6  Q.  At the time you were working on the designs you told us

 7  about yesterday, correct?

 8  A.  Correct.

 9  Q.  At the time you were trying to enlist or enter into

10  contracts with celebrities, some of whom would have their faces

11  on the face of the watch, right?

12  A.  No.

13  Q.  When were you working with the celebrities?

14  A.  That was my first company, Marquee Watch.

15  Q.  That had nothing to do with Banneker?  You weren't going to

16  execute that plan with respect to Banneker?

17  A.  Yes, no, two separate companies.

18  Q.  Two separate companies?

19  A.  Right.

20  Q.  2009 had not yet occurred, because on the first page we saw

21  this was January 2007, right?  Obvious point.

22  A.  Say that again.  I'm sorry.

23  Q.  Yes.  This document was created, as we saw from the first

24  page, in January of 2007, right?

25  A.  I don't know that.

1    Q.  You saw the date on the exhibit in evidence that it was

2    January 2007?

3    A.  I saw the date on it, but I don't know when it was put

4    together.

5    Q.  Did you know that for the year 2009 you or one of your

6    officers or aides or employees projected revenue of $8,424,000

7    in 2009?

8    A.  I don't know that.

9    Q.  Do you have any recollection whatsoever of these

10   projections on the bottom ending in 2013, that's this year,

11   that the revenues would be 341 million and 16,000 dollars?  Do

12   you recall any number like that?

13   A.  Again, sir, no, I don't.

14   Q.  Let me ask you a question.  When these documents were

15   prepared, whether you call them business plans or projections,

16   whatever you call them, you were trying to present an honest

17   picture, weren't you?

18   A.  Two things.  One is I don't remember this particular plan.

19   Q.  Fair enough.

20   A.  Accordingly and moreover, business plans are usually put

21   together with projections in mind and a goal that you would

22   like to hit.  So that's correct.

23   Q.  That was a goal or an objective; you wanted the company to

24   succeed, right?

25   A.  Sure.

D3drlev2                    Holmes - cross

1   Q.  You wanted it to grow, right?

2   A.  Yes.

3   Q.  You saw an enormous potential for this company, didn't you?

4   A.  I was in hopes of it.

5   Q.  You had a good product, you believed in the product,

6   correct?

7   A.  Yes.

8   Q.  You liked the back story.  You know what I mean, the back

9   story?  The history of Mr. Banneker, who was an important

10  African-American figure and craftsman, isn't that right?

11  A.  Yes.

12  Q.  You thought that that back story, I'm just calling it a

13  back story, but the underlying idea was going to be very

14  helpful to selling these watches, right?

15  A.  Hopefully, yes.

16  Q.  You actually had a plan in mind to grow the company, and

17  the objective was to have a very, very successful enterprise,

18  is that a fair statement?

19  A.  Sure.

20  Q.  I show you what's been marked --

21          MR. SHARGEL:  May I approach, your Honor?

22          THE COURT:  Yes, you may.

23  Q.  -- as Defense Exhibit A175 for identification.  I ask you

24  to look at that and tell me if you recognize it.

25  A.  It looks familiar.

1  Q.  What is the familiar take on it?  What does it seem to be?

2  A.  It says it's the Banneker executive overview.

3  Q.  You were the chief executive, right?

4  A.  Correct.

5  Q.  I know some years have passed, but this is an overview that

6  you were familiar with, right?

7  A.  Possibly.

8          MR. SHARGEL:  Based on the answer, I offer it into

9  evidence.

10         MR. MASTER:  Objection.

11         THE COURT:  No objection?  Objection or no objection?

12         MR. MASTER:  Withdrawn.  No objection.

13         THE COURT:  A175 is received in evidence.

14         (Defendant's Exhibit A175 received in evidence)

15         MR. SHARGEL:  May I publish it?

16         THE COURT:  Yes, you may.

17         MR. SHARGEL:  This is on the computer.

18  Q.  I'd like to go to the page called "The Market."  The pages

19  aren't numbered.  "The market.  Population of urban youth near

20  $24 million."  I'm sorry.  Not dollars.  Forgive me.  Near

21  24 million, right, do you see that?

22  A.  Yes.

23  Q.  The focus or the objective based on the back story is that

24  you would be focusing sales attention on urban youth, is that a

25  fair statement?

1    A.  Not necessarily, no.

2    Q.  The next bullet point is "Hip hop consumers are most

3    non-Hispanic whites."  In other words, that was a target

4    population?

5    A.  Not necessarily.

6    Q.  Then why don't you tell us what the target population was.

7    A.  Anybody who wore a watch or wears a watch globally was our

8    overall goal.

9    Q.  You have in this exhibit the urban youth and the buying

10   power totals $496 billion annually, right?

11   A.  That is a statistic.  Again, like I said, I don't

12   remember -- I'm not saying that this isn't things that we put

13   together.  I can't say a hundred percent that that is or that I

14   approved that.  So I'm trying to understand your point.

15   Q.  Here is my point.  When you went to Mr. Levy's home in Fort

16   Lauderdale, Florida, you were making an honest presentation,

17   weren't you?

18   A.  That was my goal, yes.

19   Q.  You certainly didn't want to fool anyone.  You wanted to

20   give what you thought was an honest appraisal of the business,

21   right?

22   A.  Yes.

23   Q.  You wanted to give your idea of where the business may go,

24   how it may grow, and how to get there.  You had that in mind,

25   correct?

1   A.  I'm sure.

2           MR. SHARGEL:  Can we have the page that says "Banneker

3   Team."

4   Q.  The Banneker team included you as founder and CEO, right?

5   A.  Yes.

6   Q.  Mr. Hardaway we know about already.  How about Mr. Johnson

7   as the COO?

8   A.  Yes, at that time.

9   Q.  At the time Ron Hunter was vice president?

10  A.  Yes.

11  Q.  You had a long relationship with Ron Hunter, didn't you?

12  A.  No.

13  Q.  When did you meet him?

14  A.  I think I may have met Ron in maybe 2005, maybe '6.

15  Q.  He was involved with the company starting when?

16  A.  I don't remember for sure.

17  Q.  Brian Simpson was the director of sales?

18  A.  Yes.

19  Q.  So that was the core of the Banneker team, correct?

20  A.  Pretty much.

21          MR. SHARGEL:  Could we have the last page.  I don't

22  know if it's the last page, but the summary.  It may be the

23  last page.

24  Q.  The summary page, the last page of this exhibit in

25  evidence, "Banneker Watch & Clock is poised for success now."

D3drlev2                    Holmes - cross

1    You then have these bullets.  "Support from Russell Simmons."

2    You had support from Russell Simmons, right?

3    A.  Russell has always liked the company.

4    Q.  Yes?

5    A.  Yes.

6    Q.  When you said "Support from Russell Simmons," what kind of

7    support did you have in mind?

8    A.  I'm not saying I said this.  I told you many times I don't

9    remember this.

10   Q.  But we just saw the team as the Banneker team, do you

11   remember that, a moment ago?

12   A.  Oh, yes, I saw it, yes.

13   Q.  You were the head of the team, right?

14   A.  I was the CEO of the company, correct.

15   Q.  My question to you again, in this document or in

16   conversations with Mr. Levy, do you remember, sir, suggesting

17   that you had support from Russell Simmons?

18   A.  I don't remember that conversation.  I'm not saying it

19   didn't happen.  I don't know specifically that I said that.

20   Q.  Did you say that the manufacturing and prototypes, of the

21   watches of course, were in place?

22   A.  Are you asking me was it in place or are you asking me

23   based upon this document?  That's what I guess I'm trying to

24   figure out.

25   Q.  Let's forget about the document.

D3drlev2                    Holmes - cross

1    A.  That would be good.

2    Q.  Were they in place?

3    A.  I'm sorry?

4    Q.  Were they in place?

5    A.  Yes.

6    Q.  You had a major deal with Jostens, right?

7    A.  Yes.

8    Q.  There is no question about that, right?

9    A.  That's correct.

10   Q.  We'll come back to Jostens in a minute.  You had major

11   celebrity endorsements, correct?

12   A.  I had some major people that were involved, Tim Hardaway

13   being the one that was involved the most as a celebrity

14   endorser.

15   Q.  You mentioned in direct testimony yesterday Beyonce.

16   A.  Beyonce was involved, yes.

17   Q.  You met with Beyonce?

18   A.  Absolutely.

19   Q.  You talked about your business and suggested that she may

20   want to design some of the watches?

21   A.  Basically, the relationship with Beyonce was through

22   Jostens she designed a ring and we brought it to market.

23   Q.  Actually brought it to market for retail sales?

24   A.  Correct.  Not retail sale, but it was through the Jostens

25   distribution.

D3drlev2                    Holmes - cross

1    Q.   Distribution still meant sales, right?

2    A.   Correct.

3    Q.   "First success with Miami Heat championship," what did that

4    mean?

5    A.   We created a line of watches for the 2006 NBA champions,

6    the Miami Heat, and that watch was facilitated through Jostens.

7    Q.   "Investment now assures a position when the company becomes

8    well known."  What did that mean?

9    A.   I don't know.

10        MR. SHARGEL:  Can we take that off, please.

11   Q.   You told us yesterday, and reference was made to it again

12   today, that you had an agreement with Jostens, right?

13   A.   Yes.

14   Q.   That was an agreement that was signed and executed, right?

15   A.   Correct.

16   Q.   I show you what's been marked for identification as A177,

17   Defense Exhibit A177.  I ask you to take a look at that and

18   tell us whether you recognize it.

19   A.   Yes, I do.

20   Q.   What do you recognize it to be?

21   A.   It appears to be the agreement that we had with Jostens.

22   Q.   The agreement you had with Jostens, we don't have to put it

23   up on the ELMO or the computer, tell the jury what the basic

24   understanding was.

25   A.   It was a relationship with my consulting company, Esteemed

D3drlev2          Holmes - cross

1    Enterprises.  We entered into an agreement with Jostens to

2    become the urban provider for grad watches/clocks/jewelry with

3    the different classes on it.  We also brought in in that deal,

4    we brought in Russell Simmons, Comora Lee Simmons, and Beyonce

5    to design urban hoodies and T-shirts, and Beyonce additionally

6    designed a ring.

7    Q.  This was, obviously, a very valuable contract, right?

8    A.  Yes.

9    Q.  Were you or were you not doing the manufacturing itself in

10   connection with the product that Jostens would distribute,

11   retail sales?

12   A.  Yes, we were doing the manufacturing of the class jewelry.

13   Q.  Whatever happened to the Jostens contract?

14   A.  We had a one-year deal.  They didn't renew the contract

15   after one year.  We kind of severed our relationship.

16   Q.  That was the end of that?

17   A.  I'm sorry?

18   Q.  That was the end of that, no more relationship with

19   Jostens?

20   A.  Correct.

21   Q.  When did that happen?

22   A.  Sometime at the end of 2008, 2009 I think it was, if I

23   remember.

24   Q.  That's your best recollection?

25   A.  Yes, my best recollection.

D3drlev2                    Holmes - cross

1   Q.  I'm switching to a different topic now.  Do you remember

2   telling us yesterday about an accountant that you had that

3   helped you with your books and records of the company?

4   A.  Yes.

5   Q.  Do you remind the jury of the name of the accountant.

6   A.  Roy Gentry.

7   Q.  Specifically directing your attention to the calendar year

8   2008, Roy Gentry or his firm -- what was it, an accounting

9   firm?

10  A.  He is an accountant, yes.

11  Q.  Certified public accountant, right?

12  A.  Yes, he is.

13  Q.  Roy Gentry did a year-end review for calendar year, as I

14  said a moment ago, calendar year 2008?

15  A.  I believe so, yes.

16  Q.  I believe that this was put in evidence yesterday as

17  Government Exhibit 301-2.

18          MR. SHARGEL:  With the Court's permission, because we

19  have it in the computer, I'm going to ask that this we use

20  Defense Exhibit A187, as we have done before.

21          THE COURT:  187 and 301-2 are the same?

22          MR. SHARGEL:  Yes.

23          THE COURT:  All right.

24          MR. SHARGEL:  If we could put the first page just so

25  we orient ourselves as to what this is.

D3drlev2          Holmes - cross

Q.  This is dated March 3, 2009.  It is addressed to you.  You

see that, right?

A.  Yes.

Q.  Do you have a recollection of this letter, by the way?

A.  I have a recollection of it because, yes, it looks like

what my accountant compiles, yes.

Q.  That is Roy Gentry's name on the top and his logo, right?

A.  Yes.

Q.  It is addressed to you, and the first paragraph explains

what is contained in the document.  "I have compiled the

accompanying balance sheet of Banneker as of December 31,

2008."  You see that, right?

A.  I do.

Q.  I want to ask you some questions, if I may, going to the

ledger portion.  All of the expenses of the company, checks

written, are contained in this report, right?

A.  I'd like to think so.  It is my accountant's job to do.  So

yes.

Q.  Referring to the general ledger, your business, like any

other business, had a general ledger, right?

A.  When you say a general ledger, what do you mean?

Q.  Money coming in and money going out.

A.  Yes.

Q.  You had that, right?

A.  Yes.

1  Q.  Let's go to page 3 of this general ledger.  If we can focus

2  in on the date of May 15, 2008.  Do you see where it says May

3  15, 2008?  And if we have to go back, I'm happy to do it for

4  you, but this is the deposit column.  Do you see that?

5  A.  Yes.

6  Q.  Money being deposited into the account.  The last column

7  you know to be disbursements, money sent out of the account,

8  correct?

9  A.  Again, I'm not an accountant, so I don't know that.

10  Q.  But even as an ordinary person, not an accountant, do you

11  see the date on the left 5/15/08, right?

12  A.  Uh-huh.

13  Q.  Do you see that there is a code number and then "general"

14  and then "Mazuma Holding Corporation"?  Do you see that?

15  A.  I see that.

16  Q.  You were asked questions yesterday about Mazuma Holding

17  Corporation, right?

18  A.  Correct.

19  Q.  Mazuma Holding Corporation is someone that you did some 504

20  deals with, right?

21  A.  Correct.

22  Q.  You told that you say yesterday, right?

23  A.  Yes.

24  Q.  You explained your own understanding of the 504 deal,

25  right?

D3drlev2                    Holmes - cross

1    A.  I believe so.

2    Q.  It was a fast way to get cash which the business needed,

3    right?  Fair statement?

4    A.  It was a way, to my knowledge and remembering back, a way

5    to, yes, bring funding into the company.

6    Q.  In return for the funding that came into the company, you

7    would issue shares?  We saw yesterday the 80,000 shares and the

8    333,000 shares.  You would issue shares, right?

9    A.  Correct.

10   Q.  You would get cash in return for the shares, right?

11   A.  Yes.

12   Q.  There was a bad side of the 504 transaction, is that a fair

13   statement?

14   A.  A what now?

15   Q.  A bad side, a negative, if you will.

16   A.  Not that I'm aware of.

17   Q.  Not that you're aware of?  Did you know that to keep

18   issuing stock on behalf of the company, you were diluting the

19   shares that other shareholders held?

20   A.  I wasn't totally aware of that, no.

21   Q.  Didn't you tell us yesterday that you had some issues or

22   some disputes with other people involved in your company about

23   504 transactions?

24   A.  I definitely had some conversations about that, yes.

25   Q.  Conversations where the person with whom you were

D3drlev2                    Holmes - cross

1    conversing was not very happy about the 504 transactions,

2    right?

3              MR. MASTER:  Objection.

4    A.  Yes.

5              THE COURT:  Overruled.

6    Q.  The answer is you remember that?

7    A.  I think I do, yes.

8    Q.  On this date, on May 15, 2008, Mazuma Holding, there is a

9    deposit recorded of $50,000.  You got that, right?

10   A.  Yes, I do.

11             MR. SHARGEL:  If we can turn to the next page,

12   Jennifer.  Now I'd like to focus and highlight May 29, 2008.

13   No, a little later.

14   Q.  May 29, 2008, you get another $50,000 from Mazuma Holding,

15   right?

16   A.  I'm seeing it there again.  I don't remember when all it

17   happened, but I'm looking at it, yes.

18   Q.  You were continuing to do 504 transactions, right?

19   A.  I did a few 504s, a couple, I know.

20   Q.  The only transactions you had with Mazuma Holdings was 504

21   transaction, right?

22   A.  That's correct.

23   Q.  So $50,000 on May 29th.  Then do you remember in July of

24   2008 getting a letter from Ron Hunter?

25   A.  I don't, no.

D3drlev2              Holmes - cross

1    Q.  Ron Hunter, as we saw just a little while ago, according to

2    the Banneker information of the executive team, the Banneker

3    team, he was the vice president, right?

4    A.  Yes, he was at that time.

5    Q.  Let me show you what's been marked -- well, you know that

6    you received a letter after that second 504 transaction that we

7    saw up on the screen?  You received a letter from Ron Hunter

8    saying stop doing these 504 transactions, right?

9    A.  Absolutely not.

10   Q.  Positively not?

11   A.  I don't remember it.  You're telling me I remember it.  I'm

12   telling you I don't.

13   Q.  Let me show you what's been marked for identification as

14   A199.  I put it in front of you.  I ask you to take a look at

15   that and tell me if you recognize it, sir.

16   A.  I don't recognize it.

17   Q.  Do you recognize your signature on the bottom?

18   A.  I actually do not.

19   Q.  Sir, is it your testimony by your oath that that is not

20   your signature on the bottom?

21   A.  My testimony under oath is that I don't recognize it.

22   Q.  Sir, would you be able to recognize it if it were your

23   signature?

24   A.  It depends on if I was able to recognize it or not, and I

25   can't recognize that as being my signature.

D3drlev2          Holmes - cross

1    Q.  Is it your testimony that it could be your signature but

2    you don't recognize it as your signature?

3    A.  That is my testimony, counselor, that I don't recognize

4    that as being my signature.

5    Q.  Is it your testimony, sir, that someone forged your

6    signature on that document?

7    A.  My testimony is just what I said earlier.

8    Q.  And you have no recollection as you sit here now of

9    receiving that letter?

10   A.  I do not.

11   Q.  Do you have any recollection independent of that letter

12   that Ron Hunter was complaining to you and asked you to agree

13   that you would stop doing these 504 transactions?

14   A.  I do not.

15   Q.  You have no recollection of that?

16   A.  No recollection of that.

17          MR. SHARGEL:  Now if we could have page 5 on the

18   screen?

19          THE COURT:  Is it in evidence?

20          MR. SHARGEL:  Yes, it is in evidence.  It is part of

21   the same exhibit I have been using.

22          THE COURT:  This is not A199 you're talking about?

23          MR. SHARGEL:  No, no.  Could we focus on the date of

24   July 30, 2008.

25   Q.  July 30, 2008, as reflected in the general ledger that is

D3drlev2                    Holmes - cross

1    now in evidence, you received another $50,000 from Palm

2    Capital, which you knew to be David Levy, right?

3    A.   It appears to be, yes.

4    Q.   It appears to be.  Sir, looking at that, do you recall that

5    after doing those two 504 transactions, David Levy stepped in

6    and gave you another $50,000?

7    A.   Again, that's what it appears to look like, yes.

8    Q.   Even though there had been some conversation -- by the way,

9    you said earlier conversation about 504 transactions.  With

10   whom did you converse, sir?

11   A.   In what respects?

12   Q.   Conversation, words coming out of your mouth and words

13   coming out of the other person's mouth.  With whom did you

14   confer?

15   A.   I don't get the question.

16          THE COURT:  He wants to know whom you talked to about

17   the Mazuma transaction.

18   A.   I don't remember.

19   Q.   Do you remember, sir, that even after David Levy stepped in

20   that summer of 2008 and gave you another $50,000, you went

21   ahead and did another 504 transaction, didn't you?

22   A.   That's what it appears to be.

23   Q.   Let me direct your attention to October 30th of the same

24   year, 2008, October 30, 2008.  October 30, 2008, after you had

25   discussions about 504 transactions, you go ahead and you do

D3drlev2                    Holmes - cross

1    another one, right, another one, Mazuma Holding Corporation,

2    $40,000?

