D3erlev1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4             v.                         11 Cr. 62 (PAC)

5   DONNA LEVY,
    DAVID LEVY,
6                                        Jury Trial
                    Defendants.
7   ------------------------------x

8
                                         New York, N.Y.
9                                        March 14, 2013
                                         10:25 a.m.
10
    Before:
11
              HON. PAUL A. CROTTY
12
                                         District Judge
13

14          APPEARANCES

15

    PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17  CARRIE H. COHEN
    HOWARD S. MASTER
18        Assistant United States Attorneys

19

    HOWARD M. SREBNICK
20  NOAH FOX
    ALEX ARTEAGA-GOMEZ
21        Attorneys for Defendant Donna Levy

22

    GERALD L. SHARGEL
23  ROSS M. KRAMER
    JENNIFER HAYS
24        Attorneys for Defendant David Levy

25
```

D3erlev1

1          (Trial resumed; jury present)

2     BENJAMIN LEFRANCOIS, resumed.

3          THE COURT:  Mr. Lefrancois, you are still under oath.

4          Mr. Shargel.

5          MR. SHARGEL:  Thank you, your Honor.

6     CROSS-EXAMINATION

7     Q.  Mr. Lefrancois, good morning.

8     A.  Good morning.

9     Q.  I have just a few more questions and then I'll sit down.  I

10    would like to direct your attention to on or about March, as we

11    say, in or about March of 2011.  There came a time when Mr.

12    Levy converted one of the notes, right?

13    A.  Yes.

14    Q.  He got unrestricted stock, free-trading stock, correct?

15    A.  Yes.

16    Q.  You knew following that conversion that he sold some stock,

17    right?

18    A.  Yes.

19    Q.  He sold stock on public markets, correct?

20    A.  Yes.

21    Q.  After he sold stock, and we are fixing that as March 2011,

22    after he sold the stock, did he provide any more money to the

23    company?

24    A.  Yes.

25    Q.  I have Defense Exhibit A712.

D3erlev1                    Lefrancois - cross

1              MR. SHARGEL:  May I approach, your Honor?

2              THE COURT:  Yes, you may.

3    Q.  Do you recognize that, sir?

4    A.  Yes.

5    Q.  What do you recognize it to be?

6    A.  A promissory note.

7    Q.  From David Levy?  David Levy is furnishing the money, and

8    your company is the borrower?

9    A.  Yes.

10   Q.  That's in the amount of how many dollars?

11   A.  Hundred thousand.

12   Q.  Hundred thousand dollars.

13             THE COURT:  Did you ask the date of that, Mr. Shargel?

14   Q.  May we have the date?

15   A.  March 24, 2011.

16             MR. SHARGEL:  I offer it in evidence.

17             MR. MASTER:  No objection.

18             THE COURT:  A712 is in evidence.

19             (Defendant's Exhibit A712 received in evidence)

20   Q.  Let me show you what has been marked as Defendant's Exhibit

21   A713.  Do you recognize it?

22   A.  Yes.

23             MR. SHARGEL:  Judge, I think we can save time IF I

24   stand here.  Is that all right with you?

25             THE WITNESS:  Yes.

D3erlev1                    Lefrancois - cross

1    Q.  What do you recognize it to be?

2    A.  A secure promissory note in the amount of $100,000, April

3    27, 2011.

4    Q.  Greenway is the borrower?

5    A.  Yes.

6    Q.  David Levy is the lender?

7    A.  Yes.

8    Q.  The date you gave us again?

9    A.  April 27, 2011.

10   Q.  In the amount of $100,000?

11   A.  Yes.

12             MR. SHARGEL:  I offer it in evidence, your Honor, 713.

13             MS. COHEN:  No objection, your Honor.

14             THE COURT:  713 is in evidence.

15             (Defendant's Exhibit A713 received in evidence)

16   Q.  I put before you what marked for identification as A714.

17   Do you recognize it?

18   A.  Yes.

19   Q.  What do you recognize it to be?

20   A.  A secured promissory note.

21   Q.  Greenway borrowing money from David Levy?

22   A.  Yes.

23   Q.  The date?

24   A.  August 16, 2011.

25   Q.  In the amount of?

D3erlev1                    Lefrancois - cross

1   A.  25,000.

2           MR. SHARGEL:  I offer it into evidence.

3           MS. COHEN:  No objection, your Honor.

4           THE COURT:  714 is in evidence.

5           (Defendant's Exhibit A714 received in evidence)

6   Q.  Finally, I put before you what has been marked for

7   identification as Defense Exhibit A715.  I ask you to look at

8   it and tell the jury if you recognize it.

9   A.  Yes.

10  Q.  What do you recognize it to be?

11  A.  A secured promissory note.

12  Q.  The date?

13  A.  September 1, 2011.

14  Q.  The amount?

15  A.  25,000.

16          MR. SHARGEL:  I offer it into evidence.

17          MS. COHEN:  No objection, your Honor.

18          THE COURT:  715 is received in evidence.

19          (Defendant's Exhibit A715 received in evidence)

20  Q.  Again, it is to Greenway from David Levy?

21  A.  Yes.

22  Q.  David Levy providing, as he did in each of the instances

23  evidenced by the paper I put in front of you now in evidence,

24  was furnishing more money to the company, right?

25  A.  Yes.

D3erlev1                    Lefrancois - cross

1    Q.  He gave to the company between March, we started this with

2    reference to March, March 24, 2011, to September 1, 2011, he

3    gave the company or provided the company with capital in the

4    amount of $250,000, correct?

5    A.  Yes.

6    Q.  We had it yesterday, I'm not going into any more detail

7    about it, but shortly after that, on April 27, 2011, he gave

8    that personal advance to you, a loan in the amount of $100,000?

9    A.  Yes.

10   Q.  By the way, do you know of any contract or instrument or

11   any other mechanism by which he was required to give you that

12   money?

13   A.  No.

14           MR. SHARGEL:  No further questions.

15           MR. SREBNICK:  No questions.

16           THE COURT:  Any redirect?

17           MR. MASTER:  Yes, your Honor.

18   REDIRECT EXAMINATION

19   BY MR. MASTER:

20   Q.  Mr. Shargel asked you on cross-examination whether David

21   Levy believed in the company.  Do you remember that?

22   A.  Yes.

23   Q.  You answered the question yes, do you remember that?

24   A.  Yes.

25   Q.  You don't know what Mr. Levy actually believed, do you?

1   A.  No.

2   Q.  You were led to believe that Mr. Levy actually believed in

3   the company, isn't that right?

4   A.  Yes.

5   Q.  That's what Mr. Levy told you?

6   A.  Yes.

7   Q.  You don't know his real motives for investing in your

8   company, do you?

9           MR. SHARGEL:  I object to the form of these questions.

10          THE COURT:  Sustained.

11  Q.  You were asked some questions about the business

12  relationship between the two of you.  You asked if you believed

13  anyone was taking advantage of the other.  Do you remember

14  that?  You were asked on cross-examination, "No one was taking

15  advantage of the other, right?"  And you said, "No."  Do you

16  remember that?

17  A.  No.

18  Q.  Did Mr. Levy disclose to you what he was taking the company

19  public that he was acquiring 9,990,000 shares in your company

20  in the name of Bluefin Financial Group?

21  A.  No.

22  Q.  He kept that secret from you, didn't he?

23          MR. SHARGEL:  Objection to the form of the question.

24          THE COURT:  Overruled.

25  A.  Yes.

Q.  It wasn't until 2010 when he told you that he had lost a

certificate in the name of Bluefin Financial Group in a

briefcase that you learned about the existence of those shares?

A.  Yes.

Q.  What did he want you to do for him about those 9,990,000

free-trading shares in Bluefin Financial?

A.  Replace them.

Q.  Mr. Shargel asked you that when David Levy got to see the

device, he was impressed with what he saw, and you answered

yes?

A.  Yes.

Q.  He acted impressed with what he saw, right?

A.  Yes.

Q.  You don't know whether he actually was impressed with what

he saw?

        MR. SHARGEL:  Judge, I object to the form of the

question.

        THE COURT:  Sustained.

Q.  Do you know what his real motives were in dealing with you?

A.  No.

Q.  You were asked whether Mr. Levy mentioned anywhere that he

wanted his name to be kept off the books, and you answered no.

Do you remember that?

A.  Yes.

Q.  What did David Levy tell you about an individual named Yael

1  Tal?

2  A.  Nothing.

3  Q.  What, if anything, did David Levy tell you about the

4  relationship between his company and Fitzwilliams Investments?

5  A.  Nothing.

6  Q.  Did David Levy ever tell you that in selling shares,

7  allegedly selling shares, from EZ English to Fitzwilliams

8  Investments, he was just transferring shares from a company he

9  controlled to another company he controlled?

10  A.  No.

11  Q.  Did David Levy ever tell you that he was forging signatures

12  on checks he was sending you?

13  A.  No.

14        MR. SHARGEL:  Judge, I object to forging signatures.

15  There is no allegation of any signature being forged on a

16  check.

17        THE COURT:  The objection is overruled.  It's already

18  been asked and answered.

19  Q.  You were asked questions about a conversation you had with

20  David Levy about selling your own shares to address your

21  personal financial difficulties.  Mr. Shargel asked you, "He

22  understood the stock market better than you, right?"  And you

23  said, "Yes."  Do you remember that?

24  A.  Yes.

25  Q.  That is correct, isn't it?

1    A.   Yes.

2    Q.   When David Levy told you not to sell your shares because it

3    would hurt the stock, you trusted him, right?

4    A.   Yes.

5    Q.   In fact, he was the person who orchestrated everything

6    related to going public in the stock?

7    A.   Yes.

8    Q.   How much stock did you actually want to sell at that time?

9    A.   I believe it was about 1.5 million shares.

10   Q.   Over what period of time?

11   A.   90 days.

12   Q.   David Levy told you not to do that, because selling your

13   shares would hurt the stock?

14   A.   Yes.

15   Q.   At that time what, if anything, did David Levy say about

16   the amount of shares he was selling?

17   A.   He didn't.

18   Q.   As you were in difficult financial straits, when, if ever,

19   did David Levy disclose that he made approximately $5.5 million

20   selling shares into the market at the time he told you that it

21   would hurt the stock for you to sell your shares?

22   A.   He didn't.

23   Q.   Mr. Shargel said that blogs could say whatever they want.

24   Do you remember that?

25   A.   Yes.

1   Q.  Blogs said that the stock was pumped and dumped, right?

2   A.  Yes.

3   Q.  Blogs can say whatever they want?

4   A.  Yes.

5   Q.  How about you?  Do you believe that the stock was pumped

6   and dumped based on what you observed?

7   A.  Yes.

8   Q.  How did that hurt your company?

9   A.  It gave us a bad reputation.

10  Q.  And it gave you a bad reputation?

11  A.  Yes.

12  Q.  Mr. Levy never disclosed to you that he was pumping and

13  dumping your stock?

14  A.  No.

15  Q.  Do you believe that that helped the company or hurt the

16  company?

17  A.  Hurt the company.

18  Q.  How much is your stock worth now?  I mean, what is the

19  share price of your stock now?

20  A.  .006.

21  Q.  How effective are your efforts to raise money for your

22  company now that your stock has been, as you believe, pumped

23  and dumped?

24  A.  It's almost impossible.

25  Q.  When you were coming back to David Levy to get $25,000,

1  $25,000, $25,000, what did David Levy insist on each time that

2  you went to him?

3  A.  A promissory note.

4  Q.  That was a promissory note that entitled him to what in the

5  event that you didn't have the ready cash to pay him off?

6  A.  Convert to stock.

7  Q.  Mr. Shargel stated that "David Levy's money," asked you,

8  "that was kind of like a lifeboat in a very difficult storm,

9  right"?

10  A.  Yes.

11  Q.  You said, "Yes."  Mr. Lefrancois, if Mr. Levy hadn't given

12  you $25,000 here and there, what could have happened to your

13  company?

14  A.  Could have went out of business.

15  Q.  What would have happened to all those shares that Mr. Levy

16  held?

17  A.  Would have been worthless.

18          MR. MASTER:  One moment.

19          Nothing further.

20  RECROSS-EXAMINATION

21          THE COURT:  Very briefly now, Mr. Shargel.

22          MR. SHARGEL:  Yes.

23  BY MR. SHARGEL:

24  Q.  Did anyone everyone ask for money back that had been

25  furnished to you?  Did anyone try to void a bank transaction?

1    A.  No.

2    Q.  Were the checks all honored by the bank?  You deposited

3    those checks in a bank, didn't you?

4    A.  Yes.

5    Q.  You were asked the question by Mr. Master about Yael Tal,

6    correct?

7    A.  Yes.

8    Q.  Did you learn that Yael Tal was Mr. Levy's sister?

9    A.  No.

10   Q.  Did you ask him any questions about who Yael Tal was?

11   A.  No.

12   Q.  But these checks were negotiated in each and every instance

13   by a bank, right?

14   A.  Yes.

15   Q.  Each time those checks cleared and you were able to use

16   that money, right?

17   A.  Yes.

18   Q.  You told us yesterday there was more than $2 million that

19   David Levy gave to you, right?

20   A.  Yes.

21   Q.  Then you were asked a moment ago by Mr. Master about

22   promissory notes, remember that?

23   A.  Yes.

24   Q.  He asked you with whether they could be converted to stock,

25   right?

1  A.  Yes.

2  Q.  You know as a businessman that any time one lends money to

3  another, there is some form of collateral or some form of

4  support for the promise, right?

5  A.  Yes.

6  Q.  You have to pay it back, right?

7  A.  Yes.

8  Q.  You either have to pay it back in cash or you have to pay

9  back in stock, correct?

10  A.  Correct.

11  Q.  There is no question about that, right?

12  A.  Right.

13  Q.  Did you find anything unusual about it?

14  A.  No.

15  Q.  Did you find anything sinister or secret about it?

16  A.  No.

17  Q.  Didn't you do -- when I say "you," as the company -- didn't

18  you do your own promotion in 2012?

19  A.  I don't know what you are referring to.

20  Q.  Do you remember doing a promotion of the stock where news

21  releases started again, press releases started again in

22  supporting the stock and the stock went up somewhat?

23  A.  Yes.

24  Q.  That happened in 2012, when Mr. Levy wasn't furnishing any

25  more money, correct?

1    A.  Correct.

2    Q.  After he had given you that more than $2 million, he wanted

3    to see if the company could stand on its own, right?

4    A.  Correct.

5    Q.  Nevertheless, it was struggling, correct?

6           MR. MASTER:  Objection.

7           THE COURT:  Overruled.

8    A.  Yes.

9           MR. SHARGEL:  I have no further questions.

10          THE COURT:  You are excused.  Thank you very much.

11          MR. MASTER:  Judge, I wanted to ask one question about

12   what Mr. Levy believed.

13          THE COURT:  It's finished.  We have had enough from

14   Mr. Lefrancois.

15          You are excused.

16          (Witness excused)

17          THE COURT:  Next witness.

18          MS. COHEN:  Your Honor, at this time the government

19   would like to read a stipulation into evidence and publish an

20   exhibit after it is admitted through the stipulation.

21          THE COURT:  All right.

22          MS. COHEN:  The stipulation has the caption of the

23   case.  It is signed and entered into by the parties in this

24   case.  It is marked for identification Government Exhibit S4.

25          Paragraph 1.  Government Exhibit 704-1 and 704-2 are

D3erlev1

1    true and accurate copies of applications by Yael Levy Tal to

2    obtain a United States passport.  Government Exhibit 704-1 and

3    704-2 are maintained by the United States state department in

4    the course of its regularly conducted business.

5              It is further stipulated and agreed that Government

6    Exhibits 704-1 and 704-2 may be received in evidence at trial

7    and that the stipulation may be received in evidence at trial.

8    Signed by the parties, dated March 11, 2013.

9              Your Honor, the government moves Government Exhibit S4

10   and Government Exhibits 704-1 and 704-2 into evidence.

11             THE COURT:  S4 and 704-1 and 2 are received in

12   evidence.

13             (Government's Exhibits S4, 704-1, and 704-2 received

14   in evidence)

15             MS. COHEN:  Your Honor, we now have an oral

16   stipulation that the parties agree that Yael Tal is David

17   Levy's sister.

18             THE COURT:  All right.

19             MS. COHEN:  If we can publish 704-1.  And if we can

20   zoom in, please, Mr. Dinet, on the signature at the bottom

21   under the photograph.

22             And if we could publish 704-2, please, Mr. Dinet.  You

23   have to go lower, at the bottom below the photo, there is a

24   signature.  Thank you.

25             Now, your Honor, the government would like to read

1    what's been marked for identification as Government Exhibit S9,

2    which is another stipulation.

3         It is hereby stipulated and agreed between the

4    parties, and it is signed by all the parties that, if called to

5    testify, a special agent of the United States Department of

6    Homeland Security Immigration and Customs Enforcement (ICE)

7    would testify as follows.

8         1.  The ICE special agent queried a database

9    maintained by ICE in the course of its regularly conducted

10   business activities regarding border crossing by individuals

11   who enter or leave the United States "the database."  The

12   database contains records concerning inbound and outbound

13   travel.  For each border crossing the database maintains

14   records concerning departure and destination airports, dates of

15   travel, and information concerning the airlines on which the

16   individuals traveled.

17        2.  The ICE special agent queried the database for

18   records concerning David Levy and Yael Levy Tal.  The results

19   of that query are contained within Government Exhibits 710 and

20   711 respectively.

21        3.  Government Exhibit 712 is a summary of the

22   information contained in Government Exhibit 710.  Government

23   Exhibit 713 is a summary of the information contained in

24   Government Exhibit 711.

25        It is further stipulated and agreed that the

D3erlev1

1  Government Exhibit 710 through 713 may be received in evidence

2  at trial and that the stipulation may be received in evidence

3  at trial.  Signed by all the parties, dated March 13, 2011.

4          Your Honor your Honor, the government moves Government

5  Exhibit S9 and 710 through 713 into evidence, please.

6          THE COURT:  S9, 710, '11, '12, and '13 are received in

7  evidence.

8          (Government's Exhibits S9, 710, 711, 712, and 713

9  received in evidence)

10          MS. COHEN:  Mr. Dinet, if you could publish 712.  No,

11  713, sorry.  Thank you.  And if you could enlarge the top part,

12  please.

13          Your Honor, at this time the government calls Ray

14  Wyman.

15          MR. SHARGEL:  Judge, before that, may we approach for

16  a moment?

17          THE COURT:  Yes.

18          (Continued on next page)

19

20

21

22

23

24

25

(At the side bar)

MR. SHARGEL: I am deeply disturbed by one point. The suggestion was, it was more than a suggestion, that the signature of Yael Tal was a forgery. They have never interviewed Yael Tal. They have no idea whether she gave permission to David Levy to use his corporation or to sign her name. They have no good faith basis to believe that she didn't. There is no suggestion of the idea that travel establishes.

There is no good-faith basis for them to think this is a forgery. This jury shouldn't be thinking that it is a forgery. The only evidence you have of a forgery is Mr. Master's question, nothing more on this record, and nothing more on this record is going to come in.

MR. MASTER: That is not the case, your Honor. Mr. Levy used Yael Tal's identity on various documents. He used his own identity on various documents. We are permitted to argue to the jury that these were forgeries intended to further the scheme by concealing his role in the pumping and dumping of various stocks. He used her identity, and it is clear that it is his handwriting, and it is clear from the context and circumstances that he was using it again in the name of other corporations and individuals to further the scheme.

MR. SHARGEL: It is not a forgery. There is no forgery here. I can sign my sister's signature if she gives me

1  permission to sign her name.  That's not a forgery.  There is

2  nothing in this record, nothing from Mr. Master, to suggest any

3  evidentiary basis to call this a forgery.

4  THE COURT:  What relief do you want?

5  MR. SHARGEL:  To strike the question and answer

6  regarding forgery.  There is no evidence in this record that

7  there is a forgery.  A very simple instruction.

8  MS. COHEN:  Your Honor, if I may.  There is evidence

9  that it is not her real signature shown on her U.S. passport

10  application and there is evidence through the border crossings

11  that she was not in the United States on the times --

12  THE COURT:  The point is that she could have

13  authorized him to use her signature.

14  MS. COHEN:  If he wants to get on the stand and

15  testify about that, that's fine.

16  THE COURT:  All right.  The application is denied.

17  (Continued on next page)

18

19

20

21

22

23

24

25

D3erlev1

1          (In open court)

2     RAY WYMAN,

3        called as a witness by the government,

4        having been duly sworn, testified as follows:

5               THE COURT:  Would you state your name for the record,

6     sir.

7               THE WITNESS:  Ray Wyman, Jr.  R-A-Y, W-Y-M-A-N.

8               THE COURT:  Please sit down, Mr. Wyman.  Pull yourself

9     up to the microphone and speak into it.

10              Ms. Cohen.

11              MS. COHEN:  Thank you, your Honor.

12    DIRECT EXAMINATION

13    BY MS. COHEN:

14    Q.  What is your educational background?

15    A.  I have a Bachelor's degree in journalism.

16    Q.  Where do you live now?

17    A.  I live in Orange, California.

18    Q.  Where do you work?

19    A.  I am self-employed, public relations.

20    Q.  How long have you been self-employed doing public relations

21    work?

22    A.  I don't know the exact years.  1984, since 1984.

23    Q.  What type of companies have you done public relations work

24    for?

25    A.  I worked for Texas Instruments, Cisco Systems, Sun

D3erlev1                    Wyman - direct

1    Microsystems, World Trade Center Association.

2    Q.  When you say public relations work, can you describe in

3    general what types of work you do regarding public relations.

4    A.  I manage communications for my clients':  Websites,

5    collateral material, presentations, and press releases.

6    Q.  Did there come a point in time you did some work on public

7    relations for Greenway Design?

8    A.  Yes.

9    Q.  How did that come about?

10   A.  I met Robert Jakubik.  He saw my work with another client

11   and called me.

12   Q.  When was this that you spoke with Mr. Jakubik about

13   possibly doing some work for Greenway Design?

14   A.  Around June 2009.

15   Q.  What happened?

16   A.  He hired me.  I did their branding and website work.  I

17   started working immediately on getting materials ready to sell

18   their product.

19   Q.  How did you get paid?  What was your arrangement with

20   Greenway Design?

21   A.  I was paid $3,000 a month.

22   Q.  Remind, who was Mr. Jakubik?  What was his role at Greenway

23   Design?

24   A.  He was vice president of marketing.

25   Q.  When you joined Greenway Design, was it a public or private

D3erlev1                          Wyman - direct

1    company?

2    A.   It was a private company.

3    Q.   At some point did Greenway Design become a public company?

4    A.   Yes.

5    Q.   When was that?

6    A.   Early 2010.

7    Q.   You started working June-July 2009?

8    A.   Yes.

9    Q.   What changed with respect to your work for Greenway Design

10   when the company went public in early 2010?

11   A.   None.

12   Q.   Did you draft and issue press releases for Greenway Design

13   when it was a private company?

14   A.   Yes, I did.

15   Q.   Why did you issue press releases for Greenway Design when

16   it was a private company?

17   A.   To sell the product.

18   Q.   Did you draft and issue press releases for Greenway Design

19   when it became a public company?

20   A.   Yes, I did.

21   Q.   Why did you issue press releases for Greenway Design when

22   it became a public company?

23   A.   To sell the product.

24   Q.   Same reason?

25   A.   Yes.

D3erlev1                    Wyman - direct

1    Q.  When did you first meet David Levy?

2    A.  That would have been summer of 2010.

3    Q.  How did that meeting come about?

4    A.  I was invited to meet our new investor.

5    Q.  Where was the meeting with David Levy?

6    A.  At Greenway Design Group's offices.

7    Q.  Who was at that meeting?

8    A.  Ben Lefrancois, Robert Jakubik, David Levy, and myself.

9    Q.  What did David Levy say at the meeting at Greenway Design'

10   offices in the summer of 2010?

11   A.  He was really effusive.  He was a cheerleader.  He was very

12   excited about the product and spent a great deal of time

13   talking about how proud he was to be participating with the

14   company.

15   Q.  What else did David Levy say at this meeting at Greenway

16   Design's offices?

17   A.  He said that we would have an attorney, a corporate

18   attorney, by the name of Bill Aul, William Aul.  He made a

19   suggestion.

20   Q.  What suggestion did David Levy make in addition to the

21   attorney Bill Aul?

22   A.  He suggested he could do a bang-up job on press releases,

23   he had somebody that could do the press releases for us.

24   Q.  Did David Levy identify that person by name?

25   A.  No, he did not.

D3erlev1                    Wyman - direct

1   Q.  What was the response from Greenway Design's side to David

2   Levy's suggestion that he had a terrific person to do press

3   release?

4   A.  Ben Lefrancois and Robert Jakubik both said that I would be

5   doing the press releases for the corporation.

6   Q.  At this meeting did there come a time where you had any

7   one-on-one discussions with David Levy?

8   A.  Yes.  He pulled me aside for a minute to ask me how I did

9   press releases.

10  Q.  What did you tell him?

11  A.  I gave him the basic journalism 101 instruction on how I

12  assemble press releases on factual, truthful information and

13  timely, newsworthy.

14  Q.  After the meeting at Greenway Design offices, what

15  discussions did you have with David Levy about press releases?

16  A.  He called me a couple of times to express his enthusiasm

17  with the company.  I took it as a cheerleading kind of event.

18  He called usually to ask me if there were any press releases

19  coming up.

20  Q.  What would you tell him?

21  A.  I told him I didn't know and that he would have to talk to

22  Ben.

23  Q.  What would David Levy say in response?

24  A.  He asked me to talk to Ben and encourage him to get more

25  press releases out.

1  Q.  Now let me take you sort of to the end of 2010, beginning

2  of 2011.  What were you working on for Greenway Design?

3  A.  I was given instructions around November to begin working

4  on something called the private placement memorandum.

5  Q.  What is a private placement memorandum?

6  A.  It's a document, a confidential document, given to select

7  investors that describes the company, its investment quality,

8  how we do things, what the technology was, a complete

9  description of the technology.  It's basically there to give

10  the investor an idea of the value of the investment.

11  Q.  Did you work on the private placement memorandum for

12  Greenway Design?

13  A.  On the business narrative portion, yes.

14  Q.  What do you mean by the business narrative portion?

15  A.  The description of how the product worked and the company,

16  our marketing.

17  Q.  When was the private placement memorandum finished?

18  A.  Around February.  It took about four months to do.

19  Q.  What discussions did you have with David Levy about

20  Greenway Design' private placement memorandum?

21  A.  He wanted a copy of it.

22  Q.  How did you learn that David Levy wanted a copy of it?

23  A.  He telephoned me.

24  Q.  What did David Levy say?

25  A.  He said send him a copy.

D3erlev1                    Wyman - direct

1    Q.  When was this phonecall?

2    A.  It had to have been February, right around the time that I

3    finished it.

4    Q.  What did you do in response to David Levy's request for a

5    copy of the private placement memorandum?

6    A.  I sent it to him.

7    Q.  In what format did you send it to him?

8    A.  In Word.

9    Q.  Why did you send the private placement memorandum in Word

10   format to David Levy?

11   A.  Because he requested it.

12   Q.  The private placement memorandum is something that goes to

13   potential investors?

14   A.  Yes, it is.

15   Q.  At this time was David Levy already an investor in Greenway

16   Design?

17   A.  Yes, he was.

18   Q.  What happened to Greenway Design's stock price in early

19   2011?

20   A.  Early 2011 it was pretty flat.  There was no movement or

21   anything.

