D3FLLEV1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

     v.                                    11 Cr. 62 (PAC)

DONNA LEVY,
DAVID LEVY,
                                        Jury Trial
         Defendants.

------------------------------x

                                   New York, N.Y.
                                   March 15, 2013
                                   10:09 a.m.

Before:

       HON. PAUL A. CROTTY

                                  District Judge

      APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
CARRIE H. COHEN
HOWARD S. MASTER
     Assistant United States Attorneys

HOWARD M. SREBNICK
NOAH FOX
ALEX ARTEAGA-GOMEZ
     Attorneys for Defendant Donna Levy

GERALD L. SHARGEL
ROSS M. KRAMER
JENNIFER HAYS
     Attorneys for Defendant David Levy

1    (Trial resumed)

2    (Jury not present)

3    THE COURT:  Is the jury here, Marlon?

4    THE DEPUTY CLERK:  Not yet.

5    THE COURT:  I reread Quattrone last night in light of

6    the objections to some of the information that may be

7    summarized.  With Quattrone, the government introduced evidence

8    of Quattrone's salary for 1999 and 2000.  And the Second

9    Circuit said that that was appropriate, it was an appropriate

10   exercise of the judge's discretion, and noted that there was a

11   cautionary instruction issued.

12       I think here in this circumstance what the government

13   wants to do, as I understand it, is to summarize all the money

14   that the Levys made.

15       What is it that you want to do?  How do you calculate

16   the $20 million?

17       MR. MASTER:  It's only money into bank accounts that

18   one or both of the Levys directly control.

19       THE COURT:  OK.  I'm going to limit the usage to just

20   the proceeds of the charged activity which are alleged in the

21   indictment.

22       My recollection is for Counts One, Two, and Three,

23   it's some $5.6 million, and for Count Four, it's 6.5.  And, of

24   course, if there's any money that's associated with the money

25   laundering, that can be introduced as well, as well as any

D3FLLEV1

1    money that can be attributed to Counts Six and Nine.

2         But that's the limitation.  I'm not going to allow

3    money in and out of the Levys' account in general.  It's got to

4    be limited to the proceeds of the charged activity.

5         MR. MASTER:  Your Honor.

6         THE COURT:  I'm not going to argue.  You argued last

7    night.  That's the ruling.

8         MR. MASTER:  Yes, your Honor.  But in view of that, I

9    just wanted to address one thing with the Court.

10        THE COURT:  All right.

11        MR. MASTER:  Because Mr. Shargel argued that we sprung

12   this on the defense.  This was provided --

13        THE COURT:  That did not enter into my deliberations.

14        MR. MASTER:  Yes, your Honor.  The only issue is that

15   we prepared these charts and have had these charts for some

16   time before the defense.  And so to have to recalculate and

17   take out the commingled proceeds at this late hour when the

18   agent is about to testify I think was an unfair tactic by the

19   defense because the defense was aware of this issue.  These

20   funds are all commingled.  We have a very neutral presentation

21   of the evidence.

22        THE COURT:  Do you want me to reverse my ruling, is

23   that what you're asking me to do?  I'm not going to do it.

24        MR. MASTER:  Well, if your Honor isn't going to

25   reverse the ruling, I think we may need to request this

1  evidence, we request the opportunity to present this evidence

2  at the beginning of next week because we've had these charts

3  before the defense for some time.  If your Honor is going to

4  tell us that we have to take out substantial sum of money,

5  then --

6           THE COURT:  I'm telling you what you can prove.  You

7  can prove what's in the indictment.

8           MR. MASTER:  But, your Honor, for example, Fotis

9  Georgiadis testified about money that he sent to Donna Levy in

10  connection with their promotion only activities.  I didn't list

11  that as proceeds of Cardiac Networks in the indictment, but it

12  is money that came in to the Levys and it's proceeds that I

13  believe are appropriately considered.

14           THE COURT:  It's within the indictment, you can do it.

15  If you can point to Fotis Georgiadis and relate it, that's

16  fine.  But I gather that you're doing more than that.

17           MR. MASTER:  Your Honor, I can pass up what we were

18  intending to do and your Honor can assess what if anything we

19  need to take out.

20           And I'll just hand up what was given to the defense

21  two weeks ago.

22           (Pause)

23           MR. SHARGEL:  Judge, may I just correct one factual

24  misstatement.  We have here, we received by email I think

25  3 o'clock in the morning that the proceeds from stock sales,

D3FLLEV1

1    total proceeds from stock sales in connection with the

2    indictment.  It's this morning I think at 3 o'clock in the

3    morning, 3:20 or something like that.

4         THE COURT:  This is all -- you're purporting to show,

5    as I read this, Mr. Master, all money in and out of various

6    accounts which are attributable to the Levys, correct?

7         MR. MASTER:  Well, it's not, it's not even every

8    single account.  It's all accounts into which proceeds flowed.

9    So, your Honor, for example, we didn't have the opportunity to

10   fully address this with the Court, but as we explained to the

11   Court in responding to the motion in limine, one of the issues

12   at trial is that the Levys kept on telling these entrepreneurs,

13   these people who owned these companies that they lacked enough

14   funds to pay for additional investments to fulfill their

15   contractual obligations.  They would say it's time for you to

16   stand on your own two feet.  We don't have the funds to cover

17   you.

18        That is not borne out by the evidence, by the fact

19   that they're taking money into their accounts.

20        THE COURT:  It's borne out by the evidence that you

21   have that you alleged in the indictment that the Levys made

22   some $5 million on Cardiac and Banneker, which is well in

23   excess of the amount of money they invested in either one.  You

24   can make the argument.  You don't need -- well, I'm not going

25   to argue with you because I've been presented with an

D3FLLEV1

1       objection.  I've done my research.  That's my ruling.  You can

2       show the proceeds that are related to the charges in the

3       indictment, and I'm not going to allow you to show all money

4       movements unless they've been related in some fashion to the

5       charges contained in the indictment.

6               MR. MASTER:  Yes, your Honor.  In that event, again,

7       given the lateness of the defendant's objection to the

8       presentation of the funds into these accounts, as I said, the

9       defendants have had access to these bank records for months.

10      They can prepare their own summary charts.  We prepared these

11      summary charts weeks ago.  I'm not --

12              THE COURT:  Mr. Master, I hear you.  I understand it's

13      a problem.  I've made my ruling.

14              MR. MASTER:  Yes.  I appreciate that, your Honor.  I'm

15      just suggesting that if we have to scramble to revise the

16      charts downward, that is not an instantaneous process.  That's

17      all I'm suggesting.

18              And so I respect your Honor's ruling.  I just, I'm

19      standing up here trying to think of how to address it in a way

20      that makes sense for the jury because that's what summary

21      charts are supposed to do.  So if we are now limited to a

22      subset of the evidence and presenting it as your Honor has

23      ruled, then how can we prepare accurate summary charts that

24      this case agent, who's an IRS agent, has the opportunity to

25      review for factual accuracy before lunch?  It's just simply not

D3FLLEV1

1    possible.

2         All I'm suggesting is that if your Honor would permit

3    us to take a recess, even during for the lunch hour, I really

4    have not -- or if we could present it on Monday morning.  I

5    really don't know, your Honor.

6         THE COURT:  It's up to you.  You have a witness on the

7    stand.  The witness is going to take -- how much longer is he

8    going to take?

9         MR. MASTER:  Not more than an hour on direct.

10        THE COURT:  Not more than an hour on direct?

11        MR. MASTER:  Yes.

12        THE COURT:  And then how much on cross?

13        MR. SHARGEL:  Depends on the pace and the answers, but

14   I'm thinking 45 minutes to an hour.

15        THE COURT:  OK.  So that will take you through the

16   morning.  The agent has all morning long to work on this.

17        MR. MASTER:  All right.  So we'll take a long lunch.

18        THE COURT:  I don't know if we'll take a long lunch.

19        MS. COHEN:  Your Honor, we'll have the agent work on

20   it and give us a status report before lunch.

21        MR. SREBNICK:  Judge, may I be heard before the agent

22   leaves?  There's another proposed chart that we received at I

23   think it was three in the morning today.

24        MR. MASTER:  Yes.

25        MR. SREBNICK:  That appears to lump together Cardiac

Network, Banneker, EWPI, and Greenway. Ms. Levy is not charged in the Greenway charge. And so I'm flagging as early as I can for the government that we are going to object to the extent that the government is going to try to lump two defendants together simply because they're husband and wife, particularly when the jury is going to be instructed, I suppose, that certain counts don't apply to Ms. Levy, certain counts don't apply to Mr. Levy. And for that reason, I want to bring that to the attention of the Court.

And when Mr. Master indicates we've had some charts for some time, the first I've seen the charts that your Honor saw for the first time last night, the first time we received them was Wednesday night this week I think at about 9:45 p.m. At least that's the first time I saw the chart which we've been discussing. So I'm flagging that for the Court.

MR. MASTER: This is a chart. It's not -- it's not relevant.

This, I'll hand up this other chart which we prepared last night after hearing Mr. Shargel's objection for the first time. It is accurate.

MR. SHARGEL: Your Honor, on the top it says David and Donna Levy. EWPI is attributed to Mr. Levy as well. There are two defendants on trial, albeit married for a long time, and you can't just lump it together. Again, I remind you this is the first time we saw this at 3:20 this morning.

1    THE COURT:  This one seems an easy one to correct if

2  that's the objection.

3    OK.  The jury is here.

4    MR. MASTER:  We'll do that, your Honor.

5    THE COURT:  The jury is here.  You want to call in the

6  witness.

7    (Witness present)

8    (Continued on next page)

1    (Jury present)

2    THE COURT:  Good morning.  Please be seated.

3    Mr. Saranello, you're still under oath.

4    All right, Mr. Master.

5    MR. MASTER:  Thank you, your Honor.

6    JOSEPH SARANELLO, resumed.

7    DIRECT EXAMINATION (cont'd)

8    BY MR. MASTER:

9    Q.  Mr. Saranello, when we left off yesterday you were talking

10   about Mr. Levy's interest in setting up a company called

11   Sadhana.

12   A.  Yes.

13   Q.  What did Mr. Levy say the purpose of Sadhana was to be?

14   A.  That was going to be his corporation that he would use for

15   his -- to receive money from the proceeds of stock sales.  And

16   he wanted it at Capital Bank so that he could move the proceeds

17   of stock sales that would go into Bluefin or Copperwood

18   directly into his account without having to do external wires.

19   Q.  And did there come a time when David Levy actually traveled

20   down to Panama to assist with setting up Sadhana Enterprises'

21   bank account?

22   A.  Yes.

23   Q.  And approximately when was that?

24   A.  That was in June of 2009.

25   Q.  And how do you know that he went down there in June of

1    2009?

2    A.  I was -- I met him down there.  He and I had talked and we

3    arranged to meet as soon as the corporation was set up.  And we

4    arranged to meet in Panama City, Panama, so that he could go to

5    the bank with me to open the account.

6    Q.  And so I'd like to just ask you a couple questions then

7    about your meeting with him.

8            Was it the latter part of June or earlier part of

9    June?

10   A.  It was the earlier part of June.

11   Q.  And so what did you -- how many times did see him down in

12   Panama?

13   A.  On that visit I saw him twice.  I met him at the airport

14   and we went to the hotel, and then the next day we went to the

15   bank to open the account.

16   Q.  And why did you go with him to open the account?

17   A.  Well, I was familiar with the bankers and he wanted me to

18   sort of introduce him to the people that he would be opening

19   the account with.

20   Q.  And what -- were you present with David Levy and bank

21   employees as they interviewed him about the account?

22   A.  Yes, I was.

23   Q.  What kind of documentation did they ask for?

24   A.  They asked for the corporate documents for the power of

25   attorney that was given to Mr. Levy by the corporate officer of

1    the corporation; and they asked for information about

2    Mr. Levy's business activities as to how he earned money in the

3    United States.

4    Q.  And what if anything did they ask about his other banking

5    activities?

6    A.  They asked Mr. Levy about other bank accounts he'd had and

7    what he intended to do with the account once it was open.

8    Q.  And what was the status of David Levy's application as of

9    the time that this meeting was completed?

10   A.  At that point the information was gathered by the bank

11   officers and they told him that they would review the

12   application and they might need some additional information and

13   they would let him know about that.

14   Q.  And based on your experience with the bank, how common was

15   it that an application would not be immediately approved?

16   A.  That was very common.  It was normally a 30 to 60 day time

17   period before the bank and its compliance committee would

18   decide on an application.

19   Q.  And, ultimately, how successful was David in setting up

20   that account?

21   A.  He was not successful.  The bank ultimately declined to set

22   up the account.

23        MR. MASTER:  And, Mr. Dinet, if you could pull up

24   Government Exhibit 500-10.

25   Q.  Now, as part of the effort to open up the bank account,

1   what did David Levy ask you to do?

2   A.  He asked me to -- when it was -- he asked me to provide a

3   commercial letter of reference for him.  David Levy and I were

4   at the bank in December of 2009 and the account still had not

5   been opened, one of the bank officers said to him that he still

6   had not provided a commercial letter of reference and David

7   Levy asked me to provide one for him.

8   Q.  Now, just a couple things in this letter.  Had you known

9   Mr. Levy for more than two years as of the time you wrote this

10  letter?

11  A.  No, I had not.

12  Q.  And did you know how he conducted his business affairs?

13  A.  No, I did not.

14  Q.  What was your purpose in -- what is Delano Capital?

15  A.  It's a shell company that I had in Wyoming.

16  Q.  And so what was your purpose in writing this letter?

17  A.  To assist Mr. Levy in getting his Sadhana account opened.

18  Q.  And, again, this was found in your house at the time the

19  search warrant was executed, correct?

20  A.  That's correct.

21  Q.  Now, setting aside Sadhana, did there come a time when you

22  were asked to assist with this Cool-n-Save deal that David had

23  mentioned to you?

24  A.  Yes.

25  Q.  And is that a deal that he mentioned to you at the -- when

1    you saw him in Panama?

2    A.  Yes.

3    Q.  Now, what's the first thing you were asked to do for this

4    Cool-n-Save deal?

5    A.  I was asked to wire $100,000 to Cool-n-Save.

6    Q.  From what entity?

7    A.  From an entity that had not been affiliated with any

8    brokerage transactions.

9    Q.  And what do you mean by not affiliated with any brokerage

10   transactions?

11   A.  An entity that didn't have active ongoing brokerage account

12   activity in the United States.

13   Q.  Who are the people who asked you to send money for

14   Cool-n-Save?

15   A.  This was Scott Gelbard and David Levy.

16   Q.  And how recently had you done trading activity with Scott?

17   A.  On an ongoing basis, very recently.

18   Q.  Now, over the course of your work as a money launderer, how

19   did you keep track of how much money was sent, where the money

20   was sent to, and on whose behalf you were sending money?

21   A.  I kept handwritten notes of outgoing wires.

22   Q.  And did you have a shorthand or code that you used to keep

23   track of this information?

24   A.  Yes.  I would write the date, the amount, the account that

25   it was sent from and the entity receiving the funds, and then

1  in parentheses a person or persons who had requested the

2  transfer.

3  Q.  And where did you maintain these handwritten notes?

4  A.  In my house.

5  Q.  And were those notes in your house on the day the search

6  warrant was executed in March of 2010?

7  A.  Yes.

8  Q.  And what happened to the notes?

9  A.  They were seized by the government.

10  Q.  And in preparation for your testimony here today, have you

11  had the opportunity to review some of those notes to determine

12  where if at all on those notes the Cool-n-Save transfer was

13  recorded?

14  A.  Yes, I have.

15  Q.  I'd like to direct your attention to Government

16  Exhibit 500-18.

17          MR. MASTER:  Mr. Dinet, if you could just pull that

18  up.  It's also up on the screen.  If you wouldn't mind,

19  Mr. Dinet, turning to it's the third page.  I believe it's

20  Saranello 7299.

21  Q.  And where, if you could tell the jury where on these

22  handwritten notes the Cool-n-Save payments were recorded?

23  A.  Under the date July 10, the third entry on that date,

24  there's a notation of a hundred thousand, meaning $100,000 from

25  the Panama Capital Partners account going to Cool-n-Save.  And

1    then the initial is SG, Scott Gelbard, on the far right-hand

2    side.

3    Q.  And so the shorthand that you use is on the left-hand side,

4    what's reflected, the numbers on the far left?

5    A.  On the far left is the date and then the amount in dollars

6    that was wired.

7    Q.  And then there's an arrow and then above the arrow there's

8    I guess it says PCP(C)?

9    A.  Meaning Panama Capital Partner account at Capital Bank.

10   Q.  And that's one of the shell company accounts that you

11   maintained?

12   A.  Yes.

13   Q.  And then after that it states "cool save," and what does

14   that represent?

15   A.  That means the receiver was Cool-n-Save.

16   Q.  And then there are initials there, SG, and there are

17   initials throughout this document.

18            And so what does SG stands for?

19   A.  SG stands for Scott Gelbard.

20   Q.  Is that a -- Scott Gelbard was one of your longtime

21   clients?

22   A.  Yes, one of the clients who was involved in penny stock

23   promotions.

24   Q.  And, again, why did you need to maintain a ledger like this

25   to keep track of whose money was being sent where?

1  A.  So that I would know how much money had been sent out and I

2  could keep track of what was being sent out as opposed to what

3  was coming in.

4  Q.  And in these shell company accounts, did you keep funds

5  segregated based on who had sent the funds to you or was it all

6  commingled?

7  A.  A lot of it was commingled.

8  Q.  And so what was one of the reasons why you needed to

9  maintain this ledger?

10  A.  So that I would know how much money I'd sent out on behalf

11  of a given party or person.

12  Q.  Now, what's the next thing that you did to help David Levy

13  and Scott with their plans for Cool-n-Save?

14  A.  I spoke with an attorney named William Aul regarding a

15  Cool-n-Save memorandum.

16  Q.  And what kind of memorandum?

17  A.  It was a memorandum regarding a escrow agreement and a

18  memorandum regarding stock ownership regarding Greenway Design,

19  precursor to Cool-n-Save.

20  Q.  I'd like you to take a look -- well, did there come a time

21  when you actually executed documents related to this

22  Cool-n-Save transaction?

23  A.  Yes, there was.

24  Q.  And, again, were copies of these documents maintained in

25  your home after you executed the documents?

D3FLLEV1                    Saranello - direct

1    A.   Yes.

2    Q.   And were they seized by law enforcement agents at the time

3    of the search warrant?

4    A.   Yes.

5    Q.   And in preparation for your trial testimony, have you been

6    shown copies of these seized documents related to the

7    Cool-n-Save transaction?

8    A.   Yes, I have.

9    Q.   All right.  I'd like you to take a look at Government

10   Exhibit -- first take a look at Government Exhibit 500-21.

11              MR. MASTER:  And if you wouldn't mind pulling that up,

12   Mr. Dinet.

13   Q.   While he does that, if you wouldn't mind pulling that up,

14   the copy up before you, 500-21.

15              So this is one of the documents that was seized by law

16   enforcement agents at the time the search warrant was executed?

17   A.   Yes.

18   Q.   And it's a document that's dated September 7, 2009.  Can

19   you explain how you came to receive this document?

20   A.   I received it by an email attachment from Mr. Aul.

21   Q.   And what if any prior dealings had you had with Mr. Aul?

22   A.   I had not had any prior dealings with him.  I was told to

23   speak with him by Mr. Levy and Mr. Gelbard because there would

24   be a document regarding one of the stock deals that I would

25   need to execute, and I would need to do so as the Panamanian

1  officer of Copperwood.

2  Q.  So it says to Copperwood Foundation.  Again, what is

3  Copperwood Foundation?

4  A.  It's one of the shell companies that I maintained in

5  Panama.

6  Q.  And how about it's CCed to Bluefin Financial Group Inc.?

7  A.  That's also one of the shell companies that I maintained in

8  Panama.

9  Q.  And then it's CCed to a Mr. David Levy, and that's David

10  Levy, the defendant?

11  A.  Yes.

12  Q.  And it's from William Aul, that's the attorney you were

13  just describing?

14  A.  Yes.

15  Q.  And so what does this confidential -- this is one of the

16  documents that you executed in the name of Panamanian nominee?

17  A.  Yes.

18          MR. MASTER:  Mr. Dinet, if you just zoom out a little

19  bit.

20  Q.  What if any involvement did you have in negotiating this

21  transaction?

22  A.  I did not have any involvement in negotiating it.

23  Q.  What did David Levy tell you about why you needed to, why

24  you needed to be involved in executing these documents?

25  A.  Because the officer of Copperwood Foundation had to execute

1  the document for Mr. Aul, and I was the one to sign that

2  document.

3  Q.  And whose handwriting is it on the bottom?

4  A.  That's mine.

5  Q.  And what signature did you write?

6  A.  The officer of Copperwood Foundation, Frederico Rodriguez.

7  Q.  Did there come a time when David Levy told you to expect a

8  call from William Aul about this transaction?

9  A.  Yes.

10  Q.  Who if anyone did he ask you to be on that call?

11  A.  He asked me to be the officer of Copperwood Foundation.

12  Q.  Which is?

13  A.  Frederico Rodriguez.

14  Q.  And did you in fact receive a call from William Aul?

15  A.  Yes, I did.

16  Q.  And who did you pretend to be on that call?

17  A.  Frederico Rodriguez, the officer of Copperwood.

18  Q.  And in connection with this document, did you also sign

19  other documents related to the purchase of the controlling

20  interest in Voice Networks as a potential merger candidate for

21  Greenway Design Group?

22  A.  Yes, I did.

23  Q.  I'd like you to take a look at Government Exhibit 500-22.

24          MR. MASTER:  Mr. Dinet, if you can pull that up.

25  Q.  And that states that's an escrow agreement among Veradad

D3FLLEV1                    Saranello - direct

1    Telecom, Bluefin Financial Group, and William Aul?

2    A.  Yes, it does.

3    Q.  And did you also execute this document on behalf of Bluefin

4    Financial Group?

5    A.  Yes, I did, in the name of Jose Vergara, an officer of

6    Bluefin Financial.

7            MR. MASTER:  Mr. Dinet, if you turn to the second page

8    of that.

9    Q.  That's, whose signature is that?

10   A.  Jose, that's my signature signing the name of Jose Vergara.

11           MR. MASTER:  If you wouldn't mind turning to 500-5,

12   Mr. Dinet.

13   Q.  Mr. Saranello, who is Jose Vergara you stated you just

14   signed?

15   A.  That's a Panamanian person whose passport identity I had

16   purchased.

17   Q.  And for what purpose?

18   A.  For having that person serve as a nominee officer of

19   Bluefin Financial Group.

20   Q.  And then this is another document related to the same

21   transaction?

22   A.  Yes, it is.

23   Q.  And, again, if you turn, this is called a secure promissory

24   note purchase agreement.  Again, what if any involvement did

25   you have in actually negotiating this transaction?

1   A.  None, sir.

2   Q.  And what if any knowledge did you have as to the purpose of

3   the documents?

4   A.  None.

5   Q.  And so who asked you to execute these documents?

6   A.  Mr. Levy.

7   Q.  If you wouldn't mind turning to the second page, this

8   document is also signed by Jose Vergara?