3    A.  OK.

4    Q.  You did that transaction, didn't you?

5    A.  I told you I did some 504s.  I don't remember exactly which

6    ones or when.

7    Q.  You used email back in 2008, didn't you?

8    A.  Yes.

9    Q.  You sent emails and you received emails, right?

10   A.  Yes.

11   Q.  You received emails from, among other people, David Levy,

12   right?

13   A.  I'm sure I did.

14   Q.  Do you remember David Levy sending you an email discussing

15   your conduct in connection with the 504 transactions?

16   A.  I don't specifically remember, no.

17   Q.  Do you remember David Levy telling you that you were

18   ruining the company?

19   A.  I don't remember that.  I remember that he wasn't happy

20   about me doing 504s, like I said yesterday.

21              (Continued on next page)

22

23

24

25

D3DLLEV3                    Holmes - cross

1   BY MR. SHARGEL:

2   Q.  But beyond not being happy, do you remember, sir, him

3   telling you that you were ruining and destroying and decimating

4   your own company with these 504 transactions?

5   A.  No, I don't.

6   Q.  No recollection of that.  I show you what's been marked as

7   Defendant's Exhibit A200A.  I put that before you and I ask you

8   if you recognize that, sir?

9           THE COURT:  All right, Mr. Shargel.

10  Q.  Are you still reading it?

11  A.  I'm still looking it over.

12  Q.  Have you had a chance to look it over?

13  A.  I have.

14  Q.  Did you -- does that refresh your recollection that David

15  Levy had that communication with you in November of 2008?

16  A.  You know, I'm not saying it didn't happen, but I can't say

17  I specifically remember it.  And that doesn't, you know, make

18  me remember it or help me to remember it.

19  Q.  Well, do you remember receiving such an email?  That's the

20  best I could ask.  Do you remember receiving such an email?

21  A.  I don't.

22  Q.  Well, you testified yesterday at the end of your direct

23  testimony that David Levy stopped funding you, do you remember

24  that, stopped getting money from David Levy?

25  A.  I don't know if I said that.

D3DLLEV3                    Holmes - cross

1    Q.  Do you remember testifying that the company was hurt

2    because David Levy didn't give you more money; do you remember

3    saying that?

4    A.  I remember saying that there were spurts of time that I was

5    supposed to receive money that I didn't receive money, but I

6    never said he stopped.  I never said I stopped receiving money,

7    so.

8    Q.  You certainly didn't receive any more money in 2009 and

9    '10, '11, and '12, did you?

10   A.  Oh, no, I did not.

11   Q.  In other words, David Levy left you, right?

12   A.  At some point I didn't receive any more money.

13   Q.  And you didn't receive any more money and you know full

14   well as you sit there now you didn't receive more money because

15   David Levy was disgusted with your conduct?

16   A.  I can't say that that's correct.

17   Q.  And you can't say it's not correct, right?

18            MR. MASTER:  Objection.

19            THE COURT:  Sustained.

20            MR. SHARGEL:  I have no further questions.

21            THE COURT:  OK, Mr. Srebnick.

22            MR. SREBNICK:  Yes, your Honor.  May it please the

23   Court, good afternoon, everybody.

24   CROSS-EXAMINATION

25   BY MR. SREBNICK:

1  Q.  Mr. Holmes, good afternoon.  My name is Howard Srebnick.  I

2  have a few questions.  I represent Donna Levy.

3  A.  OK.

4  Q.  I'd like to ask you first about the business address for

5  Banneker.  Did it have a business address in Denver, Colorado?

6  A.  Correct.

7  Q.  Was that the 1660 Albion Street, Suite 309, in Denver?

8  A.  Correct.

9  Q.  Was that an office that you used for Banneker?

10  A.  Correct.

11  Q.  And is the zip code 80222?

12  A.  Correct.

13  Q.  And who had the keys to that office, who was stationed in

14  that office?

15  A.  Myself.

16  Q.  And, for example, if mail would come, you would have access

17  to receive the mail at that location?

18  A.  Yes.

19  Q.  I'd also like to ask you about phone numbers associated

20  with the company and/or yourself back in the time period 2007,

21  '08, and as late at 2009.

22       The phone number (303)856-3135, does that number

23  correspond to either you or Banneker?

24  A.  Definitely not during that time, no.

25  Q.  Does that number sound familiar to you at all?

1    A.  It sounds familiar but it was never a business number.

2    Q.  Is 303 the area code for Denver?

3    A.  It's one of them, yes.

4    Q.  How about (319)230-9564?

5    A.  Yes.

6    Q.  And would that be a phone number either associated with you

7    or with Banneker?

8    A.  Yes.

9    Q.  Is that a cell phone perhaps?

10   A.  It is.

11   Q.  Was that a cell phone, your personal cell phone at that

12   time?

13   A.  Yes, it was.

14   Q.  Now, Banneker, in the time period that we're discussing

15   when it became public, Donna Levy was handling press releases

16   for the company?

17   A.  Yes.

18   Q.  Handling investor relations for the company?

19   A.  Yes.

20   Q.  And that was a role that essentially had been delegated to

21   her by Banneker, correct?

22   A.  That was a role that I don't know if it was delegated or it

23   was decided amongst us all, but I know that was her skill set

24   and her involvement in our relationship.

25   Q.  So it was agreed upon, rather than use the word delegate,

D3DLLEV3                    Holmes - cross

1    it was agreed upon that would be Donna's role, correct?

2    A.  Yes.

3    Q.  Fair enough.  Do you recall that from time to time Donna

4    and yourself would correspond by email so that you could see a

5    press release before it would go out?

6    A.  Yes.

7    Q.  I'd like to go through a few with you.  I'd like to pull up

8    what's been marked as Exhibit A190?

9               MR. SREBNICK:  A190, is that available?

10   Q.  Mr. Holmes, if you could follow along, do you recognize

11   your email address, Derrick_Holmes@yahoo.com?

12   A.  Yes.

13   Q.  And do you recognize the email address LUVMEE40@aol.com; do

14   you remember that was Donna Levy's email address?

15   A.  Yes, I do.

16   Q.  OK, good.  Now if we could go to the sort of the second

17   half.  There's a straight line going across.

18              MR. SREBNICK:  And if we could perhaps just enlarge

19   the whole center of the email from further down.

20              THE COURT:  Mr. Srebnick, it's not on the screen.

21              MR. SREBNICK:  First I'd like to move it into

22   evidence, if I could.

23              MS. COHEN:  One moment, your Honor.  Just trying to

24   find our copy.

25              MR. SREBNICK:  If we could publish A190 now that it's

1   been offered and received.

2           THE COURT:  Was there an objection?

3           MR. MASTER:  No objection, your Honor.

4           THE COURT:  A190 is in evidence then.

5           (Defendant's Exhibit A190 received in evidence)

6           MR. SREBNICK:  If you could scroll down a little bit.

7   Fine.  Good.

8   Q.  This is what I'll call the bottom half of the email.  Do

9   you see that it's dated July 29, 2008?

10  A.  Yes.

11  Q.  Are you able to see on your screen?

12  A.  I am.  I'm looking at the top though opposed to the bottom,

13  but, yes, I see it.

14  Q.  Maybe it's not synced.  If you have any problem, let me

15  know and we'll work it out.

16  A.  OK.

17  Q.  Do you see it's from Donna Levy's email address and it's

18  addressed to your email address, you see that?

19  A.  I do.

20  Q.  The subject says, front page website approve, make sure

21  every word 100 percent accurate; do you see that?

22  A.  Uh-huh, yes.

23  Q.  If we could now just for ease of reference, you see the

24  headline of the proposed press release, Banneker Inc. --

25          MR. SREBNICK:  Stop moving it if we could.  It's

1    moving again.  Is it just my copy or is everybody's moving?

2              THE COURT:  What's the question?

3              MR. SREBNICK:  I'll have to go over here, Judge,

4    because mine is moving.  It's a moving target.

5    Q.  Do you see the headline, Banneker Inc. CEO Derrick Holmes

6    joins forces with hip hop fashion moguls and launches high

7    school jewelry and apparel with urban attitude in an

8    unprecedented business venture, correct?

9    A.  Yes.

10   Q.  And if we go to the top of the email, you were able to give

11   Donna your input and your input was:  Looks great, go with it,

12   Derrick.

13             You see that?

14   A.  Yes.

15   Q.  If we could publish 103-1, Government Exhibit 103-1, do you

16   see it has the same headline, Banneker Inc. CEO Derrick Holmes

17   joins forces, do you see that?

18   A.  Yes.

19   Q.  And so with regard to this press release, which we can see

20   on the screen says July 29, 2008, it appears that an email was

21   sent to you, you had a chance to look at it, it then went on

22   the wire for the public to see, correct?

23   A.  Yes.

24   Q.  And do you recall that happening from time to time where

25   you and Donna would exchange discussions or comments about the

1   press release and then it would go on the wire?

2   A.  Yes.

3   Q.  Now, these events occurred some years ago.  Is it fair to

4   say your recollection may not be perfect from that time period;

5   fair to say?

6   A.  That is fair to say.

7   Q.  Because as I recall your testimony yesterday, the

8   prosecutor asked you about a 12 to one stock split; do you

9   remember some discussion about that?

10  A.  Yes.

11  Q.  And as I recall your testimony, they asked you whether you

12  were familiar were the press release regarding that 12 to one

13  stock split; do you remember those questions?

14  A.  Yes.

15  Q.  And if we could put the press release on the screen, 103-3.

16          Now, Mr. Holmes, if you think back, do you remember

17  that before this press release went out, you and Donna

18  exchanged emails about announcing the 12 to one stock split?

19  A.  I can't say I remember a hundred percent but I can't say,

20  you know, that we didn't.

21          MR. SREBNICK:  I'd like to offer into evidence at this

22  time A196.  A196.

23          MR. MASTER:  No objection.

24          THE COURT:  A196 is received in evidence.

25          (Defendant's Exhibit A196 received in evidence)

D3DLLEV3                    Holmes - cross

1          MR. SREBNICK:  I'd like to publish A196 at this time.

2     And if we could, right where your cursor is now, if we can go

3     from that part of the email down.  Yes.

4     Q.  Do you see this is an email dated February 2, 2009, from

5     Donna to you, regarding the announcement of the 12 to one

6     forward stock split?

7     A.  Yes.

8     Q.  Does that refresh your memory that there was a discussion

9     via email about the announcement of the 12 to one stock split?

10    A.  You know, I don't doubt it.

11    Q.  OK.  Fair enough.  And it announces the exact words that

12    appear, and we'll just have to compare it, but it announces

13    Banneker Inc. announces board of director approval of a forward

14    stock split with a 12 to one ratio; do you see that?

15    A.  Yes.

16    Q.  Now, this proposed press release dated February 2, 2009 has

17    a sound bite or a I guess a quote attributed to you, "This

18    forward stock split is intended to lay the groundwork for the

19    anticipated growth of the company, said chairman Derrick

20    Holmes.  It is also part of our ongoing efforts to improve

21    trading liquidity, broaden ownership, promote capital

22    investment, and enhance shareholder value."

23          Do you see that on the --

24    A.  Yes, I see that.

25    Q.  Now, if we highlight the top of it or just enlarge it

1   perhaps, do you see on the same day, February 2, 2009, you

2   responded to Donna:  It looks good.  Go with it, Derrick.

3           Do you see that?

4   A.  I see that.

5   Q.  And then if we could then publish the actual press release

6   that the government offered, 103-3 -- and thank you for

7   assisting -- do you see it's word for word what you had

8   approved in the email?

9   A.  Again, like I said, I don't remember it but I see it.

10  Q.  Perfect.  OK.  Now, if we could then go back to the email,

11  Jen, if we could publish A196, now, there's a few things I want

12  to discuss.  If we can just roll down, this is now you're

13  looking at the email that Donna sent to you that you said go

14  with it.

15          Do you see that it provides a little summary about the

16  company, Banneker Inc. is a manufacturer and distributor of

17  quality watches and fine jewelry; do you see that?

18  A.  I do.

19  Q.  Based on the legend of Benjamin Banneker?

20  A.  Yes.

21  Q.  And speaking of Mr. Benjamin Banneker, is Mr. Banneker or

22  his family associated with the company in any way?

23  A.  No.

24  Q.  Did you have to seek their approval or authorization to use

25  the name Banneker?

D3DLLEV3                    Holmes - cross

1    A.   No.  I own the trademark to Banneker.

2    Q.   You just trademarked the name?

3    A.   Correct.

4    Q.   But you didn't have to get any prior permission or

5    authorization from the Banneker family to do that?

6    A.   No.

7    Q.   Correct?

8    A.   Correct.

9    Q.   Then at the bottom of the proposed press release in the

10   email, there's a section called safe harbor statement; do you

11   see that?

12   A.   Yes.

13   Q.   And then it reads, except for historical information

14   contained herein, the matters set forth above may be

15   forward-looking statements that involve certain risks and

16   uncertainties that could cause actual results to differ from

17   those in the forward-looking statements.

18        You see that, right?

19   A.   Yes.

20   Q.   And then the jury can read it for itself.

21        But that was all incorporated into the press release

22   that ultimately was disseminated to the public, correct?

23   A.   Again, I don't really totally remember to be honest.

24   Q.   But you see it, the government asked you about the press

25   release?

1  A.  I'm looking at it, yes.

2  Q.  If we could just go to the bottom of the page, there's a

3  number there, USAO, do you see that number here?

4  A.  Uh-huh.

5       MR. SREBNICK:  Judge, that's to be redacted later on.

6  I just wanted to make sure that's not part of the original

7  document.

8       THE COURT:  It's an identifier for the document?

9       MR. SREBNICK:  It's an identifier for the document for

10  us, yes.

11  Q.  If we could go to the top, this document, was it shown to

12  you before today in preparation for your testimony here?

13  A.  It looks familiar that I may have seen it.

14  Q.  OK.  Yesterday when the prosecutor was asking you questions

15  about this 12 to one stock split and what you knew about it, do

16  you recall if the prosecution in preparing you for the

17  testimony showed you this document to refresh your memory?

18  A.  I believe so.

19  Q.  So the prosecutor you recall having this document?

20  A.  I believe so, yes.

21  Q.  Now, do you recall, does that refresh your recollection

22  that there was a meeting to approve the 12 to one stock split?

23  A.  Again, man, it was a long time ago.  So I don't want to

24  just -- I'm not going to send you long and throw short, you

25  know.  I don't remember for sure.

1  Q.  But now having had a chance to look at the emails, etc., is

2  it fair to say that the 12 to one stock split was something

3  that Banneker and yourself had approved before it was released

4  to the public on February 6?  That's the date of the press

5  release.

6  A.  You know, I do recall that we -- that I spoke about it, you

7  know, that we had spoke about a 12 for one split which, you

8  know, I didn't really understand it and know all about it and

9  it was a long time ago, but that's safe to say.

10        MR. SREBNICK:  If we could publish 103-36, and if we

11  can highlight the section right in here from using the green.

12  That's great.

13  Q.  Do you see that this is a press release from February 6,

14  2009, and it just announces, it has come to our attention that

15  over the past few days, some investors of Banneker are confused

16  as to when the actual split takes place.  All shareholders on

17  record as of the close of the market day Friday, February 6,

18  2009, will be eligible for the 12 shares for every one share

19  owned.  We hope this statement will address those concerns.

20        Do you see that?

21  A.  Yes.

22  Q.  You had told the jury yesterday that from time to time you

23  would get calls from investors; do you recall telling the jury

24  that?

25  A.  Yes, I recall.

1  Q.  And that eventually the decision was made to just refer

2  those type of investor relation calls over to Donna, correct?

3  A.  As I remember, I believe that is true.

4  Q.  Do you recall if there had been some investors calling to

5  get a better handle on when is this stock split taking place

6  because the press release went out and there was some questions

7  among investors; do you recall that one way or the other?

8  A.  I don't.

9  Q.  Do you recall though that the press release went out to

10  address those concerns?

11  A.  You know, I really don't.  I don't really remember this

12  press release.

13  Q.  Would you agree though that it's consistent with the

14  earlier press release of just announcing the February 6, 12 to

15  one stock split?

16  A.  You know, it looks familiar to the other one, so.

17  Q.  I'd like to show you Government Exhibit 103-5.  Do you

18  remember the government asking you about this press release?

19          MR. SREBNICK:  Is this in evidence, I believe, if I

20  could ask the prosecutors, 103-5?

21          THE COURT:  103-36?

22          MR. SREBNICK:  I'm going to offer 103-5, the press

23  release.  It's in already.

24  Q.  Banneker unveils for the first time the Aristocrat.

25          Do you recall what the Aristocrat was?

1   A.  Yes.

2   Q.  Could you tell us what that was?

3   A.  The Aristocrat was a clock that I designed.  It was a big

4   grandfather clock, stood seven and a half feet tall, had

5   crystals in the face of the clock.

6   Q.  The first paragraph of the press release describes some of

7   the attributes, some of the features of that clock?

8   A.  Yes.

9   Q.  And in one line it announces the retail price is $10,000;

10  do you see that right in the middle?

11  A.  Yes.

12  Q.  The following paragraph talks about Banneker, his memory,

13  and then talks about a cognac ad.

14          Do you remember the cognac ad?

15  A.  Yes.

16  Q.  I think I got that in my next folder so we'll get to that

17  in a moment.

18          And then do you see that the press release at the

19  bottom says, please view Banneker Inc.'s new Swarovski crystal

20  grandfather clock now by visiting

21  http://www.wallstreetpremiere.com/Aristocrat.php, where you can

22  also sign up for continuing alerts on Banneker Inc.

23          Do you see that?

24  A.  Yes, I see it.

25  Q.  You told the jury yesterday that you thought you had

1   remembered the name Wall Street Premiere, that you heard it

2   somewhere; do you remember that?

3   A.  I believe so.

4   Q.  And is this consistent with your recollection that you had

5   heard about Wall Street Premiere back in February of 2009?

6   A.  You know, I don't remember when, I don't remember where I

7   heard it, but I mean I remember the name sounding familiar.  I

8   do remember that.

9   Q.  OK.  Let me show you --

10          MR. SREBNICK:  First let me move into evidence at this

11  time A193.  It's emails, and it's in particular page 2, if I

12  could offer it at this time.

13          THE COURT:  Ladies and gentlemen, why don't we take a

14  short ten-minute recess.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    (Jury not present)

2    (Witness not present)

3    THE COURT:  Mr. Holmes had to take a comfort break.

4    Anything else?

5    MS. COHEN:  I'm not sure, your Honor.  We'll confer

6    and we'll tell Marlon if we need to raise something with you.

7    MR. MASTER:  I think we'll be fine.

8    THE COURT:  All right.

9    (Recess)

10   MR. SHARGEL:  Judge, may I say one thing.  There was a

11   issue raised about what I viewed as a prior inconsistent

12   statement, and apparently the government's view, although

13   expressed informally, was that they didn't believe the

14   statement was inconsistent.  The last time, and we're just

15   about to sign and maybe ten more minutes and we'll resolve the

16   other issue with respect to Mr. Georgiadis.

17   But with respect to this witness, I can hand up to the

18   Court at a later time perhaps, if you don't want to take the

19   jury's time, but I can hand up to the Court the disclosure in

20   the December 3 letter that we received, the so-called Giglio

21   disclosure, and I think that you would agree that there's a

22   conflict between "I don't remember" and denying it to the U.S.

23   Attorney's Office.  So that's my -- because one way or the

24   other, I'd either offer it in evidence or we could stipulate.

25   MR. MASTER:  And, your Honor, just on that point, I

D3DLLEV3             Holmes - cross

1  know we haven't had a full opportunity to discuss this because

2  I think we're going to reach a factual stipulation concerning

3  Mr. Georgiadis, but I just wanted to make our office's position

4  clear having consulted with our appeals unit, this is certainly

5  not a situation that is analogous to U.S. v. GAF where the

6  government itself as a party takes a particular litigation

7  position and then tries to change it around.