22   Q.  Did there come a time in 2011 that the stock price moved?

23   A.  Yes, spring.  In spring it jumped both in terms of volume

24   and price.

25   Q.  What do you mean by it jumped in terms of volume?

D3erlev1                    Wyman - direct

1   A.  It was a rather surprising jump.  Instead of a couple of

2   hundred thousand shares exchanged in a day, we were shooting

3   for a million or more.

4   Q.  Why was that quite a surprising jump?

5   A.  It was a surprise because it was just all of a sudden.  It

6   just happened in it seemed like a matter of a week or something

7   like that that it had taken off.

8   Q.  What happened to the price of the stock at the time the

9   volume took off?

10  A.  It also went up.

11  Q.  What happened after the price of the stock went up and the

12  volume of stock traded?

13  A.  It sharply went down.

14  Q.  Was the stock movement, when it went up and sharply came

15  down, before or after you sent the private placement memorandum

16  to David Levy?

17  A.  After.

18  Q.  What types of calls or emails did you receive about the

19  movement in the stock price dramatically up and then falling

20  down?

21  A.  None from anybody except for people in the company itself.

22  Q.  What types of questions did you get from any investors in

23  Greenway Design at the time the stock price went up and then

24  came down?

25  A.  I got a lot of phonecalls from investors after it came

1    down.

2    Q.  In general, without telling us exactly what the investors

3    said, what was the nature of those investor calls to you?

4    A.  They were upset.  They were angry.  Some were in tears.

5    Q.  Why were you getting calls from outside investors?

6    A.  My name is on those press releases with my phone number and

7    email address.

8    Q.  What documents did the outside investors in Greenway Design

9    who were calling and were upset about the stock price coming

10   down send to you?

11   A.  They sent me copies of an email that they had received from

12   other entities.

13   Q.  Do you recall what entities those emails were from?

14   A.  Yes.  I remember Best Damn Penny Stocks.

15   Q.  When was the first time you had heard of Best Damn Penny

16   Stock?

17   A.  When I received those emails.

18   Q.  Did you ever pay or ask Best Damn Penny Stocks to promote

19   the stock of Greenway Design?

20   A.  No, never.

21   Q.  What language did you see in the emails from Best Damn

22   Penny Stocks that were forwarded to you by the outside

23   investors when the stock fell in 2011?

24   A.  There was one in particular that seemed to have a lot of

25   information about our projections in terms of units sold,

1    things that we would only release to our investors.

2    Q.  Where did you recognize that language to come from, the

3    language you saw in the Best Damn Penny Stock?

4    A.  In one of the emails.

5    Q.  The language that was in the Best Damn Penny Stock email,

6    where did you recognize that language to have come from?

7    A.  From our PPM.

8    Q.  By PPM you mean the private placement?

9    A.  Yes, I'm sorry.

10   Q.  The same private placement memorandum you testified earlier

11   that you sent to David Levy in February 2011?

12   A.  Yes.

13   Q.  I'm going to ask you to look at.  It's in front of you, I

14   think it is probably the second document in your pile.

15   Actually, let's look at the third document in your pile.

16   Sorry.  It's marked for identification Government Exhibit

17   605-7C.

18           MS. COHEN:  Which we will move into evidence subject

19   to a stipulation between the parties.

20   Q.  If you can tell me if you have ever seen Government Exhibit

21   605-7C, if you have ever seen the emails that are contained

22   within it.  I'm focusing on the first 17 pages right now.

23           MS. COHEN:  Mr. Dinet, if you can publish the first

24   page.

25           THE COURT:  Is it in evidence?

D3erlev1                    Wyman - direct

1      MS. COHEN:  Your Honor, it's going to be in evidence

2   after we read another stipulation.  So subject connection

3   later, it is in evidence.

4   A.  Yes, I recognize some of this text.

5   Q.  What do you recognize the emails contained in Government

6   Exhibit 605-7C to be?

7   A.  On the first page, the top paragraph, according to an

8   article from the U.S. Department of Energy, I compiled this

9   data, this information.

10      MS. COHEN:  For the record, your Honor, Government

11   Exhibit 605-7C, and for the jury pursuant to the stipulation,

12   are copies of emails sent from Best Damn Penny Stock.  The date

13   range for the first 17 of these exhibits is March 22, 2011, and

14   the few days after.  It goes from March 22, 2011, through March

15   30, 2011.

16   Q.  Mr. Wyman, where do you recognize the language in the first

17   paragraph to be from?

18   A.  Top paragraph, this is from our PPM.

19      (Continued on next page)

20

21

22

23

24

25

D3ELLEV2                    Wyman - direct

1    BY MS. COHEN:

2    Q.  You say our PPM, you're referring to Greenway Design?

3    A.  Yes, Greenway's private placement memorandum.  There's also

4    in the second page, yeah, there's more information here.

5    According to the energy information administration, there are

6    2.6 million commercial buildings and 65 million residents that

7    have central air conditioning in the U.S. today.  I wrote that

8    sentence.

9    Q.  And where did you write that sentence for?

10   A.  For the private placement memorandum.

11   Q.  That's the fifth, sixth sentence on page 2 of Government

12   Exhibit 605-7C?

13   A.  I don't know which number sentence.  It's on the second

14   page.

15   Q.  Do you recognize -- when was the first time you saw this

16   first document, which is dated March 22, 2011, from

17   bestdamnpennystocks?

18   A.  Well, I saw this in one of the emails that one of our

19   investors sent me.

20   Q.  And if you can look through the first 17 pages of

21   Government Exhibit 605-7C, do you recognize any other emails

22   from bestdamnpennystocks that you'd seen before?

23   A.  Yeah.  There's on the third page, fourth page, I'm sorry,

24   fourth page.

25   Q.  That's the email from bestdamnpennystocks dated March 22,

D3ELLEV2                    Wyman - direct

1    2011?

2    A.  Yes.

3    Q.  My Godzilla pick is Greenway Design GDGI?

4    A.  That's right.

5    Q.  When did you first see this email, which is the fourth page

6    of this document?

7    A.  When an investor sent this to me.

8    Q.  And that was when the stock price had gone down in 2011?

9    A.  Yes.

10   Q.  What do you recognize any of the language?

11   A.  Yeah, it's under the caption about GDGI, and there's two

12   sentences.  GDGI began development in 2005 and sold 16,000

13   do-it-yourself kits.  Although we were releasing that in our

14   press release, that was also in the PPM.

15          Then the next sentence after that, GDGI is now ramping

16   up to meet the goal to sell 670,000 systems in three years.  To

17   my knowledge, that was only released in our PPM.

18          And it looks like the end of this also, why GDGI's

19   products are important, why this has impact on all of us.

20   There are whole swads of copy here that was taken out of our

21   PPM.  Although some of this could have been in a later press

22   release, but it seems like the timing would be from the PPM.

23          I just noticed something else.  On the --

24          MR. SHARGEL:  Is there a question before the witness?

25          MS. COHEN:  I asked him if he recognized anything in

D3ELLEV2                    Wyman - direct

1    this document.

2              THE COURT:  He's reviewing the document and

3    responding.

4    A.  On the seventh page, excuse me, on the seventh page they're

5    mentioning some of our potential clients that we had listed in

6    the PPM:  El Pollo Loco, Darden, Nike.  Well, Nike was

7    announced.  But let's see, this one, I don't know the date of

8    this one, but --

9    Q.  While you're looking at it, just so we're all on the same

10   page, you're looking at an email sent from bestdamnpennystocks

11   on March 23, 2011?

12   A.  Yeah.

13   Q.  Continue.  What do you recognize here?

14   A.  Well, there's just a couple mentions of El Pollo Loco, you

15   know, I'm not really sure where that came from.  There's also

16   Red Lobsters, you know.  It seems like that might have come

17   from the PPM because we did mention some of the potential

18   customers we were talking to.  The timing is about right too

19   because it mentions the city of Geneva, Illinois, which was a

20   client of ours by late March, mid-March.

21   Q.  But some of these companies, Darden or El Pollo Loco --

22   A.  They were talking to us.

23   Q.  They were talking to us, but they weren't clients of

24   Greenway Design at the time --

25   A.  No.

1    Q.  -- of March 23, 2011, were they?

2    A.  No.

3    Q.  Anything, any other language in any of these

4    bestdamnpennystock emails that you recognize?

5    A.  That's it right now, up to the 17th page.

6    Q.  And when these you called them -- I believe you called them

7    outside investors were calling you, without naming names, what

8    type of individuals were the outside investors?

9    A.  They were individual speculators, investors who, you know,

10   wanted to buy stock off the market.  You know, they would go to

11   the whatever device they had and just buy stock.  And some of

12   them would buy 5,000 shares, some of them would buy 10,000.  We

13   had a few that bought a lot more than that.

14   Q.  There were investors you referred to that called you and

15   emailed you and some forwarded to you the bestdamnpennystock

16   emails --

17   A.  Yes.

18   Q.  -- were they people who owned shares in Greenway Design at

19   the time they called you?

20   A.  Yes.  These would be people I considered high-quality

21   investors.  They had a really deep interest in the product.

22   They were greenies like me.  They appreciated energy savings.

23   They had followed our development.  They hadn't just walked in

24   and discovered us.  They had done some research on us.

25   Q.  And when the stock price went up and down, did you get any

D3ELLEV2                    Wyman - direct

1   calls from David Levy about why the stock price was moving?

2   A.   Not from David Levy, no.

3   Q.   Did there come a time that the stock price moved again?

4   A.   Yes, in September.

5   Q.   What happened in September 2011 to Greenway Design's share

6   price?

7   A.   Same pattern.  Increase in -- prior to that our share price

8   had settled down, our volume had settled down.  But then around

9   September sometime, it shot back up.  We had instead of the

10  average 400,000 share volume, then we would have then suddenly

11  shot up to a million or more, and I believe it was a lot more

12  than a million shares sold.

13  Q.   And when you say it had been -- I think your words were it

14  had been stabilized, what do you mean by that?

15  A.   It stabilized before that.  You know, between the time of

16  March and before September, the share price and volume had

17  really just been normal.  We would be looking at an average day

18  of 40 cents a share with about 200 to 300 shares sold per day.

19  Q.   And what was happening -- and we'll go back to when it went

20  up and down again in September 2011 -- but if you can just tell

21  us what was going on at the company after March 2011, what was

22  the company working on?

23  A.   Well, selling the product.  We shifted away from the

24  residential product and we were really focusing on the

25  commercial product because it was more profitable, and but

1    aside from that, really not much.

2    Q.  If you could actually take a look now at what's marked for

3    identification, I think it's in front of you, might have been

4    the first document on your batch or the second, Government

5    Exhibit 400-24 for identification.

6    A.  I have 400-20 here.  I don't have 400-24.

7              THE COURT:  He doesn't have 400-24.

8              MS. COHEN:  I have an extra copy, your Honor.

9              THE WITNESS:  Oh, yes.

10   Q.  Do you recognize Government Exhibit 400-24?

11   A.  Yes.

12   Q.  And what do you recognize it as?

13   A.  It's one of the press releases I wrote.

14   Q.  And if you look through Government Exhibit, what's marked

15   for identification Government Exhibit 400-24, are these true

16   and accurate copies of press releases you wrote starting in

17   March 4, 2011?

18   A.  Yes.

19             MS. COHEN:  Your Honor, the government moves

20   Government Exhibit 400-24 into evidence.

21             MR. SHARGEL:  No objection.

22             THE COURT:  400-24 is received in evidence.

23             (Government's Exhibit 400-24 received in evidence)

24             MS. COHEN:  Thank you, your Honor.

25   Q.  And if you can, just let's just flip through them a little

D3ELLEV2                    Wyman - direct

1   bit and give us a sense of what the company is doing starting

2   in March 2011 briefly by looking through these press releases.

3            And did you draft these press releases?

4   A.  Yes.

5   Q.  And you were responsible for issuing them on behalf of

6   Greenway Design?

7   A.  Yes.

8            MS. COHEN:  Mr. Dinet, if you could just pull up the

9   first page, please, of Government Exhibit 400-24, which is

10  dated March 4, 2011.

11  Q.  Can you just briefly tell us what's going on in this press

12  release?

13  A.  This one is from November 23, 2011.

14           MS. COHEN:  You know what, a moment, your Honor.

15  Q.  I'm sorry, Mr. Wyman.  If you could just look at the first

16  one in your packet, which is also now up on the screen.

17  A.  All right.  Yes.

18  Q.  It's now in chron order.  That's the difference.

19           It's dated March 4, 2011?

20  A.  Yes, ma'am.

21  Q.  Just tell us very briefly what's it about.

22  A.  Well, this is something that Ed Begley came up with to

23  compare Greenway Cool-n-Save residential product using DOE

24  figures on compact fluorescent lights, and we equated our

25  energy savings to 38 compact fluorescent light bulbs.

1  Q.  Who is Ed Begley?

2  A.  He was our celebrity endorsor when I joined the company.

3  Q.  If you can look at the next press release, second one.

4  This one is also dated March 4, 2011.  What's going on at

5  Greenway Design here?

6  A.  We had a dealership relationship in Jamaica.  This was

7  through the government of Jamaica.

8  Q.  And if you can turn to the next press release, which is

9  dated March 9, 2009, which is about a Nike installation?

10  A.  Yes.

11  Q.  Nike was one of the companies referenced in those

12  bestdamnpennystocks emails we looked at before?

13  A.  Yes.

14  Q.  What's that press release about?

15  A.  We were approved to install a system on that particular

16  Nike installation.

17  Q.  If you can look at the next press release dated March 18,

18  2011, what's the Hughes Network Solutions installation?

19  A.  That was a big sale.  That actually was one of our biggest

20  sales that year for Hughes Network Systems and that was a big

21  event.

22  Q.  That's March 18, 2011, right?

23  A.  Yes, it is.

24  Q.  If you can go to the next one, which is also dated

25  March 18, 2011, this is about the energy saving?

1  A.  Yeah.  We had some of our dealers ask us to start putting

2  out releases that validated the technology more clearly because

3  it was in our sales literature and on our website.  So we

4  extracted this information and put it in this press release.

5  Q.  And if you can look at the next press release, dated

6  March 21, 2011, announcing a municipal installation, which I

7  believe you saw earlier in one of the bestdamnpennystock emails

8  about the fire department?

9  A.  Yes.  This is for the police department and the fire

10 department, Geneva, Illinois.  And this was a significant event

11 because it was definitely one of our first municipal

12 installations.

13 Q.  If you can look at the next press release, which is dated

14 March 23, what was the reason for that press release?

15 A.  This was the first release that described our water

16 treatment system that goes with the technology, very important,

17 again, another release that our dealers were asking us to issue

18 to validate the technology.

19 Q.  If you can look at the next press release dated March 28,

20 2011.

21 A.  Yes.

22 Q.  Why was this press release issued?

23 A.  Commercial installations, testimonials from one of our --

24 couple of our oldest installations.  And, again, another one

25 that we were issuing in support of our dealers to show that the

1   technology was being used and had verifiable results.

2   Q.  If you can look at the next press release, which is dated

3   April 19, 2011, which announces an installation at a Denny's

4   restaurant?

5   A.  Yeah, that was a test installation.  Denny's corporate had

6   approved us for this franchise location.  And it was an

7   important one because it signaled the beginning of our

8   relationship with Denny's restaurants.

9   Q.  This was April 19, 2011?

10  A.  April 19, yes.

11  Q.  If you can look at the next press release, April 21, 2011.

12  A.  Yes.

13  Q.  And this references that Greenway Design is a finalist for

14  the Harvey Mudd award?

15  A.  Yeah, this was a major event.  I spent quite a few months

16  learning thermodynamics and learning how to talk to engineers

17  and made quite a few presentations to engineers at Harvey Mudd

18  College and they selected us as a finalist.

19  Q.  And if you can look at the next press release, which I

20  believe announces Greenway's win of that Harvey Mudd award,

21  June 16, 2011?

22  A.  June 16.  This is a joint release that was released by Tech

23  America and us.  And we beat, in this release, we beat Fisker

24  Automotive, which is one of my crowning jewels here, our

25  crowning glory.  But this was a major, major event.

D3ELLEV2                    Wyman - direct

1   Q.  If you can look at August 18, 2011.

2   A.  Yes.

3   Q.  Talking about a new treatment and filtration system that

4   you got a patent for?

5   A.  Yeah, we filed a patent for it.  We had mentioned it before

6   in an earlier release, but we were re-mentioning it because by

7   that time we had filed a patent.

8   Q.  If you can look at the next press release, which is dated

9   September 13, 2011, what's being talked about in this press

10  release?

11  A.  The Washington University in Missouri approved us for a

12  test on one of their buildings.

13  Q.  If you look at the next press release, which is dated

14  September 14, 2011, about Costa Rica?

15  A.  No, this is testing results, September 13.

16  Q.  Apologies.  I skipped one.  What is this about?

17  A.  We had collected quite a bit of new data on our

18  performance.  Century Link, and I think maybe there was one

19  other -- oh, it was all about Century Link.  Century Link had

20  told us not to use their corporate name in the headline, but we

21  could mention them in the body of the press release.  So this

22  is a way of getting that information out.

23  Q.  Without violating your instructions from your deal?

24  A.  Without violating our instructions, that's right.

25  Q.  And if you can look at the next page, which I think is now

D3ELLEV2            Wyman - direct

1    the Costa Rica?

2    A.   Costa Rica, right.

3    Q.   And what is this press release announcing?

4    A.   Our first installation in Costa Rica, the Banco National in

5    Jaco.

6    Q.   And if you can look next press release, which talks about

7    commercial sales, and that's dated September 26, 2011?

8    A.   Yeah, September 26.  This is announcing that our sales had

9    increased 370 percent over the previous year.

10   Q.   And I think that takes us back to before we started, we

11   went through these press releases, that the stock price went up

12   and down dramatically again September of 2011?

13   A.   Yes.

14   Q.   And what calls did you get at that time, September 2011,

15   from investors or what emails did you get from investors

16   regarding the dramatic increase and drop in the share price?

17   A.   More upset people.  We were beginning to lose our faith --

18   our really high-quality investors that were very upset, angry.

19   And then they started sending me more of the emails that they'd

20   been receiving.

21   Q.   If I can have you look back at Government Exhibit 605-7C,

22   turn to page 18 of the document which are press -- which are

23   emails sent from bestdamnpennystocks started September 13,

24   2011, and just look through them and tell me if you recognize

25   any of these emails from bestdamnpennystocks?

1   A.  Yes, I recognize some of these.

2   Q.  And how do you recognize them?

3   A.  Just some of the verbiage that's used on this, it caught my

4   eye, lots of superlatives that are trying to describe the

5   investment opportunity, I guess.

6   Q.  And were any of the emails contained here in Government

7   Exhibit 605-7C the same as the emails forwarded to you from

8   outside investors?

9   A.  Yes.

10  Q.  What did you tell the outside investors when they were

11  calling and emailing you about what was happening to Greenway

12  Design stock?

13  A.  Well, in September I had to come up with, you know, we had

14  to explain more what was going on with the stock and we told

15  them that it was, you know, probably rogue investors.  We

16  didn't know.  We were really grasping at straws.  But, you

17  know, really we weren't in control of the marketplace.  But

18  most important, that none of our board members or any employee

19  was selling stock.  We were accused of that.  And so that was

20  one of the things I had to tell everybody.

21  Q.  Who was accusing Greenway Design of its board members and

22  employees selling stock they held in Greenway Design?

23  A.  These investors that were calling me.

24  Q.  And why was it important to tell those investors that the

25  stock was not being sold from people inside the company?

1  A.  Well, they didn't want to feel like we were abandoning them

2  or betraying their trust.

3  Q.  I'm going to ask you to look at what's in evidence as

4  Government Exhibit 400-20.  I'm going to ask you to look at the

5  first page, which is a shareholder letter dated September 28,

6  2011.  Do you recall this letter?

7  A.  Yes, I do.

8  Q.  And why do you recall it, what is it?

9  A.  This letter was an attempt to formalize what I'd been

10  telling people verbally on the phone.

11  Q.  Why was it necessary to formalize what you'd been telling

12  people verbally on the phone?

13  A.  As a statement from the corporation.

14  Q.  Why did you believe it was necessary to issue a statement

15  from the CEO of the corporation?

16  A.  Because we felt it needed to be in print and part of our

17  disclosure.

18  Q.  If I can back up for a minute and have you look at what's

19  in evidence as Government Exhibit 104-14.

20  A.  Yes.

21  Q.  Have you look through them, first one is up on the screen.

22  You have it in front of you as well?

23  A.  Yes.

24  Q.  Do you recognize this newsletter from

25  bestdamnpennystock.com?

D3ELLEV2                    Wyman - direct

1   A.  Not this one.

2   Q.  Did you ever authorize or draft anything for

3   bestdamnpennystock.com?

4   A.  We would never say anything speculative about the price of

5   our stock, so no.

6   Q.  If you can look at the second document, Government

7   Exhibit 104-15, another email from bestdamnpennystocks, sort of

8   newsletter?

9   A.  I don't recognize it.  But, again, it's nothing that we

10  would ever submit.

11  Q.  Look at the third document, which is Government

12  Exhibit 104-16, from something called smallcapsource.com?

13  A.  This I recognize.

14  Q.  How do you recognize this?

15  A.  Because of the big bold headline there, smallcapsource.com.

16  Q.  And when was the first time you saw this email to Small Cap

17  Source subscribers?

18  A.  It was emailed to me by an investor.

19  Q.  It was emailed to one of those investors that was angry

20  about the price of the stock plummeting?

21  A.  Yes.

22  Q.  I'm going to ask you to look at the Government

23  Exhibit 104-18 --

24  A.  Yes.

25  Q.  -- from something called Penny Stock Perfection, did you

1  ever see this before?

2  A.  No.

3  Q.  Ask you to look at Government Exhibit 104-19.  It's another

4  email from Penny Stock Perfection to their members about

5  Greenway Design.  Have you ever seen this before?

6  A.  No, I did not.

7  Q.  Ask you to look at Government Exhibit 104-20, web posting

8  from Microstock Profit.  Have you ever seen this before?

9  A.  No.

10  Q.  If I can ask you to look at Government Exhibit 104-21,

11  which is an article from Microstock Profit talking about

12  Greenway Design?

13  A.  This one actually rings a bell.  I think I saw this one.

14  Q.  And in what context did you see it?

15  A.  It was among the emails that was submitted, sent to me by

16  our investors.

17  Q.  Do you see on the second page there's a chart; do you

18  recognize that chart?  Was that --

19  A.  Yeah, it's part of our SEC filings.

20  Q.  What happened after the stock price went up and down

21  September 2011 and Greenway issued the shareholder letter,

22  Government Exhibit 400-20, what happened to the company?

23  A.  Well, we actually our financial situation became dire.

24  Company was unable to pay my bills, my invoices on a regular

25  basis.  The morale of the company and with our investors fell

D3ELLEV2                    Wyman – direct

1   sharply.  I began hearing from our investors that they were

2   leaving and they were getting out.  Some are our older

3   investors, the people who invested in the company when it was

4   still a private company, were pretty upset too.

5   Q.  When you say investors were getting out, what do you mean

6   by that?

7   A.  They were selling out.  They were taking their losses.

8           THE COURT:  Ms. Cohen, would this be a convenient

9   place to take our morning break?

10          MS. COHEN:  Perfect, your Honor.

11          (Recess)

12          THE COURT:  Ms. Cohen, you can proceed.

13          MS. COHEN:  Thank you, your Honor.

14  Q.  Mr. Wyman, when did you stop working for Greenway Designs?

15  A.  September 2012.

16  Q.  And why did you stop doing work for Greenway Designs?

17  A.  The company was no longer paying me.

18  Q.  And why was the company no longer paying you?

19  A.  It had run out of funds.

20  Q.  What was the last thing you did work-wise for Greenway

21  designs?

22  A.  I filed a press release regarding the moratorium of

23  issuance of shares.

24  Q.  And what do you mean by that, what was that press release?

25  A.  The company was promising a six-month cessation of issuing

D3ELLEV2                    Wyman - direct

1    new shares based on various mechanisms that companies use,

2    converting debt into shares and things of that nature.

3    Q.  Why was the company stopping to issue shares in

4    September 2012?

5    A.  Sorry.  Because many of our older investors, debt holders,

6    were cashing out.

7    Q.  When you mean older, do you mean long-term or age-wise?

8    A.  Long-term investors.

9    Q.  Why was it necessary for the company to put a moratorium of

10   selling shares in September 2012?

11   A.  Because the stock was dropping precipitously.  We had gone

12   into sub-penny.

13   Q.  What effect did the stock price that went up and down the

14   two times in March 2011 and again in September 2011, what

15   effect did this have on the company's financial situation?

16   A.  Well, it didn't really have any effect because the company

17   never received any money from the sales of stock.

18   Q.  What effect did the stock price going up and down two times

19   dramatically in 2011 have on the company overall?

20   A.  From, well, everybody felt terrible.  Everybody felt awful

21   about.  And it I believe that it also impacted our customers, a

22   few of our customers were watching.  And I was told actually

23   specifically --

24             MR. SHARGEL:  Objection what he was told.

25             THE COURT:  Sustained.

D3ELLEV2                    Wyman - direct

1   Q.  What was the impact from customers on Greenway Designs?

2   A.  I know from a dealer that a customer was watching our

3   stock.

4           MR. SHARGEL:  Same objection.

5           THE COURT:  Overruled.

6   Q.  You may continue.

7   A.  That a customer, this would be a major one, I can't

8   remember the name of the customer in Oklahoma, and they were

9   watching our stock prices, mainly because they were looking for

10  stability and they didn't see it.

11  Q.  When you left the company, what was the share price at?

12  A.  Sub-penny.  It was below a penny.

13          MS. COHEN:  No further questions, your Honor.

14          THE COURT:  Mr. Shargel.

15  CROSS-EXAMINATION

16  BY MR. SHARGEL:

17  Q.  Mr. Wyman, my name is Jerry Shargel and I represent David

18  Levy.  So I have some questions for you.

19          You said just a few moments ago that investors, that

20  some of the older investors -- not an age, by length of time

21  they had been investors -- that some of the older investors

22  were cashing out; do you remember that?

23  A.  Yes.

24  Q.  And how did they do that?

25  A.  Well, they converted their debt to stock.

D3ELLEV2                    Wyman - cross

1   Q.   And then they sold the stock, right?

2   A.   I assume so.

3   Q.   And, well, that was one of the issues that you had in 2012,

4   right?

5   A.   What they did with their stock after they did that, they

6   talked to me and they made arrangements with Mr. Lafrancois.

7   Q.   And the investors had unrestricted shares, right?

8   A.   The ones that had purchased shares?

9   Q.   Yes.

10  A.   Yes.

11  Q.   And if they could sell the shares, then they would sell the

12  shares, right?

13  A.   Yes.

14  Q.   No question about that, correct?

15  A.   That's right.

16  Q.   Now, in 2012, you said you left the company.  Do you

17  remember the month in 2012?

18  A.   September.

19  Q.   And in the spring of 2012, around April of 2012, was there

20  another promotion of Greenway stock?

21  A.   I don't know anything about a promotion.  I just know that

22  the company was selling, you know, that old debt holders were

23  converting their shares and selling their shares.

24  Q.   So what you know is that the debt holders, meaning people

25  who had advanced money to the company -- and do you know who

1   the largest debt holder was?

2   A.   David Levy was.

3   Q.   He was the largest, right?

4   A.   Yes, he was.

5   Q.   So before we talk about David Levy, the other debt holders,

6   as you described them, were doing all they could to recoup

7   whatever money they could, right?

8   A.   I assume that's what they were doing.

9   Q.   Well, you know from your business experience that those

10  investors had a right to try to recoup their investments,

11  right?