9   A.  It's signed by me using the name Jose Vergara.

10  Q.  And why did you sign the name Jose Vergara?

11  A.  Because he is the officer of Bluefin Financial Group.

12  Q.  Now, did there come a time when David asked you to use yet

13  another shell company to receive funds for him?

14  A.  Yes.

15  Q.  And describe the conversation where he asked you to do

16  this.

17  A.  David told me that he wanted to send about $150,000, and

18  since his Sadhana account had still not been opened, he wanted

19  me to give him the name of an account that he could send funds

20  to.

21  Q.  Approximately when did you start having these

22  conversations?

23  A.  This was I believe in September of 2009.

24  Q.  And what did he say he -- what did he say was the reason

25  that he wanted to send the funds down there?

D3FLLEV1                    Saranello - direct

1   A.  He had said that he wanted to send money down there to use

2   as he might need.  He just was feeling a lot of pressure on him

3   in the States.

4   Q.  And what if any account name did you give him as an account

5   to receive the funds?

6   A.  Udino Investments Inc. in Capital Bank in Panama.

7   Q.  Is that another shell company, is Udino Investments another

8   shell company that you maintained?

9   A.  Yes.

10  Q.  And does the shell company have -- did the shell company

11  have a bank account associated with it?

12  A.  Yes, it did, at Capital Bank.

13  Q.  And Capital Bank is the same bank where David Levy had

14  attempted to open up the Sadhana account?

15  A.  Yes.

16  Q.  I'd like you to take a look at Government Exhibit 503-2.

17          MR. MASTER:  Mr. Dinet, if you could pull that up and

18  pages would be 3 and 4 of this document.  503-2, pages 3 and 4.

19  Q.  Did there come a time when David Levy in fact sent you

20  $150,000 to the Udino bank account?

21  A.  Yes.

22  Q.  And where on this document is that transfer indicated?

23  A.  It's about the eighth or ninth line down under credits.

24  It's got $149,950, which is the amount received less the bank's

25  wire fee, and it says from Date Palm Capital Corporation.

D3FLLEV1                    Saranello - direct

1    Q.  Who did you know to be the owner of Date Palm Capital?

2    A.  David Levy.

3    Q.  And whose records are these that you're looking at?

4    A.  These are records that were -- these are records of Capital

5    Bank in Panama, the Udino Investment Inc. account.

6    Q.  And just a couple of additional questions about this Udino

7    investment account.

8         Who was the sole signatory on the account?

9    A.  I was.

10   Q.  If you wouldn't mind taking a look, Mr. Dinet, of

11   Government Exhibit 503-1.

12        And, Mr. Saranello, are these the account opening

13   statements that are maintained by Capital Bank concerning Udino

14   Investments?

15   A.  Yes.

16        MR. MASTER:  Mr. Dinet, if you could do a facing page,

17   one and two, pages 1 and 2.

18   Q.  So that's a translation of the first page.

19        MR. MASTER:  If you wouldn't mind, Mr. Dinet, just

20   doing pages 3 and 4 and zooming in on the translated page.

21   Q.  And so this is your -- who's listed as the client, as the

22   named owner of the account?

23   A.  I am.

24   Q.  When if ever was David Levy an authorized signatory on this

25   account?

1   A.  He never was an authorized signature on the account.

2   Q.  Now, after he sent you the $150,000 from Date Palm Capital,

3   did there come a time when David Levy told you he had

4   substantially more funds than he wanted to deposit into that

5   same account?

6   A.  Yes.

7   Q.  Approximately when did you start having conversations with

8   him about that?

9   A.  During October of 2009, he wanted to come to meet me in

10  Panama and deposit funds into the Udino account.

11  Q.  And did he tell you why he wanted to actually come down to

12  Panama instead of just sending more wires to Panama?

13  A.  He said he didn't want to send wires.  He wanted to make

14  cashier's checks and would -- wanted to deposit them in the

15  account in the form of cashier's checks.

16  Q.  And did he tell you why he wanted to use cashier's checks

17  instead of wires?

18  A.  He felt that there would be too much scrutiny with wires of

19  that size coming into the account and he wanted to use

20  cashier's checks.

21  Q.  What did he say he wanted to use the funds that he would be

22  depositing to do?

23  A.  He said he wanted to use them for future deals in stocks.

24  Q.  What did he say that the money that he was going to be

25  depositing had come from?

1   A.  They had come from the proceeds of other stock deals.

2   Q.  And, Mr. Saranello, when if ever did you maintain Udino

3   Investment accounts in the United States?

4   A.  In 2008 and 2009.

5   Q.  And what kind of accounts?

6   A.  They were in brokerage accounts in the United States.

7   Q.  Did you ever have any bank accounts in the United States in

8   the name of Udino Investments?

9   A.  No, I did not.

10  Q.  Now, did there come a time when you agreed to meet David

11  Levy again in Panama for the purpose of receiving these

12  cashier's checks?

13  A.  Yes.  We had agreed to meet in early December.

14  Q.  Of what year?

15  A.  Of 2009, in Panama.

16  Q.  Why did it take several weeks for you to make these

17  arrangements?

18  A.  I had other things that I was doing and just could not get

19  to Panama before that time.

20  Q.  And did you in fact go to Panama and meet David Levy in

21  Panama in early December 2009?

22  A.  Yes.

23  Q.  How many times did you see him?

24  A.  About three times on that visit.

25  Q.  And describe the first meeting.

1  A.  The first meeting I saw him at the hotel, I believe it was

2  a Wednesday, and we then agreed to meet for dinner that

3  evening.

4  Q.  And who were the other gentlemen with him at the meeting?

5  A.  There was Don Edwards and Dwayne Bigelow were at the

6  meeting as well as David Levy.

7  Q.  And had you -- when if ever had you met these people, Don

8  Edwards or Dwayne Bigelow, before?

9  A.  That was the first time I'd met them.

10  Q.  And how was Don Edwards introduced to you by David?

11  A.  Don Edwards was introduced to me as someone who had done a

12  lot of promoting of stocks, penny stocks.

13  Q.  And how was Dwayne Bigelow introduced to you by David?

14  A.  Also someone who had done a lot of promoting of penny

15  stocks and as a partner of Robert Ross.

16  Q.  And who is Robert Ross to you?

17  A.  He is someone that I had done some stock deals with.

18  Q.  And what topics did David discuss during dinner?

19  A.  Discussed that there would be future deals going on and he

20  discussed with me the checks that he wanted to deposit into the

21  bank.

22  Q.  And after your dinner, did there come a time when David

23  showed you checks?

24  A.  Yes, there was a time he showed me the several cashier's

25  checks.  And the amounts that they totaled, which was very

 1   large, over $2 million, and I told David that I would have to

 2   prepare documents to support the consideration for those checks

 3   and asked David about that.

 4   Q.  I'll let you finish.

 5   A.  And I asked David about what was the source of funds of

 6   those checks.

 7   Q.  Let's go through that one by one.

 8          First of all, I'd like you to take a look at what's

 9   been marked for identification as Government Exhibit 500-24.

10   Do you recognize those items?

11   A.  Yes.  They were copies of the cashier checks that David

12   showed me that evening.

13          MR. MASTER:  Government offers Government

14   Exhibit 500-24.

15          MR. SHARGEL:  Without objection.

16          THE COURT:  500-24 is received in evidence.

17          (Government's Exhibit 500-24 received in evidence)

18          MR. MASTER:  Permission to publish?

19          THE COURT:  Yes, please.

20          MR. MASTER:  Thank you, your Honor.

21   Q.  And so how many checks in total were presented?

22   A.  There were a total of six checks.

23   Q.  So three of them are from Peter Veugler?

24   A.  Yes, he's listed as the remitter on three of them.

25   Q.  And one of them is from an entity called Seven Palms

1   Investments; do you see that?

2   A.  Yes, and that David told me was his company.

3   Q.  Whose company?

4   A.  David Levy's company.

5   Q.  And how about the second page there's --

6   A.  Well, one of the checks does not have a remitter, and the

7   other check has David Levy as the remitter.

8   Q.  So the $700,000 check doesn't have a remitter?

9   A.  That's correct.

10  Q.  And how about the bottom check?

11  A.  That lists David Levy as the remitter.

12  Q.  And that's a check in the amount of 275,000?

13  A.  Yes.

14  Q.  And what do you mean when you say remitter?

15  A.  Remitter would be the person who obtained the cashier's

16  check.

17  Q.  And so when the name David Levy is listed at the bottom,

18  that means that you understood he was the person who actually

19  obtained that check?

20  A.  Yes.

21  Q.  Again, all those checks were made out to what entity?

22  A.  Udino Investments Inc.

23  Q.  And that is one of your shell companies?

24  A.  Yes.

25  Q.  So now getting to the second issue that you raised, matter

1    of consideration, can you explain what you were concerned about

2    and what you mean by the term consideration?

3    A.   What I was concerned about was the bank accepting the

4    checks, and I knew that the bank would want an explanation or

5    supporting documents as to how these funds came into existence.

6    And I asked David about that and he told me he had no support.

7              MR. SREBNICK:  Objection, hearsay confrontation.

8              THE COURT:  OK.  Overruled.

9    A.   When I asked David about that, he told me that he did not

10   have any supporting documents and he told me to just make some

11   documents up and present them with the checks for deposit.

12   Q.   And what kind of documents did you decide to make up?

13   A.   I made up stock purchase agreements which would show Udino

14   Investments transferring stock to these remitters in exchange

15   for the funds.

16   Q.   And if you can just explain, stock purchase agreement is a

17   legal document that documents what?

18   A.   It documents the sale of stock by Udino to the remitter and

19   the remitter, in exchange for that stock as consideration,

20   giving a cashier's check to Udino.

21   Q.   In other words, it purported, they purported to show that

22   Udino Investments was selling some stock to these individuals?

23   A.   Yes.

24   Q.   And was it receiving these cashier's checks in exchange for

25   the stock?

D3FLLEV1                    Saranello - direct

1   A.  Yes.

2   Q.  Was there in fact any real stock that was exchanged for

3   these cashier's checks?

4   A.  No, there was not.

5   Q.  And where did you go to create these documents?

6   A.  I went to an internet cafe that had internet computers and

7   printers and I made up the documents.

8   Q.  Now, did there come a time when you were asked to review a

9   torn document, half of a document that was found in your home

10  by law enforcement agents when they executed that search

11  warrant?

12  A.  Yes.

13  Q.  And is that a portion of one of those stock purchase

14  agreements that you just described creating?

15  A.  Yes, it was.

16  Q.  I'd like to show you Government Exhibit, Mr. Dinet, if you

17  wouldn't mind publishing Government Exhibit 500-19.

18          MR. MASTER:  And so if you wouldn't mind just turning

19  to the last page, Mr. Dinet.

20  Q.  It's a document that purports to have been created on

21  October 1, 2009, and lists a seller as Udino Investments and

22  the purchaser as Peter Veugler?

23  A.  Yes.  I created that document.

24  Q.  And what was the purpose of your creation of that document?

25  A.  To show that to the bank as evidence of consideration for

1  one of the checks that was being deposited in the Udino

2  Investment account.

3  Q.  Well, if you wouldn't mind turning back to the first page.

4  Again, the document is torn, but it purports to relate to

5  $1,043,000 in payment; do you see that?

6  A.  Yes.

7          MR. MASTER:  Now, Mr. Dinet, if you wouldn't mind

8  flipping back to 500-24.

9  Q.  If you could see, there's one check from Peter Veugler in

10  the amount of 823,000?

11  A.  Yes.

12  Q.  And if you wouldn't mind turning to the last page, another

13  $220,000 in checks from Peter Veugler?

14  A.  Yes.

15  Q.  And so what's the total?

16  A.  That total is 1,043,000, which is the figure that's

17  reflected on the document that I created.

18  Q.  And just getting back to the last page.

19          MR. MASTER:  I'm sorry for making you jump around,

20  Mr. Dinet.

21  Q.  But, first of all, when if ever had you met Peter Veugler?

22  A.  I'd never met Peter Veugler.

23  Q.  How did David describe Peter Veugler to you?

24          MR. SREBNICK:  Same objection, Judge.  May I have a

25  standing objection, hearsay confrontation?

1   THE COURT:  I don't think you're involved in this,

2   Mr. Srebnick.

3   Anyway, objection is overruled.

4   Object when you want.

5   Q.  Please proceed, Mr. Saranello.

6   A.  He described Peter Veugler as a pumper of stock and someone

7   who made money on the pumping of the stock and would sell it

8   quickly.

9   (Continued on next page)

D3frlev2                     Saranello - direct

Q.  First of all, whose signatures are actually on here?

A.  Those are my signatures.

Q.  Did you ever meet Peter Veugler?

A.  No.

Q.  What did you do once you created these documents?

A.  Once I created them, I printed them out and then signed the documents except for the ones that had David Levy, and he actually signed those.  Then we went to the bank the next morning to deposit the checks.

Q.  Let me ask right now, other than this torn portion of a stock purchase agreement that was found in your home by searching agents, did you retain copies of any of the stock purchase agreements that you wrote that day?

A.  No, I did not.

Q.  What did you bring with you to the bank along with those cashier's checks that are reflected in Government Exhibit 500-24?

A.  The contracts that supported, that showed consideration for the cashier's checks, the stock sales.

Q.  By "contracts," you mean stock purchase agreements?

A.  Stock purchase agreements.

Q.  Again, by "consideration" you just mean the thing that was given in exchange for the money that is reflected in the cashier's checks?

A.  Yes.

D3frlev2                    Saranello - direct

1    Q.  That in fact was fictional?

2    A.  Yes.

3    Q.  What happened when you brought the checks to the bank along

4    with these stock purchase agreements?

5    A.  The bank accepted the cashiers checks for deposit and

6    deposited the checks for collection.

7          MR. MASTER:  Mr. Dinet, if you wouldn't mind going

8    back to Government Exhibit 503-2.  Actually, Mr. Dinet, if you

9    could go to the third and fourth pages.  If you could zoom in.

10   Mr. Dinet, if you could pull up the first page and zoom in on

11   that.

12   Q.  How much of those fees did the bank say that it would take

13   on these cashiers checks for processing them?

14   A.  One quarter of a percent.

15   Q.  Did you see earlier in Government Exhibit 500-24 a $700,000

16   cashier's check from an individual who wasn't identified?

17   Where is the deposit of that $700,000 cashier's check reflected

18   in this statement?

19   A.  It's reflected on the third line from the bottom under

20   "credits" in the amount of $698,200 on December 23rd.  The bank

21   does not give a credit until the check has been collected.

22   Q.  What is your understanding of what the bank has to do

23   before it can actually clear that check, deposit that check?

24   A.  They have to send the check through their correspondent in

25   the United States for collection.

D3frlev2                    Saranello - direct

1  Q.  Speaking of which, I believe you testified earlier about

2  this, but what was the correspondent bank that you used to have

3  funds wired to all of your accounts at Capital Bank?

4  A.  HSBC New York, New York.

5          MR. MASTER:  Mr. Dinet, if you could pull that up on

6  Government Exhibit 500-6.

7  Q.  How would a sender of a wire from the United States to

8  Panama indicate which of your shell company accounts the funds

9  were to be directed to upon arrival at the correspondent bank

10  account?

11  A.  By listing a beneficiary name and beneficiary account

12  number.

13  Q.  Were all the wires going through this very same --

14  A.  Yes, every wire would have to go through the correspondent

15  bank, which was HSBC Bank USA New York, New York.

16  Q.  This was a document that was found by seizing agents in the

17  search?

18  A.  Yes.

19  Q.  It was created at the time for the purpose of facilitating

20  wire transfers?

21  A.  Yes, it was.

22  Q.  How did David Levy wire funds, the $150,000, from Date Palm

23  Capital to your Udino Investments bank account?

24  A.  Based on the wire instructions I gave them, which again are

25  HSBC New York, New York, to Capital Bank and to the Udino

D3frlev2                    Saranello - direct

1    Investment account and the account number.

2              MR. MASTER:  Getting back, Mr. Dinet, to Government

3    Exhibit 503-2.

4    Q.  I'd like to ask you, if you don't mind going up to the

5    account, what is the account number on the Udino Investment

6    account?

7    A.  The account number is 0112200037.

8              MR. MASTER:  Going back down, Mr. Dinet, to page 3 of

9    that document.  I know I'm jumping around.  I apologize.

10   Q.  Below the $698,200 transaction there is a credit in the

11   amount of $274,262.50.  Do you see that?

12   A.  Yes.

13   Q.  Do you recall getting a $275,000 cashier's check from David

14   Levy?

15   A.  Yes.

16   Q.  Is that what is reflected here?

17   A.  Yes.

18   Q.  Then turning to the fifth and sixth pages of the document,

19   primarily the fifth page, is this a continuation of the bank

20   statements that were obtained from Capital Bank?

21   A.  Yes.

22   Q.  Are there additional credits reflected in this statement

23   related to the deposit of those cashier's checks?

24   A.  Yes, there are credits for $820,791.37 and a credit for

25   $179,531.75.

D3frlev2                    Saranello - direct

1   Q.  There is a credit and a debit.  Do you know why?

2   A.  I don't know why it was an equal amount.  I don't know what

3   the bank -- I assume that was perhaps some incoming error and

4   then they just voided that out.

5   Q.  There is a slightly different amount below that?

6   A.  Yes, for $179,531.75.

7   Q.  Those correspond with some checks you received from Peter

8   Veugler?

9   A.  Yes.

10  Q.  And from Seven Palm?

11  A.  Yes, they do.

12  Q.  Do you know whether the standard bank checks, cashier's

13  checks, that are reflected in 500-24 ever cleared?

14  A.  As far as I can tell, they did not clear, based on the bank

15  statements.

16  Q.  There is a debit reflected here in the amount of

17  $1 million.

18  A.  Yes.

19  Q.  Can you explain to the members of the jury how that debit

20  came about.

21  A.  I had requested a certificate of deposit be opened in the

22  amount of $1 million.  I explained to David that that was going

23  to be done.  The bank likes to have certificates of deposit

24  opened for a part of the deposit so that you weren't just

25  running money through your bank.

D3frlev2                    Saranello - direct

1   Q.  Although that is in fact what you were doing?

2   A.  Yes.

3   Q.  What is a certificate of deposit?

4   A.  It's a deposit of funds for a period of time, in this case

5   for 90 days.

6   Q.  Are you allowed the withdraw the funds during that 90-day

7   period?

8   A.  No, you're not.

9   Q.  I'd like you to take a look at Government Exhibit 503-3.

10          MR. MASTER:  Mr. Dinet, pull that up.

11  Q.  Those are additional records from Capital Bank?

12  A.  Yes.

13          MR. MASTER:  Mr. Dinet, if you could do facing pages.

14  There is a lot of Spanish language here.

15  Q.  What do these documents relate to?

16  A.  They relate to the opening of the certificate of deposit.

17  Actually, it was for 180 days, not 90 days.

18  Q.  What day was it created?

19  A.  It was created on December 3rd of 2009.

20  Q.  Is that approximately when you went into the bank with

21  David Levy to deposit these cashier's checks?

22  A.  Yes, it was.

23  Q.  It states in the middle in the English language "capital

24  $1 million."  Do you see that?

25  A.  Yes.

D3frlev2                    Saranello - direct

1    Q.  Then it states above that, "Initial deposit cash" and then

2    "Udino Inv."  Do you see that?

3    A.  Yes, I do.

4    Q.  What did you understand that to mean?

5    A.  It meant that the $1 million from the Udino Investment

6    account was being used to open the time deposit or certificate

7    of deposit.

8    Q.  In what name did you have the certificate of deposit

9    opened?

10   A.  In the name of Bluefin Financial Group, Inc.

11   Q.  What is the account number of that CD?  I'm sorry.  The

12   time deposit account.

13   A.  The time deposit account --

14   Q.  Do you see where it says "account number"?

15   A.  Account number was 01506010885.

16   Q.  Who is an authorized signatory on this account?

17   A.  Myself only.

18   Q.  Whose signature is on the bottom?

19   A.  Mine.

20   Q.  When, if ever, was David Levy an authorized signatory on

21   this account?

22   A.  Never.

23   Q.  Did there come a time when David Levy asked you to wire

24   some money out of the Udino Investment account to someone in

25   Israel?

D3frlev2                    Saranello - direct

1    A.  Yes, in January of 2010 he asked me to send $5,000 to

2    Yehuda Levy at a bank in Israel.

3         MR. MASTER:  Turning back to 503-2, page 5, Mr. Dinet.

4    Q.  Do you see right above the million-dollar withdrawal, what

5    is reflected there?

6    A.  There is reflected a debit which represents the wire of

7    $5,000 that was sent and the wire fee of $52.50.

8    Q.  Did there come a time when you actually logged that $5,000

9    payment in the ledger that you maintained?

10   A.  Yes.

11   Q.  I'd like you to turn back to Government Exhibit 500-18.

12        MR. MASTER:  Mr. Dinet, if you could turn to what is

13   Bates marked as 07320.

14   Q.  As Mr. Dinet is doing that, getting to 07320, again, this

15   is one of the ledgers that you maintained for what purpose?

16   A.  To notate and keep track of the outgoing wires that I sent.

17   Q.  What is the reason that you maintained this ledger?

18   A.  So that I would know what funds I'd sent out for each

19   person or entity.

20   Q.  That's because all the funds or many of the funds were

21   commingled?

22   A.  Yes.

23        MR. MASTER:  If you could scroll up a little bit, Mr.

24   Dinet.

25   Q.  Where on this document do you see the payment to Yehuda

D3frlev2                    Saranello – direct

Levy?

A.   January 19, 2010, the fourth entry down on that date

reflects a wire from Udino to Yehuda Levy in the amount of

$5,000.

Q.   I'm going to direct your attention to March 2010.  That's

when you were arrested, correct?

A.   Yes.

Q.   That's when all these documents that we have been showing

to you, other than the documents from Udino Investments -- or

from Capital Bank, were seized.  What happened to the funds

that were in those Capital Bank accounts?

A.   They were all frozen by the U.S. government.

Q.   Does that include all the funds in the Udino Investment

account that David Levy had deposited?

A.   Yes.

Q.   Did it include all the funds in the Bluefin Financial Group

time deposit that had come from David Levy's money?

A.   Yes.

Q.   How long after the funds were frozen did David Levy start

to call you?

A.   In April of 2010 he sent actually an email.

Q.   By that time had you agreed to make calls, recorded calls,

to individuals with whom you had worked in stock fraud or money

laundering activities?

A.   Yes, I had.

Q.  Had you been equipped with a recording device that you

could use?

A.  Yes.

Q.  A quick question about the Bluefin Financial $1 million

time deposit.  Again, what was the source of the funds were

deposited into that account?

A.  Those were from the cashier's checks that David had given

me.

Q.  That were deposited in the first instance into the Udino

account?

A.  Yes.

Q.  Were there some commingled funds also in the Udino account?

A.  Yes.

Q.  David Levy's money was the last money in?

A.  Yes.

Q.  As of April 2010 had you yet pled guilty to the crime that

you described?

A.  Yes, I had.

Q.  I am going to ask to see if it refreshes your memory.  I'm

going to show you again 3514-8.

A.  OK.

Q.  That is the plea agreement that you entered?

A.  Yes.

Q.  What is the date that you signed it?  Look at the back

page.

1    A.  April 22nd.

2    Q.  Of what year?

3    A.  Of 2010.

4    Q.  Had you in fact pleaded guilty as of the beginning of April

5    2010?