8          It's quite common for us to make pretrial disclosures

9  as 3500 material or in Giglio, and I don't think there is a

10  complaint about the quality or comprehensiveness of our Giglio

11  disclosure.  It is not, however, the case that a Giglio

12  disclosure is an admission of the government party.  It's

13  simply part of the government's constitutional obligation,

14  which we take very seriously in this case and every other case,

15  and it gives the defense a basis to inquire and to

16  cross-examine, as they did with Mr. Holmes and as they did with

17  Mr. Georgiadis.

18          THE COURT:  If you can work it out, you'll work it

19  out.  If you can't, then Mr. Shargel will make what he feels is

20  appropriate in the circumstances.

21          MR. MASTER:  Thank you, your Honor.

22          MR. SHARGEL:  Thank you, Judge.

23          THE COURT:  Want to see if the jury is ready?

24          Mr. Srebnick, have you been able to work out your

25  evidentiary?

D3DLLEV3                    Holmes - cross

1          MR. SREBNICK:  I think the government has no objection

2    to the email.

3          THE COURT:  All right.  We'll see if the jury ready.

4    Can you get Mr. Holmes.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3DLLEV3                    Holmes - cross

1          (Jury present)

2          THE COURT:  Please be seated.

3          Mr. Srebnick.

4          MR. SREBNICK:  Thank you, Judge.  May it please the

5    Court, good afternoon again.

6          I'd like to begin with A193, which I believe there's

7    no objection, Judge.  I move it at this time.

8          THE COURT:  A193 is in evidence then.

9          (Defendant's Exhibit A193 received in evidence)

10         MR. SREBNICK:  I'd like to go to page 2 of the email

11   exchange.  Are we able to get it on the big screen?

12         THE COURT:  It's on the small screen.

13         MR. SREBNICK:  It's on the small screen in the jury

14   box?  Great.

15   BY MR. SREBNICK:

16   Q.  And, Mr. Holmes, you have it on your screen?

17   A.  I do.

18   Q.  If we can enlarge the bottom half of the email or the first

19   half.  There we go.  OK.

20         Mr. Holmes, do you see it's an email dated February 7,

21   2009, from Donna to you?

22   A.  Yes.

23   Q.  The subject, ad premiering grandfather clock; do you see

24   that?

25   A.  Yes.

D3DLLEV3                    Holmes - cross

1    Q.  If I could ask you to read that, you can read it to

2    yourself, everybody can read it to themselves, and satisfy

3    yourself that this is the proposed press release which later is

4    made public and we saw it as Government Exhibit 103-5?

5    A.  I have.

6    Q.  OK.  And you see that it's the same as the later press

7    release that comes out?

8    A.  Yes, it looks similar to it, or...

9    Q.  OK, and we can just compare word for word later, but you

10   see it talks about the retail price of $10,000, talks about the

11   honor of Benjamin Banneker, and then indicates at the end that

12   they can visit the website Wallstreetpremiere.com to sign up

13   for continuing alerts on Banneker Inc.; you see that?

14   A.  Yes.

15   Q.  If we could go to the top of the screen, same date,

16   February 7, 2009, you see that at 20:51, that's military time,

17   that would be 8:51, I believe, p.m., does that sound right, did

18   I get that right, 20:51 would be 8:51 p.m., does that sound

19   right?

20   A.  You're asking me?

21            THE COURT:  He's asking you.

22   A.  Yes.

23            THE COURT:  Military time.

24            MR. SREBNICK:  Military time, I think that's what they

25   call it.

D3DLLEV3                    Holmes - cross

1          THE WITNESS:  OK.

2     Q.  It says this is an email from Derrick to Donna that says,

3     This looks great to use in our upcoming PR ad.  Also, Donna,

4     always use Derrick M. Holmes.  And it was sent from your

5     BlackBerry?

6     A.  Yes.

7     Q.  And Derrick M., you wanted your middle initial to be

8     included whenever your name is mentioned, correct?

9     A.  Yes.

10    Q.  And so now if we publish 103-5, the very first line of the

11    press release now includes your middle initial M, Derrick M.

12    Holmes; do you see that?

13    A.  Mm-hmm.

14         THE COURT:  Is that yes?

15    A.  Yes.

16    Q.  Now if we could go to back to the Defendant's Exhibit A193,

17    page 1 of that document, I'd like to show you some email

18    exchange from earlier.  This would be in 2008.

19         MR. SREBNICK:  I think we can probably get the whole

20    thing on this right there.  Great.  Thank you.

21    Q.  Do you see that this is an email that you forwarded to

22    Donna Levy regarding a Snoop Dogg video featuring the Banneker

23    clock?

24    A.  Yes.

25    Q.  It comes from a Kevin Barkey at Firm Entertainment; do you

1    know who that is?

2    A.  I think that was one of Snoop Dogg's people that worked,

3    you know, in his camp.

4    Q.  And just for the record, tell us who Snoop Dogg is so that

5    it's part of the record.  Who is Snoop Dogg?

6    A.  Snoop Dogg is one of the top premier rappers of all time.

7    He goes by the name Snoop Doggy Dogg.  His mom named him Snoop

8    when he was a kid and that name stuck with him.

9    Q.  And it is a helpful situation for Banneker to have someone

10   of Snoop or Snoopy, or whatever he likes to be called, have his

11   name associated with a product?

12   A.  Yes.

13   Q.  Maybe not Snoopy.  Forgot about that.

14        OK.  In any event, it was important enough that you

15   forwarded a link on You Tube to Donna regarding the Snoop Dogg

16   video, right?

17   A.  Yes.

18   Q.  Now, the video, did it portray this -- is he a hip hop

19   artist; is that a correct statement?

20   A.  Yes.

21   Q.  It portrayed the hip hop artist Snoop Dogg with your

22   product, the Banneker clock?

23   A.  Yes, it did.

24   Q.  And that's an important event for your company, correct?

25   A.  Yes.

1   Q.  Now I'd like to show you Government Exhibit 103-6.

2           MR. SREBNICK:  Is that in evidence already?

3           MR. MASTER:  Yes.

4   Q.  If we could publish 103-6, do you remember the press

5   release announcing Snoop Dogg had used the grandfather clock,

6   the Aristocrat, in his video, the new hit song "Those Gurlz"?

7   A.  You know, I remember, I remember us putting things

8   together.  I don't remember specific, but I know that we, you

9   know, had worked on that, Donna and I.

10  Q.  Those Gurlz, is that the name of the song?

11  A.  Yes, that was the name of the song and the video.

12  Q.  Earlier I asked you about some cognac ad.  I'd like to show

13  you a document related to that.

14          MR. SREBNICK:  I'd like to offer at this time A195.

15          Your Honor, at this time I offer A195.

16          THE COURT:  OK.  A195 is in evidence.

17          (Defendant's Exhibit A195 received in evidence)

18          MR. SREBNICK:  If we could publish A195.

19  Q.  OK.  Do you see what's not a very good reproduction, but

20  you see Snoop over here?

21  A.  Yes.

22  Q.  OK.  And do you see this is an email from Donna to you with

23  a draft of a press release regarding Snoop cognac ad.  Banneker

24  is pleased to announce that Landy cognac, along with

25  spokesperson Snoop Dogg, has featured the Aristocrat in their

D3DLLEV3                    Holmes - cross

1    new cognac ad.

2              Do you see that?

3    A.  Yes.

4    Q.  If you go to the top, you tell Donna on that same day,

5    February 8, 2009, OK, sounds good.  Right?

6    A.  Yes.

7    Q.  And then the press release goes out as Government

8    Exhibit 103-7, if you could publish that.

9              Do you remember the press release now going out

10   February of 2009 regarding Snoop Dogg, Landy cognac, the clock,

11   etc.?

12   A.  Like I said, I don't specifically remember, but I'm not

13   disputing it.

14   Q.  Do you remember previously, meaning even before the press

15   release went out, sending Donna some photos of Snoop Dogg with

16   the clock, some photos that had been done?

17   A.  Ask me that again.

18             MR. SREBNICK:  Let me try offering B98 into evidence.

19             No objection?  Publish B98.

20             I'll put it up on the Elmo.

21             THE COURT:  Why don't you do that.

22             (Defendant's Exhibit B98 received in evidence)

23   Q.  Snoop Dogg right here?

24   A.  Yes.

25   Q.  With the girls?

D3DLLEV3                    Holmes - cross

1   A.  Yes.

2   Q.  Is that the clock back there?

3   A.  Yes.

4   Q.  OK.  Is that a cognac ad for a drink?

5   A.  Yes, it was.

6           MR. SREBNICK:  I'd like to move into evidence at this

7   time A192.  There's no objection, Judge.

8           THE COURT:  A192 is in evidence.

9           (Defendant's Exhibit A192 received in evidence)

10  Q.  Do you recall from looking at the email, once we publish it

11  for you, that -- from you to Donna, here is the photo shoot

12  Snoop did with our clock in a Landy cognac ad.  Hot, huh?

13  Also, Jamie Foxx wants to meet soon, as soon as his baby is

14  born in the next few days, Derrick.

15          Do you remember that?

16  A.  It sounds familiar, yeah.  I think it was something that I,

17  you know, wrote.

18  Q.  Now, speaking of celebrities like Snoop Dogg and Jamie

19  Foxx, do you recall there had been, even before you met the

20  Levys, some publicity that you were able to achieve regarding

21  your company, its association with celebrities?

22  A.  I'm sure, yes.

23          MR. SREBNICK:  Judge, at this time I'd like to offer

24  without objection composite Exhibit B96.  These would be some

25  newspapers, Judge.

1    THE COURT:  Any objection there?

2    MR. MASTER:  No, your Honor.

3    THE COURT:  B96 is in evidence.

4    (Defendant's Exhibit B96 received in evidence)

5    MR. SREBNICK:  And I'd like to use the Elmo to publish

6    just a few pages and we'll be done with the media.

7    Q.  If you could tell the jury, the Denver Urban Spectrum, what

8    publication is that?

9    A.  It is a monthly publication, it's in Denver, Colorado, that

10   is tantamount to Ebony or Jet on a smaller scale.

11   Q.  Do you recall that in 2007, over several months, the

12   Denver, the Denver Urban Spectrum published several articles

13   featuring you associated with celebrities and your watch

14   company?

15   A.  Yes.  I know I had been in Urban Spectrum a couple times.

16   I don't remember exactly when or when the dates were, but I

17   know I've been in it.

18   Q.  I'm going to publish the article from February 2007.  I may

19   be a little clumsy here but I'll get it done.

20        You recognize of course yourself in the picture,

21   right?

22   A.  Yeah, I had hair then.

23   Q.  OK.

24        THE COURT:  Is that a matter of choice, Mr. Holmes.

25   Q.  And I think we can see the picture of all the watches that

D3DLLEV3                    Holmes - cross

1   were being advertised or at least being featured, I should say,

2   in this article, correct?

3   A.   Yes.

4   Q.   And the next page there's some mention of the history of

5   Mr. Banneker, and a little bit more about the clock, correct?

6   A.   Yes.

7   Q.   Do you recall the next month there was an article also

8   featuring yourself, photograph?

9   A.   I remember it.  I don't remember the time frame, of course,

10  but I do remember the article.

11  Q.   Was this consistent with the -- one of the business

12  objectives of Banneker was to introduce graduation type jewelry

13  in the format that you thought would be successful to the

14  urban -- I think we called it the urban youth?

15  A.   Yes.

16  Q.   Let me show you from December of 2007, do you recall you

17  were featured with Joel Osteen?

18  A.   Yes.

19  Q.   OK.  And then Beyonce?

20  A.   Yes.

21  Q.   That's you with Beyonce?

22  A.   Yes, it is.

23  Q.   OK.

24          THE COURT:  Next question.

25          MR. SREBNICK:  Thank you, Judge.

D3DLLEV3                    Holmes - cross

1  Q.  And we don't have to read them now, but at least as it was

2  made known to the public, it indicated that you were also

3  associated with other celebrities, including Russell Simmons,

4  correct?

5  A.  Yes.

6          MR. SREBNICK:  I'd like to move into evidence at this

7  time, I don't know if it was introduced yesterday, Judge, at

8  this time, without objection, I'm going to move in B101.

9          THE COURT:  There's no objection, it's received in

10  evidence.

11          (Defendant's Exhibit B101 received in evidence)

12          MR. SREBNICK:  I'll just use the Elmo.  I thought it

13  was handy.

14  Q.  I think you were shown an email yesterday under a different

15  number but it was this one.

16          Do you recall the BannekerInc.@gmail.com was the email

17  address that Donna had registered to receive investor relations

18  issues as you discussed yesterday?

19  A.  I was familiarized with it and I did remember it once I saw

20  it.  I didn't know exactly what context exactly it was used

21  for, but I remember it.

22  Q.  OK.  And you see that actually Donna copied you on an

23  email.  This one shows -- let's see if I can read this right.

24  Somebody named Tracy is asking -- let's see.  Let me read it.

25  One second.

1    OK.  So this one actually in the correct order.

2  Sometimes they're in reverse order; that's why I got confused.

3         At the top, it's Donna Levy to Tracy W.  Dear Tracy, I

4  cannot find the email with your phone numbers.  Derrick needs

5  to reach you concerning marketing of the Banneker jewelry.

6  Please send your phone number as soon as you can, and that's

7  your email address, Derrick_Holmes@Yahoo.  Best regards, Donna.

8         Correct?

9  A.  Yes, I was shown that and it looks.

10  Q.  Looked familiar?

11  A.  Yes.

12  Q.  Do you recall then Tracy sending to Donna with a copy to

13  you all the contact information, Tracy Webb?

14  A.  I don't remember it specifically, but it looks right.

15  Q.  OK.  Good.  Do you recall that you mentioned yesterday a

16  person named Bree, Sabrina I think is her name?

17  A.  Yes.

18  Q.  Do you recall that Sabrina at some point was issued shares

19  in the company, Banneker, that you issued shares to her,

20  correct?

21  A.  Yes, I know she was issued some shares.

22  Q.  At the same time you issued the shares to her, you issued

23  the shares to Donna Levy, correct?

24  A.  Yes.  I don't know if it was in the same time, but I know

25  that they both received shares.

1  Q.  And do you recall that Donna Levy had received a million

2  shares, does that sound right to you?

3  A.  It could be.  I can't remember exactly what it was to be

4  totally honest.

5  Q.  If I show you a document it might refresh your memory,

6  maybe?

7          Let me show you what I'm just going to mark for the

8  time being as A188.  Just see if that refreshes your

9  recollection how many shares Donna got and how many shares Bree

10 got.

11 A.  It looks familiar.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D3drlev4                    Holmes - cross

1    Q.  Does that refresh your memory that Donna Levy got a million

2    shares and Bree got a hundred thousand shares?

3    A.  Very possible.

4              THE COURT:  Do you recall it one way or the other?

5              THE WITNESS:  I recall it, yes.  I can't remember

6    specifically.  But seeing it, that is my signature there, yes,

7    I have to say yes.

8              MR. SREBNICK:  Let me offer A188 into evidence at this

9    time.

10             THE COURT:  Any objection to 188?

11             MR. MASTER:  No, your Honor.

12             THE COURT:  It's in evidence.

13             (Defendant's Exhibit A188 received in evidence)

14             MR. SREBNICK:  If I could have one moment, Judge, I

15   think I'm almost done.  Judge, there is one other exhibit.  If

16   I could have a moment, I'll be done.  I just have to locate it.

17             THE COURT:  Mr. Srebnick, do we need the witness for

18   it?

19             MR. SREBNICK:  If I could have a moment, Judge?

20             THE COURT:  OK.

21             MR. SREBNICK:  Just one other article.  I think I'll

22   be able to get a stipulation on it.  At this time, Judge,

23   subject to stipulating to another document, I have no further

24   questions of the witness.  Thank you, Mr. Homes.

25             THE WITNESS:  Thank you.

D3drlev4                    Holmes - cross

1    MR. SHARGEL:  I want to see if the government has any

2    redirect.  I have an application.

3    THE COURT:  Do you have any redirect?

4    MR. MASTER:  Yes, I do, your Honor.

5    THE COURT:  Go ahead.

6    REDIRECT EXAMINATION

7    BY MR. MASTER:

8    Q.  Mr. Homes, you were shown on cross-examination an exhibit

9    marked as Government Exhibit A175.  Do you remember that?

10   A.  Yes.

11   Q.  I'm sorry.  Defense Exhibit A175.

12   MR. MASTER:  If I may show this on the ELMO.

13   Q.  It is described as executive overview of Banneker?

14   A.  Yes.

15   Q.  Do you see where it says "Initial investment"?  How much

16   money does it say you're seeking as an initial investment for

17   startup costs?

18   A.  At the bottom, minimum of 2 million and a maximum of

19   2.5 million.

20   Q.  You testified on direct that that's how much you asked

21   David Levy for, right?

22   A.  Yes, we had agreed to.

23   Q.  How much did David Levy agree to invest in Banneker?

24   A.  2 million.

25   Q.  As 2008 progressed, how much of that 2 million was David

1   Levy delivering to Banneker?

2   A.   You mean the totality of the year or are you saying --

3   Q.   How much of the 2 million did you end up getting?

4   A.   I know it was somewhere in the neighborhood of 700,000, if

5   I recall.

6   Q.   As 2008 progressed and you weren't getting the 2 million

7   that he promised you, how did that affect your ability to

8   deliver on that Jostens contract that you had been asked about

9   on cross-examination?

10  A.   That first money was invested in the Jostens contract, in

11  the watches, paying back some loans.  That affected my ability

12  to get additional watches made and to do things moving forward.

13  Q.   Would it be fair to say that it had a bad effect or adverse

14  effect on your ability to deliver the Jostens contract?

15          MR. SHARGEL:  Objection to the leading.

16          THE COURT:  Overruled.

17  A.   I would say to the overall business, yes.

18  Q.   That overall business included the Jostens contract?

19  A.   Yes.

20  Q.   You were asked some questions on cross-examination about

21  your 504s with Mazuma Holdings and David Levy's reactions to

22  those 504s.  Do you remember that?

23  A.   Yes.

24  Q.   You were shown an email that was marked as Defendant's

25  Exhibit A200A, do you remember that?

1  A.  Yes.

2  Q.  That's an email from David Levy dated November 28, 2008, do

3  you remember that?

4  A.  Yes.

5          MR. MASTER:  I would offer Defendants' Exhibit A200A

6  as a government exhibit, as a statement of a party opponent.

7          MR. SHARGEL:  I have no objection.

8          THE COURT:  200A is in evidence.

9          (Defendant's Exhibit A200A received in evidence)

10  Q.  You stated on cross-examination that you don't specifically

11  remember seeing that, right?

12  A.  Correct.

13  Q.  What was that?

14  A.  I say correct.

15  Q.  Was that how David Levy talked to you and referred to you

16  in emails, in this tone?

17  A.  Yes, I don't remember that.

18  Q.  David Levy states, "This time it was idiotic since you knew

19  better and you also knew that we were getting ready to help

20  you."  How many times did David Levy say that he was going to

21  be sending you money and then the money didn't show up?

22  A.  It was several times that that happened.

23  Q.  When in November 2008 David Levy states "we were getting

24  ready to help you," how confident could you be that he was

25  actually going to deliver the money that he was saying that he

1    was going to give to you?

2    A.   Hopeful but not confident.

3    Q.   You were shown some emails on cross-examination about some

4    friendly interactions that you had with Donna Levy in February

5    2009.  That's after this email was sent.  Do you remember that?

6    Do you remember being asked those questions?

7    A.   Yes.

8    Q.   After David Levy expressed his disgust, Donna Levy sent you

9    a number of friendly emails, do you remember that?

10   A.   A number of?

11   Q.   Emails about press releases that she wanted to issue.  Do

12   you remember that?

13   A.   Yes.

14   Q.   By the way, the press release about the Landy Cognac ad,

15   that was dated when?  February 2011, right?