12  A.   Yes.

13  Q.   No question about that, right?

14  A.   That's right.

15  Q.   Nothing improper about that?

16  A.   That's right.

17          MS. COHEN:  Objection, your Honor.

18          THE COURT:  Overruled.

19  Q.   And one of the ways of recouping the investment was to take

20  the stock that they have in the company and to sell the stock,

21  right?

22  A.   Yes.

23  Q.   Now, you said, and I don't want to jump around, but you

24  said that in -- you wouldn't put anything speculative, you

25  wouldn't be speculative in talking about numbers, right?

D3ELLEV2                    Wyman - cross

1    A.  About the share price.

2    Q.  About share prices and revenues, right?

3    A.  That's right.

4    Q.  And, in fact, you said that in connection with the private

5    placement memorandum, that you were the person who would

6    assemble the financial information, right?

7    A.  I assembled the business narrative.

8    Q.  The business narrative, how is that different from the

9    financial information?  Please explain to the jury.

10   A.  The financial information is produced by the CPA.  That's

11   the balance sheet, you know, our ledger, our general

12   accounting.

13   Q.  And that's a report of the present health, financial health

14   of the company, right?

15   A.  Yes.

16   Q.  It's all in the present.  The CPA is giving you a backward

17   look in his study, what's happened in the last year, and if

18   you're on a calendar year or fiscal year, gives you an account

19   of what happened during that year, right?

20   A.  Yes.

21   Q.  What the income was and what the expenses were, right?

22   A.  That's right.

23   Q.  And what profits there were, if any, right?

24   A.  Yes.

25   Q.  And the time you came into the company -- remind us what

1    year that was?

2    A.  2009.

3    Q.  In 2009, at the end of the year, can you remember as you

4    sit here now whether there were profits in the company?

5    A.  No, I do not.

6    Q.  You don't remember or?

7    A.  I don't remember.

8    Q.  And 2010, do you remember whether it was profitable in

9    2010?

10   A.  No, it was not profitable then.

11   Q.  It was running in the negative, right?

12   A.  Yes, it was.

13   Q.  So you were still dependent upon investors, right?

14   A.  Yes.

15   Q.  You were still dependent on fresh money, right?

16   A.  Yes.

17   Q.  And David Levy over here, your largest investor, you were

18   depending on him, right?

19   A.  Yes.

20   Q.  And you knew that he was doing everything he could to raise

21   money, right?

22           MS. COHEN:  Objection, your Honor.

23           THE COURT:  Overruled.

24   A.  Yes.

25   Q.  And raise money, one way to raise money was in connection

D3ELLEV2                    Wyman - cross

1    with the private placement memo, right?

2    A.  Yes.

3    Q.  And that was to see if you could go out and not only bring

4    his money into the company, but to bring fresh or new money

5    into the company, right?

6    A.  Yes.

7    Q.  Because this startup company needed to -- needed capital to

8    keep it afloat until it could float by itself, right?

9    A.  Yes.

10   Q.  Or swim by itself, better said, right?

11   A.  Yes.

12   Q.  And from the time you joined that company to the time that

13   you left in 2012, was there ever a moment when it was, if I

14   could borrow the metaphor, swimming by itself?

15   A.  No.

16   Q.  In 2011, 2011, when you drew the -- I'm sorry -- 2010, when

17   you drew -- I stand corrected -- when you drew the private

18   placement memorandum; you recall that?

19   A.  Yes, I do.

20   Q.  You told us that you had a background in journalism, right?

21   A.  Yes.

22   Q.  So you know how, and based on that and based on your long

23   business experience, you knew how to do a private placement

24   memo, right?

25   A.  I knew how to write the business narrative.

D3ELLEV2                    Wyman - cross

1   Q.  What was the business narrative?  Please define that for

2   us --

3   A.  Describe --

4   Q.  -- as you're using the term.

5   A.  Describing the product, describing how it works, what

6   markets it applies to, describing the customer, describing the

7   conditions of the marketplace.

8   Q.  Is it fair to say that the objective is to put it, put the

9   company in the most favorable light consistent with truth and

10  accuracy; is that a fair statement?

11  A.  Consistent with truth and accuracy, yes.

12  Q.  And let me show you what's been marked as Defendant's

13  Exhibit A303 for identification.  Do you recognize it?

14  A.  Yes.

15  Q.  What do you recognize it to be?

16  A.  The private placement memorandum.

17          MR. SHARGEL:  I offer it in evidence.

18          MS. COHEN:  No objection, your Honor.

19          THE COURT:  303 is in evidence then.

20          (Defendant's Exhibit A303 received in evidence)

21          MR. SHARGEL:  Yes.

22  Q.  And just tell us the date so we have a record of some

23  certainty, the date of the memorandum.

24  A.  Well, I finished it in February.

25  Q.  Of '10?

1   A.  Of two thousand -- no, 2011.

2   Q.  2011?

3   A.  I think so.

4   Q.  Do you want to take a look at it again?

5   A.  Yeah, please.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3erlev3              Wyman - cross

1  A.  I was writing this from November 2010 on, so there is

2  material here.  But I had the impression --

3  Q.  Could you speak a little louder.

4  A.  I started writing this in November 2010.

5  Q.  When was it completed?

6  A.  I believe it was --

7  Q.  The best you can recall.  I'm not pinning you to --

8  A.  February 2011.

9  Q.  May I have it for a moment?

10  A.  Yes.

11  Q.  Thank you.  You said at the beginning of your testimony

12  that David Levy paid you and -- I'm sorry.  You said you

13  started writing it in November of 2010?

14  A.  I believe so, yes.

15  Q.  Let me show you what's been marked for identification as

16  Defense Exhibit A302.  I put this in front of you.  I'm going

17  to ask you to take a look at it and see if it refreshes your

18  recollection as to when you wrote this and when it was

19  completed.

20  A.  This is correspondence between Kevin Reed, our general

21  manager, and somebody named Swartzburg, Michael Swartzburg.

22  Q.  Yes.  My question to you is, does it refresh your

23  recollection?

24  A.  Yes.

25  Q.  As to the dates?

D3erlev3                    Wyman - cross

1    A.   Yes.

2    Q.   Could you tell the jury, please, what dates, now that your

3    recollection is refreshed.

4    A.   March 2010.

5    Q.   May I have the document.

6            THE COURT:  You started in March of 2010, not November

7    of 2010?

8            THE WITNESS:  Yes, I think maybe that is more

9    accurate.  Sorry.

10   Q.   Actually, already you had a first draft in March of 2010,

11   correct?

12   A.   Right.

13   Q.   Actually, this was being distributed in March of 2010,

14   right?

15   A.   I don't remember.  I really, honestly don't remember.

16   Q.   Let me show you what's been marked as Defense Exhibit A300

17   for identification.  I put this in front of you and I ask you

18   if this refreshes your recollection about whether it was in

19   March of 2010 that this private placement memo that you drew

20   began to be circulated.

21   A.   Yes, it seems to follow that it was distributed, or at

22   least the first draft was available by March 10, 2010.

23   Q.   Do you remember telling us at the beginning of your direct

24   testimony that there came a time when David Levy called you on

25   the telephone and asked you for a copy of that in Word?

D3erlev3                    Wyman - cross

1    A.  Yes, he did.

2    Q.  Was there a draft circulated that was not in Word, PDF,

3    Adobe?

4    A.  It was a PDF document, right.

5    Q.  That's the same as Adobe?

6    A.  Yes.

7    Q.  That means you can't cut and paste from it if it's sent in

8    that format?

9    A.  I wouldn't say you can't.  You can.

10   Q.  But the request, as you testified, was for a Word version,

11   right?

12   A.  Yes.

13   Q.  It was David Levy's request?

14   A.  Yes.  I submitted a Word document.

15   Q.  If you submitted as a Word document, do you know about a

16   Word document being distributed?  I show you what has been

17   marked as Defense Exhibit A301 for identification.  I ask you

18   to take a look at that.  How many people in the company had put

19   in a request for a Word document or received a Word document?

20   A.  Everybody.

21   Q.  David Levy was asking you for a Word document?

22   A.  Yes.

23   Q.  And it was distributed to whom?

24   A.  To David Levy.

25   Q.  Who else?

D3erlev3                    Wyman - cross

1    A.  Kevin Reed, who was also editing.

2    Q.  Yes, and who else?

3    A.  Ben Lefrancois.

4    Q.  Anyone else?

5    A.  Yes, Robert Jakubik.

6    Q.  My question to you, sir, is after you circulated the Word

7    document, were there edits that were sent back to you?

8    A.  Yes.

9    Q.  Did you incorporate any of those edits or suggestions into

10   the Word document?

11   A.  Yes.

12   Q.  Did you incorporate those changes or suggestions?  First of

13   all, who made them?  Let's start with that.  Who made the

14   suggestions?

15   A.  Everybody.

16   Q.  That included Mr. Lefrancois, right?

17   A.  Yes.

18   Q.  That included Mr. Reed, correct?

19   A.  Yes.

20   Q.  Anyone who received a copy of the Word document suggested

21   that there were edits to be made, right?

22   A.  Yes.

23   Q.  You were the person in charge, right?

24   A.  Yes.

25   Q.  You were the final scribe in connection with this, right?

D3erlev3                    Wyman - cross

1    A.   Yes.

2    Q.   You gathered information when you put this private

3    placement together, you gathered information from internal

4    sources, right?

5    A.   And external.

6    Q.   What was the external sources you were canvassing?

7    A.   The Department of Energy.

8    Q.   The United States Department of Energy?

9    A.   Yes.

10   Q.   And statistics and information with regard to that agency,

11   right?

12   A.   Yes.

13   Q.   What other source?

14   A.   Ed Begley, Jr.

15   Q.   He was --

16   A.   Celebrity.

17   Q.   The talent or the celebrity?

18   A.   Yes.

19   Q.   May I ask this question.  I have to ask this question.  Did

20   you really think that because Ed Begley, Jr. liked this

21   product, everyone would rush out and buy it?

22            MS. COHEN:  Objection, your Honor.

23            THE COURT:  Sustained.

24   Q.   Actually, the person who asked for the Word document was

25   Kevin Reed, not David Levy, correct?

D3erlev3          Wyman - cross

1   A.  No.  David Levy asked me for the document.  I received a

2   phonecall.  As I said, he was a cheerleader.  He wanted to make

3   sure that I was doing my job right.  I know that David Levy

4   asked me to send the document.

5   Q.  Do you remember Kevin Reed asking to receive a copy of the

6   document in Word?

7   A.  Oh, yes, multiple times.

8   Q.  So he wanted a copy in Word as well?

9   A.  Every time there was a draft.

10  Q.  I don't want to belabor this.  The point is that everyone

11  or anyone who asked for the Word version would get the Word

12  version, right?

13  A.  Absolutely, yes.

14  Q.  And anyone and everyone who had something to say would go

15  back to you, right?

16  A.  Yes.

17  Q.  The Word version, whether it was red-lined or changed,

18  however it was, came back to you, right?

19  A.  Yes.

20  Q.  When it came back to you, you were the person who made the

21  ultimate decision as to what should be added, edited, changed,

22  or not, right?

23  A.  Per instructions.

24  Q.  Per instructions from Mr. Lefrancois?

25  A.  Yes.

D3erlev3              Wyman - cross

1    Q.  Certainly David Levy wasn't saying take this, he wasn't

2    giving you orders to take something out or put something in,

3    right?

4    A.  No.  He wasn't my client.

5    Q.  He was not your client, he was not your boss, right?

6    A.  That's right.

7    Q.  He did not in any way suggest that you change numbers or

8    change facts or change figures, right?

9    A.  No, he did not.

10   Q.  Going back for a moment, and I'll come back to that

11   subject, going back to the idea of whether speculative

12   information would be contained in anything that went out to the

13   public, I show you what is now in evidence as A303.  I'm going

14   to direct you to a certain page.  We don't have it in the

15   computer.  I'll work without it.

16          MR. SHARGEL:  I'm going to do it the old-fashioned

17   way, Judge.

18          THE COURT:  OK.  We'll enjoy that.

19   Q.  Let me show you page 24 of A303.  This is a document in

20   evidence.  What you have here, if I may -- this is the

21   old-fashioned way.  I'll show you.

22          MR. SHARGEL:  May I publish this to the jury, your

23   Honor?

24          THE COURT:  Please.

25   Q.  All right.  This is the old-fashioned way.  The projected

D3erlev3                    Wyman - cross

1    revenues, the highlights, the objective were $50 million in

2    2011, more than a hundred million dollars in revenue in 2012 in

3    sales, in sales, more than $150 million in 2013, and in 2014

4    approximately $200 million in sales.  Do you see that.

5    A.  Yes.

6    Q.  Now I'm going to turn the page to page 36.

7         MR. SHARGEL:  I'm going to ask permission to publish

8    this.

9    Q.  This is sales by year.  This is a summary, right?, sales by

10   year:  2010 under $50 million, somewhere between zero, closer

11   to zero, and $50 million, pretty close to zero; 2011

12   $50 million; 2012, over $100 million; 2013 almost $200 million;

13   in 2014 $250 million.  Do those numbers sound familiar to you,

14   sir?  You went over this carefully before it ever got out of

15   your hands, right?

16        MS. COHEN:  Your Honor, if he could ask a question.

17        THE COURT:  If that's an objection, it's overruled.

18   Q.  You went over it carefully before you let this out of your

19   hands?  The whole document.  I'm not isolating a page.  This

20   document.

21   A.  Yes.

22   Q.  On page 42 also projections and yearly gross margin, do you

23   see that?  2014, again $104 million in cash balance,

24   $104 million.  Is it fair to say that these numbers are

25   speculative?

D3erlev3                    Wyman - cross

1    A.  Yes.  They are in our private placement memorandum.

2    Q.  But the private placement memorandum was not some secret

3    document that you kept in a safe in the office.  This was

4    intended to be shown to potential investors, right?

5    A.  To investors that received our questionnaire and were

6    qualified.

7    Q.  Qualified investors?  You weren't being that picky, were

8    you, about who was investing?  You needed cash very

9    desperately, right?

10   A.  We followed rules.  We had questionnaires filled out, and

11   people subscribed and promised that they wouldn't release the

12   information.  So this was not a press release.

13   Q.  This was not a press release, but this was a document that

14   contained accurate information, right?

15   A.  What we believed to be accurate, yes.

16   Q.  Including within it speculation, fair statement?

17   A.  Yes.

18   Q.  Now I'm going to ask you a question about the press

19   releases.  You as an experienced journalist knew that they had

20   to be truthful and accurate, right?

21   A.  Yes.

22   Q.  Each one of the press releases that were put before you by

23   the government, by Ms. Cohen, when she put them before you and

24   you looked at press release after press release, is there

25   anything that you wrote in any one of those press releases that

D3erlev3          Wyman - cross

1    was not truthful and accurate?

2    A.   Nothing.

3    Q.   You didn't put anything in your press release that was

4    intended to mislead the public, right?

5    A.   Did not.

6    Q.   This is, like you said you gave Mr. Levy, press release 101

7    or however you phrased it, right?  Basic rules regarding press

8    releases, right?

9    A.   Yes.

10   Q.   You knew and you were well familiar with and had experience

11   in the area of issuing press releases, right?

12   A.   Yes.

13   Q.   You had been doing that as an important part of your

14   professional résumé, right?

15   A.   Yes.

16   Q.   That was something that you were well qualified to do,

17   right?

18   A.   Yes.

19   Q.   Keep your voice up a teeny bit.

20   A.   Yes.

21   Q.   Maybe get closer to the microphone.  You knew that a press

22   release, by its terms, to go back to 101, by its terms, press

23   release means that the public is going to get information

24   through the media, right?

25   A.   Yes.

D3erlev3                    Wyman - cross

1    Q.  That is something different than a private placement

2    memorandum because there is nothing confidential about a press

3    release, right?

4    A.  That's right.

5    Q.  It doesn't say on the top on any one that you saw or had in

6    front of you or ever wrote, it doesn't say "confidential press

7    release," does it?

8    A.  That's right.

9    Q.  A press release is like spreading the good news, right?

10   A.  Yes.

11   Q.  Seriously, you were out there trying to get good news about

12   the company published, right?

13   A.  Yes.

14   Q.  You didn't want to just sit in your office.  You wanted

15   people to start reporting and circulating and acting,

16   purchasing, investing?

17   A.  Yes.

18   Q.  Based on the press release, right?

19   A.  Yes.

20   Q.  Every time that there was a good story that went out, a

21   positive event or development, you wanted to get that out there

22   in the public, right?

23   A.  Yes.

24   Q.  You weren't trying to fool or deceive anyone, right?

25   A.  That's right.

D3erlev3            Wyman - cross

1    Q.  If that got picked up, your press release -- by the way,

2    how did that work?  The press release is drawn, it's ready for

3    release.  I'll make up a date.  March 14th, like today.  Is it

4    the 14th?  March 14th you issue a press release on behalf of

5    the company.  What happens next in terms of media attention?

6    Please tell us.

7    A.  It's a little different than it's been in past years.  We

8    send it out on the wire, like a Market Wire or PR Newswire.

9    Then those releases are picked up by outlets like Google News,

10   Yahoo! News.

11   Q.  Bloomberg?

12   A.  Yes, Morningstar, those outlets.  They disseminate that

13   information directly to the reading public.  We don't wait for

14   news editors to pick up our release anymore.  We send it out

15   directly to the audience.

16   Q.  If a news organization, whether it's Barron's or Wall

17   Street Journal or New York Times, if a news organization has

18   someone from the financial pages for the business section of

19   the Times, for example, reading the wire and gathering this

20   positive information about the company and the product, only

21   the company and the product, what the company's objectives are

22   and developments in Mexico or whatever it is, those people are

23   free to write a story about the company, aren't they?

24   A.  Yes.

25   Q.  They are free to look at the Pink Sheets and suggest that

D3erlev3          Wyman - cross

1   this might be something worth looking into and purchasing, a

2   stock that might be worth purchasing, they are free to do that,

3   right?

4   A.  Yes.

5   Q.  There is no need to call you on the phone to say if

6   Bloomberg picks it up, does Bloomberg have to call you on the

7   phone and say, sir, do I have your permission to write a story

8   about your product?

9   A.  No.

10  Q.  You're delight that had a story is picked up by Bloomberg

11  or any other news outlet, right?

12  A.  Yes.

13  Q.  They don't have to say, could we have your permission to

14  write a story, right?

15  A.  No.

16  Q.  If someone were picking this up, whether it's a tout or

17  whether it's someone who professes to be an expert at picking

18  stock, whatever it is, they are using your news release to

19  report the story, right?

20  A.  Yes.

21  Q.  If they pick up on truthful and accurate information, that

22  is entirely proper, right?

23  A.  Yes.

24  Q.  No question about that, right?

25          THE COURT:  Do you have any questions about that, Mr.

1    Wyman?

2    A.  No.

3            MR. SHARGEL:  I think I'm done.  No further questions.

4            THE COURT:  Ms. Cohen?

5            MR. SREBNICK:  I have no questions, Judge.

6    REDIRECT EXAMINATION

7    BY MS. COHEN:

8    Q.  Mr. Wyman, are people free to use the press releases that

9    you write to make false statements about stock in Greenway

10   Design?

11   A.  Would you repeat that, please?

12   Q.  Sure.  Are people free to use your press releases about

13   false statements about the share price of the stock in Greenway

14   Design?

15   A.  They can use a press release for anything they want.

16   Q.  Are they free to use your press release to manipulate the

17   stock?

18           MR. SHARGEL:  Objection.  I'm going to object to this.

19           THE COURT:  Overruled.

20   A.  Yes.

21   Q.  You were asked some questions about what you wanted the

22   public to do with your press releases while you were

23   disseminating them.  Do you remember that, on cross?

24   A.  Yes.

25   Q.  Was one of the things you wanted to be done with your press

D3erlev3          Wyman

1    releases was to have them used by Best Damn Penny Stocks to

2    manipulate the stock?

3          MR. SREBNICK:  Objection to the term "manipulate."

4          THE COURT:  Overruled.

5    A.  I have no determiner as far as who reads our press release.

6    Anybody can use it.

7    Q.  You were asked on cross I think a couple of questions about

8    what you wanted the press releases to do in the marketplace.

9    You wanted them to help sell the product and to help promote

10   the product.  Do you recall that line of cross?

11   A.  Yes.

12   Q.  Was one of the things you wanted to do by issuing the press

13   releases, did you want different websites and email addresses

14   to send out press releases about the stock price?

15   A.  No.  I really wanted people to use what I wrote and use it

16   faithfully, truthfully.

17   Q.  Also on cross you were asked if you were happy if the New

18   York Times or The Wall Street Journal wrote about Greenway

19   Design, do you recall?

20   A.  Yes, I would be very happy.

21   Q.  Were you very happy, "delighted" I think was your word,

22   when you saw the emails from the investors about what you said

23   about Greenway Design in Best Damn Penny Stocks?

24   A.  I was devastated, actually.

25   Q.  You talked about the private placement memorandum and that

D3erlev3          Wyman

1  you had sent out a questionnaire to prospective investors to be

2  certified.  Do you recall that?

3  A.  Yes.  The private placement memorandum is a package.  It's

4  three documents.  There is a questionnaire, there's a

5  subscription agreement, and then there is the private placement

6  memorandum, the document itself that describes the company.

7  Q.  What is the questionnaire?

8  A.  The questionnaire is a suitability questionnaire.  We want

9  to know who these people are.  We want to know if they are a

10  viable investor.

11  Q.  Why does Greenway Design want to know who is getting a copy

12  of the private placement memorandum?

13  A.  They have to have the wherewithal to be able to invest in

14  the company.

15  Q.  What is the subscription agreement that you also send along

16  with the private placement memorandum?

17  A.  Once we agree that they are suitable investor, then we

18  authorize the subscription agreement for them to purchase

19  shares from the company at a discounted rate.

20  Q.  You were shown the private placement memorandum.  On the

21  cover of it says "confidential."  Do you recall that?

22  A.  Yes.

23  Q.  Why does it say "confidential" on the face of the document?

24  A.  Because I put it there.

25  Q.  Why did you put it there?

D3erlev3          Wyman

A.  Because I was instructed.  It's a document that doesn't go

out to the public.

Q.  You were also asked some questions about numbers in the

private placement memorandum that Mr. Shargel called

speculative.  Do you remember that?

A.  Yes.

Q.  Why are speculative numbers in a private placement

memorandum?

A.  We're giving the investor an idea of what might happen if

we got full funding in our marketing and in our operations.

Q.  Would you use those same speculative numbers in a press

release for the company?

A.  No.

Q.  Why not?

A.  For one thing, we would get into a lot of trouble for that.

But it's not truthful, it's not newsworthy, it's based on our

guesses.

Q.  Do you recall you were asked some questions on cross-

examination about David Levy, instructions he did not give to

you about the private placement memorandum?  Do you remember

Mr. Shargel asked you did David Levy tell you to change the

private placement memorandum?

A.  I remember that.

Q.  After you sent the private placement memorandum in Word to

David Levy, what discussions did you have?  Did David Levy call

1    you and tell you you had to change the document or edit it in

2    any way?

3    A.  No, he did not.

4    Q.  What other investors did David Levy bring to Greenway

5    Design?

6    A.  I do not know.

7         MS. COHEN:  No further questions, your Honor.

8         MR. SHARGEL:  Very briefly.  May I?

9         THE COURT:  Yes.

10   RECROSS-EXAMINATION

11   BY MR. SHARGEL:

12   Q.  Did I hear you say that you would send out the private

13   placement memo to potential investors along with the

14   questionnaire?

15   A.  I believe that the sequence of events was that the

16   questionnaire would go to the investor first.

17   Q.  You would get the questionnaire back and then decide

18   whether to send the private placement memo?

19   A.  Yes.  Actually, that decision wasn't mine.  It was other

20   people.

21   Q.  You were familiar enough with the company to know that

22   that's what would happen?

23   A.  That's right, yes.

24   Q.  The two items didn't go out at the same time, it was one

25   after another, right?

D3erlev3          Wyman - recross

1   A.  One after another, yes.

2   Q.  The questionnaire came back, someone looked at it, and the

3   private placement memo was sent out?

4   A.  Yes.

5   Q.  The private placement memo was after the questionnaire had

6   demonstrated that these were qualified investors, right?

7   A.  That's right.

8   Q.  Both amount of money, level of sophistication perhaps, that

9   they were qualified investors?

10  A.  Yes.

11  Q.  The whole idea was to attract, to then attract an

12  investment, right?

13  A.  Yes.

14  Q.  The idea that it was confidential or the numbers you didn't

15  want to get out, you certainly didn't want to fool anyone with

16  those numbers, right?

17  A.  No.

18  Q.  Those were the product of an honestly held belief that this

19  is where the company may go under the right circumstances,

20  right?

21  A.  Well, there was a huge disclaimer, about I think almost 15

22  pages, that says you could lose money on this thing.

23  Q.  That disclaimer is important, isn't it?

24  A.  Yes.

25          MR. SHARGEL:  No further questions.

1    MS. COHEN:  Nothing further, your Honor.

2    THE COURT:  Mr. Wyman, you are excused.  Thank you

3  very much.

4    (Witness excused)

5    THE COURT:  Do you have a next witness?

6    MS. COHEN:  Your Honor, the government calls Wieghaus

7  W-I-E-G-H-A-U-S, I believe.

8    THE CLERK:  Please spell your name for the record.

9    THE WITNESS:  Mark, M-A-R-K.  The last name is

10  W-I-E-G-H-A-U-S.

11   MARK WIEGHAUS,

12     called as a witness by the government,

13     having been duly sworn, testified as follows:

14    THE COURT:  Mr. Weighaus, please sit down.  Speak

15  right into the microphone.

16    Ms. Cohen.

17  DIRECT EXAMINATION

18  BY MS. COHEN:

19  Q.  Mr. Wieghaus, how old are you?

20  A.  59.

21  Q.  Where do you live?

22  A.  I live in Emerson, New Jersey.

23  Q.  Are you married?

24  A.  Yes.

25  Q.  How many children do you have?

```
       D3erlev3              Wieghaus – direct
```

1   A.   Three.

2   Q.   Are they young, grown, out of the house?

3   A.   Grown.

4   Q.   Where do you work now?

5   A.   I work for Toshiba Corporation.

6   Q.   What is your title at Toshiba?

7   A.   My title is director of operations.

8   Q.   In general, what are your duties and responsibilities as a

9   director of operations at Toshiba?

10  A.   I manage the order process, purchasing, inventory, and

11  distribution functions.  We distribute copiers, multifunction

12  copiers, in the tri-state area.

13  Q.   By copiers, are you referring to photocopiers?

14  A.   Yes.

15  Q.   How long have you work at Toshiba?

16  A.   About a year and a half.

17  Q.   What were you doing prior to working at Toshiba?

18  A.   Prior to that I was unemployed for about 14 months.  Then

19  prior to that I worked for Ricoh Corporation for about 22

20  years.

21  Q.   What did you do at Ricoh Corporation?

22  A.   My last position, I was a manager of supply chain.

23  Q.   What types of products were you working on for Ricoh?

24  A.   The same, photocopiers.

25  Q.   When you were working at Ricoh, how did you invest your

D3erlev3                    Wieghaus - direct

1    money?

2    A.   Over the years, just through the 401(k) plan that the

3    company provided.

4    Q.   What investing could you do with the money you held in

5    Ricoh's 401(k) while you were at Ricoh?

6    A.   You could just invest in various mutual funds.

7    Q.   What happened when you left Ricoh's employment with respect

8    to the money held in the 401(k) there?