6    A.  No, I had not.  At that time I had not.

7    Q.  Were you in negotiations to plead guilty?

8    A.  Yes.

9    Q.  Did you provide copies of the emails that you exchanged

10   with David Levy about the frozen funds to government agents?

11   A.  Yes, I did.

12   Q.  I'm going to show you what's been marked as Government

13   Exhibit 500-23.  Do you recognize that?

14   A.  Yes.  These are copies of the emails that I had exchanged

15   with David Levy.

16          MR. MASTER:  The government offers Government Exhibit

17   500-23.

18          MR. SHARGEL:  No objection.

19          THE COURT:  22 or 23?

20          MR. MASTER:  23, your Honor.

21          THE COURT:  500-23 is in evidence.

22          (Government's Exhibit 500-23 received in evidence)

23          MR. MASTER:  May I publish that?

24          THE COURT:  Yes, you may.

25   Q.  Are these emails all exchanged on the same day or was it

D3frlev2                    Saranello - direct

1   over several weeks?

2   A.  It's over a period of time.

3   Q.  What is the first email you received from David Levy?

4   A.  Tuesday, April 6th of 2010.

5   Q.  Who is it from?

6   A.  It's from David Levy.

7   Q.  It's david@datepalmcapital.com?

8   A.  Yes.

9   Q.  You know that to be associated with David Levy, the

10  defendant?

11  A.  Yes.

12  Q.  There is an email admin@ward.hush.com.  Whose email was

13  that?

14  A.  That's my email.

15  Q.  Was that the only email that you received from David Levy?

16  A.  No.  There are other emails that are in the exhibit.

17  Q.  If you could turn to the next email.  It starts with an

18  April 16th email from david@datepalmcapital.  "Should I start

19  worrying?"  Then there is some text there, "David, sorry, I've

20  been tied up with some things that have delayed my travel.  I

21  will call on Tuesday and make plans."  Who wrote that?

22  A.  I did.

23  Q.  Why did you write that?

24  A.  Because the agents that I was working with wanted me to

25  delay my conversation with David.

1  Q.  Then David wrote to you later that day, "Why can't you talk

2  to me today"?

3  A.  Yes.

4  Q.  Did you in fact talk with him that day or was it later?

5  A.  I think it was later that I talked to him.

6  Q.  Now I turn to the next email in that chain, in that series.

7  It's from David Levy dated April 20, 2010.  "You don't think

8  you owe me a call"?

9  A.  Yes.

10 Q.  In response to these repeated requests from David Levy, did

11 there come a time when you in fact made a recorded call to

12 David Levy?

13 A.  Yes, I did.

14 Q.  In fact, you made several recorded calls?

15 A.  Yes, there were several calls.

16       MR. MASTER:  At this time, your Honor, I'd like to

17 hand out the transcript binder to the jury.

18       THE COURT:  Yes.

19 Q.  Mr. Saranello, while the binders are being passed out, who

20 actually equipped you with that recording device so you could

21 make recordings with David Levy?

22 A.  Agent Jeff Eastman.

23 Q.  After you made recordings, what would you do with the

24 recordings?

25 A.  I would email them to Agent Eastman.

D3frlev2                    Saranello – direct

Q.  After the recording device was full or after a certain

period of time, what would you do with it?

A.  I sent it to Agent Eastman to clear or take all the

recordings off the device.

        MR. MASTER:  Your Honor, there's about 30 minutes of

calls to play.  It is up to the Court.

        THE COURT:  I think we'll take our morning recess, Mr.

Master.

        (Jury not present)

        (Continued on next page)

D3frlev2                    Saranello - direct

1          THE COURT:  Mr. Srebnick, what was the nature of your

2      objection?  You have the right to confrontation, but this is

3      not a count that involves your client.

4          MR. SREBNICK:  The concern I have is the witness is

5      describing David Levy's conversations about a client that my

6      count is not charged in but it refers to David Levy's past

7      activities involving stocks.  The witness is describing it as

8      stock fraud.  By implication Mrs. Levy, who is married to David

9      Levy, is being imputed with David Levy's purported statements

10     to the witness about his past activities in stock fraud, which

11     I can't confront.

12         THE COURT:  I don't agree with that at all.  Anything

13     else?

14         MR. MASTER:  No, your Honor.

15         THE COURT:  See you in ten minutes.

16         (Recess)

17         MR. SREBNICK:  Judge, I would request a limiting

18     instruction at this time, that the jury be instructed that they

19     are not to consider this testimony at all against Ms. Levy.

20         THE COURT:  I intend to do that, and I welcome further

21     instructions to the final instructions, that for each count

22     they have to make a separate consideration and there is no

23     spillover effect.  But I don't think I'm going to do that now,

24     Mr. Srebnick.

25         MS. COHEN:  Your Honor, the government's charges have

D3frlev2                    Saranello – direct

1    those exact proposed instructions.

2              THE COURT:  I'll emphasize that.  I think it is

3    appropriate.  But I'm not going to do it now.

4              Consistent with my prior ruling, I'm not going to

5    allow you to do any examination of this witness.  If you want

6    to object, you can have a continuing objection.

7              MR. SREBNICK:  Very well.  Understood.

8              MS. COHEN:  Your Honor, there are several evidentiary

9    issues regarding stipulations that at some point we need to

10   bring to your attention, unless you want to do it now.

11             THE COURT:  I don't want to do it now.  We have a

12   witness on the stand ready to go.  I'll be more than happy to

13   do it when we break for lunch.

14             MS. COHEN:  Perfect.  Thank you, your Honor.  Let me

15   get the witness.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1    (Jury present)

2         MR. MASTER:  If the jury could turn to Government

3    Exhibit 520-T.

4    Q.  Mr. Saranello, do you have a copy of the transcripts?

5    A.  No, I do not.

6         THE COURT:  The Court doesn't have a copy either.

7         MR. MASTER:  That's the first priority.

8    Q.  Prior to the break you described receiving an email and you

9    saw a copy of an email of April 20, 2010, from David Levy,

10   stating, "You don't think you owe me a call"?

11   A.  Yes.

12   Q.  Did you give him a call?

13   A.  Yes, I did.

14   Q.  What were you doing when you were calling?

15   A.  I was recording the telephone call.

16   Q.  Did you tell him you were making a recording?

17   A.  No, I did not.

18   Q.  If you could turn to Government Exhibit 520-T.

19        MR. MASTER:  Mr. Dinet, if you could play Government

20   Exhibit 520, which is already in evidence.

21        (Audio played)

22   Q.  I want to ask you a few questions about this call, Mr.

23   Saranello.  If you wouldn't mind turning to the first page.  Is

24   this the first time that you actually spoke with -- withdrawn.

25   What is the reason that you stated to David Levy that the IRS

D3frlev2                    Saranello – direct

1    and Panama regulatory authorities were behind the seizure

2    rather than federal criminal authorities?

3            MR. SHARGEL:  Excuse me.  I'm going to object and ask

4    for an instruction with regard to the conversation.

5            THE COURT:  Come up to the side bar.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the side bar)

2    MR. SHARGEL:  I believe we are entitled to an

3    instruction that it is not the words that Mr. Saranello speaks

4    on the tape, it's the words that are spoken by the defendant,

5    and Mr. Saranello's words are just to put the defendant's words

6    in context.  That is unassailably the law.  He is a cooperator.

7    He knows he is wired.  That is a traditional instruction that

8    is given.

9    MR. MASTER:  I'm not familiar with such an

10   instruction.  It's a rule of evidence.

11   MR. SHARGEL:  These are admissions or statements of a

12   party opponent that is coming in.  That's the evidentiary basis

13   for the statements to come in against Mr. Levy.  But the

14   statements of Saranello are not coming in against Mr. Levy;

15   it's just putting this in context.  The Second Circuit recently

16   spoke to this when someone raised a Crawford challenge.  I

17   don't see a Crawford challenge and neither did the Second

18   Circuit.  But the fact remains that it is Mr. Levy's words that

19   are to be considered.

20   MR. MASTER:  I'm not familiar with this issue.  It

21   sounds like a rule of evidence.

22   THE COURT:  What would the instruction be?

23   MR. SHARGEL:  The instruction would be that you are to

24   consider Mr. Saranello's words just to place Mr. Levy's words

25   in context, you can't just have one side.

1           THE COURT:   The request is denied.   It's confusing.

2           (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3frlev2                    Saranello - direct

1           (In open court)

2           THE COURT:  All right, Mr. Master.

3           MR. MASTER:  Thank you, your Honor.

4    BY MR. MASTER:

5    Q.  Mr. Saranello, back to the issue.  Was it true that the

6    reason for the seizure was IRS and Panama regulatory

7    authorities?

8    A.  No.  The agents had asked me to use that as an excuse to

9    talk to David.

10   Q.  Then turning to page 2, you stated that you had some health

11   problems in early April that prevented you from speaking to

12   David.  Was that accurate?

13   A.  No.  I had just used that as an excuse.

14   Q.  Pursuant to whose instructions?

15   A.  Agent Eastman.

16   Q.  That is because you were instructed earlier not to contact

17   David Levy for a period?

18   A.  That's correct.

19   Q.  On several occasions you asked David Levy to explain the

20   source of funds.  Do you remember that?

21   A.  Yes.

22   Q.  What is the reason that you were asked that?

23   A.  Agent Eastman had asked me to try and draw out in

24   conversation from David what his claim was of the source of the

25   funds that he had presented in cashier's checks.

D3frlev2                    Saranello - direct

1  Q.  Now turning to page 3 and 4, there is a reference to a

2  $1 million plazo fijo.  That is Spanish for CD or time deposit?

3  A.  CD or time deposit, yes.

4  Q.  That a reference to the $1 million CD that you testified

5  about earlier?

6  A.  Yes, it is.

7  Q.  In fact, the CD was opened in the name of Bluefin Financial

8  as reflected by the documents?

9  A.  That's true.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3FLLEV3                    Saranello - direct

1    BY MR. MASTER:

2    Q.  And so what's the reason you said it was still in the name

3    of Udino?

4    A.  At that time in the conversation, I did not have those

5    documents and I wasn't sure exactly how the bank had opened it,

6    in which account name.

7    Q.  There's a reference in this call to the stock purchase

8    agreements that you testified about earlier?

9    A.  Yes.

10   Q.  And you previously testified about the torn portion of the

11   Peter Veugler stock purchase agreement that was found in your

12   house in the search warrant?

13   A.  Yes.

14   Q.  What did you do with the original stock purchase agreements

15   other than that torn copy?

16   A.  The original stock purchase agreements I had to tender to

17   the bank and did tender to the bank.

18   Q.  Did you have complete sets of all of them?

19   A.  No, I did not.

20   Q.  Did you provide a copy to David Levy at the time that the

21   stock purchase agreements were given to the bank?

22   A.  No, I did not.

23   Q.  And so what happened to the only complete set?

24   A.  They were given to Capital Bank as the source, showing the

25   source of funds for those cashier's checks.

D3FLLEV3                    Saranello - direct

1    Q.  And do you recall exactly which stock you had said had been

2    sold by Udino Investments as you described the consideration

3    for all these cashier's checks?

4    A.  No, I don't.

5    Q.  Now, without describing, on page 6 of 8, without describing

6    the nature of the trouble that David Levy referred to, your

7    other friend is in trouble, do you know -- and then it states,

8    um Scotty.

9            Without describing the nature of the trouble, who did

10   you understand him to be referring to?

11   A.  To Scott Gelbard.

12   Q.  And that's the person who you referenced earlier introduced

13   you to David Levy?

14   A.  Yes.

15   Q.  Now, on this call you promised to send David Levy copies of

16   the cashier's checks that he had had deposited into Udino

17   Investments; do you recall that?

18   A.  Yes, I do.

19   Q.  And that's on page 5 of 8.  It says, you said, yeah, OK,

20   I've got, um, yeah, I've got copies of the checks.  I'll go

21   ahead and pull those and email those to you in the morning, OK.

22           Do you remember that?

23   A.  Yes.

24   Q.  And did you in fact do that?

25   A.  Yes, I did.

D3FLLEV3                    Saranello - direct

1          MR. MASTER:  And, Mr. Dinet, if you could turn to

2     500-23.

3     Q.  And actually, Mr. Saranello, the million-dollar CD, was

4     that part of the funds that were frozen by the authorities as

5     well?

6     A.  Yes, it was.

7     Q.  So the entire amount, the $150,000 plus the entire amount

8     of the cashier's checks was frozen?

9     A.  Yes.

10    Q.  And what if any ability did you have, to your knowledge, or

11    David Levy have in actually getting the funds out?

12    A.  None.

13    Q.  So now there's an email.

14         MR. MASTER:  Mr. Dinet, if you could turn to the

15    fourth page.

16    Q.  That's the next morning, right?

17    A.  Yes.

18    Q.  The first call was on -- the call just played was on

19    April 20?

20    A.  Yes.

21    Q.  So what did you do the next morning?

22    A.  I said David Levy an email with a scan of the checks

23    attached.

24    Q.  And, Mr. Dinet, if -- it states attached are the scans with

25    checks.  I will call later in the day.  And that's what you

1    wrote to David Levy?

2    A.  Yes.

3         MR. MASTER:  Mr. Dinet, if you could briefly flip

4    through the next three pages, and back to the second to last

5    page.

6    Q.  There's handwritten notation there, 219800 or 2,198,000.

7    Is that the total value of the checks?

8    A.  Yes, that was the total value of the checks.

9    Q.  Who actually wrote that?

10   A.  The banker at Capital Bank.

11   Q.  And you received these copies when you deposited the

12   checks?

13   A.  Yes.

14   Q.  By the way, why did you have to deposit the checks and be

15   present?

16   A.  Because the Udino account was an account that I was sole

17   signatory on.

18   Q.  So what if any ability did David have to actually deposit

19   funds into that account?

20   A.  He was not able to do that.

21   Q.  So now, back to the call, or, I'm sorry, back to that

22   email, it says attached are the scans of the checks.  I will

23   call later in the day.

24         Did you in fact call later in the day?  If you could

25   turn to Government Exhibit 521-T and members of the jury.

D3FLLEV3                    Saranello - direct

1    A.  Yes, I did.

2            MR. MASTER:  At this time I'd like to play 521 and

3    request the jury follow along, 521-T.

4            THE COURT:  All right.

5            (Audio recording played)

6    Q.  OK.  I'd just like to ask you a few questions about some

7    things that you said on Government Exhibit 521-T.  If you could

8    just turn to the second page.

9            When David said can you show me what you gave them and

10   you said sure I can, again, did you in fact have those stock

11   purchase agreements?

12   A.  No, I did not.

13   Q.  And so what's the reason that you said sure I can?

14   A.  At that point I was going to create documents if David

15   requested me to do that.

16   Q.  That is create a new set?

17   A.  A new set of documents, yeah.

18   Q.  Again, that was pursuant to agent's instructions?

19   A.  Yes, pursuant to Agent Eastman's instructions.

20   Q.  And there's some conversation here about that the money was

21   earned from marketing to begin with for real.  Do you see that?

22   A.  Yes.

23   Q.  When if ever did David Levy present you with any marketing

24   agreements for I guess to back up or support the money that he

25   gave you?

1  A.  He never did.

2  Q.  And on page 5 of 8, 4 to 5 where David says, I mean why did

3  they take the money to begin with if it was suspicious, if it

4  was too big of a check.  He states I just don't get it.

5      You stated, I don't, that part I don't understand, and

6  in fact you did understand?

7  A.  Yes, I did.

8  Q.  And what was the reason that the funds were frozen?

9  A.  The funds were frozen because of the actions by the U.S.

10  government, but the agents told me not to discuss that part

11  with David.

12  Q.  Back on page 2 of 8, Mr. Saranello.  You state the money is

13  frozen right now but we just have to show the source of funds

14  that this was, I mean, all these funds were legitimate and we

15  can get these funds released.

16      And, again, based on your conversation with David Levy

17  and the actions you took, what was your understanding of

18  whether these funds were in fact legitimate?

19  A.  They were not legitimate.  I mean there's David in Panama

20  had told me to make up documents to show the consideration for

21  the funds.

22  Q.  And he had also told you about his relationship with Peter

23  Veugler?

24  A.  Yes, he had.

25  Q.  And he had told you about the nature of his business?

1  A.  Yes.

2  Q.  And so you understood that the funds --

3       MR. SHARGEL:  Object to the leading, your Honor.

4       THE COURT:  Yes, Mr. Master.

5       MR. MASTER:  I'll rephrase, your Honor.

6       THE COURT:  Thank you.

7  Q.  What did you understand about the nature of the funds and

8  the source of the funds?

9  A.  That the funds and the source were not legitimate based on

10 what David had told me about Peter Veugler and based on David

11 telling me to make up documents so that the bank would accept

12 them, the checks, for deposit.

13 Q.  And, again, what did David tell you about the nature of his

14 own business?

15 A.  He told me that he was involved in promoting and pumping up

16 stocks, small cap prices of stocks.

17 Q.  Go ahead.

18 A.  And then selling the funds as quickly, selling the stock as

19 quickly as possible to maximize his funds that he would get

20 from the prices of the stock.

21 Q.  And you understood from your prior work that that was not

22 legitimate?

23 A.  Yes.

24      MR. SREBNICK:  Same objection.  I move to strike the

25 last answer in particular.

1          THE COURT:  OK.  It's denied.

2    Q.  Now, during this call, David Levy asked you to speak to

3    someone named Don Edwards?

4    A.  Yes.

5    Q.  Who again was Don Edwards?

6    A.  Don Edwards was someone who was at the dinner that when I

7    had dinner with David in Panama in December, and someone who

8    was described to me by David as a stock promotor, someone who

9    is involved in pumping stock.

10   Q.  And, again, what other gentleman was at the dinner besides

11   David?

12   A.  Dwayne Bigelow was also at the dinner.

13   Q.  And what did you discuss at this dinner?

14   A.  We discussed that there would be future stock deals that

15   they wanted to use companies that I had set up and brokerage

16   accounts that I had in existence in the United States to hold

17   stock and for stock to be sold through.

18   Q.  So did there come a time when you actually called Don

19   Edwards?

20   A.  Yes.

21   Q.  Without describing the substance of what you discussed, did

22   you have multiple conversations with him?

23   A.  Yes, I did.

24   Q.  And after you had those conversations, were you directed to

25   call David back?

D3FLLEV3                    Saranello - direct

1    A.  Yes, I was.

2    Q.  I'd like you to take a look at Government Exhibit 525-T, if

3    the jury could just turn to that.  And that's a call that

4    occurred how many days after the prior call?

5    A.  About two days after.

6    Q.  In the interim, had you had several calls with Don Edwards?

7    A.  Yes, I had.

8              MR. MASTER:  And at this time I request permission to

9    play that.

10             THE COURT:  Yes.

11             (Audio recording played)

12   Q.  OK, now, Mr. Saranello, just as we did before, just a

13   couple of follow-up questions about you the reason why you said

14   certain things on this call.

15             The CD, turning to page 2 of 6, when David Levy said

16   it's not in Udino.  You said I told them to put in Udino.

17             Are you referring to the $1 million CD that was

18   discussed earlier?

19   A.  Yes.  When I said Barrington, I just couldn't be sure

20   whether it was Barrington or Bluefin.  And it turns out that

21   when I did see the documents from the bank months later, I

22   realized it was in Bluefin.

23   Q.  And those are the documents that are in Government

24   Exhibit 503-3 that you described earlier?

25   A.  Yes.

1    MR. MASTER:  Mr. Dinet, if you could just briefly pull

2  up Government Exhibit 500-23.  That would be the second to last

3  and the last page.

4  Q.  There's discussion during this call about a letter that he,

5  Mr. Levy wanted you to send to the bank to get the CD

6  transferred back into Udino; do you remember that?

7  A.  Yes.

8  Q.  And what did the agents tell you to do after David Levy

9  made this request?

10  A.  They told me to send by email to David Levy an attachment

11  of a letter that I would be purportedly sending to the bank to

12  transfer the CD back to Udino, but not to actually send a

13  letter to the bank.

14  Q.  And what was your understanding of the reason why you were

15  asked to do that?

16  A.  Because they wanted me to show David that I was sending a

17  letter to the bank, but they knew that sending anything to the

18  bank was futile because all the funds were already frozen.

19  Q.  Is this email one that you sent later that day concerning

20  that letter that you had created in response to his request?

21  A.  Yes, it is.

22    MR. MASTER:  And if you could just turn to the second

23  page, Mr. Dinet, next page.

24  Q.  And so is that the letter that you actually sent to David

25  Levy as reflected in this email?

1  A.  Yes, it is.

2  Q.  And did you in fact submit it to the bank?

3  A.  No, I did not.

4  Q.  Back to the recording.

5          MR. MASTER:  And, actually, you know what, Mr. Dinet,

6  while you have this up, just go back to Government

7  Exhibit 503-3.  If you can just go to the translated page.

8  Q.  And this is the page that refers to the actual

9  million-dollar CD?

10  A.  Yes, it is.

11  Q.  And it states, what is the actual name of the CD in?

12  A.  In Bluefin Financial Group Inc.

13  Q.  And it indicates their, where the source of the funds came

14  from and states cash -- see in the middle of the page -- cash,

15  Udino INV; what did you understand that to refer to?

16  A.  That it's from the Udino Investment account.

17  Q.  And that the debit account number right there, the one

18  ending in 037?

19  A.  Yes, that's the Udino account.

20  Q.  That's the same one into which David Levy had put all that

21  money?

22  A.  Yes.

23  Q.  Now, on this call you also described a CAT scan and a

24  closed head injury and those being reasons why you couldn't

25  meet with David Levy; do you remember saying those words?

1    A.  Yes.

2    Q.  Did you in fact, were you in fact about to get a CAT scan?

3    A.  No, I was not.  I had had an injury about five months

4    earlier that David was aware of and the agents asked me to use,

5    you know, the excuse of my medical condition to say that I

6    couldn't fly because they did not want me flying.

7    Q.  And flying to where?

8    A.  To Miami to meet with David.

9    Q.  And then on page 5 of 6, where David Levy says he's going

10   to make a whole new set of documents for the source of the

11   funds?

12   A.  Yes.

13   Q.  When if ever did you ever get a new set of documents?

14   A.  I never did get a new set of documents from David.

15           MR. MASTER:  One moment, your Honor.

16   Q.  Now, eventually did you stop speaking further with David

17   Levy?

18   A.  Yes.

19   Q.  And when if ever have you seen him between the last time

20   you saw him in -- well, between the time you saw him in

21   December of 2009 and appearance in court?

22   A.  Not until yesterday.

23   Q.  Now, just a couple of final questions.

24           Oh, and have those funds ever been unfrozen?

25   A.  No, they have not.

D3FLLEV3              Saranello - direct

1    Q.  Couple final questions.

2              You testified earlier about the $5,000 that was sent

3    to Yehuda Levy.  What if anything did David Levy say about the

4    reason for that transfer?

5    A.  He didn't give me any reason.  He just asked me to send it

6    and he sent me the wiring instructions for Yehuda Levy.

7    Q.  And you testified earlier about the Greenway Design or

8    Cool-n-Save transaction --

9    A.  Yes.

10   Q.  -- do you remember that.  When if ever did David Levy tell

11   you that he was excited about the Cool-n-Save technology?