16   A.   I believe so.

17   Q.   Where did the actual Landy Cognac ad come out?  You were

18   shown some emails about that, too.  It came out several months

19   early, do you remember that?

20   A.   I believe so.

21   Q.   Did you have any idea why Donna Levy was so interested in

22   issuing press releases on Banneker's behalf in February 2009?

23   A.   I guess I could say -- is that a yes-or-no question?

24   Q.   Did you know?

25   A.   Overall, I've always known that it was to promote the

D3drlev4          Holmes - redirect

1    stock.  So to say specifically, I can say no.

2    Q.  You were shown a number of emails that came between you and

3    Donna Levy.  Do you remember which of those emails you were

4    shown in preparation for your trial testimony?

5    A.  I don't necessarily remember, no.  I've seen a lot of

6    information.

7    Q.  So it's possible that some of those emails you were shown

8    you had not seen before?

9    A.  Yes, it's possible.

10   Q.  What, if any, knowledge did you have at the time that these

11   emails were being changed that Donna Levy and David Levy were

12   selling hundreds of thousands of dollars of Banneker stock?

13   A.  I never really knew in terms of the interaction with stock,

14   their stock, or what.

15   Q.  So you had no knowledge that they were selling at that

16   time?

17   A.  No.

18   Q.  After February 2009, you testified on direct that you got a

19   total of approximately 5,000 more dollars in total from the

20   Levys, do you remember that?

21   A.  Yes.

22   Q.  Is that an accurate representation of how much money you

23   ended up receiving after February 2009 from the Levys?

24   A.  Yes.  As I recall, yes.

25            MR. MASTER:  Nothing further, your Honor.

 1           MR. SHARGEL:  Your Honor, addressed to the redirect

 2    examination?

 3           THE COURT:  Yes.

 4    RECROSS-EXAMINATION

 5    BY MR. SHARGEL:

 6    Q.  Yesterday, Mr. Holmes, you said that you loved the Levys,

 7    right?

 8    A.  Yes.

 9    Q.  You still do, correct?

10    A.  Yes, I do.

11    Q.  You had many social engagements with the Levys, you had

12    meals together over the years, is that a fair statement?

13    A.  Yes.

14    Q.  But you knew that business was business, right?

15    A.  Business is always business.

16    Q.  Business is always business.  We have seen a number of

17    contracts up there.  We have seen memoranda and agreements.

18    Business is business, right?

19    A.  Correct.

20           MR. SHARGEL:  If we could have this up there again.

21           THE COURT:  What's this?

22           MR. SHARGEL:  I'm sorry.  A200A.

23           THE COURT:  Mr. Levy's letter, email?

24           MR. SHARGEL:  Yes, email.

25           THE COURT:  All right.

1   Q.  This was on November 28, 2008.  Before we take a look at

2   that, let's go back one more time to a 504 transaction.  A 504

3   transaction, the stock is being sold essentially at discount,

4   right?

5   A.  Yes.

6   Q.  Sometimes as low as half price, right?

7   A.  I don't know for sure, but I know generally, from what I

8   remember of 504s, you sell your stock at a discounted price.

9   Q.  As we said before, to get quick money, fair statement?

10  A.  Yes.  To bring investment money into the company, yes, I'd

11  say quickly.

12          MR. SHARGEL:  Could we focus on the first half.

13  Q.  "I just want to give you a little math to think about."

14  This was written not only to you but to Ron Hunter, your vice

15  president, right?

16  A.  You're asking me was Ron Hunter my vice president?

17  Q.  He was.  You testified to that before, right?

18  A.  Correct.

19  Q.  William Aul, you knew he was the lawyer, right?

20  A.  Yes.

21  Q.  This is Mr. Levy writing, because it is from him, "Just

22  want to give you a little math to think about, and why you

23  should all," capital letters, "consider resigning from the

24  board and get some help.  Less than a year ago your company was

25  worth about $175 million.  That's 175 million.  And today the

1  company is worth 1,200,000 and declining rapidly.  So I just

2  wanted to review how you got to such great accomplishment.

3          "You did a 504 funding and got $60,000, and in turn

4  you lost half of your net worth, not to mention the fact that

5  it cost me $250,000 to buy it all back.  We realized that you

6  were fooled into it due to your lack of experience and spent a

7  considerable amount of time trying to educate and explain to

8  you in details how you got," I'll omit the word, "and in turn

9  your company and all the shareholders, and why you shouldn't

10  have done it and certainly why you should not do it again.

11          "So what do you do?  Of course do it again.  And if

12  the first time was a mistake, this time it was idiotic, since

13  you knew better, and you also knew that we were getting ready

14  to help you.  This time you only received $4,000, laugh out

15  loud, and caused the stock to go from 70 cents down to 3 cents,

16  a loss of $27 million, that's 27 million, in your company and

17  shareholder value.  Brilliant," in capital letters.  "I hope

18  that $40,000 made a big change in your life.  I was going to go

19  on and on and realized that there is no point.  You guys are

20  way smarter than me.  Good luck."

21          MR. MASTER:  Is there a question?

22          MR. SHARGEL:  Yes.

23          THE COURT:  What is the question?

24  Q.  The question is now, sir, after looking at these documents,

25  do you now recall Mr. Levy's position as written in this letter

1   back in November 2008?

2   A.  I don't really remember the letter per se, but, like I said

3   to you earlier, I remember having uncomfortable dialogue about

4   the 504s.

5          MR. SHARGEL:  I'll stay with "uncomfortable dialogue."

6   Thank you, your Honor.

7          THE COURT:  Mr. Srebnick?

8          MR. SREBNICK:  I found the document.  I think I can

9   stipulate with the government.  Another newspaper article.  It

10  will be 100.  We don't need to publish it now.

11         THE COURT:  Also from the Denver spectrum, the urban

12  spectrum?

13         MR. SREBNICK:  Yes, from the Urban Spectrum, the

14  online version.

15         Mr. Holmes, you are excused.  Thank you very much.

16         (Witness excused)

17         THE COURT:  Call your next witness.

18         MS. COHEN:  Your Honor, if we could have five minutes?

19         THE COURT:  All right.  Why don't we take another

20  afternoon break.  Mr. Shargel, you had an application?

21         MR. SHARGEL:  My application was to admit the exhibit

22  that my adversary was kind enough to admit for me.

23         (Recess)

24         THE COURT:  Mr. Master, can you call your next

25  witness, please.

1          MR. MASTER:  Yes.  At this time the government calls

2    Benjamin Lefrancois.

3     BENJAMIN LEFRANCOIS,

4       called as a witness by the government,

5       having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. MASTER:

8    Q.  Good afternoon.  Where you are you employed, sir?

9    A.  Greenway Design Group.

10   Q.  What is your position there?

11   A.  CEO and president.

12   Q.  What does Greenway Design Group do?

13   A.  Greenway Design Group is the master company of a product

14   called Cool-n-Save.

15   Q.  What is Cool-n-Save?

16   A.  Cool-n-Save is a product that helps air conditioning become

17   more efficient, reduces carbon pollution, and helps consumers,

18   residentially and commercially, save money on their bills.

19   Q.  I'm going to show you what's been marked for identification

20   as Government Exhibit 400.  Do you recognize that?

21   A.  Yes.

22   Q.  What is Government Exhibit 400?

23   A.  This is the residential version of Cool-n-Save.

24   Q.  Is that one of the products that you manufacture and

25   market?

D3drlev4                    Lefrancois - direct

1    A.  Yes.

2              MR. MASTER:  Your Honor, the government offers

3    Government Exhibit 400 and requests permission to publish it to

4    the jury.

5              MR. SHARGEL:  No objection.

6              THE COURT:  400 is received and it will be shown to

7    the jury.

8              (Government's Exhibit 400 received in evidence)

9              THE COURT:  Are you going to take it out of the box?

10             MR. MASTER:  I guess it's up to the jury, if they want

11   to publish it that way.  Just don't break it.

12   Q.  You stated the residential application of Cool-n-Save.

13   What other applications of the Cool-n-Save technology are

14   there?

15   A.  We have a commercial version which is designed for larger

16   buildings and multiple units on the top of the building.

17   Q.  How does that technology differ from this technology?

18   A.  The technology is basically the same other than it's a much

19   bigger system.  It's beefier, I would say.  We use a reverse

20   osmosis system for the water, three-stage filtration system.

21   It is just designed for a much larger application rather than

22   just a simple residential air conditioning unit.

23   Q.  What is reverse osmosis?

24   A.  What we do is basically on the larger version we treat the

25   water so that any of the metal on any of the air conditioning

1  units can't corrode or rust.  Reverse osmosis takes a lot of

2  the minerals out of the water.

3  Q.  What, if any, patents do you have on this technology?

4  A.  We have the patent on the residential system right now on

5  the paddle that is on top of that box, which opens a pin valve,

6  which allows water to flow to the nozzles.  Also it has an

7  inlet that water comes from a hose into that little dome on

8  top, and that is the patent we have on that.  We have

9  exclusivity on the chemical that is inside of the filtration

10  system, and we are patent pending on the commercial system

11  right now.

12  Q.  Explain briefly for the jury how it actually works to cool

13  and increase energy efficiency.

14  A.  Both of them work with the same concept.  Basically, we

15  take water.  We have a misting system around the air

16  conditioning unit.  You can imagine if you were at a restaurant

17  where they have the misters outside.  It's a hundred degrees

18  outside, the misters turn on, and it drops the ambient

19  temperature down to a certain degree.  We average about 26

20  percent savings on our product.

21  Q.  26 percent savings on what?

22  A.  On energy bills, of the AC portion of the merge bill we

23  average about 26 percent savings.

24  Q.  How does the chemical that you are describing work to

25  address I guess the corrosion issue that you mentioned.

1    A.  On the core corrosion system it has at a polymer-based

2    chemical.  What it does is distort the calcium molecule so it

3    cannot adhere to metal.  So the water will hit metal, and the

4    calcium, instead of sticking to metal, which causes rust and

5    corrosion, falls off.

6    Q.  The calcium is in the water that would be reducing the

7    temperature?

8    A.  Yes.

9    Q.  When did you found Greenway Design?

10   A.  2007.

11   Q.  Who did you found it with?

12   A.  A few partners of mine, Larry McKenna, Ron Browning, Carlos

13   Ventura were the original partners.

14   Q.  What was it originally set up to do?

15   A.  Originally, it wasn't just the Cool-n-Save.  It was green

16   products, such as synthetic turf to save on water.  We had some

17   wood products that were supposed to be a little bit more

18   advanced.  But we decided to focus more on the Cool-n-Save.

19   Q.  Who actually invented the Cool-n-Save technology?

20   A.  The paddle itself was invented by Larry McKenna, an

21   original partner.

22   Q.  What is the reason that you switched to focus exclusively

23   on Cool-n-Save?

24   A.  We just felt that it had a better market for us.  We wanted

25   to focus on one thing rather than trying to be broad.  And we

1    were really small at that time.

2    Q.  How was Greenway Design originally set up?  Was it a public

3    or private company?

4    A.  Private company, LLC, Texas LLC.

5    Q.  Who put in the money to fund the company initially?

6    A.  Initially, it was some private investors that I had

7    approached, along with myself getting some lines of credit,

8    bank loans.

9    Q.  That's your personal lines of credit?

10   A.  Yes.

11   Q.  How much money did you put on your personal line of credit

12   to fund the company?

13   A.  Lines of credit, there was 150,000.  Then the loans I

14   believe were about another 125,000.

15   Q.  What is the difference between a line of credit and a loan.

16   A.  Investor loans I was speaking of, not loan from a bank.

17   Q.  You personally took out how much?

18   A.  150,000.

19   Q.  How much did investors loan you or your company?

20   A.  125,000.

21   Q.  Did there come a time when some of the original investors,

22   original founders, left and others came in while you were still

23   a private company?

24   A.  Yes.

25   Q.  Describe the changes in management.

1  A.  Ron Browning and Carlos Ventura left to do other things,

2  and I brought in Darius Jakubik, Robert Jakubik is his real

3  name, and Scott Christiansen.

4  Q.  What is their relationship to you?

5  A.  Darius I worked with in the past, and Scott Christiansen is

6  my brother-in-law, who is a dentist, private investor.

7  Q.  How much time did you put in, would you estimate, per week

8  in trying to build Greenway Design Group?

9  A.  Per week?  I would say 60 hours.  We were always working.

10 Q.  What were you doing during those 60 hours to try to build

11 Greenway Design Group?

12 A.  We were doing research and development, trade shows,

13 working on marketing projects, anything we could to get the

14 word out.

15 Q.  How much travel did you have to do for Greenway Design

16 Group?

17 A.  We did a lot of travel to Las Vegas, to Arizona, some to

18 Texas.  Most of the trade shows were in Las Vegas that we

19 attended, though.  Then we did some travel to -- not at that

20 time.  I think we might have done one trade show in San Diego.

21 Q.  Where is this company based?

22 A.  Huntington Beach, California.

23 Q.  Did there come a time when you began looking for a

24 substantial amount of additional financing?

25 A.  Yes.

1  Q.  What was the reason that you were looking for additional

2  financing?

3  A.  In order to get to the next level, we knew we needed to get

4  substantial financing in order to build inventory, do a

5  correct, proper marketing program, branding, and again just

6  hitting the trade shows.

7  Q.  How much does it cost to build or to manufacture sufficient

8  inventory of that residential system to distribute it?

9  A.  An order of just the filters is about $30,000.  Inventory,

10  depending on how much we would order, probably about a hundred

11  thousand.

12  Q.  For how many units?

13  A.  That would probably be 5,000, in that range.  I don't have

14  it exactly.

15  Q.  What does that residential unit retail for?

16  A.  99.99.

17  Q.  Did there come a time when you met David Levy and Donna

18  Levy in your effort to find financing for Greenway Design?

19  A.  Yes.

20  Q.  How did you come to meet them?

21  A.  I was working with somebody I knew that was trying to raise

22  funds for us.  We had tried several avenues through venture

23  capital, angel investors, and they weren't working out.  So we

24  started looking, just reaching out for people to help us raise

25  money.  I met with somebody, and that's how it happened.

1    Q.  Who were the venture capital and angel investors?

2    A.  Basically investment groups that are looking to invest in

3    companies.

4    Q.  What is the name of the person you started reaching out to

5    see if they could connect you directly with an investor?

6    A.  His name was Mark Sinkinson.

7    Q.  After you made the introduction with Mark Sinkinson, did

8    there come a time when you received a call from Donna Levy?

9    A.  Yes.

10   Q.  What did Donna Levy say on the call?  What did she say to

11   you and what did you say to her?

12   A.  She introduced herself and said she was interested in our

13   company, our product, but was not thrilled with the terms that

14   were being offered.  And we decided to move forward from there

15   with different terms.

16   Q.  Terms that were being offered by whom?

17   A.  I'm sorry?

18   Q.  Terms that were being offered by whom?

19   A.  Originally, Mark Sinkinson would take a commission or a

20   percentage of any of the amount of money raised, that he

21   raised.

22   Q.  How did you know that Donna had some connection to Mark

23   Sinkinson?

24   A.  I didn't other than the fact that until she called me and

25   just went over the terms and wasn't thrilled with them.

D3drlev4                    Lefrancois - direct

1    Q.  How much were you looking for initially?

2    A.  Initially, we thought we would need about 300,000.

3    Q.  Did there come a time when you actually met with David Levy

4    in connection with your quest for $300,000 in financing?

5    A.  Yes.

6    Q.  Who actually appeared at the meeting?  Were David Levy and

7    Donna Levy present or just David Levy?

8    A.  Just David.

9    Q.  Approximately when did this meeting occur?

10   A.  I want to say it was within three weeks of the initial

11   conversation, if not a little sooner.

12   Q.  I'd like to direct your attention to mid 2009.  Did there

13   come a time when you met with David?

14   A.  Yes.

15   Q.  Where did you meet?

16   A.  At my office.

17   Q.  Which is where?

18   A.  Huntington Beach, California.

19   Q.  What did you say to David and what did he say to you at the

20   meeting?

21   A.  We just went over what our wants and needs were and what we

22   needed to do to try to get the company to the next level.  We

23   discussed the product itself and what we needed to do.

24   Q.  What was David's reaction to your description of what your

25   company did and what you needed to do?

D3drlev4                    Lefrancois - direct

1  A.  He was thrilled.  He really thought we had a really good

2  idea and saw the potential in it and was basically on board.

3  Q.  How much money did he offer you initially at the first

4  meeting?

5  A.  The first meeting I believe was a hundred thousand, and we

6  discussed going up to 300,000.

7  Q.  When did he give you that first hundred thousand?

8  A.  When we met.

9  Q.  The first time he saw you he gave you $100,000?

10  A.  Yes.

11  Q.  How did he give it to you?

12  A.  By check.

13  Q.  Did you retain a copy of that check for your own records?

14  A.  Yes.

15  Q.  In preparation for your testimony today, did you examine

16  the check, a copy of which you had retained for your records?

17  A.  Yes.

18  Q.  What is the name of the individual who allegedly signed

19  this check?

20          MR. SHARGEL:  Excuse me.  I object to the form of the

21  question, "allegedly."

22          THE COURT:  Sustained.

23          MR. MASTER:  Yes, your Honor.  Withdrawn.

24  Q.  I'd like to show you what's been marked for identification

25  as Government Exhibit 400-8.  Do you recognize that document?

1   A.  Yes.

2   Q.  What is it?

3   A.  It's a general security agreement signed by myself and

4   David, and then it's a promissory note.

5   Q.  Is there something attached to the back?

6   A.  Yes, there is a check.

7   Q.  Is that the first check that you just described receiving

8   from David?

9   A.  Yes.

10  Q.  How do you recognize it?  From your own signature and that

11  of David's?

12  A.  Yes.  Well, the one isn't signed, but the one is by both of

13  us.

14  Q.  You recognize the document from your dealings?

15  A.  Yes.

16          MR. MASTER:  The government offers Government Exhibit

17  400-8.

18          MR. SHARGEL:  May I see the check?  I have no

19  objection.

20          THE COURT:  400-8 is received in evidence.

21          (Government's Exhibit 400-8 received in evidence)

22          MR. MASTER:  If you could publish the last page of

23  that, Mr. Dinet.

24  Q.  There is a signature on that check that you remember

25  receiving.  Do you recognize that signature?

1   A.  No, I don't.

2   Q.  Have you ever met anyone named Yael Tal?

3   A.  No, I haven't.

4   Q.  Do you know an individual named Yael Tal's relationship to

5   David Levy?

6   A.  No, I don't.

7   Q.  Did David Levy ever describe being in business with his

8   sister?

9   A.  No.

10  Q.  Who did you understand EZ English to be owned by?

11  A.  David Levy.

12  Q.  In fact, David Levy entered into this -- well, withdrawn.

13  What, if any, other companies did you know David Levy to be

14  controlling?

15  A.  The only other one I thought was Date Palm Capital.

16  Q.  In fact, even though this first check was written on the

17  bank account of EZ English, if you look at the first page of

18  Government Exhibit 400-A -- Mr. Dinet, if you could turn to the

19  first page.  Who is this general security agreement between?

20  A.  Greenway Design Group and Date Palm Capital.

21  Q.  Again, who did you know to be the person running Date Palm

22  Capital?

23  A.  David Levy.

24  Q.  What did you understand the purpose of this general

25  security agreement to be?

1  A.  Just as it says.  Basically, a general security agreement,

2  the terms we had talked about, coming in with a hundred

3  thousand and then looking to get up to 300,000 if needed.

4  Q.  The reference to the initial hundred thousand and the up to

5  300,000, that's in paragraph A there under the "Whereas"?

6  A.  Correct.

7  Q.  "Secured party agreed to transfer to debtor," and that's

8  you, the Greenway Design Group, correct?

9  A.  Correct.

10  Q.  "The sum of $100,000 to debtor in exchange for debtor's

11  issuance of the secured note."  Then it references a principal

12  amount of $100,000 and it may be increased to an aggregate of

13  $300,000.  Do you see that?