9    A.   I transferred it out of the company 401(k) plan and into an

10   IRA type account.

11   Q.   When you left Ricoh, was it mandatory that you take the

12   money out of its 401(k) plan?

13   A.   No, it wasn't mandatory, no.

14   Q.   Where did you move your money to?

15   A.   I moved some of it, I think half to an IRA account that I

16   was invested in mutual funds, and then another part into like a

17   stock type trading account.

18   Q.   Did you move it in equal parts?

19   A.   Pretty much, yes.

20   Q.   What was the total amount of the 401(k) from your 22 years

21   at Ricoh?

22   A.   About 250,000.

23   Q.   So the half of it is about 125,000?

24   A.   Roughly, yes.

25   Q.   The 125,000 that you moved into the mutual fund account,

1    what trading could you do in that account?

2    A.   Very little.  Just in mutual funds.

3    Q.   The other half of the 401(k), the other 125,000 you said

4    you put in a stock trading account?

5    A.   Yes.

6    Q.   Where was that stock trading account?

7    A.   With TD Ameritrade.

8    Q.   Other than those two accounts, did you have any other

9    investments or savings accounts?

10   A.   Very little.

11   Q.   Around what time period did you split your 401(k) half into

12   a mutual fund account and half into a trading account?

13   A.   Roughly at the end of 2010, like December 2010, maybe

14   January 2011.

15   Q.   Is that after you had left Ricoh?

16   A.   Yes.

17   Q.   What did you do with the money that went into your IRA

18   stock trading account?

19   A.   I started to invest in various types of stocks.

20   Q.   What types of stock did you invest in?

21   A.   All types.  Large corporations, medium size, and small.

22   Q.   When you say small, what are you talking about?

23   A.   Some small startup companies.

24   Q.   How did you decide what stocks to trade in?

25   A.   I had subscribed to some various type stock newsletters.

D3erlev3                    Wieghaus - direct

1   Q.  Do you recall the names of any newsletters you subscribed

2   to?

3   A.  I think one was called like Stansbury Research, something

4   to that effect.  I think The Street.  Then there may have been

5   one other.  Then over the course of time some like penny stock

6   newsletters.

7   Q.  What penny stock newsletters did you subscribe to?

8   A.  I think one was called the Penny Stock News or something

9   like that.  Then another one was Best Damn Penny Stocks.

10  Q.  How do you subscribe to, for example, Best Damn Penny

11  Stocks newsletter?

12  A.  I probably received an email and then I signed up on their

13  website.

14  Q.  How do you sign up on the went to receive a newsletter from

15  Best Damn Penny Stocks?

16  A.  You give them your email address.

17  Q.  Do you pay anything to be a subscriber?

18  A.  Excuse me?

19  Q.  Do you pay any fee to be a subscriber?

20  A.  No, not on that specific one.  Others, yes.

21  Q.  After you provide Best Damn Penny Stocks with your email

22  address, how often do you receive newsletters from Best Damn

23  Penny Stocks?

24  A.  They would vary, but you would get several in a day and

25  then nothing for a week.  So it varied.

                D3erlev3                Wieghaus - direct

 1   Q.  Why did you sign up to receive, for example, the Best Damn

 2   Penny Stock newsletter?

 3   A.  Just looking for different types of investments.

 4   Q.  At some point in time did you learn about a company called

 5   Greenway Design?

 6   A.  Yes.

 7   Q.  How did you learn about Greenway Design?

 8   A.  Through an email that I received from Best Damn Penny

 9   Stocks.

10   Q.  What did you learn about Greenway Design through the email

11   you got from Best Damn Penny Stocks?

12   A.  That it was a startup company and they had some products

13   that saved energy, and that they were in the process of

14   manufacturing them and doing field testing and then trying to

15   start generating revenue to operate the company.

16   Q.  What did you do after you read about --

17            THE COURT:  Excuse me.  Speak right into the

18   microphone so the jury can hear you.

19            THE WITNESS:  OK.

20            THE COURT:  Go ahead.

21   Q.  What did you do after you read about Greenway Design in the

22   Best Damn Penny Stock newsletter?

23   A.  I tried to do some additional research into the company,

24   which you can do on the Internet in general or through the TD

25   Ameritrade trading account, where they give you information on

D3erlev3                    Wieghaus - direct

1  the companies.

2  Q.  What did you look at with respect to Greenway Design on the

3  Internet?

4  A.  It gives you the basic information:  Press releases from

5  the company itself, just general information about their

6  products and what their goal is and what they are trying to do.

7  Q.  When you looked online, did you look online to see a

8  website for Greenway Design, the company?

9  A.  Yes, I think I did visit the actual website.

10 Q.  Why did you do additional research online about Greenway

11 Design after reading about it in the Best Damn Penny Stock

12 email?

13 A.  I just tried to get information from various sources just

14 to sort of confirm things.

15 Q.  What do you mean by confirm things?

16 A.  That you read just to confirm that the company was involved

17 in the manufacture of the, I forget the name, I think it was

18 Cool-n-Save, a product to save electricity with air

19 conditioning systems.

20 Q.  After you did the additional research online about Greenway

21 Design, what did you do with respect to any investment of your

22 money in Greenway Design stock?

23 A.  I started to make some investments in Greenway Design.

24 Q.  Do you recall when it was that you started investing in

25 Greenway Design?

D3erlev3                    Wieghaus - direct

1   A.  I think it was March 2, 2011.

2   Q.  Did you make subsequent investments in Greenway Design?

3   A.  Yes, I did.

4   Q.  I'm going to ask you to look at a document that's been

5   marked for identification Government Exhibit 400-28.  I ask you

6   if you recognize it, and if so, what is it?

7   A.  Yes, I recognize it.  It's a detailed transaction log of

8   the transactions of the stock that I had purchased, of the

9   sales and purchases that I provided to you.

10  Q.  That document, where does it come from?

11  A.  It comes from the TD Ameritrade account.

12          MS. COHEN:  Your Honor, the government moves

13  Government Exhibit 400-28 into evidence.

14          MR. SHARGEL:  No objection.

15          THE COURT:  400-28 is in evidence.

16          (Government's Exhibit 400-28 received in evidence)

17          MS. COHEN:  Mr. Dinet, if we can publish it, please.

18  Q.  If you could please explain for us what is shown here on

19  Government Exhibit 400-28.

20  A.  It shows all the detailed transactions of purchases and

21  sales of the GDGI symbol, which is the symbol for Greenway

22  Design.

23  Q.  You see in the amount column it has negatives sometimes and

24  positives.

25  A.  Right.

D3erlev3                    Wieghaus - direct

1    Q.  Did you that mean a loss or a profit?  What does that mean?

2    A.  No.  The negative indicates that it was a purchase, meaning

3    money went out of my account.  Then the positive would be a

4    sale, which means money into the account.

5    Q.  On this document it shows all your trades, buying and

6    selling, of Greenway Design starting on March 22, 2011?

7    A.  Yes.

8    Q.  Do you recall when was the stock of Greenway Design at its

9    highest price level?

10   A.  I believe right near the end of March, right around the end

11   of March in 2011.

12   Q.  Was that when you first started buying the stock, when it

13   was at its high price?

14   A.  Yes, slightly before that.

15   Q.  I ask you to look at what's in evidence subject to a

16   stipulation as Government Exhibit 605-7C.  I ask you to look at

17   those.  For the record, those are emails from Best Damn Penny

18   Stock starting March 22, 2011.

19   A.  Yes.

20   Q.  Do you recognize any of those emails?

21   A.  Yes, I recognize most of them.

22   Q.  How do you recognize them?

23   A.  Just from remembering what I was reading about the company

24   I think actually one thing was these particular newsletters,

25   quite often they talked about people trying to short the stock.

D3erlev3                    Wieghaus - direct

 1  I remember that.  That's something a lot of them did.

 2  Q.  What about when you got the emails from Best Damn Penny

 3  Stocks starting March 22, 2011, which was the first day you

 4  bought stock in Greenway Design, right?

 5  A.  Yes.

 6  Q.  What about those email newsletters led you to invest in

 7  Greenway Design?

 8  A.  They provided information about the company.  I guess

 9  together with whatever research that I had done, I thought it

10  would be a good investment.

11  Q.  Do you see -- look at the first one, for example, I think

12  it is the second or third page -- there is some sort of

13  disclaimer on the bottom?

14  A.  Yes.

15  Q.  Do you recall if you read the disclaimer when you got the

16  email?

17  A.  No, I didn't.

18  Q.  Why not?

19  A.  Disclaimers are in agreements all over the place.  I don't

20  generally read them.

21  Q.  What happened to the stock price after you started buying

22  Greenway Design starting on March 22, 2011?

23  A.  The stock price went up for a short period of time and then

24  started to go down.

25  Q.  What did you do when the stock price started to go down?

D3erlev3                    Wieghaus - direct

1   A.  In this case I was purchasing more.

2           MS. COHEN:  Mr. Dinet, if you can put back the 400-28

3   in evidence.  Thank you.

4   Q.  Why did you buy more stock when the stock price started to

5   go down?

6   A.  I guess I originally intended that it was a good company

7   and that long term it would be good.

8   Q.  What happened to your investment?  Overall, how much did

9   you invest in Greenway Design?

10  A.  I'm not sure of the amount.  This shows just the net

11  result.

12  Q.  How much money did you lose in Greenway Design?

13  A.  107,000.

14  Q.  In the stock trading account you had 125,000?

15  A.  Yes.

16  Q.  You lost 107,000 of that?

17  A.  Yes.

18  Q.  So most of it?

19  A.  Mm-hm.

20  Q.  The only other savings account you had at the time was the

21  other 125 in mutual funds?

22  A.  Yes.

23  Q.  That was from your 20 years working at Ricoh, right?

24  A.  Yes.

25          MS. COHEN:  A moment to confer, your Honor?

1           THE COURT:  Yes.

2           MS. COHEN:  No further questions, your Honor.

3           THE COURT:  Mr. Shargel.

4    CROSS-EXAMINATION

5    BY MR. SHARGEL:

6    Q.  Do you have a paper copy of this exhibit in front of you,

7    of your purchases and sales?

8    A.  Yes.

9    Q.  May I take it from you, please.  The first page of this

10   transaction, if we could go to the first page.  Is it possible

11   to blow up, say, the first third of the page.  We'll come back

12   to this in one second, for now we will have it on the screen.

13           You have a full-time job at Toshiba?

14   A.  Yes.

15   Q.  Back in 2011 you were employed full time as well?

16   A.  No.

17   Q.  What was your employment then?

18   A.  I was unemployed.

19   Q.  That's right.  I think you said on direct examination you

20   were unemployed for, what, how many months?

21   A.  I think like 14 months.

22   Q.  You had money in a 401(k) that you took out and you had

23   money in a 401(k) that you withdrew from the 401(k), right?

24   A.  Yes.

25   Q.  Then you put into --

D3erlev3                    Wieghaus - cross

1    A.  Into an IRA.

2    Q.  You had purchased penny stocks before, right?

3    A.  Yes, but only maybe like a year before.

4    Q.  At this time in March of 2011, you were unemployed?

5    A.  Yes.

6    Q.  You bought 5,000 shares of Greenway on March 22nd, right?

7    A.  Yes.  This shows the actual trades that were made but not

8    the actual, let's say, trades that I entered.  In other words,

9    if you see like two purchases there, one for 5,000 and a second

10   line says 10,000, I may have put out a purchase order for

11   15,000 and then purchased two different transactions.

12   Q.  Two tranches, two sections, correct?

13   A.  Yes.

14   Q.  That could have been at one time.  Then on the same day,

15   March 22, 2011, you sold 5,000 shares, right?

16   A.  Yes.

17   Q.  You told us that you went to the website of Greenway,

18   right?

19   A.  Yes.

20   Q.  You thought it seemed like a good product to you, right?

21   A.  Mm-hm.

22   Q.  You have to answer orally.

23   A.  Yes.

24   Q.  Did you ever purchase one for your home out in New Jersey?

25   A.  No.

D3erlev3                    Wieghaus - cross

Q.  Did you do any other research in connection with the
company?

A.  No.

Q.  Let's go back to the line, the third line, 3/22/2011, where
you sold 5,000 shares, and then you sold 1,000 shares, and then
you sold 215 shares, and then you sold 1,000 shares, and then
you sold 500 shares.  I'm not going to read this whole thing.

A.  Right.

Q.  But sold, sold, sold.  Then on 3/28, six days later, you
bought, bought, bought, right?

A.  Well, the way it works is it's not like a market.  You
can't put a market order in.  You have to buy at a certain
price and sell at a certain price.

Q.  Yes.

A.  If you say, I want to sell at a certain price, you enter
that price.  You don't know when it is going to execute.

Q.  Right.

A.  Right.  So it could take a week, a month, whatever.

Q.  The bid and the asked could change, right?

A.  Yes.

Q.  No question about that, right?  There is a spread between
the bid and the asked, right?

A.  Yes, right.

Q.  Keeping in mind what you just told us, 3/28, 3/28, and then
let's look at March 30th.

D3erlev3                    Wieghaus - cross

1    MR. SHARGEL:  If you could scroll down a little.

2    Q.  March 30th, starting with now buying Greenway stock, we

3    have a whole lot of entries for March 30th, right?

4    A.  Yes.

5    Q.  Then we have a whole lot of entries on the next page of the

6    document, I don't have to belabor this, but you were buying in

7    a lot of tranches and selling.  You looked at this exhibit in

8    preparation for your testimony, right?

9    A.  Yes.

10   Q.  You went over this with the government, right?

11   A.  Yes.

12   Q.  What you were really doing was day trading, weren't you?

13   Weren't you?

14   A.  Yes.

15   Q.  You were unemployed.  I'm not being critical of this at

16   all.

17   A.  Yes, I understand.

18   Q.  You were unemployed.  You would sit at the computer, and

19   regardless of whether Greenway had a good product or a bad

20   product, you would see the ticks in the market.  You're a

21   sophisticated guy, right?

22   A.  Not really.

23   Q.  Well, semi-sophisticated?  You have been in business your

24   entire life, right?

25   A.  Yes.

D3erlev3          Wieghaus – cross

1  Q.  The bottom line is this is day trading activity, fair

2  statement?

3  A.  Fair.

4  Q.  You mentioned on direct examination about startup

5  companies, do you recall that?

6  A.  Yes.

7  Q.  You knew Greenway was a startup company by going to its

8  website, right?

9  A.  Yes.

10  Q.  You had invested in startup companies before, right?

11  A.  Yes, a few.

12  Q.  Were there any startup companies that you invested in where

13  you made a whole lot of money?

14  A.  No.

15          MR. SHARGEL:  No further questions.

16          MS. COHEN:  A few, your Honor?

17          THE COURT:  OK.  Be very brief.  Then we can break for

18  lunch.

19          MR. SREBNICK:  Judge, can I have a moment before the

20  prosecutor?

21          MS. COHEN:  I'm sorry.

22          THE COURT:  No.  Go ahead, Ms. Cohen.

23  REDIRECT EXAMINATION

24  BY MS. COHEN:

25  Q.  The first time you heard about Greenway Design, that was

D3erlev3          Wieghaus - redirect

1    when Best Damn Penny Stocks sent you an email saying it would

2    be a good investment?

3    A.  Yes.

4    Q.  If we could look again, please, at Government Exhibit

5    605-7C.  First, leave Government Exhibit 400-28.  You buy and

6    sell stock on March 22nd, then again March 28 and March 30th,

7    right?  We are talking about March.

8    A.  Yes.

9    Q.  If you can look at Government Exhibit 605-7C for a minute,

10   which is in front of you.

11   A.  Yes.

12   Q.  Do you see the emails from Best Damn Penny Stock, and they

13   are dated March 22nd?  There is a bunch of them on March 22nd?

14   A.  Yes.

15   Q.  There is a few on March 23, March 27, March 28, and March

16   23, correct?

17   A.  Yes.

18           MS. COHEN:  No further questions, your Honor.

19           THE COURT:  You are excused.

20           MR. SHARGEL:  May I have one?

21           THE COURT:  No.

22           You are excused.  Thank you very much.

23           (Witness excused)

24           THE COURT:  Ladies and gentlemen, we will now take our

25   luncheon recess.

D3erlev3

1           (Jury not present)

2           THE COURT:  Does anybody want to take up anything?

3           MR. SREBNICK:  I do, your Honor.

4           THE COURT:  Yes, Mr. Srebnick?

5           MR. SREBNICK:  I believe I have a right to cross-

6       examine the witness.

7           THE COURT:  I agree with that on a count that is

8       relevant.  All this testimony dealt with David Levy.  There is

9       not a word in this count about Donna Levy.  Any questions you

10      would ask I believe are irrelevant.  This testimony deals only

11      with Greenway.

12          MS. COHEN:  And she is not charged in that count, your

13      Honor.

14          THE COURT:  That's what I just said, Ms. Cohen.

15      Anything else?

16          MR. MASTER:  No, your Honor.

17          THE COURT:  See you at 2 o'clock.

18          (Luncheon recess)

19

20

21

22

23

24

25

D3ELLEV4

AFTERNOON SESSION

2:04 p.m.

(Jury not present)

THE COURT:  Mr. Shargel.

MR. SHARGEL:  May I take something up?  I hope you're in a cheerful mood when I do this.

THE COURT:  I'm always in a cheerful mood.

MR. SHARGEL:  Judge, we have been working diligently, and if you looked at our email traffic, we're up half the night.  This is an enormously complicated case on the stock fraud and wire fraud and what the issues are.  If you insisted, we would do it, but it's very, very difficult.  Here's what I'm proposing.

THE COURT:  You're not going to submit your jury charges today.

MR. SHARGEL:  That's where I'm getting.

THE COURT:  It's all right.  If I can get them by tomorrow night, I'll have the weekend to work on it.

MR. SHARGEL:  That would be great.

THE COURT:  Can you do it by tomorrow night?

MR. SHARGEL:  Here's what I was going to propose.  Let me put it before you.

We're finishing this trial before any, earlier than any expectation, including the jurors.  We were thinking if we could sum up Tuesday instead of Monday and have the charge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3ELLEV4

1    conference after you read the request and have the charge

2    conference on Monday and sum up, we would be to the jury by

3    Tuesday afternoon or Wednesday morning at the latest.  It's

4    about a week and a half earlier than our earliest expectation.

5            Would that work for your Honor?

6            THE COURT:  So you're suggesting the jury be off on

7    Monday.

8            MR. SHARGEL:  Yes.

9            MS. COHEN:  We have no objection to that.

10           MR. SHARGEL:  Thank you, Judge.

11           THE COURT:  Is everybody going to be finished by

12    Friday?

13           MR. SHARGEL:  Yes, tomorrow.  We'll be finished by

14    tomorrow.  Defense is going to be something like a hour.

15           MR. SREBNICK:  We'll all be done by tomorrow.

16           THE COURT:  Further instructions from Mr. Kramer?

17           MR. SHARGEL:  Pardon me, Judge.  Mr. Kramer should be

18    speaking for himself.

19           MR. KRAMER:  I was going to ask.

20           MR. SHARGEL:  You understand he's the ventriloquist.

21           MR. KRAMER:  I was going to ask if we could have

22    Saturday to work on the jury instructions because since we're

23    working in court on Friday, it's hard to have a team meeting

24    about it, and we get it to you by the end of the day on

25    Saturday.

1    MS. COHEN:  Fine with the government, your Honor.

2    THE COURT:  That's fine too.

3    MR. SHARGEL:  Thank you, Judge.

4    MR. SREBNICK:  Thank you very much.

5    THE COURT:  You're entirely welcome.  Is the jury

6  here?

7    THE DEPUTY CLERK:  Not yet, no.

8    THE COURT:  Who's the witness for this afternoon?

9    MS. COHEN:  Your Honor, the government is going to

10  call Special Agent Eastman.  Sorry.

11    THE COURT:  You have some stipulations.

12    MS. COHEN:  First we're going to call another investor

13  victim, Mr. Shiflet, then we're going to Special Agent Eastman

14  very briefly, and then Joseph Saranello.  It's all with respect

15  to the money laundering part.

16    THE COURT:  That's it?

17    MS. COHEN:  Then we have some stipulations and

18  documents we want to publish.  And also at the end we'll have

19  Agent Reinhardt, but I expect that will happen Friday morning.

20    THE COURT:  OK.  And what kind of defendant's case do

21  we have, just documents, Mr. Srebnick?

22    MR. SREBNICK:  Judge, there is one witness we're

23  contemplating calling who would be less than half an hour but

24  we may be able to avoid.

25    (Pause)

1    THE COURT:  Mr. Shargel and Ms. Cohen, you're working

2  on submitting a joint jury charge, is that it?

3    MS. COHEN:  We had tried, your Honor.  The defense

4  said they want to submit their own so that's why we submitted

5  ours.

6    THE COURT:  How far apart are we, Mr. Kramer?  Is

7  there going to be some commonality?

8    MR. KRAMER:  There's going to be a lot of commonality.

9  We have no problem with the pattern jury instructions for the

10  money laundering, wire fraud.  We feel based on what we think

11  are the government theories about wire fraud and securities

12  fraud that there should be little tweaks to them.  For example,

13  that certain things are not securities fraud that you can

14  instruct.

15    THE COURT:  OK.

16    MR. KRAMER:  Forward looking statements, for example.

17  So we're going to have a short letter with additions to the

18  pattern jury instructions.

19    THE COURT:  OK.  The jury is all here.

20    (Witness present)

21    THE COURT:  Ms. Cohen, are these exhibits for the next

22  witness?

23    MS. COHEN:  No, I don't believe they are.  No, your

24  Honor, sorry.  We didn't retrieve them from the last witness.

25    (Continued on next page)

D3ELLEV4

1     (Jury present)

2          THE COURT:  Mr. Master, are you going to call your

3     next witness?

4          MR. MASTER:  Yes.  At this point the government calls

5     William Shiflet.

6      WILLIAM MARION SHIFLET II,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. MASTER:

11    Q.  Good afternoon, Mr. Shiflet.

12    A.  Good afternoon.

13    Q.  How old are you, sir?

14    A.  I'm 45 years old.

15    Q.  And where do you live?

16    A.  I live in Union, West Virginia.

17    Q.  And how big of a town is Union, West Virginia?

18    A.  It is a population of 500, and it is in southern West

19    Virginia near Roanoke, Virginia, below White Sulphur Springs,

20    West Virginia.

21    Q.  How far did you go in school?

22    A.  I have my business of administration degree from Concord

23    University with a emphasis on marketing, and I also have some

24    postgraduate education.

25    Q.  And are you married?

1    A.  Yes, I am.

2    Q.  What does your wife do?

3    A.  She is a director of vocational education in Greenbrier

4    County schools in West Virginia.

5    Q.  And do you have any children?

6    A.  Yes, I do.  I have three children.

7    Q.  How old are they?

8    A.  They are 13, 15, and 16 -- or 17.

9    Q.  And where do you work?

10   A.  I am a Nationwide insurance agent in Union, West Virginia,

11   and also, my family, we own a farm and run a cattle farm.

12   Q.  I'd like to direct your attention to 2010.

13   A.  Yes, sir.

14   Q.  How much money did you have in savings at that time, liquid

15   savings?

16            MR. SREBNICK:  Objection, relevance.

17            THE COURT:  Overruled.

18   A.  I had just sold some bank stock and it was about $135,000

19   that I put in an E*Trade account, around there.

20   Q.  And what if any financial objectives did you have at that

21   time?

22   A.  Well, I wanted to supplement my income as the company I

23   work with -- I'm a captive agent -- had recently lost a large

24   settlement in West Virginia and stated they were going to

25   retract from the market.  They had closed all the regional

1  offices and they had raised the premium and the underwriting,

2  so it made it very difficult to sell policies.  We had the

3  business for 16 years and since I was captive, I was not

4  allowed to sell with any other company.

5              So I was looking for something to supplement my income

6  to keep paying on my farm mortgage and send my kids to college.

7  Q.  Did there come a time when you started looking for

8  investments with the opportunity of higher returns to try to

9  meet those goals?

10  A.  Absolutely.

11  Q.  And as part of that activity, what if anything did you do

12  to research what's known as penny stocks?

13  A.  I would look on the internet, not necessarily penny stocks,

14  but any stock where the volume had increased or the price had

15  increased.  And CNBC, I would watch it every day and Fox

16  financial, anything that I could find, any internet thing that

17  I could find that was related to investments.

18  Q.  And as you were looking around the internet for investment

19  options and information, did there come a time when you saw a

20  paid internet advertisement for a penny stock newsletter called

21  bestdamnpennystock?

22  A.  Yes.

23  Q.  What did you do when you saw the internet advertisement?

24  A.  I clicked on it and gave them my email address and started

25  receiving newsletters.

D3ELLEV4                    Shiflet - direct

1    Q.  Was that in approximately 2010?

2    A.  That is correct.

3    Q.  Did there come a time when you invested in penny stocks

4    that were recommended on bestdamnpennystock.com?

5    A.  Yes.  I believe I invested in at least three of their penny

6    stocks.

7    Q.  How much money did you lose on those three?

8    A.  Close to $50,000.

9    Q.  Now let's talk about one of the stocks you invested in.

10   It's called Emerging World Pharma.

11            Are you familiar with the stock that trades under the

12   symbol EWPI?

13   A.  Yes, I am.

14   Q.  I'd like you to take a look at what's in front of you as

15   Government Exhibit 607 to 611.  Do you recognize those

16   documents?

17   A.  Yes, sir, I do.

18   Q.  And first with respect to 607 to 609, what are they?

19   A.  607 through 609 are my E*Trade statements.

20   Q.  And how about 610 and 611?

21   A.  610 and 611 are emails that I received from

22   bestdamnpennystocks.

23   Q.  Concerning what stock?

24   A.  EWPI.

25            MR. MASTER:  At this time the government offers

D3ELLEV4                    Shiflet - direct

1    Government Exhibit 607 to 611.

2           MR. SREBNICK:  No objection, Judge.

3           THE COURT:  Mr. Shargel.

4           MR. SHARGEL:  I have no objection.

5           THE COURT:  607 to 611 are in evidence.

6           (Government's Exhibits 607 to 611 received in

7    evidence)

8           MR. MASTER:  Now, Mr. Dinet, if you could publish

9    Government Exhibit 607.

10   Q.  It's an email entitled Seven Reasons to Love EWPI, and it's

11   dated April 6 at 2:57 a.m.

12          Do you remember looking at this email in the morning

13   of April 6, 2010?

14   A.  Yes, I do.

15   Q.  And your email address is SHIFLEW@hotmail.com?

16   A.  That is correct.

17   Q.  And what about this email attracted you to EWPI?

18   A.  Well, it was a glowing report on this up and coming company

19   that once I looked at this email and then looked at the company

20   news and the volume of the stock, I believe that, you know,

21   according to Yahoo finance, EWPI's market cap is 1.7 million.

22   That is in my opinion EWPI would have to go to three to four

23   bucks before it is fairly valued.  I felt like with looking at

24   the company news that this was an opportunity to make some

25   money.

D3ELLEV4                    Shiflet - direct

1    Q.  To reach the goals that you had described?

2    A.  To reach the goals that my wife and I have set for our

3    family.

4    Q.  Now, in addition to going and looking at company news, what

5    if anything did you do to look at what's known as the chart for

6    the stock?

7    A.  Right.  I always look at the chart to see the volumes and

8    whether they're up or down, if there's momentum or it's going

9    downwards with the volume.