12   A.  He never did talk to me about the technology, just about he

13   was excited about the deal because he thought he would make a

14   lot of money from it.

15             MR. MASTER:  Nothing further.

16             THE COURT:  Mr. Shargel, it's almost lunch time.

17             MR. SHARGEL:  I'd like to ask one or two questions, if

18   I may.

19             THE COURT:  All right.  Go ahead.

20   CROSS-EXAMINATION

21   BY MR. SHARGEL:

22   Q.  Mr. Saranello, at any time from May of 2009, that's when

23   you first met Mr. Levy, right?

24   A.  Yes.

25   Q.  At any time before doing any business deals with him, did

1  you tell him that you were a disbarred lawyer?

2  A.  No, I did not.

3          MR. SHARGEL:  And why don't we take the lunch break,

4  Judge.

5          THE COURT:  All right.  Ladies and gentlemen, we'll

6  take our luncheon break now.  Maybe we can resume a little bit

7  earlier.  Thank you.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Jury not present)

2     THE COURT:  Mr. Saranello, you can step down.

3     MR. SHARGEL:  Can we have an instruction, your Honor?

4     THE COURT:  Oh, yes.  You're on cross-examination now,

5     Mr. Saranello, so don't talk to the government about your

6     testimony.

7     THE WITNESS:  Yes.

8     (Witness not present)

9     MR. SHARGEL:  Your Honor, the application that I made

10    at the side bar I realized was totally muddled.  I'd just like

11    to put before you that I think the standard instruction is that

12    the statements of the cooperating witness are not admitted for

13    the truth of the matter asserted.

14    I respect the ruling.  If that changes your mind, it

15    does.  If it doesn't, it doesn't.  But that's the instruction,

16    that those statements are not admitted for the truth of the

17    matter asserted.

18    THE COURT:  What's the Second Circuit case?

19    MR. SHARGEL:  I don't remember the name but it's a

20    challenge, it was a Crawford challenge to the fact that the

21    person who was on the conversation was not available and under

22    Crawford hadn't been crossed.  The Second Circuit rejected that

23    and emphasized that the words of that person, the absent

24    person, were like a vessel through which the words of the

25    defendant were being admitted.

D3FLLEV3

| | |
|---|---|
| 1 | THE COURT:  But he was here. |
| 2 | MR. SHARGEL:  No, I'm not suggesting that.  Of course |

he was here, but these are still out-of-court declarations.

The mere fact he's here doesn't satisfy the hearsay rule if

they don't fall within an exception, and they are admitted but

not for the truth of the matter asserted.

THE COURT:  So you'd like an instruction that says?

MR. SHARGEL:  Simply that, that the statements made by

Mr. Saranello are not admitted for the truth of the matter

asserted, but just to put the words of Mr. Levy in context.

THE COURT:  Well, OK, and the government's position?

MR. MASTER:  We would oppose that.  I think that is --

THE COURT:  I'll find the case and read it.

MR. SHARGEL:  Thank you, Judge.

THE COURT:  Without trying to put any parameters on

it, how long do you think you're going to be, Mr. Shargel?  Are

we going to get to a conclusion today?  I don't think we are.

MR. SHARGEL:  I think we are.

THE COURT:  Oh, we are, OK.

MR. SHARGEL:  Unless the government has some --

THE COURT:  More exhibits they want to send you at

1 o'clock in the afternoon.

MR. SHARGEL:  I don't think -- look, again, I'm still

sticking to my 45 minutes and no longer than an hour with this

witness.

D3FLLEV3

1          THE COURT:  Bring us to three.

2          MR. SHARGEL:  That will bring us to three.

3          MS. COHEN:  Your Honor, the government has

4   stipulations to read into evidence and wants to publish some

5   documents.  We will check with Agent Reinhardt to see where he

6   is progressing on the chart.

7          THE COURT:  One of the charts you disseminated at

8   3 o'clock in the morning does what I suggested you do.

9          MS. COHEN:  Correct, your Honor.  It was in response

10  to Mr. Shargel's objection last night that we put that together

11  last night.  But I also think that agent --

12         THE COURT:  The total amount of money on that is

13  $15 million?

14         MS. COHEN:  I think it's 12 million plus dollars, your

15  Honor.

16         THE COURT:  Plus the $2 million in the --

17         MS. COHEN:  That's why we want to go back and look at

18  the other charts and make sure we're not missing anything.

19         THE COURT:  OK.

20         MR. SHARGEL:  You know one thing about it, it's

21  12,444,000, round numbers.  But this also has stock that Fotis

22  Georgiadis traded and that was in the amount of $4,022,322, and

23  it says of which $1,535,000, round numbers, were transferred to

24  David Levy and Donna Levy.

25         So why should Fotis's money be on the chart, on this

D3FLLEV3

1  one chart?  It doesn't make any sense.  It would seem to me

2  that the number to put on the chart would be 1,535,000.

3            THE COURT:  We'll cross that bridge when we come to

4  it.

5            OK.  Be back a little bit early.  We'll try to

6  resume -- what time did you tell the jury?

7            THE DEPUTY CLERK:  1:45.

8            THE COURT:  That's an hour from now.

9            MS. COHEN:  Your Honor, there are several evidentiary

10  objections.

11            THE COURT:  What are the evidentiary objections?

12            Please be seated.

13            MR. SREBNICK:  OK, Judge.  Let me, if I could tender

14  what the government is proposing to offer in substance 801-25,

15  801-26.

16            THE COURT:  Are they stipulations, Mr. Srebnick?

17            MR. SREBNICK:  Authenticity is stipulated to, but

18  relevance and 403 are for the Court to decide.

19            It's a chain of emails.  It makes reference,

20  apparently there's a conversation by email, one of those email

21  addresses is Ms. Levy, and there's a discussion about a Tokyo

22  Joe, a case involving somebody named Tokyo Joe.  I just emailed

23  to the government what I found on the internet about Tokyo Joe.

24  I just learned about this Tokyo Joe business today.

25            It turns out Tokyo Joe that is being referred to under

1    the SEC's own website was a civil case involving I think a

2    published decision known as Tokyo Joe, but the parties involved

3    SEC v. Park.  In any event, it was a civil case where a company

4    known as Tokyo Joe was holding itself out as an investment

5    adviser, not disclosing the conflict of interest it had because

6    the company owned stock in the companies it was promoting.  And

7    the SEC through a civil settlement required that Tokyo Joe post

8    that they had conflicts of interest, disclosure requirements,

9    etc.  All of the trimmings of that Tokyo Joe event are not

10   discussed in the email chain your Honor is looking at.  And so

11   my fear is it's going to be awfully confusing to the jury.

12           And let me give the Court the cite.  It's SEC v. Park,

13   99 F.Supp.2d 889 out of the Northern District of Illinois.

14           THE COURT:  Who is fuss and frill, is that Ms. Levy?

15           MR. SREBNICK:  Yes.

16           THE COURT:  And who's James Connolly?

17           MR. SREBNICK:  Just a third party also apparently in

18   the promotion business who's not a part of this case.  This has

19   nothing to do with these stocks.  It's just, as I understand

20   it, just discussion among promotors discussing this Tokyo Joe

21   civil settlement involving the SEC, which I've now cited for

22   the record.

23           THE COURT:  OK.  Ms. Cohen.

24           MS. COHEN:  Your Honor, just to put this in some

25   context, this was a document that was found on Donna Levy's

1  laptop when it was seized pursuant to the court-authorized

2  search warrant.  And this document is relevant to show Donna

3  Levy's knowledge of stock promotion business, to show, among

4  other things, her consciousness of guilt.  I can elaborate

5  further, your Honor, but I think the document speaks for

6  itself.  There's no grounds on which to exclude it.

7          THE COURT:  I'll read the case.

8          What else do you have?

9          MR. SREBNICK:  Then there's what's remaining.  I think

10  we'll need to work over the lunch hour to find out what the

11  government is going to connect up in terms of the promotions

12  that it relied upon to make its chart and connecting it to

13  Donna Levy.  If I could use the lunch hour and I can report

14  back to the Court at 1:45.

15          MS. COHEN:  I believe other objections, 105 series you

16  wanted to raise.

17          THE COURT:  And what do we do about the stipulations

18  about the witnesses who --

19          MR. SHARGEL:  Read it in the record.

20          MS. COHEN:  We have worked out stipulations signed by

21  all the parties.

22          MR. SHARGEL:  And I can move it into evidence.  We'll

23  do it on the defense case and --

24          THE COURT:  So that particular problem is behind us?

25          MR. SHARGEL:  Yes, sir.  And the problem with the --

1  we had the dispute about another issue, the same letter, we're

2  going to waive on that one.

3          THE COURT:  That's Mr. Holmes?

4          MR. SHARGEL:  Yes.

5          THE COURT:  OK.  Mr. Srebnick, anything else?

6          MS. COHEN:  I'm told by Mr. Srebnick there are no

7  further objections.

8          THE COURT:  I'll rule on this when we come back at

9  1:45.  Thank you.

10          (Luncheon recess)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3frlev4

1:45 p.m.

(Jury not present)

THE COURT:  Mr. Srebnick, with respect to your

objections to 801-25 and 801-26, I have considered the

materials you have submitted.  The objection is overruled.

With regard to your request, Mr. Shargel, we read the

Dominguez case from Richard Berman several years ago.  Maybe

Mr. Kramer was the law clerk.  In any event, it doesn't seem to

me this is the situation at all.  Mr. Saranello is on the

stand.  He has already admitted he's lied.  I don't understand.

MR. SHARGEL:  I am not raising a confrontation issue

at all.  I submitted two citations to your law clerk.  I think

both stand for the proposition that the statements of a

cooperator are not admitted for the truth of the matter

asserted and are only admitted for context.  There is a Second

Circuit case.

THE COURT:  Who is saying that they are submitted for

the truth?  He said he lied.

MR. SHARGEL:  No, no.  He lied, yes, he lied that he

had an accident, hit his head.  That is not the point.  The

point is that anything he was saying, more importantly, about

transactions, it's just that there is a blanket prohibition

against using anything that he says for the truth of the matter

asserted.

1    I am, obviously, not concerned about the little lies

2    that he told about his head.  But that is an instruction, most

3    respectfully, that I think I am entitled to.  It doesn't have

4    to be done right now.  I respectfully refer you to the two

5    cases that I cited.

6        THE COURT:  OK.  I wasn't moved by Dominguez.  I'll

7    look at the other two cases.

8        MR. SHARGEL:  That is because Mr. Kramer was the

9    clerk.  It could have been my son, who was his co-clerk.

10       MS. COHEN:  If I could make a proposal for your Honor

11   with respect to the timing of the summary charts that we are

12   revising per your Honor's order.  I have spoken with defense

13   counsel, who are in agreement with our proposal to the Court.

14       After Mr. Saranello finishes his testimony, we will

15   introduce certain exhibits and publish certain exhibits and

16   read certain stipulations into evidence.  We then will put

17   Agent Reinhardt on the stand to testify about everything he

18   would testify to except the summary charts.  We would then

19   adjourn for the day.  I think this would take us close to 4

20   o'clock anyway.

21       We will double-check our charts after the end of court

22   today.  We will then provide them to defense counsel.  Defense

23   counsel will have some time to look at them, figure out what

24   their objections will be.  We will try to work it out with them

25   to see if we can reach an understanding.  Then, on Monday

1  morning we could put Agent Reinhardt on the stand only to

2  testify about the summary charts.  Then he could be

3  cross-examined on everything.

4              THE COURT:  He is the final witness?

5              MS. COHEN:  Yes.  There is a slight chance we would

6  need another stipulation or perhaps a Federal Reserve witness

7  who would testify about a couple of wires, but that would be

8  it.

9              THE COURT:  Is that all right with the defendants?

10             MR. SHARGEL:  That's fine.  Then we will be here for a

11 charge conference on Monday morning.

12             MS. COHEN:  Defense case.

13             MR. SHARGEL:  Yes, it's fine.

14             THE COURT:  You will finish up your case on Monday?

15             MS. COHEN:  Monday morning.

16             THE COURT:  We will let the jury go early and do the

17 charge conference.

18             MR. SHARGEL:  Very well.

19             MS. COHEN:  Thank you, your Honor.

20             THE COURT:  Is there anything else that anybody wanted

21 to bring up?

22             MR. SHARGEL:  Your Honor, when we broke for lunch --

23 do you want to do this at the side bar?

24             THE COURT:  Out of an abundance of caution, yes.

25             (At the side bar)

1    MR. SHARGEL:  I noticed that there was a person

2    sitting, as we face it, on the left side of the spectator

3    portion during the entire morning session.  When we broke for

4    lunch, there were a few jurors coming into the hallway.  We

5    made certain that none of us went on the elevator at the same

6    time.  But we did notice, I noticed, that the person who was in

7    the back went on the elevator with Juror No. 2 and they seemed

8    to be in conversation.

9        I'm not making any application.  But it's the end of

10    the day Friday, I'm just asking for a emphatic instruction --

11    it's an open courtroom, can't exclude anything, an emphatic

12    instruction that they don't discuss the case with anyone else.

13        MR. MASTER:  I have no objection.

14        THE COURT:  I will do that.

15        MR. SREBNICK:  Judge, maybe we could resolve some of

16    the objections to some of the exhibits.  Mr. Gomez is going to

17    identify them.

18        THE COURT:  All right, Mr. Gomez.

19        MR. GOMEZ:  The government introduced through Mr.

20    Melley certain exhibits that are collected by FINRA, and those

21    are in a series of 101 through 105.  Our objection is to the

22    relevance of a number of online postings.  I'll identify the

23    precise government exhibit numbers.

24        The government hasn't established a connection between

25    Donna or David Levy and that particular posting.  For example,

D3frlev4

1  if a posting states by Bullishalerts.com and it announces

2  something about Cardiac Networks, the government has suggested

3  and shown that to certain witnesses, suggesting that there was

4  a connection that our clients, one or both of our clients, paid

5  or asked to have that published.  So far, for the numbers I'm

6  about to identify, we believe the government hasn't drawn a

7  connection between the Levys and that particular posting.

8       Another category is with respect to online promotions

9  by, for example, Best Damn Penny Stocks.  The government has

10  drawn a connection between the owner of that website, Eric

11  Cusimano, and the Levys on a general level, that there is a

12  general business relationship.  We believe that is insufficient

13  to establish the relevance of those motions.

14       THE COURT:  You're going to object?

15       MR. GOMEZ:  Yes.

16       THE COURT:  Put it on the record.

17       MR. GOMEZ:  The government exhibits are 101-14 through

18  101-28, 102-6 through 102-26, 103-16 through 103-43, 104-14

19  through 104-21, 105-15 through 105-34, 105-40 through 105-45,

20  and 605-1 through 605-8.

21       THE COURT:  Does the government want to be heard?

22       MS. COHEN:  With respect to those email addresses that

23  are directly linked to Eric Cusimano, I think the government

24  has shown that Eric Cusimano is a co-conspirator, so I don't

25  think there is any issue with respect to those emails.

D3frlev4

1          With respect to the other blog postings or Internet --

2          THE COURT:  Excuse me.  Marlon, tell the marshal to

3   bring in Mr. Saranello.

4          MS. COHEN:  -- newsletters that were done by email

5   addresses or blogs that are not directly linked to the Levys or

6   any of their unindicted co-conspirators, we argue they are

7   relevant because Donna Levy and her co-conspirators put that

8   information out there.  It was then picked up on the Internet

9   and redisseminated.  That's relevant to show the extent of the

10  fraud and the impact on different investors who invested in it

11  based on information that they were responsible for putting out

12  there.

13         MR. MASTER:  I would add, your Honor, that there was

14  testimony that Donna Levy actually leaked information out to

15  other posts in order to increase the impact of the promotion.

16         THE COURT:  The objection is overruled.

17         (Continued on next page)

18

19

20

21

22

23

24

25

D3frlev4

1          (In open court)

2          MR. SREBNICK:  Judge, we are going to sign the

3     stipulation, reserving the objections that we have made to the

4     admissibility that you have already overruled.  OK?

5          THE COURT:  Yes, sir.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3frlev4

1    (Jury present)

2    JOSEPH SARANELLO, resumed.

3         THE COURT:  Mr. Shargel.

4         MR. SHARGEL:  Thank you, your Honor.

5    CROSS-EXAMINATION (continued)

6    BY MR. SHARGEL:

7    Q.  Mr. Saranello, I asked you one question before the break

8    about whether you ever told David Levy that you were disbarred.

9    Do you recall that?

10   A.  Yes.

11   Q.  Just so we are all on the same page, disbarred means that

12   you are no longer a lawyer, right?

13   A.  That's correct.

14   Q.  That a disciplinary committee, in your case in Texas, found

15   that you were unfit to practice law, correct?

16   A.  Correct.

17   Q.  Yesterday, you were asked questions by Mr. Master about

18   your disbarment.  Do you remember when he asked what were you

19   disbarred for?

20   A.  Yes.

21   Q.  Do you remember giving this answer to the question, at page

22   1298 of the record?  "I had neglected approximately four cases

23   and failed to keep up with the deadline on those cases, and

24   they were dismissed for want of prosecution and I was

25   disbarred."  Is that the whole story, Mr. Saranello?

D3frlev4                    Saranello - cross

1    A.   That's a summary.  I failed to keep up with the cases, and

2    disciplinary committee found that I did not perform the duties

3    of an attorney in keeping clients informed of their cases.

4    Q.   They also found out and also held in disbarring you that

5    you had lied, isn't that right?

6    A.   I didn't file a response to the pleadings.  They found that

7    I had lied to clients.

8    Q.   Did you think that you were permitted to lie to clients?

9    A.   No.  That would be part of my --

10   Q.   I'm sorry.  I misspoke.  Forgive me.  Let me state the

11   question accurately.  Did you think that as an attorney

12   licensed to practice in the State of Texas, you were permitted

13   to lie to a client?

14   A.   No.  I should have supplemented my answer to Mr. Master

15   that the disciplinary committee found that I had lied to

16   clients.

17   Q.   To clients plural, right?

18   A.   Yes.

19   Q.   There was a client by the name of Gary Holmes, do you

20   remember that client?

21   A.   Yes.

22   Q.   You lied to Gary Holmes, didn't you?

23   A.   Yes.

24   Q.   There was a woman by the name Samad Latif, do you remember

25   that client?

1    A.  Yes.

2    Q.  You lied to her as well?

3    A.  Yes.

4    Q.  It is a fact, is it not, sir, that the reason that was

5    given by the Texas bar, the state bar of Texas, the reason that

6    you were disbarred was for engaging in conduct involving

7    dishonesty, fraud, deceit, or misrepresentation, and that was

8    what led to your disbarment, isn't that right, sir?

9    A.  Yes.

10   Q.  That was back in May of 1997, right?

11   A.  Yes.

12   Q.  Eight or nine years before you even meet David Levy, right?

13   Actually, more than that, correct?

14   A.  Yes.

15   Q.  Bringing us to a more recent event, you told us on direct

16   examination about your plea of guilty.  Do you remember that?

17   A.  Yes.

18   Q.  That took place on April 27, 2010, in Santa Ana,

19   California, right?

20   A.  Yes.

21   Q.  You stood before a judge, didn't you?

22   A.  Yes.

23   Q.  You were required to answer certain questions that the

24   judge asked, right?

25   A.  Yes.

D3frlev4                    Saranello - cross

1    Q.  You remember that the judge, Judge Salina, was the judge

2    presiding?

3    A.  Yes.

4    Q.  He asked you certain questions and you were required to

5    give certain answers, right?

6    A.  Yes.

7    Q.  You were 61 years old at the time, right?

8    A.  Yes.

9    Q.  The judge said at the beginning of his questions put to

10   you, the judge said, "Tell me about your education," and you

11   said in response, "Postgraduate education, your Honor?  College

12   and law practice."  And the judge goes on to say, "Are you

13   admitted to practice?"  And you say, "I practiced in Texas."

14           You misled that judge, didn't you?

15   A.  No, I didn't.  I said that I had practiced, but I didn't

16   claim to still have a law license.

17   Q.  In other words, you thought the judge caught the subtlety

18   of "I had practiced in Texas"?

19   A.  Yes.  The U.S. Attorney knew that I had been disbarred.

20   Everyone knew I had been disbarred.

21   Q.  But the U.S. Attorney wasn't going to sentence you, it was

22   the judge, the federal district court judge who was going to

23   sentence you, right?

24   A.  Right.

25   Q.  It was the federal district court judge who asked about

D3frlev4                    Saranello - cross

 1  whether you were admitted to practice.  That means a lawyer who

 2  has a license to practice, right?

 3  A.  Yes.  I did not say that I was admitted to practice.

 4  Q.  So your answer was "I had practiced in Texas"?

 5  A.  Yes.

 6  Q.  Last question on the subject.  Did you think that that was

 7  somewhat misleading?

 8  A.  I didn't think it was misleading or I would not have said

 9  that.

10  Q.  Because you wouldn't say anything that's misleading?

11  A.  I thought the answer to that was appropriate.

12  Q.  At the United States Attorney's office out in Santa Ana,

13  California, you had discussed almost immediately after your

14  home was searched on the question of cooperation, right?

15  A.  Yes.

16  Q.  You, sir, did not want to go to prison, right?

17  A.  I wanted to cooperate and end up with the best possible

18  sentence.

19  Q.  The best possible sentence means the lowest possible

20  sentence, right?

21  A.  Yes.

22  Q.  And the lowest possible sentence includes a sentence of

23  probation, right?

24  A.  Yes.

25  Q.  You, sir, said on that witness stand that you had laundered

D3frlev4                    Saranello - cross

1   some $30 million in illegal proceeds, didn't you say that?

2   A.  Yes.

3   Q.  You're a lawyer who, licensed or not, disbarred or not, you

4   knew something about the sentencing process, right?

5   A.  Yes.

6   Q.  You heard of something called the federal sentencing

7   guidelines, right?

8   A.  Yes.

9   Q.  And you knew what the federal sentencing guidelines were

10  for laundering money in the amount of $30 million.  You knew

11  that, right?

12  A.  Approximately, yes.

13  Q.  Approximately?  You knew full well that you were facing the

14  possibility of double-digit time in prison, meaning a prison

15  sentence of more than 10 years.  You knew that, right?

16  A.  Yes.

17  Q.  You didn't want to go to any prison or jail for 10 or more

18  years, did you?

19  A.  No.

20  Q.  How old are you now?

21  A.  I'm 64.

22  Q.  At 64 years old you didn't want to be sentenced to 10 or 20

23  years in some narrow jail cell, some federal penitentiary

24  somewhere.  You didn't want that, right?

25  A.  That's correct.

D3frlev4                    Saranello - cross

1    Q.  You knew full well when you were sitting in that room in

2    Santa Ana, California, that the only way that you were going to

3    be able to avoid going to prison for that period of time was by

4    striking a deal with the government, right?

5    A.  Yes.

6    Q.  In April of 2010, actually April 5, 2010, you attended a

7    proffer session, right?

8    A.  Yes.

9    Q.  You knew what a proffer session was, right?

10   A.  Yes.

11   Q.  You knew the purpose and you knew, I'll say, the contours

12   of that proffer session, right?