14  A.  Yes.

15  Q.  By the way, that last page, the copy of the check, you

16  recognize that check as the check that you received from David

17  Levy at that first meeting you had with him?

18  A.  Yes.

19  Q.  Now back to the general security agreement.  You stated

20  that you entered into this for an initial amount of 100,000 up

21  to a maximum of 300,000.  When was this agreement actually

22  drafted up?  In other words, had it been drafted before your

23  meeting where he gave you the check?

24  A.  No, I believe it was drafted right after.

25  Q.  Who drafted this agreement?

1    A.  Bill Aul.

2    Q.  Who is Bill Aul?

3    A.  Bill Aul was our attorney.

4    Q.  That's A-U-L, right?

5    A.  Yes.

6    Q.  Bill A-U-L?

7    A.  Yes, correct.

8    Q.  How did you find Bill Aul?

9    A.  David Levy helped us.

10   Q.  In connection with the general security agreement, you

11   referenced there is a second agreement that you agreed to enter

12   into.  Withdrawn.  Following this agreement, did you have

13   subsequent conversations with David Levy about some plans that

14   David Levy suggested you pursue for your business?

15   A.  Our agreement originally was to get some money to put into

16   the company for what I have already talked about, inventory,

17   etc.  Then the plan turned to going to public entities so we

18   could raise significantly more money.

19   Q.  Whose idea was it to take your company public so that you

20   could raise significantly more money?

21   A.  David Levy.

22   Q.  When, if ever, had you managed a public company before?

23   A.  I hadn't.

24   Q.  What was your background before founding Greenway Design

25   Group?

1   A.  Mortgage broker, did some home building.

2   Q.  When, if ever, had you taken a company public before?

3   A.  I hadn't.

4   Q.  What did David Levy say he would do to help take your

5   company public?

6   A.  He would help with everything.  He will help guide us

7   through it, get us going, get us the company that we needed to

8   merge with, legal expenses.  Everything.

9   Q.  What did he say he would be able to do once he took the

10  company public?

11  A.  Raise money.  That was the whole idea, to be able to raise

12  a significant amount of money so that we could basically go to

13  the next level.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. MASTER:

2  Q.  Now, at the time that you entered into these discussions

3  with David Levy, was there an ownership structure for the LLC,

4  in other words, did different people own different percentages

5  of the LLC?

6  A.  Yes.

7  Q.  And by LLC, I should step back.  What was the corporate

8  structure for Greenway Design, the private company?

9  A.  The percentages, is that what you're asking me?

10 Q.  Well, I stated Greenway Design LLC, and I hadn't asked you

11 before what is an LLC?

12 A.  Limited liability company.

13 Q.  OK.  Is that a type of private company?

14 A.  Yes.

15 Q.  And so what was the ownership structure of this private

16 company that you owned?

17 A.  The ownership structure was I owned 60 percent, Darius

18 Jakubik owned 20 percent, Larry McKenna owned 10 percent, Scott

19 Christiansen owned 10 percent.

20 Q.  And did there come a time when you entered into more

21 serious discussions with David Levy about taking the company

22 public?

23 A.  More serious discussions, I mean we had a plan and that was

24 the basic was to take it public and go from there.

25 Q.  Now, in fact, you went forward with the plan?

D3DLLEV5                    Lefrancois - direct

1    A.  Correct.

2    Q.  Now, who drafted the documents that were needed to take

3    your company public?

4    A.  Bill Aul.

5    Q.  And who found the shell company that you used to merge

6    into?

7    A.  David Levy and Bill Aul.

8    Q.  And what was the name of that shell company?

9    A.  Voice Networks.

10   Q.  And what was your understanding of the company that I guess

11   what Voice Networks was?

12   A.  My understanding, they had something to do with sprinklers.

13   Q.  And what was the status of the company as of the time of

14   the merger?

15   A.  Which company, mine or theirs?

16   Q.  Voice Networks.

17   A.  I'm not aware, I don't know.

18   Q.  And did there come a time when the merger was completed?

19   A.  Yes.

20   Q.  At the time that you were negotiating this merger, what if

21   anything did David Levy say about the relationships he had in

22   Panama?

23   A.  I didn't know anything about that.

24   Q.  Well, at the time of the merger, what if anything did David

25   Levy say about an investor group that he had in Panama?

1  A.  Well, when we were talking about trying to raise money, one

2  of the ideas he had had was a group that he thought he might be

3  able to get in Panama for us.

4  Q.  To do what?

5  A.  To raise money either through grants or bonds or loans.  We

6  didn't ever get to that point.

7  Q.  And as David was funding the company, what if anything did

8  David say to you about the source of some of the funds he was

9  investing in the company?

10  A.  He didn't.

11  Q.  What if any connection to Panama did he say there was

12  between, well, with respect to the funds he was investing?

13  A.  My only understanding that he had banking relationships in

14  Panama, and I didn't really ask much more than that.  I just

15  knew that he dealt with some people in Panama because some of

16  the wires we would receive went from Panama to Bank of America

17  to us.  So that's all I know.

18  Q.  Now, at the time you merged, how many shares were issued in

19  the name of Greenway Design Group, the public company?

20  A.  For Greenway, it was a hundred million.

21  Q.  And how many shares did you get in that company?

22  A.  60 million.

23  Q.  And how about the other insiders or the other founders?

24  A.  It was broken up to the percentages.  So Darius got

25  20 million, Scott Christiansen got 10 million, and Larry

1  McKenna got 10 million.

2  Q.  And approximately when did the merger occur?

3  A.  2009, I believe it was September of 2009.

4  Q.  At around the time of the merger, did there come a time

5  when you learned that in addition to the hundred million shares

6  that were issued in your name and the names of these other

7  insiders that you learned that an entity named Bluefin

8  Financial Group --

9  A.  Yes.

10  Q.  -- had acquired an interest in Greenway Design?

11  A.  Yes.

12  Q.  I'm going to show you what's already been introduced into

13  evidence as Government Exhibit 450-2.

14         MR. MASTER:  And if you wouldn't mind publishing that,

15  Mr. Dinet.

16  Q.  And what is Government Exhibit 450-2?

17  A.  This is a shareholder list.

18  Q.  Of which company, of your company?

19  A.  Yes.

20  Q.  As of what date?  There's a date printed on --

21  A.  This is of November 15, 2010.

22  Q.  And is that a shareholder list that's maintained by your

23  transfer agent?

24  A.  Yes.

25  Q.  And what's a transfer agent?

D3DLLEV5                    Lefrancois - direct

1    A.  He deals with all of our shares, full standing or

2    outstanding.

3    Q.  Just handing you a copy of Government Exhibit 450-2.  I'd

4    like you to turn to the last page of that document.

5            MR. MASTER:  And, Mr. Dinet, if you wouldn't mind

6    turning to the last page.

7    Q.  What's the name of the entity that's listed on the last

8    page of that document?

9    A.  Bluefin Financial Group.

10   Q.  And what's the address that's listed as being associated

11   with Bluefin Financial Group?

12   A.  3100 North 29th Court, Second Floor, Hollywood, Florida

13   33020.

14   Q.  And how many shares were issued in the name of Bluefin

15   Financial Group?

16   A.  9,900,000.

17   Q.  And do you know how Bluefin Financial Group came to gain a

18   9,900,000 share interest in Greenway Design Group?

19   A.  No, I don't.

20   Q.  And who did you know, who did you understand to be

21   associated with Bluefin Financial Group?

22   A.  David Levy.

23   Q.  And how did you come to learn that?

24   A.  There was incident where his brief case was stolen and we

25   had to change the stock certificates.  We had to delete -- I

D3DLLEV5                    Lefrancois - direct

1    don't know what you say -- we had to get so no one else could

2    use them.

3    Q.  Well --

4    A.  And reissue.

5    Q.  Who told you, first of all, who told you that the brief

6    case was stolen?

7    A.  David Levy.

8    Q.  And whose brief case did David Levy say had been stolen?

9    A.  His.

10   Q.  And when did David Levy tell you that his brief case was

11   stolen?

12   A.  Just prior to when we had to reissue the stocks.

13   Q.  And prior to that, what knowledge if any did you have that

14   David Levy owned 9,900,000 shares in Greenway Design Group

15   through Bluefin Financial Group?

16   A.  I didn't.

17   Q.  And what if any contract or promissory note did Greenway

18   Design Group have with Bluefin Financial?

19   A.  We didn't.

20   Q.  Now, with respect to the Bluefin Financial, what if any

21   connection were you aware of that Bluefin Financial had to

22   Panama?

23   A.  I didn't.

24   Q.  What if anything did David Levy say about relationships

25   that he had in Panama in connection with Bluefin Financial?

D3DLLEV5                    Lefrancois - direct

1    A.  I have no knowledge of that.

2    Q.  He never said anything about that?

3    A.  No.

4    Q.  And what happened -- who was your transfer agent when David

5    Levy reported to you that his shares in Bluefin Financial were

6    stolen?

7    A.  Pacific Stock Transfer.

8    Q.  And what was Pacific Stock Transfer's reaction when David

9    Levy tried to get the Bluefin Financial shares reissued to him?

10            MR. SHARGEL:  Objection, hearsay.

11            THE COURT:  Overruled.

12   A.  They wouldn't reissue them.

13   Q.  And so what did David Levy ask you to do when Pacific Stock

14   Transfer refused to reissue the shares to David Levy in the

15   name of Bluefin Financial?

16   A.  We changed to West Coast Stock Transfer.

17   Q.  At whose request?

18   A.  David Levy and Bill Aul.

19   Q.  And what was your understanding of the reason why you

20   switched to West Coast Stock Transfer?

21   A.  At that time I didn't really understand why, but we just --

22   I was doing what I was told to do.  And they were -- I was told

23   that West Coast would be easier to work with, they're closer to

24   Bill and they're in San Diego, where he was.

25   Q.  And that followed Pacific Stock Transfer's refusal to

1    reissue the Bluefin Financial shares to David Levy?

2    A.   Correct.

3    Q.   Approximately when did David Levy report that his shares in

4    Bluefin Financial had been stolen from a brief case?

5    A.   I don't know the exact date of that.  I mean it was prior

6    to him having to or us changing transfer agents.

7    Q.   Who told you to change transfer agents?

8    A.   David Levy.

9    Q.   I'd like to show you what's been marked for identification

10   as Government Exhibit 450 -- it's actually in evidence as

11   Government Exhibit 450-16, and it's from you to an individual

12   named -- it's an email dated December 1, 2010, from you to an

13   individual named Frank Brickell.

14   A.   Correct.

15   Q.   Who is Frank Brickell?

16   A.   He was the transfer agent for West Coast Stock Transfer.

17   Q.   And did this email exchange occur soon after you switched

18   from Pacific Stock Transfer to West Coast Stock Transfer?

19   A.   Yes.

20   Q.   And what does this email relate to?

21   A.   Seeing if the new certificates were issued.

22   Q.   New certificates in the name of what entity?

23   A.   I believe Bluefin Financial.  That's what I'm writing,

24   that's what it says on here.

25   Q.   And do you recall asking if West Coast Stock Transfer would

D3DLLEV5                    Lefrancois - direct

1   reissue the shares in the name of Bluefin Financial to David

2   Levy?

3   A.  I didn't ask.  They just did it.

4   Q.  Well, what were you doing when you were -- what was the

5   reason you were writing to West Coast Stock Transfer about the

6   Bluefin Financial shares?

7   A.  I was seeing if the lost certificates were transferred over

8   and if they were ready to go, so it looks like to be traded.

9   Q.  What was your understanding of the reason why David Levy

10  wanted to get those shares reissued to him?

11  A.  To start trading and get the stock public, get it going.

12  Q.  What kind of shares did you get in Greenway Design Group

13  when it merged in September 2009?

14  A.  Restricted shares.

15  Q.  And how about the other founders of the company, what kind

16  of shares did you get?

17  A.  We all got restricted shares.

18  Q.  And as of 2009, what if any understanding did you have that

19  David Levy had his own shares in Greenway Design?

20  A.  I wasn't aware at the beginning.

21  Q.  And it was -- when did you learn that he had shares in

22  Greenway Design Group?

23  A.  Well, just when we went over the strategy of how we were

24  going to go public and get everything going.  At that time I

25  didn't know much about it.

D3DLLEV5                         Lefrancois - direct

1    Q.  And when did he tell you that he had already had shares

2    issued to him in the name of Bluefin Financial?

3    A.  I don't recall that conversation, actually.

4    Q.  OK.  But you do recall the discussion about the lost brief

5    case?

6    A.  Yes.

7    Q.  And I'd like you to take a brief look at Government

8    Exhibit 450-15.  Do you recognize Government Exhibit 450-15?

9    And, actually, if you could just start at the bottom,

10   Mr. Dinet.  It's an email, starts with an email dated

11   December 7, 2010, at 2:07 p.m.

12            Ben/Bill, do either of you have the contact

13   information for Bluefin Financial Group?  We have not received

14   the lost certificate docs yet.  I wanted to follow up just to

15   make sure everything is all right.  It's from Frank Brickell.

16            What was your understanding of the lost certificate

17   documents that he was remembering to?

18   A.  My understanding was the ones that David was referring to

19   in his brief case.

20   Q.  By the way, when if ever were you presented with a police

21   report or other document indicating that he actually had a

22   brief case stolen?

23   A.  I didn't.

24   Q.  And then what's the top email?  It's from later that day.

25            MR. MASTER:  Mr. Dinet, if you go up to the top.

D3DLLEV5                      Lefrancois - direct

1    Q.  It states, I just forwarded this to David Levy, his number,

2    and then it lists a phone number, and it's from you to Frank

3    Brickell, copy to William Aul.

4            Why did you forward that email to David Levy?

5    A.  No, I forwarded that -- oh.  Frank was asking for Bluefin

6    Financial's number.  That's the only one that I knew had

7    anything to do with it, with Bluefin.

8    Q.  And did there come a time later when David Levy reported

9    some control changes with Bluefin Financial?

10   A.  No.

11   Q.  I'd like you to take a look at Government Exhibit 450-14.

12   And if you wouldn't mind looking at the bottom email dated

13   March 10, 2011, it states, he mentioned the shareholder will

14   need to fill them out.  I forwarded these documents a while ago

15   to David Levy.  He mentioned there was some control changes

16   with Bluefin Financial.  Are they requesting replacement

17   certificates.

18           And what did you reply?  If you could go to the top.

19   It states, no, they wish to cancel them.  Can you please email

20   me the documents that need filling out so I can get them to

21   Bluefin.

22           Who told you that there was an interest in canceling

23   shares in Bluefin?

24   A.  David Levy.

25           MR. MASTER:  Now, if you wouldn't mind taking that

D3DLLEV5                    Lefrancois - direct

1   off.

2   Q.  Now, in between the June meeting in 2009 and 2011, David

3   Levy, well, about how much in financing did David Levy provide

4   to Greenway Design?

5   A.  At that time it would have had to have been close to

6   $2 million.

7   Q.  And in what form did the financing take?

8   A.  They were all notes.

9   Q.  What do you mean by notes?

10  A.  Well, they're secure promissory notes.

11  Q.  And can you just explain to the jury what a secure

12  promissory note is?

13  A.  It was basically a loan with interest or right to convert

14  into stock at a certain price.

15  Q.  Is that also known as a convertible note?

16  A.  Yes.

17  Q.  Who drafted all the convertible notes that you entered into

18  with David Levy?

19  A.  Bill Aul.

20  Q.  And was all the financing incorporated into a single note

21  or were there several notes?

22  A.  Several notes.

23  Q.  And how would it come about that you would get multiple

24  notes between yourself and entities controlled by David Levy?

25  A.  Well, we were just we kept needing money.  We kept trying

D3DLLEV5                    Lefrancois - direct

1    to build the business.  We kept trying to get big deals closed

2    that weren't closing.  So, we kept borrowing.

3    Q.  And you stated borrowing.  What if any I guess equity

4    position did David Levy take in Greenway Design Group, the

5    publicly traded corporation, other than the position in Bluefin

6    Financial that you later learned about?

7    A.  He didn't have an equity position.

8    Q.  And by equity position, what's your understanding of that

9    term?

10   A.  Ownership or percentage of ownership.

11   Q.  I'd like to show you what's been marked for identification

12   as Government Exhibits 400-5, 400-6, 400-7, 400-14, 400-11,

13   400-12, 400-13, 400-18, 400-15, 400-16, and 400-17.  And I

14   apologize for jumping around in the numbers but that's in

15   chronological order.

16           Do you recognize each of those documents?

17   A.  Yes.

18   Q.  Just take a moment to flip through them.  Do you recognize

19   each of those documents?

20   A.  Yes.

21   Q.  OK.  What are they?

22   A.  They are general security notes.  They are board -- actions

23   of the manager without a board meeting consent, approved the

24   notes.

25   Q.  And so each of those is one of these convertible notes?

D3DLLEV5                    Lefrancois - direct

1    A.  Correct.

2    Q.  And those are notes that were authorized by the board of

3    directors of Greenway, right?

4    A.  Yes.

5    Q.  Does your signature appear on each of those documents?

6    A.  Yes.

7              MR. MASTER:  At this time the government offers

8    Government Exhibits 400-5, 400-6, 400-7, 400-14, 400-11,

9    400-12, 400-13, 400-18, 400-15, 400-16, and 400-17 into

10   evidence.

11             MR. SHARGEL:  Without objection.

12             THE COURT:  They're received in evidence.

13             (Government's Exhibits 400-5, 400-6, 400-7, 400-14,

14   400-11, 400-12, 400-13, 400-18, 400-15, 400-16, and 400-17

15   received in evidence)

16             MR. MASTER:  So if you could just quickly publish the

17   front pages of each of those notes, Mr. Dinet, if you could

18   just publish the front page of 400-5.

19   Q.  And when was this note entered into?  This is a note dated

20   September 21, 2009.

21             When was this note entered into in relation to your

22   going public, approximately?

23   A.  A couple months.

24   Q.  It states the manager of this company acknowledges that the

25   company has completed a merger with Voice Networks.

1    A.  Correct.  I'm sorry, I thought you meant when we started

2    trading.  Yes, it was right after.

3    Q.  And what's the amount of the note?

4    A.  100,000.

5    Q.  And who issued the note to you?  Your company is the

6    debtor, correct?

7    A.  This the first one?

8    Q.  And it states the parent company and this company have a

9    preexisting business relationship with the principals EZ

10   English.  Do you recall?

11   A.  Yes.

12   Q.  And, again, who did you understand to control EZ English?

13   A.  David Levy.

14   Q.  Now, if you could turn to Government Exhibit 400-6, first

15   page, and what's the date of that note and how much is it for?

16   A.  November 2, 2009, for another hundred thousand.

17   Q.  And who's the lender?

18   A.  EZ English.

19   Q.  And who actually gave you the money for this note?

20   A.  You mean what account did it come from?

21   Q.  Well, not what account, but which individual?

22   A.  David Levy.

23   Q.  And now 400-7, and what's the date of that note and how

24   much is that for?

25   A.  This is for 50,000, December 15.

D3DLLEV5                    Lefrancois - direct

1   Q.  And who is it with?

2   A.  EZ English.

3   Q.  And, again, who gave you that money?

4   A.  David Levy.

5   Q.  And by the way, as you're going through these, do you know

6   what was the conversion rate for the note, was it at the actual

7   stock price or was there a discount to the stock price that you

8   agreed to accept?

9   A.  At this time we didn't have a stock price.  There was

10  actual price on here.

11  Q.  It states on page 1, two, three, four of the document and,

12  Mr. Dinet, if you wouldn't mind turning to page 4, it states

13  there's a --

14  A.  Hold on.

15  Q.  Do you see Section 1.4 on payments?  I'm sorry.

16  A.  This one wasn't stapled.

17        THE COURT:  Both people are talking at the same time

18  now.  Do you want to direct the witness to a particular spot?

19        MR. MASTER:  I was directing to page 4 of the document

20  which states under, well, one moment.  We're just going to put

21  it up on the Elmo to avoid any confusion.

22  Q.  Under Section 1.4, right of conversion, do see that on the

23  screen?