10   Q.  And why is the volume, why was the volume important to you?

11   A.  The volume is very important to show that other investors

12   are purchasing the stock and are positive on it as well.  It's

13   a good sign that it's going to go up in my previous -- in my

14   thought processes in 2010, that was a great indicator that I

15   was not the only one that thought this was a positive purchase.

16   Q.  And at the time, what if anything did you observe happening

17   to the price of EWPI?

18   A.  It had gone up to this point.  I had looked and it had gone

19   up with the volume, the price had.  I can't remember from what

20   to what, but it had risen.

21   Q.  And as you later learned, to cut to the chase, that was the

22   peak of the stock price?

23   A.  That was the peak that day, I believe, yes, when they sent

24   this, 90 some cents.  And they were predicting, one email, two

25   to three, and this one, three to $4.

D3ELLEV4                     Shiflet - direct

1    Q.  Now, there is -- if you could just turn to the second page.

2    A.  Of 611?

3    Q.  Yeah.  Just going to ask you, first of all, something --

4    there's some language at the end of this, after "sincerely,

5    staff of bestdamnpennystock.com," right?

6    A.  Yes.

7    Q.  How carefully did you read that before making the decision

8    to invest?

9    A.  I read it but not carefully, as I do not read most

10   disclaimers, unfortunately, as I should in the business I'm in,

11   but I don't necessarily.

12   Q.  How commonly do you see disclaimers in investment

13   newsletters?

14   A.  Well, just like in a prospectus or company news, there are

15   disclaimers on forward-looking statements on every investment.

16   I think it's required by the SEC.  So everything that you read

17   anymore has a disclaimer of some type.

18   Q.  And when you skimmed through the disclaimer, what if

19   anything in the disclaimer suggested to you that the

20   recommendation to purchase the stock was something you weren't

21   supposed to act on?

22   A.  What my opinion of the disclaimer at the time was is if I

23   did lose on this stock, I could not civilly hold

24   bestdamnpennystocks for my loss, which I understand that.

25   That's a civil disclaimer.  And I'm not here asking for my

D3ELLEV4                    Shiflet - direct

1    money back and I understand that.

2            There is no disclaimer that I know of that has ever

3    been written that excludes --

4            MR. SREBNICK:  Objection, Judge.

5            THE COURT:  Sustained.

6    Q.  Now, it states at the bottom that the message was sent from

7    bestdamnpennystock.com to you, and it states it was sent from

8    Eric Cusimano; do you see that?

9    A.  Yes, I do.

10   Q.  Do you know who Eric Cusimano is?

11   A.  No, I do not.

12   Q.  And it also states -- you read it again in preparation for

13   your testimony here today, right?

14   A.  Correct.

15   Q.  It states that bestdamnpennystock.com expects to be

16   compensated $250,000 cash from a third party, Capital

17   Investment Group, for EWPI investor relations services; do you

18   see that?

19   A.  Yes, I do.

20   Q.  Do you have any idea who Capital Investment Group is?

21   A.  No, I do not.

22   Q.  Or what connection if any they have to the selling of EWPI

23   stock?

24   A.  No, I do not.

25   Q.  And so what did you do after you saw this recommendation,

1  stock purchase recommendation?

2  A.  Purchased I think close to $15,000 worth of stock.

3  Q.  And if you wouldn't mind turning to Government Exhibit 608,

4  Mr. Dinet.  Fifth page.  I'm sorry.  Sixth page.

5  A.  OK.

6          MR. MASTER:  And if you wouldn't mind zooming in on

7  that.

8  Q.  It shows you purchased Emerging World Pharma on April 6,

9  2010 at 9:33 a.m, do you see that, and then there was an

10  additional purchase recorded at 9:39 a.m.; do you see that?

11  It's page 6 of 7.

12  A.  Yes, I do see that.

13  Q.  And what price did you buy it at?

14  A.  I bought one transaction at 90 cents and one transaction at

15  eighty-nine fifty.

16  Q.  And how soon after market opened were these purchases

17  recorded?

18  A.  Well, it looks like nine minutes after the market opened

19  and eight minutes or three minutes.

20  Q.  Market opens at 9:30?

21  A.  Yes, sir.

22  Q.  And what happened to the price of Emerging World Pharma on

23  April 6, 2010?

24  A.  It dropped drastically.

25  Q.  Dropped in half?

1   A.  That is correct.

2   Q.  And even after it dropped in half, what if anything had you

3   received from bestdamnpennystocks?

4   A.  I received an email stating that there was a short position

5   and that it had to be covered, I believe.

6           MR. MASTER:  Mr. Dinet, if could you publish

7   Government Exhibit 610.

8   Q.  Is that the email you remember receiving that evening,

9   April 6, 2010?

10  A.  Yes.

11  Q.  It states, What the heck are you waiting for?  And it says,

12  EWPI ripped right of the gate this morning hitting a high of 94

13  cents.  Then it states, EWPI then pulled back giving plenty of

14  opportunities.  What happened today was even stronger

15  confirmation of more possible huge upside with EWPI closing in

16  the green 15 percent and a complete wash out of weak hands.

17          Actually, and then I just want to call your attention

18  to the paragraph, Today EWPI exploded out of the gate with a

19  huge high of 94 cents for a 51 percent gain and then dipped

20  down so the savvy investor could average down and take

21  advantage of this bad boy at a nice discount.

22          What if anything did you understand this to mean?

23  A.  Well, at the time I believed what they were saying and I

24  thought this was a wonderful opportunity to get back in to

25  dollar cost average my position.  And I was still thinking of

1    two to $3 in the future from what I was told in these emails.

2    Q.  And what do you mean by dollar cost averaging?

3    A.  Well, if you have the opportunity to purchase the stock at

4    a lower price, it lowers your average cost per share.  And as

5    some analysts say, buy on the dips.  Hopefully, it's not a

6    roller coster dip going down, but you catch it at a bottom in

7    order to acquire more shares to lower your average.

8    Q.  Is that what you understood average down to me?

9    A.  Yes.

10   Q.  Because the average price of your shares go down?

11   A.  Correct.

12   Q.  And what did you do after you received this email?

13   A.  I made another purchase.  I can't remember how much; I'm

14   sure it's here.  But I made another purchase that morning or at

15   lunch time, I believe, on lunch break from a conference.

16           MR. MASTER:  And if you wouldn't mind returning to

17   page 6 of Government Exhibit 608, Mr. Dinet.

18   Q.  Do you see there on this trade list it shows your purchase

19   during a lunch break, as you remember, on the next day,

20   April 7, 2010?

21   A.  That's correct.

22           MR. MASTER:  And so, Mr. Dinet, if you wouldn't mind

23   just zooming out a little bit so the jury can see how much he

24   purchased.

25   Q.  It shows you purchased an additional 20,000 shares at 49

1    cents?

2    A.   Yes.

3    Q.   And, again, what was your purpose in making that purchase?

4    A.   It was to try to take advantage of a dip to lower my dollar

5    cost per share and, hopefully, watch it go up, as this

6    newsletter said it should.

7    Q.   That was what you understood bestdamnpennystock to be

8    recommending?

9    A.   Yes.

10   Q.   Now, what ended up happening to the price of Emerging World

11   Pharma?

12   A.   I believe a month later I sold part of my position for 29

13   cents.  So it went -- it just continued going down from that

14   point.  It was not a dip.

15   Q.   You mean it turned out not to be a dip?

16   A.   Absolutely.

17   Q.   It turned out to be straight down?

18   A.   Straight down.

19        MR. MASTER:  If you wouldn't mind turning to

20   Government Exhibit 609, Mr. Dinet.

21   Q.   Take a look at page 6 of 7 of Government Exhibit 609,

22   Mr. Shiflet, and if you wouldn't mind zooming in on Emerging

23   World Pharma, it shows you sold 10,000 shares at 28 cents; is

24   that the sale that you're referring to?

25   A.   That is correct.

D3ELLEV4                    Shiflet - direct

1    Q.  What were the proceeds of that sale?

2    A.  It looks like $2,799.95.

3    Q.  And at this point, based on your purchase on April 6 and

4    April 7, you had bought, you had accumulated a position of

5    25,000 shares?

6    A.  That's correct.

7    Q.  So what happened, why did didn't you sell all 25,000?

8    A.  I should have but I thought, I still was a believer that in

9    what the newsletter said that there was possible $20 million in

10   sales and other things and I was just taking money off the

11   table while I still could and probably should have taken it

12   all.

13   Q.  I'd like you to take a look at what's been marked as

14   Government Exhibit 607.  What is Government Exhibit 607?

15   A.  It is my statement as of January 1, 2013.

16   Q.  Do you see the last page where your Emerging World Pharma

17   holdings, remaining 15,000 shares were listed?

18   A.  Yes.

19   Q.  If you could zoom in on that, Mr. Dinet, what's the price

20   of the Emerging World Pharma holdings that you currently have?

21   A.  The price is .0003 cents.

22   Q.  And what's the value of those holdings?

23   A.  The value is $4.50 for 15,000 shares.

24            MR. MASTER:  Nothing further.

25            THE COURT:  Mr. Srebnick.

D3ELLEV4                    Shiflet - direct

1    MR. SREBNICK: Yes, Judge. May it please the Court,

2    good afternoon, everybody.

3    CROSS-EXAMINATION

4    BY MR. SREBNICK:

5    Q. Good afternoon, Mr. Shiflet. My name is Howard Srebnick.

6    We've never spoken before; is that correct?

7    A. That is correct.

8    Q. You told the ladies and gentlemen of the jury you're 45

9    years old and you're in the insurance business?

10   A. That is correct.

11   Q. You're a Nationwide insurance agent?

12   A. That is correct.

13   Q. And what kind of insurance do you sell?

14   A. Property and casualty, mainly automobile and fire home

15   insurance.

16   Q. And I thought you mentioned to the jury in passing that

17   perhaps you have some familiarity with disclaimers based on

18   your business?

19   A. Based on my business and the other boards I've served on

20   and so forth, yes.

21   Q. In particular, as an insurance agent, as you've told us,

22   you sell insurance policies to clients, correct?

23   A. Yes, sir.

24   Q. You're independent or?

25   A. I'm a captive agent.

D3ELLEV4                    Shiflet - cross

1    Q.  You're exclusive with one company?

2    A.  Yes.

3    Q.  And when in your profession you sell insurance policies to

4    clients, do you have them sign disclaimers?

5    A.  Not exactly disclaimers, but we have to have signed

6    uninsured, underinsured forms and so forth, yes.

7    Q.  And so, of course, based on your business, you understand

8    how important it is to have your clients be aware of these

9    disclaimers, correct?

10   A.  Absolutely.

11   Q.  And you encourage them to read the disclaimers before they

12   sign the papers, right?

13   A.  Absolutely.

14   Q.  And you hold them to those disclaimers when you sell them

15   the insurance policy, correct?

16   A.  Correct.

17   Q.  So that if they later come to you and have some dispute,

18   your company relies on those disclaimers as part of its

19   ordinary course of business, correct?

20   A.  Absolutely, yes.

21   Q.  And, of course, it's your job as an insurance agent to sell

22   and make money off of your clients by selling them these

23   insurance policies, correct?

24   A.  That is correct.

25   Q.  Now, I'd like to ask you a few questions about your

D3ELLEV4                    Shiflet – cross

1    experience in trading or in the stock market.

2            I think you told us you do have a business degree?

3    A.  Yes.

4    Q.  And how young when you were you started trading stock or

5    buying and selling stock?

6    A.  I was probably 29 or 30.

7    Q.  So you had a good ten-plus years of experience before you

8    made a decision to buy stock in EWPI, correct?

9    A.  Yes.

10   Q.  Now, we saw some records from E*Trade Financial.  That's

11   the I guess the company through which you buy and sell stock at

12   the time?

13   A.  Yes.

14   Q.  Now, when you signed up to have a trading account with

15   E*Trade, they too required that you review or sign or authorize

16   them to act on your behalf through a disclaimer as well,

17   correct?

18   A.  That is correct.

19   Q.  And that disclaimer through E*Trade explained to you the

20   risks of investing in the stock market, correct?

21   A.  Absolutely.

22   Q.  And, indeed, do you recall if E*Trade made a special

23   disclaimer with regard to penny stocks because those present an

24   even greater risk?

25   A.  They may have.  I don't recall it right now, but I'm sure

D3ELLEV4                    Shiflet - cross

1    they did.

2    Q.  And you understand, of course, that penny stocks do present

3    a much greater risk than other stocks, right?

4    A.  Absolutely.  I'm not arguing that at all.

5    Q.  We're not arguing.  I just need to ask the questions.

6           And I'd like to then discuss what you understood those

7    risks to be.

8           Did you understand based on the years of trading as

9    well as your education that there is something known as a risk

10   return tradeoff, that if you want big returns, sometimes you

11   got to take very big risks, correct?

12   A.  Absolutely.

13   Q.  Now, when you signed up with E*Trade, you were engaged in

14   trading beyond just EWPI, correct?

15   A.  That is correct.

16   Q.  And over the course of your trading career, would it be

17   fair to say you have bought and sold dozens of different

18   stocks?

19   A.  That is correct.

20   Q.  I'd like to take a look at I think it's Government

21   Exhibit 608, if I could just have a moment.  Yes, it is.

22   Government Exhibit 608.  It's page 6 that was shown to you

23   earlier, and I'd like to actually zoom in on the center of the

24   document.  Perfect.

25           There's in addition to EWPI, it appears you invested

1  in a company called AMBAC Financial Group, do you see that

2  there, AMBAC I think I pronounce it?

3  A.  Yes.

4  Q.  And does it reflect, this document, that on April 12, 2010,

5  at 10:06 in the morning, you purchased 10,000 shares of that

6  company stock at $1.62 per share?

7  A.  Correct.

8  Q.  And it looks like at about 12:47, roughly two and a half

9  hours later, you sold those 10,000 shares for $1.68 per share?

10 A.  That is correct.

11 Q.  So in two hours and 40 minutes, more or less, you were able

12 to get a profit of roughly $500 minus the transaction costs?

13 A.  That is correct.

14 Q.  And E*Trade charged you how much for those transactions?

15 A.  They're all different, but probably $9, $12, something like

16 that.

17 Q.  Would that be known as a day trade?

18 A.  Yes.

19 Q.  So in the morning, you buy, by lunch time, you've sold it?

20 A.  Yes, on that.

21 Q.  Did you have any information about that company, AMBAC,

22 what was it that motivated you to buy that company?

23 A.  It was on the, I believe, the most traded list the day

24 before or volume.  I look at all the top gainers, top losers,

25 top volume, and it was probably a volume.  I don't know which

1    one, but it was on something that brought my attention to it.

2    Q.  Do you know what AMBAC Financial does?

3    A.  No, I don't.  I can't remember.  I'm sure I looked it up at

4    the time, but it's been two years.

5    Q.  And had you done any research on AMBAC, about the company

6    itself before you made that investment decision, about the

7    fundamentals of the company?

8    A.  Yes.  I always, when I look at a stock, and if you'll go to

9    any screen that says most active, you click on it, then it

10   brings up a quote screen that has its financials, its company

11   news, its volume, its average daily volume, average price, all

12   that.

13         If you want to read, I usually read the news, the most

14   recent news, and also look at the financials because they're

15   glaring, how much money they're losing or if they're making

16   money, try to figure out why it's going up or why it's going

17   down.

18   Q.  As you sit here today, it's been so long, as to that one

19   stock you don't have a recollection; fair statement?

20   A.  No, sir, I do not.

21   Q.  Fair enough.  Now, you were able to make $500 in a couple

22   hours or even less than three hours on AMBAC.  And were you

23   relying on what you described to the jury earlier as momentum,

24   was that a factor that was important to you?

25   A.  Yes.

D3ELLEV4                    Shiflet - cross

1   Q.  And what is this concept of momentum that you're describing

2   for the jury, what do you mean by that?

3   A.  Well, once the volume goes up on a particular stock, it

4   gives it momentum and usually it's a feeding frenzy.  Other

5   people purchase if it's really good news and makes the stock go

6   up.  Then it's same thing going down.  When there's bad news

7   and everybody starts selling, the momentum goes crazy downward

8   if there's negative or sometimes --

9   Q.  I didn't mean to interrupt you.

10  A.  Just negative information or something is misrepresented.

11  Q.  Were you trying then in some of your trading strategies to

12  try to predict which way the momentum would carry the stock

13  price?

14  A.  Absolutely.  That's the goal, right.

15  Q.  Is to try to guess which way that stock price is going to

16  go based on what everybody else in the market is doing?

17  A.  Well, it's not so much a guess.  Hopefully, it's an

18  educated guess where you looked at news and looked at volume

19  and the things that you read are correct and not misrepresented

20  and usually.

21  Q.  I take it, did you ever invest in blue chip stocks like

22  Apple?

23  A.  I invested a lot in Citibank when it was very high volume

24  at low, and Ford, I've owned Ford.  Yes, I've invested in blue

25  chips.

D3ELLEV4                    Shiflet - cross

1    Q.  And even the best of stocks drop for reasons that none of

2    us really know, correct?

3    A.  That is correct.

4    Q.  Is it fair to say there's really no way to predict which

5    way the momentum will drive the stock, whether up or down,

6    isn't it really fair to say that, none of us can really predict

7    that?

8    A.  You can't predict it for seeing the future, but hopefully

9    you can use your tools and the news.  And if the news is

10   correct and if the statements are correct, you should be able

11   to determine that it's truly in a positive way or it should be

12   in a negative way, if the information you receive is correct.

13   Q.  I'd like to ask you some questions now about the

14   information that you had on EWPI.

15   A.  Yes.

16   Q.  You told us about a email you received from

17   bestdamnpennystock.com on April 6 you 2010, correct?

18   A.  Correct.

19   Q.  Before that date, did you have any information about EWPI?

20   A.  No, I did not.  I had never heard of the stock before then.

21        MR. SREBNICK:  If we could just put on the screen then

22   I think it's Government Exhibit 611.  I think that's the first

23   one.

24   Q.  Do you see that, the email appears to have been sent to you

25   at 2:57 a.m. on April 6, 2010?

D3ELLEV4                    Shiflet - cross

1    A.   That's what it says, yes.

2    Q.   And I know it's an impossible thing to remember, but more

3    or less, what time of day would you have read that email, would

4    that have been the first thing you saw when you woke up in the

5    morning?

6    A.   Yes.  Probably around 6:30 I would have gone through my

7    emails.

8    Q.   OK.  So the markets open at 9:30?

9    A.   Mm-hmm.

10   Q.   And so you bought the stock shortly after the market opened

11   at 9:30?

12   A.   9:33 I believe it said.

13   Q.   This was the very first time in your whole life you'd ever

14   seen those four letters put together, EWPI?

15   A.   That is correct.  I probably spent 30 minutes looking at

16   company news, looking at the quote screens of CNBC or one of

17   them, and maybe looked at another one and thought this was,

18   from this email and from what I read company news, which must

19   have correlated, I purchased the stock.

20   Q.   Now, had you looked at any of the company's financial

21   statements before making the investment?

22   A.   I always, like I said, when you pull up a quote screen,

23   they have the financials that are on there and at the time I

24   trusted them --

25   Q.   I understand.  I'm asking did you actually look at them?

1   A.  Yes.

2   Q.  Do you remember if EWPI had even posted a financial

3   statement on the internet?

4   A.  I can't remember at the time, but most of the time they do.

5   Q.  Isn't it true, sir, that EWPI had its most recent postings

6   had shown that up to that date it had zero revenues?

7   A.  Right, but that's not uncommon.  Yahoo had zero revenues

8   and went through the roof.  Many companies have had zero

9   revenues.  It's their forward-looking, what's in the tank.  So

10  that's not uncommon.

11  Q.  So you were relying on the forward-looking statements?

12  A.  Correct, and what I was told.

13  Q.  And isn't it true, sir, that EWPI had reported up to that

14  date no earnings?

15  A.  That is probably correct because that's common with penny

16  stock.  They wouldn't be a penny stock if they had many

17  earnings.  That is true.

18  Q.  Now, did you review the press releases that this company,

19  EWPI, had issued prior to making your investment decision?

20  A.  Almost all, and I can't remember, but yes.  I'm sure I did

21  because I always look at the press releases.  That's the

22  company news usually follows these emails that I get from

23  bestdamnpennystocks.  Then you'll go to the news of the company

24  and it's the same information usually.

25  Q.  Did you research EWPI on the Pink Sheets website?

D3ELLEV4                    Shiflet - cross

1    A.  No, I didn't.

2    Q.  Did you know what the nature of EWPI's business was

3    according to EWPI?

4    A.  Yes.  It was a pharmaceutical company and drug coming down

5    the pipeline.  $20 million in sales they mentioned in several

6    emails.

7    Q.  One of the forward-looking statements in the email was that

8    there was this aspiration, this goal, this projection of

9    $20 million of annual revenues in the future?

10   A.  Correct.

11   Q.  But as of the date you made the investment, it was you were

12   aware that EWPI had zero revenues and zero earnings, correct?

13   A.  Correct.

14   Q.  Did you know anything about the pharmaceutical business

15   generally?

16   A.  I was aware of Merck and I was aware of some other,

17   Boehringer, yes, a little bit.

18   Q.  Any personal experience in the pharmaceutical business?

19   A.  No.

20   Q.  Did EWPI, do you remember from the press release it

21   indicated that its business would be somewhere in Africa?

22   A.  Yes.

23   Q.  Did you know anything about the African economy?

24   A.  Just that it's a third world growing, it's the next China,

25   supposedly, and it's a huge population that's untapped.

D3ELLEV4                    Shiflet - cross

1    Q.  Did you know whether businesses in Africa up to that date

2    were successful or not successful?

3    A.  No.

4    Q.  Did you know anything about the rules and regulations for

5    distributing pharmaceuticals in Africa?

6    A.  No, I did not.

7    Q.  Did You do any research or know anything about the

8    political climate in the country of Ghana?

9    A.  I know it's very unstable.

10   Q.  Mr. Shiflet, do you subscribe to any other newsletters

11   other than the ones you've described for the jury so far?

12   A.  Yes, there's a couple others.

13   Q.  And do you remember which ones those were at the time in

14   2010?

15   A.  I don't remember their names.  Maybe if you give me some, I

16   recollect, but I don't.

17   Q.  OK.  That's all right.  Did you, before you made the

18   investment decision, did you try to phone or call the investor

19   relations department at EWPI?

20   A.  No, I did not.

21   Q.  Did you go to EWPI's website?

22   A.  I don't recall going to their website the morning of the

23   purchase.  Later I did, I looked at their website.

24   Q.  I'd like to now discuss with you the disclaimer that was

25   available to you.

1          MR. SREBNICK:  If we could publish Government

2     Exhibit 610 towards the third page, if we can put the third

3     page on the screen.  That's fabulous.  Thank you.

4     Q.  Now, the disclaimer informed you and, in fact, stated,

5     "never invest in any stock featured on our site or emails

6     unless you can afford to lose your entire investment," correct?

7     A.  Correct.

8     Q.  "The disclaimer is to be read and fully understood before

9     using our site or joining our email list," correct?

10    A.  Correct.

11    Q.  Did you read the disclaimer and fully understand it before

12    using the website?

13    A.  Yes.

14    Q.  Did you read it and fully understand it before you joined

15    the email list?

16    A.  Yes -- no, I didn't see it.  There was no disclaimer

17    available to me from the ad I saw on the internet to when I

18    signed on.  I didn't get the disclaimer until after I signed

19    in.

20    Q.  We'll go through that.  I have that to show you.

21    A.  I don't remember that.

22    Q.  OK, we'll get to that.

23          "Please note well, the bestdamnpennystock.com

24    employees are not registered as an investment adviser in any

25    jurisdiction whatsoever."  Did you know that at the time?

1  A.  Yes, I understand that.

2  Q.  Do you see it says their full disclaimer can be read at,

3  and then it gives the website where the full disclaimer is

4  available?

5  A.  Yes.

6  Q.  Do you remember that being available to you before you made

7  your investment decision?

8  A.  I can't say yes or no.  I'm not sure.  I'm sure it was.

9  I'm not disputing that it was.

10  Q.  This is the email that you saw the day that you --

11  A.  Right.

12  Q.  -- at 6:30 in the morning?

13  A.  Right.

14  Q.  The email you got gave you the website to go to where you

15  could read the full disclaimer, correct?

16  A.  OK.

17  Q.  Do you see that it said, "Through the use of this website,

18  viewing or using, you agree to hold bestdamnpennystock.com, its

19  operators, owners, and employees harmless and to completely

20  release them in any all liability," etc., do you see that?

21  A.  Yes.

22  Q.  Next sentence.  Do you remember that the email you got

23  stated, "The information contained herein is based on sources

24  which we believe to be reliable but is not guaranteed by us as

25  being accurate and does not purport to be a complete statement

1   or summary of the available data."  Do you see that?

2   A.   Yes.

3   Q.   So you understood that when you received the email, this

4   was just a small amount of information, not the complete

5   picture of this company, EWPI, you understood that?

6   A.   Yes, I understood.

7   Q.   OK.   Next sentence, "Bestdamnpennystock affiliates may from

8   time to time have a position in the securities mentioned herein

9   and may increase or decrease such positions without notice."

10  Do you remember that?

11  A.   Yes.

12  Q.   That meant, of course, that the owners of

13  bestdamnpennystocks could buy or sell the stock at any time,

14  correct?

15  A.   Correct.

16  Q.   "Bestdamnpennystocks owners may or may not hold positions

17  in the companies that are profiled.  It should be assumed that

18  the owners of bestdamnpennystocks own positions in companies

19  profiled and may buy or sell at any time before, during, or

20  after investor relations services."  Do you see that?

21  A.   Yes.

22  Q.   And next sentence, "Bestdamnpennystocks.com affiliates and

23  friends and family may have a position in such securities."  Do

24  you see that?

25  A.   Yes.

1   Q.  And do you see that's letting you know that

2   bestdamnpennystocks may be trading on this information, right?

3   A.  Correct.

4   Q.  "The position may have been acquired prior to the

5   publication of any website information or email alert.  You

6   should be also aware that the aforementioned parties do have

7   the right to sell their positions at any time without further

8   notification."  You understood that at the time?

9   A.  I understand that.

10  Q.  "Any opinions expressed are subject to change without

11  notice."  You knew that, right?

12  A.  Yes.

13  Q.  "Bestdamnpennystocks.com encourages readers and investors

14  to supplement the information in these reports with independent

15  research and other professional advice."

16          Did you seek any other professional advice between

17  6:30 in the morning and 9:30 before you made your investment

18  decision?

19  A.  Just looked at the company news.  But as far as calling a

20  broker, no, I did not.

21  Q.  Did -- you consulted with no one else; is that a fair

22  statement?

23  A.  That's a fair statement.

24  Q.  "All information on featured companies is provided by the

25  company's profile or is available from public sources, and

1    bestdamnpennystocks makes no representations, warranties, or

2    guarantees as to the accuracy or completeness of the disclosure

3    by the profiled companies."  Do you see that?

4    A.  Yes.

5    Q.  So bestdamnpennystocks was letting you know and did you

6    understand that they were gathering information from the

7    company and publishing it with whatever other forward-looking

8    statements they offer, correct?

9    A.  Correct.

10   Q.  And a forward-looking statement, in case that's a phrase

11   that may sound confusing, it's a statement of looking forward,

12   a predictive type of statement, correct?

13   A.  Correct.

14   Q.  Looking into the future, right, trying to surmise which way

15   a stock price will go, whether it be up or down, correct?

16   A.  That is correct.

17   Q.  Four lines from the bottom, "Bestdamnpennystocks.com

18   expects to be compensated $250,000 cash from a third party,

19   Capital Investment Group, for an EWPI investor relations

20   service."  Do you remember reading that at the time?