13   A.  Yes.

14   Q.  You sat with prosecutors in a room, didn't you?

15   A.  Yes.

16   Q.  Agent Eastman, the case agent as well, right?

17   A.  Yes.

18   Q.  How long was the meeting, as best you can recall?

19   A.  An hour or so.

20   Q.  You knew that during that proffer session the prosecutors

21   out in Santa Ana, California, were measuring your worth or

22   value as a witness, right?

23   A.  Yes.

24   Q.  They wanted to know how much information you to impart,

25   right?

1   A.  Yes.

2   Q.  You knew full well that the more you gave them, the better

3   off you would be, correct?

4   A.  Yes.

5   Q.  The more valuable you were as a witness, the more likely it

6   would be that they would come to your aid, right?

7   A.  Yes.

8   Q.  You have testified here yesterday and today recounting

9   conversations between you and David Levy, do you remember that?

10  A.  Yes.

11  Q.  You have given this jury accounts of conversations with

12  David Levy, right?

13  A.  Yes.

14  Q.  Including conversations on the telephone and conversations

15  in person, right?

16  A.  Yes.

17  Q.  You knew full well, you knew as you sat and continued to

18  sit on that witness stand, that you were giving information

19  that in many respects was totally uncorroborated.  You knew

20  that, didn't you?

21  A.  Some of it was corroborated by the tapes.

22  Q.  The tapes had to do with, and I'll get to the tapes, but

23  the tapes had to do with the money down in Panama, right?

24  A.  Yes.

25  Q.  My question to you, sir, is that as you sit there now and

D3frlev4                    Saranello - cross

1   as you sat on that witness stand in front of this jury, you

2   have been talking about, you have been relating versions, your

3   version, of conversations that you had with David Levy on

4   subjects relating to pumping up stock, do you remember that?

5   A.  Yes.

6   Q.  And getting quick profits, do you remember that?

7   A.  Yes.

8   Q.  Many of those conversations, sir, to your knowledge, many

9   of those conversations were totally uncorroborated.  You now

10  that, right?

11  A.  Yes.

12  Q.  How much time did you spend with the prosecutors in this

13  case preparing this testimony?

14  A.  Approximately two or three hours.

15  Q.  Two or three hours in total?

16  A.  No.  Probably about a total of 10 or 12 hours all together.

17  Q.  10 or 12 hours.  When was the last time you met with the

18  prosecutors?

19  A.  On Tuesday evening.  I'm sorry.  On Wednesday evening.

20  Q.  Wednesday evening?

21  A.  Yes.

22  Q.  Again, help me with that, 10 or 12 hours altogether?

23  A.  Yes.  But on Wednesday evening it was about 3 hours or so.

24  Q.  I want to take you back.  I want to take you back to Santa

25  Ana, California.  I'm not going to jump back and forth.  I know

D3frlev4          Saranello - cross

1    that I just asked you about prosecutors here in New York.

2    Santa Ana, California, April 2010.  Are you with me?

3    A.  Yes.

4    Q.  April 22, 2010, after your proffer session about a week

5    earlier, the proffer session in which your worth as a witness,

6    as you testified, your worth as a witness was being measured,

7    you signed what is called a cooperation, a plea or cooperation

8    agreement, right?

9    A.  Yes.

10   Q.  One week later, April 22, 2010, correct?

11   A.  Yes.

12   Q.  That's something that you went over very carefully with

13   your lawyers, right?

14   A.  Yes.

15   Q.  This was a contract that you were making with the

16   government, right?

17   A.  Yes.

18   Q.  You would have to sign for your side, your lawyer would

19   have to sign for your side, and prosecutors and perhaps an

20   agent would sign as well, right?

21   A.  Yes.

22   Q.  That contract is something you wanted, right?

23   A.  Yes.

24   Q.  Because you knew full well, you knew full well that that

25   was the way, with the benefit of a cooperation agreement, that

D3frlev4                    Saranello - cross

1   you would be able to escape that phenomenon, if I may, of

2   double-digit prison time, right?

3   A.  Yes.

4   Q.  I show you what's been marked for identification --

5       MR. SHARGEL:  I'm going to write on here Defendant's

6   Exhibit A306, with the Court's permission.

7       THE COURT:  Yes.

8       MR. SHARGEL:  I did it by hand.

9       THE COURT:  Good for you.

10      MR. SHARGEL:  It's only in one color.

11      THE COURT:  It's OK.

12  Q.  I put before you A6 for identification -- 306.  I'm getting

13  distracted.  A306 for identification.  Do you recognize it?

14  A.  Yes.

15  Q.  What do you recognize it to be?

16  A.  The signed plea agreement.

17  Q.  Do you want to take a look to see if it's actually the

18  agreement you signed?

19  A.  No.

20      MR. SHARGEL:  A306 for identification that I am now

21  moving into evidence.

22      THE COURT:  Do you have any objection, Mr. Master?

23      MR. MASTER:  No, your Honor.  I was going to introduce

24  it on redirect.  No problem.

25      THE COURT:  306 is in evidence.

D3frlev4                    Saranello - cross

1       (Defendant's Exhibit A306 received in evidence)

2       MR. MASTER:  It is the same as 3514-8 already shown to

3   the witness.

4   Q.  Like any contract, this agreement obligated you to do

5   certain things and the government to do certain things, right?

6   A.  Yes.

7   Q.  First, you managed to change the maximum jail sentence from

8   those double digits that we spoke about down to a maximum of 5

9   years, right?

10  A.  That's correct.

11  Q.  After having a maximum of 5 years -- by the way, the

12  millions of dollars that you earned over the years, tell the

13  jury what the amount of restitution is that you were able to

14  work out.  It's not a number you remember?

15  A.  I'm looking in the plea agreement.  Do you have the page

16  that it is reflected on?

17  Q.  Do you remember the amount $60,000?

18  A.  Yes.

19  Q.  Look at page 3.  You were going to pay in restitution the

20  amount of $60,000?

21  A.  Yes.

22  Q.  Then the agreement was that the sentencing guidelines --

23  you're familiar with the sentencing guidelines, right?

24  A.  Yes.

25  Q.  They are not binding on the judge, but they are advisory.

D3frlev4             Saranello - cross

They inform the judge of what a reasonable sentence may be in a

case like yours, right?

A.   Yes.

Q.   Then your total offense level under the guidelines, it's a

complicated statutory scheme, but the total offense level was

23.  You understood that, right?

A.   Yes.

Q.   Now, instead of double digits and facing double digits, the

guidelines recommended sentence was 46 to 57 months, right?

A.   Yes.

Q.   But that's not all you wanted.  You don't want to go to

jail, right?

A.   No, but I have to accept that the judge may sentence me

whatever he decides in his discretion.

Q.   Whatever he decides in his discretion.  But now the

government accepted the responsibility, their part of the

bargain is that if you cooperated fully and told the truth all

the time, your sentence would be reduced to 37 to 46 months,

level 21, right?

A.   Yes.

Q.   Yes?

A.   Yes.

Q.   That's a pretty good bargain.  Is that how you see it,

pretty good bargain?

A.   Yes.

D3frlev4                    Saranello - cross

1    Q.   Still with the possibility of receiving no time in jail?

2    A.   Yes.

3    Q.   Have you ever testified at another trial?

4    A.   No, I have not.

5    Q.   Have you ever testified at another hearing?

6    A.   No.

7    Q.   You sat down with the prosecutors in April of 2010 and here

8    you are today and yesterday for the first time in a courtroom,

9    right?

10   A.   Yes.

11   Q.   What have you been doing?  I'm not asking for identifying

12   information.  But what have you been doing generally speaking

13   between April 2010, when you signed this agreement, and now?

14   A.   I've worked with various prosecutors and agents on cases.

15   I've also been doing my own business of consulting.

16   Q.   Consulting in what business?

17   A.   Risk management.

18   Q.   What does risk management mean?

19   A.   It means, in the business of captive insurance companies,

20   forming basically self-insurance units for businesses as a way

21   of self-insuring a lower level of risk, reinsuring a greater

22   level of risk with a private reinsurer.

23   Q.   So you're working now again with the same, essentially the

24   same, career that you had before with captive insurance

25   companies, right?

D3frlev4          Saranello - cross

1   A.  Yes.

2   Q.  In other words, you're back at work, right?

3   A.  Well, I'm working with captive insurance companies, yes.

4   Q.  You're back at work with captive insurance companies,

5   right?

6   A.  Yes.

7   Q.  Your life has, shall I say, normalized somewhat?

8   A.  Not exactly.  I'm always subject to call to assist agents

9   or prosecutors.

10  Q.  Do you find that, sir, to be a burden?

11  A.  No, but it takes time.

12  Q.  Do you find it to be a burden?

13  A.  No.

14  Q.  Going back to when you gave that proffer session on April

15  15, 2010, you knew that you had an obligation, even at the

16  proffer session, to tell the truth, right?

17  A.  Yes.

18  Q.  You had an obligation to not lie, right?

19  A.  Yes.

20  Q.  Actually, that was part of your proffer session contract.

21  We needn't put it in evidence, but you remember that, right?

22  A.  Yes.

23  Q.  You knew that making a false statement to a federal agent

24  is a crime, right?

25  A.  Yes.

D3frlev4                    Saranello - cross

1   Q.  You knew it back in April 2010 and you knew it in the month

2   of February 2013, right?

3   A.  Yes.

4   Q.  And you knew that Agent Reinhardt -- you recognize the man,

5   don't you?

6   A.  Yes.

7   Q.  You knew that he was a special IRS agent, right?

8   A.  Yes.

9   Q.  An agent of the United States government, right?

10  A.  Yes.

11  Q.  And you, who wanted not to go to jail, you knew that to lie

12  to Special Agent Reinhardt is a federal offense punishable by

13  up to 5 years in prison by itself, right?

14  A.  Yes.

15  Q.  A 1001 violation.  You have heard of that, right?

16  A.  Yes.

17  Q.  You knew that going back to the proffer session in 2010,

18  right?

19  A.  Yes.

20  Q.  As an adult, you likely knew it from your life experience,

21  right?

22  A.  Yes.

23  Q.  You also knew that to lie to prosecutors, federal

24  prosecutors, Assistant United States Attorneys, like Mr. Master

25  and Ms. Cohen -- you knew that they were federal officials,

D3frlev4              Saranello - cross

1   right?

2   A.  Yes.

3   Q.  U.S. federal officials, yes?

4   A.  Yes.

5   Q.  You knew that to lie to those federal officials is a crime,

6   right?

7   A.  Yes.

8   Q.  Another violation of 1001 for which you could be punished

9   up to 5 years in prison, right?

10  A.  Yes.

11  Q.  With your life experience, you had even read about people,

12  prominent people, who have gone to prison for lying to federal

13  agents and prosecutors?

14          MR. MASTER:  Objection.

15          THE COURT:  Overruled.

16  A.  Yes.

17  Q.  With the exhibit that is A306 or by whatever name or

18  number, you understood, and it is set out at page 14, that any

19  false statement, any false statement or misleading statement by

20  defendant will subject defendant to prosecution for false

21  statement, obstruction of justice, and perjury, and will

22  constitute a breach by defendant of this agreement?  You read

23  that before you signed it, right?

24  A.  Yes.

25  Q.  You know that when you signed this, you had to give

D3frlev4                    Saranello - cross

1    substantial assistance by the very terms of the contract,

2    right?

3    A.   Yes.

4    Q.   Whether you give substantial assistance in the case is

5    entirely up to prosecutors, right?

6    A.   That's correct.

7    Q.   Not up to your lawyer, right?

8    A.   That's right.

9    Q.   Not even up to the judge, because the judge would have to

10   have a motion made by the prosecutors, the only way out, right?

11   A.   Yes.

12   Q.   You knew full well that you have to please the prosecutors.

13   When I say please the prosecutors, I don't mean to make light

14   of it.  You have to be appreciated, if you will, by the

15   prosecutors?

16   A.   Yes.

17   Q.   Let me ask you a question.  As you understand this

18   agreement, what would happen if you told the truth and the

19   prosecutors thought it was a lie?

20   A.   The agreement could be voided.

21   Q.   What happens if you tell a lie and the prosecutors think

22   it's the truth?  What happens then?

23   A.   I guess it could still be voided or it could not be voided.

24   Q.   It could not be voided in a situation where the

25   prosecutors, thinking that you are telling the truth when you

1  are telling a lie, they never find out, right?

2  A.  Yes.

3  Q.  Actually, there was a specific reference later on page 16

4  of Defense Exhibit A306, and they actually give an example.

5  "For example, if the defendant knowingly in an interview before

6  a grand jury or a trial falsely accuses another person of

7  criminal conduct or falsely minimizes his own role or the role

8  of another in criminal conduct, he will have breached."  You

9  read that, right?

10 A.  Yes.

11 Q.  When was the first time that you learned that you would be

12 coming to New York in connection with this case?

13 A.  In January of this year.

14 Q.  Two months ago, approximately?

15 A.  Approximately.

16 Q.  There is also another requirement before we get to January

17 in New York, there is another requirement in your Santa Ana

18 cooperation agreement.  I'm reading from page 8, Mr. Master,

19 paragraph 17.  "The defendant further agrees to disclose to law

20 enforcement officials at a date and time to be set by the U.S.

21 Attorney's office the whereabouts of defendant's ownership

22 interest in and all other information known to defendant about

23 all moneys, property, or assets of any kind derived from or

24 acquired as a result of or used to facilitate the commission of

25 defendant's" -- that's you, the defendant, right?

1  A.  Yes.

2  Q.  -- "defendant's illegal activities and to forfeit all

3  right, title, and interest in and to such items, specifically

4  including all right, title, and interest in and to all United

5  States currency, property, and assets, including domestic and

6  international proceeds from liquidated stocks."  Did you read

7  that before you signed the agreement?

8  A.  Yes.

9  Q.  Your obligation, as you understood it, going back to April

10  of 2010 was, in short, to tell the government about all the

11  money you had, right?

12  A.  Yes.

13  Q.  All the accounts that you had, right?

14  A.  Yes.

15  Q.  Omitting any of that or telling a lie about any of that was

16  a very serious matter, it could mean the end of your

17  cooperation, right?

18  A.  Yes.

19  Q.  All bets off, right?

20  A.  Yes.

21  Q.  You came to New York in January of 2013.  When, as best you

22  can recall, is the first time that you met with prosecutors in

23  this case?

24  A.  The prosecutors came in January.  I first met with them in

25  June of 2012.

D3frlev4                    Saranello - cross

1    Q.   In June of 2012 where did that meeting take place?

2    California?

3    A.   Yes.

4    Q.   How long was that meeting?

5    A.   Approximately 4 to 5 hours.

6    Q.   Let's go ahead 6 months, January of 2013.

7    A.   Yes.

8    Q.   When was the first time you met with prosecutors in the

9    early part of this year, 2013?

10   A.   On January 17th.

11   Q.   January 17th you were questioned by Agent Reinhardt?

12   A.   Yes.

13   Q.   And the others as well, right?

14   A.   Yes.

15   Q.   When you started the meeting, did you say, I want to go out

16   front and tell you I've lied to agents before?  Did you say

17   anything like that?

18   A.   No.

19   Q.   Do you remember, sir, after you were arrested and after

20   signing the agreement that required you to be honest and

21   forthright and disclose your financial information, do you

22   remember that on October 19, 2010, some 6 months after you

23   signed your plea agreement, your cooperation agreement, your

24   agreement to be good -- right?  Yes?

25   A.   Yes.

D3frlev4                    Saranello - cross

1    Q.  -- you went and opened a bank account at the CoBiz Bank in

2    Colorado, right?

3    A.  Yes.

4    Q.  Then, between account opening in October of 2010 -- by the

5    way, when you opened that account -- I want your thinking, your

6    thought process -- when you opened that account, you knew full

7    well that you were taking steps, the first steps, in a road

8    that led to complete, complete abandonment and violation of

9    this agreement, right?

10   A.  Yes.

11   Q.  You opened that account, and between the account opening in

12   October of 2010 and September 27, 2012, September 27, 2012, the

13   total deposit activity into the account consisted of 9 incoming

14   wires from Pan American Group, an alleged investment firm based

15   in Panama, totaling $126,680, right?

16   A.  Yes.

17   Q.  You, sir, spent a significant portion of your life hiding

18   money in Panama, right?

19   A.  Not a significant portion of my life.  I was only there a

20   couple of years.

21   Q.  A couple of years is a fairly significant time where you

22   are violating the law, right?

23   A.  Yes.

24   Q.  Do you have anything to tell us about criminal behavior in

25   other parts of your life?

D3frlev4                    Saranello - cross

1    MR. MASTER:  Objection.

2    THE COURT:  Sustained.

3    Q.  You put $126,680 withdrawn from the Pan America Capital

4    Group.  Cash withdrawal activity consisted of 49 cash checks

5    made payable to cash, endorsed by Mr. Saranello, 2 to 3 times a

6    month in increments of 1,000 and 3,000, totaling 116,700.  In

7    addition, you issued two $5,000 cashier's checks to yourself

8    and two cashier's checks payable to an entity named Rockwell

9    Real Estate.  What is Rockwell Real Estate?

10   A.  It was a venture that was going to look for assets for one

11   of the captive insurance companies.

12   Q.  That was a shell?

13   A.  It wasn't able to find anything that took the venture

14   beyond the initial amount of money.

15   Q.  One of the $5,000 payments went into your own bank account,

16   right?

17   A.  That's correct.

18   Q.  You were questioned by prosecutors from this district

19   concerning this matter of money coming from Panama to Colorado

20   on February 24, 2013, right?

21   A.  Yes.

22   Q.  That was on the telephone, right?

23   A.  Yes.

24   Q.  They called you up and they asked you, the prosecutors

25   called you up and on the telephone -- this is after, by the

D3frlev4             Saranello - cross

1    way, not only did you agree to cooperate in Colorado, but you

2    agreed with the prosecutors here in New York to cooperate,

3    right?

4    A.  Yes.

5    Q.  You knew that that could help you in California as well,

6    right?

7    A.  Yes.

8    Q.  You were eager to cooperate, that's a fair statement, isn't

9    it?

10   A.  Yes.

11   Q.  You were eager to be truthful and forthright, right?

12   A.  Yes.

13   Q.  On February 24, 2013, when the prosecutors called on the

14   telephone -- by the way, you knew you had the same obligation

15   to tell the truth on the telephone or in person, fair

16   statement?

17   A.  Yes.

18   Q.  When the prosecutors called you on the telephone and they

19   asked you in words or substance what's up with this account you

20   have in Colorado and checks coming from Panama and going in,

21   you knew what they were talking about, right?

22   A.  Yes.

23   Q.  You knew that at that time you had violated every agreement

24   that you signed with the United States government, right?

25   A.  Yes.

D3frlev4                    Saranello - cross

1    Q.   The violation had already occurred.  It was in the past.

2    You did something in violation of the agreement, right?

3    A.   Yes.

4    Q.   Going back to October of 2010?

5    A.   Yes.

6    Q.   So, when you were confronted, the harsh reality of a

7    confrontation, you, sir, made up on the spot -- were you

8    expecting a phonecall, by the way?

9    A.   No.

10   Q.   The phonecall came out of the blue, right?

11   A.   Yes.

12   Q.   When you got that phonecall on February 24, 2013, right

13   there on the spot you made up a story, right?

14   A.   Yes.

15   Q.   You not only said no, you got the wrong guy, you actually

16   made up a story, right?

17   A.   Yes.

18   Q.   Invented the story, yes?

19   A.   Yes.

20   Q.   Concocted the story, right?

21   A.   Yes.

22   Q.   Made up out of whole cloth, right?

23   A.   Yes.

24   Q.   It was during that telephone call that you were asked

25   whether you maintained a bank account in Panama after your

D3frlev4                    Saranello - cross

1    arrest, and you denied that you did.  You were asked about

2    receiving funds from a Panamanian account into a bank account

3    in your name, and then you said in substance that those funds

4    were not held in his name but that the account held funds

5    earned by him from legitimate business activity, specifically,

6    from his work on captive insurance companies.  That's what you

7    said, right?

8    A.  Yes.

9    Q.  It was all a lie, right?

10   A.  Most of those funds were not from captive.  Most of those

11   funds were from money laundering activities.

12   Q.  What you did is you took a little bit of truth, right, a

13   little bit of truth and a big lie, you mushed it together, and

14   that's what happened?

15   A.  I lied about the source of most of those funds, yes.

16   Q.  You said that you did not file an FBAR.  That was true,

17   wasn't it?

18   A.  Yes.

19   Q.  You never filed an FBAR, right?

20   A.  That's correct.

21   Q.  Could you tell the jury what an FBAR is.

22   A.  It's a form regarding a foreign bank account.

23   Q.  In other words, the U.S. government requires a taxpayer to

24   disclose any foreign bank accounts that are being held by or

25   for that taxpayer, correct?

D3frlev4                    Saranello - cross

1   A.   Yes.

2   Q.   You never filed that, right?

3   A.   That's correct.

4   Q.   Did you know that David Levy filed FBARs?

5            MR. MASTER:  Objection.

6            THE COURT:  Overruled.

7   Q.   Did you know from your conversations with David Levy that

8   he had filed with the United States government FBARs

9   identifying Panamanian banks?

10  A.   I didn't know that.  He mentioned to me that he had filed

11  FBARs, but he didn't say in what context.

12           MR. SHARGEL:  I offer in evidence pursuant to the

13  stipulation, Government Exhibit 705-1 and Government Exhibit

14  705-2.

15           THE COURT:  Any objection?

16           MR. MASTER:  No objection.

17           THE COURT:  705-1 and 2 are received in evidence.

18           (Government's Exhibits 705-1 and 705-2 received in

19  evidence)

20  Q.   You were going to arrive in New York.  I just asked about

21  the telephone conversation.  You were going to arrive in New

22  York on February 26, 2013, right?

23  A.   Yes.

24  Q.   You had blocked aside or it was agreed that you would be in

25  New York on February 26th and February 27th, 2013, for witness

1    preparation, right?

2    A.  Yes.

3    Q.  You arrived in New York on February 26th as scheduled,

4    right?

5    A.  Yes.

6    Q.  On February 26th you provided copies of recent account

7    statements of the Colorado bank?

8    A.  Yes.

9    Q.  That was the only documentation that you had, right?

10   A.  Yes.

11   Q.  Then you told them, you told the prosecutors that you had

12   misunderstood the government's questions when asked about the

13   account over the telephone, right?

14   A.  I said that, but that was not accurate.

15   Q.  You well understood the questions on the telephone, right?

16   A.  Yes.

17   Q.  That was a lie by itself, right?

18   A.  Yes.

19   Q.  Making up the story that you misunderstood the question,

20   right?

21   A.  Yes.

22   Q.  You then proceeded to state that the funds were earned

23   legitimately, right?

24   A.  Yes.

25   Q.  Where were you when you made this statement?  Were you at

D3frlev4                    Saranello - cross

1    the U.S. Attorney's office?

2    A.   Yes.

3    Q.   Was Agent Reinhardt there again?

4    A.   Yes.

5    Q.   Were the prosecutors, one or both of the prosecutors, there

6    again?

7    A.   One of the prosecutors was there.

8    Q.   Once again, once again, you had the opportunity to tell the

9    truth, yes?

10   A.   Yes.

11   Q.   You had the opportunity to tell the truth.  You sat across

12   from the prosecutors, and you looked at them and this time, the

13   prosecutor -- you said one was there, Mr. Master was there --

14   you looked him in the eye and you lied again, right?