24  A.  Yeah, but I have it on page 2.

25  Q.  OK.  My apologies.  It states right of conversion.

1   A.  10 cents per share.

2   Q.  And is that -- that's the rate at which, the price per

3   share at which the debt would be converted into shares?

4   A.  Correct.

5   Q.  And did you also agree to pay interest on those, on the

6   money that was paid to you by David Levy?

7   A.  Yes.

8   Q.  Now, if you could just turn to Government Exhibit 400-14,

9   Mr. Dinet.  That's another $50,000.  Just to help us get

10  through, it's another $50,000, dated January 5, 2010, and in

11  the name of EZ English, correct?

12  A.  Yes.

13  Q.  And then 400-11 is another $50,000, January 29, 2010, and

14  that's in the name of EZ English as well, correct?

15  A.  Yes.

16  Q.  And then 400-12, that's not with EZ English, correct?

17          What is the name of the entity that was used to issue

18  that note?

19  A.  Date Palm Capital.

20  Q.  And who controlled Date Palm Capital?

21  A.  David Levy.

22  Q.  And what's the amount of that note?

23  A.  300,000.

24  Q.  And that's dated March 1, 2010?

25  A.  Yes.

1    Q.  And 400-13, that's another note issued by EZ English for

2    $50,000 dated May 25, 2010?

3    A.  Yes.

4    Q.  Do you remember that?

5    A.  Yes.

6    Q.  400-18 is another 50,000 dated June 22, 2010; do you

7    remember that one?

8    A.  Yes.

9    Q.  That's with EZ English.

10           Government Exhibit 400-15, that's another 25,000 dated

11   July 23, 2010, that's with EZ English, as well, correct?

12   A.  Yes.

13   Q.  And 400-16 is another 25,000 dated August 26, 2010, with EZ

14   English?

15   A.  Yes.

16   Q.  And Government Exhibit 400-17, that's another $31,470,

17   that's dated October 19, 2010?

18   A.  Yes.

19   Q.  That's with EZ English as well, right?

20   A.  Yes.

21   Q.  What did you spend all this money on?

22   A.  Research and development, inventory, packaging, marketing.

23   Q.  And how much -- how many employees did you have?

24   A.  Five.

25   Q.  And how about costs of getting patents issued to you, how

1    expensive is that?

2    A.   The residential patent was approximately 25,000.

3    Q.   And how about the application for the commercial patent?

4    A.   Right now about 12,000.

5    Q.   OK.  And how about costs of your building and physical

6    plant?

7    A.   The building, with everything, that was about 12,000 a

8    month.

9    Q.   And at this time did you have an accountant?

10   A.   No.  We had, well, we had accountant that did our quarterly

11   reports.

12   Q.   And you reported all your expenses and your income --

13   A.   Yes.

14   Q.   -- to your accountant?

15   A.   Yes.

16   Q.   When if ever did your accountant refuse to sign off on your

17   quarterly report because of any irregularity in how you spent

18   this money?

19   A.   No.

20   Q.   And all this money was spent trying to build -- was any of

21   this money spent on improper personal expenses?

22   A.   No.

23   Q.   And as you were spending this money on building the

24   business, how often did you keep David Levy updated on what you

25   were doing?

D3DLLEV5                    Lefrancois - direct

1    A.  Very often, monthly, weekly.

2    Q.  Now, as the end of 2010 approached, what if anything had

3    David Levy done to exercise any of those notes?

4    A.  Nothing, he hadn't.

5    Q.  Now, did there come a time when David Levy told you that he

6    wanted to exercise one of the notes?

7    A.  Yes.

8    Q.  And what did he ask you to do to authorize the conversion

9    of one of these notes to stock?

10          MR. SHARGEL:  May we fix a time?

11          THE COURT:  Can we have a time, please.

12          MR. MASTER:  Yes.

13   Q.  I'd like to direct your attention to December 2010.  Do you

14   recall being asked by David Levy at that time or informed by

15   David Levy at that time that he wished to exercise one of those

16   notes?

17   A.  Yes.

18   Q.  I'd like you to take a look at what's already in evidence

19   as Government Exhibit 450-12.

20          MR. MASTER:  If you wouldn't mind, Mr. Dinet, just

21   pulling that up.

22   Q.  It's dated December 22, 2010.  Hi, Frank.  It states:  Hi,

23   Frank.  Here is the filled out form.  If at all possible,

24   please have the issued stock FedExed overnight to EZ English.

25   The account number is on the form.

1    And if you, first of all, who wrote that email?

2  A.  I did.

3  Q.  And if you wouldn't mind turning to the third page of that

4  document, Mr. Dinet, and it's something called an issuance

5  resolution.

6    Do you recall seeing that before?

7  A.  Yes.

8  Q.  And what does that issuance resolution relate to?

9  A.  We did a debt conversion on one of the notes.

10  Q.  And it states certificate mailing instructions at the

11  bottom, contact name, and what's the contact name listed?

12  A.  David Levy.

13  Q.  And related to what entity?

14  A.  EZ English.

15  Q.  Is that the person who told you that he wanted to exercise

16  or convert one of the notes?

17  A.  Yes.

18  Q.  From a debt to stock?

19  A.  Yes.

20  Q.  And how many shares did he get as a result of the

21  conversion?

22  A.  10 million.

23  Q.  And what kind of shares did he say that he wanted to get as

24  a result of the conversion?

25  A.  Free trading shares.

D3DLLEV5                    Lefrancois - direct

1    Q.  And what it states, if exempt from registration, please

2    detail the reason and will provide for the exemption from

3    registration thereby allowing shares to be issued without any

4    restrictive legend.

5              And then there's some writing, "pursuant to legal

6    opinion," whose handwriting is that?

7    A.  Mine.

8    Q.  And what legal opinion were you referring to?

9    A.  Bill Aul's.

10   Q.  And what did Bill Aul determine in his legal opinion

11   concerning the conversion of the note from debt to stock?

12   A.  I'm not a hundred percent sure.

13   Q.  Well, based on this, do you recall that you received a

14   legal opinion letter that authorized you to issue 10 million

15   shares to EZ English in -- without restrictive legend, that is,

16   free trading shares?

17   A.  Yes.

18   Q.  Is that what the purpose was of this document?

19   A.  Yes.

20   Q.  And then there's an address associated with EZ English,

21   3109 Northeast 23rd Court, Fort Lauderdale, Florida, and then

22   there's a zip code.

23             Do you recall knowing anything about that address?

24   A.  No.

25   Q.  Who supplied that address to you?

D3DLLEV5                    Lefrancois - direct

1    A.  David Levy.

2    Q.  What's the date of the issuance of this issuance

3    resolution?

4    A.  December 22, 2010.

5    Q.  And as of this date, what if any trading of Greenway Design

6    Group was occurring on the public markets?

7    A.  I don't believe we were traded at all.

8    Q.  And on what exchange you were listed?

9    A.  OTC markets or Pink Sheets.

10   Q.  And how did, who made the arrangements for you to be traded

11   on OTC markets or Pink Sheets?

12   A.  David Levy and Bill Aul.

13   Q.  Now, I'd like to ask you what awareness if any do you have

14   with something known as the 5 percent or 10 percent rule?

15   A.  I know now, I didn't know then.  So do you want me to tell

16   you?

17   Q.  Yes.  Based on your experience.

18            MR. SHARGEL:  Judge, I object to this.

19            THE COURT:  Overruled.

20            What's your understanding of the five or 10 percent

21   rule?

22            THE WITNESS:  My understanding is that an individual

23   can't sell more than 5 percent of the stock at any time.

24   Q.  Well, you were the CEO of Greenway Design Group, right?

25   A.  Yes.

D3DLLEV5                    Lefrancois - direct

1    Q.   And that made you an insider, correct?

2    A.   Yes.

3    Q.   And what if any restrictions were there on you selling

4    shares, even if you had unrestricted shares?

5    A.   I could sell 1 percent every 90 days.

6    Q.   1 percent of what?

7    A.   Of the outstanding shares.

8    Q.   And was that true whether or not you held restricted

9    shares?

10   A.   No, that's only if they were unrestricted.

11   Q.   And as a result of David Levy's holding of 9,900,000 shares

12   in Bluefin and 10 million shares in EZ English, what was his

13   percentage ownership of Greenway Design Group's stock after the

14   issuance of this note?

15   A.   I don't have that figure in front of me.

16   Q.   How many other shares were there aside from the 19,900,000

17   shares that were then held by David Levy?

18   A.   Just whatever was on Voice Networks that came over.  That

19   was it.  We didn't have any.

20   Q.   Well, how many restricted shares did you and your partners

21   have?

22   A.   A hundred million.

23   Q.   Now, what did David Levy do with his single certificate for

24   10 million EZ English shares after the issuance of this

25   resolution, do you know?

1    A.  No.

2    Q.  I'm going to show you what's been marked, actually,

3    introduced as Government Exhibit 450-8.  And I'm going to show

4    you, this is document issued by West Coast Stock Transfer.

5              And what's West Coast Stock Transfer again?

6    A.  Our transfer agent, transfers the stock certificates.

7    Q.  And I'd like you to just turn, Mr. Dinet, if you go to the

8    first page of that or second page, and it's a FedEx from David

9    Levy to Frank with EZ English to Frank Brickell.  And if you

10   could just turn to the next page.  It's a document in the name

11   of EZ English to Frank Brickell signed by David Levy.

12             Have you seen that document before your preparation to

13   testify today?

14   A.  Yes.

15   Q.  It states, Please exchange certificate of 10 million shares

16   into ten certificates of 1 million each.

17             What if any knowledge do you have that David Levy had

18   broken up the 10 million shares into ten certificates of

19   1 million each?

20   A.  I didn't have any knowledge.

21   Q.  And what if any discussions did you have with David Levy

22   about the purpose of this breaking up the shares in this way?

23   A.  I didn't.

24   Q.  And now I'm going to show you what's been introduced as

25   Government Exhibit 450-5.  That's another document in the name

D3DLLEV5                    Lefrancois - direct

1     of West Coast Stock Transfer and -- Mr. Dinet -- it relates to

2     3 million shares.

3              MR. MASTER:  Mr. Dinet, if you could turn to the

4     seventh page in that document.

5     Q.  It relates to EZ English Inc., and it relates to the

6     issuance of shares and deposit of shares by an individual named

7     Yael Tal.

8              What if any knowledge do you have that an individual

9     named Yael Tal was holding shares of Greenway Design Group in

10    the name of EZ English?

11    A.  I had no knowledge.

12    Q.  And then I'm going to show you another document that's

13    marked as Government Exhibit 400-23 -- withdrawn.  Sorry.  I

14    had the wrong exhibit.

15             Government Exhibit 400-23.  Do you recognize that

16    document, Mr. Lafrancois, do you recognize that?

17    A.  Yes.

18    Q.  What is it?

19    A.  It's confirmation that EZ English sold 5 million shares to

20    Fitzwilliam Investments.  It's on the way to the transfer

21    agent.

22    Q.  Is that an email that you exchanged with David Levy?

23    A.  This is from David Levy to Bill Aul with CC to myself.

24             MR. MASTER:  Government offers Government

25    Exhibit 400-23.

D3DLLEV5                    Lefrancois - direct

<pre>
 1              MR. SHARGEL:  No objection.

 2              THE COURT:  400-23 is received in evidence.

 3              (Government's Exhibit 400-23 received in evidence)

 4              MR. MASTER:  Mr. Dinet, if you can publish that,

 5    please.

 6    Q.  And if you wouldn't mind, it states David Levy and his

 7    email address, David@DatePalmCapital.com?

 8    A.  Yes.

 9    Q.  Right.  And this is David Levy writing:  Good morning,

10    gents.  Please be aware that EZ English Inc. sold 5 million

11    shares to Fitzwilliam Investments Inc.  The certs are on their

12    way to the transfer agent to change ownership.

13              Do you remember receiving that email?

14    A.  Yes.

15    Q.  And what if any connection were you aware of between David

16    Levy and Fitzwilliam Investments?

17    A.  I wasn't, no connection.

18    Q.  When did David Levy, when if ever did David Levy say that

19    he also owned Fitzwilliam Investments?

20    A.  He didn't.

21    Q.  What was your understanding of the purpose of this

22    transfer, the alleged sale -- withdrawn.

23              What was your understanding of the purpose of this

24    communication?

25              MR. SHARGEL:  Foundation.
</pre>

1        THE COURT:  Overruled.

2   A.  I had no understanding and I didn't know why or what was

3   going on at this time.

4   Q.  Let's get back to what happened after David Levy had the

5   10 million shares issued to EZ English.

6        How soon after the December 22, 2010 issuance did the

7   shares begin to trade on public markets?

8   A.  Soon after.

9   Q.  And I'd like to now direct your attention to January 2011.

10  Actually, withdrawn.  I want to address another topic.

11       First of all, as of the beginning of 2011, what was

12  your company's financial position?

13  A.  Not strong.

14  Q.  And what was the reason for that?

15  A.  Just we had lots of overhead.  We were trying to get to

16  trade shows, trying to get marketing packages, everything.  We

17  spent a lot of money building inventory, that kind of stuff.

18  Q.  And how much revenue was coming in to compensate for costs?

19  A.  Not enough.

20  Q.  And what was your personal financial situation in 2011?

21  A.  Very bad.

22  Q.  What are the reasons why it was very bad?

23  A.  I just spent everything I had either building the company

24  or doing what we could to sustain not getting paid.

25  Q.  And what happened to the work you had been doing as a

1    mortgage broker at that time?

2    A.  That was a while back.  It was all gone.  I spent all of

3    it, you know, building this company and trying to survive.

4    Q.  Did there come a time when you discussed with David Levy

5    the possibility -- well, actually, withdrawn.

6            As of the beginning of 2011, what was the status of

7    your 60 million shares, did they remain restricted or had you

8    been able to get the restrictive legend removed?

9    A.  I could get the restrictive legend removed.

10   Q.  Your understanding was you could get it removed?

11   A.  Right.

12   Q.  What was the reason you were allowed to get it removed?

13   A.  Because I owned it over a year.

14   Q.  And your -- you had been told that once restricted shares

15   had been held for a year you could remove the restricted

16   legend?

17   A.  Correct.

18   Q.  As a company insider, what if any restrictions remained on

19   your selling those shares or limitations remained on your

20   selling those shares even once they were unrestricted?

21   A.  I could sell 1 percent every three months.

22   Q.  And did there come a time when you discussed with David

23   Levy the possibility of selling your own stake in Greenway

24   Design Group in that manner, in 1 percent every three months,

25   to help address your personal financial situation?

1    A.   Yes.

2    Q.   What did David Levy say in response to that proposal?

3    A.   Not to do it because it could be looked at as damaging to

4    the company.

5    Q.   And why did he say it would be damaging to the company for

6    you to sell shares, some of your 60 million shares?

7    A.   We didn't really get into much more than that.  He just

8    advised me not to do it and I didn't do it.

9    Q.   And why didn't you do it?

10   A.   Because he advised me not to do it.

11   Q.   Did there come a time then when you asked David Levy, when

12   you informed David Levy that you continued to have personal

13   financial difficulties throughout 2011?

14   A.   Yes.

15   Q.   And what did David Levy offer to do for you instead of

16   selling the shares, your own shares in Greenway Design?

17   A.   He offered me a personal note for a hundred thousand.

18   Q.   I'm going to show you what's been marked for identification

19   as -- it's actually 3504-4, do you recognize those documents?

20   A.   Yes.

21   Q.   What are they?

22   A.   It's a note to me for a hundred thousand dollars.

23   Q.   And are there other documents behind it?

24   A.   Yeah, there's another one for 5,000.

25   Q.   And there's some handwritten notes in the back?

1    A.  Right.

2    Q.  Do you recognize that handwriting?

3    A.  It's mine.

4    Q.  And what do you recognize that handwritten list to be?

5    A.  Three other loans that were not exact -- weren't presented

6    as notes.

7    Q.  From whom to who?

8    A.  From David Levy to myself.

9    Q.  And did you in fact --

10          MR. MASTER:  Well, Government Exhibit offers

11   Government Exhibit --

12          THE COURT:  3504.

13          MR. MASTER:  -- 3504-4 into evidence.

14          MR. SHARGEL:  No objection.

15          THE COURT:  It's received in evidence.

16          (Government's Exhibit 3504-4 received in evidence)

17   Q.  Did you during any point in 2011 convert your stock from

18   restricted stock to unrestricted stock?

19   A.  No.

20   Q.  And, again, what's -- and at any point in 2011 did you sell

21   any of your shares in Greenway Design Group?

22   A.  No.

23   Q.  And what's the reason that you didn't sell any of your

24   shares in Greenway Design Group?

25   A.  I was advised against it.

D3DLLEV5                    Lefrancois - direct

1   Q.   By whom?

2   A.   David Levy.

3   Q.   Now, what was the price of Greenway Design Group when it

4   began trading in January 2011?

5   A.   I don't have that in front of me.

6   Q.   Was it above a dollar?

7   A.   Yes.

8   Q.   What was your -- well, based on that valuation, how much

9   did you believe you might be worth?

10  A.   Well, I had 60 million shares, so whatever it was above a

11  dollar would be that times 60 million.

12  Q.   The price per share would be multiplied by the number of

13  shares you have to come up with the worth of your shares,

14  correct?

15  A.   Correct.

16  Q.   And so what was your reaction when you saw the stock right

17  at the beginning of 2011 start trading at above a dollar?

18  A.   I was excited.  It was unbelievable.

19  Q.   And what if any understanding did you have as to why the

20  stock was trading at such a high price in early 2011?

21  A.   I didn't.

22  Q.   Now, did there come a time when you noticed that the stock

23  started to increase dramatically in price and increase

24  dramatically in trading volume?

25  A.   Yes.

1   Q.  And when was the first time you noticed that?

2   A.  Early, I believe it was March.  We usually that's our

3   busiest season, we start going into the warmer months.

4   Q.  Well, what if anything did David Levy say you needed to do

5   in order to help keep the stock price at a high valuation?

6   A.  Get a lot of news out of our projects, things that were

7   positive.

8   Q.  And what if anything did you do to keep David Levy informed

9   as to the issuance of press releases in the name of Greenway

10  Design Group?

11  A.  Just kept him informed of what all of our projects were,

12  what was going on.

13  Q.  And what if any knowledge -- withdrawn.

14          In March, I'd like to direct your attention to March

15  of 2011, did there come a time when you noticed the stock price

16  increase dramatically, even above a dollar?

17  A.  Yes.

18  Q.  How high did it get, as far as you can recall?

19  A.  As far as I can recall, it got about $1.60, in that range.

20  Q.  And were there times when it traded even higher than that?

21  A.  Yes, I believe.

22  Q.  Now, based on the number of shares you had outstanding,

23  that would be a valuation of over $150 million for Greenway

24  Design?

25  A.  Correct.

D3DLLEV5                           Lefrancois - direct

1    Q.  What if anything was going on at Greenway Design Group that

2    to your knowledge would have justified such a high valuation?

3    A.  The only thing I could think of is our -- the other

4    companies we were working with, the big companies that we had

5    possibilities of closing with.

6    Q.  But had you closed any of those deals?

7    A.  No.

8    Q.  As of March 2010 or 2011?

9    A.  No.

10   Q.  And what involvement if any did you have in the promotion

11   of Greenway Design Group stock in March of 2011?

12   A.  I had none.

13   Q.  At the time, what if any knowledge did you have that anyone

14   was promoting Greenway Design Group stock in March of 2011?

15   A.  I had none.

16   Q.  What if anything did David Levy tell you about his plans to

17   promote Greenway Design Group stock in March of 2011?

18   A.  None.

19   Q.  And what happened after the price and trading volume of

20   Greenway Design Group increased so dramatically in March of

21   2011, what happened to the price and trading volume?

22   A.  It decreased.

23   Q.  And by a little bit or by a lot?

24   A.  By a lot.

25   Q.  And what if any knowledge did you have as to the reasons

D3DLLEV5                    Lefrancois - direct

1    for this dramatic change in price and trading volume?