21   A.  No, I don't remember reading that at the time, but I have

22   read it since then.

23   Q.  That's an important piece of information, wouldn't you say,

24   that bestdamnpennystocks.com is actually being paid to promote

25   this company?

1    A.  Yes, it is.  Hopefully, they are promoting it to go higher

2    and that their legitimate goal is like mine.  That's when I

3    read this, that they are promoting a stock and not hopefully

4    trying to get out of it.

5    Q.  Well, they told you they might try to get out of it, didn't

6    they?

7    A.  They might, but that's definitely not their intention in

8    this letter.

9    Q.  Do you see three or four times they told you that as

10   they're promoting the stock, they might take advantage of the

11   increase in price and sell at the same time, right?

12   A.  Right, and I wish they would have said 94 cents is our

13   getting out instead of two to $3, as it states here.

14   Q.  They actually did.  They told you earlier on they might

15   sell before it gets to the top.  Right?

16   A.  Well, in the disclaimer they might, but in the newsletter

17   they feel like they would go two to three on the same day it

18   dropped.

19   Q.  Well, the newsletter is in the same document as this,

20   right?

21   A.  Yes.

22   Q.  OK.  And so you were aware that this advertisement was paid

23   for by somebody who was telling you that he or she might sell

24   the stock, indeed, would sell the stock as it went up, right?

25   A.  That is correct, but they do not correlate very well.

D3ELLEV4                    Shiflet – cross

1    Q.  Do you see the next sentence says, "This is not a

2    solicitation to buy or sell any securities.  Any claims or

3    statements should be deemed apocryphal."  Do you see it says

4    that there?

5    A.  Yes.

6    Q.  And apocryphal means basically don't rely on it, not to be

7    relied upon, correct?

8    A.  Yes.

9    Q.  "Bestdamnpennystocks, nor any of its affiliates, they're

10   not registered investment advisers or broker dealers."

11           And that completed the disclaimer you got in the email

12   that morning?

13   A.  Correct.

14   Q.  Without going through it again, do you remember that exact

15   same disclaimer was provided in the next email, Government

16   Exhibit 611?

17   A.  Yes.

18   Q.  Let's not read it again, but if we can publish it, please.

19   A.  Yes.

20   Q.  That disclaimer was the one that came with the email.  But,

21   indeed, when you registered for bestdamnpennystocks.com, you

22   were provided access to an even more expansive disclaimer, even

23   more information, when you decided to sign up for

24   bestdamnpennystocks.com.

25           Do you remember that?

D3ELLEV4                    Shiflet - cross

1   A.   I don't remember that, no, but I'm sure.  I'm not disputing

2   it.

3            MR. SREBNICK:  If we could, I offer, or, if it's not

4   already in evidence, offer Government Exhibit 708.

5            MR. MASTER:  No objection.

6            THE COURT:  708 is in evidence.

7            (Government's Exhibit 708 received in evidence)

8            MR. SREBNICK:  I think it's the web page, if I'm not

9   mistaken, of bestdamnpennystocks.com, and if we could publish

10  it.

11  Q.   OK.  And do you remember this looking like the web page for

12  bestdamnpennystocks?

13  A.   Yes, I do remember that now.

14  Q.   Now, bestdamnpennystocks doesn't charge a fee to subscribe,

15  does it?

16  A.   That is my understanding, no.

17  Q.   OK.  And if we scroll down to the next page, free to sign

18  up, you see that?

19  A.   Yes.

20           MR. SREBNICK:  Keep going down.  Thank you.  Who's got

21  it?  Jen has it.  Great.  If you go down, they show some of

22  their picks.  And then we get to keep scrolling.  OK.  I think

23  you passed it.  Got to go slow.  My eyes aren't great.

24  Q.   "Be sure to completely read our legal disclaimer before

25  signing up or proceeding to the rest of our site."  Do you

D3ELLEV4                    Shiflet - cross

1    remember that?

2    A.  I'm sure I looked at it.  I don't remember it.

3    Q.  OK and --

4          THE COURT:  You don't remember it now?

5          THE WITNESS:  I don't remember seeing it when I signed

6    up.

7          THE COURT:  OK.

8          THE WITNESS:  But I'm sure it was there.

9    Q.  OK.  And did you, did you make a conscious decision not to

10   read it or you just don't remember?

11   A.  I just don't remember.  I don't.  To be honest with you, on

12   whether it's my cell phone or whatever, the disclaimers, sign

13   up for software, which are sometimes ten, 20 pages, I don't

14   read them, necessarily, unless it's -- I will start now, I can

15   tell you.  Anything that has the word apocryphal.

16   Q.  Probably worth looking it up in the dictionary, right?

17   A.  I can tell you for sure I've never had a client sign

18   anything, a disclaimer that says whatever preceded this was a

19   joke and should not be taken seriously.

20   Q.  When you decided not to read it, did you understand of

21   course that bestdamnpennystocks, I think the very first

22   question you were asked, they're an advertising company?

23   A.  They are.

24   Q.  Did you understand?  That's all I'm asking.  Did you

25   understand it at the time -- I think it was the very first

D3ELLEV4                    Shiflet - cross

1    question by the prosecutor about this subject -- that this was

2    an advertisement?

3              MR. MASTER:  Objection.  Misstatements the testimony.

4              THE COURT:  Sustained.

5    Q.  You understood this was an advertisement that was being

6    paid for by somebody who held the stock, correct?

7    A.  It was now I do.  At the time I thought it was someone who

8    was trying to sell their newsletter based on success because it

9    says he is tired of his 800 percent returns and how horrible.

10   He wanted to be much more.

11             I had no idea that it was a marketing tool at the

12   time.  I thought it was somebody generally trying to get in the

13   investment.

14   Q.  There's no fee for it, so they're not charging you a fee.

15   The only way, they told you the way they make money is they

16   charge to promote the stock?

17   A.  I'm not into their business.  From the way it reads, they

18   become successful by having a track record.  It also says in

19   here that if this EWPI does not double, that he will stop this.

20             So when I look back, it's all full of rhetoric and

21   things that should not.  It's apocryphal, whatever you call it.

22   Q.  Fair enough.  Now, the stock did do quite well on the day,

23   on the change from April 5 to April 6, the stock did go up as

24   bestdamnpennystocks predicted, right?

25   A.  What day?

1  Q.  It closed higher?

2  A.  What day did I purchase?

3  Q.  According to -- let me show you.

4  A.  I thought it went down from the 5th to the 6th.  Just

5  technicality on the days.

6  Q.  Let's take a look at Government Exhibit 105-52.

7  A.  OK.

8  Q.  You haven't seen that yet.  I'm going to publish it for

9  you, 105-52.  I think we're going to need to enlarge like half

10  of it so we can all see it.  OK.  This is already in evidence

11  and that's perfect for now.

12          Now, you let me tell what you it is.  If we go to the

13  top, Michael, just so the witness who hasn't seen this before

14  has a chance, this is already in evidence.  And I think without

15  dispute, this is what the government presented earlier in the

16  case, and it just tracks the last stock price of the day and

17  the volume for particular days.  OK?

18  A.  I understand.

19  Q.  Now, if we start in January, you see a very -- the stock

20  price was 16 cents back in January of 2010 with a volume of 541

21  shares?

22  A.  Yes.

23  Q.  OK.  Now, you had said that you track what, the volume, the

24  momentum of volume of a stock?

25  A.  That is correct.

D3ELLEV4                    Shiflet - cross

1    Q.  Do you see that on March 22, 2010, about two weeks or so

2    before you bought the stock, the stock had reached 66 cents as

3    its last price on a volume of two and a half million shares?

4    A.  Correct.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3erlev5                    Shiflet - cross

1    MR. SREBNICK:  If we can scroll down from that date.

2    Perfect.

3    Q.  Before that, there had never been a day where the stock had

4    even traded a hundred thousand shares, before March 22 of 2010,

5    in that year, correct?

6    A.  Correct.

7    Q.  The volume then started declining all the way until

8    basically April 5th, correct?

9    A.  Yes, the day that this newsletter was sent out, and the

10   volume went through the roof.

11   Q.  On the day you bought?

12   A.  Yes.

13   Q.  Was the date everybody bought?

14   A.  Right.

15   Q.  It appears a lot more people bought?

16   A.  Right.

17   Q.  It was the highest volume of that stock in that year to

18   date, correct?

19   A.  Right.  And it jumped the day before.

20   Q.  The stock price, if you can track what the last price is,

21   the stock price had been somewhere in the 40s, do you see that?

22   Starting in March 24th, it was 38 cents, then 44 cents, do you

23   see that?

24   A.  Yes.

25   Q.  Then 46, 42, 43, 43, 48.  Are you following along?

D3erlev5                    Shiflet - cross

1   A.  Yes.

2   Q.  Then on April 5th it increased to 62 cents as the last

3   price.  Let's not move it so we all stay focused.  And it

4   closes the next day at 71 cents or the last price, whatever

5   that means.  Do you see that?

6   A.  Yes.

7   Q.  The stock price indeed did go up between the 5th and the

8   6th?

9   A.  Yes, in correlation with this newsletter.

10  Q.  Yes.  A lot of people bought the stock.  I guess there was

11  increased demand, correct?

12  A.  Mm-hm.

13  Q.  The volume was much higher, the stock price went up,

14  correct?

15  A.  Right.

16  Q.  The next day the last price was 49 cents on a million 7 in

17  trading, right?

18  A.  Mm-hm.

19          THE COURT:  That's a yes?

20  A.  Yes.  I'm sorry.

21  Q.  A million 7 shares, 1,700,000 shares, still represents the

22  third highest volume of shares traded for that year in that

23  stock, correct?

24  A.  Correct.

25  Q.  With all that volume, the stock price still came down,

D3erlev5                    Shiflet - cross

1   correct?

2   A.  Correct.

3   Q.  The next day, April 8th, another 1,100,000 shares, the

4   stock price ticked up to 53 cents, do you see that?

5   A.  Correct.

6           MR. SREBNICK:  If we keep scrolling down.  Please stop

7   there.

8   Q.  Then the stock price hovered right around, let's say, the

9   50 cent range, 49 cents, 53 cents, 55 cents, do you see that?

10  A.  Yes.

11  Q.  On volume either over a million shares or 700,000 shares,

12  but during that time period it's hundreds of thousands of

13  shares of stock trading, right?

14  A.  Correct.

15  Q.  Mr. Shiflet, did you have a margin account for this trading

16  activity?

17  A.  No, I did not.  It was a margin account, but I did not have

18  any margin.  Every account is a margin account, I guess.  But I

19  had capital to cover.  I was not risking borrowed funds, if

20  that's what you are asking.

21  Q.  I couldn't tell from the document.  That's why I asked the

22  question.

23  A.  Yes.

24  Q.  Thank you.  You were trying to foresee the momentum, is

25  what I think you told us.  You were trading on momentum of the

1  stock?

2  A.  Momentum and positive news that I had received.

3  Q.  From April 6th to April 7th the stock price came down,

4  correct?

5  A.  Yes.

6  Q.  For whatever reason, it was your expectation that the stock

7  price would eventually go back up?

8  A.  According to this newsletter, the next newsletter I

9  received they said the short position was impossible or

10  whatever, and it was going to have to be covered, and it would

11  go back up because, whatever, there was no reason for the

12  excessive shorts.  You can read it, the newsletter.

13  Q.  Short position, for those of us that are not active

14  traders, does that mean people that are selling the stock

15  without even owning the stock?

16  A.  They can own it or not, but most times it's an uncovered

17  short, yes, they do not own it.

18  Q.  Uncovered short means?

19  A.  They are betting the stock goes down.

20  Q.  So Best Damn Penny Stocks provided information that there

21  were a lot of people betting that the stock would go down?

22  A.  Right.

23  Q.  You had people betting on both sides of the stock, people

24  betting it was going down and Best Damn Penny Stocks providing

25  information about why it could go up?

D3erlev5                    Shiflet - cross

1   A.  Correct.

2   Q.  I'd like to fast-forward now to the next month, May 20,

3   2010.  That was a day I think you told us when you decided to

4   take some money off the table.

5   A.  That is correct.

6   Q.  When you say take money off the table, is that sort of an

7   allusion or a reference to like a gambling table?

8   A.  Or an investment.  You take money off the market.

9   Q.  Was there any other news that you had received about the

10  company on May 20, 2010?

11  A.  What had happened, I think they had -- I don't remember any

12  emails after, and they had stopped coverage maybe of it.  I

13  understand when they stop coverage, that it is usually over.

14  The company news may have stopped.  I decided that it was time

15  to pull some off, find another investment maybe.

16  Q.  You kept some of your stock in your portfolio, meaning you

17  didn't sell all of EWPI stock, right?

18  A.  No, I did not sell it all.

19  Q.  Did you do any other research after April 7 to May 20

20  regarding EWPI?

21  A.  I remember, yes, I looked it up every day to see what the

22  company news was, what was reported.  I can't remember, but

23  yes, I looked every day, I guarantee you, at every one of my

24  stocks in my portfolio to see if there was something exciting

25  or negative.

D3erlev5                    Shiflet - cross

1   Q.  Do you recall a press release coming out from EWPI

2   indicating that there had been some discussions with the food

3   and drug board of Ghana and that test runs expected to start in

4   May had been pushed back 45 days?

5   A.  I do believe I remember that, yes.  45 days is not

6   uncommon.  If that was true, that is not necessarily bad news,

7   if there were such.

8   Q.  Mr. Shiflet, when you signed up for BestDamnPenny-

9   Stocks.com, do you recall that you were advised by BestDamn-

10  PennyStocks.com to seek the advice of other professionals

11  before making an investment decision?

12  A.  Yes.  That's on most of them.

13          THE COURT:  What was that?

14  A.  That's on most of the newsletters.  That's another

15  disclaimer.

16  Q.  Mr. Shiflet, at any point after the morning of April 6th,

17  after 9:30 in the morning, did you thereafter take a look at

18  the public filings of EWPI available at the OTC Market's

19  website or the Pink Sheets website?

20  A.  Maybe in 2011 I looked at the SEC filings.  I can't

21  remember.  I looked at several, a lot of companies.

22  Q.  Did you ever take a look at the balance sheet as it was

23  posted by EWPI on the Pink Sheets website?

24  A.  I can't remember that certain company.  I have looked at a

25  lot of SEC filings.

D3erlev5                    Shiflet – cross

1    MR. SREBNICK:  If I could have a moment?

2    THE COURT:  Yes.

3    MR. SREBNICK:  Your Honor, those are all the questions

4    I have.  Thank you.

5    THE COURT:  Thank you very much.  Mr. Master?

6    MR. MASTER:  A few questions on redirect.

7    REDIRECT EXAMINATION

8    BY MR. MASTER:

9    Q.  Mr. Shiflet, you were asked some questions about your

10   experience with disclaimers as an insurance agent, do you

11   remember that?

12   A.  Yes.

13   Q.  You understand that even though there are disclaimers in

14   the policies that you sell, are you allowed to lie to people to

15   trick them into buying insurance policies?

16   A.  Absolutely not.  That would not last very long.

17   Q.  You could get into a lot of trouble for that, right?

18   A.  Absolutely.

19   Q.  You can't misrepresent a policy and think that a disclaimer

20   would save you, right?

21   A.  That is correct.

22   Q.  You can't misrepresent the risk of the insurance that you

23   are selling and think that a disclaimer could save you?

24   A.  Correct.

25   Q.  You can't misrepresent your intentions in selling insurance

1    and think that a disclaimer would save you?

2    A.  No, I can't stay in business very long doing that,

3    absolutely not.

4    Q.  Because you could get in a lot of trouble for that?

5    A.  A lot of trouble.

6    Q.  The disclaimer that was read to you line by line by Mr.

7    Srebnick, that wasn't a disclaimer that you read line by line

8    and fully understood before making your investment decision,

9    right?

10   A.  That is true.

11   Q.  It's only going over it afterwards, after you had lost all

12   that money, that you went back and looked at what had been

13   represented in the disclaimer?

14   A.  Correct.

15   Q.  Even after having read the disclaimer, let me ask you, sir,

16   do you see someone over there, a woman?  Have you ever seen her

17   before?

18   A.  No, sir, I have not.

19   Q.  Donna Levy, do you know that name?

20   A.  No, I do not.  Sorry.

21        MR. MASTER:  I'd like to pull up Government Exhibit

22   700-1T, page 2.

23        MR. SREBNICK:  I have an objection to that exhibit

24   with this witness.

25        THE COURT:  It's overruled.

1  Q.  Was it disclosed to you and did you understand from the

2  disclaimer -- by the way, this was a call on April 5, 2010, at

3  4 p.m.  Was it disclosed to you in that disclaimer, did you

4  understand from that disclaimer, that Donna Levy was

5  coordinating the sending out of stock purchase recommendations

6  concerning Emerging World Pharma?  Do you see where it says

7  "every single person is going out full blast tonight"?

8          MR. SREBNICK:  Objection.  Leading.

9          THE COURT:  Overruled.  Did you know that?

10  A.  No, sir, I did not.

11  Q.  Did you have any awareness that there was a coordinated

12  effort among penny stock news letters to promote Emerging World

13  Pharma on the very day that you got that stock purchase

14  recommendation?

15  A.  At the time absolutely not.  I had no idea.

16  Q.  Had you known that, would that have affected your

17  investment decision?

18  A.  Absolutely.

19  Q.  The next day were you on a call or were you aware of a call

20  on April 6, 2010, involving Donna Levy?

21  A.  No, I was not.

22  Q.  If you could turn to Government Exhibit 700-2T.  Mr.

23  Shiflet, were you clued in at all to conversations Donna Levy

24  was having regarding a coordinated effort?

25          MR. SREBNICK:  Standing objection to this, Judge.

1    THE COURT:  OK.  Overruled.

2    A.  No, I was not.

3    Q.  Would it have affected your investment decision had you

4    known that Eric Cusimano had a high spam score in the emails

5    that he was sending?  You haven't seen this before, have you,

6    sir?

7    A.  No, I have not.

8    Q.  Would it have affected your investment decision had you

9    known that Eric Cusimano, the person who is listed on that Best

10   Damn Penny Stock website, had a high spam score?

11       THE COURT:  Do you even know what it is?

12   A.  I'm not sure I understand what a spam score is.  I

13   understand the word "spam" as an email, but I'm not sure what a

14   spam score is.

15       MR. MASTER:  Turn to the second page, Mr. Dinet.

16   Q.  Would it have affected your investment decision had you

17   known that Donna Levy and others were copying and pasting each

18   other's stock purchase recommendations concerning Emerging

19   World Pharma, in other words, that all of these were cut and

20   pasted from each other?

21   A.  If I would have known the details, yes, that would have

22   raised some red flags.

23   Q.  If you turn to page 5 of this.  Would it have affected your

24   investment decision had you known that Eric Cusimano was

25   spending a hundred thousand dollars a month to advertise on the

1    Internet so that people like you could sign up for BestDamn-

2    PennyStocks.com?

3    A.  Yes, that would have.  A hundred thousand a month seems

4    like a lot, and I would have wanted to know the motive or how

5    the return would -- questions would have been --

6    Q.  Or 200,000 a month.

7              MR. MASTER:  Nothing further, your Honor.

8              MR. SREBNICK:  May I ask two questions from right

9    here?

10             THE COURT:  Yes.

11   RECROSS-EXAMINATION

12   BY MR. SREBNICK:

13   Q.  You knew that Best Damn Penny Stocks was getting paid

14   $250,000 to promote this stock on one single day?  You knew

15   that?

16   A.  No, I didn't realize one day.  I thought that was part of

17   the disclaimer that came with all the emails.  I was not aware

18   of just one day 250.  I thought that was their fee for

19   promoting it over a year or two years.

20   Q.  Where did you get that from?

21   A.  Because I thought it was part of the normal disclaimer.  I

22   did not realize it was one day.

23   Q.  You woke up at 6:30 in the morning, the document told you

24   they were being paid $250,000, and within 2½ hours you buy the

25   stock, right?

D3erlev5          Shiflet - recross

1  A.  Correct.

2              MR. SREBNICK:  I have nothing further.

3              THE COURT:  You are excused.  Thank you very much.

4              (Witness excused)

5              THE COURT:  Ladies and gentlemen, why don't we take

6  our afternoon recess.

7              (Recess)

8              MR. MASTER:  Your Honor, I want to publish one item to

9  the jury.  It's being admitted subject to connection.  It is

10  Government Exhibit 605-7D-1.  It is a copy of an email from

11  BestDamnPennyStocks.com concerning EWPI dated 2010, April 6th.

12  It includes a list of recipients of the email.

13              MR. SREBNICK:  I'm sorry?

14              THE COURT:  A list of recipients of the email, is that

15  it?

16              MR. MASTER:  Yes.

17              MR. SREBNICK:  No objection.

18              THE COURT:  What is the number, Mr. Master?

19              MR. MASTER:  605-7D-1.

20              THE COURT:  It is in evidence.

21              (Government's Exhibit 605-7D-1 received in evidence)

22              THE COURT:  All right, Mr. Master.

23              MR. MASTER:  At this time the government calls Jeffrey

24  Eastman.

25   JEFFREY EASTMAN

D3erlev5                    Eastman - direct

                THE WITNESS:  Jeffrey Scott Eastman.  Eastman is

E-A-S-T-M-A-N.

                THE COURT:  Please sit down, Mr. Eastman, make

yourself comfortable.  Pull yourself right up to the

microphone.

                Mr. Master.

                MR. MASTER:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. MASTER:

Q.  Where are you employed, sir?

A.  I'm employed by the Department of Homeland Security

Investigations in California.

Q.  What is your title?

A.  I'm a special agent.

Q.  For how long have you been a special agent with Homeland

Security Investigations?

A.  I've been a special agent with what is now Homeland

Security Investigations since 2001.  Before that, it was called

U.S. Customs.  And before that, I was a special agent with the

U.S. State Department Diplomatic Security Service starting in

1997.

Q.  Where did you work at the diplomatic security service?

A.  I worked in New York, San Francisco, Los Angeles, and at

embassies overseas, such as in Cairo, Kathmandu, Algiers,

Algeria.

D3erlev5                    Eastman – direct

1    Q.  Did there come a time when you were asked to help execute a

2    search warrant at the residence of an individual named Joseph

3    Saranello?

4    A.  Yes.

5    Q.  I would like to direct your attention to March 16, 2010.

6    What happened on that date?

7    A.  On March 16th, 2010, I traveled to Colorado and I

8    participated in the execution of a federal search warrant on

9    the residence of a Joseph Saranello in Colorado.

10   Q.  What was the legal basis for the search warrant?

11   A.  The legal basis was to obtain evidence of international

12   money laundering and securities fraud.

13   Q.  There were a number of agents on the search?

14   A.  Yes, there were a number of IRS agents and ICE agents.

15   Q.  ICE is yet another predecessor name for Homeland Security?

16   A.  Yes.  It's a long story.  Customs merged after 9/11 with

17   immigration.  In 2001 it became ICE.  And recently ICE had a

18   name change to Homeland Security Investigations.  Really one

19   and the same agency, just with a name change.

20   Q.  Did there come a time when you actually executed the search

21   of Joseph Saranello's residence?

22   A.  Yes, we did.

23   Q.  There were a number of documents that you recovered from

24   the search?

25   A.  Yes.

1    Q.  In preparation for your testimony here today, did you have

2    the opportunity to look at what's been marked as Government

3    Exhibits 500-1 to 500-22?

4    A.  Yes.

5    Q.  I think there is a Redweld, a binder, in front of you.  If

6    you wouldn't mind taking a look at the contents of that.  That

7    should contain 500-1 to 500-22.

8    A.  Yes, it does.

9    Q.  Do you recognize those documents?

10   A.  Yes, I do.

11   Q.  What are they?

12   A.  These are documents recovered from the residence of Joseph

13   Saranello in Colorado.

14   Q.  I what date?

15   A.  I believe the date was March 15, 2010.

16   Q.  Prior to executing the search warrant, what, if any,

17   advance notice did you give Joseph Saranello that he was a

18   target of a federal investigation?

19   A.  We didn't give him any notice at all.

20   Q.  What happened to the documents after they were seized from

21   Joseph Saranello's residence?

22   A.  The documents were boxed up by an ICE agent in Colorado and

23   they were mailed to my office in Orange County, California.

24   Q.  What did you have done with the documents once they were at

25   your office?

D3erlev5                    Eastman - direct

1  A.  We took them from our evidence room at one point over to

2  the U.S. Attorney's office in Santa Ana, California, where they

3  were scanned and given these Bates numbers by Xerox.

4  Q.  What's a Bates number?

5  A.  We have tracking documents.  The bottom of this document,

6  for example, might say Saranello 008385 as a reference point.

7  Q.  Each page has a unique reference number?

8  A.  Yes, each page has a unique identifying Bates number.

9  Q.  With the exception of 500-19, are each of the documents in

10  that Redweld documents that are Bates numbered from the

11  Saranello search?

12  A.  Do you want me to go through the whole Redweld?

13  Q.  Yes.

14  A.  I see Bates numbers on all the pages here.

15  Q.  If you could look at what is Government Exhibit 500-19.

16  What is Government Exhibit 500-19?

17  A.  It is a torn piece of paper.

18  Q.  Have you previously seen that as Bates numbered from the

19  Saranello search?

20  A.  Yes, I have.

21  Q.  Do you recognize that as the original of a torn page?

22  A.  It's the original, yes.

23          MR. MASTER:  Your Honor, at this time the government

24  offers Government Exhibits 500-1 to 500-22.

25          MR. SHARGEL:  May I see a copy, your Honor, or the

1    original?

2           THE COURT:  Certainly.

3           MR. SHARGEL:  May I have one moment with Mr. Master?

4           THE COURT:  Yes.

5           MR. SHARGEL:  No objection.

6           THE COURT:  500-1 through 500-22 are received in

7    evidence.

8           **(Government's Exhibits** 500-1 through 22 received in

9    evidence)

10          MR. MASTER:  May I publish the exhibits briefly.

11          THE COURT:  Do you want to publish them?

12          MR. MASTER:  First may we publish 500-1 to the jury?

13          THE COURT:  Yes.

14   Q.  Mr. Eastman, you can look on on the screen or at the

15   document in front of you.  This is a document that has a tab

16   "Summary."

17          MR. MASTER:  If you could turn to the next page, Mr.

18   Dinet.

19   Q.  It states "Individual account summary."  I'm going to ask

20   you some questions about this document.  This was found at Mr.

21   Saranello's home, correct?

22   A.  That's correct.

23   Q.  Based on your investigation, did there come a time when you

24   came to learn that each of these names was associated with a

25   Panamanian bank account?

D3erlev5                    Eastman - direct

1    A.    That's correct.  The majority, if not all, were associated

2    with Panamanian bank accounts.

3    Q.    Those Panamanian bank accounts include a bank account in

4    the name of Bluefin Financial Group?

5    A.    Yes, that was one of them.

6    Q.    And a Panamanian bank account in the name of Udino

7    Investments?

8    A.    Yes, that was another account in Panama.

9    Q.    And an account in the name of Copperwood Foundation?

10   A.    Yes.

11   Q.    What did you and other law enforcement agents do when you

12   identified all of these Panamanian bank accounts?

13   A.    Myself and other ICE law enforcement agents obtained a

14   seizure warrant for various bank accounts maintained at banks

15   in Panama.  Most of these are listed here, the names of the

16   various accounts.

17   Q.    Can you explain for the members of the jury what a seizure

18   warrant is.

19   A.    A seizure warrant is a civil warrant to seize whatever is

20   in an account.  Usually, you put the name of the account on it

21   and the account number, sometimes just the account number.  You

22   have to have probable cause why you are doing this.  Then the

23   account is seized and maintained by the government until it is

24   adjudicated civilly.