15   A.   Yes.

16   Q.   A completely different occasion you lied again, right?

17   A.   Yes.

18   Q.   You looked at him just as you looked at the jury and

19   everyone in this courtroom and you made up a story, right?

20   A.   Yes.

21   Q.   You said that the funds were earned legitimately from a

22   captive insurance deal related to a company called United

23   National Insurance that you had put together several years

24   later -- I'm sorry, earlier, forgive me -- that you put

25   together several years earlier.  Do you remember saying that?

1    A.  Yes.

2    Q.  That was a complete lie, right?

3    A.  Yes.

4    Q.  That's not one where you mixed up truth and lies.  You just

5    told a complete story after you had been confronted by them,

6    you told a complete story which again subjected you to

7    prosecution for perjury, as it said in your agreement,

8    obstruction of justice, yes?

9          THE COURT:  You have to answer.

10   A.  I did.  I'm sorry.  Yes.

11   Q.  Let me ask you this question.  The first time you met Mr.

12   Levy was in 2009, right?

13   A.  Yes.

14   Q.  In 2009 there was conversation at a restaurant in Beverly

15   Hills, right?

16   A.  Yes.

17   Q.  IN that conversation in Beverly Hills in 2009, did the

18   subject of the Panamanian bank come up?  Yes, right?

19   A.  Yes.

20   Q.  You told us you gave your account of the conversation,

21   right?

22   A.  Yes.

23   Q.  Was there anything that was said about interest rates?

24   A.  I don't recall anything that was said about interest rates.

25   Mr. Levy may have asked me what interest the bank paid on

D3frlev4          Saranello - cross

 1  funds, but I don't recall that specifically.

 2  Q.  You knew at the time, you knew at the time, didn't you,

 3  that in the United States the interest rates at this time, in

 4  '09, interest rates were very low, if they existed at all,

 5  right?

 6  A.  Yes.

 7  Q.  You knew that interest rates back then for a CD in a United

 8  States bank was something around 1.25 percent, right?

 9  A.  Yes.

10  Q.  We don't have to put it on the screen again, but you

11  remember, I don't know that it was pointed out by the

12  prosecutor, you remember that the interest rate on that CD was

13  3.875 percent, correct?

14  A.  Yes.

15  Q.  Considerably higher than any bank in the United States,

16  right?

17  A.  That's true.

18  Q.  Thinking back to May of 2009, is it your testimony that Mr.

19  Levy raised this issue about interest rates?

20  A.  I don't recall that he mentioned anything about interest

21  rates.  He could have, but I just don't specifically recall

22  that.

23  Q.  You were, obviously, very, very familiar with the Capital

24  Bank in Panama, right?

25  A.  Yes.

D3frlev4                    Saranello - cross

1    Q.  Panama City, right?

2    A.  Yes.

3    Q.  You had your own money there as well, right?

4    A.  Yes.

5    Q.  For approximately two years, at the very least, you were

6    conducting transactions involving your own affairs, right?

7    A.  Yes.

8    Q.  You knew when you were down there, you actually had bank

9    connections, right?

10   A.  Yes.

11   Q.  When I say connections, you knew the people well, right?

12   A.  Yes.

13   Q.  If you walked into the bank, people would say good morning,

14   Mr. Saranello, or even by your first name, right?

15   A.  Yes.

16   Q.  You were a well-known figure, right?

17   A.  I wouldn't say well-known, but I knew some of the people.

18   They knew my name.

19   Q.  Go ahead.  I'm sorry.

20   A.  Some of the people knew my name, not everyone.  It's a

21   large bank.

22   Q.  It's a large bank and Panama is a fairly well populated

23   country, right?

24   A.  Yes.

25   Q.  You knew your way around enough to know, you knew your way

1   around enough to get false identifications, right?

2   A.  Yes.

3   Q.  We saw a passport that was in a different name, right?

4   A.  Yes.

5   Q.  What was that name.

6   A.  The name was Federico Rodriguez.

7   Q.  How do you get a passport in the name of Federico

8   Rodriguez?  How do you do that?

9   A.  I got it from that person.  I purchased it.

10  Q.  You purchased the person's passport?

11  A.  I purchased the photo page of the passport.

12  Q.  Did you stick your own photo in it?

13  A.  No.

14  Q.  You just took the passport photo of Mr. Rodriguez, right?

15  A.  Yes.

16  Q.  How did you find Mr. Rodriguez to be able to buy his

17  passport?  How did you do that?

18  A.  I had known some people and I asked them if they knew of

19  someone who would sell me a passport photo page.

20  Q.  In other words, you knew a guy who knew a guy?

21  A.  Exactly.

22  Q.  You had other phony identifications, right?

23  A.  There were other passport photo pages of people, yes.

24  Q.  Do you remember some of the names?

25  A.  One of the names that was introduced was José Vergara.

D3frlev4                    Saranello - cross

1    Q.  José Vergara, we saw you sign with that name, right?

2    A.  Yes.

3    Q.  He was a real person and you just bought his passport,

4    right?

5    A.  I bought his passport photo page, yes.

6    Q.  How much did you pay for his passport photo page?

7    A.  About $500.

8    Q.  Pretty modest, right?

9    A.  Yes.

10   Q.  Same thing with the other passport?

11   A.  Yes.

12   Q.  Any others?

13   A.  Yes, there were some others.

14   Q.  How many others?

15   A.  I would estimate about 7 to 9 others.

16   Q.  Can you tell me how the United States Attorney's office,

17   whether in Santa Ana, California, or in New York, New York,

18   really know whether you have in other people's names with other

19   passports money secreted, hidden, in Panama?  How do they know

20   that?

21   A.  Sir, I never opened a bank account with someone else as the

22   person on the account or as the signer, only myself.

23   Q.  What was the account, the Panamanian account that I just --

24   I can do it again -- identified?  You just said that you never

25   opened a bank account under a false name?

D3frlev4             Saranello - cross

1    A.  I only opened bank accounts -- I couldn't open it under

2    another name, because they required your passport.

3    Q.  You had plenty of passports.  You had like a whole

4    accordion of passports.

5    A.  Yes, but my photo and my signature did not match the

6    passport.

7    Q.  Let me show you what's been marked for identification as

8    Government Exhibit 500-2.  I ask if you recognize --

9             MR. SHARGEL:  This is in evidence, isn't it?

10            MR. MASTER:  Yes.

11            THE COURT:  Yes, it is in evidence.

12   Q.  -- 500-2.

13            MR. SHARGEL:  May I stand here for a moment, your

14   Honor?

15            THE COURT:  Sure.

16   Q.  This is an investment account application?

17   A.  Right, in the United States.

18   Q.  In the United States?

19   A.  Yes.

20   Q.  Where in the United States?

21   A.  That was in California.

22   Q.  Where in California?

23   A.  In Irvine, California.

24   Q.  In what name is the bank account opened?

25   A.  It's opened in the name of Udino Investment, and the

D3frlev4                    Saranello - cross

1    signing authority is Federico Rodriguez Romero.

2    Q.  So here in the United States you walk into a bank, you walk

3    into a bank and you sign for Udino with a completely false

4    name?

5    A.  That's a brokerage account application, sir.  I opened a

6    brokerage account, as I testified to on direct.

7    Q.  Let me go back.  I didn't mean to cut you off.  Were you

8    finished?

9    A.  Yes.

10   Q.  Let me go back, then, to my question.  How, in light of the

11   experience, I'll just call it that, that you had with the

12   United States Attorney's office here in New York, lying several

13   times, how would we in court be satisfied that you don't have

14   investment accounts, brokerage accounts, and bank accounts in

15   various other places throughout the U.S. or the world?  How

16   would we know that?  Do we have your word?

17   A.  Because all of the Panama banks were furnished with orders

18   to hold and freeze any account in which I had an interest.  And

19   in the United States the clearinghouses were served with papers

20   that froze all of the brokerage accounts.

21   Q.  Your testimony is that it would be impossible, and I'll

22   leave it at that, that it would be impossible for you, whether

23   we were talking about Central America or South America, whether

24   we were talking about Europe or the Middle East, your

25   testimony, based on your experience as a money launderer and

1    whatever else that you did, is that it would be impossible in

2    the United States for there to be a bank account, a brokerage

3    account, an investment account, it would be impossible to have

4    such an account without the government knowing about it?  Is

5    that your testimony?

6    A.  My testimony is that the accounts --

7    Q.  That calls for a yes or no.  Is that your testimony?

8    A.  Yes.

9    Q.  After the meeting with Mr. Levy in Beverly Hills,

10   California, in May of 2009, the plan was that there would be a

11   trip to Panama, right?

12   A.  Yes.

13   Q.  The idea was that there would be an account opened of Mr.

14   Levy, right?

15   A.  Yes.

16   Q.  When was it that you first went down to Panama?

17   A.  With Mr. Levy?

18   Q.  With Mr. Levy, yes.

19   A.  It was in early June of 2009.

20   Q.  In early June of 2009 you take a trip.  Do you go down, or

21   do you go down and meet him in Panama City?

22   A.  I met him in Panama City.

23   Q.  Did you leave Panama with him or you remained on, you

24   stayed on?

25   A.  I believe we left either within a day or so of each other,

D3frlev4          Saranello - cross

1    but not at the same time.

2    Q.  Did you have occasion in the bank to see his passport?  You

3    did, didn't you?

4    A.  Yes.

5    Q.  He had a passport in his own name, right?

6    A.  Yes.

7    Q.  And he had his own picture, right?

8    A.  Yes.

9    Q.  And he had, I said his own name.  But "David Levy" was

10   right on the passport, right?

11   A.  Yes.

12   Q.  Then you went over to the bank, and there is this Sadhana

13   corporation, and Mr. Levy told you you couldn't use that

14   corporation, right?

15   A.  Yes.

16   Q.  When he went into the bank with you, he introduced himself

17   as David Levy, right?

18   A.  Yes.

19   Q.  He didn't have any mixed-up phony name.  He said, I am

20   David Levy, right?

21   A.  Yes.

22   Q.  Actually, he was introduced to the president of the bank?

23   A.  Yes.

24   Q.  Someone who he took a liking to because the man was Israeli

25   or at least a Jewish man who was the president of the bank in

D3frlev4                    Saranello - cross

 1    Panama City, right?

 2    A.  Yes.

 3    Q.  The president of the bank was Mr. Cohen, Moises Cohen,

 4    correct?

 5    A.  Correct.

 6    Q.  He and Moises Cohen had a conversation together, a pleasant

 7    conversation, right?

 8    A.  Yes.

 9    Q.  He said, I'm David Levy, right?

10    A.  Yes.

11    Q.  Then there was a woman who was the head of private banking

12    in Panama City at Capital Bank, right?

13    A.  Yes.

14    Q.  You introduced him to the woman who was the head of private

15    banking, right?

16    A.  Yes.

17    Q.  That's an important person in the bank, right?

18    A.  Yes.

19    Q.  You introduced them.  Right in your presence David Levy

20    said, hello, I am David Levy, in words or substance, right?

21    A.  Yes.

22    Q.  Then there were other people who were in the bank, right?

23    Other people who were in the bank, right?

24    A.  Yes.

25    Q.  You introduced him to those people as well, right?

D3frlev4          Saranello - cross

1   A.  Yes.

2   Q.  I show you an exhibit marked as Government Exhibit 802-15,

3   and I ask if you recognize the content of that exhibit.

4   A.  Yes.  These are business cards of other individuals at

5   Capital Bank.

6           MR. SHARGEL:  Do we have a stipulation with regard to

7   this, that this came from Mr. Levy?  We have a stipulation,

8   your Honor, that this came from Mr. Levy's computer, and I'll

9   offer it into evidence.

10          MR. MASTER:  No objection.

11          THE COURT:  802-15 is in evidence.

12          (Defendant's Exhibit 802-15 received in evidence)

13          MR. SHARGEL:  May I publish this on the ELMO?

14          THE COURT:  Yes, you may.  It's upside down.

15          MR. SHARGEL:  First you didn't like the exhibit.

16  Now --

17          THE COURT:  I'm just trying to help you.

18  Q.  You recognize this exhibit as cards from people at Capital

19  Bank and the people who work there.

20          MR. SHARGEL:  If we could focus in.  If I could have

21  your help to focus in a little on the titles of the various

22  people.  There we have Mr. Moises Cohen, the president of the

23  bank; Bostron Estribi, private banking assistant.  Can we go

24  further down.  The official relations at private banking at

25  banca privada.  And we have the general executive at the

D3frlev4                    Saranello - cross

1    private bank.  Can we go down further.  By the way, Lourdes

2    Correa, she was the person to whom you addressed the letter,

3    correct?

4    A.  Yes.

5    Q.  That was the letter.  We don't have to take the time to put

6    it back.  But I think everyone remembered the letter of

7    reference where you signed your own name.  Government Exhibit

8    500.10, just to remind you, but I'm sure that everybody knows.

9    That is letter of recommendation.  However long you knew Mr.

10   Levy at the time, I guess it was under a year, this was in your

11   own name, right?

12   A.  Yes.

13   Q.  And it was in Mr. Levy's own name, right?

14   A.  Yes.

15   Q.  So all these people.  If we go to the left to get the other

16   one, again a manager at the private bank, and we had the

17   president above.

18        MR. SHARGEL:  We can take that down.  Thank you very

19   much.

20   Q.  There is no question about the fact that when Mr. Levy went

21   into the bank, he made himself known, introduced himself, gave

22   his correct name, right?

23   A.  That's correct.

24   Q.  As a matter of fact, in the tapes that we heard, the

25   recorded conversations that we heard this morning, you heard

D3frlev4              Saranello - cross

1    Mr. Levy say, they know me at the bank, right?

2    A.   Yes.

3    Q.   Obviously, he had made some phonecalls to the bank, right?

4    A.   Yes.

5    Q.   I'm not suggesting it happened, but he was very concerned

6    in those recorded conversations that one possibility was that

7    you had stolen money from him, right?

8    A.   Yes, he was.

9    Q.   Knowing you less than a year, you present this opportunity

10   to him and you take a very large sum of money and deposit it

11   into the bank, and he's hearing in Miami, in Fort Lauderdale,

12   that his accounts are frozen.  His first concern -- he said

13   "freaked me out," remember, "you freaked me out"?

14   A.   Yes.

15   Q.   "I was very nervous," in words or substance.  He actually

16   suspected you of stealing the money, right?

17   A.   Yes.

18   Q.   And you assured him that you didn't steal the money, right?

19   A.   Yes, I did.

20   Q.   Then you heard him say, we don't have to queue it up again,

21   but you heard him say, Would it be better if I went down there

22   because they know me at the bank?

23   A.   Yes.

24            (Continued on next page)

25

1   BY MR. SHARGEL:

2   Q.  Actually, actually there was one point where he said should

3   I get on a plane, should I get on a plane and go down to Panama

4   to find out what's going on, right?

5   A.  Yes, he did say that.

6   Q.  And also at that first meeting at the bank in Panama, he

7   wanted to open, I'm not sure that we got that, that I got this

8   before, but he wanted to open an account in his own name,

9   right?

10  A.  He wanted to open an account in the name of Sadhana

11  Corporation whereby he was the signer on the account.

12  Q.  Yes, yes, because this was the money he had deposited,

13  right?

14  A.  He was going to be depositing.

15  Q.  Yes.  And eventually was deposited, right?

16  A.  Yes, but the Sadhana account was not yet opened.

17  Q.  It was not yet opened and it was never opened during any of

18  this period of time, right?

19  A.  That's correct.

20  Q.  There was a delay for some unknown reason -- that's

21  actually your words -- for some unknown reason there was a

22  delay in opening his account, right?

23  A.  The bank, I mean according to him, from what he said he

24  found out, the committee didn't, didn't approve the account

25  application.

1   Q.  They didn't approve the account application, but -- and you

2   might have heard a reference to this on the recorded

3   conversations this morning, Mr. Levy was doing a reality show

4   at the time on television, wasn't he?

5   A.  Yes.  He had given the card to the banker of Sin City

6   Production.

7   Q.  And Sin City having to do with the reality show about Las

8   Vegas, right?

9   A.  I've never seen the show, but if you say so.

10  Q.  I'm not testifying.  But they thought that there was

11  something, Sin City, they didn't really like the name; fair

12  statement?

13  A.  Probably, but I don't know for sure.

14  Q.  And so you never -- I know you never watched the show, but

15  did you come to realize that he had a reality show, did you

16  have any discussions about that?

17  A.  He told me he had a reality show.

18  Q.  So because of the fact that his bank account with

19  Sadhana -- and, obviously, he was the owner, he presented

20  himself to the bank, don't have to repeat that, that with

21  Sadhana, and he, as the corporate officer, just like we saw

22  that you did with your various accounts, whether it's Udino --

23  I'm talking Panama now -- where you would sign as an owner of

24  the account, right?

25  A.  Yes.

D3FLLEV5                    Saranello - cross

1    Q.  So it's not like it's some secret who owns Sadhana.  David

2    Levy was there to open an account.  Right?

3    A.  Yes.

4    Q.  And that's where he wanted to keep his money, right?

5    A.  Yes.

6    Q.  Did he ever, at any time in any of the trips to the bank,

7    any of the trips to the bank, did he at any time suggest that

8    don't use my name when we're in the bank or anything like that?

9    A.  No.

10           MR. SHARGEL:  May I just have a moment, your Honor.

11           THE COURT:  Sure.

12   Q.  Let me show you -- hold on one moment.  So I'm showing you

13   what's been marked for identification as Government

14   Exhibit 500-24 -- is this in evidence -- in evidence.  Yeah,

15   actually we saw or, yes, actually we saw these deposits up on

16   the screen this morning.  Do you see that one?

17   A.  Yes.

18   Q.  OK.  Now, here is a deposit for $275,000, Wachovia Bank

19   official check.  This is part of that exhibit.

20   A.  Mm-hmm.

21   Q.  Now, whose name is on the lower left portion of the -- as

22   the remitter on the check?

23   A.  On the Wachovia check it's David Levy.

24   Q.  David Levy, right?

25   A.  Yes.

D3FLLEV5          Saranello - cross

1   Q.  Spelled correctly and everything else, right?

2   A.  Yes.

3   Q.  Now, on the Capital Bank, the Capital Bank documents, this

4   is part of the document in evidence, a deposit of credit of

5   $149,950; do you see that?

6   A.  Yes.

7   Q.  And that comes in in --

8   A.  September.

9   Q.  -- September, September 25, 2009, right?

10  A.  Yes.

11  Q.  And it comes in, it shows the source of the money, doesn't

12  it, yes?  You want to look at it?

13  A.  Yes.

14  Q.  Tell the jury what the source of the money is.

15  A.  Date Palm Capital.

16  Q.  And you knew that Date Palm Capital was Mr. Levy's company,

17  right?

18  A.  Yes, he told me.

19  Q.  And he did business with Date Palm Capital Corporation,

20  right, there was no secret?

21  A.  Yeah, that's what he told me, yes.

22  Q.  Let me ask you this question.  You told us about Bill Aul;

23  do you recall that?

24  A.  Yes.

25  Q.  You knew that Bill Aul was David Levy's lawyer, right?

D3FLLEV5                    Saranello - cross

1    A.  Yes.

2    Q.  And you were -- what role was Bill Aul going to play, did

3    he have a role in connection with one of the corporations down

4    there?

5    A.  My understanding from David was that Bill Aul needed to

6    have this document signed by the officer of Copperwood, and so

7    I executed it on behalf of the officer of Copperwood.  I signed

8    the name.

9    Q.  What name did you use?

10   A.  Frederico Rodriguez.

11   Q.  So you used Frederico Rodriguez in your dealings with Bill

12   Aul.  Did you ever -- you talked to him on the telephone once,

13   didn't you?

14   A.  Yes.

15   Q.  And you called yourself Frederico, right?

16   A.  Yes.

17   Q.  This was David Levy's lawyer.  Do you think that Bill Aul

18   wanted to keep up this secret?

19   A.  This is what David had asked me to do so I did it.

20   Q.  So, wait.  David asked you to impersonate another person?

21   A.  David asked me to in the conversation and the document

22   regarding Bill Aul was going to send me, to execute it on

23   behalf of Frederico Rodriguez of Copperwood.

24          MR. SHARGEL:  Just one moment, your Honor.

25          I want to go back to one thing and then I'll be done.

D3FLLEV5                     Saranello - cross

1   Q.  You said yesterday, I believe it was yesterday, you said

2   yesterday that you were at risk that your cooperation agreement

3   would be, as its terms reveal, ripped up, right?

4   A.  Yes.

5   Q.  But you said yesterday that this was all subject to certain

6   interviews that the U.S. Attorney's Office would have with you,

7   right?

8   A.  I believe Mr. Master asked me if that would be the case and

9   I said --

10  Q.  I'm sorry, asked you or told you?

11  A.  I think he asked me if that would be the case and that's my

12  understanding, that there will be interviews and there will be

13  a decision made.

14  Q.  So after this trial, and I'm not suggesting the next day,

15  perhaps after the weekend, after this weekend, you're going to

16  go back to Santa Ana, California, and sit down with

17  prosecutors?

18  A.  That's my understanding, yes.

19  Q.  You pled guilty almost three years ago, right?

20  A.  Yes.

21  Q.  And why do you think, in your own mind, your own frame of

22  mind, why do you think there's such a delay between guilty plea

23  and sentence?

24  A.  Because of the cases that I've been working on with agents.

25  Q.  And do you think those interviews have anything to do with

D3FLLEV5                    Saranello - cross

1    what happens here in New York?

2    A.   No, I don't think so.

3    Q.   Do you think that they're awaiting sentence to see how you

4    do as a cooperator?

5    A.   I don't think they're waiting to see what happens here in

6    New York.

7    Q.   What do you think the interview is going to be about?

8    A.   I think it's going to be reviewing with me all of the cases

9    that I've cooperated on.

10   Q.   Do you think there will be any questions asked about the

11   lies that you told here in New York?

12   A.   Yes, yes.

13   Q.   And you're looking for what, a second chance?

14   A.   I don't know what will happen.  I mean that will be up to

15   the prosecutors.

16   Q.   Actually, it's not a second chance because as we had it

17   with the dates, it's probably a fourth chance.  You're looking

18   for a fourth chance?

19            MR. SHARGEL:  I have no further questions.

20            THE COURT:  Mr. Master.

21            MR. MASTER:  Yes, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. MASTER:

24   Q.   You remember the first question Mr. Shargel asked you was

25   whether you told Mr. Levy that you were a disbarred lawyer?

D3FLLEV5                    Saranello - redirect

1   A.  Yes.

2   Q.  And you said no, right?

3   A.  That's correct.

4   Q.  But you did tell Mr. Levy what you were?

5   A.  Yes.

6   Q.  When you first met him, right?

7   A.  Yes.

8   Q.  You told him you were a money launderer?

9   A.  Yes, I did.

10  Q.  And that was because he was looking for that service?

11  A.  Yes, that was certainly my -- that's from what he said to

12  me, yes.

13  Q.  You were quite explicit about it?

14  A.  Yes.

15  Q.  Mr. Levy didn't seek you out, well, did Mr. Levy seek you

16  out for legal representation?

17  A.  No.

18  Q.  What did he seek you out for?

19  A.  He sought me out for the money laundering and stock fraud

20  activities that I engaged in that he was aware from others that

21  I had engaged in.

22  Q.  Is there any excuse for the lies that you told about the

23  money you hid?