2    A.  I didn't.

3    Q.  Now, did there come a time later in 2011 when investors,

4    you began to hear from investors in Greenway Design Group

5    stock?

6    A.  Yes.

7    Q.  Without stating the content of what was told to you, what

8    was their reaction to what had happened with Greenway Design

9    Group stock?

10   A.  It was negative.

11   Q.  And what did they accuse Greenway Design Group stock of

12   being?

13   A.  Pump and dump.

14   Q.  And what familiarity did you have with that term?

15   A.  At that time I had none.

16   Q.  And did there come a time when you were forwarded emails

17   from an entity called bestdamnpennystocks.com about Greenway

18   Design Group?

19   A.  Yes.

20   Q.  And what -- did this occur after the dramatic change in

21   price and trading volume that you'd observed in March of 2011?

22   A.  Yes.

23            MR. MASTER:  One moment, your Honor.

24   Q.  Did there come a time when you read closely a disclaimer

25   that was at the bottom of these bestdamnpennystocks promotions

D3DLLEV5                    Lefrancois - direct

1    concerning Greenway Design Group?

2    A.  Yes.

3    Q.  And who did it say was paying for the bestdamnpennystocks

4    promotion concerning Greenway Design Group?

5    A.  EZ English.

6    Q.  And who did you know owned EZ English?

7    A.  David Levy.

8         MR. MASTER:  One moment, your Honor.

9    Q.  How much money did it say that EZ English was paying for

10   these bestdamnpennystocks promotion?

11   A.  500,000.

12   Q.  $500,000?

13   A.  Yes.

14   Q.  And what was your reaction when you saw that EZ English was

15   paying $500,000 to bestdamnpennystocks?

16   A.  My reaction was I didn't really have one because I didn't

17   know if that was a normal process or how it worked.  I wasn't

18   involved in any of that.

19   Q.  Did there come a time when you discussed this

20   bestdamnpennystocks promotion with David Levy?

21   A.  Yes.

22   Q.  And describe what you said to him and what he said to you.

23   A.  I basically said there was people blogging negative things

24   about us and what is this about, and I was told it was

25   basically normal promotional process.

1   Q.  To do what?

2   A.  To promote stock.

3   Q.  And did there come a time when the price of Greenway Design

4   Group began changing dramatically again in the fall of 2011?

5   A.  Yes.

6   Q.  And what was your reaction to this dramatic price change?

7   A.  Baffled, really, just didn't really understand it.

8   Q.  What if any notice did David Levy give you that there was

9   going to be another promotion concerning Greenway Design Group?

10  A.  I didn't get any.

11  Q.  And what if any reactions were you getting from

12  shareholders concerning -- withdrawn.

13          What about the trading volume of Greenway Design

14  Group, what happened to the trading volume of Greenway Design

15  Group in the fall of 2011?

16  A.  It went back up.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  How dramatically was the change, or how dramatic was the

2    change?

3    A.  It was significant.

4    Q.  When, if ever, did you confirm with David Levy whether or

5    not he was in fact selling Greenway Design Group stock in

6    connection with this promotion?

7    A.  I was not aware of it.

8    Q.  After the price increased dramatically, the trading volume

9    increased dramatically in the fall of 2011, what happened to

10   the price and the trading volume?

11   A.  It dropped.

12   Q.  As it did before?

13   A.  Yes.

14   Q.  Again were you hearing complaints that Greenway Design

15   Group stock was a pump and dump?

16   A.  Yes.

17   Q.  What did you determine you had to do to address these

18   concerns?

19   A.  We had to come out with a shareholder letter because on the

20   blogs we were being directly accused as officers --

21        MR. SHARGEL:  Judge, I'm going to object to nameless

22   people on the blogs and what they were saying.

23        THE COURT:  Overruled.  Go ahead.

24   A.  We were basically defending ourselves.  They thought we

25   were actually selling stock and raising the price to sell stock

D3drlev6                    Lefrancois - direct

1    to make money for the company, so we had to go out and issue a

2    letter that basically said not one officer has sold one share

3    of stock.

4    Q.  I'm going to show you what's been marked as Government

5    Exhibit 400-20.  There are a number of pages to that document.

6    What is in that packet?

7    A.  These are press releases, stockholder letter.

8    Q.  Those are the press releases and stockholder letter issued

9    in the name of Greenway Design Group during 2011?

10   A.  Correct.

11   Q.  Who actually wrote the press releases and the stockholder

12   letter?

13   A.  Ray Wyman.

14   Q.  Who is Ray Wyman?

15   A.  Ray was one of our marketing directors in charge of our

16   website press releases, any editing we needed done.

17          MR. MASTER:  The government offers Government Exhibit

18   400-20.

19          MR. SHARGEL:  No objection.

20          THE COURT:  400-20 is received in evidence.

21          (Government's Exhibit 400-20 received in evidence)

22          MR. MASTER:  Mr. Dinet, if you wouldn't mind

23   publishing the first page of that document.

24   Q.  It's dated September 28, 2011.  Again, what's the reason

25   that you issued this stockholder's letter?

D3drlev6                    Lefrancois - direct

1    A.  One, to get a little bit of information out about an award

2    we won.

3    Q.  That's the first part.

4    A.  Yes.

5    Q.  Later in the letter --

6    A.  Later in the letter it's regarding the fact that none of us

7    have sold any stock and any of the rumors that are going around

8    are not true.

9           MR. MASTER:  Can you turn to page 2, Mr. Dinet.

10   Q.  It states, "We are surprised by the extent of the unusual

11   recent daily trading volume recorded for our company's common

12   stock."  Then it states, "We are certain that since January 1,

13   2011, to the present date the company's officers and directors

14   have not undertaken any public resale of their stockholdings."

15   Is that correct, to your knowledge?

16   A.  Yes.

17   Q.  It states, "We are not certain what may have caused these

18   increased trading levels."  Who did you suspect was responsible

19   for the increased trading --

20          MR. SHARGEL:  I object to the form of the question.

21          THE COURT:  Sustained.

22          MR. MASTER:  Withdrawn.

23   Q.  What effect did it have on your company's stock to have the

24   stock jump up dramatically and jump down dramatically in price

25   and trading volume?

D3drlev6               Lefrancois - direct

1    A.  It had a negative effect.

2    Q.  How about to have your stock be called a pump and dump?

3    A.  Very negative.

4    Q.  After the blogs had circulated that the stock was a pump

5    and dump, how successful were you in being able to offer shares

6    of your stock to potential new investors in Greenway Design

7    Group?

8    A.  It was very difficult.

9    Q.  What was the reaction from people who you tried to offer

10   your shares as collateral for a loan or as equity for potential

11   investment?

12              MR. SHARGEL:  I object to the form of the question.

13              THE COURT:  Overruled.

14   A.  We didn't have much success at all once it started

15   declining.  We tried to do a PPM.  We did a little bit of that,

16   but not very much.

17   Q.  What is a PPM?

18   A.  A private placement memorandum.  It was basically going to

19   get smaller loans.

20   Q.  In exchange for what?

21   A.  For a discounted price.

22   Q.  Of what?

23   A.  Of stock.

24   Q.  There was low interest in that?

25   A.  Yes.

D3drlev6                    Lefrancois - direct

1   Q.  What is the stock trading at now?

2   A.  Yesterday it closed at .007 of a penny.

3   Q.  How much is your stock worth now, the 60 million shares

4   that at one point were worth over $60 million?

5   A.  I believe it's mid 350,000.

6   Q.  Have you sold any shares yet in the company?

7   A.  I sold 3 million shares a couple of months ago, like six

8   months ago, and that was at .002.

9   Q.  What effect has this had on a your personal financial

10  picture?

11  A.  It's huge.  That's why I had to sell some in the first

12  place.

13  Q.  How about on your company's financial picture?

14  A.  Very difficult.

15          MR. MASTER:  Nothing further, your Honor.

16          THE COURT:  Ladies and gentlemen, do you need a short

17  recess?  Take a short recess.

18          (Recess)

19          THE COURT:  Mr. Shargel.

20  CROSS-EXAMINATION

21  BY MR. SHARGEL:

22  Q.  Mr. Lefrancois, I don't believe that we have your entire CV

23  or background in business.  Could you put that before the jury,

24  please.

25  A.  Mostly grew up doing restaurant management, general

D3drlev6                    Lefrancois - cross

1    manager.  After being in the restaurant industry for quite a

2    while, I worked as a mortgage broker in finance, doing loans

3    for the purchase of business, real estate, refinancing, second

4    mortgages.  Then I got with a partner and we built some homes

5    in Dallas, Texas.  That brought me on to Greenway Design Group.

6    Q.  Your entire background -- I'm sorry.  What is your

7    educational background?

8    A.  Three years of college.

9    Q.  So, your entire background, your entire work experience,

10   has been in the business world, fair statement?

11   A.  Yes.

12   Q.  You understand the nature of contracts and purchases and

13   sales, right?

14   A.  Correct.

15   Q.  You know what is necessary to start up a business and keep

16   a business going, fair statement?

17   A.  Yes.

18   Q.  Going back to the beginning of your testimony, when you

19   were asked questions by Mr. Master about money that was going

20   to be furnished by David Levy after you met Mr. Levy -- do you

21   recall that testimony?

22   A.  Yes.

23   Q.  And Mr. Master put up on the board that the money was

24   coming from a company called EZ English?

25   A.  Yes.

D3drlev6             Lefrancois - cross

1    Q.  Were you concerned about which company at that first

2    meeting where it was followed by a hundred thousand dollar

3    check and the check was from EZ English with a signature that

4    you didn't recognize?  Right?

5    A.  I wasn't concerned.

6    Q.  You weren't concerned at all.  You were familiar with using

7    different corporate structures to lend money, borrow money,

8    engage in business.  That's perfectly proper, as you understand

9    it in the business world, right?

10   A.  Yes.

11   Q.  The idea that you didn't recognize the name Yael Tal or

12   know the corporate structure of EZ English meant nothing to you

13   at the time, correct?

14   A.  Correct.

15   Q.  Whether it was Fitzwilliams or Date Palm Capital, that was

16   money being received in the ordinary course of business, right?

17   A.  Yes.

18   Q.  There was no suspicion to be raised, fair statement?

19   A.  Yes.

20   Q.  You started off with a cordial relationship with Mr. Levy,

21   right?

22   A.  Yes.

23   Q.  You got to know him over time, right?

24   A.  Yes.

25   Q.  And he was the largest investor in the company, correct?

D3drlev6                    Lefrancois - cross

1    A.  Yes.

2    Q.  He also was in a certain sense hands-off on management.  He

3    didn't micromanage or call you every day or anything like that,

4    did he?

5    A.  Correct.

6    Q.  He wanted you to grow the company?

7    A.  Yes.

8    Q.  He believed in the product?

9    A.  Yes.

10          MR. MASTER:  Objection.

11          THE COURT:  Overruled.

12   Q.  I think you said on direct examination he, and Donna

13   perhaps, were excited about the project?

14   A.  Yes.

15   Q.  The unit that was passed around among the jurors was, just

16   to make clear, the residential unit, correct?

17   A.  Correct, yes.

18   Q.  It was for homes, individual homes or small buildings,

19   where it would be used simply to save money, correct?

20   A.  Correct, yes.

21   Q.  You demonstrated again and again that it can provide

22   substantial savings, correct?

23   A.  Yes.

24   Q.  But that was only one part of your business, fair?

25   A.  Yes.

1  Q.  The more significant part of the business that you were

2  trying to develop when you were growing the business was larger

3  buildings?

4  A.  Correct.

5  Q.  Commercial ventures, right?

6  A.  Yes.

7  Q.  Large companies?

8  A.  Yes.

9  Q.  You even were negotiating down in Mexico to supply these

10  devices, right?

11  A.  Yes.

12  Q.  You were hoping to build an international business,

13  correct?

14  A.  Correct, yes.

15  Q.  It is common, based on your business experience, to not be

16  limited by the borders of the United States; there are markets

17  outside the United States, right?

18  A.  Absolutely.

19  Q.  No question about it, right?  There was a promotional video

20  that showed how the product worked, right?

21  A.  Yes.

22         MR. SHARGEL:  With the Court's permission, and we have

23  a stipulation on this, your Honor, as to the admissibility of

24  the very short video, I would like, as Mr. Master did, to start

25  with the product and show the video to the jury.

D3drlev6             Lefrancois - cross

1       THE COURT:  Go ahead.  Are you going to read from a

2   stipulation or are you just telling us?

3       MR. SHARGEL:  I'll read from it.  It is stipulated,

4   once again among the lawyers and the parties, Defense Exhibit

5   A232 is a true and accurate copy of a video downloaded on March

6   11, 2013, from Greenway Design Group, Inc.'s website located

7   at, and then there is the web address.

8   Q.  The company is still in business, correct?

9   A.  Yes.

10  Q.  And you hope to grow it again, right?

11  A.  Yes.

12  Q.  It's not like the end of the road, right?

13  A.  No, I hope not.

14  Q.  You do maintain this website and video on the website,

15  right?

16  A.  Yes.

17      MR. SHARGEL:  Are we ready, Jennifer?

18      (Video shown)

19  Q.  As a businessman, you know that advertising is a key and

20  crucial element, correct?

21  A.  Yes.

22  Q.  No matter how good your product is, if no one knows about

23  it, the business isn't going anywhere, right?

24  A.  Correct.

25  Q.  We heard that the gentleman who was describing the product

D3drlev6                    Lefrancois - cross

1    and describing the technicalities of the project, if you will,

2    said that the savings was 30 percent.  Do you recall that?

3    A.   Yes.  We claim up to 30 percent only because we have ranged

4    24 percent, we have gone as high as 36 percent.  So we have a

5    range of up to 30 percent.

6    Q.   You have that range depending on the presentation, right?

7    A.   Yes.

8    Q.   You certainly don't mean to be misleading with that, you

9    mean to be accurate, correct?

10   A.   Yes.

11   Q.   Accuracy brings with it a range, fair statement?

12   A.   Correct.

13   Q.   In terms of news and publicity, that serves two purposes.

14   First, the consumer, whether it's a commercial consumer or a

15   residential consumer, fair?

16   A.   Yes.

17   Q.   In addition to advertising for that market, and your

18   website is used for this purpose, it also has the potential of

19   attracting investors, correct?

20   A.   Correct.

21   Q.   You're not going to find investors, once again, until you

22   grow the company and it becomes known, fair statement?

23   A.   Yes.

24   Q.   You were asked questions by Mr. Master about press

25   releases.  Do you recall those questions?

D3drlev6                    Lefrancois - cross

1    A.   Yes.

2    Q.   Those press releases were written, I believe you said on

3    direct examination, by a man named Ray Wyman, right?

4    A.   Yes.

5    Q.   Ray Wyman, what is his official position in the company?

6    A.   Marketing director.  He doesn't really have an exact one.

7    He is our marketing --

8    Q.   By whatever title, he is the individual, he is the man who

9    actually draws the press releases, right?

10   A.   Yes.

11   Q.   During the period of time that we have been talking about

12   all afternoon, during that period of time he would draft the

13   press releases, right?

14   A.   Yes.

15   Q.   He would show them to you before they were issued, fair

16   statement?

17   A.   Correct.

18   Q.   Because you were the CEO of the company, right?

19   A.   Correct.

20   Q.   He would show them to Bill Aul, the attorney for the

21   company, correct?

22   A.   Correct.

23   Q.   The reason that he showed them to Bill Aul and to you was

24   that everyone could put their collective heads together to make

25   sure that what was being said was accurate, right?

1   A.  Correct.

2   Q.  You certainly didn't want to mislead anyone, right?

3   A.  Correct.

4   Q.  You weren't looking to artificially pump the value of the

5   stock, right?

6   A.  No.

7   Q.  The work that you were doing along with Mr. Aul -- who is

8   an attorney, as you told us, in San Diego, right?

9   A.  Yes.

10  Q.  An attorney who specializes in or whose area of competence

11  is business, right?

12  A.  Yes.

13  Q.  Mr. Aul Or attorney Aul would approve those press releases,

14  right?

15  A.  Yes.

16  Q.  You were well-intentioned at the time that the press

17  releases were issued, right?

18  A.  Yes.

19  Q.  After review by you and Mr. Aul and Ray Wyman, the content

20  of the press releases were, to the best of your ability and

21  knowledge, true and accurate, right?

22  A.  Yes.

23  Q.  There was no question about that, right?

24  A.  Correct.

25  Q.  The first time that this stock rose and you had

1  conversations with Mr. Levy, right?

2  A.  Yes.

3  Q.  You discussed with him the very fact that volume and price

4  was increasing in the stock, right?

5  A.  Yes.

6  Q.  You told us that on direct examination, right?

7  A.  Yes.

8  Q.  Mr. Levy told you he was promoting the stock, right?

9  A.  Yes.

10  Q.  He didn't say, I'm promoting the stock but don't tell

11  anyone whatever you do?  It was nothing like that, was it?

12  A.  No.

13  Q.  He flat-out said that this was the reason that it was

14  working, he told you that he needed to have advertising,

15  correct?

16  A.  Yes.

17  Q.  Press releases?

18  A.  Yes.

19  Q.  I'm sorry if I'm going to too fast.  I'll slow down.  You

20  needed to get the product out there, right?

21  A.  Yes.

22  Q.  You needed to get the company out there, yes?

23  A.  Yes.

24  Q.  The efficaciousness of the product had to get out and be

25  known in order to sell this product, correct?

1    A.  Correct.

2    Q.  Just like going to the residential model for a moment for

3    home consumers, just like any other product, here you had a

4    device that was selling for I think you said $99.99, right?

5    A.  Yes.

6    Q.  Consumers buy on the basis of advertising, right?

7    A.  Yes.

8    Q.  Whether the advertising is on television, on the Internet,

9    as we just saw this promotion, by whatever means, that's how

10   you would get the company out there, right?

11   A.  Yes.

12   Q.  When there is no news and there was a question as to why

13   the stock went down and why it wasn't selling, the volume went

14   down and, as Mr. Master pointed out, your millions of shares

15   dropped in value, as every stockholder's shares dropped in

16   value, right?

17   A.  Yes.

18   Q.  That was a period of time when there wasn't a whole lot of

19   news, right?

20   A.  Correct.

21   Q.  That was at a time when there was a very low volume of

22   business, right?

23   A.  Yes.

24   Q.  When you had news to report, you reported the news, right?

25   A.  Yes.

D3drlev6                    Lefrancois - cross

1    Q.  In the press release?

2    A.  Yes.

3    Q.  For example, if you recall, there was an announcement in

4    March.  I think you have the government exhibits in front of

5    you, a batch of press releases, right?

6    A.  Yes.

7    Q.  In preparation for your testimony, you went over the press

8    releases with Mr. Master?

9    A.  Yes.

10   Q.  You went over those press releases one by one, right?

11   A.  Yes.

12   Q.  During your preparation for your testimony here as a

13   witness, you told Mr. Master that the information that's in

14   those press releases was true, right?

15   A.  Correct.

16   Q.  Could you give the jury a sense of what those press

17   releases were about.  We are not going to take all the time to

18   put them on the screen.  Just go through them, if you will, and

19   tell me what they generally were about.

20   A.  Generally, they are about new jobs that we were going to

21   get, companies that we had convertible agreements with or we

22   were further down the road on, or some that we have actually

23   installed on:  Denny's for example, Hughes Network Systems,

24   some banks down in Costa Rica, that kind of stuff.

25   Q.  Those press releases were going out and being disseminated

D3drlev6               Lefrancois - cross

1   for further reporting because you knew full well that the whole

2   idea of a press release means that it would be published

3   somewhere, right?

4   A.  Correct.

5   Q.  Other people who collect information relative to stocks

6   would pick up the news that was being released, right?

7   A.  Yes.

8   Q.  Essentially, excitement would be generated, right?

9   A.  Yes.

10  Q.  That would increase or promote the idea not only of sales

11  but of interest in the stock, right?