25   Q.    Where were these accounts located, which banks?

D3erlev5                    Eastman - direct

1    A.   Chiefly Capital Bank in Panama.  Before that, some of these

2    accounts had been in Multibank, and they were transferred over

3    to Capital Bank.

4    Q.   What happened a couple of days after you executed the

5    search warrant with respect to Joseph Saranello?

6    A.   We arrested him a couple of days later.

7    Q.   Prior to that had Mr. Saranello been cooperating with the

8    government?

9    A.   No.

10   Q.   After his arrest, what did he start to do?

11   A.   He very quickly started to cooperate with the government.

12   Q.   In connection with his cooperation, without saying any of

13   the substance of what he told you, did he provide certain

14   information about individuals he had worked with?

15   A.   Yes.  He gave us names of different individuals he worked

16   with and volunteered to make phonecalls to them.

17   Q.   I'm going to get to that in a moment.  Before I do, let me

18   flip through a couple of additional documents from the seizure

19   warrant.  I'm sorry.  From the search warrant.

20            MR. MASTER:  If you wouldn't mind, Mr. Dinet, turning

21   to 500-2 quickly, and the second page.

22   Q.   Do you recognize this as an account application in the name

23   of Udino Investments?

24   A.   Yes.

25   Q.   Do you recognize that handwriting?

1  A.  Yes, I do.

2  Q.  Whose handwriting?

3  A.  It's the handwriting of Joseph Saranello.

4  Q.  If you wouldn't mind turning to 500-4.  And if you wouldn't

5  mind turning to the fourth page.  I'm sorry.  The next page.

6  Do you see there is an individual named Christian Burnett?  Do

7  you see that name?

8  A.  Yes.

9  Q.  That was also a document that was seized from Joseph

10  Saranello's home?

11  A.  Yes.

12  Q.  Now turn to 500-5.  This is also a document seized from

13  Joseph Saranello's home?

14  A.  Yes, it is.

15  Q.  It's dated September 9, 2009, do you see that?

16  A.  Yes, I do.

17  Q.  It's between Bluefin Financial Group and Veradad Telecom

18  Inc.?

19  A.  Yes.

20  Q.  Do you see where it relates to a secured promissory note

21  issued to it by a company called Voice Networkx?

22  A.  Yes.

23  Q.  Now 500-6.  Do you see there there are wire instructions

24  for a Bluefin Financial Group?  You stated that Capital Bank,

25  Inc. -- where is that bank located?

D3erlev5                    Eastman - direct

1    A.  It's located in Panama.  I don't remember the exact city,

2    but it is located in Panama.

3    Q.  You understood that all the wires that go to Capital Bank

4    in Panama are routed through HSBC Bank in New York, New York?

5    A.  The majority of them were.  They might have changed at some

6    point, but the majority were going through HSBC Bank in New

7    York, yes.

8    Q.  Now if you could turn to 500-10.  Was this found in Joseph

9    Saranello's home?

10   A.  Yes.

11   Q.  This was on the search that you executed in March of 2010?

12   A.  Yes, it was.

13   Q.  Now I'd like you to take a look quickly at Government

14   Exhibits 500-11, 500-12, 500-13, 500-14, 500-15, 500-16,

15   500-17, 500-18.  Without telling the jury what your

16   interpretation of these documents are, were documents of this

17   nature, with dates and this type of writing, found in multiple

18   locations in Mr. Saranello's home?

19   A.  Yes.

20   Q.  Then take a brief look at Government Exhibit 500-19.  Do

21   you have that in front of you or did I take it?  Do you have

22   the original in front of you?

23   A.  No.  I think you took the original back.

24   Q.  Yes.  Here it is.

25           MR. MASTER:  If I could publish that to the jury?

1    THE COURT:  Yes, you may.

2    Q.  On page 1 it says "Stock Purchase Agree."  Do you see that?

3    It relates, at least from what you can see, to $1,043,000?

4    A.  Yes.

5    Q.  If you could turn to the last page.  It has to do with a

6    seller, Udino Investments, Inc., and a purchaser, Peter

7    Veugler.  Do you see that?

8    A.  That's correct, yes, I see that.

9    Q.  Now Government Exhibit 500-21.  Was this document also

10   found in Joseph Saranello's home in March of 2010?

11   A.  Yes.

12   Q.  You had no prior investigation of an individual by the name

13   of David Levy at that time, correct?

14   A.  No.

15   Q.  This is a confidential memorandum dated September 7, 2009,

16   to Copperwood Foundation and cc Bluefin Financial Group, cc Mr.

17   David Levy, from a William Aul.

18   A.  That's correct.

19   Q.  It relates to a potential merger with Greenway Design Group

20   LLC, do you see that?

21   A.  Yes, I do.

22   Q.  Did you have any pending investigation of Greenway Design

23   Group LLC?

24   A.  No.  No, I do not.

25   Q.  It's signed by --

D3erlev5                    Eastman - direct

1           MR. MASTER:  Mr. Dinet, if you could go down.

2    Q.  Do you recognize that signature?

3    A.  Oh, yes.  That's the signature of Joseph Saranello, as it

4    looks like "Federico Rodriguez."

5    Q.  Was that one of the identities he assumed?

6    A.  That was one of the many Panamanian nominee identities that

7    he was assuming.

8    Q.  Then Government Exhibit 500-22.  Was that also found in the

9    home at the time that you executed the search warrant?

10   A.  Yes.

11   Q.  You mentioned earlier that you had executed some seizure

12   warrants with respect to Panamanian bank accounts, correct?

13   A.  Yes.

14   Q.  And that some other agents also working on this broader

15   investigation also executed seizure warrants, correct?

16   A.  That's correct.

17   Q.  Did there come a time when you also obtained what is known

18   as documents under a Mutual Legal Assistance Treaty?

19   A.  Yes.

20   Q.  Also known as an MLAT?

21   A.  Yes, we did.

22   Q.  Did those include bank records for certain bank accounts at

23   Capital Bank in Panama?

24   A.  Yes.

25           MR. MASTER:  Government Exhibits 502-1, 502-2, and

1    502-3 have previously been admitted by stipulation of the

2    parties.  I am now going to read another stipulation,

3    Government Exhibit S8.  It relates to Government Exhibits

4    503-1, 503-2, and 503-3.  It contains the customary language in

5    front and states:

6             If called as a witness, Dena Millman would testify as

7    follows:

8             1.  Ms. Millman is a certified court interpreter and

9    translator with more than 38 years of experience having been

10   certified by the administrative office of the United States

11   courts.  As such, she is fully qualified as an interpreter and

12   translator of the Spanish language into the English language

13   and vice versa.  She has testified as a Spanish language

14   interpreter and translator on numerous occasions.

15            Ms. Millman reviewed Government Exhibits 502-1, 502-2,

16   and 502-3 and translated those portions of such exhibits that

17   were written in the Spanish language into the English language.

18   Government Exhibits 503-1, 503-2, and 503-3 contain the Spanish

19   language portions of Government Exhibits 502-1, 502-2, and

20   502-3 respectively and the translated portions of such

21   exhibits.

22            It is further stipulated and agreed that Government

23   Exhibits 503-1, 503-2, and 503-3 may be received in evidence at

24   trial and that this stipulation may be received in evidence at

25   trial.

D3erlev5                    Eastman - direct

1          THE COURT:  Received in evidence.

2          (Government's Exhibits S8 and 503-1 through 3 received

3     in evidence)

4          MR. MASTER:  At this time I'd like to publish

5     Government Exhibit 503-1.

6          THE COURT:  This is the English version?

7          MR. MASTER:  Yes.  It is the facing page.  I would

8     request, Mr. Dinet, that you publish the first and second page

9     side by side.

10    Q.  Do you recognize documents related to an account by the

11    name of Udino Investments?

12    A.  Yes.

13    Q.  Is that one of the account statements which you obtained by

14    MLAT, Mutual Legal Assistance Treaty?

15    A.  That's correct.

16    Q.  Who is the signatory on the Udino Investments account?

17    A.  My recollection is that Joseph Saranello is the signatory

18    on all the accounts for which we did the MLAT.

19          MR. MASTER:  If you could turn to I guess it would be

20    the third and fourth pages, Mr. Dinet.  Can you zoom in on the

21    English language.  This relates to Udino Investments account at

22    Capital Bank.

23          Now turn to 502-3, Mr. Dinet, if you wouldn't mind

24    doing the facing page.  Actually, Mr. Dinet, if you wouldn't

25    mind going to what I guess would be the third and fourth pages

1    of this document.

2    Q.  Do you recognize these as statements of the Udino

3    investment account?

4    A.  Yes.

5    Q.  These are documents that you obtained through this Mutual

6    Legal Assistance Treaty from Capital Bank in Panama?

7    A.  Yes, we did.

8            MR. MASTER:  If you wouldn't mind zooming in, Mr.

9    Dinet, on a transaction that is reflected on this statement

10   25/09/2009 on the left-hand side in the middle of the page.  It

11   says NCD PTO Comercio Exterio, and then in parens, P/O Date

12   Palm Capital in the amount of $149,950.

13   Q.  Do you see that reflected there?

14   A.  Yes, I do.  I see that reflected in the credit column.

15           MR. MASTER:  If you wouldn't mind turning to the next

16   page, Mr. Dinet, where that is translated.  That's translated

17   as "Credit Foreign Trade Department ordered by Date Palm

18   Capital Corp."

19   Q.  Then 503-3, do you recognize that as another document that

20   you obtained from Capital Bank by MLAT?

21   A.  Yes.

22   Q.  That relates to what entity?

23   A.  This entity is Bluefin Financial Group, Inc.

24           (Continued on next page)

25

D3ELLEV6                          Eastman - direct

1    BY MR. MASTER:

2    Q.  And who is the signatory on the account?

3    A.  Joseph Saranello.

4    Q.  Now, you stated that Joseph Saranello offered to make

5    recordings of a number of individuals, correct?

6    A.  Yes.

7    Q.  And was one of the individuals who he offered to make

8    recordings of David Levy?

9    A.  Yes, it was.

10   Q.  And these have previously been stipulated into evidence,

11   but I just wanted to ask, how did you manage the process of the

12   recordings?

13   A.  We provided Joseph Saranello or I provided Joseph Saranello

14   a digital recorder, which he took with him to Colorado.  I was

15   in California.  And he would make calls to individuals such as

16   Mr. Levy, and then he would email those calls to myself and

17   copy an IRS agent on them.

18        And approximately two to three times during that

19   process, he would send the recorder out to me.  One time he

20   brought the recorder with him to a meeting.  And I would

21   download the recorder onto my computer and I could compare the

22   actual original download off the digital recorder to the

23   ultimate email to me.

24   Q.  To confirm they were authentic?

25   A.  Yes.

D3ELLEV6                         Eastman – direct

1    Q.  Now, in this preparation for your testimony today, did you

2    have the opportunity to listen to calls that are in evidence as

3    Government Exhibits 520, 521, and 525?

4    A.  Yes, I did.

5           MR. MASTER:  And, Mr. Dinet, if you wouldn't mind just

6    playing at the very beginning of call 520.  520.  It's a call

7    on April 20, 2010, and I'm just going to ask if you recognize

8    voices on the call.

9           THE COURT:  Do we have a call into the bull pen?

10          MS. COHEN:  It's just loading, your Honor, it takes a

11   minute.

12          MR. SHARGEL:  If it helps, I will stipulate it is

13   Mr. Levy's voice on the recording.  We stipulated that in

14   evidence.

15          MR. MASTER:  That's fine, your Honor, if there's a

16   delay.

17          Nothing further.

18          THE COURT:  Mr. Shargel.

19   CROSS-EXAMINATION

20   BY MR. SHARGEL:

21   Q.  Agent Eastman, you're here from California, right?

22   A.  Yes, sir.

23   Q.  That's where the middle district of California is where the

24   case against Mr. Saranello developed?

25   A.  Central District of California.

1    Q.  I'm sorry.  What did I say, middle?  I mean central

2    district.

3    A.  Yes, sir.

4    Q.  So just so orient ourselves geographically, what's the

5    largest city in the central district?

6    A.  Los Angeles is the largest city in the district, but the

7    case is out of Santa Anna, which is in Orange County,

8    California.

9    Q.  I want to go back to something you said on direct

10   examination about the HSBC Bank.  The question was in relation

11   to transactions between where, would you remind us?

12   A.  Panama and the United States.

13   Q.  And I believe the answer to the question was that at

14   present, at present, all such transactions go through HSBC in

15   New York.

16   A.  That's my understanding, yes.

17   Q.  Where did you get the understanding?

18   A.  From looking at the records, through the --

19   Q.  I'm sorry?

20   A.  Through the MLAT, looking through the bank records.

21   Q.  And you said in your direct testimony -- correct me if I'm

22   wrong -- that there was a time when not all of them went

23   through HSBC?

24   A.  Well, when I said that, I'm also thinking about other bank

25   accounts that were down there, such as accounts maintained at

1   Multibank.  They might have cleared through a different bank

2   than HSBC.

3   Q.  Can you say with certainty that the transactions that

4   occurred with respect to Mr. Levy went through HSBC, can you

5   point to any document that tells us that with certainty?

6   A.  If I had the documents in front of me, I could go through

7   each wire.

8   Q.  So maybe that would be the redirect, so I'll just leave it

9   at that.

10          But you'd have to see the documents and you'd have to

11  look at the wires to see whether it went through New York at

12  all or HSBC, right?

13  A.  Right.  I'd want to look at the wires and make sure I'm

14  looking at the HSBC on there.  But my understanding is from

15  looking at the records, they were going through HSBC with

16  Capital Bank.  At one point Mr. Saranello moved from using

17  Multibank to Capital Bank, and I'm not sure about where

18  Multibank was clearing through.

19  Q.  As you sit here now, you can't state with any degree of

20  certainty that it went through New York or HSBC Bank?

21  A.  I would want to see the records.

22  Q.  You would want to see the records to make certain, right?

23  A.  Yes.

24  Q.  So that leaves, if I may just repeat the question, that

25  leaves that right now it's uncertain --

1    A.  Yes.

2    Q.  -- fair point.  You said mm-hmm?

3    A.  Yes.

4    Q.  Were you -- I should say are you the case agent on this

5    case?

6    A.  I am one of the case agents on the Joseph Saranello case,

7    not the Levy case.

8    Q.  You're not a New York agent?

9    A.  No.

10   Q.  You're a stranger in a distant land here?

11   A.  Well, I used to work here.

12   Q.  You're not a stranger but you're in a distant land.

13          You're a case agent on the Saranello case?

14   A.  Yes.

15   Q.  And that's why you were part of the search team when the

16   agents, number of agents went to his house on that March day in

17   2010?

18   A.  That's correct.  I was there.

19   Q.  And as the case agent, did you continue to work with

20   Mr. Saranello during the period of his cooperation?

21   A.  Yes, I did.

22   Q.  I think you said on direct examination that he started to

23   cooperate with the government almost immediately, right?

24   A.  That's correct.

25   Q.  It was what, in March he started to cooperate with the

1    government, the same month that the search warrant was

2    executed?

3    A.  I believe it was the end of March.

4    Q.  And then the following March, I'm sorry, the following

5    month he started cooperating and there was a proffer session

6    that you attended, right?

7    A.  I attended a proffer session.  I'm not sure the exact date,

8    but I attended a proffer session with Mr. Saranello.

9    Q.  You became aware that probably a week after the proffer

10   session, April 22, 2010, if that refreshes your recollection,

11   that Mr. Saranello entered into a cooperation agreement, right?

12   A.  Yes.

13   Q.  And you knew with any -- you've been an agent a long time,

14   an investigator a long time.  You knew that like with any

15   cooperation agreement, he was agreeing that he would tell the

16   truth, right?

17   A.  That's correct.

18   Q.  And made promises that he wouldn't commit any more crimes

19   and wouldn't lie and so on and so forth?

20   A.  That is true.

21   Q.  But you since learned that even after he agreed to do that,

22   he lied to the agents, right, to agents?

23   A.  I learned that very recently.

24   Q.  Like last week or something, right?

25   A.  That's correct.

D3ELLEV6                    Eastman - cross

1          MR. SHARGEL:  No further questions.

2          THE COURT:  Anything?

3          MR. MASTER:  No, your Honor.

4          THE COURT:  Mr. Eastman, thank you very much.

5          (Witness excused)

6          THE COURT:  Next witness.

7          MR. MASTER:  Government calls Joseph Saranello.

8    JOSEPH SARANELLO,

9        called as a witness by the Government,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. MASTER:

13         THE COURT:  Mr. Master, do you want to reclaim these

14   documents?

15         MR. MASTER:  No, actually, Mr. Saranello is going to

16   be using them.

17         THE COURT:  All right.

18   Q.  Mr. Saranello, how old are you?

19   A.  I'm 64 years old.

20   Q.  What's your level of education?

21   A.  I have a bachelor's degree and a law degree.

22   Q.  Where did you grow up?

23   A.  In Brooklyn, New York.

24   Q.  Where did you go to high school?

25   A.  In Stuyvesant High School.

1    Q.   Where did you go to college?

2    A.   At City University of New York.

3    Q.   And where did you go to law school?

4    A.   At the University of Texas.

5    Q.   And after law school where did you practice?

6    A.   In Houston, Texas.

7    Q.   And did there come a time when you were disbarred?

8    A.   Yes, I was.

9    Q.   What were you disbarred for?

10   A.   I had neglected approximately four cases and failed to keep

11   up with deadlines on those cases and they were dismissed for

12   want of prosecution and I was disbarred.

13   Q.   After you were disbarred, what did you start doing for a

14   living?

15   A.   I engaged in risk management consulting and the forming of

16   captive insurance companies.

17   Q.   Can you just explain for the members of the jury what a

18   captive insurance company is?

19   A.   It's basically an insurance company that's owned by the

20   people that are actually being insured and the -- so that they

21   take part of the risk and self-insure part of the risk and they

22   reinsure the catastrophic risk.

23   Q.   And did there come a time when your work with captive

24   insurance companies took you down to Panama?

25   A.   Yes, it did.

D3ELLEV6                    Saranello - direct

Q.   And what's the reason for that?

A.   Because of the favorable laws and tax treatment laws in Panama.

Q.   Concerning what?

A.   Concerning captive insurance companies.

Q.   And so did there come a time when you began traveling down to Panama to set up captive insurance companies?

A.   Yes, there was.

Q.   And what kind of clients did you have when you were --

began setting up these captive insurance companies?

A.   They were mostly small medical practices or locum tenens practices who hired doctors on a temporary basis.

Q.   What's a locum tenens basis?

A.   A company that hires doctors to work in hospitals on a temporary basis.

Q.   Did there come a time when some of the doctors and dentists who asked you to set up their locum tenens -- or, I'm sorry --

their captive insurance companies asked you to set up other accounts for them?

A.   Yes, they would.  I was setting up some companies and bank accounts for them.

Q.   And what kind of companies?

A.   They were basically shell companies.  They had a name, an address in Panama, and a registry agent in Panama.

Q.   When you say shell company, what do you mean by shell

1   company?

2   A.  A company that had an address but no real assets and no

3   real business activity.

4   Q.  And what was the purpose of setting up these shell

5   companies for these clients?

6   A.  So that they could open up investment accounts or brokerage

7   accounts and also so that they could shelter assets of theirs

8   in the event of creditor judgments or divorce.

9   Q.  In other words, they wanted to hide their money?

10  A.  Yes.

11  Q.  In Panama?

12  A.  Yes.

13  Q.  And --

14          MR. SHARGEL:  I object to that question.  I object to

15  the leading.

16          THE COURT:  Overruled.

17  Q.  And so what if any real activity did these companies engage

18  in that you set up?

19  A.  No real activity in Panama.

20  Q.  And so what would happen when funds would arrive in these

21  accounts that you set up in Panama?

22  A.  The accounts, the funds would then be sent to -- they would

23  be used by the parties who had the accounts set up.  They would

24  be wired to them or sent to them and/or the funds would sit in

25  the bank accounts until the parties wanted to use them.

1  Q.  And who was the actual signatory on the bank accounts that

2  you set up for these people?

3  A.  In the early years, it was themselves.  But later on, I

4  signed as the signatory on the bank accounts.

5  Q.  And what if anything did you do to further -- well,

6  withdrawn.

7          What if any use did you make of Panamanian identities

8  to further your work for these people?

9  A.  When I set up brokerage accounts in the United States, I

10  would present a passport photo of a Panamanian who would be the

11  nominee or the person on the account.

12  Q.  Where did you get these identities?

13  A.  I got them in Panama from other people that I knew.

14  Q.  Did you pay for those identities?

15  A.  Yes, I did.

16  Q.  And what would you do when funds were received back in

17  Panama and your clients asked you to send money to another

18  location?

19  A.  I would wire the funds over.  The accounts all had internet

20  access, and I would wire the funds and keep notes as to the

21  funds that were wired and the amounts and the purpose.

22  Q.  What if any fees did you charge for your services?

23  A.  I charged $5,000 to set up the accounts, and I charged

24  1 percent of the fees.

25  Q.  1 percent of the funds?

1   A.  Of the funds.

2   Q.  And did there come a time when you began providing these

3   services for a different type of client other than doctors and

4   dentists?

5   A.  Yes.

6   Q.  And for whom did you begin providing these services?

7   A.  I provided for people who wanted to set up penny stock

8   accounts, brokerage accounts in the U.S.

9   Q.  And what types of services did you provide these people who

10  were involved in penny stocks?

11  A.  I would set up the corporation in Panama and I would open

12  the bank account in the name of the corporation and then I

13  would open up a U.S. brokerage account for that corporate

14  entity.

15  Q.  Where did you set up brokerage accounts?

16  A.  I set the brokerage accounts up at various brokerage houses

17  in the U.S., such as Thomas Anthony, Orion, and Oppenheimer.

18  Q.  And where if any offshore brokerage houses did you use?

19  A.  I used Gibraltar Securities, and I used Moneyline brokers

20  in Costa Rica.

21  Q.  Where is Gibraltar Securities located?

22  A.  In the Bahamas.

23  Q.  Whose names would appear as the founders of these shell

24  corporations that you would set up?

25  A.  There would be corporate officers provided by the company

D3ELLEV6                    Saranello - direct

1    or attorney that would file the corporate papers.  And then on

2    the brokerage applications, I would substitute the name of a

3    Panamanian nominee to be on that brokerage account.

4    Q.  That was one of the Panamanian nominees whose identities

5    you purchased?

6    A.  Yes.

7    Q.  And, again, whose names would you use on the Panamanian

8    bank accounts?

9    A.  I would use my name on the Panamanian bank accounts.

10   Q.  And how would you be able to use your name if other

11   identities were associated with the account?

12   A.  I would receive a power of attorney signed by the corporate

13   officer.

14   Q.  And how about if you needed to sign documents associated

15   with United States activities in the names of -- well,

16   associated with the identities you purchased, what would you

17   do?

18   A.  I would just sign that person's name to the document.

19   Q.  Using that identity?

20   A.  Using that identity.

21   Q.  And what did you come to understand about the purpose of

22   your work for these people who were involved in penny stocks?

23   A.  That they were basically pumping up the price of the stock

24   very quickly through various kinds of promotions, through press

25   releases, information that wasn't accurate, designed to pump up

D3ELLEV6                    Saranello - direct

1   the stock, and then they would quickly sell the stock.

2           MR. SREBNICK:  Objection, your Honor.

3           THE COURT:  Overruled.

4           MR. SREBNICK:  Move to strike.

5           THE COURT:  Denied.

6   Q.  What would you do once the proceeds of that promotion were

7   generated?

8   A.  I would request that the brokerage firm wire the funds to

9   the Panamanian bank account.

10  Q.  And then what would you do with the funds once they were in

11  the Panamanian accounts?

12  A.  I would wire them as per the instructions of the person who

13  had set up the account with me.

14  Q.  In preparation for your testimony today, were you asked to

15  review your records to identify approximately how much money

16  you laundered for people involved in stock promotion?

17  A.  Yes.

18  Q.  And what would you estimate would be the amount that you

19  laundered?

20  A.  I'd estimate about $30 million.

21  Q.  Now, there came a time when you were arrested, right, do

22  you remember that?

23  A.  Yes.

24  Q.  And prior to that a number of documents were seized from

25  your home; do you remember that?

D3ELLEV6          Saranello - direct

1   A.  Yes.

2   Q.  At the time the documents were seized from your home, were

3   you cooperating with the government?

4   A.  At that time, no.

5   Q.  And were you aware that the government was planning on

6   executing a search warrant at your home before the warrant was

7   executed?

8   A.  No, I was not.

9   Q.  After you were arrested, you began cooperating with the

10  government --

11  A.  Yes.

12  Q.  -- correct.  And eventually you pleaded guilty to pursuant

13  to a cooperation agreement with the United States Attorney's

14  Office for the Central District of California, correct?

15  A.  That's correct.

16  Q.  I'm going to show you what's been marked as Government

17  Exhibit 3514-8.  Do you recognize that document?

18  A.  Yes, I do.

19  Q.  What document is that?

20  A.  That is the plea agreement that I entered into with the

21  government.

22  Q.  That's with the United States Attorney's Office for the

23  Central District of California?

24  A.  Yes.

25  Q.  You were originally arrested for something having nothing

1    to do with David Levy, correct?

2    A.   That's correct.

3    Q.   And it related, as described in Exhibit A to your

4    cooperation agreement, related to something called R-U-N-U, a

5    penny stock called Runu Nutrition?

6    A.   Yes.

7    Q.   What crime did you plead guilty to in this cooperation

8    agreement?

9    A.   Conspiracy to commit wire fraud.

10   Q.   And what was your understanding of what you're obligated to

11   do under this agreement with the United States Attorney's

12   Office in California?

13   A.   To cooperate with the government, provide information

14   regarding any criminal activities, and to truthfully describe

15   information that I was aware of regarding any criminal

16   activities.

17   Q.   And are you required to truthfully testify if called upon

18   by the government?

19   A.   Yes.

20   Q.   Were you required to provide truthful information about

21   criminal activity that you were involved in?

22   A.   Yes.

23   Q.   And are you allowed to commit any future crimes?

24   A.   Yes.

25   Q.   Are -- I'm sorry -- are you allowed to commit any future

1    crimes?

2    A.  No.

3    Q.  And do you have to attend meetings and provide documents if

4    requested by the government?

5    A.  Yes.

6    Q.  Now, just taking a look at this agreement, you recognize

7    it, correct?

8    A.  Yes, I do.

9    Q.  And it's your signature on page 21 of the agreement,

10   correct?

11   A.  Yes, it is.

12   Q.  Now, as part of your cooperation, you were asked to

13   identify any bank accounts that you were aware of that had not

14   been seized by the government that were involved in your money

15   laundering activities; do you remember that?

16   A.  Yes.

17   Q.  And how many, well, how much money had not been seized that

18   you identified by through your cooperation?

19   A.  There had been several million dollars that was seized by

20   the government.

21   Q.  And was that in part as a result of your cooperation?

22   A.  Yes.

23   Q.  But, Mr. Saranello, was there another account that you

24   maintained that you did not tell the government about?

25   A.  Yes, there was.

1    Q.  How much money was in that account?

2    A.  There was approximately $125,000 in that account.

3    Q.  And when did you establish that account, Mr. Saranello?

4    A.  That had been established around 2009.

5    Q.  Where was it established?

6    A.  It was in Panama.

7    Q.  And what was the source of the funds in that account?

8    A.  Those were funds that I had earned over the course of time

9    in Panama and also funds that I had earned from money

10   laundering.