24  A.  No.

25  Q.  And you understand that you could face additional

1    prosecution as a result of that?

2    A.  Yes.

3    Q.  You understand that your cooperation agreement could be

4    ripped up?

5    A.  Yes, I do.

6    Q.  Now, what happens if you don't tell the truth here today?

7    A.  I'm sure the cooperation agreement would be ripped up.

8    Q.  So what's your only hope of trying to keep this cooperation

9    agreement?

10   A.  By being truthful in my testimony.

11   Q.  And you stated that -- you were asked some questions by

12   Mr. Shargel about corroboration, right, do you remember that?

13   A.  Yes.

14   Q.  That term?

15   A.  Yes.

16   Q.  That just simply means what other evidence do you have to

17   back up what you're saying, right?

18   A.  Yes.

19   Q.  Now, you know about the documents that you have here,

20   right?

21   A.  Yes, I do.

22   Q.  And, in fact, you walked the jury through the documents

23   that mention David Levy's name?

24   A.  Yes, I did.

25   Q.  Do you know anything about the government's investigation

1    of what Mr. Levy did with Greenway Design Group?

2    A.  No, I do not.

3    Q.  You never had any conversations with anyone in the

4    government about that, right?

5    A.  No.

6    Q.  And the only source of the information that you have about

7    Greenway Design Group or Cool-n-Save is from Mr. Levy and Scott

8    Gelbard, right?

9    A.  That's correct.

10   Q.  So when you're telling the jury about what you know about

11   Mr. Levy's intentions concerning that company, that's because

12   it came from Mr. Levy?

13   A.  Yes.

14   Q.  And you don't know what corroboration, if any, the

15   government has about that, right?

16   A.  No, I do not.

17   Q.  And you also don't know what bank records the government

18   has concerning Mr. Levy's financial transactions and the source

19   of the funds that he wired down to you and brought down to you?

20   A.  That's correct, I do not.

21   Q.  And, Mr. Saranello, you were asked some questions about

22   whether the government would find out if you lied and you were

23   asked these hypothetical questions; do you remember that?

24   A.  Yes.

25   Q.  About what would happen if one person lied and if you told

1  the truth and the government thought you lied and what would

2  happen if the government thought you had told the truth and you

3  had lied; do you remember those?

4  A.  Yes.

5  Q.  Now, you did lie to the government about your bank account?

6  A.  Yes, I did.

7  Q.  And what happened?

8  A.  I admitted to the government, you know, that I did lie

9  about it.

10  Q.  You got caught?

11  A.  Yes.

12  Q.  And you don't know what information the government has on

13  you?

14  A.  That's correct, I do not.

15  Q.  You don't know what access to other information about what

16  you know and who you were involved with the government can get

17  through subpoena, through interviewing other people who you

18  worked with?

19  A.  That's correct, I do not.

20  Q.  What do you know that you have to do here today?

21  A.  Is tell the truth.

22  Q.  You were asked some questions about the fact that this is

23  the first time you've testified in court?

24  A.  Yes.

25  Q.  But you've -- this isn't the first time that you provided

1    information on David Levy, is it?

2    A.   No, it's not.

3    Q.   In fact, you were asked some questions --

4           MR. SHARGEL:  I object to this, your Honor.

5           THE COURT:  Overruled.

6    Q.   In fact, when you signed this plea agreement on April 22,

7    2010, you were in the middle of making recordings of David Levy

8    that were just played to this jury?

9    A.   Yes, I was.

10   Q.   You were actively cooperating on the David Levy matter?

11   A.   Yes.

12   Q.   And, in fact, you were actively cooperating on several

13   other matters?

14   A.   Yes, that's true.

15   Q.   Your cooperation agreement didn't rest only on David Levy,

16   right?

17   A.   That's true, it did not.

18   Q.   And, in fact, the plea agreement describes an entirely

19   different scheme that led to your arrest?

20   A.   Yes, it does.

21   Q.   You cooperated on that as well?

22   A.   Yes.

23   Q.   You were asked some questions on cross-examination about

24   Mr. Levy's discussion, if any, of interest rates; do you

25   remember that?

D3FLLEV5                    Saranello - redirect

1   A.  Yes, I do.

2   Q.  Mr. Levy didn't -- when if ever did Mr. Levy say he was

3   wiring $150,000 to your shell company account to get a higher

4   interest rate?

5   A.  I don't recall him ever mentioning interest rates to me.

6   Q.  And when if ever did David Levy say that he was bringing

7   almost $2.2 million in cashier's checks personally, body

8   carrying them down to Panama, because he wanted a higher

9   interest rate?

10  A.  He never said that to me.

11  Q.  I mean how much money does it cost to go down to Panama and

12  spend several days in Panama; it's not free?

13  A.  No.

14          MR. SHARGEL:  I'm sorry, is that testimony?

15  Objection.

16          THE COURT:  Sustained.

17  Q.  How much money does it cost to go down to Panama?

18  A.  It would cost, staying in a hotel, three, $4,000.

19  Q.  And those cashier's checks were gathered from several

20  different people, right?

21  A.  Yes.

22  Q.  When if ever did David Levy say that he was going to take

23  several days to fly down to Panama with $2.2 million or

24  thereabouts in cashier's checks to get a slightly higher

25  interest rate?

1  A.  He never said that to me.

2  Q.  And, in fact, most of the money in that account was not in

3  a CD, right?

4  A.  That's true.

5  Q.  And what did David Levy say he wanted to use that money

6  for, it wasn't to -- it wasn't as a nest egg, was it?

7  A.  No.  He said he was going to use it for stock deals.

8  Q.  And you were asked whether Mr. Levy identified himself to

9  the bank by name; do you remember those questions?

10  A.  Yes.

11  Q.  How about when you went into the bank, did you pretend to

12  be Mr. Vergara?

13  A.  No.  I always identified as myself.  That's who I was known

14  as at the bank.

15  Q.  You were very open at the bank about who you were?

16  A.  Yes.

17  Q.  In fact, when you went with Mr. Levy to put in those

18  $2.2 million in cashier's checks, you were very open about who

19  you were, right?

20  A.  Yes.

21  Q.  And you went to the bank with those cashier's checks and

22  what did you do with the checks?

23  A.  I deposited them into the Udino account.

24  Q.  And why did you deposit them instead of David Levy?

25  A.  Because I, Udino Investments was my account.

1   Q.  And whose shell company was it?

2   A.  It was mine.

3   Q.  And when if ever did David Levy say he wanted to take over

4   your shell company and take over your bank account?

5   A.  He did not.

6   Q.  You were asked about identities that you assumed, Frederico

7   Rodriguez, Jose Vergara.

8           MR. MASTER:  Mr. Dinet, can you just pull up

9   Government Exhibit 500-21.

10  Q.  That's the document where you pretended to be Frederico

11  Rodriguez; do you remember that?

12  A.  Yes.

13  Q.  Now, again, you were asked on direct examination whether

14  you had any independent knowledge of Voice Networks Inc. or

15  Greenway Design; do you remember that?

16  A.  Yes, I do.

17  Q.  And just tell the jury what -- when had you ever heard of

18  these companies before you met David Levy?

19  A.  I had never heard of them before.

20  Q.  Now, Copperwood Foundation and Bluefin Financial Group,

21  those are two of your companies, correct?

22  A.  That's correct.

23  Q.  When if ever had you met William Aul before?

24  A.  I had not.

25  Q.  Do you even know where he lives?

1  A.  No, I don't.

2  Q.  And David Levy is copied on that document; do you see that?

3  A.  Yes, I do.

4  Q.  David Levy received a copy of this document; are you aware

5  of that?

6  A.  Yes.

7  Q.  In fact, you executed this document at the express request

8  of David Levy?

9  A.  Yes, I did.

10  Q.  And who asked you to -- was David Levy surprised at all

11  when you indicated that you had assumed the identity of

12  Frederico Rodriguez in executing this document?

13  A.  No.

14  Q.  In fact, he asked you to do that?

15  A.  Yes.

16  Q.  And when Bill Aul called or William Aul called, who did he

17  say you should be, Joseph Saranello?

18  A.  I should be Frederico Rodriguez, the officer of Copperwood.

19  Q.  And you followed his instructions?

20  A.  Yes.

21  Q.  So your assumption of identities in furtherance of this

22  money laundering enterprise, did you keep that hidden from

23  David Levy at all?

24  A.  No.

25  Q.  In fact, it was the opposite?

1    A.  Yes.

2            MR. MASTER:  One moment, your Honor.

3            Nothing further.

4            MR. SHARGEL:  One or two questions.

5    RECROSS EXAMINATION

6    BY MR. SHARGEL:

7    Q.  If this were January of 2013, your answers with respect to

8    your plea agreement would be the same as you're giving now,

9    it's better to tell the truth, right?

10   A.  Yes.

11           MR. SHARGEL:  No further questions.

12           THE COURT:  Ladies and gentlemen, we'll take our

13   afternoon recess now.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D3FLLEV5

1        (Jury not present)

2        THE COURT:  Thank you, Mr. Saranello.  You're excused.

3        (Witness excused)

4        THE COURT:  Do you want to get the exhibits?

5        MR. SHARGEL:  Yes, your Honor.

6        THE COURT:  See you in about ten minutes.

7        (Recess)

8        THE COURT:  Marlon, call in the jury.

9        We're going to read stipulations now?

10        MS. COHEN:  Your Honor, judging by the numbers of

11   documents we want to publish combined with the length of

12   stipulations, we spoke with defense counsel.  I think it take

13   us until about 4:15.

14        Would it be acceptable, your Honor, to adjourn and

15   start with Agent Reinhardt on Monday fresh?

16        THE COURT:  He's your final witness?  How long is that

17   going to be?

18        MS. COHEN:  90 percent sure he's our final witness.

19   We may have to call someone from Fed Reserve to do a wire or

20   two.  Other than that, he's our final.  His direct is no more

21   than an hour.

22        MR. MASTER:  Yes, but that's what I said about Joseph

23   Saranello.  So I would think that we would be no more than,

24   just to be safe, an hour and a half.

25        THE COURT:  What's the length of the defendants' case,

1    if they consent?

2          MR. SHARGEL:  I'm sorry, Judge?

3          THE COURT:  What's the length of the defendants' case?

4          MR. SHARGEL:  An hour.

5          THE COURT:  That includes you, Mr. Srebnick?

6          MR. SREBNICK:  I believe so, yes.

7          THE COURT:  So they're going to have a morning

8    session.

9          MS. COHEN:  I think that's fair to say, your Honor.

10          MR. MASTER:  We'll end early.

11          MR. SHARGEL:  And then we can do the charge

12    conference.

13          THE COURT:  In the afternoon.

14          MS. COHEN:  Thank you, your Honor.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  All right.  Please be seated.

3    Ms. Cohen.

4    MS. COHEN:  Thank you, your Honor.

5    At this time the government would like to read several

6    stipulations into evidence and publish certain exhibits, some

7    of which are already in evidence through other stipulations

8    that are in evidence, and some of which we will admit with the

9    stipulations the government is now going to read.

10   First, Mr. Dinet, if you can publish what's in

11   evidence, I believe it's Government Exhibit 712.  It's in

12   evidence through stipulation already.

13   Government Exhibit 712, according to stipulation, is a

14   summary chart of David Levy's border crossings between 2007 and

15   2011, and it was taken off of records from the Department of

16   Homeland Security with respect to David Levy every time he left

17   and entered the United States of America.  On the bottom it

18   just sums up the number of trips to Panama in each year.  The

19   chart reflects the different dates of those trips as well as

20   other trips.

21   THE COURT:  OK.

22   MS. COHEN:  Your Honor, next the government would like

23   to read into evidence a stipulation.  It's been marked for

24   identification as Government Exhibit S-10.

25   It has stipulated and agreed to by the parties in this

D3FLLEV5

1  matter that:

2          Paragraph 1:  If called to testify, a law enforcement

3  agent ("Agent 1") would state that on October 5, 2010, he

4  executed an arrest warrant for Donna Levy at her residence

5  located at 3109 Northeast 23rd Court, Fort Lauderdale, Florida

6  ("the Levy residence").  Agent 1 also participated in executing

7  a court-authorized search warrant of the Levy residence on

8  October 5, 2010.  During the course of the court-authorized

9  search, Agent 1 recovered, among things, two laptop computers

10  ("laptop 1" and "laptop 2") a cellular telephone ("cell phone")

11  and certain documents.

12          Government Exhibit 803 is a true and accurate copy of

13  certain of the documents that were recovered from the Levy

14  residence on October 5, 2010 pursuant to the court-authorized

15  search warrant.

16          Paragraph 3.  If called to testify, a forensic

17  examiner with the Internal Revenue Service, Criminal

18  Investigations, would testify that he used forensic software to

19  extract data from laptop 1 and laptop 2.  He would further

20  testify that:

21          A.  Government Exhibit 801-1, 801-3 through 801-5,

22  801-11 through 801-13, 801-20, 801-25, 801-26, 801-32, and

23  801-35 are true and accurate copies of records recovered from

24  laptop 1 as a result of the forensic search of laptop 1.

25          B. Government Exhibits 802-1 through 802-32, and

D3FLLEV5

1    802-34 through 802-39, 802-41 through 802-43, 802-46 through

2    802-51, 802-54, 802-55, 802-59, 802-60, and 802-66 are true and

3    accurate copies of records recovered from laptop 2 as a result

4    of the forensic search of laptop 2.

5         Government Exhibit 804 is a forensic examination

6    report prepared by a forensic examiner with Internal Revenue

7    Service, Criminal Investigations, concerning data contained on

8    the cell phone.  The forensic examination report, among other

9    things, identifies the cellular telephone number associated

10   with the cell phone as (954)319-7981.  Government Exhibit 804

11   also contains phone contacts and text messages recovered from

12   the cell phone.

13        If called to testify, a law enforcement agent

14   ("Agent 2") would state on March 16, 2010, he participated in

15   executing a court-authorized search warrant of the residence of

16   Joseph Saranello (Saranello residence).  During the course of

17   the court-authorized search, Agent 2 recovered, among other

18   things, certain documents.

19        Government Exhibits 500-1 through 500-22 are true and

20   accurate copies of certain of the documents that were recovered

21   from the Saranello residence on March 16, 2010, by Agent 2

22   pursuant to the court-authorized search warrant.

23        It is further stipulated and agreed that Government

24   Exhibits 801-1, 801-3 through 801-5, 801-11 through 801-13,

25   801-20, 801-25, 801-26, 801-32, 801-35, 802-1 through 802-32,

1   802-34 through 802-39, 801-41 through 802-43, 802-46 through

2   802-51, 802-54, 802-55, 802-59, 802-60, 802-66, 803, 804, and

3   500-1 through 500-22 may be received in evidence at trial and

4   that this stipulation may be received in evidence at trial,

5   signed by all the parties, dated March 15, 2013.

6          Your Honor, the government moves Government Exhibit

7   S-10 and the exhibits referenced therein into evidence.

8          THE COURT:  S-10 and the exhibits referred to are

9   received in evidence.

10          (Government's Exhibits S-10, 801-1, 801-3 through

11   801-5, 801-11 through 801-13, 801-20, 801-25, 801-26, 801-32,

12   801-35, 802-1 through 802-32, 802-34 through 802-39, 801-41

13   through 802-43, 802-46 through 802-51, 802-54, 802-55, 802-59,

14   802-60, 802-66, 803, 804, and 500-1 through 500-22 received in

15   evidence)

16          MS. COHEN:  Your Honor, at this time, if I can ask

17   Mr. Dinet, please, to pull up 803 in evidence and just start at

18   the first page.

19          And, your Honor, just for reference, according to

20   stipulation just entered into, the documents in Government

21   Exhibit 803 are the documents that were recovered from the Levy

22   residence on October 5, 2010, pursuant to the court-authorized

23   search warrant that was executed at the time of Donna Levy's

24   arrest.

25          Scroll through the next page.  Next page.  Next page.

D3FLLEV5

1    THE COURT:  Would you remind us, Ms. Cohen, what

2    documents these are?

3    MS. COHEN:  Sure.  These are the documents that were

4    seized from the Levy residence at the time of Donna Levy's

5    arrest on October 5, 2010.

6    THE COURT:  Thank you.

7    You can step this up a little bit, nothing but blank

8    checks.

9    MS. COHEN:  Now, your Honor, if we can just pull up,

10   please, pursuant to the stip, Government Exhibit 802-1.

11   And this next series of 802 documents are documents

12   found on the laptop 2 that was recovered from the residence of

13   Donna Levy and David Levy on October 5, 2010, at the time Donna

14   Levy was arrested.

15   802-2.

16   If I may do it from here, your Honor, speed it up.

17   803-3.

18   THE COURT:  Sure.

19   MS. COHEN:  802-4.  802-5.  802-6.

20   And, your Honor, some of these are multipage

21   documents.  We're just showing the first page.  Some of these

22   documents have been introduced to the jury as other documents

23   the jury has seen.

24   802-7.  802-8.  802-9.  802-10.

25   And, your Honor, just for the record, 802-9 and 802-10

1  are stock purchase agreements between different companies and

2  Fitzwilliam Investment.

3           THE COURT:  Thank you.

4           MS. COHEN:  802-11.  802-12.  802-13.  802-14.

5  802-15, which we saw in evidence as a defense exhibit.

6  802-16 -- actually, as a Government Exhibit.

7           802-16, thank you.  802-17.  802-18.  802-19.  802-20.

8  802-21.  802-22.  802-23.  802-24.  802-25.  802-26.  802-27.

9  802-28.  802-29.  802-30.  802-31.  802-32.  And I'm going to

10 go to 802-34.  802-35.  802-36.  802-37.  802-38.  802-39.

11 802-41.

12          And, again, these are documents that were seized from

13 laptop 2 from the Levy residence on October 5, 2010.

14          802-42.  802-43.  And these are, this is a multipage

15 document.  It's copies of different business cards found in the

16 Levy residence.  If we could just flip through each page of

17 this document.  Sorry, your Honor.  It's actually Outlook

18 contacts off the computer.  It's not business cards.

19          802-46, please.  802-47.  802-48.  If we can just

20 scroll to the next page, following page, and the next page.

21          802-49.  802-50.  802-51.  802-54.  802-55.  802-59.

22 802-60.  802-66, which is the last document from laptop 2.

23          OK, your Honor.  If we can look at laptop 1 now, and

24 there are less documents on laptop 1, and I'll try to roll

25 through them a little quicker.

D3FLLEV5

1        Government Exhibit 801-1.  801-3.  801-4.  801-5.

2   Actually, that should not be, 801-5.  801-11.  801-12.  801-13.

3   801-20.  801-25.  801-26.  801-32.  And 801-35.

4        Thank you, Mr. Dinet.

5        Your Honor, we have another stipulation, it's been

6   marked for identification Government Exhibit S-7, which is

7   entered into between the parties.  It states as follows:

8        1.  If called as a witness, a records custodian from

9   Regus would testify as follows:  Government Exhibit 601 was

10  retrieved from the files of Regus concerning Regus customer

11  Emerging World Pharma Inc.  The records reflected on Government

12  Exhibit 601 were created by a person with knowledge of, or

13  created from information transmitted by a person with knowledge

14  of, the information shown; were created at or near the time the

15  information became available to Regus; and were created and

16  maintained by Regus as part of its regularly conducted business

17  activity.

18        (Continued on next page)

19

20

21

22

23

24

25

D3frlev6

1      2.  If called as a witness, a records custodian from

2  Coral Cadillac would testify as follows.  Government Exhibit

3  602 was retrieved from the files of Coral Cadillac.  The

4  records reflected on Government Exhibit 602 were created by a

5  person with knowledge of, or created by information transmitted

6  by a person with knowledge of, the information shown; were

7  created at or near the time the information became available

8  Coral Cadillac; and were created and maintained by Coral

9  Cadillac as part of its regularly conducted business activity.

10     3.  If called as a witness, a records custodian from

11  DelMarva RV Center would testify as follows.  Government

12  Exhibit 603 was retrieved from the files of DelMarva RV Center.

13  The records reflected on Government Exhibit 603 were created by

14  a person with knowledge of, or created from information

15  transmitted by a person with knowledge of, the information

16  shown; they were created at or near the time the information

17  became available to DelMarva RV Center; and were created and

18  maintained by DelMarva RV Center as part of its regularly

19  conducted business activity.

20     4.  If called as a witness, a records custodian from

21  Pompano Ford Lincoln Mercury ("Pompano Ford") would testify as

22  follows.  Government Exhibit 604 was retrieved from the files

23  of Pompano Ford.  The records reflected on Government Exhibit

24  604 were created by a person with knowledge of, or created from

25  information transmitted by a person with knowledge of, the

information shown; were created at or near the time the

information became available to Pompano Ford; and were created

and maintained by Pompano Ford as part of its regularly

conducted business activity.

5.  If called as a witnesses, a records custodian from

First Bank Florida would testify as follows.  Government

Exhibits 1001-1 through 1001-4 were retrieved from the files of

First Bank Florida.  The records reflected on Government

Exhibits 1001-1 through 1001-4 were created by a person with

knowledge of, or created from information created by a person

with knowledge of the information shown; they were created at

or near the time the information became available to First Bank

Florida; and were created and maintained by First Bank Florida

as part of its regularly conducted business activity.

6.  If called as a witness, a records custodian from

Winning Media would testify as follows.  Government Exhibit 606

was retrieved from the files of Winning Media.  The records

reflected on Government Exhibit 606 were created by a person

with knowledge of, or created from information transmitted by a

person with knowledge of, the information shown; were created

at or near the time the information became available to Winning

Media; and were created and maintained by Winning Media as part

of its regularly conducted business activity.

7.  If called as a witness, a records custodian from

Securities and Exchange Commission ("SEC") would testify as

D3frlev6

1 follows.  Government Exhibits 1701-4, 1701-5, and 1701-6 and

2 Defense Exhibit A145 were retrieved from the files of the SEC.

3 The records reflected on Government Exhibits 1701-4, 1701-5,

4 and 1701-6 and Defense Exhibit A145 were created by a person

5 with knowledge of, or created from information transmitted by a

6 person with knowledge of, the information shown; they were

7 created at or near the time the information became available to

8 the SEC; and were created and maintained by the SEC as part of

9 its regularly conducted business activity.

10             8.  If called as a witness, a records custodian from

11 the United States Department of the Treasury ("Treasury

12 Department") would testify that Government Exhibit 705-1 was

13 retrieved from the files of the Treasury Department.

14 Government Exhibit 705-1 was created by a person with knowledge

15 of, or created from information transmitted by a person with

16 knowledge of, the information shown; it was created at or near

17 the time the information became available to the Treasury

18 Department; and was created and maintained by the Treasury

19 Department as part of its regularly conducted business

20 activity.

21             It is further stipulated and agreed by all parties

22 that the exhibits referenced in the stipulation and the

23 stipulation which is marked S7 may be received into evidence at

24 trial.  Dated March 15, 2013.

25             THE COURT:  S7 and the exhibits referred to are

D3frlev6

1    received in evidence.

2         (Government's Exhibit S7 and referred-to exhibits

3    received in evidence)

4         MS. COHEN:  Mr. Dinet, if you could publish 1701-4,

5    and the second page.  Go one more, please.  This is a document

6    request sent by the SEC to David Levy.  Next page.  Mr. Dinet,

7    the next page, please.  And the next page.