12  A.  Yes.

13  Q.  Because you knew that there were companies who specialize

14  in putting the news out there, the news that is contained in

15  the press releases, right?

16  A.  Yes.

17  Q.  During the time that this promotional campaign was going

18  on, the stock was rising, right?

19          MR. MASTER:  Objection.

20          THE COURT:  Overruled.

21  Q.  The stock was rising.  Then there came a time when stock

22  started to decline, as we had it.  But, as you said, I think

23  you said both on direct and cross, there was really no activity

24  to report, right?

25  A.  Correct.

1   Q.  You certainly weren't going to make something up, right?

2   A.  Right.

3   Q.  You certainty weren't going to create a press release that

4   was either false or misleading, right?

5   A.  Correct.

6   Q.  This was an honest company that wanted to do honest

7   business, correct?

8   A.  Yes.

9   Q.  A company above reproach, right?

10  A.  Yes.

11  Q.  That's why you wrote that letter to shareholders when the

12  people on blogs -- you're familiar with blogs, right?

13  A.  Yes.

14  Q.  You know that anyone, anyone, it could be a 10-year-old,

15  could go on a blog and say anything he or she wants to say,

16  right?

17  A.  Correct.

18  Q.  There is no filter on a blog, is there?

19  A.  Correct.

20  Q.  Within reason there is no filter.  There is no one who has

21  to have a certain level of education or interest or experience

22  to write something on a blog, right?

23  A.  Correct.

24  Q.  If someone, a faceless person with the anonymity of the

25  Internet, writes that this is a pump and dump, it doesn't mean

1  that it's a pump and dump, right?

2  A.  Correct.

3  Q.  It just means that there is that nameless, faceless person

4  who chose to write that on a blog, right?

5  A.  Right.

6  Q.  You know from reading blogs, whether it is in the housing

7  business or the restaurant business or any business that you

8  have ever been in, that there are people who are mean-spirited,

9  who would say anything on a blog, right?

10  A.  Yes.

11  Q.  Restaurant reviewers who would review a restaurant and say

12  nasty things about the restaurant even though you knew full

13  well that those things weren't true, right?

14  A.  Yes.

15  Q.  It is true that at the time, I think it was 2008, when the

16  price of the stock started declining -- or 2009.  Do you

17  recall?  Do you remember it went up?

18  A.  It would be higher in '11.

19  Q.  Went higher in '11.  Again -- we had this before, I don't

20  mean to repeat -- but there wasn't a whole lot of press

21  releases going on at those times, right, in '11?

22  A.  Correct.

23  Q.  Some of the projects that you were thinking you would have

24  in Mexico were kind of falling off, right?

25  A.  Taking longer than we thought.

D3drlev6                    Lefrancois - cross

1   Q.   Taking longer than you thought.  You thought you would have

2   contracts.  There were some major companies that you were

3   talking to?

4   A.   Correct, yes.

5   Q.   Tell the jury, what were the major companies?

6   A.   I don't know how to pronounce it.  It's 50 grocery store

7   chains in Mexico, and we are still working with them now.  We

8   have been working with them for six months trying to get this

9   deal done.  Then we have over 600 banks in Costa Rica that we

10  have been working with that we are trying to get finished and

11  still it hasn't gotten done yet, but it's in the pipeline.  A

12  few examples.

13  Q.   I didn't mean to cut you off.

14  A.   That's OK.

15  Q.   You're still working with those companies.  But 2011 was a

16  very difficult year, right?

17  A.   Yes.

18  Q.   As the price went down, the value of your stock went down,

19  right?

20  A.   Correct.

21  Q.   Mr. Levy was still providing funds in 2011, wasn't he?

22  A.   Yes.

23  Q.   Let's talk about the funds that Mr. Levy gave you.  You

24  were looking, I think you said, for an investor that was

25  willing to come forward and lend the company or invest in the

D3drlev6                    Lefrancois - cross

1    company $300,000, correct?

2    A.   Correct.

3    Q.   What options did you have at the time that you were looking

4    for that initial investment?  Did you have any stock to give at

5    that point?

6    A.   No.

7    Q.   Because it was a privately held company at that point,

8    right?

9    A.   Correct.

10   Q.   The only option was to essentially take a loan or borrow

11   from the investor, right?

12   A.   Correct.

13   Q.   Or the investor could take an equity piece in the company,

14   right?

15   A.   Yes.

16   Q.   But the format that you agreed to with Mr. Levy was to take

17   the loan, right?

18   A.   Correct.

19   Q.   That he was going to lend you money?

20   A.   Right.

21   Q.   You said on that first day that you met him, he agreed that

22   he would give you a hundred thousand dollars and then another

23   $200,000 in a short period of time, right?

24   A.   Correct.

25   Q.   In other words, he, Mr. Levy, agreed at one meeting with

D3drlev6            Lefrancois - cross

1   you, based on your enthusiasm, your presentation, your

2   projections of what the future might bring, he was willing to

3   lend you the money, right?

4   A.  Yes.

5   Q.  You entered into these promissory notes, right?

6   A.  Correct.

7   Q.  The terms of the promissory notes were known to you, right?

8   A.  Yes.

9   Q.  Everything that had been agreed upon was reduced to

10  writing, correct?

11  A.  Yes.

12  Q.  There were no side deals or anything like that, right?

13  A.  No.

14  Q.  You knew as a businessman that when you enter into a

15  contract, whether it be a promissory note or anything else,

16  that the contract spoke for itself, right?

17  A.  Yes.

18  Q.  The government, Mr. --

19          THE COURT:  Master.

20  Q.  -- Master.

21          MR. SHARGEL:  It's late in the day.  Sorry.  He

22  forgets mine, too.

23          MR. MASTER:  Never.

24  Q.  Mr. Master was asking you about the terms of the agreement

25  that you entered into, right?

D3drlev6                    Lefrancois - cross

1   A.  Yes.

2   Q.  Starting at the beginning and then going straight forward

3   in the time it was a public company and the notes became

4   convertible notes, right?

5   A.  Right.

6   Q.  He was questioning some terms and putting questions to you

7   about some of the terms, right?

8   A.  Yes.

9   Q.  Going back to the initial payment of money or the initial

10  loan, going back to that point, and we were talking about June

11  of 2009, you read and understood the contract, meaning the

12  promissory note, right?

13  A.  Yes.

14  Q.  You had other people with whom you worked who you discussed

15  this with, right?

16  A.  Yes.

17  Q.  You were an adult and an experienced businessman, right?

18  A.  Yes.

19  Q.  You found the terms satisfactory, right?

20  A.  Correct.

21  Q.  You believed that you could live with those terms and that

22  they were fair to you and fair to Mr. Levy, right?

23  A.  Yes.

24  Q.  No one was taking advantage of the other, right?

25  A.  No.

D3drlev6            Lefrancois - cross

1   Q.  Mr. Levy, based on what you told him, what he saw in the

2   film -- did he ever see the device live or working?

3   A.  I'm not sure at that particular day, but he has.

4   Q.  I wasn't talking about that particular day.  I was really

5   talking about just over time.

6   A.  Yes.

7   Q.  He got to see the device, right?

8   A.  Yes.

9   Q.  He was impressed with what he saw?

10  A.  Yes.

11  Q.  Everyone in this deal -- when I say "in this deal," now Mr.

12  Levy was in the deal, you were in the deal, your colleagues

13  were in the deal, your company was in the deal -- everyone was

14  happy and satisfied, is that a fair statement?

15  A.  Yes.

16  Q.  The work by you was to grow the company, right?

17  A.  Yes.

18  Q.  The work by Mr. Levy, I won't call it the work, but his

19  role was that he was the investor, right?

20  A.  Correct.

21  Q.  You're talking about venture capitalists, companies out in

22  California that would lend money to a promising business,

23  right?

24  A.  Yes.

25  Q.  Lend money to a startup company with a good idea?

D3drlev6                    Lefrancois - cross

1    A.   Correct.

2    Q.   You were a startup company with a darned good idea, right?

3    A.   Yes.

4    Q.   You believed in it, so now everyone's working together, Mr.

5    Levy, whether you call him an investor or venture capitalist,

6    he was going to be the money guy and everything was going to go

7    forward, right?

8    A.   Yes.

9    Q.   He did supply, as you said, over $2 million, right?

10   A.   Yes.

11   Q.   There came a time, as you told us this afternoon, that Mr.

12   Levy decided, when you were in that area of convertible notes,

13   now a public company -- by the way, with a public company and

14   what you were doing, Mr. Levy explained to you that that's a

15   good method of a startup to raise cash and have continued

16   influx of cash, right?

17   A.   Yes.

18   Q.   A continued influx of investors, that that would provide

19   the best opportunity, right?

20   A.   Correct.

21   Q.   And that it was better than staying private, right?

22   A.   Yes.

23   Q.   He told you about this reverse merger and how a shell would

24   be taken and you would merge into the shell, right?

25   A.   Yes.

D3drlev6                    Lefrancois - cross

1    Q.  And how that would be the most cost-effective and

2    expeditious way of going public, right?

3    A.  Yes.

4    Q.  He said it was a time-worn model that companies, starting

5    with companies that are now major companies, I'm not going to

6    name any companies, but major corporations trading on the New

7    York Stock Exchange started in that way, with reverse mergers

8    and exchange of stock, right?

9    A.  I don't remember that conversation, but the rest of it,

10   yes.

11   Q.  Did Mr. Levy suggest that in going public, he was doing

12   anything wrong?

13   A.  No.

14   Q.  Did he ever suggest that to you?

15   A.  No.

16   Q.  Did he ever suggest that he didn't want his name to be

17   mentioned anywhere or his companies to be mentioned anywhere,

18   keep it off the books, or anything like that?

19   A.  No.

20   Q.  Never, right?

21   A.  Never.

22   Q.  He started supplying the money to you, and there came a

23   time, this is where I want to get back to, there came a time

24   when he was going to convert one of the notes, right?

25   A.  Yes.

D3drlev6          Lefrancois - cross

1    Q.  You had the option -- when I say "you," I'm not singling

2    you out.  You're the CEO.  But the company, the company, had

3    the option of not permitting the conversion, but rather you

4    could have paid the cash back, right?

5    A.  Correct.

6    Q.  That didn't really make any sense, correct?

7    A.  No.

8    Q.  Because all during the period of time we have been talking

9    about, you were cash-starved?

10   A.  Yes.

11   Q.  Or at least cash-hungry, right?

12   A.  Yes.

13   Q.  So it didn't make any business sense to say, for example,

14   with respect to the hundred thousand, the 300,000, we have seen

15   notes in all denominations, it didn't make any business sense

16   for you to go to the cash register of the business, because you

17   didn't have that kind of money on hand, to say I'm going to

18   give you back the cash and we'll rip up the note and that note

19   is satisfied; you couldn't do that, right?

20   A.  No.

21   Q.  The best way for you to do it, think back to that time, was

22   to simply let the note be converted and giving him stock rather

23   than cash makes a whole lot of sense because it will allow us,

24   whether it was with Mr. Levy or other investors, to get money

25   in return for paper as opposed to get money in return, for you

D3drlev6                    Lefrancois - cross

1    have to pay it back in three months or six months, is that fair

2    to say?

3    A.   Yes.

4    Q.   The fact that he converted that note pursuant to contract

5    pursuant to what the price was and the terms of the note, that

6    was actually easier for you and the company rather than paying

7    back cash.

8    A.   Correct.

9    Q.   Fair statement also?

10   A.   Yes.

11   Q.   Over time, when things were being delayed and the business

12   prospects in Mexico, not that it was over but it was going a

13   whole lot slower than you wanted to go, right?

14   A.   Yes.

15   Q.   The business, is it fair to say, wasn't performing?  You

16   didn't lose hope, you stayed with it, but the business wasn't

17   performing as quickly and as expeditiously as you would have

18   liked, right?

19   A.   Yes.

20   Q.   Lack of performance, lack of performance, was a very

21   difficult situation, a very difficult phenomenon when the

22   shares started to drop in 2011, correct?

23   A.   Correct.

24   Q.   Nevertheless, even though you had performance problems,

25   even though you were like crunched and felt like almost

D3drlev6                    Lefrancois - cross

1    claustrophobic about what was happening in the business, Mr.

2    Levy, David Levy, continued to supply money, right?

3    A.  Yes.

4    Q.  You would call him on the telephone and say, David, we need

5    more money, right?

6    A.  Yes.

7    Q.  There was no contract that said that David Levy had to

8    supply more money, right?

9    A.  Correct.

10   Q.  There was an oral understanding you had that he was going

11   to supply up to $300,000, but now it's no longer '08, it's '09,

12   it's '10, it's '11.  He had no obligation.  He could have said

13   to you, Ben, it's not performing and don't come by here

14   anymore, I'm not going to give you any more money.  He could

15   have said that, right?

16   A.  Yes.

17   Q.  But he believed in the company and he stayed with it,

18   right?

19   A.  Yes.

20   Q.  You were the guy who looked to David Levy each and every

21   time and said, David, can we borrow some more money, can we

22   sign some more convertible notes, do you remember that?

23   A.  Yes.

24   Q.  Again and again I think that you saw some of the promissory

25   notes.  You had promissory notes dated March 24, 2011,

1  $100,000; August 16, 2011, $25,000; September 1, 2011, $25,000;

2  April 27, 2011, $100,000.  This was almost like, and I don't

3  mean to belittle either my client or you, but this was almost

4  like when you needed to turn on the faucet, there is the

5  faucet, right?

6  A.  Right.

7          MR. SHARGEL:  Mr. Master just jumped.

8  Q.  By the way, with regard to the press releases, and we had

9  the subject matter of the press releases, did Mr. Levy control

10 either the timing or the content of the press releases?

11 A.  No.

12 Q.  Then there came a time when you had personal financial

13 difficulties, as you told us, correct?

14 A.  Yes.

15 Q.  You were having difficulties paying the mortgage on your

16 house, right?

17 A.  Yes.

18 Q.  How many children do you have?

19 A.  Two.

20 Q.  So you have a family of four and you had enormous

21 obligations that were difficult to meet, right?

22 A.  Correct.

23 Q.  You went to David Levy and there was a question about

24 whether you should sell some shares because your shares were

25 unrestricted, right?

D3drlev6                    Lefrancois - cross

1    A.   Yes.

2    Q.   You knew at that time that a person that held unrestricted

3    shares had the ability to sell, right?

4    A.   Yes.

5    Q.   Mr. Levy said to you, and I think you were asked this

6    question several times, Mr. Levy said to you, Ben -- it was Ben

7    and David, right?

8    A.   Yes.

9    Q.   Ben, don't sell your shares, it's not a good idea.  He

10   understood the stock market better than you, right?

11   A.   Yes.

12              MR. MASTER:  Objection.

13              THE COURT:  Overruled.

14   Q.   He was giving you advice, right?

15   A.   Yes.

16   Q.   You testified to that advice that he gave you on direct

17   examination, you remember that?

18   A.   Yes.

19   Q.   He said don't sell your stock.  You wanted to sell your

20   stock, but he said don't sell your stock, it won't look good,

21   in words or substance, right?

22   A.   Yes.

23   Q.   He made clear to you that you were still, as you are now,

24   the chief executive officer of the company and anyone could

25   understand that if the CEO is selling his stock, that suggests

D3drlev6                    Lefrancois - cross

1   maybe to the market a lack of confidence in the stock, right?

2   A.  Yes.

3   Q.  A lack of confidence in the company, right?

4   A.  Yes.

5   Q.  It made sense to you what he said, didn't it?

6   A.  Yes.

7   Q.  It was he who came up with the solution, and the solution

8   was, because of your financial difficulties, your personal

9   financial difficulties, he made a check out on whichever one of

10  these corporations, his corporate vehicles, he made a check out

11  to you and your wife for $100,000, right?

12  A.  Yes.

13  Q.  That was kind of like a lifeboat in a very difficult storm,

14  right?

15  A.  Yes.

16  Q.  With that hundred thousand dollars you were able to, at

17  least for a while, mend your financial fences, right?

18  A.  Yes.

19          THE COURT:  Mr. Shargel, you will have to excuse me

20  now.  We are going to have to break.  It's 5 o'clock.

21          MR. SHARGEL:  Fine.

22          THE COURT:  A little bit before 5 o'clock.  We will

23  resume tomorrow morning at 10 o'clock.  Remember the

24  instructions.  Keep open minds, don't discuss the case, don't

25  do any research.  See you tomorrow at 10:00.

1    (Jury not present)

2    THE COURT:  You're on cross-examination.  Don't talk

3    to the government about your testimony.  OK?

4    THE WITNESS:  Yes.

5    (Witness not present)

6    THE COURT:  I'm the host for the Federal Bar

7    Association meeting at 5 o'clock.  General Suter, the chief

8    clerk of the Supreme Court is our guest.  I have to go

9    downstairs.  Do you want to talk a scheduling matter?

10    MR. SREBNICK:  I want to find out when the defense

11    witnesses will need to be here.  They are out of town.  Does

12    your Honor intend to proceed at a particular time?

13    THE COURT:  I intend to proceed at 10 o'clock.

14    MR. SREBNICK:  Tomorrow the government still has its

15    witnesses.  But when they are going to conclude their

16    presentation, because it is a weekend on Friday.

17    MS. COHEN:  Your Honor, as I said, I think we will

18    either conclude tomorrow or on Friday.  So I would have defense

19    witnesses for Friday.

20    THE COURT:  Have your witnesses available for Friday.

21    MR. SREBNICK:  Will do.

22    MR. SHARGEL:  Are we doing the charge conference on

23    Friday?

24    THE COURT:  Yes.  Maybe we'll break a little bit

25    early.  I haven't seen any of the charges.

1          MR. SHARGEL:  Remember yesterday?

2          THE COURT:  I know.  You're going to submit them on

3    Thursday.  So I can expect them on Thursday.

4          MR. SHARGEL:  Yes, sir.

5          THE COURT:  Do you think we will be charging the jury

6    on Monday or Tuesday?

7          MR. SHARGEL:  Not Monday.  I hope we sum up on Monday.

8    Or Tuesday.

9          MR. SREBNICK:  Thank you, Judge.

10         THE COURT:  But it will be early next week?

11         MR. SHARGEL:  Yes, for sure.

12         (Adjourned to 10:00 a.m., March 14, 2013)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                              Page

3    DERRICK M. HOLMES

4    Cross By Mr. Shargel . . . . . . . . . . . . 966

5    Cross By Mr. Srebnick  . . . . . . . . . .1002

6    Redirect By Mr. Master . . . . . . . . . .1033

7    Recross By Mr. Shargel . . . . . . . . . .1038

8    BENJAMIN LEFRANCOIS

9    Direct By Mr. Master . . . . . . . . . . .1042

10   Cross By Mr. Shargel . . . . . . . . . . .1098

11                   GOVERNMENT EXHIBITS

12   Exhibit No.                              Received

13    400-5, 400-6, 400-7, 400-14, 400-11,  . . . .1070

14           400-12, 400-13, 400-18,

15           400-15, 400-16, and 400-17

16    400  . . . . . . . . . . . . . . . 1043

17    400-8  . . . . . . . . . . . . . . 1052

18    400-23  . . . . . . . . . . . . . 1083

19    400-20  . . . . . . . . . . . . . 1095

20    3504-4  . . . . . . . . . . . . . 1087

21                   DEFENDANT EXHIBITS

22   Exhibit No.                              Received

23    A175  . . . . . . . . . . . . . . .985

24    A188  . . . . . . . . . . . . . . 1032

25    A190  . . . . . . . . . . . . . . 1006

1  A192  . . . . . . . . . . . . . . 1026

2  A193  . . . . . . . . . . . . . . 1020

3  A195  . . . . . . . . . . . . . . 1024

4  A196  . . . . . . . . . . . . . . 1008

5  A200A  . . . . . . . . . . . . . . 1035

6  B101  . . . . . . . . . . . . . . 1029

7  B96  . . . . . . . . . . . . . . 1027

8  B98  . . . . . . . . . . . . . . 1025

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25