11   Q.  And you understood the work you were doing for these

12   individuals who were involved in stock promotion was money

13   laundering?

14   A.  Yes.

15   Q.  And why did you understand that you were helping launder

16   money?

17   A.  Because the proceeds that the -- the proceeds of the stock

18   sales was obtained through stock fraud and then the funds were

19   then wired into Panama and then distributed to other

20   individuals.

21   Q.  And you maintained shell companies for what purpose?

22   A.  For the purpose of laundering those funds, for sending them

23   from other companies that weren't related to companies that had

24   brokerage accounts always.

25   Q.  And you understood that one of the purpose of what you did

1   was to hide the origin of those funds?

2   A.  Yes.

3   Q.  And to hide the ownership of the funds?

4   A.  Yes.

5   Q.  And to hide who was controlling the funds?

6   A.  Yes.

7   Q.  Now, let's get back to that bank account that you didn't

8   tell the government about.  How much money was it again?

9   A.  Approximately 125, $126,000.

10  Q.  And you testified just a moment ago that it contained a

11  mixture of legitimately earned funds and funds from illegal

12  activities, correct?

13  A.  Yes, that's correct.

14  Q.  Do you have any documentation as to where, which of the

15  funds were earned from legitimate activities and which were

16  earned from money laundering?

17  A.  No, I do not.

18  Q.  And just describe for the jury why you held back that one

19  account?

20  A.  I was wrong to hold it back.  I don't have a reason for

21  holding back on and not disclosing it, but that was wrong to

22  do.

23  Q.  Well, what did you use the money for?

24  A.  When I received the funds, I used it for living expenses.

25  Q.  And what had happened to your main source of income after

1   your arrest?

2   A.  Money was frozen, most nearly all of my funds were frozen,

3   so it was difficult to kind of get on my feet again and it took

4   me a little while to do that.

5   Q.  And you used these illegal funds to get back on your feet,

6   you said?

7   A.  Yes.

8   Q.  And you had handling agents, correct?

9   A.  That's true.

10  Q.  And by that I mean agents who you checked in with every

11  day?

12  A.  Yes.

13  Q.  And was Jeffrey Eastman one of those agents?

14  A.  Yes.

15  Q.  And, again, you stated you told Jeffrey Eastman about

16  millions of dollars in funds that were in Panama, correct?

17  A.  That's correct, and also in the United States.

18  Q.  But you didn't tell him about the $125,000?

19  A.  That's correct.

20  Q.  And you didn't tell anyone in the government about it until

21  it had been spent, correct?

22  A.  That's correct.

23  Q.  And how did the government find out about the account?

24          MR. SHARGEL:  If he knows.  Objection, if he knows.

25  A.  I believe it was a report filed by the bank with the

D3ELLEV6          Saranello - direct

1    government.

2    Q.  What bank did you use to receive these funds from Panama?

3    A.  Colorado Business Bank.

4    Q.  And in preparation for trial, this office, the United

5    States Attorney's Office in New York, asked you whether you had

6    a Panamanian bank account, correct?

7    A.  Yes.

8    Q.  And that was just a few weeks ago, correct?

9    A.  Yes.

10   Q.  And what did you do when you were first asked about it?

11   A.  I was asked about the Colorado business account and the

12   explanation that I gave for the account was not correct.

13   Q.  It was false?

14   A.  It was false.

15   Q.  And you stated to the government here that the funds were

16   earned from captive insurance work; do you remember that?

17   A.  Yes, I do.

18   Q.  And you maintained that story for two days; do you remember

19   that?

20   A.  Yes, that's correct.

21   Q.  And you had a description of how the funds were earned

22   legitimately; do you remember that?

23   A.  Yes, I do.

24   Q.  And you maintained that for two days until what happened?

25   A.  I told -- I then told the government the truth about the

1   funds, that how they were obtained and that the information

2   about the captive earning for those funds was not true.

3   Q.  And that was only after the government confronted you and

4   asked you, directed you to call the individual who you said had

5   set up this captive insurance company in the government's

6   presence, correct?

7   A.  That's correct.

8   Q.  And you couldn't do that, correct?

9   A.  That's correct.

10  Q.  Because?

11  A.  There was no such.

12  Q.  There was no such thing?

13  A.  Yes, that's correct.

14  Q.  What is now the status of your cooperation agreement?

15  A.  The government has the option to void that cooperation

16  agreement.

17  Q.  Have they told you yet whether they're going to exercise

18  that option?

19  A.  No, they have not.

20  Q.  What have you been told about what needs to happen before

21  the government decides whether or not to maintain your

22  cooperation agreement?

23  A.  I need to continue to cooperate as requested by the

24  government.

25  Q.  And what has to happen before the government is able to

D3ELLEV6                    Saranello - direct

1    evaluate whether to keep your cooperation agreement?

2    A.  I need to testify truthfully in any proceedings that the

3    government requests that I do so.

4    Q.  And have you been told that the government needs to conduct

5    further investigation and further interviews with you?

6    A.  Yes.

7    Q.  And so you're testifying here today under the cooperation

8    agreement, correct?

9    A.  That's correct.

10   Q.  But as you sit here today, you don't know whether or not

11   the government is going to agree to be bound by the agreement,

12   correct?

13   A.  That's correct, yes.

14   Q.  What are you hoping will happen?

15   A.  I'm hoping that the government will abide by the agreement.

16   Q.  Have any promises been made to you in any regard with

17   respect to that cooperation agreement?

18   A.  No, they have not.

19   Q.  Now, if the cooperation agreement is not voided because of

20   you held back and lied about the $125,000, what will the

21   government agree to do for you?

22   A.  If it's not voided, then the government could choose to at

23   my sentencing write a letter requesting a departure from the

24   level of guideline that I would be sentenced at.

25   Q.  Is that called a 5K letter?

1  A.  Yes.

2  Q.  And that would -- well, what could happen to your sentence

3  if a 5K letter is written?

4  A.  The sentence could be lower than under the current

5  guideline level.

6  Q.  Does it have to be lower?

7  A.  No.

8  Q.  Who decides your sentence?

9  A.  The judge.

10  Q.  And have you been sentenced yet for the crime that you

11  pleaded guilty to?

12  A.  No, I have not.

13  Q.  And in the Central District of California, you negotiated

14  an agreement capping the potential sentence that you would face

15  under the agreement as five years, correct?

16  A.  That's correct.

17  Q.  If the agreement is voided, do you still get that benefit?

18  A.  No.

19  Q.  And under the agreement, you were required to become

20  current on your taxes by the time of your sentencing; do you

21  remember that?

22  A.  Yes.

23  Q.  Have you become current on your taxes yet?

24  A.  Not yet, I have not become current.  I've paid estimated

25  taxes, but I have not yet become current on my taxes.

D3ELLEV6                    Saranello - direct

1   Q.  Do you know yet when you're going to be sentenced?

2   A.  December 9.

3   Q.  Of which year?

4   A.  Of this year.

5   Q.  Do you know is that a firm date or could the date change?

6   A.  That date could be moved earlier or later.  It's up to the

7   government.

8   Q.  So have any promises at all been made to you about your

9   sentence by anyone?

10  A.  No, they have not.

11  Q.  Why did you enter into the cooperation agreement with the

12  government in the first place?

13  A.  In the hopes that I would receive as low a sentence as

14  possible.

15  Q.  So now let's get back to what you did for a living before

16  you were arrested.

17          I'd like to direct your attention to the middle of

18  2009.  At the time, who were your primary clients?

19  A.  They were penny stock promotors.

20  Q.  And what record if any did you -- withdrawn.

21          What records if any did you maintain concerning these

22  shell company bank accounts that you maintained in Panama?

23  A.  I maintained records of wires that I sent out and I

24  maintained some ledgers of the bank account balances, as well

25  as copies of wire confirmations.

1  Q.  I'm going to show you what's been marked and previously

2  admitted as Government Exhibit 500-1.

3         Do you recognize Government Exhibit 500-1?  And if you

4  wouldn't mind turning to the second page.

5  A.  Yes.

6  Q.  What is Government Exhibit 500-1?

7  A.  It's a listing of various shell companies and their

8  balances that I had set up in Panama.

9  Q.  And so was Bluefin Financial Group one of the shell

10  companies that you had set up?

11  A.  Yes, it was.

12  Q.  And how about Udino Investments, is that another shell

13  company that you had set up?

14  A.  Yes, it was.

15  Q.  In fact, each of these, what are each of these?

16  A.  Each of these are shell companies that I had set up, and

17  some of which had brokerage accounts and some not.

18  Q.  And there are balances listed.  Do you see the balance

19  totals?

20  A.  Yes.

21  Q.  And those are balances in those accounts?

22  A.  Yes, they were.

23  Q.  What are the two primary banks that you used?

24  A.  It was Capital Bank and Multibank.

25         THE COURT:  What bank?

D3ELLEV6                    Saranello - direct

1          THE WITNESS:  Multibank in Panama.

2     Q.   Where in Panama?

3     A.   In Panama City, Panama.

4     Q.   And now if you wouldn't mind turning to Government

5     Exhibit 500-2, what is depicted in Government Exhibit 500-2?

6     A.   That's a brokerage account application for Udino

7     Investments.

8     Q.   And what is Udino Investments again?

9     A.   It was one of the shell companies that I set up in Panama.

10    Q.   And if you wouldn't mind turning to page 2, there's a

11    signature on the bottom, Frederico Rodriguez Romero?

12    A.   Yes.

13    Q.   Who is Frederico Rodriguez Romero?

14    A.   That is one of the persons whose passport photo ID I

15    purchased and I used -- that's my signature -- and used that

16    name to establish the account.

17    Q.   And so that's your signature?

18    A.   Yes.

19    Q.   About how many shell corporations did you maintain in

20    Panama?

21    A.   Approximately some 12 to 15.

22    Q.   And about how many bank accounts did you maintain through

23    these shell corporations?

24    A.   Each corporation had a bank account.

25    Q.   And did you maintain funds in each of those bank accounts?

1   A.  Yes.

2   Q.  Now, who is Scott Gelbard?

3   A.  He is one of the penny stock promotors who I set up

4   accounts for and brokerage accounts for, both bank accounts,

5   corporations, and brokerage accounts.

6   Q.  Did there come a time when he said he wanted to introduce

7   you to David Levy?

8   A.  Yes.

9   Q.  When was that?

10  A.  Approximately May of 2009.

11  Q.  And what did you agree to do?

12  A.  I agreed to fly to California and meet with Scott and David

13  Levy.

14  Q.  And where did you meet?

15  A.  We met in the lobby of a hotel in Beverly Hills,

16  California.

17  Q.  Who was at the meeting?

18  A.  At the meeting was Scott Gelbard, David Levy, Ted Dudley

19  and myself.

20  Q.  And had you previously engaged in penny stock fraud and

21  money laundering activities with Scott Gelbard?

22  A.  Yes, I had.

23  Q.  And had you previously engaged in penny stock fraud and

24  money laundering activities with Ted Dudley?

25  A.  Yes, I had.

1  Q.  When if ever had you met David Levy before?

2  A.  That was the first time I met David Levy.

3  Q.  And at the meeting, what if anything did you tell David

4  about what you did?

5  A.  I told David that I set up corporations and bank accounts

6  in Panama, and also that I set up brokerage accounts in the

7  United States for those Panamanian companies.

8  Q.  And what if anything did David say that he did?

9  A.  David said that he was involved in promoting and pumping up

10 prices of small microcap stocks and selling them quickly to

11 make large profits.

12 Q.  And what did he say, what if anything did he say he needed

13 your help doing?

14 A.  He wanted to set up accounts, an account for himself in

15 Panama that would be his own personal account in the name of

16 Panamanian corporation.

17 Q.  What did he say he wanted to set up that account for?

18 A.  Because he wanted to -- he was going to be working on some

19 stock deals with Scott Gelbard and he wanted to have an account

20 where once the proceeds of the accounts, the stock sales came

21 into the bank, he could move it without having to wire funds

22 into his own account.

23 Q.  And what else if anything did David ask of you concerning

24 these upcoming deals?

25 A.  David asked me to provide him with the names of two

1    corporate entities that had not yet been used much and I did.

2    Q.  Used much for what?

3    A.  For stock promotions and for stock sales.

4    Q.  And what did he say he wanted those corporate entities for?

5    A.  He was going to be doing some deals with Scott Gelbard and

6    he wanted to have these corporate entities to use for those

7    deals.

8    Q.  At the time did he identify the name of the entity

9    concerning which he needed these Panamanian identities or

10   Panamanian corporate identities?

11   A.  No, he did not at that meeting.

12   Q.  Later?

13   A.  Yes.

14   Q.  Did you come to have a conversation with David Levy where

15   he gave a name of the deal that he wanted to use these

16   Panamanian identities to facilitate?

17   A.  Yes.  He told me it was Cool-n-Save.

18   Q.  Do you know anything about any company associated with

19   Cool-n-Save?

20   A.  Not really other than Levy also mentioned that Greenway

21   Design was a sort of precursor to Cool-n-Save.  But other than

22   that, I didn't know much about what those companies did.

23   Q.  And so what if anything did you agree to do in response to

24   his requests?

25   A.  I agreed to provide him with the names, which I did Bluefin

1   Financial Group and Copperwood Foundation, to set up to hold

2   stock that would come into as part of the deal.  And I told him

3   that I had these corporate accounts, bank accounts set up, as

4   well as brokerage accounts set up, and I would -- and the bank

5   accounts were already at Capital Bank.

6   Q.  And these are shell companies that you previously set up?

7   A.  Yes.

8   Q.  And who is the signatory on the Bluefin Financial Group and

9   Copperwood Foundation accounts?

10  A.  I was.

11  Q.  Now, what about the request that you set up a corporation

12  in Panama and a Panamanian bank account in the name of that

13  corporation?

14  A.  At the meeting I told him that I would do that and that he

15  would need to meet with me in Panama.  And he said that as soon

16  as the corporation was set up, he would go ahead and meet me in

17  Panama.  I told him I also needed the name of the corporation

18  that he wanted me to use.

19  Q.  And following the meeting, did there come a time when he

20  gave you the name of a corporation?

21  A.  Right.  He gave me the name of the corporation that he

22  wanted to use called Sadhana Enterprises Inc.  And he wired

23  $5,000 to me as the fee for me to go ahead and have the

24  corporation formed and set up.

25            THE COURT:  How are you spelling the name?

1           THE WITNESS:  S-A-D-H-A-N-A Enterprises Inc.

2           MR. MASTER:  Mr. Dinet, if you could just publish

3     Government Exhibit 500-10.

4     Q.  This is a document that was found in your house at the

5     execution of the search warrant?

6     A.  Yes.

7     Q.  And what does this letter relate to?

8     A.  This letter relates to -- it's a commercial letter of

9     reference that on -- for David that the bank was requesting

10    that he provide the bank.  In our meeting at the bank in

11    December, the bank said the account had still not been opened

12    and some additional information was needed, one of them being a

13    commercial reference letter.  And David asked me if I would

14    provide one for him and so I did and then sent that off to the

15    bank.

16    Q.  And so that's what -- the David Levy who's referenced in

17    this letter is the same David Levy who you met in May of 2009,

18    correct?

19    A.  That's correct.

20    Q.  Do you see David Levy in the courtroom today?

21    A.  Yes, I do.

22    Q.  Can you just point him out and identify him by an article

23    of clothing?

24    A.  He's over at that back table.

25          MR. MASTER:  Let the record reflect that the witness

1    has identified David Levy.

2             THE COURT:  Yes.

3             MR. MASTER:  You can take that off the screen,

4    Mr. Dinet.

5    Q.  Now, after he gave you the name Sadhana Enterprises, did

6    there come a time when you requested that he pay your $5,000

7    fee?

8    A.  Yes.

9    Q.  And where did you have him send the money to?

10   A.  He wired it to the United National account in Panama at

11   Capital Bank.

12   Q.  And United National is one of the shell companies that you

13   maintained?

14   A.  Yes.

15   Q.  And do you remember receiving the $5,000 into your United

16   National account?

17   A.  Yes, I do.

18   Q.  Where do you maintain that account?

19   A.  At Capital Bank in Panama.

20   Q.  And, by the way, all accounts at Capital Bank clear

21   through --

22            MR. MASTER:  Well, Mr. Dinet, if you wouldn't mind

23   pulling up Government Exhibit 500-6.

24   Q.  This is a document that was found in your home at the time

25   of the search; do you remember that?

D3ELLEV6                    Saranello - direct

1    A.  Yes.

2    Q.  And do you remember that's information that was obtained

3    from Capital Bank, correct?

4    A.  Yes.  That's the wiring instructions for sending a wire to

5    Capital Bank.  All of the wires to Capital Bank go through HSBC

6    Bank in New York, New York.

7    Q.  And that's information that is from Capital Bank, correct?

8    A.  Yes.

9    Q.  And that you maintained to facilitate your money laundering

10   activities, correct?

11   A.  Yes.

12   Q.  And all wires would clear through this corresponding bank

13   account at HSBC?

14   A.  Yes, all U.S. dollar wires.

15   Q.  And then once they arrived in Panama from this bank account

16   in New York, New York, what would happen?

17   A.  I would be able to confirm their receipt by checking the

18   account on the internet.

19   Q.  And did you in fact confirm that this $5,000 had been

20   received from David Levy into your United National shell

21   company bank account at Capital Bank?

22   A.  Yes.

23   Q.  And what did you do once the funds were received?

24   A.  I went ahead and started the steps to have the corporation

25   formed and the corporation was formed.  And then I spoke with

1    David to set up a date for him to meet me in Panama City.

2              THE COURT:  Mr. Master, would this be a convenient

3    place to break?

4              MR. MASTER:  This would be fine.

5              THE COURT:  Good night.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3ELLEV6

1    (Jury not present)

2    THE COURT:  You can step down.

3    (Witness not present)

4    THE COURT:  The schedule tomorrow is, what do you

5    think the schedule is?

6    MS. COHEN:  Your Honor, I think Mr. Saranello has

7    about -- we're going to play the tapes, so we probably have

8    another 45 minutes or more.

9    THE COURT:  Another hour.

10    MS. COHEN:  Two hours more on direct, and however long

11    on cross.

12    MR. SHARGEL:  Hour.

13    MR. MASTER:  And then we're going to put Agent

14    Reinhardt on for about an hour tops.

15    MR. SHARGEL:  Before we here that Agent Reinhardt, I

16    have an objection to an exhibit that he's going to use and

17    presumably his testimony as well.

18    THE COURT:  Do you want to take it up now?

19    MR. SHARGEL:  I'm happy to.  I don't have it here

20    though.  We received it last night, but I'm sure I can get

21    another copy or two.

22    THE COURT:  Do you want to do it first thing tomorrow

23    morning?

24    MR. MASTER:  If we can hear the nature of the

25    objection.

1    MR. SHARGEL:  The nature of the objection is that

2  Agent Reinhardt is being called as a summary agent, and the

3  information that I saw late last evening was really a

4  compilation of all the money that the Levys had in their

5  possession or that went through their hands.

6    And this is a continued objection where we had a trial

7  where they opened on wealth, where they elicited from every

8  witness that met Mr. Levy in connection with financing about

9  his cars and his wealth.  And to put up numbers like

10  $21 million, I don't see what the relevance is.

11    But if there is any relevance, the relevance is very

12  low compared to the substantial prejudice that I think that

13  completely outweighs the probative value.  The probative value,

14  if it exists at all, and I don't concede that it exists, but if

15  it does exist, it's extremely low.  It's not really making a

16  point.  It's not under Rule 401 making it more likely that this

17  offense was committed.  I know it's a low threshold.  But,

18  again, I don't think it's relevant.  But under a 403 balancing

19  test, I think it should be excluded.

20    THE COURT:  Is there any amount of money -- what if he

21  was able to segregate the amount of money that was with the

22  companies that are in issue here?

23    MR. SHARGEL:  I don't know.  I didn't do the math.

24  Maybe we can do that in anticipation of our meeting again

25  tomorrow morning.  But to see staggering numbers like

D3ELLEV6

1    $21 million going into the accounts and the various accounts

2    that they controlled, what does it prove?  It's as simple as

3    that.  What does it prove?  But it has the potential for

4    prejudicing the Levys and in front of the jury and I think it

5    should be excluded.  I think any fair 403 balancing test should

6    result in its exclusion.

7            THE COURT:  You want to give me a preview of your

8    response, Mr. Master, Ms. Cohen?

9            MR. MASTER:  Yes, your Honor.  We previously briefed

10   the issue and Mr. Shargel lost on and the Court ruled for the

11   government on the issue of introducing evidence of funds that

12   they received.

13           THE COURT:  I ruled on cars and lifestyle means and

14   method.

15           MR. MASTER:  Correct, your Honor.

16           THE COURT:  I didn't rule on $21 million.  This is the

17   first I'm hearing of this.

18           MR. MASTER:  Well, $21 million doesn't come from

19   anywhere other than the bank records that are already in

20   evidence by stipulation of the parties.  And they're voluminous

21   records.  They're summary records that the government, through

22   summary witness, they're voluminous records.  The government

23   simply added up the funds that came into the account and the

24   funds that went out of the accounts.

25           MR. SHARGEL:  The Stahl case, I know it's 1980, a long

1    time ago, but it's still good law.  And in the context of

2    Stahl, when I think back to the prosecutors in that case saying

3    fancy offices on Park Avenue, seems very similar to fancy

4    Bentleys in the driveway and buses.  But you did rule on that

5    and I respect that.  Of course we respect the ruling, but this

6    is just over the top.  I just ask you to look at it tomorrow.

7              THE COURT:  I will.

8              MR. SHARGEL:  Seeing it is much more dazzling.

9              THE COURT:  I'm not easily dazzled, but I'll take a

10   look.

11             MR. MASTER:  Your Honor, just to briefly reply, it's

12   not over the top.  It's their records that are simply being

13   summarized, their proceeds from stock fraud, from the ongoing

14   charged conspiracies.  The funds are used to pay coconspirators

15   and to facilitate the scheme.

16             THE COURT:  OK.  Here's what I want to ask.  I'll

17   think about this and I'll take it up tomorrow morning.  I'll be

18   here early.

19             How much time are you going to need for closings?

20             MR. SHARGEL:  I would say 90 minutes.

21             MS. COHEN:  I'd say the government would need about

22   two hours, your Honor.

23             THE COURT:  Mr. Srebnick.

24             MR. SREBNICK:  I think the 90 minutes sounds good.

25             THE COURT:  In light of the schedule, are you going to

1    be able to get your case on tomorrow?

2           MR. SREBNICK:  Oh, yes.

3           MR. SHARGEL:  And I have a case tomorrow I'll get on

4    as well in very short time.

5           MR. SREBNICK:  We have reached stipulations on

6    documents that will obviate the need for the witness, so that's

7    going to save time.

8           MS. COHEN:  Your Honor, if I can just ask the defense,

9    are you going to have to call a witness?

10          MR. SHARGEL:  I'm going to have a little witness.

11          MS. COHEN:  OK.

12          THE COURT:  A little witness.

13          MS. COHEN:  Tell us who it is?

14          THE COURT:  You mean a short witness?

15          MR. MASTER:  Short or little?

16          THE COURT:  OK.

17          MR. SHARGEL:  Ms. Hays will be my witness, seriously.

18          MS. COHEN:  Thank you.

19          THE COURT:  Do we need an all day conference on the

20   jury charge?  Is there any possibility of doing, starting the

21   summations on Monday?

22          MR. SHARGEL:  Well, this, as I said, is a complicated

23   record, complicated issues.  I'd rather brief it fully.  As I

24   said, we're working as hard as we possibly can.  And I

25   respectfully ask to stay with that generous -- maybe it's later

1   in the day now, but the generous schedule later on.

2           THE COURT:  So would we be able to get all the closing

3   in on Tuesday?

4           MR. SHARGEL:  Yes, I believe so.

5           THE COURT:  Mr. Srebnick, do you think so?

6           MR. SREBNICK:  I heard five hours total of closings is

7   what I heard.  Two plus three is five is what I heard.

8           THE COURT:  Is that right?  You want to Georgetown.

9           MR. SREBNICK:  For law school.  I went to Penn

10  undergrad.  They have a pretty good math department, but I was

11  only a math major for first semester.

12          MR. MASTER:  Should be enough to charge, do the

13  summations and to charge.

14          MR. SHARGEL:  No, wait a minute.  Not going to be able

15  to do that.

16          MS. COHEN:  Not going to be able to charge and do the

17  closings.

18          MR. SHARGEL:  With Mr. Srebnick's math skills, he left

19  out rebuttal.

20          THE COURT:  All right.  We'll plan on summations on

21  Tuesday and charge the jury on Wednesday.

22          We'll let the jury know on Monday they have a day off?

23          MR. SHARGEL:  I'm sure they'll welcome that.

24          THE COURT:  Yeah, right.  And it will be in their

25  hands by Wednesday?

D3ELLEV6

1              MR. SHARGEL:  Yes, sir.

2              MS. COHEN:  Your Honor, if I can ask, if we can see

3    how the day goes tomorrow.  I don't want to tell the jury

4    they're off and something comes up.

5              THE COURT:  I'll tell them at the end of the day.

6    We'll know by the end of the day, right?

7              MR. MASTER:  Yes, your Honor.

8              THE COURT:  Thanks very much.

9              (Adjourned to March 15, 2013, at 10 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    BENJAMIN LEFRANCOIS

4    Cross Q. . . . . . . . . . . . . . . . . .1131

5    Redirect By Mr. Master . . . . . . . . . .1135

6    Recross The Court  . . . . . . . . . . . .1141

7    RAY WYMAN

8    Direct By Ms. Cohen  . . . . . . . . . . .1150

9    Cross By Mr. Shargel . . . . . . . . . . .1179

10   Redirect By Ms. Cohen  . . . . . . . . . .1200

11   Recross By Mr. Shargel . . . . . . . . . .1204

12   MARK WIEGHAUS

13   Direct By Ms. Cohen  . . . . . . . . . . .1206

14   Cross By Mr. Shargel . . . . . . . . . . .1217

15   Redirect By Ms. Cohen  . . . . . . . . . .1221

16   WILLIAM MARION SHIFLET II

17   Direct By Mr. Master . . . . . . . . . . .1228

18   Cross By Mr. Srebnick  . . . . . . . . . .1241

19   Redirect By Mr. Master . . . . . . . . . .1271

20   Recross By Mr. Srebnick  . . . . . . . . .1275

21   [ ]*[,]

22   Direct By Mr. Master . . . . . . . . . . .1277

23   Cross By Mr. Shargel . . . . . . . . . . .1292

24   JOSEPH SARANELLO

25

1   Direct By Mr. Master . . . . . . . . . . . .1297

2                    GOVERNMENT EXHIBITS

3   Exhibit No.                              Received

4    607 to 611 . . . . . . . . . . . . . . . .1232

5    S4, 704-1, and 704-2   . . . . . . 1145

6    S8 and 503-1 through 3   . . . . . 1289

7    S9, 710, 711, 712, and 713   . . . . 1147

8    400-24  . . . . . . . . . . . . 1166

9    400-28  . . . . . . . . . . . . 1213

10   500-1 through 22   . . . . . . . . 1281

11   605-7D-1   . . . . . . . . . . . 1276

12   708  . . . . . . . . . . . . . . 1260

13                   DEFENDANT EXHIBITS

14  Exhibit No.                              Received

15   A303   . . . . . . . . . . . . . 1185

16   A712   . . . . . . . . . . . . . 1132

17   A713   . . . . . . . . . . . . . 1133

18   A714   . . . . . . . . . . . . . 1134

19   A715   . . . . . . . . . . . . . 1134

20

21

22

23

24

25