8         If you could publish David Levy's response, which I

9    believe is 1701-5.  Second page.  It is another request by the

10   SEC except it is to Fotis Georgiadis.  Sorry.  It's his

11   response.

12        1706, please.  We have to switch it to the ELMO.

13   Sorry, your Honor.  Your Honor, we will publish it at another

14   date.

15        THE COURT:  All right.

16        MS. COHEN:  Along with Defense Exhibit 845 to keep it

17   moving.

18        Your Honor, at this time we would like to publish

19   about ten exhibits that are in evidence, documents obtained

20   from Legend Securities related to Greenway Design, starting

21   with Government Exhibit already in evidence, the jury hasn't

22   seen them yet, Government Exhibit 1200-32.  If we can look also

23   at the second page of this document.  And the third page,

24   please.  And the fourth page.  Actually, keep going to the next

25   page.  I won't go through all the pages, your Honor.  They are

1    similar.

2            Government Exhibit 1200-1, please.  This is just an

3    email from David Hudzik at Legend Securities to David Levy.  We

4    can show the next page.  That is just the attachment to the

5    email.

6            Government Exhibit 1200-43.  Go to the last page of

7    the document, to the fourth page.

8            Government Exhibit 1200-11 in evidence, an email from

9    David Levy to David Hudzik at Legend Securities attaching a

10   document which is on the next page of Government Exhibit

11   1200-11.

12           Government Exhibit 1200-12, another email from David

13   Hudzik at Legend Securities to David Levy.  If we could go to

14   the next page and zoom in on the stock purchase agreement,

15   first paragraph.

16           Government Exhibit 1200-13, an email from David Levy

17   to David Hudzik attaching the document that is shown on the

18   next page.  If you can zoom in again.

19           Government Exhibit 1200-18, which is an email from

20   David Hudzik to David Levy attaching certain documents.  If we

21   can look at the next page.

22           Government Exhibit 1200-20, please, an email from

23   David Hudzik to David Levy again attaching documents.  These

24   are all regarding Greenway Design, your Honor.  If you could

25   turn to the third page, a sample of one of the documents that

D3frlev6

1   are attached.

2           Government Exhibit 1200-28, another email from David

3   Hudzik at Legend to David Levy regarding EZ English.  These all

4   have different dates, your Honor.

5           Government Exhibit 1200-20, the second page, please.

6           Finally, Government Exhibit 1200-36.  If you could

7   scroll through, please, Mr. Dinet.

8           Now, your Honor, if I can ask Mr. Dinet to pull up

9   what's been marked Government Exhibit 804.  I'll ask if I can

10  stand by Mr. Dinet to make this go a little faster.  Government

11  Exhibit 804 is a printout, a report done by a forensic analyst

12  of the cell phone recovered from Donna Levy and David Levy's

13  residence on October 5, 2010.  Let's pull up 804.  I think it

14  will be easier on the ELMO actually, your Honor.  I'll just

15  show certain pages.  I'll highlight Jarret Wollstein's phone.

16          THE COURT:  Which one?

17          MS. COHEN:  Jarret Wollstein.

18          THE COURT:  Why don't you put your finger on it.

19          MS. COHEN:  This one, your Honor, Peter Veugler cell

20  phone, Peter Veugler office phone.  D. Newren; Eric Cusimano;

21  Brett cell, Brett office; Dwayne Bigelow, two numbers; E.

22  Cusinano; Eric Cus; Gibralter Jason; Brett Taylor; Moty.

23          The next part of it we have to do on computer.  You

24  can scroll through.  These are text messages that have been

25  redacted.  Next page.  Next page.  Next page.

D3frlev6

1    THE COURT:  How much more of this?

2    MS. COHEN:  Not much more, your Honor.  We're almost

3    done.  Next page.  That's it, your Honor.

4    Your Honor, at this time government would like to read

5    Government Exhibit S11 into evidence.  It is stipulated and

6    agreed to by the parties as follows.  This is marked S11 for

7    identification.

8    1.  If called to testify, a representative from Go

9    Daddy Group, Inc. ("Go Daddy") would testify as follows.

10    a.  Go Daddy is an Internet service provider and it

11    registers domain names and hosts websites.

12    b.  Government Exhibit 900 is a true and accurate copy

13    of Go Daddy's billing and subscriber records for domain names

14    it registered and certain websites that it had hosted,

15    including BestDamnPennyStocks.com.  Government Exhibit 900A is

16    a subset of documents contained in Government Exhibit 900.

17    c.  Government Exhibits 901-1 through 901-30 are true

18    and accurate copies of Go Daddy's records of certain emails

19    sent to or from BestDamnPennyStocks.com.

20    d.  Government Exhibits 902-1 through 902-3 are true

21    and accurate copies of Go Daddy's records of emails sent from

22    pennystockjerk.com.

23    e.  Government Exhibits 900, 901-1 through 901-30,

24    and 902-1 through 902-3 were created by a person with knowledge

25    of, or created from information transmitted by a person with

D3frlev6

1    knowledge of, the information shown; were created at or near

2    the time the information became available to Go Daddy; and were

3    created and maintained by Go Daddy as part of its regularly

4    conducted business activity.

5         2.  If called to testify, a representative from

6    iContact LLC ("iContact") would testify as follows.

7              a.  IContact is an email marketing company that

8    allows customers to create, send, and track email messages to

9    email addresses supplied by the customer.

10             b.  Government Exhibit 605-4-A is a true and accurate

11   copy of the text of email messages sent from, and recipients

12   of, emails sent via the iContact service for client ID 713393

13   concerning GDGI.  Messages sent out under client ID 713393 are

14   issued in the name of siri.biz with the logo of siri.biz.

15   Government Exhibit 605-4-A contains the text of the messages

16   sent in the name of siri.biz to up to 68,249 recipients.

17             c.  Government Exhibit 605-5-B, 605-5-C, and 605-5-D

18   are true and accurate copies of the text of email messages sent

19   from and recipients of emails sent via the iContact service for

20   client ID number 298339 concerning BANI, EWPI, and CNPI

21   respectively.  Messages sent out under client ID 298339 are

22   issue in the name of pennystockperfection.com with the logo of

23   pennystockperfection.com.

24             d.  Government Exhibits 605-6-A, 605-6-B, and 605-6-C

25   are true and accurate copies of the text of email messages sent

D3frlev6

from and recipients of email sent via the iContact service for

client ID number 308244 concerning CNWI, BANI, and EWPI

respectively.  Messages sent out under client ID 308244 are

issued in the name of monsterpennystocks.com with the logo of

monsterpennystocks.com.  Government Exhibits 605-6-A, 605-6-B,

and 605-6-C do not indicate the number of recipients of emails

from client ID number 308244.

        e.  Government Exhibits 605-7-A, 605-7-B, 605-7-C,

and 605-7-D are true and accurate copies of the text of email

messages sent from and recipients of emails sent via the

iContact service for client ID 323895 concerning CNWI, BANI,

EWPI, and GDGI respectively.  Messages sent out under client ID

323895 are issued in the name of BestDamnPennyStocks.com with

the logo of BestDamnPennyStocks.com.  Government Exhibits

605-7-A, 605-7-B, 605-7-C, and 605-7-D contain the text

messages sent in the name of BestDamnPennyStocks.com to up to

261,288 recipients.  Government Exhibits 705-7-A-1, 605-7-B-1,

605-7-C-1 and 605-7-D-1 contain lists of the email recipients

of messages from BestDamnPennyStocks.com concerning CNWI, BANI,

EWPI, and GDGI respectively.

        f.  Each message sent via the iContact service has a

unique ID number.  Header information on the exhibits

accurately reflects the following information:  The client ID,

the unique ID number of the message, and the year, month, day,

and time (in hours, minutes, and seconds) that the message was

D3frlev6

1    sent.

2              g.   Government Exhibit 605-9 contains a true and

3    accurate copy of iContact's billing records for the accounts

4    reflected in Government Exhibits 605-4-A; 605-5-B, 605-5-C,

5    605-5-D; 605-6-A, 605-6-B, 605-6-C; 605-7-A, 605-7-B, 605-7-C,

6    605-7-D; 605-7-A-1, 605-7-B-1, 605-7-C-1, and 605-7-D-1.

7              h.   Government Exhibits 604-4-A; 605-5-B, 605-5-C,

8    and 605-5-D; 605-6-A, 605-6-B, 606-6-C; 605-7-A, 605-7-B,

9    605-7-C, 605-7-D; 605-7-A-1, 605-7-B-1, 605-7-C-1, and

10   605-7-D-1; and 605-9 were created by a person with knowledge

11   of, or created from information transmitted by a person with

12   knowledge of, the information shown; they were created at or

13   near the time the information became available to iContact; and

14   were created and maintained by iContact as part of its

15   regularly conducted business activity.

16              3.   Government Exhibit 706 is a true and correct copy

17   of an email sent from wallstreetpremiere.com on April 6, 2010,

18   at 7:38 p.m.

19              It is stipulated and agreed to by the parties that all

20   the exhibits referenced in this stipulation marked as S11 and

21   the stipulation S11 may be received in evidence at trial.

22   Dated March 15, 2013, signed by all the parties.  The

23   government moves Government Exhibit S11 and all the exhibits

24   referenced therein into evidence.

25              THE COURT:  They are received in evidence.

D3frlev6

1          (Government's Exhibit S11 and referred-to exhibits

2     received in evidence)

3          MS. COHEN:  I am going to quickly publish Government

4     Exhibit 900A.  Mr. Dinet, if you could flip through.

5     Government Exhibit 900A is the subscriber and billing contact

6     information for Go Daddy.  It's a subset of 900.  If you can

7     zoom in on that, please, Mr. Dinet.  These are the website

8     addresses associated with Jamie Boye, B-O-Y-E.

9          the next page is subscriber ID number up top for Eric

10    Cusimano and an address for Eric Cusimano and phone numbers.

11    This is the list that goes with Eric Cusimano.  These are the

12    email addresses.  Go to the second page, please, a continuation

13    of the email addresses Eric Cusimano has at Go Daddy.  Next

14    page.  Next page.  Next page.  This is the detail of some of

15    the billing information for certain of the stocks of the email

16    addresses related to Eric Cusimano.  This one is for penny-

17    stockperfection.com.

18          Turn to the next page.  Zoom in a little.  This one is

19    for Three Mile  Consulting

20          THE COURT:  It is 4:30 now, Ms. Cohen.

21          MS. COHEN:  Two more pages left, your Honor.  This one

22    is from Monster Penny Stocks.  It shows the contact

23    information.  And the next one is for siri.biz.

24          There are several more exhibits we want to publish,

25    but maybe we can do it on Monday very briefly.  They will be

1   much, much shorter.

2           THE COURT:  How much shorter?

3           MS. COHEN:  I could do one of them now.

4           THE COURT:  Do one of them now.

5           MS. COHEN:  Thank you, your Honor.

6           This is Government Exhibit 601 in evidence through one

7   of the stipulations.  Maybe it would be easiest if I do it on

8   the ELMO.  These are true and accurate copies of documents from

9   Regus related to Emerging World Pharma.  Your Honor, we have

10  one or two miscellaneous ones to do on Monday.

11          THE COURT:  Do you have any more stipulations to read?

12          MS. COHEN:  I do not believe we have any more

13  stipulations to read, no.

14          THE COURT:  Ladies and gentlemen, we are going to

15  break now for the weekend.  Let me tell you, we are getting

16  very close to the end.  I think Monday will be the final day

17  for testimony.  We'll have summations on Tuesday and I'll

18  charge you on Wednesday.  Then your deliberations can begin.

19          As you go into the weekend, remember what I said.

20  Don't discuss the case with anybody, keep open minds, and do

21  don't do any research.  The lawyers will be working on their

22  summations over the weekend and will summarize all the evidence

23  for you.  I'll give you the law, and then you can begin your

24  deliberations.

25          I hope you have a nice weekend.

1          (Jury not present)

2          MS. COHEN:  You could have conducted that last hour

3  and a half in Urdu without any loss of recognition on the part

4  of the jury.

5          With respect to the cases that Mr. Shargel has handed

6  up, did you give those cases to the government?

7          MR. SHARGEL:  Yes.  No, I'm sorry, I didn't.

8          THE COURT:  Ms. Cohen and Mr. Master, I'd like to get

9  a response from the government on this issue.

10          In light of what happened here this afternoon, where I

11  was told was going to be an hour, it went on for an hour and a

12  half, what are we going to do on Monday?  The jury has to be

13  out of here by 1 o'clock.  That means we will start around

14  10:00.

15          MS. COHEN:  Your Honor, I don't think there will be

16  any problem getting the jury out by 1 o'clock.

17          THE COURT:  We'll start with the jury charge at 2:00.

18          MR. SHARGEL:  That's fine.  Judge, may I raise an

19  issue?

20          THE COURT:  Yes, you may.

21          MR. SHARGEL:  If we hadn't entered in the stipulation

22  with all these documents, I believe that the trial would be at

23  least a week longer.

24          THE COURT:  Yes.

25          MR. SHARGEL:  We did this in good faith.  What I'm

concerned about is this.  Since the government didn't really

care about the jury appreciating the content of these

documents, because they were just rolled up without any

opportunity for the jury to grasp the significance of the

document or to read it in any kind of detail, what I am

concerned about is the government during summation going to any

one now of if not hundreds of documents, then thousands of

documents, and pulling one and making arguments on documents

that never were addressed by a witness, a witness never saw the

document, it was a product of a search at this place or a

subpoena at that place, and we have no idea of what is coming.

I'm afraid we are going to get blindsided.

There was a similar problem in a trial before Judge

Pauley where there were file cabinets of patient records.  U.S.

v. Lauerson.  You may remember the case.  In the first trial,

not the second trial, the government went over to the file

cabinets, picked out a patient's record, and was making an

argument that the trial counsel -- I tried the second case

after a hung jury -- had no way of anticipating the argument.

That's not fair.

I think the remedy, the only sensible remedy, is if

the government identifies those documents -- they don't have to

identify the arguments -- but those documents that they are

going to address in summation.  If they want me to do the same,

I'll do the same.  This is a document-intensive case.  To allow

D3frlev6

1  them to just pick a document from the air and make an argument

2  based on it is I think unfair.

3           THE COURT:  Ms. Cohen?

4           MS. COHEN:  First of all, all the documents are in

5  evidence, are in evidence for both parties to use.  One of the

6  reasons the government engaged in that exercise was to avoid

7  any unfair surprise.  Obviously, the documents that we scrolled

8  through and that we picked out within the exhibits that we

9  admitted are the ones that we believe are relevant.  I think

10 Mr. Shargel got a preview of whatever documents we will use in

11 closing that have not already been talked about.

12          THE COURT:  How many documents were referred to in the

13 stipulations?

14          MS. COHEN:  There were many documents.  But the ones

15 pulled up on the screen, your Honor, I would say there are a

16 hundred or so pieces of paper.  They are all documents that

17 have been known to the defense.  There was nothing surprising

18 in any of those documents.  They have all been turned over.

19          MR. SHARGEL:  It's not a question of being turned

20 over.  Tens of thousands of documents were turned over.  It's a

21 matter of the government -- and I say it's more than a hundred,

22 it's well into the hundreds -- the government being able to

23 just cherry-pick a document that we don't anticipate.  Are we

24 supposed to now go, because of what happened here with the

25 rolling screen I'll call it, we should go home and go through

D3frlev6

1    every document because any and every document is in play?  I

2    don't think that is fair.

3         MS. COHEN:  Your Honor, most of the documents scrolled

4    through were the documents found on the defendants' laptops.

5    I'm sure they have already looked through those documents.  I

6    know for a fact both sides have because they talked to me about

7    taking out certain documents which we agreed to take out.  So

8    the defense is very familiar with all the documents.

9         MR. SHARGEL:  If the documents are limited to two

10   laptops, I have no problem.

11        MS. COHEN:  You also asked me to remove certain other

12   documents from, which basically we either agreed to omit or

13   it's been before your Honor to decide.  There is nothing

14   surprising in anything that was shown.

15        THE COURT:  How much trouble would it be, Ms. Cohen,

16   for you to disseminate or distribute the stack of documents

17   which would be the documents you're going to refer to in your

18   summation?

19        MS. COHEN:  Your Honor, I don't know when I will

20   finish that, so it might be close to impossible.  The

21   stipulations list all the documents that were just scrolled

22   through, so they can go through the stipulations and pull

23   whatever documents.  They have them on disk.  If they are

24   missing one, they can let me know.  I don't know what more I

25   can do.  I'm not going to preview my entire closing.  I don't

D3frlev6

1  think I should have to preview our entire closing.

2          THE COURT:  I'm not suggesting that.  How many

3  documents do you intend to refer to in your summation?

4          MS. COHEN:  Your Honor, I've given it some thought,

5  obviously, but I can't tell you right now which documents I

6  will either reference and/or show in the summation.  I just

7  don't know.  But I think by doing that for the past hour and a

8  half, we gave a very good preview of those documents, at least

9  the ones that a witness didn't testify to.

10          THE COURT:  Answer my question, then.  How many

11  documents did you refer to?

12          MS. COHEN:  Can I could go through the stipulation and

13  count it, if you would give me a second?

14          THE COURT:  Sure, I wish you would.  How many

15  stipulations?

16          MS. COHEN:  Your Honor, we are up to S11, although

17  those are only about three or four of the stipulations.  I'm

18  estimating, your Honor, quickly.

19          THE COURT:  You started with S7?

20          MS. COHEN:  Yes, your Honor.  S7, your Honor, refers

21  to a lot of different business records.  The only one that I

22  showed, and it was about 6 pages, was Government Exhibit 601,

23  which were the Regus documents.  On Monday I am going to show

24  certain pages out of --

25          THE COURT:  Are you going to use the documents from

D3frlev6

1    DelMarva RV?

2              MS. COHEN:  Yes.  Those Agent Reinhardt will testify

3    about very briefly, your Honor.

4              MR. SHARGEL:  That's going to money spending.

5              THE COURT:  That's the RV and the Ford.

6              MR. SHARGEL:  The RV and the bus, I suppose, and the

7    Bentley.

8              MS. COHEN:  Correct.

9              MR. SHARGEL:  Let me be specific.  I don't want to be

10   vague.  Let me be more specific.  There have been a number of

11   so-called touts and news releases.  Witnesses who have

12   testified here have addressed those issues.  I don't think

13   there is a single one that any witness said was false and

14   misleading.  Obviously, that is going to be a subject of the

15   charge conference.

16             What I am concerned with is cherry-picking documents

17   and coming up with the document saying, oh, look, this is false

18   and misleading, no witness said it but we are making a claim

19   based on this document that it is false and misleading, it's

20   backwards rather than forward.

21             I don't know of any such document in this case, but I

22   don't want to have to deal with it on the fly.  I don't want to

23   have to deal with it where the government cherry-picks a

24   document that I have no advance notice of other than rolling

25   through the screen that that's a document that they are going

D3frlev6

1   to rely on.

2           I'm not trying to burden the government.  I'm just

3   trying to ask that in fairness, and I'll do the same in

4   exchange, that they identify.  It's a finite number.

5           THE COURT:  I can't decide it now.  When you submit

6   your jury charges tomorrow, if you want to brief this point,

7   I'll take your briefing and I'll read it and let you know on

8   Monday.  That will give you plenty of time.

9           MS. COHEN:  Your Honor, the parties can discuss it and

10  maybe, if we don't come to a resolution, present it to your

11  Honor on Monday.

12          THE COURT:  Don't present it to me on Monday.  I read

13  stuff over the weekend.  On Monday we are all going to be busy.

14          MS. COHEN:  We will talk this evening, your Honor.

15          THE COURT:  All right.  Anything else?  Thank you.

16  Have a good weekend.

17          When you submit your jury charges, I would be most

18  interested in getting the verdict sheet, your different

19  versions of the verdict sheet.  And there was another thing I

20  wanted.

21          MS. COHEN:  Redacted indictment, your Honor?

22          THE COURT:  A redacted indictment, yes.  Thank you

23  very much.

24          MS. COHEN:  Is it possible on the verdict sheet we

25  could get a sample of one you used at another trial so we could

D3frlev6

1    format it?

2              THE COURT:  I will give you the one I used in

3    Tomasetta.

4              MS. COHEN:  Thank you.

5              THE COURT:  Not the second one, the first one.  There

6    are multiple charges there.

7              MR. SHARGEL:  Do you think we could get a copy of the

8    charge in Tomasetta?

9              THE COURT:  Yes.

10             MR. SHARGEL:  How should we go about it?

11             THE LAW CLERK:  I'll email it to you.

12             MR. SHARGEL:  That would be great.

13             MR. KRAMER:  If you could put it in a Word version, it

14   might be even better.

15             THE CLERK:  It would be helpful if we received the

16   proposed charges in Word as well.

17             MS. COHEN:  Of course.  We have ours.

18             MR. SHARGEL:  We have learned to do that.

19             THE COURT:  Tomasetta comes in two versions, Tomasetta

20   1 and Tomasetta 2.  Tomasetta 2 just has the conspiracy,

21   violation of the conspiracies law.  Tomasetta 1 has a number of

22   other charges.

23             MS. COHEN:  I think we should do 1 because it's

24   complicated with all the counts.

25             THE COURT:  OK.  Thank you very much.

D3frlev6

1          This is going to be a long and complicated charge.

2     How about giving the jury the charge to read along?

3          MS. COHEN:  I think that's a great idea, your Honor.

4          THE COURT:  Talk about it.  The other thing is a

5     PowerPoint presentation or some kind of video presentation so

6     they are focused on that.  I don't know if that is going to be

7     helpful when I give them the jury charge.  Any way to simplify

8     this or engage them a little bit more.  I'd appreciate your

9     ideas on Monday.  Thank you.

10          (Adjourned to 10 a.m., March 18, 2013)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        INDEX OF EXAMINATION

2   Examination of:                              Page

3   JOSEPH SARANELLO

4   Direct By Mr. Master . . . . . . . . . . . .1344

5   Cross By Mr. Shargel . . . . . . . . . . . .1402

6   Redirect By Mr. Master . . . . . . . . . . .1466

7   Recross By Mr. Shargel . . . . . . . . . . .1476

8        GOVERNMENT EXHIBITS

9   Exhibit No.                              Received

10   S-10, 801-1, 801-3 through 801-5, . . . . . .1482

11            801-11 through 801-13, 801-20,

12            801-25, 801-26, 801-32,

13            801-35, 802-1 through 802-32,

14            802-34 through 802-39, 801-41

15            through 802-43, 802-46 through

16            802-51, 802-54, 802-55,

17            802-59, 802-60, 802-66, 803,

18            804, and 500-1 through 500-22

19   S7 and referred-to exhibits   . . . . 1489

20   S11 and referred-to exhibits   . . . 1496

21   500-24   . . . . . . . . . . . . . 1362

22   500-23   . . . . . . . . . . . . . 1378

23

24

25

```
 1   705-1 and 705-2  . . . . . . . . . 1444

 2                    DEFENDANT EXHIBITS

 3   Exhibit No.                        Received

 4    802-15   . . . . . . . . . . . . 1457

 5    A306   . . . . . . . . . . . . . 1429

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```